IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, et al., | ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | 2:13cv405-MHT |
| | ) | (WO) |
| v. | ) | |
| | ) | |
| ROBERT BENTLEY, in his official capacity as Governor of the State of Alabama, et al., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

OPINION AND ORDER

This lawsuit challenges recent Alabama legislation that would require all physicians who perform abortions at the State's licensed abortion clinics to obtain staff privileges at a local hospital.  Plaintiffs Planned Parenthood Southeast Inc., Reproductive Health Services, and June Ayers, RN, on behalf of themselves, their patients, physicians, and staff, allege that, if enacted, this legislation would violate their rights under the Due Process Clause and the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution. The plaintiffs have named as defendants the following state officials: Robert Bentley, in his official capacity as Governor of Alabama; Luther Strange, in his official capacity as Attorney General of Alabama; Ellen Brooks, in her official capacity as District Attorney of Montgomery County, Alabama; Brandon K. Falls, in his official capacity as District Attorney of Jefferson County, Alabama; Ashley Rich, in her official capacity as District Attorney of Mobile County, Alabama; Donald E. Williamson, MD, in his official capacity as State Health Officer of Alabama; George C. Smith, Jr., MD, in his official capacity as Chairman of the Alabama Board of Medical Examiners; James E. West, MD, in his official capacity as Chairman of the Medical Licensure Commission of Alabama; and Martha Lavender, DSN, RN, in her official capacity as President of the Alabama Board of Nursing.

This matter is now before the court on the plaintiffs' motion for a temporary restraining order.

Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)-(4) (civil rights). For reasons that follow, and based on the limited record now before the court, the motion for a temporary restraining order will be granted.

## I.  LEGAL STANDARD

To demonstrate that a temporary restraining order is warranted, the plaintiffs must show: (1) a substantial likelihood of success on the merits of their suit; (2) that they will suffer irreparable harm absent injunctive relief; (3) that the harm to the plaintiffs absent an injunction would outweigh the harm to the defendants from an injunction; and (4) that an injunction is in the public interest. Ingram v. Ault, 50 F.3d 898, 900 (11th Cir. 1995); Centr. Ala. Fair Hous. Ctr. v. Magee, No. 2:11cv982-MHT, 2011 WL 5878363, at *1 (M.D. Ala. Nov. 23, 2011) (Thompson, J.) (citing Grizzle v. Kemp, 634 F.3d 1314, 1320 (11th Cir. 2011)).

3

## II.  DISCUSSION

The law at issue is § 4(c) of HB 57, the "Women's Health and Safety Act."  This provision requires that every physician who performs abortions "shall have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the facility [where the physician performs abortions] is located that permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications."  HB 57, § 4(c), available at (Doc. No. 4-1) Ex. A.  If an administrator of an abortion or reproductive health center were to allow his or her facility to be operated in a manner that violates the staff-privileges requirement, the administrator would be guilty of a Class C Felony, which in Alabama carries a punishment range of one to ten years imprisonment.  HB 57, § 12(c); 1975 Ala. Code § 13A-5-6.  The abortion or

4

reproductive health center could also have its license revoked, HB 57, § 14(b), as could any individual physician who performs an abortion without having met the staff-privileges requirement.  Id. at § 14(a).  This law is set to take effect July 1, 2013.

The plaintiffs in this case operate three of the five licensed abortion facilities in this State.  June Ayers, the owner and Administrator of Reproductive Health Services (RHS) in Montgomery, and Staci Fox, the President and Chief Executive Officer of Planned Parenthood Southeast (PPSE), the sole licensed abortion provider in Mobile and Birmingham, explain that their physicians will be unable to obtain admitting privileges at any local hospital due to a slew of prerequisites for obtaining such privileges which have little if anything to do with the caliber of the physicians themselves, and everything to do with the hospitals' own needs.[1]  For

_____

1.    The defendants dispute that the plaintiffs' clinics and physicians cannot meet the staff privileges requirement and contend that the hospitals' prerequisites (continued...)

example, Jackson Hospital in Montgomery requires that physicians with staff privileges guarantee a minimum of 48 admissions, inpatient evaluations, consultations, or procedures in the hospital every year; because abortion patients so rarely require hospitalization, RHS's physicians cannot meet this requirement.   Ayers Decl. (Doc. No. 4-4) Ex. C ¶ 23.   An additional impediment to satisfying the staff-privileges requirement is that many

---

    1(...continued)
are not as stringent as the plaintiffs submit.   However, based on the record as it stands, the court finds the plaintiffs' assertions to be credible.   Further, plaintiffs have credibly asserted that applying for staff privileges and being denied can render significant harm to a physician's professional reputation.   Such a denial must be reported in a national database that is then available to every State in which that physician has a license, every State where that physician may seek a license in the future, and every hospital where that physician may seek privileges.   The plaintiffs' physicians should not be required to risk damage to their professional reputations in order to test their ability to comply with this law, particularly where it seems highly unlikely that an attempt to obtain staff privileges would be successful.   However, the ability of the plaintiffs' physicians to obtain staff privileges is likely to be a critical factual issue at the preliminary-injunction stage; this issue will benefit from a more developed record, which the court will duly consider at that time.

of the plaintiffs' physicians do not live in the communities they serve. This is a problem because HB 57 requires an abortion physician to have admitting privileges at a hospital in the vicinity of the clinic where the physician performs abortions, and the hospitals, in turn, require doctors seeking staff privileges to live a reasonable distance from the hospital from which they seek admitting privileges. <u>See, e.g.</u>, Baptist Health Bylaws (Doc. No. 43-13) Ex. 25 at 9 (requiring that physicians with staff privileges "maintain a practice and residence within a reasonable distance to the Baptist Health hospital at which he or she practices"); Ayers Decl. (Doc. No. 4-4) Ex. C ¶ 23 (relating Jackson Hospital's requirement that physicians with staff privileges be located close enough to the hospital to provide both continuous care to patients and emergency room coverage). The defendants argue that the plaintiffs should persuade their doctors to move their residences to comply with this requirement or hire new

7

doctors.  But the plaintiffs have submitted substantial
evidence that the severe harassment and even death
threats targeted at abortion providers makes it nearly
impossible for them to find doctors willing to live near
their clinics.[2]

The record therefore currently reflects that, as they
cannot comply with the staff-privileges requirement
imposed by HB 57, unless it is enjoined, the plaintiffs
will be unable to provide abortion services once the law
takes effect.

---

2.  "Doctors and others who provide abortion care are
harassed at their homes, picketed at their private
practices, and targeted online."  Gray Decl. (Doc. No.
47) Ex. A ¶ 4.  The West Alabama Women's Center in
Tuscaloosa, for example, has faced gun shots through its
windows, bomb threats, and, on one occasion, a man
attempted to drive his car through the clinic.  Id.  In
1997, the clinic was set on fire.  Id.  An abortion
clinic in Birmingham was bombed, killing an off-duty
police officer who was working there as a security guard.
Nationwide, four doctors who provided abortions have been
targeted and murdered because of their work. Id. ¶ 5.  A
clinic physician at RHS recently quit because someone had
posted her home address, phone number, and the addresses
and phone numbers of her family members, on a website
encouraging harassment of abortion providers.  Ayers
Decl. (Doc. No. 4-4) Ex. C ¶ 8.

A.  <u>Justiciability</u>

It appears from the record thus far that the plaintiffs have standing to bring this lawsuit on behalf of themselves, their staff, and their patients.  In order to bring a claim on behalf of a third party, as the plaintiffs do for their claim that HB 57 threatens the substantive-due-process rights of their patients, the plaintiffs must satisfy three requirements: (1) they must in fact be injured; (2) they must have a close relationship with the third party; and (3) there must be some obstacle or hindrance to the third party's ability to bring the claim on its own behalf.  <u>Singleton v. Wulff</u>, 428 U.S. 106, 112-16 (1976) (plurality opinion).

The plaintiffs face imminent criminal prosecution if they continue to perform abortions after July 1.  This is a "real and immediate" threat, neither "imagin[ed]" nor "speculative."  <u>Summit Med. Assocs., P.C. v. James</u>, 984 F. Supp. 1404, 1426 (M.D. Ala. 1998) (Thompson, J.) (quoting <u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974))

aff'd in part, rev'd in part on other grounds and
remanded sub nom. Summit Med. Assocs., P.C. v. Pryor, 180
F.3d 1326 (11th Cir. 1999).  The threat is particularly
credible since the State has confirmed that the criminal
provisions will be in effect as of July 1.   The
plaintiffs have thus, so far, shown an injury sufficient
to create an Article III case or controversy.  See Doe v.
Bolton, 410 U.S. 179, 188 (1973) (finding physicians
challenging an abortion statute had standing to do so
"despite the fact that the record does not disclose that
any one of them has been prosecuted, or threatened with
prosecution.... They should not be required to await and
undergo a criminal prosecution as the sole means of
seeking relief."); Planned Parenthood Ass'n of
Cincinnati, Inc. v. City of Cincinnati, 822 F.2d 1390,
1396 (6th Cir. 1987) (same).

       As for the second and third requirements, federal
courts routinely recognize an abortion provider's
standing to assert the claims of its patients.  See,

e.g., Stenberg v. Carhart, 530 U.S. 914 (2000) (adjudicating challenge to abortion statute brought by abortion provider on his patients' behalf); Okpalobi v. Foster, 190 F.3d 337, 353 (5th Cir. 1999) (same), vacated on other grounds on reh'g en banc, 244 F.3d 405 (5th Cir. 2001).   In Singleton v. Wulff, the Supreme Court recognized that the closeness of the relationship between an abortion physician and his patients is "patent."  428 U.S. at 117 ("Aside from the woman herself ... the physician is uniquely qualified to litigate the constitutionality of the State's interference with, or discrimination against, th[e] decision" to have an abortion.).  The Court also identified two obstacles to the patients' litigation of their rights: aversion to having personal reproductive choices made public and the "imminent mootness" of any one woman's claim.  Id.  These considerations are equally applicable to the case at hand.  Plaintiffs assert the right of their patients to have an abortion free from any undue burden; abortion providers are inextricably entwined in the exercise of

11

this right.  And while one might expect that the public

opprobrium leveled at women who have abortions would have

softened since the Court decided <u>Singleton</u> in 1976, the

plaintiffs' evidence, at this time, demonstrates that

this is not the case.  Accordingly, the plaintiffs'

assertion of their patients' claims is proper.[3]

---

    3.  The defendants argue it is improper for the
plaintiffs to litigate the substantive-due-process claims
of their patients because the economic and liberty
interests of the plaintiffs conflict with their patients'
interests in a safe, healthy abortion--an interest that
the defendants assert is advanced by the staff-privileges
requirement.  But where the requirements for third-party
standing are satisfied, courts have found this to be
sufficient assurance that the third parties'
constitutional rights will be well represented by the
plaintiffs.  <u>See</u> <u>Charles v. Carey</u>, 627 F.2d 772, 779 n.
10 (7th Cir. 1980) (rejecting a similar argument and
allowing an abortion provider to assert third-party
standing for his patients); <u>Okpalobi</u>, 190 F.3d at 352
(same).  The court agrees that the test for third-party
standing already protects against a "wolves ...
guard[ing] the ... sheep" scenario and that the
plaintiffs "will adequately represent the absent women's
constitutional rights."  <u>Okpalobi</u>, 190 F.3d at 352
(quotations and citations omitted).

B.   <u>Substantial Likelihood of Success on the Merits</u>

Though the plaintiffs have put forth four theories for relief, the court need consider only one in order to resolve this motion.   The court is persuaded that the plaintiffs are likely to succeed in their argument that the staff-privileges requirement would impose an undue burden on a woman's right to choose abortion, thereby impeding on the Fourteenth Amendment right to privacy.

The  Constitution  protects  a  woman's  right  to terminate her pregnancy.   This right, derived from the Due  Process  Clause  of  the  Fourteenth  Amendment,  was reaffirmed  by  the  U.S.  Supreme  Court  in  <u>Planned Parenthood v. Casey</u>, 505 U.S. 833 (1992), which left in tact the essential holding of <u>Roe v. Wade</u>, 410 U.S. 113 (1973).   This right is not limitless, however; the State has legitimate interests in protecting the health of the woman and the potential life of a fetus.   Accordingly, the Court in <u>Casey</u> developed a standard to distinguish between  lawful  state  regulation  of  abortion  and regulation that violates due process.   The Court held

that when a regulation imposes a "substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," it unduly burdens the right to choose abortion. Id. at 877.  And "where state regulation imposes an undue burden ... the power of the State reach[es] into the heart of the liberty protected by the Due Process Clause."  Id. at 874.  Thus, even "a statute which ... further[s] the interest in potential life or some other valid state interest," but "has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."  Id. at 877.  On the other hand, "reasonable measures" regulating abortion––even those that pose incidental inconvenience––are valid so long as they do not create a substantial obstacle to a woman's exercise of her due process right.  Id. at 883.[4]

---

4.  The State makes much of the stringency with which courts review a facial challenge to legislation.  But as this court explained in Summit Medical, 984 F. Supp. at 1449-50, plaintiffs challenging a pre-viability regulation on undue-burden grounds need not show that the
(continued...)

The plaintiffs assert that it is impossible for them to comply with the staff-privileges requirement that this law would impose.  Thus, based on the record now before the court, the law's inevitable impact seems to be that three of Alabama's five licensed abortion clinics would have to cease performing abortions.  Only two clinics would remain--one in Huntsville and one in Tuscaloosa--while the rest of the State, including the metropolitan areas of Montgomery, Birmingham, and Mobile, would have no licensed abortion providers at all.  This absence would add not only the onus of distance for most women in Alabama (women in some parts of the State could have to travel up to 200 miles in order to obtain an in-state abortion), but also the accompanying burden of increased travel costs.  As a majority of the plaintiffs' patients

---

4(...continued)
law is unconstitutional in every possible application. Rather, as the Supreme Court stated in Casey, the test is whether, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Id. (emphasis in original) (quoting Casey, 505 U.S. at 895).

are poor and many do not have any access to a car, it appears that, for a significant number of women, this distance would be no mere encumbrance, but an insurmountable barrier to obtaining an abortion.[5] Studies presented by Dr. Stanley K. Henshaw, a researcher in the field of reproductive health care, are consistent with the common-sense inference that significant increases in the travel burden (and hence, the cost burden) of obtaining an abortion hinder a woman's ability to terminate her pregnancy.[6]

---

5. Staci Fox testified that the majority of her patients at PPSE are at 130 % of the poverty level or less, which means that they earn less than $ 1250 each month.  Fox Decl. (Doc. No. 4-2) Ex. B ¶ 36.  Fox attests that many of them do not own cars, and if they do, would struggle to pay for gas to travel to a distant clinic. Id.  June Ayers likewise stated that the majority of RHS's patients are at 130 % of the poverty level or less and that many do not own cars.  Ayers Decl. (Doc. No. 4-3) Ex. C ¶ 26.

6.   Dr. Henshaw describes a number of studies connecting the availability of abortion providers with the number of abortions.   One such study focused on a Texas law that had the effect of reducing the State's abortion providers such that the average distance a woman had to travel to obtain an abortion increased from 33 miles to 252 miles.  Henshaw Decl. (Doc. No. 4-7) Ex. F
(continued...)

The State argues that, even if HB 57 does cause the plaintiffs' clinics to cease abortion services, it will not impose an undue burden because patients can still travel to the operative clinics in Huntsville and Tuscaloosa, as well as to clinics in Columbus, Georgia (which is approximately 85 miles from Montgomery) and Pensacola, Florida (which is approximately 70 miles from Mobile).   However, that a woman has some conceivable opportunity to exercise her right does not mean that a substantial obstacle to the exercise of that right is not imposed; nor can a serious burden be ignored because some women of means may be able to surmount this obstacle while poorer women (who constitute a majority of the plaintiffs' patients and thus a "large fraction" of those

---

6(...continued)
¶ 4.  The study estimated that, over the course of three years, 6631 abortions did not take place that otherwise would have occured.  Id. ¶ 5.  Dr. Henshaw also describes a Georgia study that found that, for every 10 miles from Atlanta, where all of the major abortion providers were located at the time, there was a decline of 6.7 abortions per 1000 live births.  Id. ¶ 6.

affected by this law) cannot.  Casey, 505 U.S. at 895.
This is simply not what Casey provides.  See Casey, 505
U.S. at 894 (finding a spousal consent requirement
unconstitutional even though many women who obtain
abortions are not married or could easily comply with the
requirement where "the significant number of women who
fear for their safety ... [we]re likely to be deterred
from procuring an abortion as surely as if the
Commonweath had outlawed abortion in all cases.").  In
this way, abortion jurisprudence mirrors a multitude of
other contexts in which our courts have found that, even
when some conceivable opportunity to exercise a
constitutionally protected choice exists, a burden on a
right can so impair it as to impermissibly compromise it.
See, e.g., Anderson v. Celebrezze, 460 U.S. 780 (1983)
(concluding that state election requirement placed an
unconstitutional burden on voters' freedom of choice and
freedom of association); United States v. Jackson, 390
U.S. 570, 582-85 (1968) (finding that an impermissible

18

burden existed where law had the effect of discouraging the exercise of Fifth and Sixth Amendment rights).

Consistent with this analysis, other federal courts have concluded that measures that would eliminate a substantial portion of abortion providers in the State can constitute a substantial obstacle to a woman's right to seek an abortion. <u>See, e.g.</u>, <u>Okpalobi</u>, 190 F.3d at 357 (finding an undue burden where a law would force the providers of approximately 80 % of abortions in the State to discontinue their abortion practices); <u>Jackson v. Women's Health Org. v. Currier</u>, ___ F. Supp. 2d ___, ___, 2013 WL 1624365, at *5 (S.D. Miss. Apr. 15, 2013) (Jordan, J.) (finding an undue burden where a law would cause the only known abortion provider in the State to close); <u>see also</u> <u>Tucson Woman's Clinic v. Eden</u>, 379 F.3d 531, 542 (9th Cir. 2004) ("[A] reasonable factfinder could certainly conclude ... that, by increasing the cost of abortion and limiting the supply of abortion providers and hours during which they can provide abortions, [the law at issue] imposes a substantial obstacle to women

19

seeking abortions at those practices and clinics."). The
Supreme Court has also implied that a regulation's impact
on the availability of abortion providers and potential
to increase the distance a woman must travel to obtain an
abortion factors into the undue burden analysis. See
Mazurek v. Armstrong, 520 U.S. 968, 974 (1997) (reasoning
that "no woman seeking an abortion would be required by
the new law to travel to a different facility than
previously available" in concluding that the law at issue
did not create a substantial obstacle to abortion).

Those courts that have upheld laws that would limit
the availability of abortion providers have taken pains
to emphasize that women could still obtain abortions
within a reasonable distance within the State when
finding that no substantial obstacle existed. See, e.g.,
Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 605
(6th Cir. 2006) (finding no undue burden where a law
would cause a Dayton, Ohio abortion clinic to close, but
abortion clinics remained in Cincinnati, Columbus,
Cleveland, and Akron, thus allowing potential patients to

obtain abortions in state "within a reasonable distance [45-to-55 miles] from the Dayton clinic"); Greenville Women's Clinic v. Bryant, 222 F.3d 157, 165 (4th Cir. 2000) (finding no undue burden where "[t]he record contain[ed] evidence from several abortion providers, only one of which would be adversely affected in any significant way in providing abortion services," and the women near the one clinic that would close could obtain abortion services at an in-state clinic 70 miles away).

The State's argument that a woman can obtain an abortion by traveling to clinics in Florida or Georgia raises a further concern acknowledged by the district court in Jackson Women's Health Organization: the prospect of "a patchwork system where constitutional rights are available in some states but not others." ___ F. Supp. 2d at ___, 2013 WL 1624365, at *5.   While, unlike the law at issue in Jackson Women's Health Organization, HB 57 would still leave two abortion clinics in operation, it is telling that the State must resort at all to suggesting that women travel across the

21

Alabama border to exercise their constitutional rights. Moreover, given the evidence so far of the near impossibility of procuring abortion doctors who can meet the staff-privileges requirement, the law threatens a permanent destabilizing effect on the provision of abortions in this State, as clinics will have to constantly struggle under threat of closure or ceasing services to maintain a medical staff that is qualified under the law.[7]  Such pressure could render the consistent provision of abortion services in Alabama a Sisyphean effort.  The number of abortion clinics in Alabama has

_____

7.  The State emphasizes that two Alabama clinics did not join this suit and ostensibly can comply with the requirements of HB 57.  One of those clinics is West Alabama Women's Center in Tuscaloosa.  However, the Clinic Director of the West Alabama Women's Center testified that, after that clinic's sole physician, a 74-year-old who happens to have staff privileges because he maintains a broader gynecologic practice, retires, she "honestly do[es] not know how the clinic will find another doctor to take his place at all, let alone someone who lives nearby and has staff privileges at a local hospital."  Gray Decl. (Doc. No. 47) Ex. A ¶ 3. Thus, "[i]f this requirement is not struck down, [she is] virtually certain that when he retires the clinic will have to shut down too."  Id.

already dwindled from seven to five in recent years. Thus, while the court's decision today hinges only on the three clinics imminently impacted by HB 57, the evidence raises the specter of an Alabama in which women are unable to exercise this due-process right at all.

The State also leans heavily on its evidence that the two Alabama clinics that are not plaintiffs in this case performed 4954 of the abortions in this State in 2012, while the plaintiffs' three clinics performed 3639. However, that women in certain parts of the State will still benefit from the availability of abortion clinics at manageable distances is immaterial to the question of whether a substantial obstacle is imposed for women for whom this is not the case. Responding to an argument that a spousal consent requirement would pose "almost no burden at all for the vast majority of women seeking abortions," the Court in Casey explained, "The analysis does not end with the one percent of women upon whom the statute operates; it begins there.... The proper focus of constitutional inquiry is the group for whom the law

23

is a restriction, not the group for whom the law is irrelevant." <u>Casey</u>, 505 U.S. at 894. Thus, the State's argument that this law will not (for now) work to impair the rights of many Alabama women has no bearing on whether it impermissibly impairs the rights of those who will feel its effects.

Thus, as the plaintiffs have demonstrated that the inevitable effect of HB 57 would be that the majority of Alabama's abortion providers would stop providing abortions, and as this court agrees, for now, that this drastic limitation in the availability of providers would impose a substantial obstacle to a woman's right to choose abortion, the plaintiffs have shown a substantial likelihood of success on the merits of this claim.

### C.  <u>Irreparable Harm</u>

The injury to the plaintiffs is concrete and imminent: as the current record shows, they cannot comply with the staff-privileges requirement and, absent equitable relief, must either stop providing abortions or

24

confront criminal liability and license revocation.  Lest
there be any doubt, the State has assured the court that
the criminal liability provisions will go into effect as
planned on July 1.  If the plaintiffs continue in their
normal course of business, there is thus a real and
imminent threat of prosecution.  The director of RHS
asserts that if this law goes into effect she will not
only have to cease providing abortions, but will "have no
choice" but to close her business altogether.  Ayers
Decl. (Doc. No. 4-3) Ex. C ¶¶ 3, 24.  Plaintiffs thus
face irreparable harm if HB 57 is not enjoined.  <u>See</u>
<u>Magee</u>, No. 2:11cv982-MHT, 2011 WL 5878363, at *3 (finding
likelihood of irreparable harm where plaintiffs faced
criminal and civil liability if a law was not enjoined);
<u>Georgia Latino Alliance for Human Rights v. Deal</u>, 793 F.
Supp. 2d 1317, 1340 (N.D. Ga. 2011) (Thrash, J.) (finding
irreparable harm where plaintiffs would be subject to
criminal penalties), <u>aff'd in part, rev'd in part on</u>
<u>other grounds and remanded sub nom. Georgia Latino</u>
<u>Alliance for Human Rights v. Governor of Georgia</u>, 691

25

F.3d 1250 (11th Cir. 2012); <u>ABC Charters, Inc. v. Bronson</u>, 591 F. Supp. 2d 1272, 1307 (S.D. Fla. 2008) (Gold, J.) (finding plaintiffs demonstrated irreparable harm where the preponderance of the evidence showed they would have to close their businesses as a result of the law); <u>Mid-Fla Coin Exchange v. Griffin</u>, 529 F. Supp. 1006, 1030 (M.D. Fla. 1981) (Scott, J.) (finding irreparable harm where plaintiffs' "businesses face virtual extinction if they are forced to comply with the legislation").

Furthermore, according to the current record, if the plaintiffs' health centers stop providing abortions, Alabama women in the southern part of the State would have to travel up to 200 miles each way to obtain an in-state abortion, and they would have to do this twice: once for a counseling session and again at least 24-hours later for the abortion procedure.  The plaintiffs have submitted evidence showing that, for many Alabama women, the increase in the burden of travel will be so great that they will not obtain an abortion at all. Henshaw

26

Decl. (Doc. No. 4-7) Ex. F ¶ 15.   And the plaintiffs'
evidence shows that women who carry unwanted pregnancies
to term are at increased risk of death and childbirth
complications.   Fine Decl. (Doc. No. 4-4) Ex. D ¶ 36.
Many Alabama women who are able to receive an abortion,
but who have to travel farther due to the effects of HB
57, would wait until later in their pregnancy term to
undergo the procedure.   This delay also carries an
heightened risk of medical complication.   <u>Id</u>. at ¶ 34;
<u>see</u> <u>Harris v. Bd. of Supervisors</u>, 366 F.3d 754, 766 (9th
Cir. 2004) (noting that plaintiffs demonstrated
irreparable harm by establishing likelihood of suffering
pain and medical complications from delayed medical
care).

     Finally, it appears from the current record that the
staff-privileges requirement threatens the
constitutionally protected privacy of the plaintiffs'
patients.   "[T]he right of privacy must be carefully
guarded for once an infringement has occurred it cannot
be undone by monetary relief."   <u>Deerfield Med. Ctr. v.</u>

City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981). Accordingly, courts presume that violations to the fundamental right to privacy are irreparable. Id. (finding the conclusion that the constitutional right to privacy was threatened by ban on abortion facilities "mandates a finding of irreparable injury"); see also Ne. Florida Chapter of Ass'n of Gen. Contractors of America v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990) (noting the general rule that on-going violations of the right to privacy constitute irreparable harm). The record here supports this presumption. Thus, for all these reasons, the plaintiffs have met their burden of showing injunctive relief is needed to avoid irreparable injury.

### D.   Balance of the Hardships

The defendants assert that the grant of a temporary restraining order would harm them, first, because a threat to women's health is posed absent this law, and, second, because a law passed by the legislature will not

be in effect.  As to the first harm, the record remains unclear: The court cannot discern from the facts presented whether the status quo does, in fact, pose a risk to the health of women seeking abortions, and the parties heartily dispute whether HB 57 will improve women's health at all.[8]   The second harm is minor, particularly given the temporary nature of this order. See Magee, No. 2:11cv982-MHT, 2011 WL 5878363, at *3 (finding that "any harm to the defendants is slight ... given the short-term nature of th[e] [temporary restraining] order").

--------

8.  The defendants present evidence that the Alabama Department of Public Health has issued 66 statements of deficiencies to 12 different clinics in the last 15 years.  It is unclear how significant these deficiencies were and whether they pose a current threat.  While the defendants present more detailed evidence of poor care at four particular facilities, three of those facilities are no longer in operation and therefore do not pose any current threat.  As for the one that remains in operation, RHS, the defendants refer only to a 2006 incident and give the court no reason to believe that this incident was not isolated, nor any reason to believe that serious deficiencies posing a threat to women's health exist at RHS today.

29

The plaintiffs, on the other hand, must stop providing abortions and potentially close their doors altogether or face criminal penalties and license revocation.  Meanwhile, women seeking an abortion will face a substantial new obstacle in obtaining one, and therefore stand to suffer a deprivation of constitutional rights as well as the numerous health risks attendant to delaying abortion.  Thus, while the plaintiffs can show concrete, serious harms, the defendants face only speculative harms and the rather abstract injury posed by a short delay in the implementation of HB 57.  The balance of hardships weighs heavily in the plaintiffs' favor.

### E.  Public Interest

The court finds that it is in the public interest to preserve the status quo and give the court an opportunity to evaluate fully the lawfulness of HB 57 without subjecting the plaintiffs, their patients, or the public at large to any of its potential harms.

30

This grant of temporary relief is based solely on the limited record now before the court.  The court does not, with this opinion, forecast the outcome of this case, and this opinion should not be interpreted as such.

***

Accordingly, it is ORDERED as follows:

(1) Plaintiffs Planned Parenthood Southeast, Inc., Reproductive Health Services, and June Ayers's motion for a temporary restraining order (Doc. No. 3) is granted.

(2) Defendants Robert Bentley, Luther Strange, Ellen Brooks, Brandon K. Falls, Ashley Rich, Donald E. Williamson, George C. Smith, Jr., James E. West, and Martha Lavender, and all those acting in concert with them, are ENJOINED from:

    (a) enforcing the requirements of § 4(c) of HB 57, and

    (b) failing to notify immediately all state officials who are responsible for enforcing the

requirements of HB 57 § 4(c) of this temporary restraining order.

(3) This injunction shall expire on July 12, 2013, at 2:45 p.m.

DONE, this the 28th day of June, 2013, at 2:45 p.m.

      /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE