IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, et al., | ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | 2:13cv405-MHT |
| | ) | (WO) |
| v. | ) | |
| | ) | |
| LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

OPINION

This lawsuit challenges subsection 4(c) of HB 57, the
Women's Health and Safety Act, codified at 1975 Ala.
Code § 26-23E-4(c).  That statute would require all
physicians who perform abortions at licensed abortion
clinics within the State of Alabama to obtain staff
privileges at a local hospital.  Plaintiffs Planned
Parenthood Southeast, Inc., Reproductive Health Services,
June  Ayers,  RN,  and  Kiwana  Brooks,  on  behalf  of

themselves and their patients, physicians, and staff, claim that, if enacted, this legislation would violate the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. The plaintiffs have named as defendants the following state officials in their official capacities: the Attorney General of Alabama, the District Attorneys of Montgomery, Jefferson, and Mobile Counties, and the State Health Officer. Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3)-(4) (civil rights). This matter is now before the court on the parties' cross-motions for summary judgment. For reasons that follow, the State's motion for summary judgment will be granted on all claims except for the substantive due process claim on behalf of women seeking abortions, and the plaintiffs' motion for summary judgment will be denied on all claims.

2

# I.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party.  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

# II.   BACKGROUND

There are currently five clinics that provide legal abortions in the State of Alabama.  The plaintiffs in this case operate three of those clinics.  Kiwana Brooks is the clinic administrator of Planned Parenthood Southeast, which operates clinics in Mobile and

Birmingham.   June Ayers is the clinic administrator of
Reproductive Health Services, which operates a clinic in
Montgomery.[1]   Together, the three 'plaintiff clinics'
provided approximately 40 % of the legal abortions
performed in the State in 2012.   The two Planned
Parenthood clinics each performed about 15 % of the
abortions, and Reproductive Health Services performed an
additional 10 %.

Reproductive Health Services performs only 'surgical
abortions,' while Planned Parenthood performs both
surgical and 'medication abortions.' Each of the
plaintiff clinics stop performing an abortion at some
point before a pregnancy reaches 15 weeks.

A medication abortion takes place through the oral
administration of two sets of pills.   At Planned
Parenthood, the patient first takes a mifepristone pill
at the clinic.   One to two days later, she takes four

_____

1. The two other clinics, which are not represented
among the plaintiffs in this case, are Alabama Women's
Center in Huntsville and West Alabama Women's Center in
Tuscaloosa.

4

misoprostol pills at home.   See Planned Parenthood Southeast Discharge Instructions, Ex. O-4 (Doc. No. 113-3) at 19.  "The types of complications that may occur following medication abortion include infection, bleeding, and retained tissue." Fine Decl., Ex. G (Doc. No. 110-7) ¶ 10.

A surgical abortion, despite its name, is "not what is typically thought of as surgery."  Fine Decl., Ex. G (Doc. No. 110-7) ¶ 11.  Instead, the physician dilates a woman's cervix and removes the fetus from the uterus either by creating a vacuum or by using a sharp tool. While a woman is at an abortion clinic, a complication may arise if there is uterine perforation.  After she goes home, other complications may arise, including infection, bleeding, and retained tissue.

The legislation at issue in this case, subsection 4(c) of § 26-23E-4, requires that every physician who performs either medication or surgical abortions "have staff privileges at an acute care hospital within the

same standard metropolitan statistical area as the facility is located that permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion related complications." 1975 Ala. Code § 26-23E-4(c). A clinic administrator who knowingly and wilfully operates an abortion clinic with doctors who do not satisfy these requirements faces felony criminal liability, § 26-23E-12(c), and the clinic "may be subject to adverse licensure action, up to and including license revocation," § 26-23E-14(b).

The phrase "staff privileges," also referred to as 'admitting privileges,' describes a relationship between an individual doctor and a hospital which allows that doctor to admit patients to a hospital and to perform procedures at the hospital. Subsection 4(c) specifically identifies three procedures, of which two, laparotomy and hysterectomy, are gynecological surgeries for which only gynecologists generally receive training. Doctors

6

receive staff privileges after an application process. Hospitals generally delineate prerequisites and procedures for that application in their bylaws, but they retain discretion whether to grant privileges.

The plaintiffs argue that if subsection 4(c) of 1975 Ala. Code § 26-23E-4 takes effect, they will not be able to comply, and their clinics will be forced to stop providing abortions.

Even before the legislation at issue in this case, Alabama's regulation of abortion clinics was "detailed and extensive." Email from Patricia Ivey, General Counsel, Ala. Dept. of Public Health, Pls.' Ex. O-5 (Doc. No. 113-3) at 24; see also 1975 Ala. Code § 26-21-1, et seq. (regarding requirements for performing abortion on a minor); Woman's Right to Know Act of 2002, § 26-23A-1, et seq. (establishing certain informed-consent and waiting-period requirements, as well as that only a physician can perform an abortion); Ala. Admin. Code

§ 420-5-1-.01 to -.04 (establishing further requirements for licensing of abortion clinics).

Under current law, prior to subsection 4(c), an abortion clinic must maintain a file documenting the credentials and background of each physician who performs abortions. Ala. Admin. Code § 420-5-1-.02(5)(d)(2). In order to be qualified to perform an abortion, the physician either must have completed a residency or fellowship that included abortion training; must maintain admitting privileges at a United States hospital that allow her to perform abortions at that hospital; or must provide verification from a disinterested, properly trained physician that she has sufficient skill at performing abortions. § 420-5-1-.02(5)(d)(2).

The preexisting regulations also include specific provisions to ensure proper care for complications. A physician must remain at the clinic until the last patient leaves. § 420-5-1-.03(6)(a). The patient, after she leaves the clinic, must have access to a 24-hour

8

answering service that will immediately refer calls about complications to a qualified nurse, nurse practitioner, physician assistant, or physician. § 420-5-1-.03(6)(d). Every such call regarding a complication must be recorded. § 420-5-1-.03(6)(e).

Furthermore, each clinic is required under current law either to have a physician on staff who has admitting privileges at a local hospital or to maintain a written contract with a "covering physician." § 420-5-1-.03(6)(b). The covering physician is required to have admitting privileges that permit her to perform "dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures necessary to treat abortion-related complications" at a hospital within the same metropolitan statistical area as the clinic.[2] § 420-5-1-.03(6)(b)(4). A clinic may not provide abortions unless an affiliated doctor with admitting

---

2. These are the same procedures which subsection 4(c) would require of every doctor providing an abortion to have admitting privileges to perform.

9

privileges will be available for 72 hours after the procedure to treat any complications that may arise. § 420-5-1-.03(6)(b)(5); (6)(c).

## III. DISCUSSION

The plaintiffs have put forth several theories for relief: (1) the requirement violates substantive due process of abortion providers because it fails rational-basis review; (2) the requirement violates procedural due process by delegating licensing of abortion clinics to hospitals; and (3) the admitting-privileges requirement violates substantive due process of women who would seek an abortion.[3]

---

3. The plaintiffs also argue that the requirement violates equal protection by treating abortion providers differently from other outpatient medical providers without sufficient justification. This claim is discussed below. See infra note 18.

A. Clinics' and Doctors' Substantive Due Process Rights

The plaintiffs argue that subsection 4(c) of 1975 Ala. Code § 26-23E-4 abridges their own substantive due process rights as clinics and medical providers, separate and apart from their patients' substantive due process right to decide whether to carry a pregnancy to term, which is discussed at length in a later section. This due-process challenge is evaluated using rational-basis review.

Rational-basis review requires that the regulation be "rationally related to a legitimate governmental purpose." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 446 (1985). While rational-basis review is not a "toothless" inquiry, Schweiker v. Wilson, 450 U.S. 221, 234 (1981), it also does not allow "courts to judge the wisdom, fairness, or logic of legislative choices," FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314 (1993). "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

11

<u>Williamson v. Lee Optical of Oklahoma Inc.</u>, 348 U.S. 483, 488 (1955).  Absent some showing of a wholly illegitimate purpose behind the act, such as "'a bare ... desire to harm a politically unpopular group,'" <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 446-47 (1985) (quoting <u>United States Dept. of Agriculture v. Moreno</u>, 413 U.S. 528, 534 (1973) (alteration in original)), even empirically dubious health justifications are sufficient to survive rational-basis review.

In <u>Lee Optical</u>, for example, the Supreme Court acknowledged that the statute at issue might "exact a needless, wasteful requirement in many cases," but emphasized that under rational-basis review "it is for the legislature, not the courts, to balance the advantages and disadvantages of the new requirement." 348 U.S. at 487.  The regulation was upheld based on a rational relationship to several possible, hypothetical health interests.  <u>Id</u>.

In this case, once the plaintiffs' due-process challenge is separated from the burden the regulation may

12

place on the right to obtain an abortion, what remains is
a regulation with an arguably rational relationship to a
legitimate state interest in health and welfare.   The
plaintiffs have offered substantial evidence that this
regulation does almost nothing to protect women's health,
but the court must uphold this statute against a
rational-basis challenge based on even the flimsiest
rational relationship.  Lee Optical, 348 U.S. at 488.


## B. Non-Delegation

The plaintiffs argue that subsection 4(c) violates
the private non-delegation doctrine, as enshrined in the
Fourteenth Amendment's due-process guarantee against
arbitrary government action, by delegating authority over
the clinics' licenses to local hospitals.  See Carter v.
Carter Coal Co., 298 U.S. 238, 311 (1936)(a consortium of
major coal producers may not dictate legally binding
employment regulations for smaller producers).  The
private non-delegation doctrine prohibits States from
granting to private individuals or entities final

decision-making authority with regard to others' rights. See Wash. ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 121-22 (1912) (zoning code may not require written consent by two-thirds of a property-owner's neighbors before a home for the elderly can be built). In order to make such a delegation, either the private actors must be held to the full standards of a public actor (not acting arbitrarily and providing procedural due process), Tucson Woman's Clinic v. Eden, 379 F.2d 531, 555-56 (9th Cir. 2004), or the public agency must retain final authority, such as through a meaningful waiver process, Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 388 (1940) (a consortium of major coal producers may propose standards to a government commission, so long as they "may be approved, disapproved, or modified by the Commission").

The text of the Women's Health and Safety Act states that, "Any abortion or reproductive health center that is found to have provided an abortion, in a manner that violates this act or any rule or regulation adopted under

14

the provision of this act, <u>may be</u> subject to adverse
licensure action, up to and including license
revocation." 1975 Ala. Code § 26-23E-14(b) (emphasis
added). Despite this permissive, rather than mandatory,
language, the plaintiffs argue that the Department of
Public Health <u>must</u> revoke their clinics' licenses if the
doctors are unable to secure admitting privileges, and
therefore the hospitals will have effective authority to
deny their licenses. Specifically, the plaintiffs point
to an Alabama regulation which bars the State Health
Officer from waiving any provision of the rules governing
abortion clinics "which restates a statutory
requirement." Ala. Admin Code § 420-5-1-.01(6)(a). The
plaintiffs argue that § 420-5-1-.01(6)(a) would apply to
whatever regulation the Public Health Department adopts
to enforce subsection 4(c)'s admitting-privileges
requirement, as that regulation would be a provision
"which restates a statutory requirement." <u>Id</u>.

Neither party has presented the court with any
regulation promulgated to enforce subsection 4(c).

15

Therefore, the court cannot determine whether any such regulation would present a non-delegation problem, should there be a legal basis to the plaintiffs' claim.   For that reason, the court will dismiss this claim without prejudice.

## C. Substantive Due Process Rights of
## Women Seeking Abortions[4]

The court now reaches the core of the plaintiffs'
case against subsection 4(c) of 1975 Ala. Code

_____

4.   The State argues that this claim is not ripe
because it is not clear that the clinics will actually
shut down, and not clear that, if they do, no other
providers will take their place.   To determine the
ripeness of an issue, the court looks to "(1) the fitness
of the issues for judicial decision; and (2) the hardship
to the parties of withholding court consideration."
Beaulieu v. City of Alabaster, 454 F.3d 1219, 1227 (11th
Cir. 2006) (internal quotation marks omitted).   While
there is dispute about what will happen if subsection
4(c) goes into effect, the court finds the issues are fit
for judicial decision after trial.   As to hardships of
withholding consideration, "The balance of hardships
weighs heavily in the plaintiffs' favor."   Planned
Parenthood Se., Inc. v. Bentley, 951 F. Supp. 2d 1280,
1290 (M.D. Ala. 2013) (Thompson, J.).

The State also argues that the plaintiff clinics have
no standing to assert the rights of their patients.   It
is well established that abortion doctors and clinics
have standing to bring this type of suit.   Singleton v.
Wulff, 428 U.S. 106, 117 (1976).   The administrators also
face criminal penalties for non-compliance.   The court
also rejects the State's more specific arguments that the
plaintiffs lack standing under the Declaratory Judgment
Act, 28 U.S.C. § 2201, and 42 U.S.C. § 1983.   See Ayotte
v. Planned Parenthood of N. New England, 546 U.S. 320,
324 (2006) (doctor and clinic sued on patients' behalf
under § 1983); id. at 331 (declaratory judgments are
appropriate under those circumstances).

§ 26-23E-4: the claim that this statute violates the substantive due process rights of the women who seek abortions from the plaintiff clinics.  The court finds that genuine disputes of material fact preclude summary judgment on this claim.  However, having considered the evidence and arguments presented at summary judgment, the court will explain, at length, the analysis the court intends to apply at trial, as a guide to the litigants as they prepare for trial.

The court will discuss this claim in five parts. First, it will introduce the current standard for evaluating the constitutionality of abortion regulations, the undue-burden standard of <u>Planned Parenthood of Southeastern Pa. v. Casey</u>, 505 U.S. 833 (1992), as well as the underlying principles and development of that standard.  Second, the court will articulate the test it will use in applying the <u>Casey</u> undue-burden standard. Third, the court will discuss how some other lower courts have applied <u>Casey</u>.  Finally, in the fourth and fifth parts, the court will explain why genuine disputes of

18

material fact preclude summary judgment with regard to the effect and the purpose of subsection 4(c), respectively.

### 1. Principles of the Undue-Burden Standard

In <u>Casey</u>, the Supreme Court announced the undue-burden standard for determining whether a regulation of abortion is constitutional: "A finding of an undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." 505 U.S. at 877. The Court developed this standard as "the appropriate means of reconciling the State's interest with the woman's constitutionally protected liberty." <u>Id</u>. at 876.

The words "substantial" and "undue" are somewhat ambiguous; to some extent, their meaning is in the eye of the beholder. Therefore, in order to understand the meaning of <u>Casey</u>'s standard, this court will look to (a) the history of abortion jurisprudence leading up to

19

_Casey_, (b) the relationship of the _Casey_ plurality opinion to the other, separate opinions in the case, (c) guidance from the ballot-access cases that were cited in _Casey_, and (d) the application of _Casey_'s standard to specific regulations in that and subsequent cases.

These sources make clear that, in articulating the undue-burden standard, the _Casey_ authors struck out a middle ground between a strict-scrutiny approach, which undervalues the State's legitimate interests in regulation, and overly deferential review, which would eviscerate the woman's right to make the fundamental decision whether to terminate a pregnancy.  This middle way instructs courts to examine carefully both the obstacles that the regulations create for women seeking abortions and the nature and strength of the State's justification for the regulations.  In particular, the _Casey_ authors illustrated that courts must take both aspects of a regulation into account, through reference to two cases in the context of ballot-access rights: _Anderson v. Celebrezze_, 460 U.S. 780 (1983) and _Norman v._

<u>Reed</u>, 502 U.S. 279 (1992).  As described at length below, the court will thus apply a modified version of the <u>Anderson/Norman</u> test, taking care to adapt the test to reflect the particular context of abortion.

   a. History of Abortion Jurisprudence Pre-<u>Casey</u>

   In <u>Roe v. Wade</u>, 410 U.S. 113 (1973), the Supreme Court first recognized that women have a constitutionally protected right to decide whether to have an abortion. This right is rooted in American law's great respect for individuals' decisions about whether and how to parent. Such decisions reside in "the private realm of family life which the state cannot enter." <u>Prince v. Mass.</u>, 321 U.S. 158, 166 (1944).  "Our law affords constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education." <u>Casey</u>, 505 U.S. at 851 (citing <u>Carey v. Population Serv. Int'l</u>, 431 U.S. 678, 685 (1977)).

21

Roe also established a "trimester framework" to govern review of state regulation of abortion. Casey, 505 U.S. at 873. The Roe Court recognized two interests that could justify such regulation, with each becoming compelling at a different point in the pregnancy. Under the Roe framework, the State's interest in the pregnant woman's health would become compelling at the end of the first trimester. After that point, the State was permitted to "regulate the abortion procedure in ways that are reasonably related to maternal health." Roe, 410 U.S. at 164. The second interest, the State's interest in potential life, would become compelling at the point of viability, when the fetus could live outside the womb. Id. at 163. The Roe Court noted that, at the time that case was decided, a fetus was generally viable during the third trimester, although viability could occur sooner. Id. at 160; see also Casey, 505 U.S. at 872 (discussing third-trimester restrictions). A State's interest in fetal life would allow the State to ban abortion entirely

22

after viability, except for "preservation of the life or health of the mother." <u>Roe</u>, 410 U.S. at 164.[5]

From the beginning, the Court was clear that the trimester framework did not preclude all state regulation or differential treatment of abortion in the early part of a pregnancy. Some women's-health regulations were permitted even in the first trimester. <u>See</u> <u>Connecticut v. Menillo</u>, 423 U.S. 9 (1975) (allowing State to limit abortion provision to physicians); <u>Planned Parenthood of Cent. Mo. v. Danforth</u>, 428 U.S. 52, 81 (1976) (allowing first-trimester recordkeeping and reporting requirements "if not abused or overdone"). Furthermore, the Court made clear that a State could "make a value judgment favoring childbirth over abortion, and ... implement that judgment by the allocation of public funds," namely by refusing to use public healthcare funding for abortions.

---

5. In the subsequent case of <u>Gonzales v. Carhart</u>, 550 U.S. 124 (2007), the Court recognized a third interest that could justify regulations: maintaining the ethical standards of the medical profession. 550 U.S. at 157.

23

<u>Maher v. Roe</u>, 432 U.S. 464, 474 (1977); <u>see also</u> <u>Harris</u>
<u>v. McRae</u>, 448 U.S. 297, 315 (1980).

However, over the course of the 1980s, the
constitutional law of abortion came to resemble "a
virtual Procrustean bed," imposing severe restrictions on
how a State could regulate the procedure. <u>Webster v.</u>
<u>Reproductive Health Services</u>, 492 U.S. 490, 517 (1989)
(plurality opinion). Some "cases decided that any
regulation touching upon the abortion decision must
survive strict scrutiny, to be sustained only if drawn in
narrow terms to further a compelling state interest."
<u>Casey</u>, 505 U.S. at 871 (citing, as an example, <u>City of</u>
<u>Akron v. Akron Center for Reproductive Health, Inc.</u>, 462
U.S. 416, 427 (1983), which invalidated the city's
informed-consent, waiting-period, and
second-trimester-hospitalization regulations as failing
to protect adequately women's abortion rights).

Even as the Court's majority, in some cases, was
applying strict scrutiny to all abortion regulations,
others on the Court were urging a complete reversal of

24

Roe, so that "a broad range of limitations on abortion
... that are now unavailable to the States would again
become constitutional possibilities." Thornburgh v. Am.
Coll. of Obstetricians & Gynecologists, 476 U.S. 747, 796
(1986) (White, J., dissenting).    In Webster v.
Reproductive Health Services, a case considered shortly
before Casey, the Court granted review on the question,
among others, of whether Roe should "be reconsidered and
discarded in favor of [a] rational basis test." 57
U.S.L.W. 3442, 3443 (January 10, 1989) (granting review
in Webster, 492 U.S. 490).   In a fractured opinion, the
Court did not clearly resolve that question. Compare
Casey, 505 U.S. at 858 (plurality opinion) (noting that,
in Webster, "a majority of the Court either decided to
reaffirm or declined to address the constitutional
validity of the central holding of Roe"); with id. at 966
(Rehnquist, C.J., concurring in the judgment in part and
dissenting in part) (describing Webster as adopting a
rational-basis standard).

### b. The Middle Way in Casey

In Casey, the Court was therefore presented with two potential paths forward. Some advocates urged the Court to strike down nearly all regulations on abortion under strict-scrutiny review. Others sought to overturn Roe, returning abortion regulations to deferential rational-basis review. Rather than take either path, the Court instead both reaffirmed Roe and developed a new standard for assessing state regulations.

First, the Court upheld the central holding in Roe, which the Court articulated as three principles. Two of the principles are relevant to this case. One principle was "a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." Casey, 505 U.S. at 846. Another principle was "that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." Id. However, "[b]efore viability, the State's interests are not strong enough to

26

support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure." Id.[6]

Second, the Court adopted a new "undue burden standard," which found a middle ground, balancing both a woman's right to an abortion and state interests.  The Court held that "an undue burden is an unconstitutional burden." Id. at 877.  "A finding of an undue burden is shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Id.  In the context of regulations which purport to further the State's interest in women's health, the Court further explains:

> "As with any medical procedure, the State may enact regulations to further the health or safety of a woman seeking an abortion.  Unnecessary health regulations that have the purpose or

_____

6. The third principle drawn from Roe concerns the State's ability to ban post-viability abortion. Casey, 505 U.S. at 846. Since no abortion provider in Alabama performs such abortions, it is not relevant to this case.

> effect of presenting a substantial
> obstacle to a woman seeking an abortion
> impose an undue burden on that right."

Id. at 878.

The non-controlling opinions in Casey illustrate the compromise the Casey 'undue-burden' standard strikes between the call for strict-scrutiny review and returning abortion regulations to deferential rational-basis review.

On one end of the spectrum was Justice Blackmun. In his separate opinion, he argued forcefully for strict-scrutiny review of state regulations on the right to an abortion. Id. at 926.[7] According to him, while a State had a legitimate interest in fetal life from the outset of a pregnancy, that interest only became compelling at the point of viability. Id. at 932-33. Justice Blackmun thus argued that no fetal-protective legislation would be constitutional if it applied to

_____

7. Justice Blackmun's opinion was a concurrence in part, concurrence in the judgment in part, and dissent in part.

28

pre-viability fetuses.  Id.  In other words, he called for the Court to continue applying the Roe framework as interpreted in Akron and Thornburgh because it would offer "the most secure protection of the woman's right to make her own reproductive decisions." Casey, 505 U.S. at 930.

On the other end of the spectrum, Chief Justice Rehnquist called for rational-basis review of any state regulation on the right to an abortion.[8]  According to him, while women's liberty interest in making reproductive decisions is protected under the Due Process Clause, States should be free to regulate abortion procedures at any point in a pregnancy so long as those interests are rationally related to a legitimate state interest.  Id. at 966.  In other words, Chief Justice Rehnquist would have overruled Roe.  Id. at 952.

_____

8. Chief Justice Rehnquist's opinion, joined by Justices White, Scalia, and Thomas, was a concurrence in the judgment in part and dissent in part.

29

_Casey_ rejected the views of both Justice Blackmun and Chief Justice Rehnquist. The _Casey_ Court's 'undue-burden' standard does not subject state regulation of abortions to strict scrutiny, which would "undervalue[]" the State's interests, _id_. at 873, invalidating nearly all abortion regulations. Nor does the undue-burden standard provide complete deference to the State by adopting a rational-basis standard of review, which would fail to give "real substance to the woman's liberty to determine whether to carry her pregnancy to full term," _id_. at 869, upholding nearly all abortion regulations.

Instead, the Court's new standard finds a middle ground, balancing a woman's right to an abortion with a State's interests. Under the standard, States may sometimes impose obstacles on women seeking an abortion without actually burdening that right. _Casey_, 505 U.S. at 873 ("not every law which makes a right more difficult to exercise is, _ipso facto_, an infringement of that right"). And, under the same standard, at other times,

obstacles will be substantial enough that they impose an impermissible burden on a woman's right to an abortion.

In developing an undue-burden standard defined by purpose and effect, the <u>Casey</u> Court was conscious to address not only explicit denials of the right, such as the Court confronted in <u>Roe</u>, but also legislation that threatens to "chip away at the private choice shielded by <u>Roe</u>" or to abrogate that right by stealth. <u>Stenberg v. Carhart</u>, 530 U.S. 914, 952 (2000) (Ginsburg, J., concurring).


c. The Ballot-Access Cases

Thus it is clear that <u>Casey</u> sought out a middle ground, a path between the strict scrutiny advocated by Justice Blackmun and the rational-basis review advocated by Chief Justice Rehnquist. But it is equally clear that the middle path <u>Casey</u> chose was not, as one might have expected, intermediate scrutiny. By pointing to the ballot-access cases, the <u>Casey</u> authors showed that the proper analysis recognizes that the strength of the

31

necessary government justifications depends in part on the extent of the burdens imposed on the right.

In many areas of constitutional law, courts apply three 'tiers' of scrutiny. Strict scrutiny and rational-basis review are discussed above. Intermediate scrutiny was articulated as a mid-way point, requiring that a challenged regulation be "substantially related" to "important governmental objectives." Wengler v. Druggists Mut. Ins. Co., 446 U.S. 142, 150 (1980) (gender discrimination); see also Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 662 (1994) (First Amendment in broadcast media). Thus, had the Casey Court sought nothing more than an analysis that was between rational basis and strict scrutiny, intermediate scrutiny was available at hand.

Yet the Court did not adopt intermediate scrutiny. Instead, Casey cites the ballot-access cases in the context of discussing the shortcomings of strict scrutiny, cases which adopted an entirely different kind of analysis. Thus, Casey, in the undue-burden standard,

rejected all categorical 'tiers of scrutiny,' whether strict, rational-basis, or intermediate, because they all demand the same kind of justification in every case.

The Casey authors criticized strict scrutiny as "misconceiv[ing] the nature of the pregnant woman's interest." Casey, 505 U.S. at 873. By treating that interest as a constitutional right to a nearly unregulated marketplace for the abortion procedure, strict scrutiny interfered with legitimate forms of state regulation. "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." Casey, 505 U.S. at 874.

Instead, Casey pointed to the example of ballot-access jurisprudence: "[N]ot every ballot access limitation amounts to an infringement of the right to vote. Rather, the States are granted substantial flexibility in establishing the framework within which voters choose the candidates for whom they wish to vote."

505 U.S. at 873-74 (citing <u>Anderson v. Celebrezze</u>, 460

U.S. 780 (1983) and <u>Norman v. Reed</u>, 502 U.S. 279 (1992)).

   <u>Anderson</u> and <u>Norman</u> established a flexible approach

to determine whether a regulation bearing on access to

the ballot is constitutionally problematic.  They provide

that courts should not rubber-stamp all ballot-access

restrictions as constitutional nor should they rigidly

protect third parties' access to ballots at all costs.

Rather, <u>Anderson</u> and <u>Norman</u> require an examination of the

injuries to rights and the justifications for a

regulation, in order to determine whether the

justifications are strong enough to merit the injuries a

regulation incurs.  This approach rejects "any

'litmus-paper test' that will separate valid from invalid

restrictions." <u>Anderson</u>, 460 U.S. at 789.

> "Instead, a court must resolve such a
> challenge by an analytical process that
> parallels its work in ordinary
> litigation. It must first consider the
> <u>character and magnitude of the asserted</u>
> <u>injury</u> to the rights protected by the
> First and Fourteenth Amendments that the
> plaintiff seeks to vindicate. It then
> must identify and evaluate the <u>precise</u>

34

> <u>interests put forward by the State as
> justifications for the burden imposed by
> its rule</u>. In passing judgment, the Court
> must not only determine the legitimacy
> and strength of each of those interests;
> it also must consider the extent to
> which those interests make it necessary
> to burden the plaintiff's rights. Only
> after weighing all these factors is the
> reviewing court in a position to decide
> whether the challenged provision is
> unconstitutional."

<u>Id</u>. (emphasis added).  The <u>Norman</u> case reinforces the importance of this approach: "To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, we have called for the demonstration of <u>a corresponding interest sufficiently weighty to justify the limitation</u>." 502 U.S. at 288-89 (citation omitted)(emphasis added).

<u>Casey</u>'s citation to these cases means more than just the narrow point that not every regulation of abortion is unconstitutional.  Rather, the ballot-access cases show that, in applying the undue-burden standard, the "character and magnitude of the asserted injury," <u>Anderson</u>, 460 U.S. at 789, affects whether the

35

"corresponding interest [is] sufficiently weighty to justify the limitation." <u>Norman</u>, 502 U.S. at 288-89. <u>Casey</u> teaches that tiers of scrutiny do not work in the abortion context because slight burdens may merit slight scrutiny, while heavy burdens warrant heavy scrutiny. This is the key to understanding the undue-burden standard.

### d. Application of the Undue-Burden Standard in <u>Casey</u> and <u>Gonzales</u>

The question remains: how is a court to determine whether any particular regulation presents a "substantial obstacle" to a woman's right to obtain an abortion? The authors of the <u>Casey</u> plurality opinion specifically cautioned against interpreting the undue-burden standard through those Justices' previous individual discussions of the concept in concurrences and dissents in other cases. 505 U.S. at 876-77. Thus, by its terms, the plurality opinion in <u>Casey</u> directs courts to look only to

36

<u>Casey</u> itself, and of course to subsequent cases, in understanding the undue-burden standard.[9]

The Supreme Court has considered four challenges to abortion regulations since <u>Casey</u>. However, only <u>Gonzales</u>, 550 U.S. 124, further elaborates on the proper application of the undue-burden standard.[10] The Court's application of the standard in these two cases shows that it adopted the <u>Anderson</u> and <u>Norman</u> approach, evaluating

---

9. The Court of Appeals for the Eleventh Circuit has never interpreted or applied the undue-burden standard.

10. The other three post-<u>Casey</u> opinions are of severely limited value in understanding how to apply the undue-burden analysis. In <u>Mazurek v. Armstrong</u>, 520 U.S. 968 (1997), the Court considered a regulation which placed essentially no burden on access to abortion services. It rejected the finding, by the Ninth Circuit Court of Appeals, of unconstitutional purpose because there was "simply no evidence" to support that conclusion. <u>Id</u>. at 974. In <u>Stenberg v. Carhart</u>, 530 U.S. 914, 938 (2000), the State did not contest that its statute, if interpreted as the Eighth Circuit Court of Appeals had understood it, would constitute an undue burden. Thus the question before the Court was not whether the burden was undue, but rather how to interpret the state statute. In <u>Ayotte v. Planned Parenthood of Northern New England</u>, 546 U.S. 320 (2006), the Court addressed only "a question of remedy." <u>Id</u>. at 323. In none of these cases, then, was the question of how to apply the undue-burden standard properly presented to or addressed by the Court.

37

a regulation's justifications as well as the extent to which it interfered with the exercise of constitutional rights. Specifically, two principles emerge from an analysis of <u>Casey</u> and <u>Gonzales</u>. First: Context matters. Courts must perform a careful, fact-specific analysis of how the restrictions would impede women's ability to have an abortion, in light of the circumstances of their lives. Second: Courts must examine the strength of the State's justifications for regulations, not just the effects of the regulation.

Starting with the first principle, that context matters, the Court has emphasized that the standard requires a fact-specific analysis of the obstacles which a regulation would place on women in the context of their lives. In particular, the Court's analysis of the spousal-notification requirement in <u>Casey</u> makes clear that the circumstances of women affected by an abortion regulation, including those circumstances which are not directly caused by the regulation, must be considered in determining the size of the obstacle. <u>See</u> <u>Casey</u>, 505

U.S. at 887-898.   The Court took into account the interaction of the regulation with other challenges in women's lives, not merely those obstacles which could be directly and solely attributable to the State's action. Id.   Women's abusive marriages were not caused by the state regulation.   Nonetheless, the Court evaluated how the spousal-notification requirement, when combined with the specific experience of those women and their relationships, operated to deprive them of their liberty. Id.

Indeed it is clear that, in considering the spousal-notification provision and throughout its application of the undue-burden standard, Casey relied heavily on the factual findings which the district court made after the three-day trial.   In discussing the spousal-notification provision, the Court quoted 18 numbered paragraphs containing some of the district court's detailed factual findings related to the provision.   Casey, 505 U.S. at 888-891.

The Court undertook a similarly fact-intensive analysis of Pennsylvania's 24-hour waiting-period requirement. The Casey Court found that whether the real-world effects of the requirement rendered it unconstitutional was "a closer question" than the theoretical question of whether such waiting periods were necessarily unconstitutional. 505 U.S. at 885. The Court noted that such a waiting period could present a substantial obstacle for certain women. In particular, the Court considered the effect of the regulation on low-income women, and urged courts to consider "whether [a regulation] is a substantial obstacle ... as to the women in that group" that is affected by the regulation. Id. at 887. The Court decided "on the record before [it], and in the context of this facial challenge, [it was] not convinced that the 24-hour waiting period constitute[d] an undue burden." Id. The waiting-period provision seems to have fallen just on the other side of the line from being a substantial obstacle, such that further evidence after the provision went into effect

40

could reveal that the obstacle presented was substantial. Furthermore, the Court made clear that it was not making a general finding about whether such waiting periods were always permissible in all circumstances--only a specific finding as to the particular factual circumstances of Pennsylvania women at that time. Id. (no undue burden "on the record before [it], and in the context of this facial challenge").

The Supreme Court took a similar approach in Gonzales, 550 U.S. 124.  That case concerned a federal ban on a particular procedure for late-term abortion, intact dilation and extraction, and provided for an exception to save the life of the pregnant woman, but not for her health.  In order to determine whether the ban presented an undue burden, the Court first determined that a more common procedure for late-term abortion would still be clearly legal under the federal statute. Therefore, there was only one possible obstacle presented: The abortion providers who challenged the statute argued that in some circumstances an intact

dilation and extraction would pose less risk to the health of the woman than the alternative procedure. In light of competing expert testimony on the safety question, the Court found that the ban did not create a substantial obstacle. "[W]here there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives," the Court was unwilling to ignore the weighty justifications for such a procedure. Id. at 166-67.

Even here, the Court left the door open to a later undue-burden challenge to the federal ban based on health risks depending on the facts. If there was a specific condition under which the inability to use intact dilation and extraction threatened women's health, but not to an extent that it threatened her life (given that exception to the federal ban), the Court indicated that an as-applied challenge would be appropriate, limiting

the applicability of the federal statute in that instance.

The second lesson from Casey and Gonzales is that the court must also consider the strength of the justifications that support a regulation.  This point is especially clear in Casey's treatment of the parental-consent and spousal-notification requirements. In many respects, these requirements mirrored each other in the demands that they placed on affected women.  A doctor could not perform an abortion on a minor woman without either the informed consent of her parents or the authorization of a court.  Casey, 505 U.S. at 904-906 (reproducing the Pennsylvania statute).  For a married woman, the statute required that she certify under penalty of perjury either that she had notified her spouse that she was undergoing an abortion, that the child was not her spouse's, or that she should be excused from notifying him due to abandonment, sexual assault, or spousal abuse.  Id. at 908-09.  Each of these provisions granted some control over the woman's decision to have an

43

abortion to another individual: the parent or the husband.  However, the Court upheld the parental-consent requirement while rejecting the spousal-notification requirement.  The Court differentiated between these two requirements, not on the basis of the difference in the obstacles they presented for women, but instead based on the difference in the strength of the State's justification for the obstacles, owing to differences in the nature and characteristics of the affected women. The <u>Casey</u> Court said that: "[parental-consent] enactments, and our judgment that they are constitutional, are based on the quite reasonable assumption that minors will benefit from consultation with their parents and that children will often not realize that their parents have their best interests at heart.  We cannot adopt a parallel assumption about adult women." 505 U.S. at 895.

44

## 2. Substantial-Obstacle Test

Thus, having reviewed <u>Casey</u> and <u>Gonzales</u>, this court will use the following test to determine whether an actual or intended obstacle is substantial: the court must determine whether, examining the regulation in its real-world context, the obstacle is more significant than is warranted by the State's justifications for the regulation.  To further explain and illustrate how this test is applied in practice, the court will expound on each portion of the test.


### a. Relationship Between Obstacles and Justifications

First, and critically, the test calls for the court to determine whether, considered in context, the obstacles imposed are greater "than is warranted" by the State's justification.  <u>Supra</u>, at 45.  That is, the heart of this test is the relationship between the severity of the obstacle and the weight of justification the State must offer to warrant that obstacle.  <u>See</u> <u>Anderson</u>, 460 U.S. at 789; <u>Norman</u>, 502 U.S. at 288-89.

45

Not every legitimate state interest will justify any and all obstacles (short of outright prohibition). Rather, the more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit.

Some obstacles will be so slight that the government need not justify them at all. See Casey, 505 U.S. at 874 (law that has only "incidental effect" on abortion will not be struck down); Mazurek, 520 U.S. at 972 (characterizing statute as "harmless"). Other obstacles will be significant enough to require a legitimate justification, but still so modest that even somewhat doubtful or marginal state interests will justify them. See, e.g., Casey, 505 U.S. at 901 (finding no undue burden from record-keeping requirements because "[a]t most they might increase the cost of some abortions by a slight amount"). However, as the severity of obstacle

46

increases, so increases the requirement that the
government establish that the regulation furthers its
interests in real and important ways. See Anderson, 460
U.S. at 789; Norman, 502 U.S. at 288-89. At some point,
the obstacles on the right to obtain an abortion will
become so significant that the State cannot justify them
at all. See Roe, 410 U.S. at 164.


### b. Obstacles - Relevant Factors

The test calls for the court to assess how
"significant" the obstacle created by the statute is.
Supra, at 45. The severity of the obstacle imposed by
any given regulation must be evaluated in context,
considering the real-world circumstances. What
circumstances will be relevant to a particular case will,
of course, vary; this court by no means imagines that the
following list is exhaustive. However, it may be helpful
to articulate certain categories of considerations that
have in the past been, and may in the future be,
important to a court's assessment of how severe the

47

obstacle is.  The court has identified five non-exclusive factors to consider, and will discuss each of them in turn.

First: the means by which the regulation operates on the right to obtain an abortion.  Some regulations establish a total ban on abortions, see, e.g., Roe, 410 U.S. at 117-18; prohibit certain procedures, see, e.g., Gonzales, 550 U.S. at 134; require certain actions or procedures before an abortion can be performed, see, e.g., Casey, 505 U.S. at 844 (describing informed-consent and waiting-period provisions); regulate or tax abortion procedures, providers, or clinics, see, e.g., id. (discussing record-keeping provision); express the State's views on the subject of abortion, see id. at 877 (State may express respect for life of fetus); deny public funding or facilities for abortions, see, e.g., Webster v. Reprod. Health Servs., 492 U.S. 490, 511 (1989).

Second: the nature and circumstances of the women affected by the regulation.  Relevant factors may include

the women's age, <u>see, e.g.</u>, <u>Casey</u>, 505 U.S. at 895 (noting importance of distinction between adults and minors); wealth and education, <u>see, e.g.</u>, <u>id</u>. at 886 (noting that impact on poor women was "troubling"); medical history and needs, <u>see, e.g.</u>, <u>Gonzales</u>, 550 U.S. at 167 (noting the possibility of as-applied challenges to a procedure ban by women with particular medical conditions); and any personal factors that may serve to amplify the harms imposed by the regulation, such as being in an abusive relationship, <u>see, e.g.</u>, <u>Casey</u>, 505 U.S. at 893, or lack of legal immigration status, <u>contra Planned Parenthood of Greater Texas Surgical Health Services v. Abbott</u>, 734 F.3d 406, 415 (5th Cir. 2013) (dismissing the role of immigration status).

Third: the availability of abortion services, both prior to and under the challenged regulation. This factor may include the number of abortion providers and their distribution geographically, <u>see, e.g.</u>, <u>Mazurek v. Armstrong</u>, 520 U.S. 968, 974 (1997) ("no woman seeking an abortion would be required by the new law to travel to a

different facility than was previously available"); travel patterns, access to transportation, and availability of information about abortion services; the capacity of providers and the likelihood that new providers will fill any gaps created by the regulation; the history of access to abortion in the relevant jurisdiction, including any trends in the availability of abortion providers; the kinds of abortion procedures that are used and their relative frequency of use, see, e.g., Gonzales, 550 U.S. at 164-5, 167 (contrasting the "availability of other abortion procedures that are considered to be safe alternatives" in Gonzales to Planned Parenthood of Central Mo. v. Danforth, 428 U.S. 52, 77-79 (1976), in which the then-dominant technique was banned).

Fourth: the kinds of harms created by the regulation. The court does not understand the term "obstacle" in Casey to refer only to a direct barrier standing between a woman and access to an abortion. Rather, "obstacle" refers to the whole array of harms that a regulation may

impose on women seeking abortions.  Those harms may include women's inability to obtain an abortion, <u>see, e.g.</u>, <u>Roe</u>, 410 U.S. at 120; risks to the woman's health, <u>see, e.g.</u>, <u>Casey</u>, 505 U.S. at 886 (finding that, given exception for medical emergencies, waiting period did not impose a health risk); additional cost or time, <u>see id</u>. at 901 ("at some point increased cost could become a substantial obstacle"); an intrusion of the woman's physical person, <u>cf</u>. <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952) (forcing suspect to vomit evidence violated constitutional rights); exposure of private or confidential information, <u>see, e.g.</u>, <u>Casey</u>, 505 U.S. at 900 (noting that record-keeping provision required confidentiality); humiliation or emotional trauma, <u>see, e.g.</u>, <u>id</u>. at 886 (noting district court's finding that regulation would expose women to harassment); and delay, <u>see, e.g.</u>, <u>Planned Parenthood of Wisconsin, Inc. v. Van Hollen</u>, 738 F.3d 786, 796 (7th Cir. 2013) ("Patients will be subjected to weeks of delay because of the sudden shortage of eligible doctors--and delay in obtaining an

51

abortion can result in the progression of a pregnancy to a stage at which an abortion would be less safe, and eventually illegal."). Given proper proof, a court might also consider the likelihood that women will seek illegal abortions because of the regulation, and the corresponding dangers to life and health. See Roe, 410 U.S. at 150 (noting "high mortality rates at illegal 'abortion mills'").

Fifth: The social, cultural, and political context. For example, an atmosphere of disapproval and stigma surrounding the provision of abortion services may decrease the likelihood that women will be able to access abortion services, see, e.g., Thornburgh, 476 U.S. at 767 (considering the potential for harassment of women identified by statute as seeking an abortion), overruled in part on other grounds by Casey, 505 U.S. 833, or that gaps in service created by the regulation will be filled in the future. See, e.g., Van Hollen, 738 F.3d at 792 (noting decreased likelihood doctors would obtain admitting privileges based on "widespread hostility to

abortion and the lack of any likely benefit to a hospital from granting such privileges to an abortion doctor").

### c. Justifications - Relevant Factors

The test also calls for the court to assess the significance of the State's interest in the particular regulation at issue. As discussed above, the Supreme Court has explicitly addressed the question of what kinds of justifications may warrant particular obstacles to the right to an abortion. But in order to evaluate the weight of the state interest involved in a particular case, it is not enough simply to note that the State has invoked one of these legitimate interests. Rather, the court must look to case-specific factors.

First: the extent of the anticipated benefit. This factor is most relevant in the context of regulations justified by concerns about the health of the woman. The marginal benefit of the new regulation, that is the additional benefit that the change in law will provide as compared to existing law, may be the most relevant

measure in many cases.  If the anticipated health benefit is significant, then the State's interest is correspondingly greater.  See, e.g., Casey, 505 U.S. at 900-901 (noting that record-keeping was a "vital element of medical research").  If the health benefit is slight, however, the State's (concededly legitimate) interest in it is also slight.  See, e.g., Doe v. Bolton, 410 U.S. 179, 195 (1973) (casting doubt on health benefit of performing abortions only in hospitals instead of well-equipped clinics).  The court notes that the contextual factors discussed above, such as the nature and circumstances of the women affected, may also be relevant to assessing the extent of the benefit. Furthermore, dangers to health caused by a particular regulation, such as might be established by a demonstrated risk of increased illegal abortions, may offset health benefits the State anticipates from that regulation.  See Roe, 410 U.S. at 150 (noting "high mortality rates at illegal 'abortion mills'").

Second: the likelihood of the anticipated benefit. Again, this factor is most likely to come up in the context of health regulations. The court should consider whether the anticipated or hoped-for benefits of the regulation are quite likely to actually occur, or whether, on the contrary, the State can offer only weak reasons to believe the regulation will achieve the anticipated benefit, or any benefit at all. See Doe, 410 U.S. at 195 (noting lack of "persuasive data" establishing that hospitals produce better health outcomes than do clinics). While the court may be more inclined to defer to legislative expectations when the relevant obstacle is slight, more serious obstacles will warrant closer examination of the evidence offered in support of the regulation.

Third: the means a regulation employs. For example, as the Supreme Court recognized in Casey, "the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." Casey, 505 U.S. at 877. While

55

<u>Casey</u> was not discussing women's health when it made this statement, it remains true that the means a State employs to achieve a legitimate interest may undermine the justification for the regulation.

Fourth: the political history and context of the regulation.  Understanding a particular regulation's meaning and its legitimacy will often involve looking behind the proffered justification to consider also the political context.  Relevant factors may include the legislative history of the particular regulation, <u>see, e.g.</u>, <u>Gonzales</u>, 550 U.S. at 157; political rhetoric, statements, and advertising connected to the regulation, <u>cf.</u> <u>Thornburg v. Gingles</u>, 478 U.S. 30, 37 (1986) (considering, in voting-rights context, "whether political campaigns have been characterized by overt or subtle racial appeals") (internal quotation marks omitted); any prior history of restrictive abortion regulation; whether the provisions at issue are novel both within the State and nationally; whether the statute is specific to abortion or is of general applicability,

and whether similar regulations are imposed on comparable procedures, see, e.g., Doe, 410 U.S. at 199 (noting that similar regulations had not been applied to other, comparable medical procedures).

### d. Purpose or Effect

To be clear, all of these considerations apply to the interpretation of the term "substantial obstacle." The Supreme Court's undue-burden analysis provides that a regulation which has either the "purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" imposes an undue, and thus unconstitutional, burden. Casey, 505 U.S. at 877. Thus, this court's test for "substantial obstacle" applies to both the "purpose" and "effects" prongs of the undue-burden test.[11]

_____

11. The State argues that there can be no unconstitutional purpose to impose a substantial obstacle without the effect of creating a substantial obstacle. It cites Mazurek, which assumed without deciding that "a legislative purpose to interfere with the (continued...)

A regulation that has the <u>purpose</u> of imposing an obstacle which is more significant than is warranted by the State's justifications is unconstitutional. For example, if the court finds, after examining the various relevant factors, that the closure of a clinic would constitute a substantial obstacle, then evidence establishing that the legislature passed a statute with

---

11.(...continued)
constitutionally protected right to abortion without the effect of interfering with that right" would be unconstitutional. 520 U.S. at 972 (emphasis omitted). Unless and until the Supreme Court holds otherwise, this court considers itself bound by the statement reiterated three times in <u>Casey</u>: "the purpose <u>or</u> effect of placing a substantial obstacle in the path of a woman seeking an abortion" creates an undue burden. <u>Casey</u>, 505 U.S. at 877-78. (emphasis added). To require that the plaintiffs show an effect in every case would read the disjunctive pronoun out of the test. <u>Cf. Reno v. Bossier Parish Sch. Bd.</u>, 528 U.S. 320, 332 (2000) (discussing "purpose or effect" provisions), <u>superseded by statute</u>, Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2005, Pub. L. No. 109-246, 120 Stat. 580 § 5. Furthermore, this would not be the only area of constitutional law in which improper motivations alone can render government action unconstitutional. <u>See, e.g.</u> <u>Wallace v. Jaffree</u>, 472 U.S. 38, 56 (1985) (intent to promote religion; establishment clause); <u>Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle</u> 429 U.S. 274, 283-84 (1977) (intent to retaliate against protected speech; free speech clause).

58

the purpose of closing down the clinic would suffice to establish a constitutional violation. Of course, whether the evidence actually does establish that purpose in any given case is a complex question. See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977).

Similarly, a regulation that has the effect of imposing an obstacle which is more significant than is warranted by the State's justifications is unconstitutional. Thus, again, if closing a clinic is found to be a substantial obstacle, then a regulation that has the effect of closing the clinic will be unconstitutional. For this prong, of course, the evidence will be quite different: the plaintiff would need to show that the regulation will actually have that effect.

### 3. Lower Court Decisions After Casey

As recounted in Casey, some of the pre-Casey abortion decisions went too far in applying strict scrutiny to "any regulation touching upon the abortion decision."

59

Casey, 505 U.S. at 871 (citing Akron, 462 U.S. at 427). However, in the years since Casey, some lower courts have erred in the other direction: regardless of whether or not they reached the correct result, they reviewed regulations in an overly deferential manner that is not faithful to the teachings of Casey. This court's test, derived from a careful reading of Casey, seeks to pursue the correct path between the two extremes.

The court has identified three shortcomings in some lower-court cases which are of particular concern: first, courts have failed to take into account the real-world context of the burdens a regulation may place on women's access to abortion services; second, courts have ignored the fact that the government's interests are stronger in some situations and weaker in others; and third, courts have not adequately considered the relationship between burdens and justifications. This court's test addresses all of these failings.

The first flaw is some other courts' failure to consider all of the relevant circumstances. Particularly

in examining regulations that, like subsection 4©, have the potential to close down clinics which provide abortion services, some courts, whether they reached the correct result or not, have tended to pluck single, often easily quantifiable factors out of context and to hold them up as conclusive evidence that there is no undue burden.  <u>See, e.g.,</u> <u>Planned Parenthood of Greater Tex.</u> <u>Surg. Health Serv. v. Abbott</u>, 734 F.3d 406, 415 (5th Cir 2013) ("An increase in travel distance of less than 150 miles for some women is not an undue burden on abortion rights"); <u>see also</u> <u>Planned Parenthood of Greater Tex.</u> <u>Surg. Health Serv. v. Abbott</u>, --- F.3d ---, slip op. at 21 (5th Cir. Mar. 27, 2014) (same).  This often involves, at the same time, disregarding other factors that make it more difficult for a woman to obtain an abortion.  <u>See,</u> <u>e.g.,</u> <u>id</u>. (dismissing the role of immigration status as "unrelated").

<u>Casey</u> teaches that the question, when it comes to abortion rights, is whether the regulation places a "substantial obstacle in the path of a woman seeking an

abortion of a nonviable fetus." <u>Casey</u>, 505 U.S. at 877. And the reality is that countless factors, including the lived experience of the actual women who will be affected, may affect whether a given regulation does or does not create a substantial obstacle in the real world. To take a simple example: it is self-evident that 50 miles on the interstate does not pose the same obstacle as 50 miles on an old country road; and that both distances in a car are quite different from 50 miles on foot. Because <u>Casey</u> directs the court to evaluate the obstacles placed in the path of women seeking abortions, the proper analysis must be fact-intensive and take in the full picture. <u>See, e.g.</u>, <u>Casey</u>, 505 U.S. at 893 (considering the context of abusive relationships).[12]

────────────

12. That courts seek clear lines and across-the-board tests is understandable. And, indeed, precise rules can be beneficial to the fair adjudication of cases. But such rules are helpful only if they reflect some principled basis and some reality in fact. Here, bright-line rules about increased travel distance or cost or time are not grounded in anything real; they amount to no more than a particular court's say-so. Thus when courts disagree, <u>compare</u> <u>Abbott</u>, 734 F.3d at 415

(continued...)

The second flaw in some lower courts' applications of
Casey is their failure to recognize that the government's
legitimate interests may be weighty in some circumstances
and flimsy in others.  The Supreme Court has identified
three legitimate governmental interests which may justify
regulation of abortion: the life of the fetus, the health
of the woman, and the regulation of the medical
profession.  But it is not enough to simply note that the
State has a legitimate interest; courts must also examine
the weight of the asserted interest, including the extent
to which the regulation in question would actually serve
that interest.  For example, the government surely has a
weightier interest in health regulation where there is a
clear, substantial risk to life and limb; its interest,

_____

        12. (...continued)
(increase of less than 150 miles travel distance is not
an undue burden) with Planned Parenthood of Wisconsin,
Inc. v. Van Hollen, 738 F.3d 786, 796 (7th Cir. 2013)
(finding  likelihood  of  success  on  the  merits  of
undue-burden claim where evidence established increase of
up to 100 miles travel distance), there is no principled
basis by which to decide which court is right and which
is wrong.

while still legitimate, would be significantly less weighty when the risk it addresses is negligible and unsupported. See, e.g., Planned Parenthood of Wisconsin, Inc. v. Van Hollen, 738 F.3d 786, 798 (7th Cir. 2013) (characterizing the State's health interests as "feeble"). Yet these considerations are almost wholly absent from some lower-court applications of the undue-burden standard. Compare Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 601-2 (6th Cir. 2006) (reviewing apparently undisputed evidence that health justification was weak at best) with id. at 604-7 (finding no undue burden without mentioning the weakness of the governmental interest).

The third and final flaw is courts' failure to consider the relationship between burdens and state interests. While some courts have recognized the relationship between obstacles and justifications, see, e.g., Van Hollen, 738 F.3d at 798 ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or

gratuitous"), others have considered the severity of particular obstacles in isolation from the weight of the government's interests. <u>See, e.g.</u>, <u>Greenville</u>, 222 F.3d at 169 ("having determined that [the regulation] serves a valid purpose, we must still consider whether the cost imposed by the lawfully directed regulation presents 'a substantial obstacle to a woman seeking an abortion'"); <u>Abbott</u>, 734 F.3d at 412-416; <u>Baird</u>, 438 F.3d at 604-7. But, as discussed above, a State's interest in women's health, for example, may fall anywhere along a huge spectrum ranging from slight (a possible better outcome in one out of a million cases) to incredibly compelling (likely death in most cases). If the severity of the burdens imposed has nothing to do with the strength of the reasons for those burdens, then courts are left to articulate a one-size-fits-all definition of 'substantial obstacle' applicable regardless of the weight of the governmental interests at stake.

This approach is hopelessly unworkable. If the one-size-fits-all level of "substantial obstacle" is set

too low, then courts will be instructed to strike down
regulations even in the face of compelling health
consequences, an outcome no one desires.  See, e.g.,
Greenville, 222 F.3d at 171 (noting that finding
increased costs to constitute a substantial obstacle
would create "an arbitrary cost threshold," preventing
States from regulating unsafe facilities because it would
cost too much to upgrade).  If, on the other hand, the
one-size-fits-all level of "substantial obstacle" is too
high, then essentially all abortion regulation would be
permitted, no matter how severe the burdens and how
slight the governmental interests.  See, e.g., Greenville
Women's Clinic v. Bryant, 222 F.3d 157, 166-168.  While
this may be an outcome some desire, it is not consistent
with the Supreme Court's abortion jurisprudence.  Rather,
it is clear from Casey that an obstacle need not be
insurmountable to be substantial.  "Before viability, the
State's interests are not strong enough to support a
prohibition of abortion or the imposition of a
substantial obstacle to the woman's effective right to

elect the procedure." <u>Casey</u>, 505 U.S. at 846 (emphasis added).[13]

    <u>Casey</u> teaches that the proper approach is one that recognizes that there is a relationship between burdens and justifications.  Courts need not declare that a particular amount of harm is (or is not) a substantial obstacle under all circumstances.  Rather, the determination of what constitutes a substantial obstacle is informed, in part, by both the extent of the burden and the strength of the government's interest under the particular circumstances of the case.


    4. Effect of Creating a Substantial Obstacle

    The plaintiffs claim that subsection 4© will shut down three of the five abortion clinics in the State, and argue that in doing so the statute will impose a substantial obstacle for women in Alabama who seek to

---

    13. Thus, while evidence that an obstacle actually prevents women from obtaining abortions would be extremely compelling evidence of a substantial obstacle, it is by no means necessary.

Case 2:13-cv-00405-MHT-TFM   Document 146   Filed 03/31/14   Page 68 of 86

have an abortion. The State argues that the clinics will not close. The court has concluded that there are genuine disputes of material fact regarding whether the clinics will close, the extent of the obstacle clinic closures would create, and the strength of the government's justifications for the statute.

### a. Will The Plaintiff Clinics Close?

Based on the facts before it, the court cannot determine as a matter of law at this stage whether the legislation's admitting privilege requirement will cause the plaintiff clinics to close. In particular, there is a genuine dispute of material fact regarding two specific questions: (1) whether current abortion doctors at the three plaintiff clinics will be able to gain admitting privileges at local hospitals; and (2) whether the plaintiff clinics can find other doctors who can gain such privileges.

## I. Obtaining Admitting Privileges for
## Current Abortion Doctors

It is undisputed that none of the current abortion doctors at the three plaintiff clinics currently has admitting privileges at any local hospital as required by subsection 4© of 1975 Ala. Code § 26-23E-4.  The plaintiffs argue that none of their doctors will be granted privileges by any local hospitals, for a variety of reasons.  The State argues that the doctors may obtain privileges.

To predict the likelihood of whether the current abortion doctors at the plaintiff clinics will receive admitting privileges at any local hospital, the parties rely on the bylaws of the hospitals in Birmingham, Montgomery, and Mobile.  These bylaws provide the court an indication of the preconditions a particular hospital requires for an abortion doctor to gain such privileges.  However, as both parties point out, hospitals sometimes make exceptions to their own written bylaws and exercise discretion in their decisions to grant privileges.

Therefore, the bylaws are relevant only as to whether a local hospital is likely to grant admitting privileges to any particular abortion doctor.[14]  That is, the bylaws are evidence of what the hospitals would likely do when presented with applications for admitting privileges.

Under the plaintiffs' interpretation of the bylaws for local hospitals near the plaintiff clinics, none of

---

14. Under Alabama law, hospital bylaws appear to constitute a contract between a hospital and its doctors. See Wells v. Mobile County Bd. Of Realtors, Inc. 387 So.2d 140, 142 (Ala. 1980) ("It is well established that the constitution, bylaws, rules and regulations of a voluntary association constitute a contract between the association's members."). However, the court will not interpret these bylaws as it would a contract in a contract-dispute case. The bylaws are not legally operative statements in this case, as a contract would be; indeed, they cannot constitute a contract with the abortion doctors, who have not been granted admitted privileges.  Rather, the bylaws are evidence of what third parties may do in the future. Further, none of the hospitals are parties and therefore, any interpretation of their bylaws would not be binding on the hospitals. See Fed. R. Civ. P. 19 advisory committee note ("the court can make a legally binding adjudication only between the parties actually joined in the action"). Thus, while the binding nature of the bylaws may be further evidence that the hospitals will actually do what the bylaws claim, how to understand the bylaws and to what extent the hospitals will abide by them are both factual questions to be determined at trial.

70

the current abortion doctors will be able to gain the necessary admitting privileges. The plaintiffs read hospital bylaws for most local hospitals in all three cities to require categorically that doctors with admitting privileges either reside or practice near the local hospital in order to provide continuous care. None of the current abortion doctors at the three plaintiff clinics resides or has a practice in the city where they perform abortions; instead, the doctors visit the plaintiff clinics only on pre-scheduled days to perform abortions. Therefore, as interpreted by the plaintiffs, none of these current doctors could meet the residency or practice prerequisites for gaining admitting privileges at a local hospital. For the few hospitals in Birmingham that do not have residency or practice requirements for admitting privileges, the plaintiffs portray the hospitals as being explicitly religious and opposed to abortion. Therefore, the plaintiffs argue that despite these hospitals' less stringent requirements for admitting privileges, current abortion doctors will be

71

denied the privileges. <u>See</u> <u>Planned Parenthood of Wisconsin, Inc. v. Van Hollen</u>, 738 F.3d 786, 792 (7th Cir. 2013) (noting decreased likelihood doctors would obtain admitting privileges based on "widespread hostility to abortion and the lack of any likely benefit to a hospital from granting such privileges to an abortion doctor").

The State interprets the local hospital bylaws for hospitals in Montgomery, Birmingham, and Mobile differently. Under its reading, some current abortion doctors will be able to gain admitting privileges at local hospitals. First, the State argues that local hospitals which require doctors to "practice" near them do not require abortion doctors to maintain full-time practices in the area. In other words, according to the State, simply providing abortions at a local abortion clinic will suffice to meet the local practice requirement for gaining staff privileges at these hospitals. Second, the State argues that the bylaws allow doctors to live in any geographic area so long as

72

they provide "satisfactory cross coverage" or "continuous care." Third, the State argues that, even when doctors are required to reside near a local hospital, many hospitals offer explicit waivers or make exceptions from these requirements. The State contends that in all three metropolitan areas at least one of the current abortion doctors will gain admitting privileges at a local hospital.

The court finds that there is a genuine dispute of material fact as to whether current abortion doctors will gain admitting privileges and therefore whether clinics will cease performing abortions. The plaintiffs have offered substantial evidence that none of the doctors will be granted admitting privileges at any of the relevant hospitals. Indeed, one court that examined this same question under similar circumstances emphasized how difficult and disputed the factual question of access to admitting privileges was. <u>Van Hollen</u>, 738 F.3d at

792-3.[15]   The State has countered with evidence that
doctors may well obtain such privileges.  See Planned
Parenthood of Greater Tex. Surg. Health Serv. v. Abbott,
--- F.3d ---, slip op. at 23 (5th Cir. Mar. 27, 2014)
(finding that record did not support finding that
abortion doctors would "likely be unable to comply with
the privileges requirement").  At trial, the court will
determine based on the bylaws and any other evidence
which the parties put forth whether current abortion
doctors will be able to gain admitting privileges at
local hospitals.

_____

15. In Van Hollen, the court expressed serious doubt,
on the record before it at the preliminary injunction
stage, that hospitals would grant admitting privileges to
the abortion doctors at issue in that case.  The court
pointed to, among other things, the high number of
admissions doctors with such privileges are expected to
make each year compared to the "negligible" number of
hospital admissions from abortions, as well as the
national trend towards hospitals tightening admitting
privileges.  Van Hollen, 738 F.3d at 792-3.

## ii. Finding New Doctors

The State argues that even if current abortion doctors cannot gain admitting privileges at local hospitals under hospital bylaws, the clinics can recruit and hire new local doctors who will meet such requirements. The State points to prior instances when local clinics were able to recruit local doctors to meet other State requirements for abortion providers. Furthermore, the State contends, the fact that doctors residing locally performed abortions at the Birmingham clinic as recently as 2012 shows that the plaintiff clinics could find new providers who meet the residency and practice requirements for staff privileges.

The plaintiffs, on the other hand, argue that violence, harassment, and stigma around abortion in Alabama make it difficult if not impossible to find local physicians willing to perform abortions. As evidence of this, the plaintiffs point to the difficulties clinics face when seeking local physicians to satisfy the covering-physician requirement. The plaintiffs also rely

75

on evidence of prior harassment of abortion doctors, bomb threats of clinics in Tuscaloosa and Birmingham, and a website publicizing the names and contact information of abortion doctors as reasons why the plaintiff clinics will be unable to find new doctors who meet bylaw requirements of residency and practice near a local hospital.  See Abbott, --- F.3d ---, slip op. at 24 (5th Cir. Mar. 27, 2014) (noting, but not relying on, evidence that doctor "feared anti-abortion violence" and therefore would not join abortion clinic).

Again, the court finds that there is a genuine dispute of material fact as to whether the plaintiff clinics will be able to find new abortion doctors who meet admitting privileges requirements at local hospitals.  Thus, this question is reserved for trial.

### b. Effect of Clinic Closures

The State argues that, even if the clinics do close, it is still entitled to summary judgment because the closures would not constitute a substantial obstacle.

The court finds that genuine disputes of material fact also preclude summary judgment on this basis.

Under the test articulated above, the court examines the severity of obstacles created by the regulation as well as the weight of the State's justifications for the regulation, and then determines whether the obstacle is more significant than is warranted by the justifications. Having reviewed the evidence offered by both sides, the court concludes that there is some dispute as to the burdens this statute will impose if the clinics close, and a great deal of dispute as to the medical interests served by the statute.  See Van Hollen, 738 F.3d at 799 (noting technical and greatly disputed character of evidence on similar questions).[16]   In particular, while

_____

16. In Van Hollen, the Seventh Circuit suggested that given the highly technical evidence likely to arise at trial regarding the safety of abortions and the health justifications for the State's regulation, the district judge may choose to appoint a neutral medical expert to testify at the trial. In the face of significant factual disputes, such an expert could help the district court "resolve the clash of the warring party experts." 738 F.3d at 799. This court is not suggesting that such an
(continued...)

the State contends that this statute offers significant
health benefits, the plaintiffs point to evidence
suggesting "the apparent absence of any medical benefit
from requiring doctors who perform abortions to have such
privileges at a nearby or even any hospital." Van Hollen,
738 F.3d at 791.[17]  As discussed above, in the face of
such a "feeble" justification, id. at 798, even obstacles
significantly lower than those claimed by the plaintiffs
may be unwarranted.  Therefore, having viewed the

---

16. (...continued)
expert would necessarily be appropriate. However, the
Seventh Circuit's recommendation does underscore that the
extent of the health benefits of admitting-privileges
requirements is very disputed.

17. The State also argues that the
admitting-privileges requirement serves a credentialing
function. Current law already provides for three
alternative ways for a doctor to establish her
credentials to perform abortions. See Ala. Admin. Code
§ 420-5-1-.02(5)(d)(2). Furthermore, it seems clear that,
even if the State does have an additional interest in
requiring privileges as "as a kind of Good Housekeeping
Seal of Approval," Van Hollen, 738 F.3d at 797, that
interest would not require, as the statute does,
privileges at a hospital within the same metropolitan
area. Id. The plaintiffs have offered evidence that, as
in Van Hollen, most of the relevant doctors in this case
have admitting privileges at hospitals in other States.

evidence in the light most favorable to the plaintiffs,

summary judgment will be denied on this claim.[18]

_____

18. The plaintiffs claim that subsection 4(c) violates equal protection by treating abortion providers differently from other outpatient medical providers without sufficient justification. They argue for heightened equal-protection scrutiny because this regulation affects the fundamental right of abortion. However, strict scrutiny for this kind of claim would serve inappropriately to sidestep <u>Casey</u> in many cases. <u>See</u> <u>Eden</u>, 379 F.3d at 544. The court could apply <u>Casey</u>'s undue-burden standard to the equal-protection claim. But the fact that this regulation may burden abortion rights is adequately addressed by considering the claim based on the patients' substantive due process rights. <u>See</u> <u>id</u>. ("with respect to burdens on patients' abortion rights, this equal protection claim collapses with the undue burden claim"). The proper analysis of the providers' equal-protection claim, independent of any burden on abortion rights, is rational-basis review. For the reasons given above, in discussing the providers' substantive due process claim, the State is entitled to summary judgment on this claim.

However, to be clear: while the equal-protection claim is no longer part of this case, the evidence offered in support of it may well be relevant to the surviving substantive due process claim on behalf of the plaintiffs' patients. <u>See</u> <u>Planned Parenthood of Wisconsin, Inc. v. Van Hollen</u>, 738 F.3d 786, 790 (7th Cir. 2013) (discussing evidence indicating that "the state seems indifferent to complications from non-hospital procedures other than surgical abortion ... even when they are more likely to produce complications").

   5. Purpose of Creating a Substantial Obstacle

      Thus far, the court has analyzed the plaintiffs'
undue-burden claim only as to the effects of subsection
4(c) of 1975 Ala. Code § 26-23E-4.  However, as noted
above, a law with the purpose of placing a substantial
obstacle before a woman seeking an abortion would be
unconstitutional even if it does not necessarily achieve
that goal.  The plaintiffs argue that subsection 4(c) was
enacted with such an illegitimate purpose.  Only the
State has moved for summary judgment on the purpose
claim.

      The plaintiffs argue that the statute was passed with
the purpose of protecting fetal life by reducing the
number of abortions.  The State contends that the statute
was passed only with the purpose of furthering women's
health.

      Resolving what purpose a State has in enacting
particular abortion regulations is a difficult task for
courts.  Furthermore, "The Casey Court provided little,

80

if any, instruction regarding the type of inquiry lower courts should undertake to determine whether a regulation has the 'purpose' of imposing an undue burden on a woman's right to seek an abortion." <u>Okpalobi v. Foster</u>, 190 F.3d 337, 354 (5th Cir. 1999) <u>vacated on other grounds on reh'g en banc</u>, 244 F.3d 405 (5th Cir. 2001). As noted above, this court will apply <u>Arlington Heights</u> principles and evidence to determine what the attempted obstacles and justifications of the bill were.

On review of the record before it, the court cannot find that subsection 4(c) was passed with a fetal-protective purpose. But nor can the court rule out the possibility. There is direct evidence, in the form of statements from legislative supporters of the bill and the governor, which indicate that a fetal-protective urge was in play during the passage of the bill. <u>Cf</u>. <u>Van Hollen</u>, 738 F.3d at 790-1 (discussing evidence of purpose to restrict access to abortion). On the other hand, there is also substantial evidence that this law is just what it purports to be: a regulation aimed at protecting

the health of women.  The court finds there is a genuine dispute on this issue.

The State argues that, even if the statute was enacted to protect fetuses, that is a legitimate State interest and thus there was no purpose to impose a substantial obstacle.  This is incorrect.

If the court finds that the statute was motivated by a purpose of protecting fetal life, then the statute had the unconstitutional purpose of creating a substantial obstacle.  Casey provides that a regulation with the purpose of protecting fetal life which operates through coercive, rather than persuasive, means is impermissible. "[T]he means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it." Casey, 505 U.S. at 877.  A statute which attempts to save fetal lives (that is, stop abortions) by using the State's coercive power to make access to abortion more difficult is interfering with the core of the constitutional abortion right: the right of a woman to make the final decision about whether

to have an abortion.  <u>Casey</u> allows the State to try to influence a woman's decision-making process, that is, to convince her, but not to throw up roadblocks just for the sake of making abortion more difficult.

Nothing in subsection 4(c) operates to persuade pregnant women about the merits of forgoing abortion.  It is clear that admitting privileges as a prerequisite to obtaining an abortion will save no fetal lives--unless the requirement closes abortion clinics or reduces their capacity.  Therefore, if subsection 4(c) was intended to protect fetal lives, it operates only through coercive means, specifically by closing down clinics or limiting their capacity.  Therefore, the dispute regarding the purported fetal-protective purpose behind the statute is material: considering the evidence in the light most favorable to the plaintiffs, this statute was motivated by a unconstitutional purpose.  As such, the State's motion for summary judgment on this claim is denied.

\*\*\*

"Liberty finds no refuge in a jurisprudence of doubt." Casey, 505 U.S. at 844.  Opening with these words, the Supreme Court in Casey reaffirmed, in the face of significant opposition, the "essential holding" of Roe v. Wade.  Casey, 505 U.S. at 846.  After Casey, there can be no more doubt.  Regardless of "whatever degree of personal reluctance" this court may have about Roe, Casey, 505 U.S. at 861, the duty is clear:  The "rule of law," id. at 868, demands that this court abide by the dictates of the Supreme Court.  This court is bound to apply the law of the land, and the law of the land is Casey.

In reaffirming Roe, the Supreme Court made it clear that courts not only must avoid "undervalu[ing]" the State's interests, Casey, 505 U.S. at 873, but must also "give some real substance to the woman's liberty to determine whether to carry her pregnancy to full term," id. at 869.  Neither interest can be entirely subordinated to the other.

84

If courts are serious only about the State's interest, but not about the woman's right, then <u>Roe</u> will be left a dead letter; or, in other words, a right "in theory but not in fact." <u>Casey</u>, 505 U.S. at 872. Likewise, if courts are serious only about the woman's right and not the State's interest, they fail to follow the middle path set out by <u>Casey</u>. Only when courts consider both interests fully do they obey, in good faith, the teachings of <u>Casey</u>; only then do they abide by the "rule of law." <u>Id</u>. at 868.

Toward this end, courts must consider these interests, as did <u>Casey</u>, in the real-world context. Only a real-world approach will help assure both that the State's interest is not undervalued and that abortion regulations, even those that do not explicitly ban the procedure, do not attack by stealth the right to have an abortion, that they not "chip away at the private choice shielded by <u>Roe</u>," <u>Stenberg v. Carhart</u>, 530 U.S. 914, 952 (2000) (Ginsburg, J., concurring), until nothing of the right remains. Only in a real-world context can courts

85

remain faithful to their obligation to give to the State's interest the full respect it is due while at the same time remaining vigilant to ensure that they are providing "real and substantial protection" of the right of women to an abortion. <u>Lawrence v. Texas</u>, 539 U.S. 558, 565 (2003) (discussing <u>Roe</u>).

An appropriate judgment will, therefore, be entered as follows: denying the plaintiffs' motion for summary judgment; denying the defendants' motion for summary judgment as to the plaintiffs' claim asserting the substantive due process rights of women seeking abortions; and granting the defendants' summary-judgment motion to this extent: the non-delegation claim will be dismissed without prejudice; and summary judgment will be entered in favor of the defendants as to all other claims. The plaintiffs' claim asserting the substantive due process rights of women seeking abortions will go to trial.

DONE, this the 31st day of March, 2014.

     /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE