```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE MIDDLE DISTRICT OF ALABAMA

 3                          NORTHERN DIVISION

 4

 5   PLANNED PARENTHOOD
     SOUTHEAST, INC., et al.,
 6
             Plaintiffs,
 7
         vs.                        CASE NO.:  2:13cv405-MHT
 8
     LUTHER STRANGE, et al.,
 9
             Defendants.
10

11

12                    * * * * * * * * * *

13             EXCERPT OF NONJURY TRIAL PROCEEDINGS

14               TESTIMONY OF JAMES ANDERSON, M.D.

15                    * * * * * * * * * *

16         BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

17   DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday, May 27,

18   2014, commencing at 9:06 a.m.

19   APPEARANCES:

20   FOR THE PLAINTIFFS:      Ms. Alexa Kolbi-Molinas
                              Mr. Andrew David Beck
21                            Ms. Susan Talcott Camp
                              Ms. Julia Heather Kaye
22                            Attorneys at Law
                              AMERICAN CIVIL LIBERTIES UNION
23                            125 Broad Street, 18th Floor
                              New York, New York  10004-2400
24

25
```

```
 1  APPEARANCES, Continued:

 2  FOR THE PLAINTIFFS:      Ms. Jennifer R. Sandman
                             Ms. Maithreyi Ratakonda
 3                           Attorneys at Law
                             PLANNED PARENTHOOD FEDERATION
 4                           OF AMERICA
                             434 West 33rd Street
 5                           New York, New York  10001

 6                           Ms. Dyanne Griffith
                             Attorney at Law
 7                           WILMER CUTLER PICKERING
                             HALE & DOOR, LLP
 8                           1875 Pennsylvania Avenue NW
                             Washington, D.C.  20006
 9
                             Mr. Randall C. Marshall
10                           Attorney at Law
                             ACLU of ALABAMA FOUNDATION, INC.
11                           P.O. Box 6179
                             Montgomery, Alabama  36106-0179
12
                             Mr. M. Wayne Sabel, Sr.
13                           Attorney at Law
                             SABEL & SABEL, P.C.
14                           2800 Zelda Road, Suite 100-5
                             Montgomery, Alabama  36106
15

16  FOR THE DEFENDANTS:      Mr. Andrew L. Brasher
                             Solicitor General
17                           STATE OF ALABAMA
                             OFFICE OF THE ATTORNEY GENERAL
18                           501 Washington Avenue
                             Montgomery, Alabama  36103
19
                             Mr. James William Davis
20                           Ms. Margaret Lindsey Fleming
                             Mr. Kyle A. Beckman
21                           Ms. Laura Elizabeth Howell
                             STATE OF ALABAMA
22                           OFFICE OF THE ATTORNEY GENERAL
                             501 Washington Avenue
23                           Montgomery, Alabama  36130

24

25
```

```
1   APPEARANCES, Continued:

2   FOR THE DEFENDANTS:      Ms. Patricia Elaine Ivie
                             Mr. Phillip Brian Hale
3                            Office of General Counsel
                             STATE OF ALABAMA
4                            DEPARTMENT OF PUBLIC HEALTH
                             RSA Tower
5                            201 Monroe Street
                             Montgomery, Alabama  36104

6
                  Proceedings reported stenographically;
7                    transcript produced by computer.

8                    * * * * * * * * * *

9                         EXAMINATION INDEX

10  DIRECT BY MR. DAVIS                                    4
    CROSS BY MS. GRIFFITH                                 39
11  REDIRECT BY MR. DAVIS                                 60
    RECROSS BY MS. GRIFFITH                               70
12  REDIRECT BY MR. DAVIS                                 70

13                   * * * * * * * * * *

14     (The following excerpt of proceedings was heard before the

15      Honorable Myron H. Thompson, United States District Judge,

16      at Montgomery, Alabama, on Tuesday, May 27, 2014,

17      commencing at 9:06 a.m.:)

18     (The witness is sworn)

19     (Call to Order of the Court)

20          THE COURT:  What's the agenda for today?

21          MR. DAVIS:  Your Honor, the defendants are ready to

22  call Dr. James Anderson, one of our experts, who is on screen

23  and ready to go.

24          THE COURT:  Okay.  Very good.  And I have your summary

25  here?
```

```
 1            MR. DAVIS:  Yes.

 2            THE COURT:  Very good.  Just let me take a moment and

 3   read it.

 4       (Brief pause)

 5            THE COURT:  Thank you.  Go ahead.

 6            **JAMES CORR ANDERSON, M.D.**, the witness, having been

 7   duly sworn to speak the truth, the whole truth, and nothing but

 8   the truth, testified by videoconference as follows:

 9                            DIRECT EXAMINATION

10   BY MR. DAVIS:

11   Q.  Good morning, Dr. Anderson.

12   A.  Good morning there, Mr. Davis.

13   Q.  Would you state your name for the record, please.

14   A.  James Corr, C-O-R-R, Anderson, A-N-D-E-R-S-O-N.

15   Q.  And what do you do for a living, Dr. Anderson?

16   A.  I've been a physician since 1978, when I finished medical

17   school.

18   Q.  Are you board --

19   A.  In practice full-time.

20   Q.  Are you board certified?

21   A.  Yes.

22   Q.  In what areas?

23   A.  Boarded in family practice and emergency medicine.

24   Q.  Have you been retained as an expert witness by the

25   defendants in this case, the State of Alabama, state officials,
```

1  to express opinions concerning HB57?

2  A.  Yes, I have.

3  Q.  And are the expert reports you've submitted an accurate

4  reflection of your expert opinions?

5  A.  Yes, they are.

6  Q.  And your first report contained a copy of your resume.  Does

7  that contain an accurate reflection of your career achievements

8  and education background?

9  A.  Yes, they are accurate.

10      MR. DAVIS:  Your Honor, we move to admit Exhibit 3,

11  Defendant's Exhibit 3, Dr. Anderson's first report and CV,

12  Exhibit 4, which is his supplemental report.  And we tender him

13  as an expert.

14      MS. GRIFFITH:  Plaintiffs object.  Dr. Anderson has not

15  been qualified as an expert to offer the opinions stated in

16  those expert reports.  They lack foundation.

17      THE COURT:  What do you mean not offered?  You mean

18  defendants have not met the procedural requirements of stating

19  that he is -- he's to be an expert?

20      MS. GRIFFITH:  Correct.

21      THE COURT:  Okay.  Mr. Davis?

22      MR. DAVIS:  I don't understand how.  We disclosed him

23  as an expert.  They have deposed him.  He has been a practicing

24  physician for 30 years.  He's offering opinions based on the

25  reasonableness and medical necessity of a privilege requirement,

1  which we contend affects the standard of care for women who seek

2  abortions.

3          THE COURT:  You're saying you didn't receive notice

4  that he would be an expert?

5          MS. GRIFFITH.  No.  We -- we received notice, Your

6  Honor.  We just don't know in what particular areas of medicine

7  Dr. Anderson is being offered as an expert.

8          THE COURT:  Okay.  You're saying that he just doesn't

9  meet the qualifications to testify about what he's testifying.

10          MS. GRIFFITH:  Correct.  Based on what defendants have

11  put forth thus far.

12          THE COURT:  Okay, then.  I'll consider his testimony

13  under the same circumstances as I'm considering, I believe, an

14  expert from the plaintiffs; that is, I'll determine whether the

15  *Daubert* requirements have been met and, if they have, whether

16  I find the witness credible.

17          MS. GRIFFITH:  Thank you, Your Honor.

18          THE COURT:  Very good.  And I believe there was one

19  witness for the plaintiff that I applied that criteria to.  Who

20  was that?

21          MS. KOLBI-MOLINAS:  Dr. Freedman, Your Honor.

22          THE COURT:  Dr. Freedman.  Okay.  The same rule applies

23  here.  So I'll conditionally allow him to testify; that is,

24  Dr. Anderson.

25          MR. DAVIS:  Thank you, Your Honor.

1  Q.  (Mr. Davis, continuing:)  Dr. Anderson, would you tell His

2  Honor about your experiences working as an emergency room

3  physician.  How many years did you engage in an emergency room

4  practice?

5  A.  I was in emergency medicine full-time from 1984 through

6  1986 -- to 1996.  Excuse me.  Twelve years full-time.  And then

7  13 more years part-time, from 1996 to 2005.  But I had to resign

8  from the emergency room because I joined the U.S. Army Reserves

9  and did their deployments to Texas, Germany, Iraq, and

10  Afghanistan.  And I worked in the combat support hospitals in

11  emergency medicine there, as well as the step-down units

12  overseas.  So I still did emergency critical care overseas; but

13  I resigned from the hospital here, emergency room, in 2005.

14      And so the emergency medicine really spans until 2012, but

15  part of that time was with the Army.  But I joined a private

16  practice training program in family medicine in 1996 and have

17  been employed there full-time since 1996.  And we're with the

18  Medical College of Virginia here in Richmond.  And we train

19  family practice doctors in family medicine.  That's why I carry

20  a dual board certification.

21  Q.  Where did you receive your medical degree, Dr. Anderson?

22  A.  University of Virginia.

23  Q.  And you practice in the state of Virginia now?

24  A.  Yes.  My whole career.

25  Q.  Dr. Anderson, in your experience as an emergency room

1  physician, have you had occasion to treat patients who were

2  coming because of complications due to outpatient procedures?

3  A.   Yes.

4  Q.   Have some of those patients been people who have had

5  abortions?

6  A.   Yes.

7  Q.   So these were patients who came to the emergency room

8  because they had a complication due to an abortion that they had

9  previously, correct?

10  A.   Correct.

11  Q.   How frequent was that, that you saw such a patient?

12  A.   Well, I don't keep any database.  I don't have to have -- or

13  I don't have any accurate way to give you the exact number; but

14  I would say it was somewhat frequently, either monthly or every

15  other month, on some of the short-term complications, but if you

16  look at the bigger picture, the psychological impact and the

17  impact on them the long-term.

18      See, one thing about our hospital at Richmond is we're an

19  intake for the psychiatric institute there, called the Tucker

20  Psychiatric Institute.  So we saw a lot of people with

21  depression.  Now, that's been noted to be a complication of

22  abortion.  So, you know, abortion complications is a big area.

23  But I saw both short-term, acute complications as well as

24  long-term.

25  Q.   What are some of the complications a patient might have

1  because of an abortion, some of the physical complications that

2  she might have?

3  A.  Well, the -- the biggest would be persistent bleeding and

4  infection.  And you could have -- and this is more rare --

5  uterine perforation, but the bleeding and infection are your two

6  biggest.

7  Q.  Can a complication due to an abortion be a serious health

8  matter?

9  A.  It can be life-threatening, cause death.

10  Q.  Is it important that such a patient receive treatment as

11  quickly as possible?

12  A.  In the area of infection and hemorrhage, sometimes a

13  little -- a delay of an hour can mean the difference between

14  life and death with infection or bleeding, because they can both

15  be massive in this setting.

16  Q.  When that patient -- someone with a complication due to an

17  abortion, when she presents to the emergency room, is continuity

18  of care important for good treatment of that patient?

19  A.  Continuity of care is one of the foundational principles of

20  a good health care system because the treating physician knows

21  the patient.  They have an idea of the past medical history.

22  They have an idea of medications.  They know what past

23  procedures have been done, whether it's, you know, cardiac

24  intervention or surgical intervention for intraabdominal issues.

25  So the continuity of care brings a knowledge base and a

1  familiarity with the patient that is very important in the

2  present treatment of that patient.  It makes it much better for

3  the patient.

4  Q.  How would you define continuity of care?

5  A.  Well, it involves communication, accessibility, and

6  availability.  If a physician is -- probably the number one

7  request we hear from patients is accessibility.  When they need

8  us, they need someone to talk to or to see.  So continuity of

9  care involves being available, being accessible, and

10  communicating.  And sometimes it's just by phone.  Sometimes

11  it's face to face.  Sometimes it's being able to set up an

12  appointment if your back's not against the wall.  But it's

13  really those three things:  availability, accessibility, and

14  communication.

15  Q.  If a patient presented to you as an ER physician with a

16  complication from an abortion, would it be helpful to you as the

17  emergency room doctor to communicate with the abortion clinic

18  about the patient?

19  A.  It would always be helpful.  There's -- whenever you're

20  starting off brand new with a patient, you've kind of got to be

21  like a detective.  You get the history, what's going on, what

22  are the symptoms, and do the physical exam and put that

23  information together.  And if I've had a call from an abortion

24  provider giving me that information, I'm not at all starting in

25  the dark.

1    And another thing that people don't factor into the

2   situation is if a young lady comes to the emergency room and

3   she's sick and she just gets put in line with the other

4   patients, you -- I don't know she's at the area in the waiting

5   room.  I don't know what's going on until she gets back.  And if

6   the abortion provider has given me a call and says, I'm sending

7   a patient, then I can tell the triage nurse, bring them straight

8   back because I have an idea.

9    And so the time delay of just getting into the medical ER is

10  significant.  But when you get history and you get patient

11  information in the present, it just gives you a reference point

12  that you can build on when you see that patient.  So it's more

13  than just a detective, you know, getting information.  You've

14  got two points of reference that is very helpful in determining

15  where she's going in her care or in her medical situation.

16  Q.  The plaintiffs in this case retained Dr. Paul Fine to

17  express expert opinions, Dr. Anderson.  And Dr. Fine testified

18  that in his opinion, there's no real benefit to a phone call

19  between the emergency doctor and the abortion doctor or even the

20  abortion clinic.  Do you agree with Dr. Fine?

21  A.  I completely disagree with that.  I -- I've been training

22  young doctors for almost 20 years.  And there are five

23  attributes the young physician has to have.  And one of them is

24  compassion, that every patient is valuable by virtue of their

25  title.  They're all mothers, fathers, brothers, sisters, sons,

 1   daughters, husbands, wives.  People are valuable.  And the

 2   second quality is communication.  If you don't communicate by

 3   being accessible, available by phone call, basically, confusion

 4   stays on the -- (audio skip) -- longer than nonconfusion.

 5   Communication clears up the uncertainty of the situation.

 6       So I just don't see any detrimental value of a two-minute

 7   phone call versus -- I mean the information I get from that

 8   phone call.  But communication is critical.  There's not one

 9   person in the health care system that doesn't want communication

10   among other physicians or not one patient that doesn't want

11   their physicians talking.

12   Q.  Now, sometimes -- or if the doctor who performs the abortion

13   can follow the patient to the hospital and treat his or her

14   patient's complications directly, that is continuity of care,

15   one form of it.  Correct?

16   A.  Yes.  Absolutely.

17   Q.  If, for one reason or another, it's not possible for the

18   abortion doctor to go to the emergency room, would communication

19   between the emergency room doctor and the clinic be another form

20   of continuity of care?

21   A.  Absolutely.

22   Q.  What can -- what dangers might you see or face as an

23   emergency room provider -- or as an emergency room patient if

24   there's not communication between the ER doctor and the abortion

25   provider?

1  A.   I would continue to say that communication is critical in

2  three different arenas in the care of a patient.   The first is

3  like what you're referring to in continuity of care.   The

4  communication allows me to have an idea of what's been going on,

5  how long.

6       I mean if the abortion was done the day before and the young

7  lady's called the doctor and says, I've got fever, that helps

8  me.   So that anything historical about the procedure, her past

9  medical history, her medications, what she's gotten, help me

10 understand -- if she's gotten things that can lower blood

11 pressure or raise blood pressure.   So all of that, the history,

12 the time, the medication, is very important.   And it's been

13 shown to -- I mean that continuity of care there is definitely

14 tied to better clinical outcomes.

15      Another area where the communication is critical is between

16 other physicians on staff, your subspecialists.   Because if a

17 subspecialist is needed in a situation and they're brought into

18 it, they come in with a focus instead of me having to track down

19 a subspecialist.   So the phone call to either me or to the staff

20 physician helps them prepare their schedule to arrive earlier,

21 to be available, and to have focus.   So the communication is

22 between doctor to doctor, and that's been shown to be of very

23 much concern in a situation in today's primary medical world at

24 times.

25      And thirdly, the time delays.   Like I said, the phone call

1   puts everybody on alert that we're looking for a young lady that

2   has a potential of being much sicker than what she would sound

3   like if she had gone home and it was the day after abortion and

4   she's just talking about pain or bleeding.  But it gets it so

5   she doesn't wait in the waiting room.  She doesn't have to go

6   through a -- (audio skip) -- process to figure out what's going

7   on.  So communication helps with the patient care, continuity.

8   And every patient wants the physician-to-physician transfer

9   consultation process.  And it helps in time delays, whether it's

10  just waiting to get back or people being prepared to move

11  quickly.

12  Q.  You mentioned bringing in specialists on occasion,

13  Dr. Anderson.  Isn't it necessary sometimes for a doctor to

14  refer a patient to another physician?

15  A.  Well, it's probably a daily occurrence for me.  It is.

16  Because medicine is so technical and so comprehensive and

17  extensive that part of everybody's care is connecting a patient

18  with someone who's an expert in that arena, if that patient is

19  outside of my medical knowledge base or my technical skill.  So

20  that transfer of care or consultation process is something we do

21  daily.

22  Q.  When you refer a patient to a specialist, do you communicate

23  with the specialist about the patient?

24  A.  I tell the young doctors, as well as my own practice, you

25  will do a much better job if you treat the subspecialist with

1    respect and dignity and give him a heads up or her a heads up

2    and say, this is what I need.  I'm worried about this.  And I've

3    done this test and I've done this.  Can you help me in this

4    arena?

5        And they always are appreciative of that because they know

6    where to drill down and they don't feel like I'm just kind of

7    sloughing off on them.  I'm making an appeal that I need their

8    help, and you treat them with dignity and respect.  It turns out

9    to better patient care.  They go in there and their patients get

10   better care and I get a better consult.  So it's a win-win for

11   all of us.

12   Q.  So you share information and records with specialists when

13   you refer patients, correct?

14   A.  Absolutely.  I copy their record, I fax it to their chart --

15   I mean to their office.  I copy that record and give it to the

16   patient with a letter from me.  And many times if my back is

17   against the wall timewise, I'll also do the phone call.  Now, if

18   I send them to the emergency room, I always do two or three

19   phone calls.  I'll call the ER doctor, I call the -- our doctor

20   who's in the hospital, and then I'll call the subspecialist

21   about them.

22   Q.  So do you remain involved in your patient's care after he or

23   she has been referred to a specialist?

24   A.  Yes, we do.  They'll either give a courtesy consult or if

25   they want us to manage something -- like if I send someone to a

1    surgeon, they want us to still manage their hypertension and

2    diabetes and ongoing medical problems.  So many times you're

3    there just to say hi.  The patients use you as a reference

4    point.  So courtesy privileges, you know, courtesy visit, we

5    don't charge for; but a lot of times they want us to handle the

6    medical situation.  And in the case of a subspecialist, like a

7    gastroenterologist or endocrinologist, they're kind of narrow in

8    their area of expertise so they want us to take care of other

9    situations as well.  So we're very much involved in the

10   patient's care.

11   Q.  Are you familiar, Dr. Anderson, with the admitting

12   privileges requirements of HB57 as applied to doctors who

13   perform abortions?

14   A.  Yes, I am.

15   Q.  Do you have an opinion, based on your education and

16   experience, of whether this provision is reasonable and

17   medically necessary?

18   A.  Yes, I do.  I believe it is reasonable and medically

19   necessary.

20   Q.  You believe it will improve the quality of care for abortion

21   patients?

22   A.  I believe it will improve the quality of care for women who

23   experience postabortion complications.

24   Q.  Speaking of complications, Dr. Anderson, Dr. Fine, one of

25   the plaintiff's experts that I mentioned before, has testified

1   that the rate of complications for abortion patients is very

2   low.  Do you agree?

3   A.  Well, it -- I don't have a database of my patients that I've

4   seen with complications.  But in 2002, I was in a court case in

5   Alaska, and they asked me for numbers, and I had to kind of

6   guess.  I didn't have a database.  But basically, I would say I

7   would see one or two a month or every other month.  But that's

8   just -- I don't -- that's my best guess estimate.  And I don't

9   know if -- how accurate that is.  I have no way of determining

10  it.  But I have seen many complications, and never have I

11  reported one because there's no vehicle in which to report it.

12  There's no database that you can input that information to.

13  There's nobody -- I mean the health department doesn't collect

14  that information.

15      So when I'm looking at reporting institutes, knowing that,

16  really, between two-thirds and one-half of women do not follow

17  up with the abortion provider and many of them come to the ER,

18  they don't have any idea of the women that have come to the ER

19  for minor complications, per se.  They can be severe; but for

20  the most part, it's early and it's minor and we can treat it

21  without them needing admission or anything.  So I would say,

22  from my perspective, the data collection is very poor, very

23  inconsistent, and there's no vehicle to make that so that it is

24  good data, that I know of.

25  Q.  Have you had patients who are reluctant to share that

1  they've had an abortion?

2  A.  Very often.  I mean I wouldn't say it's the majority of

3  patients, but it's a significant minority that are really

4  fighting the guilt or sense of shame or being labeled.  It's

5  something that they're not proud of.  And it's private

6  information.  And I've had them tell me they haven't had an

7  abortion when actually they have.  And I've had them tell me,

8  please don't disclose on my medical record that I've had an

9  abortion, because it's hidden from family and friends, and they

10  don't want any way that it can come back.

11  Q.  Let's go -- let's go back to your emergency room experience,

12  Dr. Anderson.  When you have treated patients who have had

13  complications resulting from abortions, have you had the benefit

14  of communication with abortion providers?

15  A.  Well, in my -- at Chippenham Hospital and Johnston Willis

16  Hospital in Richmond, Virginia -- I've been in those hospitals,

17  like I said, 24 years -- 23 years.  And I never have received

18  once a call from an abortion provider about a young lady that he

19  was worried about and he would like me to see.  I've never

20  received an initiatory phone call.  Now, I've called them to let

21  them know and to give them information, but I've never had a

22  phone call initiated by the abortion provider.

23  Q.  When there has been no communication between you and the

24  abortion clinic, you've still been able to treat the patient,

25  correct?

1  A.  Yes.  I mean it takes longer to figure out what's going on

2  and the degree of her illness, the -- how far the problem has

3  gone, the bleeding or the infection.  But yes, absolutely, we

4  treat as soon as we can.

5  Q.  But would the treatment be better and quicker if you had

6  good communication between you, the ER doctor, and the abortion

7  provider?

8  A.  There is no question about that.  Continuity of care has

9  been shown over and over to improve clinical outcomes.  In a

10  good health care system, Jim, the -- the patient's safety and

11  the patient outcome is our top priority.  If you have a

12  patient-centered health care system, that's your priority.  Now,

13  if you have a doctor-centered health care system, it can get

14  entered as a convenience or things like that.  But all of us

15  want a patient-centered health care system where clinical

16  outcomes, patient safety are our top priority.  And continuity

17  of care has been shown over and over again to impact clinical

18  outcome and patient safety.

19  Q.  Dr. Anderson, I want you to assume that some of the clinics

20  in Alabama do not retain doctors who have local admitting

21  privileges.  I want you to assume that they retain doctors who

22  come from other cities for a day, perform abortions, and then go

23  back to their home cities.  What dangers does that model present

24  to patient care?

25  A.  Well, let me see.  Let's go to the credentialing process

1   that this law is making mandatory.  The credentialing process,

2   looking at a physician's comprehensive knowledge base and

3   technical skills proficiency has been -- really been shown to be

4   a very important thing for patient safety and clinical outcomes.

5   So if you have physicians that fly in and fly out or come in and

6   come out and they're not scrutinized by this very rigorous,

7   protective process, that can really leave women wide open if

8   they place their trust in a physician that could be unqualified,

9   both from a technical standpoint or from a knowledge-base

10  standpoint, to do this procedure.

11      And really, the key that you and I are driving at here is

12  physician and qualifications that are scrutinized and,

13  therefore, protective for the patient as well as the

14  vulnerability of the patient.  The patient trusts the physician,

15  that they've gone through some qualification process.  And

16  there's not been the process if they're coming in and going out

17  and don't have hospital privileges scrutiny.  So I think it

18  really leaves a major crack in the system that a vulnerable

19  young lady can fall into when she places her trust into that

20  physician.

21  Q.  Okay.  Let's pause there for just a second.  If -- do I

22  understand you to say that if a doctor has no privileges

23  anywhere, that they're missing an important check on their

24  qualifications?

25  A.  Yes.  I mean local or if they don't have privileges in other

1   hospitals.  It could be out of state.  That is beneficial for
2   sure.  But the local privileging brings them into the continuity
3   of care, the staff relationships, the communication, and the
4   time delays we talked about earlier.  But most hospitals are
5   governed by the Joint Commission and have a very rigorous
6   qualification scrutiny of physicians.  So out-of-state
7   hospitals' scrutiny should be somewhat equivalent from one
8   hospital to another, but I don't have experience in that realm
9   to give you an expert opinion on that.
10  Q.   Okay.  You mentioned continuity of care again, which can be
11  an advantage of having local privileges.  So are there problems
12  with continuity of care if a doctor lives in one city and treats
13  patients far away and then goes back home?
14  A.   Well, what I said, continuity of care involves
15  accessibility, availability, and communication.  So that doctor
16  who travels can communicate by phone if they take the initiative
17  to do that; but they're really not accessible and available if
18  they're out of touch, if they're on a plane, if they're out of
19  the city.  And it is very different than having your own
20  partner, who has access to your medical information, taking call
21  for you.
22      So I would say the continuity of care in that arena is zero
23  for the most part, except maybe a phone call.  But it's --
24  it's -- if it's -- if there's any, it's minuscule if the doctor
25  doesn't have relationships and a practicing physician partner

1   with him or her that has access to the information.

2   Q.   Okay.   Let's say a woman gets an abortion in her home city.

3   The doctor who performs the abortion has admitting privileges in

4   that same city.   If she has a complication, can, in many

5   situations, the doctor -- if the doctor is going to send her to

6   the emergency room, ask her to come to a particularly --

7   particular emergency room where -- where the doctor practices?

8   A.   I'm not sure I heard you right.   If the doctor lives in a

9   city that's different than her, he would ask her to come back to

10  her -- his city?

11  Q.   No.   I asked that poorly.   I asked that poorly,

12  Dr. Anderson.   Let's say everything is in the same city.   The

13  doctor practices in Birmingham, has privileges in Birmingham,

14  the woman lives in Birmingham.   Doctor has privileges at UAB

15  Hospital.   The doctor can say, you need to go to the emergency

16  room; I want you to come to the UAB emergency room so I can

17  treat you there.   Is that correct?

18  A.   Yes.   I mean -- yes.   That is correct.

19  Q.   And that would help continuity of care.

20  A.   Yes.   That -- that same physician who initiated treatment

21  and knows the patient is involved.   That's really what

22  continuity of care is.

23  Q.   But let's say the woman lives in Atlanta and she's chosen to

24  drive to Birmingham for an abortion for personal reasons and

25  then she goes back home to Atlanta.   Well, her doctor has

1    privileges in Birmingham.  So if she goes to the ER, she's most

2    likely to go to the ER in Atlanta, correct?

3    A.   Yes.

4    Q.   Is there any benefit to that patient to her doctor having

5    privileges in a Birmingham hospital?

6    A.   Outside of, you know, what we said about qualifications.  If

7    you get privileges anywhere, that's a good scrutiny.  But she

8    needs to go to the ER closest to her if at all, you know,

9    worried about hemorrhaging or infection.  You know, a phone call

10   at that time is the best they can do.  I mean in certain

11   situations, all you and I have is the best we can do.  And so

12   you've kind of got to opt for what's best for the patient.

13        In this case, I would say it's best for the patient to go to

14   the ER, notify the abortion provider in Birmingham, and have him

15   or her call the physician -- ER in Atlanta.  I mean it's easy to

16   call long distance.  You know that, I know that, and I do that

17   when I get a patient come in.

18   Q.   So the doctor can communicate with the emergency room in

19   Atlanta, but consider this, Dr. Anderson.  If the doctor in

20   Birmingham has local admitting privileges and is more accustomed

21   to following his patients through the emergency room and observe

22   continuity of care, is that doctor more likely to observe

23   continuity of care than a doctor who routinely flies in and out

24   and just refers patients to emergency rooms?

25   A.   Well, you're talking about habits.  That's what you're

1   talking about.  And with the young physicians, I tell them all

2   day long, you develop habits now that will last for 30 years.

3   If you're not going to be sloppy now, it will carry you through

4   30 years.  And the continuity of care habits, once they're

5   ingrained in you, you try to operate by those habits.

6      So if you're used to not communicating, if you're used to

7   not calling the ER physician, then you won't do it at any time,

8   because that's your norm.  That's your day to day.

9   Q.  So in that circumstance, it's still a benefit to the patient

10  if the doctor has admitting privileges and is accustomed to

11  observing continuity of care.  Would you agree with that?

12  A.  Yes.  Absolutely.

13  Q.  If an abortion clinic routinely depends on emergency rooms

14  to take care of their patients, is this likely to result in

15  delays and affect the speed of treatment?

16  A.  And affect what?

17  Q.  Affect the speed of treatment.

18  A.  Yes.  Because it -- the emergency room doctor has to start

19  over:  And how long was the gestation?  What procedure was done?

20  And like I said, I've had patients that denied the abortion.  So

21  you have to start off as a detective right from the beginning.

22  You might not even mention abortion.  If they come in and they

23  have a fever and you're thinking, well, they could just have a

24  pneumonia, they could have a gastroenteritis.  So in that

25  situation, time delays are very much a part, potentially.  And

 1   then again, like I said, if you don't get a phone call, the

 2   patient might sit out in the waiting room and be in extreme

 3   distress, but nobody knows because that young lady is sitting

 4   there quietly and just waiting her turn, and her blood pressure

 5   and her sickness might be getting worse.

 6       So if the physician doesn't communicate normally with the ER

 7   doctor, there's -- just would be fraught with problems.

 8   Q.   And if an abortion clinic routinely relies on emergency

 9   rooms to treat their patients' complications, does that make

10   miscommunications more likely?

11   A.   It almost guarantees it.  Because when you get a 14- or a

12   15-year-old young lady who's had an abortion and she's scared to

13   death and you start asking her medical questions, you can't get

14   information from her, for the most part.  I mean sometimes you

15   can, but young people who are real scared -- and it doesn't have

16   to be young.  If people are sick, their communication skills get

17   inaccurate.  They feel lethargic, they feel poorly, and they

18   just want to get better.  So I would say it is fraught with

19   complications if the ER doctor is just considered normal

20   postabortion care.

21   Q.   Let's go back to admitting privileges, Dr. Anderson.  Do you

22   have admitting privileges at a hospital in Virginia?

23   A.   I do.

24   Q.   How many hospitals?

25   A.   Over my medical career, when I worked in different emergency

1  rooms, I would say six or eight hospitals in Virginia and

2  emergency room privileges.  And only two have I admitted

3  patients to, Chippenham Hospital and Johnston Willis Hospital,

4  as far as my family practice, general medical care.  I have

5  admitting privileges there.  And the Army gave me admitting

6  privileges when I was deployed by them in Landstuhl and

7  Beaumont, Texas, and in Afghanistan; Landstuhl, Germany, and

8  Iraq and Afghanistan.  I had to go through the credentialing

9  process with them every other year, that whole process.

10 Q.  As part of that credentialing process, do you have to

11 satisfy the hospitals of your qualifications as a doctor?

12 A.  It's very extensive.  You've got to get letters of

13 recommendation.  They go to your continuing education.  They go

14 to your technical skills as far as what I would do in emergency,

15 intubate and subclavian lines, proving that I was technically

16 proficient.  They look at my board status and my

17 recertification.  So -- and then they pass it through a board of

18 their own to check.  Then they call physicians that I work with.

19 Q.  Are you aware, Dr. Anderson, of any other states that, like

20 Alabama, has passed a statute requiring abortion doctors to have

21 local admitting privileges?

22 A.  I have.  Five different states, Mississippi, North Dakota,

23 Wisconsin, Alabama, and Texas have passed similar legislation.

24 Q.  Do you know if the law has gone into effect in any of those

25 states?

1    A.   Only in Texas that I know of.   I'm not sure if -- if -- I

2    don't think it's gone in effect in any other states; but in

3    Texas, it has.

4    Q.   Do you know if people can still get abortions in Texas?

5    A.   Yes.   I mean I -- in the deposition that we did for -- for

6    this case here in November, I received information from the

7    Attorney General's Office in Texas that an abortion provider had

8    applied for admitting privileges, received those admitting

9    privileges, and was continuing in providing abortions for the

10   women in his area.

11   Q.   There's been testimony in this case, Dr. Anderson, that a

12   doctor might be reluctant to apply for privileges because she's

13   fearful that the application will be denied and that will be a

14   stain on her record going forward.   Are there reporting

15   requirements if an application for privileges is denied?

16   A.   Yes, there are.

17   Q.   Do all denials get reported?

18   A.   No, they don't.

19   Q.   Are you familiar with the National Practitioner Data Bank

20   Guidebook, Dr. Anderson?

21   A.   I am.   I am.

22   Q.   And what's your understanding of what types of denials must

23   be reported?

24   A.   The ones that are based on physician competency and patient

25   care.   If a physician's privileges are denied for maybe

1    advertising or something like that, that's really not patient

2    care and physician competency.  That does not need to be

3    reported.  But if it has to do with patient safety and patient

4    care, the denial, then that has to be reported to the national

5    data bank.

6                MR. DAVIS:  Your Honor, I'm going to ask the witness

7    some questions about a document.  I have provided a copy to the

8    plaintiffs, and I have a copy for Your Honor as well, if I may

9    approach.

10               THE COURT:  Okay.  Go ahead.

11               MS. GRIFFITH:  Your Honor, I'd just like to reaffirm

12   our earlier objection in that Dr. Anderson has not established

13   experience with granting admitting privileges or being charged

14   with admitting privileges or making determinations about whether

15   or not denials need to be reported under the guidebook that he's

16   about to talk about.

17               THE COURT:  I know that defense counsel filed a brief

18   challenging the *Daubert* qualifications of two of the plaintiffs'

19   expert witnesses; is that correct?

20               MS. GRIFFITH:  Correct, Your Honor.

21               THE COURT:  And you filed a response?

22               MS. GRIFFITH:  Yes, Your Honor.

23               THE COURT:  Have you actually filed a brief challenging

24   the *Daubert* qualifications of this witness as well as any others

25   whom you contend do not meet the qualifications as an expert?

1          MS. GRIFFITH:  We have not, Your Honor.  Our intention

2    was to develop that during his testimony.

3          THE COURT:  Well, then, I have to wait --

4          MS. GRIFFITH:  And we did not know --

5          THE COURT:  I'll -- rather than interrupting

6    constantly, why don't you just reserve your challenge and either

7    let me know in writing exactly why I should not credit his

8    testimony and then I'll hear from plaintiffs in response.  Why

9    don't we put a tickler on this and any other experts whom you

10   contend I should discredit.  And then let me know why I should

11   not believe them, either because as a gatekeeper or whether I

12   should not believe them -- even if they are experts, I just

13   shouldn't find them qualified.  I need to know that in writing,

14   and I think I need to give the plaintiffs an opportunity to

15   respond.

16         MS. GRIFFITH:  Thank you, Your Honor.

17         THE COURT:  Okay?  With that understanding, as I said

18   before, I'll allow the testimony conditionally.

19         Go ahead.

20   Q.  (Mr. Davis, continuing:)  Dr. Anderson, is the reporting

21   requirement that hospitals face for denial of privileges, is

22   that something that's common knowledge among doctors?

23   A.  I would say no.  It's not common knowledge.  Because not

24   many doctors are covering that extensively.  Now, there is more

25   shift now than there's ever been; but in my range of physicians,

1    I've worked with groups that have been present for 30 years and

2    we've been operating -- I mean practicing medicine in the same

3    community.  So applying for privileges at a lot of different

4    hospitals is really unknown -- or not common practice for us.

5    That's my guess, that it's not that well-known.

6    Q.  Now, you are aware personally, though, that there are

7    reporting requirements, correct?

8    A.  Yes.

9    Q.  And you're aware that there are limitations on those

10   reporting requirements.

11   A.  Yes.

12   Q.  Is that something you've come to learn over your experience

13   as a doctor practicing in a hospital, over the course of your

14   career?

15   A.  You know, the database came in during my career.  And where

16   I'm kind of familiar with it is the malpractice situation.  So

17   it's just recently on this type of exposure that I'm familiar

18   with it in other cases.  I mean I didn't know that the database

19   was used in any way beyond the malpractice.  I've never been to

20   it until now in these cases.

21   Q.  Would you -- do you have a copy of the guidebook with you,

22   Section E, specifically?

23   A.  Yes, I do.

24   Q.  Would you look at page E-17, Dr. Anderson.

25   A.  All right.  I have it.

1   Q.   And do you see in the left column, the second paragraph that

2   begins, Reportable adverse clinical privileges?

3   A.   Yes.

4   Q.   Would you read that paragraph for the record, please.

5   A.   Reportable adverse clinical privileges actions are based on

6   a physician's or dentist's professional competence or

7   professional conduct that adversely affects or could adversely

8   affect the health or welfare of a patient.

9   Q.   Thank you.   That's --

10  A.   Hospital and other -- okay.

11  Q.   You can stop there, Dr. Anderson.   And let's --

12  A.   It's easy reading.

13  Q.   And look at the next page, please, page E-18.

14  A.   All right.

15  Q.   Do you see in the right-hand column the heading, Denial of

16  Applications?

17  A.   I don't think I have that.

18  Q.   Page E-18.

19  A.   Yeah.   I think I have E-17 and E-19.   I don't think I

20  printed out E-18.   I'm sorry.

21  Q.   Okay.   Well, let me ask -- let me read this and ask if this

22  is your understanding of what the guidebook requires; that,

23  quote, A restriction or denial of clinical privileges that

24  occurs solely because a practitioner does not meet a health care

25  institution's established threshold eligibility criteria for

 1    that particular privilege is not reportable to the NPDB, which,

 2    of course, stands for National Practitioners Data Bank.  And

 3    then quoting again, Such restrictions or denials are not deemed

 4    the result of a professional review action relating to the

 5    practitioner's professional competence or professional conduct

 6    but are considered decisions based upon eligibility.

 7        Is that consistent with your understanding of what the

 8    guidebook requires?

 9    A.   Yes.  Yes.

10    Q.   So Dr. Anderson, if a doctor applies for privileges and the

11    hospital says, we're not going to grant you privileges because

12    of where you live, is that based on physician competence, and

13    would that be reportable?

14    A.   No.  It doesn't have anything to do with that.

15    Q.   What if a hospital denies privileges because a doctor --

16    because they don't believe the doctor will meet some minimum

17    admissions requirement?  Is that based on qualifications, and

18    would that be reportable?

19    A.   No, it would not.

20    Q.   And then page E-19, Dr. Anderson.  You do have that page?

21    A.   I have some of it.

22    Q.   Do you have the left-hand column that begins, Withdrawal of

23    applications?

24    A.   No, I don't.  I have adverse actions, but -- yeah, I don't

25    have that.  I remember reading that, but I don't have that.  I'm

1    sorry.

2    Q.   Thank you.  Well, if you read that, then does it sound

3    correct to you, Dr. Anderson, that, quote, Voluntary withdrawal

4    of an initial application for medical staff appointment or

5    clinical privileges prior to a final professional review action

6    generally is not reportable to the NPDB?  Is that consistent

7    with your understanding of the requirements?

8    A.   Yes.

9    Q.   So if a doctor voluntarily withdraws an application for some

10   reason other than physician competency, is that reportable under

11   your understanding?

12   A.   It is not reportable.  They're looking for qualification,

13   competency, conduct and -- that are relevant to patient care,

14   patient outcome, patient safety.

15        MR. DAVIS:  Your Honor, in light of questions that

16   plaintiffs may raise about Dr. Anderson and with the reading

17   that we've done, I would move that the copy of the National

18   Practitioners Data Bank Guidebook be admitted as an exhibit.  It

19   would be in the nature of a rebuttal exhibit because of

20   testimony that has arisen earlier in the trial and so that Your

21   Honor would have a record of what the National Practitioner Data

22   Bank requires for reporting.

23        THE COURT:  Have you highlighted the parts you want me

24   to look at so I don't have to read this document, which is --

25        MR. DAVIS:  I have not --

```
1              THE COURT:  -- pretty lengthy?
2              MR. DAVIS:  I have not physically highlighted a copy
3    yet, Your Honor.  Everything that we would refer Your Honor to
4    would be on pages E-17 through E-23.  Those six or seven pages.
5              THE COURT:  It's admitted subject to, as I said, my
6    ultimate decision as to whether I should consider this
7    testimony.
8              Anything else?
9              MR. DAVIS:  Yes, Your Honor.
10             THE COURT:  Go ahead.
11   Q.  (By Mr. Davis, continuing:)  Dr. Anderson, are you aware of
12   a regulation that's presently in effect in Alabama that permits
13   abortion clinics to operate even if the doctors don't have
14   admitting privileges but if they, instead, have a written
15   contract with an outside covering physician?
16   A.   Yes.
17   Q.   Is that arrangement sufficient, in your opinion, to ensure
18   continuity of care?
19   A.   It -- it's helpful.  It's not the best.  But if -- if that
20   physician has access to the medical records, if that physician
21   will communicate and be accessible to the ER physician so that
22   if a patient calls a clinic, that physician will handle that
23   transfer.  And so it really depends if it's in name only or if
24   it's somebody that's sharing call or a partner who has access to
25   the information.  But just to have a name only doesn't do
```

1    anything for the continuity of care.

2    Q.   Okay.

3    A.   So I'm not sure on the degree of involvement this individual

4    is.

5    Q.   If the clinic's practice is not to involve the outside

6    contracting physician as a matter of course but, instead, to

7    simply send patients to the emergency room, does that affect

8    your opinion on how effective that would be?

9    A.   Well, it's just a hollow shell.  I mean it might look like

10   it could help continuity of care; but if that physician doesn't

11   communicate and doesn't have access to information and doesn't

12   know the patient, then the accessibility, the availability, and

13   the communication that continuity of care implies, there's no

14   benefit.  So I would say it doesn't satisfy any of the

15   continuity of care desires that the law would have.

16   Q.   In your experience, do patients like going to a crowded

17   emergency room and waiting to see a doctor they've never met?

18   A.   Well, they put it off as long as they can.  They will wait

19   to make sure they're super sick before they do that.  And that's

20   what happens in our overcrowded emergency rooms is that patients

21   who haven't been there before or who don't want to go there and

22   meet a new physician or the expense -- I mean all of those

23   things -- say I don't want to go there, until they really

24   realize that they have to.

25        I had a call from a young lady that was super sick, and she

1  had waited three days.  Now, she wasn't an abortion

2  complication.  But as soon as she talked to me on the phone, I

3  said -- this is just two weeks ago -- you've got to go to the

4  ER.  And then she went to immediate surgery.  But she put it off

5  for three days because of expense.  She didn't have insurance

6  and didn't want to go and do that.  So when you talk about

7  crowding, new doctor, and expense, it's a big hurdle.

8  Q.  If a woman has a complication resulting from an abortion,

9  can that delay be detrimental to her health?

10  A.  Absolutely.

11  Q.  Do you know, Dr. Anderson, if physicians who practice in

12  ambulatory surgery centers typically have privileges?

13  A.  Well, the ambulatory surgical center that I use here, that

14  I -- the ear, nose, throat physicians and other -- the

15  urologists that I use in my practice, when I talk to them, it's

16  mandatory by -- to be on the group, you have to have admitting

17  privileges.  It's just a group requirement that they have

18  admitting privileges because they want them to be able to follow

19  up their patients in the hospital.

20  Q.  In your experience, do doctors who practice in ambulatory

21  surgery centers, are they typically local or do they fly in and

22  out?

23  A.  Well, the American Academy of Surgeons really condemns the

24  fly-in and fly-out because of a sense of abandonment to patient

25  care.  So they forbid their doctors fly in and fly out.  They're

1   all local physicians.

2   Q.   Dr. Anderson, based on your experience and education, is it

3   your opinion to a reasonable degree of medical certainty that if

4   doctors in Alabama who perform abortions were required to obtain

5   admitting privileges at a local hospital, that abortion would be

6   safer in our state?

7   A.   The complications of abortion as well as probably the

8   procedures would be safer.  I would agree.  Because on a number

9   of issues -- we've already said the scrutiny of hospital

10  privileging helps identify the comprehensive backgrounds of the

11  physician and the technical proficiency or the proficiency of

12  their technical skills.  So that's related to patient safety and

13  patient care.  And then being on staff, it improves the

14  continuity of care with the patient and improves communication

15  with the physician staff and reduces time delays if a patient

16  does come to the emergency room.  So in those areas, I would say

17  it would improve both abortion care as well as the care of women

18  experiencing complications of abortion.

19  Q.   And is it your opinion to a reasonable degree of medical

20  certainty that such a privileges requirement would reduce the

21  likelihood of communication errors in patient care?

22  A.   Yes.  Yes.  Just -- once you have a hospital's governing

23  board and their standard of care for consultation and transfer

24  of patient care, then both the admitting physician and the

25  subspecialist are operating on the same playing field or

1  expectations.  And it -- it holds you accountable.  If you don't

2  do it and things fall through the cracks, you have to answer for

3  it.  Now, if that physician does not have admitting privileges,

4  there's no standard of care that he or she is held accountable

5  to, so they can walk away from the situation, and then the

6  medical staff is just charged with picking it up and doing the

7  best they can.  So I would say yes.

8  Q.  And would the privileges requirement reduce the -- reduce

9  the likelihood of delays in treatment?

10  A.  It sure would.  It would cut down -- I mean care would get

11  instituted quicker.  You would start off with a knowledge base

12  of that patient sooner.  The patient would really come to the ER

13  sooner if they talked to their abortion provider and he or she

14  said go to the ER sooner than if that abortion provider wasn't

15  available and they just wait till the last minute before they

16  were sick enough that they knew they had to go.

17          MR. DAVIS:  Thank you, Dr. Anderson.

18          That concludes the direct examination, Your Honor.

19          THE COURT:  Very good.

20          MS. GRIFFITH:  Your Honor, may I have a brief moment

21  before we proceed?

22          THE COURT:  Yes.  Do you want like five minutes?

23          MS. GRIFFITH:  That would be great, Your Honor.  Thank

24  you.

25          THE COURT:  Pardon me?

```
 1           MS. GRIFFITH:  That would be wonderful, Your Honor.
 2  Thank you.
 3           THE COURT:  We'll take a five-minute recess.
 4           MR. DAVIS:  Your Honor, I'm not sure the witness
 5  understands what's going on.  May I just tell him we're on a
 6  recess?
 7           THE COURT:  Yes, you may.
 8           MR. DAVIS:  Dr. Anderson, the Court is in recess for
 9  five minutes.
10           THE WITNESS:  You don't want me to drive away?
11           MR. DAVIS:  Please, no.
12           THE WITNESS:  Okay.
13      (Recess at 10:06 a.m. until 10:22 a.m.)
14           THE CLERK:  Please remain seated.  Court is in session.
15           THE COURT:  Proceed.
16                         CROSS-EXAMINATION
17  BY MS. GRIFFITH:
18  Q.  Good morning, Dr. Anderson.  My name is Dyanne Griffith.
19  I'm one of the attorneys here with the plaintiffs, and I believe
20  we've met before there in Richmond.  So I just wanted to follow
21  up on your qualifications you were discussing with counsel
22  before the break.  You've not published any report in a
23  peer-reviewed journal, correct?
24  A.  No.  You're correct.
25  Q.  And the last time that you worked in an emergency room
```

1  outside of the military hospitals was in 2005.  That's right?

2  A.  That's correct.

3  Q.  And you --

4  A.  I'm still board certified.  I mean I still maintain my ER

5  certification, so I'm still actively board certified and could

6  work in the ER.

7  Q.  But you have -- but you have not, outside of the military

8  hospitals, since 2005, correct?

9  A.  That's correct.

10  Q.  And you are only board certified in family and emergency

11  medicine, correct?

12  A.  That's correct.

13  Q.  And you've not completed a residency outside of those two

14  areas, correct?

15  A.  That's correct.

16  Q.  You've been provided or been retained to provide expert

17  testimony in support of similar admitting privileges

18  requirements, correct?

19  A.  Correct.

20  Q.  And that's in Wisconsin?

21  A.  Yes.

22  Q.  And in Texas?

23  A.  Yes.

24  Q.  And in Mississippi?

25  A.  Yes.

1  Q.   And in North Dakota.

2  A.   Yes.

3  Q.   And you have also provided expert testimony or expert

4  reports in other cases in support of laws that would restrict

5  access to abortion, correct?

6  A.   Parental notification in Alabama -- I mean -- excuse me --

7  in Alaska and Florida.   The parental notification laws in those

8  two states.

9  Q.   And it's also true that you belong to a number of

10  organizations that advocate for abortion restriction, correct?

11  A.   They advocate something better than abortion.   I wouldn't

12  say abortion restriction, but we do have what I believe are

13  better alternatives.

14  Q.   Those organizations advocate for abortion regulation; is

15  that right?

16  A.   I guess.   I mean the physician -- Physicians for Unborn

17  Children -- Unborn Child we dissolved in 1988.   And we worked on

18  a viability bill that said once a child had a 20 percent chance

19  of survival, then abortion wouldn't be an option.   And that's

20  about 21 weeks' gestation.   So that is an abortion limitation

21  based on time and age.

22  Q.   Thank you, Dr. Anderson.   Do you have your expert report

23  with you today?

24  A.   I do.

25        MS. GRIFFITH:   Is that Exhibit 3, Jim?

```
 1            MR. DAVIS:  Three.
 2   Q.  I believe that should be marked as Defendant's Exhibit 3,
 3   Dr. Anderson.
 4   A.  Okay.
 5   Q.  Now, if you could turn --
 6            THE COURT:  Could I just interrupt you for just a
 7   minute?  I did not understand your response to the last
 8   question.  You said, I guess I mean the physicians -- physicians
 9   from unborn children -- unborn child we dissolved in 1988.  Did
10   you mean dissolved?  What were -- what were you saying?  I just
11   didn't understand your answer.
12            THE WITNESS:  Are you asking me?
13            THE COURT:  Yes.
14            THE WITNESS:  Oh.  We no long -- we disbanded that
15   organization in 1988.
16            THE COURT:  Oh, okay.  It's the organization that you
17   disbanded.
18            THE WITNESS:  Yes.
19            THE COURT:  Okay.  Go ahead.
20   Q.  (By Ms. Griffith, continuing:)  Dr. Anderson, you have
21   Defendant's Exhibit 3, your expert report, there?
22   A.  Yes.
23   Q.  And if you could turn to paragraph three, I'm going to read
24   the second sentence of that -- of that paragraph:  CMS
25   guidelines state that the ambulatory surgical center, ASC, must
```

1   ensure that all physicians performing surgery in the ASC have

2   admitting privileges at a hospital that meets the requirements

3   of paragraph B2 of that section.

4        Did I read that correctly?

5   A.   Yes.

6   Q.   Now, during your deposition, which I -- do you have a copy

7   of your deposition there, Dr. Anderson?

8   A.   I do.   Mr. Davis told me to print it out.

9   Q.   Well, I'm hoping that you have page 120.

10  A.   Is this where you corrected me?

11  Q.   It may be, yes.

12  A.   Okay.   I thought this was familiar.   All right.   120.

13  Q.   Okay.   Now, Dr. Anderson, if you'll recall, during your

14  deposition, we were looking at the CMS guidelines that you had

15  quoted from in paragraph three of your expert report.   That's

16  the paragraph that you -- the sentence that you just read for

17  us.   Does that sound familiar?

18  A.   Yes.

19  Q.   Okay.   And then in your deposition, you read that section of

20  the CMS guidelines.   And I'm going to read that for you now.

21  It's on page 120, starting at line 17:   The ASC --

22  A.   I'm there.

23  Q.   The ASC must have a written transfer agreement with a

24  hospital that meets the requirements of paragraph B2 of this

25  section or ensure that all physicians performing surgery in the

1   ASC have admitting privileges at a hospital that meets the

2   requirements of paragraph B2 of this section.

3       Did I read this correctly?

4   A.   You did.

5   Q.   And based on your recollection from the deposition, that was

6   an accurate representation of what was in the CMS guidelines,

7   correct?

8   A.   Correct.

9   Q.   Did you write that second sentence in paragraph three of

10  Exhibit 3 knowing that you were leaving out the first half of

11  the sentence?

12  A.   No, I did not.  You corrected me on the deposition.

13  Q.   Okay.  So now it's clear that HB57 does in fact have an

14  alternative -- or HB57 is not similar in that it has an

15  alternative to a physician maintaining privileges, correct?

16  A.   Correct.

17  Q.   Do you also have a copy of your supplemental report with

18  you, Dr. Anderson?  I believe that is Exhibit 4, Defendant's

19  Exhibit 4.

20  A.   I do.

21      (Brief pause)

22  A.   All right.

23  Q.   Now, in this report, you purport to rely on a NAF

24  publication.  Does that sound correct?

25  A.   We quoted that, yes, on page 2.

1  Q.  When you submitted your supplemental report, you had not in

2  fact reviewed that NAF publication, correct?

3  A.  Correct.

4  Q.  In fact, you had only read the one sentence that was

5  included in your report, correct?

6  A.  Now, on this, I didn't refer to that in this expert report.

7  I don't remember.  I -- I don't remember so far as -- what are

8  you referring to?

9  Q.  Do you have -- you have your supplemental report that's

10 Exhibit 4?  I'm referring to --

11 A.  I --

12 Q.  -- paragraph seven.

13 A.  Yes.  Now, what's your question about that?

14 Q.  My question was at the time that you signed this report, you

15 had only --

16 A.  This report?

17 Q.  Yes.  This supplemental report, Dr. Anderson.

18 A.  Okay.

19 Q.  -- you had only read the portion of the NAF publication that

20 is included in this report.  Those are the sentences in

21 paragraph seven.

22 A.  Yes.

23 Q.  And it's accurate to say that you did not attempt to access

24 that Web site at the Internet address that you provided in the

25 text of that report; is that correct?

1   A.   At that time or now?

2   Q.   At that time.

3   A.   Yes, that's correct.  I had not accessed the Web site.

4   Q.   Did you -- did you have any idea when you signed your report

5   that neither the quote nor the publication you reference appears

6   on the Web site that you quoted in the text, that you cited to

7   in the text of your report?

8   A.   Well, I went to that Web site.  I mean the other day, I

9   looked at this.

10  Q.   You went to the Web site that is in the text of your report?

11  A.   Well, I went to a link.  It was archived.  I went to an

12  archive link that showed this.

13  Q.   And when did you do this, Dr. Anderson?

14  A.   Well, I did this afterwards, and then I did this the other

15  day.

16  Q.   Okay.  So when you signed --

17  A.   But not before.

18  Q.   When you signed your supplemental report, you had not

19  actually accessed that Web site?

20  A.   I think -- I would say yes.

21  Q.   And you were not aware that it was on an archived Web site;

22  is that correct?

23  A.   That is correct.

24  Q.   So you were not familiar with the Way Back When machine when

25  you signed your supplemental report.

1    A.   I'm not familiar with what?

2    Q.   The Way Back When machine.

3    A.   Oh, is that the archive machine?

4    Q.   When you signed this report, you were not familiar with it.

5    No?

6    A.   Well, it was different -- the archive machine I used was

7    different than what you're talking about, Way Back When.  But

8    anyway, no.

9    Q.   And so the way that you accessed this Web site just the

10   other day was through an archive?  Is that accurate?

11   A.   Yes.  But I don't know the name of it.

12   Q.   Isn't it true that you did not write your report on your

13   own?

14   A.   Well, I do have help with it, but I did write it, because it

15   takes a lot of time and I'm not a fast typer.  So you -- I mean

16   I spent a lot of time typing this report.  I did have help with

17   it, but this is my report.

18   Q.   Isn't it true that --

19   A.   And -- now, are you talking about the expert report or the

20   supplemental report?

21   Q.   I'm talking about both or either.

22   A.   All right.  The expert report, I wrote.  Initially -- this

23   was initiated from an e-mail and then sent to me.  So the

24   supplemental report, I was given that with the fellow I worked

25   with on this, but I wrote this expert report.  And this

1    supplemental report, I had read before I signed that; but I

2    didn't write this.

3    Q.  And who was it that sent you the supplemental report?

4    A.  The fellow that I work with, Vince Rue.

5    Q.  And you've worked with Mr. Rue on other cases regarding

6    restrictions on abortion; is that correct?

7    A.  I started doing that just because of time issues.  The

8    typing is very laborious.  And looking for documentation and

9    looking up things, it's time.  So I needed help.  So that's

10   basically -- I don't have a secretary helping me, so Vince is

11   kind of, you know, just that logistics help.

12   Q.  And he helps you -- he helps on this end on other cases; is

13   that right?

14   A.  Yes.  Yes.

15   Q.  When did you meet Vincent Rue?

16   A.  Two -- by 2011.  He called me when I was in Afghanistan in

17   2011 to see if I would help with that Alaska case on parental

18   notification.  Now, I'm pretty sure he was involved in the

19   Alaska case back in 2002 on parental note -- consent, but I

20   worked straight with the Attorney General's Office.  I didn't

21   work with Vince Rue on that case in 2002.  But he's the one who

22   contacted me, that said that they asked him to get hold of me,

23   or maybe it's just a copy of an e-mail.  I forget.  But the

24   Attorney General's Office and him and me were all on the same

25   e-mail, seeing if I would submit an expert report in 2011 for

1    parental notification.  So that's really when I had these

2    reports working together.

3    Q.  And Vincent Rue is not a medical doctor, correct?

4    A.  Not that I know of.  I'm sure -- I mean, I'd say I'm sure

5    he's not.  I've never asked him that.

6    Q.  You have never been trained to perform an abortion, correct?

7    A.  Correct.

8    Q.  You have never performed an abortion, correct?

9    A.  Correct.

10   Q.  You have never supervised others performing an abortion,

11   correct?

12   A.  Correct.

13   Q.  You have never taught the procedures for performing an

14   abortion, correct?

15   A.  Correct.

16   Q.  So you are not testifying as an expert in abortion

17   procedures, correct?

18   A.  Correct.

19   Q.  And the last time that you claim to have treated a

20   complication from an abortion procedure was in or before 2005,

21   correct?

22   A.  Correct.  But they -- basically, my clinical expertise in

23   hemorrhage and infection is why they asked me to submit a

24   report, because that -- in relation to emergency care.

25   Q.  At your deposition, you testified under oath that you could

1   only recall one specific instance of treating an abortion

2   complication, correct?

3   A.   An abortion-related death, not complication.

4   Abortion-related death.  I've treated many complications, but

5   there -- I know the name of the young lady on that one you're

6   referring to.  I'm pretty sure there's two young ladies that

7   I've had die, but that particular was one patient that died from

8   an abortion complication.

9   Q.   Dr. Anderson, do you still have your deposition there with

10   you?

11   A.   Yes.

12   Q.   Can you turn to page 183.

13       (Brief pause)

14   A.   I'm there.

15   Q.   Okay.  So starting on page 183 through 184, I'm asking you

16   about the specific instance of abortion complications that you

17   can recall.  Is that accurate?

18   A.   Oh.  Well, the question begins on line 25, the day -- page

19   before.  Okay.  That's correct.

20   Q.   Okay.  So then starting on page 184, on line 3, Question:

21   You don't have an estimate of how many women you treated?

22   Answer:  Witness shakes head.

23       Question:  What about women with bleeding or blood loss?

24   Answer:  Common.

25       Question:  When is the last one that you recall?  Answer:

1    Those final years of the ER.

2        Question:  Sometime between 2000 and 2005, you saw at least

3    one woman with bleeding?  Answer:  I'd say that's good.  I mean

4    I'm part-time.  I'm not full-time there.

5        Question:  And you don't remember any specific incidence?

6        I don't.

7        Question:  What about infection?

8        The same.  One thing, infection and bleeding can both look

9    the same, causing pain.  And early infection or early bleeding

10   are very similar looking.

11       Question:  But you don't recall any specific incidence of

12   treating a woman with infection following an abortion?  Answer:

13   I'm trying to update my memory.

14       Question:  I understand.  It's a bit late in the day.

15       And then I recall that we discussed one woman after that.

16   A.   Yeah.  So what -- what are you saying from that?

17   Q.   I say from that that you could only recall one or two

18   specific instances of treating a woman in the emergency room.

19   A.   What I'm basically saying was as far as memory, to give you

20   the exact circumstances, the patient's name and the details of

21   her situation, it really turns into a fog when you see 20 and 30

22   patients a day.  I had treated women with complications from

23   abortions; but to give you the exact incidents, I just got --

24   kind of got to pull pieces from different patients to give you

25   an accurate picture.  But it is not, at all, saying just one

1    patient between 2000 and 2005.  But if -- if I start trying to

2    give you exact details, I can't.

3        I don't think -- I mean I don't see me saying I just had one

4    patient there.  Now, I did have -- well, you and I talked about

5    one patient.  I did have one lady who died on me, a young lady,

6    but -- and I remember the details with her.

7    Q.  And in that instance, having admitting privileges would have

8    made no difference.  Isn't that right?

9    A.  Well, if she had come earlier, it could have made a

10   difference.  I mean she came septic and came late, and that's

11   why she died.  And if the doctor had been involved and had her

12   there earlier, it might have been different.

13   Q.  Dr. Anderson, when you were testifying earlier, you

14   discussed women that have psychological impact from abortion; is

15   that correct?

16   A.  Yes.

17   Q.  And this was some of the complications that you stated that

18   you treated in the emergency room; is that correct?

19   A.  Yes.

20   Q.  And it is not --

21   A.  The depression.

22   Q.  Excuse me?

23   A.  When -- when you see patients who are depressed.

24   Q.  And it is not your view that admitting privileges in

25   obstetrics and gynecology would change the treatment of

1  psychological complications, correct?

2  A.  Let me think about that.  It -- I -- I guess so.  I'm not

3  sure on that.  I don't know.  I mean if someone's severely

4  depressed and the physician knows about it and is seeing them in

5  follow-up care and they're suicidal, maybe they can get them in

6  sooner if they're accessible and available.  It could make a

7  difference if they're seeing them and they're still depressed.

8  There are some patients you see, you've kind of got to push them

9  toward intervention.

10  Q.  Dr. Anderson, you've been named as a defendant in at least

11  three malpractice suits, correct?

12  A.  Correct.

13  Q.  And your hospital privileges were not suspended while these

14  suits were pending, correct?

15  A.  No, not at all.

16  Q.  In paragraph five of your expert report -- that's

17  Defendant's Exhibit 3 -- you discuss complications from

18  abortion, correct?

19  A.  Paragraph five of page 3 of my expert report?

20  Q.  Yes.  You discuss complications --

21  A.  Yes.

22  Q.  -- from abortion, correct?  But as you already testified,

23  you do not have experience with abortion procedures; isn't that

24  right?

25  A.  That's true.  That doesn't mean you don't have experience

1    with complications.

2    Q.  In your report, you state that there is underreporting of

3    abortion complications, correct?

4    A.  Yes.

5    Q.  And one reason you cite for that is because many states do

6    not have mandatory reporting of data about abortion

7    complications, correct?

8    A.  Yes.  I'm not aware of a good national reporting source or a

9    state -- good sources.

10   Q.  Which states do not mandate reporting of abortion

11   complications?

12   A.  All I really know is Virginia for sure because it -- that's

13   where I practice medicine, but I've never seen good numbers from

14   other states.  I'm just assuming that many of them are like

15   Virginia.  And people's care is similar.  I mean other ERs are

16   similar to us if the patients don't follow up with abortion

17   providers or they don't want it known that they've had an

18   abortion.  People aren't real different from state to state.

19   Q.  Thank you.  I believe you testified earlier that if a woman

20   has persistent bleeding and infection, she should be treated as

21   soon as possible, correct?

22   A.  Correct.

23   Q.  So in that case, the woman should go to the emergency room

24   closest to her, correct?

25   A.  Correct.

1  Q.  And that --

2  A.  If she's unstable for sure.

3  Q.  Excuse me?

4  A.  Immediate -- if she's unstable or she's scared to death, she

5  should go to the closest emergency room.

6  Q.  That's --

7  A.  She can call her abortion provider process as an

8  intermediary step, which is a good step if she's starting to get

9  sick.

10  Q.  So she should go to the closest hospital even if that's not

11  the one where her physician has privileges, correct?

12  A.  If she's unstable, she should.  If -- if she's stable and

13  she can go see the physician that she knows -- I mean when we're

14  talking about closest hospitals, I'm talking about four or five

15  miles apart like we have in Richmond between a number of

16  hospitals; but if you're talking about 50 miles apart, then

17  that's a different -- comparing apples with oranges.

18  Q.  Dr. Anderson, I'd now like to talk a little bit about your

19  experience with the hospital privileging process.

20  A.  Uh-huh.

21  Q.  The extent of your experience with hospital credentialing

22  has been as the recipient of hospital privileges, correct?

23  A.  Correct.

24  Q.  You have never served on a committee charged with approving

25  physicians for privileges, correct?

```
 1    A.   Correct.

 2    Q.   You have never --

 3    A.   I just know it's very rigorous.

 4    Q.   You have never been responsible for determining what action

 5    should be reported to the national practitioner database,

 6    correct?

 7    A.   Correct.

 8    Q.   When did you find Defendant's Exhibit 80?  That's the

 9    national practitioner database guide that you testified about

10    earlier.

11    A.   The last three or four days.  On this comment.

12    Q.   You just testified that until this case, you had no idea

13    that the database had anything to do with reporting malpractice;

14    is that right?

15    A.   Except malpractice.

16    Q.   So you don't have any --

17    A.   Until this --

18    Q.   Please continue.

19    A.   I mean that's the only experience I've had with the national

20    data reporting is malpractice.  I've never been to the Web site,

21    just because why?

22    Q.   So you don't have any personal knowledge or experience with

23    the national practitioner database beyond reading the document

24    that was provided to you about three days ago, correct?

25    A.   Outside of just knowing that it reports malpractices and a
```

1   lot of the young doctors are scared to death of it, yes.

2   Q.   Since you are not involved with reporting to the national

3   practitioner database, Exhibit 80 is not something that you

4   would typically rely on in your own practice, correct?

5   A.   What's Exhibit 80?  The national --

6   Q.   The national --

7   A.   Is that what you're referring to?

8   Q.   Yes.  The guidebook.

9   A.   That's right.  That's right.

10  Q.   Now, there are over 2,000 physicians on staff at the

11  hospital where you hold privileges, correct?

12  A.   Correct.

13  Q.   And you don't know all those physicians, do you?

14  A.   Correct.

15  Q.   In your report, you cite to certain studies that discuss the

16  miscommunication in medicine.  None of those studies you cite

17  identify lack of privileges as a contributing factor to errors

18  or miscommunication in medicine; isn't that right?

19  A.   I would say that's just related to my personal experience

20  for sure.  Because if they don't have privileges, they don't

21  feel at all -- I mean a doctor feels like he -- he's not in the

22  process.  And you don't know him relationally, so there's just

23  not the familiarity or the standard expectation of the hospital.

24  Q.   Now, I believe you also testified about a doctor in Texas

25  that received admitting privileges; is that correct?

1   A.   It is correct.

2   Q.   And the source of that information was an e-mail that you

3   received; is that right?

4   A.   Yes.   Under that supplemental support.

5   Q.   And is such an e-mail the type of material that you would

6   typically rely on in your practice?

7   A.   If I trust people, if I have a relationship with them.   I

8   mean it depends on the level of trust I have with the individual

9   who sends me the e-mail.   And that -- that looked pretty

10   reliable.   It was coming from Vince.

11   Q.   Do you have a relationship with the Texas Attorney General?

12   A.   Just that phone call that asked me to be involved.

13   Q.   Thank you.

14        MS. GRIFFITH:   May I have one moment --

15   A.   And submit a report.

16        THE COURT:   Yes.

17        MS. GRIFFITH:   -- to confer, Your Honor?

18      (Brief pause)

19   Q.   (By Ms. Griffith, continuing:)   Dr. Anderson, at the

20   beginning of our discussion, we were talking about Vincent Rue.

21   Do you recall that?

22   A.   Yes.

23   Q.   And are you aware that Vincent Rue has been discredited as

24   an expert in abortion cases by a number of courts?

25   A.   No.

1    Q.   In preparing your opinions in this case, you have not spoken

2    to any physician associated with an abortion or reproductive

3    health center in Alabama; is that right?

4    A.   That's correct.

5    Q.   You did not talk to any emergency room physician in Alabama,

6    correct?

7    A.   Correct.

8    Q.   It's also --

9    A.   Yes.

10   Q.   -- true that you did not do any research or review any data

11   specific to abortion care in Alabama?

12   A.   Yes.  Correct.

13   Q.   And you --

14   A.   I just know that admitting privileges are very protective in

15   a number of arenas with what I said earlier, with the standard

16   of care of medicine in the health care system.

17   Q.   Thank you.  You do not know if any patients from plaintiff's

18   clinics ever received hospital-based care, do you?

19   A.   I don't.

20   Q.   You do not know if any patients from plaintiff's clinics

21   have ever experienced a medication error, do you?

22   A.   You mean know those patients?  I don't know them.

23   Q.   So you have no way of knowing whether any abortion patient

24   in Alabama experienced a negative outcome because her provider

25   did not have admitting privileges; isn't that right?

 1   A.  Yes, this is true.  I don't have any personal --

 2           MS. GRIFFITH:  I have no further questions at this

 3   time.

 4           THE COURT:  Redirect?

 5           MR. DAVIS:  Yes, Your Honor.  Your Honor, before

 6   redirect, it is seven till eleven.

 7           THE COURT:  Yes.

 8           MR. DAVIS:  I would expect I have ten minutes or so.

 9   There may be redirect.  By your leave, we will call Mr. Sims --

10   do you wish us to call Mr. Sims and have him begin at, say,

11   11:15 or --

12           THE COURT:  Whatever you want as long -- as efficiently

13   as we can proceed.

14           MR. DAVIS:  Then let's do.

15                          REDIRECT EXAMINATION

16   BY MR. DAVIS:

17   Q.  Dr. Anderson, however frequent it is for a woman to have

18   complications for an abortion -- or however infrequent it is,

19   would you agree that a woman who has a complication due to an

20   abortion deserves the best of care?

21   A.  I would agree.  Yes.

22   Q.  The opinions that you've expressed today and in your expert

23   report, are those opinions based on your personal views of

24   abortion or your personal views of what is good medical care?

25   A.  Well, since I teach physicians that are from many different

1  backgrounds and beliefs, I teach about health care itself and a

2  patient-centered health care system and building trust with the

3  patient.  So really, all of this is part of good clinical care,

4  patient safety.  Nothing -- it has nothing to do with my belief

5  about abortion itself.  This is just good clinical care and

6  patient safety issues.

7  Q.  In your discussion of the CMS guidelines a moment ago,

8  Dr. Anderson, is it your experience generally that doctors at

9  ambulatory surgical centers have admitting privileges, whether

10 it's required or not?

11 A.  Well, as I said, Jim, the -- the physicians in the

12 ambulatory care centers that I work with all have admitting

13 privileges.  The gastroenterologists who do colonoscopies are

14 required to have admitting privileges by their -- by the, you

15 know, office itself, as are the surgeons in the ambulatory care

16 centers, because they want to take care of the complications

17 themselves or be involved in the complications.  They want

18 continuity of care.

19 Q.  Are -- is it common for doctors in ambulatory surgical

20 centers to fly in and out of state to treat patients?

21 A.  It's not common at all.  It doesn't exist in Richmond.

22 Q.  Is it common for doctors at ambulatory surgical centers to

23 depend on emergency rooms to take care of their patients if

24 there's a -- a complication?

25 A.  Only to stabilize them until they can get there.  They use

1    it as an intervention.

2    Q.   But they don't abandon their patients to emergency rooms as

3    a matter of course, do they?

4    A.   They -- they would probably lose their privileges if they

5    did.   Abandonment is really very detrimental.

6    Q.   The reports that you have submitted in this case,

7    Dr. Anderson, do they accurately reflect your own personal

8    opinions?

9    A.   Yes.   Absolutely.

10   Q.   You got information from a variety of sources, correct?

11   A.   Correct.

12   Q.   Well, and that's true when you're treating a patient.   You

13   get information from the patient, you may have information based

14   on your experience and background, and you might sometimes refer

15   to a medical journal, correct?

16   A.   In all years of life, you're not an island.   You -- you

17   relate with people.   You build teams in whatever you do.

18   Q.   And then wherever the information comes from, you apply your

19   30 years plus of experience, your medical education, your years

20   of treating patients in the emergency room, and use that to form

21   your opinions.   Would you agree?

22   A.   I would agree.   That's really what you call -- talking about

23   is competence.   You take your education and training, your

24   ongoing review of the literature, 30 years of clinical

25   experience, combined with the patient's individual uniqueness;

1    and that makes your judgment competent.  It makes your judgment

2    good and individualized.  It's -- it really -- being isolated is

3    arrogance.  And that just opens up for all kinds of things.  But

4    over the years, you build a team concept in just about

5    everything you do.  And right now, it's a huge push in the

6    medical arena to build health care teams, that you're part of a

7    team and communicate with a team.  That's one of the

8    proficiencies that we have to measure residents by is how they

9    relate within a health care team.

10   Q.   Now, you testified that you've never performed an abortion,

11   correct?

12   A.   Correct.

13   Q.   You've never been trained in how to perform an abortion.

14   A.   Correct.

15   Q.   But you have treated women who had complications after an

16   abortion, haven't you?

17   A.   I have.  Many times.

18   Q.   How many patients would you typically see in a day if you're

19   a doctor working in an emergency room?

20   A.   Between 30 and 40.

21   Q.   And how many years, again, did you serve as an emergency

22   room doctor?

23   A.   Twenty-five.  Twenty-four total.

24   Q.   So that's a lot of patients.  Wouldn't you agree?

25   A.   I think I've seen, between all clinical practice, 150,000

1    patients.

2    Q.   So when you --

3    A.   Live patients.

4    Q.   When you say that you know you've treated many women who had

5    complications after an abortion, that doesn't mean you can

6    necessarily right now remember their name and the date and what

7    they were wearing and those other details, though, correct?

8    A.   It -- it turns into a fog real quickly when you're seeing 20

9    or 30 or 40 patients a day.

10   Q.   But are you certain that you have treated many patients who

11   had complications after an abortion and that you're familiar

12   with the dangers of those complications?

13   A.   I am certain.

14   Q.   You have known over the course of your career, have you not,

15   that the -- the data bank collects data concerning malpractice

16   suits.

17   A.   Yes.

18   Q.   So you knew that it was involved with recordkeeping

19   concerning physician competency, correct?

20   A.   Correct.

21   Q.   So you already knew, did you not, that they weren't involved

22   with keeping track of things unrelated to competency?

23   A.   I would say yes.

24   Q.   Yes.

25   A.   It was strictly related to malpractice.

1  Q.   And you reviewed that guidebook, correct?

2  A.   I did.

3  Q.   And what we read today accurately reflects what is in the

4  guidebook.

5  A.   Absolutely.

6  Q.   So are you, therefore, certain today that if a doctor has

7  said, I fear being reported because a hospital might not like

8  where I live or they might not think I make medical -- I might

9  not have sufficient admissions over the course of a year, that

10  that, according to the guidebook, is not the type of item that

11  would be reported?

12  A.   I would say their fear was unfounded, that that would not at

13  all be reportable.

14  Q.   Have you ever, over the course of your career, heard of

15  someone being reported to the data bank for something unrelated

16  to physician competency?

17  A.   Never.

18  Q.   Now, you said, Dr. Anderson, that you haven't spoken

19  directly to a patient in Alabama who's had an abortion; is that

20  correct?

21  A.   Yes.  I have not.

22  Q.   But do you know what good medical care is?

23  A.   I do.  I do know what good medical care is.

24  Q.   Whether you've spoken to an Alabama patient or not, do you

25  know that if their physician flies in and out of state and

1    doesn't observe continuity of care, that that's going to make it
2    harder for an ER doctor to treat those complications?
3    A.   With a hundred percent certainty, yes.
4            MR. DAVIS:   Thank you, Dr. Anderson.
5            Well, first, Your Honor, may I have a moment to confer?
6            THE COURT:   Yes.
7        (Brief pause)
8    Q.   (Mr. Davis, continuing:)   Dr. Anderson, you've mentioned a
9    couple of times a patient of yours that passed away that had
10   abortion complications.   Could you tell us about that situation,
11   what you recall of it, being careful, of course, not to use any
12   names?
13   A.   Well, it was a young lady that had an abortion probably 48
14   hours and was at home with a fever and pain, and then she came
15   to the emergency room.   And her -- she was hypotensive, and she
16   died about 12 hours later.   And she -- I can't remember the
17   details in her follow-up with the abortion clinic or anything;
18   but when she came to the emergency room, it was too far in to --
19   to intervene.   And there had been a ruptured uterus that had
20   happened during the abortion procedure.   And -- but anyway,
21   we -- we recognized what was going on, but it was just too late
22   to turn her around.   I don't -- I've admitted a number of ladies
23   in extreme infection, but antibiotics and fluid were able to
24   turn it around so that -- I mean, there are some ladies that
25   have had to have hysterectomies to deal with the site of

1    infection and the infected uterus, but they didn't die.

2    Q.  Is that an example of a situation where quick care is

3    critical for the patient?

4    A.  Yes.

5    Q.  Is it an example of a situation where good communication

6    between the ER doctor and the clinic is critical?

7    A.  Yes.

8            MR. DAVIS:  Thank you, Dr. Anderson.

9            MS. GRIFFITH:  We have nothing further, Your Honor.

10           THE COURT:  Okay.  Thank you.  Thank you.  Oh, I may

11   have some questions.  I would like to take just a recess to

12   gather my thoughts.

13           Doctor, I'm not through with you yet.

14           THE WITNESS:  Okay.

15           THE COURT:  Just give me about two or three minutes.

16      (Recess at 11:05 a.m. until 11:17 a.m.)

17           THE CLERK:  Please remain seated.  Court is in session.

18           THE COURT:  Dr. Anderson, can you hear me?

19           THE WITNESS:  Yes.

20           THE COURT:  Okay.  I believe one of the counsel

21   mentioned a Kevin Rue, R-O-O.

22           THE WITNESS:  A Vince Rue.

23           THE COURT:  Pardon me?

24           THE WITNESS:  R-U-E.

25           THE COURT:  Oh, it's R-U-E.  Great.  Thank you.

1          THE WITNESS:  That's right.

2          THE COURT:  Okay.  Does this person have any

3   institutional affiliations that you're aware of?

4          THE WITNESS:  Not that I'm aware of.

5          THE COURT:  Okay.  Are you aware of his employment

6   other than assisting you with writing I believe it was certain

7   expert reports?  I -- correct me if I'm wrong.

8          THE WITNESS:  No, I'm not.

9          THE COURT:  So you don't know his employment?

10          THE WITNESS:  I think that he's a consultant in this

11   arena, but that's all I know.

12          THE COURT:  Consultant.  What do you mean?

13          THE WITNESS:  Well, he's been a help in doing the

14   logistical typing and researching information.  So I know that

15   he's been involved in these cases and works with other states.

16          THE COURT:  Do you know exactly who he is?

17          THE WITNESS:  No, not beyond just talking to him.

18          THE COURT:  Okay.  Did he assist you in writing your

19   report?

20          THE WITNESS:  He helps me.  I write the report; and

21   then he helps me find materials, do searches for, you know,

22   backup articles and that type of thing.  But I write the reports

23   except for that supplemental report.

24          THE COURT:  Okay.  How long --

25          THE WITNESS:  He sent me that information, and we just

 1  submitted that.

 2          THE COURT:  Right.  How long have you known him?

 3          THE WITNESS:  I -- I worked close with him -- with him

 4  starting in 2011, but he was involved in the case in 2002 in

 5  Alaska, but I was working straight for the Attorney General's

 6  Office in 2002 in Alaska.

 7          THE COURT:  You say you don't know his employment or

 8  any organizations that he belongs to --

 9          THE WITNESS:  No, I do not.

10          THE COURT:  -- or is affiliated with?

11          THE WITNESS:  I don't.

12          THE COURT:  Why do you trust him?

13          THE WITNESS:  Well, we go back to 2002, and I've found

14  him to be reliable, I mean.  So -- I mean talking to him on the

15  phone, I've just gotten to know him.  And when I write these

16  reports, the things that he gives me as far as typing assistance

17  and research has been good.

18          THE COURT:  Okay.  And you don't know anything about

19  what he does?

20          THE WITNESS:  No, I don't, outside this.

21          THE COURT:  Okay.  Anything else?

22          MS. GRIFFITH:  I just have two questions.

23          THE COURT:  Okay.  Go ahead.

24

25                      RECROSS-EXAMINATION

1   BY MS. GRIFFITH:

2   Q.   First I wanted to clarify, Dr. Anderson, it's Vincent Rue;

3   is that correct?

4   A.   Yeah.   Vincent.   Vince.

5   Q.   And are you aware of where Vincent Rue got his degree?

6   A.   No.

7   Q.   So you are not aware of whether he in fact has a degree from

8   a school of home economics?

9   A.   No.   I've been work -- I've been working with Vince and his

10   wordsmithing the document and finding articles.   And he's been

11   good in that arena.

12   Q.   But -- so just to clarify --

13   A.   And I write the --

14   Q.   You're not aware that he has a degree from the School of

15   Home Economics from UNC; is that correct?

16   A.   That's correct.

17          MS. GRIFFITH:   Thank you.   Nothing further.

18          THE COURT:   Okay.   Go ahead.

19                         REDIRECT EXAMINATION

20   BY MR. DAVIS:

21   Q.   Dr. Anderson, your opinions, again, are based on your views,

22   correct?

23   A.   Correct.

24   Q.   They're based on --

25   A.   A hundred percent.

1  Q.  They're based on your medical education, correct?

2  A.  Correct.

3  Q.  Has anybody told you what you should think as a doctor in

4  this case, what your medical opinions have to be?

5  A.  I started in this arena back in the 1981-82 time period.  I

6  didn't meet Vince until 2002.  I had been in this arena 20 years

7  before I met Vince.

8  Q.  So the -- the conclusions that you've reached in this case

9  and that you've expressed are based on your knowledge, your

10  experience, your education, correct?

11  A.  Absolutely.

12        MR. DAVIS:  Thank you.

13  A.  Absolutely.

14        THE COURT:  Anything else?

15        MS. GRIFFITH:  No.  Nothing further, Your Honor.

16        THE COURT:  Thank you.

17        Thank you, Doctor, very much.

18        THE WITNESS:  Thank you.

19        THE COURT:  You're excused.

20     (End of excerpt)

21                      * * * * * * * * * *

22

23

24

25                 COURT REPORTER'S CERTIFICATE

1          I certify that the foregoing is a correct transcript

2   from the record of proceedings in the above-entitled matter.

3          This 27th day of May, 2014.

4

5                              /s/ Risa L. Entrekin
                               Registered Diplomate Reporter
6                              Certified Realtime Reporter
                               Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25