```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       NORTHERN DIVISION

 4

 5  PLANNED PARENTHOOD
    SOUTHEAST, INC., et al.,
 6
            Plaintiffs,
 7
        vs.                    CASE NO.:  2:13cv405-MHT
 8
    LUTHER STRANGE, et al.,
 9
            Defendants.
10

11

12                      * * * * * * * * * *

13              EXCERPT OF NONJURY TRIAL PROCEEDINGS

14              TESTIMONY OF PETER UHLENBERG, Ph.D.

15                      * * * * * * * * * *

16          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

17  DISTRICT JUDGE, at Montgomery, Alabama, on Monday, May 27, 2014,

18  commencing at 1:05 p.m.

19  APPEARANCES:

20
    FOR THE PLAINTIFFS:    Ms. Alexa Kolbi-Molinas
21                         Mr. Andrew David Beck
                           Ms. Susan Talcott Camp
22                         Ms. Julia Heather Kaye
                           Attorneys at Law
23                         AMERICAN CIVIL LIBERTIES UNION
                           125 Broad Street, 18th Floor
24                         New York, New York  10004-2400

25
```

```
 1  APPEARANCES, Continued:

 2  FOR THE PLAINTIFFS:       Ms. Jennifer R. Sandman
                              Ms. Maithreyi Ratakonda
 3                            Attorneys at Law
                              PLANNED PARENTHOOD FEDERATION
 4                            OF AMERICA
                              434 West 33rd Street
 5                            New York, New York  10001

 6                            Ms. Dyanne Griffith
                              Attorney at Law
 7                            WILMER CUTLER PICKERING
                              HALE & DOOR, LLP
 8                            1875 Pennsylvania Avenue NW
                              Washington, D.C.  20006
 9
                              Mr. Randall C. Marshall
10                            Attorney at Law
                              ACLU of ALABAMA FOUNDATION, INC.
11                            P.O. Box 6179
                              Montgomery, Alabama  36106-0179
12
                              Mr. M. Wayne Sabel, Sr.
13                            Attorney at Law
                              SABEL & SABEL, P.C.
14                            2800 Zelda Road, Suite 100-5
                              Montgomery, Alabama  36106
15

16  FOR THE DEFENDANTS:       Mr. Andrew L. Brasher
                              Solicitor General
17                            STATE OF ALABAMA
                              OFFICE OF THE ATTORNEY GENERAL
18                            501 Washington Avenue
                              Montgomery, Alabama  36103
19
                              Mr. James William Davis
20                            Ms. Margaret Lindsey Fleming
                              Mr. Kyle A. Beckman
21                            Ms. Laura Elizabeth Howell
                              STATE OF ALABAMA
22                            OFFICE OF THE ATTORNEY GENERAL
                              501 Washington Avenue
23                            Montgomery, Alabama  36130

24

25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:     Ms. Patricia Elaine Ivie
                             Mr. Phillip Brian Hale
 3                           Office of General Counsel
                             STATE OF ALABAMA
 4                           DEPARTMENT OF PUBLIC HEALTH
                             RSA Tower
 5                           201 Monroe Street
                             Montgomery, Alabama  36104
 6
                     Proceedings reported stenographically;
 7                     transcript produced by computer.

 8                     * * * * * * * * * *

 9                     EXAMINATION INDEX

10   DIRECT BY MS. HOWELL                              4
     CROSS BY MR. BECK                                35
11   REDIRECT BY MS. HOWELL                           52

12                     * * * * * * * * * *

13      (The following excerpt of proceedings was heard before the

14       Honorable Myron H. Thompson, United States District Judge,

15       at Montgomery, Alabama, on Monday, May 27, 2014, commencing

16       at 1:05 p.m.:)

17            THE CLERK:  Dr. Uhlenberg.

18            THE WITNESS:  Yes.

19            THE CLERK:  I'm going to swear you in.  Would you raise

20   your right hand, please.

21      (Dr. Uhlenberg is sworn)

22            THE CLERK:  Please remain seated.  Court is in session.

23            THE COURT:  Counsel, where are we in light of the lunch

24   break?

25            MR. DAVIS:  Your Honor, in light of both the courthouse
```

1   staffs being involved -- and Your Honor was generous enough to

2   allow this -- we decided to go ahead and call Mr. Uhlenberg --

3   Dr. Uhlenberg.  Pardon me.  And then we'll resume with Mr. Sims

4   as soon as that's complete.

5        THE COURT:  Very good.  Go ahead, then.

6        **PETER UHLENBERG, Ph.D.,** the witness, having been duly

7   sworn to speak the truth, the whole truth, and nothing but the

8   truth, testified as follows:

9                    DIRECT EXAMINATION

10  BY MS. HOWELL:

11  Q.  Good afternoon, Dr. Uhlenberg.  Would you please introduce

12  yourself to the Court.

13  A.  Yes.  I'm Peter Uhlenberg.  That's U-H-L-E-N-B-E-R-G.

14  Q.  Thank you.  Would you please tell us your educational

15  background beginning after high school.

16  A.  Yes.  I attended San Jose State College for one year and

17  then transferred to Wheaton College where I completed by

18  undergraduate work.  In 1964, I entered a graduate program at

19  the University of California at Berkeley and received my

20  master's degree and my Ph.D. in demography from there.

21  Q.  And what do you do now?

22  A.  I'm a professor of sociology at the University of North

23  Carolina at Chapel Hill.

24  Q.  And how long have you been in that position?

25  A.  Forty-five years.

1  Q.   What are your duties as a professor of sociology?

2  A.   The expectation is that we would -- the expectation is that

3  we would teach classes, both undergraduate and graduate-level

4  classes, that we would conduct research and publish findings

5  from that research, that we would be involved in professional

6  organizations and tasks in terms of administrative

7  responsibilities in the department.

8  Q.   And what -- what subjects -- excuse me -- do you

9  specifically teach?

10 A.   Most of my teaching is in the area of sociology of the

11 family, of population, demographic methods, and aging and life

12 course.

13 Q.   And do you conduct research on the same subjects?

14 A.   Yes.

15 Q.   Is that the focus of your research?

16 A.   Excuse me?

17 Q.   Sorry.  Is -- is your focus the same -- sorry -- as the

18 things that you teach?

19 A.   Yes.  The research -- the research is in the areas of

20 family, life course and aging and demography.

21 Q.   Have you been published in any of those areas?

22 A.   Yes.  I've published in all those areas.

23 Q.   Specifically, have you studied the areas of fertility and

24 fertility control as part of your research?

25 A.   Yes.  Quite a lot of attention to fertility change over

1    time.  And part of that would be reasons for changing fertility

2    or differences in fertility between minority groups and a

3    dominant group in a population.

4    Q.  Have you published anything specifically related to

5    fertility and fertility control?

6    A.  Yes.  Several.  Fertility control is marginally what the

7    studies would be with interest in why fertility changes over

8    time forces you to look at why -- what the factors are in

9    controlling fertility.

10   Q.  Dr. Uhlenberg, have you previously testified as an expert

11   witness?

12   A.  Yes.

13   Q.  When?

14   A.  The first case was in Wisconsin maybe 20 years ago.  And

15   since then, I have been an expert witness in probably seven or

16   eight other cases in different states.

17   Q.  Have those all been on similar subject matter?

18   A.  They've all been related to abortion policy.  And I've been

19   called as an expert to defend the state's policy.

20   Q.  Has your expertise ever been denied by any court?

21   A.  No.

22   Q.  If you have it with you, I'd like you to take a look at

23   Defendant's Exhibit 6, which I believe is your expert report.

24   And specifically, I want to focus on Attachment A, which begins

25   at page 19.

1  A.  Yes.  I have that.

2  Q.  Okay.  What is that?

3  A.  This is a recent copy of my curriculum vita, which goes

4  through my academic career of education, employment,

5  publications, and such things.

6  Q.  Okay.  And is it a true representation of your professional

7  accomplishments?

8  A.  Yes.

9       MS. HOWELL:  Your Honor, the State would tender

10  Dr. Uhlenberg as an expert in the field of demography and trends

11  in fertility and fertility control.

12       THE COURT:  Proceed.

13  Q.  Dr. Uhlenberg, I want to look back at Defendant's Exhibit 6

14  again but look at the report this time.  And you have that with

15  you, correct?

16  A.  Yes.

17  Q.  Does this document accurately represent the opinions you've

18  formed with regard to this case?

19  A.  Yes.

20       MS. HOWELL:  Your Honor, I'd move to admit Defendant's

21  Exhibit 6 into evidence.

22       THE COURT:  Admitted.

23  Q.  Dr. Uhlenberg, do you have an opinion as to the effects of

24  HB 57's admitting privileges requirement?

25  A.  Yes.  It's my opinion that there is not scientific evidence

1  to suggest that the effect of this act would be to prevent women

2  from obtaining abortions if they want.

3  Q.  And what is the basis for your opinion?

4  A.  There are two parts, I think, to the argument I would make.

5  The first is questioning the accuracy of the assertion that the

6  effect of the law would be to force the closing of abortion

7  clinics in Alabama.  I think that may or may not happen, but I

8  think the evidence is not clear that that would be a necessary

9  outcome.  If it did close one or more abortion clinics, then the

10  distance that women would have to travel for an abortion

11  provider would increase.  And Dr. Henshaw in particular makes

12  the argument based upon several studies that this would prevent

13  a significant number of women from obtaining abortions they

14  want.  I think the evidence that he has does not merit that kind

15  of strong conclusion.

16  Q.  And you've mentioned one of the plaintiff's experts in this

17  case, Dr. Henshaw.  And I take it that you have had time to

18  review his report; is that correct?

19  A.  That's right.

20  Q.  And what is your opinion with respect to his conclusions?

21  You've said a little bit about it, but if you could elaborate

22  more.

23  A.  Yes.  He is drawing conclusions from studies in several

24  different states at different time periods that show a

25  correlation between abortion rates per county and the distance

1  from that county to the nearest abortion provider.  The

2  difficulties I have with those studies are that in no case does

3  he have any evidence from women that they are unable to obtain

4  an abortion that they want.  The data simply do not say that and

5  are not relevant to that.

6      Beyond that, to suggest that this correlation means that

7  distance is the cause of a lower abortion rate is not justified.

8  As most all of us know at this point, causation requires much

9  stronger evidence than correlation.

10  Q.  Now, in his expert report, Dr. Henshaw cited a lot of

11  different data and specifically a lot of different studies that

12  pertain to different states that have faced similar trends in

13  abortion rates and distance from providers.  I want to look

14  closely at one of those studies, and that is the Colman and

15  Joyce study.  And I believe that is Plaintiff's Exhibit 63.

16  And do you have that?

17  A.  Yes, I have that.

18  Q.  Wonderful.  So we have already heard Dr. Henshaw's testimony

19  as to this study.  But if you could, just give us a brief recap

20  of what exactly the study set out to do and what it found, just

21  to refresh our memories.

22  A.  The motivation of the study was that in Texas in 2004 an act

23  was passed called the Women's Right to Know.  And one of the

24  aspects of that law was to say that abortion clinics could not

25  perform abortions on women past 15 weeks' gestational age unless

1   they were certified as ambulatory surgical centers.  None of the

2   abortion clinics in Texas at that time qualified, so that after

3   2004, women could not obtain abortions after 16 weeks' gestation

4   in Texas.  The Colman and Joyce study, then, is trying to

5   discover what the effect of that was on the number of abortions

6   to women -- late-term abortions for women in Texas.

7       They concluded that because women would have to travel out

8   of state to an abortion clinic to obtain the abortion, the

9   distance increased significantly from about 33 miles on average

10  to 250 miles on average.  And they found that the number of

11  abortions reported in Texas at gestational age past 15 declined

12  precipitously.  There were only a limited number occurring in

13  hospitals.  And the number increased in out-of-state abortions

14  for women at that gestational age, but not enough to counter the

15  decline so that the total was a much lower number of women past

16  gestational age 15 obtaining abortions in Texas after the act

17  was in effect.

18  Q.  But after a while, didn't some clinics reopen as ambulatory

19  surgical centers?

20  A.  Yes.  Within three years, clinics qualified for that in the

21  four largest metropolitan areas of Texas, which was -- about

22  two-thirds of the population live in these areas so that most

23  women in Texas, within two or three years, had access to

24  late-term abortions in Texas.  Despite that access, the number

25  of late-term abortions reported for residents of Texas increased

1   only a relatively small amount compared to the drop between 2004

2   and 2005.  It did not rebound nearly to what it was in the 2004

3   period.

4   Q.  In Dr. Henshaw's testimony, he told us that it rebounded by

5   50 percent, which sounds like a large number.  Why do you

6   disagree with that?

7   A.  No.  He's saying what the increase was from 2005 until 2006,

8   I believe.  But that is -- I've got the numbers in my expert

9   report if you want the actual numbers.  But as a proportion of

10  what they were prior to 2004, the increase was relatively

11  modest.

12  Q.  So Dr. Uhlenberg, if distance were a significant driver of

13  abortion rates, why wouldn't the rate increase all the way back

14  to the pre-2004 level once those clinics began offering those

15  services again?

16  A.  Yes.  The -- the average distance was still 20 miles greater

17  than it was in 2004, so one argument could be that that

18  increased travel distance would reduce the number of abortions.

19  But it's implausible that it could have had such a significant

20  effect, a 20-mile difference should have such a significant

21  effect.  The other argument used by the Colman and Joyce -- in

22  the Colman and Joyce article was that the cost of late-term

23  abortions had increased and perhaps this increased cost of

24  abortions had discouraged a very large proportion of women from

25  obtaining these later term abortions.

1   Q.   Now, what do the study's findings indicate to you in terms

2   of a clinic's ability to comply with a newly imposed

3   requirement?

4   A.   Well, we know that in the case of Texas, that a significant

5   number of the abortion clinics performing late-term abortions

6   were able to comply with the new requirement within a few years.

7   And I think additional clinics have done that or evidence is

8   that new clinics are in -- expected to be available later this

9   year performing late-term -- meeting the ambulatory surgical

10  requirement.  So in general, I think that the immediate effect

11  of an abortion clinic not being able to comply with the law

12  doesn't mean that, over time, it is not able to.

13  Q.   Are there other possibilities for what might happen to the

14  availability of abortions in Alabama if the plaintiff clinics

15  here were to shut down, either permanently or temporarily?

16  A.   Yes.  I think the immediate consequence would be that women

17  would travel further to obtain abortions that they want.  And

18  we've looked at what those increased distances might be, and

19  they tend to be under a hundred miles.  But in addition, an

20  abortion clinic might be able to find a doctor who would be able

21  to perform abortions and meet the state requirement.  Or if an

22  existing clinic couldn't do that in a city like Birmingham,

23  which has over a million population, it's not unlikely that

24  another abortion clinic would be established that could comply

25  with the law.

1   Q.  And why do you say that it's not unlikely that another

2   clinic would open?

3   A.  We know that new abortion clinics are being established over

4   time in different places.  And in the case of Texas in

5   particular, we have evidence that Planned Parenthood is

6   preparing a new abortion clinic to comply with the law

7   requiring -- meeting the standard of ambulatory surgical

8   centers.

9   Q.  I believe in your report you also mentioned something about

10  the inelasticity about the demand for abortions.  Might that not

11  also be another reason?

12  A.  Well, a number of studies by economists suggest that there

13  is price inelasticity, which means that the demand for abortion

14  is not particularly sensitive to the cost.  If the cost goes up

15  and abortions are strongly enough wanted, they will pay the

16  additional cost.  And so if it is a market situation and the new

17  center could open and charge more for abortions, again, there

18  would be an incentive, then, to establish a new clinic.  If we

19  think of this as a supply and demand and the demand is high, the

20  market is there, there's no reason to expect that someone

21  wouldn't step forward to provide that service.

22  Q.  Thank you.  Looking back at the text of the Colman and Joyce

23  study, you had also suggested in your report that there were

24  several limitations to the study.  What were those limitations?

25  A.  Well, I think there are two issues here.  One is the

1  relevance of the Colman and Joyce study for the situation in

2  Alabama, which I think both the authors and myself would agree

3  the situation is not generalizable from Texas with a different

4  law applying to women in late gestational age.  Given all those

5  conditions, it simply is not applicable to the situation in

6  Alabama of some clinics closing, potentially closing, and women

7  having to travel distances of less than a hundred miles to

8  obtain abortions.

9      The other issue in the Colman and Joyce study that I call

10 attention to is probably a fairly significant exaggeration in

11 terms of the effect of the law in Texas in terms of deterring

12 women from obtaining late-term abortions.

13 Q.  How would it have been exaggerated?

14 A.  One of the obvious responses to making -- of a clinic not

15 being able to perform abortions after 15 weeks when it

16 previously had been performing late-term abortions would be for

17 that clinic to schedule abortion patients to come in before 16

18 weeks.  And Colman and Joyce say that they have taken that into

19 consideration and added a few hundred abortions occurring at 15

20 weeks that they think might have been transferred from 16-plus

21 weeks if the law had not gone into effect.  But their assumption

22 here is that there would have been no change in the number of

23 abortions after 16 weeks -- after 15 weeks if the law had not

24 gone into effect, and their assumption is that the number of

25 abortions at 13 through 15 weeks' gestation would have not

1  changed in absence of the law.

2      So the only possible transfer of abortions from later to

3  earlier period is the small increase in number of abortions at

4  15 weeks.  But that assumption that abortions at 13, 14, or 15

5  weeks would not increase, would not decrease, or that abortions

6  after 16 weeks would not decrease in the year following is only

7  an assumption.  And alternative assumptions could be made that

8  would suggest that probably the number of abortions that were

9  advanced by clinics was very significant.

10 Q.  So you mentioned that assumption.  And so I wanted to pose a

11 hypothetical to you, because Dr. Henshaw's testimony last week

12 said that the authors had essentially done as much as they

13 possibly could to make their study error-proof.  If Dr. Henshaw

14 is correct and the possibility of any kind of error, even based

15 on that assumption, is minimal, would that change your opinion

16 at all about the study's applicability to Alabama?

17 A.  That's a strong assumption.  But if I make that assumption,

18 I still would say that the application of the Texas study to

19 Alabama is not very helpful.

20 Q.  And why is that?

21 A.  The reason would be that -- and I'm sharing this exactly

22 with what Dr. Joyce has commented about trying to extrapolate

23 from the Texas study to other situations which involve abortions

24 for women of all gestational ages.  And he says that there's no

25 clear reason why it would be applicable.  The difficulty is that

1    abortions at 16-plus weeks' gestation account for only about

2    five percent of all abortions, and these women have limited time

3    to make other arrangements.  And the distances we're talking

4    about in Texas are much greater than anything in Alabama.  So to

5    try to transfer this to a whole population of women interested

6    in obtaining abortions simply is very, very limited.

7    Q.  Dr. Uhlenberg, just so that the record is perfectly clear,

8    what was the Colman and Joyce study's main goal?

9    A.  Well, I -- I'm not sure I have it right, but I think it had

10   to do with what the effect of this law would be on the number of

11   women obtaining late-term abortions in Texas and what impact it

12   would have on the clinics.

13   Q.  So did it deal directly with the relationship between

14   distance and abortion rates?

15   A.  No.  That's something that would have been very helpful if

16   they had actually calculated changes in abortion rates for

17   counties based upon the change in distance to an abortion

18   provider.  The data were available to do that; but for some

19   reason, they didn't.  So all they do is say that there was this

20   average change in distance of 200 miles or something and then

21   suggest that that was perhaps the deterrent to women traveling

22   out of state to obtain abortions.

23   Q.  Now, I think I heard you right to say that they said perhaps

24   that was a deterrent.  Was that correct?

25   A.  I wouldn't -- I would not suggest that they said perhaps.  I

1   think they said it may have been a deterrent, was their

2   language.

3   Q.  All right.  But in Dr. Henshaw's expert report, which is

4   Plaintiff's Exhibit 61, he concluded that the Joyce study showed

5   that the travel burden imposed by the ASC law, which was the

6   2004 Texas law, prevented thousands of women from obtaining

7   abortions.  So are you saying that Colman and Joyce did not make

8   that assertion in their article?

9   A.  No.  They never say that it prevented any particular number

10  of women from obtaining abortions that they wanted.

11  Q.  What did they say?

12  A.  They said that they found a significant decline in the

13  number of Texas women obtaining late-term abortions after the

14  law was in effect compared to the preceding time period.

15  Q.  So I've just mentioned Dr. Henshaw's expert report wherein,

16  as you note in your expert report, he argues repeatedly that the

17  implementation of HB 57, which is the Alabama act, would prevent

18  a substantial number of women from obtaining abortions in

19  Alabama.  In your expert opinion, did Dr. Henshaw make any

20  assumptions that would have affected his conclusions about the

21  law's effects on accessibility to abortion services?

22  A.  Well, he bases that opinion on probably four different

23  studies that show a correlation between distance from provider

24  and abortion rates at a county level.  In none of those studies

25  do the authors suggest that the distance is preventing women

1    from obtaining abortions.  So I think that Dr. Henshaw is making

2    a very large jump here from finding studies that correlate

3    distance to a provider with abortion rates at the county level

4    with the conclusion that women are being prevented from

5    obtaining abortions because of distance.

6    Q.  Now, in your report, you cited some events from other

7    states.  I remember specifically an example from Tennessee where

8    abortion clinics were responding to laws similar to HB 57, laws

9    that required admitting privileges.  I wonder if you could tell

10   us what happened in those states.

11   A.  Yes.  I have a few states where this would be relevant.  In

12   Tennessee, a very similar law was enacted.  It was not

13   challenged in the courts, and so the abortion clinics had to

14   comply with the law or close.  And eight of the nine abortion

15   clinics in Tennessee were able to comply with the law; that is,

16   they continued operation after the law was in effect.

17       In Utah, a somewhat similar law, not identical, did not have

18   the effect of closing any of the four abortion clinics in Utah.

19       In North Dakota, where the law was going to a court trial,

20   the one abortion clinic that had brought the case the last week

21   or so was able to obtain hospital admitting privileges for their

22   doctors.  And so the -- the case was withdrawn.

23       And in Wisconsin, where a very similar case is being heard,

24   the abortion provider in Appleton claimed that they would be

25   forced to close if the law was enacted; but now they -- their

1   doctors have been able to obtain admitting privileges, and so

2   the clinic does not have to close.

3        Also, we have the situation in Texas, which was recently

4   decided.  And in that case, we had plaintiffs saying that

5   abortion clinics in several cities would be forced to close if

6   the act was enforced.  And in some of those cases, those clinics

7   were able to obtain admitting privileges for their doctors, and

8   so they're still open.

9        So because this law is relatively recent in terms of being

10  enforced, we don't have a whole range of states to look at.  But

11  as far as I know, in every state where this has been suggested,

12  that it would force abortion clinics to close, at least some of

13  the clinics have not been forced to close.

14  Q.  So Doctor, just to make the record perfectly clear, are you

15  saying -- are you opining that these situations are more

16  applicable to the situation in Alabama than the studies cited by

17  Dr. Henshaw?

18  A.  I -- I don't know the situation in Alabama at all well in

19  terms of hospitals granting admitting privileges.  But, of

20  course, we do have the abortion clinics in Huntsville and

21  Tuscaloosa where doctors have been able to obtain admitting

22  privileges.  And so that's the only basis I have for suggesting

23  that a huge metropolitan area like Birmingham -- it really seems

24  plausible that an abortion doctor could obtain admitting

25  privileges.

1   Q.  And Doctor, that was a bad choice of words on my part.

2   Would you say that the evidence that we've seen in those other

3   situations is more predictive of what might happen in Alabama

4   should the law go into effect?

5   A.  I'm sorry.  Are we talking about Henshaw's generalization

6   from other states?

7   Q.  No, sir.  Talking about the -- the different states that you

8   have just spoken about, Utah, South -- North Dakota -- excuse

9   me -- Wisconsin; that what we have seen with those laws and

10  their admitting privileges might be more indicative of what we

11  might hope to see in Alabama.

12  A.  Yeah.  I would have difficulty knowing whether the same

13  situation would apply in Alabama, but at least we have evidence

14  that abortion clinics that have claimed they would have to close

15  in these other states did not in fact have to close because they

16  were able to obtain admitting privileges.  I think admitting

17  privileges differ from state to state, and so it is only

18  suggestive of cases where this has really been tested and found

19  that abortion clinics often can comply with that requirement.

20  Q.  And Dr. Uhlenberg, let's assume for the moment that some of

21  the plaintiff clinics here did have to close because of the law,

22  if HB 57's admitting privileges requirement went into effect.

23  Are there other ways that access to abortion could be

24  maintained?

25  A.  Well, I think we've already mentioned that a new clinic

1  could open, which would increase access.  I think we've already

2  mentioned that women could travel to clinics in another area,

3  which presumably many women from Birmingham already are doing

4  that.  And so it's not clear that the burden would be very great

5  on them traveling to other abortion clinics to obtain abortions.

6  In the long-term, another possibility is that the provision of

7  abortions could shift from abortion clinics to OB-GYN doctors

8  incorporating abortion within their more general practices.  And

9  this has been suggested as a trend that might emerge as support

10  for that kind of plan, though that would presumably be a

11  long-term shift, not an immediate solution to the problem.

12  Q.  I'd like to turn now to the Shelton study that's discussed

13  in Dr. Henshaw's expert report.  Are you familiar with this

14  study?

15  A.  Yes.  I've reviewed that study.

16  Q.  During his trial testimony, Dr. Henshaw stated that the age

17  of this study did not in any way diminish its value for

18  predicting outcomes today.  Do you agree with his opinion on

19  that?

20  A.  No.  I think that a study that is -- I'm trying to think how

21  many years old it is now -- I think 50 years ago or so,

22  conditions have changed remarkably so that you would need to be

23  hesitant in terms of trying to say what happened in Georgia in

24  the 1970s, early 1970s, is applicable to Alabama in 2014.

25  Q.  What would be different now than it was in the mid 1970s if

1  I represent to you that that study was conducted in 1976?

2  A.   Yes.   The information available has changed remarkably now

3  with Internet so that it is very easy for people to gather

4  information about abortion providers, about transportation,

5  Google maps.   And we have increased use of Facebook and other

6  social media arrangements so that people can communicate

7  generally, get information, ask for support, ask for advice.

8  This -- these are just some of the way -- things that have

9  changed remarkably since the mid 1970s.

10  Q.   Now, your report also stated that there were problems in

11  using this particular study, regardless of its age, to predict

12  what could happen in Alabama.   One of the problems I believe

13  that you mentioned was the specific timing of that study, not

14  its age but when it was conducted.   What would that problem have

15  been?

16  A.   Well, this was probably a couple of years after *Roe v. Wade*

17  had been decided.   And up until that time, abortion had been

18  illegal in Georgia.   And one might assume that in rural areas

19  especially, there was not widespread acceptance of abortion as a

20  solution to unwanted pregnancy.   In a major metropolitan area

21  like Atlanta, it might be much more accepted.   And so the

22  information, attitudes toward abortion at that time period were

23  very different than they are today.

24  Q.   Why would we make the assumption that the attitudes in

25  Atlanta, which is also in Georgia, would be different from the

1  attitudes of the women living in rural Georgia?

2  A.   Yes.   All studies of urban/rural differences find that the

3  composition of the population differs, the -- things like church

4  attendance differ by rural/urban residents, access to medical

5  care, just a whole range of variables.   And so in large

6  metropolitan areas, I think we tend to find people with more

7  liberal attitudes, less -- greater anonymity, less constrained

8  by the community feelings.   And I haven't formulated a good

9  answer to your question, but all the evidence is that urban

10  areas differ substantially from rural areas on a lot of

11  dimensions.

12  Q.   Thank you, Doctor.   I want to ask you a couple of quick

13  questions about there are, I believe, three other studies that

14  Dr. Henshaw cites in his report to support his conclusions

15  regarding the correlation of distance to an abortion provider

16  and abortion rates.   And those are, I believe, a Dobie study,

17  Brown, and Matthews.   Are you familiar with those studies?

18  A.   Yes.   I've looked at all those.

19  Q.   And what is your expert opinion of those studies?

20  A.   In none of those studies do the authors report that any

21  women were denied access to an abortion that they wanted.   None

22  of those studies, in fact, look at characteristics of individual

23  women to determine whether they obtain an abortion or not that

24  they want.   And so they are based on aggregate data, usually at

25  the county level, and are for primarily reporting that counties

1   that are further from places where abortions are provided have

2   lower abortion rates than counties that are close to abortion

3   providers.  That is not very compelling evidence that distance

4   is the cause of lower abortion rates in these more distant

5   counties or that women in those counties have been prevented

6   from obtaining abortions that they want.

7   Q.  You also made the point in your expert report that

8   Dr. Henshaw didn't cite any literature that might contradict his

9   opinions.  Are there studies that contradict his conclusions?

10  A.  There are two or three studies that have concluded that

11  distance is not a significant predictor of abortion rates.  One

12  of these studies is probably valuable because this is looking at

13  individual women over time and comparing those who obtained

14  abortions to those who did not obtain abortions.  And that study

15  found that women's proximity -- or the availability of abortion

16  providers was not a predictor of whether these women obtained

17  abortions or not.  This is, I think, the Currie study.  I could

18  look up the whole title if you want.  Do you need the title for

19  that study?

20  Q.  Is it written in your expert report?

21  A.  Yes, it is.

22  Q.  Then we'll rely on that.  And just to confirm, you said it

23  was three different studies that contradicted his conclusions?

24  A.  Well, I referred to two studies.  The other was by Gohmann,

25  G-O-H-M-A-N-N, which is relatively similar to the Matthews study

1   in terms of looking at differences across states.  One of them

2   finds that access to abortions in the state is a predictor of

3   higher abortion rates.  The Gohmann study finds that it is not a

4   predictor.

5       I'm not -- what I'm not suggesting is that these are the

6   only two studies which don't support the conclusion of

7   Dr. Henshaw.  It was more to draw attention to the fact that he

8   has selected only studies that would reinforce his perspective.

9   Q.  Doctor, in your report, you also look specifically at some

10  data for the state of Alabama; specifically, I believe, from the

11  years 2005 to 2008.  Do you recall --

12  A.  Yes.

13  Q.  -- looking at that data?

14  A.  Yes.

15  Q.  What did it show?

16  A.  I think that the reference I was making there was to the

17  fact that the number of abortion providers in Alabama actually

18  declined from 2005 to 2008, but the abortion rate increased

19  somewhat.  I would also say that the same situation applied to

20  other states.  It wasn't unique to Alabama.  That a declining

21  number of abortion providers does not necessarily imply that

22  abortion rates will decrease.

23  Q.  What other states are you referring to?

24  A.  I don't have a whole list of states in front of me, but I

25  remember a significant decline in either number of abortion

1    providers or an increase in number of women living in counties

2    without an abortion provider occurred in Illinois and

3    Pennsylvania, but both of those states experienced increasing

4    abortion rates between 2005 and 2008.  There were other states

5    as well.  I haven't gone through and written down what those

6    states -- or I don't have that with me.

7    Q.  Dr. Uhlenberg, if you would, please look at your expert

8    report, which is, again, Defendant's Exhibit 6, on page 10, at

9    paragraph 16.  And just let me know when you get there.

10   A.  Yes.

11   Q.  And will you summarize the contents of this paragraph for

12   me.

13   A.  The first part of the paragraph is what we just discussed,

14   is that you cannot conclude that a decrease in number of

15   abortion providers in the state will lead to decreasing abortion

16   rates, because that did not happen in Alabama between 2005 and

17   2008.  The second part turns that around and says that, also,

18   increasing access to abortion does not necessarily mean that

19   abortion rates go up.  And we have the evidence there from Iowa

20   where telemedicine was used to increase access to abortion for

21   women in rural parts of the state, but the abortion rate in Iowa

22   did not increase after those were in place, after women had much

23   greater access to abortion.

24   Q.  And I wonder, Doctor, could you give me the specific data,

25   the numbers, for what the rate changes were in both of those

1    states.

2    A.   In Iowa?

3    Q.   In Iowa and then in Alabama.

4    A.   Okay.  Well, the videoconferencing made dispensing abortion

5    pills to women in clinics throughout the states allowed.   So

6    I don't have a number of new abortion clinics that were --

7    clinics providing abortions were, but it was substantial.   And

8    despite that increase, the number of abortions declined by 30

9    percent between 2007 and 2012 in Iowa.   So it was a very

10   significant drop in number of abortions despite greater access.

11       In the case of Alabama, the number of abortion providers

12   declined from 13 in 2005 to eight in 2008.   And the abortion

13   rate remained essentially stable at 11.9.   It increased to 12.0.

14   Q.   So it's actually a small increase, correct?

15   A.   A small increase, but I wouldn't make much of that.

16   Q.   Would you consider a drop from 13 abortion providers down to

17   eight within a span of three years a loss of a large number of

18   abortion clinics in Alabama, proportionally speaking?

19   A.   Yeah.  To answer that question, I would have to have

20   information about the number of abortions provided at each of

21   the different clinics; but certainly, it looks like a trend

22   going on here of a declining number of abortion providers.

23   Q.   And that doesn't appear to affect the abortion rate,

24   correct?

25   A.   Could you repeat that?

1  Q.  I'm sorry.  That doesn't appear to affect the abortion rate,

2  correct?

3  A.  It did not.  It -- again, one cannot say whether it affected

4  the abortion rate, but the abortion rate did not go down as a

5  consequence of that.  So there might have been other factors

6  involved that would have maintained the higher abortion rate.

7  I'm just trying to be cautious here in again saying that

8  correlation is not an indicator of causation.

9  Q.  Now, Doctor, we've talked some about what's been happening

10  in other states with similar legislation.  I want to ask you a

11  different question about out-of-state possibilities for women

12  seeking abortions.  If the three plaintiff clinics in this suit

13  were to all close down, what are the options for out-of-state

14  abortions?  Are they viable for the women of Alabama?

15  A.  Yes.  I think that clearly, for Montgomery, the distance to

16  Columbus, Georgia, is less than 80 miles.  And we already have

17  evidence that -- I don't know -- 900 or more women from Alabama

18  go to Georgia to obtain abortions, and so that kind of travel is

19  not exceptional.

20      For the clinic in Mobile, there's an abortion clinic

21  available in Pensacola, Florida.  I don't have the exact

22  distance, but 60 miles or something like that.  Unfortunately,

23  Florida does not report number of abortions to women from

24  other -- occurring in Florida to women from other states, so we

25  don't know the volume of that, but I have seen that that

1  Pensacola abortion clinic advertises in the Mobile context.

2  That is, if you do a Google search, abortion clinic Mobile, you

3  will get -- one of the sites that comes up near the top is the

4  Pensacola abortion center.  So it would appear that they are a

5  provider of abortions for women from Alabama.

6  Q.  Doctor, if I could get you to turn to page 11 of your expert

7  report.  And I'm specifically looking at paragraph 17.

8  A.  Yes.

9  Q.  If you would -- my apologies.  If you would, please read

10 aloud the last sentence of that paragraph.

11 A.  If abortion clinics in Montgomery, Birmingham, and Mobile

12 were to close, women in any of these cities would need to travel

13 less than 90 miles to the nearest abortion provider.

14 Q.  Thank you, Dr. Uhlenberg.  I want to ask you a couple more

15 quick questions about the other expert reports that you

16 addressed in your expert report.  One of the things that we have

17 heard about in the last couple of weeks is that poverty is

18 something that can stand in the way of accessibility for women

19 seeking abortions.  And we have heard testimony from the

20 plaintiff's expert, Dr. Katz, about poverty's effect on access.

21 Your report addresses her expert opinions and disagreed with her

22 conclusions saying that experts in the field probably wouldn't

23 agree with her.  Is that right?

24 A.  Yes.  That's my view.

25 Q.  Doctor, before I ask a couple more questions, just to

1  confirm, you wouldn't call yourself an expert in poverty

2  studies; is that correct?

3  A.   That is not a major area of my research, although I do

4  include poverty information in much of my research.   And I

5  certainly read the poverty literature and use that in my

6  classes.   So I know a great deal about poverty research in this

7  country.

8  Q.   So would it be fair to say that you're familiar enough with

9  the literature in the area to be able to summarize accurately

10  the findings of experts in the field?

11  A.   I'm confident in doing that, yes.

12  Q.   So why would you say that leading experts in the field of

13  poverty would disagree with Dr. Katz's conclusions?

14  A.   Well, the conclusion that she states in her report suggests

15  that women who are poor are incapable of planning and carrying

16  out a trip of a hundred miles or something like that to achieve

17  something that is very important to them.   And this fits more

18  into the old idea of a culture of poverty, that people who are

19  in poverty are there because they are incapable of making wise

20  choices and they're stuck in that situation.

21       That perspective on poor people or poor women, in

22  particular, has been challenged by a number of poverty experts

23  who find that people in poverty in fact do make rational

24  decisions, that they have significant social networks of support

25  and are able to make do.   No one is making light of the hardship

1   of people living in poverty, but to think that they are

2   incapable of accomplishing something like a trip of a hundred

3   miles is, I think, something that most poverty researchers would

4   not want to endorse.

5   Q.   And which poverty researchers are you thinking of

6   specifically right here?

7   A.   The first one that comes to mind is Carol Stack, who has

8   done qualitative research in the community of poor women, and

9   especially finding that from the inside, it looks very different

10  than it does for an outsider looking, who might think this is a

11  disorganized community and so on.   She finds strong levels of

12  support within the community and people able to help each other

13  out when crises emerge, a car breaks down or a child gets sick.

14  They have ways of meeting those unexpected challenges.

15      Other important research is done by someone like Kathy Edin,

16  a study called Fragile Families in Urban Areas, looking at --

17  this is mostly adolescent women who are having children.   And

18  she finds that, again, these women are not simply having

19  children because they aren't able to obtain abortions.   I mean

20  she -- I don't know how much attention she focuses on abortion,

21  but she is saying that these are the choices that these women

22  have made.   Often the pregnancy is -- sometimes the pregnancy is

23  unintended, sometimes it is intended, even though these are

24  poor, unmarried women; but the women are finding advantages to

25  having children and want to have these children.   And again, it

1  presents a picture of these women as making choices within a

2  context where those choices make sense to them.

3  Q.   Now, Dr. Uhlenberg, you also state in paragraph 18C of your

4  report, which is on page 12, that -- and I'm quoting here -- If

5  some women should decide not to obtain an abortion when the cost

6  increases, one cannot conclude that the increased cost prevented

7  the abortion.

8       Could you elaborate on that point for the Court?

9  A.   What I have in mind here is that people make choices under

10  certain constraints.  And if the cost of something goes up, they

11  may choose not to purchase that product.  It doesn't mean that

12  they're prevented from purchasing that product; but they have

13  decided that under new conditions, that they don't want to or

14  will make another choice.

15      In this situation of thinking of women who may be confronted

16  with traveling a greater distance to obtain an abortion, the

17  decision might be that this is not something that they want at

18  this point.  And even if that is their choice, I don't think the

19  way we generally use the word "prevent" would allow us to say

20  that they are prevented from traveling to obtain an abortion.

21  It is still a choice.

22  Q.   Thank you.  All right.  Dr. Uhlenberg, at the very end of

23  your report, you addressed a couple of other assertions made by

24  some of plaintiff's experts and then other declarations that

25  they had submitted at the beginning of the case.  And these

1  mainly dealt with the problems of threats of violence or fear of

2  physical harm that might be experienced by the employees of the

3  clinics.  This problem was raised by several clinic

4  administrators, and that would tend to make recruiting new

5  doctors or staying -- or finding new personnel more difficult,

6  wouldn't it?

7  A.  I'm sure there are several factors that make it challenging

8  to find doctors who want to provide abortions at these clinics.

9  If the doctors are indeed fearful of their safety, that would be

10  a consideration; but that is, of course, an empirical question

11  of whether that is a significant factor in terms of their

12  preference not to be abortion providers.

13  Q.  Well, several of them spoke about specific incidents of

14  violence, murder, that had occurred in the past.  And I believe

15  that you had a thought on that as being nonspecific.  And I

16  wondered if you could tell us what you meant by that.

17  A.  Well, one can talk about the number of abortion providers

18  who have been killed or injured in the last 50 years, but that

19  doesn't tell us what the current situation is, what the current

20  environment is.  And as I recall, looking at information on

21  abortion clinic violence in Alabama, there are no reported cases

22  in the past 15 years.  So I would think that this is probably

23  not a salient consideration for people preferring not to provide

24  abortions.

25      I also remember a study of 30 or so physicians who were

1  trained in providing abortions, and only three of them are

2  actual abortion providers, and asking why the others were not.

3  Fear of violence was expressed as the primary concern by only

4  three out of 30.  So, you know, I don't know if we have very

5  solid empirical evidence.  That's what you would really need to

6  answer that question.

7  Q.  Even if these instances of violence were more than 15 years

8  or more ago, wouldn't it be fair to say that the memory of some

9  of those instances and the extent to which people still think

10  about them have some effect on the current personnel in the

11  clinic?  I believe at your deposition, you were asked a question

12  about whether 9/11 might still have an effect on the citizens of

13  New York.

14  A.  Yes.  Of course, that is such a dramatic effect and still

15  discussed in the news and so on, that the relevance of that to

16  most people's thinking would be much greater than an abortion

17  doctor who was killed many years in the past, a single abortion

18  doctor who was assassinated.  But even in the case of New York

19  and the 9/11 tragedy, I think the evidence is that the impact

20  this has on people's daily lives falls off fairly quickly.  And

21  in research -- of course, research asking about the impact of

22  past events on current behavior, the consistent finding is that

23  those proximate events have much greater significance than those

24  events in the distant past.

25         MS. HOWELL:  Thank you very much, Dr. Uhlenberg.

1    That's all I have.

2            THE WITNESS:   Thank you.

3                             CROSS-EXAMINATION

4    BY MR. BECK:

5    Q.  Good afternoon, Dr. Uhlenberg.   My name is Andrew Beck.   We

6    met several months ago in North Carolina, as you may remember,

7    and I represent the plaintiffs in this matter.

8        Can you just, before we -- before I ask some of the

9    substantive questions, do you have before you some of the

10   documents that were printed out there?   And in particular, do

11   you have the deposition from this case, the transcript, the

12   deposition from the recent Wisconsin case, and a transcript from

13   *Karlin versus Foust*?   I just want to make sure that you have

14   those materials in front of you.

15   A.   I do have three documents that were handed to me when I

16   arrived at court, yes.

17   Q.  Wonderful.   Now, if I understand your opinions correctly,

18   it's your opinion that plaintiffs have not met our burden of

19   proving that the statute will have negative consequences; is

20   that correct?

21   A.   That's correct.

22   Q.  And you have opinions about what might happen if the statute

23   is enforced, but you are not opining on what will happen; is

24   that correct?

25   A.   I do have the opinion that the effect would not be as

1    significant as Dr. Henshaw has suggested, although he's not

2    specific about the numbers.  He says a significant number of

3    women would be affected, and I think that that is unlikely.

4    Q.  But as to the remaining opinions in your report -- we can

5    return to that subject in a second.  You are saying the clinics

6    might stay open; they might not.  Women might be able to travel;

7    they might not.  Violence might not be so bad.  You're not --

8    you're not opining firmly that, for example, the clinics will

9    stay open, are you?  You're just saying we don't know?

10   A.  I'm saying we don't know.

11   Q.  Okay.  So let's talk for a moment about your hypothesis that

12   the clinics would not close.  It's your opinion that plaintiffs

13   have not met our burden of proving that three out of the five

14   abortion clinics in Alabama would close, but you're not opining,

15   again, that those clinics will stay open; is that correct?

16   A.  Correct.

17   Q.  And you don't have evidence of any physician with privileges

18   who would be willing to perform abortions at plaintiff's

19   clinics, do you?

20   A.  No, I don't.

21   Q.  And you don't know of a single abortion provider -- I'm

22   sorry -- a single physician in Alabama who is not currently

23   providing abortions but who wants to; is that correct?

24   A.  Correct.

25   Q.  And it's also correct, isn't it, that you similarly lack any

1   evidence of a single physician in Alabama who would provide

2   abortions and who could satisfy the requirements of the act if

3   the pay for doing so were higher; is that correct?

4   A.   Correct.

5   Q.   Now, you also don't have any specific information on what

6   kinds of efforts plaintiffs could make in order to persuade

7   local doctors with privileges to work at our clinics; is that

8   correct?

9   A.   Could you repeat the question?

10  Q.   Sure.   You don't have any specific information or theories

11  about what kind of steps plaintiff's clinics could take in order

12  to ensure that physicians would work at their clinics, correct?

13  A.   I think there are rather obvious steps that could be taken,

14  so I suppose I do have a theory of what would constitute a

15  genuine effort to find an abortion provider.

16  Q.   Okay.   Let's actually -- if you could look at your

17  deposition transcript from this case, at page 46.   And let me

18  know when you're there.   I'm going to read from line 2.

19      (Brief pause)

20  A.   I think this is it.   The cover page doesn't indicate what

21  the transcript is, but it has 11/18/13.   I guess that was the

22  date of the deposition?

23  Q.   That's correct.

24  A.   Okay.

25  Q.   Tell me if I read these questions and answers correctly.

1    Question:  And do you think that they just haven't made a

2  strong enough effort yet but that with the right incentive, they

3  would make a greater effort to find providers who comply with

4  the law?  Answer:  I don't know about that.

5    Question:  And you don't know what kind of efforts they'd

6  make, for example?  Answer:  I don't know.

7    Did I read that series of questions and answers correctly

8  word for word?

9  A.  Correct.

10  Q.  And in fact, the only support for your hypothesis that

11  plaintiff's clinics would stay open is what happened in some of

12  the other states you've mentioned with admitting privileges

13  laws; is that correct?

14  A.  The evidence from other states suggests that abortion

15  clinics have been able to comply with the law of having doctors

16  with admitting privileges.

17  Q.  But you wouldn't claim that the same thing that happened in

18  those other states with admitting privileges laws would

19  necessarily happen in Alabama, would you?

20  A.  No.

21  Q.  And in fact, you, I think, testified earlier you don't know

22  whether or not hospitals in Alabama use criteria similar to

23  hospitals in other states when deciding whether or not to grant

24  privileges; is that correct?

25  A.  Yes.  Except that we do know in Alabama, some abortion

1  providers are able to obtain hospital admitting privileges.
2  Q.  But once again, you don't know -- I'm sorry.  I didn't mean
3  to cut you off, but you don't know whether or not hospitals in
4  Alabama use the same criteria as hospitals in the other states
5  you've listed in determining whether or not to grant physicians
6  privileges; is that correct?
7  A.  I don't have that information.
8  Q.  And so you don't actually know whether or not plaintiff's
9  clinics would close; is that correct?
10  A.  I don't know.
11  Q.  You testified earlier that you submitted a declaration -- or
12  you're referring, actually, to the Texas lawsuit concerning an
13  admitting privileges law in that case; is that correct?
14  A.  Yes.
15  Q.  And you submitted a declaration in that case?
16  A.  I -- I believe it was a declaration, yes.
17  Q.  And in that declaration, just like in this case, you
18  questioned the assumption that abortion clinics would cease to
19  operate if the law went into effect; is that correct?
20  A.  Correct.
21  Q.  And you are aware that the admitting privileges law in Texas
22  has gone into effect; is that correct?
23  A.  Yes.
24  Q.  And you believe that six clinics have closed in Texas since
25  that law became effective; is that correct?

1  A.   I don't have information on all the abortion clinics in

2  Texas, but I have seen evidence that six have closed.

3  Q.   You've also hypothesized that if plaintiff's clinics are

4  forced to stop providing abortions, new abortion clinics might

5  open to take their place; is that correct?

6  A.   Yes.

7  Q.   You have no information, though, about anyone who intends to

8  open an abortion clinic if plaintiff's clinics close; is that

9  correct?

10  A.   Are you referring to Alabama?

11  Q.   That's correct.   Yes, I'm referring to Alabama.

12  A.   I don't -- okay.   No, I don't know about the situation in

13  Alabama.

14  Q.   And so you are just speculating that new clinics might open;

15  is that correct?

16  A.   I'm suggesting that as a possibility, as it happened in --

17  is happening in Texas, yes.

18  Q.   But at this point, it's speculation, correct?

19  A.   Yes, it's speculation about what could happen.

20  Q.   And even if a new abortion clinic were to open, you have no

21  information about when that would happen; is that correct?

22  A.   That's correct.

23  Q.   And it could be years before such a hypothetical clinic

24  would open?

25  A.   That's possible.

1  Q.  And there's no guarantee that such a hypothetical clinic

2  would ever open; is that correct?

3  A.  Correct.  It's possible that one could open next year or

4  it's possible that one would never open.

5  Q.  You also made reference to what you described as an emerging

6  trend in the provision of abortion care concerning provision of

7  abortion at OB-GYNs' offices; is that correct?

8  A.  I reported on an article that suggested that was an emerging

9  trend, yes.

10  Q.  And that article is a *New York Times Magazine* article by

11  Emily Bazelon called The New Abortion Providers; is that

12  correct?

13  A.  Correct.

14  Q.  Do you have your expert report in front of you?

15      (Brief pause)

16  Q.  And I'm specifically asking about paragraph 24 of your

17  expert report.  Tell me when you're there.

18      (Brief pause)

19  A.  Yes.

20  Q.  In paragraph 24, you quote this magazine article as saying

21  that, If the young doctors succeed at making abortion mainstream

22  and respected within medicine, abortion could move from clinics

23  to doctors' offices and hospitals.  Did I read your quotation of

24  that article correctly?

25  A.  Yes.

1  Q.  You have no information as to whether or not young doctors

2  are succeeding at making abortion mainstream and respected

3  within medicine in Alabama; is that correct?

4  A.  Correct.

5  Q.  And you also have no evidence that the provision of abortion

6  in Alabama would move to hospitals if plaintiff's clinics should

7  close; is that correct?

8  A.  Correct.

9  Q.  And the same question as to physicians' offices or OB-GYNs'

10 offices.  You have no information as to whether or not the

11 provision of abortion would shift to those offices if

12 plaintiff's clinics should cease providing abortions?

13 A.  Correct.

14 Q.  Now, Dr. Uhlenberg, you would agree that if plaintiff's

15 clinics close and if no new clinics open, that would increase

16 the distance that some women in Alabama would have to travel in

17 order to obtain an abortion; is that correct?

18 A.  Yes.

19 Q.  But you believe that plaintiffs have not met our burden of

20 proving that increased travel distance to obtain an abortion

21 would restrict abortion access; is that correct?

22 A.  Yes.

23 Q.  You would agree that an increase in travel distance would

24 increase the cost of obtaining an abortion for some women in

25 Alabama; is that correct?

1   A.   Yes.

2   Q.   And you have no opinion about the amount by which this

3   increased travel would increase the cost of obtaining an

4   abortion?

5   A.   I don't have those estimates, no.

6   Q.   You would also agree with me that proximity to an abortion

7   provider is one of the predictors of abortion rates in a given

8   area, correct?

9   A.   In the case of Alabama, I don't have that information.

10  Q.   How about in general?  Would you agree with me that in

11  general, proximity to an abortion provider is one of the

12  predictors of abortion rates in a given area?

13  A.   I know that several studies have reported that.

14  Q.   And you would agree that the majority of studies relating

15  abortion rates to distance find that there is a relationship

16  between travel distance and abortion rates; is that correct?

17  A.   Yes.  I would agree with that.

18  Q.   You would also agree that the number of abortion providers

19  in the state could have an effect on the abortion rate; is that

20  correct?

21  A.   I suppose anything could, yes.

22  Q.   And you've previously testified under oath that it is

23  reasonable to conclude that if one is geographically close to an

24  abortion provider, it would be easier to get an abortion; is

25  that correct?

1  A.  Well, that's a reasonable statement.  There might be

2  qualifications to that; but in general, that seems like a

3  reasonable conclusion.

4  Q.  And you still stand by that testimony today, don't you?

5  A.  Yes.

6  Q.  You have also previously testified, again under oath, that

7  access to abortion providers has an effect on abortion rates,

8  correct?

9  A.  I believe this is what you called to my attention from

10  testimony of some 20 years ago.  And as I recall in the

11  deposition, I said I would qualify that at this point.

12  Q.  But at that time, you did testify under oath that -- that

13  access to abortion providers has an effect on abortion rate; is

14  that correct?

15  A.  If that's what I said, yes.

16        THE COURT:  How much longer are you going to be?

17        MR. BECK:  I probably have about 15 or 20 minutes more.

18        THE COURT:  Okay.  And recross?

19        MS. HOWELL:  Should be very brief, Your Honor.  Just

20  about ten minutes.

21        THE COURT:  We're having some technical problems.

22  We'll take just a brief recess.

23     (Recess at 2:29 p.m. until 2:50 p.m.)

24        THE CLERK:  Please remain seated.  Court is in session.

25        THE COURT:  Proceed.

1        MR. BECK:  Thank you, Your Honor.

2   Q.  Dr. Uhlenberg, you have also, continuing the previous line

3   of questioning, previously testified under oath that the

4   evidence showing that travel distance has an impact on women's

5   access to abortions is quite solid, correct?

6   A.  I think that was the statement I made, yes.

7   Q.  You would agree with me that at some critical point, an

8   increase in travel distance would have an effect on abortion

9   rates, correct?

10  A.  Right.

11  Q.  Now, you testified earlier about events in Iowa related to

12  telemedicine.  Do you recall that testimony?

13  A.  Yes.

14  Q.  And the source of the -- or the source of your opinions on

15  that point, or the basis, was a *USA Today* news article on Iowa;

16  is that correct?

17  A.  Yes.  That's not the only source, but that's one I cite.

18  Q.  The only source you cited in your report is a *USA Today* news

19  article; is that correct?

20  A.  Correct.

21  Q.  The *USA Today* news article is not a peer-reviewed scholarly

22  study, is it?  It's just journalism?

23  A.  Journalism.

24  Q.  And the story doesn't conduct any statistical analysis, does

25  it?

1   A.   No.

2   Q.   Nor does it attempt to account for the influence of any

3   potentially confounding factors; is that correct?

4   A.   Correct.

5   Q.   And you would agree with me that a confounding factor is an

6   unaccounted-for variable; is that correct?

7   A.   Yes.

8   Q.   The news story mentions that at the time period in question,

9   there was a multimillion-dollar free contraceptive demonstration

10  project going on in Iowa; is that correct?

11  A.   I think that's correct.

12  Q.   And I think you'd agree with me that increased contraceptive

13  use could be a confounding factor in terms of the number of

14  abortions; is that correct?

15  A.   It could be.

16  Q.   And the news story doesn't rule out the potential influence

17  of increased contraceptive use at the time as a confounding

18  factor for the data it reports; is that correct?

19  A.   Correct.

20  Q.   And you also can't rule out increased contraceptive use as a

21  potentially confounding factor?

22  A.   Correct.

23  Q.   The news story also mentions increased antiabortion protest

24  activity in Iowa at that time; is that correct?

25  A.   Yes.

1  Q.   And like increased contraceptive use, that increased protest

2  activity could be a potentially confounding factor for the

3  abortion statistics at that time; is that correct?

4  A.   It could influence the abortion rate, yes.

5  Q.   And the article does not rule that out as a potentially

6  confounding factor?

7       I'm sorry.  I didn't hear your answer.

8  A.   No.

9  Q.   No.  And you can't rule that out as a potentially

10  confounding factor either; is that correct?

11  A.   Correct.

12  Q.   And would you agree with me that it would be unwise to go

13  very far in drawing a conclusion based on this *USA Today* news

14  article about the relationship between abortion rates and

15  distance to an abortion provider?

16  A.   I wouldn't go beyond the conclusion that increasing --

17  decreasing distance means that the abortion rate would increase.

18  Q.   But you would agree with me that this article is of lesser

19  quality compared to, for example, scholarly studies, as far as

20  evidence goes?

21  A.   Yes.  It's not scholarly.

22  Q.   And it's of lesser quality as evidence goes, correct?

23  A.   Yes.

24  Q.   Dr. Uhlenberg, you also testified using Alabama statistics

25  that a decline in the total number of abortion providers in

1    Alabama didn't necessarily change the abortion rate; is that

2    correct?

3    A.   Correct.

4    Q.   If all of those clinics closed in cities where one clinic

5    remained open, that wouldn't affect the travel distance for any

6    woman seeking an abortion in Alabama in any meaningful way,

7    would it?

8    A.   Correct.

9    Q.   You also testified about a study by Janet Currie that did

10   not find a relationship between travel distance and abortion

11   rates; is that correct?

12   A.   Yes.   For individual women.

13   Q.   And that study used, as its measure of abortion incidence, a

14   self-reported survey called the National Longitudinal Survey of

15   Youth; is that right?

16   A.   I'm not sure what you mean by self-reported.   Individuals

17   gave answers to questions.   Is that what you mean?

18   Q.   Yes, that is what I mean.   I believe it's described in the

19   article itself as a self-reported survey, but I guess I'm more

20   interested in just the name, the National Longitudinal Survey of

21   Youth.   Is that correct?

22   A.   That's correct.

23   Q.   And you don't think, I believe -- you don't think that that

24   survey is a reliable measure of abortion incidence, do you?

25   A.   No.   That's not the purpose.

1  Q.   But it -- okay.   And so you would agree with me that it's

2  not a reliable measure of abortion incidence?

3  A.   It should not be used in that way, yes.

4  Q.   And would you agree with me that the unreliability of that

5  data could affect the results of this study?

6  A.   It -- it could or it may not.   Yes.

7  Q.   And would you also agree with me that this study's measure

8  of the availability of abortion providers is not the best

9  measure of provider availability?

10  A.   Probably.   I would have to review that question.

11  Q.   Do you recall testifying at your deposition that you agreed

12  that the measure of abortion -- of abortion provider

13  availability was not the best measure?

14  A.   I don't recall saying that, but I -- I'm not saying I didn't

15  say that.

16  Q.   Okay.   You testified also about a study by Steven Gohmann

17  which did not find a relationship between abortion rates and

18  travel distance; is that correct?

19  A.   Correct.

20  Q.   And you would agree with me that that study has significant

21  weaknesses; is that correct?

22  A.   Weaknesses like all the other studies that were reviewed,

23  yes.

24  Q.   Switching gears to a different topic, Dr. Uhlenberg, you

25  don't consider yourself an expert on the extent to which

1    abortion providers experience violence and harassment, do you?

2    A.   No.   My expertise is in the area of evaluating statistics

3    and reports on that.

4    Q.   And so you don't consider yourself an expert on that

5    particular subject.

6    A.   That's a very narrow topic that I wouldn't list as an area

7    that I'm an expert in.

8    Q.   And you are not offering any opinion in this case about

9    whether or not abortion providers in Alabama experience

10   harassment and intimidation, are you?

11   A.   No.

12   Q.   And you have no idea whether abortion providers in Alabama

13   operate under a threat of violence; is that correct?

14   A.   That's right.

15   Q.   Is it correct that you've served as an expert witness in

16   eight to ten cases dealing with abortion?

17   A.   That sounds right.   I wouldn't -- if it's 11, I -- it's

18   possible, but eight or ten sounds about right.

19   Q.   Okay.   And in all of those cases, you've testified as a

20   witness for the state in defense of laws restricting abortion;

21   is that correct?

22   A.   Yes.

23   Q.   And the vast majority of your academic work has not

24   addressed abortion or reproductive health; is that correct?

25   A.   Yes.

1  Q.  And apart from the instances in which you've served as an

2  expert witness in litigation, you've done no original research

3  on abortion; is that correct?

4  A.  Limited research related to teaching.

5  Q.  But you've done -- you've conducted -- oh, excuse me,

6  Dr. Uhlenberg.  You've conducted no original research on

7  abortion outside of your work in litigation; is that correct?

8  A.  I have not published any research on that topic.  I expect

9  that I have done original research related to questions that

10  have come up with regard to teaching or other interests --

11  Q.  But none of that research has been --

12  A.  -- outside of litigation.

13  Q.  I apologize.  Could you repeat the end of your last answer?

14  I cut you off.

15  A.  I said I think the research was outside -- some of the

16  original research would have been outside of litigation research

17  but was not published, if that's the key element here.

18  Q.  And you've written no publication, whether peer-reviewed or

19  otherwise, on the topic of abortion; is that correct?

20  A.  Correct.

21       MR. BECK:  Your Honor, may I have one moment to confer

22  with counsel?

23       THE COURT:  Yes.

24   (Brief pause)

25       MR. BECK:  Thank you, Dr. Uhlenberg.  We have no

1    further questions.

2                         REDIRECT EXAMINATION

3    BY MS. HOWELL:

4    Q.  Dr. Uhlenberg, I just have a couple of follow-up questions

5    for you.  Mr. Beck just asked you some questions about whether

6    the plaintiff clinics in this case would definitely close, did

7    he not?

8    A.  I think so.

9    Q.  And at that point, you replied that you didn't know; is that

10   correct?

11   A.  That's right.

12   Q.  And you said that that was speculation; is that right?

13   A.  Yes.  Speculation as to whether it would or would not close.

14   Q.  Wasn't your point that no one could know whether the clinics

15   would close at this point?

16   A.  I think based on the experience of other states, that would

17   be a correct assertion.

18   Q.  So any speculation -- well, any answers about the ultimate

19   fate of the clinics would be speculation at this point; is that

20   correct?

21   A.  That would be my position.

22   Q.  Now, would it also be speculation to assume that abortion

23   clinics will close, as Dr. Henshaw did in his expert report?

24   A.  Yes.  I think he provides no evidence to support that

25   position except that's what he was told.

1  Q.   Okay.   And it would also be speculation to assume that no

2  other doctors in Alabama would perform abortions or would be

3  willing to perform abortions in the future; is that correct?

4  A.   Yes.   I'm quite sure that no research has been done of all

5  doctors in Alabama to answer that question.

6  Q.   So ultimately, a conclusion that the law would definitely be

7  a burden on women requires a lot of speculation, does it not?

8  A.   That would be my position.

9  Q.   Now, Mr. Beck also asked you about a *USA Today* article that

10  had contained certain facts about telemedicine and the

11  availability of abortions in Iowa; is that right?

12  A.   Yes.   Yes.

13  Q.   And to your knowledge, journalism is a method of reporting

14  or cataloging, for history, facts; is that correct?

15  A.   Well, that may be one function.

16  Q.   Now, the article presented the fact that access to abortion

17  increased, right?

18  A.   Yes.

19  Q.   And the article also presented the fact that at the same

20  time that access increased, the abortion rates decreased; is

21  that right?

22  A.   Yes.

23  Q.   Have you seen anything, whether scholarly or purely

24  journalistic, that contradicts those two facts?

25  A.   Well, I saw Rachel Jones from the Guttmacher Institute in

1  her most recent report on abortion incidence and clinic

2  availability -- I think that's the title of it -- which comes

3  out every few years -- made that same point in her article.

4  That's the other place I have seen that reported.

5  Q.  But you have seen nothing else that contradicts the facts.

6  A.  No.

7          MS. HOWELL:  Thank you very much, Dr. Uhlenberg.

8          MR. BECK:  We have no further questions, Judge.

9          THE COURT:  Thank you.

10          Thank you very much, Doctor.  Thank you.

11          THE WITNESS:  Thank you.

12      (End of excerpt)

13                    * * * * * * * * * *

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4            This 27th day of May, 2014.

5

6                                   /s/ Risa L. Entrekin
                                    Registered Diplomate Reporter
7                                   Certified Realtime Reporter
                                    Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25