1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE MIDDLE DISTRICT OF ALABAMA

3                            NORTHERN DIVISION

4

5  PLANNED PARENTHOOD
   SOUTHEAST, INC., et al.,

6
            Plaintiffs,

7
        vs.                      CASE NO.:  2:13cv405-MHT

8  LUTHER STRANGE, et al.,

9
            Defendants.

10

11

12                              VOLUME I

13                      * * * * * * * * * *

14                   NONJURY TRIAL PROCEEDINGS

15                      * * * * * * * * * *

16          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

17  DISTRICT JUDGE, at Montgomery, Alabama, on Monday, May 19, 2014,

18  commencing at 10:08 a.m.

19  APPEARANCES:

20  FOR THE PLAINTIFFS:     Ms. Alexa Kolbi-Molinas
                            Mr. Andrew David Beck
21                          Ms. Susan Talcott Camp
                            Ms. Julia Heather Kaye
22                          Attorneys at Law
                            AMERICAN CIVIL LIBERTIES UNION
23                          125 Broad Street, 18th Floor
                            New York, New York  10004-2400

24

25

```
 1   APPEARANCES, Continued:

 2   FOR THE PLAINTIFFS:        Ms. Jennifer R. Sandman
                                Ms. Maithreyi Ratakonda
 3                              Attorneys at Law
                                PLANNED PARENTHOOD FEDERATION
 4                              OF AMERICA
                                434 West 33rd Street
 5                              New York, New York  10001

 6                              Ms. Dyanne Griffith
                                Attorney at Law
 7                              WILMER CUTLER PICKERING
                                HALE & DOOR, LLP
 8                              1875 Pennsylvania Avenue NW
                                Washington, D.C.  20006
 9
                                Mr. Randall C. Marshall
10                              Attorney at Law
                                ACLU of ALABAMA FOUNDATION, INC.
11                              P.O. Box 6179
                                Montgomery, Alabama  36106-0179
12
                                Mr. M. Wayne Sabel, Sr.
13                              Attorney at Law
                                SABEL & SABEL, P.C.
14                              2800 Zelda Road, Suite 100-5
                                Montgomery, Alabama  36106
15

16   FOR THE DEFENDANTS:        Mr. Andrew L. Brasher
                                Solicitor General
17                              STATE OF ALABAMA
                                OFFICE OF THE ATTORNEY GENERAL
18                              501 Washington Avenue
                                Montgomery, Alabama  36103
19
                                Mr. James William Davis
20                              Ms. Margaret Lindsey Fleming
                                Mr. Kyle A. Beckman
21                              Ms. Laura Elizabeth Howell
                                Assistant Attorneys General
22                              STATE OF ALABAMA
                                OFFICE OF THE ATTORNEY GENERAL
23                              501 Washington Avenue
                                Montgomery, Alabama  36130
24

25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:     Ms. Patricia Elaine Ivie
                             Mr. Phillip Brian Hale
 3                           Assistant Attorneys General
                             Office of General Counsel
 4                           STATE OF ALABAMA
                             DEPARTMENT OF PUBLIC HEALTH
 5                           RSA Tower
                             201 Monroe Street
 6                           Montgomery, Alabama  36104

 7              Proceedings reported stenographically;
                  transcript produced by computer.
 8
                        * * * * * * * * * *
 9
                            VOLUME INDEX
10
     JUNE AYERS
11        DIRECT BY MS. KOLBI-MOLINAS             9
          CROSS BY MS. FLEMING                   66
12        REDIRECT BY MS. KOLBI-MOLINAS          88

13   STACI FOX
          DIRECT BY MS. SANDMAN                  91
14        CROSS BY MR. DAVIS                    121
          REDIRECT BY MS. SANDMAN               134
15        RECROSS BY MR. DAVIS                  136
          REDIRECT BY MS. SANDMAN               138
16
     SHEILA KATZ, Ph.D.
17        DIRECT BY MR. BECK                    144
          CROSS BY MR. BECKMAN                  184
18        REDIRECT BY MR. BECK                  217
          RECROSS BY MR. BECKMAN                219
19
20                      * * * * * * * * * *

21

22

23

24

25
```

1      (The following proceedings were heard before the Honorable

2       Myron H. Thompson, United States District Judge, at

3       Montgomery, Alabama, on Monday, May 19, 2014, commencing at

4       10:08 a.m.:)

5      (Pursuant to oral order of the Court, any reference to an

6       anonymous doctor by name has been substituted with the

7       appropriate pseudonym)

8      (Call to Order of the Court)

9          THE COURT:  The Court calls the case of Planned

10  Parenthood Southeast and Others versus Luther Strange and

11  Others, Civil Action Number 13cv405.

12          Who do we have representing the United States?  Pardon

13  me.  The plaintiff?

14          MS. KOLBI-MOLINAS:  Your Honor, Ms. Alexa Kolbi-Molinas

15  for Plaintiff Reproductive Health Services.

16          THE COURT:  Yes.

17          MS. KOLBI-MOLINAS:  And I can introduce the other

18  counsel that you haven't met yet if you would like.

19          THE COURT:  Why don't you introduce the other counsel.

20          MS. KOLBI-MOLINAS:  Okay.  This is Ms. Jennifer

21  Sandman.  She's an attorney from Planned Parenthood Federation

22  of America on behalf of Plaintiff Planned Parenthood Southeast

23  and Kiwana Brooks.

24          MS. SANDMAN:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1          MS. KOLBI-MOLINAS:  And then we have Ms. Julia Kaye

2    from the ACLU on behalf of Plaintiff Reproductive Services.

3          MS. KAYE:  Good morning, Your Honor.

4          THE COURT:  Good morning.

5          MS. KOLBI-MOLINAS:  Maithreyi Ratakonda from Planned

6    Parenthood Federation of America on behalf of the Planned

7    Parenthood plaintiffs.

8          THE COURT:  Very good.

9          MS. KOLBI-MOLINAS:  We have Dyanne Griffith from Wilmer

10   Hale who's on behalf of other plaintiffs and Ms. Talcott Camp,

11   who is on behalf of Plaintiff Reproductive Health Services.

12         THE COURT:  Welcome.

13         And who do we have representing the defendants?

14         MR. DAVIS:  Good morning, Your Honor.

15         THE COURT:  Good morning.

16         MR. DAVIS:  I'm Jim Davis from the Attorney General's

17   Office.  Also from our office, Margaret Fleming.

18         THE COURT:  Yes.

19         MS. FLEMING:  Good morning, Your Honor.

20         MR. DAVIS:  Kyle Beckman.

21         MR. BECKMAN:  Good morning, Your Honor.

22         MR. DAVIS:  Laura Howell.

23         MS. HOWELL:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MR. DAVIS:  And our solicitor general, Andrew Brasher,

1   has also appeared in this case.

2           THE COURT:  Very good.

3           MR. DAVIS:  And then with the Alabama Department of

4   Public Health is Patricia Ivie.

5           MS. IVIE:  Good morning, Your Honor.

6           THE COURT:  Ms. Ivie.

7           One preliminary matter.  I understand that counsel for

8   plaintiffs were concerned that they might not have enough room

9   at the table; is that correct?

10          MS. KOLBI-MOLINAS:  Your Honor, we've got another table

11  over there.  And I think we will -- at the break, they'll be

12  able to find us another table that we can put binders on so

13  they're not in boxes.

14          THE COURT:  Very good.  Usually the table where you're

15  sitting is the desired table because it's closest to the jury.

16  And this table on my right is usually larger because we have

17  probation and a lot of other officers of the court sitting

18  there.  But I've never heard anyone complain about that table

19  before.

20          How do you suggest we proceed this morning?

21          MS. KOLBI-MOLINAS:  Your Honor, we're happy to proceed

22  however you would like.  We can call our first witness or if

23  you -- I think today --

24          THE COURT:  I've read everything, so I don't think I

25  need any opening statements.  We'll reserve that until the end

1   of the proceeding.

2           MS. KOLBI-MOLINAS:  And I think today and Wednesday

3   will probably be fuller with witnesses.

4           THE COURT:  Okay.

5           MS. KOLBI-MOLINAS:  So if we want to take up

6   objections, Tuesday, Thursday, or Friday might be -- but I'm

7   happy to do them --

8           THE COURT:  So you suggest we take up objections on

9   Tuesday?

10          MS. KOLBI-MOLINAS:  Okay.

11          THE COURT:  Okay.  How long do you think Tuesday will

12  last with witnesses?

13          MS. KOLBI-MOLINAS:  I think it will be a full day, but

14  we could -- there could be an hour or two.

15          THE COURT:  Maybe we could take up objections at eight

16  o'clock on Tuesday.  That way we can still put in a full day and

17  start on the objections.  That would be the objections to the

18  depositions and the objections to the exhibits.

19          Any problem starting with the first witness, Mr. Davis?

20          MR. DAVIS:  No, Your Honor.

21          THE COURT:  Call your first witness.

22          MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call

23  Ms. June Ayers.

24          THE COURT:  Okay.  Are there any -- does either side

25  desire the rule?

```
 1            MR. DAVIS:  We do --

 2            THE COURT:  Except as to experts.  I think I said the

 3   rule would not be invoked as to experts.

 4            MR. DAVIS:  You're correct, Your Honor.  For fact

 5   witnesses, we do wish that the rule be invoked.

 6            THE COURT:  Okay.  The rule is invoked for fact

 7   witnesses who are not parties.  I'm going to leave it up to you

 8   to make sure that each witness is sworn.  Do we have any -- do

 9   we have several witnesses in the courtroom right now?

10            MS. KOLBI-MOLINAS:  Yes.

11            THE COURT:  Let's swear all of them in right now.

12            MS. KOLBI-MOLINAS:  Okay.

13            THE CLERK:  Raise your right hand, please.

14       (Three prospective witnesses are sworn)

15            THE CLERK:  Who's first?

16            THE COURT:  Okay.  Proceed.

17            MS. KOLBI-MOLINAS:  Thank you.  Your Honor, we have

18   binders just for the collected exhibits that will be referenced

19   in this direct.

20            THE COURT:  Very good.  Now, I've already entered an

21   order admitting all of the exhibits to which there were no

22   objections.

23       (Brief pause)

24            THE COURT:  Proceed.

25
```

1          **JUNE AYERS**, the witness, having been duly sworn to

2     speak the truth, the whole truth, and nothing but the truth,

3     testified as follows:

4                              DIRECT EXAMINATION

5     BY MS. KOLBI-MOLINAS:

6     Q.   Good morning, Ms. Ayers.   Can you please introduce yourself

7     to the Court.

8     A.   My name is June Ayers, and I am the owner and director of

9     Reproductive Health Services here in Montgomery.

10    Q.   If I refer to Reproductive Health Services as RHS, will you

11    understand what I mean?

12    A.   Yes, ma'am.

13    Q.   How long have you lived in Alabama?

14    A.   I moved to Alabama in the summer of 1973.

15    Q.   Can you explain to the Court your educational background

16    beginning after high school.

17    A.   When I moved to Montgomery in 1973, I attended the

18    Montgomery campus of Auburn University and received a bachelor's

19    degree in psychology and went back to school again in

20    approximately '95 and received a bachelor's degree in nursing in

21    1998.

22    Q.   What did you do after you graduated from AUM?

23    A.   The very first summer, I received a phone call and -- to

24    work at Reproductive Health Services as the front desk

25    receptionist.   And so I started work there the first summer I

1  graduated.

2  Q.   Had -- when had Reproductive Health Services opened?

3  A.   It had opened that year.

4  Q.   Can you tell the Court all the positions you have held at

5  RHS since that time.

6  A.   I initially started as the front desk receptionist.  I then

7  moved to the counselor position.  I had my background in

8  psychology, which assisted that.  And I moved to the assistant

9  director position, the director position; and then a year after

10  I became director, I became co-owner.

11  Q.   Are you the sole owner today?

12  A.   I am the sole owner today.  Yes, ma'am.

13  Q.   Can you explain how -- what you did in terms of counseling

14  for patients.

15  A.   At that time, counseling was done more in a group session.

16  So we -- we provided information for informed consent.  We

17  provided emotional support for patients, information for

18  patients on not only the surgical procedures that we were doing

19  but birth control education so that when the patient moved

20  forward, she would have that information.  We helped assist with

21  the emotional aspects of abortion.  And then the family members,

22  the people that were involved also, we -- those are people that

23  we counseled with.

24  Q.   Is that any different than the counseling that you offer at

25  RHS today?

1    A.  It's a little bit different.  It's still basically the same

2    counseling for informed consent and educational purposes and

3    emotional support.  We just do it on an individual basis now

4    with the patient and whoever -- whatever family members are with

5    her.

6    Q.  What does being the director of the clinic entail?

7    A.  I do so many things at the clinic from the -- from the front

8    door to the back door.  I am in charge of the staffing and

9    making sure that my staff are trained adequately and that I have

10   the appropriate follow-through with staff such as evaluations,

11   annual evaluations, but then things as simple as TB testing,

12   CPR.

13       I do the same thing basically for the physicians that come

14   in.  I do hire the physicians, but I keep up with their

15   credentialing, which is licensure and the various aspects of

16   making sure that their credentials are up to date.

17       I do policies and procedures.  I develop those and then have

18   meetings with the medical director so that we can implement

19   those programs.

20       We -- I buy supplies for the kitchen.  I buy janitorial

21   supplies.  If something goes wrong in the clinic, I'm the person

22   they go to.  So I pretty much do everything from the front door

23   to the back door.

24   Q.  Why did you go back to school for a nursing degree?

25   A.   Initially, the -- my degree in psychology helped me in the

1    clinic as far as with patient counseling and advocacy, but I

2    wanted to have a bigger footprint.  I wanted to have a bigger

3    commitment to my patients from a medical perspective.  And there

4    are things you can't do as a layperson that you can do when

5    you're a medical professional.  And the medical -- and certainly

6    the knowledge -- you know, expanding that knowledge base helped

7    provide much -- much, much higher quality care, I think, for my

8    patients.

9    Q.   And what do you do as a nurse at the clinic?

10   A.   As the nurse, once again, I do policies and procedures.  But

11   I -- I can be involved in the -- in the medical care of the

12   patients, which means I provide patients with Depo injections,

13   which are the three-month birth control injections, with

14   medications in recovery room and -- and that type of thing.

15   Q.   What services does RHS provide?

16   A.   We provide abortion procedures.

17   Q.   And up to what gestational age do you provide abortion

18   procedures?

19   A.   We provide abortion procedures to 14 weeks.

20   Q.   When are most of your procedures performed?

21   A.   Most of the procedures are done prior to 11 weeks.

22   Q.   What other nonabortion services do you provide?

23   A.   We provide birth control services.  We provide STI testing.

24   We provide educational services for the community.  We provide

25   referrals for patients that come in that are going to continue

1    the pregnancy or are seeking adoption.  We -- we certainly can

2    manage, you know, referring those patients.  Patients that come

3    in, you know, as patients that may have other gynecological

4    problems, those are patients we're going to -- we can refer out

5    also.  So we provide supportive care in that environment.

6    Q.  Can you explain what an STI is.

7    A.  An STI is a sexually transmitted infection.

8    Q.  What percentage of services would you estimate are

9    abortions?

10   A.  Ninety-nine percent of what we do is abortions.

11   Q.  And about how many abortions do you estimate that you

12   provide per year?

13   A.  It's approximately a thousand.

14   Q.  Could you keep the clinic open if you could no longer

15   provide abortions?

16   A.  No.

17   Q.  Could you explain the method of abortion that you use at the

18   clinic?

19   A.  We use a surgical method, and it's called vacuum aspiration.

20   It is a means of anesthetizing the uterus, numbing the uterus,

21   opening it, and then removing the contents through a suctioning

22   process.

23   Q.  Ms. Ayers, could you turn to what is marked as Plaintiff's

24   Exhibit 1 in your binder?

25   A.  If somebody would provide me a binder.

1  Q.   Oh.

2       (Brief pause)

3  A.   Thank you.  Yes, ma'am.

4  Q.   Can you look it over?

5  A.   Yes, ma'am.

6  Q.   And what is that?

7  A.   That -- it is a list of the physicians that have worked at

8  my office and a pseudonym.

9  Q.   I'm going to ask you some questions about these physicians;

10  so when responding, please use the pseudonyms as opposed to

11  their names.  Do you understand?

12  A.   Yes, ma'am.

13  Q.   How many doctors currently work at RHS?

14  A.   Currently Dr. A and Dr. B work at the office.

15  Q.   And who is your primary physician?

16  A.   Dr. A is the primary physician.

17  Q.   Do Drs. A and/or B live in Montgomery?

18  A.   Neither one of them live in Montgomery.  No.

19  Q.   How do you provide care in the event of a complication?

20  A.   Then Dr. F is available.  And we have a contractual

21  agreement with Dr. F that he provides care after hours for our

22  patients.

23  Q.   Does Dr. F have privileges at hospitals in Montgomery?

24  A.   Dr. F has privileges at -- at both Baptist South, Baptist

25  East, and Jackson's Hospital, yes.

1  Q.  In the history of the clinic, have you ever had a

2  Montgomery-based doctor provide abortions at Reproductive Health

3  Services?

4  A.  No.  We've never had a Montgomery doctor.

5  Q.  Who were the first physicians to work at the clinic?

6  A.  The first physician that I worked with -- the first

7  physicians were from Pensacola.  And then -- then worked for a

8  very short period of time.  I worked then with Dr. H from

9  approximately 1982 to 2005.

10 Q.  And was Dr. H the only physician at the clinic between 1982

11 and 2005?

12 A.  Except for times when he might be on vacation, he was the

13 primary physician from '82 to 2005.  Yes, ma'am.

14        THE COURT:  Let me interrupt you here.  With regard to

15 Dr. F, who is your -- what?

16        THE WITNESS:  He's my backup physician.

17        THE COURT:  Backup physician.

18        THE WITNESS:  Backup physician.  He provides

19 after-hours care to patients that call in with any problems.

20        THE COURT:  Okay.  Does he or she exclusively do

21 complications, or does Dr. F also do abortions?

22        THE WITNESS:  He does not do abortions.  No, sir.  He

23 exclusively does --

24        THE COURT:  So Dr. F only handles complications.

25        THE WITNESS:  Complications and then -- and patients

1    that we refer for other gynecological things that he can -- he

2    can handle.

3            THE COURT:  So if there are other gynecological

4    problems, those patients would be referred to Dr. F.

5            THE WITNESS:  Yes.

6    Q.  How old was Dr. H when he retired?

7    A.  Dr. H was born in 1921, so that would have made him 84 when

8    he retired.

9    Q.  And did Dr. H ever live in Montgomery?

10   A.  No.  Dr. H initially was from Tuscaloosa and then left

11   Tuscaloosa, moved to Baltimore, and worked at Johns Hopkins in

12   Baltimore for many years.  His last years after he retired from

13   Johns Hopkins were spent in Savannah, and he traveled from

14   Savannah to Montgomery.

15   Q.  After Dr. H retired, who became the physician at RHS?

16   A.  After Dr. H retired, Dr. D had been -- during the last few

17   years had been doing the lion's share of the patients.  And

18   Dr. D became our primary physician then.

19   Q.  How long did Dr. D work at the clinic?

20   A.  She worked at the clinic ten years.

21   Q.  Where did Dr. D live?

22   A.  She lived in Birmingham.

23   Q.  Does Dr. D still work at the clinic?

24   A.  No, she does not.

25   Q.  Why not?

1  A.  Because in the latter part of 2011 moving into 2012, Dr. D's

2  information that had been provided to the Board of Medical

3  Examiners, her licensure information, had been released to

4  someone who posted it on an antiabortion site.

5  Q.  How did you know her information was on this Web site?

6  A.  I received a call from another director telling me that that

7  information was on the Web site.

8  Q.  Did you look at it?

9  A.  And then I went to the Web site and -- and pulled up the

10  information and sat down with Dr. D.  We reviewed the

11  information together.

12  Q.  Could you turn to what is Plaintiff's Exhibit 40 in your

13  binder?

14  A.  Yes, ma'am.

15  Q.  Does that look like what you saw?

16  A.  Yes, ma'am.

17  Q.  What sort of information about Dr. D did you see on the Web

18  site?

19  A.  All of her licensure information, the information that she

20  had sent to the Board of Medical Examiners to renew her license,

21  the information that they had for the last ten years of her

22  licensure.  I know that her home address was also released along

23  with her personal cell phone, family members, the information

24  that she had listed on her family.  Even the letters of

25  reference when she initially applied for licensure, those --

1  that information was also on there.  And her picture was on

2  there.

3  Q.  Do you see her picture on one of those pages in Exhibit 40?

4  A.  On the next page over, yes, I do.

5  Q.  What happened after you showed this to Dr. D?

6  A.  Dr. D was very upset that her information was on this Web

7  site and --

8           THE COURT:  We're looking at what exhibit?

9           THE WITNESS:  We're looking at --

10          MS. KOLBI-MOLINAS:  Plaintiff's Exhibit 40, Your Honor.

11          THE COURT:  I have it here.

12          MS. FLEMING:  Your Honor -- pardon me, Your Honor.  I

13  didn't understand that counsel was going to be referring to

14  exhibits that had not -- that we had objected to.

15          THE COURT:  Right.  I was about to say, there is an

16  objection to Exhibit 40.

17          MS. FLEMING:  There is an objection to this exhibit on

18  the grounds of hearsay, Your Honor.

19          THE COURT:  Right.  Grounds of what?

20          MS. FLEMING:  On the grounds of hearsay.

21          THE COURT:  Let me see for what purpose it's being

22  used.  Go ahead.

23          MS. KOLBI-MOLINAS:  Your Honor, this is being used --

24          THE COURT:  Why don't you ask your questions, and then

25  I'll see for what purpose it's being used.

1        MS. KOLBI-MOLINAS:  Well, I've asked -- the questions

2   were did she recognize that this was the Web page that she saw

3   and did she see her picture of her physician.

4        THE COURT:  Okay.  And I think you were going on to ask

5   her what?

6        MS. KOLBI-MOLINAS:  I was now going to ask about

7   Dr. D's conduct or behavior after she saw this information.

8        THE COURT:  Okay.  Did Dr. D see this page?

9        THE WITNESS:  We viewed it together.  Yes, sir.

10        THE COURT:  Okay.  I'll allow it in for the purpose of

11   showing what Dr. D did in response to this exhibit.  Whether the

12   exhibit is true or not is not necessarily the issue.  The

13   question is how did she react; that is, how did Dr. D react.  Go

14   ahead.

15   Q.  How did her conduct change after she saw this exhibit?

16   A.  Dr. D was -- told me she was very upset over --

17        MS. FLEMING:  Objection, Your Honor.  The question was

18   not what she said but how her -- what her conduct was and how

19   her conduct changed.

20   Q.  Ms. Ayers, can you tell me how her conduct changed?

21   A.  Dr. D began to -- began to show us that she was very nervous

22   about coming into the clinic and leaving the clinic.

23        MS. FLEMING:  Object.  Objection, Your Honor.  That's

24   nonresponsive.

25        THE COURT:  I think that's part of her reaction.  Go

1   ahead.   Overruled.

2   A.   She would -- she would take her tag off.   When -- about

3   three blocks away from the office, she would take her tag off

4   and then come into the office.   She would call us.   We made

5   arrangements for her to call us ten minutes ahead of time so we

6   knew that she was arriving so that I could send a security

7   officer out to escort her from the car into the building.

8   Q.   Was this her practice before she saw this information on

9   line?

10   A.   No, it was not.

11   Q.   What happened next?

12   A.   The -- her anxiety, from my perspective, began to get -- she

13   was more and more anxious about doing -- coming in and doing

14   abortions.   We had more problems with people coming up onto

15   other property taking pictures of her as she was entering, and

16   she finally just said she had -- she just had enough, and she

17   told me she was going to quit.

18   Q.   What did you do next?

19   A.   I -- at that time, I called Dr. A.   Dr. A -- we had worked

20   together many years before, but Dr. A at that time was filling

21   in for Dr. K when she went on -- Dr. D.   I'm sorry -- Dr. D when

22   she went on vacation.   And so I asked Dr. A if he would be our

23   primary physician, as Dr. D was leaving.

24   Q.   Did Dr. A or does Dr. A live in Alabama?

25   A.   No, he does not.

1   Q.   Does he work at any other clinics in Alabama?

2   A.   At that time, he was working at the facility in -- at the

3   clinic in Huntsville.

4   Q.   Does he still work there?

5   A.   He still works at the facility in Huntsville.  Yes, ma'am.

6   Q.   And you mentioned -- how did you find Dr. D?

7   A.   Dr. D was working at another clinic in Birmingham.  And I

8   talk to other clinic directors on a weekly or every other weekly

9   basis regarding a myriad of issues.  And -- and I called one of

10  the other clinics in Birmingham, and they -- they -- Dr. D was

11  working there.  I asked about, you know, how she was with

12  patients, what her surgical record was and so forth, and then

13  was given her name.  So they were -- they gave her my name.  She

14  contacted me, and we set up a meeting so that she could then

15  begin working in our office if that's what she chose to do.  And

16  she did.

17  Q.   Why did you turn to the other clinics when looking for a new

18  physician?

19  A.   Because the other clinic directors already -- they have

20  physicians that are there that I know that are interested in

21  providing abortion care on an outpatient basis, the way that we

22  do it.  And -- and it's a really good means of finding qualified

23  physicians.

24  Q.   Why is it important to you to hire physicians who have

25  experience working in a clinic setting?

1  A.   Because the clinic setting is different than a hospital

2  setting.   There are doctors that can do a D&C in a hospital

3  setting, but that patient, when they're in a hospital setting,

4  is normally asleep.   The patient is under general anesthesia in

5  most cases.   And what we do in our office is minimal anesthesia.

6  We do a local anesthesia with minimal sedation, and that patient

7  is awake and alert.   And the doctor needs to respond not only to

8  her from a medical aspect, but also he needs to respond to the

9  patient emotionally and help them through that process.

10  Q.   Have any of the physicians that have ever worked at --

11  provided abortions at RHS ever had admitting privileges at a

12  local hospital?

13  A.   No, they have not.

14  Q.   Have they had admitting privileges at other hospitals

15  outside Montgomery?

16  A.   They have had admitting privileges at other hospitals in

17  places where they live.

18  Q.   So how do you provide hospital-based care in the event of a

19  complication?

20  A.   We have a contract with Dr. F; and Dr. F, then, will provide

21  any care that -- when a patient needs to see someone after

22  hours.   If they need to see him even in his office, he will

23  provide that care.

24  Q.   So does he see all of your patients in the ER?

25  A.   No.   No.   There may be -- there may be a patient that only

1   needs some additional medications or that type of thing, and so

2   he would be available to make sure that those were prescribed

3   for the patients.  He may want to see the patient in his office

4   if he's in the office for the day.  So it's not necessarily at

5   the emergency room.  He can, certainly.  But no, it's not always

6   at the emergency room.

7   Q.  Do you provide follow-up care at the clinic?

8   A.  We schedule every patient for a follow-up exam.  They go

9   home with a postoperative sheet, and the postoperative sheet

10  initiates an exam.  We explain that to patients several times as

11  they go through the process that we want them back for a

12  checkup.  It is included in the fee.  So it's just basically

13  time and effort for the patient to come back for the checkup.

14  Q.  Are you legally required to have a backup physician?

15  A.  We are legally required, yes.

16  Q.  Were you always legally required?

17  A.  No.  We were not always legally required.

18  Q.  Did you have one even when you were not required?

19  A.  Many years ago, yes, we did.

20          THE COURT:  Let me ask you this.  You said for Dr. D

21  that on the Web site her licensure information, information that

22  she had sent to the Board of Medical Examiners to renew her

23  license, her home address, and information about family members

24  was all on the Web site.  I don't see that in the exhibit.  Is

25  that not reflected in the exhibit?

1            THE WITNESS:  It's not reflected in the exhibit.  No,

2    sir.  It -- it was -- it was extensive.

3            THE COURT:  Okay.  But that's not in this exhibit, 40.

4            THE WITNESS:  No, sir.

5            THE COURT:  Okay.  Go ahead.

6            THE WITNESS:  I --

7    Q.  Who was the backup physician before it was a legal

8    requirement?

9    A.  His name is not on this list.  It would be Dr. Henry

10   Johnson.

11   Q.  And how did you find him to be the backup physician?

12   A.  Dr. Henry Johnson was my personal OB-GYN.

13   Q.  And how long did he serve as your backup physician?

14   A.  He started in the eighties.  I can't tell you exactly when

15   in the eighties, but he started in the eighties and went through

16   2006.

17   Q.  Did you pay Dr. Johnson for backup services that he

18   rendered?

19   A.  When he saw a patient, we would pay for that patient's care

20   if the patient's care wasn't covered by insurance.

21   Q.  Can you turn to what is Plaintiff's Exhibit 38.

22   A.  Yes, ma'am.

23   Q.  Can you explain what these are.

24   A.  These are letters that I sent out in 1999.  I sent them to

25   local OB-GYNs look -- at that time, I was looking to hire a

1    local backup physician.

2    Q.  So what happened in 1999 that made you send these letters?

3    A.  Dr. Johnson was receiving flack, for lack of a better word,

4    from the hospitals for seeing our patients and -- and he was

5    asking to back out.  And we, at that time, knew that we wanted

6    somebody to provide that care, so Dr. H (pseudonym substitution)

7    and I put these letters together to send to the local OB-GYNs to

8    see if we could hire someone locally.

9    Q.  Can you read from the second paragraph of the letter

10   starting with the sentence, I do not reside in Montgomery?

11   A.  I do not reside in Montgomery; and therefore, local

12   hospitals will not grant me admission privileges.  The most

13   common complications usually require a D&C and routine

14   follow-up.  In the last ten years, this has averaged no more

15   than twice a year.  We usually treat these people -- these

16   patients -- excuse me -- appropriately in the clinic.  In

17   addition to backup, the clinic needs a physician to whom we may

18   refer obstetrical patients desiring to continue their pregnancy

19   and gynecological patients -- gynecology patients in need of

20   other services, such as fertility testing, tubal ligation,

21   colposcopy, and other problems.

22   Q.  Can you go on to the third paragraph, please.

23   A.  I realize the controversial nature of the services provided

24   by the clinic.  However, I have been committed to providing safe

25   and legal services to women in this area for more than two

1  decades.  I hope that you also feel that these women, some of

2  whom may be your patients, deserve all the reproductive choices

3  and the best possible care.

4      Please thoughtfully consider participating as our -- I'm

5  sorry; it's just small -- as our backup.  My goal is to have

6  several physicians to provide backup so that there is a minimal

7  time commitment.  We have a growing number of patients with

8  BlueCross BlueShield coverage, as I am a PMD provider.  In any

9  case, when the patients have no insurance, the clinic will pay

10  for all services you render.

11      My staff understands the importance of discretion and

12  confidentiality and does not disclose the name of our backup

13  physician unless absolutely necessary.  I appreciate your

14  support.

15  Q.  Why did you offer potential backup physicians discretion and

16  confidentiality?

17  A.  Because that was the reason that Dr. Johnson gave me for not

18  wanting to continue providing backup for the -- for our clinic.

19  He was getting negative feedback from other physicians and from

20  the hospital.

21  Q.  Did anyone express any interest in being the backup after

22  you sent out these letters?

23  A.  No.

24  Q.  Have you ever had several backup physicians at one time?

25  A.  No.

1   Q.   So what happened in terms of Dr. Johnson?

2   A.   At that time, I went back to Dr. Johnson and -- and

3   requested again that -- that we had done this, and I had had no

4   one that had offered their services and I had had nothing but

5   negative responses.   And I went back to Dr. Johnson and talked

6   to him on a one-on-one basis, and he agreed to continue to

7   provide backup services.

8   Q.   Did Dr. Johnson ever try to quit again?

9   A.   Yes, he did.

10  Q.   When was that?

11  A.   In 2003.

12  Q.   What happened in 2003?

13  A.   Basically, the same thing happened in 2003 that happened in

14  '99.   Once again, I think he had become anxious about -- about

15  seeing our patients at the hospital and what that might -- you

16  know, what that might do to his reputation.

17  Q.   Was there a regulatory change in 2003?

18  A.   There was a regulatory change.   And the Department of Public

19  Health asked us to have -- well, not asked us, but put in their

20  regulations that we were to have a backup physician.

21  Q.   Can you turn to Plaintiff's Exhibit 37 and look at page 65

22  in that exhibit.

23  A.   Yes, ma'am.

24  Q.   And what is that?

25  A.   That is a joint letter that I worked with the -- there were

1    two clinics in town at that time, and I worked with the -- the

2    director of the other facility.  We sent out a letter, once

3    again, requesting to hire a local backup physician.

4    Q.  Can you read the third paragraph starting with, Accordingly?

5    A.  Accordingly, we write to you to ask if you would please

6    consider entering into an arrangement with the clinic to satisfy

7    these new requirements.

8        And the new requirements are listed above.

9        Ideally, we would be able to have a written contractual

10   agreement with you so that if the clinic is inspected by the

11   department, we will be able to document that we have satisfied

12   these regulations.  We're extremely sensitive to the security

13   concerns and would be happy to work with you to attempt to

14   provide you with as much confidentiality as possible while still

15   attempting to satisfy the department's requirements.

16   Q.  In the decades that you've worked at the clinic and been a

17   small business owner, have you ever entered into a contractual

18   agreement with someone that did not involve payment of some

19   sort?

20   A.  No.

21   Q.  Did you get any positive responses to your letter?

22   A.  No.  We, once again, got nothing but negative responses.

23   Q.  Do you see any of the negative responses you received in

24   this exhibit?

25   A.  Exhibit 64 is a letter dated July 16th.  And --

1    Q.  Could you read that letter, please.

2    A.  Yes.  It is addressed to Ms. Coleman, and it says:  I just

3    completed 50 years as a licensed physician and surgeon.  The

4    clinical part of my career was practicing obstetrics and

5    gynecology exclusively.  The latter part of my career was

6    involved with administration.  In all those years, I have never

7    found it necessary to interrupt a pregnancy.  At this stage of

8    my career, I do not wish to be involved in any way with any

9    facility that provides such services.  I am not amenable to any

10   further discussion.

11   Q.  And can you also read page 82.

12          MS. FLEMING:  Excuse me, Your Honor.  I've having

13   trouble locating that exhibit.

14          Is it in the notebook that I received?

15          MS. KOLBI-MOLINAS:  Yes.  It's under Plaintiff's

16   Exhibit 37.

17          MS. FLEMING:  37.  Thank you.

18   A.  Exhibit 82 is a letter dated October 18, 2003, again, to

19   Ms. Coleman.  Would you like me to read it?

20      I am writing to you in regard to your request for your --

21   for your support of privileges at our hospital.  I have indeed

22   received both requests that you mailed to my office.  I believe

23   I speak for my entire practice when I say that we must refuse

24   any involvement with your endeavors.  We are committed -- we

25   have committed our practice to the preservation of human life,

1  not to the destruction of it.

2  Q.  To whom did you send these letters in 2003?

3  A.  We looked -- we had a list of all the local OB-GYNs, and

4  these were sent to the local OB-GYNs in the Montgomery area.

5  Q.  After you sent out these letters, did you notify ADPH that

6  you were concerned you couldn't comply with the requirement?

7  A.  Yes.  Yes, we did.

8  Q.  Why did you do that?

9  A.  Because we were getting nothing but negative responses.

10  Q.  So what did you do next?

11  A.  At that time, Laurasenia and myself went back to Dr. Henry

12  Johnson and once again begged him to stay on as backup

13  physician, as our doors would probably not be open if we

14  couldn't meet that regulation.

15  Q.  And what was the result?

16  A.  The result was Dr. Johnson agreed again to be our backup

17  physician.

18  Q.  Did you put that agreement in writing?

19  A.  No, we did not.  And we -- we had an agreement, and it

20  wasn't -- it wasn't a written contract.  But that satisfied the

21  requirements.

22  Q.  Did you want to put the agreement in writing?

23  A.  Oh, it would have been -- it would have been very nice to

24  have put the agreement in writing so that we had something set

25  up on a -- on an ongoing basis and something that we could, you

 1   know, put our hands on as permanent.

 2   Q.   So why didn't you?

 3   A.   Because it was not something Dr. Johnson wanted to do.

 4   Q.   How long did this arrangement last with Dr. Johnson?

 5   A.   Until the summer of 2006.

 6   Q.   And what happened then?

 7   A.   In the summer of 2006, the health department came in to my

 8   office on a complaint.  And when they came to my office, one of

 9   the things they reviewed was who was doing the backup.  And they

10   called Dr. Johnson.  Dr. Johnson then called me and told me that

11   he did not want the health department calling him, and he would

12   no longer be doing the backup care for our patients.

13   Q.   So what did you do next?

14   A.   I immediately started looking into the community for someone

15   that I might be able to talk to about obtaining a written

16   contract with.

17   Q.   And what happened?

18   A.   And I found Dr. F.  Dr. F had -- had -- I didn't have an

19   association with him, but we knew who he was.  And -- and so

20   we -- I went to him.  Initially he declined to -- to enter into

21   the contract.  I then sent two more staff members over to appeal

22   to him, and he finally agreed to sign a written contract with us

23   to provide backup services.

24   Q.   And under what conditions did he impose on that contract?

25   A.   That -- that there be a monthly fee and that he be paid on

1    a -- on a per-patient basis for anyone he saw in the emergency

2    room.

3    Q.   About how much -- what percentage of what you pay Dr. F

4    every year -- what percentage of that is the business's annual

5    income?

6    A.   His -- what he makes in a year's time is approximately 10

7    percent of the gross income of Reproductive Health Services.

8    Q.   And about how many patients does he see a year?

9    A.   One, no more than two.

10   Q.   How does the business afford this expense?

11   A.   We had to -- we had to increase our fees in order to cover

12   that cost.

13   Q.   What is the extent of Dr. F's involvement in the clinic

14   today?

15   A.   Dr. F is now my -- our medical director.  He -- we sit down

16   and -- on a monthly basis and do a myriad of things.  We put

17   policy and procedures together and implement that.  He is --

18   it's the two of us.  It's a small clinic, so the two of us do

19   infection control and he recertifies my physicians on an annual

20   basis.  He is involved in the day-to-day things that we do in

21   the office besides providing ongoing care for patients after

22   hours.

23   Q.   We already established that he doesn't do abortions at the

24   clinic.  Does he do abortions in his private practice?

25   A.   No, he does not.

1   Q.   Has he ever asked you if he could see patients at your

2   clinic?

3   A.   No.   He's -- Dr. F has made it very clear that he does not

4   do abortion procedures.

5   Q.   I'd like to ask you some questions now about the laws and

6   regulations governing abortion clinics.   Are you in compliance

7   with all of these laws and regulations?

8   A.   Yes, we are.

9   Q.   And how do you know that?

10   A.   We have an annual inspection.   And on the -- during the

11   annual inspection, we're -- we're reviewed for two days on our

12   compliance to the regulations.

13   Q.   What does an inspection by the department of health entail?

14   A.   On the first day normally when the health department comes

15   in, they review -- they do -- a walk-through inspection is

16   usually the first thing that they do.   They come in and look in

17   the refrigerator and the cabinets and in our drug boxes and our

18   crash cart and our procedure rooms and our sterilization.   They

19   literally do a -- like a -- almost a white-glove inspection from

20   one end of the clinic to the other.

21      And after that, we sit down and they look through the

22   various logs, which -- which -- regarding oversight over the

23   crash cart, over the physicians and their licensing, over staff

24   members and their training and CPR management and that type of

25   thing.   They look at folders that we have.   We keep a record of

1    all the equipment that we have and it is inspected annually, so

2    they look over that.  And then, of course, they look at the

3    equipment that we have.

4        In general, it's a lot of paperwork on the first day.

5    They -- by the end of the day, we're pulling records so that

6    they can review patient charts.  And so most of the first day is

7    paperwork.  And they usually arrive around eight or 8:30 and

8    stay until four or 4:30 in the afternoon.

9        On the second day, normally, when the health department

10   comes in, they do a walk-through from a patient's perspective.

11   When they come into the office, they -- they like to literally

12   go through with a patient, see how we manage the patients.  The

13   patients come in.  They're admitted.  They have vitals.  They

14   have an ultrasound done by the physician.  Once the ultrasound

15   is done, then the patient gets their preoperative medications.

16   They're following that patient through.

17       And if the patient is willing, they'll go into the procedure

18   room with the patient, observe the doctor, observe the

19   assistant.  They observe how the rooms are cleaned up between

20   patients, how sterilization is handling instruments.  And then

21   they'll stand in recovery room and monitor what -- you know,

22   what -- what the process is in recovery room.  So they're in

23   from admission to discharge with patients on that day.

24   Q.  Do they observe your physicians performing procedures?

25   A.  Yes.  They're in the -- they're in the room with the -- with

1  several patients and -- with a patient at a time, but with

2  several patients, and observing not only what the physician is

3  doing, but what the assistant is doing.  Yes.

4  Q.  You've mentioned a couple of times a crash cart.  Can you

5  explain what that is.

6  A.  A crash cart is a -- it's several things.  It's -- has to do

7  with patient emergencies.  And the crash cart will have our IV

8  fluids and our IV setups.  It will have emergency medications.

9  It will have -- we have a defibrillator.  We have support

10  oxygen.  And so it has all the things that you would need in --

11  in case of a patient emergency.

12  Q.  In observing your physicians during these inspections, has

13  ADPH -- sorry -- the Department of Public Health -- ever found

14  fault with any of your physicians?

15  A.  No.

16  Q.  Is this the only time your physicians are reviewed?

17  A.  No.  Actually, the medical director is in on an annual

18  basis.  And the medical director actually comes in and observes

19  our physicians doing the ultrasound and then goes into the

20  procedure room and observes the physician doing actual abortions

21  for the patients.

22  Q.  About how many procedures get a review?

23  A.  They will usually do -- he does at least a half a dozen,

24  somewhere between five and six that he observes.

25  Q.  I'd like to ask you some questions about -- about

1    complications of your patients.   In your experience, are

2    complications usually resolved before the patient gets

3    discharged?

4    A.   Complications are very rare to begin with.   But whatever

5    complications that a patient has is normally, yes, resolved at

6    the clinic before the patient leaves.

7    Q.   Do your records reflect all of the patients who have had

8    complications?

9    A.   I have a logbook that I keep on an ongoing basis, and in

10   that logbook are the phone calls that come in with patient

11   complaints.   And so that is a record of not only the complaint

12   that the patient makes, but whatever treatment.   It's my

13   assessment, and then it's however I follow up -- how I follow up

14   with that patient.

15   Q.   Are those records reviewed by the department of health?

16   A.   Yes, they are.

17   Q.   How often?

18   A.   On an annual basis or on a complaint basis.

19   Q.   When does the physician leave the clinic?

20   A.   The physician does not leave the clinic until the last

21   patient is discharged.

22   Q.   Do you remember the last time you had to call an ambulance

23   to the clinic for one of your patients?

24   A.   In the 36 years that I have been at the clinic, we have

25   never called an ambulance.

1   Q.   What does a patient do if she needs care after discharge?

2   A.   After discharge, if the patient calls back after hours,

3   the -- they can do one of two things.   If it's -- if it's a

4   nonemergency, they can leave a voice mail.   If it -- if they

5   feel that it's urgent, then they can leave a message with the

6   answering service personnel.

7        And then the answering service personnel takes -- there's a

8   caller ID number that comes in for that patient, but the

9   answering service actually takes down the patient's name or

10  whoever's calling for that patient and the information about her

11  complaint.   At that time, they do two things.   They notify me at

12  home or they notify me on my cell phone.   They also send an

13  e-mail to my personal e-mail that shows up on my phone.   So they

14  have two means of notifying me.   I then immediately call the

15  patient so I can assess the nature of the call.

16  Q.   And what happens after you make this assessment?

17  A.   It depends on what the phone call is about.   If it -- if

18  it's something where the patient would need additional

19  treatment, then I would -- I would call Dr. F.   If it's just

20  answering questions or making sure that the -- sometimes it's

21  just asking the patient -- they're given prescriptions for

22  medications for pain.   It's asking them to please get those

23  filled and start taking those.   Then I follow up with that

24  patient making sure that her problem is resolved.

25  Q.   What is the procedure if you need to refer a patient to

1  Dr. F?

2  A.  If it happens -- if it does happen after hours, then I

3  will -- I'll do an assessment on a patient and -- and talk with

4  him.  And if he decides that patient needs to go to emergency

5  room, then we will send the patient to emergency room and he

6  will treat them in the emergency room.  If -- if it requires

7  additional medications, then he will order those so that I could

8  call those in for a patient.  And that may happen maybe once or

9  twice a year, as far as for additional medications.  But he will

10  see the patient in emergency room if need be.

11      Now, if the patient goes into emergency room without calling

12  us -- and sometimes that does happen where the patient will just

13  present at emergency room -- then the emergency room will call

14  my answering service.  And I did -- have sent letters, actually,

15  to the emergency room specifying that we want them to call the

16  office first because I have the records there for the patient so

17  that I can get those to Dr. F.  But then Dr. F will certainly go

18  to emergency room to treat that patient.

19          THE COURT:  How often does a patient present herself at

20  the emergency room without calling?

21          THE WITNESS:  We -- actually, patients in the local

22  emergency room, we may have one or two in a year's time.  So 50

23  percent of those.  It would be one -- most of the time it would

24  be patients that call in first.  But we have had patients that

25  will show up at emergency room and will not have made a call to

1   us first.

2   Q.   Can you turn to Plaintiff's Exhibit 35 in your binder.

3   A.   Yes, ma'am.

4   Q.   And what is that?

5   A.   That is a summary of complications in the years 2010, 2011,

6   2012, and 2013.

7   Q.   And how did you get the data for this summary?

8   A.   This, I pulled from the -- the binders that I have that have

9   a list of the daily -- daily phone calls.

10  Q.   And do you keep these records in the regular course of

11  business?

12  A.   Yes, I do.

13  Q.   Do these documents and this summary therefore reflect the

14  full number of patients who received follow-up care at a local

15  hospital in 2010 to 2003 -- '13?

16  A.   Yes, they do.

17  Q.   How many patients received follow-up care at a local

18  hospital in 2010?

19  A.   In 2010, there were two patients.  One patient had a

20  nonabortion-related problem, but she still was seen at emergency

21  room.

22  Q.   And how do you know it was nonabortion related?

23  A.   Because I follow up with Dr. F in his course of treatment.

24  And -- and that is written in on my log as to -- as to how he

25  treated this patient.  And -- and that was written at the bottom

1    of the log as -- that this patient's particular problem was not

2    related to the abortion.

3    Q.  According to --

4            THE COURT:  So for 2010, each entry there stands for

5    one patient.

6            THE WITNESS:  Yes, sir.

7            THE COURT:  So add the two together, you get two.

8            THE WITNESS:  Yes, sir.

9            THE COURT:  And the same thing for 2011?  Since you

10   have only one entry, that's one patient?

11           THE WITNESS:  We have only one patient.  Yes, sir.  And

12   that one also was not related to the abortion procedure.

13           THE COURT:  And for 2012, you have two.  Does that mean

14   two patients?

15           THE WITNESS:  We had two patients that were --

16           THE COURT:  Were those different patients?

17           THE WITNESS:  They were different patients.  Yes, sir.

18           THE COURT:  Oh, okay.

19   Q.  And in 2013?

20   A.  In 2013, we had none.

21   Q.  Did any of these patients -- were any of them admitted as

22   inpatients to the hospitals?

23   A.  These patients were treated on an outpatient basis and

24   discharged at the same time -- the same day.

25   Q.  Did your treatment of any of these patients result in any

1  adverse license consequences from the department of health?

2  A.  No, they did not.

3  Q.  Has there ever been a patient death at RHS?

4  A.  No, there has not been.

5  Q.  Has there ever been a complication resulting in a

6  hysterectomy at RHS?

7  A.  No, there has not been.

8  Q.  Has the clinic's license ever been suspended?

9  A.  Yes.  The license was suspended in 2006.

10  Q.  What happened?

11  A.  In 2006, the health department came in on a complaint from a

12  local physician.  And when they spoke with the backup physician

13  that I had at that time, which was Dr. Henry Johnson, and he

14  said he no longer wanted to participate, then my license was

15  suspended.

16  Q.  And what was the complaint that the department of health was

17  investigating?

18  A.  The patient had -- had actually come in that morning and --

19  for a checkup and had said she wanted to see her physician.  I

20  was out of town at that time.  The nurse that was there saw the

21  patient, and the patient said she wanted to see her physician.

22  Later on that evening, I received a phone call from my nurse at

23  my office.  She was stating that the patient was in emergency

24  room, that she had spoken to the emergency room physician, and

25  that -- and the emergency room physician wanted to -- wanted the

1    name of our doctor.  So I told the nurse to call the doctor back

2    and please give that doctor the name of our primary physician,

3    the one that did the abortion, which she did.  And then she said

4    he wants to talk to her.  When she called me back, she said that

5    the physician wants to talk to her.  So I called -- I didn't

6    call.  I talked to my nurse again.  She called our primary

7    physician in Birmingham, and she called the emergency room.

8    It's my understanding that when she called the emergency room,

9    that the doctor was unavailable.

10   Q.  Have you seen the department of health's write-up of this

11   complaint that they received?

12   A.  Yes, I have.

13   Q.  And is their version of events the same as yours?

14   A.  No.

15   Q.  And what do you think the difference is?

16   A.  Obviously there must have been some problem in

17   communicating.  I don't think it was communicating on our end.

18   But -- but the version of events between the physician and my

19   nurse -- and this is a nurse that I worked with for ten years --

20   I -- we just obviously have two different versions of this

21   event.

22   Q.  And what was the basis for the suspension of your license?

23   A.  Is that we didn't have -- we didn't immediately have a

24   backup physician.

25   Q.  Was that suspension lifted when you signed a contract with

1    Dr. F?

2    A.   Yes, it was.

3    Q.   Has your license ever been suspended since then?

4    A.   No, it has not.

5    Q.   I'd like to ask you some questions about the law that we're

6    here talking about today.  Are you familiar with HB 57?

7    A.   Yes, I am.

8    Q.   And are you familiar with the admitting privileges

9    requirement in that law?

10   A.   Yes, I am.

11   Q.   Before HB 57 was passed, did you ever ask your doctors to

12   get admitting privileges at local hospitals?

13   A.   I never asked my physicians to get privileges because we had

14   Dr. F in place and he provided the services for after hours for

15   our patients.

16   Q.   Have you ever requested applications for privileges from the

17   local hospitals?

18   A.   I -- yes, I have.

19   Q.   And when was that?

20   A.   May I look at --

21   Q.   If you'd like to look at your declaration to remind yourself

22   of the dates --

23   A.   Please.

24   Q.   -- that's fine.  The declaration is in there.

25            MS. FLEMING:  And Your Honor, we have objected to this

1    declaration.  Obviously, it's an out-of-court statement and a

2    self-serving statement made by the clinic's owner when she is

3    here to testify personally.

4         MS. KOLBI-MOLINAS:  Your Honor, she's just using it to

5    refresh her recollection of the dates at which she made

6    entreaties to the hospitals for applications.

7         THE COURT:  Go ahead.

8    A.  Initially, I made a -- I'm sorry.  Ask the question again.

9    Q.  (Ms. Kolbi-Molinas, continuing:)  Sure.  Do you remember the

10   steps that you took to get these applications?

11   A.  Initially, I made phone calls.  I had to find out who were

12   the credentialing people at the hospitals, so my initial

13   response was to make a phone call.  And this was done in April

14   of 2013.  And I did receive a phone call back from Robin Pate at

15   Jackson's Hospital.  After that, I didn't receive -- I didn't

16   receive any applications.

17   Q.  So what did you do next?

18   A.  I sent letters to the people that I had information that

19   they were the people to get the credentialing information from,

20   to get an application from.  I also sent it, since I didn't know

21   who exactly to send it to, to the president of the hospital and

22   to their attorney so that I could blanket whomever could get me

23   an application.

24   Q.  On what date did you send these letters?

25   A.  The letters were sent on April the 26th of 2013.

1    Q.   And then what happened after you sent the letters?

2    A.   After I sent the letters, I -- I received a phone call from

3    Ms. Broadwell, who was with Baptist Health.  She sent me a

4    one-page document.  And approximately three weeks after that, on

5    May the 22nd, I received an application from Jackson's Hospital.

6    Q.   Did you look at the one page of qualifications in the

7    application that you received?

8    A.   Yes, I did.

9    Q.   And did your doctors meet any -- all of the criteria?

10   A.   The -- the first thing that they didn't meet was they didn't

11   live in the Montgomery area.  And that is a qualification for --

12   my understanding, that's a qualification for obtaining

13   privileges.  But after I reviewed the application from Baptist

14   Hospital -- not Baptist.  I'm sorry -- Jackson's Hospital, there

15   were a myriad of other things that -- such as there was a

16   minimum number of admissions required each year.  From our

17   previous record there, we would never meet that number of

18   admissions.  There were several other things in there that our

19   physicians, no, couldn't meet.

20   Q.   If either of your doctors had qualified for privileges,

21   would you have asked them to apply?

22   A.   If either of the doctors had qualified, I would have

23   requested they do so, yes.

24   Q.   Do you think it would make a difference to the clinic's

25   operation if they had privileges?

1  A.  No, because I would still be referring to Dr. F for our

2  services after hours, and he is my medical director.

3  Q.  And why would you still be referring to Dr. F?

4  A.  Because I -- number one, I had a contractual agreement with

5  him, and he's the person in town that would see those patients.

6  Q.  Did you try to hire any new doctors with privileges in order

7  to comply with the law?

8  A.  I've lived in Montgomery since 1973.  I've worked at the

9  clinic for more than 30 years.  And I have never known any

10  physician in the Montgomery area that provides abortion services

11  at clinics like myself.  And so going into the community to look

12  for someone who could provide abortion services for us was --

13  no, that wasn't a consideration that I made.

14  Q.  Have you ever been -- in your 35 or 36 years that you've

15  been at the clinic, have you ever been approached by a local

16  doctor that was interested in providing abortions?

17  A.  Not only have I never been approached by any physician, I've

18  never known of a physician that was doing abortions in their

19  office or in any way was interested in providing the clinic any

20  support whatsoever.

21  Q.  Did you ever consider just cold-calling all the OB-GYNs in

22  Montgomery to ask them to work at the clinic?

23  A.  I -- I would not make a phone call to -- I sent letters.

24  That was -- and got negative responses on two separate occasions

25  years before.  The -- the idea of calling local physicians and

 1  asking them if they wanted to work at the clinic doing abortions

 2  just doesn't seem logical to me.  If I was looking for -- if I

 3  was even looking for a plumber, I would go in a different

 4  direction.  I would ask someone else.  I would look for

 5  references.  I would go out and look for something else.  No, I

 6  would not just make phone calls.

 7  Q.  I'd like to ask you some questions about violence and

 8  harassment at the clinic.  Do you have protestors outside your

 9  clinic?

10  A.  We have protestors on an almost daily basis, yes.

11          THE COURT:  Before you get to that, you said that you

12  got negative responses on two separate occasions years before.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  What years are we talking about, and what

15  did you do to get those negative responses?

16          THE WITNESS:  In 1999, I -- we -- I blanketed the area

17  with letters trying to hire a backup physician, just somebody

18  who would -- who -- who would be amenable to working with the

19  clinic to provide backup services.  So in '99, I looked to hire

20  somebody and also in 2003.  And not only did I get negative

21  letters, but I got some very negative phone calls.

22          THE COURT:  What do you mean by negative?

23          THE WITNESS:  Telling us -- telling me, specifically,

24  since I was the director and took the phone call, that -- that,

25  number one, they didn't want me to call them, that they wanted

1   to have nothing to do with abortions, that type of -- that type

2   of phone call.

3          THE COURT:  Go ahead.

4   Q.  (Ms. Kolbi-Molinas, continuing:)  What do the protestors who

5   are outside your clinic do?

6   A.  It depends on the protestor that's outside.  Some protestors

7   will just hand out pamphlets to patients that are coming up to

8   the front door.  I have one particular one that shows up at

9   least once a week and spends an hour screaming at the building.

10   I have other ones that stand out there with red tape over their

11   mouths.  Last week, four days out of five we had some form of

12   protesting out front.

13   Q.  What is -- can you explain what 40 days of life is?

14   A.  Forty days of life is a -- we call it 40 days of siege.

15   It's where the people in this area will post people outside my

16   office.  And it may be as little as two or three.  It may be 40

17   people.  They're posted out on the sidewalk in front of my

18   office from sun up to sun down for 40 days straight.

19   Q.  Do the protestors ever carry signs?

20   A.  They post signs in -- they carry signs.  They post signs in

21   the right-of-ways.  And we have some very small trees out front,

22   so they post them in trees also.

23   Q.  And what sort of noise do the protestors make?

24   A.  We have one that brings a bullhorn.  We have one protestor

25   that brings a goat's horn.  I'm not sure exactly what it is, but

1    it's a type of goat's horn.  We have protestors that bring

2    cameras in order to take pictures of patients and that type of

3    thing.

4    Q.  Can you hear the protestors from inside the clinic?

5    A.  The -- the one that screams at the building, I'm -- he

6    can -- especially early in the morning when he can see in -- me

7    sitting at the front desk, he will yell comments directly at me

8    at the front desk.  And you can hear everything that he says.

9    It's up front where I have my waiting area for patients and

10   their guests, so they're listening to everything that he says.

11   Q.  Do the protestors ever talk to you?

12   A.  That -- when I -- when I pull up in the back, they will yell

13   comments to the -- when I pull up in the back, when I'm coming

14   into the building.  And a lot of times, I will park in the front

15   to leave those spaces open in the back, because they're much

16   more protected from the protestors.  So when I park in the front

17   and walk up the sidewalk, the minute I exit my car, they're over

18   there at me.  They walk up the sidewalk with me.  And even when

19   I turn and come into the building, they will -- they will be

20   making comments.  Initially, they'll be nice comments such as

21   "I'm praying for you, June," "you need to get another job," and

22   that type of thing.  And then by the time I get to the front

23   door, it's normally something unpleasant such as I'm going to

24   burn in hell.

25   Q.  Does the clinic receive hate mail?

1    A.   In the last two weeks, I received what I consider three

2    pieces of threatening mail.

3    Q.   And do you regularly receive hate mail?

4    A.   Yes.

5    Q.   Can you turn to Plaintiff's Exhibit 36.

6    A.   Yes, ma'am.

7    Q.   What is that first page?

8    A.   The first page is a letter that was received -- or that was

9    written September 30th, 2010, that was received at my office.

10            MS. FLEMING:  And there is an objection to that

11   exhibit, Your Honor, on the basis of hearsay.

12            THE COURT:  This is exhibit what number?

13            MS. KOLBI-MOLINAS:  36.

14            THE COURT:  And you just received this in your office?

15            THE WITNESS:  This -- and in the past week, I received

16   not exactly something like this, but something very similar.

17   This was received in 2010.  I keep everything that we receive in

18   a folder so that if -- if anything were to happen, I would at

19   least have some reference materials available.  So I do try to

20   make sure that I keep them.

21            THE COURT:  Now, there's an objection to 36.

22            MS. FLEMING:  Yes, there is, Your Honor.  The -- it's

23   actually three pages.

24            THE COURT:  Oh, three pages?  Are you objecting to all

25   three pages?

1           MS. FLEMING:  I believe so, Your Honor.  I'm not sure

2   that she has testified about the second and third pages.

3           THE COURT:  What are the second and third pages?

4           MS. KOLBI-MOLINAS:  They're just other examples of --

5           THE COURT:  Okay.  Well, let me hear from the witness.

6           THE WITNESS:  I'm sorry?

7           THE COURT:  What are the second and third pages?

8           THE WITNESS:  The second and third pages?  The second

9   page is a -- more like a postcard.  It comes in on a glossy.  I

10  receive them routinely.  And -- and this comes in on like a

11  glossy postcard, so it is a piece of mail that comes from what I

12  would consider someone who was antiabortion.  The third page is

13  actually Dr. -- a picture of Dr. H that was taken outside my

14  clinic.  This was put -- this picture was put on a big poster

15  and -- identifying him as a murderer and as an abortionist.  It

16  was placed on telephone poles and in the front doors of his

17  neighborhood in Baltimore, Maryland.

18          THE COURT:  Now, it says redacted, home and office.

19          THE WITNESS:  And, well, the office number, sir, would

20  have been -- Your Honor, would have been my -- the office here

21  in Montgomery.  But the home was his home in Baltimore.

22          THE COURT:  Now -- yes.  I'll hear from you.

23  Ms. Fleming?

24          MS. FLEMING:  Your Honor, we withdraw the objection.

25          THE COURT:  Okay.  They're all admitted.

1  Q.  (Ms. Kolbi-Molinas, continuing:)  Can you turn to page 86 of

2  Exhibit 36.

3  A.  To the first letter.  Yes, ma'am.

4  Q.  Could you read the first and third paragraphs.

5  A.  The first paragraph says:  I believe it is my duty to inform

6  you that I am beginning this day a siege to stop abortions in

7  Alabama.  You may believe that you have every right to murder

8  children, but that right has not been given to you.  And all who

9  work here will be judged by a holy, righteous, life-giving God.

10  I write in warning because my prayers have been successful on

11  many fronts.  And I want each one who works at the location to

12  know what is happening to them is not simply bad luck or an

13  unfortunate turn of events, but they are due to one person

14  praying in alignment with God's will.

15      And the third paragraph:  Is this a threatening letter?  Not

16  any more threatening than how you offer abortion to unsuspected

17  clients.  You choose what your future will be.  That's much more

18  than you offer each child who will never see the light of day

19  due to your work.  And by the way, no one will be exempt who

20  works here, whether they condone abortions or not.  I'm not

21  threatening you or anyone who works here.  I am simply praying

22  for justice.

23  Q.  Thank you.  And could you -- you've already explained,

24  actually, what the other two are, so we'll move on.  Do your

25  doctors ever take security precautions?

```
 1   A.   I'm sorry.  I didn't hear it.
 2   Q.   Do your physicians ever take security precautions?
 3   A.   In 1992 or 1993 when Dr. Gunn was killed in Pensacola, I
 4   purchased a bulletproof vest for Dr. H.  And Dr. H wore that
 5   vest faithfully to the clinic and from the clinic every clinic
 6   day for at least five years.  Yes.  We have a security officer
 7   on days that we provide abortion services so that we can
 8   maintain obviously a secure environment for my staff and my
 9   patients.  And -- and so yes, we -- we take security very
10   seriously.
11   Q.   Who is Dr. Gunn you mentioned who was murdered?
12   A.   Dr. David Gunn actually worked for my facility periodically.
13   Once again, he was a fill-in physician when my doctors were on
14   vacation.  He worked at both of the other facilities that were
15   in Montgomery at that time, and -- and he also worked at a
16   facility in Pensacola.  He was shot and killed outside of a
17   Pensacola clinic.
18   Q.   When would Dr. H put on the bulletproof vest?
19   A.   Dr. H would put on the vest when he left home, and he would
20   come into the clinic.  And he wore it under his scrubs, and he
21   wore it home in the same manner.
22   Q.   And how was he traveling?
23   A.   He was traveling -- he was flying in.  Yes.
24   Q.   Can you tell me about any threats or acts of violence
25   against the clinic building itself?
```

1    A.   Years ago we would have people who would come and nail the

2    door shut or put super glue in the locks or put wood putty in

3    the locks, something to stop us from coming into the clinic --

4    nails in the parking lot, that type of thing.  The federal

5    government passed what they call -- what we call the FACE

6    legislation, which is the Free Access to Clinic Entrances.  And

7    once we -- we had that -- that legislation in place, the direct

8    attacks to the clinic, the vandalizing attacks to the clinics,

9    basically stopped.  We still had protestors outside.  We still

10   had rescues up until that point.  But after the FACE

11   legislation, things got a little calmer.

12   Q.   You mentioned a rescue.  Can you explain what that is.

13   A.   In Montgomery, we had one rescue.  A rescue means that --

14   that a lot of people, not just from the Montgomery areas -- we

15   would have -- I can remember license plates that came from

16   Mississippi and Georgia and so forth.  There would be -- a

17   hundred or so people would gather at the clinic and lay down on

18   the sidewalks or chain themselves to the pillars out front so

19   that we could not access -- we could not get in our front doors.

20   Q.   And what happened during that rescue?

21   A.   Those -- the people that actually stayed on the property

22   were -- were arrested for trespass.

23   Q.   And about how many?

24   A.   On one occasion, there were 69 arrests.  It took two buses

25   to move those people to downtown.

 1   Q.  Did you take any precautions after the bombing of the clinic

 2   in Birmingham?

 3   A.  After the bombing at the clinic in Birmingham -- and we have

 4   always taken security, as I said, very seriously.  But after the

 5   bombing in Birmingham, I did an in-service.  That particular

 6   bomb was in a potted plant.  And I made sure that staff members

 7   knew when -- you know, what to be looking for when they pull up

 8   to the office.  Certainly we've gone over many times what --

 9   what a packaged bomb may look like or an envelope bomb.

10       We at least on three separate occasions received anthrax --

11   they didn't actually have anthrax in them, but we got letters

12   that obviously looked like they were -- they were anthrax

13   threats that were turned over to the FBI.  But, you know, we

14   made sure that security knew what to be looking for also when he

15   comes up in the morning.  And we set into place such things as

16   having the physician call us -- once again, in advance -- to let

17   us know kind of when they were going to be in town, you know,

18   when they were coming up.

19   Q.  Have you ever felt threatened or in danger yourself?

20   A.  On several occasions I've had people stop me, tap on my back

21   when I was in a grocery store and say, oh, yeah, I saw you on

22   television; you're the person that runs the abortion clinic.

23   And they weren't there to shake my hand for doing so.  They --

24   one time when my daughter was approximately three or four, I did

25   have two people that I knew were protestors and were fairly

1    threatening people that followed me through the mall.

2    Q.  How have the protests evolved over the years?

3    A.  The -- it waxes and wanes.  And there has been -- I want to

4    say probably when we moved onto the Perry Street location, there

5    was about a three-year span that incidents were -- we actually

6    had a picketer every week, but it wasn't -- it wasn't four and

7    five days a week.  And they call themselves sidewalk counselors.

8    They hand out material to the people coming to the clinic.  But

9    in the past -- I would definitely say in the last four or five

10   years, that has definitely escalated.

11   Q.  And what was that one picketer or that one sidewalk

12   counselor like?

13   A.  She was actually very pleasant.  She was very nice.  When

14   she approached the patients, she was -- she was polite.  It is

15   her right to be out there to hand out that material, and she was

16   very pleasant.  She didn't scream at the building.  She

17   didn't -- you know, we had no issues with her trespassing or

18   anything like that.

19   Q.  Is she still out there?

20   A.  No, she isn't.

21   Q.  I'd like to ask you some questions about your patients now.

22   Are all of your patients from the Montgomery area?

23   A.  The majority of our patients are from the Montgomery and

24   surrounding area; but no, they come from various areas around

25   the state.

1    Q.   And how do you know that?

2    A.   Because we -- we are required -- when the patient comes in,

3    we're going to fill out a medical history.  So we take general

4    information when a patient comes in such as their addresses and

5    telephone numbers and that type of thing.  But we also, for

6    every patient that we see for abortion, we fill out a vital

7    statistics form.  And that vital statistics form includes not

8    identifying patient information, but information that includes

9    the city that they live in, are they in the city limits, the

10   county they live in, what -- where -- you know, what their zip

11   code is, and that type of thing.

12   Q.   Are you able to estimate how many of your patients are low

13   income?

14   A.   We routinely have patients that call asking if Medicaid will

15   pay for an abortion procedure.  We do talk to our patients about

16   their income.  Because if they fall below a certain level, we

17   can refer them to a private fund that will help them pay a

18   portion of the fee.

19   Q.   And about how many of your patients do you refer to this

20   private fund?

21   A.   The ones that actually call -- contact the fund and access

22   it, that's at least six out of ten patients.

23   Q.   And how does it work for them to access the fund?

24   A.   They have to make less than a certain percentage of the

25   poverty level.  And then when they call the fund, they speak

1  with -- it's like an intake person.  The intake person takes the

2  information and then -- and then provides a pledge to us that

3  says that they're going to -- they agree to pay X amount of

4  dollars on behalf of this particular patient.

5  Q.  That fund, does that fund cover the entire cost of the

6  abortion?

7  A.  That fund covers no more than 30 percent of the -- so the

8  patient is going to have to come up with the lion's share of the

9  fee.

10  Q.  Even with outside financial assistance, do you have patients

11  that struggle to cover the cost of the procedure?

12  A.  Definitely.

13  Q.  Do you ever have patients who can't pay when they come in?

14  A.  We try to work with patients looking at where they might be

15  able to -- to pull together funds.  But we will work with

16  patients, especially if I have somebody that is a rape case or

17  just has special circumstances, then we will either reduce the

18  fee or cut the -- you know, our -- I have done procedures for

19  nothing.

20  Q.  Does the clinic take a loss when you do that?

21  A.  Yes.

22  Q.  Is there a limit to how many times you can do that?

23  A.  It's something that we have to look at and certainly

24  something we have to manage.

25  Q.  Do patients have to comply with a waiting period before

1 obtaining an abortion?

2 A.   Prior to the last two weeks, we've had a 24-hour waiting

3 period in Alabama.   Now we have a 48-hour waiting period as of

4 legislation that passed this year.

5 Q.   And how does that affect the patients?

6 A.   We do abortions one day a week, so we have one surgical day.

7 And we have four days that we do our intakes where we'll -- when

8 we do a pre-op visit, we'll do everything from the patient's

9 pregnancy test to her ultrasound and we bring them in and do a

10 pre-op.   If the patient comes in on Monday or Tuesday or early

11 Wednesday morning, that means the patient can come back on

12 Friday, which is the surgical day, to have the abortion done.

13 If the patient comes in later on Wednesday or Thursday, then

14 that patient has to wait until the following week when we do --

15 because we can't meet the 48-hour waiting period for that week.

16 Then they'll have to come in the following Friday, which puts

17 them another eight to nine days from the point that we actually

18 initially saw them for that first visit.

19 Q.   And what effect --

20        THE COURT:   Now, you do only surgical?

21        THE WITNESS:   We only do surgicals.   Yes, sir.

22 Q.   What effect do you think this will have on your patients?

23 A.   The 48 hours?   It delays -- it delays for several reasons

24 patients being able to come back:   obviously, the constraint of

25 the 48 hours.   But previously, patients could come in on

1   Thursday morning and -- they'd have to be there early; but they
2   were there early Thursday morning, and they would spend the
3   night at a local hotel if they could and come back the next
4   morning.  That is really no longer an option, because they would
5   have to stay two nights in a hotel.
6       And patients have to do a lot of logistics to be able to
7   come in for two visits.  My patients have to -- have to work out
8   their child care.  They have to work out being out of -- you
9   know, off of their job for a period of time.  They're going to
10  have to work out the -- you know, getting to the clinic and from
11  the clinic.  The day that they have the abortion procedure,
12  they're going to have to have someone drive them; so they have
13  to make arrangements for that.  So there's a lot of logistics
14  involved in it.  This is going to -- I certainly see this
15  delaying it for patients.
16  Q.  How many clinics are in Montgomery right now?
17  A.  We're the only clinic in Montgomery.
18  Q.  Do you remember the last time a new clinic opened in
19  Montgomery?
20  A.  The -- it's been a long time ago.  It was when I was first
21  involved with Reproductive Health Services, and that would have
22  been '79 or '80.
23  Q.  Is that clinic still open?
24  A.  No.  That clinic is not still open.
25  Q.  And when did it close?

1   A.   That clinic closed about three to four years -- about three

2   to four years ago.

3   Q.   And in the past three to four years, have you heard of any

4   new clinics trying to be opened in its place?

5   A.   No.

6   Q.   And have any opened?

7   A.   No.

8   Q.   What's it like owning the only clinic in Montgomery?

9   A.   To be the only clinic in Montgomery is -- is kind of

10  difficult.  I have access to the other two facilities that are

11  still open, so I do talk to their directors on a regular basis.

12  But the Montgomery community has never accepted Reproductive

13  Health Services, I don't think, into the medical services

14  community.  We've been ostracized for what we do, not how we do

15  it, I don't think, but what we do.  And -- and so it's a -- it's

16  a difficult proposition.  Each year there are more and more

17  pieces of legislation that come -- that come down the pike, and

18  it just -- it's becoming more and more difficult with every

19  year.

20  Q.   Why do you feel that you're not integrated into the local

21  medical community?

22  A.   Because we -- when I -- whenever I've attempted to -- to go

23  to the community to ask for support -- hence, the letters in the

24  past -- it was never met with anything but -- but negativity.

25  Q.   What do you think would happen to your patients if the

1  clinic closed?

2  A.  In the day and age that we live now --

3         MS. FLEMING:  Objection, Your Honor.  Objection, Your

4  Honor.  That calls for speculation.  She asked what does she

5  think would happen to the patients.

6         THE COURT:  Let me see what she bases it on.

7  A.  In -- I have -- we do have patients that call us up about

8  self-inducing for an abortion, even with our services being

9  available.  I've had patients in recent months who have gone to

10  the Internet to access medications over the Internet, which

11  weren't true medications.  I don't know exactly what they were

12  sent, but I fear for their safety when they take something from

13  the Internet.  So I'm certain that women would -- would use --

14  would take advantage of that opportunity if they felt desperate

15  enough.

16     Patients certainly could find another facility.  The problem

17  with that is there -- there's three of us left.  There's

18  Huntsville, there's Tuscaloosa, and there's Montgomery.  My

19  patients that are here in Montgomery, if I close my doors, their

20  access is dramatically, dramatically reduced.  And it would just

21  be that much more difficult for patients.  And it's already a

22  difficult proposition, I believe.

23         THE COURT:  Let me ask you some questions about two

24  things you said.  The first one is you said you felt you were

25  ostracized.  I didn't quite understand what you meant by that

```
 1   other than the letter -- the responses to your letters.

 2           THE WITNESS:  And we've never had any support.  I mean,

 3   you know, anytime that I've gone out into the community,

 4   especially in recent years -- many years ago, the -- I would

 5   have churches that called me up to do -- you know, because we

 6   have a speakers bureau, okay?  We have information that we can

 7   disseminate, and it isn't just on abortion.  It may be on date

 8   rape.  It may be on teenage sexuality.  But we've gone -- I've

 9   gone into the community to do that.  And years ago, I've had --

10   well, Huntingdon College would call.  Many of the -- you know,

11   AUM.  We would go into the community and do that kind of

12   in-service, but we don't do that anymore.

13           THE COURT:  Are you basing that on a conclusion that

14   they're not calling you or you're not calling them and you're

15   being --

16           THE WITNESS:  And we're making -- I'm making that

17   accessible to them, but they're not calling us anymore.  And

18   even physicians that initially we would go and leave brochures

19   in their waiting rooms, that became just a -- a big -- when we

20   would go, we would obviously be denied.  You know, they didn't

21   want us to put any brochures in their waiting room.  They didn't

22   want --

23           THE COURT:  How recently did you try to put brochures?

24           THE WITNESS:  Brochures?  We probably quit doing

25   brochures about ten years ago.
```

1          THE COURT:  Why was that?

2          THE WITNESS:  Just because I met with so many obstacles

3    going in.  And it's very difficult just to go into an office and

4    say, you know, we have some brochures and, you know, are you

5    willing to put this out for people who might need this

6    information.  And I never received anything but a negative

7    response.

8          THE COURT:  Now, you said that some women went on line

9    or used other methods or thought about using other methods, I

10   should say.  How often did you hear women talk about using other

11   methods?

12         THE WITNESS:  On -- I'm not going to say on a weekly

13   basis.  But on a monthly basis, we have people that still call

14   us up about if I take -- my friend says if I take this, this may

15   cause an abortion; what do you think about that.

16         But we've actually had patients in recently that did

17   get something from the Internet.  That makes me very anxious;

18   because when that patient comes in and tells me this, I don't

19   know what medication she has taken.  It was something that she

20   received from the Internet.  It did not cause an abortion, but

21   I'm still not familiar with what it was that -- you know, I

22   don't know what it was she took.

23         THE COURT:  Go ahead.

24   Q.  (Ms. Kolbi-Molinas, continuing:)  What would happen to you

25   if you had to close the clinic?

1   A.   I would -- I'm a registered nurse, and there's the

2   possibility that I could work at a hospital.   My problem is that

3   I have very, very bad knees.   I have degenerating joints.   I'm a

4   two-time cancer survivor, and the cancer treatments have caused

5   arthritic problems in my joints.   Probably -- in order to pay my

6   mortgage, I would probably have to file disability.

7   Q.   Why do you do this work, Ms. Ayers?

8   A.   I have dedicated 36 years to providing access for women in

9   this area safe, legal abortions.   And I get up in the morning,

10   and I feel like what I do is important.   I get up in the morning

11   and feel like that I've helped somebody today; at the end of the

12   day, that I've helped somebody; that I've made -- because -- and

13   I love patient care.   If I was denied doing that, I would be

14   denying half of what I've committed my life to.

15          MS. KOLBI-MOLINAS:   Your Honor, I'd like to take a

16   moment to confer with counsel.

17          THE COURT:   Yes.

18      (Brief pause)

19          MS. KOLBI-MOLINAS:   Your Honor, before I rest, I just

20   wanted to take a moment to move to admit the exhibits that were

21   not already admitted just for the limited purposes that they

22   were used in the direct examination.

23          THE COURT:   I'm not sure if I officially admitted 40.

24   Forty.   Forty is admitted.

25          MS. KOLBI-MOLINAS:   Forty is the abortion docs dot org;

1   is that correct?

2          THE COURT:  Yes.  What other exhibits are we talking

3   about?

4          MS. KOLBI-MOLINAS:  There's 40, 38, 37, and 36.

5          THE COURT:  Are there objections to those exhibits?

6          MS. FLEMING:  Let me see.  Thirty-eight and 37 I don't

7   believe we objected to; is that correct?

8          THE COURT:  Thirty-eight and 37 are admitted.  Anything

9   else?

10          MS. KOLBI-MOLINAS:  So then that leaves 40 and 36.

11          THE COURT:  I've already admitted 40.

12          MS. KOLBI-MOLINAS:  Okay.  Thirty-six.

13          THE COURT:  Thirty-six?  Thirty-six they withdrew their

14   objection to.  Defendants withdrew their objection.

15          MS. FLEMING:  Okay.

16          THE COURT:  It's admitted.  Is that it?

17          MS. KOLBI-MOLINAS:  That's it.

18          THE COURT:  Very good.

19          Cross, Mr. Davis?  I assume Ms. Fleming.

20          MS. FLEMING:  Yes, sir, Your Honor.

21          THE COURT:  Yes.

22                        CROSS-EXAMINATION

23   BY MS. FLEMING:

24   Q.  Ms. Ayers, is your clinic, RHS, is that a corporation?  Are

25   you incorporated?

1   A.   Yes.

2   Q.   And it's a nonprofit corporation?

3   A.   No.   It's a sub S corporation in Alabama.

4   Q.   So it's a for-profit corporation.

5   A.   Yes.

6   Q.   I noticed when you were listing your experience you did not

7   include any business experience; is that correct?

8   A.   My business experience has been on the job.

9   Q.   But you have no training in operating a business, no formal

10   training?

11   A.   Not any formal training.   No.

12   Q.   Is it correct that all of your patients are advised about

13   the risks of death and hospitalization associated with abortion?

14   A.   That's part of our informed consent.   Yes.

15   Q.   And my understanding is your clinic performs abortions one

16   day a week?

17   A.   At the present time, one day a week.   Yes, ma'am.

18   Q.   And the doctors who perform abortions at your clinic

19   generally arrive in the Montgomery area on the day of the

20   procedure?

21   A.   Yes, ma'am, that's correct.

22   Q.   And they depart Montgomery on the day of the procedure?

23   A.   After the last patient is discharged.   Yes, ma'am.

24   Q.   What's the average amount of time that they stay within the

25   city limits?

1    A.  It would depend on the number of patients that we have that

2    day, so it may be as little as four hours, as much as eight

3    hours.

4         MS. FLEMING:  And I understand -- I spoke to counsel

5    earlier about stipulation number 30, and there was a concern

6    about my inquiring about the amount of money that's paid to

7    doctors for abortion.  But my understanding is that amount is in

8    the stipulation.  It's now public record.

9         So am I free to proceed?

10        MS. KOLBI-MOLINAS:  Yes.

11        MS. FLEMING:  Thank you, Your Honor.

12   Q.  Ms. Ayers, you've been paying doctors 80 to $85 per

13   abortion.  Is that the rate that you pay now?

14   A.  Yes, it is.

15   Q.  How long have you paid that rate?

16   A.  I would have to look back in the records to see how long,

17   but I would say approximately 18 months to two years.

18   Q.  What did you pay before that rate?

19   A.  It would have been probably $5 or $10 less per patient.

20   Q.  And how long did you pay that rate?

21   A.  Once again, I would have to look.  I don't know the specific

22   times.

23   Q.  You've been in the industry now for 36 years; is that

24   correct?

25   A.  Yes, ma'am.

1  Q.  Do you recall what the rate was that you paid abortion

2  providers per abortion 36 years ago?

3  A.  I didn't own the clinic 36 years ago, and so I don't know

4  what the -- the initial owners paid.

5  Q.  How long have you been an owner or a part owner of the

6  clinic?

7  A.  Since 1983 or 1984.

8  Q.  In 1983 or 1984, what were you paying physicians to perform

9  abortions in Alabama?

10 A.  I would have to make an educated guess.  I would say

11 probably 45, $50 per procedure.

12 Q.  And you've testified, I believe, that you schedule follow-up

13 appointments for patients at the time the procedure is

14 performed?

15 A.  All the patients go home with a -- a postoperative sheet.

16 And on that postoperative sheet, they are scheduled a firm

17 appointment.  They can call if they need to make arrangements.

18 We will certainly adjust the time or the date depending on the

19 patient's schedule.  But yes, ma'am.  Everyone walks out with

20 a -- with a written date and a written time to return for a

21 checkup.

22 Q.  And you maintain an after-hours answering service for

23 patients with complications?

24 A.  Yes, ma'am.

25 Q.  Those calls come to you; is that correct?

1    A.   The calls actually come to the answering service first.

2    The -- the line is forwarded to the answering service itself.

3    And the answering service has two options.   The patient may

4    leave a voice mail message if they just have a question.   If the

5    patient has an urgent issue, then they would press nine, and

6    then they would get a person at the answering service.

7    Q.   And then when are those patients -- are those patients

8    referred to you at some point?

9    A.   They -- as soon as the intake person at the answering

10   service takes down whatever the patient complaint is, they will

11   call me and give me -- they do two things.   They'll, one, send

12   me an e-mail with that written -- with the written reason for

13   the patient's call, and then they will also contact me via my

14   cell phone or my home phone.

15   Q.   So -- and you are responsible for doing after-hours

16   screening of patients.

17   A.   Yes, ma'am.

18   Q.   Now, what are some of the factors that might occur that

19   would cause you to involve your backup physician?

20   A.   I will do a nursing assessment.   And if a patient is

21   bleeding in excess of a pad an hour, if a patient has a fever of

22   100.4 or more that lasted more than a couple of hours, if they

23   have any -- anything that would be something that might require

24   additional medication or to be seen by the backup physician, I'm

25   going to contact the backup physician about it.

1   Q.  Do you feel it's part of your role in advocating for the

2   patient to contact the backup physician on behalf of the

3   patient?

4   A.  Yes, ma'am.

5   Q.  Is it fair to say you would refer to the -- a patient to the

6   backup physician if there were any serious complications?

7   A.  Yes, ma'am.

8   Q.  And you've already testified that your backup physician, if

9   there is an emergency, personally sees the patient.  Or if there

10  is a referral to the emergency room, he would follow the patient

11  to the emergency room; is that correct?

12  A.  That's correct.

13  Q.  And that's part of his contract with you, is my

14  understanding.

15  A.  Yes, ma'am.

16  Q.  How long has Dr. F also served as your medical director?

17  A.  Since two thousand -- it was when Dr. H retired.  And that

18  would have been 2005, 2006.  I'd have to look back.

19  Q.  I believe you said 2005 earlier, so that's -- and as your

20  medical director, he's responsible, is he not, for ensuring that

21  all clinical functions in the facility meet the requirements of

22  public health rules?

23  A.  Yes, ma'am.

24  Q.  He's also responsible for ensuring that all professional

25  standards of care are obeyed by the clinic and its doctors and

1    clinical staff; is that correct?

2    A.   That's my understanding.   Yes, ma'am.

3    Q.   And he's responsible for the development and implementation

4    of all protocols and policies used by your facility.

5    A.   Yes.

6    Q.   He's also responsible for ensuring that all clinical staff,

7    both inside and outside the facility, including covering

8    physicians associated with the facility, are competent, as

9    required by the rules and professional standards of care; is

10   that correct?

11   A.   That's correct.

12   Q.   Now, how many days per year would you say that Dr. F spends

13   performing his functions as the medical director for your

14   facility?

15   A.   As far as -- you want the number of hours that he spends or

16   you want --

17   Q.   The number of days or hours per year.

18   A.   I call Dr. F on a weekly basis.  I give him -- he has

19   material, and we sit down -- he does that once a month.  He

20   reviews my call logs.  He reviews any -- anytime we have an

21   infection.  If -- obviously, I would contact him more if we had

22   a patient that was seeing him.  I would say he spends at least

23   six to eight hours in any given month.

24   Q.   Six to eight hours a month?

25   A.   He reviews the policy.  He's required to review the policy

1    annually.  He reviews -- he has a copy of any policies -- all

2    the policies that we have.  And any changes that we make, I --

3    we sit down and discuss together.  I'm the person that's

4    actually on-site, but -- but certainly, if I have any need for

5    him, then -- then I pick -- he's as close as the phone.

6    Q.  How often is he actually on-site?

7    A.  He doesn't come to the clinic except to recertify physicians

8    or to come by to sign paperwork or, you know, that type of

9    thing.  Normally, I go to his office or send someone to his

10   office.

11              THE COURT:  Let me ask you this.  What does to

12   recertify physicians mean?

13              THE WITNESS:  To recertify means that he actually comes

14   into the office and spends a morning with us.  He watches our

15   physician do the ultrasounds, because our physician is required

16   to do his own ultrasound the day of the procedure.  And then he

17   actually goes into the procedure room and observes the doctor

18   actually doing the abortions.

19              THE COURT:  This is the backup physician?

20              THE WITNESS:  This is my medical -- this is my medical

21   director.

22              THE COURT:  Oh, your medical director.

23              THE WITNESS:  It's the same person.  It's actually the

24   same person, but he is the backup physician also.  Yes, sir.

25              THE COURT:   Is the backup physician and the covering

1   physician the same person?

2           THE WITNESS:  Yes, sir.

3           THE COURT:  Go ahead.

4   Q.  (Ms. Fleming, continuing:)  Now, he's actually responsible

5   for all of the rules of the Department of Public Health in

6   ensuring that your clinic is in compliance; is that correct?

7   A.  As the medical director, yes, ma'am.

8   Q.  Okay.  Does he ever do on-site inspections of anything other

9   than certifying your physicians?

10  A.  I don't know what you're asking.

11  Q.  You said that he comes on-site for one --

12  A.  He comes on-site to --

13  Q.  -- for one purpose, to recertify your physician.

14  A.  And he may come by -- he may drop by to discuss anything

15  from the ultrasounds to -- anytime there's a change in the

16  policy or I have information that comes in that we need -- we

17  need to -- I meet with him all the time, and I call him all the

18  time.  But it doesn't mean that he necessarily comes in and sits

19  and we chat for an hour or two each week.

20  Q.  Well, and I believe that you said that most of your meetings

21  occur off premises.

22  A.  I go to his office.  Yes, ma'am.

23  Q.  But you said that he comes on premises to do the annual

24  recertification of your physician.

25  A.  Yes, he does.

1   Q.   Does he do anything else on-site?

2   A.   If -- it just depends on what my need is as to whether he

3   comes on.  He's actually seen a patient at our office if --

4   if -- you know, if that need -- if he needs to do that.  He will

5   review a record at my office.

6   Q.   I'm sorry.

7   A.   If we're going over policies and procedures, then certainly

8   we would come in and sit down.  It just depends on whose office

9   is most convenient at the time.

10  Q.   And perhaps I wasn't clear.  I was speaking in his role not

11  as backup physician, but in his role as medical director.  Is

12  there anything else that he does when he -- does he come to your

13  clinic and make any other sort of visitation or inspection in

14  his role as medical director?

15  A.   Not -- not formally.

16  Q.   Before 2003 and the requirement that you have a written

17  agreement with a backup physician, were you already providing

18  for emergency health and safety needs of RHS patients through

19  the services of a qualified physician?

20  A.   Yes, we were.

21  Q.   And it's my understanding that you believe that the staff

22  privileges requirement is unnecessary because you are already

23  caring for the emergency needs of your patients; is that

24  correct?

25  A.   Yes, ma'am.

1    Q.   Do you feel that your method of providing backup care is

2    perfectly medically adequate to take care of your patients?

3    A.   I -- I think it has been perfectly adequately medically

4    sound since 2006.

5    Q.   How many other abortion clinics is your medical director

6    responsible for?

7    A.   No other but, as far as I know, just Reproductive Health

8    Services.

9    Q.   The incident that you spoke of earlier, was that

10   involving -- the 2006 incident that involved a write-up by the

11   Department of Public Health, is that the same incident that was

12   reported by Dr. Duggar?

13            THE COURT:   Dr. who?

14   A.   Yes.

15            MS. FLEMING:   Duggar.

16   Q.   And tell the Court who Dr. Duggar was.

17   A.   He was the -- my understanding, he was the physician at the

18   emergency room with that patient.

19   Q.   And it was Dr. Duggar's assertion that he was not able to

20   contact anyone at your clinic to provide him information about

21   the patient that presented at the emergency room; is that

22   correct?

23   A.   That's his assertion, yes.

24   Q.   And he actually filed a report as a result of that incident;

25   is that correct?

1    A.   That's correct.

2    Q.   Do you know why your backup physician was not available to

3    take care of the patient on that occasion?

4    A.   The backup physician that evening was not called at all.

5    The -- it was relayed to me that Dr. Duggar wanted to speak to

6    the attending physician.  First he wanted to know who the

7    attending physician was.  That was the first phone call I got.

8    I received another phone call that he wanted to talk to the

9    attending physician.  And my response to the nurse that was

10   relaying the message was to contact Dr. D and tell her that she

11   needed to contact Dr. Duggar at the emergency room.

12   Q.   Right.  I understood from your testimony earlier, though,

13   Ms. Ayers, that the protocol is that if a patient presents at

14   the emergency room, that your backup physician is going to meet

15   the patient at the emergency room.  Is that correct?

16   A.   That is my protocol as of 2006.

17   Q.   As a result of this incident?

18   A.   As a result of that incident.  Yes, ma'am.  We -- policies

19   and procedures are things that do change.  And we instated a new

20   policy and procedure or a revised policy and procedure in 2006.

21   Q.   Is it your testimony that before 2006, then, you were not

22   providing adequate emergency care?

23   A.   No, ma'am.  It is not my testimony that we did not provide

24   that care.

25   Q.   What assurances do you have that Dr. F will not decide that

1  he is no longer going to provide medical care to your patients?

2  A.  I -- we have a written contract in place that specifically

3  states that he does need to give me notice if he is going to not

4  provide those services.

5  Q.  Did you receive notice in 2006 when your backup physician

6  decided to stop providing backup services?

7  A.  I received a phone call from him after -- I received a phone

8  call from him after the complaint was made, after the health

9  department came into the office.

10  Q.  So after he decided to no longer provide backup services, he

11  called you to let you know?

12  A.  He called me and told me specifically that he did not want

13  the health department calling him, and he would no longer be

14  providing backup services.

15  Q.  Do you know whether in Alabama the appropriate standard of

16  medical care requires that a physician performing a particular

17  procedure remain responsible for any complications that arise?

18        MS. KOLBI-MOLINAS:  Objection, Your Honor.  She's --

19  she knows about abortion procedures.  She's not an expert in the

20  standard of care for physicians providing -- all sorts of

21  physicians in Alabama and all the procedures they provide.

22        THE COURT:  I think she's asking her for her knowledge.

23        Is that it?  You just want to know if she knows --

24        MS. FLEMING:  Correct.

25        THE COURT:  -- what the standard is?

1          MS. FLEMING:  Yes.

2          THE COURT:  Okay.  I'll allow that.

3   A.   And no, I'm not aware of what the standard is.

4   Q.   Do you know whether you meet that standard?

5   A.   At the present time, yes, ma'am, we do.

6   Q.   You have testified now that you meet the standard of care

7   that's required of a physician performing a procedure, an

8   abortion procedure; is that correct?

9   A.   If you're specifically saying that the physician that is my

10  provider, who actually does the abortion procedure, is providing

11  the ongoing care for that patient, then that is the purpose of

12  having a contract with Dr. F, is to provide that care.

13  Q.   All right.  My question to you is this.  Do you know -- does

14  your clinic meet the standard of care required of physicians who

15  perform surgical procedures in the state of Alabama?

16  A.   I mean I still don't know if I understand what you're asking

17  me.  Please repeat the question again.

18  Q.   Yes.  Is it your testimony that your clinic meets the

19  standard of care that is required of physicians who perform

20  abortion procedures in the state of Alabama?

21  A.   In the -- in the manner in which you're asking me, if you're

22  asking me if my providers provide backup care or after-hours

23  care for the patients they have seen, we have a means in place

24  to do that.  But no, my physicians themselves do not provide

25  that care.

1  Q.  It's my understanding that RHS does not compete with local

2  hospitals or OB-GYNs?

3  A.  I'm sorry.  Say the question again.

4  Q.  RHS does not compete with hospitals or local OB-GYNs in the

5  provision of abortions?

6  A.  No.  We do not compete with them.  No, ma'am.

7  Q.  And you have referred patients to other clinics, including

8  clinics in Atlanta, Birmingham, and Tuscaloosa?

9  A.  Yes, ma'am.  We do refer.

10  Q.  Is it true that all regular full-time employees of RHS live

11  in the Montgomery area?

12  A.  Yes, ma'am.  All the full-time employees do live in the

13  Montgomery area.

14  Q.  And you have not asked the physician who currently performs

15  abortions at your clinic to attempt to obtain local hospital

16  admitting privileges?

17  A.  I have obtained a copy of Jackson's Hospital's application;

18  but we didn't pursue that application because on the face value

19  of what they were asking, my physicians couldn't meet those

20  requirements.

21  Q.  All right.  Let me ask you the question again.  Is it true

22  or not that you have not asked any of the physicians who

23  currently perform abortions at your clinic to attempt to attain

24  hospital admitting privileges?

25  A.  Neither one of my physicians have completed an application.

1   Q.   And you have not asked them to do so; is that correct?

2   A.   That's correct.

3   Q.   Have you offered any of the physicians who currently perform

4   abortions at your clinic -- have you offered them any financial

5   incentive to apply for staff privileges?

6   A.   Once again, it's my understanding that they cannot obtain

7   those staff privileges.

8   Q.   My question was have you offered them any financial

9   incentives to attempt to obtain staff privileges.

10  A.   No, ma'am.

11  Q.   And is it true that you have never recruited any physician

12  to move to Alabama to perform abortions at your clinic?

13  A.   The physicians that I've had for 36 years were all

14  physicians who came from out of town.  For 36 years, they have

15  always been physicians from came from outside Montgomery.

16  Q.   All right.  Let me ask my question again, Ms. Ayers.  Is it

17  true that you have never recruited any physician to move to

18  Montgomery to perform abortions at your clinic?

19  A.   I have -- no.  I've never recruited someone to move to

20  Montgomery.

21  Q.   Have you ever advertised in any publication for physicians

22  to perform abortions at your clinic?

23  A.   No, ma'am.  That has not been the established way that I

24  have obtained physicians in the past.

25  Q.   Is it true that you yourself have never successfully

1  recruited a doctor to come to your clinic and, instead, you've

2  only hired doctors that were referred to you by other clinics?

3  A.  That's not true.  That's not true.  When I have needed a

4  physician in the past, I have gone to other directors and

5  discussed with them the physicians that they were -- that were

6  currently working for them and/or physicians who had -- who had

7  worked for us on previous occasions.

8  Q.  So the only doctors you have hired to perform abortions are

9  those referred to you by another clinic?

10 A.  They weren't referred to me.  I actually went and actively

11 sought to hire these physicians.

12 Q.  Let me rephrase that question.  Are they doctors that you

13 found by talking to other abortion clinics?

14 A.  Yes, ma'am.

15 Q.  So at no point did you recruit a doctor from someplace other

16 than another abortion clinic.

17 A.  No.  And the -- and the reason for going to the other

18 centers --

19 Q.  Let me --

20      MS. FLEMING:  Pardon me, Your Honor.  Before the

21 witness offers her explanation, I need the answer to the

22 question.  If I could ask --

23      THE COURT:  Ask your question again.

24      MS. FLEMING:  Yes.

25 Q.  Have you ever hired a doctor to perform an abortion at your

1 clinic who was not a physician performing an abortion at another

2 clinic?

3 A.  No.

4 Q.  Is it true that when the Alabama Department of Public Health

5 first required abortion clinics to contract with a physician to

6 provide backup that you did not believe you would be able to

7 comply with that requirement?

8 A.  Yes, ma'am.  That is correct.

9 Q.  And were you eventually able to comply with that

10 requirement?

11 A.  We were eventually able to comply with it after I went and

12 begged my OB-GYN to continue, yes.

13 Q.  And would you say that your current protocol is a result of

14 that regulation, your current emergency protocol?

15 A.  I would say my current emergency protocol was -- it was

16 developed in 2006.

17 Q.  As a result of that particular requirement?

18 A.  Yes, ma'am.  As a -- as a result of the contractual

19 agreement from 2006.

20 Q.  What letters have you written in an attempt to recruit a

21 physician to move to Montgomery to work with RHS?

22        THE COURT:  How much longer are you going to be,

23 Ms. Fleming?

24        MS. FLEMING:  Not very long at all, Your Honor.

25        THE COURT:  Okay.  It's five after twelve.

1        MS. FLEMING:  I expect to be able to complete this by

2    12:15.

3        THE COURT:  Why don't we take our recess now, then.

4    We'll come back at 1:05.

5      (Recess at 12:05 p.m. until 1:08 p.m.)

6        THE CLERK:  Please remain seated.  Court is in session.

7        THE COURT:  You may be seated.  Please proceed,

8    Ms. Fleming.

9    Q.  Ms. Ayers -- pardon me.  Ms. Ayers, have you contacted any

10   medical schools in an attempt to locate a physician who might be

11   interested in coming to work for RHS on a full-time or a

12   part-time basis?

13   A.  No, ma'am.  I've not contacted medical schools.

14   Q.  Have you placed ads in any medical journals or alumni

15   magazines or other publications in an attempt to hire a

16   physician to come to work for RHS either on a full-time or

17   part-time basis?

18   A.  No, ma'am.  As I explained before, I've gone to other

19   directors.

20   Q.  Right.  Have you conferred with directors of other

21   ambulatory care centers or medical clinics to see what process

22   they go through to hire physicians?

23   A.  No, ma'am, I have not.

24   Q.  And you're a member of the National Abortion Federation; is

25   that correct?

1  A.  Yes, ma'am.

2  Q.  And I believe you said in your deposition that belonging to

3  that federation bolsters your networking ability?

4  A.  Yes, ma'am, it does.

5  Q.  Okay.  Have you contacted that group in an attempt to locate

6  a doctor who would come to Alabama and work for you?

7  A.  I've not contacted that group specifically.  I've contacted

8  other NAF clinics and spoke to their directors.

9  Q.  But you haven't worked through that federation.

10 A.  Not through the -- no.  It's not been necessary to work

11 through that.  It's not been necessary to work through the NAF

12 federation.

13 Q.  And I believe that you testified to this earlier, but I want

14 to make sure.  Have you attempted to hire a physician to

15 relocate to Montgomery to serve RHS patients to enable RHS to

16 comply with the Women's Health and Safety Act?

17 A.  Okay.  Repeat -- repeat just the very first part of it.

18 Q.  Yes.  I'll repeat it again a little more slowly.  Have you

19 attempted to hire a physician to relocate to Montgomery to serve

20 RHS patients to enable RHS to comply with the Women's Health and

21 Safety Act?

22 A.  No, ma'am, I've not attempted to hire someone to relocate.

23 Q.  What percentage of your patients return for their follow-up

24 exam?

25 A.  Approximately 40 to 45 percent return for their checkups.

1  Q.  Do you do any follow-up -- if they don't come back for their

2  follow-up checkup, do you do any follow-up with them?

3  A.  It depends on if there -- if there's any indication in their

4  medical record where I would contact the patient to ask them to

5  make sure they return for their checkup.  There are various

6  reports that I file in their record.  And certainly if there's

7  any indication that that patient has missed a checkup and I

8  would like to see her back for whatever reason, then I will

9  contact them.  Now, I will first try to, obviously, contact them

10  by phone; but if necessary, recently I just sent out certified

11  return-receipt mail for just that reason.

12  Q.  Now, if a patient -- I think you testified before that a

13  patient will pay you a single fee for -- that covers the

14  abortion and also the follow-up visit.

15  A.  Yes, ma'am.

16  Q.  If any complications arise from that, you said that you pay

17  a fee to your doctor, who would also cover or pay -- or provide

18  care, rather, for that patient as a follow-up.  Is that right?

19  You -- you pay a fee to your cover-up or backup physician to

20  provide care to a woman that experiences complications.

21  A.  If the -- if the backup physician sees the patient in

22  emergency room, then I'm going to pay him a fee for doing so.

23  Q.  Does the patient have to pay an additional fee for that?

24  A.  If she goes to the hospital, yes, ma'am, she would have to

25  pay.

1  Q.  Does she pay that to the hospital or to you?

2  A.  She would pay that to the hospital for her care.

3  Q.  Would she owe you an additional fee for her care --

4  A.  No, ma'am, she would not.

5  Q.  -- emergency care?  And you testified -- I believe you said

6  that you had referred patients to other clinics.  And I asked

7  you about Atlanta, Birmingham, and Tuscaloosa, but I want to be

8  clear.  You have referred patients to Atlanta; is that correct?

9  A.  We have.  It -- in Alabama, I'm not aware that there are any

10  hospitals that do medically necessary abortions.  For instance,

11  if you have a patient with one kidney or lupus or some medical

12  reason why this patient would be seeking an abortion and need it

13  done in a hospital setting, then I would be referring them to

14  Atlanta.

15  Q.  Have you referred patients to Birmingham as well?

16  A.  In the past, yes, ma'am.

17  Q.  What about to Tuscaloosa?

18  A.  Yes, ma'am.

19  Q.  What about to Mobile?

20  A.  Especially if a patient calls me from that area.  And caller

21  ID now identifies somebody that would be in the Mobile area or

22  in the Birmingham area.  And so those patients, I would not even

23  see them, but I can simply refer them if I know they're coming

24  from that -- if they're coming from that area and that's the

25  closest clinic to them.  I certainly want to advocate for my

1    patients, you know, in that regard.

2    Q.  Have you had patients travel for two to three hours to come

3    to your clinic?

4    A.  Occasionally they do, yes.

5    Q.  Have they traveled to your clinic when it would have been

6    closer for them to go to another clinic?

7    A.   If I know that they're closer to another clinic, then I'm

8    going to refer to the clinic that's closer to them.  If they're

9    closer to us, then certainly we're going to move in that

10   direction for them to become a patient at our office.

11   Q.  I'll ask it again in case it wasn't clear.  Have you ever

12   seen a patient in your clinic that was geographically closer to

13   another clinic?

14   A.  Occasionally.  Somebody may not want to have the procedure

15   done in the city where they live; and for privacy reasons, they

16   may come to our facility.  I'm sure that that probably happens

17   in the reverse, too.

18          MS. FLEMING:  Very well.  Thank you, Ms. Ayers.  I'll

19   pass the witness.

20                      REDIRECT EXAMINATION

21   BY MS. KOLBI-MOLINAS:

22   Q.  Ms. Ayers, does Dr. F, your backup physician, have hospital

23   privileges at any hospitals outside Montgomery?

24   A.  No, ma'am, he does not.

25   Q.  Do you ever have patients that go to emergency rooms in

1  hospitals outside Montgomery?

2  A.  Occasionally we have a patient that goes to a hospital

3  outside Montgomery.

4  Q.  And so does the backup physician see that patient there?

5  A.  He does not have privileges at those hospitals; so no, he

6  would not.

7  Q.  Do you think your patients received adequate care at Alabama

8  hospitals outside Montgomery?

9  A.  It's been my experience that they have adequate care at

10  those hospitals, yes.

11  Q.  Are all of your policies, procedures, and protocols approved

12  by the Department of Public Health?

13  A.  When they have a change in policies and procedures, I submit

14  that information to the Department of Public Health for their

15  review.  And then they let me know whether it meets their

16  approval or not.

17  Q.  Has the Department of Public Health ever asked you to change

18  any of your policies, procedures, or protocols?

19  A.  In 2006, we had new regulations and a change in regulations,

20  so we changed policies and procedures then.  Anytime we have a

21  change in regulations, they -- they may ask me to do that.  If

22  they come in and I have a particular -- if I have a deficiency,

23  they may not like the policy that I have in place.  And yes, I

24  would then change that policy and procedure.

25  Q.  And how often do they review your policies and procedures

1  and protocols?

2  A.  At least on an annual basis.

3  Q.  And does that include review of the policies, procedures,

4  and protocols concerning your medical director?

5  A.  Yes, ma'am.

6          MS. KOLBI-MOLINAS:  Thank you.  That's all.

7          THE COURT:  Any further cross?

8          MS. FLEMING:  No further cross, Your Honor.

9          THE COURT:  Thank you very much.  You may step down.

10         THE WITNESS:  Thank you.

11         THE COURT:  Next witness.

12         MS. KOLBI-MOLINAS:  Your Honor, we call Staci Fox, and

13  my colleague, Ms. Sandman, will --

14         THE COURT:  Ms. Fox.

15         MR. DAVIS:  Your Honor, while the witness is

16  approaching, may I ask a procedural question?

17         THE COURT:  Yes.

18         MR. DAVIS:  Was it tomorrow morning when you wish to

19  meet at eight to discuss objections?

20         THE COURT:  I really didn't say which morning.  Why

21  don't we take that up after we hear from this witness.

22         MR. DAVIS:  Certainly.

23         THE COURT:  I was just saying I would meet at eight.

24         MS. SANDMAN:  Good afternoon, Your Honor.  May I pass

25  out the binders?

1         THE COURT:  Yes.  I think, though, tomorrow has the

2    shorter list of witnesses.  Tomorrow does sound like a good day

3    to do that.

4         MR. DAVIS:  We weren't expressing a preference.  My

5    main question was whether you also wanted to take up the

6    exhibits or just depositions.  And I had some comments and

7    thoughts about that.

8         THE COURT:  Okay.  Very good.

9         **STACI FOX**, the witness, having been previously sworn

10   to speak the truth, the whole truth, and nothing but the truth,

11   testified as follows:

12                       DIRECT EXAMINATION

13   BY MS. SANDMAN:

14   Q.  Ms. Fox, please introduce yourself to the Court.

15   A.  Sure.  My name is Staci Fox, and I'm the CEO at Planned

16   Parenthood Southeast.

17   Q.  And is that commonly referred to as PPSE?

18   A.  Yes, it is.

19   Q.  If I refer to Planned Parenthood, will you also understand

20   me to be referring to PPSE?

21   A.  Yes.

22   Q.  How long have you been the president and CEO of PPSE?

23   A.  Since late January 2013.

24   Q.  And what did you do before that?

25   A.  I was CEO at a Planned Parenthood affiliate in Florida.

1    Q.   And was that your first position with Planned Parenthood?

2    A.   No.  I've been with Planned Parenthood for over 17 years.

3    Q.   What are your responsibilities as CEO?

4    A.   My primary responsibility is to carry out the mission of our

5    work, overseeing our health care operations, our education, and

6    our advocacy.

7    Q.   Can you tell the Court about PPSE and the health care

8    centers it operates?

9    A.   Sure.  We operate eight health centers in Georgia, Alabama,

10   and Mississippi.

11   Q.   And is PPSE a for-profit organization?

12   A.   No.  We are a not-for-profit organization.

13   Q.   What services do these health centers provide?

14   A.   Provide a wide range of reproductive health services,

15   including access to birth control, testing and treatment for

16   sexually transmitted diseases, cancer screenings, and abortion

17   care.

18   Q.   How long has Planned Parenthood provided care in Alabama?

19   A.   For over 70 years.

20   Q.   And where in Alabama does Planned Parenthood operate health

21   centers?

22   A.   We have health centers in Mobile and Birmingham.

23   Q.   And are the services that you provide there the same as the

24   services you described a moment ago?

25   A.   Yes, they are.

1  Q.  Can you explain for the Court what the relationship is

2  between PPSE and Planned Parenthood's national office?

3  A.  Sure.  Planned Parenthood Southeast is an affiliate of

4  Planned Parenthood Federation of America.  We're a separate

5  corporation with a separate board and CEO.  However, we meet the

6  standards set forth by our national organization in order to be

7  a Planned Parenthood.  The standards of accreditation are

8  medical standards and also go through an accreditation process

9  every three years with our national office.

10  Q.  Ms. Fox, turning to the patients that PPSE serves, does PPSE

11  do anything to track the income levels of its patients?

12  A.  Yes, we do.

13  Q.  And why do you track this information?

14  A.  For a number of reasons.  One is so -- part of their medical

15  record, but also part of financial assistance that they are

16  eligible for when accessing our services, specifically around

17  abortion care.

18  Q.  And can you explain to the Court how that process works for

19  access to funds for abortion care.

20  A.  Sure.  Every woman that calls Planned Parenthood Southeast

21  for an appointment for abortion care is screened for eligibility

22  for assistance funds.

23  Q.  And the assistance that is given, is that Planned Parenthood

24  money?

25  A.  No.  It is money given by a donor to Planned Parenthood.

1  Q.   And Ms. Fox, do you know how many of your abortion patients
2  are living in poverty?
3  A.   I do.
4  Q.   How do you know?
5  A.   We know from the information we gather, both in the
6  screening process that I mentioned and in their medical record.
7  Q.   Ms. Fox, how many of your abortion patients are living in
8  poverty?
9  A.   In 2013, over 70 percent of our patients were living at or
10 below 150 percent of the federal poverty limit, which from my
11 understanding for a family of two is around $30,000 a year.
12 Q.   And do you have information for -- for other years as well?
13 A.   Yes.  We implemented a new electronic practice management
14 system in our health centers in 2013, so we have a different
15 data set to examine that data.  But based on the justice funds,
16 the funds that we use for patient assistance for abortion care,
17 we know that over half of our patients in 2011 and 2012 were
18 eligible and did access those funds.  And those funds require
19 that the patients are living at or below 133 percent of the
20 federal poverty level.
21          THE COURT:  The funds are available if they're living
22 at -- below 133 percent?
23          THE WITNESS:  At or below.  Yes, sir.
24 Q.   Ms. Fox, does PPSE do anything to track how many abortion
25 patients travel from outside of Birmingham or Mobile to access

1  abortion services there?

2  A.   Yes, we do.

3  Q.   And what is it that you do?

4  A.   We collect their demographic information as part of their

5  medical records, so we have their address of residence and their

6  zip code.

7  Q.   And have you reviewed this information?

8  A.   I have reviewed a zip code report prepared for -- prepared

9  by my staff at my request.

10  Q.   And can you speak to how many of your patients travel to

11  access abortion services in Birmingham or Mobile?

12  A.   Sure.  Broadly speaking, over half of our patients are

13  coming in from outside either Mobile or the Birmingham area.

14  And more specifically in Mobile, nearly 60 percent of our

15  patients are coming in from outside the Mobile area.

16  Q.   Ms. Fox, are you familiar with the admitting privileges

17  requirement at issue in this case?

18  A.   Yes, I am.

19  Q.   And what do you understand it to require?

20  A.   I understand it to require that the doctors providing

21  abortions at our clinics must have local hospital privileges and

22  also be able to provide specific surgeries, such as laparotomies

23  and hysterectomies.

24  Q.   And if I speak of the act, is that also what you understand

25  that I'm referring to?

1  A.   Yes.

2  Q.   Ms. Fox, how many physicians perform abortions for PPSE in

3  Alabama?

4  A.   Two.

5  Q.   Does either of these doctors have admitting privileges that

6  meet the act's requirements?

7  A.   No.

8  Q.   Let's start by talking about your medical director.   If

9  you'll look at Exhibit 1 in your binder, do you recognize what

10 that is?

11 A.   Yes, I do.

12 Q.   What is it?

13 A.   It's a list of pseudonyms for physicians that are referenced

14 in this case.

15 Q.   And who created this document?

16 A.   The document was created by counsel.

17 Q.   And what do you understand its purpose to be?

18 A.   The purpose of the document is to protect the identity of

19 these physicians.   Security is a very important issue in the

20 provision of abortion care.

21 Q.   Looking at this list, how will your medical director be

22 identified?

23 A.   Our medical director is identified as Dr. Roe.

24 Q.   And does she work -- excuse me.   Does she work full-time for

25 PPSE?

1   A.   No, she does not.

2   Q.   Can you explain to the Court how she shares her time?

3   A.   Sure.  She also has an appointment at a teaching hospital in

4   the Atlanta area, so sees patients and is on the faculty there.

5           THE COURT:  Now, Dr. Roe is a pseudonym?

6           THE WITNESS:  Yes.

7           THE COURT:  Okay.  That's R-O-E.

8           THE WITNESS:  Yes.

9           THE COURT:  Okay.

10  Q.   And just to be clear, when you say that Dr. Roe was on

11  faculty at a hospital, meaning that there's a relationship with

12  a medical school?

13  A.   Yes.  Yes.  She sees patients through that medical school.

14  Q.   In addition to Dr. Roe's responsibilities as medical

15  director, does she also provide abortion services for PPSE in

16  Alabama?

17      (The court reporter interrupts for clarification)

18          MS. SANDMAN:  I apologize.

19  Q.   In addition to Dr. Roe's responsibilities as medical

20  director, does she also provide abortion services for PPSE in

21  Alabama?

22  A.   Yes, she does.

23  Q.   And where does she do that?

24  A.   Primarily in Birmingham, but she also provides coverage and

25  oversight for our Mobile clinic.

1  Q.  And you testified earlier that Dr. Roe teaches at a medical

2  school and provides services there in Atlanta.  Do you know what

3  type of medical services she provides to these patients?

4  A.  Yes.  She provides OB-GYN care, delivers babies and takes

5  care of gynecological issues for her patients.

6  Q.  In your capacity as CEO, are you familiar with the hospitals

7  at which Dr. Roe has admitting privileges?

8  A.  Yes.  She has admitting privileges at a couple of area

9  hospitals in Atlanta.

10  Q.  And where does Dr. Roe live?

11  A.  In the Atlanta area.

12  Q.  How many days a week does she work in Birmingham?

13  A.  Regularly, one day a week.

14  Q.  And just so the record is clear, is your Birmingham facility

15  open currently?

16  A.  No, it is not.

17  Q.  We'll come back to that in a moment.  In addition to

18  Dr. Roe's duties in Birmingham, does she provide services for

19  PPSE elsewhere in Alabama?

20  A.  Yes.  She provides coverage and oversight for our physician

21  who practices in Mobile.

22  Q.  And does she provide services for PPSE outside of Alabama as

23  well?

24  A.  Yes.  She provides services also in the Atlanta area and in

25  Augusta, in Georgia.

1    Q.  Focusing now on your health center in Mobile, if you could

2    refer again to your pseudonym list, which doctor provides

3    abortion services for PPSE in Mobile?

4    A.  Dr. P1.

5    Q.  And in your capacity as CEO, are you familiar with her area

6    of specialty?

7    A.  Yes, I am.  She's a board-certified family medicine

8    physician and also did a fellowship in family planning.

9    Q.  And does Dr. P1 work full-time for PPSE?

10   A.  No, she does not.

11   Q.  Where else does she work?

12   A.  She also works in the Atlanta area for other abortion

13   providers as well as out of state in Virginia and at a hospital

14   in the Atlanta area.

15   Q.  And is she also at a medical school in Atlanta as well?

16   A.  Yes, she is.  She teaches students there at the medical

17   school.

18   Q.  And in your capacity as CEO, are you familiar with the

19   hospitals at which Dr. P1 has admitting privileges?

20   A.  Yes.  She has admitting privileges at an Atlanta hospital.

21   Q.  We have talked about Dr. Roe and Dr. P1.  Are those the only

22   two physicians providing abortion services at PPSE in Alabama?

23   A.  Yes.

24   Q.  And at the time that you first filed this lawsuit, was there

25   another physician providing these services?

1  A.  There was another physician at the time, and that physician

2  is no longer working with us.  She's working at another abortion

3  provider in Huntsville.

4  Q.  And just so the record is clear, she is no longer in

5  Birmingham?

6  A.  No.

7  Q.  And did that doctor have admitting privileges in either

8  Mobile or Birmingham?

9  A.  No, she did not.

10  Q.  Turning now to the questions of admitting privileges under

11  the act, in your capacity as CEO, are you familiar with the

12  steps that were taken in response to the act to figure out

13  whether your doctors could get admitting privileges that would

14  meet the requirements?

15  A.  Yes, I am.  Broadly speaking, I can speak to the process

16  that we undertook.

17  Q.  And what were those steps?

18  A.  We worked to identify the hospitals in the area that were

19  potential hospitals where we may obtain privileges and then

20  reviewed the most likely candidates or the most likely hospitals

21  and their requirements.

22  Q.  And who was involved in the process?

23  A.  Dr. Roe, our medical director, as well as some of our senior

24  staff at PPSE as well as staff at our national office, at

25  Planned Parenthood Federation of America.

1   Q.  And did you consider this to be a high-priority question?

2   A.  Absolutely.  Our mission is to provide abortion care for

3   patients and, specifically at Planned Parenthood Southeast, for

4   women in Alabama, Georgia, and Mississippi.  So this was a

5   priority for us.

6   Q.  What was the process in connection with Dr. P1?

7   A.  We determined, based on the act's requirements, that Dr. P1

8   would not be eligible because of the specific procedure

9   requirements outlined in the act.

10  Q.  And why was that?

11  A.  She's a board-certified family medicine physician.  So

12  procedures such as hysterectomies and laparotomies would be out

13  of her scope of service.

14  Q.  And can you tell the Court more about the process that you

15  pursued for Dr. Roe?

16  A.  Sure.  We worked in tandem with our partners at our national

17  office to review a set -- certain set of hospitals and their

18  bylaws requirements to determine if we could meet those

19  requirements as outlined.

20  Q.  And what was your -- what was your conclusion from that

21  process?

22  A.  Our conclusion was that our -- neither physician would be

23  able to meet the requirements.

24  Q.  And did the requirements that they could not meet have

25  anything to do with quality of care?

1  A.   No, not at all.

2  Q.   Broadly speaking, what were the reasons?

3  A.   The reasons included things like minimum admissions to

4  hospitals in the area, geographic location of residence or

5  office space, and taking on-call hours for the hospital.

6  Q.   And do you know whether every hospital in Birmingham and

7  Mobile imposed each of these requirements for a doctor to get

8  admitting privileges?

9  A.   I couldn't speak to specificity about each hospital's

10  requirements, but I do know that every hospital had some

11  combination of those requirements.

12  Q.   And you mentioned earlier that the national office was also

13  involved in this process.  What was the national office's

14  involvement?

15  A.   Our national office staff helped our medical director,

16  Dr. Roe, review the bylaws and their requirements to determine

17  if she could -- she could meet those requirements.  They also

18  helped with outreach.

19  Q.   And when you say they helped with outreach, can you speak

20  more specifically to what they did?

21  A.   Sure.  At my request, our national office contacted via

22  e-mail our network of physicians and medical directors that work

23  for Planned Parenthood affiliates all over the country and asked

24  them if they had any contacts in our local area that were

25  providing service in Mobile and Birmingham.

1   Q.   And when you say medical director, that this went out to the

2   medical directors, how many people would the e-mail have gone

3   out to?

4   A.   Approximately a hundred.

5   Q.   And do you know if that e-mail in fact went out?

6   A.   It did.  I received it myself.

7   Q.   And do you know whether there was a result from that e-mail

8   that was helpful to this process?

9   A.   Ultimately, we had no results that were helpful.  There

10  were, you know, a couple of contacts that we were able to make,

11  but nothing that panned out to be helpful to obtain privileges.

12  Q.   And do you know whether the national office took any other

13  steps to try to find contacts that could be helpful?

14  A.   Yes.  They've been a great help in that process by doing

15  outreach at other medical conferences and other connections that

16  they have within the medical community.

17  Q.   And what was the result of that process?

18  A.   We've not been able to find any contacts or physicians.

19  Q.   Focusing again on Dr. Roe, did she apply for privileges at

20  any of the Birmingham or Mobile hospitals?

21  A.   No, she did not.

22  Q.   Why not?

23  A.   She felt that applying for privileges would put her

24  professional license at risk.

25  Q.   Can you explain that a little further for the Court?

1  A.   Sure.  She felt that applying for privileges at the hospital

2  and being denied privileges would then get reported to the

3  national practitioner database, which would have an impact on

4  her licensure renewal as well as any other applications for

5  hospital privileges in the future.

6  Q.   And did you ask her to apply for privileges anyway?

7  A.   We talked about -- we talked about her application.  But

8  once she explained to me the risk to her career, I wasn't

9  willing to put her in that place to cause such professional

10 damage.  So she did not apply.

11 Q.   Now, Ms. Fox, you've testified that one of the factors that

12 makes it impossible for Dr. Roe to get privileges that meet the

13 act's requirements is the fact that she does not live in

14 Birmingham and she only practices there once a week.  Did you

15 ask her if she would move?

16 A.   No.  I did not ask her if she would relocate her family.  I

17 know she has strong personal reasons for why she left the

18 Birmingham area.

19 Q.   And did you ask her if she could add more days of the week

20 to work in Birmingham?

21 A.   We have discussed scheduling possibilities.  But given her

22 other responsibilities in the Atlanta area and her

23 responsibilities at the teaching hospital -- and honestly, given

24 the fact that she gave up a private practice to do this -- I

25 mean her time is already taken up.  She doesn't have much

1  leeway.

2  Q.  One more question about Dr. Roe before we turn to Dr. P1.

3  In your capacity as CEO, do you know whether she took any steps

4  to see if she could get privileges at a hospital where she

5  already had relationships?

6  A.  Yes, I do.

7  Q.  And what was that?

8  A.  She had a meeting with the University of Alabama-Birmingham

9  Medical School where she had a previous relationship to discuss

10  a faculty appointment.

11  Q.  And why was she discussing a faculty appointment with them?

12  A.  Because at the University of Alabama-Birmingham, a faculty

13  appointment is required in order to obtain privileges.

14  Q.  And to your knowledge, did she have a prior relationship

15  with UAB?

16  A.  Yes.  She was previously employed by UAB.

17  Q.  And just so the record is clear, when I say UAB, do you

18  understand me to mean the University of Alabama at Birmingham?

19  A.  Yes.

20  Q.  And do you know the result of this meeting?

21  A.  Yes.  She was unsuccessful in obtaining a faculty

22  appointment.

23          THE COURT:  She was what?

24          THE WITNESS:  Unsuccessful at obtaining a faculty

25  appointment.

1    Q.   Focusing now on Dr. P1, your doctor who provides abortion

2    services in Mobile, you testified earlier that she could not get

3    privileges that meet the act's requirements because she's a

4    family medicine doctor.   As CEO, do you have an understanding of

5    whether -- other than that factor, that she's a family medicine

6    doctor, whether she could otherwise meet the hospital bylaws'

7    requirements?

8    A.   No.   She would not be able to.

9    Q.   And why is that?

10   A.   Because of the same requirements that I spoke of in relation

11   to Dr. Roe.

12   Q.   And how frequently does Dr. P1 work in Mobile?

13   A.   Weekly.

14   Q.   We've been speaking about your health centers in Birmingham

15   and Mobile, but you testified earlier that the Birmingham Health

16   Center is not currently open.   Why is that?

17   A.   We had a troubling incident in December of last year that

18   elevated some concerns about our daily operations of the clinic.

19   So we separated the staff and suspended services at the clinic.

20   Q.   And what was the troubling staff incident that sparked this

21   process?

22   A.   We had a nurse and another staff member that sold medication

23   abortion drugs in our parking lot to a patient.

24   Q.   And just to be very clear, is this something that your

25   health center policies permit a staff member to do?

1  A.  Absolutely not.

2  Q.  What did you do when you discovered this?

3  A.  When we discovered the incident, we immediately terminated

4  the two staff involved.

5  Q.  And is that the reason that you decided to suspend services?

6  A.  No, it's not.  The incident elevated concerns, as I

7  mentioned, about the day-to-day operations.  We have really good

8  procedures and policies in place; but at the end of the day, our

9  team didn't feel like we could trust the staff to carry out

10  those procedures.  So we let the entire staff go.

11  Q.  And just so the record is very clear, did any of the

12  concerns that you mentioned relate to the quality of medical

13  services provided to patients?

14  A.  No.

15  Q.  Ms. Fox, how long had you been CEO when this incident took

16  place?

17  A.  Less than a year.

18  Q.  What did you do after you terminated the two staff members?

19  A.  After we terminated the first two staff members, we

20  discussed as a team about how we wanted to proceed.  We made the

21  decision that it would be best to suspend services and separate

22  the rest of the staff.

23  Q.  And how did you proceed in terms of your -- excuse me.  How

24  did you decide to proceed in terms of the medical services

25  during this period?

1  A.  Sure.  We -- we scheduled clinic in early January in order

2  to see patients that had already been scheduled previously and

3  followed up with patients that had been seen in the previous

4  month for any need for follow-up care and obviously reported to

5  the State -- the State, as required, our schedule of services

6  for January.

7  Q.  And just so the record is very clear, when you spoke earlier

8  of terminating staff, were any doctor staff terminated in

9  connection with this?

10  A.  No.

11  Q.  Are you aware of whether any arrangements were made to

12  ensure continuity of care for the patients who had abortions in

13  January?

14  A.  Yes.  The patients that we saw for abortions in January were

15  given the same instructions for follow-up care as patients that

16  we've seen in any other day of clinic.

17  Q.  So can you walk the Court through how that would work from a

18  patient perspective?

19  A.  Sure.  So for the patients that we saw in January, if they

20  received surgical abortion services, after-hours nurse --

21  nursing service was available to them for any complications, as

22  well as our medical director was available to the patients and

23  to the on-call service.

24  Q.  And so just to be very clear, if a patient calls with a

25  question or symptoms they were concerned about, they could still

1  talk to the nurse?

2  A.  Absolutely.

3  Q.  And what about for patients who had abortions before the

4  decision to suspend clinical services?

5  A.  We reached out to all of those patients to let them know

6  that they could come in that first week -- that first, second

7  week in January.

8  Q.  And did patients still have access to their medical records

9  during this period when services had been suspended?

10  A.  Yes, they did.  We had a regular schedule of staff on-site

11  in the clinic if there was a need to obtain medical records.

12  Q.  And at what stage did ADPH become involved in this process?

13  A.  ADPH became involved on January 17th.

14  Q.  And before that, did you have any plan to report the

15  incident to any regulatory body in the state?

16  A.  Yes.  We reviewed our reporting requirements and had drafted

17  reports to the Board of Nursing and had planned to copy that

18  same report to the Board of Medical Examiners.

19  Q.  Now, I'm assuming that the report to the board of nurses was

20  because a nurse's conduct was at issue.  Why would this be

21  reported to the Board of Medical Examiners?

22  A.  We also reported to the Board of Medical Examiners because

23  we felt like the staff involved were practicing outside of their

24  scope of service.

25  Q.  And since that time, have you made this report?

1  A.   Yes, we have.

2  Q.   Ms. Fox, at this stage, when do you think the health center

3  will reopen?

4  A.   We hope to be open later this month or sometime in June.

5  Q.   And why has it taken so long?

6  A.   Honestly, staff recruiting has been challenging.  Finding

7  staff who are skilled and willing to work at Planned Parenthood

8  has been difficult.

9  Q.   And why has it been so difficult?

10  A.   Given the political climate that we work in, working at

11  Planned Parenthood is a -- is a burden and it's challenging for

12  folks.  There are concerns when people come to work for us.

13  Q.   Ms. Fox, just a few more questions on this topic.  To your

14  knowledge, was the patient to whom the nurse sold the

15  medications injured or harmed in any way?

16  A.   No.

17  Q.   Did she seek hospital treatment?

18  A.   No, she did not.

19  Q.   If your doctors had admitting privileges, would that have

20  prevented this incident?

21  A.   No, it would not.

22  Q.   Turning to a different topic, are you aware of any security

23  threats that PPSE and your providers face?

24  A.   Unfortunately, yes, I am.

25  Q.   Tell the Court about that.

1  A.  Our staff -- and specifically, our providers -- face

2  harassment.  We receive suspicious packages and threating mail

3  on a regular basis.

4  Q.  Are you aware of any security measures that are taken to

5  protect your providers and other staff?

6  A.  I am.  We take security very seriously at Planned Parenthood

7  for our staff and specifically for our providers.  All of our

8  health centers have security cameras and security systems.  We

9  have policies and procedures related to mail handling in case

10 there are suspicious packages that come in, similar policies and

11 procedures to deal with protestors, procedures for the arrival

12 and departure of our physicians, and procedures for staff, you

13 know, in the clinic should something arise.

14 Q.  Do you understand these to be measures that are taken to

15 protect the physical safety of your doctors and staff members?

16 A.  Yes, I do.

17 Q.  Has there been a particular incident, either here or

18 nationally, that caused these measures to be increased?

19 A.  I think when -- when anything happens on a national scale,

20 we all pause and take a look at our security measures.  You

21 know, when something happens like Dr. Tiller being shot in his

22 own church, that certainly gives us all pause to make sure that

23 we're doing everything we can to make sure our physicians are

24 safe.

25 Q.  Have you personally encountered harassment by antiabortion

1  protestors at PPSE?

2  A.   Yes, I have.

3  Q.   And was that -- have you experienced that in Birmingham and

4  in Mobile?

5  A.   Yes.  I've had opportunity to witness our protestors in

6  Mobile and had a little bit more interaction with them in

7  Birmingham.

8  Q.   Tell the Court about those interactions.

9  A.   Sure.  My first visit to Birmingham when I first became CEO,

10 the protestors blogged about my visit.  They commented that the

11 pretty blonde lady in the suit was arriving in the building and

12 that it must have been an important day at Planned Parenthood.

13 I had another occasion to visit the Birmingham clinic where

14 protestors threatened to come visit me at my Atlanta office and

15 most recently had an encounter with protestors when I was

16 staffing the clinic and alone.

17 Q.   And can you describe that last incident that you just

18 referenced?

19 A.   Sure.  I arrived to the clinic, and the protestors followed

20 me to get as close as they could to interact with me as I was

21 getting out of the car.

22     (The court reporter interrupts for clarification)

23         THE COURT:  You're going a little fast for me even to

24 hear it.

25 A.   When I arrived to the clinic, the protestors followed me to

1   get as close as they could to the car I was in.  And as I got

2   out of the car, they immediately offered to help me find another

3   job, helped -- offered help working on my resume, if needed, to

4   help me find another job.  I think once they realized that I was

5   not engaging with them, they started to yell at me as I was

6   entering the building and making comments such as that I would

7   have to answer in heaven for the babies that had been killed in

8   the facility.

9   Q.  In your time at PPSE, have you ever called the police

10  because of protestors?

11  A.  I actually called the police that particular day.  I was

12  alone in the building.  And our trash cans outside, big metal

13  trash bins, were being rattled; and they are on our property.

14  So I called the nonemergency number of the police to let them

15  know that I was alone in the building for their --

16  Q.  And were you afraid for your personal safety?

17  A.  I actually was that day.  It doesn't often happen for me.

18  But I was alone.  And I knew that if the protestors were on our

19  property, they were crossing a line that they knew they

20  shouldn't have crossed.

21  Q.  And do you know from the time that you've spent in the

22  health centers whether your doctors in Alabama receive similar

23  harassment?

24  A.  Oh, similar and much worse than that.

25  Q.  Do you know whether PPSE has received antiabortion mail?

 1   A.   Yes.   We do on a regular basis.

 2   Q.   And do you know whether that mail is tracked and kept on a

 3   regular basis?

 4   A.   Yes, it is.

 5   Q.   Can you walk the Court briefly through that process.

 6   A.   Sure.   Depending on the -- the content of the mail, if it is

 7   a known sender and the mail is not threatening, we will log the

 8   mail in our incident report system.   If the mail is threatening

 9   in any way or from an unknown sender, we also contact the local

10   FBI.

11   Q.   Directing your attention to what's been marked as Exhibits

12   47, 48, and 79, marked for identification -- and those are in

13   your binder -- do you recognize those documents?

14   A.   Yes, I do.

15          MR. DAVIS:   Your Honor, we have raised objections to

16   these exhibits on the basis of hearsay.   If the witness is just

17   saying that yes, these are items that we received, we have no

18   objection.   But if it's beyond that, we have a hearsay

19   objection.

20          THE COURT:   Okay.   What exhibit numbers are we talking

21   about?

22          MS. SANDMAN:   47, 48, and 79, Your Honor.

23          MR. DAVIS:   That's correct.

24          THE COURT:   Okay.

25          MS. SANDMAN:   And they are being offered solely for

1    their existence.

2         THE COURT:  I thought I had already admitted these.

3    But obviously, I don't think anyone is admitting them for the

4    truth of the matter asserted.  I think the fact is is they just

5    were received.

6         MR. DAVIS:  That's certainly what we'd expect.

7         THE COURT:  Right.

8         MR. DAVIS:  But I also certainly didn't wish to waive

9    an objection, Judge.

10        THE COURT:  Right.  I can't even imagine that the

11   plaintiffs would want these admitted for the truth of the matter

12   asserted.

13        MS. SANDMAN:  We do not, Your Honor.

14        THE COURT:  I think they would take issue with what's

15   stated in them.  So I think we're all on the same page on that

16   one.  Very good.

17        MS. SANDMAN:  So Your Honor, if those are already in

18   the record from the prior testimony, I'll move on.

19        THE COURT:  Right.  Okay.

20   Q.  (Ms. Sandman, continuing:)  You've been testifying about the

21   harassment and threats faced at PPSE's health centers.  Do you

22   know whether there has been publicity around those incidents?

23   A.  Sure.  There is often media attention around protests.  You

24   can drive by one of our health centers and see the protestors

25   outside.  And in fact, fall of last year, we received a

1  suspicious package and handled it in the way that we -- our

2  security procedures tell us to do.  That also made the media.

3  Q.  And do you know whether people in the community, broadly

4  speaking in Birmingham and Mobile, are aware of the security

5  risks that your providers face?

6  A.  I think they are.  I mean I think these issues are both

7  elevated to local news and national news.  And as I mentioned,

8  just being a member of the community, it would be hard to not

9  see protestors standing outside of local clinics.

10 Q.  You testified earlier about how your two doctors who provide

11 abortions in Alabama both live in Atlanta and that one issue in

12 their inability to get privileges --

13          THE COURT:  Could I get just a clarification of one

14 issue?

15          You have a clinic in Mobile and where else?

16          THE WITNESS:  And Birmingham.

17          THE COURT:  Okay.  The Birmingham one is now closed.

18          THE WITNESS:  Yes, sir.

19          THE COURT:  So you only have one now in Alabama.

20          THE WITNESS:  Right.

21          THE COURT:  Okay.  Go ahead.

22 Q.  When are you hoping that that clinic will reopen?

23 A.  Hopefully later this month or in June.

24          THE COURT:  Actually, that was going to be one of my

25 questions too.  Okay.  So you expect that clinic to open again

1   in --

2           THE WITNESS:  Within the next month, yes.

3           THE COURT:  Within the next month.  Okay.

4   Q.  Ms. Fox, you testified earlier that --

5           THE COURT:  Now, let me get a clarification here from

6   plaintiffs' counsel.  How many clinics are there in the state

7   that are open today?

8           MS. SANDMAN:  Five, Your Honor.

9           THE COURT:  Will Birmingham make six?

10          MS. SANDMAN:  Birmingham will make five.  Four today;

11  five next month.

12          THE COURT:  That's why I wanted clarification.  So

13  there are four actually open.  Birmingham, if it opens, would

14  make five; is that correct?

15          MS. SANDMAN:  Correct, Your Honor.

16          THE COURT:  Okay.

17  Q.  (Ms. Sandman, continuing:)  Ms. Fox, you testified earlier

18  that one of the issues with the inability of your two doctors to

19  get privileges is the fact that neither live in Alabama;

20  specifically, in Birmingham and Mobile.  Are you familiar with

21  efforts that have been made to identify local doctors who would

22  be willing to provide abortions in Alabama?

23  A.  Yes, I am.

24  Q.  Please explain this to the Court.

25  A.  This has been going on long before I even got to Planned

1    Parenthood Southeast looking -- constantly looking for

2    additional physicians to provide services for us.

3    Q.   And is that -- just so the record is very clear, is that

4    something that was done solely in response to the admitting

5    privileges requirement?

6    A.   No.

7    Q.   In your capacity as CEO, have you made yourself familiar

8    with the history of efforts to find local doctors?

9    A.   I am familiar with some of the efforts, not -- not to

10   specificity.

11   Q.   And can you speak a little bit to what measures have been

12   taken and what the results have been.

13   A.   Sure.  We really will follow any lead to the very end to see

14   if there is a physician identified who is in our area or who has

15   contacts in our area.  We work closely with our partners at our

16   national office on looking to identify physicians, which is a

17   national issue.  So when our national partners are at

18   conferences, other medical communities, they're always looking

19   for those contacts to pass along to us.

20   Q.   One final question on this topic.  Is it possible --

21           THE COURT:  Could you just be a little bit more

22   specific?  Now, you say that you expect Birmingham to reopen in

23   a month.  What specific efforts have you made to get a physician

24   for Birmingham?  You would be familiar with that, wouldn't you?

25           THE WITNESS:  Well, we actually still have a physician

```
 1  for Birmingham.

 2            THE COURT:  Okay.

 3            THE WITNESS:  We terminated all of the health center

 4  staff, but not the physician.

 5            THE COURT:  So you already have one.

 6            THE WITNESS:  Yes.  Our medical -- Dr. Roe is our

 7  provider in Birmingham.

 8            THE COURT:  Okay.  Very good, then.  So Dr. Roe will

 9  still be at Birmingham.

10            THE WITNESS:  Be able -- yes, sir.

11            THE COURT:  Okay.

12  Q.  And just so the record is very clear, was Dr. Roe's role

13  ever called into question in any way in the process that you

14  went through internally to decide what to do about Birmingham?

15  A.  No, not at all.

16  Q.  Ms. Fox, is it possible that there are doctors who live in

17  Mobile or Birmingham who are willing to provide abortion

18  services but have not been asked whether they're willing to come

19  work for you?

20  A.  I can't imagine after, you know, all this time and effort

21  that there is one rock left unturned.

22  Q.  If the act is allowed to go in effect -- into effect, what

23  would happen to your health center in Birmingham that you're

24  hoping to reopen next month?

25  A.  If the center was open, we would have to cease providing
```

1  abortion care.

2  Q.  And would you be able to continue providing family planning

3  services?

4  A.  That would be our hope, but that is something we would have

5  to look at, if that could sustain the clinic long-term.

6  Q.  And are there any other licensed abortion clinics in

7  Birmingham?

8  A.  No, there are not.

9  Q.  And if the act is allowed to go into effect, what would

10  happen to your health center in Mobile?

11  A.  The same would happen.  We would have to cease providing

12  abortion care to women in the Mobile area.

13  Q.  And would the health center close altogether?

14  A.  Same would be true in Mobile.  In the short-term, probably

15  we would have to look at the long-term sustainability of

16  providing family planning services only.

17  Q.  And are there other licensed abortion clinics in Mobile?

18  A.  No, there are not.

19  Q.  One final question, Ms. Fox.  Why do you do this work?

20  A.  I do this work because I believe that women should have an

21  equal seat at life's table.  And I think having the ability to

22  control when and if you have a family is part of allowing women

23  to have that equal seat.  And that's what gets me up every

24  morning to come and do this work.

25        MS. SANDMAN:  No further questions.

1    THE COURT:  Yes.

2                        CROSS-EXAMINATION

3    BY MR. DAVIS:

4    Q.  Hello, Ms. Fox.

5    A.  Hello.

6    Q.  Ms. Fox, my name is Jim Davis.  I'm with the Attorney

7    General's Office, and I have a few questions on behalf of the

8    defendants.

9    A.  Sure.

10   Q.  Do I understand your testimony that you said the clinics in

11   Birmingham and Mobile would have to close or would have to cease

12   providing abortion services if this bill went into effect?

13   A.  Yes.

14   Q.  But Ms. Fox, your doctors have not applied for privileges at

15   any hospitals in Birmingham or Mobile, have they?

16   A.  No, they have not.

17   Q.  Can you say with any certainty what would happen if they

18   did?

19   A.  I can't say for certainty.

20   Q.  You said you made a determination that you thought your

21   doctors were ineligible for privileges, though; is that correct?

22   A.  Were not eligible -- yes.  Dr. P1 is not eligible based on

23   the act's requirements of the procedures and could not meet the

24   other stipulations in the hospital bylaws.

25   Q.  But you're testifying as to your or Planned Parenthood's

1  understanding of those hospital requirements, correct?

2  A.  Correct.

3  Q.  Has any hospital told you, no, those doctors cannot get

4  privileges at this hospital?

5  A.  No, they have not.

6  Q.  Have you inquired about the availability of any waivers to

7  certain requirements for admitting privileges?

8  A.  My understanding is that we have reviewed that verbiage and

9  some of the bylaws requirements.  And they often made some

10  similar stipulations and -- that we would not be able to meet.

11  Q.  But have you asked the hospitals --

12  A.  No, we have not.

13  Q.  -- specifically whether your doctors may be eligible for

14  waivers?

15  A.  No, we have not.

16  Q.  And do you know, Ms. Fox -- let's say one of your doctors

17  applies for privileges at a hospital and that in that process

18  they sought a waiver of certain requirements and that then, if

19  that hospital said, no, I'm sorry, Doctor, we're not willing to

20  waive that requirement for you, do you know if that is the same

21  thing as having your application for admitting privileges

22  denied?

23  A.  My understanding is that at any point in the process, there

24  could be repercussions from either denial or withdrawal of an

25  application.

1  Q.  And what is the basis of your understanding?

2  A.  Conversations that I've had with my physicians and our

3  national office staff.

4  Q.  No hospital has told you that, correct?

5  A.  No.

6  Q.  Okay.  And you haven't approached any hospital, I take it,

7  as to what special arrangements you might make to prevent that

8  from happening; in other words, if somebody might be willing to

9  take a cursory look at an application?

10  A.  No.

11  Q.  How many clinics are operated by Planned Parenthood

12  Southeast?

13  A.  Eight health centers.

14  Q.  And how many of those offer abortion services?

15  A.  Six.

16  Q.  How many doctors total provide abortion services for Planned

17  Parenthood Southeast?

18  A.  Give me a second.  There are approximately six physicians

19  that provide services for us as well as fellows that come from a

20  teaching hospital in Atlanta.

21  Q.  Okay.  Six clinics with services, abortion services,

22  correct?

23  A.  Correct.

24  Q.  Six doctors who perform abortions plus some additional

25  fellows available on occasion; is that correct?

1   A.   Yes.  And the fellows have to work under supervision.

2   Q.   What risks do clinics tell patients about in preabortion

3   counseling, if you're familiar with that process?

4   A.   I'm somewhat familiar with the counseling process in that we

5   inform patients of all known risks related to abortion care.

6   Q.   What are those known risks?

7   A.   Risks related to the procedure.  Anything from bleeding and

8   cramping afterwards to the possibility of complications, a

9   perforation or a need to be admitted to the hospital.

10  Q.   Are the clinics being truthful when they disclose those

11  risks?

12  A.   Yes.

13       MS. SANDMAN:  Your Honor, I'm going to object to this

14  line of questioning as beyond the scope of the direct.  And

15  also, I would just note that we have two doctors from our health

16  centers who will be testifying later this week.  Ms. Fox is not

17  one of them.

18       THE COURT:  To the extent that your objection is that

19  it exceeds the scope of direct, it's overruled.  And the other

20  is you just have another witness who will address this, is what

21  you're saying, or other witnesses?

22       MS. SANDMAN:  We do have two doctors from the health

23  centers testifying later this week, Your Honor.  My objection is

24  that this is beyond the scope of the direct.

25       THE COURT:  That objection is overruled.  Go ahead.

1          MR. DAVIS:  I have nothing further on that point, Your

2    Honor.

3          THE COURT:  Proceed.

4    Q.  (Mr. Davis, continuing:)  What clinics specifically in this

5    area, Ms. Fox, do you consider to be competitors of the clinics

6    in Birmingham and Mobile?  Actually, I recognize the current

7    status of Birmingham; but if the clinic in Birmingham were

8    presently open, what would you -- what clinics in the area would

9    you consider to be competitors?

10   A.  In the Birmingham and Mobile area?

11   Q.  Correct.  Please continue.

12   A.  We don't consider having any direct competition for abortion

13   care.

14   Q.  Okay.  I asked that poorly.  Let me try another way.  Do you

15   consider the clinic in -- is there a clinic in Columbus,

16   Georgia, that offers abortion services?

17   A.  Yes, there is.

18   Q.  Do you consider that to be a competitor of the clinic in

19   Birmingham if the clinic in Birmingham were operating?

20   A.  So the other abortion providers in our area we see as

21   collaborative partners in the business.  Obviously, it's a --

22   it is a business, but we work in tandem with them on issues such

23   as these but obviously with the mind-set of operating our own

24   business.

25   Q.  Let me use a different word other than "competition."  What

1  clinics would you consider to be viable alternatives for your

2  patients?

3  A.  I think that depends on the individual patient and their

4  ability to make accommodations to travel to other clinics.

5  Q.  What percentage did you say of your patients in Mobile come

6  from outside the area of Mobile?

7  A.  Nearly 60 percent.  Fifty-nine percent of our patients in

8  2013 came from outside the local Mobile area.

9  Q.  Do you keep up with how many come from outside the state of

10  Alabama?

11  A.  We do, but I wouldn't be able to speak to that.

12  Q.  Do you have any judgment?

13  A.  Do I have any --

14  Q.  A judgment as to what percentage of patients cross state

15  lines?

16  A.  I don't.  I don't.

17  Q.  Are you able to say that yes, there are some patients who do

18  cross state lines?

19  A.  Yes.  There are patients that do cross --

20  Q.  Do you know if you have patients that come from the

21  Pensacola area?

22  A.  We have patients who come from all three -- all surrounding

23  states, from Mississippi and Florida.

24  Q.  Do you know if any of those patients who cross state lines

25  for abortion services live below 150 percent of the poverty

1  line?

2  A.  I couldn't be specific about federal poverty level and the

3  patients traveling.

4  Q.  What are the clinics that provide abortions in the state of

5  Georgia?  Where are they located?

6  A.  Our clinics?

7  Q.  Yes.  I'm sorry.  Planned Parenthood clinics.

8  A.  The Planned Parenthood clinics that provide abortion care in

9  Georgia are located in Lawrenceville, Marietta, in Augusta, and

10  Savannah.

11  Q.  Lawrenceville, Marietta?  Those were the first two?

12  A.  Yes.

13  Q.  Are both of those in the Atlanta metropolitan area?

14  A.  Yes, they are.

15  Q.  Why would you have two providing abortion services so close

16  together?

17  A.  Population density issues.  If you look at the Atlanta metro

18  area, the population is fairly dense.

19  Q.  How does Planned Parenthood decide where to locate a clinic?

20  A.  I couldn't speak to where -- how the decisions were made for

21  these clinics.  That preceded me.  But when we look at future

22  clinics, if that's possible, we certainly look at the

23  demographics of the area, the population density, and are there

24  enough people to support a clinic and then is there a need.  Are

25  there other providers in the area that are already meeting that

1  need.

2  Q.  Supply and demand is a concern.

3  A.  Yes.

4  Q.  Is a consideration.

5  A.  Yes.

6  Q.  Population density is a consideration.

7  A.  Sure.

8  Q.  Have there been any conversations, Ms. Fox, with UAB about

9  what Planned Parenthood perhaps could do with its business model

10  to increase the chances that your doctors would get privileges

11  at UAB?

12  A.  My understanding of the conversation that I spoke of earlier

13  that Dr. Roe had with UAB, there was a discussion of what could

14  have been done in the past to obtain privileges.  There was no

15  promise towards the -- the future.

16  Q.  There was no discussion, Ms. Fox, that if Planned Parenthood

17  would expand its business services, that perhaps you would

18  increase your chances of getting privileges?

19  A.  There was a discussion of that if we had an expanded service

20  in the past, we would have -- we could have obtained -- may have

21  been able to obtain privileges because of that wider scope of

22  service in the past, yes.

23  Q.  But haven't you actually taken steps since that conversation

24  to expand your services in the hopes of increasing your chances

25  of getting privileges?

1  A.   Yes.  We have expanded services in both areas but not -- not

2  solely for the reason for obtaining privileges.  But yes, we

3  have expanded services.

4  Q.  And increasing your chance of getting privileges was at

5  least one goal of the expansion of services; isn't that correct?

6  A.   Sure.

7  Q.  And what specific steps have you taken to expand the

8  services?

9  A.  We're working to expand our family planning services in

10  Mobile and Birmingham.  We've hired nurse practitioners to

11  provide those services in Mobile and are working to grow the

12  patient volume, and we've been working to recruit nurse

13  practitioners in Birmingham to do the same.

14  Q.  And those efforts are ongoing, then?

15  A.   Yes, they are.

16  Q.  Any future plans beyond what you've discussed?  Other steps

17  you might take to expand services?

18  A.   No.  No other future plans.

19  Q.  Would you be open to those?

20  A.  Yes, if they would fit into our business model and mission,

21  yes.

22  Q.  Dealing with the clinic in Birmingham, Ms. Fox, what

23  additional steps have to occur before the clinic reopens?

24  A.  We are working with Alabama Department of Public Health to

25  finalize their site visit findings, plan of correction and

1    response to their deficiency report, and an on-site inspection

2    that they have requested before we open our doors.

3    Q.   Okay.   So first, is it not correct the Alabama department of

4    health must approve Planned Parenthood's plan of correction?

5    A.   Yes.

6    Q.   And after the plan of correction is approved, then they must

7    have a reinspection of the premises?

8    A.   Yes.

9    Q.   Are either of those scheduled?   Do you have --

10   A.   The -- go ahead.

11   Q.   No.   I interrupted you.   Please continue.

12   A.   No.   Neither are scheduled.   The deficiency report is

13   complete and is due to be sent back to ADPH.

14   Q.   How many staff members have you replaced for the Birmingham

15   clinic?

16   A.   We have -- goodness.   We've hired three or four new staff.

17   Q.   Are there any vacancies that have yet to be filled?

18   A.   Yes.   We're still recruiting for a health center manager at

19   that -- as well as a nurse practitioner for the services I

20   mentioned earlier.

21   Q.   Do you have sufficient staff to reopen next week should

22   Planned Parenthood approve your plan of correction and if the

23   reinspection goes as you hope?

24   A.   Yes.   We have enough staff to leverage from other sites

25   while we're recruiting and hiring new staff.

1  Q.  The new staff members that you've hired, do they live in the

2  Birmingham area?

3  A.  Yes, they do.

4  Q.  What positions have you filled?

5  A.  I'm not sure that I can speak to that specificity.  I know

6  that we've hired health care assistants and a licensed -- LPN

7  nurse.

8  Q.  Okay.  And I don't need to know an exact job title, but how

9  many nurses have you hired to work in the Birmingham clinic when

10  it reopens?

11  A.  I believe there's an RN and an LPN that have been hired.

12  Q.  Okay.  And you're still looking for a manager for the

13  center, correct?

14  A.  Yes.

15  Q.  Okay.  And what other positions are there?

16  A.  Health center associates that work at the front desk.

17  Q.  Providing administrative assistance?

18  A.  Yeah.  Check-in and check-out for patients.  Paperwork

19  processing.

20  Q.  And how many of those?

21  A.  How many of those what?

22  Q.  Have you hired.

23        MS. SANDMAN:  Your Honor, I'm going to object.  This is

24  getting very far afield of anything of relevance in this

25  litigation.

```
 1              THE COURT:  Far afield of what?
 2              MS. SANDMAN:  Anything of relevance to admitting
 3    privileges or this litigation.
 4              MR. DAVIS:  We disagree.
 5              THE COURT:  I'll -- pardon me.  Go ahead.
 6              MR. DAVIS:  Well, we disagree, Your Honor.  The
 7    plaintiffs have taken the position that --
 8              THE COURT:  Overruled.  Overruled.  Actually, I was
 9    going to inquire about efforts to find nurses and so forth
10    myself.  Go ahead.
11              MR. DAVIS:  Okay.
12    Q.  Ms. Fox, dealing with the outreach you spoke of, looking for
13    new physicians, when did that begin?
14    A.  Physician recruitment has been going on before I was hired
15    at Planned Parenthood Southeast.
16    Q.  And that continues, correct?
17    A.  Yes, but I would say with a caveat of given the political
18    environment, I mean it's awfully difficult to be looking for new
19    physicians when we can't promise them that our doors are open.
20    Q.  Is the political environment here markedly different from
21    what you would find in Tuscaloosa or Huntsville, if you know?
22    A.  When I say political environment, I mean the state of
23    Alabama.
24    Q.  You are aware, are you not, that two clinics in the state of
25    Alabama have local physicians with admitting privileges?
```

 1  A.   I am aware of that.

 2  Q.   They were able to find doctors.  You would agree with that.

 3  A.   They had doctors in place that already had admitting

 4  privileges.  They didn't go out and recruit new physicians that

 5  gained privileges.

 6  Q.   If I understood you correctly, Ms. Fox, in your direct

 7  examination you said that if your doctors had admitting

 8  privileges, that the things that occurred in Birmingham leading

 9  to the closure of the clinic still would have occurred.  Did I

10  understand you correctly?

11  A.   I stated that having admitting privileges would not have had

12  an impact on that incident, yes.

13  Q.   Do you really think that's the case?  Because Ms. Fox, with

14  someone -- if you operated in the model such as Tuscaloosa or

15  Huntsville where you had a local doctor who's a member of the

16  medical community, his professional reputation is on the line

17  locally and who's there minding the store, do you really think

18  that would have no difference on the culture of compliance in

19  the clinic?

20  A.   Yes.  I really think it would have no difference on the

21  culture of compliance.  Our physicians are on-site and oversee

22  the medical care of our patients, and we entrust that our

23  operational staff are going to oversee the operations in the

24  clinic.  I don't think that -- you know, if someone is going to

25  do something such as what happened at our clinic -- you know, I

1    mean if -- I don't see that stopping them.

2            MR. DAVIS:  Your Honor, may I confer with cocounsel?

3            THE COURT:  Yes.

4        (Brief pause)

5    Q.  Ms. Fox, the doctors that perform abortion services in

6    Birmingham and Mobile, how much time during the week do they

7    spend at the clinic?

8    A.  They're there regularly one day a week.

9    Q.  From what hours?  How many hours for that one day?

10   A.  I would say somewhere between six and ten hours.

11           MR. DAVIS:  No further questions at this time, Your

12   Honor.

13           THE COURT:  Okay.  Any redirect?

14           MS. SANDMAN:  Thank you, Your Honor.

15                        REDIRECT EXAMINATION

16   BY MS. SANDMAN:

17   Q.  Ms. Fox, is Dr. Roe willing to apply for privileges at any

18   of the hospitals in Mobile or Birmingham?

19   A.  No.  She's not willing to take a risk with her professional

20   license.

21   Q.  Can Dr. P1 provide laparotomies or hysterectomies as

22   required by the act?

23   A.  No.  Those are outside of her scope of service, her

24   speciality.

25   Q.  You were asked on cross-examination about the other doctors

1  who provide abortions for PPSE outside of Alabama.  Do any of

2  those doctors live in Birmingham or Mobile?

3  A.  No.  They don't live in the area, nor are they licensed in

4  the state of Alabama.

5  Q.  Putting the license issue to the side, to your knowledge,

6  would any of them be able to qualify for admitting privileges in

7  Mobile or in Birmingham?

8  A.  No, they would not.

9  Q.  Has UAB made any commitment to PPSE or to anyone at PPSE

10  that it would grant privileges to Dr. Roe if you expand your

11  family planning services?

12  A.  No.  There were no promises made.

13  Q.  Do you see any realistic prospect of this happening in the

14  near future?

15  A.  No, I do not.

16       MR. DAVIS:  Object to the speculation, Judge.

17       THE COURT:  Okay.  I'll allow her to testify to that.

18  Overruled.

19  Q.  Ms. Fox, Dr. Roe is your medical director.  Is the medical

20  director the person with ultimate responsibility for operational

21  issues at a Planned Parenthood facility?

22  A.  No.  Our medical director is ultimately responsible for the

23  delivery of health care, and they work in tandem with our

24  operations team to carry out those services.

25  Q.  And who within the Planned Parenthood managerial

1  structure -- what position is responsible for oversight of

2  operational issues?

3  A.   There are a chain -- there is a chain of oversight, so each

4  health center has a health center manager that reports to our

5  director of patient services.   And that position reports to our

6  COO.

7  Q.   And is the person who held that position at the time of the

8  incidents in Birmingham still with PPSE?

9  A.   No, she is not.

10        MS. SANDMAN:   No further questions.

11        THE COURT:   Any further cross?

12        MR. DAVIS:   Yes, Your Honor.

13                        RECROSS-EXAMINATION

14  BY MR. DAVIS:

15  Q.   Ms. Fox, could you summarize for me what you understand the

16  role of the medical director to be, according to the rules of

17  the Alabama Department of Public Health?

18  A.   My understanding is that the medical director is responsible

19  for the oversight of our clinical delivery of care.

20  Q.   Do you understand that the medical director is responsible

21  for supervising all clinical functions?

22  A.   Yes.

23        THE COURT:   All what?

24        MS. SANDMAN:   Your Honor, I'm going to -- beg your

25  pardon.

1          THE COURT:  Just ask your question.  All what?

2          MR. DAVIS:  Clinical functions.

3          THE COURT:  Clinical functions.  Okay.  Go ahead.

4          Did you have an objection?

5          MS. SANDMAN:  Your Honor, I believe this is beyond the

6    scope of the redirect to the degree that there's inquiry about

7    the ADPH requirements.

8          MR. DAVIS:  I think the witness spoke to what she

9    understood the role to be.

10          THE COURT:  Overruled.  Go ahead.

11   Q.  (Mr. Davis, continuing:)  Do you understand that the medical

12   director must ensure that the facility meets the requirements of

13   the rules of the Alabama Department of Public Health?

14   A.  Yes.

15   Q.  And all professional standards of care?

16   A.  Yes.

17   Q.  Do you understand that the medical director has ultimate

18   responsibility for the development and implementation of all

19   protocols and policies used by the facility?

20   A.  Yes.

21   Q.  And would you agree that the medical director must ensure

22   that all clinical staff, including both facility and outside

23   covering physicians, are competent as required by the rules of

24   the Alabama department of health?

25   A.  Yes.

```
 1              MR. DAVIS:  Thank you.

 2              THE COURT:  Any further direct?

 3              MS. SANDMAN:  One moment, Your Honor, if I may.

 4                      REDIRECT EXAMINATION

 5  BY MS. SANDMAN:

 6  Q.  Ms. Fox, is the medical director charged with monitoring the

 7  parking lot of the health care facility?

 8  A.  No.

 9  Q.  And did ADPH find that the health center was at fault for

10  the underlying incident that happened here?

11  A.  No.  There were no deficiencies in the report related to the

12  incident.

13              MS. SANDMAN:  No further questions.

14              THE COURT:  Anything else?

15      You may step down.

16              THE WITNESS:  Thank you.

17              THE COURT:  Who's your next witness?

18              MS. KOLBI-MOLINAS:  Your Honor, we call Dr.  --

19  Dr. Sheila Katz.

20              THE COURT:  Okay.  And how long will Dr. Katz take?

21              MR. BECK:  Your Honor, about an hour and a half or two

22  hours.

23              THE COURT:  Okay.  We'll take a brief recess right now.

24      I have one question for Dr. Ayers, who's a party, so I

25  know she's in the courtroom.  Because she's a party, she's
```

 1    excused from the rule.  That question is -- and I'd like to ask

 2    her so she doesn't have time to think about it.

 3            MS. KOLBI-MOLINAS:  Do you want her --

 4            THE COURT:  Can she just -- yeah.  Just have her come

 5    back.  Just one simple question.

 6            MS. KOLBI-MOLINAS:  Your Honor, if I may, she's not a

 7    doctor.

 8            THE COURT:  I'm sorry.  You're right.  You're

 9    absolutely right.

10            MS. AYERS:  You just elevated my position.

11            THE COURT:  Yes.  Well, people call me doctor, too,

12    sometimes.  I'm definitely not a doctor.

13            MS. AYERS:  Yes, Your Honor?

14            THE COURT:  Ms. Ayers, Dr. F is your covering

15    physician; is that right?

16            MS. AYERS:  That's correct.

17            THE COURT:  Okay.  And you said that he does not

18    perform abortions.

19            MS. AYERS:  He does not perform abortions.

20            THE COURT:  Okay.  Did you ever ask him to perform

21    abortions?

22            MS. AYERS:  He has made it very clear to me when we --

23    when we first were associated that he does not provide abortion

24    services at all.

25            THE COURT:  Okay.  Did he say why?

 1          MS. AYERS:  Initially, he was harassed to the extreme,

 2  I think, because he was the one person that stood between

 3  whether my clinic stayed open and whether my clinic doors were

 4  shut when we made the agreement in 2006.

 5          THE COURT:  Do you have personal knowledge of this

 6  harassment?

 7          MS. AYERS:  Yes, I do.

 8          THE COURT:  Okay.  Can you describe your personal

 9  knowledge.

10          MS. AYERS:  There was a physician at one of the local

11  hospitals that told him and --

12          THE COURT:  Okay.  Now, how do you know this?

13          MS. AYERS:  Because he told me.

14          THE COURT:  Okay.  That's not personal knowledge.

15          MS. AYERS:  Okay.  Okay.  No.  I guess I don't know.  I

16  haven't seen it myself.  No, sir.

17          THE COURT:  Okay.  Now, is -- he's referred to as

18  Dr. F.  Is he on any of your stationery or anything like that?

19          MS. AYERS:  No.

20          THE COURT:  His real name?

21          MS. AYERS:  Beg your pardon?

22          THE COURT:  His real name.

23          MS. AYERS:  His real name is on my -- his -- I am

24  required by the health department --

25          THE COURT:  I know.  But is he on any of your public

1    documents?

2         MS. AYERS:  No.  Not on any of the public documents.

3    No, sir.  I am required, though, to put it on my post-op sheet.

4    There has to be -- his name is now -- has to be on my post-op

5    sheet.  So that is handed out to all patients.

6         THE COURT:  Does he have any problems with his name

7    being on any of your documents?

8         MS. AYERS:  It was --

9         THE COURT:  Or has he told you one way or the other?

10        MS. AYERS:  When we had -- we just -- when I put it on

11   there initially when I was --

12        THE COURT:  On what?

13        MS. AYERS:  On the post-op sheet.

14        THE COURT:  Right.

15        MS. AYERS:  He -- we discussed his opposition to being

16   on that sheet.

17        THE COURT:  Okay.  Anything else?  Any cross?

18        MS. KOLBI-MOLINAS:  No, Your Honor.

19        THE COURT:  Thank you.

20        MS. FLEMING:  No, sir.

21        THE COURT:  Any cross?

22        MS. FLEMING:  No, sir, Your Honor.

23        THE COURT:  Okay.  Thank you.  We'll take a brief

24   recess, then.

25        MR. DAVIS:  What time shall we be back, Your Honor?

1            THE COURT:  Ten minutes.

2       (Recess at 2:21 p.m. until 2:39 p.m.)

3            THE CLERK:  Please remain seated.  Court is in session.

4            THE COURT:  Proceed.  Counsel, let me just give you the

5    schedule for the rest of the day.  Unfortunately, we're going to

6    have to take another break at three o'clock, and then we'll go

7    the rest of the afternoon.

8            MR. BECK:  Wonderful.  Thank you, Your Honor.  I meant

9    to give this to you earlier.  These are the short summary of the

10   expert's testimony for the Judge and the law clerks.

11           THE COURT:  Yes.  That's right.  Counsel, do you want

12   these filed, or do you just want them for my information?  I

13   suppose they really should be filed since I'm reading them.  I

14   hate -- I don't like for something to -- for the Court to read

15   something that's not part of the record.

16           MR. BECK:  We defer to Your Honor's preference.

17           THE COURT:  I think they should be.  I don't think it's

18   right for me to read something that's not part of the record.

19   So that will apply to both sides.

20           MR. BRASHER:  Your Honor, may I?

21           THE COURT:  Yes.

22           MR. BRASHER:  This is Andrew Brasher.

23      (The court reporter interrupts for clarification)

24           THE COURT:  Yes, Mr. Brasher.

25           MR. BRASHER:  This is Andrew Brasher.  I would say

1    maybe we should just file them all at the same time after --

2          THE COURT:  Whatever you want to do.  I just think they

3    should be made part of the record since I am reading them.

4          MR. BECK:  Yes, Your Honor.

5          THE COURT:  Go ahead.

6          MR. BECK:  Your Honor, plaintiff's next witness is

7    Dr. Sheila M. Katz.  Dr. Sheila Katz is a sociologist whose work

8    focuses on issues of gender and poverty.  She's an assistant

9    professor of sociology at Sonoma State University.  Based upon

10   her own research and her extensive knowledge of the research in

11   her field, Dr. Katz will testify that forced discontinuation of

12   abortion services in Montgomery, Birmingham, and Mobile would

13   impose severe obstacles on low-income women seeking abortions.

14   As Dr. Katz will testify --

15         THE COURT:  Actually, I can read this.  You don't need

16   to read it to me.

17         MR. BECK:  I apologize, Your Honor.  I thought you did

18   want it --

19         THE COURT:  Oh, you know, you may be right.  I did say

20   that I would --

21         MR. BECK:  But I trust your ability to read it, and I

22   will spare everyone and not read any more of it.

23         THE COURT:  Well, I appreciate your trusting my ability

24   to read.

25         MR. BECK:  And I apologize for misunderstanding Your

1    Honor's instructions.

2         THE COURT:  I think I did say that.  And then I think I

3    said I wanted it in writing.  By the way, I will take these only

4    as argument, these summaries, as argument only.  Very good.

5         MR. BECK:  Yes, Your Honor.  I apologize.

6         THE COURT:  Oh, that's okay.  I think you're right,

7    though.  I think I did say initially to summarize orally, and

8    then I said I'd prefer it in writing.

9         MR. BECK:  Yes, Your Honor.

10        THE COURT:  Go ahead.

11            **SHEILA KATZ, Ph.D.**, the witness, having been

12   previously sworn to speak the truth, the whole truth, and

13   nothing but the truth, testified as follows:

14                        DIRECT EXAMINATION

15   BY MR. BECK:

16   Q.  Dr. Katz, could you please describe your educational

17   background.

18   A.  Yes.  I have a Bachelor's of Arts in sociology and women and

19   gender studies from the University of Georgia, and I also have a

20   master's degree in sociology from Vanderbilt University and a

21   Ph.D. in sociology from Vanderbilt University.

22   Q.  And do you have a specialization within the field of

23   sociology?

24   A.  Yes.  Within the field of sociology, my specialty is

25   sociology of gender and also sociology of poverty.

1    (The court reporter interrupts for clarification)

2  A.  My speciality within the field of sociology is sociology of

3  gender and sociology of poverty.

4  Q.  Where are you currently employed?

5  A.  So I'm currently employed at Sonoma State University in a

6  tenure-track position.  I'm an assistant professor.  But I'm in

7  the middle of transitioning to a new job at the University of

8  Houston as an assistant professor of sociology.  It's also a

9  tenure-track position.

10  Q.  And when will you be starting at the University of Houston?

11  A.  My starting date in Houston will be in August of 2014.

12  Q.  What does your work as a professor of sociology entail?

13  A.  So my work as a professor of sociology entails sort of three

14  main components.  The first component is the research that I do

15  in the field; and the second component is the teaching, classes

16  in sociology; and then the third is service to both my

17  university and the profession of sociology and the community.

18  Q.  Could you please give the Court an overview of the research

19  you conduct as a sociologist.

20  A.  Yes.  So I do a significant amount of research in the field.

21  And I guess the best way to do it is to walk through the

22  different research projects that I'm either currently working on

23  or have worked on in the recent time.

24    The first one is the research that started with my

25  dissertation.  I do research in the San Francisco Bay area with

1    low-income women, most of them who are on welfare, who are using

2    health and human services, who are attending higher education,

3    and who are looking for employment to help get them out of

4    poverty.  And so I interviewed -- I do qualitative research, and

5    so I do in-depth interviewing focus groups and also ethnographic

6    fieldwork.

7        And the research started -- this project started with

8    interviews of 45 women who are low income in the San Francisco

9    area in 2006.  And then I reinterviewed the same group of women

10   in 2008, and I reinterviewed the same women in 2011.  And my

11   study had a 78 percent retention rate, so 35 of the women who --

12   of the 45 that I interviewed in 2006 were still in the study in

13   2011, which was five years later.

14       And the type of questions that I asked them in that

15   research, there were background questions about how they got

16   onto welfare, why they were in poverty, said to tell them --

17   tell me about them having their children, to tell me about their

18   educational and work histories.  And then a middle group of

19   questions about getting onto welfare and how they access health

20   and human services in their day-to-day lives.  And then -- and

21   they go to school.  Many of them attend college and work

22   part-time.  And then a group of questions around sort of

23   everyday lived experiences in poverty, what it means to be poor,

24   how they make ends meet, what they do in an emergency if they

25   need additional child care or if an unexpected expense comes up,

1    how they deal with sort of the day-to-dayness, their everyday

2    lived experiences in poverty.  So that's my main research

3    project.

4        I also do significant research with domestic violence

5    survivors, so women who are low income or on welfare who have

6    experience with domestic violence.  And that research goes back

7    to probably 2000.  And that research was both in Tennessee and

8    in California.

9        And then I just started a new research project with students

10   who are enrolled in colleges who are also parents, so students

11   who have dependent children while they're in college.  And that

12   project just kicked off this spring.

13   Q.  And could you please give the Court a brief overview of the

14   methodology that you use in your work.

15   A.  Sure.  So I use qualitative research, but I also -- I use

16   sort of census -- U.S. Census Bureau information to support and

17   to kind of paint a picture.  And then I use my qualitative

18   in-depth interviewing, focus groups, and ethnographic field

19   research to understand women's experiences on a day-to-day

20   basis.

21   Q.  And has the research that you've conducted been disseminated

22   in any way?

23   A.  Yes.  So my research is disseminated in a couple of primary

24   ways.  The first one is that I'm published in my field in

25   peer-reviewed journals, in -- I have a teaching publication as

1  well.  And I'm also writing a scholarly book on the topic, and

2  so that manuscript is in preparation and the proposal is under

3  review at Academic Presses.

4     The other way that I disseminate my research results is I

5  present at conferences in my field, so both conferences within

6  sociology, conferences within women and gender studies,

7  conferences within poverty studies and the field of public

8  policy.

9     And then the other main way that I disseminate my research

10  results is that I participate in policy briefings and research

11  testimony to Capitol Hill to lawmakers and policy makers and

12  also in Sacramento at the California State Capitol.

13  Q.  Now, is there a literature in your field on the subject of

14  gender and poverty?

15  A.  Yes.  There's an extensive literature in my field on gender

16  and poverty going back, you know, 50, 60, 70 years.  And this is

17  one of -- a very important area in sociology, so looking at

18  women's experiences in poverty, looking at why women are poor

19  and the -- sort of how different laws and social policies either

20  help women get out of poverty or don't.  And also, within this

21  field, there's many books published on the topic.  Edin and

22  Lein's *Making Ends Meet* is one --

23     (The court reporter interrupts for clarification)

24  A.  Edin and Lein, their last names.  There's a book called

25  *Making Ends Meet*.  Another book that is widely known in my field

1   is Sharon Hayes' *Flat Broke With Children*.   And then my research

2   is published and contributes to this ongoing and scholarly

3   conversation in this area.

4   Q.   Does this research address low-income women's access to

5   particular services or resources?

6   A.   Yes, it does.   It looks at low-income women's access to

7   health and human services, access to transportation services,

8   access to job support services.   Yes.

9   Q.   Can you describe any courses that you've taught that deal

10  with issues of gender and poverty?

11  A.   Yes.   So I have I think nine courses in my course

12  repertoire, and a couple of them address this area.   The best is

13  my Sociology of Gender course.   And I also teach a course about

14  the American dream to senior sociology majors who are about to

15  graduate.   And within the American Dream class I talk about

16  issues of access to elements of the American dream by

17  socioeconomic status, by gender, by race or ethnicity.

18     I also cover these topics -- I teach a class called Drugs In

19  Society, and so access to health and human services and how that

20  access is gendered is also a part of that class.   I teach an

21  Introductory Sociology class, so these topics also come up in

22  that class.   I teach a Women in Social Policy class, and these

23  topics are also covered in that class.

24  Q.   And do you have any experience other than what you've just

25  described that informs the opinions that you've reached in this

1  case?

2  A.   Yes.   So I have three professional experiences besides my

3  current position as an assistant professor that I think informs

4  my opinions in this case.   While I was in graduate school, I

5  worked at the Vanderbilt Institute for Public Policy Studies.

6  And my job there was to do data analysis on qualitative focus

7  groups as part of the Immigrant Community Assessment Project.

8  And the work that I was doing was analyzing the focus group data

9  and writing reports about how members of five different

10 immigrant groups to the Nashville community accessed health and

11 human services, accessed work and job opportunities, and also

12 sort of believed in health -- I'm sorry -- safety issues in

13 their community.

14      The other job at -- while I was in graduate school, I worked

15 for Vanderbilt University's Women's Social Policy and Research

16 Center.   And that was -- we were doing research with domestic

17 violence survivors across the state of Tennessee and looking at

18 reasons sort of why women left domestically violent situations

19 but also, more importantly, kind of why women went back to those

20 domestically violent situations.   Sort of what factors led them

21 to go back to someone who was abusing them and how many times

22 did they leave that person before there was a clean break in

23 that relationship.   And economic factors really played a huge

24 role in that research.

25      And then from 2003 until 2007 I worked with a nonprofit

 1   grassroots organization in Oakland, California.  The grassroots

 2   organization served low-income families, mainly women.  Most of

 3   them were on welfare.  And the organization was a grassroots

 4   advocacy organization.  They were helping the low-income women

 5   advocate for health and human services that they needed access

 6   to.  And the group worked both sort of -- they didn't provide

 7   the direct services, but they were advocates and went with the

 8   women in hearings and various meetings.

 9       My role within the group was to help document the work they

10   were doing and do research on the work that they were doing and

11   also to help them plan meetings and plan the policy briefings

12   and the research briefings that I discussed a minute ago.  And

13   so through that work, one of the things that I spent a lot of my

14   time doing was coordinating, so planning a meeting.  We would

15   have people traveling from across the state of California to

16   Sacramento for a three-day weekend and then speaking at the

17   Capitol on, say, a Monday.  And so I would coordinate the travel

18   for low-income women from across California to come to the

19   Capitol to speak.

20       Or another time I -- well, I guess there were three or four

21   times that I coordinated travel from five or six different

22   states to come to D.C.  And these were low-income women either

23   on welfare or were welfare-eligible traveling.

24   Q.  And are you a member of any professional associations in

25   your field of expertise?

1   A.   Yes.  I'm a member of the sociological associations in my

2   field, so California Sociological Association, the Pacific

3   Sociological Association, and the American Sociologial

4   Association.

5   Q.   Dr. Katz, you have in front of you a manila folder.  If you

6   could open that up --

7   A.   Yes.

8   Q.   -- and look at Plaintiff's Exhibit 55.  Do you recognize

9   this document?

10  A.   Yes, I do.  It was my CV from August of 2013.

11  Q.   And is this an accurate statement of your education,

12  experience, publications, and other credentials?

13  A.   It was as of August.  I was up for tenure this year at

14  Sonoma State, and I should be finding out later this week that I

15  hopefully got tenure at Sonoma State.  And so I've added to it,

16  of course, in the last nine months.  So I have additional

17  publications, I have presented three conference papers, et

18  cetera.  So there's minor additions to it, but it was accurate

19  in August of 2013.

20        MR. BECK:  Your Honor, at this time we would tender

21  Dr. Katz as an expert in the sociology of gender and poverty

22  under Rule 702.

23        THE COURT:  Okay.  Proceed.

24  Q.   Dr. Katz, if you could also look at the next exhibit, which

25  is Exhibit Number 56.

1    A.   Yes.

2    Q.   Do you recognize that document?

3    A.   Yes.   It's the expert report, the revised expert report that

4    I submitted.

5    Q.   And does that expert report accurately reflect the opinions

6    you formed in this case?

7    A.   Yes, it does.

8         MR. BECK:   Your Honor, we would move to admit Exhibit

9    Number 56 into evidence.

10        THE COURT:   Admitted.   Did you move for 55?

11        MR. BECK:   I believe Exhibit 55 has already been

12   admitted, Your Honor.

13        THE COURT:   Very good.

14   Q.   Dr. Katz, did you make any assumptions in forming your

15   opinions in this case about which clinics in Alabama would stay

16   open and which would be closed?

17   A.   Yes.   So in writing this report, I made the assumption that

18   three of the state's five clinics would no longer be able to

19   offer abortion services if this act is implemented.

20   Q.   And what is the breakdown of the three clinics that you're

21   referring to?

22   A.   The three clinics are the clinics in Montgomery, Birmingham,

23   and Mobile.   And then I assumed that the clinics in Tuscaloosa

24   and Huntsville would still be providing those services.

25   Q.   And do you have an opinion regarding the effect that

1   discontinuation of abortion services in these three of five

2   clinics would have on abortion access for low-income women in

3   Alabama?

4   A.  Yes.  So I'm very concerned that if these three clinics were

5   to stop providing abortion services, that low-income women in

6   the state of Alabama would have significant burdens to access

7   services that they would otherwise be able to access if the

8   services remained available in those three cities and that it

9   would -- that these burdens would prevent many low-income women

10  from accessing services that they would otherwise be able to

11  access.  But also, if women are still able to access those

12  services, are able to sort of overcome some of these burdens, it

13  still, I'm concerned, will have great harm or could have great

14  harm on their lives in order to -- sort of to access the

15  service, to travel to access the service in the remaining

16  cities.

17          THE COURT:  I didn't understand that comment.

18          THE WITNESS:  Okay.  That if the three clinics were

19  forced to stop providing services, that some women are --

20  there's going to be burdens that some women are not going to be

21  able to overcome and so would be prevented from accessing the

22  service.  However, for some women, they are going to be able to

23  overcome some of those burdens.  But the decisions that they

24  would have to make in their everyday life in order to pay the

25  additional travel costs may have other harms in their life.  So

1    they might have to do without food or might have to skip their

2    rent or something in order to be able to pay the additional

3    cost.

4    Q.  Dr. Katz, can you explain what you mean by the term

5    "low-income women"?

6    A.  Yes.  So when I talk about low-income women, I talk about

7    women who are at or near the federal poverty threshold.  And

8    so -- and the federal poverty threshold is a measure that's set

9    each year by the U.S. Department of Health and Human Services.

10   And for one person, it is approximately $14,000 a year.

11        Would it be okay if I referenced my report for exact

12   figures?

13   Q.  Yes.

14   A.  Okay.  And so the federal poverty threshold is if a single

15   person makes less than $11,490 per year.  And if there is an

16   additional person in the household, an additional $4,020 is

17   allowed.  So, for example, a single mother with one child needs

18   to -- if she makes less than approximately 15,500, then she's

19   below the federal poverty threshold.

20        However, it's widely known and concerned -- social

21   scientists are concerned that the way that the U.S. Department

22   of Health and Human Services sets this poverty threshold is an

23   inadequate measure of poverty in this country.  And those

24   concerns go back to the beginning of when the measure was set,

25   because it's set on what a food budget is for a household.

1    However, most families, food is not their most expensive or

2    significant cost.  And so other measures that the federal

3    government uses, state and local government uses, nonprofits use

4    in order to determine the near poverty is 125 percent, 150

5    percent, or 200 percent of this federal poverty threshold.

6    Q.  Are you familiar with data on poverty rates in Alabama,

7    Dr. Katz?

8    A.  Yes, I am.  So Alabama -- and this is data coming from the

9    U.S. Census Bureau.  Alabama is the sixth poorest state in the

10   U.S., and it's tied with Kentucky for that measure.  And again,

11   I'm going to refer to the report for exact percentages, if

12   that's okay.  Alabama has an overall poverty rate in 2011 of

13   19.1 percent.  And Alabama also, in addition to having this 19.1

14   percent overall poverty rate, has the fifth lowest median income

15   in the U.S. at about $41,427 a year.  And this is, again,

16   according to data from the U.S. Census Bureau.

17       When we look at the cities that we're discussing here today,

18   if we look at the overall poverty rate in Mobile, it's

19   approximately the same as the state's overall poverty rate.

20   It's at about 19.5 percent.  But the cities of Birmingham and

21   Montgomery have even higher rates of poverty.  And so the

22   poverty in Montgomery is approximately 20.6 percent, overall

23   poverty, and for Birmingham, it's 27.3 percent overall poverty.

24   And so I'm concerned that in a state that is already very poor,

25   that these cities are even poorer than the state's average.

1  Q.  And are you also familiar with the percentage of people in

2  Alabama living at or below 200 percent of the poverty line?

3  A.  Yes.  I'm also familiar with that data.  Approximately 43

4  percent of residents in Alabama are living below that 200

5  percent of the poverty-line threshold.  And that, again, is much

6  higher than the nation as a whole, which is about 23.5 percent;

7  but it's also higher than the South as a region, which is 36.4

8  percent of overall poverty at 200 percent of the federal poverty

9  threshold.

10        MR. BECK:  And Your Honor, should I continue or are

11  you --

12        THE COURT:  That's right.  It's now three o'clock.  I

13  think it's probably a good idea to stop.  I should only need

14  about ten minutes.

15        MR. BECK:  Okay.

16        THE COURT:  Very good.  Thank you.

17     (Recess at 3:00 p.m. until 3:23 p.m.)

18        THE CLERK:  Please remain seated.  Court is in session.

19        THE COURT:  Proceed.

20  Q.  (Mr. Beck, continuing:)  Dr. Katz, are you familiar with

21  data on the poverty rate among abortion patients?

22  A.  Yes, I am.  So nationally, research with women having

23  abortions in the United States, the Guttmacher Institute finds

24  that about 42 percent of women in the United States as a whole

25  who seek an abortion are below the federal poverty threshold and

1   another 27 percent had incomes below the 200 percent of the

2   federal poverty threshold mark.  And so this is -- 69 percent of

3   those seeking abortions nationally were below 200 percent of the

4   federal poverty line.

5       And so given the high rates of poverty in Alabama -- and

6   women also within Alabama have higher rates of poverty than men

7   do -- I think that a majority of people -- of women seeking

8   abortions in Alabama are below the 200 percent of the federal

9   poverty line, which this data is different, but earlier this

10  morning we heard testimony from the other two witnesses that

11  their own clinic data was finding about 70 percent were below

12  that 200 percent.  So here's two separate sources of data

13  finding that.

14  Q.  Dr. Katz, what does it involve to make ends meet while

15  living at or near the federal poverty level?

16  A.  It is very, very difficult.  Low-income women employ a

17  number of strategies in order to make ends meet.  But at the end

18  of the day, it's very difficult.  And at the end of the day,

19  many of them don't have enough resources to meet their basic

20  needs.

21      And so low-income women work.  So many of them have jobs.

22  They're working one or two, sometimes three, jobs in the formal

23  labor market or they're looking for jobs.  Some of them may be

24  working but may also be working for cash wages or working under

25  the table, we might call it.  Some low-income women are not

1  working, and so some may be on welfare for a very short time

2  that welfare aid is available.

3      Low-income women try to reduce their costs in any way they

4  can.  They try to, you know, live as cheaply as possible.  They

5  try to make sure their kids have enough to eat, but often

6  there's not enough money at the end of the month in order for

7  food or in order to meet all of their basic needs.

8      And then a lot of times low-income women do without.  They

9  have to make sacrifices in order to pay their rent that maybe

10  another bill goes unpaid.  Or if they have an unexpected bill or

11  an emergency or a car repair, that other areas of their life

12  suffer.

13  Q.  What is the largest expense that low-income women have?

14  A.  So the largest expense for low-income women or low-income

15  families is usually their rent or housing.  And so while

16  middle-income families usually pay between 25 to 30 percent of

17  their take-home pay for rent or for their mortgage, low-income

18  families pay much higher percentages.  And actually, HUD

19  identifies anything above about 30 percent of your take-home pay

20  as a burden for middle- and low-income families to meet.

21      And so we know that from research that low-income families

22  pay between 40 and 90 percent of their take-home pay for rent.

23  And it's usually in about the 60 -- you know, 50 to 60, 65

24  percent of their take-home pay goes to rent.  And so in research

25  on this topic, as low-income women talk about sort of how they

1  pay their rent, how they pay their utilities, or how they're

2  trying to pay for other things, they talk a lot about doing

3  without.  And so we know that women do without needed medical

4  services all the time.  And in research on the topic, about 40

5  percent of women in the last year, according to Edin and Lein

6  that I mentioned earlier, have done without a necessary medical

7  expense in order -- in order to meet other needs in their life.

8  Q.  And you said that between 40 and 90 percent of a low-income

9  family's take-home pay goes toward rent.  How does that compare

10 to middle- and upper-income families?

11 A.  Middle- and upper-income families, it's usually under 30

12 percent; and usually it's under the 25 percent rate.  And most

13 of us know that who have applied for a mortgage at some point,

14 that they won't -- many banks won't lend you more than, you

15 know, 30 percent of your take-home pay for a mortgage.  And so

16 it's much lower for middle-income and upper-income families.

17 Q.  Given what you've just described, what do low-income women

18 in these circumstances do when they need money to pay for an

19 unexpected emergency?

20 A.  Well, okay.  So based on my own research, low-income

21 women -- one of the questions that I ask in my research on the

22 topic is if you had an unexpected emergency or if you needed

23 some extra cash, who would you borrow it from, how would you get

24 it.  And about half of the women in my own research said that

25 they have no one that they could borrow some extra money from.

1    And in the interviews, I specified that that emergency cash was

2    less than $50.  And so I'm talking about what many middle- and

3    upper-income families would think of as a very minor amount of

4    extra cash or emergency money.  And half of my participants said

5    they had no one that they could borrow that from.

6        The other half talked about doing without another necessity,

7    and so maybe not putting gas in their car that week, which then,

8    of course, affects their ability to get to work or to get their

9    kids to school.  Some of them talked about doing without food

10   for themselves, that they did their best to make sure their

11   children had enough food to eat by the end of the month, but

12   many of them did without food themselves or the whole family

13   lived on an incredibly tight food budget.

14       And they also talked about if there was, you know, a bill

15   like their electric bill that they didn't -- you know, they

16   didn't pay that month, then they ran the risk of their

17   electricity being cut off or paying just a little bit less on

18   their rent.  But that runs the risk -- low-income women don't

19   live in housing that if you miss a month's rent or miss a

20   hundred dollars of your month's rent, that you don't risk being

21   evicted.  Their landlords would certainly start eviction

22   proceedings.  And so in many cases, when they have this extra

23   expense or emergency, sometimes they just do without.

24       I -- in my own research, I was doing a third interview with

25   a woman who I had met in 2006.  I had met her again in 2008.

1    And when she came into the interview, she was much skinnier than

2    the last time I had seen her.  She obviously -- I actually

3    thought she was on drugs.  But during the course of the

4    interview, it came out that she had significant medical problems

5    in the last couple of years.  And in California -- so her

6    medical problems led to all of her teeth falling out.  And in

7    California, our Medi-Cal or low-income health insurance program

8    will pay for one set of dentures and one adjustment to those

9    dentures.  And so she had a set of dentures made and the

10   adjustment made, but she was still sick.  Her gums were still

11   swollen.  And so she came to the interview with no teeth.

12       And as I was talking to her about her current situation and

13   what was going on with her and we started talking about her

14   teeth, then I asked her, you know, why she didn't wear her

15   dentures.  And they didn't fit.  And so even though they needed

16   another adjustment or she needed a new set made, she just

17   couldn't afford it.

18       And we continued with the interview.  And come to find out,

19   she had been looking for a job but she couldn't find a job,

20   which many people will not hire someone who has no teeth.  And

21   she was living in her car that also was not working.  Her and

22   her friend had pushed the car to the end of a cul-de-sac, and

23   the car also needed a repair that was approximately 40 or $50.

24   And so she didn't have money to put gas in the car or to make

25   that repair, so her son -- her and her son, who is also

 1    disabled, were living in her car.

 2        And so these are the stories they're telling of their lives

 3    in my research of what they -- what happens when they have an

 4    emergency that they can't pay for or what happens when they

 5    can't make ends meet.

 6    Q.  What does the literature show are the greatest barriers to

 7    low-income women's ability to access health and human services?

 8    A.  That on top of being able to pay for whatever the health

 9    care is, they have transportation issues to accessing health and

10    human services and they also have child care issues in order to

11    access health and human services.

12    Q.  Turning to the specific facts of this case, what sorts of

13    burdens do you think would be imposed if the three clinics that

14    you've discussed were to stop providing abortions?

15    A.  So I think there's significant financial burdens of travel

16    to the clinics that will continue providing the services.  I

17    also think that there's sort of sociopsychological stress and

18    anxiety burdens.  And I also think that there are a category of

19    other harms that low-income women may experience if the three

20    clinics in this case were to stop providing abortion services.

21    Q.  So starting with the first of those, can you explain what

22    you mean by cost-related burdens.

23    A.  Yes.  And so for low-income women to access a service in her

24    city, she's going to travel from wherever she lives to the

25    service within her city or to the services that were available

1    at the three clinics that would stop providing services.

2    However, if those services were to be discontinued, then she

3    would have to travel to another city.  And so there's travel

4    costs associated with that.  And I think that there's -- there's

5    five sort of things -- there's the actual travel cost, and then

6    there's if she has to get a hotel room to stay overnight --

7    there's four things -- lost wages, and also child care

8    responsibilities that go into this category.

9    Q.  So let's start with the first item that you just listed,

10   which is the cost of transportation or the travel cost itself.

11   A.  Yes.

12   Q.  Are you -- first, are you familiar with data on low-income

13   women's access to vehicles?

14   A.  Yes.  So low-income women -- so low-income families have

15   less access to private cars than other -- than middle- or

16   high-income families.  And women -- specifically, low-income

17   women -- have less access to private automobiles than low-income

18   men do.  And so also -- may I look at the report?

19   Q.  Yes.

20   A.  If we look at the average age of the car --

21            THE COURT:  What are you looking at?

22            THE WITNESS:  I'm looking at -- in the expert report

23   that I wrote, I'm looking at number 16.

24            THE COURT:  Page --

25            THE WITNESS:  It's number 16.

1          THE COURT:  Number 16.

2          THE WITNESS:  Maybe page 8.

3          THE COURT:  Okay.  I have it here.

4          THE WITNESS:  Okay.

5   A.  And so a quarter of low-income families and a third of

6   low-income families headed by single parents were without a

7   private car.  These numbers are from the mid to late 1990s.  And

8   given some more recent research -- and also, one of the areas

9   that I've been doing a lot of work, because my research study

10  started in 2006 and ended in 2011, is on the Great Recession.

11  So I'm very familiar with a lot of the Great Recession work.

12  Families have less access to assets such as automobiles than

13  they did in the mid to late nineties.  So these numbers, to me,

14  are very conservative on the access that low-income families

15  have to cars.

16      But a third of families headed by low-income single parents

17  were without a private car.  And this is in comparison to only

18  four percent of other families.  And then also, the cars that

19  low-income families own are older than cars that middle- and

20  upper-income families own.  So the average age of a car that a

21  low-income family owns is approximately ten years, as opposed to

22  7.5 years old for cars that other families own.  And given the

23  age of those cars, I'm concerned about the reliability of those

24  cars in order to make intra-city trips.

25  Q.  So Dr. Katz, did you evaluate the transportation costs

1  associated with accessing abortion if the clinics in these three

2  cities that we've been discussing were to cease providing

3  abortions, both for women with and without automobiles?

4  A.   Yes.   And so I did an assessment of -- of the costs

5  associated if they had access to a private car and also if they

6  did not have access to a private car.

7  Q.   So let's start with the costs associated with travel for

8  those without a private car.

9  A.   Okay.

10  Q.   How did you evaluate those costs?

11  A.   And so myself and my research assistant looked at how a

12  women might get from where she lives to the clinic.   And so we

13  looked at intra-city bus service and also train service and then

14  also if you take a bus --

15       So I'm looking at Plaintiff's Exhibit 57.   Is that okay?

16       And so if you look at taking a bus round trip between

17  Montgomery and Tuscaloosa -- also a woman, if she doesn't have

18  access to a private car, in addition to taking the bus to the

19  city would need to take a taxi from the bus depot to the clinic.

20  And so I assessed the cost of both the bus ticket and then also,

21  in some cases, a taxi.   There were a couple of instances where

22  she could likely walk from the bus depot to the clinic.

23  Q.   And so could you just summarize the price range for

24  intra-city travel from Montgomery to Tuscaloosa, Birmingham to

25  Tuscaloosa, and Mobile to Tuscaloosa?

1   A.   Yes.   And so the price round trip between Montgomery and

2   Tuscaloosa if she took a bus and then also she would need to

3   take a taxi, that ranges from $93 to $137.   If we go down the

4   table just a little bit and look at the round-trip bus ticket to

5   Mobile and Tuscaloosa, the transportation costs would be between

6   130 and 182.   And then also on the second page, if we looked at

7   between Birmingham and Tuscaloosa, that cost would range between

8   $47 to $151.

9   Q.   And you said as well that you analyzed the transportation

10  costs for women who do have access to a vehicle?

11  A.   Yes.   And so if -- can we turn to Plaintiff's Exhibit 58?

12      So this table was also in my report that my research

13  assistant and I looked at the distance between the cities.   And

14  we used gas mileage at fuel economy dot gov for an approximately

15  ten-year-old car, a small sedan.   And we estimated also the time

16  it would take to drive those distances and the gas estimates

17  range from Birmingham to Tuscaloosa at approximately $15 for one

18  round trip.

19          THE COURT:   Just a minute.   You've lost me here.

20          THE WITNESS:   I'm sorry.

21          MR. BECK:   It's Exhibit 58, Your Honor.

22          THE COURT:   I know.   But I have --

23          THE WITNESS:   It's in a folder, maybe.

24          THE COURT:   It's still in the folder.   You don't have

25  this in the binder?

1          MR. BECK:  It's in our set of binders.  I apologize for

2    that, Your Honor.  It's in the middle folder.

3          THE COURT:  Great.  So it's in the folder here.  I go

4    up to 56, Plaintiff's Exhibit 56.  That's the expert report.

5          Okay.  Thank you.  Okay.  I have it here.

6    A.  Okay.  And so the first column is between the cities where

7    clinics would close and cities where clinics would still be able

8    to provide the service, the next column is the round-trip

9    distance in miles, the next column is round-trip times, and the

10   last is the estimated gas cost using fuel economy dot gov and

11   also the American Automobile Association's TripTik trip planner

12   to estimate gas costs.

13       At the low end, the Birmingham-to-Tuscaloosa round trip I

14   estimate the cost at approximately $15.

15       (The court reporter interrupts for clarification)

16   A.  TripTik trip planner.

17       So the low end is the round trip between Birmingham and

18   Tuscaloosa.  I estimated it to be approximately $15 in gas.  And

19   then Mobile to Tuscaloosa would be approximately $51 in gas.

20   Now, the table includes all sort of permutations between the

21   various cities -- not all, but between cities that have clinics

22   to close and the clinics that will remain open.  And so the

23   range was 15 to 93.  But it seems likely that someone would

24   drive from Birmingham to Tuscaloosa or Mobile to Tuscaloosa.

25   Q.  Now, the transportation costs that you've just discussed are

1  for a single round-trip journey; is that correct?

2  A.   Yes.   It's for a single round trip.

3  Q.   Is that the extent of the transportation-related costs that

4  the increased travel distance would impose on low-income women

5  seeking an abortion?

6  A.   No.   It seems likely that a low-income woman would have two

7  round trips that she -- for her to receive counseling and the

8  pre-op appointment type material.   She would need to make one

9  trip and then, for the day of the procedure, she would have to

10  make a second trip.

11  Q.   And are you aware of whether Alabama law actually requires

12  the counseling to be done in person?

13  A.   I am aware of that.   What I'm aware of is that the

14  counseling can be done either in person or by mail, but the mail

15  has to be mailed to the patient with restricted delivery.   And

16  given my research and also given extensive research on this

17  topic, mail in low-income communities is notoriously unreliable.

18  Mail has -- low-income communities often has mail stolen.   The

19  low-income families might often move, and so they -- the mail

20  might not get to them.   Also, low-income families -- adults

21  don't often trust that the mail would get to them.   And so both

22  in my own research and in the research in this field, many

23  low-income women, when given the option of receiving a piece of

24  mail versus going in person and making sure that the matter is

25  handled in person, just handle it in person.   So from my own

1    research, with women who often have to deliver documents to the

2    welfare office or pick up documents from the welfare office,

3    they go in person.

4        Also, if a woman was to receive the materials restricted

5    delivery, my concern is that low-income women would -- many of

6    them might be working during the day when the mail is often

7    delivered and so would not be at home to sign for it in person.

8    And my other concern is that whereas middle-income and

9    upper-income people might be able to then have the piece of mail

10   delivered to them at work, low-income women do not work in

11   occupations in which they could receive mail at work.  Many of

12   them work in retail and other serving professions, and so

13   getting mail at work is highly unusual.  But then even if that

14   was the case that she could get mail at work, that may

15   compromise her confidentiality or medical privacy of the mail

16   that she's receiving at work.

17   Q.  Now, in addition to a woman buying herself two round-trip

18   tickets, are there any other transit-related costs that should

19   be included in the analysis?

20   A.  Yes.  And so I think that a third ticket -- so a woman needs

21   to have someone to accompany her to the procedure in order to

22   accompany her home from the procedure because of sedation.  And

23   so I think that a third ticket is likely.

24   Q.  Now, the costs you've described look at the burdens of

25   traveling within the state of Alabama to access an abortion

1  provider; is that correct?

2  A.  Yes, they are.

3  Q.  Would it change your opinions about the travel burdens in

4  this case if you were to consider the possibility that

5  low-income women would have to travel out of state to obtain

6  abortions?

7  A.  It doesn't change my opinion in this case.  My opinion is

8  that low-income women will have additional travel burdens.  And

9  so whether the travel is within the state of Alabama or outside

10  the state of Alabama, my concern is the additional travel and

11  the costs and burdens associated with that additional travel.

12  So a service that had been provided and available in her own

13  city is no longer available, and she has to travel outside of

14  her city or further from her city in order to access it.

15  Q.  And are there any other reasons why out-of-state travel

16  would be burdensome to low-income women seeking abortions?

17  A.  I'm concerned would they know about the service being

18  available out of state.  And so when I look at and think about

19  research on the topic about why people don't access particular

20  health and human services, that there's a knowledge base, that

21  you have to know that that service exists in another place.

22       And so I'm familiar with a handful of studies on this, one

23  looking at people accessing health and human services in North

24  Carolina, families living in rural areas.  And the researchers

25  looked at why they did or did not access various services that

1  were, you know, 30 miles from their house, 60 miles from their

2  house, 90 miles from their house.  And one of the top reasons

3  why they didn't access those services is they just didn't know

4  about them.  And there's been some recent research with veterans

5  that also covered that, why veterans aren't accessing various

6  services and cases of not knowing about it.

7      And so while you and I or many of us may do research on it,

8  may do research on the Internet about it or in other ways, that

9  low-income woman's access to Internet availability is not at the

10  same rate as middle-income families and high-income families.

11  And so that lack of knowledge of where the services may be -- if

12  the service has always been available in your city and it's no

13  longer available, how would you know about it?  And so some may,

14  but many may not as well.

15  Q.  In addition to the financial costs of transportation, you

16  testified that you identified other travel-related financial

17  costs.  Can you give me an example of one of those costs?

18  A.  Yes.  So one of those costs would be a hotel room, that if

19  you are traveling from the city that you live in or near to

20  another city and that distance is significant enough or the

21  length of time by bus is significant enough, you may need a

22  hotel room.  When I did the report, I was thinking one hotel

23  room or one night of hotel.  But it's my understanding since

24  then that Alabama's waiting period has increased from 24 hours

25  to 48 hours.  And so to me, it seems likely that two nights of

1  hotel might be needed.

2  Q.  And did you evaluate the cost of what a night or two nights

3  in a hotel would cost?

4  A.   Yes.  So I evaluated -- I looked at -- I used -- I looked at

5  hotel costs in Tuscaloosa and Huntsville and used Expedia dot

6  com, the commonly known travel Web site.  And hotel costs were

7  $94 a night on average on Expedia and 93 in Huntsville.

8  Q.  And the figure you just quoted is an average price?

9  A.  It's an average price at the time that I was writing the

10  report, yes.

11  Q.  And is that -- sorry.  Is that the lowest priced hotel that

12  a low-income woman could possibly find, you think, in those

13  cities?

14  A.  No.  It's an average price.  It's not the lowest price.

15  It's also not the most expensive price.  I used the Internet.

16  And I was just speaking about how I'm concerned that low-income

17  women don't have the same access to the Internet as middle- and

18  upper-income folks do.  And so when you are searching for hotel

19  rooms, you can usually get a better price by booking ahead of

20  time, which requires that you have a credit card and you have

21  room on that credit card in order to do that and you have

22  Internet access.  And both of those things low-income women are

23  less likely to have.  Hotel costs, when you walk up to the hotel

24  and walk into the lobby and ask if they have any rooms

25  available, are often more expensive than the rates -- than rates

1   that are booked ahead of time.  And so this is an average cost.

2   It's not the lowest cost, but it's also what I think might not

3   be the highest cost either.

4   Q.  Now, you stated before that an additional cost burden that

5   the act would impose in this case would be lost wages?

6   A.  Yes.  And so if a low-income woman has to travel from the

7   city she lives in or near the city she lives in to another city

8   and then possibly wait the 48 hours -- so the counseling, 48

9   hours, and then the procedure -- she's going to lose additional

10  days of work if she is working.  And so those lost wages -- in

11  the analysis in the report, I looked at an average wage for an

12  average occupation in -- for low-income women, and that's being

13  a server.  And I used the example wage of $8.52 an hour.  And so

14  low-income women may miss one or two additional days of work in

15  order to have to travel for the procedure.

16      And low-income women, we know from other research -- the

17  Institute for Women's Policy Research does a significant amount

18  of research in the area of low-income women's access to paid

19  time off from work.  And so while I might be able to take a sick

20  day or two from work, low-income women, over 40 percent of them

21  don't have -- are not working in jobs that have access to paid

22  time off of work.  And so if a low-income woman needs to take

23  more than one day off at a time, she risks her job.  So not only

24  is she not being paid for it, but also the professions that

25  she's working in, it may risk her employment.  And so I'm

1  concerned about the lost wages, but I'm also concerned about the

2  risk that it puts on her position.

3  Q.  And did you calculate the amount in dollars that a woman

4  would lose if she were to miss a day or two or three of work?

5  A.  Yes.  And so I calculated that for one day of work, it was

6  approximately $62.  And -- hold on.  Let me look at -- if you

7  don't mind, I'm going to look at Plaintiff's Exhibit 59.  That

8  one lost shift of work is $68.  And two lost shifts of work, as

9  in the expert report, is approximately $136.

10 Q.  Now, the costs in lost wages that you've just discussed

11 would apply to a low-income woman with a job.  But what about a

12 woman who is unemployed?

13 A.  So if a low-income woman is unemployed, I think that there

14 are still costs to her missing this time.  And so low-income

15 women who are unemployed may be on welfare.  And welfare

16 requirements are usually that you have to be engaged in

17 welfare-to-work activities.  And so up to 38 -- 30 hours a week

18 she needs to be doing these welfare-to-work activities.  And so

19 if she misses any of those activities, she risks being

20 sanctioned off of welfare and so that she may lose her whole

21 monthly benefit.

22     And the welfare-to-work activities are -- they're just

23 slightly different than a job in that you can't necessarily just

24 ask for a day off of work.  You have to provide documentation

25 and things like that.  And so that may risk her, again, medical

1    privacy on the issue.

2        But also, if a woman -- if a low-income woman is looking for

3    work, she is actively looking for work.  And if there's an

4    additional day or two that she is missing, that's a day or two

5    further down the road that she can get a job -- that she can't

6    get a job.  And so it's the same -- it's similar in that it's

7    still a day or two of wages.  It's just -- it won't come out of

8    the next paycheck.  It may come out of, you know, a couple of

9    weeks or months down the road.

10       And then there's a category of women who may not be looking

11   for work, who are not working, may not be looking for work, who

12   are on welfare.  And these women -- we know in the U.S. extreme

13   poverty has increased rather significantly in the last eight to

14   ten years and that there are many women that don't have jobs and

15   aren't working and have no income.  And so it's for those --

16   those women that I'm most concerned that travel would -- travel

17   to another city either by car -- which, you know, if they have

18   no income, the chances of them having a car is low -- and -- or

19   affording an expensive bus ticket, I just -- I think it's very

20   unlikely.  So it's this group of women I'm most concerned about.

21   While they may access a service if it was available in their

22   city, them traveling a couple hundred miles to another city is

23   highly unlikely.

24   Q.  In addition to transportation, lodging, and lost wages, are

25   there any other costs that you figured into the analysis?

1    A.   Yes.   And so I think that child care costs should also be

2    figured into the analysis, that we know that -- that many women

3    who seek an abortion have at least one child.   And I know from

4    national research and then also my own research -- the U.S.

5    Department of Health and Human Services puts out characteristics

6    of women on welfare every year.   And so nationally, the average

7    woman on welfare has 2.4 children, which is -- you know, no one

8    has .4 children, but that's to say that low-income women have

9    between two and three children.   And so in my analysis, I looked

10   at how much child care would be for two days of child care for

11   two children.

12   Q.   So Dr. Katz, let's add these costs up.   Did you compute the

13   costs that a low-income woman in one of these three cities would

14   incur as a result of having to travel to obtain an abortion?

15   A.   Yes, I did.   So if we look at Plaintiff's Exhibit 59, it's

16   representative travel costs for low-income women in Montgomery,

17   Birmingham, and Mobile.   So I'm going to take the first part of

18   the table.   And I looked at the travel costs between Montgomery

19   and Tuscaloosa.   And as I've been talking about, I looked at the

20   round-trip travel for the counseling, the round-trip travel for

21   the procedure, and then also the round-trip travel for a person

22   accompanying the patient to the procedure.   Why that number is

23   slightly lower is that it's the bus ticket -- the top two

24   numbers are bus ticket plus a taxi.   But it seems likely that if

25   you're bringing someone along with you to accompany the patient

1  home from the procedure, you would use the same taxi.  And so

2  that's why the number is slightly lower.  And then I also used

3  one lost shift of wages at $68 and then child care for two

4  children for two days.

5  Q.  And what does that add up to?

6  A.  It adds up to $415 in addition to the cost of the procedure.

7  So this is just the travel costs that would be required if the

8  service was no longer available in Montgomery.

9  Q.  And what about for Birmingham?

10  A.  For Birmingham, I also did the analysis.  So Birmingham to

11  Tuscaloosa, this is the smallest amount of money in my analysis.

12  So the round-trip travel for the counseling, the round-trip

13  travel for the procedure, round-trip travel for the person

14  accompanying the woman having the procedure, one lost shift of

15  work, one additional lost shift of work, and child care for two

16  children for two days is 237.

17  Q.  And what about the cost for Mobile?

18  A.  And then Mobile and Tuscaloosa, it's on the higher end.  So

19  round-trip travel, again, for the patient and the person

20  accompanying the patient.  This is two lost shifts of work and

21  child care for two children for two days.  And then in this

22  analysis, I also included hotel costs for two nights.  Given the

23  length of the trip, I think that it is likely that she would

24  travel, stay overnight for the waiting period, and then travel

25  home after the procedure.  And that amount is $651.

1          MR. BECKMAN:  Your Honor, I'm sorry to interrupt, but

2     we have not been given a copy of this.  Could we get one?

3          THE COURT:  Yes.

4          MR. BECK:  Do you not have Exhibit 59 in your --

5          MR. BECKMAN:  No.

6          MR. BECK:  I apologize for that.

7     Q.  So how burdensome would these costs that you just described

8     in the 200 to 600 dollar range be to a low-income woman?

9     A.  I think that these costs are incredibly burdensome.  These

10    costs are more than many low-income women make in a week and

11    sometimes as much as they may make in a month.  In my own

12    research when I asked women if they could borrow if they had an

13    emergency and they needed to borrow less than $50, half of them

14    said they had no one that they could even borrow $50 from.  And

15    so when we're looking at costs that start at $237 and go up to

16    $650, I am very concerned that these costs would put the

17    procedure out of range for -- for the women that -- in my

18    analysis.

19    Q.  Now, Dr. Katz, are the figures you've just described

20    identical to the range of sums included in your expert report?

21    A.  They're not identical.  In the report, I looked at many

22    different scenarios.  But in the Plaintiff's Exhibit 59, these I

23    think are the likely scenarios of the trip.

24    Q.  And do the -- does the difference in the range set forth in

25    your report and the range included in Plaintiff's Exhibit 59

1  change your opinion about the burdens that this would impose on

2  low-income women?

3  A.   It doesn't change my opinion at all.  My opinion is that

4  low-income women who previously had a service available in their

5  own town are going to need to travel to another town.  And the

6  costs -- the costs matter.  And the costs are -- have a major

7  effect on whether or not they would be able to access that

8  service.  And so the -- the way that, you know, a low-income

9  woman would assess whether or not she would be able to afford

10  this and then think about, you know -- yeah.  The costs -- at

11  the end of the day, you know, the exact numbers -- these are

12  estimates for travel.  But they're all way outside of what I

13  think the range that a low-income woman would be able to afford.

14  Q.   And in addition to the pure financial costs, are there other

15  burdens that you think this additional travel would impose on

16  low-income women?

17  A.   Yes.  So I'm concerned about social psychological factors,

18  stress and anxiety that additional travel would impose.  And so

19  I know that in my work with low-income women and the research

20  that I do and also within the research in the field in this area

21  that low-income women, many of them, don't have as much

22  experience traveling as middle- and upper-income people do.  And

23  so they may have experience traveling from where they live to

24  the nearest big city or within their city, but they don't have

25  experience doing intracity travel in the same way.  And this

1    causes a lot of stress and anxiety.

2        And the logistics of this travel -- in addition to the

3    costs, the logistics of being able to get more than one day off

4    of work in a row -- and in some cases, two or three days off of

5    work.  The logistics of finding child care for their children.

6    My analysis considered daytime child care.  And while many

7    low-income women may be able to find daytime child care, they

8    might not be able to find overnight child care for their kids.

9        And so do they trust someone?  Do they have someone that

10   they can leave their kids with?  That was another research

11   question I asked my own -- in my study, is if you needed

12   emergency child care -- and that was usually for two to three

13   hours -- who would you turn to.  And again, about 40 percent of

14   the mothers in my study said I have no one that I can turn to

15   for emergency child care.

16       There's a recent book on this topic.  It's call *Ain't No*

17   *Trust*.  And she explores the issue of child care and the role of

18   that in low-income women's lives and that many low-income women,

19   even if they can afford the child care, don't trust who they're

20   leaving their kids with.  And I think this issue is compounded

21   when you have to spend the night or when it's for several days

22   in a row.  And so I'm concerned that in addition to these travel

23   costs, that there's these other social psychological factors and

24   increases in stress and anxiety that a low-income woman would

25   experience.

1  Q.  So in addition to financial burdens and sociopsychological

2  burdens, are there any other harms or obstacles that you are

3  concerned about in this case?

4  A.  Yes.  And so even if a woman is able to overcome those first

5  two categories of financial -- the additional financial costs of

6  the travel and also the additional social psychological or

7  stress and anxiety that the travel would produce, I think

8  there's this category of other harms.  I talked about earlier

9  that -- my research with domestic violence survival and why they

10  would go back to abusive partners.

11      And so there's a set of decisions that low-income women have

12  to make when they have an emergency or they have an expense

13  that's unexpected, and that can create real harm in their life.

14  And so low-income women, when they have an unexpected expense or

15  an emergency, the first category of these harms is they do

16  without other necessities.  So they don't pay their rent or they

17  don't pay their electric bill or they don't put gas in their car

18  that week or they don't -- they don't have enough money for

19  their food budget.

20      Another practice that's common in low-income communities is

21  predatory and payday lending.  And so in order to borrow $250,

22  you pay $300.  And so at the end of the month, they have to pay

23  the $300 back.  But that's increasing the cost of the travel.

24  So the travel is already expensive, and now she has to get one

25  of these predatory loans in order to cover that cost if she's

1    even eligible for one of those loans, if it's even available in

2    her area as well.

3        And then the third one is sort of the risk that she would

4    have to take in order to borrow that money from -- this is where

5    I was talking about the domestic violence research.  If she

6    decided that the only way she could get that money would be to

7    borrow it from an abusive ex-partner or to allow a boyfriend

8    back into her life, that puts herself and her children at a

9    great amount of harm.  And there's a significant literature on

10   this that says that that's actually one of the ways that

11   low-income women deal with unexpected expenses in emergencies,

12   is they allow abusive ex-partners back into their life.  And

13   they really -- women in those interviews talk about that can

14   they endure the abuse or the risk of the abuse in order to meet

15   that need.

16       I'm also concerned that that, again, puts her medical

17   privacy at risk in case -- if that person is the person who she

18   got pregnant with or is not, that that puts her at an increased

19   risk.  So there's this category of other harms that even if

20   she's able to come up with the money, how did she come up with

21   the money and what harm is that giving in her life.

22   Q.  Now, Dr. Katz, if you learned that some low-income women in

23   Alabama are already traveling to access abortion services, would

24   that change the opinions you offered in this case?

25   A.  It doesn't change the opinions I've offered in this case,

1  the fact that some low-income women are already traveling.  But

2  they're traveling to the cities that are closest to them or

3  they're traveling -- you know, that they've made the decision to

4  travel.  But this is an additional travel.  So they may be

5  traveling to the closest big city to them, but this would be an

6  additional trip.  And so no, it does not change my opinion.

7  Q.  And I have just one more question, Dr. Katz.  You've

8  discussed the burdens that this law would impose on low-income

9  women.  But aren't there just a lot of ways in which it's just

10 difficult to be poor?

11 A.  Yes.  It's difficult to be poor.  But in all of the ways

12 that it is very difficult to be poor, if these clinics were

13 forced to stop providing this service, it would be even more

14 difficult for these women to access this service.  And so to me,

15 it's -- if we think of it in this way, that if the State

16 implements this law, it's as if the State is passing a tax on

17 abortion and that this tax is going to be the most burdensome to

18 low-income women.  And so I am most concerned that that would

19 prevent many low-income women from accessing the service.

20          MR. BECK:  Thank you, Dr. Katz.

21          THE COURT:  Cross.

22          MR. BECKMAN:  Yes, Your Honor.

23                         CROSS-EXAMINATION

24 BY MR. BECKMAN:

25 Q.  Dr. Katz, am I correct in understanding that you're not

1  giving any testimony today about whether the doctors at the

2  Mobile or Birmingham clinic or the Montgomery clinic can get

3  privileges?

4  A.  No, I'm not.

5  Q.  And you're not giving any opinion about whether those

6  clinics might be able to hire new doctors that already have

7  privileges or that might be able to get privileges.

8  A.  No, I'm not.

9  Q.  You don't have any opinion about whether new clinics might

10  open up and fill the competitive vacuum if those clinics were to

11  close.

12  A.  That's outside my scope.

13  Q.  You're also not a psychologist, are you?

14  A.  I am not a psychologist.

15  Q.  And you're not an economist?

16  A.  I'm not what?

17  Q.  You're not an economist?

18  A.  I'm not an economist.  But you need to understand that these

19  fields are not distinct fields, that sociology and psychology,

20  there's a significant overlap.  Sociology and economics, there's

21  a significant overlap.  And so I'm expert in sociology; and in

22  those ways, I'm an expert in, you know, aspects of social

23  sociology and I'm an expert in the way low-income women make

24  ends meet.

25  Q.  Now, your report did not consider any need-based financial

1    aid that might be available for these women through various

2    federations or associations.

3    A.   No, it did not.

4    Q.   You haven't talked to any of the hospitals, any of the

5    abortion clinics, or any of the abortion doctors, have you?

6    A.   No, I have not.

7    Q.   Would you agree with me that -- well, you cited a study that

8    said approximately 40 percent of women seeking an abortion

9    haven't given live birth before.  Yes?  I think it was a CDC

10   study --

11   A.   If you want to --

12   Q.   -- in paragraph 23 of your report.  Approximately 40 percent

13   haven't given a live birth before of the women seeking an

14   abortion.

15   A.   Yes.  I did cite that study.

16   Q.   Now, that study probably has some margin of error.  Yes?

17   A.   That study, you know, came out from the CDC and that I trust

18   its methodology.  I'm not familiar with its margin of error.

19   But if they're reporting a number that's 59.9 percent, then --

20   Q.   Sure.  I'm just trying to establish that it may not be the

21   exactly precise number.  But we can work with that as an

22   approximate number, can't we?

23   A.   I would like to mention that if the CDC goes to the effort

24   of saying 59.9 percent instead of 60 percent, that they're

25   being -- I wouldn't call that an approximate number.  I mean

1    there's -- you know, it's -- it depends on the sampling and

2    stuff of the study, but I'm comfortable with this number.

3    Q.   Okay.  Now, for the women that have not given birth and of

4    those 40 percent, they wouldn't have any additional child care

5    based costs, would they?

6    A.   So out of the four costs that I discussed, one of them they

7    may not have.

8    Q.   Child care based.  Yes.

9    A.   Child care based.

10   Q.   I'm going to refer to them in terms of what you called them,

11   lodging based, child care based, and so forth.

12   A.   They may not have child care costs.

13   Q.   Well, they wouldn't, because they don't have children,

14   right?

15   A.   Well, they haven't given birth to a child.  They may have

16   stepchildren.  They may have other children that they are

17   responsible for.  So you can't say that they don't have

18   dependents.  I would feel comfortable saying they haven't

19   biologically given birth to a child.  So they may -- they

20   actually may have child care costs, given the way that families

21   work.

22   Q.   Well, the converse would be true as well.  Of the

23   approximately 60 percent of women who have given a live birth

24   before, some of those women may not presently be the guardians

25   of those children.  Yes?

1   A.   Some of them may not be.

2   Q.   We could -- some of them may have given those children up

3   for adoption, may have given them to their own parents.   There

4   are different scenarios we could come up with.

5   A.   Yes.   But those women may then also have stepchildren or

6   other children they are responsible for.

7   Q.   Sure.   Both converses are true.

8   A.   Yes.

9   Q.   Now, for those women who are not the guardians of their

10  children, there are no child care based costs.   Yes?   If you

11  don't have any other children.

12  A.   Yes.

13  Q.   Now, you would agree with me that for the women who do act

14  as their children's guardian or as a stepparent to another

15  child, many of those women may be able to find a trusted family

16  friend or -- trusted family member or friend on varying degrees

17  of notice to watch their children.

18  A.   Some may.

19  Q.   You would agree that many may.

20  A.   I think that some to many may.

21  Q.   Now, in those situations, there would also not be any

22  additional child care based costs.

23  A.   No.   I disagree with that.   Although you may be able to find

24  a trusted family member or friend to watch your child, you may

25  have to pay that trusted family member or friend to watch your

1   child.  They might be willing, but they might expect some sort

2   of payment.  Or also, low-income families may have to pay for

3   the food or other costs that are associated with that person

4   caring for the child.  And so while caring for your child in

5   your own home is usually the least expensive option, you may

6   have to give -- even if you're not paying, say, the grandmother

7   to watch the child, you may need to give the grandmother 20 or

8   $30 to pay for the food for the child or other costs.  So there

9   are costs associated with it.

10  Q.  Now, those women, couldn't they send their children over to

11  grandmother's house or their own mother's house with the food

12  they were going to feed them in their own home?

13  A.  Maybe.

14  Q.  I mean they could, couldn't they?  I didn't ask whether they

15  would.  I asked whether they could.

16  A.  They could.  Are they likely to?  Do they have enough extra

17  food in order to do that?  These are -- a lot of the work that I

18  do in my research is sort of taking middle-class assumptions

19  that -- we can't have middle- and upper-class assumptions that

20  that's how it works in low-income families.  And so that's

21  assuming that you have an extra two or three days of food on

22  hand that you could send over to the grandmother's house.  And

23  that's not the case in many low-income households.

24  Q.  Okay.  Well, we'll talk about the length of time in a little

25  bit.  Let's stay on child care right now.  So for those women,

1   it certainly, wouldn't you agree, a lesser cost associated with

2   child care for women who give it to a trusted -- who give their

3   child to a trusted family member or friend?  It's less than what

4   it would cost to use a day care or something else.  Yes?

5   A.  It may be, yes.

6   Q.  Now, for the women who do need to pay for child care, who

7   aren't in those first three categories -- women without

8   children, women who have a trusted family member or friend,

9   women who just aren't the guardians of previous children that

10  they've had -- would we agree that they could, in theory, save

11  money by using the certified mail option for informed consent?

12  A.  Save money where?

13  Q.  By not visiting the clinic on that first day.  They could

14  use the certified mail option.  I know you have reservations

15  about it, but that is something they could do and save money of

16  child care based expenses, isn't it?

17  A.  That is an option.

18  Q.  And you would agree that they could save money if they

19  reduced the length of their trip.  For instance, if a woman in

20  Mobile chooses instead to go to Tuscaloosa instead of going to

21  Huntsville or chooses to go to Pensacola instead of going to

22  Tuscaloosa, they would save child care based expenses?

23  A.  Yes.  It may.

24  Q.  Now, for a Mobile woman choosing to go to Pensacola, you're

25  aware that it's only about a 58-mile trip.  Would you agree that

1  they could probably --

2  A.  I'm not aware of that, actually, so --

3  Q.  Okay.  Well, it's a 58-mile trip.

4  A.  Okay.

5  Q.  You understand that now.  Would you agree that they could

6  probably go to and from that clinic in less than eight hours if

7  they had their own car?

8  A.  That seems possible.

9  Q.  And in that situation, if they can make it in less than

10  eight hours, that roughly corresponds with the length of a

11  school day, doesn't it?

12  A.  For children who may be in school or old enough to be in

13  school.

14  Q.  Sure.  Well, I'm just asking whether it corresponds with the

15  school day.

16  A.  Sure.

17  Q.  So in theory, a woman could drop a child off in the morning,

18  go to Mobile, whether or not with a friend who's driving them,

19  come back, pick the child up.  And there are no additional child

20  care costs in that situation.

21  A.  In that situation.  But that is one scenario.

22  Q.  It's also roughly the length of a work shift, isn't it?

23  A.  Yes.

24  Q.  If a woman perhaps was uncomfortable with telling a trusted

25  family member or friend that she was going to get an abortion,

1  she, in theory, could tell this person I've got to pick up an

2  extra shift; I'll be gone about eight hours.  That could happen?

3  A.  That could happen.

4  Q.  Now, would you agree with me that for many women seeking an

5  abortion, they won't need to take the extra expense of lodging

6  or hotels?

7  A.  I don't agree with you.  It depends on the scenario.  It

8  depends on her travel -- her access to, you know, money for a

9  bus ticket or access to a private car.  It was one of the

10  factors that I considered in the various scenarios, was she may

11  need lodging.

12  Q.  Would you agree that at least some women won't need a hotel?

13  A.  Some women may not.

14  Q.  For instance, a women, again, using the informed consent

15  option may be able to avoid having to stay in a hotel at all.

16  She can go the very first time to the clinic and have the

17  procedure done.  She gets the ultrasound; she has the procedure

18  that very same day.

19  A.  Some may avoid staying in a hotel.  Others will need to get

20  a hotel room.

21  Q.  What about a woman going from Birmingham to Tuscaloosa?

22  That's about 59 miles.  Do you understand that?

23  A.  Uh-huh.

24  Q.  In that situation, does a woman need a hotel?

25  A.  She may not.  But she may also need one.

1   Q.   What about Mobile to Pensacola?   In that situation, a woman

2   may well not need a hotel.   It's also about 59 miles.

3   A.   She may not need a hotel.

4   Q.   Now, a woman going from Montgomery to Columbus, Georgia,

5   where there's another clinic, that's about 81 miles one way.

6   She may not need a hotel, right?

7   A.   She may or may not.   I would have to look at bus schedules,

8   et cetera, for that trip.

9   Q.   And the women in Huntsville, Tuscaloosa, and the surrounding

10  areas, they may also not need hotels, correct?

11  A.   They may not.

12  Q.   Now, for the women who may want to stay the night or need to

13  stay the night and make that choice, some of them may stay with

14  a friend in town.   Is that possible?

15  A.   It is possible.

16  Q.   Now, you say in Tuscaloosa the average hotel is $94 and in

17  Huntsville it's $93.   Yes?

18  A.   The day that I looked at the hotels for the report that I

19  put together, those were the average hotel costs.

20  Q.   But you would agree that those aren't the cheapest hotels in

21  those respective towns.

22  A.   Those are not the cheapest hotels in those respective towns.

23  Q.   Are you aware that a Motel 6 charges about 39.99 plus I

24  think it's around a 13 percent lodging tax?   I believe they do

25  that in Tuscaloosa and in Huntsville.   Are you aware of that?

1  A.  I am not aware of that.  But as I testified to earlier, this

2  is a median, you know, an average hotel cost.  There are going

3  to be hotels that are cheaper and there are going to be hotels

4  that are more expensive.  And so yes, there will be hotels that

5  are less expensive.  There will be hotels that are more

6  expensive.

7  Q.  You would agree, Dr. Katz, that low-income women prefer a

8  cheaper option to a more expensive option, though, don't you?

9  A.  I agree that the cost of the hotel is going to be one of the

10  primary concerns but also, you know, the hotel's safety, the

11  hotel's cleanliness.  If someone's just had a medical

12  procedure --

13  Q.  I'm sorry.  That's not quite my question.  I asked which

14  they preferred.  You would agree they prefer a cheaper to a more

15  expensive option.

16       MR. BECK:  Objection.  Your Honor, if he could let the

17  witness finish her answer to the question before he cuts her

18  off, I would appreciate it.

19       MR. BECKMAN:  I don't mean to interrupt, Your Honor.

20       THE COURT:  Can you answer that question?

21  A.  I agree that finances are a concern to them.  I think that

22  low-income women are concerned, like many people, about a

23  hotel's safety, about a hotel's cleanliness.  And so -- but

24  finances are an important concern, but that how a low-income

25  woman chooses a hotel, that's one of the factors.  So I don't

 1  agree with how he's phrasing it exactly.  And so I was trying to

 2  answer the question.

 3          THE COURT:  Go ahead.

 4  Q.  (Mr. Beckman, continuing:)  Thank you, Dr. Katz.  Now, are

 5  you also aware that a Masters Inn in Tuscaloosa charges 43.49 a

 6  night?

 7  A.  Yes, because I believe this came up during my deposition.

 8  I'm also aware that that same Masters Inn is the lowest rated

 9  hotel in Tuscaloosa and that all of the reviews of the Masters

10  Inn talk about how unsafe the facility is, how dirty the

11  facility is, and how people wouldn't ever stay there again given

12  those factors.

13  Q.  Now, you've testified previously, though, that these women

14  don't have great access to Internet; but you're now testifying

15  that they are reviewing TripAdvisor dot com and other Web site

16  ratings?

17  A.  I'm testifying that I reviewed it, because this hotel came

18  up in the deposition.  But I also -- I know that low-income

19  women, when they drive up to a property that looks unsafe and

20  dirty and filthy, that they're going to be concerned and so

21  would probably not walk in the door to book a hotel room.  And

22  so if they don't have Internet access, I do think that they

23  would observe those things driving up to the property.

24  Q.  So you do understand that these motel rates are available on

25  line?

1    A.   Yeah.   I understand that motel rates are available on line.

2    I also understand that low-income women's Internet access is

3    much lower than middle-class families' Internet access.

4    Q.   And you understand that local libraries often provide free

5    Internet access that a low-income woman could avail herself of?

6    A.   I do understand that.   But I also understand that low-income

7    women have many responsibilities in their life, such as working

8    and child care, that often happen during the hours that

9    libraries are open and that library free Internet access in many

10   areas of the country is very limited for a time -- for very

11   short periods of time.   And often you cannot have your kids with

12   you while you're using the computer.   And so those are my

13   concerns.   In my own research with low-income women who need to

14   access the Internet in that way, they talk about great

15   difficulties using public library free Internet access.

16   Q.   And it would also be an option for these low-income women to

17   simply call a couple of hotels that she found in the phone book

18   and find out what the rates are, couldn't she?

19   A.   She could.   But that's also assuming that a low-income woman

20   has a credit card that she then could reserve the room with,

21   that -- if someone has given you a rate to a hotel room over the

22   phone, they usually ask for a credit card to hold the room --

23   and that many low-income women, especially under 200 percent of

24   the poverty line, do not have a credit card that they then hold

25   the room with.   And so that rate that she's given ahead of time

1    would not be the same rate that she would get when she walks up

2    on that day if she can't reserve that room.

3    Q.   Now, the time away from work category that you discussed,

4    would you agree that -- is it fair to say that that portion made

5    up a large percentage of the additional costs you say would be

6    imposed if these clinics closed?

7    A.   It does not make up a large percentage.

8    Q.   Now, there are some women, you would agree, that this

9    category wouldn't add any additional costs for.   Yes?

10   A.   Yes.   Some women may not miss additional days of work.

11   Q.   There are women who, if they don't have jobs, they're not

12   going to lose any income.   Yes?

13   A.   No.   As I testified to earlier, if you're on welfare, you

14   are engaging in 30 hours a week of welfare-to-work activities.

15   And so you may lose income.   And if you're looking for a job and

16   you're actively looking for a job and you miss what would be a

17   day or two additional of looking for a job, then you will lose

18   income.   It will just be further down the road.   It won't be in

19   this week's paycheck; it will be, you know, once you find a job.

20   Q.   Now, I heard you to say it was up to 30 hours.   So it's not

21   necessarily always 30 hours every week, is it?

22   A.   I would have to check on that, but I think the Alabama

23   welfare-to-work requirements are 30 hours every week.

24   Q.   Okay.   Well, I heard you say "up to 30" earlier, but we'll

25   move on.   Now, for those women who do have jobs, maybe -- they

1  probably don't work every single day.  Or not every single woman

2  works seven days a week, do they?

3  A.  It is likely that they don't.  But low-income women work in

4  jobs that you don't have two consecutive days off of work.  Like

5  many of us work in jobs where we may have the weekend off; but

6  low-income women work in jobs where you get one day off, you

7  work three of four days, you get one day off.  Or you may work

8  six or seven days, eight days, and get one day off and then

9  another two days and get one day off.

10 Q.  Are you aware that the Huntsville clinic and the Tuscaloosa

11 clinic both offer abortion procedures on Saturday?

12 A.  And so that may -- I'm not aware of that.  And that may be

13 important for many jobs that middle- and upper-income people

14 work in; however, low-income women are working retail and

15 service jobs that -- restaurants are open six, seven days a

16 week.  And so they're not on a Monday-through-Friday schedule

17 like many middle-class people are.

18 Q.  Sure.  But it does increase the options for at least some

19 women, doesn't it, by offering abortion procedures I believe at

20 least on Saturdays and days throughout the week.  There are some

21 women for whom there will be a weekday that she can go because

22 she doesn't have to work.  As you said, she may have a day off

23 in between on a random weekday.

24 A.  Yes.  But I also heard testimony earlier this morning that

25 said that services may only be provided one day a week.  And so

1  my concern is if she doesn't have that day off that week, that

2  she would then have to take that off and the days around it in

3  order to travel.

4  Q.   Which witness are you referring to?

5  A.   The first witness this morning.

6  Q.   Okay.

7  A.   But also, actually, both of them talked about it.

8  Q.   Now, under your theory, though, that wouldn't really matter,

9  because you say both of those clinics closed down.  We're only

10  concerned about the Tuscaloosa and the Huntsville clinics.

11  A.   Okay.

12  Q.   And Pensacola and Columbus, Georgia, clinics, right?

13  A.   I don't know the schedules of services at those clinics you

14  just mentioned.

15  Q.   Okay.  But it's not going to matter, under your report, what

16  a Montgomery clinic offers because your report assumes that

17  they've closed down.

18  A.   Yes.  However, the broader point is that -- I think you were

19  trying to say that clinics offer the same services every single

20  day they're open.  And the point that I'm making is that it

21  seems that clinics are offering, you know, services one day a

22  week for abortion services.  And so it does matter which days of

23  the week she has off or is working or needs to take off.  And so

24  I think there's a broader -- in my mind, there was a broader

25  point.

1   Q.   Now, your report cited the 2012 Women's Policy Research

2   study that found that 59 percent of working parents at or below

3   200 percent poverty had access to paid sick leave, vacation

4   days, personal days, or other forms of compensated leave.

5        (The court reporter interrupted for clarification)

6             MR. BECKMAN:   Excuse me.

7   Q.   You've cited a report -- in your report, you cited the 2012

8   Women's Policy Research study which found that 59 percent of

9   working parents had access to paid sick leave, vacation days,

10  personal days, or other forms of compensated leave.

11  A.   So I cited -- it's the Institute for Women's Policy

12  Research.   And their report -- I cited that 41 percent of

13  working parents at or below the 200 percent of the poverty line

14  had no access to paid sick leave, vacation days, personal days,

15  or any other form of compensated leave.   I don't feel

16  comfortable reversing that number, because the Institute for

17  Women's Policy Research, by reporting it this way -- like you

18  don't know what access the other 59 percent have.   So they may

19  have one day off a month or something, but I feel comfortable

20  saying 41 percent don't have any access.

21  Q.   So you feel comfortable saying 41 percent, but you don't

22  feel comfortable saying that 59 percent do have access, even

23  though that would be the logical conclusion.   If they say 41,

24  it's not 42 and 58.   It's 41.

25  A.   Their finding was that 41 percent have no access.

1   Q.   So why can't you conclude that 59 percent do have access if
2   they say only 41 percent don't?
3   A.   I would have to look at what they're looking -- so I would
4   have to review the report to figure out what the other 59
5   percent -- it's  -- in social science and statistics, just
6   because 41 percent have no access, it's not -- I don't want to
7   assume that 59 percent do have some sort of access.
8   Q.   In any event, you would agree that for the women who do have
9   some access to leave, that there are less time-off-work losses
10   that they would incur.
11  A.   Yes.
12  Q.   And you would agree that it's the same for those women
13  without jobs.  And if there are women who can schedule
14  accordingly, if they don't work seven days a week, they might be
15  able to not miss any time too, as well.  Yes?
16  A.   I agree with the first and third.  It's the -- just because
17  a woman doesn't have a job doesn't mean that she's not going to
18  lose some sort of compensation.  Because I am concerned about
19  women actively looking for work, and I'm concerned about women
20  who are participating in welfare-to-work programs and being
21  sanctioned off of welfare.
22  Q.   But you would agree that even today there are time-off-work
23  losses for women that even attend an in-town abortion clinic.
24  A.   Yes.  But their travel time would be significantly less.
25  Q.   And you would agree that they may still need child care as

1    well.

2    A.   Yes.

3    Q.   Even with an in-town clinic?

4    A.   Yes.  But my report looked at the additional child care they

5    would need and the additional travel time and lost wages.

6    Q.   Sure.  I'm just -- we're just trying to get at where the

7    number started versus where it's ended up.  And it doesn't start

8    at zero, does it?  There are costs right now associated with

9    going to an in-town clinic.

10   A.   Yes.  But those are not part of my analysis.  I'm looking at

11   the additional costs.

12   Q.   Well, sure.  For a woman using an in-town clinic, if she

13   goes in on the day of her procedure, if she's doing a surgical

14   abortion, she's going to get a sedative, isn't she?

15   A.   That's outside my scope.

16   Q.   Well, I'll represent to you that she's going to get a

17   sedative.  Would it be your testimony that she's not likely to

18   come back into work after she has the procedure, gets the

19   sedative?

20   A.   That seems not likely.

21   Q.   So that could mean as much as a whole day off work even if

22   it's an in-town clinic if she has a surgical abortion.  Yes?

23   A.   Yes.

24   Q.   And that's right now, even in an in-town clinic.

25   A.   Yes.

1    Q.   Now, your report only looked at the Huntsville and

2    Tuscaloosa clinics, correct?

3    A.   Yes, it did.

4    Q.   And you'd agree that for those women living in those areas,

5    there are no additional travel-based costs if the other three

6    clinics in the state close down.

7    A.   Overall, I think that's fair to say.  But I am concerned

8    that those clinics might be busier or -- you know, would their

9    access to the clinics change.  I -- that, I think, is outside my

10   scope.  I didn't look at it.

11   Q.   Okay.  So you would agree that you haven't talked to any of

12   those clinics about whether they would make time to accommodate

13   more patients, whether they would add an extra day.  You've not

14   talked to any of those clinics or doctors, have you?

15   A.   I have not.

16   Q.   And you understand that the Birmingham clinic has been

17   closed since roughly January 11th and that women in Birmingham

18   have had to travel out of town to get abortions?

19   A.   I understand that, yes.

20   Q.   So you would agree with me that if this law went into effect

21   tomorrow, that the Birmingham women would not be in any

22   different position, travelwise, than they've been in for the

23   last four months and a week or so.

24   A.   I do understand that.  But I also heard testimony this

25   morning that that clinic plans to reopen shortly.

1    Q.   Sure.   But for the last four months -- tomorrow.   It's not

2    going to open tomorrow.   I know we heard that much.   So you

3    would agree that if the law went into effect tomorrow, the women

4    would be in the same position, travelwise, as they've been in

5    for the last four-plus months.

6    A.   Yes.

7    Q.   And you understand that many women living outside these five

8    big cities that your report considered already drive distances

9    longer than 50 or 60 miles to reach an abortion clinic?

10   A.   I do understand that.   But also, when low-income women

11   travel, they're traveling to the nearest big city to access a

12   service.   And so they do already travel significant distances;

13   and now, if the -- the three clinics were to stop -- well, two

14   of the clinics stopped providing and the Birmingham clinic

15   prevented from reopening, they would have to travel additional

16   distances.

17   Q.   But your report explicitly did not consider how much

18   further, if at all, a woman in one of these outside towns may

19   have to travel if one of these clinics shut down.

20   A.   Well, my report looked at the distance and the travel costs

21   between the cities.   And so say if the closest clinic would be

22   to travel, say, from -- if a clinic -- a woman was traveling

23   already to Birmingham and then we need to travel to Tuscaloosa,

24   there's additional travel that has to happen and costs

25   associated with that.

1  Q.  So your report just lists the total distance between six

2  different trips.  Yes?  Two trips from Mobile, two from

3  Montgomery, two from Birmingham, all of which go to either

4  Huntsville or Tuscaloosa.

5  A.  That -- that was, yeah, what I was looking at in the report

6  in terms of travel -- possible travel scenarios, yes.

7  Q.  Now, earlier you talked about a '95 study involving the age

8  of a car.

9  A.  Uh-huh.

10 Q.  And you -- your report doesn't have any other studies, but

11 you said that you had seen some more recent studies.  And if you

12 recall in your deposition, you'd said previously that the most

13 recent study you could find was the '95 study and that was the

14 only one you felt comfortable using and that you felt was

15 reliable.

16 A.  Uh-huh.

17 Q.  Is your testimony changing today on that point?

18 A.  I'm an academic.  I continue to do research on an ongoing

19 basis.  My deposition was in mid-November.  And so yes, I have

20 read research since mid-November that has come to my attention.

21 UC-Berkeley -- I think it was the School of Public Policy -- I'd

22 have to look it up -- but it's a study out of UC-Berkeley that

23 looks at car ownership that had numbers that -- these were

24 conservative numbers.  And it looked at car ownership among

25 low-income families and found lower numbers of car ownership.

1    And so yeah, I have read that study since November.

2    Q.   Okay.

3    A.   But that's -- I mean that's one of the things -- I'm not

4    trying to -- you know, that's one of the things I do as my job,

5    is I'm constantly reading new research or finding research on

6    topics that I'm interested in.

7    Q.   Now, you agreed earlier that it was a more likely scenario

8    for a Mobile woman to travel to Tuscaloosa rather than

9    Huntsville.

10          THE COURT:   Rather than where?

11   Q.   For a Mobile women to drive to Tuscaloosa rather than

12   Huntsville.

13   A.   I think that's likely.

14   Q.   Would you also agree that it's more likely for a Mobile

15   woman to drive to Pensacola rather than Tuscaloosa?  I believe

16   it's about 275 miles closer.

17   A.   It -- it may be.  It wasn't -- when I prepared the report,

18   it wasn't within the scope of the report.

19   Q.   But you would agree that travel distance and the total cost,

20   those are important considerations for a low-income woman using

21   an abortion clinic.

22   A.   Yes.

23   Q.   Those considerations are important because they help a woman

24   determine whether she needs someone to watch her kids or for how

25   long.  Yes?

1    A.   Yes.

2    Q.   How much gas that woman may need to buy if she's driving a

3    car?

4    A.   Yes.

5    Q.   Whether or not she needs to stay in a hotel for the night?

6    Whether or not -- what the price of a bus ticket cost?

7    A.   (Nods head)

8    Q.   And all these considerations, they -- you would agree they

9    fluctuate or come in and out of effect based upon the distance a

10   woman lives from an abortion clinic.

11   A.   Yes.

12   Q.   So if you can cut -- a low-income woman can cut 320 miles

13   from her total travel, that would be something it would benefit

14   her financially to do.

15   A.   Yes.

16   Q.   Now, you said earlier that you were not aware that the

17   Mobile clinic was only 117 miles round trip from the Pensacola

18   clinic.

19   A.   I know that Mobile is near Pensacola.  And I did not know

20   the distance exactly between the two clinics, no.

21   Q.   And you weren't aware that the Columbus, Georgia, clinic was

22   only 81 miles from the -- from Montgomery?

23   A.   No.

24   Q.   But you would agree, then, that because of these cost

25   considerations, some of your numbers could be lower if you

1    looked at these other clinics?

2         THE COURT:  Where in Georgia?

3         MR. BECKMAN:  Columbus, Georgia, Your Honor.

4    A.  The numbers may change if I considered those two clinics.

5    The overall point, though, remains unchanged in that additional

6    travel would be required of the women who had a service

7    available in their city and now no longer have that service and

8    so travel is necessary -- additional travel is necessary.  And

9    that travel has costs.

10   Q.  Sure.  Well --

11   A.  Financial and otherwise.

12   Q.  Now, if we've got a Birmingham woman who has her own car,

13   which you've said approximately -- I believe you cited the '95

14   study that said approximately 60 percent of low-income women do,

15   and that's the only study we have in front of us.  Right?

16   A.  It's the study --

17   Q.  The Jennifer Young study.  I won't use the other name,

18   because it will get butchered.

19   A.  Yeah.  A quarter of low-income families and a third of

20   low-income families were without a private car.

21   Q.  Yes.  So if you've got a Birmingham woman with her own car,

22   she drives to Tuscaloosa, that's approximately $15 in gas?

23   A.  That is what I estimated.  And this is families that have a

24   car.  That's assuming that the woman has access to the car on

25   that day.  And so if a family has a car and there's another wage

1    earner in the family that may need the car to get to work that

2    day, the woman -- you know, the family has to decide who gets

3    access to a car.  I live in a family that only has one car, and

4    we constantly talk about who needs the car and for what reasons

5    and there's, you know, that discussion.  And so these are

6    families.  It's not -- you're making an assumption or I hear you

7    saying in your words that the woman has a car.  And it's the

8    family or the household has the car.

9    Q.  Well, maybe I'm misreading your report.  Because you say as

10   of '95, a quarter of low-income families and a third of

11   low-income families headed by single parents.  So if it's headed

12   by single parents, I took that to mean there's only one person

13   driving a car.  I took that to mean a third of them don't, so

14   approximately two-thirds of single parents in a low-income

15   family have a private car.

16   A.  Okay.  If you want to phrase it that way, yes, I agree.

17   Q.  So in that scenario, if she doesn't have any children, if

18   she isn't the guardian of her child, if she doesn't need to stay

19   in a hotel because it's only 58 miles one way, we're still

20   looking at $15 in additional costs, aren't we?

21   A.  We are still looking at at least $15 in additional costs.

22   Q.  Now, even before that clinic closed, there would have been

23   some travel-based cost.  It's not free to drive from one end of

24   Birmingham to the other.

25   A.  It's not.

1   Q.  So it's actually a little less than $15 in additional costs,

2   isn't it?

3   A.  I mean -- I don't know.  It depends on where the woman lives

4   in Birmingham.

5   Q.  Would you agree that --

6   A.  So she may have to drive all the way across the city and

7   then to --

8   Q.  It would be a similar situation for a Mobile woman traveling

9   to Pensacola if she has her own car, like roughly 60 to 65

10  percent of low-income women do, because it's almost an identical

11  distance that separates Birmingham and Tuscaloosa and Mobile and

12  Pensacola.

13  A.  And so can you repeat your question?

14  Q.  I'm asking if you'd agree it would be about the same $15 in

15  additional costs if you've got a woman who has her own car or

16  borrows a car from a friend --

17  A.  Then it may be $15 in additional costs and up.

18  Q.  And for a Montgomery woman, the other clinic that you have

19  assumed may close down, it would probably be about $20 in gas

20  costs, because we're looking at a little bit further.  You

21  didn't run those numbers, but the drive -- the 160 miles round

22  trip to Georgia would be roughly $20 in gas if 120 miles is 15?

23          MR. BECK:  Objection.  Is counsel testifying here?

24          MR. BECKMAN:  No, that was a question.

25          THE COURT:  I'll allow the question.

1  A.  I didn't run those analyses.  It's -- yeah.  I mean I didn't

2  run the analysis.  I would want to check and make sure the

3  mileage -- I would want to look at -- you know, I would want to

4  run the analysis.

5  Q.  Now, do you -- would you agree with me that low-income women

6  can make decisions about these cost-saving options?

7  A.  I think that low-income women, yes, can make decisions about

8  these cost-saving options.  Do they have the same access to

9  information that upper-income and middle-income families do?

10  They may not.

11      But how middle-income families make decisions around how

12  much things cost is oftentimes relying on the Internet.  And

13  numerous studies show that low-income families and low-income

14  women have less access to the Internet.  And so yes, I believe

15  they can make decisions around costs, but they also need the

16  information.

17  Q.  But there is -- there's no reason that a woman in Mobile

18  would know about the Huntsville clinic and not know about the

19  Pensacola clinic, is there?

20  A.  I -- I don't know.  That's outside of my scope.

21  Q.  Now, you gave some testimony earlier about a reasonable

22  estimate of what low-income women pay in rent, and your report

23  cites something called the fair-market rent from the Housing and

24  Urban Development Agency?

25  A.  Yes.

1  Q.  Are you aware that HUD places that FMR value at the fortieth

2  percentile on a distribution of rents from the cheapest to the

3  most expensive?

4  A.  Yes, I do.

5  Q.  And you would agree that low-income women likely pay a

6  number below that 40 percent and not above it?

7  A.  I -- I used the HUD fair-market rent number because that's

8  the number that's used widely in the field of poverty studies.

9  And so when determining eligibility for low-income families for

10  federal assistance programs, that HUD fair-market rent value is

11  used.  And so that is why I used it.  It's -- it's the number

12  that's commonly used in our field.

13  Q.  But you would agree that a number -- that it's more likely

14  for a low-income woman to pay a rent below 40 percent and not

15  above 40 percent of that number.

16  A.  I agree that some low-income women may be paying under that

17  40 percent number.

18  Q.  Are you aware that HUD, when it computes that number,

19  excludes from its distribution of rents all units falling below

20  a specified rent level that they determine is either assisted

21  housing or otherwise below-market rents?

22  A.  I am aware that HUD leaves some numbers out of its analysis.

23  Yes.

24  Q.  And you would agree that number pushes -- excuse me.  You

25  would agree that by doing that, it would push the FMR number

 1  higher.
 2  A.   I -- so the broader point, to me, to this is that I used the
 3  HUD number because this is a widely respected number in my
 4  field.   May some low-income women find rent below this 40
 5  percent number?   Yes.   But I'm using the most respected number
 6  in my field to make estimates.
 7  Q.   But HUD doesn't use those numbers to determine how much of a
 8  disposable income these women have, do they?
 9  A.   They use the numbers to determine who needs housing
10  assistance.   And so in part by doing that, yes, they're making a
11  determination about how much disposable income they have.
12  Q.   In your report, you didn't consider any other sources of
13  income, did you, such as the earned income tax credit?
14  A.   That is not in the scenarios in the report.   No.
15  Q.   So you -- you didn't put anything in your report about if a
16  woman with one child makes less than $37,000, that she's
17  eligible for $3250 in an earned income tax credit?
18  A.   That is not in the report.   No, it's not.
19  Q.   And that for two women making less than 43,000 -- excuse me.
20  For a woman with two children making less than 43, that she's
21  eligible for $5372 in tax credit?
22  A.   That's not in the report.
23  Q.   You would agree that for women making poverty-level wages
24  that an additional three to $5,000 can make a substantial
25  difference in paying their bills, yes?

 1   A.   I do agree.  And the research on the earned income tax

 2   credit shows that women -- so that comes in at a specific time

 3   of year, and so that's assuming that the woman could use the

 4   money to pay for the additional costs to access an abortion.

 5   However, the research on this shows that women use that money

 6   once a year to catch up on bills that they've gotten behind on,

 7   to pay one-time expenses, like repairing a car.  So they use

 8   that money up very quickly on very necessary expenses in their

 9   lives or to catch up on bills that are significantly behind.

10   Q.   Are you familiar with Phenix City, Alabama?

11   A.   I am not.

12   Q.   So you're not aware that it's literally across the river

13   from Columbus, Georgia, about 86 miles east of Montgomery?

14   A.   I'm not.

15   Q.   And you're not aware that there's actually a pedestrian

16   bridge about a quarter-mile long that separates the two cities

17   and the two states?

18   A.   I'm not aware of that.

19   Q.   Now, if you had been asked to include Phenix City in your

20   report about how the clinics' closures would affect Phenix

21   City's residents, your report -- it would have said that those

22   residents were 86 miles from the Montgomery clinic, wouldn't it?

23   A.   I don't think anywhere in my report that -- like -- I was

24   looking at if the clinics were to close in these three cities,

25   the people who have been accessing the services in those

1   clinics, what their options would be.

2   Q.   Yes.   So if Phenix City had been included with Mobile,

3   Birmingham, Montgomery, it would have said these women are 86

4   miles from the Montgomery clinic.

5   A.   I did not include small towns in the report in terms of

6   where those women are currently accessing procedures and where I

7   would suppose they would be accessing procedures.   So there

8   aren't examples of outlying small towns in the report.   And so

9   it seems unlikely, given the report, that I would have included

10  Phenix City.

11  Q.   I was asking for you to do this as a hypothetical.   Phenix

12  City -- if the Montgomery clinic closed, take me at my word that

13  it would be 189 miles, then, from the clinic in Tuscaloosa.

14  Would that have been in your report?   It would have said -- when

15  you've got your bus stuff that you've done, you've got the total

16  driving distance, it would have said these women are now 241

17  miles from the clinic in Huntsville.

18  A.   When I -- when I prepared the report, I was looking at

19  services that were currently available in Alabama.   And so, yes,

20  I may have included it that way.   However, that's --

21  Q.   And your report would not have said that these women could

22  walk across a quarter-mile bridge to the clinic in Columbus,

23  Georgia, would it?

24  A.   I don't know.

25  Q.   That would have been outside the scope of your report.

1  A.  Yes.

2          MR. BECKMAN:  Just a moment, Your Honor.  If I may have

3  a moment to confer, Your Honor.

4          THE COURT:  Yes.

5      (Brief pause)

6  Q.  (Mr. Beckman, continuing:)  Dr. Katz, what child care costs

7  are you assuming for someone who gets an in-town abortion?

8  A.  I -- the report did not include the additional -- the report

9  did not include the costs if someone was getting an in-town

10  procedure.  I was looking at the additional child care and the

11  additional travel costs.  And so the report didn't include what

12  child care if someone got an in-town procedure.

13  Q.  In your report, how much missed work are you assuming there

14  would be for someone who gets an in-town abortion?

15  A.  So if someone gets an in-town procedure, I think that it is

16  likely they may miss a day of work.  But again, the report's

17  scope is looking at the additional time off of work that they

18  would miss, given travel.

19          MR. BECKMAN:  No further questions, Your Honor.

20          Thank you, Dr. Katz.

21          THE WITNESS:  Thank you.

22          THE COURT:  Redirect?

23          MR. BECK:  Just a couple questions, Your Honor.

24

25

REDIRECT EXAMINATION

BY MR. BECK:

Q.   Dr. Katz, was it your testimony that every woman in Alabama would be unable to make the trip to access an abortion if the three clinics were to close?

A.   No.

Q.   Do you think the scenarios that you set forth in your report and testified to here today are more likely scenarios than the ones you were asked about in terms of a $15 round trip expense?

A.   Yes.

Q.   And how prohibitive would those scenarios that you think are the more realistic scenarios be for low-income women in Alabama?

A.   I think they're extremely prohibitive.

Q.   You were asked some questions about a certified mail option. You actually described it as a restricted mail option.  Do you think that's an important distinction?

A.   I think that on the restricted, you have to sign for it. And so I think that it's an additional level of security.

Q.   And so do you -- what -- do you think the fact that it's restricted mail makes it less likely that a woman would use the mail option as opposed to --

A.   Yes.

Q.   -- going in person to access counseling materials?  And why is that?

A.   Yes.  Because she has to sign for it in person.  And I'm

1  concerned about her not being home in which it's delivered and

2  so -- in order to be able to sign for it and that many

3  low-income women work in jobs in which they can't receive mail

4  at work in order to sign for them.  So certified mail I think

5  can be left -- I don't know all the ins and outs, but I know

6  restricted mail needs to be signed for in person.  And so that's

7  my concern.

8  Q.  You were asked some questions about whether or not someone

9  could make an eight-hour trip from one city to another and just

10  leave her children in school during the day.  If a school day is

11  from 8:30 to three or 3:30, does that sound like a realistic

12  option for you?

13  A.  It may be an option; but also, if she's going to go to

14  another town while her children are in school, she needs to make

15  arrangements that if her child got sick at school that day or if

16  something came up, that someone else could go pick up her child.

17  So additional child care -- so there might not be a cost, but

18  there would also be -- there would be -- sorry -- additional

19  child care logistics that would need to get worked out.

20  Q.  And -- never mind.  Do you have any reason to think that the

21  clinics that you were asked about in Huntsville and Tuscaloosa

22  would add clinic days and make the accommodations that you were

23  asked about?

24  A.  I -- I don't have any reason to -- to think that.

25  Q.  You were asked about the distance between the Montgomery

1    clinic or Montgomery and the clinic in Columbus, Georgia, and

2    were represented that that was about a 90-mile or

3    80-something-mile travel distance?

4    A.   Uh-huh.

5    Q.   Your report assesses the significance of a hundred-mile

6    travel distance between Montgomery and Tuscaloosa.  Is that a

7    meaningful distinction, and does it undermine the opinions you

8    formed in this case?

9    A.   Yeah.  I don't think that the ten miles is a meaningful

10   distinction.  It's ten miles, so 20 miles round trip.  But I

11   think that the ideas and the assumptions that I'm basing on are

12   the same, that there's gas costs, there could be lost wage

13   costs, there could be child care costs.  And so whether that ten

14   miles makes a difference or not, I don't think it's a big

15   difference.

16             MR. BECK:  Thank you.  No further questions.

17             MR. BECKMAN:  Real briefly, Your Honor.

18             THE COURT:  Yes.

19                        RECROSS-EXAMINATION

20   BY MR. BECKMAN:

21   Q.   You're aware that it's actually a 22-mile difference, aren't

22   you, ma'am?

23   A.   Ten miles each way.  Sure.  Twenty-two miles.

24   Q.   Twenty-two each way.

25   A.   Twenty-two?  Okay.

```
 1          THE COURT:  Is that it?
 2          MR. BECKMAN:  That's it, Your Honor.
 3          THE COURT:  Thank you.  You may step down.
 4          THE WITNESS:  Thank you.
 5          THE COURT:  Very good, counsel.  We're on time.  What
 6   do we have tomorrow?
 7          MS. KOLBI-MOLINAS:  Tomorrow we have some of the
 8   hospitals testifying.  And so we've let the courts know in
 9   Mobile and Birmingham that we're going to put the hospitals
10   on -- the Mobile ones on at nine and the Birmingham ones on
11   right after lunch.  And we also have Dalton Johnson, who owns
12   the clinic in Huntsville, and Dr. Lori Freedman.
13          THE COURT:  Okay.  Now, you said that the trial might
14   be shorter for Tuesday, and so I was thinking about taking up
15   the objections tomorrow morning.  And I believe, Mr. Davis, you
16   said that you -- you had a question about whether that would be
17   as to, what is it, exhibits or what?
18          MR. DAVIS:  Correct, Judge.  My question was I think it
19   makes good sense at any time you wish to go ahead and take up
20   the objections to depositions.
21          THE COURT:  Okay.
22          MR. DAVIS:  As far as the objections to exhibits, I
23   think we've seen today that it will be helpful, rather, to save
24   those until the witness is testifying.  Perhaps they will come
25   in.
```

 1          THE COURT:  So we'll kind of have an idea as to why

 2   they're coming in.

 3          MR. DAVIS:  Right.

 4          THE COURT:  Right.  That actually makes sense to me.

 5          MS. KOLBI-MOLINAS:  Your Honor, except some of the

 6   exhibits are not attached to a specific witness.

 7          THE COURT:  I think he's just saying we'll have fewer

 8   exhibits to take up.

 9          MS. KOLBI-MOLINAS:  Yes.

10          MR. DAVIS:  That's fine.

11          THE COURT:  All right.  How many depositions are we

12   talking about?

13          MR. DAVIS:  There are six transcripts, Your Honor.

14          THE COURT:  Okay.  And both sides have objections to

15   all six depositions?

16          MR. DAVIS:  There are some that we do not.  At least we

17   do not have objections to them, Your Honor.  There may actually

18   be objections raised by either side to only four of those

19   depositions, Your Honor.

20          THE COURT:  Four of the six?

21          MR. DAVIS:  Four of the six.  That's my understanding.

22          MR. BECKMAN:  I believe that's correct.

23          THE COURT:  Okay.  Why don't we start at eight

24   tomorrow, and let's see if we can dispose of some of the

25   objections to the depositions.  Then we'll start promptly at

 1    nine.  Because aren't some of these witnesses by

 2    videoconferencing?

 3              MS. KOLBI-MOLINAS:  Yes, Your Honor.  We told the

 4    Mobile court --

 5              THE COURT:  We definitely want to keep that on

 6    schedule.  So we'll start at eight tomorrow with the objections

 7    to depositions -- we'll do that in the library but on the

 8    record -- and then we'll start in open court at nine o'clock.

 9              I have one question.  I believe the last witness was

10    asked a question about the impact of whether the wait period was

11    24 hours or 48 hours.  Educate me about that better.

12              MR. BECK:  Your question is whether the waiting period

13    is 24 or 48 hours or whether it's --

14              THE COURT:  Yes.

15              MR. BECK:  The waiting period was 24 hours and recently

16    went into effect to extend it to 48 hours.

17              THE COURT:  Which background should I use in assessing

18    this case, 24 hours or 48 hours?

19              MR. BECK:  Well, it would be our position, Your Honor,

20    that you stated in your opinion that you want a real-world

21    understanding of the effect of this law.  And the real-world

22    scenario as we're presently operating is a 48-hour waiting

23    period.

24              THE COURT:  Has the 48-hour waiting period gone into

25    effect?

1        MR. BECK:  Yes.  As of I think about a week or two ago.

2        MR. DAVIS:  It did go into effect about a week ago,

3   Your Honor.

4        THE COURT:  Okay.  Is there any other change in

5   circumstance that I need to consider other than that?

6        MR. BECK:  Not that I'm aware of.

7        MS. KOLBI-MOLINAS:  No, Your Honor.  I'm not aware of

8   anything else out of the Legislature this year.

9        THE COURT:  Very good.  Okay.  We'll start at eight

10  o'clock tomorrow in chambers in the library.

11     (Evening recess at 4:57 p.m.)

12                    * * * * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4            This 2nd day of June, 2014.

5

6                              /s/ Risa L. Entrekin
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25