# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF ALABAMA

| | |
|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, *et al.*,<br><br>     Plaintiffs,<br><br>v.<br><br>LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, *et al.*,<br><br>     Defendants. | CIVIL ACTION<br><br>Case No. 2:13-CV-405-MHT |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF EXCLUDING PORTIONS OF THE EXPERT REPORTS AND TESTIMONY OF DEFENDANTS' EXPERT WITNESSES JAMES CORR ANDERSON, M.D., AND JEFFREY WILLIAM HAYES

As set forth further below, Plaintiffs seek to exclude the testimony of Defendants' expert James Corr Anderson, M.D., and Jeffrey William Hayes under Federal Rules of Evidence 702 and 703, and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). In the alternative, Plaintiffs respectfully request that this Court take into account Dr. Anderson's and Mr. Hayes's lack of expertise and credibility, and the unreliability of the methods and data supporting their opinions when determining the weight to give their opinions.

Specifically, this Court should exclude Dr. Anderson's Supplemental Expert Report (Defendants' Trial Exhibit 4) in its entirety, and his trial testimony on the subjects it addresses, because Dr. Anderson did not author the report, does not have expertise in the subjects it addresses, and thus did not lay an adequate foundation for the admission of these opinions. This Court should also exclude paragraphs 13-18 of Dr. Anderson's Expert Report (Defendants' Trial Exhibit 3), as well as any trial testimony concerning the hospital credentialing process and the

National Practitioner Database (including Defendants' Exhibit 80, which was offered at trial

through Dr. Anderson), because Dr. Anderson lacks the "knowledge, skill, experience, training,

or education," Fed. R. Evid. 702, to offer expert testimony on this subject.

Likewise, this Court should exclude the deposition testimony of Jeffrey Hayes, including

his attached declaration, because Defendants cannot demonstrate that he is qualified to give the

opinions contained therein on the basis of "knowledge, skill, experience, training, or education,"

*id.*, and because his testimony falls woefully short of Rule 702's requirement that an expert's

conclusions be "based on sufficient facts or data" and "the product of reliable principles and

methods." *id.* at (b), (c).

## I.    LEGAL STANDARD

Under Rule 702 of the Federal Rules of Evidence and *Daubert*, district courts must act as

"gatekeepers," admitting expert testimony only if it "both rests on a reliable foundation and is

relevant to the task at hand." Fed. R. Evid. 702; 509 U.S. at 597. To fulfill its gatekeeper role,

this Court

> must engage in a rigorous inquiry to determine whether: (1) the expert is qualified
> to testify competently regarding the matters he intends to address; (2) the
> methodology by which the expert reaches his conclusions is sufficiently reliable
> as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony
> assists the trier of fact, through the application of scientific, technical, or
> specialized expertise, to understand the evidence or to determine a fact in issue.

*Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotation marks and

citation omitted). "The party offering the expert has the burden of satisfying each of these three

elements by a preponderance of the evidence." *Id.* (citation omitted).

Rule 702 allows for qualification as an expert on the basis of "knowledge, skill,

experience, training, or education." Fed. R. Evid. 702. "If the witness is relying solely or

primarily on experience, then the witness must explain how the experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"  Fed. R. Evid. 702, advisory committee's note (2000 amends.).  Part or all of an expert's testimony may be excluded if it concerns issues outside of the expert's area of competence.  *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 564 (11th Cir. 1998) (excluding portions of an expert's testimony that fell outside of the expert's "area of competence as a statistician"); *see also McDowell v. Brown*, 392 F.3d 1283, 1296 (11th Cir. 2004); *Increase Minority Participation by Affirmative Change Today of Nw. Fla. v. Firestone*, 893 F.2d 1189, 1192, 1195 (11th Cir. 1990) (upholding the lower court's exclusion of expert testimony on statistical evidence because the expert "is a political scientist, not a statistician or economist").  Furthermore, in determining whether a purported expert's testimony is reliable, courts "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate."  *McDowell*, 392 F.3d at 1298 (citation omitted).  Finally, expert testimony must "assist[] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue"  *Rink*, 400 F.3d at 1291 (citation omitted).

## II.    ARGUMENT

### A.    Opinions of Dr. Anderson

Dr. Anderson testified that his background and training is in family and emergency medicine.[1]  As such, he has no foundation to offer an expert opinion on the current quality of

---

[1] *See* Exhibit A to Dr. Anderson's Expert Report; *see also* Excerpt of Trial Proceedings, Testimony of James Anderson, M.D., attached hereto as Ex. A ("Tr.") at 4:14-23.

care offered patients at abortion clinics in Alabama. *See McDowell*, 392 F.3d at 1296 (holding witness was not competent to testify in a medical malpractice case unless the expert's "realm of expertise . . . encompass[es] knowledge of the standard of care applicable to the defendant-professional as to at least one of the matters on which the plaintiff's malpractice claim is based"). Moreover, he has neither conducted nor published any scientific research on any subject, let alone those at issue in the case here.[2]  Finally, Dr. Anderson lacks any experience with the hospital credentialing process other than as an applicant for and recipient of hospital privileges in Virginia and at military hospitals.  *See* Tr. at 55-56.

Despite these limitations on his expertise, Defendants have attempted to use Dr. Anderson as a mouthpiece to opine on a number of topics outside his knowledge, training, and experience, such as hospital credentialing, the ability of Plaintiffs' physicians to obtain privileges at Alabama hospitals, and the standard of care for outpatient abortion procedures.  Defendants have also tried to use Dr. Anderson as a vehicle to introduce evidence that Dr. Anderson had never seen or considered prior to the days leading up to his deposition and/or trial testimony, if at all; are unrelated to the areas in which Dr. Anderson purports to have experience; and are not the types of materials Dr. Anderson would otherwise rely on in his medical practice.  Therefore, Dr. Anderson's opinions on these points should be excluded.

1.    The Court Should Exclude Dr. Anderson's Supplemental Report and Testimony on the Matters it Addresses.

This Court should exclude Dr. Anderson's Supplemental Report and his trial testimony on the subjects it addresses because Dr. Anderson did not author the report, does not have expertise in the subjects it addresses, and did not lay an adequate foundation for its admission.

---

[2]  *See* Exhibit A to Dr. Anderson's Expert Report; *see also* Tr. at 18-24.

Indeed, the report, which was provided to Plaintiffs' counsel the day before Dr. Anderson's deposition and apparently only provided to Dr. Anderson for his signature a few days before that, is nothing more than an attempt by Defendants to use Dr. Anderson to introduce otherwise inadmissible evidence into the record.  *See* Deposition of James Anderson, M.D., attached hereto as Ex. B ("Anderson Dep.") at 215:12-217:13.

As a threshold matter, Dr. Anderson's Supplemental Report should be excluded because it does not actually contain his opinions, but the unqualified expert opinions of Vincent Rue.[3] Vincent Rue was apparently retained by the Alabama Attorney General's office as a "consultant" in this case.  *See* Tr. 47:12-48:4; Dep. of John Thorp, Jr., M.D., M.H.S., attached hereto as Ex. C ("Thorp Dep.") at 72:18-73:20; Dep. of Geoffrey R. Keyes, M.D., attached hereto as Ex. D ("Keyes Dep.") at 71:18-72:21; *cf. Aid for Women v. Foulston*, 427 F. Supp. 2d 1093, 1110 n.14 (D. Kan. 2006) *vacated*, No. 06-3187, 2007 WL 6787808 (10th Cir. Sept. 20, 2007) ("Dr. Rue was hired by the Attorney General's office to work in some manner on this case, although the exact nature of his involvement was not fully explained.  From the testimony, it is clear that Dr. Rue was involved significantly in assembling the team of defendants' experts, although he himself did not testify.").  According to state government documents, the Alabama Attorney General's office paid Rue nearly $80,000 for his services in 2013 and 2014.  *See* Open.Alabama.gov, Payments to Dr. Vincent Rue (2013), attached hereto as Ex. E;

---

[3] "Q. Isn't it true that you did not write your report on your own? A. Well, I do have help with it, but I did write it, because it takes a lot of time and I'm not a fast typer.  So you – I mean I spent a lot of time typing this report.  I did have help with it, but this is my report. I did have help with it, but this is my report . . . . The expert report, I wrote. Initially – [the Supplemental Report] was initiated from an e-mail and then sent to me.  So the supplemental report, I was given that with the fellow I worked with on this, but I wrote this expert report.  And this supplemental report, I had read before I signed that; but I didn't write this." Tr. 47:12-48:2; "Q. And who was it that sent you the supplemental report. A. The fellow that I work with, Vincent Rue." Tr. 48:3-4; *see also* Anderson Dep. 10:2-10.

Open.Alabama.gov, Payments to Rue & Stanford-Rue, P.A. (2014), attached hereto as Ex. F.

However, despite being hired by Defendants and authoring at least one of the expert reports in

this case, Vincent Rue was not disclosed as an expert by Defendants.  In fact, Defendants

attempted on numerous occasions to object to any attempt by Plaintiffs' counsel to question Dr.

Anderson and other experts about their relationship to Dr. Rue.  *See* Anderson Dep. 8:7-16:3;

Keyes Dep. 71:17-72:25, 112:7-113:5; Thorp Dep. 72:18-75:5.

Vincent Rue is not a medical doctor; rather, he appears to have a degree from the

University of North Carolina, School of Home Economics at Greensboro.[4]  When openly

proffered as an expert, rather than being used behind the scenes, Vincent Rue's "expert" opinions

have been rejected by other federal courts.  *See*, *e.g.*, *Hodgson v. State of Minn.*, 648 F. Supp.

756, 768 (D. Minn. 1986), *rev'd*, 853 F.2d 1452 (8th Cir. 1988), *aff'd sub nom. Hodgson v.*

*Minn.*, 497 U.S. 417 (1990) ("Dr. Vincent Rue possesses neither the academic qualifications nor

the professional experience of plaintiffs' expert witnesses.  More importantly, his testimony

lacked the analytical force of contrary testimony offered by plaintiffs' witnesses."); *Planned*

*Parenthood of Se. Penn. v. Casey*, 744 F. Supp. 1323, 1333-34 (E.D. Pa. 1990), *aff'd in part,*

*rev'd in part*, 947 F.2d 682 (3d Cir. 1991), *aff'd in part, rev'd in part*, 505 U.S. 833 (1992).

Specifically, the trial court in *Casey* concluded:

> Because Dr. Rue lacks the academic qualifications and scientific credentials
> possessed by plaintiffs' witnesses, I conclude that his testimony, which is based
> primarily, if not solely, upon his limited clinical experience, is not credible.  His
> testimony is devoid of the analytical force and scientific rigor which typified the
> testimony of plaintiffs' expert psychologist, Dr. Walker.  Moreover, his admitted
> personal opposition to abortion, even in cases of rape and incest, suggests a
> possible personal bias.  Finally, his testimony concerning informed consent is
> suspect in light of his lack of direct involvement in obtaining informed consent
> for any medical treatment or procedure.

---

[4]  *See* Voir Dire of Dr. Vincent Rue in *Planned Parenthood of Se. Penn. v. Casey*, 744 F. Supp.
1323 (E.D. Pa. 1990), Trial Tr. at 147:11-148:17, attached hereto as Ex. G.

*Casey*, 744 F. Supp. at 1333-34.

Notwithstanding Rue's lack of expertise, Dr. Anderson submitted Rue's report as his own Supplemental Expert Report.[5]  Yet even had Dr. Anderson written the report himself, the report should be excluded because it rests entirely on hearsay, unreliable sources and offers opinions that are clearly outside Dr. Anderson's expertise.  For example, the first document Dr. Anderson sought to rely on in his Supplemental Report is what purports to be a fifteen-year-old publication by the National Abortion Federation ("NAF") that was apparently accessed through an internet archiving website.[6]  At the time Dr. Anderson submitted his Supplemental Report, he had not reviewed the NAF publication in question.[7]  He had not attempted to access the website at the address included in the text of the Supplemental Report[8] nor was he aware that the cited

---

[5]  Although Dr. Anderson claims to find Rue reliable, he conceded that he does not have any legitimate basis to trust Vincent Rue.  He does not know what organizations he is affiliated with or what he does other than assist Dr. Anderson with his expert reports. *See* Tr. 69:7-20. Dr. Anderson also admitted that Rue "helps [Dr. Anderson] find materials, do searches for, you know, backup articles." Tr. 68:18-23.

[6]  Although this document is referenced in Dr. Anderson's Supplemental Report and was identified by Defendants as Defendants' Exhibit 73 (*see* doc. 192), Defendants have not yet moved for its admission. Plaintiffs have already objected to the introduction of this document as a separate exhibit on the grounds that it is hearsay and that Defendants have filed to authenticate the document pursuant to Fed. R. Evid. 901(a) (*see* doc. 192).  *See also St. Luke's Cataract v. Sanderson*, No. 8:06-CV-223-T-MSS, 2006 WL 1320242, at *2 (M.D. Fl., May 12, 2006) (holding that "in order to satisfy the requirement of Fed. R. Evid. 901, that is, to show that the printouts from Internet Archive are accurate representations of the laserspecialist.com and lasereyelid.com websites on various dates since 2000, Plaintiff must provide the Court with a statement or affidavit from an Internet Archive representative with personal knowledge of the contents of the Internet Archive website").

[7]  "Q. When you submitted your supplemental report, you had not in fact reviewed that NAF publication, correct? A. Correct." Tr. 44:1-4.

[8]  "Q. And it's accurate to say that you did not attempt to access that Web site at the Internet address that you provided in the text of that report; is that correct?  A. At that time or now? Q. At that time. A. Yes, that's correct. I had not accessed the Web site." Tr. 44:23-45:3.

material was contained in an internet archive, rather than currently available on the NAF webpage.[9]  In fact, according to Dr. Anderson's trial testimony, he accessed the document for the first time "the other day" though he could not remember the name of the internet archive on which he found it.[10]

The second document Dr. Anderson purports to rely on is similarly hearsay and similarly suspect—it is an email from Planned Parenthood counsel in a different case to the Texas Attorney General's office, reporting that a physician in Austin, Texas, had received privileges.[11] Dr. Anderson testified that he received this email from Vincent Rue when he was sent the Supplemental Report.  Tr. 57-58.

It is abundantly clear that the archived NAF publication and the email between lawyers are not the type of data that physicians would reasonably rely upon in forming opinions within their field of competence.  *See United States v. Gaskell*, 985 F.2d 1056, 1060-61 (11th Cir. 1993) ("Although an expert may rely upon hearsay as the basis for his or her opinion if the out of court statements are of a type reasonably relied upon by experts in the particular field, the government did not establish that Dr. Mittleman's hearsay knowledge of this unrelated case provided any reliable or accurate basis upon which to draw conclusions regarding Kristen's death.") (quotation marks and citation omitted).  The Defendants cannot use Dr. Anderson as a backdoor to introduce evidence that lacks foundation and constitutes inadmissible hearsay.

---

[9] "Q. And you were not aware that it was on an archived Web site; is that correct? A. That is correct." Tr. 45:21-23.

[10]  "Q. And so the way that you accessed this Web site just the other day was through an archive? Is that accurate? A. Yes. But I don't know the name of it."  Tr. 47:9-12.

[11] "Q. The source of [information about a doctor in Texas that received admitting privileges] was an e-mail that you received; is that right? A. Yes. Under that supplemental report." Tr. 58:2-4.

Indeed, even if Defendants could lay the foundation for the NAF webpage and prove it is an accurate representation of what appeared on NAF's website fifteen years ago, Defendants cannot seriously argue that medical experts regularly rely on fifteen year old archived webpages in determining the standard of care, *particularly* when the evidence shows that current published medical standards conflict with the older materials. *See* Excerpt of Trial Proceedings, Testimony of Paul Fine, M.D., attached hereto as Ex. H, at 61:2-63:16. Likewise, it would be absurd for Defendants to try to argue that an email from a Planned Parenthood attorney to the Texas Attorney General's office—sent in the context of a different litigation—stating that a single physician was able to obtain admitting privileges at a single hospital in Austin, Texas, is the sort of material experts in hospital credentialing regularly rely on in determining whether other physicians may be eligible for privileges at other hospitals.

For these reasons, Plaintiffs seek to have Dr. Anderson's Supplemental Report and Exhibit stricken. In the alternative, Plaintiffs ask the Court to keep in mind the dubious origins of the Supplemental Report, the unreliability and inadmissibility of the materials on which it relies, and the fact that Dr. Anderson has not demonstrated expertise in either of the two areas covered by the Supplemental Report when determining the weight to give the Supplemental Report and related testimony.

2.    Dr. Anderson is Not Qualified to Offer Expert Evidence on Hospital Credentialing.

In addition to excluding Dr. Anderson's Supplemental Report in its entirety, this Court should also exclude those portions Dr. Anderson's Expert Report and trial testimony relating to hospital credentialing because the topic plainly falls outside his "area of competence." *City of Tuscaloosa,* 158 F.3d at 564. As he testified at trial, the extent of Dr. Anderson's experience with hospital credentialing is as the recipient of privileges in Virginia and at a small number of

military hospitals.[12]  He has never served on a committee responsible for reviewing or

recommending applicants for privileges.[13]  And when asked at trial whether there was any

difference between receiving privileges at an in-state hospital as opposed to an out-of-state

hospital, he stated "out-of-state hospitals' scrutiny should be somewhat equivalent from one

hospital to another, but I don't have experience in that realm to give you an expert opinion on

that."[14]  Therefore, he is not qualified to offer expert opinions on the hospital credentialing

process and the Court should not consider the "expert" opinions he offered on this subject. *See*

*e.g.*, Exp. Rep. ¶¶ 12-17; Supp. Rep. ¶¶ 4-6; Tr. 19:19-21:9, 26:10-18, 27:11-33:14.

In particular, the Court should exclude Defendants' Exhibit 80, the Guidebook for the

National Practitioner Data Bank ("NPDB"), which was introduced through Dr. Anderson.[15]   As

he testified, Dr. Anderson has never been involved with making decisions about whether to

report a denial or withdrawal of an application for privileges to the NPDB.[16]  Indeed, according

to Dr. Anderson, the contours of the reporting requirement are not common knowledge.[17]  In

---

[12] "Q. The extent of your experience with hospital credentialing has been as the recipient of hospital privileges, correct? A. Correct." Tr. 55:21-23.

[13] "Q. You have never served on a committee charged with approving physicians for privileges, correct? A. Correct . . . . I just know that it's very rigorous."  Tr. 55:24-56:3.

[14] Tr. 21:6-9.  *See also* Tr. 29:20 – 30:5 ("So applying for privileges at a lot of different hospitals is really unknown – or not common practice for us.  That's my guess, that it's not well-known.").

[15] Dr. Anderson's opinions on the NPDB—and the NPDP Guidebook itself—were not disclosed in his expert reports as required by Fed. R. Evid. 26(a)(2)(B).  *See also* Tr. 56:8-11.  As such, Defendants are "not allowed to use that information or witness to supply evidence . . . at a trial[.]"  Fed. R. Civ. P. 37(c)(1).

[16] "Q. You have never been responsible for determining what action should be reported to the national practitioner database, correct? A. Correct." Tr. 56:4-7.

[17] "Q. Dr. Anderson, is the reporting requirement that hospitals face for denial of privileges, is that something that's common knowledge among doctors? A. I would say no.  It's not common

fact, prior to approximately three days before his testimony, when he was provided the NPDB

guidebook,[18] Dr. Anderson thought the NPDB "was strictly related to malpractice." Tr. 64:21-25.

He was not aware of any other reporting requirements.[19] Clearly, Dr. Anderson does not have the

training, experience, or knowledge about the reporting requirements of the NPDB to testify as an

expert about it.  Given that he lacks any experience NPDB reporting requirements and practices

beyond the words he read aloud from the guidelines in Court (or that were read to him by

Defendants' counsel, *see* Tr. 31:13-32:8, 32:20-33:8), Dr. Anderson's testimony on this topic

should be excluded as it obviously fails to help the Court to understand the evidence or to

determine a fact in issue.

      B.     <u>Opinions of Jeffrey Hayes</u>

     This Court should exclude the testimony from Jeffrey Hayes that "most doctors

performing procedures at ambulatory surgical centers in Alabama have staff or admitting

---

knowledge.  Because not many doctors are covering that extensively. . . . So applying for
privileges at a lot of different hospitals is really unknown – or not common practice for us.
That's my guess, that it's not well-known."  Tr. 29:20 – 30:5. Whether or not that is the case for
all doctors, there is no question that it was not common knowledge to Dr. Anderson.

[18] "Q. When did you find Defendant's Exhibit 80? That's the national practitioner database
guide that you testified about earlier. A. The last three or four days.  On this comment." Tr. 56:8-
11; "Q. So you don't have any personal knowledge or experience with the national practitioner
database beyond reading the document that was provided to you about three days ago, correct?
A. Outside of just knowing that it reports malpractices and a lot of young doctors are scared to
death of it, yes."  Tr. 56: 22 – 57:1.

[19] "[T]he only experience I've had with the national data reporting is malpractice.  I've never
been to the Web site, just because why?"  Tr. 56:19-21; "Q. Now, you are aware personally,
though, that there are reporting requirements, correct? A. Yes. Q. And you're aware that there
are limitations on those reporting requirements. A. Yes. Q. Is that something you've come to
learn over your experience as a doctor practicing in a hospital, over the course of your career? A.
You know, the database came in during my career.  And where I am kind of familiar with it is in
the malpractice situation. So, it's just recently on this type of exposure that I'm familiar with it in
other cases.  I mean I didn't know that the database was used in any way beyond malpractice.
I've never been to it until now in these cases."  Tr. 30:6-20.

privileges at a local hospital," Dep. of Jeffrey William Hayes, attached hereto as Ex. I ("Hayes Dep."), at 73:21-74:13, because Defendants have not demonstrated that he is qualified to give that opinion on the basis of "knowledge, skill, experience, training, or education," Fed. R. Evid. 702. Indeed, Mr. Hayes's opinion rests on the results of an "informal poll" he conducted of a limited group of Alabama ambulatory surgical centers ("ASCs") after being contacted by the Defendants in this litigation. Hayes Dep. 21:20-22:17. Since Mr. Hayes's opinion was not the result of any preexisting expertise on the topic of admitting privileges, and since his informal poll falls well short of the requirement that expert testimony be based upon sound methodology and data, Mr. Hayes's testimony is nothing more than rank hearsay and must be excluded. *See* Fed. R. Evid. 703; *see also United States v. Steed*, 548 F.3d 961, 975 (11th Cir. 2008) ("Rule 703, however, is not an open door to all inadmissible evidence disguised as expert opinion . . . an expert witness may rely on information he received from other people if such sources of information were regularly relied upon by experts in his field.") (internal quotation marks and citations omitted).

1. <u>Mr. Hayes is Not Qualified to Provide Expert Testimony on Whether Most Physicians Employed by the 42 Ambulatory Surgical Centers in Alabama Have Admitting Privileges.</u>

When asked at his deposition to describe his relevant experience and basis for his opinion, Mr. Hayes referred to his role as the administrator of the Tuscaloosa Surgical Center ("TSC"), *see, e.g.*, Hayes Dep. 63:5-67:5, and his various part-time leadership positions in the Alabama Association of Ambulatory Surgical Centers ("AAASC"), *id.* at 46:16-47:6; 52:16-21. However, if a witness "is relying solely or primarily on experience, then the witness must explain *how* the experience leads to the conclusion reached [and] why that experience is a sufficient basis for the opinion." *United States v. Frazier*, 387 F.3d 1244, 1261 (11th Cir. 2004)

(quoting Fed. R. Evid. 702, advisory committee's note (2000 amends.)) (emphasis in original). Mr. Hayes could offer no such explanation here.

TSC is the only ASC—out of 42 in Alabama—at which Mr. Hayes has ever worked. Hayes Dep. 65:7-23, 91:15-17. Mr. Hayes' employment at one ASC manifestly does not qualify him to provide expert testimony on the practices of the other 41 ASCs in the state. Indeed, Mr. Hayes admitted that when first approached by the Attorney General's office in relation to this litigation, he was familiar with the practices at TSC but could not opine with certainty about the practices of Alabama ASCs in general. *See id.* at 10:22-12:3 ("I told them, yes, I thought we did [have privileges]. I thought that—I knew my facility did. I felt like that, you know, just based on experience being in the business for a while that it seemed like one of those pretty routine things."); 74:18-22, 107:3-10. Nor does Mr. Hayes's work with the AAASC qualify him to opine on the practices of ASCs across the state: approximately half of the ASCs in Alabama are not even members of this organization. *Id.* at 18:7-19.

As Mr. Hayes candidly admitted, it was only *after* he conducted, in his words, "an informal poll" of eighteen other ASCs—again, out of a total of 42 ASCs in Alabama—that Mr. Hayes reached his purported expert conclusion. *Id.* at 22:6-12 ("I said, well, I'm pretty sure, but, you know, I could do just a quick poll and see. And so that's when I did just an informal poll."). Mr. Hayes' reliance on this "informal poll" betrays his lack of expertise.[20] Mr. Hayes's regular job functions do not require him to conduct surveys or polls of other ASCs on the question of admitting privileges or any other topic. Indeed, it requires no special expertise to reach out to the administrators of other ASCs and ask them if they require their physicians to have admitting

---

[20] As discussed *infra* this "survey" is hardly reliable: fewer than half of the ASCs in Alabama are even members of the AAASC and not even all of the group's members responded to Mr. Hayes's "survey." *See* Hayes Dep. 53:7-12.

privileges at local hospitals; Mr. Hayes is thus no different than any other layperson with access to a phone and a computer.  *See Thomas v. Evenflo Co., Inc.*, 205 F. App'x 768, 773 (11th Cir. 2006).  Plaintiffs do not doubt that Mr. Hayes is qualified to do his job as the administrator of the TSC, but there is also no doubt that until he conducted his "informal poll" he had nothing more than a feeling or hunch about whether most ASCs in Alabama had admitting privileges. Because his opinions so obviously concern a topic outside of his "area of competence," his testimony should be excluded in its entirety.  *See City of Tuscaloosa*, 158 F.3d at 564.

     2.    <u>Mr. Hayes' Methodology is Unreliable under Rule 702 and *Daubert*.</u>

Even if he could be qualified as an expert, Mr. Hayes' testimony falls woefully short of Rule 702's requirement that an expert's conclusions be "based on sufficient facts or data" and "the product of reliable principles and methods."  Fed. R. Evid. 702 (b), (c); *see also Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) ("[O]ur caselaw plainly establishes that one may be considered an expert but still offer unreliable testimony.").  As noted above, his methodology consists of an "informal poll" of 18 of the 42 ASCs in Alabama, Hayes Dep. 22:2-23:16; 91:15-19, and one conversation with a representative of a Mississippi hospital system, *id.* at 78:23-80:21.  Because Mr. Hayes' conclusion that most physicians at ASCs have admitting privileges is based on patently inadequate data and methods, it should be excluded under Rule 702.

Mr. Hayes's "informal poll" lacks all indicators of reliability under *Daubert*.  At his deposition, Mr. Hayes explained that he carried out this survey through "[p]hone calls, some e-mail, I guess, and seen a few people since then.  You know, this happened over—I don't know—a little bit of time."  Hayes Dep. 22:13-17. When asked how many different ASCs he contacted, he estimated: "Yeah. I'm going to say 23 to—or 21 to 24.  We'll use that number.  I think 24

is—or 23 is how many we actually have on the e-mail distribution." *Id.* at 22:18-23:2. Describing how he kept track of his results, he ventured: "I think I had a list—a little notebook piece of paper that I kind of just put, yes, no, yes, no, yes, no." *Id.* at 23:11-16.  And critically, by his own admission, Mr. Hayes received responses from only 18 of the ASCs he contacted; he did not even attempt to reach the other 24 ASCs in the state to determine whether their physicians have admitting privileges.  *Id.* at 94:12-95:5.  Moreover, while Mr. Hayes opines that "most doctors performing procedures at ambulatory surgical centers in Alabama have staff or admitting privileges at a *local* hospital," *id.* at 74:3-10 (emphasis added), he neglected to include any geographic specification in his survey question, *id.* at 78:4-22 ("Q. And was your question specific to admitting privileges at a local hospital, or was it broader to admitting privileges at any hospital? A. I just said hospital.").  When asked directly whether, in addition to the poll, he relied on "any other documents or research" to come to his conclusion, he explained that he asked the chief medical officer of a Mississippi hospital system: "I said . . . if I asked you a question do doctors have hospital privileges that work at surgery centers, what would it be.  He said, oh, yeah, that's pretty much the way it's done." *Id.* at 78:23-79:13.  Mr. Hayes was not sure how many ASCs this Mississippi physician had worked with, musing: "Oh, I don't know.  Over the years, I mean, he's worked with ours, a couple in Alabama." *Id.* at 80:4-10.[21]

---

[21] Mr. Hayes asserts that many ASCs actually *require* that physicians have admitting privileges, a fact that he claims to have learned at TSC and in conversations with "[m]anagement companies, other administrators, accreditation agencies, consultants, regulators."  Hayes Dep. 76:2-77:2. However, he subsequently clarified that the standards to which he refers all require only that the ASC have *either* a physician with admitting privileges *or* a transfer agreement.  *See, e.g.*,74:18-78:3; 85:22-86:5 ("I believe what [the accrediting bodies] require now is they use— they adopt the CMS standard/which states either/or."). Mr. Hayes' conversations about such "either/or" requirements hardly form a sufficient basis for an opinion that most ASCs require that all physicians have admitting privileges at local hospitals.

Even Defendants do not attempt to argue that this back-of-the-envelope survey of fewer than half of the ASCs in Alabama is an example of the "level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999)). It is well-established that testimony is not sufficiently reliable if the only link between the data and the expert's conclusion is the expert's own say-so. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing . . . requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1112 (11th Cir. 2005). While Mr. Hayes claims that his opinion is based on his "[g]eneral observation and practice of being in the ASC industry since 1991," *id.* at 73:21-74:13, he conceded that the only "conversations about the state of admitting privileges at Alabama ASCs" that he has had were with the Mississippi medical officer, a select number of AAASC members, his wife, and his lawyer, *id.* at 78:23-80:21. There is too great of an analytical gap between Mr. Hayes' conclusion about the practices of all ASCs in the state and the "data" on which he is relying. *See Joiner*, 522 U.S. at 146. Because his testimony does not satisfy *Daubert*'s reliability standard, it must be excluded.

## III.    CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court exclude the opinions of Mr. Hayes and the opinions of Dr. Anderson discussed herein. In the alternative, Plaintiffs ask that this Court give appropriately minimal weight to those opinions in ruling on the merits of this case.

Dated: <u>June 2, 2014</u>

Respectfully submitted,

<u>/s/ Alexa Kolbi-Molinas</u>
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Andrew Beck*
New York State Bar No. 4740114
Susan Talcott Camp*
New York State Bar No. 2688703
Julia Kaye*
New York State Bar No. 5189733
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
abeck@aclu.org
tcamp@aclu.org
jkaye@aclu.org
(212) 549-2633

Randall C. Marshall
ASB-3023-A56M
ACLU Foundation of Alabama, Inc.
900 S. Perry St., Suite B
Montgomery, AL 36104
rmarshall@aclualabama.org
(334) 265-2754

Dyanne M. Griffith*
District of Columbia Bar No. 100918
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Dyanne.Giffith@wilmerhale.com
(202) 663-6411

*Attorneys for Plaintiffs Reproductive Health
Services and June Ayers*

Jennifer Sandman*
New York State Bar No. 458681
Roger Evans*
New York State Bar No. 1797075
Maithreyi Ratakonda*
New York State Bar No. 179707

Planned Parenthood Federation of America
434 W. 33rd Street
New York, NY 10001
jennifer.sandman@ppfa.org
roger.evans@ppfa.org
mai.ratakonda@ppfa.org
(212) 541-7800

*Attorneys for Plaintiff Planned Parenthood
Southeast, Inc., Kiwana Brooks, and
Barbara Buchanan*

M. Wayne Sabel
ASB-4249-L74M
Sabel & Sabel, PC
2800 Zelda Road, Suite 100-5
Montgomery, AL 36106
waynesabel@sabellaw.com

*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that service of Plaintiffs' Memorandum in Support of Excluding the Expert Opinions of Dr. Anderson and Jeffrey Hayes will be perfected upon the following counsel of record via ECF filing on this 2nd day of June, 2014:


Andrew L. Brasher
James W. Davis
William G. Parker
Laura E. Howell
Kyle A. Beckman
abrasher@ago.state.al.us
Office of the Attorney General
501 Washington Avenue
Montgomery, AL 36130

*Counsel for Defendants Strange, Brooks, Falls and Rich*

Patricia E. Ivie
P Brian Hale
pat.ivie@adph.state.al.us
brian.hale@adph.state.al.us
Alabama Department of Public Health
P.O. Box 303017
Montgomery, AL 36130

*Counsel for Defendants Williamson*


/s/ Alexa Kolbi-Molinas
Alexa Kolbi-Molinas