# Exhibit B

## Page 1

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA NORTHERN DIVISION

-----------------------------

PLANNED PARENTHOOD SOUTHEAST, INC., on
behalf of its patients, physicians, and staff, et al,

        Plaintiffs,

   vs.      Case No.  2:13-CV-405-MHT

LUTHER STRANGE, in his official capacity
as Attorney General of the State of
Alabama, et al,
        Defendants.

-----------------------------

Deposition of JAMES ANDERSON, M.D.
November 25, 2013
9:05 a.m.

Taken at:
Chippenham Medical Center
Levinson Heart Hospital
7101 Jahnke Road
Richmond, Virginia

REPORTED BY:  RUTH A. LEVY, RPR

COOK & WILEY, INC.
Registered Professional Reporters
3751 Westerre Parkway, Ste. D-1
Richmond, Virginia 23233

## Page 2

Appearances:
Dyanne Griffith, Esq.
WILMER, CUTLER, PICKERING, HALE & DORR
1875 Pennsylvania Avenue, NW
Washington, DC 20006
202.663.6411
Counsel for Planned Parenthood Southeast, Inc.

Kyle A. Beckman, Esq.
ASSISTANT ATTORNEY GENERAL FOR
  THE STATE OF ALABAMA
501 Washington Avenue
Montgomery, Alabama 36130
334.353.2619
Counsel for Defendants Strange, Brooks,
  Falls, and Rich

By telephone:

Alexa Kolbi-Molinas, Esq. (pro hac vice)
AMERICAN CIVIL LIBERTIES FOUNDATION
125 Broad Street, 18th Floor
New York, New York 10004
212.549.2633
Counsel for Reproductive Health Services
  and June Ayers

William G. Parker, Esq.
ASSISTANT ATTORNEY GENERAL FOR
  THE STATE OF ALABAMA
501 Washington Avenue
Montgomery, Alabama 36130
334.353.2619
Counsel for the Defendants Strange, Brooks,
  Falls, and Rich

INDEX
                    Page No.
James Anderson, M.D.
  Exam by Ms. Griffith        4
  Exam by Mr. Beckman    226
  Re-exam by Ms. Griffith  232

## Page 3

EXHIBITS

                       Page No.
Anderson Exhibit 1         9
  House Bill 57
Anderson Exhibit 2       10
  Page 1 of the Amended Complaint
Anderson Exhibit 3       11
  Notice to take Dr. Anderson's deposition
Anderson Exhibit 4       12
  Expert report of Dr. Anderson
Anderson Exhibit 5      119
  State Operations Manual, Appendix L, Guidance
  for Surveyors, Ambulatory Surgical Centers

Anderson Exhibit 6      123
  Deposition transcript of Dr. Anderson
  dated 8-5-02 in the matter of Planned
  Parenthood v. State of Alaska
Anderson Exhibit 7      141
  Dr. Anderson's testimony from the trial
  transcript in the matter of PPGNW, et al
  v. State of Alaska, et al, dated 2-27-12
Anderson Exhibit 8      212
  Letter to a doctor from J. Allen Tyra, CEO of
  Crossgates River Oaks Hospital dated 7-25-12

Anderson Exhibit 9      215
  Supplemental report of Dr. Anderson

## Page 4

JAMES ANDERSON, M.D., called by the Plaintiff, after being duly sworn, testified as follows:

EXAMINATION BY MS. GRIFFITH:

Q   Good morning, Dr. Anderson.  As I said, my name is Dyanne Griffith, and I'm with WilmerHale that represents the Plaintiffs in this case.  Are you represented today by counsel?

A   Yes.

Q   And your counsel is?

MR. BECKMAN:  Kyle Beckman with the State of Alabama Attorney General's Office.

Q   And have you testified or been deposed before, Dr. Anderson?

A   Yes.

Q   So you're familiar with some of these rules, but I'm still just going to go over some of the background.  First, you need to answer each question verbally and out loud.  The court reporter cannot transcribe nods or gestures.  Also, we can't speak over one another, or else the court reporter will have difficulty transcribing the discussion.  Please wait till I've finished the question before you respond to it.  I will try and wait for you to finish your answer before asking the next question; is that fair?

A   Yes.

Page 5

1    Q   If you don't understand a question, please ask me to
2  rephrase or clarify.  If you answer a question, I'll assume
3  that you've understood the question.  If you need a break at
4  any time, just let me know.  The only thing I will ask is that
5  you answer any pending questions before we take a break.
6    A   Yes.
7    Q   If you realize at any time that an answer was
8  incorrect or incomplete, just let me know, and I'll give you a
9  chance to correct it.  Also, your counsel may object from time
10  to time.  That gives me an opportunity to withdraw my question
11  or rephrase it.  If I do not withdraw or rephrase it, you must
12  respond.  Is that understood?
13    A   Yes.
14    Q   Do you understand that you're under oath and should
15  answer questions as if you were sitting in a court in front of
16  a judge or jury?
17    A   Yes.
18    Q   Are you currently under or taking any medications or
19  do you have any medical conditions that would affect your
20  ability to testify truthfully or accurately to the best of
21  your knowledge?
22    A   None.
23    Q   Is there anything that might affect your ability to
24  answer my questions truthfully and accurately today to the
25  best of your knowledge?

Page 6

1    A   None.
2    Q   Do you understand all of the instructions that I've
3  just outlined?
4    A   Yes.
5    Q   Do you have any questions before we proceed?
6    A   No.
7    Q   Have you previously served as an expert in a
8  lawsuit?
9    A   Yes.
10    Q   And can you describe those situations.
11    A   **I've been an expert witness in malpractice suits, in**
12  **other court hearings or different issues, drunk driving, and**
13  **then this, Alaska's parental notification law, and**
14  **Virginia's -- no, I was not an expert witness there back in**
15  **the 1980s; I just gave testimony, but not as an expert**
16  **witness.**
17    Q   Are there any other cases in which you served as an
18  expert?
19    A   **There might be, but I'm not remembering them.**
20    Q   Are you currently acting as an expert in Texas?
21    A   **Yes.**
22    Q   And in Wisconsin?
23    A   **Yes.**
24    Q   Anywhere else?
25    A   **North Dakota, Texas, Wisconsin, Alabama, and**

Page 7

1  Mississippi on this issue.
2    Q   Okay.  And this issue is?
3    A   **Doctors' admitting privileges -- requiring doctors to**
4  **have admitting privileges as far as doing outpatient elective**
5  **surgical procedures.**
6    Q   And with respect to the parental notification, you
7  served as an expert witnesses in Alaska?
8    A   **I was an expert witness in 2002 on parental consent,**
9  **and then I was an expert in Alaska in 2011 on parental**
10  **notification.**
11    Q   And did you serve as an expert in parental consent in
12  any other states other than Alaska?
13    A   **Florida, 1999, I think.**
14    Q   Okay.  And in these cases where you've served as an
15  expert, have you generally submitted an expert report?
16    A   **Yes.**
17    Q   And provided testimony?
18    A   **Florida, I did not.  Alaska, I did.  Yes, that's it.**
19  **You're not asking me about the malpractice?**
20    Q   No, I'm just talking about the parental notification
21  and consent and the admitting privileges cases.  Have you been
22  deposed and provided testimony in any other states where you
23  were serving as an expert witness on the admitting privileges
24  requirement?
25    A   **No, as far as my recollection.**

Page 8

1    Q   Have you ever been the subject of a challenge to
2  disqualify you from providing expert testimony?
3    A   **No.**
4    Q   Are you familiar with Alabama House Bill 57?
5    A   **Yes.**
6    Q   How did you become familiar with this bill?
7    A   **I was asked to give expert testimony concerning**
8  **doctors needing or being required to have admitting privileges**
9  **for outpatient elective surgical procedures in relation to**
10  **doing elective pregnancy termination.**
11    Q   And who asked you to give expert testimony?
12    A   **The Attorney General's Office; somebody there called**
13  **me.  They'd gotten my name and asked me if I would be willing,**
14  **but I don't know who it was who called me.**
15    Q   You don't recall who from the Attorney General's
16  Office called you?
17    A   **I don't.**
18    Q   Do you know how the individual at the Attorney
19  General's Office got your name?
20    A   **I do not.**
21    Q   Who contacted you to provide testimony in the other
22  admitting privileges cases?
23    A   **The Attorney General's Office called me.  I write**
24  **down the names and call them back, but that's it; I mean,**
25  **you're just busy.  The North Dakota Attorney General's Office**

Page 9

1  called me.
2          (Anderson Exhibit 1 is marked.)
3
4  BY MS. GRIFFITH:
5      Q   Dr. Anderson, I'm handing you what's been marked as
6  Exhibit 1.  Do you recognize this document?
7      A   Not right now, I don't.  Let me look at it.
8      Q   Sure.
9      A   (Witness reviews document.)  This must be House Bill
10 57.
11     Q   So if you turn to what's marked as page 6, Section
12 4(c), is that the section of the law that this litigation
13 involves?
14     A   Yes.
15     Q   So you mentioned that you were contacted by someone
16 at the Alabama Attorney General's Office about providing
17 expert testimony.  Is that when you first became aware of this
18 litigation involving House Bill 57?
19     A   No.  Mississippi, a year ago, a year prior -- or
20 maybe six months prior, had similar legislation.
21     Q   And did you say that you were an expert in that case
22 as well?
23     A   I did file an expert report.
24     Q   So what have you been told about this lawsuit?
25         MR. BECKMAN:  Objection.  This seems to be

Page 10

1  getting into attorney-client privilege.
2      Q   Okay.  So who did you speak to about this lawsuit
3  other than your attorneys?
4      A   Vince Rue.
5      Q   And who is he?
6      A   A gentleman in Florida that assists -- has assisted
7  me in the past in both the Alaska and Florida cases, just
8  preparing.  I can't type; he helps me type.  He helps me just
9  wordsmith the documents so they read easier.  It's more of a
10 time issue than anything.
11         (Anderson Exhibit 2 is marked.)
12
13 BY MS. GRIFFITH:
14     Q   I'm handing you what has been marked Exhibit 2.  Are
15 you familiar with this document?
16     A   Is this the injunction?
17     Q   This is the complaint that was filed.
18     A   I've seen it.
19     Q   So the Plaintiffs listed on the top left corner of
20 this page, prior to becoming involved in this case, have you
21 ever heard of any of the Plaintiffs?
22     A   No.
23     Q   You have not heard of Planned Parenthood?
24     A   Planned Parenthood as an organization, yes, but the
25 individual people, no.

Page 11

1      Q   What about Reproductive Health Services, had you
2  heard of them before?
3      A   No.  I assume they were the same.
4      Q   And what is your impression of Planned Parenthood?
5      A   That question is too general.
6         MR. BECKMAN:  Object to form.
7      Q   Did you have any impressions about Planned Parenthood
8  before you became involved in this litigation?
9      A   I've been on opposing situations with them at other
10 cases, so we just have some difference of opinion.
11     Q   Okay.  And what about the Defendants, are you
12 familiar with any of the Defendants in this case?
13     A   No.  But I have heard of the State of Alabama.
14     Q   Fair enough.
15         (Anderson Exhibit 3 is marked.)
16
17 BY MS. GRIFFITH:
18     Q   I'm handing you what has been marked as Exhibit 3.
19 Do you recognize this document?
20     A   Yes.
21     Q   What is it?
22     A   It's just telling me to be here.
23     Q   It's your notice of deposition?
24     A   Yes.
25     Q   And are you here pursuant to this notice of

Page 12

1  deposition?
2      A   Yes.
3      Q   So in preparing for today's deposition, did you do
4  anything to prepare?
5      A   I reread my expert report.
6      Q   Did you review any other documents?
7      A   No, I didn't have time, to tell you the truth.
8      Q   Did you meet with counsel?
9      A   Yesterday.
10     Q   Was anyone else present?
11     A   No.
12     Q   How long did you meet with counsel?
13     A   Hour and a half.
14     Q   And just yesterday?  On any other occasions?
15     A   No.
16         (Anderson Exhibit 4 is marked.)
17
18 BY MS. GRIFFITH:
19     Q   I'm handing you what has been marked as Exhibit 4.
20 Do you recognize this document?
21     A   Yes.
22     Q   What is it?
23     A   It's my expert testimony.
24     Q   The expert report you submitted in this case?
25     A   Yes.

Page 13

1    Q  If you could turn to page 26.  Is that your
2  signature?
3    A  Yes.
4    Q  And you signed this report on September 8th, 2013?
5    A  Yes.
6    Q  Is that your electronic signature there?
7    A  No.  I must have faxed it.
8    Q  Okay.  So can you talk to me about the process that
9  you went through to write this report?
10    MR. BECKMAN:  Objection.  I think this gets into
11  attorney-client as well.  The method by which he prepared
12  this report is a privileged matter between the State of
13  Alabama and the expert.  We can talk about the opinions
14  in this, but the method by which it was prepared...
15    MS. GRIFFITH:  So my understanding is that any
16  drafts and comments on the drafts are protected.
17    MR. BECKMAN:  Yes.
18    MS. GRIFFITH:  But in general, the process that
19  he went through and whether or not he had any help
20  drafting that as far as not substantive but the actual
21  process is not protected by --
22    MR. BECKMAN:  I'm not sure what exactly you mean
23  by unsubstantive processes of preparing an expert
24  report.
25    MS. GRIFFITH:  So we can discuss the process that

Page 14

1  he went through, who he talked to, how long he took in
2  preparing the report, the materials that he considered,
3  whether he was sent any materials by counsel to consider
4  in forming the report.  But what we can't talk about is
5  anything substantive, whether or not counsel made changes
6  and edits to the various drafts.  But other than that,
7  the generalities of how it was prepared, who he talked
8  to, who typed it up, who provided him with materials...
9    MR. BECKMAN:  I'm going to instruct my client not
10  to answer questions about how it was typed up, what
11  materials were sent to him by the Attorney General's
12  Office.  Questions about what he relied upon, though, I
13  think, are perfectly legitimate, but the other issues
14  I've addressed, I would instruct him not to answer those
15  questions, and we're perfectly willing to talk about it
16  in a meeting outside of -- off the record, but I would
17  instruct him not to answer those types of questions.
18    MS. GRIFFITH:  Okay.  So I just want to
19  understand that you are instructing your client not to
20  answer how many hours he spent preparing Exhibit 4?
21    MR. BECKMAN:  No, I think that's a legitimate
22  question.
23    Q  Dr. Anderson, how many hours did you spend preparing
24  Exhibit 4?
25    A  Probably six to eight hours.

Page 15

1    Q  And did anyone send you materials to consider in
2  drafting your report?
3    MR. BECKMAN:  I would instruct my client not to
4  answer questions about materials sent to him by anyone in
5  the State of Alabama Attorney General's Office or any of
6  the agents.  But if he received materials from someone
7  other than his attorney, I think that's a legitimate line
8  of inquiry.
9    MS. GRIFFITH:  Can we can we go off the record?
10    MR. BECKMAN:  Sure.
11    (Recess from 9:23 a.m. to 9:30 a.m.)
12
13  BY MS. GRIFFITH:
14    Q  Dr. Anderson, were you provided any materials that
15  you considered in preparing your report?
16    A  My report is mainly from experience, commonsensical,
17  and then I searched out material myself.  Now, I do -- I
18  teach, so I have a lot of material on these issues of
19  communication, of trust, of doctor-patient relationship, and
20  continuity of care.
21    Q  Were you sent any materials to consider in forming
22  your opinions?
23    A  I did get one or two articles, yes.
24    Q  Do you recall which articles those were?
25    A  About medical errors related to communication.

Page 16

1  That's it.
2    Q  Anything else?
3    A  (Witness shakes head.)
4    Q  Were you provided Dr. Fine's expert opinion in this
5  case?
6    A  Oh, yes, I've been provided all the expert reports
7  from the Plaintiffs.
8    Q  Anything else?
9    A  No.
10    Q  Does Exhibit 4 accurately set forth your opinions
11  with respect to the topics that are discussed therein?
12    A  Is that my expert report?
13    Q  Yes.
14    A  Yes.
15    Q  Have you changed any of those opinions since signing
16  Exhibit 4?
17    A  No.
18    Q  At this time, do you plan to do any further work to
19  formulate or revise the opinions set forth in Exhibit 4?
20    A  No.  I think it's complete.  It's not -- I reserve
21  the right to add something with more things coming out, but
22  for the most part, it's accurate.
23    Q  At this time, you don't plan to add anything to it?
24    A  That's right.
25    Q  Did you include all the significant points about

Page 17

1  which you may be asked to testify at trial?
2      A   I think so.
3      Q   Is there anything that you expect you might be called
4  on to testify about at trial that's not included in your
5  report or your supplemental report?
6      A   I'm not sure.
7      Q   Did you make an effort to include in your report all
8  the relevant facts and data on which your opinions are based?
9      A   Yes.
10     Q   Is there anything in your report that you'd like to
11  change?
12     A   Not really.
13     Q   Is there anything that you would sort of like to
14  change?
15     A   You can always improve something if you have more
16  time. You can always make it more clear, better.
17     Q   Understood. But any of the substance, not just
18  drafting?
19     A   Not really.
20     Q   Okay. Is a list of materials considered, which is
21  included in your expert report, complete?
22     A   In the medical literature, if I had more time, I'm
23  sure I could add more, but for the moment, it's my best effort
24  to make it complete.
25     Q   So it includes everything that you investigated or

Page 18

1  considered in forming your opinions?
2      A   Yes.
3      Q   Your compensation is $300 an hour; is that correct?
4      A   Yes.
5      Q   And $3,500 a day for time spent testifying at trial
6  or deposition?
7      A   I think so.
8      Q   Is your compensation in this matter contingent in any
9  way on the outcome?
10     A   No.
11     Q   Okay. Can you turn to page 27 of your expert report
12  that's Exhibit 4. Can you identify this part of Exhibit 4 for
13  the record?
14     A   My CV, yes.
15     Q   Was it up to date as of the filing of your report?
16     A   I assume so. That's dependent on my diligence to
17  correct it if it's not up to date. But right now, it looks up
18  to date.
19     Q   So you believe that this is up to date as of today?
20     A   I am retired from the Army; that's what is different.
21  The Army discharged me when I turned 60. And I didn't have
22  that in there. I had finished my Army Reserve duty.
23     Q   And that was in September of 2012?
24     A   That's right.
25     Q   Okay. So based on your review, you don't have

Page 19

1  anything to add to your CV?
2      A   No.
3      Q   So according to this, you received a bachelor of
4  science from the University of Virginia in 1974?
5      A   Yes.
6      Q   And you received your medical degree in 1978 from the
7  University of Virginia, as well?
8      A   Yes.
9      Q   And you had a residency in family practice from 1978
10  to 1981?
11     A   Yes.
12     Q   Did you have any fellowships?
13     A   No.
14     Q   And as far as your work history, you worked at
15  Johnston-Willis Hospital doing emergencies within the hospital
16  from 1981 to 1985; is that correct?
17     A   Yes.
18     Q   And then you also worked as a full-time emergency
19  room physician from 1985 to 1995?
20     A   Yes.
21     Q   And that was at both Johnston-Willis Hospital and
22  Chippenham Medical Center?
23     A   Yes.
24     Q   Are those two separate locations?
25     A   Yes.

Page 20

1      Q   When you were full time, how did you split your time
2  between those two locations?
3      A   About 70 percent here and 30 percent -- 70 percent at
4  Chippenham Hospital and 30 percent at Johnston-Willis, but
5  that did change year to year, depending on where they needed
6  staff based on patient numbers.
7      Q   Are those two hospitals connected?
8      A   Yes.
9      Q   What is the relationship between the two hospitals?
10     A   They're both owned by Hospital Corporation of
11  America.
12     Q   Okay. And then you also worked part time in the
13  emergency room at those two hospitals from 1995 to 2005?
14     A   Yes.
15     Q   And was the split approximately the same as when you
16  were full time?
17     A   It was 90 percent here at Chippenham Hospital.
18     Q   So most of the time you worked at Chippenham Medical
19  Center and only occasionally at Johnston-Willis Hospital; is
20  that accurate?
21     A   From '95 to 2005, yes.
22     Q   And you also have worked as the associate director at
23  Chesterfield Family Practice Center from 1995 to the present?
24     A   Yes.
25     Q   And what is the role, associate director?

## Page 21

1  A  I'm involved in -- I have 50 percent private patient
2  population, where you take care of patients, and then 50
3  percent teaching duty of residents in family practice
4  training.
5  Q  Are you full time in that position today?
6  A  Yes.
7  Q  And then from 2002 to 2012, you also served in the
8  U.S. Army reserve with several deployments?
9  A  Yes.
10  Q  And then it also appears that you have taught at VCU
11  School of Medicine as associate professor from 1996 to 2010
12  and as a clinical professor from 2010 to the present?
13  A  Yes.
14  Q  What courses do you teach?
15  A  Foundations of clinical medicine, which is first-year
16  medical students.  I have third-year medical students assigned
17  to me every month, and that's more of an apprenticeship.  And
18  then I do lectures.
19  Q  What are the subjects of the lectures?
20  A  Emergency medicine, primary care, whether it's trauma
21  or whether it's pediatrics or clinical.  And in primary care,
22  the topics are very wide ranged.
23  Q  So you give lectures on emergency room care, but you
24  don't teach any full courses on it; is that accurate?
25  A  Yes.

## Page 22

1  Q  What are the areas in which you possess expertise,
2  the medical areas?
3  A  I'd say emergency medicine, I'm Boarded in.  And
4  family practice, I'm Boarded in.
5  Q  So you're not an expert in obstetrics and
6  gynecology?
7  A  No.
8  Q  And if you wanted to work in an emergency room again,
9  do you think you'd have any difficulty getting hired by an
10  emergency room?
11  A  They call me all the time.
12  Q  That is, Chippenham calls you to --
13  A  No.  Chippenham has not called me because I'm in
14  private practice here, and I've told them that I'm just too
15  busy, so they don't call me.  But other emergency rooms who
16  are looking for physicians see that I'm Board certified and
17  they'll call me.
18  Q  Okay.
19  A  Chippenham just knows I'm not available.
20  Q  Okay.  And so you're Board certified in family
21  practice.  What is family practice?
22  A  Primary care, general medicine, pediatrics to death.
23  We do train our physicians in obstetrics, but they're not
24  Boarded.
25  Q  And your CV states that you're Board certified in

## Page 23

1  emergency medicine by the American Association of Physician
2  Specialists; is that accurate?
3  A  Yes.
4  Q  What is that organization?
5  A  It's an organization that puts you through a process
6  of accreditation.  It's oral exams, it's years of experience,
7  and then written exams to be certified.
8  Q  Okay.  And how is that different from your Board
9  certification in family practice?
10  A  Same.
11  Q  It's the same?
12  A  Just different topics or more focused on emergency
13  medicine versus primary care.
14  Q  But it's issued by a different organization; is that
15  accurate?
16  A  Yes.  American Board of Family Practice does my Board
17  certification for family practice and American Association of
18  Physicians Subspecialists does my emergency medicine Board
19  certification.
20  Q  What did you have to do to maintain your
21  certification in emergency medicine?
22  A  You submit CMEs and then you do your written exam.
23  Q  How frequently?
24  A  Every ten years.
25  Q  And how frequently do you have to do an exam for your

## Page 24

1  certification in family practice?
2  A  Every seven years, but this year it went to ten.
3  Q  Have you ever acted as a director of an EMT squad?
4  A  In the Army, I did.
5  Q  Other than in the Army?
6  A  No.
7  Q  Have you been trained to perform abortions?
8  A  No.
9  Q  Have you ever performed an abortion?
10  A  No.
11  Q  Have you ever supervised others performing
12  abortions?
13  A  No.
14  Q  Have you ever taught the procedures for performing an
15  abortion?
16  A  No.
17  Q  So you're not here today as an expert in abortion
18  procedures?
19  A  Yes, I am not an expert in abortion procedures.
20  Q  Do you currently hold staff privileges at any
21  hospitals?
22  A  Chippenham and Johnston-Willis Hospitals.
23  Q  How long have you held those?
24  A  Since 1979.
25  Q  At both hospitals?

---

Page 25

1    A   Uh-huh.  So 33 years, 34.  Maybe 35.  Soon to be
2  35.
3    Q   And are staff privileges specific to allowing you to
4  perform certain procedures in the hospital?
5    A   Yes.
6    Q   And so what procedures are your staff privileges
7  associated with for those facilities?
8    A   It's procedures for advanced cardiac life support.
9  Now, because of my emergency medicine, I could do chest tubes,
10  which you are needed to do on emergency basis, or intubation
11  to stabilize a patient or subclavian lines to stabilize the
12  patients.  So procedures you needed to initially stabilize a
13  patient that was unstable.
14    Q   Anything else?
15    A   That's probably the basis.  I mean, they allow me --
16  I mean, I've got procedures to do lumbar punctures to evaluate
17  children for meningitis; that's both family practice and
18  emergency medicine, so there's some technical procedures, but
19  it's not a huge list of them.
20    Q   Are there any other hospitals at which you have
21  previously held staff privileges?
22    A   Over what time period?  All 35 years?
23    Q   Yes.
24    A   I've had emergency room privileges at Carilion
25  Hospital in Bedford, Virginia.

---

Page 26

1    Q   And when was that?
2    A   It's Roanoke Memorial Hospital in the Carilion
3  system.  That was in the year 2000 to 2001.  I had privileges
4  at Farmville; it's called Southside Hospital in Farmville,
5  Virginia, in their emergency department from 1984 to 19 --
6  somewhere in the 1990s, before I stopped working there.  And
7  then I had privileges at Rocky Mount Hospital, in the Carilion
8  system in South Virginia.
9    I've had privileges at Petersburg Hospital in the
10  emergency room there in the 1980s.  And then the hospital had
11  to grant me privileges at both Beaumont Medical Center and
12  Landstuhl, Germany, and then the combat support hospitals that
13  I served in in Iraq and Afghanistan.
14    Q   So Beaumont, is that in Virginia?
15    A   No.  Beaumont is in Texas.  It's El Paso.  It's
16  called Beaumont.  It's El Paso, Texas.
17    Q   And was that part of your Army Reserve that you held
18  privileges there?
19    A   Yes.
20    Q   Okay.  So Beaumont, Landstuhl, and combat support?
21    A   Combat support hospitals in Iraq and Afghanistan.
22    Q   And those are all associated with your service in the
23  Army?
24    A   Yes.
25    Q   Do you recall when you held privileges at Rocky Mount

---

Page 27

1  Hospital?
2    A   It was 2000 through 2001.
3    Q   And all of these hospitals in Roanoke, Farmville,
4  Rocky Mount, and Petersburg, were these hospitals all part of
5  the Carilion network?
6    A   No.  Farmville and Petersburg are different
7  systems.
8    Q   Why did you hold privileges at all these different
9  hospitals?
10    A   They needed me to work in the emergency room.  And I
11  was happy to do it.  I had kids in college, weddings, you know
12  the deal.
13    Q   So did you live in Roanoke?
14    A   No.
15    Q   How far did you live from Roanoke?
16    A   I lived here.
17    Q   How far is it to Roanoke from here?
18    A   Two and a half hours.
19    Q   How often did you work at Roanoke?
20    A   Probably six shifts -- no, change that.  Two to four
21  shifts a month.
22    Q   But you no longer hold privileges at Roanoke?
23    A   No.
24    Q   Why not?
25    A   Too far to drive.  I don't have time.

---

Page 28

1    Q   Do the privileges expire?
2    A   Yes.  You have to renew those every two years.
3    Q   And is that based on having a certain number of
4  admissions?
5    A   No.
6    Q   So for the hospital in Farmville, you worked there
7  from 1984 to somewhere in the 1990s, and did you live in
8  Farmville?
9    A   No.
10    Q   How far a drive is it?
11    A   Fifty minutes.
12    Q   And how frequently did you work in Farmville?
13    A   Two to four shifts a month.
14    Q   And that was for five to seven years that you did
15  that?
16    A   No.  Sometimes I'd go two to three months and not
17  work at all.  It was just very much when they needed help in
18  their rotation.
19    Q   Okay.  And you did that while you were working full
20  time at the emergency rooms here at Chippenham and
21  Johnston-Willis?
22    A   Petersburg and Farmville, I was house doctor in the
23  '80s.  And so I was working full time as house doctor here.
24  And once I started working full time at Chippenham in '80 --
25  what did I say, '85 or '86?

---

Page 29

1    Q   '85.
2    A   Then I was very rarely at Petersburg -- I mean,
3    actually, I did no more work at Petersburg, but I was very
4    rarely at Farmville, because these hospitals kept me busy.
5    Q   Okay. So let me understand. You worked at
6    Petersburg while you were the house physician at
7    Johnston-Willis; is that correct?
8    A   Yes, that's correct.
9    Q   How far is Petersburg from Richmond?
10   A   Thirty minutes.
11   Q   Rocky Mount Hospital, how far is Rocky Mount from
12   Richmond?
13   A   It's two and a half hours.
14   Q   And how frequently did you work there?
15   A   During that time period, the total frequency for
16   Bedford and Rocky Mount, because they run on the Carilion
17   system, was two to four shifts a month. Sometimes it would be
18   heavier at Bedford, but it was dependent on their schedule.
19   Bedford is Roanoke, outside Roanoke.
20   Q   And those are both part of the Carilion network?
21   A   Yes.
22   Q   So between the two, you worked two to four shifts a
23   month --
24   A   That's right.
25   Q   -- for those two years?

Page 30

1    A   It was probably 18 months.
2    Q   And you worked in the emergency room --
3    A   Yes.
4    Q   -- in both of those? And at Farmville and
5    Petersburg, that was also in the emergency room?
6    A   Yes.
7    Q   And other than these four hospitals we talked about,
8    Johnston-Willis and Chippenham and the facilities you worked
9    in in the Army, are there any other hospitals that you held
10   privileges?
11   A   No.
12   Q   Have you ever served on a committee charged with
13   approving physicians for privileges?
14   A   No.
15   Q   Have you performed any procedures at an ambulatory
16   surgical center or on an outpatient basis?
17   A   Just simple dermatological procedures at the
18   office.
19   Q   Are you a member or otherwise affiliated with any
20   organizations, professional or non-professional, other than
21   the ones that are listed on page 30 of Exhibit 4? It's
22   paragraph 7 and 8.
23   A   It's 4?
24   Q   Page 30 of Exhibit 4.
25   A   Oh, page 30. (Witness reviews document.) There is

Page 31

1    one group called Virginia Christian Alliance. Today, I'm head
2    of their medical, Virginia Christian Alliance. I think it's
3    otherwise complete.
4    Q   Is that a professional organization or is that a
5    social organization?
6    A   It's a social organization. Just like the other ones
7    I have down here.
8    Q   Listed in paragraph 8?
9    A   Yes.
10   Q   Are any of these -- do any of these organizations
11   have a mission to oppose abortion rights?
12   A   Not worded like that. I think that wording is
13   incorrect.
14   Q   Do any of these organizations oppose the provision of
15   abortion services?
16   A   These organizations protect the unborn child.
17   Q   So you would say they advocate for abortion
18   regulation?
19       MR. BECKMAN: Object to form.
20   Q   You can still answer.
21   A   What's your question?
22   Q   Would you say that they advocate for abortion
23   regulation?
24       MR. BECKMAN: Object to form.
25   A   Yes.

Page 32

1    Q   And which organizations are those?
2    A   The Richmond Christian Medical and Dental Society is
3    a -- we have a legal -- you know, a larger organization, the
4    Christian Medical and Dental Society out of Bristol,
5    Tennessee, and they advocate for the rights of the unborn
6    child.
7    Q   What about any of the social organizations listed in
8    paragraph 8 of Exhibit 4?
9    A   No.
10   Q   What is Virginia Physicians for the Unborn Child?
11   A   I was looking for that. That's the same.
12   Q   Okay.
13   A   I'm sorry; I didn't see that. Virginia Physicians
14   for the Unborn Child advocated for the unborn child.
15   Q   And are you still a member of that organization?
16   A   No. We dissolved it.
17   Q   When?
18   A   '88.
19   Q   Okay. So you already mentioned the Christian Medical
20   and Dental Society. What about the Family Policy Council?
21   A   That is -- last night we had a meeting where we
22   collected 22,000 pounds of food for the Feed More Food Bank
23   here, and we served 600 inner city kids Saturday a
24   Thanksgiving dinner with 100 volunteers in association with
25   the Richmond Outreach Center. So the Family Policy Council

## Page 33

1  has no political social agenda -- I mean, social -- no
2  political agenda.  It just is a collaboration of service to
3  mentorship poor -- it involves mentorship, it involves serving
4  the poor, it involves a post-prison recidivism, trying to
5  reduce recidivism, so those are all activities, but it doesn't
6  have any mission.
7      Q   Okay.  What about Abstinence Now Until Marriage?
8      A   That was just a campaign into the schools that
9  particular year, 2000, where we talked to 40,000 high school
10 students about a drug-free, sex-free lifestyle and the dignity
11 and the value for that.
12     Q   What was your role?
13     A   Organizer.
14     Q   Have you done anything similar since 2000?
15     A   We did a campaign -- the Regal Crusade that we did
16 in, it says, 2003 there, Chairman of the Greater Richmond
17 Regal Crusade, going into high schools, again, on drug-free,
18 sex-free lifestyle.
19     Q   When was that?
20     A   That was 2003.
21     Q   Okay.
22     A   It's there.
23     Q   Okay.  Have you ever been involuntarily terminated
24 from a job?
25     A   No.

## Page 34

1      Q   Have you ever been accused of academic misconduct?
2      A   No.
3      Q   Have you ever been accused of professional
4  misconduct?
5      A   No.
6      Q   Have you ever been sued for malpractice?
7      A   Yes.
8      Q   Can you explain.
9      A   The -- do you want to know the cases?
10     Q   Yeah, I'd just like to know when and what the subject
11 of the cases were.
12     A   In 1999, we had a radial artery injury in the
13 emergency room; that turned into a malpractice suit.  And in
14 2001, we had an unexpected death of a patient after discharge
15 from the hospital, and that turned into a malpractice suit.
16 In 1996, we just had a drug allergy complication that turned
17 into a malpractice suit.
18     Q   Any others than those three?
19     A   No.
20     Q   Were you a named defendant in those three?
21     A   Yes.
22     Q   Was the hospital also a named defendant?
23     A   In two of them.  The death of the patient after
24 discharge, I think they were named a defendant; I am not
25 positive.  That was settled.  The 1999 radial artery injury,

## Page 35

1  the hospital was named.  But the drug allergy suit was
2  outpatient at the office.
3      Q   Okay.  Have you ever been arrested or charged with a
4  crime?
5      A   Nope.
6      Q   Okay.  So right now, I'd like to talk about your
7  specific medical experience.  So I understand that you have
8  specific medical experience in the private practice working at
9  Chesterfield?
10     A   Yes.
11     Q   And have you worked at any other private practice
12 offices other than Chesterfield?
13     A   I spent two months in Mannboro, Virginia, in 1981
14 covering for a doctor who went overseas.
15     Q   But other than that?
16     A   No.
17     Q   And you've worked there since 1995 to present; is
18 that correct?
19     A   Yes.
20     Q   And you've been associate director that whole time?
21     A   I don't know when they made me associate director.
22 Warm bodies and titles.
23     Q   Do you recall that that was your position when you
24 were hired in 1995?
25     A   No, it was not my position.

## Page 36

1      Q   Okay.  So to what position were you hired?
2      A   As an attending.
3      Q   Okay.  And then at some point between '95 and today,
4  you were given the title of associate director?
5      A   Yes.
6      Q   Were there any interim titles in between attending
7  and associate director?
8      A   No.
9      Q   So you said you're currently practicing full time at
10 Chesterfield?
11     A   Yes.
12     Q   And how often are you there?
13     A   Five to seven days a week, depending on call.
14     Q   Okay.  And how many patients do you see there on a
15 given day?
16     A   If I'm not teaching, I see between 20 and 24.
17     Q   So if you work five to seven days a week and see 20
18 to 24 a day, you see sometimes a hundred patients a week; is
19 that accurate?
20     A   I teach 50 percent of my time.  All right.  So
21 probably -- in the sixth and seventh day, I'm on call; it's
22 hospital patients.  I'm not doing outpatients unless I have
23 Saturday hours in the morning.  So I essentially see 300 to
24 400 patients a month.
25     Q   Okay.  There are other physicians in that practice as

---

**Page 37**

1  well; is that right?
2  A   Yes.
3  Q   First, let me ask, that 300 to 400 patients a month,
4  has that been consistent since 1995?
5  A   Yes.
6  Q   How many other physicians are in your practice?
7  A   There's six attendings and then 24 residents.
8  Q   Okay.
9  A   Now, on the patient numbers, I see a lot of patients
10  with the residents, but they're not assigned to me.  They
11  won't go under my numbers.
12  Q   The patients are not assigned to you?
13  A   The residents -- they'll be assigned to a resident,
14  and I'll see the patient with the resident.
15  Q   And you said those patients were included in the 3-
16  to 400 a month?
17  A   Probably not.  I don't know how to give you a number.
18  Because all day long you're seeing patients but sometimes
19  you're not with another doctor and sometimes you're solo and
20  sometimes you're on hospital rounds, and so my patient contact
21  during the week, probably 4- to 500 easy.
22  Q   Okay.
23  A   But I'm not billing the 4- to 500.
24  Q   But in terms of patients that you see in the office?
25  Let's exclude when you're on call and doing rounds; let's just

---

**Page 38**

1  say you're in the office and you're seeing patients.
2  A   I would say 300 a month or --
3  Q   And that includes the patients that you see with
4  residents?
5  A   No.
6  Q   Those are just your patients --
7  A   Yes.
8  Q   -- that would call and say, Dr. Anderson is my
9  physician?
10  A   That I meet with them one-on-one; there's no other
11  resident there.
12  Q   And then you would say there's an additional 50 to
13  100 that you would see a month with residents?
14  A   More than that.
15  Q   More?
16  A   Greater than a hundred.
17  Q   More than a hundred but less than 200?
18  A   Yes.  I would say around a hundred.  It's an
19  estimate.  I really haven't counted.  You just get the work
20  done.
21  Q   Okay.  I'm just trying to get some ballpark figures.
22  A   Yes.
23  Q   And do all of the physicians that work in your
24  practice have admitting privileges at a hospital?
25  A   Yes.

---

**Page 39**

1  Q   Have you ever worked with a physician that does not
2  have admitting privileges at a hospital?
3  A   No.
4  Q   Have you observed, in family practice, a trend away
5  from physicians having admitting privileges?
6  A   Yes.
7  Q   Can you describe that?
8  A   The hospital expertise and time demands, either/or,
9  have forced many -- or the time demands have caused many
10  family practice physicians to give up hospital privileges.
11  Q   What are those time demands?
12  A   Patient care, logistics, communication, phone
13  calls.
14  Q   So do all the residents that work in your private
15  practice also have admitting privileges?
16  A   Yes.
17  Q   Generally, what procedures are family practice
18  physicians trained to perform?
19  A   We train our physicians to deliver babies, to do
20  neonatal and adult resuscitation, to do neonatal, pediatric,
21  and adult resuscitation, obstetric baby deliveries.  And then,
22  like, lumbar puncture and central line placement, joint
23  injections.
24  Q   What is a joint injection?
25  A   Putting a needle in your knee or shoulder when it

---

**Page 40**

1  hurts.
2  Q   That's normally to deliver steroids?
3  A   Yes.
4  Q   What about mole removal?
5  A   Yes.  Skin surgeries, yes.
6  Q   What other type of skin surgeries?
7  A   Laceration repair, wound management.
8  Q   Wart removal?
9  A   Yes.
10  Q   What about joint aspiration?
11  A   Yes.
12  Q   What is joint aspiration?
13  A   Once you get the needle in the joint, you pull off
14  fluid to analyze it.
15        (Recess from 10:10 a.m. to 10:21 a.m.)
16
17  BY MS. GRIFFITH:
18  Q   So before we took the break, we were talking about
19  some of the procedures that family practice physicians
20  perform.  And are these procedures that are performed at your
21  family practice office?
22  A   What procedures?
23  Q   The wart removal, laceration repair, joint
24  aspiration, joint injection.
25  A   Yes.

Page 41

1  Q   And those are all performed on an outpatient basis;
2  is that correct?
3  A   Yes.
4  Q   Is anesthesia used for any of those procedures?
5  A   No.
6  Q   None of them?
7  A   Local anesthesia, but not general anesthesia.
8  Q   What are the possible complications of a mole
9  removal?
10  A   A little bit of bleeding, infection.
11  Q   Which of the procedures that we discussed do you
12  perform?
13  A   Be more specific.
14  Q   Do you perform mole removal?
15  A   Yes.
16  Q   Wound repair?
17  A   Yes.
18  Q   Wart removal?
19  A   Yes.
20  Q   Joint aspiration?
21  A   Yes.
22  Q   Joint injection?
23  A   Yes.
24  Q   CPR?
25  A   I am trained in it.  But thankfully, I only had to do

Page 42

1  it in the hospital setting.  Not in my office.
2  Q   What about labor and delivery?
3  A   Be more specific of what you're asking me.
4  Q   So before, you said family practice physicians are
5  trained to perform labor and delivery.  Is that something that
6  physicians in your practice do?
7  A   Our physicians get 40 deliveries in their training.
8  I am not -- I do not do obstetrics as part of mine.
9  Q   Do other physicians in your practice?
10  A   No.
11  Q   No one in your practice does obstetrics, other than
12  the residents in their training?
13  A   Be more specific.
14  Q   Okay.  Do any of the physicians in your practice
15  oversee a woman during her pregnancy?
16  A   Our staff physician has GYN-obstetrical family
17  practice privileges, so one of our doctors oversees our OB
18  program.
19  Q   So before, we were talking about the privileges that
20  you have at the hospital and those are specific to certain
21  procedures, and then we were talking about the procedures that
22  you perform in your practice.  So do you have privileges to
23  perform a mole removal in the hospital?
24  A   I don't know how to answer that because I've never
25  done that in the hospital.

Page 43

1  Q   Is that something that you could do in the
2  hospital?
3  A   Theoretically.  That's never been an issue.
4  Q   After performing these procedures, how far have you
5  traveled from the hospital where you have privileges?
6  A   Be more specific.
7  Q   So if you perform a mole removal on a patient --
8  A   Where?
9  Q   At your private practice.
10  A   Okay.
11  Q   So in the office.
12  A   Yes.
13  Q   Your patient comes in, they have a mole removed.  And
14  then within the next 24 hours, what's the furthest that you've
15  traveled away from the hospital?
16  A   Fifteen miles to home.  Or --
17  Q   So -- okay.  Or?
18  A   I mean, are you asking me -- more specific, what do
19  you want?
20  Q   Okay.  So you have a patient that comes in on a
21  Friday and has a mole removed, and then over the weekend, have
22  you ever left to go out of town on vacation?
23  A   Yes.
24  Q   Traveled on an airplane?
25  A   Yes.

Page 44

1  Q   So you've traveled a pretty far distance away from
2  your patient within 24 to 48 hours after --
3  MR. BECKMAN:  Object to form --
4  Q   -- a procedure, like a mole removal?
5  A   Are you asking me specifically about mole removal or
6  like a mole removal?  Be more specific.
7  Q   So have you ever traveled a far distance away after a
8  mole removal procedure?
9  MR. BECKMAN:  Object to the form.
10  A   Yes.
11  Q   And what about other procedures, specifically, a
12  wound repair?
13  A   Be more specific.
14  Q   Have you traveled a hundred miles away from your
15  patient within 24 to 48 hours after a wound repair?
16  A   Can you qualify the type of wound you're asking me
17  about?
18  Q   Well, why don't you tell me about what different
19  types of wounds there may be.
20  A   A superficial laceration that goes through the dermis
21  and epidermis, yes.
22  Q   Okay.
23  A   I mean, wound is a huge issue.  Are you talking about
24  a chainsaw wound to the side of the neck?  Are you talking
25  about a piece of glass on the finger?

Page 45

1  Q  Would you treat both of those in your private
2  practice?
3  A  I would do what was appropriate for the situation.
4  Q  Have you ever treated someone with a chainsaw wound
5  in your private practice?
6  A  Be more specific.
7  Q  So at Chesterfield, as a physician at Chesterfield,
8  working in that capacity, have you ever treated a patient with
9  a chainsaw wound?
10  A  The chainsaw wound has a huge degree of complexity.
11  That question just begs to be too generalized.  A very minor
12  chainsaw wound, yes, I have treated that in my practice.
13  Q  And what was required to treat that minor chainsaw
14  wound?
15  A  Stitches.
16  Q  But after you treated the patient with a minor
17  chainsaw wound, how far did you travel away from the hospital
18  where you had privileges?
19  A  Home.  Life.  I mean, if it's minor.
20  Q  After treating any patient with any type of wound --
21  I understand this is a very broad spectrum.
22  A  Huge.  It is huge.
23  Q  -- after treating a patient with any type of wound,
24  have you traveled more than a hundred miles away from the
25  hospital where you have privileges within the 24- to 48-hour

Page 46

1  window after treating them?
2  A  That question is too general to answer.  That is way
3  too general.
4  MS. GRIFFITH:  Can you read the question back?
5  (Court reporter read back pending question.)
6
7  A  Please clarify the wound that you're referring to.
8  Q  Any type of wound.
9  A  I can't answer that.
10  Q  Have you ever treated a patient with a wound, treated
11  their wound, and traveled more than 24 -- more than a hundred
12  miles away from the hospital where you had admitting
13  privileges within 24 to 48 hours afterwards?
14  A  Are you referring to very superficial wounds?
15  Q  That would be included.  Any type of wound.
16  A  I would say the only wound I take care of is very
17  superficial.
18  Q  Okay.
19  A  So can you rephrase the question?
20  Q  So after treating a superficial wound, have you ever
21  traveled more than a hundred miles away from the hospital
22  where you have admitting privileges within 24 to 48 hours
23  after treating that patient?
24  A  Yes.
25  Q  Okay.  What about colonoscopies?  Do family practice

Page 47

1  physicians perform colonoscopies?
2  A  Some do.
3  Q  Do any of the doctors in your practice perform
4  colonoscopies?
5  A  No.
6  Q  Why not?
7  A  Gastroenterologists are trained to do that,
8  specifically.
9  Q  Okay.  So you said that the residents in your
10  practice are trained to provide OB-GYN services?
11  A  They deliver babies here in the hospital.
12  Q  Okay.  And what about IUD insertion; is that anything
13  that any of your physicians in your practice do?
14  A  I'm not sure.
15  Q  What about LEEP procedures?
16  A  Would you explain what that is?
17  Q  Loop electrosurgical excision procedures; are you
18  familiar with that?
19  A  I don't know.
20  Q  You said that the physicians in your practice perform
21  labor and delivery?
22  A  Only here at the hospital.
23  Q  And are they trained to provide for both vaginal and
24  Cesarean deliveries?
25  A  No.

Page 48

1  Q  Which one are they trained to provide?
2  A  Vaginal.
3  Q  And so if they oversee a patient, an OB-GYN patient,
4  through their pregnancy, is that something that they do?
5  A  Yes.
6  Q  And then as she comes to the hospital and has a
7  Cesarean section, what happens?
8  A  The GYN family doc or her partner on call will do the
9  C-section.
10  Q  You said the OB-GYN would do the C-section?
11  A  Our associate that oversees our obstetrics and
12  gynecology is Board certified in OB-GYN and family practice.
13  Q  So you said either she or somebody else in her
14  practice would oversee the Cesarean?
15  A  If needed, yes.
16  Q  And that would be needed if the woman had a Cesarean
17  section?
18  A  Yes.
19  Q  What are potential complications of vaginal
20  delivery?
21  A  That's too broad.
22  Q  Can you identify some potential complications of
23  vaginal delivery?
24  A  You can have bleeding or infection or anoxia; they
25  are just some.

Page 49

1    Q   And are family practice doctors that oversee vaginal
2    delivery, are they qualified to treat all potential
3    complications of vaginal delivery?
4         MR. BECKMAN: Object to form.
5    **A   That question is too general.  The complications are**
6    **extensive.**
7    Q   So there are some complications of vaginal delivery
8    that a family practice doctor would not be qualified to
9    treat?
10   **A   What complications are you referring to?  Be more**
11   **specific.**
12   Q   Are there any complications following a vaginal
13   delivery that a family practice doctor is not qualified to
14   treat?
15   **A   I can't answer that well right now.  I'm not sure.**
16   Q   You are not aware of any complications from vaginal
17   delivery that a family practice doctor is not qualified to
18   treat?
19        MR. BECKMAN: Object to form.
20   **A   It's not in my day-to-day teaching, so to answer**
21   **that, I would just be guessing, without considering it and**
22   **evaluating it.**
23   Q   Okay.  Based on your experience, would you say that
24   there are at least some complications from vaginal delivery
25   that would require an OB-GYN to treat?

Page 50

1    **A   Are you talking about the mother or the child?**
2    Q   The mother.
3    **A   Yes.**
4    Q   Are family practice doctors generally qualified to
5    treat miscarriages?
6    **Be more specific.**
7    Q   Are they qualified to perform D&Cs?
8    **A   No.**
9    Q   Do you prescribe birth control in your private
10   practice?
11   **A   Yes.**
12   Q   Under what circumstances?
13   **A   Just if the patients ask for it.  Be more specific**
14   **about circumstances.**
15   Q   So if a patient requests it, then you will prescribe
16   it?
17   **A   Yes.**
18   Q   In your family practice do you refer patients for
19   abortions?
20   **A   No.**
21   Q   You do not?
22   **A   That's correct, I do not.**
23   Q   So what happens if a patient comes in and tells you
24   that they're interested in getting an abortion?
25   **A   It hasn't happened for 20 years.**

Page 51

1    Q   What did you do 20 years ago?
2    **A   You give me -- be more specific with that question.**
3    Q   So if you had a patient who came to your private
4    practice, saw you in your private practice, and told you they
5    were interested in having an abortion, would you refer the
6    patient to get an abortion?
7    **A   No.**
8    Q   Have you ever referred a patient to get an
9    abortion?
10   **A   No.**
11   Q   Never in your 35 years of practicing medicine?
12   **A   Never.**
13   Q   What did you do when the patient requested or told
14   you they were interested in getting an abortion?
15   **A   I referred them to an OB-GYN doctor.**
16   Q   Do you prescribe emergency contraception?
17   **A   I have.**
18   Q   In your private practice?
19   **A   It has not come up.**
20   Q   In your private practice, the issue of emergency
21   contraception has not come up?
22   **A   That's correct.**
23   Q   You've prescribed it in the emergency room?
24   **A   Yes.**
25   Q   Okay.  Have you ever had an emergency transfer from

Page 52

1    your private practice office?
2    **A   Be more specific.**
3    Q   Has there ever been an instance where there's been an
4    emergency with a patient that's in your private practice
5    office that needed to be transferred to the hospital?
6    **A   Yes.**
7    Q   Can you tell me about that situation.
8    **A   People -- we have geriatric patients or people come**
9    **in with chest pain, and they're having an acute myocardial**
10   **infarction and we need to transfer them.**
11   Q   So what happens when those patients are
12   transferred?
13   **A   We call the EMT.**
14   Q   An ambulance?
15   **A   Yes.**
16   Q   So the EMTs arrive at your office?
17   **A   Yes.**
18   Q   And they transport the patient to the hospital?
19   **A   Yes.**
20   Q   Which hospital would they take them to?
21   **A   Chippenham, Johnston-Willis, or St. Francis.**
22   Q   Do you have privileges at St. Francis?
23   **A   No.**
24   Q   What are the circumstances in which the patient will
25   go to St. Francis?

Page 53

1       A   If they want to.  Be more specific to that
2   question.
3       Q   Why would a patient go to St. Francis Hospital?
4       A   Some have their cardiologist there.
5       Q   Which hospital is closest to your office?
6       A   All three are about equal.
7       Q   Okay.  Is there another hospital in Richmond that's
8   further away from your office?
9       A   There are 22 hospitals in Richmond.
10      Q   If you had a patient in your private practice that
11  was experiencing a myocardial infarction, would that patient
12  ever go to a hospital further away than Chippenham,
13  Johnston-Willis, or St. Francis if that was the hospital where
14  their cardiologist practiced?
15      A   Be more specific.
16      Q   Are you aware of an instance in which a patient at
17  your private practice who's experiencing a myocardial
18  infarction and had to be transferred to the hospital would go
19  to a hospital further away from the office than Chippenham,
20  Johnston-Willis, or St. Francis?
21      A   I'm not sure.
22      Q   Would you recommend this patient go to a different
23  hospital?
24      A   In what circumstances?
25      Q   If their cardiologist practiced at a hospital that

Page 54

1   was further away?
2       A   If they were unstable, I would not.
3       Q   What if they were stable?
4       A   I would do my best to get them, for the continuity of
5   care, say, to their cardiologist.  You do what's best for the
6   patient.
7       Q   How far would you recommend they travel to see their
8   cardiologist?
9       MR. BECKMAN:  Object to form.
10      A   Too hypothetical.  You asked me what distance is
11  safe?
12      Q   Or how far would you recommend that they travel?  I
13  mean, I don't know the hospitals in Richmond, so I can't give
14  specific examples of the 22 which are closest and which are
15  furthest.  So the example is a geriatric patient is suffering
16  from myocardial infarction, but they're stable.  So how far
17  would you recommend they travel to go to a hospital where
18  their cardiologist practices?
19      A   If I thought they were very stable, I could send them
20  20 and 30 miles, but that is very wide open question.
21      Q   If you had -- so this example of an emergency
22  transfer from your office, would you accompany your patient to
23  the hospital?
24      A   Sometimes I have.
25      Q   In what circumstances have you accompanied them?

Page 55

1       A   When I thought they were very unstable.
2       Q   What if you had other patients to see that day?
3       A   My partners would cover it.
4       Q   And if you didn't accompany your patient, would
5   another physician from your office accompany them?
6       A   Possibly.
7       Q   But not all the time?
8       A   Depended on stability.  It's very general, what
9   you're asking me.
10      Q   But if the patient went to St. Francis, you don't
11  have admitting privileges there?
12      A   No.
13      Q   So would you visit your patient at St. Francis?
14      A   That has not happened to me.  Some of our patients
15  have requested St. Francis, but with my patients, when they've
16  had it, I've sent them here and worked with them here.  But it
17  could happen.
18      Q   So you have not had any of your patients that have a
19  cardiologist at St. Francis that went there?
20      A   Not straight from my office on an emergency
21  situation.
22      Q   So if your patient is transferred to Chippenham or
23  Johnston-Willis from your office, you generally wouldn't
24  accompany them unless they were very unstable; is that
25  correct?

Page 56

1       MR. BECKMAN:  Object to form.
2       A   You're correct.  Yes.
3       Q   And when would you next see your patient?
4       A   That day, many times.
5       Q   So often, when you've had a patient transferred from
6   your office to the emergency room, you've gone to see them in
7   the emergency room?
8       MR. BECKMAN:  Object to form.
9       A   Yes.
10      Q   Not in every circumstance?
11      MR. BECKMAN:  Object to form.
12      A   Be more specific with the question.
13      Q   In every situation in which you had a patient
14  transferred from your private practice to an emergency room,
15  have you always visited them in the emergency room?
16      A   No.
17      Q   And what do you do -- what is your interaction with a
18  patient once they're in the emergency room or once they've
19  been transferred to the hospital?
20      A   I call the emergency room physician.  I will call the
21  cardiologist, and I will call our hospital physician --
22  physician in-hospital.
23      Q   What information would you give them in the phone
24  call?
25      A   Tell them about the patient, what I think is going

Page 57

1   on, make sure they're alerted to take care of the patient.
2       Q    And in those situations, the phone call is sufficient
3   to convey the information that the doctor would need for
4   initial treatment and diagnosis?
5           MR. BECKMAN:  Object to form.
6       A    It's very, very helpful.
7       Q    Is it sufficient?
8           MR. BECKMAN:  Object to form.
9       A    It's -- I'm not sure what you're asking with that.
10  Be more specific.
11      Q    Is the phone call sufficient to give the treating
12  physician the information they need to take care of your
13  patient?
14          MR. BECKMAN:  Object to form.
15      A    If I'm talking to my consulting staff, consulting
16  physicians here, the ER physician who's well trained at our
17  hospital, yes.  But are you asking -- anyway, I'm not a
18  hundred percent sure of what you're asking with that question.
19  But it is very, very helpful.
20      Q    So you said you would call the ER physician, you
21  would call the cardiologist, and you would also call the
22  hospital physician?
23      A    We have a team stationed here at the hospital.
24      Q    Who is we?
25      A    Chesterfield Family Practice.  Of the 24 doctors and

Page 58

1   attendings, we have people here 24/7.
2       Q    Who are physically at Chippenham Hospital?
3       A    Yes.
4       Q    So are there certain instances in which the one of
5   the doctors in your practice who is at the hospital would talk
6   to the ER physician?
7       A    I do.  They will call go talk to them after I do.
8       Q    Are there any situations in which they talk to them
9   instead of you?
10      A    No.  If I send them to the ER, I call the ER
11  physician.
12      Q    Are there ever circumstances in which you're not able
13  to get in touch with them?
14      A    No.  If I'm sending them, they're here 24/7; I can
15  get the ER physician on the phone.
16      Q    Is the same true at Johnston-Willis?
17      A    Yes.
18      Q    In that situation in which the patient experiences a
19  myocardial infarction and goes to the hospital, when they go
20  to the hospital, would the cardiologist assume care of that
21  patient?
22      A    We admit them to our service and we use them as a
23  consultant.  If the cardiologist isn't already that patient's
24  doctor, there have been times that they will just take over if
25  they have to take them to the cath lab.

Page 59

1       Q    In your experience, how frequently does the
2   cardiologist take over?
3       A    I haven't counted.
4       Q    Would you say more than half?
5       A    It's purely a guess on my part.  Do you want me to
6   guess?
7       Q    Yes, that's fine.
8       A    I'd say anywhere from 40 to 60 percent.
9       Q    Okay.  So about half?
10      A    If it's a guess, yes.  I've never counted.
11      Q    I know you haven't counted, but just based on your
12  experience, what you recall, how frequently that occurs.  So I
13  just want to clarify that if your patient is stable, then you
14  would entrust the ambulance and the EMTs that accompany the
15  ambulance to transport your patient to a hospital?
16          MR. BECKMAN:  Object to form.
17      A    Yes.  They are well-trained.  I have trained them in
18  the Army.  They are well-trained individuals.
19      Q    So before, when we were talking about your private
20  practice, you talked about being on call one or two days a
21  week?
22      A    Uh-huh.
23      Q    What does it mean when you're on call?
24      A    You just receive phone calls from residents or
25  hospital nursing staff, and you see patients in the

Page 60

1   hospital.
2       Q    So you said you received phone calls from residents
3   and nursing staff at the hospital?
4       A    Yes.  We are on call at nighttime and weekends, so
5   they are to call somebody.
6       Q    Do you ever receive phone calls from patients?
7       A    The residents do, and they'll call me if they have a
8   situation that they want advice on.
9       Q    So in the evenings -- so, basically, during hours
10  when your private practice office is not open, you have an
11  after-hours call number --
12      A    Yes.
13      Q    -- when patients can call?
14      A    Yes.
15      Q    And when a patient calls, do they speak to a
16  resident?
17      A    They speak to a resident who's stationed in the
18  hospital.
19      Q    And the resident is the one that generally tells them
20  what to do?
21      A    Yes.
22          MR. BECKMAN:  Object to form.
23      Q    And in certain circumstances, the resident will call
24  it to a physician that's on call as well?
25      A    Now, what do you mean by the certain circumstances?

Page 61

1  What are you referring to?
2  Q   Well, every time that a patient calls in on the
3  on-call line and speaks to a resident, in every instance, does
4  the resident call you?
5  A   No.
6  Q   So what circumstances would the resident call you?
7  A   If they felt they wanted to have another opinion.
8  Q   And they wouldn't always call you; is that correct?
9  A   Only if I'm on the list for that night or weekend.
10 Q   And other doctors in the practice are on call at
11 different times?
12 A   Yes.
13 Q   So if a patient calls the resident and sometimes
14 maybe the resident talks to you, is there certain
15 circumstances that you would recommend to the patient to go to
16 the emergency room?
17     MR. BECKMAN:  Object to the form.
18 A   Do that again.
19 Q   Do you ever recommend that the patient who calls in
20 visit an emergency room?
21 A   Yes.
22 Q   What emergency room do you recommend that they go
23 to?
24 A   What are you referring to?  That's awful general.
25 Q   Do you tell them to go to the nearest emergency

Page 62

1  room?
2  A   Depending on a whole multitude of situations; that's
3  just too broad of a question to say that one answer fits
4  all.
5  Q   When would you tell them to go to a hospital other
6  than the nearest emergency room?
7  A   If they had a cardiologist at a different hospital
8  and they had had chest pain that had resolved and they were
9  stable, they could go to where that cardiologist practices.
10 If they have something that I'm concerned is more unstable,
11 you can always send them to the nearest emergency room.
12 Q   What are some examples of somebody who's more
13 unstable?
14 A   If they're lightheaded, you're worried about possible
15 low blood pressure.  So there are certain symptoms that
16 communicate instability.
17 Q   Other than lightheadedness, what are other
18 symptoms?
19 A   Shortness of breath, chest pain.
20 Q   What about a fever?
21 A   Huge category.
22 Q   So if the patient has a fever --
23 A   Be more specific.
24 Q   -- would you always recommend that they go to the
25 nearest hospital?  Sometimes?

Page 63

1     MR. BECKMAN:  Object to form.
2  A   A fever can be a very mild issue.  If somebody has a
3  fever and headache, that's a different situation.  It's too
4  broad a category to give a one-answer-fits-all.
5  Q   What could a headache and fever be?
6  A   Possible meningitis.
7  Q   In your experience, how often do you recommend that
8  the patient go to the nearest hospital?
9     MR. BECKMAN:  Object to form.
10 A   Do that again.
11 Q   In your experience, how frequently do you recommend
12 that a patient go to the nearest emergency room --
13     MR. BECKMAN:  Object to form.
14 Q   -- if you decided that they needed to go to the
15 emergency room?
16     MR. BECKMAN:  Object to form.
17 A   You're making me guess again.
18 Q   I would hope that you don't have to guess and, based
19 on your experience, you some background to determine the
20 answer.
21 A   The reason -- this is where we practice, and my
22 patients know that I have admitting privileges at these two
23 hospitals.
24 Q   Okay.
25 A   So they come here almost exclusively, knowing when

Page 64

1  they come to us, these are the hospitals that we use.  So I
2  never use the term nearest hospital because we live here, the
3  practice is here, so I would say it's assumed.
4  Q   So most of your patients live local to Chippenham and
5  Johnston-Willis?
6  A   In this area, yes.
7  Q   Did you ever have a patient that didn't live local to
8  this area?
9  A   I'm sure I have but didn't know it.
10 Q   What if your patient was visiting family, you know,
11 on the north side of Richmond?
12 A   Be more specific.
13 Q   So in a situation where your patient was experiencing
14 some symptoms, but they weren't at home; they were visiting,
15 you know, in downtown Richmond or visiting family on the north
16 side of Richmond.  So they were within 10 to 20 miles of
17 Chippenham and Johnston-Willis, but it wasn't the nearest
18 hospital to them.
19     MR. BECKMAN:  Object to form.
20 A   And what symptoms are you talking about?
21 Q   I'm just saying in your experience --
22 A   I'm listening.
23 Q   -- how frequently would you recommend that they go to
24 the nearest hospital?
25     MR. BECKMAN:  Object to form.

Page 65

1    A   It all depends on stability.
2    Q   Okay.  If you suspect that the patient has a possible
3  infection or severe blood loss, would you tell them to go to
4  the nearest emergency room?
5        MR. BECKMAN:  Object to form.
6    A   Absolutely, nearest.  Blood loss, infection, it's too
7  general.  It's too general.  But when you're talking about
8  significant blood loss, they're going to need to go to the
9  nearest hospital.
10   Q   What about severe infection?
11       MR. BECKMAN:  Object to form.
12   A   And how are you and -- what are you saying about
13 severe infection?  How are you categorizing that?
14   Q   How would you categorize severe infection?
15   A   Drop in blood pressure.  If they were unstable, I
16 send them to the nearest hospital.
17   Q   I know that's what my doctor also says in the
18 messages when I call:  If this is a medical emergency, please
19 hang up and go to your nearest emergency room.  So in a
20 situation where your patient has gone to the hospital, gone to
21 the emergency room, what do you do next?
22       MR. BECKMAN:  Object to form.
23   A   I talk to the emergency room physician.
24   Q   Do you talk to anyone else?
25   A   I talk to our team doctor here.  And if need be, I'll

Page 66

1  talk to a consultant.
2    Q   And who would the consultant be?
3    A   That is very general.
4    Q   Would that be a specialist?
5    A   Yes.
6    Q   If a specialist was required?
7    A   Yes.
8    Q   And would that be the specialist that was on call at
9  that time?
10   A   No.  You work with the specialist you know so they
11 will work with you.  Now, if I'm on call at nighttime, I will
12 take the on-call specialist.  But you have relationships with
13 your referral staff, and you know what specialists you work
14 with or the specialist of -- that has seen that patient.  But
15 we do not get a specialist on every admission.
16   Q   So when you don't contact the on-call specialist,
17 sometimes that's because you speak to the doctor that the
18 patient has a previous relationship with?
19       MR. BECKMAN:  Object to form.
20   A   If they have a doctor-physician [sic] relationship, I
21 talk to them.
22   Q   But sometimes it's the specialist that you have a
23 relationship with.
24   A   If they don't already have a prior specialist.
25   Q   Now, if you weren't the doctor on call in the evening

Page 67

1  when your patient went to the emergency room, would you be the
2  one that called and spoke to the emergency room physician?
3        MR. BECKMAN:  Object to form.
4    A   No.
5    Q   Who would you call?
6    A   On-call physician.
7    Q   And the on-call physician would be the one that would
8  convey information to the ER doctor for initial treatment and
9  diagnosis?
10   A   Yes.
11   Q   And that's consistent with continuity of care?
12   A   Yes.
13   Q   Are there ever situations in which your patient goes
14 to the emergency room and you don't know?
15   A   I am sure.
16   Q   How do you find out?
17   A   That's too broad.  Be more specific.
18   Q   If your patient arrived at the emergency room without
19 calling the on-call line first, how would you discover that
20 they were at the emergency room?
21   A   The ER doctor would call our office in the daytime or
22 on-call doctor in the evening if they felt it warranted it.
23   Q   So not in every situation?
24       MR. BECKMAN:  Object to form.
25   A   All right.  Be more specific.  Give me the

Page 68

1  situation.
2    Q   So we were discussing a patient that shows up in the
3  emergency room without calling your office first.  And you
4  said the doctor would call the office or the after-hours call
5  line to speak to the physician if he felt it was warranted.
6    A   Yes.
7    Q   So I understand that to mean that in some
8  circumstances, the ER physician wouldn't feel it was warranted
9  and wouldn't call the physician -- or wouldn't call your
10 office?
11   A   Yes.
12   Q   In your private practice, how often do you refer
13 patients to other specialists?
14   A   Daily, weekly, routine.
15   Q   What are some of the reasons that you do that?
16   A   Be more specific.  Say that question again.
17   Q   Can you give me situations in which you would refer a
18 patient to a specialist?
19   A   If they had bad arthritis in the spine and they need
20 a neurosurgeon is one example; if they have chest pain and
21 they need a cardiologist for catheterization are two specific
22 examples.
23   Q   What continuing obligations do you have for the
24 patient after you refer them to a specialist?
25       MR. BECKMAN:  Object to form.

Page 69

1    A   What do you mean by obligation?
2    Q   What do you mean by obligation?  What do you
3  understand that to mean?
4    A   I can't -- I'm trying to figure out what you're
5  asking me, so...  What are you asking me?
6    Q   I'm asking you what are your responsibilities towards
7  those patients after you refer them to a specialist?
8    A   They, in the doctor-patient trust, they trust my
9  decision to refer them to someone who's going to be competent
10  with them and they trust that I will communicate and stay in
11  communication with the subspecialist.
12    Q   So you communicate with the specialist when you refer
13  them?
14    A   Yes.
15    Q   How do you communicate with them?
16    A   Either phone or letter.
17    Q   How often by phone?
18    A   Depends on severity.
19    Q   If the communication happens by letter, how does that
20  work?
21    A   I type a letter.  I fax it to the subspecialist.  I
22  give the patient a copy to carry with them to the
23  subspecialist.
24    Q   What type of information is in the letter?
25    A   Be specific.

Page 70

1    Q   If you type a letter for your patient to take to the
2  subspecialist, what type of information do you include in the
3  letter?
4    A   The area of my concern, the question I'm looking for
5  help.
6    Q   Is it always a typed letter?
7    A   Nowadays.
8    Q   Do you ever just write something on a prescription
9  pad for your patient to take with them?
10    A   Not anymore.
11    Q   But you used to?
12    A   Yes.
13    Q   When was the last time that you just wrote something
14  on a prescription pad?
15    A   I can't answer that.  Ten years ago.  I'm not sure.
16    Q   How does the specialist communicate with you?
17    A   Either phone call, face-to-face, or letter, depending
18  on severity and options.
19    Q   Can you assign percentages to how often it happens by
20  phone call, face-to-face, or letter?
21    A   I never counted.
22    Q   And you don't have a sense, based on your
23  experience?
24    A   It's too broad, depending on the severity and the
25  time.  And if you're asking me about specifically somebody

Page 71

1  with chest pain, it's a hundred percent, if they're
2  unstable.
3    Q   That you would talk by phone?
4    A   Yeah, or face-to-face.
5    Q   Okay.  So when the specialist communicates by letter,
6  they send you a letter that you put in the patient's file; is
7  that how that works?
8    A   Yes.
9    Q   So for some patients, you refer them to a specialist,
10  you send a letter to the subspecialist, and they might fax
11  back information about the patient that you put in their file;
12  is that correct?
13    A   Fax or letter.
14    Q   So some situations you may never talk to those
15  subspecialists about the patient?
16        MR. BECKMAN:  Object to form.
17    A   Ask questions about stable or unstable.
18    This is a stable patient.
19    A   Okay.  So ask that question again.
20    Q   So are there some patients that you refer to a
21  specialist who see the specialist and you never have a phone
22  call with the specialist or meet with them face to face?
23        MR. BECKMAN:  Object to form.
24    A   If they're stable?
25    Q   Yes.

Page 72

1    A   Yes.
2    Q   And have you provided continuity of care to that
3  patient?
4    A   Yes.
5        MS. GRIFFITH:  Do you guys want to take another
6  break?
7        MR. BECKMAN:  Yes.  Let's take about five
8  minutes.
9        (Recess from 11:12 a.m. to 11:22 a.m.)
10
11  BY MS. GRIFFITH:
12    Q   Before we move on, Dr. Anderson, we were talking
13  about the on-call system that you use at your private
14  practice, before we took the break.  Is this how you would say
15  most private practices are organized today?
16        MR. BECKMAN:  Object to form.
17    Q   Would you say it's common?  A common on-call
18  system?
19    A   I would say it's -- it's hard to say.  We're a
20  residency, so not every private practice out there has
21  residents.  We have to do it -- we do what works for us in our
22  situation.
23    Q   Because you train residents that are also affiliated
24  with the hospital?
25    A   Yes.

Page 73

1    Q   So some private practice offices don't have an
2  after-hours call number?
3    A   No, I think they do.
4    Q   But they would -- they would just have one of the
5  doctors in the office that would be on call after hours?
6    A   Yes.  That would be my expectation.
7    Q   Okay.  So if your patient goes to the hospital, you
8  said, the on-call resident that's in the hospital would go by
9  and see that patient in the emergency room?
10       MR. BECKMAN:  Object to form.
11   A   Yes.
12   Q   Would they assume care of that patient?
13   A   Yes.
14   Q   So the care would be transferred from the emergency
15 room physician to --
16   A   Our team.  Yes.
17   Q   So who would treat them in the emergency room?
18   A   The emergency room doctor sees him, and then we take
19 care of him.  Sometimes it's together.
20   Q   With the emergency room physician?
21   A   (Witness nods head.)
22   Q   And then when would you see your patient if they were
23 admitted to the hospital --
24       MR. BECKMAN:  Object to form.
25   Q   -- and you were not the doctor that was on call that

Page 74

1  night?
2        MR. BECKMAN:  Object to form.
3    A   Sometimes -- depends on my assignment, in office or
4  here.  But generally sometimes -- be specific.  I'm having a
5  hard time answering your question.
6    Q   So if your patient calls the after-hours line at
7  night and you're not the doctor -- well, even if you are the
8  doctor on call, you wouldn't come in that night to see them;
9  is that correct?
10   A   No.  That is correct.
11   Q   The resident would see them?
12   A   That is correct.
13   Q   Would you see them the next day?
14   A   Not necessarily.
15   Q   Would you see them the day after that?
16   A   Well, be specific, because you're talking about a
17 huge range of patients.  You're talking about stable,
18 unstable; some patients are assigned my patient panel that
19 might not be complicated; some of them I might know for 20
20 years and we have a hospital team that I'm communicating
21 with.
22   Q   Right.
23   A   So the range is huge.  The hospital team will take
24 care of him.
25   Q   And the hospital team are the residents?

Page 75

1    A   And our attendings that are assigned here.
2    Q   And they rotate through the residents and the
3  attendings that are assigned?
4    A   Yes.
5    Q   Are you ever assigned to the hospital team?
6    A   Yes.
7    Q   So is everyone at Chesterfield Family Practice on the
8  hospital team?
9    A   We all have hospital duty.
10   Q   Okay.  So is there a week where you don't have
11 hospital duty?
12   A   Yes.
13   Q   So if your patient is admitted to the hospital on a
14 Monday, and you're not on call and you're not the hospital
15 physician that week, would you see your patient in that
16 week?
17       MR. BECKMAN:  Object to form.
18   A   That's too -- it depends on way too many variables to
19 answer that with one answer.
20   Q   Okay.
21   A   Stability, longevity, meaning, criticalness of
22 illness, complexity of problem.
23   Q   How would that affect whether or not you saw the
24 patient that week?
25   A   Well, the more complex and the more fragile the

Page 76

1  situation, it's going to pull me in sooner than on general
2  terms; those are the things that we will see sooner rather
3  than later.
4    Q   So if the patient was in worse condition, it would be
5  more likely that you would come in and see them that week?
6        MR. BECKMAN:  Object to form.
7    A   Yes.  If you're talking about unstable and you're
8  talking about complexity with a continuity of care, the
9  communication, as well as the doctor-patient relationship were
10 all needed.
11   Q   What if the patient was unstable, but it was a
12 simple, straightforward case?
13       MR. BECKMAN:  Object to form.
14   A   No such existence.
15   Q   So whenever a patient is unstable, by definition,
16 that's a complex case?
17   A   You're worried about --
18       MR. BECKMAN:  Object to form.
19   A   Do you mean unstable meaning they're going to die,
20 potentially?
21   Q   I don't know.  I'm just using the phrasing that you
22 were using.
23   A   Well, I'm using unstable, meaning that we were
24 worried about them dying.
25   Q   And if your patient is unstable, even if you weren't

Page 77

1  on the hospital team that week, you would come in and see your
2  patient?
3      A   As much as I could.
4      Q   If your patient were stable, would you come in and
5  see your patient if you weren't on the hospital team that
6  week?
7      A   Not necessarily, yes.
8      Q   I'd like to talk about your emergency room
9  experience.  You worked in the emergency room from 1985 to
10  1995 full time.
11      A   Uh-huh.
12      Q   And then from '95 to 2005 part time?
13      A   Yes.
14      Q   How often did you work in the emergency room when you
15  were part time from 1995 to 2005?
16      A   Probably four times a month, four to six shifts a
17  month.
18      Q   And this was in addition to working full time at
19  Chesterfield; is that correct?
20      A   Yes.  Anywhere from two times to six times.  I didn't
21  always do a minimum of four shifts.
22      Q   Okay.  And how long is a shift?
23      A   Eight hours to twelve hours.  Eight to twelve
24  hours.
25      Q   How many patients would you see per shift on

Page 78

1  average?
2      A   The typical ER doctor sees between two and three
3  patients an hour, so a shift, if it's ten hours, you could say
4  you see somewhere between 20 and 30 patients.  That's just
5  generality.
6      Q   And you would say the amount that you see is
7  consistent with what the general ER doctor sees?
8      A   Yes.
9      Q   So it would be 20 to 30 per shift, which would be 40
10  to 180 a month?
11      A   I've never counted, but I think those generalities
12  are realistic.
13      Q   And is that number consistent from 1995 to 2005?
14      A   Yes.
15      Q   Was it about twice that when you were full time
16  before that?
17      A   Per month?
18      Q   Yes.
19      A   I hope so.  They would fire me otherwise.
20      Q   So can you talk to me a little bit about what the
21  purpose of the emergency room is.
22      A   Stabilize, disposition, so diagnosis.  But that's a
23  very general question, so I would reserve the right to add to
24  that.  But diagnosis, disposition, stabilize, and treat.
25      Q   Would you say that one purpose is to quickly assess

Page 79

1  the severity of a patient's illness and provide immediate and
2  necessary care?
3      A   Yes.
4      Q   Could you describe how the emergency room works.
5      A   Be more specific.
6      Q   What do you do as an emergency room physician?
7      A   Diagnose, stabilize, treat, disposition, manage.
8      Q   What does disposition mean?
9      A   Does the patient need further care?  Do they need
10  more specialized care?  What's the next step?
11      Q   So an example of disposition would be discharge?
12      A   Yes.
13      Q   It would also be probably a specialist?
14      A   Yes.
15      Q   When you are working the emergency room and you call
16  a specialist, who do you call?
17      A   The appropriate specialist.
18      Q   Who would the appropriate specialist be?
19      A   That's a very general question.  Can you be more
20  specific?
21      Q   Would you call the on-call specialist?
22      A   Yes.
23      Q   Are there circumstances which you would not call the
24  on-call specialist --
25          MR. BECKMAN:  Object to form.

Page 80

1      Q   -- if you're working as the ER physician?
2      A   I think that's an accurate statement.
3      Q   Okay.  So would you say that emergency room
4  physicians are trained to provide quality care to patients who
5  come in off the street?
6      A   Yes.
7      Q   To patients who are directed to go to the emergency
8  room by their physician?
9      A   Yes.
10      Q   Does it make a difference if you know the patient
11  previously?
12      A   Yes.
13      Q   How does that affect the care that you provide as an
14  emergency room physician?
15      A   It's better.
16      Q   So if I see you in the emergency room and I don't
17  have a previous relationship with you, I will receive a lower
18  standard of care than someone that you know?
19          MR. BECKMAN:  Object to form.
20      A   No.
21      Q   Then how does the previous relationship affect the
22  care?
23      A   The previous -- you know information about the
24  patient that always allows you to build the management,
25  disposition, treatment, diagnosis, plan better.  You're able

Page 81

1  to do it faster if you know the patient. So you use the word
2  substandard; that's not appropriate.
3     Q  I didn't say substandard. I said a lower, a lower
4  standard of care.
5     A  That's not appropriate.
6     Q  Why not?
7     A  Because you're giving the best care on either
8  circumstance, but one of them you have more information to do
9  it faster.
10    Q  So would you say those patients receive a higher
11  standard of care?
12       MR. BECKMAN: Object to form.
13    A  No.
14    Q  They get better care but not a higher standard of
15  care?
16       MR. BECKMAN: Object to form.
17    A  They get more time with care.
18    Q  Would you say that's better care?
19       MR. BECKMAN: Object to form.
20    A  I can't say.
21    Q  So you would agree that timely evaluation and care of
22  the patient's symptoms are of critical importance in
23  determining a positive outcome for the patient?
24    A  Are you asking me -- be more specific about stable or
25  unstable. Or be more specific about that question.

Page 82

1     Q  Does stable or unstable matter? Would timely
2  evaluation not be of critical importance if they're stable?
3     A  Depending on the diagnosis -- I'm still confused.
4     Q  Don't you have to treat them in a timely fashion in
5  order to make a diagnosis?
6     A  But if you're talking about -- are you talking about
7  a time period of 30 minutes or an hour or a sprained ankle
8  versus blood pressure from hemorrhage?
9     Q  I'm not talking about anything specific here. I'm
10  just saying, in general, would you agree that timely
11  evaluation is of critical importance for patient outcome?
12       MR. BECKMAN: Object to form.
13    A  The word critical is -- what do you mean by critical?
14    Q  Would you say it's important if we get rid of the
15  word critical?
16    A  Yes.
17    Q  So you would say timely evaluation of a patient's
18  symptoms is important for a positive patient outcome?
19       MR. BECKMAN: Object to form.
20    A  It's one of the factors for a good outcome.
21    Q  Generally, are emergency room physicians trained to
22  quickly and comprehensively evaluate patients and their
23  symptoms?
24    A  Yes.
25    Q  Are emergency room physicians trained to take vital

Page 83

1  signs?
2     A  Yes.
3     Q  To evaluate organ function?
4     A  Yes.
5     Q  To take and interpret lab results?
6     A  Yes.
7     Q  To identify what labs are needed to diagnosis
8  patients?
9     A  Yes.
10    Q  If a patient presents with significant bleeding or an
11  infection, are you able to diagnose the severity of the
12  condition and initiate necessary diagnostic evaluation and
13  management?
14       MR. BECKMAN: Object to form.
15    A  Do that again.
16    Q  If a patient presents with significant bleeding or
17  infection, as an emergency room physician, are you able to
18  diagnose and treat that patient?
19       MR. BECKMAN: Object to form.
20    A  I do the best I can to do just that, to diagnose and
21  treat that patient, yes.
22    Q  Are you trained to do that?
23    A  Yes.
24    Q  Okay. How often does the emergency department
25  receive transfers from other hospitals and physicians?

Page 84

1     A  That's too general. Ask me again.
2     Q  In the emergency room, how often do you receive
3  transfers from other hospitals and physicians?
4     A  Physicians, commonly. Other hospitals, not common.
5     Q  So you're receiving from hospitals infrequently, but
6  you frequently receive transfers from other physicians?
7       MR. BECKMAN: Object to form.
8     A  Other physicians send patients to the ER, yes.
9     Q  Would you say that happens every shift, that you
10  would see a patient referred by another physician or sent to
11  the emergency room by a physician?
12    A  Happens very frequently. I'm not sure every shift,
13  but very frequently.
14    Q  When the patient is transferred from their physician,
15  how often does the transferring physician accompany the
16  patient?
17    A  I have to guess at that.
18    Q  Do they always accompany the patient?
19    A  No.
20    Q  Would you say they more often than not accompany the
21  patient?
22    A  Are you talking about unstable or stable?
23    Q  Either, both, together.
24    A  All right. It's too hard to combine them on that
25  generality.

Page 85

1  Q   To your recollection, do you remember more than half
2  the time, if a patient was transferred from a physician's
3  office, the physician would accompany them?
4      MR. BECKMAN:  Object to form.
5  A   Unstable or stable?  Because it's totally two
6  different --
7  Q   Stable.
8  A   They do not accompany them 50 percent of the time, if
9  unstable.
10  Q   Would you say less than 50 percent of the time
11  they -- less than 25 percent of the time they would
12  accompany?
13  A   If stable?  I would guess less than 25 percent, if
14  stable.
15  Q   How would the physician -- the transferring physician
16  provide information to the emergency room physician?
17  A   Telephone call, face-to-face, or fax.
18  Q   Okay.  So if they didn't accompany the physician,
19  would it be face-to face or would it be by phone call?
20  A   Some won't come in with a patient at the time; they
21  would send them, and then they would show up an hour later or
22  two hours later.  So there's a difference between riding in
23  the ambulance with the patients versus coming to the hospital
24  for rounds in the afternoon or the morning or at lunchtime.
25  Q   Okay.  If that physician came in an hour or two hours

Page 86

1  later, would they call you as well?
2  A   Depends.  If the patient's still in the emergency
3  room, depends on stability of the patient.
4  Q   So the physician wouldn't necessarily call you right
5  away to give you information about the patient?
6  A   Give me -- I don't understand your question.  I think
7  we're talking about two different circumstances.
8  Q   Okay.  So the physician transfers the patient to the
9  emergency room.
10  A   Right.
11  Q   And you said sometimes you discuss a patient with
12  that physician face to face.  You said if they didn't
13  accompany them in the ambulance, they might come an hour or
14  two hours later?
15  A   Yes.
16  Q   And in each of those circumstances, would the
17  physician call you first when the patient first arrived or was
18  on their way to the emergency room?
19  A   I would say yes, they would call me first.
20  Q   And they would give you the information that you
21  needed about the patient?
22  A   If unstable.
23  Q   If unstable.  If stable?
24  A   If stable, they might send the patient's chart with
25  them, they might call me, they might show up.

Page 87

1  Q   They might send a fax?
2  A   They can do that.
3  Q   Okay.  Do all physicians that have admitting
4  privileges that transfer their patient to the hospital meet
5  their patients there?
6      MR. BECKMAN:  Object to form.
7  A   I'd have to guess that the answer's no.
8  Q   So they don't all come by and do rounds and see their
9  patients at the hospital?
10  A   Ask me that again.
11  Q   Do all physicians that have admitting privileges see
12  their patients in the hospital once they're admitted?
13  A   No.
14  Q   How often -- this is, again, working in the emergency
15  room.  How often would you see patients who have concerns or
16  complications related to a recent outpatient procedure after
17  leaving the care of the physician?
18  A   I don't know.
19  Q   Every shift?
20  A   No.  No.
21  Q   Every other shift?
22  A   It's a guess.  The ambulatory care centers that
23  you're -- are you referring to ambulatory care centers or are
24  you talking about surgeries here in the hospital?
25  Q   It could be a surgery in the hospital after they were

Page 88

1  discharged, it could be a surgery that took place at an
2  ambulatory surgical center after they were discharged, it
3  could be an outpatient procedure that was performed in a
4  physician's office after they left the office.  So you
5  repaired a wound and then the wound got infected.  All of
6  those situations are what I'm including in this example.
7  A   Oh, ask me that question.
8  Q   How often would you see those types of cases in the
9  emergency room?
10  A   That's a guess.  Monthly?
11  Q   So you just do it once a month?
12  A   Yes.  That's a guess.  I don't have any numbers on
13  that.
14  Q   So any type of surgical wound can lead to infection;
15  is that right?
16  A   Yes.
17  Q   And if left untreated, could that result in sepsis?
18  A   That's a very broad category, but the answer would be
19  any untreated infection has the potential to lead to sepsis.
20  Q   Even an infection from a mole removal?
21  A   Yes.
22  Q   So in those situations where the patient comes into
23  the emergency room after being discharged from the prior
24  procedure, how often does the provider come into the emergency
25  room?

Page 89

1     MR. BECKMAN: Object to form.
2     **A   Ask me again more specifically.**
3     Q   So we were discussing patients that come into the
4  emergency room after they have a procedure, an outpatient
5  procedure at a physician's office or after they have a
6  procedure at an ambulatory surgical center or even after they
7  have surgery in the hospital, again, all those groups of
8  people; so they go home and they come back to the emergency
9  room because they're experiencing some complication associated
10  with the procedure.  How often would the individual that
11  actually performed the procedure come to the emergency room?
12     MR. BECKMAN: Object to form.
13     **A   That's a guess.  I would say almost always them or**
14  **their partner, if it had a complication from that procedure.**
15     Q   Would they come in right away?
16     **A   Give me circumstances.  Give me more specifics.**
17     Q   I mean, would they meet their patient there to help
18  them through intake?
19     **A   Sometimes.**
20     Q   Not always?
21     **A   Not always.**
22     Q   Would they meet them -- would they come into the
23  hospital and talk to you while you're treating them in the
24  emergency room?
25     **A   Sometimes.**

Page 90

1     Q   Sometimes would they come in a few hours later?
2     **A   Yes.  If stable.**
3     Q   And you said it might not always be the physician
4  that performed the procedure, but it might be their partner or
5  the other individual when their practice is on call?
6     **A   Yes.**
7     Q   And that individual that's on call is able to provide
8  continuity of care for his partner's patients?
9     **A   Yes.**
10     Q   Okay.  How often would you call the doctor that
11  performed the procedure?
12     **A   Give me better circumstances.**
13     Q   So an individual had a procedure at an ambulatory
14  surgical center, they're experiencing a complication, they
15  come into the emergency room.  Would you call the physician
16  that performed the procedure?
17     **A   Almost --**
18     MR. BECKMAN: Object to form.
19     **A   Almost always I will call the physician except on**
20  **nonrelevant or very minor situations.**
21     Q   What is a minor or nonrelevant situation?
22     **A   A patient's safety was not an issue and they can see**
23  **them in follow-up, see the physician in follow-up to -- like,**
24  **a normal, routine, arranged follow-up.  But if it was serious,**
25  **I always call.**

Page 91

1     Q   Is there a difference between stable and unstable, or
2  is that different?
3     **A   Probably it's the third category.**
4     Q   Okay.
5     **A   They haven't gotten unstable, they're serious, but**
6  **you don't have to admit them.  You always call in that**
7  **situation, so they'll follow up soon.  It's just too general**
8  **to say one size fits all in how you're handling that**
9  **situation.**
10     Q   Okay.  Can it be a challenge to get in touch with the
11  physician that performed the procedure?
12     MR. BECKMAN: Object to form.
13     **A   What do you mean by challenge?**
14     Q   Do you ever have difficulty reaching the doctor that
15  provided the care at the ambulatory surgical center, for
16  instance --
17     MR. BECKMAN: Object to form.
18     Q   -- if they're providing procedures to other
19  patients?
20     **A   What time period are you talking about, 24 hours, 48**
21  **hours, two hours?**
22     Q   Less than 24 hours.
23     **A   Not generally.**
24     Q   What about within one hour?
25     **A   Yes.  Sometimes.**

Page 92

1     Q   How often do you know the physician that performed
2  the original procedure?
3     MR. BECKMAN: Object to form.
4     **A   In this area, I generally know them.**
5     Q   If the patient that you are seeing in the emergency
6  room, if their physician has admitting privileges, how often
7  does that physician assume care of the patient?
8     **A   Generally, I would say almost always, if they have**
9  **admitting privileges.**
10     Q   Is that just in situations that the patient would be
11  admitted to the hospital, that you would refer care?
12     **A   Yes.  Well, what are you referring to?**
13     Q   Well, I mean, someone could come into the emergency
14  room to be treated and you treat them in the emergency room
15  and you discharge them.
16     **A   Yeah, they don't assume care in that.**
17     Q   Okay.
18     **A   But if they're admitted, they assume care.**
19     Q   As an ER physician, once a patient is discharged from
20  the ER, what is your continuing responsibility to that
21  patient?
22     MR. BECKMAN: Object to form.
23     **A   Very general.  Give me -- be more specific.**
24     Q   Do you have any continued responsibilities to a
25  patient once they're discharged from the ER?

Page 93

1      MR. BECKMAN: Object to form.
2      A   Good discharge instructions are part of my
3   responsibility.  Under the disposition, I give them a time
4   period of when to come back if the symptoms get worse, what
5   symptoms to watch out for; that's all part of good
6   instructions for seeing their care get better, if it does.  I
7   mean, and if it doesn't, what to watch out for.  And then what
8   is the next step.
9      Q   So if a patient experiences a complication from
10  something that happened in the emergency room, something that
11  you treated them for or with, would you always know?
12      MR. BECKMAN: Object to form.
13      A   What kind of complication are you talking about?
14      Q   Oh, let's say you intubated someone and then there
15  was some kind of complication that arose around the
16  intubation.  I imagine that happens from time to time.
17      A   I think so.  I would know.
18      Q   You would always find out?
19      A   (Witness nods head.)
20      Q   And would you be the one to provide care to them for
21  that complication as the emergency room physician?
22      A   No.  If I admitted them, the admitting physician
23  would --
24      Q   Would then --
25      A   Now, if they were in the emergency room, and we had a

Page 94

1   complication, I would fix it.
2      Q   Okay.  So in the emergency room, have you treated
3   patients with complications following abortions?
4      A   Yes.
5      Q   And that's in the emergency room.  How many women
6   have you treated with post-abortion complications?
7      A   I've never kept a log.  I never counted.  I would say
8   over the 30 years, it's been -- not 30 years, the 25 years in
9   the ER, it's been -- frequent's not the right word.  But
10  common.
11      Q   How many would you say you see a month?
12      A   I can't say.
13      Q   More than one?
14      A   What do you mean by complications?  Be more specific
15  about that.
16      Q   Well, what would you consider to be a complication?
17      A   I consider bleeding, hemorrhage, infection could be a
18  complication.  These can be very minor; they can be very
19  severe.  So it's a huge range there.  Then you have
20  psychological complications, depression.  You have long-term
21  complications.  One example is -- I mean, if they had any
22  fertility issues, that's really more of a complication of
23  STDs, where you get tubal scarring.  But the bleeding and
24  infections, there's a huge range from minor to severe.
25      Q   So for bleeding and infection, including the entire

Page 95

1   range from minor to severe, how often would you see those
2   complications from an abortion each month?
3      A   I can't say.  I can't answer that.
4      Q   Once?  Less than once?
5      A   I can't -- when you see 25, 30 patients a day, you
6   forget what you saw in the morning, more or less having
7   numbers and frequency.  But you had just a sense of whether
8   things are common.  Like, heart attacks are common; you see
9   them often.  But if somebody asks me how many heart attacks
10  did you see, it's a guess from my standpoint.
11      Q   So of the complications you mentioned, bleeding and
12  infection, and you say those are on a range from minor to
13  severe.  Do you have a sense of what percentage that you saw
14  were severe?
15      A   Low percentage.
16      Q   So most were minor?
17      MR. BECKMAN: Object to form.
18      A   Not severe.
19      Q   And what is the most common complication that you
20  saw?
21      A   Bleeding and infection.
22      Q   And when is the last time that you treated a woman
23  with an abortion complication?
24      A   When I stopped the ER.
25      Q   In 2005?

Page 96

1      A   Yes.
2      Q   So now I'd like to talk to you a little bit about the
3   opinions that you offer in your report.  If you could turn to
4   page 1, paragraph 2 of your expert report that's Exhibit 4.
5      A   (Complying.)
6      Q   So on page 1, paragraph 2 of Exhibit 4 you state, In
7   my expert opinion, this provision is reasonable and medically
8   necessary to protect women's health in Alabama; is that
9   right?
10      A   Yes.
11      Q   Does this provision refer to HB57, Section 4(c) that
12  we looked at earlier?
13      A   Yes.
14      Q   And that's the provision that requires all physicians
15  who perform abortions to have staff privileges at a local
16  hospital?
17      A   Yes.
18      Q   For the remainder of the deposition -- and I think up
19  to this time, as well -- I've been using staff privileges and
20  admitting privileges to refer to the requirements of HB57; is
21  that okay?
22      A   Yes.
23      Q   So what is your basis in this sentence and in your
24  report for stating that this provision is reasonable?
25      A   Thirty years of experience.

Page 97

1    Q   That's your medical experience?
2    A   Uh-huh.
3    Q   You're not a lawyer?
4    A   No.
5    Q   Do you have any legal training?
6    A   No.
7    Q   What, in your opinion, makes a law reasonable?
8    A   If it's good for the people, that's the -- be more
9    specific on that as far as when you're talking about all
10   good.
11   Q   You made an expert opinion in this case that this
12   provision is reasonable, and so I'm asking what, in your
13   opinion, makes a law reasonable.
14   A   If it's protective and not damaging.
15   Q   What is your basis for your stating that this law is
16   medically necessary?
17   A   Because it helps ensure the doctor-patient trust
18   relationship or it acknowledges that necessity for good care.
19   It acknowledges the communication necessity for good care.
20   And it acknowledges the continuity of care and necessity for
21   good care.  And then it also holds the doctors accountable for
22   the credentialing process, assures that they've been trained,
23   as well as continuing practice and good care.  So it's an
24   accountability factor on the physician, and it's protective of
25   the foundational aspects of medicine for the woman's health.

Page 98

1    Q   What is medical necessity?
2    A   I'm not sure -- ask me again.
3    Q   What is medical necessity?
4    A   I would say that medical necessity refers both to
5    standard of care or what we assume is the process of
6    healthcare delivery for good patient outcomes for the benefit
7    of the patient's care.
8    Q   So the standard you're applying to determine whether
9    or not something is medically necessary is whether or not it's
10   good for patient care; is that accurate?
11   A   Ask me again.  Be more specific.
12   Q   Are you saying that the standard that you're using to
13   determine whether something is medically necessary is whether
14   it's good for patient care?
15   A   Good for patient outcomes.  And when you take care of
16   people, that patient outcome is huge.  What's best for the
17   patient, overall health outcome.
18   Q   Would you say that anything that improves patient's
19   outcomes is medically necessary?
20       MR. BECKMAN:  Object to form.
21   A   That's way too generalized to answer that question.
22   Q   So what standard then are you applying to determine
23   if something is medically necessary?
24   A   Well, we have a standard of care out there that
25   people would say is a reasonable expectation within the

Page 99

1    healthcare community and the patients, so that's what we refer
2    to as the standard of care.  Does that answer your question?
3    Q   No.
4    A   What's your question?
5    Q   What standard are you using to determine whether or
6    not something is medically necessary?
7        MR. BECKMAN:  Object to form.
8    A   The standard of care that we operate by that's out in
9    the community that we're aware of on a day-to-day basis for
10   handling problems and then my 30 years of experience.
11   Q   So the standard of care -- so anything that's part of
12   the standard of care is medically necessary?
13       MR. BECKMAN:  Object to form.
14   A   I can't answer because I don't understand your
15   question.
16   Q   I'm just trying to understand how is the standard of
17   care relevant to when something is medically necessary.
18   A   I still don't understand your question about medical
19   necessity.  My opinion --
20   Q   Your opinion is that HB57 is medically necessary,
21   correct?
22   A   Yes.
23   Q   So what I want to understand is when you say
24   medically necessary in this -- in your report, what do you
25   mean?

Page 100

1    A   I mean that the law is protective to help ensure good
2    medical care for women seeking abortion, because it helps
3    maintain better doctor-patient relationships, better
4    doctor-patient communication, better doctor-patient continuity
5    of care, and it holds the abortion physician to have the
6    qualifications to take care of those patients seeking
7    abortions.  He has the credentials -- or she has the
8    credentials -- that they can perform that procedure safely for
9    that woman and manage complications in the best maximum way.
10   Q   Do you have any other example of anything else that
11   you would consider medically necessary, based on that
12   definition that you provided?
13       MR. BECKMAN:  Object to form.
14   A   I think that that's pretty much the standard of care
15   that you want and that I want and a reasonable doctor who's
16   credentialed to make the procedures that they're doing or the
17   expertise to do the procedures as well as to have
18   doctor-patient trust, communication, and continuity of care.
19   I think that's across the board.
20   Q   Okay.
21   A   The norm.
22   Q   So do you think that it is also medically necessary
23   that doctors that perform colonoscopies have admitting
24   privileges?
25   A   The group here does.

Page 101

1    Q   Do you think all doctors who perform colonoscopies
2  should have admitting privileges?
3    A   I haven't thought about it.  As far as the group
4  here, the ones that I do, they all have it.  They can handle
5  complications.  I think it provides a better standard of care.
6  Is it --
7    Q   Would you consider a provision that required all
8  physicians that perform colonoscopies to have admitting
9  privileges medically necessary?
10    A   I hadn't thought about it.  I can't answer that.  If
11  you ask me tomorrow, I'll have time to think about it.  But
12  you won't be here tomorrow.  But I don't know.
13    Q   Doesn't it do all these things that you say that this
14  provision does for women that receive abortions, is protective
15  of good medical care, it improves the doctor-patient
16  relationship and trust, it holds that physician to a higher
17  standard of care, and makes sure that they have credentials to
18  perform it safely?
19    A   I agree with all of that.
20    Q   So then would that be medically necessary?
21    MR. BECKMAN:  Object to form.
22    A   Yes, it would.  As far as saying it's consistent with
23  all of those things, and GY doctors here all have admitting
24  privileges.  But it is consistent.
25    Q   Would you say it's medically necessary that all

Page 102

1  providers who insert IUDs have admitting privileges?
2    A   I would say no on that.  That's not a surgical
3  elective procedure like a colonoscopy or elective abortions.
4  I mean, that's not a surgical procedure.
5    Q   But it can result in complications, can't it?
6    A   Anything can result in complications.  You can take
7  any pill and result in complication.  And you don't require
8  every doctor who prescribes a pill to have admitting
9  privileges.
10    Q   So in this situation, though, you've told me that
11  something is medically necessary if it's protective of good
12  medical care because it improves the doctor-patient
13  relationship, if it holds the physician to a higher standard
14  of care, and ensures that the doctor has credentials to
15  perform it safely; why would that not also apply to inserting
16  an IUD?
17    A   IUD is not a surgical elective procedure.  It's just
18  an insertion.
19    Q   What about mole removal?
20    A   It's so superficial, it doesn't have the risk of
21  complications with frequency.  I mean, mole removal frequency
22  complication is 1 in 10 million.
23    Q   So it's only important to protect good medical
24  care -- something is only medically necessary to achieve these
25  things if it has a certain complication rate?

Page 103

1    MR. BECKMAN:  Object to form.
2    A   Well, you're talking about percentages and the risk
3  associated with any elective procedure.  That's all part of
4  the decision, the degree of risk, and the potential of
5  complications.
6    Q   I mean, if I'm a patient and I want to get a mole
7  removed, I would think I would want to get good medical care,
8  I would want to have good doctor-patient relationship, I would
9  want to trust my doctor, I'd want them to know that they can
10  perform it safely, I think I would want all of these things
11  that you -- I think I would want my doctor to be held
12  accountable if something went wrong.  So if that's what makes
13  something medically necessary, why isn't it medically
14  necessary to have admitting privileges to perform mole
15  removal?
16    A   It just doesn't carry the risk that other elective
17  surgeries like colonoscopy -- I mean, mole removal is a total
18  different surgical procedure than elective surgical procedures
19  or colonoscopies.
20    Q   So it's just based on the risk?
21    A   It's risk and the potential for risk, the percentages
22  of risk; it's all that.  It's as different as night and day.
23    Q   Okay.  So do you think that HB57 will decrease the
24  number of abortions that are performed in Alabama?
25    MR. BECKMAN:  Object to form.

Page 104

1    A   No.
2    Q   Would you have an opinion one way or the other if it
3  did?
4    A   I think this law is designed purely for the physician
5  and for the woman seeking an abortion, and that should be
6  better abortion care.
7    Q   Do you think reducing the number of abortions is a
8  laudable goal?
9    MR. BECKMAN:  Object to form.
10    A   It's not relevant to this law.  It's not related to
11  this law.
12    MS. GRIFFITH:  Can you read the question back?
13    (Court reporter read back question on page 104, line 7.)
14
15    MR. BECKMAN:  Same objection.
16    A   It's not relevant.  I mean, it doesn't come anywhere
17  in my thinking and my expert opinion.
18    Q   Your attorney has objected, and those objections will
19  be preserved, but you still need to answer the question.
20    MR. BECKMAN:  I think he just did answer it.
21    MS. GRIFFITH:  He said it wasn't relevant, but he
22  didn't answer the question.
23    A   It's not relevant.  You want to go with that question
24  again?
25    Q   Can you read it one more time?

## Page 105

1    (Court reporter read back question at page 104, line 7.)
2
3      A   I don't think you can assume that that's what this
4    law would do.  And it just has nothing to do with my expert
5    opinion, so I don't -- I hadn't -- I say it's -- I can't
6    answer that in relation to this law.  This law is protective
7    of the woman and holds the physician to a higher standard of
8    care.
9      Q   I'm not asking about this law.  I'm just asking
10   you --
11     A   Okay.
12     Q   -- whether you think reducing the number of abortions
13   is a laudable goal.
14        MR. BECKMAN:  Object to form.
15     A   Well, I have told you I disagree with Planned
16   Parenthood, and we have different opinions, so I do think that
17   reducing abortions is a laudable goal.
18        MS. GRIFFITH:  Okay.  Thank you.  Why don't we
19   take a break for lunch.
20        (Luncheon break from 12:12 p.m. to 12:54 p.m.)
21
22   BY MS. GRIFFITH:
23     Q   Dr. Anderson, if you could turn to paragraph 37 of
24   Exhibit 4, your expert report; it's on page 22.
25     A   Oh, paragraph 37?

## Page 106

1      Q   So in this paragraph you discuss the current Alabama
2    Code that requires an ARHC to have a valid written contract
3    with an outside covering physician; is that correct?
4      A   Yes.
5      Q   And in this paragraph you say that the requirement is
6    insufficient and substandard; is that accurate?
7      A   It's not as good as the highest standard that an
8    elective outpatient procedure gets.
9      Q   So you --
10     A   My opinion is it's insufficient and substandard.
11     Q   Okay.  What is the basis for this opinion?
12     A   Well, the physician isn't held to the communication
13   on elective procedures on your physicians that leave the area
14   or aren't available or partners aren't available or records
15   aren't available; it just depends on how tight that outside
16   covering physician is.  But if the physician is not available,
17   the communication and continuity of care could both be subject
18   to time delays that would undermine better patient care in the
19   face of complications that turned out to be serious.
20     Q   So have you reviewed Alabama Administrative 420-5-103
21   6(b)?
22     A   Awhile back, but I don't remember except what I see
23   right here.
24     Q   Do you recall that this provision requires that the
25   outside covering physician have admitting privileges and be

## Page 107

1    available to treat patients post procedure?
2      A   I mean, I would assume that.  I mean, do I remember
3    reading that?  No.  But I would assume that that covering
4    physician would have admitting privileges but is not someone
5    in the partnership or practice of that -- I mean, this is --
6      Q   What do you base that on?
7      A   I'm just -- a lot of times, you know, when we've done
8    this or I say -- that's not true.  It's just my assumption
9    that it's the physician in a different practice.  You know,
10   it's an OB doctor or somebody else, covering physician, a
11   transfer.  And my assumption that the -- see, no transfer of
12   care is needed if your operating physician is in your
13   practice.  So this transfer of care is predicated that one of
14   your physicians is not available for cross coverage.  Because
15   cross coverage is the reality of life.  You have to.  Nobody
16   can be available 24/7.
17     Q   So what is your assumption that it's a physician in a
18   different practice based on?
19     A   I don't understand your question.
20     Q   So you said that your assumption about the outside
21   covering physician's role was that this was an individual that
22   was not --
23     A   You don't need a transfer of care order.  It's just
24   going to happen automatically, physician's coverage.
25     Q   And how is it different than what the outside

## Page 108

1    covering physician does?
2      A   What specifically?
3      Q   How are you differentiating between how the outside
4    covering physician supports the continuity of care of the
5    patients of the abortion and reproductive health centers
6    versus the physicians within the same practice?
7      A   Well, they have a relationship, they understand each
8    other, they communicate.  It's just natural you can have
9    better communication, ambiguity of communication.  It's going
10   to be better with people you know and you have a relationship
11   with than people who are uninvolved.  I mean, you might know
12   these folks, but they're not going to be as closely associated
13   with you as your partners.
14     Q   Have you spoken to anybody that works at an abortion
15   or reproductive health center in Alabama?
16     A   No.
17     Q   Have you spoken with anyone that acts as an outside
18   covering physician for an abortion or reproductive health
19   center in Alabama?
20     A   No.
21     Q   So what do you base your assumption that they will
22   not have close interaction or communication?
23     A   Thirty years of experience.
24     Q   Thirty years of experience in Virginia?
25     A   Uh-huh.

Page 109

1    Q   How does your 30 years of experience in Virginia --
2    A   Because you see doctors who are working in
3    partnerships, you see physicians that are working in
4    relationship, doing much more timely communication, clearer
5    communication.  It's just these are kind of foundational
6    things that the stronger the relationship, the better the
7    communication.  And physicians that are working together, when
8    I was an ER doctor, when you'd call members of a group, it's a
9    whole different relationship dynamic than when you call folks
10   that are a non-member of a group trying to take care of the
11   patients.  You just don't have as much information or they
12   don't have as much information access; they're not in the same
13   offices.
14       Q   In what circumstances would that occur?
15       A   Be more specific.
16       Q   You said when you call and talk to a member of the
17   group, there's a different level of communication when you
18   call and talk to non-members of the group.  When would you
19   talk to non-members of a group?
20       A   If I couldn't get the on-call physician to call me
21   back and I was, you know, in a situation of necessity,
22   unstable; then we have kind of a protocol, if you can't get
23   the physician group that you need.
24       Q   And how often does that happen?
25       A   I don't know.  I mean, it's not frequent.

Page 110

1    Q   But frequently enough that you have a protocol for
2    how to handle it?
3    A   Yes.
4    Q   And who would you contact in that situation?
5    A   I would call -- I mean, according to protocol, who
6    would be next in that group, whether it's orthopaedics or
7    cardiologists.
8    Q   And would that patient on whose behalf you're
9    calling, would that patient receive continuity of care?
10   A   Not as good as if the physician's partner was
11   involved, but they would receive as good of care as possible;
12   it just takes more time to get information.
13       Q   Have you had any interaction with any emergency
14   department physicians in Alabama?
15       A   No.
16       Q   So you haven't had any conversations with them about
17   their experience dealing with outside covering physicians?
18       A   No.
19       Q   So you don't know if they find communication with
20   outside covering physicians to be inadequate?
21       A   No, I don't know.
22       Q   Do you know the record of patients from Plaintiffs'
23   clinics that have received hospital-based care?
24       A   No.
25       Q   Do you know if there was ever a medication error for

Page 111

1    one of Plaintiffs' patients?
2    A   In Alabama?
3    Q   Yes.
4    A   No.
5    Q   Do you know if any of Plaintiffs' patients suffered
6    harm because of no communication or poor communication?
7    A   I don't know.
8    Q   Do you know if they have suffered harm because they
9    didn't know -- because the doctor couldn't determine the right
10   course of treatment?
11       A   I don't know that.
12       Q   So what then is your basis to state that the current
13   regulations are insufficient?
14       A   Well, the standard of care that's across the board
15   medically that most people want and have been shown to provide
16   the best outcome across this general medical care is the
17   doctors be well-trained and credentialed; that there be a
18   relationship with the patient; that there be good
19   communication, timely communication; and there be continuity
20   of care.  Those things are general principles that are the
21   foundation of medical -- good healthcare system.
22       Q   But you don't know if individuals that receive an
23   abortion in Alabama are currently experiencing that standard
24   of care, do you?
25       A   Well, if they don't have this hospital credentialing

Page 112

1    accountability, then you're just creating situations that
2    aren't at all moving in that direction.  So just by the fact
3    that they don't have credentialing, you're making a situation
4    where those things can happen.
5    Q   But you don't know that they are not happening
6    today?
7    A   No, I can't tell you.
8    Q   So how can you conclude if it's insufficient and
9    substandard if you don't know if those patients aren't
10   receiving care from well-trained providers that have a
11   relationship with a patient and that the backup physician is
12   able or the provider themselves is able to provide timely
13   information and provide for continuity of care?
14       MR. BECKMAN:  Object to form.
15       A   It's just this law is consistent with a good
16   healthcare system.  I mean, you can look at the law and know
17   you're dealing with elective procedures and credentialing is
18   protective and this is just good.  I mean, that's how I can
19   make that opinion with 30 years of experience.
20       Q   Do you have any experience with the Alabama
21   Department of Public Health?
22       A   No.
23       Q   So the Alabama Department of Public Health is the
24   body that's currently responsible for regulating ARHCs in
25   Alabama.  Do you have any reason to doubt the adequacy of

Page 113

1  ADPH's ability to promulgate regulations and provide for
2  patient safety?
3      **A   I think if the law does not exist, you can assume**
4  **that the accountability is marginal, because there's no**
5  **credentialing process as good as a hospital credentialing**
6  **process.**
7      Q   So you don't think that the Alabama Department of
8  Health is able to --
9          MR. BECKMAN:  Object to form.
10     **A   Yeah, I'm not --**
11     Q   -- adequately --
12     **A   I'm saying the law is good.  The law is protective of**
13  **women.  It's consistent with the standard of care that almost**
14  **every patient desires.  So I'm not making any assumptions**
15  **about the Alabama Department of Health.**
16     Q   So if the Alabama Department of Health reviewed this
17  regulation and decided that it was unnecessary to protect
18  women's health, why do you think you are in a better position
19  than the Alabama Department of Health to determine what women
20  in Alabama need to protect --
21         MR. BECKMAN:  Object to form.
22     Q   -- them?
23     **A   People in Alabama are pretty much the same as**
24  **Virginia and across the nation.  They want good healthcare.**
25  **They want physicians they can trust that have proven**

Page 114

1  **credentials.  They want communication, continuity of care, and**
2  **good communication, continuity of care, and physicians they**
3  **can trust.  There's no difference in that arena between**
4  **Alabama and Virginia.**
5      Q   So isn't it true that Alabama already requires that
6  the physician who performed an abortion procedure be
7  responsible for ensuring that all patients receive adequate
8  follow-up care?
9      **A   I imagine it's true.  I mean...**
10     Q   In paragraph 36 you cite the Alabama Code that
11  currently has that provision.
12     **A   Yes.  I mean, the physician who performs an abortion**
13  **procedure is responsible for ensuring that all patients**
14  **receive adequate follow-up care.**
15     Q   So that's the current law in Alabama?
16     **A   Yes.**
17         MR. BECKMAN:  Object to form.
18     Q   Why is that not sufficient?
19     **A   Because ensuring that all patients receive follow-up**
20  **care is very vague and nebulous.  You can leave that up to a**
21  **nurse, you can leave that up to a non-physician; it doesn't**
22  **say the physician is going to necessarily be the one that**
23  **communicates about follow-up care or the physician's partner.**
24  **I mean, it's just very wide open.**
25     Q   So is it your opinion that the Alabama Department of

Page 115

1  Public Health does not adequately enforce this provision?
2          MR. BECKMAN:  Object to form.
3      **A   Oh, I think it's just very vague.  They might enforce**
4  **it; it's just vague.**
5      Q   So you say that Alabama is contradicting itself by
6  requiring that physicians be responsible for follow-up care
7  but not requiring local hospital admitting privileges; is that
8  right?
9          MR. BECKMAN:  Object to form.
10     **A   Well -- go ahead and ask me again.**
11     Q   So in this paragraph, you say, Alabama would be, in
12  effect, contradicting itself by requiring that physicians be
13  responsible for follow-up care but not requiring local
14  hospital admitting privileges.
15         MR. BECKMAN:  Object to form.
16     Q   Is that right?
17     **A   I would say they are maximizing the benefit of**
18  **follow-up care by saying the physicians have admitting**
19  **privileges; they're clarifying what follow-up care would be,**
20  **because it would help ensure continuity of care, communication**
21  **from lapsing.  It's the desire of Alabama that all patients**
22  **have adequate follow-up care, so it's consistent with their**
23  **desire.**
24     Q   So you now think that these two provisions are
25  consistent, not contradictory?

Page 116

1          MR. BECKMAN:  Object to form.
2      **A   Well, I never thought -- they are consistent, if they**
3  **say we want to take it from vague to specific.**
4      Q   Do you agree that in your report you said that this
5  was contra -- that not having them --
6      **A   If they fault the law --**
7      Q   If they don't have it, then it's contradictory?
8      **A   Yes.  I mean, I said it that way.**
9      Q   Yeah, that's right.  Is there a way in which an
10  abortion provider can ensure adequate follow-up care without
11  having admitting privileges at a local hospital?
12         MR. BECKMAN:  Object to form.
13     **A   The best outcomes are things that enhance a**
14  **patient-physician relationship, communication, and continuity**
15  **of care.  Anything that moves us in that direction just**
16  **creates a better healthcare system.**
17     Q   Is anything that moves us in that direction medically
18  necessary?
19         MR. BECKMAN:  Object to form.
20     **A   That's just way too wide open as far as some of**
21  **the -- that's just wide open.  Be more specific.  Are you**
22  **talking about an elective surgical procedure?  Are you talking**
23  **about --**
24     Q   You said that anything that moves us in the direction
25  of increasing continuity of care would be --

Page 117

1    A    Would be good.  I didn't say it was medically
2  necessary to -- we're not going to do laws about taking pills.
3  But it's good for patient outcome to enhance things that
4  improve physician-patient trust, continuity of care, and
5  communication.  That's always going to be beneficial.
6    Q    This law doesn't actually require that the abortion
7  provider provide follow-up care, does it?  HB57, the new
8  law?
9        MR. BECKMAN:  Object to form.
10   Q    Does it require that the abortion provider
11 communicate with a physician that's providing follow-up
12 care?
13   A    It basically says that he will have -- he or she will
14 have admitting privileges in the local hospital.  So because
15 of that, it just enhances communication and continuity of care
16 and accessibility, which enhances trust.
17   Q    Okay.  If we could turn to paragraph 3 of your report
18 that's Exhibit 4.  In this paragraph you say, HB57 is
19 consistent with a standard of care expected of ambulatory
20 surgical care centers regulated by the Centers for Medicare
21 and Medicaid Service; is that accurate?
22   A    Yes.
23   Q    I read that accurately?
24   A    Yes.
25   Q    How did you arrive at this opinion?

Page 118

1    A    Well, I called our HCS and they said that because of
2  this, all of their physicians are required to have admitting
3  privileges.  And so we have an ambulatory care center that
4  does a lot of outpatient surgeries down the road and their
5  office managers said that all the surgeons are required and
6  she sent me this.
7    Q    So what is your experience with ambulatory care
8  centers; is that what you call them in Virginia?
9    A    Ambulatory -- well, I'm messing it up.  We've got
10 ambulatory surgical centers, ASCs.
11   Q    What experience do you have with ambulatory surgical
12 centers?
13   A    Just this one here; they all have admitting
14 privileges.  I mean, I refer patients to them and they
15 communicate, and we have a relationship.
16   Q    Do you have a relationship with the doctors that
17 provide services at the ASCs?
18   A    Uh-huh.  I don't know them all.  There are a lot of
19 doctors in them.
20   Q    Do you know all the doctors that you refer your
21 patients to for procedures?
22   A    Yes.
23   Q    You've never practiced in an ambulatory surgical
24 center?
25   A    No.

Page 119

1    Q    Do you agree that there's a risk of serious
2  complications associated with certain procedures at ambulatory
3  surgical centers?
4        MR. BECKMAN:  Object to form.
5    A    Yes.
6    Q    Is general anesthesia generally used at ambulatory
7  surgical centers?
8        MR. BECKMAN:  Object to form.
9    A    I'm not positive.  But it's across the board as far
10 as -- I can't answer that; I'm not sure.
11   Q    They may not be used at all at ambulatory surgical
12 centers?
13   A    Well, you have your light sedation which is -- they
14 don't use general anesthesia for it.  You just give a little
15 bit of Valium, make you a little sleepy.  So I'm not sure of
16 the answer, how to answer that.
17   Q    But some ambulatory surgical centers use general
18 anesthesia?
19   A    I don't know.
20   Q    You don't know.  Are you familiar with the
21 regulations of the ambulatory surgical centers in Alabama?
22   A    No.
23        (Anderson Exhibit 5 is marked.)
24
25

Page 120

1  BY MS. GRIFFITH:
2    Q    I'm handing you what has been marked as Exhibit 5.
3  For the record, it's the State Operations Manual, Appendix L,
4  Guidance for Surveyors, Ambulatory Surgical Centers.  If you
5  can turn to Section 416, about 41(b).  Can you read -- first,
6  can you tell me, do you recognize this document?
7    A    Yes, it looks very similar.
8    Q    To what you reviewed?
9    A    Yes.
10   Q    Okay.  Can you read what's there at 416.41(b).
11   A    The ASC must have an effective procedure for
12 immediate transfer, to a hospital, of patients requiring
13 emergency medical care beyond the capabilities of the ASC.
14 This hospital must be a local, Medicare participating hospital
15 or local, non-participating hospital that meets the
16 requirements for payment for emergency services under 482.2 of
17 this chapter.  The ASC must have a written transfer agreement
18 with a hospital that meets the requirements of paragraph
19 (b)(2) of this section; or ensure that all physicians
20 performing surgery in the ASC have admitting privileges at a
21 hospital that meets the requirements of paragraph (b)(2) of
22 this section.
23   Q    So you agree that this requirement is disjunctive?
24   A    They're saying or?
25   Q    Correct.

Page 121

1    A   Yes.
2    Q   So the ambulatory surgical center could satisfy this
3 by either having physicians that have admitting privileges or
4 having a written transfer agreement with a hospital?
5    A   Yes.
6    Q   Does HB57 have a similar alternative to a physician
7 maintaining staff privileges?
8    A   I don't think so.
9    Q   So in light of this, would you say that the
10 requirement is consistent or that HB57 is higher?
11        MR. BECKMAN:  Object to form.
12    A   I would say HB57 ensures a better healthcare outcome
13 and has a higher standard than the transfer agreement.
14    Q   So it's higher than what's required under the CMS
15 guidelines for ASCs?
16    A   I'd say it's -- better healthcare outcome would be
17 with HB57 than with this transfer.
18    Q   Are you aware that Alabama does not require
19 physicians practicing at ambulatory surgical centers to
20 maintain or retain local privileges at a local hospital?
21    A   Which physicians are you talking about?
22    Q   Those that practice at ambulatory surgical centers.
23 This is Alabama.
24    A   Are you talking about podiatrists?  Are you talking
25 about general surgeons doing --

Page 122

1    Q   I'm talking anybody that practices at an ambulatory
2 surgical center in Alabama isn't required by Alabama law to
3 have admitting privileges at a local hospital.  Not this; this
4 is the CMS guidelines.  I'm just talking about Alabama
5 regulations of ambulatory surgical centers.
6    A   No.  I mean, here, like I said, everybody at this
7 particular ambulatory care center is required to have
8 admitting privileges.
9    Q   That's in Virginia?
10    A   In this center here.  I'm not positive what's across
11 the board for the State of Virginia.
12    Q   Okay.  Let's talk about some of the complications
13 that can arise following an abortion.  You admit that post
14 abortion complications are infrequent, correct?
15        MR. BECKMAN:  Object to form.
16    A   Well, in the report --
17    Q   Paragraph 6, I think?
18    A   What page are you on?
19    Q   I'm on page 4.  You say, Even if post abortion
20 complications may be infrequent.
21    A   Are you on page 4, what paragraph?
22    Q   Paragraph 6, the last sentence.
23    A   (Witness reviews document.)  Yes, but I mean, I did
24 say may be infrequent, but our numbers, our reporting systems
25 are inaccurate, so I wasn't making a blanket statement that

Page 123

1 they are infrequent.  We just don't have good reporting.
2    Q   So you don't think that they are infrequent?
3        MR. BECKMAN:  Object to form.
4    A   I think it just depends on the wording and what you
5 mean by infrequent.
6    Q   Would you agree that the majority of complications
7 following an abortion can be treated -- handled as
8 outpatients?
9    A   Yes.
10    Q   Would you agree that percentage-wise, abortion is not
11 a dangerous procedure?
12        MR. BECKMAN:  Object to form.
13    A   I think that statement is too general.  Restate the
14 question.
15    Q   Would you agree that percentage-wise, abortion is not
16 a dangerous procedure?
17        MR. BECKMAN:  Object to form.
18    A   That's too general.
19        (Anderson Exhibit 6 is marked.)
20
21 BY MS. GRIFFITH:
22    Q   Do you recognize this, Dr. Anderson?
23    A   Yes.  I mean, I have not seen it since 2002, but I do
24 recognize it.
25    Q   Can you tell us what it is, for the record.

Page 124

1    A   It is the deposition obtained in 2002 on Alaska's
2 parental notification -- or no, parental consent law.
3    Q   Were you under oath when you took this deposition?
4    A   Yes.
5    Q   So you were truthful?
6    A   Yes.
7    Q   If you could turn to page 49.  If you could read at
8 line 17 to 18.
9    A   "It has potential for long-term consequences.
10 Percentage-wise I wouldn't classify it as dangerous.  Whereas,
11 a bypass surgery in the face of a heart attack, I would say
12 that's a dangerous procedure, because you're going to have a
13 maybe 50/50 percent.  But it has the potential for significant
14 long-term complications."
15    Q   So based on this, would you agree that abortion
16 percentage-wise is not a dangerous procedure?
17        MR. BECKMAN:  Same objection.
18    A   Give me that question again.
19    Q   Do you agree that percentage-wise, you would not
20 classify abortion as a dangerous procedure?
21        MR. BECKMAN:  Object to form.
22    A   In this situation, comparing it to bypass surgery, it
23 is not as dangerous as bypass surgery.
24    Q   So in 2002 you testified that it was -- that you
25 would not classify it as dangerous.

Page 125

A  As compared to bypass surgery.  And in that context, it's not as dangerous as bypass surgery.

Q  So you disagree, then, that the risk of complications from abortion is low?

MR. BECKMAN:  Object to form.

A  I don't think we have as good of numbers to just formulate a flat-out opinion.

Q  Are there any studies or other materials that report a higher complication rate?

A  I just don't think we have the studies or the reporting procedures to give us accurate recording rates.

Q  Do you think that there's sufficiently accurate reporting of complications from other procedures?

A  In hospital surgical procedures, they have to record complications.  But there's no reporting mechanism for complications of abortion that I know of.

Q  Are you aware that Alabama has a new code regulating surgical-based surgeries that requires all surgical-related deaths and all events related to the procedure that resulted in an emergency transfer to a hospital, anesthesia, or surgical events requiring CPR, or unscheduled hospital-related surgery and surgical site deep wound infection have to be reported?

A  What are you asking me; am I aware of that?

Q  Yes.

Page 126

A  No.

Q  Would this change your mind about whether or not there's mandatory reporting of complications in Alabama?

A  I can't answer that.  I don't have a good enough grasp of what you read me 30 seconds ago to say that -- to answer that well.  Do you want to read it again?

Q  No.  Okay, so Dr. Fine, in his report, noted a complication rate associated with abortion.  Does that sound familiar?

A  Yes.

Q  And you state that you disagree that the risk of complications from abortion is low, in your report; is that right?

A  I disagree because we don't have good reporting and have not had good reporting mechanisms.

Q  And in that regard, you think that reporting of abortion complications is different than reporting of other complications from other similar procedures, for example, colonoscopies?

A  Your example, I don't know, like, how you report complications in colonoscopies.

Q  How do you know how we report complications from abortions?

A  Well, there's just no mechanism to report them in patients.  I state in there, the patients in the emergency

Page 127

room, I never reported one; there was no mechanism to do it.

Q  Do you report other complications as an emergency room physician?

A  No.  Except STD, you know, there are things that I do report, but not complications.

Q  So how do abortion complications differ from other complications?

A  Because the hospitals track complications from carotid bypass surgeries, heart surgeries, because they have to report post-op infections from bypass surgery, they have to report their infection rates, so it's a very tight, in-hospital system for those surgical complications.

Q  What about for office-based procedures that aren't hospital-based?  Do you think there's enough data to say what the risk of complication from colonoscopies would be?

A  I don't know.

Q  Do you think that a .05 complication rate is a low risk?

A  For what?

MR. BECKMAN:  Object to form.

Q  Anything.  Any medical procedure.  If there was a .05 risk of complication, would you say that's low?

A  I can't really say; I'm not an expert on complication rates.  That's not where my focus is.

Q  But you disagreed with Dr. Fine about whether or not

Page 128

the risk of complications associated with abortions is low.  So what is your --

A  I just know because there's no reporting mechanism.

Q  So you don't necessarily disagree that it's low; you just disagree that we can't know what it is?

MR. BECKMAN:  Object to form.

A  Yes.

Q  But you don't know how that differs from reporting for other complications for other outpatient procedures?

A  Well, ask me more -- be more specific in that question.

Q  You don't know how reporting of complication rates following abortions compares to reporting of complication rates following other procedures that are performed outside of a hospital?

A  Are you talking about colonoscopies?

Q  That is an example, yes.

A  No, I don't know how they're reported.

Q  But do you think that a physician could discuss with a patient the possible risks associated with a colonoscopy?

A  Yes.

Q  Why?

A  Based on their experience and their -- I mean, colonoscopies have also been in hospitals for years, done on hospital grounds, so I guess there's reporting mechanisms

Page 129

1  there, but I don't know.
2      Q   So in your opinion, any procedure that hasn't been
3  performed in a hospital where there's mandatory reporting, you
4  would consider reporting of complications from those
5  unreliable?
6          MR. BECKMAN:  Object to form.
7      A   That's too general.  I don't know.  I can't make a
8  yes or no on that; it's just too general.  If you asked me
9  individually, but it's just too general.
10     Q   Well, what about, for instance, IUD insertion?
11         MR. BECKMAN:  Same objection.
12     A   No comparison to elective procedure.
13     Q   It's still a procedure, correct?
14     A   No.  It's not a surgical procedure.  It's not
15  breaking sterile and non-sterile barriers.  It's not a
16  surgical procedure.
17     Q   How is an IUD performed?
18     A   Well, you just go in the vaginal vault and you insert
19  that into the cervix.
20     Q   And that's not --
21     A   Well, that is.  I mean, you're inserting that into a
22  sterile environment, so I guess I'm wrong trying to define
23  surgery as sterile and non-sterile.  But there's just no
24  comparison to that and certain surgical procedures.
25     Q   Is there a complication rate associated with

Page 130

1  insertion of IUDs?
2      A   I'm sure there is.
3      Q   Would you think it's reliable?
4      A   I don't know.  I've never -- I don't know.  That's
5  not been in my area of expertise or really medical decision
6  process like emergency room situations.
7      Q   Are abortion complications within your area of
8  expertise?
9          MR. BECKMAN:  Object to form.
10     A   Yes.
11     Q   Based on what?
12     A   My experience and my Board certification.
13     Q   Which Board certification?
14     A   Emergency medicine.
15     Q   Your Board certification in emergency room qualifies
16  you as an expert in abortion complications?
17         MR. BECKMAN:  Object to form.
18     A   Yes, sir.
19     Q   Does it qualify you as in expert in complications
20  related to colonoscopies?
21         MR. BECKMAN:  Object to form.
22     A   Taking care of those complications, yes.
23     Q   Okay.  Would you agree that the most common
24  complications from abortion are not life threatening?
25         MR. BECKMAN:  Object to form.

Page 131

1      A   Yes.
2      Q   And the most common complications are bleeding and
3  infection; is that right?
4      A   Yes.  They're life threatening if they're extensive.
5  So any one of those can be life threatening if extensive.
6      Q   How often does sepsis occur as a result of an
7  abortion?
8      A   I don't know.
9      Q   How often does hemorrhagic shock occur as a result of
10  an abortion?
11     A   I don't know.
12     Q   So now I want to talk a little bit about what happens
13  when a woman arrives at the emergency room experiencing a
14  complication from an abortion.  In paragraph 19 of Exhibit
15  4 -- this is your report -- you say, Every patient desires and
16  expects to receive care from a physician that they know and
17  trust.  This explains why a patient will delay care as long as
18  possible rather than deal with a new physician with whom they
19  have not established a relationship of trust.  Did I read that
20  correctly?
21     A   Yes.
22     Q   Do I understand that you are saying here that a
23  patient will delay going to the emergency room because they
24  don't know the emergency room doctor?
25     A   Yes.  It is much easier to communicate with a doctor

Page 132

1  you know.
2      Q   And that's the reason why the patients delay going to
3  the emergency room?
4      A   One of them.  It's not the only one, but one of
5  them.
6      Q   What's another reason why a patient might delay going
7  into the --
8      A   Might be expense.
9      Q   It's also your opinion that she will delay as long as
10  possible if her doctor is not on staff at the hospital?
11         MR. BECKMAN:  Object to form.
12     A   Yes.
13     Q   What is the basis for this opinion?
14     A   Treating patients that avoid establishing a new
15  doctor-patient relationship.
16     Q   Is there any data?
17     A   This is what we teach foundational first-year medical
18  students; you build trust in patients through accessibility,
19  availability, communication, continuity of care, and they will
20  want to come back and see you.  It's something that data --
21  there are statements out there that support that, but I can't
22  give you numbers.  I'm just saying it.
23     Q   Did you review any data or studies in arriving at
24  that opinion?
25     A   Just what I reviewed, and then what we teach students

Page 133

through textbooks. But this is over the last 15 years. I can't cite anything in particular; it's just foundational.

Q    Is there anything else that this opinion's based on?

A    Thirty years of experience, patient's value, trust. Every patient requires and expects to receive care from physicians they know and trust; that's their desire and hope.

Q    In your opinion, do patients trust emergency room physicians?

A    As best they can. But not as good as someone they know.

Q    Why not?

A    Relationship builds trust. If you don't know someone...

Q    Has any patient ever told you that?

A    Oh, yes. That's life.

Q    Do you recall any specific examples of a patient telling you this?

A    All the time, patients communicate how valuable they consider the relationship. In fact, they trust you for guidance.

Q    But has any patient told you that they didn't go to the emergency room because their physician was not there?

A    Yes. They will come to my office, if they know I'm

Page 134

available, much sooner. Many times, they won't go to the emergency room until we open up because they trust us.

Q    How do you know that's based on trust instead of other factors?

A    90 percent of the time they'll tell you: I trust you, I know you, I would like to see you. Patients just communicate that. It's foundational when you're making decisions that affect them. Did you ever go to a doctor you don't trust?

Q    Wouldn't you agree that denial is frequently a cause of delay in patients going to the emergency room?

MR. BECKMAN: Object to form.

A    It can be one of them.

THE DEPONENT: Can I take a break?

MS. GRIFFITH: Sure.

(Recess from 1:44 p.m. to 1:49 p.m.)

BY MS. GRIFFITH:

Q    So before we took a break, we were talking about patients delaying treatment and we were talking about delaying and the trust relationship with the doctor and whether or not denial is frequently the cause of delay in a patient seeking treatment. Would you agree that that's --

MR. BECKMAN: Object to form.

A    Ask the question more specifically.

Page 135

Q    Would you agree that denial is frequently the cause of patients delaying going to the emergency room?

MR. BECKMAN: Object to form.

A    I don't know -- I don't agree with frequently. I would say it's one of the causes to delay going to the emergency room.

Q    And in your experience, is denial of complications common to all patients post surgery?

MR. BECKMAN: Object to form.

A    It can be. I'm not sure percentage, again, or frequency.

Q    I don't think that was my question.

A    Do you want to ask it again?

MS. GRIFFITH: Can you read it back?

(Court reporter read back question at page 135, line 7.)

A    It is one of the reasons.

Q    It's not unique to the abortion context; it's common to all post surgeries?

A    Yes.

Q    In your experience, would you agree that women know that emergency doctors are there to help them?

A    Yes.

Q    Would you agree that they don't feel like they're in a hostile environment when they're in the emergency room?

Page 136

A    Yes, not hostile.

Q    If a woman does not live in the area local to the hospital, would the current admitting privileges requirement have any effect on whether she would delay going to the emergency room?

MR. BECKMAN: Object to form.

A    Say that again.

Q    If a woman does not live in the area local to the abortion clinic, would the admitting privileges requirement have any effect on whether she would delay going to the emergency room?

MR. BECKMAN: Object to form.

A    It probably has no affect on her in that circumstance.

Q    So a woman is experiencing complications after an abortion and she contacts an ambulance to transport her to the emergency room. In your opinion, is the biggest issue in treating a patient suffering from a complication of abortion time?

MR. BECKMAN: Object to form.

A    One of the issues is time.

Q    So should a woman suffering from a complication following an abortion go to the nearest emergency room?

A    If she's unstable, yes.

Q    What are the situations in which she would be

Page 137

1  unstable?
2      A   The emergency transfer is trained to recognize
3  instability as far as patient status and vital signs.
4      Q   By patient transfer, are you referring to the EMTs
5  working with the ambulance?
6      A   Yes.
7      Q   So if the EMT identifies that she is unstable, they
8  would transport her to the nearest emergency room?
9      A   Yes.
10     Q   In what situations would she not be transported to
11 the nearest emergency room?
12     A   If she's stable and requested to go to a particular
13 hospital, that's one situation; the nearest wouldn't
14 necessarily be used -- what the medical technicians do is try
15 to accommodate the patient as best as possible without
16 compromising health.
17     Q   Do you know how often patients request to be taken to
18 a specific hospital?
19     A   Pretty frequently, but I don't know.  Our patients
20 request Johnston-Willis and Chippenham because they know we're
21 here.
22     Q   You mentioned before, those were also the nearest
23 hospitals.
24     A   This is true.  But not necessarily if they live on a
25 southern part of Chesterfield.  Coming up to our place, it

Page 138

1  might be other hospitals, but they know we operate -- I mean,
2  we admit here.  So they request here.
3      Q   And what's the additional distance that those
4  patients would travel?
5      A   Five miles, ten miles.
6      Q   In your experience, what is the furthest distance
7  that an EMT would take a patient to take them to a hospital of
8  their preference?
9      A   We have hospitals on the West End, Henrico Doctors'
10 and St. Mary's, and they're 20 miles.  And some patients in
11 southern Chesterfield will request St. Mary's or Henrico
12 Doctors', and the ambulance will take them there, but only if
13 they're stable.  But the mileage, I don't -- I would say the
14 mileage would be 20 to 30 miles, at best.  But I don't know
15 the distance from Chesterfield to the West End except in that
16 broad category.
17     Q   And in this situation, what do you mean by stable?
18     A   That their vital signs and their -- the vital signs
19 are stable, there's no symptoms, mental status changes,
20 there's no symptoms of shortness of breath, no mental status
21 changes, skin color, pallor; there's a whole host of different
22 clues that might indicate instability that would become part
23 of the decision-making process.
24     Q   And the EMTs have a process for determining which
25 hospital to take patients to?

Page 139

1      A   I don't think they have a protocol.  Is that what you
2  mean by process?
3      Q   Yes, that's what I mean by process.
4      A   No.  Their protocol is nearest hospital if patient is
5  unstable.
6      Q   You said if patient is unstable?
7      A   That's nearest hospital.
8      Q   If they're stable?
9      A   If they're stable?  Then there are a number of
10 factors:  Patient preference, ambulance availability, and
11 distance; I'm sure they're not going to drive the patient to
12 Roanoke.
13     Q   What if an emergency room is closed?  Has that ever
14 happened where the emergency room is not accepting patients?
15     A   No, not here.
16     Q   It's never happened at Chippenham?
17     A   Define what you mean by closed.
18     Q   Not accepting patients.
19     A   It hasn't happened for ten years.  But when it did
20 happen, then they would go to Johnston-Willis or the nearest
21 receiving hospital, again, dependent on stability and
22 instability.
23     Q   So they might go to St. Francis?
24     A   They could.
25     Q   So in your report, you say that HB57 is designed to

Page 140

1  protect the sickest patients who need timely care; is that
2  accurate?
3      A   Yes.
4      Q   In these situations, why wouldn't these women need to
5  get treatment at the nearest emergency room?
6          MR. BECKMAN:  Object to form.
7      A   They would.
8      Q   They would.  Okay.  So this woman arrives at the
9  emergency room.  Can you tell us what happens next?
10     A   What woman?
11     Q   The woman suffering from an abortion complication.
12         MR. BECKMAN:  Object to form.
13     A   She checks in, she gives them their name -- you want
14 that whole process?
15     Q   Sure.
16     A   She checks in, and -- tell me how she's arrived; by
17 ambulance or car?
18     Q   Say, by car.
19     A   She's going to check in, give them her name and
20 address, and tell home what her problem is, and she's going to
21 wait till they call her.  And they're going to do vital signs
22 and they're going to put her in a bed and then the ER
23 physician is going to see her.
24     Q   Okay.  And in your experience, are most women
25 truthful and tell you that they've had an abortion?

Page 141

1    A   Not all.  The word most is -- I don't know what you
2   mean by most.  Can you clarify that?
3    Q   What do you understand most to be?
4    A   Most, 90 percent.
5    Q   So will most women be truthful and tell you that
6   they've had an abortion?
7    A   What do you mean by most?  You just heard that --
8    Q   You need to answer the question based on what you
9   understand that term to mean.
10    A   I would say if we're defining most as a major
11   majority, I'm not positive.
12    Q   Is that generally how you define most, as the major
13   majority?  Is that your understanding of most?
14    A   I would define most as probably 90 percent, in
15   general terms, but to apply it here, if you want me to -- to
16   answer it, you've got to give me what you think the percentage
17   is.
18            (Anderson Exhibit 7 is marked.)
19
20   BY MS. GRIFFITH:
21    Q   I'm handing you what has been marked as Exhibit 7.
22   Do you recognize this?
23    A   I've never seen it before, but I do recognize the
24   names and the date.
25    Q   Can you tell us what this is, for the record.

Page 142

1    A   This is the trial in Alaska about parental
2   notification in February of 2012, and this must be my recorded
3   trial.
4    Q   And you were under oath?
5    A   Yes.
6    Q   If you could turn to page 1679.  If you can read
7   starting at line 12.
8    A   "How have you gone about determining that a young
9   adolescent girl with, she shows up -- or a woman in general,
10   shows up at the ER, that what she's experiencing an abortion
11   complication?  Well, your history is your most -- my answer
12   is, Well, your history is your most critical piece.  If they
13   can tell you or they're willing to tell you -- which most are.
14   I mean, most of them are scared and they're fearful, and
15   they're going to be truthful most of the time.  I'm not going
16   to say all of the time.  But then there's a group that fear
17   causes them to live in such denial that you can't get at the
18   truth.  But for the most part, I get the history.  They'll
19   give me the history."  And then --
20    Q   That's good.  Thank you.  So when you said here that
21   most of the time they'll be truthful and tell you, do you know
22   what you meant by "most" in this testimony?
23    A   Whether it's 60 percent or 90 percent, I don't know
24   at that moment in time.
25    Q   But you agree that that was your testimony?

Page 143

1    A   Oh, yes.  Yes.
2    Q   And has anything changed between now and then that
3   would change your opinion about whether most women are
4   truthful and tell you that they've had an abortion?
5    A   Just what I meant by "most" might have changed, and I
6   am not sure if that definition of most then is the same as it
7   is now, today.  They didn't ask me to define it then, so it
8   might be new wording.
9    Q   Now, in the situation where the woman does not tell
10   you that she's had an abortion, are you able to discover
11   enough for initial treatment from a physical exam and other
12   diagnostic tests?
13    A   Yes.  Ask me that again.
14    Q   If the woman does not tell you that she's had an
15   abortion, are you able to get enough information for initial
16   treatment from a physical exam and other diagnostic tests?
17        MR. BECKMAN:  Object to form.
18    A   Eventually, the answer is yes.  But the time delays
19   in that process can be much different.
20    Q   What are those time delays?
21    A   If she does deny an abortion or if I don't have
22   information from the doctor, then the extent of her
23   complication and information in trying to put together the
24   whole picture just takes more time.  Just like anything, if
25   you had more information -- the more information you have, the

Page 144

1   quicker you can put a picture together and know how to respond
2   to it.
3    Q   Is treating abortion complications different than
4   treating a miscarriage?
5        MR. BECKMAN:  Object to form.
6    A   When it comes down to hemorrhage and infection, no.
7    Q   So it would be the same diagnosis to determine what
8   treatment is needed, whether she's suffering from a
9   miscarriage or an abortion?
10        MR. BECKMAN:  Object to form.
11    A   The abortion has an array of complications possibly
12   that are different from miscarriage.  They can bring in other
13   factors, like uterine perforation and infection in the abdomen
14   that a miscarriage is not going to have.
15    Q   A miscarriage does not carry the risk of infection of
16   the reproductive system?
17    A   It does, but possibly; it's very much less frequent.
18   I'm trying to remember -- I can't tell you a time when I've
19   treated a miscarriage for an infection.
20    Q   How often do you treat women presenting with
21   miscarriage?
22    A   Very seldom now, but in the emergency room.
23    Q   How often in the emergency room?
24    A   It was common.
25    Q   Once a shift?

Page 145

1    A   No.  Common just means you see it.  Once a month.
2    Maybe.  I'm not sure.  I just -- I don't measure or keep
3    records on it, so I'm guessing.
4    Q   You stated in paragraph 5 -- I'm referring back now
5    to Exhibit 4 -- you state that you have had many patients
6    request to conceal the fact that they had an abortion as part
7    of their medical history; is that correct?  Did I read that
8    correctly?
9    A   Yes.
10   Q   How many women have you had request that you conceal
11   the fact that they had an abortion?
12   A   I don't have numbers.  I don't keep tabulation, but
13   as far as requesting that it not be in the diagnosis, I think
14   many is accurate over the 25 years I was in the emergency
15   room.
16   Q   How many times do you specifically recall a woman
17   asking you to conceal this information from her medical
18   record?
19       MR. BECKMAN:  Objection, asked and answered.
20   A   I think to put a number on it when I don't measure it
21   and keep records is just guessing.
22   Q   When is the last time that you recall this
23   happening?
24   A   During my ER tenure that stopped at 2005, so I can
25   say it has not happened since 2005.

Page 146

1    Q   Do you recall any specific incidents in which a woman
2    asked you not to put this in her medical record?
3    A   Yes.
4    Q   Can you tell me about those?
5    A   One woman, her husband didn't know about it, and she
6    asked me not to put it in her record.  Another woman, nobody
7    knew about it, and she just asked me not to put it in the
8    record.  And you don't have to put it in an admitting
9    diagnosis; you put infection or bleeding.  But number-wise --
10   those specific instances, I can tell you about, but I don't
11   have numbers.
12   Q   So you recall two specific instances where a woman
13   asked you not to put this in her medical record?
14       MR. BECKMAN:  Object to form.
15   A   I recall at least those two, but it was not uncommon.
16   When you see 20 and 30 patients a day, it just becomes a blur,
17   but you see certain reoccurrences that you would just label as
18   common and go on.  But I do not have numbers.
19   Q   And you don't recall any other specific instances
20   other than the two that you've already identified?  That's
21   accurate?
22   A   I mean, yes, as far as the face and a particular
23   incidence.  But again, I don't keep any records to remember
24   stuff like that, except knowing that it's common.
25   Q   What does common mean?

Page 147

1    A   Common, it happens frequently enough that you're not
2    surprised by it.  It's just something that you see in your
3    realm of experience.
4    Q   So would that be once a year?
5    A   I don't know.
6    Q   In these instances where the women asked you to
7    conceal that they had an abortion, were you still able to give
8    those women adequate care?
9    A   Yes.
10   Q   So it had no impact on the quality of care they
11   received?
12       MR. BECKMAN:  Object to form.
13   A   Except for the time delays to figure out the
14   situation.  But the concealing of information if they didn't
15   tell me the truth, that they'd had an abortion, or if I didn't
16   have communication with the physician, those time delays were
17   always putting the patient at some increased risk.
18   Q   How long does it take to do a simple physical exam?
19   A   Five to ten minutes.
20   Q   Is that a time delay?
21   A   No.  You can do a physical exam.
22   Q   So if you can discover that a woman had an abortion
23   or might be suffering from a complication related to a
24   miscarriage by a simple physical exam, does that create a time
25   delay?

Page 148

1        MR. BECKMAN:  Object to form.
2    A   You can't tell that from physical exam.
3    Q   Can you tell if a uterus is firm?
4    A   Yes, most of the time.  But if they're super tender
5    or if they're very nervous, you can't do an adequate pelvic
6    exam.  So physical exam doesn't always tell you the
7    information.
8    Q   If you could refer to your 2012 testimony; I think
9    it's Exhibit 7.
10   A   All right.
11   Q   On page 1680 of Exhibit 7, at lines 8 through 13, you
12   say: "So most of the time abortion is not a hidden thing,
13   thankfully, and once we're starting to work with the history,
14   you just put the pieces of puzzle together.  And then we have
15   physical exam, we have lab work, we have X rays, all those
16   tests that help define a situation."
17       So then continuing on page 1681, you talk about a
18   simple physical exam giving you information about if their
19   uterus feels enlarged, not --
20   A   Where are you reading?
21   Q   I'm reading at -- this is on page 1681, line 1
22   through 5.
23   A   (Witness reviews document.)  It's going to give you
24   information, but it's not always going to give you everything
25   you need to make your diagnosis.  But if a uterus feels tight

Page 149

1   and hard, that's going to give you some information, and if it
2   doesn't, if it feels enlarged, you're going to think they're
3   pregnant but it's not black and white.
4       I don't think I'm saying -- I mean, the physical exam
5   helps you, but it's -- if someone weighs 250 pounds, your
6   physical exam is different than if they're small.  So I would
7   never imply that the physical exam alone is going to give you
8   all the information.
9   Q   What if someone presents with vaginal bleeding and
10  you do this physical exam; what additional information would
11  you need to diagnose her?
12  A   For what?  Be specific.
13  Q   To provide her with initial treatment.
14      MR. BECKMAN:  Object to form.
15  A   You could do a history.  You could -- I'm still not
16  clear on what you're asking me.
17  Q   If a woman presents with vaginal bleeding and you
18  perform this physical exam and her uterus feels enlarged, what
19  additional information will you need in order to treat that
20  woman?
21  A   I would use the history.  I'm going to do the
22  physical exam.  I'm going to do lab work.  Now I'm going to
23  use ultrasound, or radiology, and if I still don't know, then
24  I'll get a consultant in.  But I'm going to use all those
25  pieces of the puzzle to help me define the situation.

Page 150

1   Q   Okay.  And where are time delays introduced in that
2   process?
3   A   If the patient has come to the emergency room because
4   they didn't want to come or if I didn't have an accurate
5   history for one reason or another, or if physical exam didn't
6   help me, so then you had to do more testing just to try to
7   figure out what was going on, so all those things can mean
8   more time.
9   Q   Do you have to do a physical exam on every patient
10  that you see in the emergency room?
11  A   Yes.
12  Q   So there's no additional time if you perform a
13  physical exam on a patient presenting with complications from
14  abortion?
15      MR. BECKMAN:  Object to form.
16  A   Just depends on -- the problem -- I think your
17  physical exams can take you a certain amount of time with
18  every patient.
19  Q   So you said if a woman comes in and she presents with
20  vaginal bleeding or lower abdominal pain, would you generally
21  look to the reproductive system as a potential cause of the
22  issue that she's presenting with in the emergency room?
23  A   Yes, if she has vaginal bleeding.
24  Q   And in those instances, you would perform a physical
25  exam and then do additional tests such as an ultrasound and

Page 151

1   then blood work; is that correct?
2   A   Yes.
3   Q   What additional information would you want from the
4   abortion provider to diagnose the woman?
5   A   Just how long has it been since the abortion and if
6   he's been treating any complications, what was he concerned
7   about, past medical history with the patient, the age of the
8   intrauterine pregnancy, the type of abortion procedure that he
9   did, were there any complications with the abortion procedure
10  or any post-op medications, antibiotics, if uterine
11  constrictors are used, and that would be -- and then his
12  recommendation or her recommendation or what they would want
13  me to do next, assuming that their involvement with the
14  patient is going to help clarify the next step.  So it's more
15  the collaboration of teamwork.
16  Q   Is there any information that you would not be able
17  to get from the patient?
18  A   As far as -- yes, I think some patients have trouble
19  with any of that, that I just said.  I think some patients
20  would be confused or fearful or just not comprehending the
21  situation.
22  Q   Have you ever seen a woman with a complication from
23  an abortion that presented with an information sheet from the
24  clinic where she received the abortion?
25  A   No.

Page 152

1   Q   So if she had an information or discharge sheet that
2   had all this information, would you need to get in touch with
3   the provider?
4       MR. BECKMAN:  Object to form.
5   A   I would still call the provider.  Absolutely.
6   Q   What additional information would you want to get
7   from the provider?
8   A   That's where the doctor-patient relationship, the
9   communication on their summation of the situation, their
10  knowledge base about this particular patient all influences
11  what you do, and what their recommendation would be if they're
12  not going to take care of her.  So the communication is very
13  helpful.
14  Q   But that could also be with their partner or someone
15  else in their practice?
16  A   Yes.  Many times the subspecialists, their partners.
17  Q   In paragraph 24 of Exhibit 4 -- that's your report --
18  you state that -- I'll let you find that.  When women came to
19  the ER with complications related to an abortion --
20  A   You're talking about paragraph 24?
21  Q   Yeah, sorry.
22  A   Not page 24.
23  Q   Yeah, paragraph 24.  You state, When women came to
24  the ER with complications related to an abortion, never once
25  did I receive a phone call initiated by the provider conveying

## Page 153

1  information about the abortion; is that accurate?
2      A   Yes.
3      Q   Have you spoken to any hospitals or clinics in
4  Alabama?
5      A   No.
6      Q   So you don't know if, in Alabama, the providers call
7  emergency room physicians?
8      A   That's correct.
9      Q   How is this different from other situations?
10         MR. BECKMAN:  Object to form.
11     A   Be more specific.
12     Q   Outside of the abortion context, when do providers
13  call you?
14     A   All the time, when I'm the ER doctor, if they know
15  their patient's coming.
16     Q   How would the admitting privileges requirement in
17  HB57 change this?
18         MR. BECKMAN:  Object to form.
19     A   The admitting privileges help create the relationship
20  connection with the other staff physicians, both ER and
21  subspecialists; where that connection creates a relationship,
22  which enhances communication.
23     Q   But HB57 does not require the provider to call the ER
24  doctor.
25     A   It does not -- yes, you're correct.

## Page 154

1      MS. GRIFFITH:  Is it time to take a break?
2          (Recess from 2:24 p.m. to 2:32 p.m.)
3
4      MR. BECKMAN:  Just for the record, during the
5  break, I handed to Counsel the supplemental report that
6  Andrew Brasher, another attorney for the State of
7  Alabama, e-mailed to all parties last night, and they've
8  confirmed that they've received the e-mail and they have
9  a hard copy now as well.
10
11  BY MS. GRIFFITH:
12     Q   Okay, Dr. Anderson.  In your experience working in
13  the emergency room, if you're treating someone suffering from
14  volume loss or infection, do you need to know the cause of
15  that volume loss or infection for initial treatment and
16  intervention?
17     A   In a certain place, define if it's -- say, a picture,
18  someone's on the edge of a cliff; they might look the same as
19  they did ten feet from the cliff, but once they fall off the
20  cliff, they're looking the same the whole way down.  With
21  volume loss and infection, your body has a compensatory
22  mechanism, so you go from ten feet away from the ledge and
23  right up to the ledge, and you're looking very much the same.
24     So during that time period, if I have information,
25  know where we're headed, I can really make much quicker

## Page 155

1  interventions than if they fall off that cliff and they're
2  airborne and falling; then all my interventions are the same.
3  It's that time before they got to the edge of the cliff -- the
4  continuity of care, communication, information -- makes a big
5  difference in the treatment of hemorrhage.
6      Because you don't know they're getting ready to fall
7  off.  But after they've fallen off, your treatment is the
8  same.  It's that time before they get to the edge of the
9  cliff.  That's just a picture.  And it's not -- I don't want
10  to say, Hey, that's a full picture of the situation, but my
11  treatment after they fall off the cliff.  Doesn't matter what
12  caused them to fall off the cliff, but if I can treat them
13  before they fall off the cliff, it does matter.
14     Q   Can you give me an example where that additional
15  information is important before they fall off the cliff?
16     A   Well, you just -- if you know they've had a procedure
17  that has potential to bleed heavy, or if you know they had a
18  procedure that has the potential to cause infection, then if
19  the woman comes in and just says she has a fever and you're
20  trying to put it all together versus the physician phone call
21  that says, We did this procedure, da, da, da, and you know the
22  complications associated with it, in general terms, that's
23  always going to move you to being more specific and quicker
24  for initiating treatment based on presumptive diagnosis.
25     Q   So if a woman presents with a fever, and if, in

## Page 156

1  getting the medical history she informs you, as most women do,
2  that she's had an abortion, what additional information would
3  you need?
4          MR. BECKMAN:  Object to form.
5      A   Well, what we said, in the communication with the
6  physician, did he have bleeding, did he have complications,
7  and the procedure of the abortion, the lateness, and what type
8  of abortion procedure might he have done in reference to what
9  complications he might have -- or she -- might expect; so any
10  information is almost beneficial.
11     But to say that it's comparing apples with apples, if
12  you had information from the abortion procedure, it's always
13  going to be helpful to help you deal with that situation.
14     Q   So if a woman presents in the emergency room with a
15  fever and she told you that she recently had an abortion
16  procedure, would a likely diagnosis be that she had an
17  infection?
18     A   It could be, yes.  If she has a fever, you would
19  think infection.
20     Q   And how would you confirm that diagnosis?
21     A   Well, you do your blood work, you do your laboratory,
22  your X rays, and if she had different types of infection, say,
23  versus intra-abdominal violation, if there was a hard time
24  doing the abortion procedure versus -- and the dates of it,
25  certain complications might be associated with different

Page 157

1  infections that would be more serious or more potentially
2  rapid.
3      Q   So if a woman presents to the emergency room with a
4  fever and she informs you that she previously recently had an
5  abortion, would you think she may have an infection and order
6  blood work and labs and X rays to confirm; is that correct?
7      A   Yeah.  You would do that, yes.
8      Q   Okay.  How would you determine what type of infection
9  she had?
10     A   You can't until you do cultures for 48 hours, but you
11 determine your antibiotic usage based on what body cavity you
12 think you're dealing with, intra-abdominal versus
13 intrauterine.
14     Q   And so what information from the abortion provider is
15 necessary to make that determination?
16     A   Well, just their opinion of what -- from the abortion
17 procedure that they used, the age of intrauterine gestation,
18 and were there complications of the abortion procedure in
19 doing it.  From those things, the abortion provider can help
20 us determine.
21     Q   So setting aside whether or not there were any
22 complications during the procedure, how would the age of
23 gestation affect what type of antibiotics you would
24 prescribe?
25     A   I'm just thinking if the uterus is larger; if they

Page 158

1  felt like there were any retained fetal parts; or if there's
2  perforation of the colon, which is more likely; if the
3  gestation gets older, abortion complications seem to be stated
4  as being more likely, the older the gestation.
5      Q   But the initial treatment of the infection would be
6  the same?
7      A   The antibiotic choices could be different, so no.
8  The information the abortion provider provides could be very
9  helpful.  Not always -- not always different but can be very
10 helpful and can be different.
11     Q   What about in the instance of blood loss -- a woman
12 experiencing vaginal bleeding and presenting to the emergency
13 room, in that instance, why is it important to know the
14 causality of her blood loss?
15     A   You've got to stop the bleeding.  If you know it's
16 intra-abdominal bleeding versus vaginal wall bleeding, that's
17 two different surgical procedures, in my limited knowledge.  I
18 have surgeons who can make this decision, but they're going to
19 be different procedures.
20     Q   So what would be the treatment in that case?
21     A   Well, if you had a uterine perforation and a colon
22 and intestinal artery bleed, you've got to operate on the
23 abdomen and close the arterial bleed.  If you have a uterus
24 that's just bleeding, either from retained placental parts,
25 you've got to do a D&C or you have to do a hysterectomy, if

Page 159

1  you had a uterine vein or uterine artery bleed or some uterine
2  bleed from the uterine wall itself.  I'm not an expert in
3  those surgical options, except just generalities and body
4  cavities.
5      Q   So how would you treat the woman when she presented
6  in the emergency room with these symptoms?
7      A   I'd give her oxygen.  I'm going to hang IV fluids,
8  order lab work, order blood type and cross units, if need be.
9  And do your ABCs of resuscitation:  Airway, breathing,
10 circulation.
11     Q   And would you call someone in to consult?
12     A   Yes.
13     Q   Who would that be?
14     A   It would be a GYN if it's -- if I know she's had an
15 abortion, I'd call an obstetrician-gynecologist.
16     Q   Would you do something different if her symptoms were
17 consistent with having had a miscarriage?
18     A   If she'd -- no, I'd call a GYN, if she's had a
19 miscarriage, if she's bleeding heavily.
20     Q   So in the case of vaginal bleeding, if a woman
21 presents to the emergency room, you're going to treat her with
22 O2, IV fluids, you are going to do blood work, blood type her,
23 give her blood, if that's necessary.  How would any of that
24 change based on a conversation with the abortion provider?
25     A   As far as your blood work determining blood loss, if

Page 160

1  he can give me her discharge vital signs and hemoglobin
2  status, it would help me determine if bleeding has been more
3  extensive than what might appear.  And you can't tell
4  significant blood loss visually.  That does not correlate with
5  clinical fragileness or criticalness.
6          And so the parameters he can give me while she's
7  there in the clinic would be helpful to determine how close
8  she is to the edge of the cliff, and then getting a drop in
9  blood pressure and being closer to the extreme, critical.
10     Q   In the absence of the information from the abortion
11 provider, is there an average for women of a certain age,
12 blood pressure and other parameters that you would use, to
13 gauge what you observe in the tests against?
14         MR. BECKMAN:  Object to form.
15     A   We have normal ranges.
16     Q   So in the absence of information from the abortion
17 provider, would you compare it to normal ranges?
18     A   Yeah.
19         MR. BECKMAN:  Object to form.
20     A   Yes.
21     Q   What additional information would talking to the
22 abortion provider give that would be more helpful than
23 comparing it to the normal ranges for a woman of her age?
24         MR. BECKMAN:  Object to form.
25     A   Well, again, the abortion providers will have a full

Page 161

1  picture of intrauterine gestation, past medical history,
2  complications, the type of procedure that he did an abortion
3  on, and post-op medications and the timing of when they did
4  the abortion, how long has it been; all those things are
5  beneficial. Many times, patients can get that information;
6  many times they're just -- it just goes over their head.
7      So normal vital signs are just one piece of the
8  puzzle; I mean, to assume it was normal versus knowing when
9  it's her vital signs when she was with the abortion
10 physician.
11     Q  Treating blood loss, you said it was important to
12 know from the abortion provider what her previous levels were
13 in order to determine the volume of blood loss; is that
14 correct?
15     A  No. You've overstated it. It can be helpful. The
16 hemoglobin -- it's what we measure -- can take up to eight
17 hours to equilibrate from the time of blood loss to the time
18 you get an accurate picture. So depending on when he did the
19 abortion, when he did the hemoglobin, when she came in there,
20 it's just a reference point that helps me in the whole
21 picture. But it's very helpful information, compared to what
22 I get.
23     Q  Compared to what you get --
24     A  At the emergency room, at that time. I mean, my
25 goal, like I said, is to prevent the patient from falling off

Page 162

1  the cliff. I want to intervene as soon as possible. And as
2  soon as I know that they're in a more extreme state of
3  infection or blood loss, then you're moving with other -- I
4  mean, your antibiotics and your blood replacement and your
5  volume replacement strategies, you need to step up.
6      Q  Infection and blood loss are something that emergency
7  room physicians are trained to treat, correct?
8      A  Correct.
9      Q  How often do you see infection and blood loss in the
10 emergency room?
11     A  It's very common.
12     Q  More than once a shift?
13     A  No, not more than once a shift. It's part of your
14 routine that's kind of -- it's just common. I mean, we take
15 care of geriatrics; they get pneumonias and bladder infections
16 and bloodstream infections downstream of that all the time.
17     Q  And you're able to diagnose and treat those
18 infections effectively?
19     A  Yes, I hope so.
20     Q  And the same with blood loss?
21     A  Yes. I hope so. Yes.
22     Q  And are you able to diagnose and treat those without
23 information from another physician?
24     MR. BECKMAN: Object to form.
25     A  Well, the other physician's information helps you

Page 163

1  intervene again before it gets extreme. We will treat
2  everybody when they have fallen off the cliff; almost all
3  supportive measures. But if you can get to them before then,
4  start antibiotics early and start appropriate antibiotics
5  early, then that makes a difference.
6      And the information I get from physicians is almost
7  always an asset. Whether it's past medical history, prior
8  medical conditions, circumstances that they're going through
9  at that time, medications, former treatments, all of that
10 stuff makes a difference.
11     Q  If we could refer back to Exhibit 4, which is your
12 expert report, paragraph 29. Here, we're talking about
13 bleeding, I believe; is that right?
14     A  Yes.
15     Q  So I think, actually, we can continue on to --
16 paragraph 29 continues on page 17. And the section that
17 reads, Even experienced emergency medical technicians and
18 surgeons often have difficulty accurately predicting the
19 amount of blood loss when viewing the scene or situation. The
20 availability of her operating physician is of utmost
21 importance in the management of her complications. The actual
22 degree of blood loss can only be determined by the patient's
23 symptoms, vital signs, organ function, and lab values. Did I
24 read that accurately?
25     A  I mean, I stated that; I stand with it.

Page 164

1      Q  But I accurately read into the record what's in the
2  report?
3      A  (Witness nods head.)
4      Q  If the only way to gauge the degree of blood loss is
5  by the patient's presented symptoms, vital signs, organ
6  function, and lab values, how is the availability of the
7  operating physician helpful?
8      A  Because so much medicine is anticipatory. That
9  information lets me know where I'm headed. So I don't
10 actually want the patient's blood loss to become severe, if I
11 can intervene prior to that. So past medical history, prior
12 vital signs, lab work gives me reference points that helps me
13 anticipate what trend is going on. Medicine is so often
14 evaluation of information and trends, and then anticipating
15 where you're headed. So I don't want that patient to fall off
16 the cliff, if I can prevent it.
17     Q  You say in your report that the actual degree of
18 blood loss can only be determined by the patient's symptoms,
19 vital signs, organ function, and lab values; is that
20 accurate?
21     A  It can -- at that point in time, if life is one point
22 in time, all that is going to give me that information. It's
23 not -- what I'm talking about visual, you can't look at the
24 context of this sentence that's predicting the amount of blood
25 loss just by viewing the scene or situation, and you can't

Page 165

1   look at the blood and have an idea of what you're dealing
2   with.
3           So one point in time, if you used all this to figure
4   out where they are at that point in time, and then if you have
5   another point in time which continuity of care gives you, then
6   you have a trend. And then your trends become anticipatory or
7   helpful, so you don't come to the place where it gets worse.
8   But one point in time, I would -- I would say yes. But you
9   need all this to determine actual blood loss. But if I have a
10  reference point, it's going to be very helpful in anticipating
11  an intervention.
12      Q   And the normal range can also serve as a reference
13  point?
14      A   Nothing like the doctor. Because you don't know if
15  the patient started off normal. Some women are anemic when
16  they go in to have the abortion. Some smaller ladies have low
17  blood pressures. You could overtreat, you could undertreat,
18  either way.
19      Q   But emergency room physicians are trained to take
20  vital signs and read tests?
21      A   You hope so.
22      Q   I'm asking you based on your experience in the
23  emergency room.
24      A   I hope so. I am sure.
25      Q   If you could turn to Exhibit 7, I believe it is, the

Page 166

1   2012 testimony; it's on page 1727. Can you read, starting on
2   page 1726 at line 25 through 1727, line 9.
3       A   Line 25?
4       Q   Starting on the previous page, 1726, starts with, But
5   this is as basic as.
6       A   "But this is as basic as, the vital signs are very
7   clear, they're very -- the normal range, the abnormal range is
8   taught since the first year of medical school. You recognize
9   abnormal vital signs, you react to vital signs. Then in
10  situations, whether it's bleeding or infection, those are
11  common enough, whether it's your world of pregnancy-related
12  disorders or normal life or aid on the battlefield, these are
13  every-day medical decisions that we train our medics to make."
14  Keep reading?
15      Q   No, that's fine. Do you still agree with this?
16      A   Now, what's the -- I agree with the statement, yes.
17  But what is the question you're asking me?
18      Q   That's all. I just wanted to confirm that you agree
19  with this, that it's very basic for medics and individuals in
20  the ER to determine when vital signs are within and outside
21  the normal range.
22          MR. BECKMAN: Object to form.
23      A   Yes, but if you take this out of context, we're
24  talking about trends and where patients started from and where
25  they're going to. Vital signs, when a patient's fallen off

Page 167

1   the cliff and are abnormal, do cause us all to react the same
2   way. But if we're trying to be anticipatory, to figure out
3   what's going on before the patient gets to the edge of the
4   cliff, that's where the time delays and the continuity of care
5   and the communication are huge, helpful maneuvers.
6           But we can all react to abnormal vital signs and
7   compare them to normal and have a good reaction. But is that
8   the best standard of care of women or patients who have
9   complications or infections? I'd rather be there early before
10  the vital signs became abnormal.
11      Q   How can you make a diagnosis and treatment before the
12  vital signs become abnormal?
13      A   Well, it's like putting a puzzle together. If people
14  had certain historical situations where they've had surgery or
15  where they've had trauma and accidents, you take the history,
16  you take your symptoms, and someone is having chills and
17  you're thinking about infection. They might not have a fever.
18  But the chills start to get your attention, and if they've had
19  a procedure that would possibly cause an infection, then those
20  things start to put your radar up, and the vital signs won't
21  change there.
22          So all that information just helps you kind of work
23  things, where once normal, and now you're here, and what's
24  going on in between that whole time and space, and any
25  information you get there is an asset in anticipatory medicine

Page 168

1   to keep things from getting worse.
2       Q   Wouldn't waiting for the abortion provider to come to
3   the hospital or even to speak to you on the phone introduce a
4   time delay in treating a patient who arrived at the emergency
5   room experiencing a complication from an abortion?
6       A   I'm not saying wait till they get there to initiate
7   treatment.
8       Q   Okay.
9       A   If the patient's stable, I can call the abortion
10  provider, talk to them, and if they're unstable, then I'm
11  going to initiate patient treatment, but I'll call the
12  abortion provider and get as much information as I can to aid
13  in the diagnosis and treatment of what's exactly going on.
14  But no way do we have to wait to do the best effort.
15      Q   If you could turn to paragraph 24 of Exhibit 4 --
16  that's your report -- on page 13.
17      A   Paragraph what?
18      Q   24. In this paragraph, you state that you always,
19  Have to evaluate the situation, come to my conclusions and
20  initiate what I thought was appropriate treatment. Did I read
21  that correctly?
22      A   Yes.
23      Q   And we're talking about here your work in the
24  emergency room, correct?
25      A   Yes.

Page 169

1    Q   If you spoke to the abortion provider, would you not
2  have to evaluate the situation?
3    A   No, I'd just have more information to do a better
4  job, but I would still have to evaluate.
5    Q   Would you still have to come to your own conclusions?
6    A   Being there at that moment in time, his information
7  helps me to arrive at conclusions, for the most part, he's
8  probably helped form.  I mean, that's where the collaboration
9  of the partnership is.  In the long run, I have to make the
10  decision at that moment in time and initiate treatment, but
11  his --
12    Q   You would do as an emergency room physician; that's
13  part of your responsibility?
14    A   I would have to own the moment, but the information
15  that he gives me and the assistant is beneficial for that
16  patient.  They're for the patient, and I'm for the patient, so
17  it's just a different asset.
18    Q   So by virtue of being in the emergency room, you take
19  responsibility for patients when they walk in the door and
20  doing an initial evaluation, diagnosis, and treatment; is that
21  accurate?
22    A   To the best of my ability.  And I pull in every piece
23  of information I can to make it better.
24    Q   The next sentence you continue to say, This
25  definitely created some time delays that were not in the

Page 170

1  patient's best interests; is that accurate?
2    A   Yes.
3    Q   What time delays are created?
4    A   All right.  I've got to ask her past medical history,
5  I've got to ask her what's been going on, I've got to get
6  information.  I mean, when did you -- if it's an abortion
7  situation, when did you have the abortion, pull all this
8  information out of someone who feels terrible, who has --
9  possibly has pain, possibly has -- depending on where they are
10  on that, whether they're at the cliff or not, and I've got to
11  get the history, to the fullest of my ability; medication,
12  drug allergies, do the physical exam, and then come to my own
13  conclusions.  I don't know the type of procedure that was
14  done.  I don't know necessarily the age of gestation, if it's
15  an abortion, post abortion, what ultrasound showed, things
16  that are just a help, and if there were any complications.
17    So I've got to try to put it together.  If it's just
18  a straightforward eight-week abortion, D&C, is it 15 weeks
19  later?  I mean, those things I can maybe get, but a lot of
20  women don't know when their last menstrual period was.
21    Q   So if you got that information from their abortion
22  provider, would you not have to still talk to the woman about
23  her medical history?
24    MR. BECKMAN: Object to form.
25    A   I do, but it takes longer.  They give me the points

Page 171

1  and say -- if a patient has a bleeding disorder, mild bleeding
2  disorder like von Willebrand, they can bleed much more
3  significantly, and I'm thinking it's all related to
4  complications and it's an inherent medical situation, our
5  treatment could be much different with clotting factors versus
6  going into surgical intervention.  So I guess the thing
7  that's -- the abortion provider wants the best for her, based
8  on our conclusions, collaborating and working together.
9    Q   But even if you spoke to the abortion provider as
10  part of your emergency room protocol, you'd still have to get
11  a medical history from her?
12    A   Oh, yes, I take a history from every patient.
13    Q   Would it be appropriate to rely on the information
14  provided by the abortion provider?
15    MR. BECKMAN: Object to form.
16    A   I don't understand what you're asking.
17    Q   Is it appropriate to rely on outside information as
18  an emergency room physician?
19    MR. BECKMAN: Object to form.
20    A   If I trust the physician, absolutely.  I trust the
21  subspecialist every day, all day long.
22    Q   And all this information that you would get from the
23  abortion provider, that's all the information that can be
24  provided over the phone?
25    MR. BECKMAN: Object to form.

Page 172

1    A   A lot of that information.  But his evaluation of the
2  patient in person is definitely going to be more quick,
3  because whenever you -- in medicine, the transfer of care is
4  always fraught with time delays, with miscommunication.
5  That's just been a well-known fact, that the continuity of
6  care, the physician who started the treatment -- not always,
7  but generally -- is in the best place to take care of the
8  patient.
9    Q   But that can be accomplished by someone else in the
10  practice, a partner?
11    MR. BECKMAN: Object to form.
12    A   Not as good.  Not as good as the primary physician
13  but better than somebody that has no relationship or
14  communication with the primary physician.  I mean, a partner,
15  where there's a relationship -- or hospital staff privileges,
16  there's a relationship.  A relationship enhances
17  communication, enhances trust, and enhances -- I mean, I know
18  how people -- it's like playing tennis in doubles; you know
19  how people handle situations.  That's --
20    Q   In your private practice, you said when individuals
21  are at the hospital, whoever the on-call individual is who's
22  at the hospital, he would be the one who would visit your
23  patient; is that correct?
24    MR. BECKMAN: Object to form.
25    A   The on-call physician who's in the hospital would see

Page 173

1  the patient in the emergency room.
2     Q   And would that create the fraught situation of
3  miscommunication that you were referring to?
4        MR. BECKMAN:  Object to form.
5     A   Not as -- when you're dealing with elective surgical
6  procedures with potential complications, that is a much
7  different situation than medical care, when we can give them
8  information over the phone about their medications, their past
9  medical history.  We're not dealing with that trend that we're
10 trying to set up, necessarily, that the surgical procedure
11 would bring into the situation and the type of surgical
12 procedure.  Here you're dealing with elective surgical
13 procedures.
14    Q   Well, we were talking before, though, the information
15 that you said would be important would be having the full
16 picture and the history; that would be important information
17 the provider would convey.  And that's information that you
18 can get over the phone?
19       MR. BECKMAN:  Object to form.
20    A   Yes.
21    Q   So the provider doesn't actually need to come to the
22 hospital?
23       MR. BECKMAN:  Object to form.
24    A   I'm not sure -- are you talking in reference to my
25 practice or the abortion situation?

Page 174

1     Q   I'm talking about the abortion situation.  I'm trying
2  to understand what's different -- you said it was an elective
3  procedure.
4     A   Elective surgical procedure, right.
5     Q   But when we were talking earlier about the
6  information that you said would be helpful to learn from the
7  abortion provider, it seemed more similar to what you were
8  talking about as far as the information you would provide in
9  your private practice in terms of the medical history.
10    A   I mean, past medical history, medications, those type
11 of information is similar.  But you can't compare apples and
12 apples when you do an elective surgical procedure versus
13 normal day-to-day life.  You know, catching pneumonia or a
14 kidney stone versus potential of having complications of a
15 surgical procedure or bleeding or infection.
16       The patient that is experiencing these complications
17 from surgical procedures, it might be mild signs like color
18 changes from drop in blood pressure.  Then the surgeon who did
19 the procedure is going to pick that up much sooner than
20 somebody who doesn't have a reference point of trends.  It's
21 very, very helpful.
22    Q   If we could look at paragraph 24, continuing on, you
23 say that you have never had an abortion provider come to the
24 emergency room to assume care; is that accurate?
25       MR. BECKMAN:  Object to form.

Page 175

1     A   Yes.
2     Q   When we were talking earlier, you said in some
3  situations, the patient's physician would assume care once
4  they were admitted, is that correct, to the hospital?
5     A   Yes.  What I call subspecialists.
6     Q   So how does the situation with the abortion providers
7  differ?
8     A   The abortion providers here don't come here.  They
9  don't have hospital privileges here.  They never apply for
10 them.  I don't know why they won't.  But the abortion
11 providers use the Medical College of Virginia.
12    Q   But no physician comes to the emergency room to
13 assume care of your patients in the emergency room?
14    A   Some do.  You mean -- ask me -- be specific.  What
15 physicians are you talking about?
16    Q   Any physician.
17    A   Are you talking about a cardiologist?  Are you
18 talking about a pulmonologist?  Be specific; I'll answer your
19 question.
20    Q   Well, when we were talking before, I recall that you
21 said when you were in the emergency room, they were your
22 patient and you treated them.
23    A   Right.
24    Q   That another physician might assume care if they were
25 admitted to the hospital.

Page 176

1     A   Yes, that's true.
2     Q   But while they were in the emergency room receiving
3  care, you had the patient and will --
4     A   Until they showed up in the ER.
5     Q   Would that doctor treat them in the ER?
6     A   Yes.
7     Q   Or would that doctor take them --
8     A   They would take over.
9     Q   -- in the emergency room?
10    A   Yes.
11    Q   And at that point, the patient would be admitted by
12 that doctor?
13    A   Well, if the doctor thought it would be going to the
14 operating room or the surgeon wanted to admit them, or if the
15 surgeon said, Let them go home, but they would take over care.
16 Once they arrive in the ER, they would take over care.  Now,
17 if they didn't get admitted and talked on the phone and I
18 didn't need them there that hour, they'll see them up on the
19 floor.
20    Q   Okay.  So as the emergency room physician, you're not
21 responsible for the patient until they're discharged or
22 admitted?
23       MR. BECKMAN:  Object to form.
24    A   Basically, I carry some responsibility until they
25 leave the ER, no matter what.  But the admitting physician

Page 177

1  assumes care in the final decision-making process.
2      Q   The admitting physician.
3      A   The one -- yeah, the surgeon or the cardiologist.
4      Q   But if the --
5      A   If the surgeon, the cardiologist -- if the
6  cardiologist says, We're taking them to cath, he's running the
7  show, but I'm there helping to make sure they're stable until
8  they leave the ER and go to catheterization.
9      Q   If the patient is never admitted, when would the
10 other physician assume care?
11     A   That's too general.  I mean, if it came in with an
12 earache and then you assumed care, if I discharged him and
13 sent him home?  I mean -- I don't understand your question.
14     Q   So the statement in your report seems to suggest that
15 the abortion provider should come in and assume care of your
16 patient; is that accurate?
17     MR. BECKMAN:  Object to form.
18     A   I'm referring -- I mean, it's the reality that an
19 abortion provider has never been there to assume care.  But I
20 don't expect them to assume care if the patient has a minor
21 complication.  I don't expect the abortion provider, just like
22 the cardiologist, to come every time somebody has chest pain
23 or every time someone has some abortion bleeding.  I don't
24 expect that.
25     Q   Does HB57 require that the abortion provider assume

Page 178

1  care of her patient in the emergency room?
2      A   No.
3      Q   So how is this relevant to whether or not HB57 is
4  reasonable and medically necessary?
5      MR. BECKMAN:  Object to form.
6      A   HB57 is relevant because of the credentialing of the
7  physician to make sure the physician has had adequate
8  training, adequate ongoing continuing education, and then the
9  accessibility, the communication, and the physician-patient
10 trust that are all foundational in a good healthcare system.
11 So HB57 really strengthens the foundation of a good healthcare
12 system.
13     Q   In paragraph 24, you say that you always had to call
14 the staff OB-GYN; this then creates another time delay; is
15 that accurate?
16     A   The OB-GYN, if they're in hospital, they're always
17 busy.
18     Q   Okay.
19     A   So if we've got to wait until they can come, if the
20 patient is needing a D&C to stop bleeding, we've got to wait
21 till they can come.  So it does create -- they don't have it
22 in their schedule; they're not anticipating us calling them.
23     Q   But isn't the on-call OB-GYN there specifically to
24 treat patients who need them in the emergency room?
25     A   The on-call physician is the person who gets the

Page 179

1  call, but that doesn't necessarily mean they're available that
2  minute.  They might be in another delivery.  They might be in
3  a C-section.  They're going about their day-to-day
4  responsibilities, but they're the one that carries the beeper,
5  but it doesn't mean they're just waiting.
6      Q   So do all emergency room patients that require an
7  OB-GYN specialist to consult experience a time delay?
8      MR. BECKMAN:  Object to form.
9      A   That's too general.  Are you talking about their
10 own -- I mean, their own patients of the OB-GYN?
11     Q   Well, you said when you were in the emergency room
12 that you would call the on-call specialist.  And you're saying
13 that whenever someone suffering from an abortion complication
14 requires an OB-GYN specialist, that they would experience a
15 time delay.
16     MR. BECKMAN:  Object to form.
17     Q   Isn't that right?
18     A   Yes.  Because they're not available at that moment in
19 time, generally.
20     Q   So I'm asking, do all patients in the emergency room
21 requiring the care of an OB-GYN specialist experience a time delay?
22     MR. BECKMAN:  Object to form.
23     A   I would say no, that answer.
24     Q   Why no?
25     A   Because if the OB-GYN or the subspecialist knows the

Page 180

1  patients and they have a track record with them, then they can
2  determine for us to do certain things without even having to
3  see them until they get there.  So if they don't know the
4  patient and we have to wait for them, yes, it could be a time
5  delay, but not necessarily.
6      Q   But only if the patient was previously under the care
7  of that OB-GYN?
8      A   Yes.  I mean, that continuity of care is what we're
9  driving at.
10     Q   So if a woman is suffering from a miscarriage and is
11 under the care of a midwife who does not have admitting
12 privileges, would she experience the same time delay?
13     MR. BECKMAN:  Object to form.
14     A   I guess so, if I had to call a subspecialist.
15     Q   So would she not receive an adequate standard of
16 care?
17     MR. BECKMAN:  Object to form.
18     A   She would receive adequate standard of care, but
19 you're still dealing with an elective surgical procedure
20 versus happenstance of life.  Some things are just not
21 preventable or anticipatory or prepared for, but on elective
22 surgical procedures, you want to have the best maximum system
23 for post-op complications and that's what ensures
24 accessibility, communication, and continuity of care.
25     Q   If the abortion provider has to travel to the

Page 181

1  emergency room to see the patient or her patient that's
2  suffering from complications, would waiting for the on-call
3  specialist necessarily create an additional time delay?
4      MR. BECKMAN:  Object to form.
5      **A  I need you to be more specific on the circumstances**
6  **you're driving at.**
7      Q  So in your practice, you have certain team members
8  that are at the hospital at all times, correct?
9      **A  Yes.**
10     Q  That's not common in all practices, right?
11     **A  Yes.**
12     Q  So, in that practice, the physician would need to
13 travel from elsewhere to come into the hospital to see their
14 patient, correct?
15     **A  Yes.**
16     Q  In your report, you suggested that calling the
17 on-call OB-GYN would produce an additional time delay.
18     MR. BECKMAN:  Object to form.
19     **A  Yes, if the post abortion physician was not available**
20 **to help or take over care.  Yes.**
21     Q  And I'm just trying to figure out what the additional
22 time delay is, if the abortion provider had to travel from
23 elsewhere to get to the hospital.
24     **A  Well, the abortion provider being involved might help**
25 **us initiate treatment related to the woman's specific**

Page 182

1  **condition.  He might not even call the OB doctor that's tied**
2  **up in a C-section.  He might be able to do the D&C the woman**
3  **needs to stop the vaginal bleeding.**
4      Q  But in a more timely fashion than the OB-GYN?
5      MR. BECKMAN:  Object to form.
6      **A  Yes.  I mean, he could get there, if the OB-GYN's**
7  **tied up in some surgical procedure and the abortion provider**
8  **can get there in 15 or 20 minutes, he can do a D&C maybe**
9  **before an hour, where the other physician would be tied up**
10 **doing something with his own patients.**
11     **So to assume someone else's patient, it's always a**
12 **change in your schedule versus taking care of your own**
13 **patient.  Not that they're all perfect transitions, you're**
14 **always available, but you're not prepared to assume other**
15 **people's patients, but we have to be prepared to do the best**
16 **we can.**
17     Q  And that's the purpose of having an on-call
18 specialist within the hospital?
19     MR. BECKMAN:  Object to form.
20     **A  Yeah.**
21     MS. GRIFFITH:  All right.  Let's take a break.
22         (Recess from 3:21 p.m. to 3:27 p.m.)
23
24 BY MS. GRIFFITH:
25     Q  Dr. Anderson, I'd like to talk a little bit about the

Page 183

1  women that you've treated in the emergency room that have been
2  experiencing complications following an abortion.  How many
3  specific complications can you recall?
4      **A  The hemorrhage, the infection, the depression, some**
5  **women related to the guilt from the abortion, but those**
6  **situations, it's mainly suicide attempts, through my medical**
7  **care.  It wasn't psychiatric; it was stabilizing from drug**
8  **overdose, Tylenol, things like that.**
9      Q  So you see women who are suffering from depression as
10 a consequence of abortion when they have attempted suicide and
11 you're intervening to stabilize them after a suicide
12 attempt?
13     **A  If they've told me it's depression from the abortion;**
14 **I don't assume that.**
15     Q  And when is the last situation in which you treated a
16 woman in that situation?
17     **A  Last in the ER, I can't give you the date of it or**
18 **them.  I would say those last five years were the last, but my**
19 **25 years in the emergency room.**
20     Q  Do you recall any specific incidents in 2005?
21     **A  No.**
22     Q  In 2004?
23     **A  Could be.  I mean, I don't know when my last one was.**
24 **The patients turn into a blur when you see 30 a day.  You just**
25 **note common things.  I've seen probably, I mean, over a**

Page 184

1  **hundred thousand patients, so it's just very hard to remember**
2  **details, except common trends.  And that's just estimates.**
3      Q  You don't have an estimate of how many women you
4  treated?
5      **A  (Witness shakes head.)**
6      Q  What about women with bleeding or blood loss?
7      **A  Common.**
8      Q  When is the last one that you recall?
9      **A  Those final years of the ER.**
10     Q  Sometime between 2000 and 2005, you saw at least one
11 woman with bleeding?
12     **A  I'd say that's good.  I mean, I'm part time; I'm not**
13 **full time there.**
14     Q  And you don't remember any specific incidents?
15     **A  I don't.**
16     Q  What about infection?
17     **A  The same.  One thing, infection and bleeding both can**
18 **look the same, causing pain.  And early infection or early**
19 **bleeding are very similar looking.**
20     Q  But you don't recall any specific incidents of
21 treating a woman with infection following an abortion?
22     **A  I'm trying to outdate my memory.**
23     Q  I understand.  It's a bit late in the day.
24     **A  When you ask me specifically, I'm trying to remember**
25 **a face and all the details, and that's what I write down for**

Page 185

1  teaching cases, but I can't come up with anything. They
2  haven't been patients that I've used for teaching.
3      Q  Okay.  In your experience, did most of the women that
4  you treated with complications after an abortion, were they
5  transferred from the abortion clinic --
6          MR. BECKMAN:  Object to form.
7      Q  -- to the emergency room?
8      A  Probably the majority came in on their own.
9      Q  So the majority came to the emergency room after
10  being discharged from the clinic?
11         MR. BECKMAN:  Object to form.
12     A  I would say I think so.  Yes.  I guess it was the
13  majority came from -- came in on their own volition by car.
14     Q  And you don't remember -- do you remember any
15  specific situation in which a woman was transferred to the
16  emergency room from an abortion clinic?
17     A  I don't remember any specific.
18     Q  Have you treated any woman experiencing sepsis
19  following an abortion?
20     A  Yes.
21     Q  What do you remember about that?
22     A  High fever, fast heart rate, borderline blood
23  pressure.
24     Q  What did you do to treat her?
25     A  She was kind of falling off the cliff because of her

Page 186

1  blood pressure; she was unstable.  So I started antibiotics,
2  IV fluids.  I can't remember if we had to use blood pressure
3  support.
4      Q  Did you contact the abortion provider?
5      A  I can't remember.  I know they didn't call me.
6      Q  But that would be consistent with other physicians if
7  you didn't know that she went to the emergency room; is that
8  correct?
9          MR. BECKMAN:  Object to form.
10     A  It could be.  I mean, I would say I tried to get a
11  hold of him because that was always -- that was the standard
12  procedure.  I don't remember if I talked to him or if we did
13  or didn't.  But I know that he didn't admit her or she didn't
14  admit her.
15     Q  Was she admitted to the hospital?
16     A  Oh, yes.
17     Q  And do you recall her outcome?
18     A  She died.
19     Q  And this was your patient?
20     A  Yes.
21     Q  When was this?
22     A  (Witness shrugs.)
23     Q  Was it while you were working full time?
24     A  (Witness shakes head.)
25     Q  You don't remember if it was before 1995?

Page 187

1      A  No.  I do not remember.  I remember her name, but I
2  can't tell you.
3      Q  Was there a lawsuit about that?
4      A  I don't know.
5      Q  Have you treated any other women suffering from
6  sepsis following an abortion?
7      A  Yes.
8      Q  What do you remember about those incidents?
9      A  Outcomes were okay.  Same similar situations, the
10  signs of serious infection, IV antibiotics, admit, but their
11  outcomes, they survived.  She was the only one that I had die
12  on me.
13     Q  Do you recall how many women you've seen suffering
14  from sepsis?
15     A  I can't give you a number.
16     Q  Would you say it's less than five?
17     A  I suspect it's more than that, but I can't give you
18  numbers.  You're asking too far back.
19     Q  What about patients suffering from hemorrhagic shock
20  following an abortion?
21     A  I had people with heavy bleeding and unstable blood
22  pressure, which is hemorrhagic shock.  Is that what you're
23  asking?
24     Q  I don't know.
25     A  Heavy bleeding, unstable blood pressure.

Page 188

1      Q  How would you define hemorrhagic shock?
2      A  That.
3      Q  Okay.  Do you recall approximately how many?
4      A  No.
5      Q  When was the last one that you recall?
6      A  Before 2005.
7      Q  You can't remember a specific instance of a woman
8  experiencing severe blood loss?
9      A  (Witness shakes head.)
10     Q  Other than the one woman with sepsis, did any other
11  patients have that negative outcome?
12     A  No.
13     Q  With the woman that had sepsis, what information from
14  her -- the first one that you talked about that did not
15  survive -- what from her abortion provider would have been
16  helpful?
17         MR. BECKMAN:  Object to form.
18     A  Remember when I talked about the free-fall off the
19  cliff?  She was there.  So you do ABCs of resuscitation.  By
20  then, we had lost the time.  In her situation, there was no
21  difference with that extreme.  The difference comes when
22  they're approaching the edge of the cliff and you can
23  anticipate and intervene.
24     Q  Dr. Anderson, can you tell me what you understand
25  about the phrase continuity of care?

Page 189

1   A   Consistency, availability, accessibility. So you
2   build on trends; you have a much broader landscape perspective
3   of a patient.
4       Q   Does it require the same physician to provide all
5   care to a patient?
6       A   That's an impossibility, I think. When you say all
7   care, be specific.
8       Q   Does continuity of care require that one physician
9   provide all care to a patient?
10      A   I would get more specific with that question. Are
11  you talking about continuity of care in relation to a
12  cardiologist, continuity of care in relation to a
13  pulmonologist, in their areas of expertise?
14      Q   I'm saying as a patient, should one patient expect to
15  receive all of her medical care from one provider?
16      A   Primary care is set up to do that and then recognize
17  when subspecialists are needed when the patient's out of their
18  realm of expertise. And then continuity of care involves that
19  physician's realm of expertise.
20      Q   And then that requires communication between those
21  physicians?
22      A   Very much an asset.
23      Q   What is patient abandonment?
24      A   When the doctor is just not available for advice or
25  rejects to be involved in the care, rejects communication,

Page 190

1   just not there to be an asset to the patient. I don't know
2   what the legal term is, but that's how I would define it
3   medically.
4       Q   Is it sufficient for the partner in your medical
5   practice to be available to provide care?
6           MR. BECKMAN: Object to form.
7       A   It's necessary, because nobody can practice 24/7.
8   Sleep is mandatory.
9       Q   Would a doctor that abandoned his or her patient lose
10  his medical license?
11      A   It's a cause for malpractice; that's what I'm sure
12  of.
13      Q   Okay. Would you agree that HB57 will have no impact
14  on continuity of care for women who have had an abortion if
15  the patient does not go to the hospital where the provider has
16  privileges?
17          MR. BECKMAN: Object to form.
18      A   No. I do not -- restate your question.
19      Q   The admitting privileges requirement will have no
20  impact on continuity of care if the patient does not go to the
21  hospital where the provider has privileges.
22          MR. BECKMAN: Object to form.
23      A   You're saying if the patient goes to a hospital where
24  the abortion physician does not have privilege, then
25  continuity of care will be broken --

Page 191

1       Q   I'm saying will this -- will HB57, will the new law
2   have any effect on continuity of care? Does it improve
3   continuity of care if the patient goes to a different hospital
4   than the one where the provider has privileges?
5       A   It probably won't, but I won't say definitely.
6   Probably won't, if the patient goes to the hospital.
7       Q   So this law only improves continuity of care if the
8   patient goes to the hospital where the provider has
9   privileges?
10          MR. BECKMAN: Object to form.
11      A   I wouldn't use the word "only." But it will
12  definitely improve continuity of care if they do go to that
13  hospital. If you have situations where big groups of
14  physicians and partners are cross-covering, then you still
15  have continuity of care because partners are taking care of
16  partners' patients and groups. And so those things, hospital
17  privileges, just improve communication in this whole
18  healthcare substratum, many times. I won't say always.
19      Q   What about situations where the abortion patient
20  doesn't live in the area local to the clinic? So she lives,
21  you know -- let's say it's a woman that lives in Roanoke. You
22  said Roanoke was two and a half hours away?
23      A   Uh-huh.
24      Q   Let's say the woman drives to Richmond in order to go
25  to the clinic in Richmond and have her abortion, and then

Page 192

1   she's discharged and she returns home to Roanoke. If the
2   woman is suffering from a complication, she would most likely
3   go to a hospital in Roanoke, right?
4           MR. BECKMAN: Object to form.
5       A   I would expect so.
6       Q   So in that case, if her abortion provider had
7   admitting privileges at a hospital in Richmond --
8       A   Yes.
9       Q   -- how would that improve the continuity of care the
10  patient in Roanoke experienced?
11      A   It would only improve it if it meant that he was more
12  accessible by phone. If he had hospital privileges and some
13  of the things, as far as communication, availability, on-call
14  physicians, if he was more -- or she was more -- available by
15  phone, it would improve it. But if the physicians in Roanoke
16  do not call down here to talk to him or her, it would have no
17  impact.
18      Q   So in paragraph 27 -- this is on page 15 of Exhibit
19  4 -- you state, When abortion providers have no relationship
20  with local hospital physicians, it is inevitable that poor
21  communication and inaccurate information will impact patient
22  care. Did I read that correctly?
23      A   Uh-huh.
24      Q   What is the basis for this?
25      A   If you have no relationship with physicians, then the

Page 193

1  accountability that relationships bring, it helps people carry
2  responsibility to communicate, just diminishes. And
3  eventually studies have shown that communication breakdown
4  will translate into patient care. This is not saying every
5  patient encounter, but eventually it will impact patient care
6  if there's no relationship, no accountability, no mutual
7  understanding, hierarchy -- hierarchy's not the right word,
8  but no team concept of responsibility.
9      Q   It's inevitable?
10     A   Poor communication has found to be so much a part
11 that eventually it will happen.
12     Q   And that happens across medicine?
13         MR. BECKMAN: Object to form.
14     A   Be more specific.
15     Q   The issue of poor communication, that's an issue
16 across all aspects of modern medicine?
17         MR. BECKMAN: Object to form.
18     A   It has been identified as a commonplace of errors and
19 time delays.
20     Q   It's not specific to the abortion context?
21     A   This is true.
22     Q   Is it possible to communicate effectively with
23 doctors with which you don't have a previous relationship?
24     A   It's possible, yes. But it's not as good as when you
25 do have a relationship with your subspecialty staff.

Page 194

1      Q   So if one of your patients is on vacation in New York
2  and experiences an emergency and goes to an emergency room
3  there, and that emergency room physician has to call and talk
4  to you, would your patient receive a lower standard of care at
5  the hospital in New York than they would here?
6          MR. BECKMAN: Object to form.
7      A   I wouldn't use the word standard of care because
8  there's no negligence involved, there's no knowledge or poor
9  decision. It's just the relationship enhances patient
10 outcomes, patient care. But in that situation, that's the
11 best you have. Generally, that's going to be sufficient,
12 because --
13     Q   And that --
14     A   -- they're in New York.
15     Q   And that patient receives an adequate standard of
16 care?
17         MR. BECKMAN: Object to form.
18     A   I hope so.
19     Q   Hopefully better than adequate?
20     A   I hope they get good care.
21     Q   Do you have a personal relationship with all of the
22 doctors on staff at Johnston-Willis Hospital?
23     A   No.
24     Q   Do you know every doctor on staff at Johnston-Willis
25 Hospital?

Page 195

1      A   No.
2      Q   What about every doctor on staff at Chippenham?
3      A   No. There are 2,000.
4      Q   So having privileges at a particular hospital doesn't
5  mean that you have a relationship with every doctor at that
6  hospital.
7          MR. BECKMAN: Object to form.
8      A   This is true. You're right.
9      Q   So how does admitting privileges improve
10 communication with doctors at your same hospital that you
11 don't have a previous relationship with?
12     A   Well, you build relationships with groups of
13 physicians in each subspecialty. So I'll build relationships
14 with a few neurosurgeons, a few general surgeons, a few
15 vascular surgeons, a few cardiologists, and so those are the
16 ones that we do consultation with. So the doctors that I
17 consult with, I have a relationship with.
18     Q   But if you're an ER physician, it's possible that
19 your patient may have, as a pulmonologist, a physician who is
20 on staff at the hospital with you, but who you never
21 previously met or interacted with.
22     A   Yes.
23     Q   So you don't have a personal relationship with that
24 doctor.
25     A   As an ER physician -- yes, I don't have -- that's

Page 196

1  possible.
2      Q   But you're still able to communicate adequately with
3  that physician?
4          MR. BECKMAN: Object to form.
5      A   I've learned to.
6      Q   Is that something that all physicians have learned to
7  do?
8          MR. BECKMAN: Object to form.
9      A   Some better than others.
10     Q   But that's something that physicians are trained
11 in?
12     A   It's part of life.
13     Q   Physicians are trained in what information to
14 communicate to other physicians to have successful transfer of
15 care of patients?
16     A   It is considered -- we spend a lot of time talking
17 about communications because there's so many mistakes from
18 communication.
19         (Discussion off the record.)
20
21 BY MS. GRIFFITH:
22     Q   Dr. Anderson, we talked before about the current
23 Alabama regulation that requires AHRCs to have what are called
24 outside covering physicians that have admitting privileges at
25 a hospital local to the clinic. Do you recall that we

Page 197

1  discussed that earlier?
2     A   Yes.
3     Q   So in those situations, why is it not sufficient that
4  that outside covering physician has the relationship with the
5  other doctors at that hospital?
6     A   That -- ask me again more specifically.
7     Q   We were just talking about having relationships with
8  people at the hospital at which you have admitting
9  privileges?
10    A   Yes.
11    Q   And we previously discussed that Alabama already
12  requires that abortion and reproductive health centers have a
13  relationship with a backup or an outside covering physician
14  that has admitting privileges at a local hospital.  Why is
15  that relationship with that doctor insufficient to address
16  your concerns about peer-to-peer relationship and transfer of
17  care?
18       MR. BECKMAN:  Object to form.
19    A   Well, there's still not a continuity of care between
20  the abortion provider and the transferring physician that
21  would be as good as an abortion provider or partner would be
22  directly with the consulting physician.  I mean, on issues,
23  like we said, of past medical history, things like that.
24    Q   So in your opinion, there's a difference between the
25  outside covering physician requirement in Alabama and a

Page 198

1  partner in your medical practice here at Chesterfield?
2       MR. BECKMAN:  Object to form.
3     A   There's a difference in the fact that you're dealing
4  with elective surgical procedures that have life-impacting
5  implications that have definite time factors where
6  doctor-patient trust relationship, communication, and
7  continuity of care all seem to reduce errors in communication
8  and time delays that helps for better outcomes for these women
9  that experience post-abortion complications.
10    Q   What I'm trying to understand is in your report you
11  discuss the importance of having a different level of
12  communication like you have between physicians who are on
13  staff together at the same hospital; is that right?
14       MR. BECKMAN:  Object to form.
15    A   Yes.  Doctor, physician, staff relationships, House
16  Bill 57 helps ensure.
17    Q   And Alabama already requires an outside covering
18  physician that has admitting privileges at a hospital in
19  Alabama, so there's already a physician associated with the
20  clinic that has those relationships that you say are important
21  and implicit in having staff privileges, correct?
22       MR. BECKMAN:  Object to form.
23    A   Correct.
24    Q   What I'm trying to understand is how is that backup
25  doctor or outside covering physician different than in your

Page 199

1  practice when your partner is the one that covers for you and
2  has the conversation or visits your patients that are in the
3  hospital getting follow-up care?
4     A   Because we have generally a much more regular routine
5  relationship environment than just the transfer position.  A
6  transfer position is somebody that just might be willing to
7  accept the call and accept the responsibility, but really, has
8  very little relationship with the abortion provider; whereas,
9  a partner, you might have 30 years of relationship, maybe ten
10  years, depending, but so the partner relationship is
11  definitely much different than a transfer between -- a
12  relationship between partners.
13    Q   But you could also have a partnership that's only for
14  six months?
15    A   Possibly.
16    Q   Okay.  So but that's not based on any research,
17  interviews, or other information that you gathered about the
18  backup doctor's rule in Alabama?
19    A   Any team does better with relationship.  No research
20  based on backup rule in Alabama.  Any team relationships
21  enhance performance of trust.
22    Q   But you haven't done any research, talked to anybody,
23  looked at any data relevant or specific to Alabama?
24    A   Yes.  You're correct.
25    Q   Okay.  How can a surgeon demonstrate that she is

Page 200

1  well-qualified and trained?
2     A   They go through the Board certification process, the
3  training process, and then credentialing process, about
4  procedures, evaluation.  And so the education process, the
5  Board certification process, and then credentialing process at
6  the hospital.
7     Q   Not all physicians go through the credentialing
8  process at the hospital, do they?
9     A   The surgeons I deal with do.
10    Q   What about other physicians, nonsurgeons?
11    A   If you're general primary care, you don't have to
12  have an association with a hospital.  You can practice general
13  medicine.  That's always been true.
14    Q   So would you require hospital credentialing of all
15  physicians?
16       MR. BECKMAN:  Object to form.
17    A   That is very nonspecific.
18    Q   It is.
19    A   That is very nonspecific.
20    Q   It is very nonspecific.  It's still the question.
21  Would you be in favor of requiring hospital credentialing of
22  all physicians?
23    A   Oh, it's not necessary.
24    Q   But it is necessary for all surgeons?
25       MR. BECKMAN:  Object to form.

Page 201

1    A   I would say it is necessary for physicians doing
2 elective, life-impacting procedures, if you want my opinion.
3    Q   What about a physician performing a colonoscopy?
4    A   The physicians here who do colonoscopies have
5 hospital privileges.  And I think, yes, if you have a bowel
6 perforation, that continuity of care that that maintains and
7 the patient-doctor trust of accessibility and continuity of
8 care is all to benefit patient outcome.
9    Q   If a physician is denied privileges, does that have
10 to be disclosed?
11   A   I don't know.
12   Q   You don't know if a physician would have to disclose
13 that in future interviews?
14   A   I don't.
15   Q   Can you please turn to page 7 of Exhibit 4, paragraph
16 12, and read the sentence starting the fourth line down that
17 starts, If a physician cannot obtain privileges.
18   A   If a physician cannot obtain privileges for the
19 specific requested procedures at his or her hospital, then in
20 my medical opinion, a physician is not qualified to do the
21 surgical procedures that have life-changing or
22 life-threatening impact.
23   Q   Do you still agree with this statement?
24   A   Yes.  I just said that.
25   Q   And at paragraph 13 of Exhibit 4 you say that,

Page 202

1 Requiring abortion providers to undergo peer review through
2 the local hospital's credentialing process is a standard which
3 is reasonable and appropriate, given the gravity and
4 uniqueness of the nature of abortion and the potentially
5 life-threatening complications that can result for the woman.
6 Did I read that correctly?
7    A   Yes.
8    Q   And the procedure with life-changing or
9 life-threatening impact, that's the abortion procedure,
10 correct?
11   A   Yes, if you have a ruptured uterus or a perforated
12 uterus or infection, yes.
13   Q   But the specific procedure you're referring to in the
14 statements, that's the abortion procedure, correct?
15   A   Yes.  Because I say that requiring abortion providers
16 to undergo peer review -- but, yes.
17   Q   So you're saying that they're not qualified to
18 perform an abortion unless they go through peer review,
19 showing that they're qualified to perform an abortion?
20       MR. BECKMAN:  Object to form.
21   A   Are you referring -- the peer review through hospital
22 committees, yes.  The hospital committees for credentialing
23 that are set up, yes; that's what we all go through.
24   Q   Does the act require physicians to hold privileges to
25 perform an abortion?

Page 203

1    A   Not that I know.
2    Q   So it doesn't actually say that they're qualified to
3 perform the life-changing procedure?
4       MR. BECKMAN:  Object to form.
5    A   The act, as far as I know, requires them to have
6 admitting privileges, and the credentialing process then will
7 ascertain whether they have the technical and educational
8 skills and credentialing to do that procedure safely.
9    Q   What procedure is that?
10   A   The elective abortion procedure.
11   Q   Can you refer back to Exhibit 1; it's House Bill 57.
12 If you could turn to page 6.
13   A   Okay.
14   Q   We're reading 4(c) again.  We looked at this
15 provision earlier.  It states that, Every physician referenced
16 in this section shall have staff privileges in acute care
17 hospitals in the same standard metropolitan statistical area
18 as the facility is located that permit him or her to perform
19 dilation and curettage, laparotomy procedures, hysterectomy,
20 and any other procedures reasonably necessary to treat
21 abortion-related complications.  Did I read that accurately?
22   A   Uh-huh.  Yes.
23   Q   So does it require that the physician be privileged
24 to perform the abortion procedure?
25       MR. BECKMAN:  Object to form.  This was asked and

Page 204

1 answered already.
2    A   I would say that to perform dilatation and curettage,
3 you could say that was an abortion procedure, but it's not
4 spelled out specifically that it requires him to have
5 admitting privileges specifically.
6    Q   Is dilation and curettage the same as abortion?
7    A   It's the same type of technical thing but they're
8 labeled differently.  I mean, that's basically what they're
9 doing.
10   Q   So it's your opinion that hospital privileging can
11 demonstrate that a physician is qualified to perform certain
12 procedures; is that accurate?
13   A   For the procedures that they're requesting privileges
14 for, the credentialing process helps assure that they are
15 qualified for it by examining.
16   Q   Does it matter which hospital grants these
17 privileges?
18   A   I don't understand your question.
19   Q   You said that privileging is important to show that a
20 doctor is credentialed and qualified to perform certain
21 procedures.  Does it matter which hospital grants those
22 privileges?
23       MR. BECKMAN:  Object to form.
24   A   Their credentialing process -- be more specific.  I'm
25 still not grasping what you're saying.

Page 205

1  Q   Does it matter which hospital grants a physician the
2  privileges to perform a procedure?
3      MR. BECKMAN:  Object to form.
4  **A   I don't -- I'm still not grasping.**
5  Q   If a physician is granting privileges to perform a
6  D&C in Birmingham, Alabama, would you consider that physician
7  qualified to perform that procedure?
8  **A   Because of the hospital credentialing practice,**
9  **JCAHO, you would assume that they were, if they're granted**
10 **privileges in Alabama.**
11 Q   And you don't know anything specifically about
12 Alabama?
13 **A   No.**
14     MR. BECKMAN:  Object to form.
15 **A   But there are enough oversights in hospitals through**
16 **the joint commission that hospitals are held to a high**
17 **standard of care.**
18 Q   So you don't know anything specifically about
19 hospitals in Montgomery, Mobile, or Birmingham?
20     MR. BECKMAN:  Object to form.
21 **A   Yes.**
22 Q   You agree, that's correct?
23 **A   Yes.**
24     MR. BECKMAN:  Object to form.
25 Q   But if an abortion provider were granted privileges

Page 206

1  at a hospital in Montgomery, Birmingham, and/or Mobile, you
2  would consider them qualified to perform the procedures for
3  which they were granted privileges?
4  **A   I would have to.**
5  Q   What about a hospital that granted privileges in
6  Washington, D.C.?
7  **A   As far as my basis, I would have to say yes, they are**
8  **all held to the high standard of care through the Joint**
9  **Hospital Commission.**
10 Q   Do you understand that House Bill 57 requires
11 physicians to obtain staff privileges at a hospital local to
12 the clinic in Alabama?
13 **A   Local, yes.**
14 Q   Why is that important?
15 **A   Because most patients are local and most doctors will**
16 **be accessible if they're local.**
17 Q   But if the physician is credentialed to perform those
18 procedures in another state, as far as the credentialing
19 showing that doctor is qualified to perform those
20 procedures, it has no impact?
21     MR. BECKMAN:  Object to form.
22 **A   Be more specific and ask me again.**
23 Q   Would you agree that if the abortion provider has
24 privileges at a hospital in a different location, that you
25 would consider that provider qualified to perform the

Page 207

1  procedures for which they have privileges?
2  **A   In that location.**
3  Q   You would consider them qualified to perform that in
4  the location where they have privileges?
5  **A   Yes.**
6  Q   But not qualified to perform them someplace else?
7  **A   They would have to go through each local**
8  **credentialing process.  Each hospital reviews every new staff**
9  **member, so there's not a reciprocity.**
10 Q   Why is it important that they go through a different
11 credentialing process?
12 **A   Well, there's just a tight process.  Local people**
13 **coming in and reviewing -- one thing that's very helpful about**
14 **hospital credentialing on quality is it is done every two**
15 **years and it is done specific; it's a hard process.  And**
16 **that's just protective for the patients that the doctors are**
17 **taking care of.  So I would say that's inherent in the system**
18 **for the good of the patient.**
19 Q   What do you understand to be the process for granting
20 staff privileges to physicians at hospitals, generally?
21 **A   I can only tell you what's applied to me.**
22 Q   Sure.
23 **A   They ask for records, they ask for recommendations,**
24 **they ask for procedures, they ask for documentation of**
25 **procedures.  They asked personal information as far as mental,**

Page 208

1  **emotional, health.  They asked for issues of drug dependency.**
2  **They asked for issues of aging -- we have an aging medical**
3  **population -- so the issues of dementia don't come in.  So**
4  **it's a very rigorous process.**
5  Q   And that's based on your experience getting
6  privileges at Johnston-Willis and Chippenham?
7  **A   And those other hospitals.**
8  Q   That we discussed at the beginning of the
9  deposition?
10 **A   Yes.**
11 Q   So you don't have any experience with hospital
12 privileges at any other hospitals?
13     MR. BECKMAN:  Object to form.
14 **A   Just those ones in the Army.**
15 Q   Did you have to go through the same process for
16 getting privileges at those hospitals?
17 **A   I sure did.  It was just as extensive.**
18 Q   You never served on a committee responsible for
19 granting privileges?
20 **A   No.**
21 Q   So the extent of your experience has been as the
22 recipient of hospital privileges?
23 **A   Yes.  It is very tight.**
24 Q   Do all criteria for obtaining staff privileges in
25 every hospital relate to the competency of the physician?

Page 209

1    A   In my experience, yes.
2    Q   Are you familiar with minimum admissions
3  requirements?
4    A   Yes.
5    Q   How does that requirement relate to the quality of
6  the physician?
7    A   It has no basis on the quality of the physician if --
8  they all go through the same credentialing process, whether
9  you are given -- you call it courtesy privileges.  Then you
10  don't have a procedure minimum or admission minimum that's
11  required.  Courtesy-privileged physicians go through the same
12  credentialing process as full admitting physicians, but they
13  don't have to have a minimum number of admissions.  They do
14  not have to go to staff meetings, so that partners across town
15  can cross-cover on weekends and have quality, but they're
16  really for the on-call process or the rare consultation.  We
17  have MCV surgeons that have admitting privileges, courtesy, so
18  we can consult them on rare diseases, so they don't have to
19  admit here, but we have access to their expertise in the
20  process for patient care.
21    Q   So the minimum admissions requirement isn't related
22  to the quality of the physician?
23        MR. BECKMAN:  Object to form.
24    A   It can be -- ask that --
25    Q   What I just understood your answer to my question to

Page 210

1  be was that there are physicians who go through the same
2  credentialing process but who don't have the same minimum
3  admissions requirements.
4    A   Yes.
5    Q   And those are called courtesy privileges.
6    A   Yes.
7    Q   So if otherwise the credentialing and reviewing their
8  competency and qualifications are the same, then I understand
9  your answer to mean that minimum admissions requirement is not
10  related to physician competency?
11        MR. BECKMAN:  Object to form.
12    A   Your statement's too broad.
13    Q   Okay.
14    A   If you want somebody to operate on your heart, you're
15  going to look at the number of heart procedures they've done.
16  And if you found they've only done one a year, you're not
17  going to go to that physician versus one that's done 30 a
18  month.  So there is a place where procedures and minimum
19  admissions is very important as far as quality.  So I do not
20  want to say a blanket statement.
21    Q   Is that admissions or the number of procedures that
22  the doctor has performed?  Aren't those different things?
23    A   Probably too broad of a statement.  Sometimes there
24  will be overlap.
25    Q   I could perform procedures at an ambulatory surgical

Page 211

1  center and not necessarily meet the minimum number of
2  admissions, although I have a lot of procedures I've
3  performed, correct?
4    A   That circumstance can exist.
5    Q   So in the context of an abortion provider, if that
6  abortion provider has a high number of patients admitted to a
7  local hospital, how would this reflect on that doctor's
8  competency?
9    A   Eventually, people would be concerned if a heart
10  physician had a high level of death; it would get their
11  attention.
12    Q   So in the context of an abortion provider, having a
13  high number of admissions suggests that they're not doing a
14  very good job, doesn't it?
15        MR. BECKMAN:  Object to form.
16    A   It's possible you could say that.
17    Q   Is the requirement that a physician live locally
18  relevant to the physician's competency?
19        MR. BECKMAN:  Object to form.
20    A   No.  I would say not so.  You could have a
21  subspecialist fly in that's as competent as they could be.
22    Q   Is it possible that a reviewing committee could deny
23  staff privileges unrelated to professional competency?
24    A   Not that I'm aware of here.  It's never been the case
25  here.

Page 212

1    Q   So you've never heard of a member of the committee
2  voting to deny privileges because they heard something bad
3  about the character of the applying physician?
4    A   I don't have that conversation with members of the
5  credentialing; that would probably be a violation of
6  privacy.
7    Q   What about a moral objection to the procedures the
8  physician performs?
9    A   Not here.
10    Q   Do you understand that that happens in other
11  places?
12    A   If you tell me it does.  I'm not aware of it, just
13  because it hasn't been on my purview.  Is that something else
14  I said?
15        MS. GRIFFITH:  No, this is not something else
16    that you've said.
17        (Anderson Exhibit 8 is marked.)
18
19  BY MS. GRIFFITH:
20    Q   I'm handing you what's been marked as Exhibit 8.  And
21  for the record, this is a letter from River Oaks Health Care,
22  Crossgates River Oaks Hospital, J. Allen Tyra, executive
23  officer, dated July 25th, 2012.  It's addressed to Dr. -- and
24  the name has been redacted.
25    A   All right.

Page 213

1  Q  Can you please read starting with, After preliminary
2  review, the text following; can you start reading after,
3  Preliminary review?
4  **A  After preliminary review, the hospital has determined**
5  **that your application should be denied and for the following**
6  **reasons:  The nature of your proposed medical practice is**
7  **inconsistent with this hospital's policies and practices as it**
8  **concerns abortion, and in particular, elective abortions; the**
9  **nature of your proposed medical practice is inconsistent with**
10 **this hospital's practices, as it concerns**
11 **obstetric-gynecological service.  This hospital has no**
12 **obstetrical services and very limited gynecological services**
13 **with no OB-GYN on its active staff and the nature of your**
14 **proposed medical practice would be both an internal and**
15 **external disruption of the hospital's function and business**
16 **within this community.**
17     MR. BECKMAN:  Just real quick, the State would
18 reserve its right to object to this document because we
19 don't know whether this is accurate.  We know nothing
20 about this document, is all I would note for the record
21 right now.  We've never seen it before.
22     Q  Based on your reading of this exhibit, was this
23 physician denied privileges for reasons related to their
24 competency?
25     MR. BECKMAN:  Object to form.

Page 214

1     **A  It does not look like that it's related to**
2  **competency.**
3     Q  It appears it is not related to competency,
4  correct?
5     **A  Yes.**
6     Q  You were talking a little bit about earlier, when you
7  were talking about minimum privilege requirements, about
8  courtesy privileges.  And in paragraph 16 of Exhibit 4 --
9     **A  I've got it.**
10    Q  Sorry; back to your report.  So this is the part of
11 paragraph 16 that's on page 10.  You say, It has been my
12 experience that hospitals do try and accommodate physician
13 staff privilege requests once they have demonstrated training,
14 experience, and clinical competency.  Did I read that
15 correctly?
16    **A  Yes.**
17    Q  What does your "experience" referred to in this
18 sentence mean?
19    **A  My dealings here with -- we have to get our**
20 **physicians credentialed, the residents, friends who I've known**
21 **who have moved into the area, the hospital-recruited**
22 **physicians, so my -- all my association with new physicians**
23 **has been at the hospital that does the best they can to**
24 **accommodate admitting privileges.  I've not heard or seen**
25 **otherwise.  Credentialing is a big deal.  You know, competency**

Page 215

1  is a big deal.
2     Q  So in your personal experience, you've seen other
3  physicians that have been granted courtesy privileges as a way
4  to try to accommodate them?
5     **A  Yes.**
6     Q  And how did you learn that?
7     **A  Well, we have a book that says Staff or Courtesy**
8  **Privileges, so when we're looking, like I said, for that**
9  **medical consultant at the Medical College of Virginia and**
10 **they're already credentialed, it makes our life a lot**
11 **easier.**
12    Q  Dr. Anderson, did you submit a supplemental report in
13 this case?
14    **A  Yes.**
15     MS. GRIFFITH:  Do you have an extra?
16     MR. BECKMAN:  I do.
17      (Anderson Exhibit 9 is marked.)
18
19 BY MS. GRIFFITH:
20    Q  Dr. Anderson, you've been handed what's been marked
21 as Exhibit No. 9.  Do you recognize this?
22    **A  Yes.**
23    Q  What is it?
24    **A  Something just submitted by me three days ago -- two**
25 **days ago -- four days ago -- somewhere very recently.**

Page 216

1     Q  It's a supplemental report that you submitted in this
2  case?
3     **A  Uh-huh.**
4     Q  And do you see on page 4, is that your signature?
5     **A  Yes.**
6     Q  And that's dated November 22nd, 2013?
7     **A  Yes.**
8     Q  Are you aware that Defendants just sent this to the
9  Plaintiffs yesterday evening?
10    **A  Sent it to you?**
11    Q  Yes.
12    **A  I thought I gave it to you just now.**
13    Q  Yeah, you just sent it by e-mail last night?
14    **A  I was not aware of last night.**
15    Q  When did you formulate the opinions that were set
16 forth in this report?
17    **A  This is in the last week to ten days.  Time becomes a**
18 **blur, but it's very recent.**
19    Q  When did Defendants contact you to submit this
20 supplemental report?
21     MR. BECKMAN:  That seems to get into
22 attorney-client privilege there.
23     MS. GRIFFITH:  When he was contacted?
24     MR. BECKMAN:  I suppose that would be all right;
25 excuse me.

Page 217

1    Q   Dr. Anderson, do you recall when Defendants contacted
2 you to submit that report?
3    A   **It's been within the last week to ten days.  I mean,**
4 **if we look at a calendar -- I just know that.**
5    Q   Is it correct that Defendants reached out to you to
6 add these items to your report?
7      THE DEPONENT:  If that's not under
8 attorney-client privilege, is that --
9      MR. BECKMAN:  I think that's probably okay.
10      THE DEPONENT:  What did you say?
11      MR. BECKMAN:  I think that is a legitimate
12 question.
13    A   Yes.
14    Q   Have you seen this before today?
15    A   **Oh, yes.  Yes.  I was sent the information.**
16    Q   Okay.  So in paragraph 6, at the bottom of paragraph
17 6, you state, In my opinion, if this physician was able to
18 obtain admitting privileges at a local hospital, it is likely
19 others will be able to do so as well.  If HB57 is implemented,
20 I believe the same would be true in Alabama.  Did I read that
21 accurately?
22    A   **Yes.**
23    Q   Would you agree that that's a new opinion from what
24 you had included in your previous reported?
25      MR. BECKMAN:  Object to form.

Page 218

1    A   **Well, I said the hospitals are accommodating, so I**
2 **think it's consistent with my opinion.**
3    Q   Do you think "hospital is accommodating" is the same
4 as you believe the hospitals in Alabama will grant them
5 privileges?
6      MR. BECKMAN:  Object to form.
7    A   **I used that word accommodate.**
8    Q   Okay.  That's fine.
9    A   **I like that word.**
10    Q   What is your basis for saying that it would be true
11 that the physician would be able to obtain admitting
12 privileges at hospitals in Alabama?
13    A   **My experience here in Richmond, Virginia.  The**
14 **credentialing process is for the protection of the patients**
15 **and the hospitals, once people have gone through the**
16 **credentialing process and find that they're able to do the**
17 **procedure competently and safety.**
18    Q   Here it suggests that your opinion is based on the
19 fact that this one physician was able to obtain privileges in
20 Texas.
21      MR. BECKMAN:  Object to form.
22    A   **Well, I think that when I read these expert reports,**
23 **Dr. Fine's report and these other reports, they said that**
24 **hospitals wouldn't give him privileges, and so I'm just saying**
25 **that it did.**

Page 219

1    Q   And where was this hospital located that granted
2 privileges?
3    A   **This was in Texas.**
4    Q   Do you know where in Texas?
5    A   **I don't.**
6    Q   If you refer to the e-mail that's attached to the
7 report on page 6.
8    A   **Of this?**
9    Q   Yes.
10    A   **I gotcha.**
11    Q   It says, A physician at a hospital within 30 miles of
12 PPGT's Austin facility; do you know anything about the city of
13 Austin, Texas?
14    A   **No.**
15    Q   Does it have a reputation of being liberal?
16      MR. BECKMAN:  Object to form.
17    A   **I have no idea.**
18    Q   You don't have any understanding of whether Austin is
19 a liberal or progressive city?
20      MR. BECKMAN:  Object to form.
21    A   **I'd flip it.**
22    Q   You have no idea?
23    A   **I have no idea.  I can flip a coin.**
24    Q   Do you know the criteria that the hospital where he
25 was granted privileges uses to grant privileges?

Page 220

1    A   **I do not.**
2    Q   Have you seen their bylaws?
3    A   **I have not.**
4    Q   Have you seen the hospital's application?
5    A   **I have not.**
6    Q   What type of evidence would you say that the e-mail
7 is?
8    A   **I don't have that e-mail.  You referred to --**
9    Q   It's attached to your report.
10    A   **Oh, there it is.**
11    Q   You rely on it in your report.
12    A   **I thought you were talking about the e-mail he sent**
13 **you last night with the report, when you referred to that**
14 **e-mail coming to you last night with this.**
15    Q   I apologize; I'm referring to the e-mail attached to
16 Exhibit 9 as page 6.  What type of evidence would you consider
17 this?  Is it scientific evidence?
18    A   **It's just confirmation of the fact that they were**
19 **given admitting privileges.**
20    Q   Would you say this is reliable?
21      MR. BECKMAN:  Object to form.
22    A   **I would assume so.**
23    Q   It's hearsay, isn't it?  I mean, they're just telling
24 you --
25    A   **That's legal, but I would tend to trust these**

Page 221

1   people were saying the truth.
2       Q   Okay.  Other than this one e-mail, do you have any
3   other evidence that other hospitals in Texas will grant
4   privileges to physicians in Texas?
5       A   No, I do not have other evidence except my personal
6   experience here; and where I've gone through credentialing
7   processes, that's been pretty standard procedure.
8       Q   Where you've been granted privileges is Virginia?
9       A   And in the Army, in Texas, Germany.
10      Q   So would you say that you are assuming that the other
11  doctors will be able to get privileges?
12          MR. BECKMAN:  Object to form.
13      A   Based on my experience, I think it's an accurate
14  assumption.
15      Q   Do you have any evidence that hospitals in Alabama
16  will do the same thing?
17      A   I don't have evidence.
18      Q   You haven't talked to anybody in Alabama?
19      A   No.
20      Q   Also in this supplemental report, in paragraph 7, you
21  refer to a publication of the National Abortion Federation.
22  Can you tell me what type of publication this is that you
23  refer to in this paragraph?
24      A   It just said -- it's what it says, the National
25  Abortion Federation.

Page 222

1       Q   But you refer to a publication.
2       A   It's available at www.prochoice, but I don't know.
3       Q   You believe that's where the publication is
4   available?
5       A   No.  It's just a quote.
6       Q   The description of what --
7       A   That's what I would expect.
8       Q   But you refer to a publication that you became aware
9   of.
10      A   Well, it says, NAF produced a women's guide, Having
11  an Abortion?  Your Guide to Good Care.
12      Q   Correct.  Are you familiar with what that publication
13  is?
14      A   No.
15      Q   Have you seen it?
16      A   Just this quote from it.
17      Q   So you haven't actually reviewed the publication
18  itself?
19      A   No.  Just this quote.
20      Q   You don't know who authored it?
21      A   No.
22      Q   You don't know where it was published?
23      A   No.  Just says documentation.
24      Q   Do you know where it came from?
25      A   Just where it says.

Page 223

1       Q   Are you aware that it hasn't been on NAF's web site
2   in over ten years?
3       A   No.
4       Q   How do you think that this publication should be
5   relevant to the case if it's not guidance that NAF promulgates
6   any longer?
7           MR. BECKMAN:  Object to form.
8       A   I think that you're still talking about foundational
9   things that you want inherently in any good healthcare system,
10  continuity of care, credentialing process to help protect
11  women or people from doctors who aren't well trained.  Then
12  you're after good communication, continuity of care, so I
13  think that's probably the case why it was there ten years
14  ago.
15      Q   Would you typically rely on medical guidance over ten
16  years old?
17          MR. BECKMAN:  Object to form.
18      A   On the foundational things, I think when you're
19  dealing with trust and communication and landscape issues like
20  continuity of care, they are what's made American medicine so
21  successful for so long.  So I would trust that this is not a
22  technical issue.
23      Q   Don't medical standards change over time?
24      A   As your equipment and drug treatments change, yes.
25  But doctor-patient trust relationship, communication, we're

Page 224

1   emphasizing those to the first-year medical students the same
2   way as if it happened to me 30 years ago; that has not
3   changed.
4       Q   If this is not included in clinic guidelines that NAF
5   promulgates to establish standards for clinics that operate in
6   their network, what weight should that publication carry?
7           MR. BECKMAN:  Object to form.
8       A   I can't say.  I don't -- I'm not familiar enough with
9   that organization to make just a broad brush stroke statement.
10          MS. GRIFFITH:  Can we take a break?
11          MR. BECKMAN:  Sure.
12          (Recess from 4:36 p.m. to 4:52 p.m.)
13
14  BY MS. GRIFFITH:
15      Q   Dr. Anderson, I just want to follow up on a couple
16  things from earlier in your testimony.  The first is that at
17  one point you mentioned a transfer of care order.  Can you
18  tell me what that is?
19      A   Well, in what context?
20      Q   I think we were talking about other physicians in
21  your practice taking care of your patient or overseeing your
22  patient in the hospital as opposed to you, and I think you
23  said that would not require a transfer of care order.
24      A   Oh, yeah.  That would just -- I mean, if I'm not
25  available, if I'm not going to hospital rounds, then the

Page 225

1  fellow who is assigned to the hospital is taking care of the
2  patients; they can talk to me and I can visit the patients,
3  but I don't have to do anything except make sure that they're
4  involved. There's no hospital ordering. We're just all on
5  the same practice. I mean, if I wanted another family doctor
6  or a hospitalist to take -- I've got to write an order of
7  transfer of care to Such-and-such.
8      Q   Okay. And then several times you mentioned -- we
9  were comparing, I think, abortion procedures to other
10 procedures, and you mentioned several times that HB57 was
11 important because abortion was an elective surgical procedure.
12 Does that sound accurate?
13     A   Yes.
14     Q   What is the significance of the fact that it's an
15 elective procedure?
16     A   In an emergency, you have to do what you have to do
17 to save the patient's life. An elective procedure is not
18 something that life and death is dependent on time like it is
19 if you're doing a hysterectomy if somebody's bleeding to
20 death; that's an emergency procedure that, if you don't do,
21 they can die, depending on -- I'm just doing a broad brush
22 stroke.
23     Q   And a colonoscopy would be another example of an
24 elective surgical procedure?
25     A   It's not surgical. It's an elective procedure.

Page 226

1      Q   And an IUD insertion would also be an elective
2  procedure?
3      A   Elective procedure.
4      Q   Mole removal?
5      A   Elective, yeah.
6      Q   Plastic surgery, would that be an example of an
7  elective surgical procedure?
8      A   If it didn't -- if it -- yes. I mean, that's a very
9  broad perspective. Give me specifics on plastic surgery.
10     Q   Would a facelift be an example of an elective
11 surgical procedure?
12     A   Yes.
13         MS. GRIFFITH: Those are all the questions I
14 have.
15         MR. BECKMAN: Kyle Beckman for the State of
16 Alabama. One thing I wanted to note for the record is
17 that this deposition is under the usual stipulations for
18 the Middle District of Alabama and my client retains the
19 right to read and sign his deposition after it concludes
20 today.
21
22         EXAMINATION BY MR. BECKMAN:
23     Q   Dr. Anderson, I'll just have a couple questions, and
24 I'll try to make them brief. And if you're confused by
25 anything that I ask, don't hesitate to ask for clarification.

Page 227

1  At some point I'll be referencing questions that they've asked
2  earlier, so if you don't recall that exact instance, we can
3  try and have that read back to you, if you don't remember the
4  exact context, so please don't hesitate to ask.
5          Looking at Exhibit 4, your expert report, in
6  paragraph 2 you write, In my expert opinion, this provision is
7  reasonable and medically necessary to protect women's health
8  in Alabama. In what context do you use the word reasonable?
9      A   It makes good sense. It's medical. It doesn't have
10 any -- it's just a good foundational principal. It's for good
11 healthcare, reasonable.
12     Q   Are you using that word as a lawyer uses
13 reasonable?
14     A   No. I'm not sure how you use it, but I'm not.
15     Q   Dr. Anderson, earlier today there was a question
16 about your expertise in abortion procedures. Can you explain,
17 based on your 25 or 30 years of medical experience, where
18 exactly your expertise resides?
19     A   It's in treating complications that deal with
20 infection, that deal with hemorrhage related to emergent care
21 in the emergency room stabilizing the patient. It's not in
22 the performance of the abortion itself.
23     Q   Earlier there was a question about whether there's a
24 way to ensure adequate continuity of care without a doctor
25 having staff privileges. Would a doctor not having staff

Page 228

1  privileges, in your medical opinion, be the best way to ensure
2  continuity of care?
3      A   State that again.
4      Q   Looking at all the different ways, however many there
5  may be, to ensure continuity of care continues, what is the
6  gold standard, perhaps?
7      A   The gold standard is being available and accessible,
8  which would include hospital admissions, hospital admitting
9  privileges, so you could continue with that patient through
10 those times of real sickness as well as in outpatient care.
11     Q   If you want to provide a woman the best care, would
12 you prefer to have a doctor on the phone or there with you in
13 person?
14         MS. GRIFFITH: Object to form.
15     A   A person always -- we say sight is better than a
16 thousand words because of the gestalt; you can pick up so many
17 clues visually that are very subtle. If you have a track
18 record with the patient and know their norm, you have
19 reference points to spot trends and changes that can be very
20 subtle.
21     Q   Doctor, when we're talking about a complication for a
22 woman who just had an abortion but it's not a complication
23 that arises immediately, say, a uterine wall tear, say she
24 goes home and then a complication arises. Do you see any
25 problem with trying to call her doctor when she presents

Page 229

1  herself at the hospital, trying to call the abortion doctor?
2  Is there any -- you talk about all the different things you
3  want to know from an abortion doctor.  In that situation, will
4  he be able to provide you all the different things that you
5  listed?
6       A   If I can get him on the phone, that would be much
7  better than if I couldn't.  And then if he has admitting
8  privileges and he comes in, then she's going to get that
9  better edition of care being seen by someone who knows her
10  well and is involved in her elective procedure, the abortion
11  procedure; whereas, if he does not or she does not have
12  admitting privileges, there's just not an option; they're not
13  going to come in.
14           So the HB57 opens up the door to continue in her
15  care, even if she's gone home after the abortion procedure.
16       Q   Is there a situation where a complication can arise
17  later, after the abortion, where the doctor who performed the
18  abortion may not be able to describe what's happening if he
19  hasn't seen that woman since she left?
20       A   What do you mean by describe what's happening?  If
21  the --
22       Q   The information -- excuse me; the information that
23  you said you believe is necessary to know from the abortion
24  doctor.  Can he adequately convey all that?  Are there
25  situations where we won't be able to do that without seeing

Page 230

1  the woman?
2       A   No, he can communicate all that he knows about her or
3  she knows about her; he can communicate that.  But his
4  presence just brings in a whole other perspective to her care
5  that, in those two or three days, he'll be able to pick up on
6  subtle changes.
7       Q   Can a patient convey everything that you need to
8  know?
9       A   Patients are notorious for being poor historians.
10  And especially when they're sick or fearful or lethargic or in
11  severe pain.  So the patient history is always fraught with
12  uncertainty.  And then if you have them very sick, or if there
13  are language barriers there, it can be very difficult.
14       Q   Doctor, you were presented earlier with two excerpts;
15  I believe one I've got it marked as Exhibit 6, which was from
16  Alaska.  This --
17           MR. BECKMAN:  I suppose I don't have a question.
18  What I'm just going to say is that the State is taking
19  the Plaintiffs at their word that these are the full
20  documents.  We haven't looked at every single page of
21  this, and this one may not be completely complete; I'm
22  not a hundred percent sure whether they accurately
23  reflect everything that was said.
24       Q   One other question I would have is can you compare
25  the adequacy of credentialing versus licensing by the state?

Page 231

1       A   Licensing by the state is based on your Board
2  certification and your education process that you've finished,
3  the internship and residency acquired, but as far as a full
4  review of credential -- of procedures that you've done and
5  then the peer review information, it's not nearly as in-depth
6  as a hospital credentialing process.  The state is mainly
7  verifying education and the residency and internship and the
8  state licensures.  But it's not near as in-depth as the
9  hospital credentialing process.
10           Just for state license, all I have to do is pay my
11  license fee every two years, and I'll have resubmitted my
12  state license; whereas, the hospital does a review and puts
13  you through the whole process again.
14       Q   In your report on page 22, paragraph 36 -- this was
15  referenced earlier today -- there's a provision of the Alabama
16  Administrative Code that reads, at least in part, The
17  physician who performs an abortion procedure is responsible
18  for ensuring that all patients receive adequate follow-up
19  care.  Do you believe that HB57 helps ensure that goal?
20       A   Yes.
21           MS. GRIFFITH:  Object to form.
22       A   I do.
23           MR. BECKMAN:  I don't believe I have any more
24  questions at this time.  The only thing that we would say
25  is that -- that's all I've got.

Page 232

1           MS. GRIFFITH:  Just two things I want to follow
2  up on.
3
4  RE-EXAMINATION BY MS. GRIFFITH:
5       Q   In response to one of Counsel's questions you said
6  that HB57 opens up a door for doctors to be able to treat
7  their patients in the hospital.  Without House Bill 57, can
8  abortion providers get privileges and treat their patients in
9  the hospital?
10       A   Yes.
11       Q   In your opinion, do you provide the patients in your
12  private practice with a good standard of care?
13           MR. BECKMAN:  Object to form.
14       A   We try.  Yes.
15       Q   Would you say generally you succeed and that your
16  patients get good care?
17       A   Yes.
18       Q   Does the care that you provide live up to the gold
19  standard that you discussed with Counsel?
20           MR. BECKMAN:  Object to form.
21       A   As much as possible with real life.  With patient
22  movement, with 24/7 requirements in medicine, but it as much
23  as possible, you know, sharing calls, after-hours,
24  accessibility, yes.
25       Q   So you provide a good standard of care even though

## Page 233

1  the physician who sees the patient in the hospital and
2  observes them may not be the physician that normally treats
3  them; is that right?
4      MR. BECKMAN:  Object to form.
5      **A   My partners, yes.  We share the care of the patients**
6  **when I can't do it.  And logistically, you just can't do it**
7  **all the time.**
8      Q   What about the OB-GYN who oversees the residents; if
9  she performs a Cesarean, has she necessarily met that patient
10 before?
11     **A   Yes.  Except for emergency, except for ladies that**
12 **show up in the emergency room pregnant, term, and never had a**
13 **doctor, as an on-call physician, she'll do a C-section then on**
14 **a patient she's never met before.**
15     Q   But in terms of in the practice, you said residents
16 are trained in labor and delivery?
17     **A   Yes.**
18     Q   But they can only oversee vaginal delivery?
19     **A   Yes.**
20     Q   But you say that program is overseen by an OB-GYN,
21 correct?
22     **A   Yes.**
23     Q   So if a resident's patient went into labor and needed
24 an emergency C-section, the OB-GYN that oversaw the program
25 would be the one that would provide that?

## Page 234

1      **A   Yes.**
2      Q   And in that situation, would she have met the patient
3  before?
4      **A   Yes.**
5      Q   She meets all the residents' patients?
6      **A   Yes, that continuity of care is in her office.**
7      MS. GRIFFITH:  Okay.  I have nothing further.
8      MR. BECKMAN:  I have nothing further.
9          (Deposition concluded at 5:12 p.m.)
10
11  AND FURTHER, THIS DEPONENT SAITH NOT.

## Page 235

1  COMMONWEALTH OF VIRGINIA AT LARGE,
2  COUNTY OF HENRICO, to wit:
3
4      I, Ruth A. Levy, a Notary Public for the
5  Commonwealth of Virginia at Large, do hereby certify that the
6  foregoing deposition of James Anderson, M.D., was duly sworn
7  to before me at the time and place set out in the caption
8  hereto.
9      Further, that the transcript of the deposition is
10 true and correct, and that there were 9 exhibits filed with me
11 during the taking hereof.
12     Given under my hand this 4th day of December, 2013.
13
14
15
16
17     Ruth A. Levy, RPR
18     Notary Public for the
19     Commonwealth of Virginia at Large
20
21 My Commission expires:  August 31, 2014
22 Notary Registration No. 224511

## Page 236

1  COMMONWEALTH OF VIRGINIA,
2  CITY/COUNTY OF _____, to wit:
3      I, James Anderson, M.D., do hereby certify
4  that I have read the foregoing pages of typewritten matter,
5  and that the same contains a true and correct transcription
6  of the deposition given by me on the 25th day of November,
7  2013, with the exception of the noted corrections, to the best
8  of my knowledge and belief.
9
10
11 _____
12     Date
13
14
15 _____
16     James Anderson, M.D.
17
18
19     Sworn and subscribed to before me this _____ day of
20 _____, 2013.
21
22 My Commission expires: _____
23 Registration No. _____