# Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, et al., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION |
| v. | ) ) | 2:13-cv-405-MHT |
| LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

DEPOSITION OF JOHN MERCER THORP, JR., M.D., M.H.S.

TUESDAY, NOVEMBER 19, 2013
WEDNESDAY, NOVEMBER 20, 2013

Conference Room

Law Offices of Patterson Harkavy, LLP

100 Europa Drive, Suite 250

Chapel Hill, North Carolina

1:30 p.m. and 2:00 p.m.

Volumes 1 and 2

Pages 1 through 208

Kay McGovern & Associates
Suite 117, 314 West Millbrook Road ù Raleigh, NC  27609-4380
(919) 870-1600 ù FAX 870-1603 ù (800) 255-7886

## Page 2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS PLANNED PARENTHOOD SOUTHEAST, INC.,
KIWANA BROOKS, SHANEKA DAVIS:

Carrie Y. Flaxman
Staff Attorney
Planned Parenthood Federation of America, Inc.
1110 Vermont Avenue, N.W., Suite 300
Washington, D.C. 20005
carrie.flaxman@ppfa.org
(202) 973-4830

Nikhel Sus, Esquire
Dyanne M. Griffith, Esquire
Wilmer Cutler Pickering Hale and Dorr, LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6552
nikhel.sus@wilmerhale.com
dyanne.griffith@wilmerhale.com
ON BEHALF OF PLAINTIFFS REPRODUCTIVE HEALTH SERVICES AND JUNE
AYERS:

Andrew Beck, Staff Attorney
Alexa Kolbi-Molinas, Staff Attorney
American Civil Liberties Foundation
125 Broad Street, 18th Floor
New York, New York 10004
akolbi-molinas@aclu.org
abeck@aclu.org
(212) 549-2633
ON BEHALF OF DEFENDANTS STRANGE, BROOKS, FALLS, and RICH:
Luther Strange
Attorney General
By:  William G. Parker, Jr.
    Assistant Attorney General
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130
wparker@ago.state.al.us

## Page 4

T A B L E   O F   C O N T E N T S
(continued)

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 6 | Rahangdale, Lisa, "Infectious Complications of Pregnancy Termination," Clinical Obstetrics and Gynecology. Volume 32, Number 2, 198-204 | 141 |
| 7 | diagram drawn by witness | 177 |

## Page 3

T A B L E   O F   C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| JOHN MERCER THORP, JR., M.D., M.H.S. | | | |
| By Ms. Flaxman | 5-199 | | 205-206 |
| By Mr. Parker | | 200-204 | |

EXHIBITS

| NUMBER | DESCRIPTION | MARKED |
|---|---|---|
| 1 | Planned Parenthood Southeast, Inc., et al. v. Strange, et al., Expert Report of John Thorp, Jr., M.D., M.H.S., 9/8/13 | 9 |
| 2 | Planned Parenthood of Indiana and Kentucky, Inc. v. Commissioner, Indiana State Department of Health, et al., Declaration of John Thorp, Jr., M.D., M.H.S., in Opposition to Plaintiff's Motion for Preliminary Injunction, 9/26/13 | 17 |
| 3 | Planned Parenthood of the Southeast, on behalf of its patients, physicians, and staff, et al. v. Bentley, et al., Rule 26(a)(2)(A) Expert Report of Paul Fine, M.D., 8/9/13 | 124 |
| 4 | Thorp, John M., Jr., "Public Health Impact of Legal Termination of Pregnancy in the US: 40 Years Later," Scientifica Volume 2012, Article ID 980812, 16 pages, accepted 10/15/12 | 129 |
| 5 | Shannon, et al., "Infection after medical abortion: a review of the literature," Contraception 70 (2004) 183-190 | 137 |

## Page 5

| | | |
|---|---|---|
| 1 | P R O C E E D I N G S    1:29 p.m. | |
| 2 | (This deposition was taken pursuant to the Federal | |
| 3 | Rules of Civil Procedure and the Local Rules of | |
| 4 | the Middle District of Alabama.) | |
| 5 | (Whereupon, | |
| 6 | JOHN M. THORP, JR., M.D., M.H.S. | |
| 7 | was called as a witness, duly sworn, and testified as | |
| 8 | follows:) | |
| 9 | D I R E C T   E X A M I N A T I O N   1:29 p.m. | |
| 10 | By Ms. Flaxman: | |
| 11 | Q   Good afternoon, Dr. Thorp. | |
| 12 | A   Howdy. | |
| 13 | Q   I'm sorry? | |
| 14 | A   I said howdy. | |
| 15 | Q   Oh, howdy.  I thought you said Allen.  I thought, | |
| 16 | "I don't remember seeing that on the record."  How are you? | |
| 17 | A   I'm good.  How are you? | |
| 18 | Q   Good, thanks.  My name is Carrie Flaxman.  I | |
| 19 | represent the plaintiffs in this case.  Could you state your | |
| 20 | full name for the record? | |
| 21 | A   John Mercer Thorp, T-h-o-r-p, no e, Jr. | |
| 22 | Q   And Dr. Thorp, are you represented today by | |
| 23 | counsel? | |
| 24 | A   I don't think so. | |
| 25 | Q   Mr. Parker is not representing you here today? | |

Page 6

1    A   I don't think I've hired Mr. Parker to represent
2   me.  I think he represents the state of Alabama.
3        Mr. Parker:    Can I interject here?  It's my
4   understanding that the defendants in this case have retained
5   Dr. Thorp as an expert witness.  I'm counsel for the
6   defendants and so will be here representing Dr. Thorp.
7        Ms. Flaxman:    Okay.
8        By Ms. Flaxman:
9    Q   Now, I know from your expert report that you have
10   been deposed before.  Is that correct?
11   A   Yes, ma'am.
12   Q   So since you've been deposed before, I'll assume
13   you're familiar with most of the rules.  I'm just going to go
14   over a few of them so we're clear.  First of all, you'll need
15   to answer each question verbally and give a verbal answer.
16   Do you understand that?
17   A   I'll try.  Yes, ma'am.
18   Q   And as Kay just mentioned, it's important that we
19   not speak over each other, so please, if you could wait until
20   I finish asking a question before you start to answer it.  Do
21   you understand that?
22   A   I'll do my best.
23   Q   And if at any time you don't understand a
24   question, please ask me to clarify that question.  And if you
25   answer the question, I will assume that you understood it.

Page 7

1   Do you understand that?
2    A   It may be a dangerous assumption, but yes, ma'am.
3    Q   Thank you.  If you need to take a break at any
4   time, let me know.  The only thing I ask is that if there's a
5   question pending, that you answer that question before we
6   break.  And I'll plan to take regular breaks as well.
7    A   Sure.
8        The Reporter:    Off the record.    1:31 p.m.
9        (Discussion off the record.)
10       The Reporter:    On the record.    1:32 p.m.
11       By Ms. Flaxman:
12   Q   And is there anything, Doctor, that might affect
13   your ability to give full and accurate testimony today?
14   A   Not that I'm aware of.
15   Q   Do you have any questions before we proceed?
16   A   No, ma'am.
17   Q   How did you come to be an expert witness in this
18   case?
19   A   I don't recall.
20   Q   Did somebody call you to ask if you were willing
21   to be a witness?
22   A   Somebody usually calls or e-mails.  I don't recall
23   the--I don't recall the specifics---
24   Q   (interposing) Do you recall generally---
25   A   ---in this case.

Page 8

1    Q   Do you recall generally how you might have come to
2   be involved?
3    A   I don't recall generally or specifically.
4   Somebody usually contacts me.
5    Q   And who might that have been?
6    A   I don't recall.
7    Q   Now, you have been a witness in other cases
8   involving admitting privileges requirements; correct?
9    A   I think so.
10   Q   And what states?
11   A   It's hard for me to keep it all straight and what
12   specific parts of what laws apply to what states.  I think
13   Texas.  I don't know where else.
14   Q   Mississippi?
15   A   I think so.
16   Q   Wisconsin?
17   A   I think so.
18   Q   And do you recall for any of those states who may
19   have contacted you about providing expert testimony?
20   A   No, ma'am.
21   Q   And have you also recently provided testimony in a
22   case in Indiana involving clinic regulations?
23   A   Yes, ma'am.
24   Q   And do you recall who contacted you about
25   participating in that case?

Page 9

1    A   No, ma'am.
2    Q   And I understand that there may have been other
3   cases that you have testified as an expert relating to
4   abortion legislation; is that correct?
5    A   Yes, ma'am.
6    Q   And in any of those cases can you tell me who
7   contacted you to provide testimony in those cases?
8    A   No, ma'am.  I don't recall.
9    Q   Do you recall who was the first attorney you spoke
10   with in the Alabama attorney general's office?
11   A   I don't.
12   Q   Was it Mr. Parker?
13   A   I don't remember.
14   Q   Was it Mr. Brasher?
15   A   Don't remember.
16   Q   Why don't we mark as Exhibit 1 your expert report?
17            (Exhibit 1 was marked for
18            identification.)
19       Ms. Flaxman:    So we've marked as Exhibit 1
20   the Rule 26(a)(2)(B) expert report of John Thorp, Jr. M.D.,
21   M.H.S.
22       By Ms. Flaxman:
23   Q   Do you recognize this document?
24   A   Yes, ma'am.
25   Q   And what is it?

Page 10

1      A    It's an expert report.
2      Q    And is it one that you have submitted in this
3  case?
4      A    I believe so.  I haven't looked and read every
5  page, but I think it is.
6      Q    Why don't you go look through it and confirm that
7  it is?
8      A    I don't think I have time to read it, so I'm going
9  to assume that you're giving me my expert report.
10     Q    And if you could look to page 34?
11          (Witness complies.)
12     A    I'm there.
13     Q    Is that your signature?
14     A    I believe it is.
15     Q    It is your signature?
16     A    Well, I don't know what it is, but I believe that
17  it is.  It looks like my signature.
18     Q    Okay.  So it looks like your signature?
19     A    Yes, ma'am.
20     Q    Any basis for thinking that it's not your
21  signature?
22     A    No, but I don't know.
23     Q    You don't recall signing this?
24     A    I don't have an independent recollection of
25  signing it.

Page 11

1      Q    This was dated September 8th of this year, so it
2  was a little more than two months ago.  But you don't recall
3  signing it?
4      A    No, ma'am.
5      Q    Do you recall signing other expert reports you've
6  submitted in the---
7      A    (interposing) No, ma'am.  I sign a bunch of stuff
8  every day.
9      Q    Is this your electronic signature?
10     A    I don't know.  That's one of the reasons why I
11  don't know.
12     Q    Why don't you take a look at it and--do you have
13  an electronic signature?
14     A    I do.
15     Q    Why don't you take a look at it again and let me
16  know?
17     A    Well, how is looking at it going to tell me
18  whether a pen signed it or a computer signed it?
19     Q    Why don't you just take a look at it, then?
20          (Witness peruses document.)
21     A    I don't know.
22     Q    Okay.  If we could look at page 31 of your report,
23  sir?
24          (Witness complies.)
25     Q    You have listed there cases in which during the

Page 12

1  past four years you have testified as an expert at trial or
2  by deposition.  And the first category you list are
3  constitutional cases in which you've provided testimony.  Do
4  you see that?
5      A    Yes, ma'am.
6      Q    And by constitutional cases, you mean these are
7  the two cases in which--well, that relate to abortion that
8  you have provided testimony in in the last four years; is
9  that correct?
10     A    I think it's fair to say that the only
11  constitutional issue that I've testified about would involve
12  termination of pregnancy, so yes, ma'am.
13     Q    And the first case listed there is Stuart v. Huff
14  in district court here in North Carolina.  Do you recall what
15  that case was about?
16     A    Not by that caption I don't.
17     Q    Well, what caption do you know it by?
18     A    Well, if I don't know what it is, then I don't
19  know it by any caption.
20     Q    So you're---
21     A    (interposing)  I don't know what Stuart v. Huff
22  means.
23     Q    If I told you it was a case involving an ultra-
24  sound requirement in the state of North Carolina for
25  abortions, does that ring a bell?

Page 13

1      A    That rings a bell.
2      Q    And what has your involvement been in that case?
3      A    I think I was an expert retained by the state of
4  North Carolina.
5      Q    And were you also involved in trying to intervene
6  in that case as a party?
7      A    I don't know what intervening means.
8      Q    Have you tried to participate as a party in that
9  case?
10     A    I don't understand what you're asking me.
11     Q    Now that I have--now that you recall what the case
12  is about, the ultrasound requirement in North Carolina, does
13  it refresh your memory as to how you came to be involved in
14  that case?
15     A    It does not.
16     Q    And the second case listed there is a case Planned
17  Parenthood v. State of Alaska?
18     A    Yes, ma'am.
19     Q    Do you recall what that case was about?
20     A    It was a parental notification/parental consent
21  statute that the state of Alaska has that went to litigation.
22     Q    And you provided testimony there by way of
23  deposition?
24     A    I actually went to Alaska at some point in time,
25  in February.  It was cold.

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

---

Page 14

1    Q   I'm sure it was in February.
2    A   Real cold.
3    Q   And do you---
4    A   (interposing)  And Alabama is warmer.
5    Q   Do you--having seen this here and talking about
6    visiting Alaska in the cold, does that refresh your memory
7    about how you came to be involved in that case?
8    A   It does not.
9    Q   And then the next category of cases in which you
10   provided testimony are medical malpractice cases?
11   A   Yes, ma'am.
12   Q   Do you testify for plaintiff or defendant or both
13   in these cases?
14   A   You haven't read my medical malpractice deposi-
15   tions because you would know that I don't like your wording
16   of the question.
17   Q   Well, I've asked the question.  It's your job here
18   to answer it, so---
19   A   (interposing)  Well, I'm going to answer it,
20   but---
21   Q   (interposing)  Okay.  That's fine.
22   A   ---that's part of my answer that--and I'd
23   appreciate your not interrupting me in the middle of an
24   answer.  Could you ask the question again, please, ma'am?
25   Q   When you have provided expert testimony in medical

---

Page 15

1    malpractice cases, do you typically testify on behalf of the
2    plaintiff or the defendant?
3    A   And I don't think I testify on behalf of either.
4    Q   When you provide expert testimony in medical
5    malpractice cases, on which side of the case--whose side of
6    the case are you retained by?
7    A   Retained by defense and retained by plaintiffs.
8    Q   And so in the cases on this list, in some of them
9    you've been retained by the plaintiffs and in some of them
10   you've been retained by the defense; is that correct?
11   A   Yes, ma'am.
12   Q   Is there--are the majority plaintiff or defense?
13   A   In what sort of testimony?
14   Q   In the medical malpractice cases.
15   A   But in what sort of testimony within the medical
16   malpractice cases because there seems to be a winnowing as
17   one gets closer and closer to trial, in my opinion.
18   Q   So explain what you mean.
19   A   That at least in my experience when I'm retained
20   by the plaintiff, it's more likely to end up in trial than
21   when I'm retained by the defense.  So I don't know whether
22   you mean opinions, whether you mean deposition testimony, or
23   whether you mean trial testimony because I think the ratio
24   changes as the cases get settled---
25   Q   (interposing)  Okay.  That's---

---

Page 16

1    A   ---or go away.
2    Q   That's fair enough.  How about in terms of just
3    your initial retention?  What would you estimate the division
4    is?
5    A   I would think two thirds by the defense and maybe
6    a third by the plaintiff.
7    Q   And how are you generally contacted?  Who
8    generally contacts you to provide that testimony?
9    A   Usually an attorney.
10   Q   And are these attorneys who you're previously
11   familiar with?
12   A   Some I am and some I'm not.
13   Q   And are any of those attorneys connected to people
14   who may have gotten you involved in the constitutional cases
15   in which you've provided testimony?
16   A   It seems to be two different strains of lawyer.
17   Q   It seems to be or you know it's two different
18   strains of lawyer?
19   A   I don't know it is, but it seems to be that people
20   who do what y'all do--what I assume you do; I don't know what
21   you do--are different than the people who do tort actions.
22   It looks different to me.
23   Q   So it's---
24   A   (interposing)  I don't see a lot of overlap
25   between the two.

---

Page 17

1    Q   So it's your recollection that they have not been
2    the same folks?
3    A   To my recollection they have not been.
4                (Exhibit 2 was marked for
5                identification.)
6    Q   Sir, I'm showing you what's been marked Exhibit
7    Number 2.  It's a declaration of John Thorp, Jr. in
8    opposition to Plaintiff's motion for preliminary injunction
9    in a case in Indiana.  Do you recognize this declaration?
10   A   Yes, because I recall Tippecanoe County.
11   Q   That's how you recall it?
12   A   Yeah.  Have you ever seen Tippecanoe County
13   before?
14   Q   I have not.
15   A   Neither have I.
16   Q   Sir, can you turn to page 14?
17   A   Sure.  I can try to.
18       (Witness complies.)
19   Q   Thank you.
20   A   I'm there.
21   Q   Great.  Your signature there--is that your
22   signature?
23   A   That's my long signature.
24   Q   Okay.  This is--because I was at--this is getting
25   back---

---

Page 18

```
 1       A   (interposing)  And this one (indicating) is my
 2  short signature.  And when I recently closed a mortgage,
 3  which was a month ago, I did the short signature.  My wife
 4  had advised me to not do the short signature.  And I had to
 5  come back and the lady had to come back and I had to do the
 6  long one.
 7       Q   So the signature in Exhibit 2 is your long
 8  signature; correct?
 9       A   To my mind that's my full name, where the second
10  one is just Thorp.
11       Q   And so then in Exhibit 1, that is what you call
12  your short signature?
13       A   Yes, ma'am.
14       Q   Both of them are your signatures; correct?
15       A   Both of them are my signatures.  And I prefer the
16  short signature.  I think it's cooler, but---
17       Q   And quicker to write?
18       A   And quicker.
19       Q   And as a doctor, you frequently sign things
20  quickly, I would imagine?
21       A   I think so.  But the mortgage underwriter did not
22  like the short signature.
23       Q   To your knowledge have you ever been the subject
24  of a challenge to disqualify you from providing expert
25  testimony?
```

Page 19

```
 1       A   Not that I'm aware of.
 2       Q   And so have you ever been disqualified from
 3  providing expert testimony to your knowledge?
 4       A   Not that I'm aware of.
 5       Q   Going back to Exhibit 1, your report, could you
 6  explain to me the process you went through to write your
 7  report?
 8       A   I think I took other reports and the like--well,
 9  let's take a step back.  Do you mean how I actually produced
10  this document or the thinking processes that led to the
11  production of this document?  How broadly do you want me to
12  go or not?
13       Q   Go ahead.  Tell me--well, not about the specifics
14  of the substance of it, but how you physically went about
15  drafting the report.  I should back up and ask you, did you
16  draft your report?
17       A   I think it was an iterative process in conjunction
18  with the attorneys and the state of Alabama.
19       Q   And so you mentioned before that you thought that
20  you had used previous reports as well; is that correct?
21       A   I think that lawyers tend to steal text from one
22  another, it looks like to me as a non-lawyer.  And so I think
23  previous reports, structures, phrases get lifted and
24  wordsmithed into new reports is my guess.
25       Q   But you were aware of the fact that the language
```

Page 20

```
 1  in your reports has been--and testimony has been similar from
 2  case to case; correct?
 3       A   Well, I think the issues and what my testimony is
 4  has been similar.  And given that it's--I've sworn to tell
 5  the truth, it better be similar.
 6       Q   How many hours did you spend, approximately,
 7  preparing your report?
 8       A   I have no idea.  I don't recall.
 9       Q   Do you keep records of the time that you bill?
10       A   Yes, ma'am.
11       Q   And so you don't recall today how long it took
12  you, but your records would speak to that?
13       A   Yes, ma'am.
14       Q   Did Defendants in this case place any limitations
15  on the amount of time that you could spend preparing your
16  report?
17       A   Not that I recall.
18       Q   So if you could take a look at Exhibit 1, your
19  report, does this document accurately set forth your opinions
20  with respect to the topics discussed in the report?
21       A   I think it summarizes my opinions.
22       Q   And have you changed any of those opinions since
23  signing it?
24       A   I don't think so.
25       Q   You have no reason to believe that you've changed
```

Page 21

```
 1  them?
 2       A   I have no reason to believe that I've changed
 3  them.
 4       Q   Do you plan to do any further work to formulate or
 5  revise these opinions?
 6       A   I haven't been asked to.
 7       Q   Have you made an effort to include in your report
 8  all the relevant facts and data on which your opinions are
 9  based?
10       A   Well, again, a summary of the relevant facts and
11  opinions.  It's not the whole universe of facts and opinions
12  that inform this topic, but I've tried to put it there for
13  you.
14       Q   So the facts and opinions--the facts and data that
15  inform your opinion that are not in this report, what do you
16  mean by that?
17       A   We;;, there's a whole universe of facts and
18  opinions.  And you obviously can't in 30 pages put every fact
19  and opinion.
20       Q   But you have done---
21       A   (interposing)  So this is a summary pertinent to
22  the legal question or the question about this law from my
23  vantage point that I've tried to put in there.
24       Q   But you don't expect to rely on any additional
25  facts or data in connection with your opinion in this case,
```

Page 22

1  do you?
2      A    Well, I imagine there could be new facts and data
3  presented to me that could either change, modify, or bolster
4  my opinion.
5      Q    At this point, though, you don't expect--you don't
6  anticipate having any additional facts or data?
7      A    But the fact whether I anticipate it or not
8  doesn't mean that it's not there.
9      Q    Right, but you don't anticipate it at this time;
10 correct?
11     A    I don't understand--I anticipate that things
12 change.  It's just a question of when.
13     Q    But at this point if nothing changes, you don't
14 expect to introduce--offer opinions based on any additional
15 facts or data; correct?
16     A    I don't have any new thing to give you this red
17 hot second, if that's what you're asking me.
18     Q    Your hourly fee is $385 per hour; is that correct?
19     A    Yes, ma'am.
20     Q    And is that the same fee that you charge in your
21 other cases in which you provide expert testimony?
22     A    Are you talking about the constitutional,
23 so-called constitutional cases, or are you talking about the
24 medical---
25     Q    (interposing)  Let's start---

Page 23

1      A    ---malpractice cases?
2      Q    Let's start with the constitutional cases.
3      A    I think it varies from place to place and what
4  people are willing--able to pay.  And having been a state
5  employee for 30 years, states try to be pretty cheap.
6      Q    Have you been paid more than this per hour in a
7  constitutional case?
8      A    I think so.
9      Q    And have you been paid less than this per hour in
10 a constitutional case?
11     A    I think so.
12     Q    What do you do with the money that you make
13 testifying as an expert?
14     A    Again, are we talking about constitutional cases
15 or are we talking about tort cases?
16     Q    Is there a difference between how it's treated?
17     A    There's a huge difference.
18     Q    Okay.  So start with constitutional cases.
19     A    I spend the money, pay taxes on it and spend it,
20 or save it.
21     Q    So the money is personal to you?
22     A    Yes.
23     Q    It goes into Dr. Thorp's bank account?
24     A    Yes, ma'am.
25     Q    And how about the malpractice cases?

Page 24

1      A    Dr. Thorp's joint bank account with his wife.
2      Q    My mistake.  And how about the malpractice cases?
3      A    My employment contract with the University of
4  North Carolina, as does every faculty member's, stipulates in
5  an action against a physician, a claim of medical negligence,
6  that that money goes to the university and it's university
7  money.  So the university bills and collects for the medical
8  malpractice cases.
9      Q    And then what happens to that money once the
10 university has it?
11     A    They take a hell of a lot of it and then they give
12 me some back, not in salary, but that I can apply to a
13 university approved expense.
14     Q    And what types of expenses?
15     A    I support a graduate student in the School of
16 Public Health.  I bought a truck in Malawi for one of our
17 doctors to use who repairs fistula; if--you know, business
18 travel expenses and the like.
19     Q    Why the difference in the treatment?  You
20 mentioned that your contract with the university says that
21 cases involving negligence that that money goes to the
22 university.
23     A    You'd have to ask my bosses, number one.  But what
24 I understand is that, as you've probably figured out if
25 you've been here awhile, that this is a small town, and

Page 25

1  you've got an 800 bed hospital, that if your doctors in your
2  hospital are out testifying against doctors in the state and
3  making money that that could impede referral of patients.
4  And so I think they just said, "Everything you do goes to the
5  university.  You can't independently consult."
6          I think the university does not--I know the
7  university does not want to have an opinion on termination of
8  pregnancy.  It wants to allow an array of different opinions
9  to exist.  Thus this is seen as my personal work.  And I'll
10 take vacation time for the deposition this afternoon, and if
11 you want to spend another night here, tomorrow afternoon.
12     Q    And so aside from the malpractice cases, is the
13 way you've described the university handles your testimony in
14 abortion cases similar to how it would treat other areas in
15 which a doctor might be retained to provide testimony?
16     A    I think so, but I don't--I don't really know.
17     Q    But there's nothing in your contract with the
18 university that precludes you from providing your testimony
19 today; correct?
20     A    Not that I'm aware of; I don't want to lose my job
21 because I spent an afternoon with you.
22     Q    So your understanding is that you take vacation
23 time to provide your testimony?
24     A    I take time off because this--because I will--if
25 the state of Alabama decides to pay me, I will get paid for

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 26

1    this over and above my university salary.
2        Q   Are there other limits on your participation in
3    terms of use of university resources or---
4        A   I have to fill out a form for external
5    professional activities for pay that says I won't use
6    university resources and the like.
7        Q   And so that's something you comply with?
8        A   I try to.
9        Q   Is your compensation in this matter contingent in
10   any way on the outcome of this case?
11       A   I hope not.
12       Q   So the answer is no, as far as you're aware?
13       A   Well, I don't know.  I think me suing the state of
14   Alabama to get money I think they owe them in Alabama would
15   be a fool's errand.
16       Q   So as far as you---
17       A   (interposing)  So I don't know if they're going to
18   cut me off or what they're going to do.
19       Q   No one has told you that your--that your payment
20   in this case is contingent on success?
21       A   No, ma'am.
22       Q   If you could turn to page 35 of your expert
23   report, sir?
24       A   Yes, ma'am.
25       Q   It should be where your CV starts.

Page 27

1            (Witness peruses document.)
2        Q   Do I have that right?
3        A   I think it's in the middle of my--well, maybe
4    that's page 35 of my CV.
5            (Witness peruses document.)
6        Q   I'm sorry.  35--it should be the Appendix A.
7        A   Yes, ma'am.  I'm there.
8        Q   Do you see that?  As far as you know, was this CV
9    up to date as of the filing of your report?
10       A   There will be a date on the last page of when it
11   last revised that we can look at, so August of 2013.  So
12   you've got a month old one.
13       Q   And so is this the most up to date version of your
14   CV?
15       A   I don't know.
16       Q   Do you update it every month?
17       A   I don't know when my secretary updates it.  I give
18   her stuff to put on it to update it.
19       Q   And so when you ask for a CV, she'll give you a
20   copy and you don't know when it was most recently updated?
21       A   Well, I know exactly when it was most recently
22   updated because I go look in the back (indicating).
23       Q   Well, you know that this was updated in August,
24   but I'm talking about whether there's a more recent version.
25       A   Well, if she updated it today, she'd say November

Page 28

1    of 2013.  I don't know whether there's a more recent copy or
2    not.
3        Q   That was my question.
4        A   Okay; sorry.
5        Q   Sitting here today, you can't say whether there's
6    anything missing from this CV; is that correct?
7        A   We can call the office and get you whatever
8    version she's giving out today.
9        Q   Could you describe for me your medical education
10   and your training?
11       A   I couldn't get in medical school at UNC, so I went
12   to the new medical school at East Carolina in Greenville,
13   North Carolina.  I then came to UNC and did a residency and
14   fellowship and joined the faculty.
15       Q   And so have you--are you a lifelong Chapel Hill
16   resident?
17       A   I didn't grow up in Chapel Hill.
18       Q   North Carolina?
19       A   Rocky Mount, North Carolina, east of Raleigh, Nash
20   and Edgecombe counties.
21       Q   And you have been at UNC for your entire
22   professional career?
23       A   Yes, ma'am.
24       Q   Where are you licensed to practice medicine?
25       A   North Carolina.

Page 29

1        Q   You know, your CV says Malawi.
2        A   And Malawi.
3        Q   Your CV just says Malawi.
4        A   Well, my CV is wrong then; North Carolina and
5    Malawi.
6        Q   Why are you licensed in Malawi?  It's on page 1 of
7    your CV.
8        A   Because we started a fistula program and
9    ultimately a residency in Malawi for Malawians, the only
10   OB-GYN residency in that country.  Our first residents were
11   enrolled on the 1st of November.
12       Q   What's a---
13       A   (interposing)  And I have colleagues, three
14   colleagues there.
15       Q   What is a---
16       A   (interposing)  We're also fortunate enough--I have
17   to dis the University of Alabama--recruited a couple named
18   Jeff and Elizabeth Stringer away from the University of
19   Alabama, who have an extensive women's health program in
20   Zambia, the adjacent country.
21       Q   And so what's a fistula program?
22       A   Do you want me to explain what a fistula is?
23       Q   Yes, please.
24       A   A fistula is a traumatic and permanent opening,
25   like a pierced ear, between bladder and vagina or rectum and

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 30

1  vagina or both that is a consequence of prolonged labor and
2  is a debilitating disease for a reproductive age woman.
3          And my colleague repairs fistula and we educate
4  and try to restore these young, mostly young--almost
5  everybody in Malawi is young--young women to become
6  productive members of society.
7      Q   And so your colleague repairs the fistulas.  Is
8  that a surgical procedure?
9      A   It is a surgical procedure.
10      Q   Is it one that you perform as well?
11      A   I've assisted him, but I don't think there are--
12  these things are so big and so expensive I don't think
13  there's an American gynecologist who's not had international
14  experience, or urologist or general surgeon, who could even
15  begin to do it.  It's fairly amazing.
16      Q   And so which doctors would you say have the
17  expertise necessary to repair them?
18      A   Because American women have access to cesarean
19  section in a safe and timely fashion, they don't develop
20  fistula to this extent.  People will develop tiny, pinpoint
21  fistula posthysterectomy, postsurgery.  Cancer can provoke
22  fistula.  So somebody would need international experience.
23  And there are a handful of fistula surgeons and there are
24  thousands of African women with fistula.
25      Q   And so---

Page 31

1      A   (interposing)  We've got, you know, a big
2  business.
3      Q   A lot of customers is what you're saying?
4      A   We've got a lot of customers.
5      Q   And what you're testifying is that doctors who are
6  best qualified to repair those fistulas are doctors who have
7  experience in doing such extensive fistula repair; correct?
8      A   Well, true, but that's not to say that other
9  doctors can't assess, diagnose, and help rehabilitate.
10      Q   But in terms of the actual surgery, the surgeons
11  who should be performing it are the doctors who have the
12  experience in doing such extensive repairs?
13      A   That's usually what I look for when I'm looking
14  for a surgeon.
15      Q   And are your--you mentioned that it's a colleague
16  who repairs the fistula.  Does that colleague live in Malawi
17  full time?
18      A   Yes, ma'am.  He and his wife and children live in
19  Malawi full time.  His name is Jeff Wilkinson.
20      Q   And do all of the doctors who provide care there
21  also reside there full time?
22      A   We found that to be the critical ingredient for
23  success, is to be willing to live there.  A bunch of
24  Americans want to go and spend a week or two.  That doesn't
25  really--the itinerant doctor doesn't work real well.

Page 32

1      Q   And when you have--when you have gone, how long
2  have you gone for?
3      A   I've gone for a month.  I went with the chancellor
4  of the university the first time.  I'm not critical to
5  anything other than the development, the fund-raising, and
6  the like.
7      Q   And do you see patients when you're there?
8      A   I assist him in surgery and see patients with him.
9      Q   And do---
10      A   (interposing)  He was our resident.  I taught him
11  how to operate.  He's far exceeded my abilities.
12      Q   And so you don't see any patients on your own when
13  you're there?
14      A   I see patients in my home.  I see patients in
15  labor and delivery.  There's a 18,000 delivery unit with one
16  little OR.  I take care of patients there.  I do some patient
17  care.  I don't repair fistulas myself.
18      Q   Do you deliver babies when you're there?
19      A   I've delivered babies there.
20      Q   And then what happens--because your testimony was
21  just that itinerant doctors don't work very well.  If you've
22  delivered a baby in Malawi and there's a complication that
23  takes place with the mother after the delivery, what if you
24  had gone home?
25      A   Well, usually we're responding to a complication

Page 33

1  that arose during labor and delivery, a uterine rupture, an
2  emergency situation.  And if there weren't a western person
3  there to help, that--you know, that might not get done at
4  all.  But itinerant doctors can't change a culture.  It's
5  people willing to live there.  So I'm willing to help doctors
6  live there.  That's my role.
7      Q   Right, but I'm asking you about the deliveries
8  that you have been involved with.  If one of those women
9  after you left had a complication, who would provide the care
10  to her?
11      A   I guess it would depend on where she was and what
12  she was doing and what the complication was.  And she might
13  not get any care at all.
14      Q   But you would not be providing that care; correct?
15      A   I can't go back 18 hours and respond to my
16  problem, if I created a problem or participated in care that
17  led to a problem.
18      Q   And so she would be obtaining care either from
19  your colleagues who are in Malawi or from another physician;
20  is that correct?
21      A   There are only four OB-GYNs in all of Malawi, so
22  she might not receive any care at all.
23      Q   But if she did receive care, it would be from
24  another physician?
25      A   True.

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 34

1    Q    Where do you have hospital privileges?
2    A    UNC Hospitals.
3    Q    Is there more than one hospital?
4    A    I don't know whether--it's one hospital.
5    Q    Several locations?  Is that why you hesitated?
6    A    Yes.
7    Q    But your privileges allow you to admit patients in
8    each of the hospitals, each of the locations?
9    A    I don't know.  I've never tried to admit anybody
10   at any of the other locations.
11   Q    So which hospital will you admit patients?
12   A    To the UNC Women's and Children's Hospital.
13   Q    Just Women's and Children's?
14   A    Yes, ma'am.
15   Q    Have you ever held admitting privileges at any
16   other hospitals?
17   A    I helped start the residency in Asheville at
18   Memorial Mission Hospital and flew out there every Wednesday,
19   staffed the high risk clinic, and I had privileges at
20   Memorial Mission.  I also have worked at Wake Medical Center
21   in Raleigh when one of the MFM doctors had a stroke, and I
22   had admitting privileges for a brief period of time.
23   Q    Is that called locus tenems (phonetic)?
24   A    No, it was not locum tenens.  Our faculty are in
25   Raleigh.  I went to a different place.  And I think at some

Page 35

1    point in time I've had privileges at Durham Regional Hospital
2    when we did consulting work there.  Currently the only place
3    I have privileges is at UNC Hospital.
4    Q    So why don't you have privileges anymore at
5    Memorial Mission?
6    A    Because we were successful and there's a free-
7    standing residency and ten attendings and they don't need me
8    anymore.  I'm hoping the same thing is going to happen in
9    Lilongwe.
10   Q    Did your privileges there lapse or were--did the
11   hospital revoke your privileges?
12   A    I've never had my privileges revoked, so--I don't
13   know what lapse means.
14   Q    Well, I assume privileges--you generally need to
15   renew them every certain period of time; correct?
16   A    I guess so.
17   Q    And do you think that that's what happened with
18   your privileges in--at Memorial Mission?
19   A    Well, I think we probably mutually agreed that
20   there was no longer a role for UNC there and thus there was
21   no need for me to have privileges there.
22   Q    And how about Durham Regional?
23   A    Duke bought Durham Regional, and I don't want to
24   work for Duke.
25   Q    Why is that?

Page 36

1    A    Well, if you have to ask the question---
2    Q    (interposing) I'm not from town.
3    A    ---you don't have a very good understanding.
4    Q    I know something about the basketball.  Was it
5    just the rivalry?
6    A    Yeah, there's a rivalry.
7    Q    Got that.
8    A    Duke sucks.
9    Q    Got it.
10   A    S-u-c-k-s.
11       (Reporter nods affirmatively.)
12       She likes it too.
13       Ms. Flaxman:      She agrees with it.
14       The Reporter:     I was just agreeing with the
15   spelling.  I have no opinion---
16       The Witness:      (interposing) As do---
17       The Reporter:     ---as to anything.
18       The Witness:      As do most North Carolinians.
19       By Ms. Flaxman:
20   Q    And so Durham Regional--did you let your
21   privileges lapse?
22   A    I don't think I let them lapse.  I think they
23   ended.  Lapse--lapse sounds like a deficit to me.  It sounds
24   like a negative word.  I just--we just quit going because the
25   Dukies were going.

Page 37

1    Q    So you didn't take steps to renew your privileges
2    when your---
3    A    (interposing) I don't remember if I took steps to
4    not renew or whether I just called and said, "Drop me.  I
5    don't need to come anymore."  I can't remember.
6    Q    And so what did you use your privileges at Durham
7    Regional for?
8    A    We had an office there and we saw patients in
9    consult from private doctors at Durham Regional.
10   Q    And so by office there--the "we" you mean the UNC
11   department?
12   A    Yes, ma'am.  But they don't credential a
13   department.  They credential an individual.
14   Q    So have you ever been denied staff privileges at
15   any hospital?
16   A    Not that I'm aware of.
17   Q    And when I say staff privileges and admitting
18   privileges, do you understand those to be the same thing?
19   A    I think there are million different variations on
20   a theme.  No, I think they could be, might not be.  It would
21   vary hospital by hospital.
22   Q    Well, how about for purposes of today's
23   depositions we'll use them interchangeably unless you think
24   that there's a difference.  Is that okay?
25   A    Well, if you ask me a specific question, I'm going

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 38

1  to get you to define a specific credential for today and any
2  other day.
3      Q   Okay.  If it matters to the answer, just let me
4  know and I'll define it.
5      A   Yes, ma'am.
6      Q   So you have said that you are an MFM; correct?  So
7  what is MFM?
8      A   I don't think I've said I'm an MFM.  I think I
9  said I've done a fellowship in maternal-fetal medicine and
10  hold a subspecialty certification therein.
11      Q   Okay, so what's maternal-fetal medicine?
12      A   Sort of taking care of mothers and/or fetuses with
13  medical or surgical conditions that put them at increased
14  risk of death or disability.
15      Q   So it's generally high risk pregnancies?
16      A   That would be one way of looking at it.
17      Q   Is this primarily your area of practice?
18      A   Well, it's a subspecialty certificate, so it's sub
19  or underneath obstetrics and gynecology.  So I think I'm
20  first an obstetrician and gynecologist as my profession.  And
21  I have special training, expertise, and certification in
22  maternal-fetal medicine.
23      Q   Are most of the patients you see pregnant women?
24      A   It's variable.
25      Q   Well, tell me then what kind of services you

Page 39

1  provide.
2      A   I practice as an obstetrician and gynecologist and
3  within that realm take care of people with, your phrase, high
4  risk pregnancies.
5      Q   What gynecological care do you provide?
6      A   I quit doing all but office based surgical
7  gynecology four or five years ago, I think--I'm bad with
8  time--because the rest of my life had gotten busy enough,
9  largely my research world, that something had to go.  So I
10  see patients in the--GYN patients in the office, do GYN
11  procedures in the office, don't go to the GYN operating room,
12  and do the full range of obstetrics.
13      Q   What types of gynecological procedures do you
14  perform in the office?
15      A   Endometrial biopsy, vulvar biopsy, colposcopy,
16  cervical biopsy, IUD insertion/removal, completion of
17  spontaneous pregnancy loss, some GYN ultrasound.
18      Q   When you say that you do these procedures in an
19  office setting, that's your everyday medical office?
20      A   I'm not every day, but--we have a bunch of
21  offices, so we do these things in multiple different offices.
22      Q   But it's not an ASC or a hospital I guess is my
23  question.  It's a medical office?
24      A   Well, one of the offices is within the Women's
25  Hospital.  It's the second floor--excuse me, the first

Page 40

1  floor--of the Women's Hospital.  The other offices are
2  freestanding.  I don't know what you mean with the phrase
3  "ASC."
4      Q   Ambulatory surgical center.
5      A   It's not within an ambulatory surgical center.
6      Q   Do you provide any sedation or anesthesia for
7  these procedures?
8      A   Local anesthesia and conscious sedation on
9  occasion.
10      Q   So when you said on occasion, you're referring to
11  conscious sedation?
12      A   Uh-huh.
13      Q   Local you provide more regularly?
14      A   Yes, ma'am.
15      Q   And what occasions might lead you to use conscious
16  sedation?
17      A   Someone who could not tolerate something done
18  under local.
19      Q   What would be an example of a patient who couldn't
20  tolerate something done under local?
21      A   People have different pain tolerances and
22  different anxiety tolerances and different--different comfort
23  levels with different things.  I go to sleep in a dental
24  chair to get my cavity filled.  My wife requires--she wants
25  conscious sedation.  I don't--we're getting the same thing

Page 41

1  done.  I think she experiences it differently than I do.
2      So I think that's the biggest variable, is that
3  individuality we all have regarding what hurts and what
4  doesn't and what scares the hell out of us and what doesn't.
5      Q   Would you agree that using conscious sedation
6  increases the risks with those procedures to the patient?
7      A   Yes, ma'am.
8      Q   What are the risks to the patient from the
9  conscious sedation?
10      A   Death would be the sort of biggest, but to have a
11  respiratory arrest, an aspiration event, to be overly
12  sedated, to be impaired on the way home and operate a vehicle
13  or something and be injured.  It increases the risk.
14      Q   And the risks that you just listed, to your
15  knowledge have any of those occurred to any of your patients
16  after a procedure?
17      A   Not to my knowledge.
18      Q   You mentioned respiratory arrest as a possible
19  complication.  If you were doing one of these gynecological
20  procedures under conscious sedation and the patient
21  experienced respiratory arrest, what steps would you take?
22      A   Which place would I be in---
23      Q   (interposing)  Let's say you're---
24      A   ---a freestanding office or the office that's in
25  the hospital?

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

---

Page 42

1    Q   Let's say freestanding office.
2    A   We would call 911 and get an ambulance. We
3  would--depending upon what we had done conscious sedation
4  with, would administer a reversal drug, would provide oxygen
5  and if need be CPR, and transport the patient to the
6  hospital.
7    Q   To which hospital?
8    A   There's only one hospital in my mind, a UNC
9  hospital.
10   Q   Is there only one freestanding office setting in
11 which you provide gynecological procedures?
12   A   There are multiple freestanding office settings.
13   Q   In which you provide procedures?
14   A   In which I provide procedures.
15   Q   And is UNC hospital the closest hospital to all of
16 this?
17   A   Yes.
18   Q   And what steps would you take with the hospital?
19 Would you call ahead to the emergency room?
20   A   Yes.
21   Q   And then what would happen?
22   A   What do you mean what would happen?
23   Q   Well, the patient would be sent by ambulance;
24 correct?
25   A   I assume it would depend on how the response to

---

Page 43

1  the reversal drug went, but if not, yes, by ambulance.
2    Q   And then she would be taken to the emergency room?
3    A   Yes, ma'am.
4    Q   And then what would happen after that, once the
5  patient arrived at the hospital?
6    A   She would be seen by the emergency room
7  physicians, and I think I would go with her to the hospital.
8    Q   And would you actually treat her at the hospital?
9    A   I would be one of the people treating her.
10   Q   And wouldn't the GYN on call also be called?
11   A   It would--not necessarily, no, ma'am.
12   Q   And why would that be?
13   A   Because I'm a GYN and I'm here with my patient.
14   Q   And what if you had other patients back in your
15 office and so you couldn't leave at the time?
16   A   I would leave them.
17   Q   You'd just leave your patients there?
18   A   Yeah, they can wait. We don't do more than one
19 procedure at a time and we don't do that real often. So yes,
20 ma'am, I would leave.
21   Q   Now, if for some reason you couldn't leave, the ER
22 doctor would have the resources of an on-call GYN; correct?
23   A   Yes. One of my partners would be the attending of
24 the day or attending of the week and I would call him or her.
25 I can't imagine a hypothetical where I couldn't leave unless

---

Page 44

1  I'd had a respiratory arrest trying to take care of a
2  respiratory arrest, but---
3    Q   (interposing) But in that case---
4    A   ---it's a hypothetical world, so you could kill me
5  as I was responding to the emergency.
6        Ms. Flaxman:   Let the record reflect that the
7  witness came up with that hypothetical and not the attorney.
8    Q   But in that case one of your partners would be on
9  call?
10   A   We have a GYN attending of the day and a GYN
11 attending of the week, yes, ma'am, and we have multiple
12 residents. So I--if I could speak in your hypothetical, I
13 would alert that team and tell them what had happened, the
14 drugs administered, where I was in the procedure, whether the
15 procedure was completed or not, what this woman's wishes
16 were--if she's a Jehovah's Witness, you can't give her
17 blood, did she have a DNR. There are multiple things for me
18 to communicate to the receiving team.
19   Q   But you could have that conversation over the
20 phone; right?
21   A   I could have that conversation over the phone,
22 yes, ma'am.
23   Q   And then those doctors would provide care at the
24 hospital?
25   A   Those doctors would provide care in your

---

Page 45

1  hypothetical, which I think is not going to happen.
2    Q   Tell me how the call structure works at the
3  hospital. You mentioned there is a gynecologist--attending
4  gyn on call every day and then also for the week. Is that--
5  do they also cover obstetrics or is there a separate OB on
6  call?
7    A   There is separate obstetric coverage and separate
8  subspecialty service coverage.
9    Q   And so each division has their own call structure,
10 or schedule, I should say?
11   A   Yes, ma'am.
12   Q   And so when you mentioned the--or maybe perhaps I
13 mentioned OB--the gyn on call, who would that be, which
14 division?
15   A   It's usually somebody in the generalist or women's
16 primary care division. Occasionally it's a subspecialty
17 gynecologist.
18   Q   Now, do you take call?
19   A   Yes, ma'am.
20   Q   And what call do you take?
21   A   I take in-house OB call and rarely do GYN call
22 because I don't--as I told you earlier, I don't go to the GYN
23 OR anymore.
24   Q   And how often do you have in-house OB call?
25   A   Two or three times a month.

---

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 46

1    Q    And you said rarely GYN call. Could you estimate
2  how often that occurs?
3    A    Less than five times a year.
4    Q    What circumstances would lead you to take call?
5    A    Holidays, meetings, things where a lot of people
6  are gone.
7    Q    So schedules you're filling in when you can't get
8  coverage?
9    A    Schedules that I'm filling in, and then I need a
10  surgical backup.
11    Q    So you're talking about call for the women's---
12    A    (interposing) For GYN, yes, ma'am.
13    Q    So in your--in the call for your division, there's
14  also a surgical backup?
15    A    I would personally need a surgical backup, some-
16  body to help me along those lines.
17    Q    Because you don't typically provide gyn surgery in
18  the hospital; correct?
19    A    I don't provide gyn surgery in the hospital.
20    Q    So when you take gyn call, you also have a
21  surgical backup. Is that---
22    A    (interposing) Yes, ma'am.
23    Q    ---what you're saying? Okay.
24    A    In the few events where I do that.
25    Q    But that's not typical of the way call is

Page 47

1  structured in your department?
2    A    It's not typical of the way call is structured in
3  my department.
4    Q    So is Women's Primary Healthcare--that's your
5  division; is that correct?
6    A    That's the division I am the division director of.
7  I don't think it belongs to me.
8    Q    That was my question, the one you're director of?
9    A    Yes, ma'am.
10    Q    Okay. And is that also the division that you are
11  a member of?
12    A    I'm a member of three divisions, the MFM Division,
13  and the Global Women's Health Division.
14    Q    So when you take OB call, you take it in
15  connection with MFM, the MFM department?
16    A    I actually take it for both. I'm both the MFM and
17  the generalist.
18    Q    Does the OB-GYN department have an ambulatory
19  surgical center?
20    A    The hospital has an ambulatory surgical center.
21    Q    And does the---
22    A    (interposing) It has multiple ambulatory surgical
23  centers.
24    Q    Do physicians in the OB-GYN department provide
25  procedures there?

Page 48

1    A    Yes, ma'am.
2    Q    What types of procedures?
3    A    It seems like every procedure in benign
4  gynecology. Nobody gets to spend the night in the hospital
5  anymore.
6    Q    What do you mean by benign gynecology?
7    A    Everything but cancer.
8    Q    The traditional meaning of benign?
9    A    The traditional meaning.
10    Q    Okay. And is that being driven by insurance?
11    A    I don't know what it's being driven by.
12    Q    Do you ever provide procedures at the ASC?
13    A    I haven't since I quit doing GYN surgery.
14    Q    But you did before?
15    A    Yes, ma'am.
16    Q    Is this a freestanding ASC or is it close to the
17  hospital?
18    A    It's freestanding and close to the hospital.
19    Q    It's both freestanding and near the hospital?
20    A    Yes, ma'am; both.
21    Q    And is there, I assume, general anesthesia
22  provided?
23    A    Yes, ma'am; general and regional anesthesia.
24    Q    And the potential risks you listed of conscious
25  sedation, they would be the same and more so for general; is

Page 49

1  that correct?
2    A    Yes, ma'am.
3    Q    And if there were some sort of complication that
4  required a transfer from that ASC, would the procedures be
5  the same as you described from your office?
6    A    I think there would be more help in the surgery
7  center than there would be in one of our off-site offices,
8  but generally the same.
9    Q    We've been going about an hour. Should we take a
10  short break?
11    A    I'll do whatever you want to do.
12    Mr. Parker:    I'm fine too. My phone just
13  ran out of battery, so I can't--I don't know what time it is.
14    Ms. Flaxman:    Oh, it's about 2:30. Why don't
15  we take just a short break?
16    Mr. Parker:    All right.
17    The Reporter:    Off the record.    2:32 p.m.
18    (A brief recess was taken.)
19    The Reporter:    On the record.    2:42 p.m.
20    By Ms. Flaxman:
21    Q    Doctor, have you ever performed an abortion?
22    A    No, ma'am.
23    Q    And have you ever personally provided the
24  counseling as the abortion provider prior to a procedure?
25    A    I don't understand the question.

John M. Thorp, Jr., M.D.     Volume 1, 11/19/13

Page 50

1     Q   Have you provided counseling to a patient about to
2  undergo an abortion?
3     A   I've talked to people with an unintended or crisis
4  pregnancy about termination.  Because I'm not going to
5  perform the procedure, I would not be the person to counsel
6  them directly about it.  I think that's the duty of the
7  surgeon who's going to do the case.
8     Q   So that counseling you were just referring to you
9  have never done; correct?
10    A   I have never done.
11    Q   And are you personally opposed to abortion?
12    A   Yes, ma'am.
13    Q   As far as you know, what are the potential
14  complications from abortion?
15    A   Well, I think that there are short term
16  complications and long term complications.  Do you want
17  either/or or both?
18    Q   Why don't you start with short term complications?
19    A   Sort of any other surgical procedure:  bleeding,
20  infection, unintended organ damage.  Unique to termination of
21  pregnancy would be the failure to terminate.
22        Then in terms of long term complications, I think
23  the strongest case can be made for subsequent preterm birth.
24  To my mind the mental health consequences are difficult to
25  ferret out between the things that lead somebody to make that

Page 51

1  difficult decision versus the actual procedure itself, but
2  some suggestion of harm.
3        And then I'm not particularly convinced about the
4  abortion-breast cancer reputed link, although there might be
5  a loss of protection phenomenon that could occur and very
6  difficult to study or measure.
7     Q   So just asking about the abortion-breast cancer
8  debate, you don't know if there's a link or not; correct?
9     A   I think the epidemiologic studies are mixed with
10  different conclusions.  I think it is a well-known fact that
11  an early term pregnancy and/or lactation are protective
12  against subsequent breast cancer.  So I wonder and have
13  actually done some very simplistic modeling--and modeling is
14  probably too fancy of a word--to show that there could be a
15  loss of protection phenomenon that could occur, particularly
16  in young women.
17    Q   So by---
18    A   (interposing)  Whether that truly exists or not I
19  don't know.
20    Q   Because you haven't studied it?
21    A   I haven't studied it and the U.S. would not be the
22  place to study it.
23    Q   Now, the long term risks that you just listed.
24  Would you agree with me that the subject matter in this case,
25  admitting privileges, that those longer term complications

Page 52

1  don't have any relevance to whether or not a provider might
2  have privileges; correct?
3     A   Well, if there--if there truly is mental health
4  consequences or harms, then privileges, being part of a
5  hospital staff, might have something--might be applicable to
6  this case.  Certainly if the pathway that leads to preterm
7  birth is subsequent preterm birth, which I think the
8  strongest epidemiologic case can be made for--if it operates
9  via cervical damage or infection, hospital privileges could
10  have something to do with that.
11    Q   Okay, but that would arise out of a short term
12  complication; correct?
13    A   I think--well, I think if they're causal, then
14  they all arise out of the event that occurred.  Whether the
15  path that leads to those outcomes can be interrupted early
16  and that harm avoided or reduced I don't think anybody knows.
17    Q   Yeah, but in the case of the cervical damage you
18  just mentioned that you think could have an effect on preterm
19  birth, that's a complication that would occur in the
20  immediate term after an abortion; correct?
21    A   Well, if it occurred at the time of the
22  abortion---
23    Q   (interposing)  Correct.
24    A   ---whether it was--whether it could be recognized,
25  repaired, or mitigated and when I don't think anybody knows.

Page 53

1     Q   But what I'm saying is, is that when admitting
2  privileges might be relevant to an abortion would be in the
3  time frame immediately after the abortion when short term
4  complications would occur, if they do.
5        Mr. Parker:     Object to the form.
6     A   But if in the short term you can interrupt the
7  processes or mitigate or reduce the processes that lead to a
8  long term consequence, then admitting privileges might have
9  relevance.
10    Q   How?
11    Q   How?
12    Q   Yeah.  Tell me how.
13    A   Okay.  Hypothetically, somebody undergoes a
14  termination of pregnancy, has a cervical laceration.  She
15  maybe--people with cervical lacerations bleed longer or bleed
16  more heavily.  Maybe that person goes to the emergency room
17  on day eight, day ten with a complaint of bleeding.
18        Maybe because of the doctor who performed her
19  surgery and because of the sensitive nature of that decision,
20  she doesn't disclose or there's not knowledge there.  And
21  maybe that laceration, that damage, could be repaired at that
22  moment in time.  So I think admitting privileges could have
23  something to do with long term consequences.
24    Q   All right.  But in that hypothetical you just
25  listed, where admitting privileges would be relevant, if at

Page 54

1   all, would be in treating that short term complication?
2       Mr. Parker:    Object to the form.
3       Q   Correct?
4       A   Well, I think that--I think--I think I've tried to
5   answer your question as best I can.
6       Q   So just to clarify your answer, then---
7       A   (interposing) Yes, ma'am.
8       Q   ---what you're saying is that admitting
9   privileges--it's your opinion that admitting privileges would
10  be relevant because of the repair that would need to be done
11  eight to ten days after the procedure; correct?
12      Mr. Parker:    Object to the form.
13      A   I think that there would be a wide array of
14  different reasons why it might be relevant.
15      Q   But in that specific example of a woman who had a
16  cervical laceration and went to the hospital eight days
17  later with bleeding, privileges are relevant in your opinion
18  at that point to repair that short term complication?
19      Mr. Parker:    Object to the form.
20      A   I think in large part some--there would have to be
21  something--a condition that could be detected and something
22  that could be done to mitigate or reduce long term harm.
23      Q   Right, but so---
24      A   (interposing) I don't know that there is or there
25  isn't.  So privileges, if there is, could have relevance.

Page 55

1       Q   Right.  So privileges in your testimony have
2   relevance if there's a condition that can be detected or
3   diagnosed at that time; correct?
4       Mr. Parker:    Object to the form.
5       A   If there is a process that can be interrupted or
6   changed by some action of a clinician, then admitting
7   privileges could have relevance to long term harms.
8       Q   Now, you mentioned the short term complications
9   being the usual surgical complications of bleeding and
10  infection, unintended organ damage, and then failure to
11  complete the termination.  Are there any other surgical
12  complications that you're aware of?
13      A   I guess it wouldn't be a surgical complication--it
14  would be a diagnostic complication--but an undiagnosed
15  ectopic pregnancy or undiagnosed heterotopic pregnancy.
16      Q   And what about medication abortion?  Are the
17  complications different from the ones you've already listed?
18      A   I think the likelihood of each is different, but
19  they are the same.
20      Q   Now, you've never performed an abortion.  So if
21  you've never performed an abortion, how do you know that
22  these are the complications from an abortion?
23      A   Well, one, I've emptied many uteruses with
24  pregnancy loss that was either incomplete or missed.  Two,
25  I've taken care of abortion complications.  Three, in my

Page 56

1   residency training and on a very busy termination of
2   pregnancy service where instillation procedures were done, I
3   did not do the instillations, but--and I did not deliver the
4   babies or the fetuses, whichever word you would prefer me to
5   use, but I did get the placentas out and handle the
6   complications for hundreds of those.  So I think short of
7   having performed a termination of pregnancy, I think I have a
8   lot of experience along those lines.
9       Q   So going back to emptying many uteruses of
10  pregnancy loss, by that are you referring to D&C?
11      A   Well, we do that the same way termination of
12  pregnancy providers empty a uterus.  You can do it surgically
13  or you can do it medically.
14      Q   And so you would agree that treatment of pregnancy
15  loss in the case of miscarriage is similar to procedures used
16  to complete abortion?
17      Mr. Parker:    Object to the form.
18      A   Similar, but not identical.
19      Q   How are they not identical?
20      A   Because a viable, ongoing--well, one, a termina-
21  tion of pregnancy results in the ending of a potential life,
22  where the other does not.  Two, a viable pregnancy, ongoing
23  pregnancy, is continuing to expand the amount of cardiac
24  output going to the uterus, where a failed pregnancy or
25  pregnancy loss is not exerting that biologic effect on the

Page 57

1   maternal vascular and cardiac systems.  So I think those two
2   things are different.
3       Q   And so the physiological difference for the
4   patient is perhaps additional blood?  Is that what you mean
5   by the second?
6       A   I think an additional propensity for blood loss,
7   yes, ma'am.
8       Q   But the techniques used are the same; correct?
9       A   The techniques used are the same.
10      Q   And you've just testified that the complications
11  from the procedures are the same; correct?
12      A   They are similar.  And then I guess the other big
13  difference is one is elective.  It doesn't have to be done.
14  The other is indicated.
15      Q   But that doesn't change the complications that
16  might occur; correct?
17      A   It changes the urgency and the--and I think there
18  is a difference, a big difference, between an elective
19  procedure and an urgent or an indicated procedure.
20      Q   Well, the patients could be sicker, right, in the
21  procedures that you perform?
22      A   They could be sicker, but they don't have a
23  choice.  Usually they're--what they would have autonomously
24  chosen has been overridden by biology or nature or nature's
25  god.

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 58

1    Q    Now, if you had--what are the complications of a
2  woman who's experiencing pregnancy loss?  I'm sorry.  What
3  are the symptoms of a woman experiencing pregnancy loss?
4    A    They range from none to bleeding, pain.
5    Q    And so they can be the same symptoms as a woman
6  who's experiencing symptoms after an abortion; correct?
7    A    Well, the symptoms can be similar.  Yes, ma'am, I
8  would agree the symptoms can be similar.
9    Q    And is it your opinion, then, that the treatment
10 of those symptoms would be different?
11   A    Well, the treatment is radically different.
12   Q    Tell me how.
13   A    The one woman wants to stay pregnant and the other
14 woman wants to not be pregnant.  So there's completely
15 different goals in treatment.
16   Q    How about in a patient experiencing pregnancy loss
17 where the pregnancy can't be saved?
18   A    The fetus is dead.
19   Q    Correct.
20   A    Okay.
21   Q    Tell me how the treatment of that patient would
22 differ from the treatment of a patient experiencing symptoms
23 after an abortion.
24   A    Well, that person may have no symptoms or may have
25 extreme symptoms.  And the person after a termination of

Page 59

1  pregnancy may have--may do fine and have no symptoms or may
2  have symptoms.  I don't see how you can compare post-
3  procedure to pre--I don't understand.
4    Q    Well, you have two women who come--two women who
5  come into the hospital.  One is complaining of bleeding after
6  an abortion and the other is bleeding because of a mis-
7  carriage.  How does the treatment differ?
8    A    Well, in the first instance you need to determine
9  whether the fetus is alive or dead, and that's a huge branch
10 point in the treatment.  In the other, I guess you could have
11 a failed abortion where a fetus was still alive, so you'd
12 want to know whether the termination terminated the fetus's
13 life or not.  But you're trying to handle a surgical
14 complication.
15         So in the one instance you're trying to handle a
16 complication of biology and the other you're trying to handle
17 a complication of an elective surgical procedure.  So I
18 think--and they have different intents, different wishes,
19 different--I think they're a little--I think they're
20 different.
21   Q    Well, I understand the causes might be different.
22 But in the case of two women who are bleeding--now, first of
23 all, I mean what's the first thing?  You're going to do a
24 pregnancy test; right?
25   A    Well, the first thing I'm going to do is take a

Page 60

1  history.
2    Q    Okay.  And then what?
3    A    Well, a history is important, so if we're going to
4  do a hypothetical, I'm going to take a history.  You're going
5  to have to give me more than then what.  You've given me two
6  facts, woman and bleeding.
7    Q    Well, okay.  So you have two women:  a woman who's
8  bleeding from an abortion and she's complaining about
9  bleeding; right?
10   A    Postabortion.
11   Q    Postabortion.
12   A    And when did she have the abortion?
13   Q    Well, let's just say she had it the day before.
14   A    Okay.
15   Q    Okay?
16   A    Surgical or medical?
17   Q    Let's say it's medical.
18   A    Done where?
19   Q    You pick a provider.
20   A    I get to pick.
21   Q    Sure.
22   A    In your hypothetical you're---
23   Q    (interposing)  Sure.
24   A    ---allowing me to---
25   Q    (interposing)  Because I wanted to explore how it

Page 61

1  may make a difference--any outpatient abortion provider.  She
2  comes in.  She's bleeding.
3    A    Can I talk to the termination provider or review
4  his or her records or am I just dependent on what the patient
5  tells me?
6    Q    Well, you tell me how it would make a difference
7  to the treatment of the patient.
8    A    It would greatly expedite the treatment for me to
9  have communication with the person that provided the
10 termination of pregnancy.
11   Q    How?
12   A    How?
13   Q    Yeah.  Tell me what you would learn that you
14 couldn't learn from the patient.  We're talking medication
15 abortion.
16   A    I would learn the doctor's estimate of gestational
17 age, pertinent medical facts, and patients don't recall all
18 that.
19   Q    But how that affect all of--knowing that, how
20 would that affect how you would treat that patient?
21   A    Well, if she were RH negative, she might need more
22 Rhogam.  If she were--I mean there--it would all depend on--
23 that history is important.
24   Q    Well, give me specifics as how.
25   A    Well, I just gave you one specific.

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 62

1    Q   Okay, okay.  You gave me Rhogam.  But if she
2  was---
3    A   (interposing)  I don't think I have to give you
4  specifics within your hypothetical.
5    Q   Well, I'm asking the questions here, sir.  You do
6  need to answer my questions.
7    A   That wasn't a question.  I said I don't think I
8  have to provide you specifics---
9    Q   (interposing)  Can you give---
10   A   ---within your hypothetical.
11   Q   Can you give me specific examples?
12   A   I gave you one and I can think of probably more,
13  but I've never really thought of it that way.
14   Q   So think for a second about whether there are more
15  facts that you would need to know from a provider in deciding
16  what treatment to provide to that patient.
17   A   Well, it would be helpful and appropriate in
18  medical care to build your care upon the foundation that was
19  constructed by another physician, who in the light of day
20  prior to an elective procedure elicited things:  parity,
21  blood type, labs, gestational age, will or won't receive
22  blood products, allergies, how did you--did you do the
23  medical abortion where you observed the patient take the
24  medicine or did you do the one where you gave the medicine
25  and she did it at home.

Page 63

1    Q   But how do any of those specific questions you
2  would have affect the care that you provide to a patient?
3    A   Well, they inform the branch points I go down---
4    Q   (interposing)  Okay, but so---
5    A   ---in the care.
6    Q   Tell me about--so if a patient is bleeding, what
7  are the possible branch points?  What are the different
8  treatments that you might choose for a patient who's
9  bleeding?
10   A   Well, is this a--this was a medical termination.
11   Q   Sure.
12   A   And did they do it the way the FDA says to do it
13  where the person takes the medicine in the facility or did
14  she take the medicine at home?
15   Q   What are the--leaving that aside, leaving aside
16  the information that you--that you want to get---
17   A   (interposing)  Well, how can I leave aside the
18  information I want to get---
19   Q   (interposing)  I'm asking you--I'm asking you a
20  different questions, sir.  I'm asking you what are the
21  possible different treatments that you have to choose from in
22  treating a patient who's experiencing bleeding after a
23  medication abortion?
24   A   What are the possible different treatments?  Well,
25  like what was her starting hematocrit.

Page 64

1    Q   Well, that's not a treatment.  That's a--that's
2  a---
3    A   (interposing)  But that's going to--when I see her
4  hematocrit now, it will give me a much more accurate
5  estimation of her blood loss, does this require a trans-
6  fusion.  You build upon--you build upon the care previously
7  rendered, particularly for something that was done
8  electively.
9    Q   What if the elective---
10   A   (interposing)  And you're always a better--
11  something somebody chose to do, "We're going to do this
12  tomorrow at 3 o'clock," fill your tooth tomorrow at 3
13  o'clock.  I could do it Friday.  I could do it next Friday.
14  I could wait until after Christmas.  I'm going to do this--
15  it's elective.  I elected to do it.
16   Q   No, I understand.  I understand what elective
17  means.  I'm just wondering how that affects what your
18  treatment is when you're treating a complication.
19   A   Well, with elective things, people have the luxury
20  of having information.  The health care providers usually
21  know a lot about the patient:  her wishes, what baby is this,
22  what were her starting lab values, why was this way chosen
23  over that way, did somebody in your office observe her take
24  the medicine or did she take the medicine at home, on and on
25  and on.

Page 65

1    So you build your care upon--upon that, upon that
2  foundation, as opposed to somebody who woke up in the middle
3  of the night, hasn't been to any doctor yet, and has bleeding
4  and a positive pregnancy test.  They're two different--
5  they're two completely different scenarios.
6    Q   Let me ask you, though--you mentioned about the
7  possible treatments that you might provide to a patient
8  experiencing these symptoms.  You mentioned transfusion as
9  one.
10   A   That's a commonly accepted treatment for bleeding.
11   Q   And what are other--would emptying the uterus be
12  one?
13   A   Well, it depends on what's in the uterus and it
14  depends on whether--what the person did with her medicine:
15  did she take it, has she not taken it.  Some of that you'll
16  get from her.  Some of that, it might have been observed.
17  Might you empty her uterus medically if it needs further
18  emptying?  Was there a cervical laceration there?  Was there
19  some cervical preparation done with laminaria, misoprostol?
20  So there's a lot of information that is of value, and why
21  should it be discarded?
22   Q   Well, I'm not asking you that question.  I'm
23  asking about as a provider---
24   A   (interposing)  You act like it's worthless, that I
25  see termination yesterday, bleeding, I'm going to do the same

Page 66

1  thing to every person, and I'm not.
2      Q    My question is just how those situations are
3  treated and whether they can be treated without having all
4  that information.  And you talked about there being---
5      A    (interposing)  Well, they certainly can, but they
6  shouldn't be.
7      Q    But they can be?
8      A    They can be, but they shouldn't be.  That's the
9  whole opinion of this case, I think.
10     Q    Well, because doctors--they can be because doctors
11 are trained to assess these complications and provide needed
12 care; correct?
13     A    Sure, but it would be better--it would be optimal
14 for that information to be communicated.
15     Q    But they don't need to have it?
16     A    They can save somebody's life without having it,
17 but can they increase the cost and increase the potential
18 harms without it?  I think they can.  And why wouldn't you
19 want the information transmitted?  Why wouldn't I want that
20 information, if it's available?
21     Q    Have you personally treated a complication from an
22 abortion?
23     A    Yes, ma'am.
24     Q    In what circumstances?
25     A    Well, the--at that point in time they were called

Page 67

1  therapeutic abortions or TAs.  These instillation procedures,
2  there were a bunch of complications from them.
3      Q    And is it just the instillation procedures?
4      A    Well, that was--that was number one.  And then in
5  the--in the emergency room when I was active in GYN call and
6  in our office people will show up after having had an
7  abortion with a complication or harm, so in multiple
8  scenarios.  And it's always helpful to me to know what's
9  going on.
10        And there are termination of pregnancy providers
11 in town--and I saw you had something from Planned Parenthood
12 on your card, but Planned Parenthood right over there
13 (indicating), Charles--I can call him and he'll tell me
14 everything and I can take much better care of his patient.
15 And sometimes he'll even come to be with his patient.  There
16 are other providers that come in and out of town, and I can't
17 communicate with them at all.  And it's very--it makes it
18 difficult to be the person responding to a complication.
19     Q    But the Planned Parenthood providers you do get
20 the information you---
21     A    (interposing)  From this Planned Parenthood across
22 the street (indicating).  I don't have experience with other
23 Planned Parenthood providers.  And maybe that's just a
24 function of him being a good doctor, not who he works for.
25     Q    And so he has called the hospital?

Page 68

1      A    He would definitely call the hospital or call the
2  office, or if his patient came without him knowing and we
3  called, he would be responsive.  If I called him up at 2
4  o'clock in the morning, he would be--he would say--or he'd
5  say, "I'll go to the office and get the records."  He would--
6  he would respond.  There are other providers in our community
7  who are not that responsive, not nearly that responsive.
8      Q    So you mentioned instillation procedures during
9  your residency.  I can probably do the math, but that was how
10 long ago?
11     A    30 years ago.
12     Q    Because they aren't doing procedures that way now;
13 correct?
14     A    I think they're doing some instillation abortions,
15 but not 1500 a year like they are now--like they were then.
16     Q    Do you happen to know how late in pregnancy the
17 plaintiffs in this case provide abortions?
18     A    Not specifically.
19     Q    Now, you talked about--you said that you saw cases
20 in the emergency room, patients experiencing abortion
21 complications, when you were active in GYN call; is that
22 correct?
23     A    Yes, ma'am.
24     Q    So that's been at least--is it four years?
25     A    Something like that.

Page 69

1      Q    So you haven't treated one of these complications
2  in at least four years?
3      A    True, in the hospital setting.  They've come to
4  our office.  Most people don't know where to come when they
5  have a problem.
6      Q    Tell me about the last specific complication you
7  recall.
8      A    I don't have an independent recollection of the
9  last specific complication.
10     Q    Well, describe a specific complication you recall.
11     A    I don't recall a specific.  I've seen bleeding,
12 infection, uterine perforation, cervical laceration post-
13 abortion in office and hospital settings.
14     Q    Do you have a specific recollection of a
15 perforation that you've seen?
16     A    No, ma'am.
17     Q    Do you have a specific recollection of bleeding
18 that you've seen?
19     A    No, ma'am.
20     Q    How about infection?
21     A    No, ma'am.
22     Q    Now, you just--you mentioned a provider from the
23 local Planned Parenthood clinic.  Can you recall at all
24 specifics of any complication that you've had interactions
25 with him about?

Page 70

1      A   On all these lines, people who do surgery have
2   complications.
3      Q   But you don't recall any specifics of the
4   complications?
5      A   Bleeding, infection, damage--unintentional
6   damage--to other organs.
7      Q   But you can't recall any specific examples?
8      A   I can't recall any specific.
9      Q   And do--you say you see these patients in your
10  office.  When was the last time you saw a patient in your
11  office?
12     A   I would guess within the past year.
13     Q   Six months ago?
14     A   Well, my guess is within the past 12 months, so
15  it's a guess.
16     Q   To your recollection do any of these patients
17  experiencing complications experience sepsis?
18     A   How would you define sepsis?
19     Q   How would you define sepsis?
20     A   Blood culture positive bacteremia or---
21     Q   (interposing)  Is that the medical definition of
22  sepsis?
23     A   It's one of the medical definitions.
24     Q   Okay.  Have you ever seen that in an abortion
25  patient?

Page 71

1      A   Yes, ma'am.
2      Q   And give me the specifics of that.
3      A   We've seen people on our termination service and
4   referred from other hospitals and providers, because we serve
5   the whole state of North Carolina, with abscesses, sepsis,
6   and infectious related death postabortion.
7      Q   But again, you don't have any specific
8   recollection of an incident?
9      A   No, ma'am.  I don't write them down.
10     Q   But you personally have treated these patients?
11     A   Yes, ma'am.
12     Q   Can you estimate how many patients total you have
13  treated?
14     A   With sepsis?
15     Q   Experiencing abortion complications generally.
16     A   Including or excluding the residency experience
17  with the instillation procedures?
18     Q   Let's exclude that.
19     A   100, 150.
20     Q   And if you added the instillation experience
21  during your residency?
22     A   I think it would at least double or triple.
23     Q   How many abortions were taking place during your
24  residency?
25     A   1500 to 2,000 instillation abortions a year.  And

Page 72

1   then I don't know how many lower gestational age abortions.
2   At one point in time the instillation terminations out-
3   numbered the number of live births we were doing in labor and
4   delivery.
5      Q   And what gestational age were you doing the
6   instillations above?
7      A   Up until 24.
8      Q   And where did you start?
9      A   When did you start?
10     Q   What gestational age would you start doing an
11  instillation?
12     A   I never did the instillations.  I think it was 18
13  to 24.
14     Q   How many abortions does the UNC Hospital do now a
15  year?
16     A   I don't specifically know.  My guess is five to
17  ten a week, so maybe 500, 250 to 500.
18     Q   Do you know Vincent Rue?
19     A   Well, I've never met him.  I've heard the name.
20     Q   Have you spoken to him?
21     A   On the phone, yes, ma'am.
22     Q   Is he the connection between you and this case?
23     A   I don't know.
24     Q   So you don't recall him calling you and asking you
25  to participate in this case?

Page 73

1      A   I do not recall him calling me and asking me to
2   participate in this case.
3      Q   Do you recall him e-mailing you to ask you to
4   participate in this case?
5      A   I don't have a recollection of how I came--became
6   aware of this case or was asked to participate.
7      Q   Is Vincent Rue your connection between you and any
8   of the other constitutional cases in which you've provided
9   testimony?
10     A   Dr. Rue was often a consultant to attorney
11  generals--attorney generals' offices--on these cases.  There
12  are other--it seems like there are other consultants that
13  help too.
14     Q   And who are the other consultants?
15     A   I can't recall anybody by name, but I meant that
16  to say he's not the exclusive consultant.
17     Q   So it may have been another consultant who
18  contacted you about this case?
19     A   Or it may have been the attorney general.  I don't
20  remember.
21     Q   Is Vincent Rue a medical doctor?
22     A   I think he is a psychologist.  He has a degree in
23  clinical psychology from the University of North Carolina.
24     Q   Do you recall--you've spoken to him on the phone
25  you testified?

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

---

Page 74

1    A  Yes, ma'am.  I don't think I've ever met him.
2    Q  And do you recall what you spoke to him on the
3  phone about?
4        Mr. Parker:      I'm going to object to that and
5  instruct you not to answer.
6        Ms. Flaxman:    On what basis?  He hasn't said
7  it had anything to do with this case.
8        Mr. Parker:      Vince Rue has been noted as
9  he's engaged with the attorney general's office.  He's an
10  agent of the attorney general for purposes of this case.  So
11  you're essentially asking what is the attorney general's
12  office communicating with the witness about.  And since this
13  witness is retained in this case to provide expert testimony,
14  I think that---
15        Ms. Flaxman:     (interposing)  Well, let me ask
16  him that and let me rephrase it, then.
17        By Ms. Flaxman:
18    Q  Aside from this case, which you've testified you
19  don't recall how you got involved, did you have communica-
20  tions with Vincent Rue that did not relate to this litiga-
21  tion?
22    A  Can--the objections make me nervous.  Can you---
23    Q  (interposing)  He'll let you answer questions that
24  don't relate to the litigation.  So I'm asking you if you've
25  had conversations with Mr. Rue that are unrelated to this

---

Page 75

1  case.
2    A  Other litigation.
3    Q  Yeah, if that's what your conversations with him
4  have been about.
5    A  Yes, ma'am.
6    Q  Okay.  So they've all been about litigation?
7    A  He told me once that he went to graduate school
8  here and we identified that his graduate school classmate is
9  my son's father-in-law.  He's a professor of psychology here.
10  That's the conversations that I remember.
11    Q  Are you---
12    A  (interposing)  I also remember that Mr. Rue has a
13  son with Down syndrome that's like the Special Olympics in
14  Florida mile run winner or something.
15    Q  Are you trained, sir, in epidemiology?
16    A  What do you mean by trained?
17    Q  Well, let's just back up for a second.  What is
18  epidemiology?
19    A  Study of causation.
20    Q  And do you teach epidemiology?
21    A  I lecture in epidemiology.  I'm an adjunct
22  professor in the School of Public Health in epidemiology.
23  I'm a professor in maternal-child health with my specialty
24  being perinatal epidemiology.
25    Q  And so what training or experience qualifies you

---

Page 76

1  to hold those teaching positions?
2    A  I have--the one embarrassing question you've asked
3  me.  This is the first time I've personally felt discomfort,
4  but I have to mention a master's degree at Duke.  And I fear
5  disinheritance of what meager inheritance I am due.
6    Q  It can stay in this room, sir.  So your---
7    A  (interposing)  No it won't.  It's on a damn
8  public record.
9    Q  The master's listed on your CV is a master's in
10  what?
11    A  Well, it's called clinical leadership, but it
12  included courses in epidemiology.  I was a tenured professor
13  in the School of Public Health before I had the degree, so I
14  would describe myself as a clinical epidemiologist, an
15  untrained epidemiologist.
16    Q  So your teaching that you were doing was based on
17  the experiences you have in treating patients; correct?
18    A  Well, I think epidemiology is the basic science of
19  clinical medicine, that every clinician uses epidemiology to
20  one extent or another, and the--but I don't have formal
21  training.  I wish I did.
22    Q  Your next life?
23    A  Maybe.
24    Q  So based on that, do you believe you're qualified
25  to offer opinions on the quality and methodological soundness

---

Page 77

1  of a particular epidemiological study?
2    A  From a clinical epidemiologic perspective.
3    Q  Can you turn to page 5 of your CV, which is
4  attached to Exhibit 1?
5        (Witness complies.)
6    Q  Are you there?
7    A  Yes, ma'am.
8    Q  Under Memberships you list a number of
9  organizations?
10    A  Yes, ma'am.
11    Q  Are you a member of any organizations other than
12  the ones listed here?
13        (Witness peruses document.)
14    A  Not that I know of.
15    Q  Are you a member or otherwise affiliated with the
16  American Association of Pro-Life OB-GYNs?
17    A  Yes, ma'am.
18    Q  Describe that for me.
19    A  Describe what for you?
20    Q  Are you a member?
21    A  Yes, ma'am.
22    Q  Okay.  And are you a member of the Christian
23  Medical and Dental Association?
24    A  No, ma'am.
25    Q  Are you affiliated with them or associated with

Page 78

1  them in any way?
2      A   Not that I'm aware of.
3      Q   And how about the Catholic Medical Association?
4      A   I know people in it, but I'm not formally
5  affiliated.
6      Q   So you're not a member?
7      A   I am not a member.
8      Q   And so are you a member or otherwise affiliated
9  with the Bioethics Defense Fund?
10     A   I'm friends with the two founders of the Bioethics
11 Defense Fund, Nik Nikas, N-i-k-a-s, N-i-k  N-i-k-a-s, and
12 Dorinda Bordlee, B-o-r-d-l-e-e.
13     Q   And do you recall submitting a brief with that
14 organization to the Supreme Court?
15     A   I think that I have.
16     Q   And what was that case about?
17     A   I don't recall.
18     Q   And do you recall submitting an amicus brief to
19 the U.S. Supreme Court with the American Association of
20 Pro-Life OB-GYNs and some other organizations in a case in
21 Oklahoma?
22     A   I don't have an independent recollection, but I'm
23 not doubting that I did.
24     Q   And if I told you it happened in the last year,
25 would that surprise you?

Page 79

1      A   Nothing about the lack of my memories would
2  surprise me at this point in time.
3      Q   And so you mentioned--so you said you were a
4  member of the American Association of Pro-Life OB-GYNs, so
5  that should be on your CV membership list as well?
6      A   Yeah.  I don't know why it isn't, but I am.
7      Q   And so are there any other organizations that you
8  can think of now that should be on here and aren't?
9      A   I'm in the process--and I don't think there's been
10 a final ruling--of becoming a North American member of the
11 Royal College of Obstetrics and Gynecology.  I hope that
12 comes to pass and my mentioning it doesn't---
13     Q   Doesn't jinx it?
14     A   Because I'd like to do that.  I can't think of
15 anything else.
16     Q   Well, let me ask you, you've been in your report
17 and here today referring not to abortions, but to termination
18 of pregnancy; is that correct?
19     A   Yes, ma'am.
20     Q   Why do you call it that instead of abortion?
21     A   Because I think abortion is a confusing term and
22 is applied in clinical medicine to wanted pregnancies that
23 are lost or in the process of being lost and to elective
24 surgical procedures to end the pregnancy.
25         So Phil Steer, S-t-e-e-r, who is the editor

Page 80

1  emeritus of the British Journal of Obstetrics and Gynecology,
2  to which I'm an editor, thinks that termination of pregnancy
3  is more precise language, more--a more accurate description
4  of what happens.  So I try to consistently use TOP or
5  termination of pregnancy, although you've been fairly
6  relentless in not adopting that terminology and I've
7  slipped---
8      Q   (interposing)  Old habits die hard.
9      A   And I've slipped on occasion into your--and I
10 don't want to be argumentative with you every time, just
11 selectively.  But termination of pregnancy I think is more--
12 is a more accurate term.  And if you were submitting a
13 manuscript to the British Journal of Obstetrics and
14 Gynecology about what I think you would describe as abortion,
15 we would insist that you use that nomenclature.
16     Q   Does the editorial staff of the British Journal
17 have a position one way or another on abortion?
18     A   I think there's a wide range of positions and
19 ideas and thoughts about the moral status of the embryo or
20 fetus vis-...-vis the autonomy rights of the mother.
21     Q   Well, the editor that you mentioned who shares
22 your views about calling it a termination of pregnancy, does
23 he share your views about abortion as well?
24     A   I don't think that he does.
25     Q   And when you refer to TOP, you're, I think you

Page 81

1  just said, trying to distinguish it from a spontaneous
2  abortion; is that correct?
3      A   Yes, ma'am.
4      Q   What about abortion or the term "abortion" other-
5  wise is ambiguous?
6      A   It's nonspecific and applied across two different
7  scenarios---
8      Q   (interposing)  Okay.
9      A   ---so it's confusing to patients.  To people
10 outside of our field it is confusing.  It can even be heart
11 wrenching to somebody who wanted to have a baby and had a
12 pregnancy loss and sees "abortion," even with the words
13 "spontaneous" or "incomplete" or "missed" on her checkout
14 sheet because it's become such a loaded term in North
15 American culture.  And I don't think it's an accurate term.
16     Q   So why don't you change the name of spontaneous
17 abortion then?
18     A   Well, I would call it--we call--we would call that
19 a pregnancy loss and describe it by gestational age.  We
20 would not use the phrase "abortion" for either--for either
21 side.  We don't think it's an accurate term.
22     Q   And by "we," who do you mean there?
23     A   I'm talking about this--and I can send you Phil's
24 sort of two page reason, which we send to particularly
25 American authors who really get mad with us because we

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 82

1  question their nomenclature or their taxonomy. I don't think
2  it's an accurate taxonomy.
3      Q  So you use termination of pregnancy versus
4  pregnancy loss---
5      A  (interposing) Pregnancy loss.
6      Q  ---to describe the two different---
7      A  (interposing) Yes, ma'am.
8      Q  ---scenarios? Are there other journals or other
9  publications that use that nomenclature?
10     A  I don't know. Not everybody can be as good as we
11 are.
12     Q  Do you believe your opposition to abortion affects
13 your ability to objectively evaluate abortion related issues?
14     A  I don't understand the question.
15     Q  Do you think your opposition to abortion affects
16 your ability to objectively judge regulation of abortion?
17     A  I strive to be objective, as I hope you do too.
18 And I don't know what your world view is, but I have a guess.
19 And I will have to defer to the wisdom of a judge or a jury
20 to find out whether I'm objective or not.
21         I am who I am. I believe that a fetus or embryo
22 has a moral status. And in this crazy world where an entity
23 with a moral status occupies an autonomous woman that is--
24 obviously has a moral status, that that is a very troublesome
25 issue, troublesome event in the developed world in the 21st

Page 83

1  century.
2      Q  So you strive to be objective, but it's possible
3  that those views might affect the way you evaluate a regula-
4  tion; correct?
5      Mr. Parker:  Object to the form.
6      A  I do the best I can and can't claim to do it
7  perfectly, nor would I believe anyone else who said they were
8  unbiased about such a fundamental human event and condition.
9      Q  Why don't we look back to Exhibit 1, your
10 report---
11     A  (interposing) Yes, ma'am.
12     Q  ---and turn to page--well, it's a paragraph 20
13 that begins on 11 and goes to page 12. If you could take a
14 look at that paragraph?
15         (Witness peruses document.)
16     A  Okay.
17     Q  Okay. I'm going to ask you first about the last
18 sentence in that paragraph. You state that "while the
19 magnitude of risk remains small, after 16 weeks, risks from
20 TOP may exceed the risks of carrying a pregnancy to term and
21 certainly do so by 20 weeks." Do you see that?
22     A  Yes, ma'am.
23     Q  So before 16 weeks, you would agree that the risk
24 of complication from an abortion is less than the risks of
25 carrying to term; correct?

Page 84

1      A  With the limits that the comparison is really
2  apples to oranges and not of--and not a fair comparison at
3  multiple different levels.
4      Q  In terms of the medical risk of harm to the
5  patient, you would agree, would you not, that the risks from,
6  using your terminology, TOP---
7      A  (interposing) Thank you.
8      Q  ---are less than the risks of carrying to term
9  prior to 16 weeks?
10     A  And the risk of what?
11     Q  The risks--well, you tell me what this means
12 because the last sentence of your report here says that "the
13 magnitude of risk remains small, [but] after 16 weeks [the]
14 risks from TOP may exceed the risks of carrying a pregnancy
15 to term."
16         Now, isn't it the case that if you take--if you
17 look at that, that means that what you're saying is that the
18 risks from TOP do not exceed the risks of carrying to term
19 prior to 16 weeks?
20     A  And I would go back to my original answer with the
21 caveats that the comparisons aren't fair.
22     Q  Well, but you make the comparison here; right?
23     A  I make a comparison in a sentence of a document
24 that, if I remember correctly--and I'd have to look to find
25 it--states why the comparisons of death or serious disability

Page 85

1  from termination of pregnancy and carrying a pregnancy to
2  term at least in United States aren't comparable.
3      Q  Because the data you think is incomplete; correct?
4      A  Well, that's one reason. And it's not that I
5  think the data are incomplete. The data are incomplete.
6      Q  So but looking again at this sentence--because you
7  have the caveat there---
8      A  (interposing) And secondly--I'm sorry I'm slow.
9      Q  I don't mean to interrupt you, sir.
10     A  I don't feel interrupted. Pregnancy is a longer
11 period of time, a longer window. And morbidities and
12 mortalities--it goes out way beyond pregnancy for six or
13 seven weeks. So it's like a feature length film, where a
14 surgical procedure is like a snapshot. It's a one point in
15 time and a little bit thereafter, and then people don't
16 attribute--so it's--the comparisons I don't think are valid
17 or fair.
18     Q  Okay. Well, let's add that caveat to the
19 sentence, going back to the last sentence of paragraph 20.
20     A  I think I've added the caveat through the gist of
21 the whole--of the whole thing. It's hard to say that in a--
22 in every sentence.
23     Q  Well, would you agree that based on the limited
24 and incomplete data available, before 16 weeks the risks of
25 carrying a pregnancy to term exceed the risks from a TOP?

Page 86

1    A   I would agree that that is conventional wisdom in
2  North American obstetrics, again with the caveats previously
3  described. I won't do it a third time unless you want me to.
4    Q   So you agree that the magnitude of risks from
5  abortion are small; correct?
6        Mr. Parker:    Object to the form.
7    A   I would agree that the magnitude of risk asso-
8  ciated with abortion, and it depends upon gestational age,
9  range somewhere between 1 and 10 percent--I said 2 and 10
10  percent--complication rates. Whether that's small or large
11  is a value judgment that different people would interpret
12  different ways. So I'd rather give that range than I would
13  to say small, large or indifferent. Different people
14  perceive risk different ways.
15    Q   Well, let's talk about that rate. Earlier in that
16  same paragraph, paragraph 20, you say, "Complication rates
17  range from 2 to 10 percent." Are you changing your opinion?
18  Did you just say 1 to 10?
19    A   2 to 10 suits me.
20    Q   What is that estimate based on?
21    A   It's based on medical literature from North
22  America and other developed countries.
23    Q   Can you cite me to this literature?
24    A   I wrote a review that's cited somewhere in here, a
25  Scientifica article, that lists tons and tons of that. I can

Page 87

1  pull that article up if you want me to, and we can go through
2  the specific references or you can--I imagine one of your
3  colleagues has it in one of these big files somewhere.
4    Q   Why don't you take a look at the articles that you
5  have listed starting at page 24 of your report and tell me
6  which of those articles have the complication rate ranging
7  from 1--or 2 to 10 percent?
8        (Witness peruses document.)
9    A   I'm looking for the review.
10        (Witness peruses document.)
11    It would be the--on page 12, "Thorp, J.
12  Scientifica, 2012, op. cit." That would be a review
13  published a year ago.
14    Q   And so---
15    A   (interposing) And it would list all I could find
16  that would inform that decision for you.
17    Q   So the estimate here of 2 to 10 percent, the
18  studies that support that rate are cited in the review in
19  Scientifica---
20    A   (interposing) Yes.
21    Q   ---that's cited at footnote 24?
22    A   Yes, ma'am. And it says "op. cit.," so there must
23  be a full reference somewhere else. I don't know where. I
24  don't understand legal footnoting and referencing.
25    Q   I don't understand medical footnoting and

Page 88

1  referencing, so---
2    A   (interposing) All right.
3    Q   ---we can agree to be confused.
4    A   All right.
5    Q   Now, the sentence we just started about the 2 to
6  10 percent---
7    A   Yes, ma'am.
8    Q   ---you then end with saying "most complications
9  can be managed without major surgery." Do you agree with
10  that?
11    A   Yes, ma'am.
12    Q   And do you also agree that most complications can
13  be managed without treatment in a hospital?
14        Mr. Parker:    Object to the form.
15    A   I think many will require diagnosis and at least
16  the beginning of treatment in the hospital that can then be
17  completed at home.
18    Q   But my question was most. Do you agree that most
19  complications can be managed without a visit to the hospital?
20    A   I would probably use the word "many."
21    Q   And what is that based on?
22    A   My understanding of what it takes to assess and
23  manage one of these complications.
24    Q   And why can't those complications be managed in an
25  outpatient setting?

Page 89

1    A   Well, oftentimes the outpatient setting is closed
2  when the complication presents itself. Two, there needs to
3  be laboratory and imaging work done that oftentimes is not
4  available in an outpatient setting. So people come to the
5  hospital, which is open 24/7 and has those modalities
6  available.
7        And so I would say "many" would be the word I
8  would use. I don't know whether it's greater or less than
9  50, but many need that. And probably the majority show up
10  there because a lot--most--there's not a termination of
11  pregnancy provider in our community that's available 24/7
12  postoperatively. Charles comes the closest.
13    Q   But you don't know how many of those patients are
14  returning to the clinics for treatment; correct?
15    A   No, ma'am, I do not.
16    Q   And if those clinics are open, those clinics could
17  treat these patients; correct?
18    A   It would depend on what the patient had wrong with
19  her, but could treat many of them, yes, ma'am.
20    Q   And probably the majority of those could be
21  treated; correct?
22    A   I don't know. I think it would depend on the
23  capacity of the clinic. You're using the word "treatment,"
24  and I'm looking at it as a diagnosis and treatment
25  phenomenon. So it would depend, even if they were open, on

John M. Thorp, Jr., M.D.     Volume 1, 11/19/13

Page 90

1    their capacities and was there a physician present there or
2    not when they're open.
3        Q   And by diagnosing--by lab and imaging, you mean do
4    they have an ultrasound machine; correct?
5        A   Well, they can have an ultrasound machine.  Do you
6    have somebody to work an ultrasound machine and interpret the
7    images?  What lab tests do you have available?  So labs,
8    imaging, and do you have somebody who can take a history and
9    do a physical exam, a knowledgeable physician, and many
10   don't.
11       Q   But if you had the lab capability and ultrasound
12   capability with someone who can operate the ultrasound as
13   well as a practitioner that can treat---
14       A   (interposing) And interpret it and a clinician
15   who can take a history and physical.  Many--maybe the
16   majority can be treated in the--in that setting.
17       Ms. Flaxman:     I'd like to go off the record
18   for a moment.
19       The Reporter:     Off the record.     3:51 p.m.
20       (A brief recess was taken.)
21       The Reporter:     On the record.     4:03 p.m.
22       By Ms. Flaxman:
23       Q   Doctor, I want to go back to something you
24   mentioned a little earlier today.  You mentioned you had
25   privileges at one time at Memorial Mission---

Page 91

1        A   (interposing) Uh-huh.
2        Q   ---Hospital, and that's in Asheville?
3        A   Yes, ma'am, Buncombe County.
4        Q   Baucom (phonetic) County, okay.
5        A   No, Buncombe, B-u-n-c-o-m-b-e; right?
6        Q   Buncombe?
7        A   Yeah, Buncombe.
8        Q   Okay.  Got it.  And how far is that from Chapel
9    Hill?
10       A   250 miles.
11       Q   Do you drive that or do you fly?
12       A   I told you I flew there every Wednesday on a
13   university airplane.
14       Q   On a university airplane?
15       A   The university operates eight airplanes.  We're a
16   suburban-rural state.
17       Q   You went there every Wednesday?
18       A   Yes, ma'am, for 15 years.
19       Q   What did you do when you were there?
20       A   I helped the residents and attendings there
21   formulate plans on high risk patients.  And I was a young
22   clinician used to a teaching hospital.  Asheville is a
23   beautiful city and a very sophisticated medical community.
24           And we went to this lunch conference where I then
25   had to sell my plans to the people who were much older and

Page 92

1    more experienced than me and were going to actually take care
2    of these patients because I was fly-by-day doctor.  I wasn't
3    going to be there on Thursday.  I could be there by phone,
4    but I couldn't be present.
5        Q   And so when you said you couldn't be there on
6    Thursday, you meant they would be taking care of the patients
7    on Thursday.
8        A   Uh-huh.
9        Q   Correct?
10       A   Yes, ma'am.
11       Q   And so they didn't have--they didn't have the
12   necessary expertise in-house at that hospital?
13       A   They didn't have a MFM specialist and they
14   desperately wanted to start a residency.  And we were
15   ultimately able to recruit multiple MFM specialists to
16   Asheville, and there is a successful community residency.
17       Q   And so when you were consulting with them, what
18   were you doing?  Were you helping them care for patients or
19   helping them develop the residency?
20       A   I was doing both.
21       Q   And when you took care of patients, tell me what
22   kind of care you were providing.
23       A   Well, it was clinical care, so it was nonsurgical,
24   making plans for--I remember it was the first pregnant person
25   they had ever taken care of with HIV.  She was--she was--had

Page 93

1    a low CD4 count, wasn't real sick yet.
2           This was pre AZ--that anybody knew that anti-
3    retrovirals could prevent mother to child transmission.  But
4    I thought due to a beneficence obligation to the mother, she
5    should be provided with treatment.  AZT was only
6    theoretically harmful to a baby.  And so we decided to
7    initiate treatment with AZT, or that was my recommendation,
8    but they executed my recommendation.  So I was purely a
9    consultant.
10       Q   But you saw patients yourself; correct?
11       A   Saw them with residents, attendings, midwives.
12   There were largely family medicine residents there.  So I was
13   a consultant.  And it's a residency now.
14       Q   You just said they were largely family medicine
15   residents.  Are they--now it would be GYN?
16       A   No.  There were--family medicine residents staffed
17   the high risk clinic.  And there was usually an attending
18   there and there was a midwife, so we worked as a team.
19       Q   And did you deliver babies when you were there?
20       A   No, ma'am.
21       Q   Who delivered?
22       A   The family medicine residents, the midwives
23   supervised by the private doctors, who were attendings.
24       Q   Were the---
25       A   (interposing) And the guy who is the executive

John M. Thorp, Jr., M.D.        Volume 1, 11/19/13

---

Page 94

1    director of the American College now, Dr. Lawrence, Hal
2    Lawrence, he was the--he was--I think that would be the thing
3    he'd be most proud of is getting that residency program
4    started in western North Carolina.
5        Q    Was he--he was a member of the hospital staff?
6        A    Yes, ma'am.
7        Q    So the attendings were OB-GYNs?
8        A    Yes, ma'am.
9        Q    Did they ever call you on the phone to ask about
10   caring for one of the patients?
11       A    Yes, ma'am.
12       Q    Give me some examples.
13       A    And I often called them on the phone to find out
14   what had happened and what was going on.  We stayed in
15   communication from--during the time that I wasn't there.
16       Q    And so they would call you and say--for example,
17   the patient with HIV, her---
18       A    They would largely call me and say, "The
19   attending," who ultimately managed the patient, "thought it
20   was a stupid idea and doesn't want to do it, Thorp.  Maybe
21   you ought to call him up and talk to him."
22           So it was very good for me to learn sort of the
23   art of clinical negotiation in a place where there was not a
24   hierarchy.  I could only change behavior by influence.  I
25   couldn't give an order to my resident, "Give her AZT" and

---

Page 95

1    they'll do it.
2        Q    If they had a concern about a patient, would they
3    call you to say, "What should we do with this patient?"
4        A    Yes, ma'am.
5        Q    And what would you do or how would you provide
6    help to them over the phone?
7        A    Get the set of facts, share my experience and
8    knowledge, make a recommendation.
9        Q    And then they would be able to take those
10   recommendations and treat the patient appropriately?
11       A    Again, I had no authority to--I could make all the
12   recommendations I want to make, but they could do with them
13   what they will.  And they took what they liked and left the
14   rest.  So it was a--it was a good experience and it averted a
15   constitutional crisis in North Carolina.
16       Q    What's that?
17       A    The speaker of the house was from Asheville and he
18   introduced a bill in the state legislature, I think at Dr.
19   Lawrence's suggestion, that the University of North Carolina
20   have two residents in Asheville at all times, two OB-GYN
21   residents.
22           And my boss here--he actually once had--the board
23   had an--the American Board had an office in this--right up
24   there (indicating)--thought that if North Carolina munici-
25   palities could begin to assign his residents that he would

---

Page 96

1    end up with no residents.
2            And so we went over and saw the speaker of the
3    house.  His name was Liston Ramsey.  We said, "Mr. Ramsey,
4    why do you want just two residents?  Why don't you get a
5    residency?"  He said, "Can you get me a residency?"  And we
6    were like "Yeah."  And we got him--we ultimately got him a
7    residency.  I think it's been a good thing.  I'm proud of it.
8        Q    Let me just turn with the time we have left today
9    to the issue of staff or admitting privileges.
10       A    Yes, ma'am.
11       Q    You mention in paragraph 1 of your report, which
12   is Exhibit 1, on the first page that you had served on the
13   UNC Health System credentials committee?
14       A    Yes, ma'am.
15       Q    What is the--what are the responsibilities of that
16   committee?
17       A    To review applications for privileges, to make
18   certain that the training and experiences of the applicant
19   are, one, true, and two, consistent with performance of the
20   privileges being requested, and to make a recommendation to
21   the chief of staff of the hospital whether those privileges
22   be granted, modified, or rejected.
23       Q    Now, does UNC only grant privileges to faculty
24   members?
25       A    UNC for years only granted privileges to faculty

---

Page 97

1    members and I think in the late 1990s opened up privileges to
2    community physicians.  The joke would be which community
3    physician would ever want to come to this big old university
4    teaching hospital not known for its efficiency.
5        Q    As a---
6        A    (interposing)  Because I don't think we've been
7    inundated by people who say, "Oh, I'd love to practice there.
8    It's so much fun."
9        Q    So when were you a member of this committee?
10       A    I can't remember.  I think that change occurred
11   when I--during my service therein.
12       Q    So you're not on the committee any longer?
13       A    No, ma'am.
14       Q    Okay.  And so has it been ten years or so since
15   you were on the committee?
16       A    Well, the late '90s seems like a relative short
17   time ago to me.
18       Q    But it was, and it was 15 or so years.  Does that
19   sound--10, 15 years?
20       A    10 or 15.
21       Q    Okay.
22       A    I think.
23       Q    Let me have you look at your CV at page 61. which
24   is Exhibit A to--Attachment A to Exhibit 1.
25           (Witness complies.)

---

John M. Thorp, Jr., M.D.    Volume 1, 11/19/13

Page 98

1    A   Yes, ma'am.
2    Q   You list a committee assignment there towards the
3  end of the page as a tenure committee.  Is that something
4  different than we've talking about with the credentialing
5  committee?
6    A   Yes, ma'am.
7    Q   Okay.
8    A   It's for faculty members to--with the up or out,
9  decision of tenure.
10   Q   So the committee assignment of the credentialing
11  committee is not on your CV?
12   A   It is not.  And I don't put hospital based
13  committees.  Some would say the CV is plenty damn long as it
14  is.
15   Q   But isn't the tenure committee a hospital
16  committee?
17   A   No, that's a university-wide committee.  And that
18  would have a lot of weight in academic circles, that you were
19  on the campus-wide appointment to promotion with tenure
20  committee, the APT committee.  You know, things in academics
21  are of such little importance to anybody else in the world,
22  but you have to take victories where you get them.
23   Q   And so do you--on the credentialing committee, you
24  were then largely reviewing applicants who were already
25  faculty members?

Page 99

1    A   Well, largely people who were being hired as
2  faculty members, as fellows, as trainees, and then at some
3  point there was an opening to community physicians.  When I
4  was there, we weren't inundated by community physicians who
5  wanted to be part of the monstrosity.
6    Q   So what you're saying is that--would a faculty
7  appointment be conditional on getting privileges?  Is that
8  how it worked?
9    A   A faculty appointment would be conditional on
10  funding.  And most clinicians fund themselves by practicing
11  clinically.  And if you can't get credentialed, you can't
12  practice clinically.  Thus you can't bill and collect.  So---
13   Q   (interposing) So it's part of---
14   A   ---passing the D.C. bar and being a partner at the
15  firm would be two separate events that would be intersected.
16  You probably aren't going to be a partner in the firm if you
17  can't pass the bar.
18   Q   So it's part of the process of hiring somebody---
19   A   (interposing) Part of the process.
20   Q   ---for a faculty appointment?  So what factors
21  were considered in deciding whether to grant privileges?
22   A   Well, one, were the credentials true or not.  We
23  had a famous case of a guy who pretended to be a psychiatry
24  resident and had never been to medical school, won
25  psychiatric teaching awards, went all over the country,

Page 100

1  published articles, a really good sociopath, ultimately
2  discovered, so are they true.
3    Are there problems, have--you know, your question
4  about me, that if I'd said I had my privileges revoked, you
5  would have been really happy.  We'd still be here talking
6  about it; have you ever had your privileges revoked,
7  suspended, have you ever been convicted of something, run a
8  big perinatal substance abuse program.  I mean now physicians
9  with DWIs or drug problems are huge issues for licensing and
10  credentialing.
11    And then do they--for certain procedures--if I'm
12  going to do--that are sort of on the cutting edge--if I'm
13  going to do robotic hysterectomy or robotic prostatectomy or
14  laparoscopic or whatever the techie thing is, what sort of--
15  did you go to a two day weekend course or do you actually
16  have training and experience.
17   Q   So demonstrating proficiency in the areas---
18   A   (interposing) Demonstrating proficiency.  We
19  didn't watch the proficiency.  You know, you have to produce
20  letters, things to say Dr. Parker has done 20 of X under my
21  supervision or as part of his residency or---
22   Q   Was there a certain number of procedures you'd
23  want to see to determine whether someone was qualified to
24  perform that procedure?  You just mentioned 20.
25   A   They would make up arbitrary minimums.  I'm not

Page 101

1  sure there was an evidence basis for the minimal number.
2    Q   But there were minimums that you would look to?
3  And who is the "they"?
4    A   The department chair, who is the content expert,
5  the last content expert, sort of the chief content expert,
6  might set minimums of what needs to get done and what doesn't
7  need to get done.  I'm not sure there is a real evidence
8  basis, if I've done 15 of something versus 20 of something
9  that I'm going to have more or fewer complications or
10  problems.  It's---
11   Q   You've mentioned---
12   A   (interposing) It's a process.
13   Q   You've mentioned you'd want to know if an
14  applicant had had privileges revoked.  Would you also want to
15  know if privileges had been denied at a hospital?
16   A   Yes, ma'am.
17   Q   And it would be a factor against that applicant if
18  they've had privileges denied; right?
19   A   I guess it would depend on the reason.
20   Q   But you'd want to know that reason; right?
21   A   You'd want to know the reason.  But I don't--I
22  think it would depend on the reason.
23   Q   Were there criteria that the committee considered
24  that did not have anything to do with clinical skill or
25  competence of a provider?

Page 102

1  A  Not that I recall.
2  Q  Personality?
3  A  Well, usually we didn't know them, so we couldn't
4  dislike them. We hadn't had time to dislike them.
5  Q  Have you ever had a report that someone was
6  difficult to get along with?
7  A  Have I ever had a report that somebody was---
8  Q  (interposing) No, no, no; in connection with the
9  credentialing committee. I'm just looking for--are there
10  examples of cases where decisions were made by factors other
11  than clinical?
12  A  I don't recall.
13  Q  Do you recall politics ever being involved at all,
14  certain---
15  A  (interposing) Like are you a Democrat or
16  Republican?
17  Q  No, no, no; more like institutional politics, some
18  doctors wanting an applicant and others not wanting an
19  applicant.
20  A  Not at our level, no, ma'am.
21  Q  But that could happen at another level?
22  A  I don't know.
23  Q  Well, what did you mean by not at our level?
24  A  I meant that I never saw that happen at the level
25  of the credentials committee. Whether the chair and the

Page 103

1  department wanted or didn't want somebody or liked or didn't
2  like somebody I don't know.
3  Q  You don't know. It could happen. You just don't
4  know one way or another?
5  A  I think it could happen. Anything that involves
6  humans is subject to imperfection and prejudice.
7  Q  Do you have knowledge of how hospital
8  credentialing decisions are made at any other hospital?
9  A  I think I do because I've helped an array of
10  learners seek and obtain an array of privileges all over the
11  United States and even some in Europe.
12  Q  Who are these doctors?
13  A  Residents; we have a fellowship program and
14  reproductive epidemiology fellows, faculty members moving to
15  other places, going to relocate, people who are out in
16  practice who are going to relocate. So you write letters.
17  You fill out forms. Sometimes you talk to credential
18  committees, the chair--or they usually have a person that
19  really does the work that you talk to.
20  Q  So you have an understanding of other hospitals
21  from the perspective of assisting an applicant?
22  A  Yes, ma'am.
23  Q  You don't have any knowledge as a member of the---
24  A  (interposing) The internal workings?
25  Q  ---credentialing committee? Correct.

Page 104

1  A  No, ma'am.
2  Q  And so you're not offering an opinion about how
3  privileges might be granted in Alabama; correct?
4  A  I don't have any idea how privileges would be
5  granted in Alabama or not.
6  Q  I want to ask you again on paragraph 1 of page
7  1---
8  A  Yes, ma'am.
9  Q  ---you mention you oversee and guide the
10  credentialing process, the last--or second to the last
11  sentence--for 12 OB-GYNs, three fellows, and three advanced
12  practice nurses. What do you mean by credentialing? Is that
13  just privileges or is that more than privileges?
14  A  Privileges. I sort of flog them to get their
15  packets in line to get their--you know, all their stuff in
16  place. And I really, really want them to do it because they
17  can't bill and collect and earn anything--although they all
18  want me to pay them while they're waiting--you know, "We've
19  got to get you credentialed, licensed and credentialed."
20  Q  You mentioned---
21  A  (interposing) And it's not a lot of fun.
22  Q  One of the headaches of leadership?
23  A  Yeah.
24  Q  You mentioned three advanced practice nurses. Are
25  they midwives, nurse practitioners?

Page 105

1  A  Nurse practitioners; one nurse midwife who retired
2  in September. So I don't know whether--I'm bad with time. I
3  don't know, so I just say advanced practice nurses.
4  Q  But they have admitting privileges as well?
5  A  Yes. North Carolina has a law that says advanced
6  practice nurses have to have a supervising physician, which
7  is a source of big contention and even constitutional
8  litigation in this state. But within that framework,
9  advanced practice nurses can admit people.
10  Q  A few more minutes.
11  A  Not many.
12  Q  A few.
13  A  Two.
14  (Reporter indicates time remaining.)
15  Four.
16  Q  Let me just ask you. You had mentioned that as
17  part of your responsibilities--this is the bottom of page
18  29--you have administrative oversight of the Family Planning
19  Fellowship and Residency training program at UNC?
20  A  Yes, ma'am. That changed in October and family
21  planning became a separate division. So Gretchen Stuart, Amy
22  Bryant; they have one fellow, Matt Zerden. David has
23  retired, so they spun off into their own division.
24  Q  What was the reason for the spin-off?
25  A  I think they had matured, and I don't mean as

Page 106

```
1    individuals matured, but matured clinically, financially, and
2    as a discipline where they could subsist independently.
3        Q   Did it have anything to do with your personal
4    views on abortion?
5        A   Not that I'm aware of.
6        Q   But that's possible?
7        A   I guess anything is possible.  I know I didn't
8    spin them off, nor did I resist them being spun off.  I see
9    it as a--as a success.  We hired Gretchen Stuart as a K Award
10   winner, as a BIRCWH, from UT Southwestern.  She now has her
11   own division and directs it.
12          While I disagree philosophically with what a lot
13   of that division does, I see that as a success.  And I admire
14   Gretchen and Amy as valued colleagues, friends--professional
15   friends.  I don't know.
16       Q   When you mentioned administrative oversight--at
17   the time when you had administrative oversight of that
18   program, what did that entail?
19       A   Responsible for figuring out what they got paid,
20   where they got set, where they sat, if there were a problem,
21   a complication, a temper tantrum, a--whatever there was, I
22   was responsible for ferreting it--for ferreting it out.  They
23   were good clinicians and they weren't ever a problem.  So
24   when I say temper tantrum, I don't mean them specifically.
25   But if there had been, I would have.
```

Page 107

```
1        Q   Did you ever teach their residents?

2        A   They don't have residents.  They have fellows.

3        Q   Did you ever teach their fellows?

4        A   Yes, ma'am, and supervised their fellows

5    clinically in things that did not involve termination of

6    pregnancy.

7        Q   And were you responsible at all for the curriculum

8    in that fellowship?

9        A   No, ma'am.

10       Q   That's it for today.

11       A   You're very kind.

12          (The deposition was recessed at 4:30 p.m. to

13          reconvene at 2:00 p.m. Wednesday, November 20,

14          2013.)
```

Page 108

```
1        F U R T H E R   P R O C E E D I N G S  1:49 p.m.
2          (Whereupon,
3          JOHN MERCER THORP, JR., M.D., M.H.S.
4    the witness on the stand at the time of adjournment, resumed
5    the stand and testified further as follows:)
6        The Reporter:   Doctor, I'm just going to
7    remind you quickly you're still under the oath I gave you
8    yesterday afternoon.
9        The Witness:   Yes, ma'am.  Thank you.
10          D I R E C T   E X A M I N A T I O N   1:49 p.m.
11          (resumed)
12   By Ms. Flaxman:
13       Q   Good afternoon, Doctor.  I appreciate you coming
14   back today.
15       A   Yes, ma'am.
16       Q   I want to ask you something I asked you yesterday,
17   which is just is there any reason today that you can think of
18   why you couldn't give fair and complete testimony?
19       A   No, ma'am.
20       Q   And I didn't ask you this yesterday, but I'd just
21   like to ask you to tell me what you did to prepare for
22   yesterday's and today's depositions.
23       A   I read the report and somebody's rebuttal, Fine,
24   F-i-n-e.  Is there a Fine in this case?
25       Q   Yes.
```

Page 109

```
1        A   They're the two things I did.
2        Q   Okay.  So by the report, you mean your---
3        A   (interposing)  My report.
4        Q   ---report, which is Exhibit 1?
5        A   Yes, ma'am, Exhibit 1.
6        Q   And you still couldn't confirm it was your
7    signature?  You'd just looked at it.
8        A   Well, I don't care about my signature.
9        Mr. Parker:   Object to the form.
10       Q   And so did you review anything else, any other
11   documents?
12       A   None comes to memory.
13       Q   And did you speak with counsel?
14       A   I think I had a teleconference with counsel maybe
15   a week before.
16       Mr. Parker:     I'll instruct you if she asks
17   any more questions about communications to be very circum-
18   spect.
19       Ms. Flaxman:     I'm not going to ask anything
20   else.
21       By Ms. Flaxman:
22       Q   All right.  Let's take a look at Exhibit 1, your
23   report.
24       A   Yes, ma'am.
25       Q   If you could turn to paragraph 2 on page 2?
```

Page 110

1    (Witness complies.)
2    A   Got it.
3    Q   Okay.  Now, the last sentence of that paragraph
4  says, "The act is a prudent and reasonable provision to
5  advance women's reproductive health and increase the
6  likelihood that those women who may experience serious TOP
7  complications will receive optimal care."  Did I read that
8  correctly?
9    A   Yes, ma'am.
10   Q   And is that your opinion in this case?
11   A   I think so.
12   Q   So tell me how the act increases the likelihood of
13 women experiencing serious complications receiving optimal
14 care.
15   A   Well, my opinion would be that there will be
16 serious complications arise in some fraction of elective
17 terminations of pregnancy and that by having a formal
18 relationship, hospital staff privileges, the termination of
19 pregnancy provider can communicate better with the hospital
20 that will attend to those complications, could even treat
21 some of them him or herself and that there would be
22 improvements in the quality of care because of the linkage.
23   Q   And you say--you use the phrase "increase the
24 likelihood."  So it's your opinion that it increases the
25 likelihood, but it may not; is that correct?

Page 111

1    A   Well, I don't think it guarantees anything.  I
2  think it improves the likelihood.
3    Q   It doesn't guarantee it.  It may improve it or it
4  may not?
5    A   Well, I think if we were--for any single
6  individual it may or may not.  For a population I think it
7  would over time.
8    Q   And you just testified that privileges could allow
9  an abortion provider to treat some of the patients him or
10 herself?
11   A   Some or all.
12   Q   But you just used the word "some."  Were there in
13 your mind some cases in which they wouldn't be the treating
14 physician?
15   A   Well, if there were a perforation and a bowel
16 injury, unless the provider were a GYN oncologist or skilled
17 in bowel surgery, I think he or she would seek somebody else
18 to repair that--that bowel, as an example.  So there--
19 depending upon knowledge, expertise, experience, there may or
20 may not be consultants involved in the care of women with
21 termination of pregnancy complications.
22   Q   And so then in a case of a perforation with a
23 bowel injury, what specialist would be the best to do that
24 repair?
25   A   Well, I think there are an array of different

Page 112

1  specialists:  a general surgeon, a trauma surgeon, a colo-
2  rectal surgeon, a GYN oncologist.  And some gynecologists
3  have enough experience to do that.  I personally would not--
4  personally did not when I did GYN surgery.  There would be
5  other complications that would be within the scope of
6  practice of the termination provider.
7    Q   If a treating physician was going to involve one
8  of these specialists in a patient's care, how would that
9  provider get that other specialist involved?
10   A   Well, I think the most crucial element of that is
11 to step back and does somebody else need to be involved.  And
12 I think the details known only to the termination provider of
13 the person's history, physical exam, and what happened
14 intraoperatively and postoperatively can inform do I think--
15 let's say I'm the termination provider--do I think there was
16 a perforation, yes or no, where was the perforation, what did
17 I see, what did I experience, what led me to believe that.
18       So one decision is do I need a consultant or do I
19 need further diagnostic work to include or exclude that, and
20 then if we get to the hypothetical I gave you, if there is a
21 bowel injury, then who best to repair it.
22   Q   And then--I know you wouldn't be the provider, but
23 staying along your hypothetical of you being---
24   A   (interposing)  Yes, ma'am.
25   Q   ---the provider and having a perf with a bowel

Page 113

1  injury, at that point you pick up the phone and call one of
2  your colleagues?  Is that how you get someone else involved?
3    A   The phone would be one way.  A lot of times we
4  have people in the hospital, specialists in the hospital, so
5  you might talk face to face.  You might get them to look at
6  an imaging study or--an imaging study and presumed perf and
7  bowel perf would be probably the thing they would want to
8  see.  So you could communicate with a colleague or peer.
9    Q   And in the case of this example, this hypo-
10 thetical, you would pass on to the specialist the history,
11 the physical exam, what happened pre and postoperatively and
12 the imaging.  Is there anything else that---
13   A   (interposing)  There might---
14   Q   ---you would need to share?
15   A   Depending upon the complication, there might be
16 lab work that's important.  There might be pieces of social
17 history that are important.  There's a lot to communicate.
18   Q   But you have those kinds of conversations with
19 colleagues all the time; correct?
20   A   I try to.
21   Q   And have you had conversations like that with
22 physicians who are not your colleagues?
23   A   I don't understand the question.
24   Q   Well, in other words, have you--let me be more
25 specific what I mean by colleagues.  By colleagues I mean

John M. Thorp, Jr., M.D.    Volume 2, 11/20/13

Page 114

1   doctors at UNC who are on staff with you. Have you had
2   conversations about a specific patient with doctors who are
3   not on your staff?
4       A   About their acute care?
5       Q   Well, sure, if you have.
6       A   No, I don't think I have.
7       Q   Have you--I know you're an MFM, so do doctors
8   sometimes---
9       A   (interposing) I think I'm an obstetrician and
10  gynecologist with a subspecialty certificate in MFM.
11      Q   Okay. Given your area of expertise, do physicians
12  who are not at UNC refer their patients to you?
13      A   Yes.
14      Q   And in the course of those referrals, have you had
15  conversations with those physicians explaining the back-
16  ground and history and the reason for the referral?
17      A   Yes.
18      Q   And you just said sometimes those are with
19  physicians who are not on staff with you; correct?
20      A   Yes.
21      Q   Have you ever had conversations like that with
22  physicians who you did not know personally?
23      A   Yes.
24      Q   So a physician knows you by reputation and refers
25  a patient with a high risk pregnancy to you for you to assume

Page 115

1   care?
2       A   Yes, ma'am.
3       Q   So let me ask you, then, you had mentioned as one
4   of the reasons why the act could increase the likelihood of
5   optimal care is you said that a TOP provider could communi-
6   cate better with a hospital in the event of a complication.
7   Is that--does that summarize your previous testimony---
8       Mr. Parker:    (interposing) Object to the
9   form.
10      Q   ---correctly?
11      A   I think it's a simplistic summation. It's
12  certainly in the spirit of what I said.
13      Q   Well, let me ask you, how---
14      A   (interposing) I don't mean to say your questions
15  are simplistic.
16      Q   I'm not taking any offense whatsoever. But tell
17  me how in your opinion a TOP provider can communicate better
18  with the hospital if he or she has admitting privileges.
19      A   How a TOP provider can communicate better?
20      Q   Yes; well, how it is that having admitting
21  privileges would allow that provider to communicate better
22  with those taking care of the patient at the hospital.
23      A   Well, it would allow the provider to take the
24  knowledge that he or she possesses into that health care
25  setting, get it into that hospital record, into that

Page 116

1   electronic record, communicate with a colleague, somebody
2   that they probably know. So I think communications are
3   easier and smoother, even for me, with people that are within
4   the health system I work in rather than people who are out.
5       Q   So the provider--the TOP provider could
6   communicate the knowledge that he or she possesses to the
7   treating physicians at the hospital; correct?
8       A   I don't understand the question.
9       Q   So in other words, if an abortion provider is
10  transferring a patient to a hospital with--we'll go back to
11  the hypothetical of a uterine perforation with a bowel
12  injury---
13      A   (interposing) Okay.
14      Q   ---or a suspected bowel injury.
15      A   Yes, ma'am.
16      Q   That providing physician could communicate the
17  history, the physical exam, what happened pre or post over
18  the telephone to the treating physicians at the hospital;
19  correct?
20      A   Could; yes, ma'am.
21      Q   And so if he or she did have that communication,
22  wouldn't then the hospital be able to treat that patient?
23      A   Well, I think that's one facet of the communica-
24  tion and it's certainly better than not doing that but is not
25  as good as having--and the predominance of the electronic

Page 117

1   medical record, to have those thoughts entered into the EMR,
2   to have the imaging studies, to have that communication. So
3   yes, it could occur by phone and sometimes does, and it
4   sometimes doesn't.
5       Q   Do those conversations take place with patient
6   transfers to a hospital when those patients are experiencing
7   complications from other types of outpatient surgery?
8       A   I don't understand the question.
9       Q   Well, going back to yesterday, you had mentioned
10  that just about every kind of gynecological surgery now is
11  taking place in an outpatient setting or an ambulatory
12  surgical center.
13      A   Yes, ma'am.
14      Q   Well, let me go back and ask you, are there
15  freestanding ambulatory surgical centers in the Chapel Hill
16  area that are not affiliated with UNC?
17      A   I don't know--I don't know whether Planned
18  Parenthood across the street considers itself--I don't
19  understand the ambulatory surgical center word. There was a
20  guy who has a surgicenter next to the post office. He just
21  sold it to UNC. It existed for years before he did that.
22      Q   Did he do gynecological surgeries there?
23      A   He largely did reversal of tubal ligation
24  surgeries there.
25      Q   And as far as you know, were there any--did he

Page 118

1 ever have to transfer to the hospital any of those patients?
2     A    The couple of transfers over the years that I
3 remember, he came to the hospital with the patient and would
4 have very much liked to have had admitting privileges so that
5 he could have interfaced with the health care team that was
6 taking care of her is my impression.
7     Q    But he didn't have privileges?
8     A    He did not have privileges.
9     Q    And you said it was your impression.  Did he ever
10 tell you that he wished he had privileges?
11    A    I--he's never told me in words.  I've sensed
12 frustration where he couldn't go back, he couldn't be
13 involved.  He--you know, he would have to be in the waiting
14 room and somebody would have to come and talk to him out
15 there.  He felt like he had--I'm projecting, but it seemed to
16 me he felt like he was abandoning his patient and wanted to
17 be part of the care team.
18    Q    But that wasn't anything he said to you.  That was
19 just a sense you got?
20    A    It's not what he said to me, no, ma'am.
21    Q    And do you know if he ever applied for privileges?
22    A    Oh, I think he did the ultimate in getting
23 privileges.  He sold his surgicenter to them for about $10
24 million.
25    Q    So he cashed---

Page 119

1     A    (interposing) I think he got privileges---
2     Q    (interposing) He cashed in and it doesn't matter?
3     A    ---and got rich.
4     Q    And so let me ask you---
5     A    (interposing) Which I find to be good revenge.
6     Q    Let me ask you, at times when he did have a
7 patient transferred, he would do the handoff, so to speak,
8 through a conversation with the treating doctors at the
9 hospital; correct?
10    A    He would do the handoff through a conversation,
11 but I don't think that handoff was as good as it could have
12 been if he had had admitting privileges, or hospital staff
13 privileges that gave him access to the records system, the
14 lab system, a name badge so he could walk back and forth, all
15 that sort of stuff.
16    Q    To the extent you remember, what were the outcomes
17 for the patients that he transferred?
18    A    I think they had complications that required
19 subsequent surgery and were ultimately good outcomes.
20    Q    So they ended up getting good treatment at your
21 hospital?
22    A    They ended up getting treatment and good treat-
23 ment, but not the best treatment we could have provided.
24    Q    Well, how do you think the treatment could have
25 been better?

Page 120

1     A    I think it would have been better if we could have
2 communicated with him.  I think it would have been better if
3 he could have held his patient's hand, who he knew prior to
4 doing an elective surgical procedure on.
5     Q    Well, but you just testified that he had
6 communications with you; correct?
7     A    He had communications with us, but you'd have to
8 go out in the waiting room to talk to him.  You couldn't--he
9 couldn't be part of the--part of the deal.
10    Q    Well, but how would being part of the deal--how
11 would part of the deal have improved the care?
12    A    Provide psychosocial support to the patient, be
13 present when the patient is being interviewed.  When new
14 information presented the need for clarification of something
15 he'd communicated, he would have been present and we could
16 have talked to him.
17    Q    But you can talk to him anyway; right?  You can
18 pick up the phone or go out in the waiting room, if that's
19 where he is; correct?
20    A    Yes, you could.
21    Q    And he I take it--now, this may have predated
22 electronic medical records, but his records also wouldn't
23 automatically have been in the EMR system; correct?
24    A    They would not have been.  I think he was smart
25 enough to not use our EMR.

Page 121

1     Q    If you are having records from an outpatient
2 facility transferred to your hospital, is there a way that
3 they get entered into the EMR?
4     A    They go to--I call it medical records purgatory,
5 but it's known as loose materials, where somebody ultimately
6 scans them in and they get loaded into the electronic medical
7 record.  Loose materials doesn't work real well on nights and
8 weekends and holidays and things when it seems like
9 complications occur.
10    Q    Do the loose materials stay with the patient
11 during that period of time?
12    A    Well, if they stay with the patient--there are no
13 paper charts anymore, so who's going to look after them?  I
14 mean I don't like electronic medical records, so--I think
15 it's sort of dumb.  I would like to have a chart to look at
16 and somewhere to stick the notes from the referring doctor
17 and the prenatal record and the things that I need to look
18 back at.  Oftentimes I can't get hold of them.
19    Q    But if you are--if the patient is being referred
20 to you, you're the person who gets those records first;
21 correct?
22    A    Maybe, maybe not.
23    Q    And you could always contact that provider to get
24 that information; correct?
25    A    If I know who that provider is and where they are

Page 122

1  and they are available to me.  And then they could be out of
2  town.  The records could be locked up in their office.  It
3  can be hard to get them when you need them.
4      Q    That's not unique, though, to treating abortion
5  complications; correct?
6      A    That's unique to all sorts of complications.  I
7  mean that's common to all--forgive me for saying it's unique
8  to all--it's common to all sorts of complications.
9      Q    Right, common across medicine and something that
10 medicine in general is trying to figure out how to manage;
11 right?
12     A    Yes, ma'am.
13     Q    So let me ask you about admitting privileges.
14 Admitting privileges don't actually require an outpatient
15 provider to actually be the one to provide care at the
16 hospital; correct?
17     A    I think what comes under the rubric admitting
18 privileges varies from place to place in the little bit I
19 know about other places as to what it requires you to do or
20 not to do.
21     Q    Okay.  How about your hospital?
22     A    So if we're talking about my hospital, can you ask
23 me again?
24     Q    So at your hospital does having admitting
25 privileges require a doctor with privileges who performs a

Page 123

1  procedure in an outpatient setting to be the doctor who
2  actually provides care to that patient in the hospital?
3      A    No, ma'am.
4      Q    I want to turn to page 20 of your report---
5      A    (interposing) Yes, ma'am.
6      Q    ---to paragraph 38.  It begins at the bottom of
7  that page.
8          (Witness complies.)
9      Q    Do you see there in the first sentence--are you
10 there now?
11     A    Yes, I'm at page 20, paragraph 38.
12     Q    Great.  You say there in the first sentence--the
13 first sentence reads, "Termination of pregnancy is not a
14 benign medical procedure."  What do you mean by it not being
15 a benign medical procedure?
16     A    It's not without potential harms, or to say it
17 positively, there are potential harms that can arise.
18     Q    And so what are other examples of--well, are there
19 examples of benign procedures?
20     A    Completely harmless procedures?
21     Q    If that's what you mean by benign.
22     A    It's not what I mean by benign; procedures with
23 such minimal harm that there's no reason to prepare--to be
24 prepared to care for those harms.  So a blood draw is
25 something the IRB considers to be of such minimal harm,

Page 124

1  although there are harms, that you don't have to get informed
2  consent or do anything additional.
3      Q    But you mentioned a number of procedures yesterday
4  that you will do in your office setting.  Those procedures--
5  would you consider those to be benign or not benign?
6      A    No.  I would consider them to have harms
7  associated with them.
8      Q    So similar to TOP, they would not be considered a
9  benign procedure?
10     A    I think the set of harms of the things I listed
11 are in some ways different from TOP, but they all have a set
12 of harms.  And I would not call them benign procedures.
13          (Exhibit 3 was marked for
14           identification.)
15     Q    So you're taking a look at what we've marked as
16 Exhibit 3.  It's the Rule 26(a)(2)(A) report of Paul Fine,
17 M.D.  Have you seen this report before?
18     A    I think I have.
19     Q    If you could turn to page 2, paragraph 5 of this
20 report?
21          (Witness complies.)
22     Q    Actually, before we do that, if we could look back
23 to page 6, paragraph 12 of your report?
24          (Witness complies.)
25     Q    Now, in that paragraph you assert that the basis

Page 125

1  for Dr. Fine's opinion about the hospitalization rate was
2  data that was approximately 38 years old?
3      A    Yes, ma'am.
4      Q    Is that correct?
5      A    Old.
6      Q    That's what I meant, 38 years old.
7      A    Old.
8      Q    So you were criticizing Dr. Fine---
9      A    (interposing) It's old.
10     Q    ---because he was relying on old data,
11 essentially?
12     A    I think that was one of the critiques.
13     Q    So let's take a look then--let's go back to
14 Exhibit 3, Dr. Fine's report, and take a look at paragraph 5
15 on page 2.
16          (Witness complies.)
17     A    Okay.
18     Q    And he cites in this paragraph some more recent
19 data.
20     A    Well, I think he---
21     A    (interposing) Do you see that?
22     A    ---cites data from the past in a book published in
23 '99.
24     Q    Well, that's--the second sentence in his paragraph
25 refers to the 1999 book; correct?

Page 126

1    A    Reference 2 is the only thing I see referenced in
paragraph 5, and reference 2 is the book.
3    Q    Well, if you go, though, to the next sentence, the
sentence that says, "More recent data regarding first
trimester surgical abortion shows even lower complication
rates," do you see that?
7         (Witness peruses document.)
8    Q
Q    And that cites to a study that was published in
9    just this year, 2013.  And then if you go to the next
10   sentence, it refers to a study of medication abortions that
11   were provided in 2009 and 2010 showing rates of treatment and
12   admissions.  And that was also a study published this year.
13   So does that change your opinion about the basis for his
14   expert testimony?
15   A    I disagree and believe he's underestimated the
16   risk of complications.  And I think my testimony yesterday
17   provided my intellectual framework for that.
18   Q    And so you think he's underestimating the
19   complication rate; correct?
20   A    Well, the complication rate--I think he makes two
21   estimates, a complication rate and then the need for
22   additional--hospital based care would be the phrase he would
23   use.
24   Q    And so--let me ask you this first.  Are you no
25   longer--do you no longer criticize Dr. Fine for reliance on

Page 127

1    old data?
2    A    I would say, one, I'm critical for reliance on old
3    data, and two, I'm critical on reliance on two small series
4    done in research institutions.
5    Q    Say that last part again.
6    A    It looks like to me that his reference 3 and 4--
7    one was done in a special setting under a California legal
8    waiver.  And I don't have the article in front of me.  You
9    can produce it.  I'm not acutely aware--I'm not aware of what
10   the N is, but it sounds like to me under special
11   circumstances.  Aspiration abortion tends to be done--tends
12   to be a term of art that refers to lower gestational ages, so
13   I'm not sure it's generalizable.
14        And then number 4, I think that's the McGee
15   Women's Hospital research group that pioneered medical
16   termination of pregnancy in the United States.  So I imagine
17   this is from their research setting and again with
18   gestational age restrictions.
19        So I think those two references, while they are
20   certainly contemporary, are a very limited look and not--and
21   not thorough, so old with the book chapter then 3 and 4
22   not particularly generalizable.
23   Q    Have you read the studies that are cited at 3 and
24   4?
25   A    No, ma'am.  I'd be happy to read them if you want

Page 128

1    to show them to me.  I'm projecting from their title and
2    could be wrong.
3    Q    And in reference number 4, the reference to the
4    Cleland article, you mentioned gestational limits?
5    A    Well, there are gestational--I don't know--again,
6    I don't have the article in front of me, but there are limits
7    on medical abortion, medical termination.
8    Q    Right, because medical abortion is only offered to
9    a certain week in pregnancy; correct?
10   A    Yes, ma'am.
11   Q    But that factor wouldn't limit the usefulness of
12   the research in that study with respect to medical abortion;
13   correct?
14   A    Well, it wouldn't limit--it would be generalizable
15   to medical abortion.  But these are the world's leaders in
16   that technique.  Is a medical abortion done in rural North
17   Carolina or Alabama the equivalent of one done at the McGee
18   Women's Hospital?  I'm not sure that it is--or wherever these
19   were done.  I'm presuming.  I don't know.
20   Q    And so you just mentioned that your framework
21   was--for evaluating complications was what we discussed
22   yesterday; correct?
23   A    Yes, ma'am.
24   Q    And that was your review article in Scientifica?
25   A    I think I tried to find everything I could find to

Page 129

1    inform this question in light of the limitations of U.S. data
2    and the like.
3         Ms. Flaxman:    Okay.  I'm going to mark
4    another article.  This will be Exhibit 4.
5         (Exhibit 4 was marked for
6              identification.)
7    Q    So is this the article that you were just talking
8    about, your review article in Scientifica?
9    A    Yes, ma'am.
10   Q    Now, you raised this yesterday when you were
11   speaking in support for the estimate in your report of a
12   complication rate of 2 to 10 percent?
13   A    Yes, ma'am.
14   Q    I've flagged here for myself page 4, section
15   heading "5. Short-Term Harms."  Is that what you were
16   referring to?
17        (Witness peruses document.)
18   A    Yes, ma'am, in part.
19   Q    Was there anywhere else?
20   A    I don't think so.
21   Q    Okay.  Now, I didn't see in this article the range
22   of 2 to 10 percent for abortion complications.  How did you
23   arrive at that number?
24        Mr. Parker:    Object to the form.
25   A    Well, if you look at these references that I think

Page 130

1  begin with 52, if I can get there, there are a series of
2  review articles which then take into account various
3  references in trying to meet the reference limitations of the
4  journal, over 300 references in this review.  From those
5  primary sources is where I get the 2 to 10 percent range.
6      Q   But is the 2 to 10 percent range in this article?
7      A   I think if you aggregate up the bleeding, the
8  damage to bowel and bladder, and the infection, I think you
9  could get to 10.  I'm at 6 just adding infection and
10 bleeding, and over 1 all the way.
11     Q   What was that last part?
12     A   And over 1 all the way.
13     Q   So you get to 6 with infection and bleeding?
14     A   With the two numbers I put in there.
15     Q   Okay.  Then how do you get from 6 to 10?
16     A   Well, cervical trauma--and all of these reflect
17 ranges.
18     Q   So the---
19     A   (interposing)  And all are dependent on
20 gestational age, as cited in the first paragraph in number 5
21 for short term harms.
22     Q   And so the 2 to 10 percent figure in your expert
23 report is essentially adding up the purported complication
24 rates you have here; is that correct?
25     A   Well, it's trying to make an educated or best

Page 131

1  guess in the aggregate of the literature with all the
2  limitations inherent thereof.
3      Q   Well, then why are you trying to make an educated
4  or best guess when there are other studies out there, such as
5  the studies that are in Dr. Fine's report, that are not based
6  on guesses, but are based on studies of patients?
7      A   Well, my guesses are based on studies of patients.
8  I'm not making anything up.  But I'm--and maybe guessing
9  isn't the best guess I can, but to make an approximation of
10 whatever the true complication rate is.
11         And I think I have been more comprehensive and
12 thorough herein--and I realize Dr. Fine was not writing an
13 article for a scientific audience, but have been more
14 comprehensive in this instance than to cite two limited and
15 nongeneralizable articles as my reference sources.
16     Q   But you haven't read the articles that are cited
17 in Dr. Fine's report, correct, to know?
18     A   I don't know whether I have or haven't.  I don't
19 know have a recollection.  I've got an iPad.  I can pull them
20 up and we can read them if you want to.
21     Q   No, that's all right.
22     A   Okay.
23     Q   We may get to there.
24     A   They're discoverable.
25     Q   Correct.  We may get there.  So your estimate of 2

Page 132

1  to 10 is an aggregate of studies of different complication
2  rates rather than any one study that studies a large
3  population of women and gives you the total complication
4  rate?
5      A   I don't think there's one definitive study, one
6  single source that reflects termination of pregnancy practice
7  in a large population like a U.S. state.
8      Q   Let me ask you then about--you mentioned reference
9  number 52.  Would you call them footnotes or reference
10 numbers?
11     A   I would call them reference numbers, but---
12     Q   (interposing)  Well, we'll use your terminology.
13     A   Okay.
14     Q   So reference number 52 looks like an article
15 involving "Management of uterine perforations complicating
16 first-trimester termination of pregnancy."  Now, it's
17 published in the Israel Journal of Medical Sciences.  Is the
18 data in that article coming from Israel?
19     A   I would assume so.
20     Q   And so how do you extrapolate that article to, you
21 know, make a guess about complication rates in this country?
22     A   Well, I don't think biology in Israel is different
23 than biology in the U.S., and I don't believe you think that
24 either.
25     Q   No, but the numbers are far different; correct?

Page 133

1      A   What do you mean the numbers are far different?
2      Q   Smaller population, fewer women obtaining
3  abortions.
4      A   There are multiple differences, yes, ma'am.
5      Q   And this was also--would you consider 1995 to be
6  old?
7      A   I consider 1957 to be old.
8      Q   Well, then 1970s and '80s to be old I gather too,
9  from what you were saying about Dr. Fine's testimony?
10     A   Ma'am?
11     Q   Huh?
12     A   Ma'am?  I didn't--I didn't--I was thinking about
13 1957.
14     Q   When you criticized Dr. Fine's testimony as being
15 based on old data---
16     A   (interposing)  Coach Smith lost a national
17 championship in 1957 in triple overtime to North Carolina.
18     Q   And do you remember that?
19     A   He was on a Kansas team.
20     Q   You don't remember that?
21     A   I was in utero.
22     Q   Okay, so you don't remember that either?
23     A   Well, I have recollection of the horns blowing in
24 Rocky Mount.
25     Q   So the---

Page 134

1    A   (interposing)  Forgive me.
2    Q   No, that's fine.  The data that Dr. Fine that you
3   criticized Dr. Fine for relying on was from the '70s and '80s
4   and you had said that that was old; correct?
5    A   Well, I'm not there's been a lot published since.
6    Q   Okay, but you would consider then an article from
7   1995 to be something that you could rely on; is that right?
8    A   Well, I'm not relying on it.  It's one of 312
9   references.
10   Q   Although with respect to complications, it's far
11  fewer than 312 references; right?
12   A   There are probably at least 20, many of which are
13  reviews that include hundreds of articles.
14   Q   Why don't we let me ask about the second
15  paragraph under short-term harms.  It's a discussion of are
16  you there on page 4?
17   A   Yes, ma'am.
18   Q   It talks about bleeding or hemorrhage occurring in
19  up to 1 percent of TOPs in the first trimester and up to 2.5
20  percent in the second trimester.  What is the source for that
21  statement because there's no reference there?
22       (Witness peruses document.)
23   A   I think that 51 would be the reference that
24  applies to all three sentences that start the second
25  paragraph on page 4 in part 5.

Page 135

1    Q   Do you are bleeding and hemorrhage the same thing
2   in your mind?
3    A   Well, I define estimated blood loss greater than
4   500 ccs, so excessive bleeding would probably be a better
5   modifier to put there.  But with defining it in the
6   parentheses, I thought I helped you out.
7    Q   I just wanted to ask you whether the parentheses
8   also applies to the bleeding.
9    A   Yes, ma'am.
10   Q   Okay.  So you don't mean bleeding in general
11  because that obviously happens in
12   A   (interposing)  Yes, ma'am.
13   Q   every procedure?  So this is bleeding with
14  estimated blood loss of greater than 500 ccs; correct?
15   A   Yes, ma'am, thus labeled a harm.
16   Q   Let me ask you, your range of 2 to 10 percent for
17  abortion complications, is that for both first and second
18  trimester?
19   A   Yes, ma'am.
20   Q   And so you would say the risk of complications
21  from a first trimester abortion is 2 to 10 percent or would
22  you give a lower estimate?
23   A   Probably less.
24   Q   So what would your estimate be for first
25  trimesters?

Page 136

1    A   Well, I we could we could back it out.  I give
2   you a hazard ratio by week in reference 50.  So each
3   additional week, you would multiply whatever the background
4   rate was by 1.38.  That's the hazard ratio.  And you could
5   determine a week specific complication rate.
6    Q   Now, I'm terrible with statistics or I wouldn't
7   have gone to law school.  Can you do that sitting here and
8   give us an estimate of first trimesters?
9    A   Well, then it would require me to aggregate all
10  the from six to 12 weeks all the risks.  The risk of harms
11  goes up as gestational age increases.
12   Q   So how about a ballpark, then, on first trimester?
13      Mr. Parker:     Object to the form.
14   A   Well, you've been previously critical of me for
15  guessing.  Now you're trying are you going to ridicule me
16  again if I make a guess?
17   Q   There's no ridicule here, sir.
18   A   Not a bit?
19   Q   Not a bit.
20   A   I would guess 1 to 3.
21   Q   Okay.  Backing up a second, what's the audience
22  for Scientifica?  I'm not familiar with this publication.
23   A   What do you mean what's the audience?
24   Q   Is it a medical
25   A   (interposing)  Whomever will pick it up and read

Page 137

1   it.
2    Q   Is it a medical publication?
3    A   It's a peer reviewed Index Medicus publication.
4    Q   And so the audience is other physicians?
5    A   Physicians, epidemiologists, biomedical
6   scientists, whoever wants to read it lawyers.
7    Q   Right now us sitting here?
8    A   Law clerks hell if I know who's read it.
9    Q   All right.  Back on page 4 again under short-term
10  harms we're going back to page 4 under short-term harms.  In
11  the third paragraph, the third sentence says, "Up to 3
12  percent of second trimester TOP procedures are complicated by
13  cervical trauma."  Do you see that?
14   A   Yes, ma'am.
15   Q   And the reference is 56, an article by a Dr.
16  Shannon.  I assume it's a doctor.  Do you see that?
17   A   Yes, ma'am.
18      Ms. Flaxman:     I'm going to ask that we mark
19  as an exhibit that article.
20       (Exhibit 5 was marked for
21        identification.)
22      (Witness peruses document.)
23   Q   Is that the article that you were referencing?
24   A   It sure looks like it.
25   Q   So if you could take a look and tell me where in

Page 138

1  that article it talks about the cervical trauma in second
2  trimester TOP procedures?
3      (Witness peruses document.)
4      A  I believe that it doesn't. And I fear, as much as
5  I hate to admit it, that in--and I believe there was a series
6  of reviews of which this was one--that I've left out a
7  reference. But I would have to go back to my original files
8  and look. So I think there is an absent reference for that
9  number or they are misnumbered.
10     Q  Why don't you take a look and see?
11     A  I can get limited by looking--I don't know whether
12 53 through 56 would--should be it, but it doesn't look like
13 it's 56. And the series of reviews are not reference 56, the
14 Contraception, but are the Clinical Obstetrics and
15 Gynecology, 57. There are a series of reviews on complica-
16 tions of pregnancy termination.
17     Q  In reference 57?
18     A  Yes, ma'am. Well, hers is infectious complica-
19 tions, but within that volume 52 of Clinical Obstetrics and
20 Gynecology, there are a series of reviews on harms of
21 pregnancy termination. And somehow I mislabeled or have done
22 something. But you are correct, and kudos to the person who
23 found the mistake. Yeah.
24     Q  Okay. So Exhibit 5, which I should have said for
25 the record is an article by Caitlin Shannon and others

Page 139

1  entitled "Infection after medical abortion: a review of the
2  literature," does not support the statement in the article
3  about risks of cervical injury; correct?
4      A  It does not support the statement. And I think
5  there is an error in that paragraph that I'm responsible
6  for--not intentionally responsible for, but ultimately
7  responsible for.
8      Q  Now, why don't we look at Exhibit 5 while we have
9  it? Have you reviewed this article before?
10     A  I think I have, but I don't have an independent
11 recollection, but every article pulled that's in the review I
12 had in the file.
13     Q  Now---
14     A  (interposing) And quite a few more.
15     Q  It does mention here that the frequency of
16 infection after medical abortion was very low. They said .92
17 percent. Do you see that?
18     A  And they also said it varied among regimens.
19     Q  Where are you referring to?
20     A  The second half of that sentence where you give me
21 the very low .92 percent.
22     Q  Let's look at page--let's see, it's 184, right at
23 the beginning section 3, which is Results. It says "Overall
24 frequency of diagnosed and/or treated infection...after
25 medical abortion treatment was less than 1 percent"?

Page 140

1      A  Yes, ma'am.
2      Q  So that's lower than the rate of infection that
3  you cite in your article; correct?
4      A  No, it's not.
5      Q  Now, why is that?
6      A  I said infection occurs after 1 to 5 percent of
7  surgical TOPs and is usually polymicrobial in nature. So I
8  haven't even commented on postmedical abortion.
9      Q  So why did you not comment?
10     A  Why did I not comment?
11     (Witness peruses document.)
12     Well, I think I did comment at the very end of
13 section 5, "When medical and surgical TOP procedures are
14 directly compared, more women in the medical...groups will
15 require surgical evacuation and experience more bleeding,
16 while surgical TOP has more traumatic complications."
17     Q  Okay. But I'm talking about infection. You don't
18 mention infections from medical abortions except for
19 mentioning deaths. Do you see that? It's a little earlier
20 in the paragraph.
21     (Witness peruses document.)
22     A  That I mention death? I think it's later in the
23 paragraph where I mention death.
24     Q  Okay. Well, the only reference--well, let me ask
25 you. Isn't the only reference about infection related to

Page 141

1  medical abortion in this paragraph about the fatal toxic
2  shock after medical TOP---
3      A  (interposing) Yes, ma'am.
4      Q  ---caused by Clostridium. Why would you have
5  included that reference without referring to an infection
6  rate for medication abortion from an article that you've
7  cited elsewhere?
8      A  I don't know.
9      Q  Would you agree with me that Exhibit--the article,
10 Exhibit 5, is a large scale study?
11     A  Yes, ma'am, that comes up with a number awfully
12 close to 1 percent.
13     (Pause.)
14     Mr. Parker:    Are you interested in a break?
15     The Witness:    Are you interested in me taking
16 a break?
17     By Ms. Flaxman:
18     Q  Let me just--I have one more set of questions
19 about this line and then we can take a break. Does that work
20 for you?
21     A  Yes, ma'am.
22             (Exhibit 6 was marked for
23             identification.)
24     Q  Okay. So now Exhibit 6 is an article by a Lisa
25 Rahangdale?

Page 142

1    A    Rahangdale.
2    Q    Rahangdale.  Do you know her?
3    A    She works for us now.
4    Q    Then you do know her?
5    A    I do know her, saw her this morning.
6    Q    And it's an article that she---
7    A
     A    (interposing)  It took me awhile to learn how to
8    pronounce it.
9    Q    I won't even try it again.  I'll just call her the
10   doctor.
11   A    Rahangdale.
12   Q    Rahangdale.
13   A    Yeah.
14   Q    She wrote an article---
15   A    (interposing)  Grew up in Fayetteville.
16   Q    Oh.  She's local?
17   A    Yes.
18   Q    ---an article called Infectious Complications of
19   Pregnancy Termination.  Have you read this article before?
20   A    Yes, ma'am.
21   Q    And that article is referenced at number 57; is---
22   A    Yes, ma'am.
23   Q    ---that correct?  And so you cite this article
24   towards the end of page 4 for the infection rate of 1 to 5
25   percent of surgical TOPs.  Do you see that?

Page 143

1    A    Yes, ma'am.
2    Q    If you could find in the Exhibit 6 where she said
3    that in the article?
4    A    Well, I think I extrapolated the first sentence on
5    page 199, "Approximately 0.1 to 4.7 percent...are affected by
6    uterine infection."
7    Q    Okay.  So you took .1 and made that 1; is that
8    correct?
9    A    Well, I don't know.
10   Q    Isn't that what you just testified?
11   Mr. Parker:    Object to the form.
12   A    Well, it's not what I just testified.  I may have
13   taken the .7 in the second sentence and the 4.7 in the first
14   sentence and rounded up to 1 and 5.
15   Q    Okay.  So in both cases, though, whether it was
16   from the .1 or the .7 and the 4.7, you rounded up; is that
17   correct?
18   A    That's what you tend to do with things over half.
19   Q    Even in scientific research?
20   A    Even in scientific research.
21   Q    Let me ask you, though, about her reference of .1
22   to 4.7 percent.  That's infections in surgical abortions
23   worldwide; correct?
24   A    That's the statement she makes and refers back--
25   number 8 says "Infection after medical abortion:  a review of

Page 144

1    the literature."
2    Q    And so on the face of it, though, this is a
3    statistic about worldwide infection and not limited to the
4    U.S.; correct?
5    A    Yes, ma'am.
6    Q    And with respect to that reference 57 about
7    surgical abortion infection, were there any other sources you
8    relied on?
9    A    Well, I think to try to limit the number of
10   references, if you go back to Exhibit 5 and Shannon--who I
11   presume is a physician like you do, but I don't know--
12   Table 1, there are 30 or 40 medical termination infection
13   rate articles, and it's continued, so there are probably 60
14   in total listed for her to get her grand total of 46,000.
15   Rather than put all 60 into the reference section, I've cited
16   back to these people, who have accumulated that literature,
17   that lump---
18   Q    (interposing)  Okay, but---
19   A    ---as opposed to every individual piece.
20   Q    You're relying both on the article and the
21   references in it?
22   A    Yes, ma'am.
23   Q    But nothing outside of either that article or the
24   references in it, I guess is my question.
25   A    Well, I think for each and every complication

Page 145

1    there are review articles in which I have done that in a
2    similar fashion, but for a different complication.  You've
3    provided me sweetly, nicely, kindly with a example of what I
4    mean.
5    Q    Okay.  Why don't we take a break?
6    A    Thank you.
7    The Reporter:    Off the record.    2:54 p.m.
8    (A brief recess was taken.)
9    The Reporter:    On the record.    3:06 p.m.
10   By Ms. Flaxman:
11   Q    Okay.  Doctor, if we could go back to Exhibit 1,
12   your report?
13   (Witness complies.)
14   A    I'm there.
15   Q    And directing you to page 14, paragraph 26.
16   (Witness complies.)
17   Q    Are you there?
18   A    Yes, ma'am.
19   Q    Okay.  In the first sentence you say:
20   "In my medical opinion, I believe most patients
21   would assume that their surgeon for an elective
22   procedure would have both current medical
23   licensure and staff privileges at an acute care
24   hospital that would allow for the diagnosis and
25   treatment of any unforeseen complications or harms

John M. Thorp, Jr., M.D.    Volume 2, 11/20/13

Page 146

1    that could arise from their surgery."
2    Did I read that right?
3        A    Yes, ma'am.
4        Q    And is that still your opinion?
5        A    Sure is.
6        Q    What's your basis for that opinion?
7        A    I haven't surveyed people, so there's not an
8    evidence basis; this is an experience basis, that if one is
9    going to undergo an elective surgical procedure that the
10    surgeon is credentialed and prepared to at least provide
11    acute care to the complications that might arise.
12        My wife is going to have elective sinus surgery
13    after the holidays.  It's not really a fair analogy because
14    it's going to be in the UNC system and I know the person has
15    credentials.  But if she were getting it done in Durham, I
16    would assume that if somebody were going to do whatever
17    they're going to do to her sinuses that if they perfed the
18    base of her skull and CSF was leaking that they could at
19    least begin to attend to that and get her into a system where
20    it could be fixed or addressed.  I don't know how you fix it.
21        Q    You wouldn't let her have surgery like that in
22    Durham, would you?
23        A    Well, I wouldn't let her have surgery in the Duke
24    system, but my wife is very independent and she might tell me
25    to drop dead, that's where she was having it done.  My

Page 147

1    assumption would be that you--I think patients assume that
2    the complications or harms mentioned to them as part of
3    informed consent can be taken care of, at least
4    preliminarily, by the surgeon that's going to do the elective
5    procedure.
6        Q    But you just said there were no surveys that you
7    did; right?
8        A    No surveys that I've done and no surveys that I'm
9    aware of either way.  It would be interesting to know what
10    people believe, I mean to actually formally assess what
11    people believe.
12        Q    So have you asked patients about it?
13        A    No.
14        Q    And so you certainly haven't spoken to anyone in
15    Alabama about it; correct?
16        A    I don't think so.
17        Q    And so what you described to me as the experience
18    with your wife, it sounds to me like rather than your medical
19    opinion, that's based on kind of your experience of being a
20    patient, a consumer of medical resources, and not so much as
21    a physician?
22        Mr. Parker:    Object to the form.
23        A    Well, as a consumer and a provider.
24        Q    But you haven't spoken to any patients you just
25    testified.  And so what is the basis of---

Page 148

1        A    (interposing)  Well, my---
2        Q    ---your opinion as a provider--your opinion as a
3    provider if you haven't spoken to any patients?
4        A    Well, my basis as a provider--when I say I haven't
5    spoken to patients, I haven't surveyed patients about to
6    undergo an elective surgical procedure about what do you
7    expect, what do you think would happen if you had a
8    complication.
9        I do know in the instances where I've cared for
10    people in the emergency department who had a complication and
11    found the termination of pregnancy office to be closed, or
12    didn't have a termination of pregnancy but had outpatient
13    gynecologic surgery and could not contact their surgeon and
14    felt abandoned, that there was an expectation there, that
15    that was part of the frustration in addition to having the
16    complication.
17        Q    But you just told me you never spoke to patients
18    about whether they expected their providers to have
19    privileges.
20        A    I've never prospectively spoken to patients.  And
21    maybe I should have qualified the I have not spoken by the
22    prospectively spoken.  That's retrospectively speaking after
23    the complication occurs.  And I think I'm opining that people
24    have that expectation prospectively.
25        Q    Did anyone ever tell you they had that expectation

Page 149

1    prospectively?
2        A    Never asked anybody.
3        Q    It was just your assumption?
4        A    It's my assumption and based on my retrospective
5    conversations with a limited number of patients, which I see
6    as different to my first answer.
7        Q    But in those retrospective conversations did
8    anyone say they wished their provider had privileges?
9        A    In the retrospective?
10        Q    Yes.
11        A    They said, "I wish my"--I don't think the average
12    person understands privileges--"I wish my doctor was here to
13    communicate and be involved in my care," you know, "They did
14    this to me this afternoon or yesterday afternoon.  Why aren't
15    they part of the deal?"  And I have heard that from both
16    patients and families.
17        Q    When have you had those conversations?
18        A    When somebody presents to our emergency department
19    after a complication from an elective procedure and are
20    frustrated by the absence of their surgeon.
21        Q    No, I'm asking you for a specific.  Can you give
22    me a specific example of when you've had this complication?
23        A    After termination of pregnancy and I remember
24    somebody with an infection after a hysteroscopy would be the
25    two instances I have recollections of.

John M. Thorp, Jr., M.D.     Volume 2, 11/20/13

Page 150

1    Q   So turning to the example of the infection after
2  hysteroscopy, what's a hysteroscopy?
3    A   It's sticking an endoscope in somebody's uterus to
4  look around and find a fibroid or polyp or lesion.  It's
5  often done in outpatient settings.
6    Q   Is that something you do in an outpatient setting?
7    A   I don't do it, but others do.
8    Q   And so in that case, what happened with that
9  patient?
10   A   The harm of hysteroscopy is infection.  The
11  patient had a postprocedure infection.  She was frustrated
12  that on a Friday night she could not get in touch with the
13  office, anybody covering the office, and that her operative
14  records, her indications and all were not available to the
15  then treating team in the emergency room.
16   Q   And so then what happened in the emergency room?
17   A   What happened?
18   Q   Well, they diagnosed the infection; correct?
19   A   We took care of her in the emergency room, but her
20  care would have been facilitated by communication, and her
21  emotional and mental health would have been enhanced by the
22  person who operated on her being present.
23   Q   Did anyone from the hospital try to get in touch
24  with her provider?
25   A   Yes, ma'am.  And the person was not available, not

Page 151

1  there, and didn't have coverage and backup.
2    Q   Did that provider have privileges in the hospital?
3    A   No.  I think communication would have been
4  enhanced if he or she had had privileges.  And if she did
5  have privileges and was not available or did not have a
6  designee available, then we would have had some recourse to
7  talk to the chief of staff.  So there would have been a
8  corrective action that might have occurred.
9        I also base it--and I'm thinking about my basis--
10  on--Bill Droegemueller, Droegemueller's Gynecology, was my
11  chair and my mentor.  And he insisted--and this isn't
12  privileging, but that you could not do something elective on
13  somebody and leave town, that if you were going to do an
14  elective surgical procedure, you had to be in town thereafter
15  for the expected length of hospital stay or then discharge
16  them out and out of the woods.  So it was drilled into me by
17  him that if you electively do something on somebody, you need
18  to be available to attend to their problem.
19   Q   But that's not the rule that other physicians
20  follow; right?
21   A   Oh, I think it's a rule that other physicians
22  should follow, that I want my physician to follow.
23   Q   But it's not necessarily typical medical practice?
24   A   I think by good surgeons and good doctors it is.
25  I don't think you do elective things on people and leave

Page 152

1  town.
2    Q   Well, but you can--you could leave town and have a
3  partner who's available to take any calls; right?
4    A   That would be a second thing, but if you knew you
5  were going to leave town, if you weren't leaving town
6  emergently, I don't think you should do something elective.
7  If the guy doing my wife's sinus surgery on December 27th is
8  going to his mother-in-law's that evening, I'm going to be
9  pissed with him if she has a complication the next day.  I
10  expect him to be in town.
11   Q   But he would presumably after hours have someone
12  else covering for him; right?
13   A   He could have somebody else covering, but I want
14  him to be in town and available.
15   Q   Well, you might want him to, but that's---
16   A   (interposing)  I expect him to.
17   Q   But that may not be the reality in medical
18  practice; right?
19   A   I think it's the reality of good medical practice.
20   Q   But there are plenty of good physicians who would
21  leave town as long as they had a partner providing for care
22  of patients after hours; right?
23   A   I think that would be a shortcoming of a good
24  practitioner and I would be critical.
25   Q   Now, some complications, though, wouldn't

Page 153

1  necessarily arise the next day; right?  They could arise a
2  week or two later in any kind of surgical procedure; right?
3    A   Or years or two later.
4    Q   No, we'll talk about the more short term.  There
5  are those complications that might occur day of, day after,
6  and then there are those that could happen a week or two
7  later.  A practitioner is not going to stay in town for weeks
8  after these procedures and you wouldn't expect them to;
9  right?
10   A   I think the great bulk of the complications would
11  occur in the first 24 to 48 hours, and I expect people to
12  stay.  If I'm going to do something elective--and what I do
13  elective are cerclages and cesarean sections.
14       And if somebody says, "Do my cesarean section this
15  morning" and I know I'm leaving town, I tell them, "I'm
16  leaving town.  If you want me to get somebody who's going to
17  be in town to stay with you who's in town to see you, then we
18  should let them do it.  If you accept the limitation of 'I've
19  got to do this tomorrow.  This is something I'm obliged to do
20  and accept substitute coverage'"--but I want them to know I'm
21  not going to be there.
22   Q   So you let your patients know, but it's not that
23  you haven't done it; is that what you're saying?
24   A   If it becomes necessary to do, I inform the
25  patient.  And some of them will say, "Let's do it a different

John M. Thorp, Jr., M.D.     Volume 2, 11/20/13

Page 154

1  day. It's elective." And others will say, "No, if Dr.
2  So-and-So is here, I'm happy with that." I think there's an
3  expectation with elective procedures that there be continuity
4  of care, and I think that's a reasonable expectation.
5       Q  What does the fact that it's an elective procedure
6  have to do with it?
7       A  Because you schedule an elective procedure. It's
8  not that somebody comes in here and shoots me with a gun and
9  I have to go get trauma surgery with a belly full of diet
10  Coke. It's that I chose to get something done tomorrow or
11  Monday or Wednesday. It doesn't matter which day it was
12  done. It's elective.
13       Q  And so are you saying, though, that patients don't
14  assume, in the case of nonelective procedure, that their
15  practitioner would have privileges?
16       A  Well, I didn't say that they--we were talking
17  about continuity of care, of which privileges is a part. And
18  I think the trauma surgeon who would care for me if I was
19  shot or in a wreck today--I hope somebody would care for me--
20  I don't have an expectation that they're not going to their
21  mother-in-law's first thing in the morning. But for an
22  elective thing, I would want continuity of care.
23       Q  So you're saying that for something that's not
24  elective, that's not critical?
25            Mr. Parker:     Object to the form.

Page 155

1       A  Well, it would be nice, but it's impossible to
2  arrange.
3       Q  Because in those cases patients need the care;
4  right?
5       A  In those cases patients need the care and there's
6  no choice exercised in when the care occurs because I acutely
7  need the care or I will die or suffer a serious harm if I'm
8  not cared for now.
9       Q  And so the physicians who are available to provide
10  care are going to be the best providers at that point; right?
11       A  They're the only providers. I don't have another
12  choice. When I have a termination of pregnancy--not that I
13  will ever be pregnant, but when I have an elective surgical
14  procedure like termination of pregnancy, I choose when,
15  where, and who.
16       Q  You mentioned a conversation you'd had with the
17  patient who had had---
18       A  (interposing) A hysteroscopy.
19       Q  ---a hysteroscopy.
20            The Witness:     (addressing the Reporter)
21  H-y-s-t-e-r-o-c-o-p-y.
22            The Reporter:     You left out an "s."
23            The Witness:     Okay, thanks. She ain't bad.
24       Q  And so with that patient, you said you'd had a
25  conversation with her where she said she wishes her doctor

Page 156

1  were there; right? So she didn't mention privileges. Is
2  that what your testimony is?
3       A  Well, she didn't mention privileges, but it would
4  be impossible for her doctor to be there at her bedside
5  without privileges. You can't care for somebody in an acute
6  care hospital at their bedside unless you're privileged. So
7  I think she was de facto asking, "I wish my doctor were here
8  and could be involved in my care," thus would need to be
9  privileged.
10       Q  Okay. But she didn't use those words. Those were
11  your words, the privileged part of it?
12       A  No. I don't think most patients have any under-
13  standing of privilege. I think they want their clinician to
14  be there who electively operated on them.
15       Q  And the physician, though, could be there without
16  privileges; right? They just couldn't provide care?
17       A  Well, they can't provide care and with HIPAA and
18  all the stuff that happens in hospitals now, it's difficult
19  for them to be even peripherally involved in the care other
20  than to relay part of the story. They're treated like a
21  visitor as opposed to a caregiver.
22       Q  You mentioned before--when you were talking about
23  why patients would expect their providers to have privileges,
24  you mentioned that they would expect their provider to at
25  least--the quote was "begin to address the complication."

Page 157

1  What did you mean by that?
2       A  Well, exactly what I said is what I meant.
3       Q  And so could--do you mean that they could begin to
4  address the complication at the time that it took place in
5  the outpatient center?
6       A  Well, at the time it became manifested, at the
7  time it showed up, and be involved in their care to the
8  fullest extent possible. And I think in many instances
9  that's going to require privileges, if it involves
10  hospitalization. Some complications can be handled in the
11  office.
12       Q  Right, which we talked about yesterday.
13       A  Yeah.
14       Q  But I guess, as we also just talked about earlier
15  today, in some cases the care that's required in treating the
16  complication would be better provided by another specialist.
17  And so the patient doesn't assume that their provider will be
18  the doctor providing care all the way through; right?
19       A  I didn't say would provide all of the care. I
20  said start, initiate the care, and do to the fullest extent
21  he or she is capable.
22       Q  Okay. And at some point if the---
23       A  (interposing) So I don't expect a trauma surgeon
24  to do my autopsy. I want him to keep me from getting an
25  autopsy.

Page 158

1    Q    But short of that---
2    A    (interposing)  But if he fails, then another
3  discipline will become involved in the care, and I hope I
4  have a corpse and a soul, in the care of my corpse.  But
5  there remains an adventure to find out whether that's true or
6  not.
7    Q    Because there are specialists who might be the
8  better provider of care in some instances?
9    A    Of specialty care, but the person who knows the
10 story best or should know the story best is the surgeon that
11 did the initial procedure.  And so at least at the beginning,
12 if not the full care, he or she needs to be involved.  I
13 think that's what Alabama is trying to make happen or
14 increase the likelihood of happening.
15   Q    And so is it your opinion that most patients
16 believe that their general practice physicians have staff
17 privileges at a local hospital?
18   A    Well, I think in a suburban-rural state like North
19 Carolina, most of them do.
20   Q    Well, how do you know what patients in a suburban-
21 rural state like---
22   A    Because I happen to live here.
23   Q    Sorry; I thought you meant--I thought you were
24 saying Alabama.
25   A    I said North Carolina.

Page 159

1    Q    You did, and that was my mistake.
2    A    I didn't say anything about Alabama.
3    Q    That was my mistake.
4    A    And then my master's project at Duke, we looked at
5  end of life decision making and communication between ER
6  providers, primary care doctors, and hospitalists, urban
7  areas in North Carolina like Durham and Chapel Hill
8  primary care doctors.  Many of them don't have hospital
9  privileges.  In rural and suburban settings, most of the
10 primary care doctors do.  I think it is very, very
11 disappointing to people when their primary care doctors don't
12 show up and the hospitalist team takes care of them.
13         I also know from my master's degree at Duke that
14 the hospitalist team has a heck of a time figuring out what's
15 going on, what conversations have ensued, what the plans are.
16 And that's what we addressed was a communication gap, that
17 communication gap and its link to dissatisfaction, excess
18 expense, and in some instances poor outcomes.
19   Q    And so going back, you were saying that patients
20 are disappointed when they find out that their provider
21 doesn't have privileges.  Was that based on the two
22 conversations you mentioned before, the hysteroscopy patient
23 and the abortion patient?
24   A    And in the master's degree at the Duke and the
25 people that we talked to.  We looked at--Raleigh Community

Page 160

1  Hospital was the site.  People were disappointed when--
2  particularly older people; maybe they're not as smart as
3  younger people--when their doctor, who they had been seeing
4  or they had told their plans for what they wanted done at the
5  end of their lives, wasn't around.  It was very frustrating
6  to the hospitalist because oftentimes they couldn't get the
7  information.  So there's a big communication gap in these
8  handoffs.
9    Q    Now, you were studying--you were studying this in
10 part because there is a trend toward use of hospitalists;
11 correct?
12   A    Yes, but I'm not sure it's a good trend.
13   Q    And you were looking at ways to improve a
14 communication gap; right?
15   A    Yes, ma'am, I think so.
16   Q    And that's something that's occurring in different
17 medical specialties; right?
18   A    I think so.
19   Q    One question I had--you were talking before about
20 a provider lacking privileges, not being able to participate
21 in the care of a patient.  You mentioned HIPAA as one thing
22 that made it difficult for that provider to be involved in
23 the patient's care.  Can't a patient waive that HIPAA barrier
24 and allow her physician to get information?
25         Mr. Parker:    Object to the form.  Objection.

Page 161

1    A    She can waive it, but in a busy emergency room
2  where a clinician is responding to a complication that may or
3  may not be acute, oftentimes the last thing on his or her
4  mind is a HIPAA waiver so I can go out in the waiting room
5  and talk to the treating physician, operating physician.
6    Q    Right, but---
7    A    (interposing)  So yes, she can waive it.  But it--
8  HIPAA limits a lot of conversations.
9    Q    But if it were medically necessary, there are ways
10 to have those conversations; right?
11   A    There are ways to have it, but I don't think that
12 most medical personnel appreciate HIPAA.  And they're so
13 frightened by the legal implications that a lot of times they
14 just don't talk to anybody about anything because they don't
15 understand--I think it's had a disincentive to communication.
16   Q    Right, but if it were medically necessary, a
17 physician would do that, would communicate or get a waiver if
18 it was necessary; right?
19   A    Could.
20   Q    Are there--you mentioned that there were primary
21 care providers who no longer have privileges in the urban
22 settings.  Are there gynecologists who no longer do OB and
23 don't maintain privileges?
24   A    I think most of them want to operate in a
25 hospital.  In fact that's a major source of their livelihood,

Page 162

1   so I'm not familiar with such--of such.
2        Q   Will you turn to paragraph 24 in your report,
3   Exhibit 1, which is at page 13?
4        A   Yes, ma'am.
5            (Witness complies.)
6        Q   The last sentence in that paragraph says, "In
7   addition, the checks and balances"--sorry; it's the last two
8   sentences in that paragraph.  "In addition, the checks and
9   balances for auditing patient outcome in the hospital setting
10  are less likely to be found in ARHCs."  Actually, I'll just
11  read that one sentence.  Did I get that right?
12       A   Yes, ma'am.
13       Q   What do you mean by that?
14       A   I think that hospitals typically have more
15  resources and can dedicate more resources to quality
16  improvement.  They see a larger number of patients, have more
17  data on practice patterns, and I think as a general rule tend
18  to do better quality improvement than do--than do free-
19  standing surgical centers.
20       Q   And what's the basis for that opinion, that
21  hospitals do a better job of quality improvement than
22  freestanding surgical centers?
23       A   Well, I don't think that's what I said.  I think
24  they have more resources that they could dedicate to that.  I
25  don't know of ambulatory surgery centers that have large

Page 163

1   quality improvement programs, multiple quality improvement
2   staff like the hospitals that I've worked in and am familiar
3   with.
4        Q   So you don't mean that auditing patient outcome
5   isn't occurring in outpatient settings; right?
6        A   No, ma'am.
7        Q   You just think---
8        A   (interposing)  And I imagine that there are
9   outlier outpatient settings that may do better than
10  hospitals, if they're really motivated. but to do quality
11  improvement audits cost money.  And hospitals seem to be the
12  entities within the health system these days that have money
13  to spend and make money, plus I think there are portions of
14  the Affordable Care Act that require them to do.
15       Q   And I--the incentives of the malpractice system
16  are powerful as well; right?
17       A   To do quality improvement?
18       Q   To do quality improvement.
19       A   I don't think that malpractice influences anybody
20  to do quality improvement because I think malpractice is a
21  fault based system.  Quality improvement tends to be an error
22  preventability system.  So I think the two often have a
23  negative influence on the other.
24       Q   Do you have any basis for knowing what type of
25  auditing of patient outcome takes place in the abortion

Page 164

1   clinics in Alabama?
2        A   No, ma'am.
3        Q   And do you know anything about what's required by
4   Alabama regulation for auditing in Alabama?
5        A   I don't recall anything, ma'am.
6        Q   So explain to me how privileges matters to the
7   subject of auditing patient outcome.
8        A   I work in an ambulatory procedure center and I'm a
9   staff provider.  And my complications are cared for in the
10  hospital, let's say postoperative reoperation.  Then at least
11  there is an entity that has numerator data on how often that
12  occurs.
13           And if I am an outlier and have a particularly
14  large number, denominator data can be sought and one can see
15  whether I'm really an outlier or just a really busy person.
16  And if I am an outlier, if I have a high number of complica-
17  tion rates, hospital staffs tend to remediate people or
18  revoke their privileges.
19       Q   But all of that could take place in an outpatient
20  setting; right?
21       A   It all could take place, though the outpatient
22  setting, because it's not a receiver of all the complica-
23  tions, might not know about a complication, might be unaware
24  of a complication that presented to the hospital, was cared
25  for, and maybe the person didn't even say she'd had a

Page 165

1   termination of pregnancy.
2        Q   Well, then how would hospital privileges make a
3   difference to that?
4        A   Well, it wouldn't make patients honest, but--and
5   so it wouldn't solve it in that sense.  But you--you would be
6   able to identify people with high numbers and then get to try
7   to see what is their percentage.
8            If I do--I may have a 1 percent infection rate,
9   which is perfectly great, do 3,000 of whatevers and have 30
10  people that need treatment for infection and can go seek
11  denominator data.  So I think it's part of a quality
12  improvement process.
13       Q   But what about providers who primarily provide
14  care in an outpatient setting?  How---
15       A   (interposing)  Well, I think that the problem is
16  that their complications, their serious complications, are
17  handled in an inpatient setting.
18       Q   Well, but the hospital is auditing--the hospital
19  is auditing patient outcomes in the hospital; right?
20       A   Well, it's auditing numerator data postop,
21  whatever.
22       Q   And so I guess what I'm getting at is a hospital--
23  neither--in your testimony neither the hospital nor the
24  outpatient provider would necessarily have a full picture of
25  patient outcomes?

John M. Thorp, Jr., M.D.     Volume 2, 11/20/13

Page 166

1      A   Neither would have a full picture.
2      Q   So I guess your testimony, you would want to have
3   auditing done in both locations; right?
4      A   True.
5      Q   Let's turn to paragraph 23 of your report,
6   starting on page 12.
7      (Witness complies.)
8      Q   On the top of page 13, you talk about JCAHO.  Is
9   that how you pronounce it?
10     A   Yes, ma'am.
11     Q   You talk about JCAHO---
12     A   (interposing) I can tell you've dealt with them
13  before.
14     Q   Occasionally--and what they have to say about
15  provider credentialing.  And you say, "According to the Joint
16  Commission on Accreditation of Healthcare Organizations
17  (JCAHO), this process is intended to assure patient safety by
18  permitting only qualified physicians to provide such care."
19  What do you mean by such care?
20     A   Well, I think it references "is an important"--the
21  preceding sentence, "an important"--"is an important process
22  that determines which physicians may admit or perform
23  procedures at a given inpatient healthcare facility."  So it
24  sets minimal standards for me to claim that I can do
25  something and do it.

Page 167

1      Q   But by that you mean procedures that are provided
2   in the inpatient hospital setting; right?
3      A   Yes, ma'am.
4      Q   And so what about physicians who only provide care
5   in outpatient settings?
6      A   What about them?
7      Q   Well, what would hospital privileging say about
8   those physicians and their ability to provide care?
9      A   I think it would depend on their training and
10  experience and past performance as to what they would be
11  allowed to do or not to do.
12     Q   But the credentialing is for purposes of providing
13  procedures in the hospital setting; correct?
14     A   Well, providing care in the hospital setting,
15  which is where the serious complications are headed from
16  termination of pregnancy.
17     Q   But what about--again, how do physicians who
18  provide care only in outpatient settings demonstrate
19  competency in those procedures that they're providing in
20  those outpatient settings?
21     A   Well, one, they would claim competency, and two,
22  they would provide evidence of competency.
23     Q   What about--I know there are abortions that are
24  performed in your hospital, but what about in a case where a
25  hospital does not allow abortions to be performed?  If an

Page 168

1   abortion provider was seeking privileges at that hospital,
2   how would that abortion provider go about and obtain
3   privileges when the majority of his or her practice was
4   providing abortions?
5      Mr. Parker:     Object to the--objection.
6      A   Like any other person, apply for them.
7      Q   But the procedure that they most often provide is
8   not one that's available in that hospital.
9      A   I don't understand what you're asking.  If they
10  wanted GYN surgery privileges to be able to perform a
11  hysterectomy, they would have to give evidence that they had
12  performed hysterectomies safety, efficiently, been trained,
13  and maintained their skill levels.
14     If they had never performed a hysterectomy, they
15  wouldn't merit privileges to perform a hysterectomy and would
16  either have to retain, retool, or not have GYN surgical
17  privileges.  I voluntarily relinquished my GYN surgical
18  procedures.  Thus I don't do that.  I can't--I'm not
19  credentialed to do that.
20     Q   Well, let's---
21     A   (interposing) If I was going to go somewhere
22  where I wanted to do it, I would probably have to reprove to
23  a credentials committee that I was competent to do so,
24  probably by operating with somebody or doing some sort of
25  tutorial.

Page 169

1      Q   Well, then let's talk about an abortion provider
2   who's been primarily providing abortions and so has not done,
3   to cite your example, hysterectomies.
4      A   Okay.
5      Q   They would not be able to get privileges to
6   provide hysterectomies; right?
7      A   But they could get privileges to care for
8   complications prior to those that needed surgical management.
9      Q   But what would those privileges be for?
10     A   History, physical, ordering lab tests, ordering
11  imaging.  None of the internists on the medical staff I hope
12  don't have surgical privileges, so within the scope of what
13  they're capable of doing.
14     Q   Right.  But what if they're an OB-GYN?  Does your
15  department give out GYN privileges just to do those things
16  that you listed?
17     A   I have GYN procedures just to do those things that
18  I listed.
19     Q   Do you have privileges to do other procedures?
20     A   What do you mean?
21     Q   In other words, you have privileges to do those
22  things.  Do you have privileges to do other things as well as
23  a GYN?
24     A   I don't have privileges to do GYN surgery outside
25  the office setting, but I could begin the care of somebody

John M. Thorp, Jr., M.D.    Volume 2, 11/20/13

---

Page 170

1  who presented with a complication.  I could take her history.
2  I could take her physical.  I could order lab tests.  I could
3  order diagnostic tests.  I could interpret those tests.  I
4  could involve consultants.  I could go to the OR and see
5  whether what I thought was there was there.  I can't do the
6  operation.
7      Q   Right.  At that point you transfer care to a
8  colleague to do the operation, if it were necessary?
9      A   Yes, ma'am.  But I could be involved in the
10  initial care and I think would be crucial to the initial care
11  if I were the person who had done the elective office
12  procedure.
13      Q   Well, are you aware that the Alabama law at issue
14  here doesn't just require admitting privileges?  It requires
15  the physician to have staff privileges to perform certain GYN
16  procedures.  Are you aware of that?
17      A   No, ma'am.
18      Q   And so the law requires, in order to provide an
19  abortion, that a provider have privileges to provide
20  hysterectomy, laparotomy, and other--I think D&C and other
21  procedures that might reasonably be needed to treat an
22  abortion complication.
23          A doctor who only provided--who only provided
24  abortions or primarily provided abortions and has as a result
25  not done a hysterectomy in a long time would have difficulty

---

Page 171

1  getting privileges to do a hysterectomy; correct?
2      A   Yes, ma'am.
3          Mr. Parker:    Object to the form.
4      A   Or would have to go through a process to--if he or
5  she was otherwise trying to do so, to prove that he or she
6  was competent.
7      Q   Because--and this is coming from JCAHO in part--
8  that hospitals want their providers who have privileges to
9  demonstrate competency to perform the specific procedures
10  that they have privileges to provide; right?
11      A   I would never want to presume to speak for JCAHO,
12  but that's my understanding.
13      Q   Okay.  I wanted to ask you--well, let's turn to
14  page 14, paragraph 25.
15          (Witness complies.)
16      Q   The first sentence there says, "When the TOP
17  provider is an ob-gyn and has staff privileges at a local
18  hospital, he or she is more likely to effectively manage
19  patient complications by providing continuity of care and
20  decrease the likelihood of medical errors."  Is that correct,
21  what I read?
22      A   You read really well.
23      Q   My parents would be pleased to hear that the money
24  spent on my education was well spent.  And so this opinion
25  assumes that the abortion patient would be seen at the

---

Page 172

1  hospital where a provider would have privileges; correct?
2      A   Yes, ma'am.
3      Q   So what if the provider did not have privileges at
4  the closest hospital to the clinic?
5      A   I don't understand the question.
6      Q   So in other words, say--let's go back to the
7  hypothetical of a patient with the perforation and a
8  suspected bowel injury.  If the provider had privileges at a
9  local hospital, but it wasn't the closest hospital---
10      A   (interposing)  The closest hospital to what?
11      Q   To the clinic.
12      A   Okay.
13      Q   And so what would happen in terms of continuity of
14  care if the patient was transferred to the closest hospital,
15  which is not where the provider had privileges?
16      A   So the termination of pregnancy place is here
17  (indicating).  Hospital A is 5 miles away and Hospital B is
18  10 miles away.
19          The Reporter:    Off the record.
20          (Discussion off the record.)
21          The Reporter:    On the record.
22          By Ms. Flaxman:
23      Q   So let's make this one 20 miles, B, if that's okay
24  with you?
25      A   We'll make it 20.

---

Page 173

1      Q   20 miles.  What would happen in terms of providing
2  continuity of care if the patient went to Hospital A instead
3  of Hospital B where the patient has--I mean, I'm sorry, where
4  the provider would have privileges?
5      A   Well, I think it depends on the acuity of the
6  situation.  So suspected bowel perforation that occurred
7  during the procedure I would think could be assessed at
8  either hospital and that the difference in travel time would
9  not make any difference.
10          If somebody shows up, suspected perforation and
11  acute abdomen and peritonitis, I think the provider at the
12  termination of pregnancy center would want to go to the
13  hospital where he or she didn't have privileges and would--
14  because of the acuity of the situation would surrender--would
15  fold on the continuity of care phenomenon.
16      Q   But how would the provider in that case ensure
17  that the patient received good care, have a conversation with
18  the hospital?
19      A   He or she would need to do--have the conversation,
20  send the medical records, be available.  It would be a
21  substitution of judgment.  I'm sure when Reagan was shot on
22  the Blue Line, he was glad that George Washington was there
23  and that the Secret Service made a decision to not take him
24  to Walter Reed or the National Naval Medical Center, where I
25  think presidents historically get treated.  He would have

---

John M. Thorp, Jr., M.D.        Volume 2, 11/20/13

Page 174

1    probably been dead if they'd taken him to--so I don't think
2    this privileging--that the advantages of this communication
3    outweigh all other considerations.  I think they're one of
4    many to take into account.
5        Q    But in that case the patient would get taken care
6    of in Hospital A even though the providing physician didn't
7    have privileges at the hospital?
8        A    I would hope so.
9        Q    And what about--let's talk about complications
10   that may arise after discharge from an outpatient center.
11       A    Yes, ma'am.
12       Q    As I'm sure you're aware, many women who obtain
13   abortions travel some distance to an abortion provider.  And
14   so those patients, if they experience complications after
15   discharge, will be away from the abortion clinic where they
16   obtained the abortion.
17            What hospital should an abortion provider send a
18   patient experiencing complications to after hours?  Would it
19   be the one that's closest to her or would you say she should
20   come back into town to go the hospital where her provider had
21   privileges?
22       A    Well, I think it's a judgment call, the same
23   judgments we talked about earlier.
24       Q    And so you think if she needs to see somebody on
25   an urgent basis, you would advise her to go to the hospital

Page 175

1    closest to her?
2        A    Yes, ma'am.
3        Q    And what would you---
4        A    I think every doctor's office I call tells me
5    that.
6        Q    So you've had experience with that?
7        A    Well, "If you're experiencing a medical emergency,
8    hang up and dial 911."  How many times do they say that?
9        Q    Well, let me ask you this--I hate to---
10       A    (interposing)  I've tried to get it off of my
11   phone and they won't---
12       Q    Liability.
13       A    But what's the liability, that an idiot doesn't
14   know if you're having an acute--"Oh, I'm going to wait here
15   and die."
16       Q    Let me ask you, in your practice do you see---
17       A    (interposing)  I can't get it off the phone in my
18   practice.  It makes me so mad every time I hear it.
19       Q    Changing the subject---
20       A    (interposing)  Urban legend.
21       Q    ---only slightly, in your practice do you have
22   patients--let's talk about your high risk obstetrical
23   practice.  Do you have patients who live closer to another
24   hospital than they live to yours?
25       A    Many.

Page 176

1        Q    And have you ever advised a patient to seek care
2    at a hospital where you don't have privileges?
3        A    I do it on the--I just told you I did it on the
4    phone all the time.
5        Q    And so a patient calls.  What's an example of a
6    time where you might advise a patient to go to a hospital?
7        A    Somebody lives 90 minutes away.  She thinks
8    she's--she doesn't know whether she's in labor or not.  It
9    costs 50 bucks to drive to see me.  Can she stop by the labor
10   and delivery in New Bern and get her cervix checked?  Yeah.
11       Q    And so what do you do in those cases?
12       A    Call Labor and Delivery in New Bern, tell them the
13   situation, send--usually fax them her records and try to find
14   out what they think, try to communicate, try to save her a
15   trip.
16       Q    And do they communicate back to you?  Do they give
17   you a call if they need to find out more about the patient?
18       A    They usually really want me to take care of the
19   patient, so yeah, they're very communicative.
20       Q    So if--let's say they checked her cervix and she
21   was dilated and needed to go up to delivery.  Then another
22   doctor at that hospital would do the delivery; right?
23       A    Yeah.  If she's complete and ready to push, they
24   shouldn't put her in the car and send her to Chapel Hill.
25       Q    If it were me, I would have delivered in the car

Page 177

1    on the way there, so I---
2        A    Have you delivered in a car?
3        Q    I have not, but it was close with my second.
4        A    Which hospital in Washington?
5            Ms. Flaxman:    Off the record.    4:00 p.m.
6    (Discussion off the record.)
7            The Reporter:    On the record.    4:14 p.m.
8                (Exhibit 7 was marked for
9                identification.)
10           Ms. Flaxman:    For the record, we have marked
11   as Exhibit 7 the diagram that Dr. Thorp graciously drew for
12   us of distances between hospitals and the abortion clinic.
13   And it was what he referred to in discussing where an
14   abortion patient would go if that patient was experiencing a
15   complication.
16           By Ms. Flaxman:
17       Q    Dr. Thorp, if you would turn to page 21 of your
18   report?
19           (Witness complies.)
20       Q    This is a continuation of paragraph 38 at the top
21   of the page.  You express, the third full sentence, your
22   opinion that "Family practice physicians, despite their
23   commitment to providing reproductive health services, are
24   simply not adequately trained and experienced to perform
25   TOPs."  Is that your opinion, sir?

Page 178

1   A   Yes, ma'am.
2   Q   What is the basis for that statement?
3   A   My experience in academic medicine and long-
4   standing participation and work with our family practice
5   residents.
6   Q   Are you aware of any studies?
7   A   No, ma'am.
8   Q   Are you aware that there are family practice
9   physicians who provide abortions?
10   A   Yes, ma'am.
11   Q   Is your concern about family practice physicians
12   about training to perform the abortion procedure or lack of
13   training in providing care in the event of complications?
14   A   Both.
15   Q   Aren't D&Cs part of their training?
16   A   Not necessarily.
17   Q   If a family practice physician had training in
18   D&Cs, would that make them qualified to perform an abortion?
19   A   I would answer half the equation.
20   Q   So it would make them qualified to perform the
21   abortion; correct?
22   A   Well, it would give them competency in
23   performance, but I think part of elective surgery is ability
24   to address or begin to address complications that experience
25   them.

Page 179

1   Q   Could a family practice physician acquire that
2   training and experience?
3   A   I don't think it's a common part of family
4   medicine training or the family medicine training programs
5   that I'm aware of, but I imagine they could.
6   Q   And you testified yesterday that family practice
7   doctors were delivering babies in Asheville; right?
8   A   And in Chapel Hill.
9   Q   Oh, okay.  Are they in your--no, I guess they
10   wouldn't be in your department.
11   A   They're in our labor and delivery, as are
12   midwives.
13   Q   And are they trained to handle--both the family
14   practice doctors and the midwives, are they trained to handle
15   all the complications that might occur after a delivery?
16   A   They are not.
17   Q   And so what happens if one of their patients
18   experiences a complication after delivery?
19   A   They work with us.  They're trained to recognize
20   the complications and begin initial treatment.
21   Q   And so if a family practice doctor were trained in
22   abortion and trained in recognizing the symptoms--recognizing
23   the complications and beginning initial treatment, in your
24   opinion they would be qualified to provide an abortion?
25   A   Yes.

Page 180

1   Q   Let's turn to page 17, paragraph 32 of your
2   report.
3       (Witness complies.)
4   Q   You mention in this paragraph that you reviewed
5   deficiency reports from the Alabama Department of Public
6   Health for abortion clinics in Alabama.  Do you recall doing
7   so?
8   A   Yes, ma'am.
9   Q   Did you review those reports while you were
10   preparing your expert report in this case?
11   A   Provided to me as part of the conversations that
12   led up to the expert report.
13   Q   Do you recall how many deficiency reports you
14   reviewed?
15   A   I don't have an independent recollection.
16   Q   And do you remember which clinics you looked at?
17   A   No, ma'am.
18   Q   You cite here--the cite for that review is to
19   footnote 33 at the bottom of page 17?
20   A   Yes, ma'am.
21   Q   You said that those reports are available at
22   abortiondocs.org.  Is that where you reviewed those
23   deficiency reports?
24   A   They were provided to me by counsel I think in a--
25   as a scanned document or a paper document sent to me.  I

Page 181

1   don't know which.
2   Q   Okay, so you didn't refer--you didn't--you just
3   cite there to abortiondocs.org, but you didn't review it on
4   that web site?
5   A   I don't think I've gone to that web site.
6   Q   Staying with that paragraph--well, the remainder
7   of that sentence--it says after reviewing those deficiency
8   reports "it is not difficult to understand the Legislature's
9   concerns and the basis for the Act's legislative findings."
10   Do you see that there?
11   A   Yes, ma'am.
12   Q   Number (2) under that, you cite to the legislative
13   finding that "At abortion or reproductive health centers,
14   patients are often treated in a manner inconsistent with a
15   traditional physician/patient relationship."  Do you recall
16   reviewing any deficiency reports that bore on that finding?
17   A   I do not.
18   Q   And on the top of page 18, it's the third
19   legislative finding.
20   A   Yes, ma'am.
21   Q   Do you see that?  It says, "Abortion or
22   reproductive health centers are not operated in the same
23   manner as ambulatory surgical treatment centers or physician
24   offices."  Do you recall reviewing any deficiency reports
25   that related to that finding?

John M. Thorp, Jr., M.D.    Volume 2, 11/20/13

Page 182

1    A  I do not.
2    Q  Do you recall if any of the deficiencies related
3  to a physician performing a procedure that he or she was not
4  qualified to perform?
5    A  I don't recall.
6    Q  And are you aware of any specific examples of
7  patients not receiving treatment for postabortion
8  complications in Alabama?
9    A  No, ma'am.
10    Q  Are you aware of the requirement in Alabama law
11  that abortion clinics have an agreement with a backup doctor
12  who has privileges?
13    A  I think counsel has mentioned that to me.
14    Q  And does that change your opinion about the
15  necessity of the providing physician?
16    A  No, ma'am.
17    Q  Why is that?
18    A  Ask the question again.
19    Q  Why--there's a requirement--the plaintiffs in this
20  case, all the abortion clinics in this case, have an agree-
21  ment with a backup doctor who has privileges at a local
22  hospital.
23    A  Yes, ma'am.
24    Q  That fact did not change your opinion about the
25  necessity of all physicians having admitting privileges?

Page 183

1    A  Does not.
2    Q  Let's turn to paragraph 28, which is on page 15.
3    (Witness complies.)
4    A  I'm there.
5    Q  Okay.  You talk at the end of that paragraph about
6  the provider of the abortion gaining that patient's
7  confidence prior to the TOP and being most familiar with her
8  future reproductive plans.  And then you say, "Her future
9  plans are often crucial in decision making when treating a
10  serious complication."  Is that your opinion?
11    A  It is.
12    Q  And what's the basis for it?
13    A  My experience.
14    Q  How would future reproductive plans be crucial in
15  decision making?
16    A  Well, the most readily thought about example--I'll
17  answer with an example--would be if a hysterectomy were
18  entertained to treat a complication or thought to be one of
19  the options.  The threshold to do that would be lower in
20  somebody who had multiple children and was considering
21  sterilization versus a woman that it was her first child.
22    I think in the midst of complications, hemorrhage,
23  infection, and the like, that thinking can--those thoughts
24  can become distorted.  So the surgeon who talked to the
25  patient when she was in the light of day, not experiencing a

Page 184

1  complication, and found out about sort of what her hopes and
2  plans were is best qualified, has information obtained
3  apriority that can inform that discussion.
4    Q  So in that sentence you're referring to possible
5  hysterectomy as a treatment for a complication?
6    A  No.  I gave you an example of a hysterectomy.  I
7  can probably think of another example.
8    Q  Okay.  Are there other examples?
9    A  I think infection would be an example and how
10  aggressively one treated an infection or not.
11    Q  How could knowing a woman wanted to have
12  additional children bear on treatment of an infection?
13    A  I think I would treat it longer and more
14  aggressively to prevent any postinfection diminution of her
15  reproduction, so IV antibiotics longer in the hospital than
16  somebody whose family was, quote, complete, say at the end of
17  her reproductive life, who you might could prevent serious
18  sequelae with antibiotics by mouth, but wouldn't necessarily
19  maintain her fertility.  So infection would have an
20  implication.
21    Transfusion would have an implication and its
22  impact on isoimmunization about what a person's future
23  reproductive plans were or weren't.  So it would be a factor
24  to consider in multiple different complications of which I
25  chose hysterectomy as the first.

Page 185

1    Q  Are there any others you can think of now?
2    A  No.  I thought I did good coming up with three.
3    Q  Two; right?
4    A  I think I gave you three.
5    Q  Hysterectomy, infection---
6    A  (interposing)  Hysterectomy, infection,
7  transfusion.
8    Q  Okay.  And then how would transfusion make a
9  difference?
10    A  Transfusion carries with it a risk of isoimmuniza-
11  tion, of developing irregular antibodies that in a subsequent
12  pregnancy can cross the placenta and cause hemolytic disease
13  in the fetus.  And so I think your threshold to transfuse
14  would be higher in somebody who had no children or who wanted
15  more children than it would be in somebody who said, "My
16  family is complete."
17    Q  Now, all of this would only matter if the patient
18  were also unconscious; correct?
19    A  No.  I think it--I don't think it matters--I don't
20  think consciousness necessarily matters.
21    Q  Well, if she's awake, you can ask her, "What are
22  your plans for future childbearing"; right?
23    A  I think in the midst of a complication and
24  hospitalization, many of us say, "I'm never doing this again
25  because I'm hurting.  I have a fever.  I'm going to have to

John M. Thorp, Jr., M.D.        Volume 2, 11/20/13

Page 186

1    undergo a second surgical procedure. I'm never going to get
2    pregnant again." So I would put more weight on what was said
3    in the time when there was not a complication. I think
4    complications influence people's short term thinking.
5        Q   But ultimately---
6        A   (interposing) Even conscious people.
7        Q   But ultimately a conscious patient, if she wanted
8    you to choose the path that would you think potentially
9    endanger future childbearing, you would have to follow her
10   wishes; right?
11       A   And I think you have a higher likelihood of regret
12   in following somebody's wishes, wishes that are made after a
13   complication has occurred as opposed to before a complication
14   occurs.
15       Q   What I'm saying is even if--even if the doctor
16   providing care--you know, just as a way of an example, if
17   there was a serious complication after one of the outpatient
18   gynecological procedures you've performed and you were
19   treating that complication in the hospital and you reached
20   one of the decision points that you just mentioned in terms
21   of choosing care or not that might preserve future
22   childbearing, even if you knew from previous interactions
23   with that patient that she wanted to have more children, if
24   she said to you in the moment, "Do X. I don't want to do
25   this again," you would have to do X; right?  And so the

Page 187

1    knowledge that she wanted to have---
2        A   (interposing) I don't think it would be binary.
3    And I think I would have the opportunity to say "Now, let's
4    go back and reflect on what your intentions were before you
5    had this bad thing happen to you, this complication. You
6    thought this. In the midst of this complication you're
7    saying that. That makes me fear that you're at increased
8    risk for regret for this decision. Should we rebalance it,
9    reconfigure it? Should we talk to your family? Do you want
10   to talk to"--you know, "Let's think about this further."
11       Q   So it's about the reflection, the opportunity to
12   have that reflection?
13       A   I think the opportunity to have that reflection is
14   really important.
15       Q   Well, she could have---
16       A   (interposing) And I think to have the knowledge
17   of the prior conversations made before the complication
18   occurs is really important.
19       Q   She could have family that are anywhere, though;
20   right?
21       A   Ask me that again, please.
22       Q   So in other words---
23       A   (interposing) "You might want to call your mom or
24   you might to call your rabbi. You might want to call your
25   best friend. You might want to"--"Let's really think about

Page 188

1    that."
2        Q   Right, but you can do all those things without
3    having had the previous conversation with them; right?
4        A   But I need to have the knowledge of the previous
5    conversation.
6        Q   Well, what if it's a, you know, 28-year-old woman
7    facing this choice? Wouldn't you encourage her to include
8    those folks in her decision anyway?
9        A   I would encourage anybody to include those people.
10   I would insist that she get an outside opinion from somebody
11   she trusted about such a personal and important decision,
12   particularly if something irreversible were about to take
13   place.
14       Q   Oh, I want to go back to one thing you said
15   yesterday. When you testified about the complications from
16   abortions that you had treated over the years, were those
17   complications all short term complications or were some of
18   them long term complications?
19       A   I've treated multiple long term complications that
20   I believe were at least in part due to termination of
21   pregnancy.
22       Q   So when you mentioned--I think you said around 100
23   or so complications that you had treated, leaving aside your
24   experience as a resident, were--how many of those were short
25   term versus long term?

Page 189

1        A   Well, if my memory serves me correct, you
2    specifically restricted the question to short term. Long
3    term I would say many, many more.
4        Q   Okay. So you were referring at the time to short
5    term?
6        A   Yes, ma'am.
7        Q   Okay. Let's go to page 18, paragraph 34.
8        (Witness complies.)
9        Q   You say in the middle of that paragraph that "In
10   the medical center where I practice at UNC, good inter-
11   physician communication is not the case except for those
12   physicians who are on our staff." Will physicians on staff
13   at the same hospital necessarily know each other?
14       A   Not necessarily.
15       Q   And so do you know all of the physicians at your
16   hospital?
17       A   I don't think so.
18       Q   So how is inter-physician communication better by
19   being on staff together?
20       A   I think there's common culture, a common medical
21   record. There is a chain of command that one can go up if
22   somebody is not available or not responsive or you don't
23   think they're doing a good job. So I think there are
24   multiple aspects of staff privileges that enhance communica-
25   tion and ultimately patient care.

John M. Thorp, Jr., M.D.        Volume 2, 11/20/13

Page 190

1    Q   But you've testified before that physicians are
2  capable of effectively communicating pertinent medical
3  information concerning patients even to physicians they don't
4  know; correct?
5    A   Sure.  Yes, ma'am.
6    Q   Do you have any knowledge, sir, of Plaintiffs in
7  this case's complication rates?
8    A   No, ma'am.
9    Q   Do you know if there have been ever--any of
10 Plaintiffs' patients have ever suffered harm because of lack
11 of communication or poor communication with a hospital?
12   A   No, ma'am.
13   Q   And are you aware of any specific instances of
14 patient abandonment by abortion providers in Alabama?
15   A   No, ma'am.
16   Q   To save time I won't refer you to a page of your
17 report unless you need me to, but you remark in your report
18 on the inadequacy of on-call coverage by OB-GYNs in suburban
19 and rural areas.  Do you recall that or do you want me to
20 refer you to---
21   A   (interposing)  Refer me.
22   Q   Page 15 (sic), paragraph 30.
23       (Witness peruses document.)
24   A   So paragraph---
25   Q   (interposing)  So in the second--paragraph 30, the

Page 191

1  second sentence, says, "In the suburban-rural mix of Alabama,
2  to assume the ready availability of an on-call ob-gyn is less
3  likely to be true, with the exception of Birmingham and
4  Mobile, than in urban metropolitan centers."
5        Are you aware that all the plaintiffs in this case
6  are in urban population centers of Birmingham, Mobile, and
7  Montgomery?
8    A   All their patients aren't in those places.
9    Q   Well, but the law doesn't require the providers to
10 have privileges at those hospitals; correct?
11   A   It doesn't require people to have privileges at
12 those hospitals, but it does require them to have privileges
13 at a hospital that non-urgent complications could receive
14 care at, vis-...-vis Exhibit 7.  If it's not urgent, I can
15 drive the 20 miles from small town to Birmingham as opposed
16 to go to the local hospital that may only have an emergency
17 department doctor and not OB-GYN backup.
18   Q   But you've testified that you sometimes send
19 patients to their local hospital; correct?
20   A   I send them to their local hospital if they have
21 somebody in my discipline.  I don't send them to the Belhaven
22 emergency department for the moonlighting ED resident to
23 check their cervix.  I send them to somewhere that has an
24 OB-GYN.  This is--that's what I'm referring to here
25 (indicating).

Page 192

1    Q   So your opinion is not that there would be
2  insufficient OB-GYNs in Birmingham, Mobile, and Montgomery;
3  correct?
4    A   I think there are too many there and too few out
5  in the countryside.
6    Q   Is there a difference, though, for on-call
7  coverage of OBs, which is just what you were talking about
8  about your patients, versus GYNs?
9    A   I think I'm talking about OBs and GYNs in this
10 instance.  And there are emergency departments certainly in
11 North Carolina--I can name many of them--that don't have
12 OB-GYN physicians on staff and don't have the ability to do
13 anything more than triage a complication.
14   Q   But they could triage a complication and they have
15 general surgeons available; correct?
16   A   Some do and some don't.  There are some small
17 places around here.
18   Q   But you don't have any knowledge specifically of
19 Alabama hospitals?
20   A   My bet is that there are places in Alabama that
21 don't, but I don't have specific knowledge.  You're correct.
22   Q   Let me point you to page 5 of your report, jumping
23 around.
24   A   That's okay.
25   Q   I appreciate that; page 5, paragraph 8.

Page 193

1        (Witness complies.)
2    A   Yes, ma'am.
3    Q   Go actually to--well, on page 5 you talk about
4  underreporting by TOP providers.
5    A   In the U.S.
6    Q   In the U.S.  Do you think there's underreporting
7  of total numbers or complications or both?
8    A   Both.
9    Q   And can you point to any evidence of the under-
10 reporting?
11   A   Well, the reporting is voluntary and in some
12 incidents based on estimates and not actual counts.  So I
13 guess rather than say underreporting or overreporting, I
14 would think inaccurate reporting would be a more precise
15 answer.
16   Q   Is this different than other medical procedures?
17   A   Well, the one that my friend David likes to
18 compare to, which is maternal mortality, abortion related
19 mortality, it's quite different because states have maternal
20 mortality commissions that systematically seek maternal
21 deaths, link birth certificates to death certificates, and
22 uncover numerous more maternal deaths that way than they do
23 through a voluntary system of reporting.
24   Q   By your friend David, do you mean Dr. Grimes?
25   A   Yes, ma'am.  I think he would allow me to call him

Page 194

1    my friend David.
2        Q   I just wanted to clarify for the record.
3        A   I thought he was such a proverbial figure in all
4    this that he could go by first name only.
5        Q   But aside from maternal deaths, are there any
6    other medical procedures that you're aware of that rely on
7    anything other than self-reporting?
8        A   Well, I think there are states that systemati-
9    cally--I think bypass surgery in the state of New York is the
10   famous one where there's a registry count.  There are cancer
11   registries kept and certainly births and birth certificates.
12   There's mandatory reporting of live births over certain later
13   gestational age.
14       Q   But your--the procedures for example that you
15   perform in an outpatient setting, if someone wanted to track
16   complications attendant to those procedures, they would need
17   to rely on self reporting; correct?
18       A   Well, I think one of the great potentials of the
19   electronic medical record and the data warehouses that people
20   are setting up is that they ought to be able to do endo-
21   metrial biopsies in the Timberlyne office, if you could do
22   the SAS program and could get it out.  And then you would
23   have a more systematic estimate than based on my memory.
24       Q   Right, but right now, before we get to that point,
25   it would be based on self reporting?

Page 195

1        A   Our health system thinks it's sort of at that
2    point.
3        Q   Five years ago when no one was at that point, it
4    was based on self reporting; right?
5        A   Self reporting is a poor surrogate for knowing,
6    for a wide variety of reasons, many of which we've discussed
7    in this deposition.
8        Q   And the electronic records presumably will allow
9    abortion providers to more effectively track complications;
10   correct?
11       A   It would be one component that would increase--
12   that would help.  But there are other problems inherent in
13   voluntary self reports.  If a person has a complication of an
14   endometrial biopsy I did yesterday afternoon and they decide,
15   "To hell with Thorp and UNC; I'm going to the Duke emergency
16   room," till our two electronic medical records talk, we would
17   never--we would never know that.
18       Q   And you wouldn't necessarily know either---
19       A   (interposing)  I wouldn't know.
20       Q   ---from self reporting?
21       A   I wouldn't know, so I can in good faith say, "Ms.
22   Jones had a complication-free endometrial biopsy," when she
23   had a serious complication.
24       Q   So your concern about underreporting or inaccurate
25   reporting is not unique to abortion care?

Page 196

1        A   No, ma'am.  I think the claims of safety with
2    abortion care based on such inaccurate reports are what make
3    it the outlier as opposed to the inaccurate data.
4        Q   So do you think that any study that addresses the
5    complications of the medical procedure is methodologically
6    flawed when it relies on data voluntarily produced by a
7    health care provider?
8        A   I think it's limited.  Now, there are health
9    systems--and we can argue whether they're good or bad--in
10   Europe and Israel where there are unique identifiers, common
11   medical records, terminations of pregnancy are registered,
12   subsequent hospital admissions or expenditures, and there can
13   be linkage.  And I think they would provide a truer picture
14   of what the numerator and the denominator are for complica-
15   tions.
16       Q   But do you rely on complication rates in your own
17   practice that come out of studies that were created through
18   self reporting of complications?
19       A   Well, that's why I cited such a huge range of 1 to
20   10 percent and am hesitant to rely on the two small studies
21   that--when you were trying to prove to me that Fine used
22   contemporary stuff and rebut my statement that he didn't.
23   That's why I think you can only do a range.
24       Q   Let me ask you about---
25       A   (interposing)  There's inherent inaccuracy.

Page 197

1        Q   Let me ask you, though, about procedures, not
2    leaving--leaving abortion aside, procedures that you would do
3    yourself.
4        A   Yes, ma'am.
5        Q   Or even delivering or, you know, high risk
6    conditions of pregnancy.  Do you rely on studies that are
7    based on data that is voluntarily produced by health care
8    providers in assessing risk?
9        A   When that's the best data available.
10       Q   So you just mentioned that there can be under-
11   reporting or inaccurate reporting because some patients don't
12   return to their provider for follow-up care; right?
13       A   That's one problem.
14       Q   And so---
15       A   (interposing)  And some people don't report a
16   previous abortion or termination when they present for
17   follow-up care.  And some people may--and all this is known
18   from maternal mortality--if I commit suicide on day number
19   two after a termination of pregnancy, nobody may know about
20   the termination of pregnancy I had.
21           In maternal mortality, the linking of birth
22   certificates and death certificates, people know that.  There
23   are special autopsy forms to check off with pregnancy.
24   There's a real systematic effort.  A large number of maternal
25   deaths aren't appreciated by the health system.  I imagine

Page 198

```
 1   the same is true for termination of pregnancy, complications
 2   and deaths.
 3       Q   Let me ask you a question, though, about the
 4   example you just gave of an endometrial biopsy---
 5       A   Sure.
 6       Q   ---if that woman decided to go to Duke.
 7       A   Yeah.
 8       Q   So---
 9       A   (interposing) She's jumping from the frying pan
10   into the fire is all I can say.  It's really going to get hot
11   now.
12       Q   So isn't it possible you would learn about that
13   subsequent, that she would call you up and say, "I had to go
14   to Duke for this"?
15       A   It may or may not.  I think a lot of times
16   patients don't tell you.  You know, the amazing thing to me
17   is how much patients love clinicians and how forgiving they
18   are and how much they don't want to disappoint their surgeon
19   by telling him about a complication.
20       Q   Well, but if the complication--if she goes to a
21   hospital where you don't have privileges and you don't learn
22   about it, having admitting privileges is irrelevant to her
23   care in that instance; right?
24       A   Well, she didn't have the benefit of being at a
25   place where I had admitting privileges.  And ignorance is
```

Page 199

```
 1   bliss, so I continue to think I'm great.
 2       Q   So in footnote 13 of your report on page 7, you
 3   talk about--you say, "Alabama ARHCs are only required to
 4   maintain a facility postoperative call log and that any
 5   adverse conditions be noted in the patient's medical record.
 6   No reporting is required."  Do you see that?
 7       A   Yes, ma'am.
 8       Q   Do you recall that?  Do you recall learning that?
 9       A   No, ma'am.  If it's not true, I'm certain you're
10   going to tell me.
11       Q   Well, so are you aware of new reporting require-
12   ments that have been recently imposed on abortion facilities
13   in Alabama?
14       A   No, ma'am.
15       Q   Just give me--I think I'm almost done.  Just give
16   me a couple of minutes just to collect my thoughts.
17       A   Do you want us to wander out so you can talk to
18   the team?
19           Ms. Flaxman:    And look at my notes.  Let's go
20   off the record.
21           The Reporter:    Off the record.    4:49 p.m.
22           (A brief recess was taken.)
23           The Reporter:    On the record.    4:53 p.m.
24           Ms. Flaxman:    I don't have any further
25   questions.
```

Page 200

```
 1           Mr. Parker:    Oh, you don't?
 2           Ms. Flaxman:    I don't.
 3           C R O S S - E X A M I N A T I O N    4:53 p.m.
 4       By Mr. Parker:
 5       Q   Dr. Thorp, I have a very few questions.  A couple
 6   quick ones relate to things that you just talked about in
 7   this past hour.  If you go to paragraph 34 of your report?
 8           (Witness complies.)
 9       A   Yes, sir, I'm there.
10       Q   I'm not there, so let me get to it.  In your
11   conversation with Ms. Flaxman about this paragraph, I think
12   you said that you do not know all of the physicians whom you
13   serve on staff with at your hospital; is that correct?
14       A   Yes, sir.
15       Q   Do you think it is more likely that you would know
16   a physician who's on staff with you than a physician who is
17   not on staff with you?
18           Ms. Flaxman:    Object to the form.
19       A   I think it is.
20       Q   Okay.  The next paragraph is paragraph 32.
21       A   Yes, sir.
22       Q   In this paragraph in your discussion with Ms.
23   Flaxman earlier, you discussed reviewing deficiency reports
24   and your statement that certain deficiency reports led you to
25   understand the legislature's concerns in passing this act.
```

Page 201

```
 1   Do you remember that discussion?
 2       A   Yes, sir.
 3       Q   Even if deficiency reports--even if you do not
 4   recall information in deficiency reports pertaining to the
 5   specific findings you quote here, is it still your opinion
 6   that you understand why the--understand the legislature's
 7   concerns in passing the act?
 8       A   Yes, sir.
 9       Q   In other words, there are other sources that would
10   allow you to sympathize with the legislature's concerns?
11           Ms. Flaxman:    Object to the form.
12       Q   Is that correct?
13       A   Yes, sir.
14       Q   Yesterday afternoon Ms. Flaxman asked you a series
15   of questions in which she compared some situation involving a
16   complication with the treatment of--a complication coming
17   from an abortion center performed by a doctor without
18   privileges.  I believe she was attempting to elicit
19   information from you about why having staff privileges--why
20   an abortion doctor having staff privileges would improve the
21   quality of care given to a patient.  Do you remember that
22   conversation?
23           Ms. Flaxman:    Object to the form.
24       A   I think that's been the source of conversations
25   yesterday and today.
```

John M. Thorp, Jr., M.D.     Volume 2, 11/20/13

Page 202

1  Q   Okay.  Maybe I'm not being specific enough.  I'm
2  trying to ask you to recall for example when you talked about
3  the situation where--if there are any differences in
4  treatment between pregnancy loss and a termination of
5  pregnancy.  Do you recall that from yesterday afternoon?
6  A   Vaguely.
7  Q   Okay.  If--let's just assume that treatment for
8  those two situations would be identical, regardless of
9  whether the doctor transferring the patient had privileges at
10  a local hospital.  Is it possible that the--in a situation
11  where the doctor has staff privileges it could speed up the
12  treatment even if the treatment of the two complications
13  would be the same?
14  A   I believe that could be the case.
15  Q   So in other words, one benefit in addition to any
16  other benefits you've mentioned in this deposition in the
17  staff privileges requirement is that it could speed up
18  treatment of a patient in certain circumstances; right?
19       Ms. Flaxman:     Object to the form.
20  A   Agreed.
21  Q   In your opinion is the time it takes to treat a
22  patient ever important to the outcome of that patient's
23  situation?
24  A   Yes, sir, and I think I discussed that in the
25  conversations around Exhibit 7.

Page 203

1  Q   Okay.  Let's also look briefly at your report,
2  paragraph 43.  And this is not something that you discussed
3  with Ms. Flaxman, I don't think, but can you read that
4  paragraph briefly and---
5       Ms. Flaxman:     (interposing) Well, does this
6  relate to testimony he's already given?
7       Mr. Parker:     I can't remember if it does,
8  but--well, I'm pretty sure it does not.
9       Ms Flaxman:     Well, then wouldn't it be
10  beyond the scope of the deposition?
11       Mr. Parker:     I don't think that I have to--
12  in this situation have to limit my questions.  Do you have
13  any authority for that?
14       Ms. Flaxman:     Go ahead.
15       Mr. Parker:     Okay.
16       By Mr. Parker:
17  Q   Are you a member of the American College of
18  Obstetricians and Gynecologists?
19  A   Yes, sir.
20  Q   Are you familiar with any statements published by
21  the college in the field of abortions or terminations of
22  pregnancy?
23  A   Yes, sir.
24  Q   How would you characterize in general the
25  statements that the college publishes on that topic?

Page 204

1  A   I think the college has had a longstanding bias,
2  preference, for there being no restrictions to termination of
3  pregnancy beyond those outlined in Roe v. Wade and Doe v.
4  Bolton.
5  Q   Are you familiar with the statement published by
6  the college specifically addressing the topic of admitting
7  privileges for TOP providers?
8  A   I think they have been opposed to any so-called
9  legislative limits or restrictions on termination of
10  pregnancy practice.
11  Q   Do you think any statement published by the
12  college on the issue of admitting privileges would fairly be
13  described as reflecting a consensus within the community--the
14  medical community on that issue?
15       Ms. Flaxman:     Object to the form.
16  A   As I know consensus, it would mean that everybody
17  was in agreement or generally in agreement.  And there--and I
18  don't know how many, but there are a significant number of
19  members of the college who would disagree with the college's
20  positions on termination of pregnancy.
21  Q   Do you have any way of estimating the degree of
22  difference in opinion on that issue?
23  A   I do not.
24       Mr. Parker:     Okay.  That's all I have.
25       Ms. Flaxman:     Just one or two follow-ups.

Page 205

1       R E D I R E C T   E X A M I N A T I O N 5:03 p.m.
2  By Ms. Flaxman:
3  Q   What is ACOG, Doctor?
4  A   The American--did they change the name from
5  College to Congress, I think?
6  Q   Okay.  And what---
7  A   (interposing) The American Congress of Obstetrics
8  and Gynecology?
9  Q   And do you consider them the leading organization
10  of OB-GYNs in this country?
11  A   No, ma'am.
12  Q   Do other OB-GYNs consider them to be the leading
13  organization?
14  A   I think they're the advocacy group for OB-GYNs in
15  this country would be how I would describe them.
16  Q   And do you yourself consider yourself a member of
17  that organization?
18  A   I think I am a member unless you know something
19  about my dues that I'm unaware of.
20  Q   No, but you are a member of ACOG?
21  A   Am a member.
22  Q   And there are many, many of their positions and
23  statements with which you agree; correct?
24  A   I have a wide variety of responses to their
25  statements.  Some I agree; some I disagree.

Page 206

John M. Thorp, Jr., M.D.      Volume 2, 11/20/13

1        Ms. Flaxman:    I don't have anything further.
2  I just wanted to preserve our objections to that last line of
3  questions.  And that's it.
4        (The deposition was closed at 5:03 p.m.)

---

Page 208

S I G N A T U R E
        I have read the foregoing pages 5 through 205,
which contain a correct transcript of the answers made by me
to the questions herein recorded.  My signature is subject to
corrections on the attached errata sheet, if any.

        (Signature of John Mercer Thorp, Jr., M.D., M.H.S.)
State of
County of

I certify that the following person personally appeared
before me this day and I have personal knowledge of the iden-
tity of the principal or have seen satisfactory evidence of
the principal's identity in the form of a_____  or
a credible witness has sworn to the identity of the
principal, acknowledging to me that he or she voluntarily
signed the foregoing document for the purpose stated herein
and in the capacity indicated:_____.
                        (Name of Principal)

Date_____  _____
                        (Official signature of Notary)
(Official Seal)    _____
                        Notary Public
                  (Notary's printed or typed name)
                  My commission expires_____.
        **********************************
        I, Kay K. Rohde, the officer before whom the foregoing
deposition was taken on 11/19/13 and 11/20/13, certify that
the foregoing transcript was delivered to the witness either
directly or through the witness' attorney or through the
attorney retaining the witness on _____ and that as of this
date I have not received the executed signature page.
        Therefore, more than 30 days having elapsed since
receipt of the transcript by the witness, the sealed original
transcript was filed with attorney for Plaintiffs on _____
by means of US Priority Mail, in accordance with Rule 30(e)
of the Federal Rules of Civil Procedure.
_____
Date              Kay K. Rohde, CVR-CM
                  Court Reporter

---

Page 207

STATE OF NORTH CAROLINA
COUNTY OF WAKE

        C E R T I F I C A T E
        I, Kay K. Rohde, Notary Public-Reporter, do hereby
certify that John Mercer Thorp, Jr., M.D., M.H.S. was duly
sworn or affirmed by me prior to the taking of the foregoing
deposition, that said deposition was taken by me and
transcribed under my direction, that the foregoing pages 5
through 206 constitute a true and correct transcript of the
testimony of the witness and the statements of counsel, and
that the witness reserved the right to review his testimony.
        I do further certify that I am not counsel for or
in the employment of either of the parties to this action,
nor am I interested in the results of this action.
        I do further certify that the stipulations con-
tained herein were entered into by counsel in my presence.
        In witness whereof, I have hereunto set my hand,
this 7th day of December, 2013.


                Kay K. Rohde, CVR-CM
                Notary No. 19971050205