# Exhibit D

Page 1

1                UNITED STATES DISTRICT COURT

2        MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

3

4    _____

     PLANNED PARENTHOOD              )

5    SOUTHEAST, INC., et al.,        )

                                     )

6                   Plaintiffs,      )

                                     )

7          vs                       ) No. 2:13-cv-405-MHT-TFM

                                     )

8    LUTHER STRANGE, in his          )

     official capacity as Attorney  )

9    General of the State of         )

     Alabama, et al.,                )

10                                   )

                    Defendants.      )

11   _____)

12

13

14           DEPOSITION OF GEOFFREY R. KEYES, M.D.

15              West Hollywood, California

16             Wednesday, November 6, 2013

17                    Volume I

18

19

20

21   Reported by:

     LYNN ZINK, RPR

22   CSR No. 9466

23   JOB No. 1760239

24

25   PAGES 1 - 137

**Page 2**

```
 1            UNITED STATES DISTRICT COURT
 2      MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION
 3
 4      _____
        PLANNED PARENTHOOD        )
 5      SOUTHEAST, INC., et al.,  )
                                  )
 6          Plaintiffs,   )
                                  )
 7        vs            ) No. 2:13-cv-405-MHT-TFM
                                  )
 8      LUTHER STRANGE, in his    )
        official capacity as Attorney )
 9      General of the State of   )
        Alabama, et al.,          )
10                                )
            Defendants.    )
11      _____)
12
13
14
15          Deposition of GEOFFREY R. KEYES, M.D., Volume I,
16      taken on behalf of Plaintiffs, at 9201 West Sunset
17      Boulevard, Suite 611, West Hollywood, California, beginning
18      at 9:19 a.m. and ending at 12:55 p.m. on Wednesday,
19      November 6, 2013, before LYNN ZINK, Certified Shorthand
20      Reporter No. 9466.
21
22
23
24
25
```

**Page 3**

```
 1      APPEARANCES:
 2
 3      For Plaintiffs:
 4        WILMER HALE, LLP
 5        BY: SKYE PERRYMAN
 6        BY: M. GOSIA SPANGENBERG
 7        Attorneys at Law
 8        1875 Pennsylvania Avenue, NW
 9        Washington, DC 20006
10        (202) 863-6031
11        skye.perryman@wilmerhale.com
12
13      For Defendants:
14        OFFICE OF THE ATTORNEY GENERAL, STATE OF ALABAMA
15        BY:  KYLE A. BECKMAN
16        Assistant Attorney General
17        501 Washington Avenue
18        P.O. Box 300152
19        Montgomery, Alabama 36130-0152
20        (334) 353-2619
21        kbeckman@ago.state.al.us
22
23      Also Present:
24        WILL PARKER, AGO, Alabama (Telephonic)
25        CARRIE FLAXMAN, Planned Parenthood (Telephonic)
```

**Page 4**

```
 1                    INDEX
 2      WITNESS                     EXAMINATION
 3      GEOFFREY R. KEYES, M.D.
        Volume I
 4
 5          BY MS. PERRYMAN    6, 132
 6          BY MR. BECKMAN  128
 7
 8
 9
10                  EXHIBITS
11      EXHIBIT         DESCRIPTION         PAGES
12      Exhibit 1  Revised Rule 26(A)(2)(B) Expert    9
13          Report of Geoffrey R. Keyes, M.D.
14
15      Exhibit 2  Postop and discharge forms from   38
16          Keyes Surgery Center
17
18      Exhibit 3  Standards and Checklist for       47
19          Accreditation of Ambulatory
20          Surgery Facilities
21
22      Exhibit 4  Rule 26(A)(2)(B) Expert Report    65
23          of Geoffrey R. Keyes, M.D. in
24          Mississippi case
25
```

**Page 5**

```
 1      INDEX (Continued):
 2                  EXHIBITS
 3      EXHIBIT         DESCRIPTION         PAGES
 4      Exhibit 5  New Jersey Administrative Code    103
 5          Title 13, Law and Public Safety
 6          Chapter 35, Board of Medical
 7          Examiners
 8
 9      Exhibit 6  Procedural Standards and          118
10          Checklist for Accreditation of
11          Ambulatory Facilities
12
13
14
15          INSTRUCTION NOT TO ANSWER
16          PAGE   LINE
               72     24
17             73     16
18
19
20
21
22
23
24
25
```

**Veritext National Deposition & Litigation Services**
**866 299-5127**

Page 6

```
 1        Los Angeles, California, Wednesday, November 6, 2013
 2                9:19 a.m.
 3
 4            GEOFFREY R. KEYES, M.D.,
 5   having been first administered an oath, was examined and
 6   testified as follows:
 7
 8               EXAMINATION
 9   BY MS. PERRYMAN:
10       Q  Dr. Keyes, thanks for being with us today.  My name
11   is Skye Perryman, and I'm with the law firm of Wilmer,
12   Cutler Pickering, Hale and Dorr.  I have Gosia Spangenberg
13   with me, and we represent the plaintiffs in this case.
14          Could you please state your full name for the
15   record.
16       A  Geoffrey Robin Keyes.
17       Q  And have you ever been deposed before, Dr. Keyes?
18       A  Yes.
19       Q  In what context?
20       A  As a defendant, as an expert, both ways.
21       Q  In what cases have you been a defendant?
22       A  A number of cases.  I don't have a list of them over
23   the past 40 years.  Actually I should say -- let me say 39.
24   Don't want to age myself too much there.
25       Q  About how many depositions have you testified in as
```

Page 7

```
 1   a defendant?
 2       A  I don't know.  I would say maybe 12, 13.
 3       Q  In any case where you've been named as a defendant,
 4   have you ever been held liable?
 5       A  One second.  I'm not sure it was that many
 6   depositions.  Probably less than that.  I just don't
 7   remember.
 8       Q  Okay.
 9       A  Have I ever been held liable -- in a malpractice
10   case?
11       Q  In any case where you've ever been a civil
12   defendant.
13       A  I was held liable in a small claims court case about
14   20 years ago.  It turned out, just so that I can add that,
15   that the bailiff of the court was the husband of the
16   plaintiff, which did play a role in a five-minute decision.
17       Q  Other than the small claims court, have you ever
18   been held liable in a civil --
19       A  Liable -- describe --
20       Q  Have you ever had a verdict or a judgment entered
21   against you?
22       A  No.
23       Q  Have you ever had an order entered against you by a
24   court?
25       A  An order.  Explain what you mean by an order.
```

Page 8

```
 1       Q  What do you think an order means?
 2       A  I really don't know.  You mean asking me to do
 3   something?
 4       Q  Has a judge ever compelled you to do something?
 5       A  Not that I can recall, no.
 6       Q  In which cases have you testified as an expert at a
 7   deposition?
 8       A  I can't remember.  I mean it's, you know, over the
 9   years -- recently I was -- I can remember one where it was
10   in Baltimore.  I don't remember the name of the case, but I
11   was an expert with respect to pulmonary embolism.  Somebody
12   died from a pulmonary embolism.
13       Q  You were an expert for the plaintiff or for the
14   defendant?
15       A  For the defendant.  Another one, I was an expert for
16   the attorney general or the district attorney, rather, of
17   Los Angeles for someone who was injured in a bike/car
18   accident.  I was an expert in Chicago for a death case
19   related to a surgical procedure, and I was an expert for
20   the plaintiff in that case.
21       Q  Have you ever provided trial testimony in any of
22   those cases?
23       A  Yes, yes.  Those are the ones I'm bringing up to you
24   now in particular.
25       Q  Okay.  Any other cases where you've provided trial
```

Page 9

```
 1   testimony?
 2       A  Yes.  I had -- I was sued by the same attorney for
 3   two breast reductions about 25 years ago.  Both cases I
 4   won, and I provided testimony there.  I -- let's see.  I'm
 5   trying to remember.  When you say testimony, I can't recall
 6   other than those two, ever.
 7       Q  And those were at trials?
 8       A  Yes.
 9       Q  And in this case you've been -- you're an expert for
10   the defendants; is that correct?
11       A  Yes.
12       Q  I'm going to hand you, and ask the court reporter to
13   mark as an exhibit, the expert report that was provided to
14   us in this case.
15       A  Yes.
16       Q  Do you recognize this document?
17       A  Yes.
18       Q  If you could have the court reporter mark it.
19          (Exhibit 1 was marked for identification
20          by the court reporter and is attached hereto.)
21   BY MS. PERRYMAN:
22       Q  You prepared this report?
23       A  Yes.
24       Q  And everything in this report is accurate?
25       A  To the best of my knowledge, yes.
```

1     Q  Can you turn to page 8 of this report, Dr. Keyes?
2     A  Uh-huh.
3     Q  And do you see there where it says, all cases in the
4  past four years in which you've testified?
5     A  Uh-huh.
6     Q  And you list one case, I believe the Maryland case,
7  that you -- that you brought up earlier?
8     A  Right.  I probably -- I don't -- I might have to
9  check the dates on the other cases.  The case for the
10  district attorney, that might have been within the last
11  four years.  I have to check.  I sometimes lose track of
12  time.
13     Q  Okay.  So it's possible that this list in your
14  report is not complete?
15     A  It's possible.  Let me see.  The two cases that I
16  mentioned to you may be within that four-year period.  I'd
17  have to check the dates, though.  It's close.  It may be
18  outside of the four years.
19     Q  No one ever asked you to check those dates prior to
20  today?
21     A  No, no one did.
22     Q  All right.  So you've been deposed before, and you
23  know the drill.  But basically I'm going to ask you a
24  series of questions.
25     A  Yes.

Page 10

1     Q  I'm going to ask that you give verbal answers.
2  We'll try not to talk over each other.  I'm going to ask
3  that you let me complete my question, and then you can
4  provide an answer, and the court reporter will get onto us
5  if we do talk over each other.
6     Is there any reason that you couldn't testify
7  truthfully today?
8     A  No.
9     Q  And you understand that you're under oath?
10     A  Yes.
11     Q  Are you represented by counsel today?
12     A  I don't believe so.
13     Are you representing me?
14     MR. BECKMAN:  Yes.
15     THE WITNESS:  Okay.  Good.  Glad to know it.
16  BY MS. PERRYMAN:
17     Q  All right.  And you understand that your counsel may
18  object at various points at the deposition?
19     A  Yes.
20     Q  But in general, he'll make his objection for the
21  record, and then you can proceed to answer the question.
22     Is that a yes?
23     A  Yes.
24     Q  We're going to practice the verbal -- the verbal
25  answers.

Page 11

1     And then you can take a break at any time if you
2  need to take a break.  It's not an endurance test.  The
3  only thing I ask is that you don't take a break while a
4  question is pending.  So I'll ask that we finish our
5  exchange, and then you can ask for a break, and we'll take
6  a reasonable break.
7     Do you understand that?
8     A  Yes.
9     Q  Can you walk us through your educational training
10  after college.
11     A  After college.  Four years of medical school at
12  Loyola University; general surgery internship at Barnes
13  Hospital, Washington University; three years in
14  otolaryngology-head and neck surgery, University of
15  Illinois.  And I'm board certify in otolaryngology, then a
16  year of general surgery fellowship at Cook County Hospital,
17  and then two years of plastic and reconstructive surgery,
18  and I'm board certified in that.
19     Q  Could you please walk us through your work history
20  starting with your residency.
21     A  Started in Chicago in 1980 and practiced in Chicago
22  through 1988 and then moved here.  And I've been here ever
23  since.
24     Q  When you say "here," do you mean Los Angeles?
25     A  Here, Los Angeles, yes.

Page 12

1     Q  Okay.  And have you -- where did you work when you
2  first arrived in Los Angeles?
3     A  I worked, shortly, in this building in another
4  office and then moved down to this one as I had it built.
5     Q  Do you have your own practice?
6     A  Yes.
7     Q  What is the name of your practice?
8     A  Well, It's Geoffrey R. Keyes, M.D., P.C.
9     Q  That's always been that name?
10     A  Yes.
11     Q  Do you have partners in your practice?
12     A  No.
13     Q  And tell me about the types of procedures that you
14  perform.
15     A  At this time or historically?
16     Q  At this time.
17     A  At this time, procedures, aesthetic procedures, the
18  head and neck, body, breast and body.
19     Q  About how many surgical -- types of surgical
20  procedures do you currently perform?
21     A  I don't know, maybe 10 or 15 -- 15, let's say.
22     Q  And how long, roughly, do those procedures take?  Do
23  they take you an hour to perform?  Do they take you eight
24  hours to perform?
25     A  Well, the simplest one would be excision of a skin

Page 13

Pages 10 to 13

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    lesion, and that usually can take 15 minutes to half an
2    hour. But I can do something like a facelift and eyelid
3    surgery that will take six hours. Or a breast reduction
4    takes, you know, five hours, four hours.
5        Q  Let's talk about the simplistic surgery that you
6    perform. What do you call it, a skin --
7        A  You know, I'll just make a little statement about
8    simple surgery that Harvey Butcher, a celebrated general
9    surgeon, with the interesting last name of Butcher, made to
10   me as an intern in general surgery. "There's no such thing
11   as simple surgery, only simple surgeons."
12       So you want to rephrase your question?
13       Q  What is the name of the procedure that you just
14   referenced that takes about 15 minutes to perform?
15       A  The surgical excision of a skin lesion.
16       Q  And what is involved in that procedure in terms of
17   the anesthesia or the sedation that may be used?
18       A  Local anesthesia, usually with Lidocaine, and then
19   excision usually with a No. 15 blade, cautery if there's
20   any bleeding, and then closure with a suture material.
21       Q  Now, where do you perform your surgical procedures?
22       A  Here. This is an accredited surgery center right
23   here in this office setting.
24       Q  Has this center always been accredited?
25       A  Yes.

Page 14

1        Q  Have you ever performed procedures in a facility
2    that was not accredited?
3        A  No. Not to my recollection.
4        Q  Okay. Prior to -- and when you say accredited, are
5    you referring to --
6        A  Let me step back. When I first came out here in
7    1989, I'm not sure, I did one or two cases in the building
8    here in a long-established practice since the '50s. I
9    don't remember if it was accredited. Probably had to be
10   because there was -- no, the law wasn't passed until 1996.
11   So it may not have been accredited at that time. AB 595
12   had not been passed.
13       Q  And you believe that you provided good care at that
14   facility as well as at this facility; is that correct?
15       A  Yes.
16       Q  Have you ever done procedures in an outpatient
17   setting that was not an ASC other than the one possible
18   instance that you just referenced?
19       A  No. Not to the best of my recollection.
20       Q  Okay. And then I noticed that you were an associate
21   professor; is that correct?
22       A  Correct.
23       Q  And is that at USC Los Angeles?
24       A  Correct.
25       Q  And about how much time a week do you spend teaching

Page 15

1    or preparing for your classes?
2        A  I don't -- it's not a week, it's on a monthly basis.
3    I usually spend a day a month in the operating room with
4    the residents, teaching them, and I lecture a couple times
5    a year. And then I spend time with resident selection.
6    So, you know, every few months there's something I have to
7    do. It's a clinical appointment, not full time.
8        Q  What is SurgiMatrix?
9        A  SurgiMetrix?
10       Q  SurgiMetrix.
11       A  SurgiMetrix is a company that I formed for the
12   analysis and compliance with surgical safety.
13       Q  And do you work in that company?
14       A  Yes.
15       Q  And where is the company located?
16       A  Right here.
17       Q  Are you a sole -- is it a sole -- are you a sole
18   proprietor?
19       A  I have a partner, and currently we now have
20   subscriptions from national associations and data
21   collection. I guess I should step back -- well, I'll let
22   you finish. Go ahead.
23       Q  So what does your -- what does SurgiMetrix do?
24       A  Manages compliance for safe surgical practice in
25   the -- primarily the outpatient arena, but eventually for

Page 16

1    surgery in general.
2        Q  And how many clients do you have?
3        A  None. It's going to be a mandatory entry system for
4    AAAASF, which is the abbreviation for the American
5    Association for Accreditation of Ambulatory Surgery
6    Facilities, and ASAPS, which is the Aesthetic Society -- or
7    the American Society or Aesthetic Plastic Surgery.
8        Q  Now, you serve as president of AAASF (sic); is that
9    right?
10       A  Yes.
11       Q  And this SurgiMatrix system --
12       A  SurgiMetrix.
13       Q  SurgiMetrix system that you've developed along with
14   your partner or that you own an interest in, that will be
15   used for --
16       A  Peer review.
17       Q  -- peer review.
18       A  And for data analysis.
19       Q  And that's required -- is that right? -- for members
20   of AAASF?
21       A  Well, SurgiMetrix isn't required, but maybe I better
22   step back. In '99 I developed the first Internet-
23   relational database for quality assurance and peer review
24   that now has 9 million procedures -- over 9 million
25   procedures in it, and that is the program that they use.

Page 17

Pages 14 to 17

1      They've asked me -- I've come up with some ideas to
2   improve the data because all that we know, even though we
3   have all these cases, is outcomes and what was done, and we
4   don't know the full surgical process, which now I am
5   developing so that we can refine our analysis of outcomes
6   and create essentially evidence-based medicine so it would
7   improve healthcare.  So they are subscribing to me to
8   develop this system.
9      Q  And "they" meaning AAASF?
10     A  And also ASAPS, the organization I -- and probably
11  other associations and organizations as we move forward.
12     Q  And how much does AAASF pay SurgiMetrix to use this
13  system?
14     A  I think that's confidential information.
15     Q  Are you saying that you're not going to answer the
16  question?
17     A  I don't know.
18        Is that -- is that something that should be answered
19  or not?
20        MR. BECKMAN:  Is this something that --
21        MS. PERRYMAN:  It's certainly not privileged.
22        MR. BECKMAN:  Yeah.
23        MS. PERRYMAN:  His experience in this case is about
24  his relationship with AAASF.
25        THE WITNESS:  I'll answer it from this standpoint.

Page 18

1   They're not paying to use the system at all.  They're
2   paying to help develop it.
3   BY MS. PERRYMAN:
4      Q  So they're paying you and your partner to help
5   develop the system?
6      A  That's right.  They're not -- there's no -- as it
7   moves forward, their subscription fee allows them to use it
8   for nothing because they're paying in to build it.
9      Q  When did they start -- when did SurgiMetrix start
10  its relation with AAASF?
11     A  Let's see.  September.  September or -- well, let's
12  step back.  I had a relat- -- SurgiMetrix has changed.  The
13  original -- I had an agreement with their for-profit
14  division to market a compliance management program which
15  never really was marketed but that was developed.
16        But then the idea changed to develop a data hub that
17  would be more inclusive and expansive with the data that
18  was collected.  And the contract was signed -- actually,
19  I'll tell you exactly when it was signed.  I happen to have
20  it right here, not for any reason other than I left it in
21  my briefcase.  Let's see.  Here it is right here.
22        September 4th.
23     Q  Of 2013?
24     A  Yeah.
25     Q  So while you were president of AAASF.

Page 19

1      A  Yes.
2      Q  Okay.  That's -- and you're not going to tell me how
3   much AAASF, an organization that you're president of, is
4   compensating you in your business?
5      A  They're not compensating me at all.  They're paying
6   $300,000 as a subscription to develop it this year.  Or
7   250- -- I'm sorry, 250,000.
8      Q  They're paying 250,000 to SurgiMetrix?
9      A  Correct.
10     Q  And you own an interest in SurgiMetrix.
11     A  Correct.
12     Q  A full interest or a half-interest?
13     A  Part interest.
14     Q  Now, in the course of your work as a physician and
15  as a surgeon, have you ever performed an abortion?
16     A  No.
17     Q  And you're not purporting today to be an expert in
18  abortion procedures; is that correct?
19     A  No, not at all.
20        MR. BECKMAN:  Object to form.
21  BY MS. PERRYMAN:
22     Q  You wouldn't undertake to perform an abortion on a
23  patient if they asked you for one; is that correct?
24     A  That's correct.
25     Q  And you're not an expert in the complications that

Page 20

1   may result or may not result from --
2        MR. BECKMAN:  Object to form.
3   BY MS. PERRYMAN:
4      Q  -- abortion-related procedures; is that correct?
5      A  Well, I'm an expert in complications in general from
6   the work that I've done.  So, for example, bleeding.  I'm
7   an expert in bleeding.  Bleeding is the same from any
8   surgical procedure.  Once you're bleeding you're bleeding.
9   So I guess you have to refine your question a little bit.
10     Q  As I understand it, you haven't reviewed
11  complications data or medical literature regarding specific
12  complications in forming your opinions in this case as they
13  relate to abortion procedures; is that correct?
14     A  As they relate to abortion procedures?
15     Q  Yes.
16     A  Well, AAAASF accredits OB/GYN surgeons and some of
17  their data is in our databank.
18     Q  Did you review that database?
19     A  Specifically for this?  No.
20     Q  And you don't purport to be an expert in that data
21  or in the standards of care for gynecologists or
22  individuals who are performing abortion-related procedures;
23  is that correct?
24        MR. BECKMAN:  Object to form.
25        THE WITNESS:  Well, I've written two papers based on

Page 21

Pages 18 to 21

1  the data in general that's been accumulated in AAAASF
2  database.
3  BY MS. PERRYMAN:
4      Q  Right.  And we can talk about those papers in a
5  second.  But what I'm asking you -- and I think it's a
6  pretty simple question based on the fact you say that you
7  don't perform these procedures and that you don't hold
8  yourself out to be an expert in these proceedings.  So my
9  question is to you, you're not saying that you're an expert
10  in specific complications that arise during or after
11  abortion-related procedures; is that correct?
12      MR. BECKMAN:  Object to form.
13      THE WITNESS:  That's a hard one to answer.  It's for
14  the reason that I said.  An infection is an infection;
15  bleeding is bleeding.  So, you know, in some ways being a
16  doctor, I have an opinion about those particular issues.
17  Am I an expert in curetting a uterus and how to manage the
18  bleeding after that occurs?  No, I wouldn't claim to be
19  that.  So it depends on how you mean an expert.
20  BY MS. PERRYMAN:
21      Q  So beyond -- so what you're saying is you're a
22  physician.  You perform surgery.  You understand bleeding
23  and infection.  But you're not claiming to be an expert in
24  any specific abortion-related complications.
25      A  Correct.

Page 22

1      MR. BECKMAN:  Object to form.  Asked and answered.
2      THE WITNESS:  Correct.
3  BY MS. PERRYMAN:
4      Q  Thank you.  And you've never practiced medicine in
5  Alabama; is that correct?
6      A  No.
7      Q  Never been licensed there?
8      A  No.
9      Q  And you're not an expert in Alabama's regulations as
10  they --
11      A  No.
12      Q  -- relate to health and medical care; is that
13  correct?
14      MR. BECKMAN:  Object to form.
15      THE WITNESS:  No.
16  BY MS. PERRYMAN:
17      Q  You don't intend to offer an opinion today on the
18  sufficiency of existing regulations; is that correct?
19      MR. BECKMAN:  Object to form.
20      THE WITNESS:  Sufficiency of regulations?  What do
21  you mean by that?
22  BY MS. PERRYMAN:
23      Q  Are you intending to offer an opinion today on the
24  existing regulations in Alabama?
25      A  My testimony's going to relate to medical/surgical

Page 23

1  care in general.  With respect to Alabama, the same would
2  apply to California or anywhere else, from my opinion.
3      Q  So you haven't reviewed or undertaken to analyze
4  specific regulations in Alabama as they relate to surgical
5  procedures or reproductive health procedures; is that
6  correct?
7      A  I know of the proposed regulation related to
8  hospital privileges if that's what you mean.  But in
9  general, all of the -- no.  I'm not an expert in all of
10  that.  No, I don't know all of that.
11      Q  Right.  So the question I was actually asking you
12  was not about the bill that the legislature passed, but it
13  was about regulations in general that regulate reproductive
14  health clinics, abortion clinics, surgical centers in
15  Alabama, you're not an expert in those existing
16  regulations --
17      A  In Alabama?
18      Q  -- is that correct?
19      In Alabama.
20      A  No.
21      Q  Okay.  And because you're not an expert in that, you
22  don't intend to offer opinions today and you don't offer
23  opinions in your report on the sufficiency of the existing
24  regulations there; is that correct?
25      MR. BECKMAN:  Object to form.

Page 24

1      THE WITNESS:  The general regulations, no, I'm not
2  going to offer an opinion about that.
3  BY MS. PERRYMAN:
4      Q  Do you have any experience with the Alabama
5  Department of Public Health?
6      A  I don't believe so, no.
7      Q  And you don't have any reason to doubt the adequacy
8  of the Alabama Department of Public Health's ability to
9  promulgate regulations that provide for patient safety?
10      MR. BECKMAN:  Object to form.
11      THE WITNESS:  I have no way of judging that.  I've
12  seen regulations in many places that I'm not particularly
13  happy with.  I wouldn't single out Alabama, but I don't
14  know all of their regulations so I couldn't comment on
15  that.
16  BY MS. PERRYMAN:
17      Q  So you don't have an opinion one way or the other.
18      A  That's right.
19      Q  And you don't have an opinion on the State's
20  enforcement of its regulations; is that correct?
21      A  I do not.
22      Q  We talked a little bit about the AAASF, but I wanted
23  to ask you a bit more about it.  Is it true it was founded
24  in around 1980?
25      A  Yes.

Page 25

Pages 22 to 25

Veritext National Deposition & Litigation Services
866 299-5127

1    Q   And prior to 1980 were you performing surgical
2  procedures in nonaccredited facilities?
3    A   No.
4    Q   And tell me what the impetus for founding the AAASF
5  was?
6    A   To improve -- outpatient surgery was growing
7  exponentially and, as you know, has continued over the last
8  30-some years.  And it was to promulgate standards for safe
9  surgical practice for people operating in the outpatient
10  environment.
11    Q   Was it founded by plastic surgeons?
12    A   Yes.
13    Q   And why were standards needed for plastic surgery?
14    A   It wasn't just for plastic surgery.  Well, at that
15  time, actually when it was founded, why were standards
16  needed?  Because patients were being operated in facilities
17  outside of the hospital, and we felt that some standards
18  should be -- and I wasn't there at the time, but felt that
19  standards should be put together to safeguard patients.
20    Q   And you were practicing -- you were a surgeon in
21  1980; is that right?
22    A   I'd just come out of residency.
23    Q   All right.  When did you become involved in AAASF?
24    A   I think about 1995.
25    Q   Now, at the time that AAASF was founded, did states

Page 26

1  have regulations for outpatient surgery?
2    A   Some did, some don't or didn't at the time.  It's
3  still true today.
4    Q   And how does that compare today, though?  Are there
5  more states now that have regulations for outpatient
6  surgery?
7    A   They have expanded dramatically.  For example, I
8  would say seven or eight years ago there were maybe 10
9  states required accreditation or licensure to perform in an
10  outpatient environment.  Now there's probably 27 states or
11  half of them.
12        And interestingly, I testified in front of the New
13  York -- I don't want to call it the medical board.  I
14  forget the exact -- how they term their medical board --
15  about five years ago and presented data to them which I
16  think was instrumental in having them make the decision, in
17  the state of New York, to require licensure or
18  accreditation.  And before that, New York didn't even have
19  it.  So it's growing.  Obviously a necessary thing.  I
20  believe all the states will have it eventually.
21    Q   And you understand that Alabama has regulations for
22  outpatients?
23    A   Yes.
24    Q   You mentioned actually providing testimony to the
25  New York board.  Have you provided testimony to other

Page 27

1  either medical boards or legislative board -- or
2  legislative bodies on the issues of credentialing
3  outpatient standards?
4    A   Yes.  Testifying -- testimony, I've spoken in front
5  of the Medical Board in California recently on issues of
6  accreditation.  I think that was back in April.  I have
7  lectured many, many times about it.  I presented at a joint
8  conference of all the accrediting associations
9  recognized nationally -- AAAHC, JCAHO, AAAASF -- that was
10  sponsored by the American College of Surgeons in January of
11  2007.
12    Q   Do you have a view or have you provided testimony on
13  the bill that California recently passed regarding abortion
14  service providers?
15    A   No.
16    Q   You don't have a view?
17    A   I haven't even read it.
18    Q   Okay.  Let's go back to talking about the AAASF and
19  the impetus for the credential -- or for the standards.
20  Was there a concern about credentialing at the time, that
21  surgeons were not appropriately credentialed to perform the
22  procedures they were performing on the outpatient basis?
23    A   I don't re- -- I'm not privy to the standards in '80
24  so I don't remember --
25    Q   Okay.  What about now?

Page 28

1    A   Now, yes, there is.
2    Q   What are the other reasons that AAASF --
3    A   AAAA.
4    Q   I'm sorry.
5        -- AAASF exists?
6    A   Quadruple A.
7    Q   Quadruple A.
8    A   Just say quad A.  It's easier.
9    Q   AAAASF, what are the other reasons, other than
10  ensuring appropriate credentialing, that the organization
11  believes accreditation is helpful?
12    A   It provides a safe surgical environment for
13  patients.
14        By the way, it took me about the first ten years in
15  the organization to learn how to say it.  So don't
16  feel --
17    Q   Did you develop the "quad A" terminology?
18    A   No.
19    Q   Because that's a good -- that's good.
20    A   Quad A simplifies the whole thing.
21    Q   You could have saved me a lot of --
22    A   Yeah, quad A.
23    Q   So safe surgical environment and credentialing.
24    A   Well, I think they go hand in hand.
25    Q   And explain that.

Page 29

Pages 26 to 29

1    A  Well, you provide an environment to perform surgery
2  that has to do with the physical plant, but that's only
3  part of it.  You have to ensure those who are providing the
4  surgical procedures are also well-qualified, trained, and
5  adhere to standards.
6    Q  How can a surgeon demonstrate that he or she is
7  well-qualified or trained?
8    A  One way is through board certification.
9    Q  Are there other ways?
10    A  Continuing medical education, peer review,
11  credentials from a hospital staff, I think they all blend
12  together.  It's -- when somebody applies to a surgery
13  center, for example, or hospital and they're credentialed,
14  they look at their overall training, background, procedures
15  they've performed, malpractice history, that type of thing.
16    Q  And you would agree there's not one thing that --
17  there's not one and only one factor that would lead to a
18  judgment about someone who is well-credentialed?
19    MR. BECKMAN:  Object to form.
20    THE WITNESS:  There's not one thing, but there are
21  many consistent things that seem to hold true in most
22  credentialing operations, in hospitals in particular,
23  although there are variations as with anything.
24  BY MS. PERRYMAN:
25    Q  Now, what percentage of the membership of AAAASF are

Page 30

1    perform or offer abortion procedures.
2    A  We don't track that as an issue.
3    Q  And how long have you been president of AAAASF?
4    A  One year this month.
5    Q  And when will your term be complete?
6    A  Next year.  Two-year term.
7    Q  And are you compensated by --
8    A  Yes.
9    Q  How much?
10    A  $70,000 a year.
11    Q  And then do you indirectly receive compensation as a
12  result of your work with SurgiMetrix, but other than that,
13  have you received compensation?
14    A  I receive -- yeah, indirectly from the development
15  for the work I do, I receive some compensation.
16    Q  And other than that, are you receiving any other
17  compensation for AAAASF?
18    A  All board members, when they travel -- we just had a
19  board meeting, actually, last week.  There's a $3,000
20  honorarium and your airfare and meals.  It's pretty much a
21  voluntary organization.
22    Q  And is there a difference between ambulatory
23  surgical facilities and ambulatory surgical centers?
24  Because I've seen both terms used.
25    A  It's confusing.  The reality is this.  There are

Page 32

1    plastic surgeons?  Do you know?
2    A  If you want to simplify it more, just say the quad.
3    Q  Okay.
4    A  Are plastic surgeons?  Less than 50 percent.
5    Q  Okay.  Is it 40 percent?
6    A  I don't know.  If I had to guess, I'd say it was 47
7  percent.
8    Q  So roughly half?
9    A  Yeah, roughly.
10    Q  And do you know what percentage are women's health
11  or abortion clinics?
12    A  I would say about 10 percent.
13    Q  About 10 percent are women's health clinics or about
14  10 percent are abortion clinics?
15    A  Well, I don't think they're classified as abortion
16  clinics.  I think they're just classified -- it's also by
17  the specialty that gets credit-- OB/GYN facilities are
18  the directors of --
19    Q  So are you saying that about 10 percent are OB/GYN
20  facilities?
21    A  Right.
22    Q  Okay.  And then of that 10 percent, you don't
23  know --
24    A  I don't know.
25    Q  -- here today, how many of those facilities would

Page 31

1    ASCs, ambulatory surgery centers, and there are office-
2  based facilities.  That's what I have here.  This is an
3  office-based facility.  But the requirements for care are
4  the same.
5    Q  Okay.  So --
6    A  But there are distinctions that are made.  And
7  actually insurance companies make distinctions, which many
8  of us feel are quite unfair, that if you're not a
9  ambulatory surgery facility, some insurance won't reimburse
10  the facility for care that's given.  And it's the same
11  thing.
12    I mean if I go over and open the door or drawers in
13  my cabinets there, you'll see a whole list of procedural
14  things that have to be done to make this run like a small
15  hospital.  And they're no different than the ASC.
16    Q  So when you use those terms --
17    A  AAAASF, by the way, also is deemed by Medicare to
18  inspect Medicare facilities, and is the only one deemed by
19  Medicare to inspect -- and this is relatively new -- rural
20  health occupational therapy.  So it's involved in both
21  sides of the corner of the medicine and surgery.
22    Q  Okay.  And have you been involved in AAAASF's
23  standards and like the revisions of the standards that have
24  come out?
25    A  I have luckily always avoided that committee, but

Page 33

Pages 30 to 33

1    I'm responsible for overview.  And as a matter of fact, we
2    just passed a standard last week related to pulmonary
3    embolism, which occurs with any surgery, to insist that
4    patients are evaluated for the potentiality of a pulmonary
5    embolism, and it's documented in the chart.  That's an
6    example.
7         So there's a standards committee, and there's an
8    anesthesiologist right now who's the head of that in
9    Florida.  And I don't know if you've seen our standards
10   but -- have you seen the standards?
11   Q   Yeah.
12   A   So you know the standards.  So they change because
13   we learn new things.  And from that standpoint, I'm always
14   pretty much up to date on them.  And I also inspect surgery
15   centers so I kind of know what's going on.
16   Q   When you inspect surgery centers, do you just
17   inspect surgery centers where the procedures that you
18   perform --
19   A   No.
20   Q   You inspect all surgery centers?
21   A   Surgery centers.  Any surgery center.
22   Q   Have you ever inspected a women's health center and
23   OB/GYN?
24   A   I haven't.
25   Q   Do you think you're qualified to inspect one?

Page 34

1    A   Yes.
2        MR. BECKMAN:  Object to form.
3    BY MS. PERRYMAN:
4    Q   So even though you don't perform those procedures,
5    you would think you would be qualified to inspect?
6    A   I've passed inspectors courses to inspect Medicare
7    facilities, non-Medicare facilities.  There are
8    classifications of facilities within our accreditation
9    which are C, which is the use of general anesthesia; B, IV
10   sedation; and, A, just local.  So I'm sure any OB/GYN
11   facility would fall under one of those classifications, and
12   then pretty much, yes, I think I would --
13   Q   Incidentally, do you know -- I mean do OB/GYN
14   facilities typically, would they fall under a
15   classification where general anesthesia was used?
16   A   In our facilities?  Yes.  Our accredited facilities?
17   Yes, they could.
18   Q   And what procedures would an OB/GYN perform where
19   general anesthesia would be used?
20   A   I'm not sure.  I mean hysteroscopy -- I don't know
21   what -- what they would do where they would want an
22   anesthesiologist.  I'm not up to date on that in
23   particular.  But, you know, more -- gallbladders are being
24   done in outpatient facilities.  So they might do, you know,
25   some relatively significant surgery in an outpatient

Page 35

1    setting.
2        Don't forget, some outpatient settings are very
3    close to a hospital, and they might be done in the
4    outpatient setting, a patient transferred over to the
5    hospital overnight.
6    Q   Do you have an understanding of whether, with
7    respect to abortion procedures, what type of sedation might
8    be used?
9    A   It's my understanding that, generally speaking, it's
10   more oral sedation than anything else.
11   Q   Not general anesthesia.
12   A   Not general anesthesia.  That's my understanding,
13   but not that it couldn't be general, depending on the case.
14   Q   But you don't have any specific knowledge of general
15   anesthesia being used in --
16   A   I don't, one way or the other, no.
17   Q   Let's talk a little bit about your patients.  Do you
18   treat patients who live all across the United States or
19   just patients here in Los Angeles?
20   A   We have international patients, yes.
21   Q   And what are the discharge protocols when you
22   perform a procedure on a patient who doesn't live locally?
23   A   Discharge from what point?
24   Q   Okay.  So after you perform a surgery.
25   A   The patient goes to the recovery room, and there's a

Page 36

1    nurse at all times with the patient.  And it's my practice
2    to walk back and, at intervals, just check and see how
3    things are going.  You know -- can we go off the record for
4    one minute?
5    Q   I mean not while a question -- I mean is there a
6    reason you need to go off the record?
7    A   Well, I was going to go get something for you.  I
8    thought it might be helpful.
9    Q   That -- if it would help your answer, that's fine.
10   A   Yeah, it would.  Okay.
11       (Recess.)
12   BY MS. PERRYMAN:
13   Q   So, Dr. Keyes, before we took a break, I had asked
14   you about what your discharge protocols were after surgical
15   procedures, and you asked -- you provided some answer and
16   then said there would be some materials that might be
17   helpful for you in answering the question.  So I'll let you
18   continue.
19   A   First, we have a recovery room form which is pretty
20   standard, much like a hospital would use, where the nurse
21   monitors the vital signs, whatever.  Then discharge
22   criteria relative to the time of discharge.
23       Do you want me to read some of those?
24   Q   Actually, if you could have the court reporter mark
25   the papers that I brought in as Exhibit 2.

Page 37

Veritext National Deposition & Litigation Services
866 299-5127

1     A   Okay.  And then we have postoperative instructions,
2   and then we have the destination of the patient and the
3   person responsible for taking them home sign off that
4   they're responsible for them.
5     Q   Okay.  So --
6       Could you mark these papers as Exhibit 2, please.
7       (Exhibit 2 was marked for identification
8     by the court reporter and is attached hereto.)
9   BY MS. PERRYMAN:
10    Q   I haven't seen these before so we may take a break
11  later and I can review them.  But just to start, maybe I'll
12  ask you about this discharge record form that you brought
13  in.  Can you tell me what occurs here?  Do you generally
14  ask people to put their address of where they're going to
15  be for the next 24 hours after a surgery?
16    A   Yes.  We have their address, the phone number of the
17  caretaker, the phone number of the patient, so that we can
18  get in touch with them for a postop call.  Actually, I
19  didn't put that in.  We also do a postoperative call, with
20  the call sheet.  Let me, just for one second, text her to
21  bring that in.  You should have that too.
22      MR. BECKMAN:  I don't mean to interrupt, but can we
23  get another copy of this?
24      THE WITNESS:  Yes.
25  BY MS. PERRYMAN:

Page 38

1     Q   And when -- are these all the -- this is all the
2   instructions that you would provide when someone leaves; is
3   that --
4     A   Yes, plus the nurse goes over it.
5       (Interruption in the proceedings.)
6       THE WITNESS:  Plus the nurse sits with the patient
7   and the caretaker and --
8       I need also the postop call sheet, and I need
9   another set of copies with that for the other attorney.
10      So the process is this:  First of all, there's a
11  physician on the premises at all times in the postoperative
12  recovery period.  When the patient goes to the recovery
13  room, the patient is handed over to the nurse.  Usually the
14  anesthesiologist takes the patient over, although the
15  patient's fully awake before we transfer them to the
16  recovery room.
17      The recovery room record is kept, discharge criteria
18  are agreed upon.  When the patient's discharged, the nurse
19  goes out, sits in the waiting room with the person taking
20  the patient out of the facility, explains everything that
21  they need to know for the evening.  We have their phone
22  numbers and access to where the patient will be, and then
23  we see the patient the next morning.
24      And then we -- that night, we call them.  And she's
25  bringing the call sheet for the things that we note when we

Page 39

1   call them.
2   BY MS. PERRYMAN:
3     Q   So if a patient lives in Orange County or Riverside,
4   they can return home and -- as long as they have someone
5   with them under your discharge protocols, and you would
6   call them there and check in on them, and they come back
7   the next morning; is that correct?
8     A   Not usually.  Usually patients stay in the vicinity.
9     Q   What is the vicinity?
10    A   Beverly Hills/West Hollywood vicinity, usually
11  within five, six miles of the office.
12    Q   That's not actually on any of your protocol sheets;
13  correct?
14    A   No.
15    Q   So there's nothing on here, when a patient comes
16  into your office, that basically advises them that they
17  should stay within five to six miles of your facility.
18    A   Well, they come in for preoperative discussions, and
19  that's all arranged before they come in.  I mean, you know,
20  somebody's having a four-hour operation, we don't send them
21  off to -- especially like a facelift or something like
22  that.  They can bleed.  So I don't want them down in Orange
23  County and have me up here because even though we're in
24  great communication, it would take an hour to have them get
25  up here, and that could be life-threatening.

Page 40

1     Q   And you don't know -- I mean, but you can't tell me
2   that your patients haven't actually gone somewhere outside
3   of the six-mile radius of your office; is that correct?
4     A   They don't.  They don't.  We don't let them do it.
5     Q   So it's not on any --
6     A   Six-mile radius?
7     Q   That's what you said a minute ago.
8     A   You know, yeah, maybe -- maybe at the max, ten
9   miles.  I mean I don't know exact- -- they don't take off
10  for an hour to drive, no.
11    Q   But that's nowhere in your protocols.
12    A   No.
13    Q   And you won't -- you wouldn't have any way of
14  showing that they don't, in fact, do that in some
15  instances.
16    A   Well, I mean, generally speaking, we make the
17  reservations for them for the hotel they stay in, or we
18  make reservations for them to stay at an aftercare place
19  that comes and picks them up and brings them back.  So I
20  mean we know what's going on with our patients.
21    Q   Is that after every procedure you perform, including
22  the procedure that you said was about 15 minutes long?
23    A   No.  If they had IV sedation -- more for general
24  anesthesia.  But IV sedation sometimes we do too.  It
25  depends on the case.

Page 41

Pages 38 to 41

1    Q So for general anesthesia --
2    A Yes.
3    Q And some cases, but not all cases, IV sedation.
4    A Yeah. Mostly general anesthesia.
5    Q So in general, for general anesthesia, your sort of
6    protocol would be to advise people to stay in the near
7    vicinity.
8    A Yes.
9    Q But not for some of the other procedures that you
10   perform that may take a shorter amount of time; is that
11   correct?
12   A It's not a matter of time. It's what the procedure
13   is.
14   Q Okay. So which procedures do you not advise
15   patients that they need to stay in the vicinity?
16   A May I ask her a question while you're --
17   Q Okay.
18   A For a local case of minor -- like excision of a skin
19   lesion or something like that, we don't ask them to stay in
20   the vicinity, no. If we do a case where there's a
21   potential for bleeding, that's usually the case that we're
22   most concerned about. Potential for postoperative
23   bleeding, then we want them in the vicinity.
24     And Kimberly usually speaks with the patient prior
25   to surgery, interviews them, gets the information on where

Page 42

1   they're going to be staying, who's going to be taking care
2   of them. We have their phone numbers. It's documented in
3   our calendar, and it's just a routine thing that we do.
4   Q Thanks for completing your answer.
5   A That's good.
6     Let me just make sure -- now you've got -- there's
7   two of these and there's not the --
8     (Discussion off the record.)
9     MS. PERRYMAN: Could you have the court reporter
10   mark this.
11     THE WITNESS: How many pages do you have?
12     MS. PERRYMAN: I have four pages.
13     THE WITNESS: So you have five so I'm missing a
14   page.
15     (Discussion off the record.)
16   BY MS. PERRYMAN:
17   Q Are there any other pages you're adding to this,
18   Dr. Keyes?
19   A No.
20   Q What has been marked as Exhibit 2 are four sheets of
21   paper that consist --
22   A Five.
23   Q -- five sheets of paper that consist of your
24   discharge protocol in your office.
25   A Correct.

Page 43

1   Q And we've just talked about some of those protocols,
2   and that comprises Exhibit 2.
3     Now, you were just telling me that for some
4   procedures that you perform, you advise patients to stay in
5   the vicinity of your office.
6   A Correct.
7   Q And you told me earlier today that you generally, at
8   this time, perform about 15 surgical -- types of surgical
9   procedures.
10   A Correct.
11   Q So which types of surgical procedures do you advise
12   patients to stay within the vicinity?
13   A Abdominoplasty, breast reduction, breast
14   augmentation, facelift, eyelid surgery, some liposuction
15   procedures, and variations of those procedures.
16   Q Okay. Which procedures do you -- so that's --
17   that's about five procedures. Which procedures -- so the
18   other ten procedures, roughly, that you perform, you would
19   not advise patients to stay in the vicinity?
20   A Yeah, like an otoplasty, excision of a skin lesion,
21   excision of a small tumor, that type of thing.
22   Q What are the other procedures?
23   A Rhinoplasty, septoplasty, usually I don't require
24   them to stay in the vicinity. The likelihood of bleeding's
25   very little.

Page 44

1   Q Okay. And what are the complication rates for
2   the -- roughly, for the procedures where you do advise
3   patients to stay in the area? So for the -- some types of
4   liposuction, a facelift, what are the sort of -- do you
5   have an idea of what the averages are in terms of
6   complication rates?
7   A I can tell you in general because you're probably
8   more interested in general than in me.
9   Q That's right.
10   A In general, for 5 million-some-odd procedures --
11   this is all complications -- about 24,000 complications.
12   Q Which is an incident rate of --
13   A 0.00 -- do you want me to look it up for you?
14   Q We can figure that out later if you want.
15   A Yeah. I mean I can -- go ahead, you can keep
16   asking. I'll just look it up.
17   Q Now, the suggestion that you make to your patients
18   that when they undergo more serious surgeries, like
19   facelifts and liposuction and breast augmentation, that
20   they stay in the vicinity, is that type of -- is that
21   something that the AAAASF requires you to do, or is that
22   just something you do as general clinical practice?
23     MR. BECKMAN: Object to form.
24     THE WITNESS: Well, AAAASF -- you know, AAAASF
25   doesn't legislate surgical practice. They establish safe

Page 45

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    surgical standards for operating and outpatient facilities.
2        MS. PERRYMAN: Right.
3        THE WITNESS: But as part of our requirements, you
4    should have hospital privileges within 30 minutes of your
5    office, and you, know, the surgical judgment of the surgeon
6    would -- should dictate that if you're doing a procedure
7    that might require hospitalization, they be within a range
8    that they can get to the hospital or to you in plenty of
9    time for safety.
10   BY MS. PERRYMAN:
11     **Q  And we'll talk about that requirement in a bit. But**
12   **the question I'm asking you appears to be no, that the**
13   **standards do not set forth a requirement that surgeons**
14   **advise their patients that they are to stay within the**
15   **vicinity of the facility; is that correct?**
16    A  Let me see. I have the --
17    **Q  Why don't you not --**
18    A  -- standards.
19    **Q  -- look at your computer, and let's focus --**
20    A  Well, I have the standards right here. I can't
21   answer the question. I'm looking. I don't have all the
22   standards precisely memorized so I want to give you the --
23   would you like me to look at that?
24    **Q  Let me go ahead and -- I have some copies of the**
25   **standards.**

Page 46

1    A  Oh, okay.
2    **Q  So I can go ahead and mark those.**
3    A  Good.
4        MS. PERRYMAN: So let's mark as Exhibit 3 --
5        (Exhibit 3 was marked for identification
6    by the court reporter and is attached hereto.)
7    BY MS. PERRYMAN:
8    **Q  So I've marked as an exhibit or asked the court**
9   **reporter to mark as an exhibit the surgical standards for**
10  **AAAASF. And you wanted to look at those standards because**
11  **I asked you a question as to whether the standards require**
12  **that surgeons advise their patients to stay within a**
13  **several-mile radius of the facility after surgical**
14  **procedures.**
15   A  I don't think there is a standard to that. I think
16   that's within the purview of the surgeon but --
17    **Q  Okay. Thank you.**
18    A  -- I don't think that's in here.
19    **Q  Then we'll talk about the standards in a bit so you**
20  **can set those aside for now.**
21    **When you were explaining earlier about the types of**
22  **procedures where you would advise a patient to stay in the**
23  **area, you said it's generally for general anesthesia, if**
24  **there could be significant bleeding. Is there any other**
25  **thing that guides you as to when -- is it the length of**

Page 47

1    time of the surgery?
2    A  Well, you know, I -- how far they go away, I mean,
3   you know, becomes, you know, a distance situation. You
4   want to patient within reasonable access to you in case
5   they have a problem. I mean that's just good logic.
6    **Q  And it's fair to say that for the majority of the**
7  **procedures you perform, you don't advise your patients to**
8  **stay within the vicinity, only for those five or six --**
9        MR. BECKMAN: Object to form.
10   BY MS. PERRYMAN:
11    **Q  -- very serious --**
12    A  That's what I do -- those are what I do mostly, the
13   ones I do more frequently.
14    **Q  Okay. Now, tell me, for those patients, what types**
15  **of complications could arise after discharge.**
16    A  Bleeding, infection, but usually not acutely, airway
17   problems, drug overdose leading to airway problems,
18   cardiovascular problems, fluid imbalance, those are the
19   primary ones.
20    **Q  Do you treat all of those complications? Like if**
21  **someone has a fluid imbalance, would you know -- be the**
22  **physician --**
23   A  Well, I would --
24    **Q  -- that would treat that?**
25   A  You mean could I treat it or would I?

Page 48

1    **Q  Do you consider yourself to be -- like, have the**
2  **expertise to treat that?**
3   A  Yes. I --
4        MR. BECKMAN: Object to form.
5        THE WITNESS: I, you know, have been in the burn
6   unit at Cook County. I was in the trauma unit at Cook
7   County. I mean fluid imbalance -- if someone had a
8   significant electrolyte and fluid imbalance that required
9   hospitalization, I'd probably get somebody to come in, make
10  arrangements myself for them to come in and assist me with
11  that. Not that I couldn't do it. I just think in this day
12  and age it would be better for me to do that.
13  BY MS. PERRYMAN:
14    **Q  And is that the same thing with the other**
15  **complications, that maybe as a surgeon you might be able to**
16  **do it, but that it would be better to get someone that does**
17  **it on a more regular basis that treats complications?**
18   A  Surgeons like to manage their own complications. If
19   I have somebody bleeding, I manage it. I can't call down
20   the street and say, Joe, would you mind coming in and
21   taking care of my complication. No, I wouldn't do that.
22    Now, if it's a complication outside the scope of my
23   specialty, like if somebody went into renal failure for
24   some reason, then I would get a nephrologist, of course.
25    **Q  And you would manage that process.**

Page 49

Pages 46 to 49

1    A  I would manage it, absolutely.  I think the
2    continuity of care is an important issue.
3        Q  Now -- and I want to talk -- what is continuity of
4    care to you?
5        A  Well, it's from -- as specific as the continuation
6    of care by the caregiver -- and I hate to use that word,
7    that's a government word; right?  By the physician, I
8    should say, or the processing of the patient into the care
9    of another physician and direct communication as to what
10   transpired in the patient's care.
11       Q  So processing -- just so I understand it, processing
12   a patient into the care of another physician, while
13   communicating with that physician, that's part of the
14   continuity of care; is that correct?
15       A  Can be, yes, depending on what the issue is.
16       Q  Now, you travel often for your speeches and for
17   board memberships, it looks like, from your CV.
18       A  Uh-huh.  Uh-huh.
19       Q  What do you do if a complication arises and you're
20   not in the Los Angeles area?
21       A  I usually have somebody covering me, but I try not
22   to do cases of major significance before I leave.
23       Q  You have in the past, though; right?
24       A  Right before I leave?  Rarely, not that I can
25   recall.  Maybe once or twice I have, yes.  But I always

Page 50

1    have somebody cover me.
2        For example, there's another surgeon operating in my
3    surgery center right now who's a colleague of 25 years.
4    And if I had to, you know, he would -- I have agreements
5    with other surgeons to admit patients in case -- for
6    example, let's say I'm doing a case, and I have a heart
7    attack during the operating room procedure, or let's say
8    not, but I have doctors who have agreements with me, even
9    in the building, who would come to take over.
10       Q  And that's to ensure continuity of care for your
11   patient.
12       A  Well, it's to ensure that the patient survives.  If
13   I'm the surgeon and somebody's open and I go down, somebody
14   has to come in to manage the care.
15       Q  So let's take the other -- maybe the less tragic
16   case where you're out of the area or traveling and a
17   complication arises.  You have agreements, relationships
18   with other surgeons that could take over the care; is that
19   right?
20       A  Right.  And the process goes like this.  I call them
21   up and I say, you know, Dr. Jones -- I probably call them
22   by their first name because I know them very well -- I just
23   did this procedure two or three days ago.  Everything's
24   fine.  The patient's stable.  Will you manage it in case
25   anything happens.  They say yes, and that's it.  Then I'm

Page 51

1    covered.
2        Q  And you think that's sufficient to achieve
3    continuity of care.
4        A  Yes.
5        Q  Now, where do you have privileges?
6        A  I have privileges at USC, which I'm just in the
7    process -- I've got to go down and get my health
8    examination done, which I'm supposed to do -- was supposed
9    to do yesterday, but I have privileges.  And I have
10   privileges at a small hospital called Miracle Mile.
11       Q  Now, Miracle Mile -- where is the USC Hospital?  How
12   many -- where is it in relationship to your office?
13       A  It's about 16 miles from here.
14       Q  Miracle Mile is how close?
15       A  About 4 miles.  4 or 5 miles.
16       Q  Miracle Mile is a hospital that's sort of in the
17   vicinity that you would suggest that your patients stay in
18   of your practice; is that right?
19           MR. BECKMAN:  Object to form.
20           THE WITNESS:  No.  I've never had a patient stay
21   there.
22   BY MS. PERRYMAN:
23       Q  No.  I'm saying Miracle Mile is in the 4-mile -- 4
24   to 6-mile radius of the facility --
25       A  Yes.  Yeah.

Page 52

1        Q  And does Miracle Mile have an emergency room?
2        A  No.  Oh, wait a second.
3        Q  So if a patient --
4        A  You mean if I had to go back to surgery?  If I had
5    to go back to surgery --
6        Q  I wasn't asking -- I just asked if Miracle Mile had
7    an emergency room.
8        A  No.  They have the capability for emergency surgery.
9        Q  And do your patients also -- have they sought care
10   at Cedars-Sinai before?
11       A  I was on the staff at Cedars for many, many years.
12   So yes.
13       Q  And you don't have privileges there.
14       A  I had them for years, but I lost them because of
15   lack of use.  You have to do 24 cases in a two-year period,
16   and obviously I did most of my cases here.
17       Q  And with respect to that, it's obviously possible to
18   lose privileges at a hospital irrespective of your
19   qualifications or credentials; is that right?
20       A  Absolutely.
21       Q  And that happened to you, in fact.
22       A  It did happen to me.
23       Q  And you still have patients that night go to
24   Cedars-Sinai -- is that right? -- if there's a
25   complication?

Page 53

Pages 50 to 53

**Page 54**

1  A  Yes.  Unlikely, unless I directed them that way.  I
2  mean, yes, if I had -- for example, the surgeon that is
3  here is a surgeon at Cedars-Sinai.  Correct.
4  **Q  So --**
5  A  If it was necessary.  If it was necessary to do
6  that, yes.
7  **Q  So if it was necessary for a patient to go to**
8  **Cedars-Sinai, do you believe that you could communicate**
9  **with Cedars-Sinai in order to continue to manage the care**
10 **of that patient even though you weren't seeing them**
11 **directly?**
12 A  Because of the way that I've set up my personal
13 situation, yes, I do, because I have a number of colleagues
14 on the staff there who would cover for me if necessary.
15 **Q  So notwithstanding that you don't have privileges at**
16 **Cedars-Sinai, you believe that you could ensure the**
17 **sufficiency of continuity of care based on the**
18 **relationships that you have there.**
19 A  Yes.
20 **Q  And privileges aren't required to do that.**
21 A  No.
22 **Q  Have you ever lost privileges anywhere else?**
23 A  Lost privileges?  You mean in the same manner?  I've
24 never lost privileges for some -- other than not performing
25 the number of cases.  Olympia Hospital's another one, same

**Page 55**

1  thing.  That's just a new thing that's come in over the
2  last three years.
3  **Q  And you think that's a problem; is that right?**
4  A  I think it's --
5  MR. BECKMAN:  Object to form.
6  THE WITNESS:  I think it's a major problem.
7  BY MS. PERRYMAN:
8  **Q  You mentioned that you work on the evidence-based**
9  **medicine and collecting data about complications rates**
10 **associated with certain procedures.**
11 A  Uh-huh.
12 **Q  I believe you've published some -- you said you**
13 **published two studies on that?**
14 A  Two papers, yes.
15 **Q  Two papers.  And am I right that in one of those**
16 **papers the data in the AAAASF database showed the incidence**
17 **rate of significant complications to be around 0.33**
18 **percent?**
19 A  It's exactly what I'm looking at right here.
20 **Q  Okay.  Is that correct?**
21 A  That's correct.  That's very good.
22 **Q  And you think that's a very good rate?**
23 A  Very good?  Well, I mean ultimately you want no
24 complications.  And that's also through the spectrum of
25 procedures too.  So there are procedures that have more or

**Page 56**

1  less, but I mean, I think that's -- I think that's pretty
2  good actually.
3  **Q  And the paper you published, I think it described it**
4  **as an excellent rate; right?**
5  A  Yeah.  Always room for improvement.
6  **Q  Right.**
7  A  Of course.
8  **Q  But these are the rates that accredited AAAASF**
9  **facilities, that meet the gold standards, this is the**
10 **complication rate that resulted from the complications that**
11 **the database catalogued; right?**
12 A  Yeah.
13 **Q  Would you agree with me that that's an excellent**
14 **incident rate, sort of generally?**
15 A  Well, you know, it's easy to say it's excellent.
16 But what we're gratified is that it's not 10 percent.  And
17 so excellent is an arbitrary -- I may have said that, but
18 I'm trying to emphasize that it's not 10 percent, but
19 ultimately there are complications that we would prefer
20 didn't occur and shouldn't occur.  So, you know --
21 **Q  Beyond the fact that it's not zero --**
22 A  Right.
23 **Q  -- you would still agree that it's an excellent**
24 **rate.**
25 A  It's -- yeah, it's low.  It's a low rate, which is

**Page 57**

1  good.
2  **Q  And if I were to represent to you that the rate of**
3  **significant complications for abortion procedures, for**
4  **instance, that are performed in non-ASC settings, is below**
5  **0.33 percent, would you consider that to be an excellent**
6  **rate?**
7  A  I would say it's good.  You know, excellent -- it
8  depends on the procedure.  Procedures all carry different
9  potential.  For example, if I excise, like I said, a skin
10 lesion, the potential for complication is not as great as
11 if you're doing like an abdominoplasty or if you're doing a
12 herniorrhaphy or something like that.  So it depends on the
13 procedure.
14 **Q  But in any event, a complication rate of lower than**
15 **0.33 percent would be considered good.**
16 A  It is good.  Yeah, it's fine.  It's acceptable, I
17 think.
18 **Q  And would you agree with me that complications can**
19 **result in patients regardless of any --**
20 (Interruption in the proceedings.)
21 BY MS. PERRYMAN:
22 **Q  Complications can occur, can't they, in patients,**
23 **regardless of whether a doctor's care was --**
24 A  What we like to call them is unanticipated sequelae,
25 and the reason for that is because complications imply that

Pages 54 to 57

1  somebody did something wrong, and that's not always the
2  case, obviously.
3     **Q  And that's not always the case with respect to any**
4  **procedure; correct?**
5     A  With any procedure, right, or any thing.
6     **Q  Well, tell me why -- I mean I take from the papers**
7  **you've written and your report and the speeches you've**
8  **given that you think accreditation is useful.  Can you tell**
9  **me why you think accreditation is useful?**
10    A  Would you like to have surgery in a facility where
11  there's no oversight?
12    **Q  So accreditation is useful because of oversight?**
13    A  Because it demands adherence to standards of safe
14  surgical care delivery.
15    **Q  And would you agree with me that in some states, not**
16  **in all, there are regulations that also provide for those**
17  **standards?  In fact, I think you said that some of the**
18  **states have modeled the regulations off of AAAASF; is that**
19  **correct?**
20    A  I believe that's true, yeah.
21    **Q  And in states where there are comprehensive**
22  **regulations, do you think accreditation is particularly**
23  **needed, or is it just something that would be helpful?**
24    MR. BECKMAN:  Object to form.
25    THE WITNESS:  You're asking for a philosophical answer

1     **Q  -- patient safety, continuity of care --**
2     A  Yes.
3     **Q  -- all of the things that --**
4     A  Yes.
5     **Q  -- we talked about; is that right?**
6     A  Yes.
7     **Q  So it's basically, it's either that a practitioner**
8  **should comply with and submit themselves to what can be**
9  **very comprehensive regulations by a department of public**
10  **health or state authority, or they should be accredited.**
11    MR. BECKMAN:  Object to form.
12    THE WITNESS:  Accreditation is in lieu of licensure.
13  They carry equal meaning to whoever obtains either one.  So
14  that's by law.
15  BY MS. PERRYMAN:
16    **Q  Right.  Okay.  Great.**
17    **Are you aware of other credentialing or accrediting**
18  **organizations that are maybe industry specific?  So, for**
19  **instance, for dental industry or for OB/GYN or for**
20  **reproductive health clinics, that there are certain**
21  **associations?**
22    A  Well, I know other accrediting associations for
23  outpatient surgery, and we've mentioned those, AAAHC, which
24  is -- and I forget the names too because I learn the
25  initials, but it's American Association for Accreditation

1  to something.  When governments do things, they oftentimes
2  overregulate to the point that they make it impossible to
3  provide a service.  That does happen at times.  Okay?
4     At other times, when they communicate with
5  accrediting associations -- for example, in California the
6  Medical Board of California communicates with the
7  accrediting association.  They get their standards so that
8  they're appropriate for the care delivery.
9  BY MS. PERRYMAN:
10    **Q  So, for instance, in California, just because you**
11  **brought it up, the medical board bases their standards off**
12  **of the accreditation standards; is that right?**
13    A  Well, I can't say they definitely do.  They don't --
14  the medical board doesn't have standards.  They deem the
15  accrediting associations as the -- you can either be
16  licensed or accredited.  If you want to be licensed, you're
17  under the Department of Public Health.  If you want to
18  accredited, the medical -- you're under the medical board.
19  So the medical board doesn't develop standards.  They deem,
20  just like Medicare deems, the accrediting association to
21  provide the standards, and they accept those standards as
22  valid for the accreditation.
23    **Q  So if a practitioner was licensed but not**
24  **accredited, you would agree that's sufficient to ensure --**
25    A  Yes.

1  of -- I forget the last two.  And then there's JCAHO also,
2  which is -- those are the hospitals.  Then there's IMAQ.
3  Those are the major accrediting associations.
4     **Q  With respect to abortion procedures, are you aware**
5  **that Planned Parenthood Federation of American and National**
6  **Abortion Federation have accrediting procedures for**
7  **clinics?**
8     A  No.  Accrediting procedures or accrediting bodies?
9     **Q  They have accreditation processes.**
10    A  So they nationally accredit, and the state accepts
11  that?
12    **Q  I'm asking are you aware of their accreditation**
13  **processes.**
14    A  No.  I'm asking is that what they do, they accredit
15  facilities in states?
16    **Q  They have accreditation processes.  What I'm asking**
17  **is, you don't have -- it sounds like you don't have**
18  **information one way or the other.**
19    A  No, I'm not -- no, I don't have any information.
20    **Q  Okay.  And you haven't reviewed any of the**
21  **accreditation standards that they might have --**
22    A  No.
23    **Q  -- for particular clinics; is that correct?**
24    A  No.  No.
25    **Q  And you don't have an opinion about whether those**

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1  are sufficient or insufficient because you --
2      A  No.
3      Q  -- haven't reviewed them.
4      A  No.  I've no view.
5      Q  Okay.  So if a patient -- just going back to your
6  practice briefly, and then we'll move on to the standards.
7  But I was just trying to understand kind of the discharge
8  procedures.  And if a patient is in Orange County, let's
9  say that's where they live, and they get discharged, and
10 something does happen to them while they're at their home,
11 would you recommend that they go to their local hospital to
12 seek care?
13     A  Yes.  If I wasn't there, of course.
14     Q  And what would happen at that point?
15     A  I would then -- they'd tell me where the hospital
16 was they were going.  I would call the emergency room.  I'd
17 ask for the emergency room physician.  I'd discuss the case
18 with him, tell him this patient -- which just happened
19 recently.  I had a patient who was a week postoperative
20 from a breast augmentation.
21     She called me up and she said, you know, I'm having
22 a little chest pain or whatever.  I didn't suspect it was
23 anything, but the chance of a pulmonary embolism is always
24 potential.  So I said go to your emergency room.  I called
25 the doctor there.  I said, I don't think this is but

Page 62

1  potentially may be, please evaluate the patient and let me
2  know, you know, what you think.
3      Q  And you didn't have privileges at that hospital;
4  right?
5      A  No, I did not.
6      Q  And you were able to communicate what -- you were
7  able to communicate with the doctors there.
8      A  For that type of an issue, yes.
9      Q  And you maintained the continuity of care; is that
10 correct?
11     A  Correct.  But an issue related to that is that is
12 something that is a nonsurgical problem.  That's not
13 something like bleeding.  Not to say that if somebody was
14 bleeding and you had no choice, but the preferable manner
15 would be for me to take care of the patient.
16     Q  Right.
17     A  I wouldn't want them to be, you know, an hour away
18 and not able to manage them.
19     Q  But in cases where you've been traveling, you've
20 been able to make -- as you said, you have relationships,
21 and you've been able to ensure the continuity of care
22 through referrals or through other ways.
23     A  Yes.  Yes.
24     MS. PERRYMAN:  Let's take like a two- or
25 three-minute break.

Page 63

1      MR. BECKMAN:  Sure.
2      (Recess.)
3  BY MS. PERRYMAN:
4      Q  Dr. Keyes, earlier in the deposition we talked about
5  cases in which you've served as an expert, and I asked you
6  about cases you testified.  But you're also an expert, are
7  you not, I think for the State of Mississippi in a case
8  about hospital privileges?
9      A  I was.  I don't know if I still am.  I don't know if
10 that's even been -- I haven't had anything to do with that
11 for a while.
12     Q  Okay.  But you have served --
13     A  Same issue, yes.
14     Q  And you submitted a report in that case; is that
15 right?  An expert report?
16     A  Yes.
17     Q  Okay.  While I'm pulling that report, are you
18 currently serving as an expert or working with any legal
19 teams to be an expert in any case involving hospital
20 privileges in the abortion or reproductive health context?
21     A  No.  No.
22     Q  Other than in Alabama and Mississippi?
23     A  No.
24     Q  Okay.  So I'm going to show you -- have the court
25 reporter mark this as Exhibit -- are we on 4? -- as Exhibit

Page 64

1  4.  And this is the -- I believe this is the report you
2  submitted in the Mississippi case.
3      (Exhibit 4 was marked for identification
4      by the court reporter and is attached hereto.)
5  BY MS. PERRYMAN:
6      Q  And just tell me, after you look at it, if it looks
7  to be that report.
8      A  Yeah.  It looks like it has my signature on it, yes.
9      Q  And that was back in March of 2013, so a few months
10 ago; correct?
11     A  Uh-huh.
12     Q  All right.  And if I could turn your attention to
13 the section on compensation, it says that you were
14 compensated $500 an hour for work performed, and I believe
15 you've been compensated by the State of Alabama for $385 an
16 hour.  Is there any particular reason that you have a
17 difference in fees between these cases?
18     A  I was asked to, and I said fine.
19     Q  Can you turn to page 3.  And I'm going to turn your
20 attention to footnote 1.  And we talked about this issue
21 before when you said that you yourself have been denied
22 privileges or lost privileges not due to any fault of your
23 own, but because of an inability to guarantee that a
24 certain amount of procedures would be performed at a
25 particular hospital; is that correct?

Page 65

Pages 62 to 65

**Page 66**

```
 1        And in footnote 1 --
 2     A  Yes.
 3     Q  -- of this report you actually admit that some
 4  hospitals are demanding a minimum number of cases be
 5  performed.  Do you see that, sir?
 6     A  Yes.
 7     Q  And that's -- this is -- I'm sure it was accurate
 8  when you wrote it, and you believe it's accurate today?
 9     A  It's accurate.  But I should have said that it's
10  reviewed on a case-by-case basis.  It's not automatic.
11  It's not an automatic thing.  In other words, we review it,
12  each one.  But I mean the concept is there.
13     Q  Of course.  So I mean -- and, in particular, the
14  concept that there are hospitals who deny privileges to
15  physicians due to no fault with their care or their
16  credentialing or their experience.
17     A  That's correct.
18     Q  Okay.  Let's turn to the expert report that you
19  submitted in this case, and I'll find my copy.  It's
20  Exhibit No. 1, if you have it on your desk.  And I'm
21  wondering if you could turn to page 5, paragraph 11 of that
22  report where you talk about --
23     A  Economic credentialing.
24     Q  Yes.
25     A  Yes.
```

**Page 67**

```
 1     Q  Is there a reason you didn't include the statements
 2  that you made in footnote 1 of the Mississippi report and
 3  you made here on the record today with me, is there a
 4  reason that you didn't include that in paragraph 11?
 5     A  Not specifically.  Just more information related to
 6  the same issue.
 7     Q  Okay.  And you're not --
 8     A  The problem is this:  Hospitals will not stipulate
 9  that it's economic credentialing, obviously.  They
10  stipulate that it's because they don't have an opportunity
11  to evaluate the care being given.  But there are concerns
12  about economic credentialing.  So that's why.
13     Q  And you would say that certain hospitals, while they
14  may not say it's economic credentialing, in effect, it is;
15  is that correct?
16     A  Well, I can't -- I mean I can't prove it.  If you
17  take this up to a hospital credentialing committee, they'll
18  say, look, we're interested in being able to monitor your
19  care, and that's why we're doing this.  I mean I believe --
20  for example, we do peer review, and that's how we have this
21  data.  And I believe we would like to be able to send our
22  peer review to document that what we're doing in the
23  outpatient arena is safe and we monitor it too.  But they
24  won't accept that.
25     Q  Right.  So you believe that there are other ways, in
```

**Page 68**

```
 1  effect, that a hospital could devise a system or a state
 2  could devise a system, where a hospital could evaluate the
 3  quality of care that a surgeon provides without having to
 4  obtain privileges.
 5     A  Are there other ways to evaluate the quality of --
 6     Q  Without having to practice in the hospital itself,
 7  in the four corners of the hospital itself.
 8     A  Well, you can document the quality of care
 9  elsewhere, and that hospital still doesn't -- the hospitals
10  don't accept documentation even from other hospitals.  They
11  all prefer to do it themselves on a case-by-case basis.  So
12  your question is yes -- the answer to your question is yes,
13  there are other means of documenting credentials, but that
14  doesn't mean a hospital's going to accept them because they
15  like to do it themselves.  And that's true for all the
16  hospitals.
17     Q  But in your medical opinion and, you know, as
18  someone that's involved in AAAASF, I mean you're not
19  denying that there are, in fact, ways that one could be
20  qualified -- you yourself for an example -- to perform
21  procedures or care for patients in hospitals, but
22  nevertheless a hospital will not allow you to have the
23  privileges.
24     A  That's right.  That's because of the requirement of
25  cases per year in particular.
```

**Page 69**

```
 1     Q  And so with respect to paragraph 11 of your report
 2  in this case, you're not denying that the practice of
 3  economic credentialing exists; is that correct?
 4     A  Economic credentialing?  I can't prove it.  I mean
 5  it's my -- it's a feeling that I have, but that's only
 6  worth so much.  I'm not saying that that's occurring,
 7  because I can't, obviously.
 8     Q  Right.  But you're not denying that hospitals will
 9  deny privileges to physicians who are otherwise qualified,
10  but because a physician cannot perform a certain amount of
11  procedures in the hospital.
12     A  That's right.
13     Q  And that, in fact, has happened to you.
14     A  Yes.
15     Q  And it's happened to you notwithstanding the fact
16  that the American Medical Association and the other sources
17  that you cite in paragraph 11 of this report have come out
18  on the issue and say that this is something that shouldn't
19  happen; is that right?
20     A  Well, no.  They're saying that it shouldn't be based
21  on economic credentialing.  There's a difference.  And
22  that's the issue that we've just addressed.  The rational
23  for them denying privileges is not, in their opinion, based
24  on economic credentialing, and that's what they would
25  argue.  They'd argue on it being their ability to be sure
```

Pages 66 to 69

1  that you are capable of practicing in their hospital.
2     **Q  And you believe, as the president of AAAASF and as a**
3  **surgeon that's practiced for 30 years, in your medical**
4  **opinion, you believe that there are ways that one could**
5  **demonstrate that they're qualified without having to**
6  **perform certain amounts of procedures at a hospital.**
7     A  Well, we -- we credential people, but one of the
8  credentialing things, we like to see that they have
9  hospital privileges at a staff, so we get that extra added
10  support.  I think if you have never been credentialed in a
11  hospital, it becomes more difficult.  If you've been in a
12  hospital, practicing for 25, 30 years and you have a very
13  good record and then you lose your privileges, well, then
14  we can look at that in light of other things and make a
15  determination.
16     **Q  That's actually what -- that's what AAAASF does;**
17  **right?**
18     A  That's right.
19     **Q  So they don't necessarily require that you have the**
20  **privileges.  It's that you either have to have the**
21  **privileges, or AAAASF has to look at why you don't have**
22  **privileges and they can credential --**
23     A  They require that you have had privileges --
24     **Q  Right.**
25     A  -- and that you never lost your privileges for

Page 70

1  malfeasance.
2     **Q  Right.  But they don't require that you currently**
3  **hold privileges.**
4     A  Case-by-case basis.
5     **Q  So the answer to my question is, yes, they do not**
6  **require --**
7     A  Yes.  With asterisks.
8     **Q  And then it's important to have flexibility on a**
9  **case-by-case basis.**
10     A  On a case-by-case basis, that's correct.
11     **Q  And one of the reasons it's important is because**
12  **there can be qualified surgeons and physicians who are**
13  **qualified to perform certain procedures, but nevertheless**
14  **do not have privileges due to no fault of their own; is**
15  **that correct?**
16     A  Correct.
17     **Q  Going back to your experience as an expert in cases**
18  **such as this one, we've talked about Mississippi for a bit**
19  **and this case in Alabama.  Have you been contacted by any**
20  **states' attorneys general's offices or any other**
21  **organizations to provide expert opinions or to seek**
22  **consultation?**
23     A  By any other state, no.
24     **Q  What about attorney general's offices?**
25     A  I don't think so, no.

Page 71

1     **Q  What about organizations?**
2     A  There is an organization -- I have to look up the
3  name --
4     **Q  Okay.**
5     A  -- if I can -- that found me for the state.
6     **Q  For which state?**
7     A  For both Mississippi and for Alabama.
8     **Q  Yeah.  That would be great if you can tell me who**
9  **the organization is.**
10     A  I mean I know the name of the contact person, but I
11  forget the organization.  I can find it readily.
12     Okay.  Litigation Consulting and Research in
13  Jacksonville, Florida.
14     **Q  Who did you speak to there?**
15     A  Vincent Rue, Dr. Vincent Rue.  He's a Ph.D.  R-u-e,
16  last name Rue, Vincent Rue.
17     **Q  What did he tell you about these cases?**
18     MR. BECKMAN:  Objection.  Object to form.  This is
19  attorney-client.
20     MS. PERRYMAN:  Is Vincent Rue an attorney?
21     MR. BECKMAN:  No, but he's an agent of our state.
22  It's an extension of the privilege.  I would have to ask
23  him not to answer.
24     (Instruction not to answer.)
25  BY MS. PERRYMAN:

Page 72

1     **Q  Your counsel has asked you not to answer this**
2  **question.  Are you going to follow the instruction of your**
3  **counsel?**
4     A  Yes, I probably should.
5     **Q  Have you been contacted by anyone else outside of**
6  **Mr. Rue and outside of individuals at the state AG's**
7  **offices in Mississippi and Alabama?**
8     A  No.
9     **Q  Have you ever been asked to sign a declaration in a**
10  **case -- these are expert reports, but have you ever been**
11  **asked to sign a declaration to support a complaint or a**
12  **motion or anything like that?**
13     MR. BECKMAN:  Again object to form.  This is, again,
14  getting into privilege.  I'm going to ask him not to
15  answer.
16     (Instruction not to answer.)
17  BY MS. PERRYMAN:
18     **Q  And I'm assuming that you'll follow the instruction**
19  **of your counsel.**
20     A  Yes.
21     MS. PERRYMAN:  We can discuss, off the record,
22  the --
23     MR. BECKMAN:  Sure.
24     MS. PERRYMAN:  -- merits of your privilege claim.
25  I'm not sure that all communications, depending on what the

Page 73

Pages 70 to 73

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1    nature of them are, would be privileged with an expert.
2       MR. BECKMAN: Sure. We're happy to discuss it.
3    BY MS. PERRYMAN:
4       Q  Let's talk about -- we've talked a little bit about
5    privileges and about AAAASF's flexibility on a case-by-case
6    basis in some cases where a doctor, you know, doesn't have
7    current privileges. What would AAAASF do for doctors who
8    perform procedures that aren't performed in hospitals so
9    that the procedure itself isn't performed in a hospitals?
10      A  They're not supposed to do that in our accredited
11   facilities. Part of the standard is that they have to
12   be -- they have to have privileges in the hospital or have
13   had privileges in a hospital to perform those procedures
14   that they perform in their outpatient facility.
15      Q  What if the hos- -- what if -- so, for instance, do
16   you have an understanding in Alabama as to whether
17   abortions are performed in hospitals?
18      A  I don't. I would assume it's possible that they
19   are. I don't know that.
20      Q  If I were to represent to you that in Alabama and
21   most states, in fact, probably all states, abortions are
22   actually not performed in hospitals, what would you -- I
23   guess I'm just trying to figure out how AAAASF would treat
24   that.
25      A  Well, if you have an OB/GYN surgeon who has had

Page 74

1    residency training in a particular area -- and this has to
2    do with many different types of procedures, but someone can
3    take a weekend course on abortion, for example, and say,
4    gee, why don't I set up shop and start doing abortions.
5    You know, we want to make sure that the credentialing is
6    based on the American Board of Medical Specialties.
7    BY MS. PERRYMAN:
8       Q  And let's actually take that example. You don't
9    have any reason to think that the regulations -- the
10   existing regulations in Alabama would allow someone that
11   took a weekend course in abortion to set up shop and start
12   performing abortions, do you?
13      A  Well, I don't know about Alabama, but I know many
14   states don't limit what you can do.
15      Q  Right. But this is about Alabama and I mean --
16      A  I don't have any reason. No, I'm not aware of
17   Alabama's --
18      Q  Right. And you're not aware of --
19      A  No.
20      Q  -- the extensive regulations --
21      A  No, I'm not.
22      Q  -- that Alabama has.
23      A  I'm not. I'm not.
24      Q  And if I were to represent to you that Alabama does
25   require certain types of credentialing, I mean, you would

Page 76

1    privileges at a hospital, that would probably be included
2    in his privileges despite the fact that he's done them in
3    the hospital. So it's a matter of credentialing, not
4    actual surgery.
5       Q  Okay. So the idea is that the reason that when
6    privileges are required in the -- you know, the reason that
7    AAAASF asked that people have privileges is because they
8    want to assure appropriate credentialing; is that right?
9       A  Right. We want to assure that somebody who's doing
10   an operation in an outpatient facility has had training in
11   that procedure.
12      Q  Right. And there are other ways to ensure that
13   credentialing -- correct? -- other than just having
14   hospital privileges. That's why there's the flexibility in
15   the AAAASF?
16      MR. BECKMAN: Object to form. This is -- we've been
17   over this ground.
18      THE WITNESS: The problem with credentialing is that
19   in this day and age there are many surgeons who are
20   stepping out of the boundaries of their clinical practice
21   to do other things on the basis of their licensure as a
22   physician and surgeon. And, theoretically, they're
23   permitted to do that.
24      Our choice, as an accrediting association, has been
25   to set the standard that if you don't have specific

Page 75

1    agree with me, as you've said before, that that is sort of
2    similar to the types of AAAA -- the types of standards that
3    associations like AAAASF and others require; is that
4    correct?
5       MR. BECKMAN: Object to form.
6       THE WITNESS: You say certain types of
7    credentialing. I may not agree with their types of --
8    BY MS. PERRYMAN:
9       Q  So we can go over it. We can go over it later.
10      A  Right.
11      Q  But you would agree with me, as a matter of
12   principle, that there are certain states that do have
13   requirements that are modeled and that are similar to
14   accreditation requirements.
15      A  The states -- no, the states' requirements in
16   general are more lacks than ours are, in general. There's
17   more of an attitude of -- and this is true of the federal
18   government, too -- more an attitude in restraint of trade,
19   and a doctor's a doctor.
20      Q  You don't have any expert knowledge that the
21   regulations in Alabama --
22      A  No.
23      Q  -- as they pertain to reproductive health clinics
24   and abortion clinics, you don't have any knowledge that
25   they're more lacks than your standards.

Page 77

Pages 74 to 77

1      A  No.
2      Q  And you've, in fact, testified that one of the
3  reasons that physicians in some states like to become
4  accredited is to avoid the regulatory apparatus of
5  licensure; is that correct?
6      MR. BECKMAN:  Object to form.  I don't recall him
7  saying that.
8      THE WITNESS:  No, I never said that.
9  BY MS. PERRYMAN:
10     Q  You've said that licensing and accreditation are two
11  separate things; correct?
12     A  Well, they're both -- they're two alternative paths
13  to the same direction.  I made a side comment about what
14  happens with legislature sometimes, but many people would
15  choose accreditation with AAAA because it is gold standard
16  and because of what it carries, you know, in terms -- so
17  I'm not saying that they're trying to avoid.  They probably
18  want to be accredited by us.
19     Q  And you did say that --
20     A  I never said that, by the way.
21     Q  You did say that licensing, though -- I mean you
22  did, if I'm -- and we could go back and look at it.  You
23  did say that there is a tendency to overregulate, did you
24  not?  That was one of the things you said?
25     A  Well, you know, I'm talking about my state in

Page 78

1  general.  There is a -- let me try to qualify that.  There
2  is a tendency with the states to come closer to Medicare
3  requirements for outpatient facilities.
4      And the problem in the case of an office-based
5  facility -- for example, a lot of Medicare laws were based
6  on nursing homes.  So let's say you have a fire in a
7  nursing home and you have to evacuate 100 people or 150
8  people.
9      There are time considerations for getting all of
10  those people out.  So they have requirements for fire walls
11  and things like that that are more stringent than maybe is
12  necessary if you have one patient and you're taking that
13  patient out.  That's just an example.
14     So the states, because they develop their standards
15  oftentimes based on federal standards, can be onerous, not
16  necessarily in the area of credentialing, but they might be
17  more onerous with the physical plant.
18     Q  And accreditation provides an alternative to that
19  "onerousness."
20     A  Well, we're onerous enough.  We think we provide a
21  responsible approach to it, and that's why we say that.
22     Q  In forming opinions in this case, again, you didn't
23  look at or review anything about the existing regulations
24  in Alabama so you can't make statements --
25     A  Sorry.  Go ahead.

Page 79

1      Q  So I guess my point is statements that you're making
2  in general about the lacks nature of regulations, you don't
3  mean for those to apply in this case because you haven't
4  done that analysis; is that right?
5      MR. BECKMAN:  Object to form.
6      THE WITNESS:  First of all, I never said lacks --
7  never said lacks.  I said different.  I don't think I said
8  lacks.  I said they have different and view it in some
9  instances, in some issues of credentialing, more on the
10  noncompete issues and those types of things, more than we
11  do.
12     In other words, if you take the most stringent
13  requirements, the American Board of Medical Specialties
14  holds the most stringent requirements for you to be able to
15  say you're board certified in a specialty.  The states
16  don't care about -- in many cases, the states don't care
17  about board certification.
18     You can practice without being board certified, and
19  you can practice and do procedures outside of the scope of
20  your training.  I'm not saying it's lacks.  I'm saying we
21  don't agree with that approach.
22  BY MS. PERRYMAN:
23     Q  But you're not making those statements with respect
24  to Alabama because -- so that was my question, actually.
25     A  Well, you asked me the question have I reviewed all

Page 80

1  the regulations.  The regulation we're talking about is the
2  one that requires hospital privileges for a surgeon
3  performing an abortion.  So I've reviewed that.
4      Q  I know that you've reviewed the bill --
5      A  Yeah, right, yeah.
6      Q  -- at issue in the case.  But what I'm saying is --
7  and we went over this in the beginning --
8      A  Yes.
9      Q  -- so I don't think this is -- I mean I don't think
10  what you've said changes that.  I'm just trying to make
11  clear that when you make statements about public health
12  regulations or states' views on certain credentialing, that
13  you're not -- you don't have any basis to make those
14  statements as to what is currently going on under existing
15  regulations in Alabama.
16     A  No.  That's absolutely true.  I'm not judging
17  Alabama.  No.
18     Q  Okay.  And along those same lines, just one thing
19  that you said earlier, when we were talking about
20  complications, is you talked about in your practice needing
21  to, in some instances, manage bleeding postcomplication,
22  that that's something that you as a surgeon would try to
23  manage for your patients.
24     And I guess what I want to clarify -- and, again, we
25  went over it at the beginning, but I just -- some of that

Page 81

Pages 78 to 81

1    I'm unclear with what you said, is that you don't have any
2    specific expertise in bleeding with respect to
3    gynecological procedures or abortions.  You wouldn't --
4       A  That's kind of like asking, if I could fly a
5    specific brand of plane, would I have some insight into
6    other planes.  I'm a doctor.  You know, I scrubbed on just
7    about every procedure in OB/GYN procedures during my
8    training.  So I've had experience.  I have an understanding
9    of it.  But you're asking me if somebody was bleeding from
10   a gynecologic procedure, I would not try to stop the
11   bleeding.  So is that what you're --
12      Q  Yeah.  And that's because -- is that correct?  I
13   mean I just -- what I'm trying to get at is that --
14      A  It's outside the scope of my practice.
15      Q  It's outside the scope of your practice, and
16   managing bleeding can be different if you're managing
17   bleeding from a complication that has to do with plastic
18   surgery to managing bleeding from a complication that has
19   to do with some other type of surgery that's not within
20   your area of expertise or specialty.
21      A  The anatomic area that is bleeding is of concern
22   when trying to stop it, and you should have expertise in
23   that anatomic area.
24      Q  Which is why you wouldn't treat a patient who had
25   been operated on in the gynecological setting; correct?

Page 82

1       MR. BECKMAN:  Wait till she finishes the question.
2       THE WITNESS:  Yes.
3    BY MS. PERRYMAN:
4       Q  Right.  And the standards of care for treating that
5    would be -- they would be very specific -- right? -- to
6    whichever specialization or whichever anatomical area.
7       A  The standard -- there's not -- I don't believe
8    there's a standard of care for stopping bleeding.  There is
9    a variety -- there are a variety of approaches that you use
10   to try to stop bleeding, but there's not a standard of care
11   for that.
12      Q  And the approach or the technique or the expertise
13   that one would employ, it would depend on the area of the
14   body that one was treating; is that right?
15      A  Yes.
16      Q  Okay.  Which is all the more reason you wouldn't
17   treat someone who might be experiencing a complication from
18   an abortion or gynecological procedure of bleeding --
19      A  Yes.
20      Q  -- correct? -- even though you feel confident enough
21   to treat someone that's experiencing bleeding as a result
22   of a facelift.
23      A  Yes.
24      Q  Let's turn back to the report that you worked on in
25   this case, which is Exhibit 1.  And I'd first like to ask

Page 83

1    you about some statements in paragraph 1 of the report.
2    And you say here -- and I guess before we start going
3    through your report, are these the opinions, the opinions
4    that are listed in this report, are these the opinions that
5    you intend to offer in this case?
6       A  Yes.
7       Q  And you don't intend to offer other opinions in this
8    case?
9       A  No.
10      Q  Okay.  So you mentioned that you reviewed the
11   opinions of Dr. Fine, Ms. Fox, and Ms. Ayers in paragraph
12   1.
13      A  Yes.
14      Q  You don't offer an opinion on their specific
15   opinions or any research or analysis that is included in
16   their reports; correct?
17      MR. BECKMAN:  I'd object to form.  I think the
18   document speaks for itself.
19   BY MS. PERRYMAN:
20      Q  Beyond what's in -- I mean I understand that you've
21   offered opinions in this document.
22      A  Well, inasmuch as the opinions that I've offered
23   differ from their opinions, yes, I would differ from them.
24      Q  And the question that I asked was not whether you
25   differed from them, but it's that you're not offering an

Page 84

1    opinion in this case about something that Dr. Fine said in
2    a particular paragraph of his report or -- of his report or
3    something that Ms. Ayers may have said in her declaration;
4    correct?
5       MR. BECKMAN:  Object to form again.
6       THE WITNESS:  I have to be, you know, honest that I
7    can't remember everything they said at this time.  I'd have
8    to look at it.  We could pull them out and look at them and
9    go paragraph by paragraph if you'd like to.  Do you have a
10   paragraph in particular that you want to ask me about?
11   BY MS. PERRYMAN:
12      Q  What I'm asking you about is the opinions that
13   you're offering in this case are confined in the opinions
14   that are in the document that's been marked Exhibit 1.
15   You've agreed with that; correct?
16      A  Yes.
17      Q  And so all I'm saying is, therefore, it follows from
18   that that other than what's in Exhibit 1, you don't have
19   other opinions that you intend to offer in this case about
20   materials you may have reviewed from Fine, Fox, and Ayers.
21      A  Not specifically, unless I was asked about them and
22   they were presented to me as such as coming from them in
23   those documents, and I was asked how do you feel about what
24   they said.  I mean I reserve my right to make an opinion
25   based on the question as it applies to the case.  I mean

Page 85

Pages 82 to 85

Page 86

1  I'm answering your questions right now.
2  **Q  But in terms of a formal expert opinion, these are**
3  **the opinions that you're offering in this case?**
4  A  These are the main opinions, yes.
5  **Q  The next sentence says that you believe that the**
6  **statutory provision is reasonable, conforms to existing**
7  **standards of care for accrediting ambulatory surgical**
8  **facilities and is medically beneficial.  Now, what I would**
9  **like to ask you about is your statement that the bill that**
10  **requires hospital privileges and contains no exception**
11  **conforms to existing standards of care for accrediting**
12  **ambulatory surgical facilities.**
13  A  Well, that is our stance with the exception of loss
14  of privileges, and you know the caveat to that.  We've
15  discussed that.  And I agree to that for this too.
16  **Q  So with respect to the statement where you say**
17  **existing standards of care for accrediting ambulatory**
18  **surgical facilities, are you only talking about AAAASF, or**
19  **did you undertake to look at the standards that other**
20  **accrediting organizations may have?**
21  A  I haven't looked at their standards in particular,
22  but I know that many of them do not require this.  I know
23  that in California, at that meeting that I brought up to
24  you, the California state and medical board are looking at
25  requiring all accrediting associations to require those

Page 87

1  types of standards.  And my opinion's based on what I think
2  is the best possible medical care and not based on what
3  their standards are.
4  **Q  So your opinion's not based on existing standards of**
5  **care for accrediting ambulatory surgical procedures, all**
6  **existing standards of care.  Your opinion is basically**
7  **based on your experience at AAAASF.**
8  A  That's correct.
9  **Q  Okay.  So you're not, for instance, purporting to**
10  **say that House Bill 57 is consistent with or is consistent**
11  **with standards that other accrediting organizations may**
12  **have.**
13  A  No.  I'm saying I think it should be in that it is
14  consistent with AAAASF.
15  **Q  And when you say that it is consistent with AAAASF,**
16  **you understand that HB 57 does not have a case-by-case**
17  **exception for when privileges are lost.**
18  A  Correct.  I understand that, and as I said, I think
19  that might be a good addendum.
20  **Q  A good addendum to HB 57?**
21  A  That's right.
22  **Q  You don't think there's any reason not to have a**
23  **case-by-case exception?**
24  A  I don't.
25  **Q  In your medical opinion.**

Page 88

1  A  Correct.
2  **Q  You've also said that the bill is medically**
3  **beneficial to protect women's health in Alabama.  You're**
4  **not saying that it's necessary to protect women's health,**
5  **are you?  You're just saying that it's beneficial?**
6  A  It goes back to the crux of the matter.  I think
7  continuity of care and having the surgeon performing a
8  procedure responsible for their complications and their
9  aftercare is an important thing and is beneficial to them.
10  I do believe that.
11  I mean, you know --
12  **Q  But you're not -- just to answer the question I was**
13  **asking, you're not saying that it's necessary for women's**
14  **health.**
15  A  Well, let's take an example so that I can clarify
16  that.  If somebody had a surgical procedure and traveled
17  400 miles and then immediately started to hemorrhage,
18  they'd have to go and seek care where they might, with the
19  hopes that they would have that bleeding stopped; right?
20  Is that the most beneficial situation?  No.  Or is
21  that the best possible situation for them?  No.  The best
22  possible situation was that the time lost from all of the
23  circumstances going on could have been obviated by them
24  being under the guidance and purview of the person doing
25  the surgery.  So obviously that's in their best interest.

Page 89

1  **Q  And someone can maintain continuity of care without**
2  **having hospital privileges at a particular hospital, just**
3  **like you said with your patients, if someone goes to**
4  **Cedars, you can call Cedars and manage that care**
5  **sufficiently, even though you don't have privileges at that**
6  **specific hospital; is that correct?**
7  A  Yes.  But the point that I'm making is that you --
8  things can happen and situations may be resolved.  But
9  we're talking about what's the best medical practice,
10  what's the best situation for the patient.
11  You know, we see the entire care system being
12  changed to make exceptions to what has been traditional
13  approaches to problems.  And I think the best -- again, the
14  best possible care would be delivered by the person who did
15  the surgery, knows what went on in the surgery, knows what
16  happened, could be right at that point immediately, versus
17  somebody coming -- no matter how much you told them
18  verbally, it's a different situation when somebody comes in
19  cold to a complication than somebody who was there from the
20  beginning.  That's the whole concept of continuity of care.
21  It's not just that you verbally transfer that to somebody.
22  **Q  And so when you, for instance, rely on your**
23  **colleague who practices here in this office, if you're**
24  **traveling or something, you don't consider that verbally**
25  **phoning in, or whatever you just said, basically verbally**

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1 transferring it. You're managing that; right? And the
2 person is affiliated with your practice and so understands
3 the patient's background; is that correct?
4      A  Well, that's exactly what happens, though.
5 Remember, I call them and I say, Dr. Jones, I operated on a
6 32-year-old white female who has X, X, X, and X and is
7 taking these medications. It was an uneventful procedure,
8 nothing happened in the procedure so everything should be
9 good. It's a breast augmentation.
10     He said -- this one's had 40 years of breast
11 augmentation experience. So once I've given him -- and I'm
12 telling him all of this in anticipation of something
13 happening, not at the acute moment of it occurring.
14     Q  Right.
15     A  So that makes a difference.
16     Q  And in that situation where you're affiliated with
17 someone and you can provide some information about the
18 procedure, maybe even in advance with an agreement that
19 they would handle a complication if you weren't able to,
20 didn't had privileges at Cedars or weren't able to because
21 you were traveling, you think that's in the best -- that's
22 a best medical practice for the patient; correct?
23         MR. BECKMAN: Object to form.
24         THE WITNESS: You said may be telling them
25 information about the patient. It's not maybe. That's

1 done on a routine basis under the circumstances of the
2 patient being out of my potential reach. So it's not
3 maybe.
4     There's a difference in somebody leaving a facility
5 after a potentially invasive procedure, having a
6 complication 24 hours later, maybe not even being able to
7 call the doctor who did the procedure, and then having to
8 fend, if the procedure is life-threatening, somewhat for
9 themselves.
10    Yes, go to the emergency room, but it's a de novo
11 situation for that emergency room doctor, and that's not
12 preferable, somebody passing off this patient to somebody
13 who's responsible since the patient's far away.
14 BY MS. PERRYMAN:
15    Q  But with respect to hospital privileges, when you
16 obtain privileges at a hospital, there's nothing in the
17 agreement that you have at that hospital that you will
18 manage all complications. The hospital doesn't require
19 that; correct?
20    A  That I will manage all complications? The hospital
21 doesn't interfere with how I treat my patients unless I'm
22 doing something incorrectly.
23    Q  Right. So in the same way, even if a doctor
24 obtained privileges at a hospital, let's say in Alabama,
25 those privileges wouldn't require that the doctor treat all

1 complications. That's something that's in the discretion
2 of the physician; correct?
3     A  Well, there's a difference between treating and
4 responsibility for care. There's a thing called
5 abandonment, which I'm sure you're well aware of and -- you
6 know, if I just let a patient be dumped on a hospital with
7 no input or provision of information and I knew about it,
8 then in a way that would kind of be abandonment, wouldn't
9 it?
10    Q  So I guess the issue -- and you brought it up -- is
11 that you're saying there's a difference in treating a
12 complication and being responsible for the care; correct?
13    A  Well, I think one goes hand in hand. I mean if
14 you're treating a patient, you are responsible for their
15 care. That's the point.
16    Q  But treating the specific complication at a
17 hospital.
18    A  Let's step back to the concept you're asking about,
19 treating and responsibility. If you treat a patient, you
20 accept responsibility. You don't treat the patient and
21 say, all right, it was nice meeting you, and I hope
22 wherever you go, life turns out well.
23    Q  And just on that point, you don't have any specific
24 knowledge that that is what the system is in Alabama
25 without House Bill 57, do you?

1     A  No. I'm here to testify as to what I think in
2 general is good patient care.
3     Q  Right.
4     A  So I'm not testifying on Alabama's -- how things
5 happen in Alabama. I've never been to Alabama.
6     Q  And so if regulations in Alabama required that a
7 physician that performed a procedure, say an abortion
8 procedure, take responsibility for the care, even if that
9 person wasn't managing the care at the hospital, do you
10 think that would be a good thing?
11        MR. BECKMAN: Object to form.
12        THE WITNESS: I think, through your questioning,
13 you, I hope, have achieved an understanding of how I view
14 things with respect to patient care. If Alabama says
15 something that is their regulatory statute, that doesn't
16 mean it's the right thing. It's what Alabama says. I'm
17 trying to tell you what I think is right for patient care.
18 BY MS. PERRYMAN:
19    Q  And what you're saying is that it's good for the
20 physician or the surgeon who operated on the patient to
21 retain responsibility for that patient's care; correct?
22    A  That's the best -- that's the best scenario.
23    Q  And responsibility, you can retain responsibility
24 for a particular patient's care without being at
25 Cedars-Sinai, doing -- actually handling in a physical way

**Page 94**

1     the postoperative complication; correct?

2     A  It's not the preferable way.  I'm trying to give you

3     best surgical practice.  I can say, well, given you alter

4     circumstances, what's the best way to come to a happy

5     conclusion, hopefully.  But it's not the best way.

6     **Q  Okay.  So let's -- so under your statement, the best**

7     **way would be for a physician who performed a particular**

8     **procedure to handle physically the complications that**

9     **result from that procedure.**

10     A  I think that that's the best possible way, yes.

11     **Q  Now, earlier we've talked about you don't think that**

12     **that should happen if a complication is outside of the**

13     **surgeon's -- the principal surgeon's area of expertise;**

14     **correct?**

15     A  You can only do what you can do.

16     **Q  Okay.  And --**

17     A  Let me follow that up with I don't think, if you're

18     not able to handle the direct complications of what you do,

19     you should be doing it.

20     **Q  And there's no hospital privileges requirement that**

21     **you are aware of that, by virtue of having the privileges,**

22     **requires physicians to meet the best medical standard of**

23     **always handling their complications; correct?**

24     A  Well, beauty's in the eye of the beholder.  It's

25     called what's proper in the community, so to speak.  So

**Page 95**

1     malpractice is what is considered the proper management of

2     a patient within the state of the community.  Okay?  So

3     it's not really -- each individual processes of care is not

4     looked at and documented in a regulatory fashion.  It's the

5     overview of what would be the standard of care.  So I

6     think --

7     **Q  So let's go back to the question I asked --**

8     A  Okay.

9     **Q  -- which was about privileges.**

10     A  Right.

11     **Q  Privileges -- I know that you, as a physician and**

12     **surgeon who manage all types of patients for 30 years, have**

13     **definite opinions about what is the gold standard or the**

14     **best medical practice.**

15     A  Right.

16     **Q  And you've said that in your view, when it's**

17     **possible, it is good medical practice for someone to try to**

18     **manage a complication.  My question to you is that, isn't**

19     **it not correct that hospital privileges themselves, by**

20     **virtue of the fact that you hold privileges at Miracle**

21     **Mile, those privileges do not require that you manage every**

22     **complication or any complication that results from your**

23     **surgery.  That is something that you, as a surgeon who's**

24     **using his best medical judgment for his patient.**

25     MR. BECKMAN:  Object to form.

**Page 96**

1     THE WITNESS:  To date, the practice of medicine or

2     surgery is not regulated in its specific action by the

3     surgeon.

4     BY MS. PERRYMAN:

5     **Q  Right.  So with respect to HB 57, the hospital**

6     **privileges requirement, there's nothing in that requirement**

7     **in requiring that physicians get privileges that would**

8     **require them to manage a patient's direct complication or**

9     **care.  The privileges themselves do not require that;**

10     **correct?**

11     A  The privileges require them to -- no, does not

12     require that, no.

13     **Q  With respect to physicians that AAAASF accredits on**

14     **a case-by-case basis, physicians who may not have**

15     **privileges --**

16     A  We don't accredit physicians.  We accredit surgery

17     facilities.

18     **Q  I'm sorry.  Facilities.  With respect to facilities**

19     **where the physicians associated with those facilities may**

20     **not have privileges that AAAASF accredits, you don't have**

21     **any reason to believe that those physicians, who otherwise**

22     **meet the gold standards of AAAASF, are not conducting their**

23     **medical practice in the best way for their patients;**

24     **correct?**

25     MR. BECKMAN:  Object to form.

**Page 97**

1     THE WITNESS:  You know, we have an investigative

2     committee, and we go case by case when issues happen in our

3     accredited facilities.  We have deaths in our facilities.

4     Deaths, unanticipated sequelae, pulmonary embolism two

5     weeks after surgery.

6     Most of the people who are looked at for waivers are

7     people who have been previously accredited -- like me,

8     luckily, I have hospital privileges at other hospitals --

9     but who have been previously accredited, had hospital

10     privileges, and lost them.  We don't generally have people

11     come in who, gee, I have no hospital privileges.  Can I

12     have a surgery center.

13     **Q  So just going -- so just going back to the question**

14     **I asked is, AAAASF has no reason to believe that the**

15     **facilities that it has accredited where physicians do not**

16     **currently have hospital privileges are not operating their**

17     **facilities in the best manner for their patients.**

18     A  Well, we try to and -- you know, there is no

19     perfect -- there's no perfect solution.  We do peer review.

20     We inspect.  We look at peer-reviewed documents.  We go

21     through and take a good look at their facilities, and that

22     gives us some pretty good insight into how they're

23     behaving.  But generally speak, we don't find them guilty

24     before they've committed a crime, so to speak.

25     **Q  So to put it another way, there are facilities with**

**Pages 94 to 97**

1    physicians who may not have current hospital privileges
2    that have been accredited by AAAASF that you would think
3    are performing procedures in the best possible way for
4    their patients; is that correct?
5      A  Yes, that is correct.  That's correct.
6      Q  In paragraph 6 of your report, you say, "In my
7    medical opinion, the Act's requirement mandating staff
8    privileges at a local hospital is a reasonable and prudent
9    provision to address patient safety issues."  What patient
10   safety issues are you talking about there?
11     A  We've discussed all of -- the potential for
12   unanticipated sequelae.
13     Q  Okay.  And is the idea -- I mean how does having
14   staff privileges allow a physician to address that?
15     A  All of the issues that we've discussed today,
16   continuity of care and management of complications, that
17   facilitates the best potential care for a patient who has a
18   problem.  I mean that's my opinion.
19       When we look at the incidents of complications, it's
20   not very high in either outpatient surgery or -- you know,
21   apparently -- although there's no registry for OB/GYN
22   procedures where you can document, like we have, what's
23   going on in your healthcare centers, but when it happens to
24   a patient, it's 100 percent.  So that's really the issue.
25       All of the regulations and all of the standards that

Page 98

1   are put forward are not put forward for those procedures
2   and patients who sail through without a problem.  They're
3   there in case, just like you have a fire extinguisher.
4   I've never had a fire here, but I have fire extinguishers
5   here in multiple places because that's a standard just in
6   case.
7     Q  And so you then say it's your understanding that a
8   healthcare facility in Alabama is required to be licensed
9   as an ARHC, and then you list the requirements for that.
10   Did you review that regulation when you drafted this
11   report?
12     A  Let me read the paragraph again.  It's been a while.
13       I did not read the requirement.  I had discussed it.
14     Q  And who did you discuss it with?
15     A  With Vincent Rue.
16     Q  So just to be clear -- and you didn't read any of
17   the Alabama regulations -- is that correct? -- other than
18   the bill itself?
19     A  I have read some of the Alabama regulations, but I
20   haven't read the whole -- I have some on my computer that
21   I've read.
22     Q  Which ones are those?
23     A  I think it was one related to -- here I have the
24   rules of the Alabama State Board of Health, Department of
25   Public Health, Abortion or Reproductive Health Centers.

Page 99

1     Q  Did you review that entire document?
2     A  I did not review the entire thing, no, I did not.
3     Q  All right.
4     A  Because I felt that the issue that I'm talking about
5   is pretty narrow.
6     Q  So you then state, "It is my further understanding,
7   based on definitions in the rules of the Alabama State
8   Board of Health, that an ARHC would qualify as an ASC, even
9   though ARHCs are regulated separately from ASCs."  Do you
10   see that?
11     A  Yes.  But the ASC -- you know, the term "ASC" really
12   includes office-based facilities.  I mean I -- everybody --
13   we talked about the confusion of that before.  It's the
14   same standard.  And I think that the -- AHRC --
15     Q  ARHC.
16     A  Yeah, they're comparable to outpatient facilities of
17   a certain level.  If they're not doing general anesthesia
18   or IV sedation, they're comparable, let's say, to our A
19   facilities or even B facilities, because they're doing more
20   invasive things.
21     Q  So are you aware that the state of Alabama does not
22   require ASC physicians and ASCs to have staff privileges?
23     A  Yes, I am.
24     Q  And do you see any reason to hold ARHCs to a higher
25   standard than ASCs --

Page 100

1     A  Yes, I think --
2     Q  -- to a different standard?
3     A  I think they both should have that requirement.  I
4   think they both should.
5     Q  And you would agree with me that there currently are
6   different standards.
7     A  Yes.
8     Q  How did you become aware that ASCs do not require
9   staff privileges?
10     A  I asked the question.
11     Q  Who did you ask?
12     A  I asked my attorney.  Or not my attorney.
13       I guess you are -- are you my attorney?  You're my
14   attorney?
15       MR. BECKMAN:  Yes.
16       THE WITNESS:  I asked my attorney.  And I don't
17   agree with that either.
18   BY MS. PERRYMAN:
19     Q  You don't see any rational basis that there
20   should -- you don't see any rational basis to treat the two
21   things differently?
22     A  From the standpoint of continuity of care and
23   complications, no.
24     Q  Those are the things that you're here to talk about
25   today.

Page 101

Pages 98 to 101

1      A   That's it.
2      Q   All right.  We've talked about how the statements
3  throughout your report that the hospital privileges mandate
4  in Alabama, which, of course, does not have this case-by-
5  case exception, which is just a blanket mandate, is
6  inconsistent with at least AAAASF and maybe other
7  standard -- or other accrediting associations insofar as it
8  doesn't have an exception.
9      A   You're asking me do I --
10     Q   So I'm just setting that up to try to provide
11 context for my next question.
12         And in paragraph 9 you talk about -- so we talked
13 about the standard setting for the accrediting
14 organizations.  In paragraph 9 you talk about another
15 state.  You say "physicians performing abortions at
16 outpatient facilities are not the only practitioners
17 required by law to have local hospital staff privileges,"
18 and then you give an example of New Jersey, and you say
19 that they require physicians administering general
20 anesthesia to have hospital staff privileges.
21     A   Uh-huh.
22     Q   Did you review the New Jersey law?
23     A   No.  I just know that from AAAA.  A lot of states
24 have different requirements.
25     Q   And do you think -- but you think from your

1  by the court reporter and is attached hereto.)
2  BY MS. PERRYMAN:
3      Q   What you cite in your report -- and I think it's
4  consistent with what you were saying.  I just wanted to --
5  you said that you weren't sure so I wanted to see if you
6  could take a look at it.
7      A   Where is it?  Tell me where to go.
8      Q   So you cite -- let me start with -- why don't we
9  start on page 92, and you'll see there -- in fact, if
10 you -- you might want to start on page 88 so you can see
11 what you're looking at, which is "Surgery, Special
12 Procedures And Anesthesia Services Performed In An Office
13 Setting."  That's subchapter 4A, which is the subchapter
14 that you cited at footnote 2 of your report.
15         And what you'll see is this lays out that
16 subchapter.  And if you go forward to page 92 --
17     A   Before we go there, where on 88 do you want me to
18 pay attention?
19     Q   So I'm just showing you that's what this subchapter
20 is so that you can see that that's what you cited.
21     A   Yes.  Okay, yes.  Yes.
22     Q   So if you could go to page 92, you'll see that
23 there's a word -- "Privileges" is defined.  And the word
24 privileges is defined as "authorization granted to a
25 practitioner...by a hospital...in the jurisdiction...or

1  experience in AAAA -- I'm now going to AAAA instead of
2  AAAASF.  You think from your experience in AAAA that this
3  New Jersey law is something that's good and beneficial for
4  patients.
5      A   Yeah, I think it is.
6      Q   Are you aware that, consistent with the standards of
7  your organization, of AAAASF, that the New Jersey law
8  actually has an exception if someone cannot get admitting
9  privileges at a hospital?
10     A   New Jersey, like New York, and like other states
11 have looked closely at our standards, and I think part of
12 that might be -- have been adopted from our standards.
13     Q   So you are aware that New Jersey has that exception?
14     A   No, I don't know the standards of all the states.
15     Q   I'll just -- just so we're not talking in
16 generalities, I'll mark this as Exhibit 5.  What I've
17 marked as Exhibit 5 --
18         MR. BECKMAN:  What is this?
19         MS. PERRYMAN:  This is the New Jersey code that's
20 cited in Dr. Keyes's report that was revised.
21         THE WITNESS:  Cited in my report?
22 BY MS. PERRYMAN:
23     Q   Yes, you cite the New Jersey code in your report.
24     A   Oh, I thought you said cited in my report.
25         (Exhibit 5 was marked for identification

1  alternatively by the Board."  Do you see that?
2      A   Uh-huh.
3      Q   And then if we go to the specific provision that you
4  cite where, in paragraph 9 of your report, it says that New
5  Jersey requires physicians administering general anesthesia
6  to have hospital privileges, that provision is on page 104.
7          And if you look at the requirement that you cite,
8  where it says, "A physician" -- it's sort of at the top of
9  the page at 1, it says, "A physician privileged by a
10 hospital...to provide" -- do you see that?
11     A   Uh-huh.
12     Q   And so if you could read that and let me know if you
13 would agree with me as you just -- as you suggested, that
14 New Jersey does have an alternative procedure if one cannot
15 obtain hospital privileges.
16         And let me just -- if you'd flip to the next page,
17 you'll actually see that procedure spelled out.
18     A   Let me read this again so I know what you're --
19     Q   Sure.
20     A   They're talking in this case about regional
21 anesthesia, not general anesthesia.  On 13:35, regional
22 anesthesia.
23     Q   That's what you cited, I believe.
24         MR. BECKMAN:  He cites 4A.8.  We're on 4A.9 here on
25 page 104.

BY MS. PERRYMAN:

1  BY MS. PERRYMAN:
2     Q  Yes, I'm sorry.  You can go to -- just one second.
3  You can go to 4A.8 too.
4        MR. BECKMAN:  4A.8.
5        THE WITNESS:  Okay.
6  BY MS. PERRYMAN:
7     Q  And you'll see where it says "Privilege," and then
8  you'll see the definition of privileges.
9     A  No. 1 in particular?  Is that what you're looking
10 at?
11    Q  Yes.
12    A  "A physician privileged by a hospital or the Board
13 pursuant to N.J.A.C." --
14    Q  So you'll see it says "by a hospital or the Board."
15    A  "or the Board."
16    Q  And it says, "pursuant N.J.A.C.," and you can flip
17 to the next page, which is the provision that talks about
18 the board privileging procedure as opposed to the hospital
19 privileging procedure.
20    A  All right.  I'm on the next page.  Where are you
21 looking at the --
22    Q  It's on page 106.  I'm just --
23    A  Page 106.
24    Q  So the paragraph that you cite in your report, sir,
25 it refers, when it's talking about hospital privileges, it

Page 106

1  says hospital privileges or privileges by the board.  And
2  it refers to a provision that is on the next page, which I
3  was -- which is on page 106.
4     A  Which is on page 106.
5     Q  Right.
6     A  Shall provide --
7        MR. BECKMAN:  We're looking at 13:35-4A.12.
8        THE WITNESS:  So their board can do it also.  Is
9  that what you're asking me?
10 BY MS. PERRYMAN:
11    Q  Right.
12    A  Yes.
13    Q  It sounds like that's consistent with AAAASF, to
14 have an alternative procedure --
15    A  Yes.
16    Q  -- if you can't get a hospital procedure; correct?
17    A  Yes, yes.
18    Q  So in paragraph 9 of your report where it says that
19 New Jersey requires physicians administering general
20 anesthesia in an office setting to have hospital staff
21 privileges, you would agree with me that it should probably
22 be amended --
23    A  Should be amended, true.
24    Q  -- right?  And it should be amended to say have
25 hospital staff privileges or obtain licensure privileges --

Page 107

1     A  Board approval.
2     Q  -- board approval; correct?
3     A  Right.
4     Q  And you're not aware of any provision in HB 57, the
5  bill in Alabama, that would provide for this alternative --
6     A  That's correct.
7     Q  -- correct?  Okay.
8        Now, do hospitals generally require doctors to
9  reside locally to have privileges?
10    A  There are provisions for intenerate surgeons, but I
11 think it's not -- it's not well accepted, but I think under
12 certain circumstances they do.  You know, obviously they
13 want you to be in the community as part of getting to know
14 your practice patterns and all of that, but there can be
15 exceptions made, just like everything else.
16    Q  But you, for instance -- I mean you don't have
17 privileges at hospitals other places in California; right?
18 Like you only --
19    A  I do.  I have privileges at Bakersfield Hospital.
20    Q  Okay.  Which is --
21    A  So that's about an hour and a half from here.
22    Q  Okay.
23    A  So if I do surgery in Bakersfield at that hospital,
24 I'll stay overnight there.  And I have patients who come
25 from Bakersfield.  But when they come here for surgery,

Page 108

1  they stay overnight here.
2     Q  If they're doing one of the surgeries that we talked
3  about.
4     A  One of the procedures that I -- yeah, one of the
5  procedures that I mentioned.
6     Q  Now, we've talked about both, I guess, now in New
7  Jersey but also just with AAAASF, that there's this
8  case-by-case -- that there's this case-by-case exception to
9  the staff privileges requirement.  And it's your view that
10 physicians can still ensure continuity of care even if they
11 don't or might not have staff privileges currently;
12 correct?
13       MR. BECKMAN:  Object to form.
14       THE WITNESS:  They can.  There are routes to do
15 that, yes.  It's not, again, what I think is preferable,
16 but yes.  I mean you do what you have to do.
17       I mean I think if you looked at it from your own
18 family, if your daughter was operated upon and something
19 happened, you would want the surgeon to take care of your
20 daughter and follow through, you wouldn't want him to call
21 somebody 100 miles away and say why don't you take over
22 from here.
23       So it's preferable.  Could the other doctor take
24 over?  We hope so, and the outcome would be successful and
25 that would be fine.  But what's -- you're asking what's

Page 109

Pages 106 to 109

1   preferable, aren't you?  I mean aren't you trying to
2   establish what the best possible care is?
3       Q  Well, and with AAAASF, I mean that is, in fact, what
4   AAAASF is trying to do as well; correct?
5       A  That's what we're trying to do, exactly.
6       Q  Right.  And notwithstanding that's what they're
7   trying to do, there is some recognition that flexibility is
8   needed to the staff privileges requirement that's in
9   AAAASF's guidelines.
10      A  There's a recognition that there needs to be some
11  flexibility, and that's true with everything.
12      Q  Exactly.  And you don't think that endangers
13  continuity of care of patient safety in any way.
14      A  It can.  I mean how could I make a general comment
15  like that?  I don't know who the doctor's referring the
16  patient to.  I don't know the doctor that performed the
17  surgery.  So it's not --
18      Q  But that's the case even with people that have staff
19  privileges; correct?  I mean someone could have staff
20  privileges and not ensure proper continuity of care.
21      A  That's true.  But the object of standards is to
22  limit the options for something to go wrong.  Okay?
23      Q  But just to be clear on that point, it is true that
24  a doctor could have privileges at a hospital and still not
25  provide the continuity of care that you yourself would try

Page 110

1   to provide in a situation or that you would think would be
2   medically beneficial; correct?
3       A  Say it one more time.
4       Q  That --
5          Actually, could you just read it back.
6          (Record read.)
7          THE WITNESS:  Yes, correct.
8   BY MS. PERRYMAN:
9       Q  Privileges are not -- there could be issues with
10  continuity of care, or there could be good continuity of
11  care.  It's not something that depends on privileges.
12         MR. BECKMAN:  Object to form.
13         THE WITNESS:  Board certification is no guaranty
14  that a surgeon is a good surgeon.  And the fact that you
15  have a small surgery center doesn't mean you know how to
16  run a hospital.  So there are no guaranties with anything.
17  Again, the idea is to try to conform to the best possible
18  standards and limit the options for bad outcome occurrence.
19  That's basically what this is all about.
20         MS. PERRYMAN:  Could you read my question back?
21         (Record read.)
22  BY MS. PERRYMAN:
23      Q  Is that correct?  You would agree with that?
24         MR. BECKMAN:  Object to form.
25         THE WITNESS:  Yes.

Page 111

1          MS. PERRYMAN:  We've been going for about an hour so
2   maybe we'll take a quick break and then we'll come back,
3   and I'll be able to assess our time.
4          MR. BECKMAN:  Sure.  Okay.  Great.
5          (Recess.)
6   BY MS. PERRYMAN:
7       Q  You mentioned that you were contacted in this case
8   by someone named Vincent Rue; is that correct?
9       A  Correct.
10      Q  When did you first meet Mr. Rue?
11      A  I've never --
12         MR. BECKMAN:  Objection.  This is -- again, this is
13  back to our attorney-client privilege --
14         MS. PERRYMAN:  It's actually establishing the
15  privilege because it's not clear when he knew him.  So if
16  he could answer when he was first contacted, then that will
17  help us.
18         MR. BECKMAN:  We can let him answer that, but I
19  think that's pretty much as far as we can go.
20         MS. PERRYMAN:  That's the question I was asking.
21         THE WITNESS:  I believe -- I've never met him.  I've
22  never met him.  I believe it was March.
23  BY MS. PERRYMAN:
24      Q  So did you know Mr. Rue prior to being contacted by
25  him for the purpose of this or the Mississippi case?

Page 112

1       A  No.  I think he contacted me because of AAAASF.  No,
2   I never knew him.
3       Q  You didn't have any prior knowledge of him?
4       A  No, no, no.
5       Q  That's all I needed.
6          If a patient that you're operating on in this
7   facility has a major complication during surgery or in the
8   recovery room, where would they -- where would you take
9   them to the emergency room, or would you call -- like what
10  would the protocol be?
11      A  Well, first of all, I would probably try to
12  stabilize -- you know, I have an anesthesiologist, board
13  certified --
14         (Interruption in the proceedings.)
15         THE WITNESS:  Sorry.  Let me turn that off.
16         The first step would be to stabilize them here.  I
17  haven't had an emergency requiring hospitalization for
18  many, many years.  When I did have one that occurred, I
19  took them to Cedars-Sinai.
20         But the first step is try to stabilize them.  If you
21  recall -- first of all, as an otolaryng- -- the types of
22  things that happen in an outpatient setting usually relate
23  to the respiratory tract or the airway or to the
24  cardiovascular system.  So those things -- first of all, as
25  an otolaryngologist, I was a head and neck cancer surgeon

Page 113

Pages 110 to 113

1   for years. So that's something I would assist or take over
2   from the anesthesiologist. And anesthesiologists are very
3   well-equipped to stabilize patients also. So that's the
4   first thing.
5       The next thing we do is we would call an EMR or a --
6   what do you call them -- emergency rescue -- EMR is
7   electronic medical records.
8      **Q  Is it EMT?**
9      A  EMT, yeah. And then take them to Cedars-Sinai.
10  That's what we've done before. Now I'd probably take them
11  to Miracle Mile.
12     **Q  Miracle Mile doesn't have an emergency room; right?**
13     A  No.
14     **Q  So if they needed ER care, would they go to Cedars?**
15     A  Possibly or USC, either one.
16     **Q  And UCS's 16 miles away?**
17     A  Yes.
18     **Q  So if they needed, like, immediate ER care, Cedars**
19  **would be where you would take them?**
20     A  I'd probably arrange for a physician to meet me at
21  Miracle Mile. If I had to go to Cedars or something, I
22  would probably take them to Cedars, yes. If I felt it was
23  in their best interest to go to Cedars, I would take them
24  to Cedars.
25     **Q  And you said before that you feel confident that you**

1  **can work with Cedars to maintain continuity of care even**
2  **though you don't have privileges there.**
3     A  Well, yeah. I mean I -- first of all, if it was a
4  cardiovascular situation, I wouldn't be managing it anyway.
5  So I would get -- you know, I know a cardiovascular -- you
6  know, cardiologists or whatever that I would get
7  immediately on the case, and that would be fine.
8     **Q  We talked about how flexibility and AAAASF and some**
9  **states and other standard setting organizations can be**
10  **needed when a physician or surgeon isn't able to obtain**
11  **privileges due to no quality issue. And one of the issues**
12  **that we talked about was economic credentialing.**
13     **Are you aware of other instances in which there**
14  **could be no quality issue with the physician's care, but**
15  **the physician nevertheless would not be able to obtain**
16  **privileges?**
17     A  I'm not. There may be, but I'm just not.
18     **Q  And if there were an issue that was unrelated to**
19  **care or the physician's qualifications or credentialing or**
20  **ability to perform the procedures and a physician was**
21  **nevertheless denied privileges, do you think there should**
22  **be flexibility in those situations?**
23     MR. BECKMAN: Object to form.
24  BY MS. PERRYMAN:
25     **Q  So in situations that aren't necessarily economic**

1  credentialing, but that essentially have the same --
2     A  Well, you have to be more specific. I mean that's a
3  pretty general question.
4     **Q  That's fine. So if a hospital were to deny someone**
5  **privileges, otherwise qualified surgeon or physician**
6  **privileges because that surgeon performs abortion and the**
7  **hospital is opposed to abortion or doesn't like the**
8  **procedure, nothing to do with the quality of the surgeon's**
9  **care or credentialing, would you agree that that's a**
10  **situation where there should be flexibility?**
11    A  Yes.
12    **Q  And flexibility meaning that the surgeon or**
13  **physician should be able to have their facility accredited**
14  **or otherwise licensed without obtaining those privileges**
15  **because the privileges would be impossible to obtain.**
16    MR. BECKMAN: Object to form.
17    THE WITNESS: I think the issue, the real issue here
18  is something should be done about the hospitals. They
19  should not have the ability to arbitrarily deny privileges
20  or to economically credential. Hard thing to do.
21    The problem is the standards aren't -- the standards
22  for care -- the best approach to patient care can't be
23  based on, well, even though it would be best, we can't do
24  it that way because these people feel this way or that. I
25  mean it's either the best standard of care or not.

1    So I agree with what you're saying, and I would
2  direct my attention at the hospitals. But that
3  notwithstanding, it doesn't mean it says, well, okay, since
4  you can't get it, then we should just do this.
5  BY MS. PERRYMAN:
6     **Q  But there is flexibility if you can't get privileges**
7  **under AAAASF; correct? Unrelated to the physician's care**
8  **and examined on a case-by-case basis, there is flexibility.**
9     A  There's flexibility, but I can tell you right now if
10  somebody had a surgery center and they have to live in the
11  vicinity to have a surgery center, if somebody who had a
12  surgery center said I have Dr. Joe flying in, you know,
13  once a month to do a couple cases and leaving, I mean we'd
14  look at that pretty seriously. I mean that's an issue.
15     **Q  But just to return back, there is flexibility, at**
16  **least with AAAASF, to be able to look at and examine the**
17  **reasons that people get denied privileges and to make**
18  **exceptions on a case-by-case basis if AAAASF determines**
19  **that those reasons were unrelated to the physician's**
20  **credentialing care or ability to perform certain**
21  **procedures.**
22    MR. BECKMAN: Object to form. Asked and answered.
23    THE WITNESS: Our purpose is to try to guarantee the
24  safest surgical practice for patients. We bend over
25  backwards to look at things to be fair to anyone who's

**Veritext National Deposition & Litigation Services**
**866 299-5127**

1  applying to our association, and flexibility is an issue,
2  but only as long as it's constrained within the best
3  possible patient care. That's it.
4  BY MS. PERRYMAN:
5      Q  So the answer to the question is yes, there is
6  flexibility.
7      A  The answer is longer than yes. That's why I gave it
8  to you that way.
9      Q  Just on the example you just gave, is there any
10  AAAASF requirement in the standards -- and we can refer to
11  the standards -- that says that a physician can't fly in to
12  perform a procedure if they're qualified to perform a
13  procedure?
14      A  No.
15      Q  In your report you cite AAAAFS's regular standards
16  and checklist for accreditation of ambulatory surgical
17  facilities, and we've marked that as an exhibit that you
18  can refer to. Is it true that AAAASF also has procedural
19  standards?
20      A  Right. For gastroenterology. Right.
21      MS. PERRYMAN: I'll just mark those. It's the next
22  exhibit.
23      (Exhibit 6 was marked for identification
24  by the court reporter and is attached hereto.)
25  BY MS. PERRYMAN:

Page 118

1      Q  And which standards would you say would apply to an
2  OB/GYN facility, including one that may perform abortion
3  procedures?
4      A  That's a tough call. You know, our classifications
5  are based on the level of anesthesia delivery. So you're
6  either going to be an A or a B. I mean you're beyond an A
7  because you're not just doing local procedures. Probably
8  it would be a B facility.
9      Q  Which means that which procedures would --
10      A  Topical anesthesia, local anesthesia, parenteral
11  sedation, regional anesthesia, dissociative drugs,
12  excluding --
13      Q  So the procedural standards may apply?
14      A  My apply, yes.
15      Q  And with respect to the issue we've been discussing
16  today, the flexibility with respect to hospital privileges,
17  you would agree with me that that same flexibility is in
18  the procedural standards as is in the surgical standards;
19  correct?
20      A  Yes.
21      Q  Is there a reason in your report, which is about
22  abortions and would implicate OB/GYN care, is there a
23  reason that you cite to the surgical standards and not the
24  procedural standards?
25      A  Probably because I was looking at more as an OB/GYN

Page 119

1  surgeon than just the procedure. In other words, these are
2  gastroenterologists. They do multiple procedures. I was
3  looking at OB/GYN as doing multiple procedures, too,
4  besides abortion.
5      Q  And the procedures that are listed -- actually, I
6  think that the procedural guidelines -- I do need to see a
7  copy. So just looking at the -- because I was -- I had a
8  question about this.
9      But just looking at the -- where it says the -- on
10  page 13 it says the "Procedural Faculty Accreditation
11  Program," and then it lists certain procedures that would
12  be included. And it lists urological procedures,
13  circumcision, vasectomies; mallio (sic) facial procedures.
14  Above that it says that procedures carried out could
15  include gastroenterologists, urologists, gynecologists,
16  pain management physicians and others. Do you see that?
17      A  Could, could, yes.
18      Q  So you aren't implying by only citing to the
19  surgical standards that the procedural standards wouldn't
20  apply?
21      A  No. It could be.
22      Q  And with respect to the issue we've been discussing
23  today, that the documents are the same, the requirements
24  are the same.
25      A  They're close.

Page 120

1      Q  There's flexibility if you can't obtain hospital
2  privileges; correct?
3      A  There's the same flexibility, same concept.
4      Q  And if you could turn to page 74 of this document,
5  and this is the same, I believe, as the surgical standards
6  as well. Do you see at 800.10.25, do you see that there is
7  a requirement here that if a physician doesn't hold
8  admitting privileges, that there be a person, a backup
9  physician with privileges?
10      A  Yes.
11      Q  Are you aware that that's also the case in Alabama
12  under existing law before the HB 57?
13      A  That the person in the same specialty -- that
14  somebody in the same specialty had to have admitting
15  privileges to take over the case?
16      Q  There has to be a backup physician to provide
17  comparable care?
18      A  I had not seen that, no.
19      Q  That's not anything that, when you were preparing
20  your report, you looked at or asked about?
21      A  No. I don't recall seeing it, no.
22      So is that true in Alabama? I'm just curious.
23      Q  There's a backup physician requirement, yes.
24      A  And it's signed and all of that?
25      Q  Yes.

Page 121

Pages 118 to 121

Veritext National Deposition & Litigation Services
866 299-5127

1    A  Good.

2    **Q  And you think that's a good thing?**

3    A  I do think it's a good thing, yes.

4    **Q  It's consistent actually with the AAAASF?**

5    A  Yes.

6    **Q  In your report you, in talking about -- on page 6**

7  **you say that it's possible in the last -- in the last**

8  **sentence of paragraph 12, you say that it's possible that**

9  **abortion providers may lack training in crisis response,**

10  **particularly resuscitation. Do you see that?**

11    A  Yes. Wait. Where is it? Under 12?

12    **Q  Yeah, last sentence.**

13    A  Uh-huh.

14    **Q  And I'm assuming, based on the answers that you've**

15  **given today, but I have to ask the question, that you**

16  **didn't review the Alabama -- the existing Alabama**

17  **regulations.**

18    A  No, I did not.

19    **Q  And so if I were to represent to you that the**

20  **clinics are required to have someone experienced and have,**

21  **like, emergency equipment and someone experienced in**

22  **resuscitation, do you think that's a good thing?**

23    A  Who experienced? What level?

24    **Q  We can go through the regs if you want to go through**

25  **the regs.**

Page 122

---

1    A  No. But in general, you know, you can have a nurse

2  who has advanced cardiac life support, but if you don't

3  have somebody who really knows how to intubate and take

4  care of, you know, more severe problems -- in other words,

5  you should have a physician who's capable.

6    **Q  And you have no reason to think that the clinics in**

7  **Alabama do not have that; correct?**

8    A  I don't. I don't, no.

9    **Q  Okay. Approximately how long -- how many hours have**

10  **you spent working -- did you spend working on your report?**

11    A  I would say -- I mean I'd have to go back and look.

12  I don't remember. Maybe six hours, something like that.

13    **Q  Okay. Earlier today you said that it was your**

14  **understanding that abortions would probably be provided,**

15  **but you weren't sure, with local anesthesia or oral**

16  **sedation. What is the basis of your understanding?**

17    A  Just from what I've heard experiencewise. I mean I

18  have not been involved with abortions.

19    **Q  Okay. So just -- and have you heard anything in**

20  **this case that made you think that?**

21    A  No. No.

22    **Q  And would you agree that procedures performed under**

23  **general anesthesia are riskier than those performed under**

24  **local anesthesia or oral sedation?**

25    A  Yes.

Page 123

---

1    MR. BECKMAN: Object to form.

2  BY MS. PERRYMAN:

3    **Q  Where do you hold medical licenses?**

4    A  Here, California.

5    **Q  California. Have you ever held licenses in other**

6  **states?**

7    A  Illinois.

8    **Q  Have you ever had a license suspended for any**

9  **reason?**

10    A  No.

11    **Q  You mentioned that you have been party to various**

12  **lawsuits. Were some of those malpractice lawsuits?**

13    A  Yes.

14    **Q  Have you ever been found liable for malpractice?**

15    A  No.

16    **Q  Have you ever settled a case related --**

17    A  Can I turn your phone off?

18    (Discussion off the record.)

19    THE WITNESS: Yes. I settled one case -- I settled

20  a small claim -- two small claims cases, and I settled one

21  malpractice case. Small claims cases I don't think are

22  really malpractice. They're disagreements, really.

23  BY MS. PERRYMAN:

24    **Q  About fees?**

25    A  No. No. About unhappiness with the procedure.

Page 124

---

1    **Q  Okay. So the small claims cases that you referenced**

2  **were -- did involve your medical practice as opposed to, I**

3  **don't know, a utility bill or something like that.**

4    A  Right, but they weren't per se malpractice cases I

5  don't think.

6    **Q  Right.**

7    A  They were only $2,500 settlements of which one ended

8  up giving it back to me because they breached the agreement

9  of the mal- -- of the malpractice. Yeah.

10    **Q  When did the --**

11    A  Per the case.

12    **Q  On the non-small claims practice, when did you**

13  **settle that case?**

14    A  20 years ago, approximately. I don't remember

15  exactly.

16    **Q  Have you ever been involved with any organizations**

17  **or groups who advocate against abortion?**

18    A  No.

19    **Q  Have you ever been involved with any organizations**

20  **or groups who advocate for pro choice?**

21    A  No. Not to my knowledge.

22    **Q  You've never donated money to either type of**

23  **organization?**

24    A  Not to my knowledge.

25    **Q  Ever supported any organizations or groups that do**

Page 125

---

Pages 122 to 125

1    that in any other way, giving speeches?
2      A  Not to my knowledge.  I mean I've made -- no, I
3   don't think so.  I just haven't.
4      **Q  Have you ever held or expressed a view on abortion?**
5      A  You mean totally pro or totally con?  What do you --
6      **Q  Any view.**
7      A  Any view?
8      **Q  Yes.**
9      A  I don't like the aspect of abortion itself, but I
10   haven't made a statement pro or con about abortion, just in
11   general.  I think most people don't like abortions.
12      **Q  What about any groups that advocate against birth**
13   **control?**
14      A  No.
15      **Q  What about any groups that advocate for birth**
16   **control or reproductive freedom?**
17      A  No.  No.
18      **Q  What about crisis pregnancy centers?  Have you ever**
19   **been involved or helped any crisis pregnancy center?**
20      A  No.
21      **Q  Do you know if anyone in your immediate family has?**
22      A  No.
23      **Q  And what about groups that would advocate adoption?**
24   **Have you ever been involved with groups that advocate**
25   **adoption?**

Page 126

---

1      A  No.
2      **Q  Have you ever been fired from a position?**
3      A  No.
4      **Q  Have you ever been arrested?**
5      A  No.
6      **Q  Is there any complaint currently pending against you**
7   **that you're aware of?**
8      A  A recent one that just was won by me.  There's a
9   complaint against my staff member, but not against me.
10   There's a complaint, but it's --
11      **Q  With what board or with a court or --**
12      A  Both.  Both were won by me, or one was won by the
13   board and the person fined for frivolous suit, and another
14   was won by me, superior court.
15      MS. PERRYMAN:  So what I would like to do is go over
16   my notes to make sure that we don't have anything.
17      MR. BECKMAN:  Sure.
18      MS. PERRYMAN:  In the interest of time, if you
19   want -- I mean we can do it two ways.  We can take a break,
20   we can go over our notes and come back, and then I can ask
21   my questions, you can ask your questions, and I can ask my
22   questions again.  Or you can ask your questions, and then
23   we can take a break, and I can go over my notes and I'll
24   ask any follow-ups I have from your questions and any other
25   general follow-ups.  It's really up to you.  So that's sort

Page 127

---

1   of however you want to do it.  I'm just trying to be
2   mindful of the time.
3      MR. BECKMAN:  Yeah, we've got 30 minutes till I need
4   to leave.  So you think we can probably go both ways on
5   this?  It shouldn't take us long.
6      Will, do you have any opinion?  Would you like to
7   talk and then do our questions?
8      MR. PARKER:  How long, Skye, would you need to look
9   at your notes, do you think?
10      MS. PERRYMAN:  I'm flexible.  I mean, you know, five
11   minutes.  I mean --
12      MR. PARKER:  Let's try to do that real quick.  Let's
13   try to -- take a break now and then try to finish
14   everything up in a flurry.
15      MS. PERRYMAN:  Okay.
16      (Recess.)
17          EXAMINATION
18   BY MR. BECKMAN:
19      **Q  Dr. Keyes, my name is Kyle Beckman.  I am going to**
20   **ask you a couple questions, and then we will proceed from**
21   **there.**
22      A  Okay.
23      **Q  We talked earlier about economic credentialing as**
24   **that phrase is used.  Do you have any affirmative evidence**
25   **or are you aware of any arbitrary denials of privileges?**

Page 128

---

1      A  No.
2      **Q  We also spoke earlier about ASCs and ARHCs and that**
3   **Alabama's law did not require ASCs -- doctors performing at**
4   **ASCs to have staff privileges.  Would it change your**
5   **opinion at all if I told you that most doctors performing**
6   **at ASCs in Alabama have staff privileges?**
7      MS. PERRYMAN:  Object to the form of the question.
8      THE WITNESS:  It would change my opinion, but it
9   would not change my opinion that it should be not most, but
10   all.  I mean I just -- that's what I believe.  Should be in
11   the statute or the accredit-- are they accredited, all of
12   these facilities, or are they licensed by the state?
13   BY MR. BECKMAN:
14      **Q  What we're talking about is doctors already having**
15   **staff privileges at local hospitals, even though they're**
16   **not required to have them by law.**
17      MS. PERRYMAN:  Same objection.
18      THE WITNESS:  I think that's great, but I think you
19   have to be able to document that.  It's the same thing.
20      MR. BECKMAN:  Sure.
21      **Q  We also spoke earlier about having what we'll call a**
22   **backup doctor or an arranged contract, if a doctor does not**
23   **have staff privileges at a local hospital, to have a**
24   **written arrangement with another doctor who has staff**
25   **privileges in that area.  In that situation is that the**

Page 129

Pages 126 to 129

1  ideal, best practice to have this contract, or is there
2  something better?
3      MS. PERRYMAN:  Object to the form of the question.
4      THE WITNESS:  The best course of action is to have
5  the doctor be able to manage his own complication where
6  it's within the scope of his practice at a hospital.
7  That's the second best situation.
8  BY MR. BECKMAN:
9      Q  We also spoke about taking someone to Cedars-Sinai,
10  where you do not have staff privileges, if there were a
11  complication.  While that may be adequate, is that the best
12  practice?
13      MS. PERRYMAN:  Object to the form of the question.
14      THE WITNESS:  No.
15  BY MR. BECKMAN:
16      Q  What is the best practice?
17      A  Exactly what I said before, to be able to admit the
18  patient myself and manage the complication if the
19  complication's within the scope of my practice, my
20  specialty.
21      Q  Regarding complications, in your facilities do
22  you -- how do you maintain information about complications?
23      A  We're required by AAAASF to, twice a year, perform
24  peer review, and we submit, for each surgeon with greater
25  surgery center or for those surgery centers with greater

                                                Page 130

1  than six -- I forget the exact number, I think ten
2  surgeons -- 2 percent of all of the procedures, random case
3  reviews on what's done in the facility.
4      We're also required to report all unanticipated
5  sequelae, any unanticipated sequelae.  We're required to
6  report any death within five business days of its
7  occurrence.  That all goes into an Internet-based program
8  that allows for us to analyze what's going on.
9      Q  How do you do follow-ups with patients?
10      A  I see patients the next day, unless it's excision of
11  a skin lesion or something minor.  And there are some
12  exceptions.  After -- I communicate with all patients
13  immediately that day of surgery by phone that night.  After
14  that, the majority of patients come in the next day to see
15  me, including on the weekend.  And then I follow them on a
16  routine basis until their sutures are out, and then
17  prolonged after that.
18      Q  And finally, we spoke earlier about AAAASF's rule
19  about having staff privileges.  Is that the general rule,
20  to have staff privileges?
21      A  The general rule for AAAASF?
22      Q  Yes.
23      A  Yes.
24      Q  And are you at all familiar with doctors being
25  denied staff privileges at hospitals before they've ever --

                                                Page 131

1  let me phrase it this way.
2      Are you familiar with doctors being denied staff
3  privileges at the beginning of their careers or before
4  they've ever had them?
5      A  I'm sure it happens, but I'm not familiar with that.
6  I mean there are circumstances -- when you apply to a
7  hospital, if you get recommendations that are mediocre from
8  your training program or whatever, that might be grounds
9  for the credentialing committee not to approve your
10  application.  So I'm sure it does happen.
11      Q  Uh-huh.
12      That is all I have right now.
13          FURTHER EXAMINATION
14  BY MS. PERRYMAN:
15      Q  Earlier in the deposition you said that these were
16  the opinions -- the opinions that were expressed in Exhibit
17  1 are the opinions that you've offered in the case to date,
18  and I just wanted to know, do you plan to do further work
19  on this case to offer more opinions?
20      A  To offer more opinions?
21      Q  Right.
22      A  No.  But I'm sure if the case progresses, I'll
23  review more of what I've done already to be up to speed on
24  it.  But, no, I don't have other opinions.
25      Q  All right.

                                                Page 132

1      A  Unless -- unless -- the same qualifier that I gave
2  you before.  If someone asks me a question outside of what
3  has been presented already and asks me to answer it, I'll
4  express an opinion on that.
5      Q  When you were denied privileges or lost privileges
6  at Cedars and the other hospital you mentioned, do you
7  believe that was because of economic credentialing?
8      A  First of all, I didn't lose privileges.  I actually
9  resigned from the hospital because I hadn't fulfilled the
10  qualifications of the hospital.  Okay?
11      Q  You could not obtain privileges if you --
12      A  I could not maintain my privileges without doing the
13  number of cases required.  I discussed it with the medical
14  staff office, et cetera.  It's just a rule.
15      Can I -- you mean how do I feel?  I mean my feelings
16  don't mean a lot.  I mean I can't -- you know, it wasn't
17  personal against me, and they're doing this in general.
18  I'm not alone.
19      I don't agree with the practice.  I understand the
20  need to certify ongoing capability, and I'm in favor of
21  that.  But I just think, possibly, there are other ways
22  that you could do it.  And they're not amenable to that --
23  some hospitals are not amenable to that.  Some may be.
24  Some may take things in lieu of being on their staff.  I
25  mean hospitals behave differently.  They have their medical

                                                Page 133

                                        Pages 130 to 133

1  staff bylaws. So it's not one universal approach.
2      **Q   If all hospitals in Alabama have minimum admissions**
3  **requirements, that could be an example of -- that could be**
4  **an example of a situation where economic credentialing**
5  **might exist; correct?**
6      A  I mean it could be. You have to prove it, though,
7  and you have to go against them to document why they use
8  alternative means of credentialing. Could be, sure.
9      **Q   And in your case you don't -- do you believe in your**
10  **case that you would have been denied privileges based on**
11  **the fact, I mean, that you could not perform, in fact, the**
12  **minimum required amount of procedures at the hospitals?**
13      A  Do I believe that I could not perform the minimal
14  amount of procedures?
15      **Q   At the hospitals.**
16      A  I couldn't, because a lot of my procedures were not
17  insurance reimbursed, which means the expense of taking the
18  patient to the hospital would have been excessive. And
19  they, in my particular case, over the years have changed
20  their policy towards plastic surgery cases because they're
21  more of a bother for them now. They take up space rather
22  than having insurance cases. So I'm not -- used to be a
23  valued commodity at the hospital. Not anymore.
24      **Q   And that's one of the reasons that you can't obtain**
25  **privileges there.**

Page 134

---

1      I, GEOFFREY R. KEYES, M.D., do hereby declare
2  under penalty of perjury that I have read the foregoing
3  transcript; that I have made such corrections as noted
4  herein, in ink, initialed by me, or attached hereto; that
5  my testimony as contained herein, as corrected, is true and
6  correct.
7      EXECUTED this _____ day of _____,
8  _____, at _____, _____.
9          (City)         (State)
10
11      _____
12      GEOFFREY R. KEYES, M.D.
13      Volume I

Page 136

---

1      A  Because I can't do the number of procedures, right.
2      **Q   Because of the economic aspect of that.**
3      A  I can't -- I can't -- well, the economic aspect,
4  that's my problem, not theirs. They can charge whatever
5  they want, or maybe not, as we move forward. But
6  especially for elective procedures. If it's not going to
7  be covered by Obamacare or whatever, the hospital would
8  say, well, gee, why don't we charge you this amount. I
9  don't think that's going to be constrained.
10      MS. PERRYMAN: I don't think we have anything else.
11      MR. BECKMAN: Will, do you have anything else? I
12  think I'm done.
13      MS. PERRYMAN: Carrie?
14      MR. PARKER: No. I think we're done. Thank you.
15      MS. PERRYMAN: Carrie, are you good?
16      MS. FLAXMAN: Yes. Thank you.
17      MR. BECKMAN: It's the usually stipulation. He's
18  reserving the right to read and sign.
19      THE REPORTER: And where is the original going?
20      MS. PERRYMAN: I think it should go to you, and you
21  should send it to him.
22      MR. BECKMAN: Yes. Send it to us.
23      (TIME NOTED: 12:55 p.m.)

Page 135

---

1      I, the undersigned, a Certified Shorthand Reporter
2  of the State of California, do hereby certify:
3      That the foregoing proceedings were taken before me
4  at the time and place herein set forth; that any witnesses
5  in the foregoing proceedings, prior to testifying, were
6  placed under oath; that a verbatim record of the
7  proceedings was made by me using machine shorthand which
8  was thereafter transcribed under my direction; further,
9  that the foregoing is an accurate transcription thereof.
10      I further certify that I am neither financially
11  interested in the action nor a relative or employee of any
12  attorney or any of the parties.
13      IN WITNESS WHEREOF, I have this date subscribed
14  my name.
15
16  Dated: 11/14/2013
17
18
19      _____
20      LYNN ZINK
21      CSR No. 9466

Page 137

---
**A**
---

**aaaa** 29:3 77:2 78:15
  102:23 103:1,1,2
**aaaafss** 118:15
**aaaasf** 17:4 21:16
  22:1 28:9 29:9
  30:25 32:3,17 33:17
  45:21,24,24 47:10
  55:16 56:8 58:18
  68:18 70:2,16,21
  74:7,23 75:7,15
  77:3 86:18 87:7,14
  87:15 96:13,20,22
  97:14 98:2 102:6
  103:2,7 107:13
  109:7 110:3,4 113:1
  115:8 117:7,16,18
  118:10,18 122:4
  130:23 131:21
**aaaasfs** 33:22 74:5
  110:9 131:18
**aaahc** 28:9 60:23
**aaasf** 17:8,20 18:9,12
  18:24 19:10,25 20:3
  25:22 26:4,23,25
  28:18 29:2,5
**ab** 15:11
**abandonment** 92:5,8
**abbreviation** 17:4
**abdominoplasty**
  44:13 57:11
**ability** 25:8 69:25
  115:20 116:19
  117:20
**able** 49:15 63:6,7,18
  63:20,21 67:18,21
  80:14 90:19,20 91:6
  94:18 112:3 115:10
  115:15 116:13
  117:16 129:19
  130:5,17
**abortion** 20:15,18,22
  21:13,14 24:14
  28:13 31:11,14,15
  32:1 36:7 57:3 61:4

61:6 64:20 76:3,11
  77:24 81:3 83:18
  93:7 99:25 116:6,7
  119:2 120:4 122:9
  125:17 126:4,9,10
**abortionrelated** 21:4
  21:22 22:11,24
**abortions** 74:17,21
  76:4,12 82:3 102:15
  119:22 123:14,18
  126:11
**absolutely** 50:1 53:20
  81:16
**accept** 59:21 67:24
  68:10,14 92:20
**acceptable** 57:16
**accepted** 108:11
**accepts** 61:10
**access** 39:22 48:4
**accident** 8:18
**accredit** 61:10,14
  96:16,16 129:11
**accreditation** 4:19
  5:10 17:5 27:9,18
  28:6 29:11 35:8
  58:8,9,12,22 59:12
  59:22 60:12,25 61:9
  61:12,16,21 77:14
  78:10,15 79:18
  118:16 120:10
**accredited** 14:22,24
  15:2,4,9,11 35:16
  56:8 59:16,18,24
  60:10 74:10 78:4,18
  97:3,7,9,15 98:2
  116:13 129:11
**accrediting** 28:8 59:5
  59:7,15,20 60:17,22
  61:3,6,8,8 75:24
  86:7,11,17,20,25
  87:5,11 102:7,13
**accredits** 21:16 96:13
  96:20
**accumulated** 22:1
**accurate** 9:24 66:7,8

66:9 137:12
**achieve** 52:2
**achieved** 93:13
**action** 96:2 130:4
  137:14
**acts** 98:7
**actual** 75:4
**acute** 90:13
**acutely** 48:16
**add** 7:14
**added** 70:9
**addendum** 87:19,20
**adding** 43:17
**address** 38:14,16
  98:9,14
**addressed** 69:22
**adequacy** 25:7
**adequate** 130:11
**adhere** 30:5
**adherence** 58:13
**administered** 6:5
**administering** 102:19
  105:5 107:19
**administrative** 5:4
**admissions** 134:2
**admit** 51:5 66:3
  130:17
**admitting** 103:8
  121:8,14
**adopted** 103:12
**adoption** 126:23,25
**advance** 90:18
**advanced** 123:2
**advise** 42:6,14 44:4
  44:11,19 45:2 46:14
  47:12,22 48:7
**advises** 40:16
**advocate** 125:17,20
  126:12,15,23,24
**aesthetic** 13:17 17:6
  17:7
**affiliated** 90:2,16
**affirmative** 128:24
**aftercare** 41:18 88:9
**age** 6:24 49:12 75:19

**agent** 72:21
**ago** 3:21,24 7:14 9:3
  27:8,15 41:7 51:23
  65:10 125:14
**agree** 30:16 56:13,23
  57:18 58:15 59:24
  77:1,7,11 80:21
  86:15 101:5,17
  105:13 107:21
  111:23 116:9 117:1
  119:17 123:22
  133:19
**agreed** 39:18 85:15
**agreement** 19:13
  90:18 91:17 125:8
**agreements** 51:4,8,17
**ags** 73:6
**ahead** 16:22 45:15
  46:24 47:2 79:25
**ahrc** 100:14
**airfare** 32:20
**airway** 48:16,17
  113:23
**al** 1:5,9 2:5,9 3:21
**alabama** 1:2,9 2:2,9
  3:14,19,24 23:5,24
  24:1,4,15,17,19
  25:4,8,13 27:21
  64:22 65:15 71:19
  72:7 73:7 74:16,20
  76:10,13,15,22,24
  77:21 79:24 80:24
  81:15,17 88:3 91:24
  92:24 93:5,5,6,14
  93:16 99:8,17,19,24
  100:7,21 102:4
  108:5 121:11,22
  122:16,16 123:7
  129:6 134:2
**alabamas** 23:9 76:17
  93:4 129:3
**allow** 68:22 76:10
  98:14
**allows** 19:7 131:8
**alter** 94:3

**alternative** 78:12
 79:18 105:14
 107:14 108:5 134:8
**alternatively** 105:1
**ambulatory** 4:19
 5:11 17:5 32:22,23
 33:1,9 86:7,12,17
 87:5 118:16
**amenable** 133:22,23
**amended** 107:22,23
 107:24
**american** 17:4,7
 28:10 60:25 61:5
 69:16 76:6 80:13
**amount** 42:10 65:24
 69:10 134:12,14
 135:8
**amounts** 70:6
**analysis** 16:12 17:18
 18:5 80:4 84:15
**analyze** 24:3 131:8
**anatomic** 82:21,23
**anatomical** 83:6
**anesthesia** 14:17,18
 35:9,15,19 36:11,12
 36:15 41:24 42:1,4
 42:5 47:23 100:17
 102:20 104:12
 105:5,21,21,22
 107:20 119:5,10,10
 119:11 123:15,23
 123:24
**anesthesiologist** 34:8
 35:22 39:14 113:12
 114:2
**anesthesiologists**
 114:2
**angeles** 6:1 8:17
 12:24,25 13:2 15:23
 36:19 50:20
**answer** 5:15 11:4,21
 18:15,25 22:13 37:9
 37:15 43:4 46:21
 58:25 68:12 71:5
 72:23,24 73:1,15,16

88:12 112:16,18
 118:5,7 133:3
**answered** 18:18 23:1
 117:22
**answering** 37:17 86:1
**answers** 11:1,25
 122:14
**anticipation** 90:12
**anymore** 134:23
**anyway** 115:4
**apparatus** 78:4
**apparently** 98:21
**appearances** 3:1
**appears** 46:12
**application** 132:10
**applies** 30:12 85:25
**apply** 24:2 80:3 119:1
 119:13,14 120:20
 132:6
**applying** 118:1
**appointment** 16:7
**approach** 79:21
 80:21 83:12 116:22
 134:1
**approaches** 83:9
 89:13
**appropriate** 29:10
 59:8 75:8
**appropriately** 28:21
**approval** 108:1,2
**approve** 132:9
**approximately** 123:9
 125:14
**april** 28:6
**arbitrarily** 116:19
**arbitrary** 56:17
 128:25
**area** 45:3 47:23 50:20
 51:16 76:1 79:16
 82:20,21,23 83:6,13
 94:13 129:25
**arena** 16:25 67:23
**arent** 54:20 74:8
 110:1,1 115:25
 116:21 120:18

**argue** 69:25,25
**arhc** 99:9 100:8,15
**arhcs** 100:9,24 129:2
**arises** 50:19 51:17
**arrange** 114:20
**arranged** 40:19
 129:22
**arrangement** 129:24
**arrangements** 49:10
**arrested** 127:4
**arrived** 13:2
**asaps** 17:6 18:10
**asc** 15:17 33:15 100:8
 100:11,11,22
**ascs** 33:1 100:9,22,25
 101:8 129:2,3,4,6
**aside** 47:20
**asked** 10:19 18:1
 20:23 23:1 37:13,15
 47:8,11 53:6 64:5
 65:18 73:1,9,11
 75:7 80:25 84:24
 85:21,23 95:7 97:14
 101:10,12,16
 117:22 121:20
**asking** 8:2 22:5 24:11
 45:16 46:12 53:6
 58:25 61:12,14,16
 82:4,9 85:12 88:13
 92:18 102:9 107:9
 109:25 112:20
**asks** 133:2,3
**aspect** 126:9 135:2,3
**assess** 112:3
**assist** 49:10 114:1
**assistant** 3:16
**associate** 15:20
**associated** 55:10
 96:19
**association** 17:5 59:7
 59:20 60:25 69:16
 75:24 118:1
**associations** 16:20
 18:11 28:8 59:5,15
 60:21,22 61:3 77:3

86:25 102:7
**assume** 74:18
**assuming** 73:18
 122:14
**assurance** 17:23
**assure** 75:8,9
**asterisks** 71:7
**attached** 9:20 38:8
 47:6 65:4 104:1
 118:24 136:7
**attack** 51:7
**attention** 65:15,20
 104:18 117:2
**attitude** 77:17,18
**attorney** 1:8 2:8 3:14
 3:16 8:16,16 9:2
 10:10 39:9 71:24
 72:20 101:12,12,13
 101:14,16 137:15
**attorneyclient** 72:19
 112:13
**attorneys** 3:7 71:20
**augmentation** 44:14
 45:19 62:20 90:9,11
**authority** 60:10
**authorization** 104:24
**automatic** 66:10,11
**avenue** 3:8,17
**averages** 45:5
**avoid** 78:4,17
**avoided** 33:25
**awake** 39:15
**aware** 60:17 61:4,12
 76:16,18 92:5 94:21
 100:21 101:8 103:6
 103:13 108:4
 115:13 121:11
 127:7 128:25
**ayers** 84:11 85:3,20

**B**
**b** 4:12,22 35:9 100:19
 119:6,8
**back** 15:6 16:21
 17:22 19:12 28:6,18

37:2 40:6 41:19
53:4,5 62:5 65:9
71:17 78:22 83:24
88:6 92:18 95:7
97:13 111:5,20
112:2,13 117:15
123:11 125:8
127:20
**background** 30:14
90:3
**backup** 121:8,16,23
129:22
**backwards** 117:25
**bad** 111:18
**bailiff** 7:15
**bakersfield** 108:19
108:23,25
**baltimore** 8:10
**barnes** 12:12
**based** 21:25 22:6
33:2 54:17 69:20,23
76:6 79:5,15 85:25
87:1,2,4,7 100:7
116:23 119:5
122:14 134:10
**bases** 59:11
**basically** 10:23 40:16
60:7 87:6 89:25
111:19
**basis** 16:2 28:22
49:17 66:10 68:11
71:4,9,10 74:6
75:21 81:13 91:1
96:14 101:19,20
117:8,18 123:16
131:16
**beautys** 94:24
**beckman** 3:15 4:6
11:14 18:20,22
20:20 21:2,24 22:12
23:1,14,19 24:25
25:10 30:19 35:2
38:22 45:23 48:9
49:4 52:19 55:5
58:24 60:11 64:1

72:18,21 73:13,23
74:2 75:16 77:5
78:6 80:5 83:1
84:17 85:5 90:23
93:11 95:25 96:25
101:15 103:18
105:24 106:4 107:7
109:13 111:12,24
112:4,12,18 115:23
116:16 117:22
124:1 127:17 128:3
128:18,19 129:13
129:20 130:8,15
135:11,17,22
**beginning** 2:17 81:7
81:25 89:20 132:3
**behalf** 2:16
**behave** 133:25
**behaving** 97:23
**beholder** 94:24
**believe** 10:6 11:12
15:13 25:6 27:20
54:8,16 55:12 58:20
65:1,14 66:8 67:19
67:21,25 70:2,4
83:7 86:5 88:10
96:21 97:14 105:23
112:21,22 121:5
129:10 133:7 134:9
134:13
**believes** 29:11
**bend** 117:24
**beneficial** 86:8 88:3,5
88:9,20 103:3 111:2
**best** 9:25 15:19 87:2
88:21,21,25 89:9,10
89:13,14 90:21,22
93:22,22 94:3,4,5,6
94:10,22 95:14,24
96:23 97:17 98:3,17
110:2 111:17
114:23 116:22,23
116:25 118:2 130:1
130:4,7,11,16
**better** 17:21 49:12,16

130:2
**beverly** 40:10
**beyond** 22:21 56:21
84:20 119:6
**bike** 8:17
**bill** 24:12 28:13 81:4
86:9 87:10 88:2
92:25 99:18 108:5
125:3
**birth** 126:12,15
**bit** 21:9 25:22,23
36:17 46:11 47:19
71:18 74:4
**blade** 14:19
**blanket** 102:5
**bleed** 40:22
**bleeding** 14:20 21:6,7
21:7,8,8 22:15,15
22:18,22 42:21,23
47:24 48:16 49:19
63:13,14 81:21 82:2
82:9,11,16,17,18,21
82:8,10,18,21 88:19
**bleedings** 44:24
**blend** 30:11
**board** 5:6 12:15,18
27:13,14,25 28:1,5
30:8 32:18,19 50:17
59:6,11,14,18,19
76:6 80:13,15,17,18
86:24 99:24 100:8
105:1 106:12,14,15
106:18 107:1,8
108:1,2 111:13
113:12 127:11,13
**boards** 28:1
**bodies** 28:2 61:8
**body** 13:18,18 83:14
**bother** 134:21
**boulevard** 2:17
**boundaries** 75:20
**box** 3:18
**brand** 82:5
**breached** 125:8
**break** 12:1,2,3,5,6

37:13 38:10 63:25
112:2 127:19,23
128:13
**breast** 9:3 13:18 14:3
44:13,13 45:19
62:20 90:9,10
**briefcase** 19:21
**briefly** 62:6
**bring** 38:21
**bringing** 8:23 39:25
**brings** 41:19
**brought** 10:7 37:25
38:12 59:11 86:23
92:10
**build** 19:8
**building** 13:3 15:7
51:9
**built** 13:4
**burn** 49:5
**business** 20:4 131:6
**butcher** 14:8,9
**bylaws** 134:1

**C**

**c** 13:8 35:9 106:13,16
**cabinets** 33:13
**calendar** 43:3
**california** 1:15 2:17
6:1 24:2 28:5,13
59:5,6,10 86:23,24
108:17 124:4,5
137:5
**call** 14:6 27:13 38:18
38:19,20 39:8,24,25
40:1,6 49:19 51:20
51:21 57:24 62:16
89:4 90:5 91:7
109:20 113:9 114:5
114:6 119:4 129:21
**called** 52:10 62:21,24
92:4 94:25
**cancer** 113:25
**cant** 8:8 9:5 41:1
46:20 49:19 57:22
59:13 67:16,16 69:4

69:7 79:24 85:7
107:16 116:22,23
117:4,6 118:11
121:1 133:16
134:24 135:1,3,3
**capability** 53:8
133:20
**capable** 70:1 123:5
**capacity** 1:8 2:8
**car** 8:17
**cardiac** 123:2
**cardiologists** 115:6
**cardiovascular** 48:18
113:24 115:4,5
**care** 15:13 21:21
23:12 24:1 33:3,10
43:1 49:21 50:2,4,6
50:8,10,12,14 51:10
51:14,18 52:3 53:9
54:9,17 57:23 58:14
59:8 60:1 62:12
63:9,15,21 66:15
67:11,19 68:3,8,21
80:16,16 83:4,8,10
86:7,11,17 87:2,5,6
88:7,18 89:1,4,11
89:14,20 92:4,12,15
93:2,8,9,14,17,21
93:24 95:3,5 96:9
98:16,17 101:22
109:10,19 110:2,13
110:20,25 111:10
111:11 114:14,18
115:1,14,19 116:9
116:22,22,25 117:7
117:20 118:3
119:22 121:17
123:4
**careers** 132:3
**caregiver** 50:6
**caretaker** 38:17 39:7
**carrie** 3:25 135:13,15
**carried** 120:14
**carries** 78:16
**carry** 57:8 60:13

**case** 4:24 6:13 7:3,10
7:11,13 8:10,18,20
9:9,14 10:6,6,9
18:23 21:12 36:13
41:25 42:18,20,21
48:4 51:5,6,16,24
58:2,3 62:17 64:7
64:14,19 65:2 66:19
69:2 71:19 73:10
79:4,22 80:3 81:6
83:25 84:5,8 85:1
85:13,19,25 86:3
97:2,2 99:3,6 102:5
105:20 110:18
112:7,25 115:7
121:11,15 123:20
124:16,19,21
125:11,13 131:2
132:17,19,22 134:9
134:10,19
**caseby** 102:4
**casebycase** 66:10
68:11 71:4,9,10
74:5 87:16,23 96:14
109:8,8 117:8,18
**cases** 6:21,22 8:6,22
8:25 9:3 10:3,9,15
15:7 18:3 42:3,3
50:22 53:15,16
54:25 63:19 64:5,6
65:17 66:4 68:25
71:17 72:17 74:6
80:16 117:13
124:20,21 125:1,4
133:13 134:20,22
**catalogued** 56:11
**cautery** 14:19
**caveat** 86:14
**cedars** 53:11 89:4,4
90:20 114:14,18,21
114:22,23,24 115:1
133:6
**cedarssinai** 53:10,24
54:3,8,9,16 93:25
113:19 114:9 130:9

**celebrated** 14:8
**center** 4:16 14:22,24
30:13 34:21,22 51:3
97:12 111:15
117:10,11,12
126:19 130:25
**centers** 24:14 32:23
33:1 34:15,16,17,20
34:21 98:23 99:25
126:18 130:25
**certain** 55:10 60:20
65:24 67:13 69:10
70:6 71:13 76:25
77:6,12 81:12
100:17 108:12
117:20 120:11
**certainly** 18:21
**certification** 30:8
80:17 111:13
**certified** 2:19 12:18
80:15,18 113:13
137:4
**certify** 12:15 133:20
137:5,13
**cetera** 133:14
**chance** 62:23
**change** 34:12 129:4,8
129:9
**changed** 19:12,16
89:12 134:19
**changes** 81:10
**chapter** 5:6
**charge** 135:4,8
**chart** 34:5
**check** 10:9,11,17,19
37:2 40:6
**checklist** 4:18 5:10
118:16
**chest** 62:22
**chicago** 8:18 12:21
12:21
**choice** 63:14 75:24
125:20
**choose** 78:15
**circumcision** 120:13

**circumstances** 88:23
91:1 94:4 108:12
132:6
**cite** 69:17 103:23
104:3,8 105:4,7
106:24 118:15
119:23
**cited** 103:20,21,24
104:14,20 105:23
**cites** 105:24
**citing** 120:18
**city** 136:11
**civil** 7:11,18
**claim** 22:18 73:24
124:20
**claiming** 22:23
**claims** 7:13,17
124:20,21 125:1,12
**clarify** 81:24 88:15
**classes** 16:1
**classification** 35:15
**classifications** 35:8
35:11 119:4
**classified** 31:15,16
**clear** 81:11 99:16
110:23 112:15
**clients** 17:2
**clinical** 16:7 45:22
75:20
**clinics** 24:14,14 31:11
31:13,14,16 60:20
61:7,23 77:23,24
122:20 123:6
**close** 10:17 36:3
52:14 120:25
**closely** 103:11
**closer** 79:2
**closure** 14:20
**code** 5:4 103:19,23
**cold** 89:19
**colleague** 51:3 89:23
**colleagues** 54:13
**collected** 19:18
**collecting** 55:9
**collection** 16:21

**college** 12:10,11
  28:10
**com** 3:11
**come** 18:1 26:22
  33:24 40:6,18,19
  49:9,10 51:9,14
  55:1 69:17 79:2
  94:4 97:11 108:24
  108:25 112:2
  127:20 131:14
**comes** 40:15 41:19
  89:18
**coming** 49:20 85:22
  89:17
**comment** 25:14 78:13
  110:14
**committed** 97:24
**committee** 33:25 34:7
  67:17 97:2 132:9
**commodity** 134:23
**communicate** 54:8
  59:4 63:6,7 131:12
**communicates** 59:6
**communicating**
  50:13
**communication**
  40:24 50:9
**communications**
  73:25
**community** 94:25
  95:2 108:13
**companies** 33:7
**company** 16:11,13,15
**comparable** 100:16
  100:18 121:17
**compare** 27:4
**compelled** 8:4
**compensated** 32:7
  65:14,15
**compensating** 20:4,5
**compensation** 32:11
  32:13,15,17 65:13
**complaint** 73:11
  127:6,9,10
**complete** 10:14 11:3

32:5
**completing** 43:4
**compliance** 16:12,24
  19:14
**complication** 45:1,6
  49:21,22 50:19
  51:17 53:25 56:10
  57:10,14 82:17,18
  83:17 89:19 90:19
  91:6 92:12,16 94:1
  94:12 95:18,22,22
  96:8 113:7 130:5,11
  130:18
**complications** 20:25
  21:5,11,12 22:10,24
  45:11,11 48:15,20
  49:15,17,18 55:9,17
  55:24 56:10,19 57:3
  57:18,22,25 81:20
  88:8 91:18,20 92:1
  94:8,18,23 98:16,19
  101:23 130:19,21
  130:22
**comply** 60:8
**comprehensive** 58:21
  60:9
**comprises** 44:2
**computer** 46:19
  99:20
**con** 126:5,10
**concept** 66:12,14
  89:20 92:18 121:3
**concern** 28:20 82:21
**concerned** 42:22
**concerns** 67:11
**conclusion** 94:5
**conducting** 96:22
**conference** 28:8
**confident** 83:20
  114:25
**confidential** 18:14
**confined** 85:13
**conform** 111:17
**conforms** 86:6,11
**confusing** 32:25

**confusion** 100:13
**consider** 49:1 57:5
  89:24
**considerations** 79:9
**considered** 57:15
  95:1
**consist** 43:21,23
**consistent** 30:21
  87:10,10,14,15
  103:6 104:4 107:13
  122:4
**constrained** 118:2
  135:9
**consultation** 71:22
**consulting** 72:12
**contact** 72:10
**contacted** 71:19 73:5
  112:7,16,24 113:1
**contained** 136:8
**contains** 86:10
**context** 6:19 64:20
  102:11
**continuation** 50:5
**continue** 37:18 54:9
**continued** 5:1 26:7
**continuing** 30:10
**continuity** 50:2,3,14
  51:10 52:3 54:17
  60:1 63:9,21 88:7
  89:1,20 98:16
  101:22 109:10
  110:13,20,25
  111:10,10 115:1
**contract** 19:18
  129:22 130:1
**control** 126:13,16
**cook** 12:16 49:6,6
**copies** 39:9 46:24
**copy** 38:23 66:19
  120:7
**corner** 33:21
**corners** 68:7
**correct** 9:10 15:14,21
  15:22,24 20:9,11,18
  20:23,24 21:4,13,23

22:11,25 23:2,5,13
  23:18 24:6,18,24
  25:20 40:7,13 41:3
  42:11 43:25 44:6,10
  46:15 50:14 54:3
  55:20,21 58:4,19
  61:23 63:10,11
  65:10,25 66:17
  67:15 69:3 71:10,15
  71:16 75:13 77:4
  78:5,11 82:12,25
  83:20 84:16 85:4,15
  87:8,18 88:1 89:6
  90:3,22 91:19 92:2
  92:12 93:21 94:1,14
  94:23 95:19 96:10
  96:24 98:4,5,5
  99:17 107:16 108:2
  108:6,7 109:12
  110:4,19 111:2,7,23
  112:8,9 117:7
  119:19 121:2 123:7
  134:5 136:9
**corrected** 136:8
**corrections** 136:6
**couldnt** 11:6 25:14
  36:13 49:11 134:16
**counsel** 11:11,17 73:1
  73:3,19
**county** 12:16 40:3,23
  49:6,7 62:8
**couple** 16:4 117:13
  128:20
**course** 20:14 49:24
  56:7 62:13 66:13
  76:3,11 102:4 130:4
**courses** 35:6
**court** 1:1 2:1 7:13,15
  7:17,24 9:12,18,20
  11:4 37:24 38:8
  43:9 47:6,8 64:24
  65:4 104:1 118:24
  127:11,14
**cover** 51:1 54:14
**covered** 52:1 135:7

covering 50:21
create 18:6
credential 28:19 70:7
  70:22 116:20
credentialed 28:21
  30:13 70:10
credentialing 28:2,20
  29:10,23 30:22
  60:17 66:16,23 67:9
  67:12,14,17 69:3,4
  69:21,24 70:8 75:3
  75:8,13,18 76:5,25
  77:7 79:16 80:9
  81:12 115:12,19
  116:1,9 117:20
  128:23 132:9 133:7
  134:4,8
credentials 30:11
  53:19 68:13
credit 31:17
crime 97:24
crisis 122:9 126:18
  126:19
criteria 37:22 39:17
crux 88:6
csr 1:22 137:24
curetting 22:17
curious 121:22
current 74:7 98:1
currently 13:20
  16:19 64:18 71:2
  81:14 97:16 101:5
  109:11 127:6
cutler 6:12
cv 50:17

**D**
d 1:14 2:15 4:3,13,23
  6:4 13:8 72:15
  136:4,15
data 16:20 17:18 18:2
  19:16,17 21:11,17
  21:20 22:1 27:15
  55:9,16 67:21
databank 21:17

database 17:23 21:18
  22:2 55:16 56:11
date 34:14 35:22 96:1
  132:17 137:16
dated 137:19
dates 10:9,17,19
daughter 109:18,20
day 16:3 49:11 75:19
  131:10,13,14
  136:10
days 51:23 131:6
dc 3:9
de 91:10
death 8:18 131:6
deaths 97:3,4
decision 7:16 27:16
declaration 73:9,11
  85:3
declare 136:4
deem 59:14,19
deemed 33:17,18
deems 59:20
defendant 6:20,21
  7:1,3,12 8:14,15
defendants 1:10 2:10
  3:13 9:10
defined 104:23,24
definite 95:13
definitely 59:13
definition 106:8
definitions 100:7
delivered 89:14
delivery 58:14 59:8
  119:5
demanding 66:4
demands 58:13
demonstrate 30:6
  70:5
denials 128:25
denied 65:21 115:21
  117:17 131:25
  132:2 133:5 134:10
dental 60:19
deny 66:14 69:9
  116:4,19

denying 68:19 69:2,8
  69:23
department 25:5,8
  59:17 60:9 99:24
depend 83:13
depending 36:13
  50:15 73:25
depends 22:19 41:25
  57:8,12 111:11
deposed 6:17 10:22
deposition 1:14 2:15
  8:7 11:18 64:4
  132:15
depositions 6:25 7:6
describe 7:19
described 56:3
description 4:11 5:3
desk 66:20
despite 75:2
destination 38:2
determination 70:15
determines 117:18
develop 18:8 19:2,5
  19:16 20:6 29:17
  59:19 79:14
developed 17:13,22
  19:15
developing 18:5
development 32:14
devise 68:1,2
dictate 46:6
didnt 27:2,18 38:19
  56:20 62:22 63:3
  67:1,4 79:22 90:20
  99:16 113:3 122:16
  133:8
died 8:12
differ 84:23,23
differed 84:25
difference 32:22
  65:17 69:21 90:15
  91:4 92:3,11
different 33:15 57:8
  76:2 80:7,8 82:16
  89:18 101:2,6

102:24
differently 101:21
  133:25
difficult 70:11
direct 50:9 94:18
  96:8 117:2
directed 54:1
direction 78:13
  137:11
directly 54:11
directors 31:18
disagreements
  124:22
discharge 4:15 36:21
  36:23 37:14,21,22
  38:12 39:17 40:5
  43:24 48:15 62:7
discharged 39:18
  62:9
discretion 92:1
discuss 62:17 73:21
  74:2 99:14
discussed 86:15
  98:11,15 99:13
  133:13
discussing 119:15
  120:22
discussion 43:8,15
  124:18
discussions 40:18
dissociative 119:11
distance 48:3
distinctions 33:6,7
district 1:1,2 2:1,2
  8:16 10:10
division 1:2 2:2 19:14
doctor 22:16 62:25
  74:6 77:19 82:6
  91:7,11,23,25
  109:23 110:16,24
  129:22,22,24 130:5
doctors 51:8 57:23
  63:7 74:7 77:19
  108:8 110:15 129:3
  129:5,14 131:24

132:2
**document** 9:16 67:22
68:8 84:18,21 85:14
98:22 100:1 121:4
129:19 134:7
**documentation** 68:10
**documented** 34:5
43:2 95:4
**documenting** 68:13
**documents** 85:23
97:20 120:23
**doesnt** 36:22 45:25
59:14,19 68:9,14
74:6 91:18,21 93:15
102:8 111:15
114:12 116:7 117:3
121:7
**doing** 46:6 51:6 57:11
57:11 67:19,22 75:9
76:4 88:24 91:22
93:25 94:19 100:17
100:19 109:2 119:7
120:3 133:12,17
**donated** 125:22
**dont** 6:22,24 7:2,6
8:2,10 10:8 11:12
12:3 13:21 15:9
16:2 18:4,17 21:20
22:7,7 23:17 24:10
24:22,22 25:6,7,13
25:17,19 27:2,13
28:16,23,24 29:15
31:6,15,22,24 32:2
34:9 35:4,20 36:2
36:14,16 38:22
40:20,22 41:1,4,4,4
41:9,9,14 42:19
44:23 46:17,21
47:15,18 48:7 53:13
54:15 59:13 61:17
61:17,19,25 62:25
64:9,9 67:10 68:10
70:19,21 71:2,25
74:18,19 75:25 76:4
76:8,13,14,16 77:20

77:24 78:6 80:2,7
80:16,16,21 81:9,9
81:13 82:1 83:7
84:7,14 85:18 87:22
87:24 89:5,24 92:20
92:23 94:11,17
96:16,20 97:10,23
101:16,19,20
103:14 104:8
108:16 109:11,21
110:12,15,16 115:2
121:21 123:2,8,8,12
124:21 125:3,5,14
126:3,9,11 127:16
132:24 133:16,19
134:9 135:8,9,10
**door** 33:12
**dorr** 6:12
**doubt** 25:7
**dr** 6:10,17 10:1 37:13
43:18 51:21 64:4
72:15 84:11 85:1
90:5 103:20 117:12
128:19
**drafted** 99:10
**dramatically** 27:7
**drawers** 33:12
**drill** 10:23
**drive** 41:10
**drug** 48:17
**drugs** 119:11
**due** 65:22 66:15
71:14 115:11
**dumped** 92:6

**E**
**earlier** 10:7 44:7
47:21 64:4 81:19
94:11 123:13
128:23 129:2,21
131:18 132:15
**easier** 29:8
**easy** 56:15
**economic** 66:23 67:9
67:12,14 69:3,4,21

69:24 115:12,25
128:23 133:7 134:4
135:2,3
**economically** 116:20
**education** 30:10
**educational** 12:9
**effect** 67:14 68:1
**eight** 13:23 27:8
**either** 28:1 59:15
60:7,13 70:20 98:20
101:17 114:15
116:25 119:6
125:22
**elective** 135:6
**electrolyte** 49:8
**electronic** 114:7
**embolism** 8:11,12
34:3,5 62:23 97:4
**emergency** 53:1,7,8
62:16,17,24 91:10
91:11 113:9,17
114:6,12 122:21
**emphasize** 56:18
**employ** 83:13
**employee** 137:14
**emr** 114:5,6
**emt** 114:8,9
**endangers** 110:12
**ended** 125:7
**endurance** 12:2
**enforcement** 25:20
**ensure** 30:3 51:10,12
54:16 59:24 63:21
75:12 109:10
110:20
**ensuring** 29:10
**entered** 7:20,23
**entire** 89:11 100:1,2
**entry** 17:3
**environment** 26:10
27:10 29:12,23 30:1
**equal** 60:13
**equipment** 122:21
**er** 114:14,18
**especially** 40:21

135:6
**essentially** 18:6 116:1
**establish** 45:25 110:2
**establishing** 112:14
**et** 1:5,9 2:5,9 133:14
**evacuate** 79:7
**evaluate** 63:1 67:11
68:2,5
**evaluated** 34:4
**evening** 39:21
**event** 57:14
**eventually** 16:25
27:20
**everybody** 100:12
**everythings** 51:23
**evidence** 128:24
**evidencebased** 18:6
55:8
**exact** 27:14 41:9
131:1
**exactly** 19:19 55:19
90:4 110:5,12
125:15 130:17
**examination** 4:2 6:8
52:8 128:17 132:13
**examine** 117:16
**examined** 6:5 117:8
**examiners** 5:7
**example** 21:6 27:7
30:13 34:6 51:2,6
54:2 57:9 59:5
67:20 68:20 76:3,8
79:5,13 88:15
102:18 118:9 134:3
134:4
**excellent** 56:4,13,15
56:17,23 57:5,7
**exception** 86:10,13
87:17,23 102:5,8
103:8,13 109:8
**exceptions** 89:12
108:15 117:18
131:12
**excessive** 134:18
**exchange** 12:5

excise 57:9
excision 13:25 14:15
  14:19 42:18 44:20
  44:21 131:10
excluding 119:12
executed 136:10
exhibit 4:11,12,15,18
  4:22 5:3,4,9 9:13,19
  37:25 38:6,7 43:20
  44:2 47:4,5,8,9
  64:25,25 65:3 66:20
  83:25 85:14,18
  103:16,17,25
  118:17,22,23
  132:16
exhibits 4:10 5:2
exist 134:5
existing 23:18,24
  24:15,23 76:10
  79:23 81:14 86:6,11
  86:17 87:4,6 121:12
  122:16
exists 29:5 69:3
expanded 27:7
expansive 19:17
expense 134:17
experience 18:23
  25:4 66:16 71:17
  82:8 87:7 90:11
  103:1,2
experienced 122:20
  122:21,23
experiencewise
  123:17
experiencing 83:17
  83:21
expert 4:12,22 6:20
  8:6,11,13,15,18,19
  9:9,13 20:17,25
  21:5,7,20 22:8,9,17
  22:19,23 23:9 24:9
  24:15,21 64:5,6,15
  64:18,19 66:18
  71:17,21 73:10 74:1
  77:20 86:2

expertise 49:2 82:2
  82:20,22 83:12
  94:13
explain 7:25 29:25
explaining 47:21
explains 39:20
exponentially 26:7
express 133:4
expressed 126:4
  132:16
extension 72:22
extensive 76:20
extinguisher 99:3
extinguishers 99:4
extra 70:9
eye 94:24
eyelid 14:2 44:14

---

## F

facelift 14:2 40:21
  44:14 45:4 83:22
facelifts 45:19
facial 120:13
facilitates 98:17
facilities 4:20 5:11
  17:6 26:2,16 31:17
  31:20,25 32:23 33:2
  33:18 35:7,7,8,14
  35:16,16,24 46:1
  56:9 61:15 74:11
  79:3 86:8,12,18
  96:17,18,18,19 97:3
  97:3,15,17,21,25
  100:12,16,19,19
  102:16 118:17
  129:12 130:21
facility 15:1,14,14
  33:3,9,10 35:11
  39:20 40:17 46:15
  47:13 52:24 58:10
  74:14 75:10 79:5
  91:4 99:8 113:7
  116:13 119:2,8
  131:3
fact 22:6 34:1 41:14

53:21 56:21 58:17
  68:19 69:13,15
  74:21 75:2 78:2
  95:20 104:9 110:3
  111:14 134:11,11
factor 30:17
faculty 120:10
failure 49:23
fair 48:6 117:25
fall 35:11,14
familiar 131:24 132:2
  132:5
family 109:18 126:21
far 48:2 91:13 112:19
fashion 95:4
fault 65:22 66:15
  71:14
favor 133:20
federal 77:17 79:15
federation 61:5,6
fee 19:7
feel 29:16 33:8 83:20
  85:23 114:25
  116:24 133:15
feeling 69:5
feelings 133:15
fees 65:17 124:24
fellowship 12:16
felt 26:17,18 100:4
  114:22
female 90:6
fend 91:8
figure 45:14 74:23
finally 131:18
financially 137:13
find 66:19 72:11
  97:23
fine 37:9 51:24 57:16
  65:18 84:11 85:1,20
  109:25 115:7 116:4
fined 127:13
finish 12:4 16:22
  128:13
finishes 83:1
fire 79:6,10 99:3,4,4

fired 127:2
firm 6:11
first 6:5 13:2 15:6
  17:22 29:14 37:19
  39:10 51:22 80:6
  83:25 112:10,16
  113:11,16,20,21,24
  114:4 115:3 133:8
five 14:4 27:15 40:11
  40:17 43:13,22,23
  44:17 48:8 128:10
  131:6
fiveminute 7:16
flaxman 3:25 135:16
flexibility 71:8 74:5
  75:14 110:7,11
  115:8,22 116:10,12
  117:6,8,9,15 118:1
  118:6 119:16,17
  121:1,3
flexible 128:10
flip 105:16 106:16
florida 34:9 72:13
fluid 48:18,21 49:7,8
flurry 128:14
fly 82:4 118:11
flying 117:12
focus 46:19
follow 73:2,18 94:17
  109:20 131:15
follows 6:6 85:17
followups 127:24,25
  131:9
footnote 65:20 66:1
  67:2 104:14
foregoing 136:5
  137:6,8,12
forget 27:14 36:2
  60:24 61:1 72:11
  131:1
form 20:20 21:2,24
  22:12 23:1,14,19
  24:25 25:10 30:19
  35:2 37:19 38:12
  45:23 48:9 49:4

52:19 55:5 58:24
60:11 72:18 73:13
75:16 77:5 78:6
80:5 84:17 85:5
90:23 93:11 95:25
96:25 109:13
111:12,24 115:23
116:16 117:22
124:1 129:7 130:3
130:13
**formal** 86:2
**formed** 16:11
**forming** 21:12 79:22
**forms** 4:15
**forprofit** 19:13
**forth** 46:13 137:7
**forward** 18:11 19:7
99:1,1 104:16 135:5
**found** 72:5 124:14
**founded** 25:23 26:11
26:15,25
**founding** 26:4
**four** 10:4,11,18 12:11
14:4 43:12,20 68:7
**fourhour** 40:20
**fouryear** 10:16
**fox** 84:11 85:20
**freedom** 126:16
**frequently** 48:13
**frivolous** 127:13
**front** 27:12 28:4
**fulfilled** 133:9
**full** 6:14 16:7 18:4
20:12
**fully** 39:15
**further** 100:6 132:13
132:18 137:11,13

**G**
**gallbladders** 35:23
**gastroenterologists**
120:2,15
**gastroenterology**
118:20
**gee** 76:4 97:11 135:8

**general** 1:9 2:9 3:14
3:16 8:16 11:20
12:12,16 14:8,10
17:1 21:5 22:1 24:1
24:9,13 25:1 35:9
35:15,19 36:11,12
36:13,14 41:23 42:1
42:4,5,5 45:7,8,10
45:22 47:23 77:16
77:16 79:1 80:2
93:2 100:17 102:19
105:5,21 107:19
110:14 116:3 123:1
123:23 126:11
127:25 131:19,21
133:17
**generalities** 103:16
**generally** 36:9 38:13
41:16 44:7 47:23
56:14 97:10,23
108:8
**generals** 71:20,24
**geoffrey** 1:14 2:15
4:3,13,23 6:4,16
13:8 136:4,15
**getting** 73:14 79:9
108:13
**give** 11:1 46:22 94:2
102:18
**given** 33:10 58:8
67:11 90:11 94:3
122:15
**gives** 97:22
**giving** 125:8 126:1
**glad** 11:15
**go** 16:22 28:18 29:24
33:12 37:3,6,7
45:15 46:24 47:2
48:2 51:13 52:7
53:4,5,23 54:7
62:11,24 77:9,9
78:22 79:25 85:9
88:18 91:10 92:22
95:7 97:2,20 104:7
104:16,17,22 105:3

106:2,3 110:22
112:19 114:14,21
114:23 122:24,24
123:11 127:15,20
127:23 128:4 134:7
135:20
**goes** 36:25 39:4,12,19
51:20 88:6 89:3
92:13 131:7
**going** 9:12 10:23 11:1
11:2,24 17:3 18:15
20:2 23:25 25:2
34:15 37:3,7 38:14
41:20 43:1,1 62:5
62:16 64:24 65:19
68:14 71:17 73:2,14
81:14 84:2 88:23
97:13,13 98:23
103:1 112:1 119:6
128:19 131:8 135:6
135:9,19
**gold** 56:9 78:15 95:13
96:22
**good** 11:15 15:13
29:19,19 43:5 47:3
48:5 55:21,22,23
56:2 57:1,7,15,16
70:13 87:19,20 90:9
93:2,10,19 95:17
97:21,22 103:3
111:10,14 122:1,2,3
122:22 135:15
**gosia** 3:6 6:12
**government** 50:7
77:18
**governments** 59:1
**granted** 104:24
**gratified** 56:16
**great** 40:24 57:10
60:16 72:8 112:4
129:18
**greater** 130:25
**ground** 75:17
**grounds** 132:8
**groups** 125:17,20,25

126:12,15,23,24
**growing** 26:6 27:19
**guarantee** 65:23
117:23
**guaranties** 111:16
**guaranty** 111:13
**guess** 16:21 21:9 31:6
74:23 80:1 81:24
84:2 92:10 101:13
109:6
**guidance** 88:24
**guidelines** 110:9
120:6
**guides** 47:25
**guilty** 97:23
**gyn** 21:16 31:17,19
34:23 35:10,13,18
60:19 74:25 82:7
98:21 119:2,22,25
120:3
**gynecologic** 82:10
**gynecological** 82:3,25
83:18
**gynecologists** 21:21
120:15

**H**
**hadnt** 133:9
**hale** 3:4 6:12
**half** 14:1 27:11 31:8
108:21
**halfinterest** 20:12
**hand** 9:12 29:24,24
92:13,13
**handed** 39:13
**handle** 90:19 94:8,18
**handling** 93:25 94:23
**happen** 19:19 53:22
59:3 62:10,14 69:19
89:8 93:5 94:12
97:2 113:22 132:10
**happened** 53:21
62:18 69:13,15
89:16 90:8 109:19
**happening** 90:13

**happens** 51:25 78:14
  90:4 98:23 132:5
**happy** 25:13 74:2
  94:4
**hard** 22:13 116:20
**harvey** 14:8
**hate** 50:6
**havent** 21:10 24:3
  28:17 34:24 38:10
  41:2 61:20 62:3
  64:10 80:3 86:21
  99:20 113:17 126:3
  126:10
**hb** 87:16,20 96:5
  108:4 121:12
**head** 13:18 34:8
  113:25
**health** 23:12 24:5,14
  25:5 31:10,13 33:20
  34:22 52:7 59:17
  60:10,20 64:20
  77:23 81:11 88:3,4
  88:14 99:24,25,25
  100:8
**healthcare** 18:7
  98:23 99:8
**healths** 25:8
**heard** 123:17,19
**heart** 51:6
**held** 7:4,9,13,18
  124:5 126:4
**hell** 11:20
**help** 19:2,4 37:9
  112:17
**helped** 126:19
**helpful** 29:11 37:8,17
  58:23
**hemorrhage** 88:17
**hereto** 9:20 38:8 47:6
  65:4 104:1 118:24
  136:7
**herniorrhaphy** 57:12
**hes** 72:15,21 75:2
  135:17
**high** 98:20

**higher** 100:24
**hills** 40:10
**historically** 13:15
**history** 12:19 30:15
**hold** 22:7 30:21 71:3
  95:20 100:24 121:7
  124:3
**holds** 80:14
**hollywood** 1:15 2:17
  40:10
**home** 38:3 40:4 62:10
  79:7
**homes** 79:6
**honest** 85:6
**honorarium** 32:20
**hope** 92:21 93:13
  109:24
**hopefully** 94:5
**hopes** 88:19
**hos** 74:15
**hospital** 12:13,16
  24:8 26:17 30:11,13
  33:15 36:3,5 37:20
  46:4,8 52:10,11,16
  53:18 62:11,15 63:3
  64:8,19 65:25 67:17
  68:1,2,6,7,9,22
  69:11 70:1,6,9,11
  70:12 74:12,13 75:1
  75:3,14 81:2 86:10
  89:2,2,6 91:15,16
  91:17,18,20,24 92:6
  92:17 93:9 94:20
  95:19 96:5 97:8,9
  97:11,16 98:1,8
  102:3,17,20 103:9
  104:25 105:6,10,15
  106:12,14,18,25
  107:1,16,20,25
  108:19,23 110:24
  111:16 116:4,7
  119:16 121:1
  129:23 130:6 132:7
  133:6,9,10 134:18
  134:23 135:7

**hospitalization** 46:7
  49:9 113:17
**hospitals** 30:22 54:25
  61:2 66:4,14 67:8
  67:13 68:9,10,14,16
  68:21 69:8 74:8,9
  74:17,22 97:8 108:8
  108:17 116:18
  117:2 129:15
  131:25 133:23,25
  134:2,12,15
**hotel** 41:17
**hour** 13:23 14:2
  40:24 41:10 63:17
  65:14,16 108:21
  112:1
**hours** 13:24 14:3,4,4
  38:15 91:6 123:9,12
**house** 87:10 92:25
**hub** 19:16
**husband** 7:15
**hysteroscopy** 35:20

**I**

**id** 10:16 26:22 31:6
  49:9 62:16,17 83:25
  84:17 85:7 114:10
  114:20 123:11
**idea** 19:16 45:5 75:5
  98:13 111:17
**ideal** 130:1
**ideas** 18:1
**identification** 9:19
  38:7 47:5 65:3
  103:25 118:23
**ill** 12:4 14:7 16:21
  18:25 19:19 37:17
  38:11 45:16 66:19
  103:15,16 108:24
  112:3 118:21
  127:23 132:22
  133:3
**illinois** 12:15 124:7
**im** 6:11 7:5 8:23 9:4
  9:12 10:23 11:1,2

12:15,18 15:7 20:7
  21:5,6 22:5 24:9
  25:1,12 28:23 29:4
  34:1,13 35:10,20,22
  43:13 46:12,21 51:6
  51:13,25 52:6,8,23
  55:19 56:18 61:12
  61:14,16,19 62:21
  64:17,24 65:19 66:7
  66:20 69:6 73:14,18
  73:25 74:23 76:16
  76:21,23,23 78:17
  78:22,25 80:20,20
  81:6,10,16 82:1,6
  82:13 85:12,17 86:1
  87:13 89:7 90:11
  91:21 92:5 93:1,4
  93:16 94:2 96:18
  100:4 102:10 103:1
  104:19 106:2,20,22
  115:17,17 121:22
  122:14 128:1,10
  132:5,5,10,22
  133:18,20 134:22
  135:12
**imaq** 61:2
**imbalance** 48:18,21
  49:7,8
**immediate** 114:18
  126:21
**immediately** 88:17
  89:16 115:7 131:13
**impetus** 26:4 28:19
**implicate** 119:22
**imply** 57:25
**implying** 120:18
**important** 50:2 71:8
  71:11 88:9
**impossible** 59:2
  116:15
**improve** 18:2,7 26:6
**improvement** 56:5
**inability** 65:23
**inasmuch** 84:22
**incidence** 55:16

**incident** 45:12 56:14
**incidentally** 35:13
**incidents** 98:19
**include** 67:1,4 120:15
**included** 75:1 84:15
  120:12
**includes** 100:12
**including** 41:21
  119:2 131:15
**inclusive** 19:17
**inconsistent** 102:6
**incorrectly** 91:22
**index** 4:1 5:1
**indirectly** 32:11,14
**individual** 95:3
**individuals** 21:22
  73:6
**industry** 60:18,19
**infection** 22:14,14,23
  48:16
**information** 18:14
  42:25 61:18,19 67:5
  90:17,25 92:7
  130:22
**initialed** 136:7
**initials** 60:25
**injured** 8:17
**ink** 136:7
**input** 92:7
**insight** 82:5 97:22
**insist** 34:3
**insofar** 102:7
**inspect** 33:18,19
  34:14,16,17,20,25
  35:5,6 97:20
**inspected** 34:22
**inspectors** 35:6
**instance** 15:18 57:4
  59:10 60:19 74:15
  87:9 89:22 108:16
**instances** 41:15 80:9
  81:21 115:13
**instruction** 5:15
  72:24 73:2,16,18
**instructions** 38:1

39:2
**instrumental** 27:16
**insufficient** 62:1
**insurance** 33:7,9
  134:17,22
**intend** 23:17 24:22
  84:5,7 85:19
**intending** 23:23
**intenerate** 108:10
**interest** 17:14 20:10
  20:12,13 88:25
  114:23 127:18
**interested** 45:8 67:18
  137:14
**interesting** 14:9
**interestingly** 27:12
**interfere** 91:21
**intern** 14:10
**international** 36:20
**internet** 17:22
**internetbased** 131:7
**internship** 12:12
**interrupt** 38:22
**interruption** 39:5
  57:20 113:14
**intervals** 37:2
**interviews** 42:25
**intubate** 123:3
**invasive** 91:5 100:20
**investigative** 97:1
**involve** 125:2
**involved** 14:16 26:23
  33:20,22 68:18
  123:18 125:16,19
  126:19,24
**involving** 64:19
**irrespective** 53:18
**isnt** 17:21 74:9 95:18
  115:10
**issue** 32:2 50:2,15
  63:8,11 64:13 65:20
  67:6 69:18,22 81:6
  92:10 98:24 100:4
  115:11,14,18
  116:17,17 117:14

118:1 119:15
  120:22
**issues** 22:16 28:2,5
  80:9,10 97:2 98:9
  98:10,15 111:9
  115:11
**iv** 35:9 41:23,24 42:3
  100:18
**ive** 12:22 18:1 21:6
  21:25 25:11 28:4
  32:24 35:6 47:8
  52:7,20 54:12,23
  62:4 81:3 82:8
  84:22 90:11 93:5
  99:4,21 103:16
  112:11,21,21
  123:17 126:2
  132:23

**J**

**j** 106:13,16
**jacksonville** 72:13
**january** 28:10
**jcaho** 28:9 61:1
**jersey** 5:4 102:18,22
  103:3,7,10,13,19,23
  105:5,14 107:19
  109:7
**job** 1:23
**joe** 49:20 117:12
**joint** 28:7
**jones** 51:21 90:5
**judge** 8:4
**judging** 25:11 81:16
**judgment** 7:20 30:18
  46:5 95:24
**jurisdiction** 104:25

**K**

**kbeckman** 3:21
**keep** 45:15
**kept** 39:17
**keyes** 1:14 2:15 4:3
  4:13,16,23 6:4,10
  6:16,17 10:1 13:8

37:13 43:18 64:4
  128:19 136:4,15
**keyess** 103:20
**kimberly** 42:24
**kind** 34:15 62:7 82:4
  92:8
**knew** 92:7 112:15
  113:2
**know** 7:2 8:2,8 10:23
  11:15 13:21 14:4,7
  16:6 18:2,4,17
  22:15 24:7,10 25:14
  26:7 31:1,6,10,23
  31:24 34:9,12,15
  35:13,20,23,24 37:3
  39:21 40:19 41:1,8
  41:9,20 45:24 46:5
  48:2,3,3,21 49:5
  51:4,21,22 56:15,20
  57:7 60:22 62:21
  63:2,2,17 64:9,9
  68:17 72:10 74:6,19
  75:6 76:5,13,13
  78:16,25 81:4 82:6
  85:6 86:14,22,22
  88:11 89:11 92:6
  95:11 97:1,18 98:20
  100:11 102:23
  103:14 105:12,18
  108:12,13 110:15
  110:16 111:15
  112:24 113:12
  115:5,5,6 117:12
  119:4 123:1,4 125:3
  126:21 128:10
  132:18 133:16
**knowledge** 9:25
  36:14 77:20,24
  92:24 113:3 125:21
  125:24 126:2
**knows** 89:15,15
  123:3
**kyle** 3:15 128:19

**L**

lack 53:15 122:9
lacks 77:16,25 80:2,6
  80:7,8,20
law 3:7 5:5 6:11
  15:10 60:14 102:17
  102:22 103:3,7
  121:12 129:3,16
laws 79:5
lawsuits 124:12,12
lays 104:15
lead 30:17
leading 48:17
learn 29:15 34:13
  60:24
leave 50:22,24 128:4
leaves 39:2
leaving 91:4 117:13
lecture 16:4
lectured 28:7
left 19:20
legal 64:18
legislate 45:25
legislative 28:1,2
legislature 24:12
  78:14
length 47:25
lesion 14:1,15 42:19
  44:20 57:10 131:11
level 100:17 119:5
  122:23
liable 7:4,9,13,18,19
  124:14
license 124:8
licensed 23:7 59:16
  59:16,23 99:8
  116:14 129:12
licenses 124:3,5
licensing 78:10,21
licensure 27:9,17
  60:12 75:21 78:5
  107:25
lidocaine 14:18
lieu 60:12 133:24
life 92:22 123:2
lifethreatening 40:25

91:8
light 70:14
likelihood 44:24
limit 76:14 110:22
  111:18
line 5:16
lines 81:18
liposuction 44:14
  45:4,19
list 6:22 10:6,13
  33:13 99:9
listed 84:4 120:5
lists 120:11,12
literature 21:11
litigation 72:12
little 14:7 21:9 25:22
  36:17 44:25 62:22
  74:4
live 36:18,22 62:9
  117:10
lives 40:3
llp 3:4
local 14:18 35:10
  42:18 62:11 98:8
  102:17 119:7,10
  123:15,24 129:15
  129:23
locally 36:22 108:9
located 16:15
logic 48:5
long 13:22 32:3 40:4
  41:22 118:2 123:9
  128:5,8
longer 118:7
longestablished 15:8
look 30:14 45:13,16
  46:19,23 47:10 65:6
  67:18 70:14,21 72:2
  78:22 79:23 85:8,8
  86:19 97:20,21
  98:19 104:6 105:7
  117:14,16,25
  123:11 128:8
looked 86:21 95:4
  97:6 103:11 109:17

121:20
looking 46:21 55:19
  86:24 104:11 106:9
  106:21 107:7
  119:25 120:3,7,9
looks 50:17 65:6,8
los 6:1 8:17 12:24,25
  13:2 15:23 36:19
  50:20
lose 10:11 53:18
  70:13 133:8
loss 86:13
lost 53:14 54:22,23
  54:24 65:22 70:25
  87:17 88:22 97:10
  133:5
lot 29:21 79:5 102:23
  133:16 134:16
low 56:25,25
lower 57:14
loyola 12:12
luckily 33:25 97:8
luther 1:8 2:8
lynn 1:21 2:19 137:23

**M**

m 1:14 2:15,18,18 3:6
  4:3,13,23 6:2,4 13:8
  135:23 136:4,15
machine 137:10
main 86:4
maintain 89:1 115:1
  130:22 133:12
maintained 63:9
major 50:22 55:6
  61:3 113:7
majority 48:6 131:14
making 80:1,23 89:7
mal 125:9
malfeasance 71:1
mallio 120:13
malpractice 7:9
  30:15 95:1 124:12
  124:14,21,22 125:4
  125:9

manage 22:17 49:18
  49:19,25 50:1 51:14
  51:24 54:9 63:18
  81:21,23 89:4 91:18
  91:20 95:12,18,21
  96:8 130:5,18
management 19:14
  95:1 98:16 120:16
manages 16:24
managing 82:16,16
  82:18 90:1 93:9
  115:4
mandate 102:3,5
mandating 98:7
mandatory 17:3
manner 54:23 63:14
  97:17
march 65:9 112:22
mark 9:13,18 37:24
  38:6 43:10 47:2,4,9
  64:25 103:16
  118:21
marked 9:19 38:7
  43:20 47:5,8 65:3
  85:14 103:17,25
  118:17,23
market 19:14
marketed 19:15
maryland 10:6
material 14:20
materials 37:16
  85:20
matter 34:1 42:12
  75:3 77:11 88:6
  89:17
max 41:8
meals 32:20
mean 7:25 8:2,8
  12:24 22:19 23:21
  24:8 33:12 35:13,20
  37:5,5 38:22 40:19
  41:1,9,16,20 45:15
  48:2,5,25 49:7 53:4
  54:2,23 55:23 56:1
  58:6 66:12,13 67:16

67:19 68:14,18 69:4
72:10 76:15,25
78:21 80:3 81:9
82:13 84:20 85:24
85:25 88:11 92:13
93:16 98:13,18
100:12 108:16
109:16,17 110:1,3
110:14,19 111:15
115:3 116:2,25
117:3,13,14 119:6
123:11,17 126:2,5
127:19 128:10,11
129:10 132:6
133:15,15,16,16,25
134:6,11
**meaning** 18:9 60:13
116:12
**means** 8:1 68:13
119:9 134:8,17
**medical** 5:6 12:11
21:11 23:12,25
27:13,14 28:1,5
30:10 59:6,11,14,18
59:18,19 68:17
69:16 70:3 76:6
80:13 86:24 87:2,25
89:9 90:22 94:22
95:14,17,24 96:23
98:7 114:7 124:3
125:2 133:13,25
**medically** 86:8 88:2
111:2
**medicare** 33:17,18,19
35:6 59:20 79:2,5
**medications** 90:7
**medicine** 18:6 23:4
33:21 55:9 96:1
**mediocre** 132:7
**meet** 56:9 94:22
96:22 112:10
114:20
**meeting** 32:19 86:23
92:21
**member** 127:9

**members** 17:19 32:18
**membership** 30:25
**memberships** 50:17
**memorized** 46:22
**mentioned** 10:16
27:24 55:8 60:23
84:10 109:5 112:7
124:11 133:6
**merits** 73:24
**met** 112:21,22
**middle** 1:2 2:2
**mile** 52:10,11,14,16
52:23 53:1,6 95:21
114:11,12,21
**miles** 40:11,17 41:9
52:13,15,15 88:17
109:21 114:16
**million** 17:24,24
**millionsomeodd**
45:10
**mind** 49:20
**mindful** 128:2
**minimal** 134:13
**minimum** 66:4 134:2
134:12
**minor** 42:18 131:11
**minute** 37:4 41:7
**minutes** 14:1,14
41:22 46:4 128:3,11
**miracle** 52:10,11,14
52:16,23 53:1,6
95:20 114:11,12,21
**missing** 43:13
**mississippi** 4:24 64:7
64:22 65:2 67:2
71:18 72:7 73:7
112:25
**modeled** 58:18 77:13
**moment** 90:13
**money** 125:22
**monitor** 67:18,23
**monitors** 37:21
**montgomery** 3:19
**month** 16:3 32:4
117:13

**monthly** 16:2
**months** 16:6 65:9
**morning** 39:23 40:7
**motion** 73:12
**move** 18:11 62:6
135:5
**moved** 12:22 13:4
**moves** 19:7
**multiple** 99:5 120:2,3

## N

**n** 106:13,16
**name** 6:10,14 8:10
13:7,9 14:9,13
51:22 72:3,10,16
128:19 137:17
**named** 7:3 112:8
**names** 60:24
**narrow** 100:5
**national** 16:20 61:5
**nationally** 28:9 61:10
**nature** 74:1 80:2
**near** 42:6
**necessarily** 70:19
79:16 115:25
**necessary** 27:19 54:5
54:5,7,14 79:12
88:4,13
**neck** 12:14 13:18
113:25
**need** 12:2 37:6 39:8,8
39:21 42:15 120:6
128:3,8 133:20
**needed** 26:13,16
58:23 110:8 113:5
114:14,18 115:10
**needing** 81:20
**needs** 110:10
**neither** 137:13
**nephrologist** 49:24
**never** 19:15 23:4,7
52:20 54:24 70:10
70:25 78:8,20 80:6
80:7 93:5 99:4
112:11,21,22 113:2

125:22
**nevertheless** 68:22
71:13 115:15,21
**new** 5:4 27:12,17,18
27:25 33:19 34:13
55:1 102:18,22
103:3,7,10,10,13,19
103:23 105:4,14
107:19 109:6
**nice** 92:21
**night** 39:24 53:23
131:13
**nonaccredited** 26:2
**nonasc** 57:4
**noncompete** 80:10
**nonmedicare** 35:7
**nonsmall** 125:12
**nonsurgical** 63:12
**northern** 1:2 2:2
**note** 39:25
**noted** 135:23 136:6
**notes** 127:16,20,23
128:9
**noticed** 15:20
**notwithstanding**
54:15 69:15 110:6
117:3
**november** 1:16 2:19
6:1
**novo** 91:10
**number** 6:22 38:16
38:17 54:13,25 66:4
131:1 133:13 135:1
**numbers** 39:22 43:2
**nurse** 37:1,20 39:4,6
39:13,18 123:1
**nursing** 79:6,7
**nw** 3:8

## O

**o** 3:18
**oath** 6:5 11:9 137:9
**ob** 21:16 31:17,19
34:23 35:10,13,18
60:19 74:25 82:7

98:21 119:2,22,25
  120:3
**obamacare** 135:7
**object** 11:18 20:20
  21:2,24 22:12 23:1
  23:14,19 24:25
  25:10 30:19 35:2
  45:23 48:9 49:4
  52:19 55:5 58:24
  60:11 72:18 73:13
  75:16 77:5 78:6
  80:5 84:17 85:5
  90:23 93:11 95:25
  96:25 109:13
  110:21 111:12,24
  115:23 116:16
  117:22 124:1 129:7
  130:3,13
**objection** 11:20 72:18
  112:12 129:17
**obtain** 68:4 91:16
  105:15 107:25
  115:10,15 116:15
  121:1 133:11
  134:24
**obtained** 91:24
**obtaining** 116:14
**obtains** 60:13
**obviated** 88:23
**obviously** 27:19
  53:16,17 58:2 67:9
  69:7 88:25 108:12
**occupational** 33:20
**occur** 56:20,20 57:22
**occurred** 113:18
**occurrence** 111:18
  131:7
**occurring** 69:6 90:13
**occurs** 22:18 34:3
  38:13
**offer** 23:17,23 24:22
  24:22 25:2 32:1
  84:5,7,14 85:19
  132:19,20
**offered** 84:21,22

132:17
**offering** 84:25 85:13
  86:3
**office** 3:14 13:4 14:23
  33:1 40:11,16 41:3
  43:24 44:5 46:5
  52:12 89:23 104:12
  107:20 133:14
**officebased** 33:3 79:4
  100:12
**offices** 71:20,24 73:7
**official** 1:8 2:8
**oftentimes** 59:1 79:15
**oh** 47:1 53:2 103:24
**okay** 7:8 8:25 10:13
  11:15 13:1 15:4,20
  20:2 24:21 28:18,25
  31:3,5,22 33:5,22
  36:24 37:10 38:1,5
  42:14,17 44:16 45:1
  47:1,17 48:14 55:20
  59:3 60:16 61:20
  62:5 64:12,17,24
  66:18 67:7 72:4,12
  75:5 81:18 83:16
  84:10 87:9 94:6,16
  95:2,8 98:13 104:21
  106:5 108:7,20,22
  110:22 112:4 117:3
  123:9,13,19 125:1
  128:15,22 133:10
**olympia** 54:25
**once** 21:8 50:25
  90:11 117:13
**onerous** 79:15,17,20
**onerousness** 79:19
**ones** 8:23 48:13,19
  90:10 99:22
**ongoing** 133:20
**open** 33:12 51:13
**operated** 26:16 82:25
  90:5 93:20 109:18
**operating** 16:3 26:9
  46:1 51:2,7 97:16
  113:6

**operation** 40:20
  75:10
**operations** 30:22
**opinion** 22:16 23:17
  23:23 24:2 25:2,17
  25:19 61:25 68:17
  69:23 70:4 84:14
  85:1,24 86:2 87:6
  87:25 98:7,18 128:6
  129:5,8,9 133:4
**opinions** 21:12 24:22
  24:23 71:21 79:22
  84:3,3,4,7,11,15,21
  84:22,23 85:12,13
  85:19 86:3,4 87:1,4
  95:13 132:16,16,17
  132:19,20,24
**opportunity** 67:10
**opposed** 106:18
  116:7 125:2
**options** 110:22
  111:18
**oral** 36:10 123:15,24
**orange** 40:3,22 62:8
**order** 7:23,25,25 8:1
  54:9
**organization** 18:10
  20:3 29:10,15 32:21
  72:2,9,11 103:7
  125:23
**organizations** 18:11
  60:18 71:21 72:1
  86:20 87:11 102:14
  115:9 125:16,19,25
**original** 19:13 135:19
**otolaryng** 113:21
**otolaryngologist**
  113:25
**otolaryngology** 12:15
**otolaryngologyhead**
  12:14
**otoplasty** 44:20
**outcome** 109:24
  111:18
**outcomes** 18:3,5

**outpatient** 15:16
  16:25 26:6,9 27:1,5
  27:10 28:3,22 35:24
  35:25 36:2,4 46:1
  60:23 67:23 74:14
  75:10 79:3 98:20
  100:16 102:16
  113:22
**outpatients** 27:22
**outside** 10:18 26:17
  41:2 49:22 73:5,6
  80:19 82:14,15
  94:12 133:2
**overall** 30:14
**overdose** 48:17
**overnight** 36:5
  108:24 109:1
**overregulate** 59:2
  78:23
**oversight** 58:11,12
**overview** 34:1 95:5

**P**

**p** 2:18 3:18 13:8
  135:23
**page** 5:16 10:1 43:14
  65:19 66:21 104:9
  104:10,16,22 105:6
  105:9,16,25 106:17
  106:20,22,23 107:2
  107:3,4 120:10
  121:4 122:6
**pages** 1:25 4:11 5:3
  43:11,12,17
**pain** 62:22 120:16
**paper** 43:21,23 56:3
**papers** 21:25 22:4
  37:25 38:6 55:14,15
  55:16 58:6
**paragraph** 66:21
  67:4 69:1,17 84:1
  84:11 85:2,9,9,10
  98:6 99:12 102:12
  102:14 105:4
  106:24 107:18

122:8
**parenteral** 119:10
**parenthood** 1:4 2:4
  3:25 61:5
**parker** 3:24 128:8,12
  135:14
**part** 20:13 30:3 46:3
  50:13 74:11 103:11
  108:13
**particular** 8:24 22:16
  30:22 35:23 61:23
  65:16,25 66:13
  68:25 76:1 85:2,10
  86:21 89:2 93:24
  94:7 106:9 134:19
**particularly** 25:12
  58:22 122:10
**parties** 137:15
**partner** 16:19 17:14
  19:4
**partners** 13:11
**party** 124:11
**passed** 15:10,12
  24:12 28:13 34:2
  35:6
**passing** 91:12
**paths** 78:12
**patient** 20:23 25:9
  36:4,22,25 37:1
  38:2,17 39:6,12,13
  39:14,20,22,23 40:3
  40:15 42:24 47:22
  48:4 50:8,12 51:11
  51:12 52:20 53:3
  54:7,10 60:1 62:5,8
  62:18,19 63:1,15
  79:12,13 82:24
  89:10 90:22,25 91:2
  91:12 92:6,14,19,20
  93:2,14,17,20 95:2
  95:24 98:9,9,17,24
  110:13,16 113:6
  116:22 118:3
  130:18 134:18
**patients** 26:16,19

29:13 34:4 36:17,18
  36:19,20 39:15,18
  40:8 41:2,20 42:15
  44:4,12,19 45:3,17
  46:14 47:12 48:7,14
  50:10 51:5,24 52:17
  53:9,23 57:19,22
  68:21 81:23 89:3
  90:3 91:13,21 93:21
  93:24 95:12 96:8,23
  97:17 98:4 99:2
  103:4 108:24 114:3
  117:24 131:9,10,12
  131:14
**patterns** 108:14
**pay** 18:12 104:18
**paying** 19:1,2,4,8
  20:5,8
**peer** 17:16,17,23
  30:10 67:20,22
  97:19 130:24
**peerreviewed** 97:20
**penalty** 136:5
**pending** 12:4 127:6
**pennsylvania** 3:8
**people** 26:9 38:14
  42:6 70:7 75:7
  78:14 79:7,8,10
  97:6,7,10 110:18
  116:24 117:17
  126:11
**percent** 31:4,5,7,12
  31:13,14,19,22
  55:18 56:16,18 57:5
  57:15 98:24 131:2
**percentage** 30:25
  31:10
**perfect** 97:19,19
**perform** 13:14,20,23
  13:24 14:6,14,21
  20:22 22:7,22 27:9
  28:21 30:1 32:1
  34:18 35:4,18 36:22
  36:24 41:21 42:10
  44:4,8,18 48:7

68:20 69:10 70:6
  71:13 74:8,13,14
  115:20 117:20
  118:12,12 119:2
  130:23 134:11,13
**performed** 15:1
  20:15 30:15 57:4
  65:14,24 66:5 74:8
  74:9,17,22 93:7
  94:7 104:12 110:16
  123:22,23
**performing** 21:22
  26:1 28:22 54:24
  76:12 81:3 88:7
  98:3 102:15 129:3,5
**performs** 116:6
**period** 10:16 39:12
  53:15
**perjury** 136:5
**permitted** 75:23
**perryman** 3:5,11 4:5
  6:9,11 9:21 11:16
  18:21,23 19:3 20:21
  21:3 22:3,20 23:3
  23:16,22 25:3,16
  30:24 35:3 37:12
  38:9,25 40:2 43:9
  43:12,16 46:2,10
  47:4,7 48:10 49:13
  52:22 55:7 57:21
  59:9 60:15 63:24
  64:3 65:5 72:20,25
  73:17,21,24 74:3
  76:7 77:8 78:9
  80:22 83:3 84:19
  85:11 91:14 93:18
  96:4 101:18 103:19
  103:22 104:2 106:1
  106:6 107:10 111:8
  111:20,22 112:1,6
  112:14,20,23
  115:24 117:5 118:4
  118:21,25 124:2,23
  127:15,18 128:10
  128:15 129:7,17

130:3,13 132:14
  135:10,13,15,20
**person** 38:3 39:19
  72:10 88:24 89:14
  90:2 93:9 121:8,13
  127:13
**personal** 54:12
  133:17
**pertain** 77:23
**ph** 72:15
**philosophic** 58:25
**phone** 38:16,17 39:21
  43:2 124:17 131:13
**phoning** 89:25
**phrase** 128:24 132:1
**physical** 30:2 79:17
  93:25
**physically** 94:8
**physician** 20:14
  22:22 39:11 48:22
  50:7,9,12,13 62:17
  69:10 75:22 92:2
  93:7,20 94:7 95:11
  98:14 105:8,9
  106:12 114:20
  115:10,15,20 116:5
  116:13 118:11
  121:7,9,16,23 123:5
**physicians** 66:15 69:9
  71:12 78:3 94:22
  96:7,13,14,16,19,21
  97:15 98:1 100:22
  102:15,19 105:5
  107:19 109:10
  115:14,19 117:7,19
  120:16
**pickering** 6:12
**picks** 41:19
**place** 41:18 137:7
**placed** 137:9
**places** 25:12 99:5
  108:17
**plaintiff** 7:16 8:13,20
**plaintiffs** 1:6 2:6,16
  3:3 6:13

plan 132:18
plane 82:5
planes 82:6
planned 1:4 2:4 3:25
  61:5
plant 30:2 79:17
plastic 12:17 17:7
  26:11,13,14 31:1,4
  82:17 134:20
play 7:16
please 6:14 12:19
  38:6 63:1
plenty 46:8
plus 39:4,6
point 36:23 59:2
  62:14 80:1 89:7,16
  92:15,23 110:23
points 11:18
policy 134:20
position 127:2
possible 10:13,15
  15:17 53:17 74:18
  87:2 88:21,22 89:14
  94:10 95:17 98:3
  110:2 111:17 118:3
  122:7,8
possibly 114:15
  133:21
postcomplication
  81:21
postop 4:15 38:18
  39:8
postoperative 38:1
  38:19 39:11 42:22
  62:19 94:1
potential 42:21,22
  57:9,10 62:24 91:2
  98:11,17
potentiality 34:4
potentially 63:1 91:5
practice 11:24 13:5,7
  13:11 15:8 16:24
  26:9 37:1 45:22,25
  52:18 62:6 68:6
  69:2 75:20 80:18,19

81:20 82:14,15 89:9
  90:2,22 94:3 95:14
  95:17 96:1,23
  108:14 117:24
  125:2,12 130:1,6,12
  130:16,19 133:19
practiced 12:21 23:4
  70:3
practices 89:23
practicing 26:20 70:1
  70:12
practitioner 59:23
  60:7 104:25
practitioners 102:16
precisely 46:22
prefer 56:19 68:11
preferable 63:14
  91:12 94:2 109:15
  109:23 110:1
pregnancy 126:18,19
premises 39:11
preoperative 40:18
prepared 9:22
preparing 16:1
  121:19
present 3:23
presented 27:15 28:7
  85:22 133:3
president 17:8 19:25
  20:3 32:3 70:2
pretty 22:6 32:20
  34:14 35:12 37:19
  56:1 97:22 100:5
  112:19 116:3
  117:14
previously 97:7,9
primarily 16:25
primary 48:19
principal 94:13
principle 77:12
prior 10:19 15:4 26:1
  42:24 112:24 113:3
  137:8
privilege 72:22 73:14
  73:24 106:7 112:13

112:15
privileged 18:21 74:1
  105:9 106:12
privileges 24:8 46:4
  52:5,6,9,10 53:13
  53:18 54:15,20,22
  54:23,24 63:3 64:8
  64:20 65:22,22
  66:14 68:4,23 69:9
  69:23 70:9,13,20,21
  70:22,23,25 71:3,14
  74:5,7,12,13 75:1,2
  75:6,7,14 81:2
  86:10,14 87:17 89:2
  89:5 90:20 91:15,16
  91:24,25 94:20,21
  95:9,11,19,20,21
  96:6,7,9,11,15,20
  97:8,10,11,16 98:1
  98:8,14 100:22
  101:9 102:3,17,20
  103:9 104:23,24
  105:6,15 106:8,25
  107:1,1,21,25,25
  108:9,17,19 109:9
  109:11 110:8,19,20
  110:24 111:9,11
  115:2,11,16,21
  116:5,6,14,15,19
  117:6,17 119:16
  121:2,8,9,15 128:25
  129:4,6,15,23,25
  130:10 131:19,20
  131:25 132:3 133:5
  133:5,8,11,12
  134:10,25
privileging 106:18,19
privy 28:23
pro 125:20 126:5,10
probably 7:6 10:8
  15:9 18:10 27:10
  45:7 49:9 51:21
  73:4 74:21 75:1
  78:17 107:21
  113:11 114:10,20

114:22 119:7,25
  123:14 128:4
problem 48:5 55:3,6
  63:12 67:8 75:18
  79:4 98:18 99:2
  116:21 135:4
problems 48:17,17
  48:18 89:13 123:4
procedural 5:9 33:13
  118:18 119:13,18
  119:24 120:6,10,19
procedure 8:19 14:13
  14:16 21:8 36:22
  41:21,22 42:12 46:6
  51:7,23 57:8,13
  58:4,5 74:9 75:11
  82:7,10 83:18 88:8
  88:16 90:7,8,18
  91:5,7,8 93:7,8 94:8
  94:9 105:14,17
  106:18,19 107:14
  107:16 116:8
  118:12,13 120:1
  124:25
procedures 13:13,17
  13:17,20,22 14:21
  15:1,16 17:24,25
  20:18 21:4,13,14,22
  22:7,11 24:5,5 26:2
  28:22 30:4,14 32:1
  34:17 35:4,18 36:7
  37:15 42:9,14 44:4
  44:9,11,15,15,16,17
  44:17,18,22 45:2,10
  47:14,22 48:7 55:10
  55:25,25 57:3,8
  61:4,6,8 62:8 65:24
  68:21 69:11 70:6
  71:13 74:8,13 76:2
  80:19 82:3,7 87:5
  98:3,22 99:1 104:12
  109:4,5 115:20
  117:21 119:3,7,9
  120:2,3,5,11,12,13
  120:14 123:22

131:2 134:12,14,16
135:1,6
**proceed** 11:21 128:20
**proceedings** 22:8
39:5 57:20 113:14
137:6,8,10
**process** 18:4 39:10
49:25 51:20 52:7
**processes** 61:9,13,16
95:3
**processing** 50:8,11
50:11
**professor** 15:21
**program** 17:25 19:14
120:11 131:7 132:8
**progresses** 132:22
**prolonged** 131:17
**promulgate** 25:9 26:8
**proper** 94:25 95:1
110:20
**proposed** 24:7
**proprietor** 16:18
**protect** 88:3,4
**protocol** 40:12 42:6
43:24 113:10
**protocols** 36:21 37:14
40:5 41:11 44:1
**prove** 67:16 69:4
134:6
**provide** 11:4 25:9
30:1 39:2 58:16
59:3,21 71:21 79:20
90:17 102:10
105:10 107:6 108:5
110:25 111:1
121:16
**provided** 8:21,25 9:4
9:13 15:13 27:25
28:12 37:15 123:14
**providers** 28:14
122:9
**provides** 29:12 68:3
79:18
**providing** 27:24 30:3
**provision** 86:6 92:7

98:9 105:3,6 106:17
107:2 108:4
**provisions** 108:10
**prudent** 98:8
**public** 5:5 25:5,8
59:17 60:9 81:11
99:25
**published** 55:12,13
56:3
**pull** 85:8
**pulling** 64:17
**pulmonary** 8:11,12
34:2,4 62:23 97:4
**purport** 21:20
**purporting** 20:17
87:9
**purpose** 112:25
117:23
**pursuant** 106:13,16
**purview** 47:16 88:24
**put** 26:19 38:14,19
97:25 99:1,1

———————

**Q**

**quad** 29:8,17,20,22
31:2
**quadruple** 29:6,7
**qualifications** 53:19
115:19 133:10
**qualified** 34:25 35:5
68:20 69:9 70:5
71:12,13 116:5
118:12
**qualifier** 133:1
**qualify** 79:1 100:8
**quality** 17:23 68:3,5
68:8 115:11,14
116:8
**question** 11:3,21 12:4
14:12 18:16 21:9
22:6,9 24:11 37:5
37:17 42:16 46:12
46:21 47:11 68:12
68:12 71:5 73:2
80:24,25 83:1 84:24

85:25 88:12 95:7,18
97:13 101:10
102:11 111:20
112:20 116:3 118:5
120:8 122:15 129:7
130:3,13 133:2
**questioning** 93:12
**questions** 10:24 86:1
127:21,21,22,22,24
128:7,20
**quick** 112:2 128:12
**quite** 33:8

———————

**R**

**r** 1:14 2:15 4:3,13,23
6:4 13:8 136:4,15
**radius** 41:3,6 47:13
52:24
**random** 131:2
**range** 46:7
**rarely** 50:24
**rate** 45:12 55:17,22
56:4,10,14,24,25
57:2,6,14
**rates** 45:1,6 55:9 56:8
**rational** 69:22 101:19
101:20
**reach** 91:2
**read** 28:17 37:23
99:12,13,16,19,20
99:21 105:12,18
111:5,6,20,21
135:18 136:5
**readily** 72:11
**real** 116:17 128:12
**reality** 32:25
**really** 8:2 19:15 95:3
98:24 100:11 123:3
124:22,22 127:25
**reason** 11:6 19:20
22:14 25:7 37:6
49:24 57:25 65:16
67:1,4 75:5,6 76:9
76:16 83:16 87:22
96:21 97:14 100:24

119:21,23 123:6
124:9
**reasonable** 12:6 48:4
86:6 98:8
**reasons** 29:2,9 71:11
78:3 117:17,19
134:24
**recall** 8:5 9:5 50:25
78:6 113:21 121:21
**receive** 32:11,14,15
**received** 32:13
**receiving** 32:16
**recess** 37:11 64:2
112:5 128:16
**recognition** 110:7,10
**recognize** 9:16
**recognized** 28:9
**recollection** 15:3,19
**recommend** 62:11
**recommendations**
132:7
**reconstructive** 12:17
**record** 6:15 11:21
37:3,6 38:12 39:17
43:8,15 67:3 70:13
73:21 111:6,21
124:18 137:9
**records** 114:7
**recovery** 36:25 37:19
39:12,12,16,17
113:8
**reduction** 14:3 44:13
**reductions** 9:3
**refer** 118:10,18
**referenced** 14:14
15:18 125:1
**referrals** 63:22
**referring** 15:5 110:15
**refers** 106:25 107:2
**refine** 18:5 21:9
**regarding** 21:11
28:13 130:21
**regardless** 57:19,23
**regional** 105:20,21
119:11

registry 98:21
regs 122:24,25
regular 49:17 118:15
regulate 24:13
regulated 96:2 100:9
regulation 24:7 81:1
   99:10
regulations 23:9,18
   23:20,24 24:4,13,16
   24:24 25:1,9,12,14
   25:20 27:1,5,21
   58:16,18,22 60:9
   76:9,10,20 77:21
   79:23 80:2 81:1,12
   81:15 93:6 98:25
   99:17,19 122:17
regulatory 78:4
   93:15 95:4
reimburse 33:9
reimbursed 134:17
relat 19:12
relate 21:13,14 23:12
   23:25 24:4 113:22
related 8:19 24:7
   34:2 63:11 67:5
   99:23 124:16
relation 19:10
relational 17:23
relationship 18:24
   52:12
relationships 51:17
   54:18 63:20
relative 37:22 137:14
relatively 33:19
   35:25
rely 89:22
remember 7:7 8:8,9
   8:10 9:5 15:9 28:24
   85:7 90:5 123:12
   125:14
renal 49:23
rephrase 14:12
report 4:13,22 9:13
   9:22,24 10:1,14
   24:23 58:7 64:14,15

64:17 65:1,7 66:3
   66:18,22 67:2 69:1
   69:17 83:24 84:1,3
   84:4 85:2,2 98:6
   99:11 102:3 103:20
   103:21,23,24 104:3
   104:14 105:4
   106:24 107:18
   118:15 119:21
   121:20 122:6
   123:10 131:4,6
reported 1:21
reporter 2:20 9:12,18
   9:20 11:4 37:24
   38:8 43:9 47:6,9
   64:25 65:4 104:1
   118:24 135:19
   137:4
reports 73:10 84:16
represent 6:13 57:2
   74:20 76:24 122:19
represented 11:11
representing 11:13
reproductive 24:5,13
   60:20 64:20 77:23
   99:25 126:16
require 27:17 44:23
   46:7 47:11 70:19,23
   71:2,6 76:25 77:3
   86:22,25 91:18,25
   95:21 96:8,9,11,12
   100:22 101:8
   102:19 108:8 129:3
required 17:19,21
   27:9 49:8 54:20
   75:6 93:6 99:8
   102:17 122:20
   129:16 130:23
   131:4,5 133:13
   134:12
requirement 46:11
   46:13 68:24 94:20
   96:6,6 98:7 99:13
   101:3 105:7 109:9
   110:8 118:10 121:7

121:23
requirements 33:3
   46:3 77:13,14,15
   79:3,10 80:13,14
   99:9 102:24 120:23
   134:3
requires 45:21 81:2
   86:10 94:22 105:5
   107:19
requiring 86:25 96:7
   113:17
rescue 114:6
research 72:12 84:15
reservations 41:17,18
reserve 85:24
reserving 135:18
reside 108:9
residency 12:20
   26:22 76:1
resident 16:5
residents 16:4
resigned 133:9
resolved 89:8
respect 8:11 24:1
   36:7 53:17 58:3
   61:4 69:1 80:23
   82:2 86:16 91:15
   93:14 96:5,13,18
   119:15,16 120:22
respiratory 113:23
response 122:9
responsibility 92:4
   92:19,20 93:8,21,23
   93:23
responsible 34:1 38:3
   38:4 79:21 88:8
   91:13 92:12,14
restraint 77:18
result 21:1,1 32:12
   57:19 83:21 94:9
resulted 56:10
results 95:22
resuscitation 122:10
   122:22
retain 93:21,23

return 40:4 117:15
review 17:16,17,23
   21:18 30:10 38:11
   66:11 67:20,22
   79:23 97:19 99:10
   100:1,2 102:22
   122:16 130:24
   132:23
reviewed 21:10 24:3
   61:20 62:3 66:10
   80:25 81:3,4 84:10
   85:20
reviews 131:3
revised 4:12 103:20
revisions 33:23
rhinoplasty 44:23
right 10:8,22 11:17
   14:22 16:16 17:9,19
   19:6,20,21 22:4
   24:11 25:18 26:21
   26:23 31:21 34:8
   45:9 46:2,20 50:7
   50:23,24 51:3,19,20
   52:18 53:19,24 55:3
   55:15,19 56:4,6,11
   56:22 58:5 59:12
   60:5,16 63:4,16
   64:15 65:12 67:25
   68:24 69:8,12,19
   70:17,18,24 71:2
   75:8,9,12 76:15,18
   77:10 80:4 81:5
   83:4,5,14 85:24
   86:1 87:21 88:19
   89:16 90:1,14 91:23
   92:21 93:3,16,17
   95:10,15 96:5 100:3
   102:2 106:20 107:5
   107:11,24 108:3,17
   110:6 114:12 117:9
   118:20,20 125:4,6
   132:12,21,25 135:1
   135:18
riskier 123:23
riverside 40:3

**robin** 6:16
**role** 7:16
**room** 16:3 36:25
  37:19 39:13,16,17
  39:19 51:7 53:1,7
  56:5 62:16,17,24
  91:10,11 113:8,9
  114:12
**roughly** 13:22 31:8,9
  44:18 45:2
**routes** 109:14
**routine** 43:3 91:1
  131:16
**rpr** 1:21
**rue** 72:15,15,15,16,16
  72:20 73:6 99:15
  112:8,10,24
**rule** 4:12,22 131:18
  131:19,21 133:14
**rules** 99:24 100:7
**run** 33:14 111:16
**rural** 33:19

                  **S**
**safe** 16:24 26:8 29:12
  29:23 45:25 58:13
  67:23
**safeguard** 26:19
**safest** 117:24
**safety** 5:5 16:12 25:9
  46:9 60:1 98:9,10
  110:13
**sail** 99:2
**saved** 29:21
**saying** 18:15 22:9,21
  31:19 52:23 69:6,20
  78:7,17 80:20,20
  81:6 85:17 87:13
  88:4,5,13 92:11
  93:19 104:4 117:1
**says** 10:3 65:13 86:5
  93:14,16 105:4,8,9
  106:7,14,16 107:1
  107:18 117:3
  118:11 120:9,10,14

**scenario** 93:22
**school** 12:11
**scope** 49:22 80:19
  82:14,15 130:6,19
**scrubbed** 82:6
**se** 125:4
**second** 7:5 22:5 38:20
  53:2 106:2 130:7
**section** 65:13
**sedation** 14:17 35:10
  36:7,10 41:23,24
  42:3 100:18 119:11
  123:16,24
**see** 9:4 10:3,15 19:11
  19:21 33:13 37:2
  39:23 46:16 66:5
  70:8 89:11 100:10
  100:24 101:19,20
  104:5,9,10,15,20,22
  105:1,10,17 106:7,8
  106:14 120:6,16
  121:6,6 122:10
  131:10,14
**seeing** 54:10 121:21
**seek** 62:12 71:21
  88:18
**seen** 25:12 32:24 34:9
  34:10 38:10 121:18
**selection** 16:5
**send** 40:20 67:21
  135:21,22
**sentence** 86:5 122:8
  122:12
**separate** 78:11
**separately** 100:9
**september** 19:11,11
  19:22
**septoplasty** 44:23
**sequelae** 57:24 97:4
  98:12 131:5,5
**series** 10:24
**serious** 45:18 48:11
**seriously** 117:14
**serve** 17:8
**served** 64:5,12

**service** 28:14 59:3
**services** 104:12
**serving** 64:18
**set** 39:9 46:13 47:20
  54:12 75:25 76:4,11
  137:7
**setting** 14:23 15:17
  36:1,4 82:25 102:10
  102:13 104:13
  107:20 113:22
  115:9
**settings** 36:2 57:4
**settle** 125:13
**settled** 124:16,19,19
  124:20
**settlements** 125:7
**seven** 27:8
**severalmile** 47:13
**severe** 123:4
**sheet** 38:20 39:8,25
**sheets** 40:12 43:20,23
**shes** 39:24
**shop** 76:4,11
**shorter** 42:10
**shorthand** 2:19 137:4
  137:10
**shortly** 13:3
**shouldnt** 56:20 69:18
  69:20 128:5
**show** 64:24
**showed** 55:16
**showing** 41:14
  104:19
**sic** 17:8 120:13
**side** 78:13
**sides** 33:21
**sign** 38:3 73:9,11
  135:18
**signature** 65:8
**signed** 19:18,19
  121:24
**significance** 50:22
**significant** 35:25
  47:24 49:8 55:17
  57:3

**signs** 37:21
**similar** 77:2,13
**simple** 14:8,11,11
  22:6
**simplest** 13:25
**simplifies** 29:20
**simplify** 31:2
**simplistic** 14:5
**single** 25:13
**sir** 66:5 106:24
**sits** 39:6,19
**situation** 48:3 54:13
  88:20,21,22 89:10
  89:18 90:16 91:11
  111:1 115:4 116:10
  129:25 130:7 134:4
**situations** 89:8
  115:22,25
**six** 14:3 40:11,17 48:8
  123:12 131:1
**sixmile** 41:3,6
**skin** 13:25 14:6,15
  42:18 44:20 57:9
  131:11
**skye** 3:5,11 6:11
  128:8
**small** 7:13,17 33:14
  44:21 52:10 111:15
  124:20,20,21 125:1
**society** 17:6,7
**sole** 16:17,17,17
**solution** 97:19
**somebody** 8:11 30:12
  49:9,19,23 50:21
  51:1,13 58:1 63:13
  75:9 82:9 88:16
  89:17,18,19,21 91:4
  91:12,12 109:21
  117:10,11 121:14
  123:3
**somebodys** 40:20
  51:13
**somewhat** 91:8
**sorry** 20:7 29:4 79:25
  96:18 106:2 113:15

sort 42:5 45:4 52:16
  56:14 77:1 105:8
  127:25
sought 53:9
sounds 61:17 107:13
sources 69:16
southeast 1:5 2:5
space 134:21
spangenberg 3:6 6:12
speak 72:14 94:25
  97:23,24
speaking 36:9 41:16
speaks 42:24 84:18
special 104:11
specialization 83:6
specialties 76:6 80:13
specialty 31:17 49:23
  80:15 82:20 121:13
  121:14 130:20
specific 21:11 22:10
  22:24 24:4 36:14
  50:5 60:18 75:25
  82:2,5 83:5 84:14
  89:6 92:16,23 96:2
  105:3 116:2
specifically 21:19
  67:5 85:21
spectrum 55:24
speeches 50:16 58:7
  126:1
speed 132:23
spelled 105:17
spend 15:25 16:3,5
  123:10
spent 123:10
spoke 129:2,21 130:9
  131:18
spoken 28:4
sponsored 28:10
stabilize 113:12,16
  113:20 114:3
stable 51:24
staff 30:11 53:11
  54:14 70:9 98:7,14
  100:22 101:9

102:17,20 107:20
  107:25 109:9,11
  110:8,18,19 127:19
  129:4,6,15,23,24
  130:10 131:19,20
  131:25 132:2
  133:14,24 134:1
stance 86:13
standard 34:2 37:20
  47:15 74:11 75:25
  78:15 83:7,8,10
  94:22 95:5,13 99:5
  100:14,25 101:2
  102:7,13 115:9
  116:25
standards 4:18 5:9
  21:21 26:8,13,15,17
  26:19 28:3,19,23
  30:5 33:23,23 34:7
  34:9,10,12 46:1,13
  46:18,20,22,25 47:9
  47:10,11,19 56:9
  58:13,17 59:7,11,12
  59:14,19,21,21
  61:21 62:6 77:2,25
  79:14,15 83:4 86:7
  86:11,17,19,21 87:1
  87:3,4,6,11 96:22
  98:25 101:6 103:6
  103:11,12,14
  110:21 111:18
  116:21,21 118:10
  118:11,15,19 119:1
  119:13,18,18,23,24
  120:19,19 121:5
standpoint 18:25
  34:13 101:22
start 19:9,9 38:11
  76:4,11 84:2 104:8
  104:9,10
started 12:21 88:17
starting 12:20
state 1:9 2:9 3:14,21
  6:14 27:17 60:10
  61:10 64:7 65:15

68:1 71:23 72:5,6
  72:21 73:6 78:25
  86:24 95:2 99:24
  100:6,7,21 102:15
  129:12 136:11
  137:5
statement 14:7 86:9
  86:16 94:6 126:10
statements 67:1
  79:24 80:1,23 81:11
  81:14 84:1 102:2
states 1:1 2:1 25:19
  26:25 27:5,9,10,20
  36:18 58:15,18,21
  61:15 71:20 74:21
  74:21 76:14 77:12
  77:15,15 78:3 79:2
  79:14 80:15,16
  81:12 102:23
  103:10,14 115:9
  124:6
statute 93:15 129:11
statutory 86:6
stay 40:8,17 41:17,18
  42:6,15,19 44:4,12
  44:19,24 45:3,20
  46:14 47:12,22 48:8
  52:17,20 108:24
  109:1
staying 43:1
step 15:6 16:21 17:22
  19:12 92:18 113:16
  113:20
stepping 75:20
stipulate 67:8,10
stipulation 135:17
stop 82:10,22 83:10
stopped 88:19
stopping 83:8
strange 1:8 2:8
street 49:20
stringent 79:11 80:12
  80:14
studies 55:13
subchapter 104:13

104:13,16,19
submit 60:8 130:24
submitted 64:14 65:2
  66:19
subscribed 137:16
subscribing 18:7
subscription 19:7
  20:6
subscriptions 16:20
successful 109:24
sued 9:2
sufficiency 23:18,20
  24:23 54:17
sufficient 52:2 59:24
  62:1
sufficiently 89:5
suggest 52:17
suggested 105:13
suggestion 45:17
suit 127:13
suite 2:17
sunset 2:16
superior 127:14
support 70:10 73:11
  123:2
supported 125:25
supposed 52:8,8
  74:10
sure 7:5 15:7 35:10
  35:20 43:6 64:1
  66:7 69:25 73:23,25
  74:2 76:5 92:5
  104:5 105:19 112:4
  123:15 127:16,17
  129:20 132:5,10,22
  134:8
surgeon 14:9 20:15
  26:20 30:6 46:5
  47:16 49:15 51:2,13
  54:2,3 68:3 70:3
  74:25 75:22 81:2,22
  88:7 93:20 95:12,23
  96:3 109:19 111:14
  111:14 113:25
  115:10 116:5,6,12

120:1 130:24
**surgeons** 14:11 21:16
26:11 28:10,21 31:1
31:4 46:13 47:12
49:18 51:5,18 71:12
75:19 94:13,13
108:10 116:8 131:2
**surgeries** 45:18 109:2
**surgery** 4:16,20
12:12,14,16,17 14:3
14:5,8,10,11,22
17:1,5,7 22:22 26:6
26:13,14 27:1,6
30:1,12 33:1,9,21
34:3,14,16,17,20,21
34:21 35:25 36:24
38:15 42:25 44:14
48:1 51:3 53:4,5,8
58:10 60:23 75:4
82:18,19 88:25
89:15,15 95:23 96:2
96:16 97:5,12 98:20
104:11 108:23,25
110:17 111:15
113:7 117:10,11,12
130:25,25 131:13
134:20
**surgical** 8:19 13:19
13:19 14:15,21
16:12,24 18:4 21:8
23:25 24:4,14 26:1
26:9 29:12,23 30:4
32:23,23 37:14 44:8
44:8,11 45:25 46:1
46:5 47:9,13 58:14
86:7,12,18 87:5
88:16 94:3 117:24
118:16 119:18,23
120:19 121:5
**surgimatrix** 16:8
17:11
**surgimetrix** 16:9,10
16:11,23 17:12,13
17:21 18:12 19:9,12
20:8,10 32:12

**survives** 51:12
**suspect** 62:22
**suspended** 124:8
**suture** 14:20
**sutures** 131:16
**system** 17:3,11,13
18:8,13 19:1,5 68:1
68:2 89:11 92:24
113:24

---

**T**

**take** 12:1,2,3,5 13:22
13:23,23 14:1,3
38:10 40:24 41:9
42:10 51:9,15,18
58:6 63:15,24 67:17
76:3,8 80:12 88:15
93:8 97:21 104:6
109:19,21,23 112:2
113:8 114:1,9,10,19
114:22,23 121:15
123:3 127:19,23
128:5,13 133:24
134:21
**taken** 2:16 137:6
**takes** 14:4,14 39:14
**talk** 11:2,5 14:5 22:4
36:17 46:11 47:19
50:3 66:22 74:4
101:24 102:12,14
128:7
**talked** 25:22 44:1
60:5 64:4 65:20
71:18 74:4 81:20
94:11 100:13 102:2
102:12 109:2,6
115:8,12 128:23
**talking** 28:18 78:25
81:1,19 86:18 89:9
98:10 100:4 103:15
105:20 106:25
122:6 129:14
**talks** 106:17
**teaching** 15:25 16:4
**teams** 64:19

**technique** 83:12
**telephonic** 3:24,25
**tell** 13:13 19:19 20:2
26:4 38:13 41:1
45:7 48:14 58:6,8
62:15,18 65:6 72:8
72:17 93:17 104:7
117:9
**telling** 44:3 90:12,24
**ten** 29:14 41:8 44:18
131:1
**tendency** 78:23 79:2
**term** 27:14 32:5,6
100:11
**terminology** 29:17
**terms** 14:16 32:24
33:16 45:5 78:16
86:2
**test** 12:2
**testified** 6:6,25 8:6
10:4 27:12 64:6
78:2
**testify** 11:6 93:1
**testifying** 28:4 93:4
137:8
**testimony** 8:21 9:1,4
9:5 27:24,25 28:4
28:12 136:8
**testimonys** 23:25
**text** 38:20
**thank** 23:4 47:17
135:14,16
**thanks** 6:10 43:4
**thats** 13:9 17:19
18:14 19:6 20:2,24
22:1,13 24:8 25:18
29:19,19 30:2 33:2
33:10 34:5 36:12
37:9 40:12,19 41:7
41:11 42:21 43:5
44:16,17 45:9 47:16
47:18 48:5,12 50:7
50:13 51:10,25 52:2
52:16 55:1,1,3,21
55:21,22,24 56:1,1

56:13 58:1,3,20
59:24 60:14 62:9
63:12 64:10 66:7,17
67:12,19,20 68:15
68:18,24,24 69:5,6
69:12,22,24 70:3,16
70:16,18 71:10
75:14 79:13,21
81:16,22 82:4,12,19
83:21 85:14 87:8,21
88:25 89:20 90:4,21
90:21,25 91:11 92:1
92:1,15 93:22,22
94:10 98:5,18,24
99:5 102:1 103:3,19
104:13,19,20
105:23 107:13
108:6,21 110:5,6,8
110:11,18,21
111:19 112:19,20
113:5 114:1,3,10
116:2,4,9 117:14
118:3,7 119:4
121:11,19 122:2,22
127:25 129:10,18
130:7 134:24 135:4
135:9
**theirs** 135:4
**theoretically** 75:22
**therapy** 33:20
**thereof** 137:12
**theres** 14:10,19 16:6
19:6 27:10 30:16,17
30:20 32:19 34:7,7
36:25 39:10 40:15
42:20 43:6,7 51:2
53:24 58:11 61:1,2
69:21 75:14 77:16
83:7,8,10 87:22
91:4,16 92:3,4,11
94:20 96:6 97:19
98:21 104:23 109:7
109:8 110:10 117:9
121:1,3,23 127:8,10
**theyll** 67:17

**theyre** 19:1,1,4,6,8
20:5,5,8 30:13
31:15,16 33:15 38:4
38:14 43:1 59:8
62:10 69:20 70:5
74:10 75:22 77:25
78:12,12,17 97:22
99:2 100:16,17,18
100:19 105:20
109:2 110:6 118:12
120:25 124:22
129:15 133:17,22
134:20
**theyve** 18:1 30:15
97:24 131:25 132:4
**thing** 12:3 14:10
27:19 29:20 30:15
30:16,20 33:11 43:3
44:21 47:25 49:14
55:1,1 58:5 66:11
81:18 88:9 92:4
93:10,16 100:2
114:4,5 116:20
122:2,3,22 129:19
**things** 30:21 33:14
34:13 37:3 39:25
59:1 60:3 70:8,14
75:21 78:11,24
79:11 80:10 89:8
93:4,14 100:20
101:21,24 113:22
113:24 117:25
133:24
**think** 8:1 18:14 22:5
26:24 27:16 28:6
29:24 30:11 31:15
31:16 34:25 35:5,12
47:15,15,18 49:11
50:1 52:2 55:3,4,6
55:22 56:1,1,3
57:17 58:8,9,17,22
62:25 63:2 64:7
70:10 71:25 76:9
79:20 80:7 81:9,9
84:17 87:1,13,18,22

88:6 89:13 90:21
92:13 93:1,10,12,17
94:10,11,17 95:6
98:2 99:23 100:14
101:1,3,4 102:25,25
103:2,5,11 104:3
108:11,11 109:15
109:17 110:12
111:1 112:19 113:1
115:21 116:17
120:6 122:2,3,22
123:6,20 124:21
125:5 126:3,11
128:4,9 129:18,18
131:1 133:21 135:9
135:10,12,14,20
**thought** 37:8 103:24
**three** 12:13 51:23
55:2
**threeminute** 63:25
**till** 83:1 128:3
**time** 10:12 12:1 13:15
13:16,17 15:11,25
16:5,7 26:15,18,25
27:2 28:20 37:22
42:10,12 44:8 46:9
48:1 79:9 85:7
88:22 111:3 112:3
127:18 128:2
135:23 137:7
**times** 16:4 28:7 37:1
39:11 59:3,4
**title** 5:5
**today** 6:10 10:20 11:7
11:11 20:17 23:17
23:23 24:22 27:3,4
31:25 44:7 66:8
67:3 98:15 101:25
119:16 120:23
122:15 123:13
**told** 44:7 89:17 129:5
**top** 105:8
**topical** 119:10
**totally** 126:5,5
**touch** 38:18

**tough** 119:4
**track** 10:11 32:2
**tract** 113:23
**trade** 77:18
**traditional** 89:12
**tragic** 51:15
**trained** 30:4,7
**training** 12:9 30:14
75:10 76:1 80:20
82:8 122:9 132:8
**transcribed** 137:11
**transcript** 136:6
**transcription** 137:12
**transfer** 39:15 89:21
**transferred** 36:4
**transferring** 90:1
**transpired** 50:10
**trauma** 49:6
**travel** 32:18 50:16
**traveled** 88:16
**traveling** 51:16 63:19
89:24 90:21
**treat** 36:18 48:20,24
48:25 49:2 74:23
82:24 83:17,21
91:21,25 92:19,20
101:20
**treating** 83:4,14 92:3
92:11,14,16,19
**treats** 49:17
**trial** 8:21,25
**trials** 9:7
**true** 25:23 27:3 30:21
58:20 68:15 77:17
81:16 107:23
110:11,21,23
118:18 121:22
136:8
**truthfully** 11:7
**try** 11:2 50:21 79:1
81:22 82:10 83:10
95:17 97:18 102:10
110:25 111:17
113:11,20 117:23
128:12,13,13

**trying** 9:5 56:18 62:7
74:23 78:17 81:10
82:13,22 93:17 94:2
110:1,4,5,7 128:1
**tumor** 44:21
**turn** 10:1 65:12,19,19
66:18,21 83:24
113:15 121:4
124:17
**turned** 7:14
**turns** 92:22
**twice** 50:25 130:23
**two** 9:3,6 10:15 12:17
15:7 21:25 43:7
51:23 55:13,14,15
61:1 63:24 78:10,12
97:4 101:20 124:20
127:19
**twoyear** 32:6 53:15
**type** 30:15 36:7 44:21
45:20 63:8 82:19
125:22
**types** 13:13,19 44:8
44:11 45:3 47:21
48:14 76:2,25 77:2
77:2,6,7 80:10 87:1
95:12 113:21
**typically** 35:14

## U

**ucss** 114:16
**uhhuh** 10:2,5 50:18
50:18 55:11 65:11
102:21 105:2,11
122:13 132:11
**ultimately** 55:23
56:19
**unanticipated** 57:24
97:4 98:12 131:4,5
**unclear** 82:1
**undergo** 45:18
**undersigned** 137:4
**understand** 11:9,17
12:7 21:10 22:22
27:21 50:11 62:7

84:20 87:16,18
133:19
**understanding** 36:6,9
36:12 74:16 82:8
93:13 99:7 100:6
123:14,16
**understands** 90:2
**undertake** 20:22
86:19
**undertaken** 24:3
**uneventful** 90:7
**unfair** 33:8
**unhappiness** 124:25
**unit** 49:6,6
**united** 1:1 2:1 36:18
**universal** 134:1
**university** 12:12,13
12:14
**unrelated** 115:18
117:7,19
**urological** 120:12
**urologists** 120:15
**usc** 15:23 52:6,11
114:15
**use** 17:25 18:12 19:1
19:7 33:16 35:9
37:20 50:6 53:15
83:9 134:7
**useful** 58:8,9,12
**usually** 14:1,18,19
16:3 39:13 40:8,8
40:10 42:21,24
44:23 48:16 50:21
113:22 135:17
**uterus** 22:17
**utility** 125:3

___

**V**

**valid** 59:22
**valued** 134:23
**variations** 30:23
44:15
**variety** 83:9,9
**various** 11:18 124:11
**vasectomies** 120:13

**verbal** 11:1,24,24
**verbally** 89:18,21,24
89:25
**verbatim** 137:9
**verdict** 7:20
**versus** 89:16
**vicinity** 40:8,9,10
42:7,15,20,23 44:5
44:12,19,24 45:20
46:15 48:8 52:17
117:11
**view** 28:12,16 62:4
80:8 93:13 95:16
109:9 126:4,6,7
**views** 81:12
**vincent** 72:15,15,16
72:20 99:15 112:8
**virtue** 94:21 95:20
**vital** 37:21
**volume** 1:17 2:15 4:3
136:16
**voluntary** 32:21
**vs** 1:7 2:7

___

**W**

**wait** 53:2 83:1 122:11
**waiting** 39:19
**waivers** 97:6
**walk** 12:9,19 37:2
**walls** 79:10
**want** 6:24 14:12
27:13 31:2 35:21
37:23 40:22 42:23
45:13,14 46:22 48:4
50:3 55:23 59:16,17
63:17 75:8,9 76:5
78:18 81:24 85:10
104:10,17 108:13
109:19,20 122:24
127:19 128:1 135:5
**wanted** 25:22 47:10
104:4,5 132:18
**washington** 3:9,17
12:13
**wasnt** 15:10 26:14,18

53:6 62:13 93:9
133:16
**way** 25:11,17 29:14
30:8 33:17 36:16
41:13 54:1,12 61:18
78:20 91:23 92:8
93:25 94:2,4,5,7,10
96:23 97:25 98:3
110:13 116:24,24
118:8 126:1 132:1
**ways** 6:20 22:15 30:9
63:22 67:25 68:5,19
70:4 75:12 127:19
128:4 133:21
**wed** 117:13
**wednesday** 1:16 2:18
6:1
**week** 15:25 16:2
32:19 34:2 62:19
**weekend** 76:3,11
131:15
**weeks** 97:5
**wellcredentialed**
30:18
**wellequipped** 114:3
**wellqualified** 30:4,7
**went** 49:23 81:7,25
89:15
**west** 1:15 2:16,17
40:10
**weve** 44:1 60:23
69:22 71:18 74:4
75:16 86:14 94:11
98:11,15 102:2
109:6 112:1 114:10
118:17 119:15
120:22 128:3
**whats** 34:15 41:20
84:20 85:18 89:9,10
94:4,25 98:22
109:25,25 131:3,8
**whereof** 137:16
**whichever** 83:6,6
**white** 90:6
**whos** 34:8 43:1 51:3

75:9 91:13 95:23
117:25 123:5
**wilmer** 3:4 6:11
**wilmerhale** 3:11
**witness** 4:2 11:15
18:25 21:25 22:13
23:2,15,20 25:1,11
30:20 38:24 39:6
43:11,13 45:24 46:3
49:5 52:20 55:6
58:25 60:12 75:18
77:6 78:8 80:6 83:2
85:6 90:24 93:12
96:1 97:1 101:16
103:21 106:5 107:8
109:14 111:7,13,25
112:21 113:15
116:17 117:23
124:19 129:8,18
130:4,14 137:16
**witnesses** 137:7
**womens** 31:10,13
34:22 88:3,4,13
**won** 9:4 127:8,12,12
127:14
**wondering** 66:21
**wont** 33:9 41:13
67:24
**word** 50:6,7 104:23
104:23
**words** 66:11 80:12
120:1 123:4
**work** 12:19 13:1
16:13 20:14 21:6
32:12,15 55:8 65:14
115:1 132:18
**worked** 13:3 83:24
**working** 64:18
123:10,10
**worth** 69:6
**wouldnt** 20:22 22:18
25:13 41:13 49:21
63:17 82:3,24 83:16
91:25 92:8 109:20
115:4 120:19

**written** 21:25 58:7
129:24
**wrong** 58:1 110:22
**wrote** 66:8

---
**X**
**x** 90:6,6,6,6

---
**Y**
**yeah** 18:22 19:24
29:22 31:9 32:14
34:11 37:10 41:8
42:4 44:20 45:15
52:25 56:5,12,25
57:16 58:20 65:8
72:8 81:5,5 82:12
100:16 103:5 109:4
114:9 115:3 122:12
125:9 128:3
**year** 12:16 16:5 20:6
32:4,6,10 68:25
130:23
**years** 6:23 7:14 8:9
9:3 10:4,11,18
12:11,13,17 26:8
27:8,15 29:14 51:3
53:11,14 55:2 70:3
70:12 90:10 95:12
113:18 114:1
125:14 134:19
**yesterday** 52:9
**york** 27:13,17,18,25
103:10
**youd** 85:9 105:16
**youll** 33:13 73:18
104:9,15,22 105:17
106:7,8,14
**youre** 9:9 11:9 18:15
20:2,3,17,25 21:8,8
22:9,9,21,21,23
23:9 24:15,21 33:8
34:25 42:16 43:17
45:7 46:6 50:19
51:16 57:11,11
58:25 59:16,18 64:6

67:7 68:18 69:2,8
76:18 79:12 80:1,15
80:23 81:13 82:9,11
82:16 84:25 85:13
86:3 87:9 88:3,5,12
88:13 89:23 90:1,16
92:5,11,14,18 93:19
94:17 101:13,24
102:9 104:11
105:18 106:9 107:9
108:4 109:25 113:6
117:1 119:5,6,7
127:7
**youve** 7:3,11 8:25 9:9
10:4,22 17:13 23:4
34:9 43:6 55:12
58:7,7 63:19,19,21
64:5 65:15 70:11
77:1 78:2,10 81:4
81:10 84:20 85:15
88:2 95:16 122:14
125:22 132:17

---
**Z**
**zero** 56:21
**zink** 1:21 2:19 137:23

---
**0**
**0** 45:13 55:17 57:5,15
**00** 45:13
**000** 20:6,7,8 32:10,19
45:11

---
**1**
**1** 1:25 4:12 9:19
65:20 66:1,20 67:2
83:25 84:1,12 85:14
85:18 105:9 106:9
132:17
**10** 13:21 27:8 31:12
31:13,14,19,22
56:16,18 121:6
**100** 79:7 98:24
109:21
**103** 5:4

**104** 105:6,25
**106** 106:22,23 107:3
107:4
**11** 66:21 67:4 69:1,17
137:19
**118** 5:9
**12** 2:18 7:2 107:7
122:8,11 135:23
**128** 4:6
**13** 5:5 7:2 105:21
107:7 120:10
**132** 4:5
**137** 1:25
**13cv405mhttfm** 1:7
2:7
**14** 137:19
**15** 13:21,21 14:1,14
14:19 41:22 44:8
**150** 79:7
**16** 5:17 52:13 114:16
**1760239** 1:23
**1875** 3:8
**19** 2:18 6:2
**1980** 12:21 25:24
26:1,21
**1988** 12:22
**1989** 15:7
**1995** 26:24
**1996** 15:10

---
**2**
**2** 1:7 2:7 4:12,15,22
37:25 38:6,7 43:20
44:2 104:14 125:7
131:2
**20** 7:14 125:14
**20006** 3:9
**2007** 28:11
**2013** 1:16 2:19 6:1
19:23 65:9 137:19
**202** 3:10
**24** 5:16 38:15 45:11
53:15 91:6
**25** 9:3 51:3 70:12
121:6

**250** 20:7,7,8
**26** 4:12,22
**27** 27:10

---
**3**
**3** 4:18 32:19 47:4,5
65:19
**30** 46:4 70:3,12 95:12
128:3
**300** 20:6
**300152** 3:18
**30some** 26:8
**32yearold** 90:6
**33** 55:17 57:5,15
**334** 3:20
**35** 5:6 105:21
**3532619** 3:20
**354a** 107:7
**361300152** 3:19
**38** 4:15
**385** 65:15
**39** 6:23

---
**4**
**4** 4:22 52:15,15,23
64:25 65:1,3
**40** 6:23 31:5 90:10
**400** 88:17
**47** 4:18 31:6
**4a** 104:13 105:24,24
106:3,4
**4mile** 52:23
**4th** 19:22

---
**5**
**5** 5:4 45:10 52:15
66:21 103:16,17,25
**50** 31:4
**500** 65:14 125:7
**501** 3:17
**50s** 15:8
**55** 2:18 135:23
**57** 87:10,16,20 92:25
96:5 108:4 121:12
**595** 15:11

| **6** | | | |
|---|---|---|---|
| **6** 1:16 2:19 4:5 5:9 | | | |
|   6:1 98:6 118:23 | | | |
|   122:6 | | | |
| **611** 2:17 | | | |
| **65** 4:22 | | | |
| **6mile** 52:24 | | | |
| | | | |
| **7** | | | |
| **70** 32:10 | | | |
| **72** 5:16 | | | |
| **73** 5:17 | | | |
| **74** 121:4 | | | |
| | | | |
| **8** | | | |
| **8** 10:1 105:24 106:3,4 | | | |
| **80** 28:23 | | | |
| **800** 121:6 | | | |
| **8636031** 3:10 | | | |
| **88** 104:10,17 | | | |
| | | | |
| **9** | | | |
| **9** 2:18 4:12 6:2 17:24 | | | |
|   17:24 102:12,14 | | | |
|   105:4,24 107:18 | | | |
| **92** 104:9,16,22 | | | |
| **9201** 2:16 | | | |
| **9466** 1:22 2:20 | | | |
|   137:24 | | | |
| **99** 17:22 | | | |