# Exhibit G

144

1    Diego.

2          He has numerous professional associations.  He's

3    provided consultation and written articles regarding

4    adolescent problem pregnancy decision making, problem

5    pregnancy decision making, spousal notice and informed

6    consent and the psychological effects following an abortion.

7    And he has presented a number of presentations on these

8    topics.

9              <u>DIRECT EXAMINATION (VOIR DIRE)</u>

10   BY MS. MERSHIMER:

11   Q    Dr. Rue, you're a licensed marriage and family therapist

12   and trained psychotherapist; is that correct?

13   A    Yes.

14   Q    Could you explain that?

15   A    I am licensed in the State of California as a marriage

16   and family therapist.  I work with individuals who present

17   with a variety of problems, from anxiety disorders to

18   depression, et cetera.  I work with marital units, husbands

19   and wives who express difficulty in one way or another with

20   communication and sexual dysfunction, et cetera.

21          And I also work with families who have experienced

22   distress and provide therapy for them.  I have had training

23   in the area of psychotherapy, which is really more advanced

24   and more in depth work than general counselling.  And that is

25   primarily what I have done in the last 15 years in

776

1  California.

2  Q    Do you clinically treat individuals with emotional and/or

3  mental problems?

4  A    Yes, I do.

5  Q    And how long have you been doing that?

6  A    I've been doing that as a licensed therapist for 15 years

7  in California.  And prior to licensure, an additional three

8  years.

9  Q    Okay, now while employed at Sir Thomas Moore Clinic, what

10  types of counselling services did you provide?

11  A    I provided personally individual counselling, individual

12  psychotherapy, psychological assessments, as well as group

13  therapy, conjoint marital therapy, conjoint family therapy,

14  crisis pregnancy counselling and post-abortion counselling.

15  Q    When you say post-abortion counselling, did you begin to

16  develop a specialty in that area?

17  A    Yes, I did.

18  Q    Could you explain that specialty?

19  A    The area of post-abortion counselling and post-abortion

20  trauma is a relatively new area.  It, in essence, focuses on

21  the painful aftermath that some women and men feel after

22  experiencing an abortion.  It's characterized by the

23  unwanted, undesired --

24          MS. KOLBERT:  Your Honor, I would object as to the

25  substantive aspects of this in that counsel for plaintiffs do

**777**

Rue - Voir Dire                                    146

1   have some questions as to voir dire.

2          THE COURT:  Yes, are you qualifying the witness at

3   this point?

4          MS. MERSHIMER:  I was attempting to, your Honor.

5          THE COURT:  Well, we're concerned with his

6   qualification, not with the substantive aspects of his

7   testimony.  You may wish to limit it in that manner.

8          MS. MERSHIMER:  I apologize, your Honor.

9          THE COURT:  And then tell me the field of his

10  expertise.

11  BY MS. MERSHIMER:

12  Q    Could you tell the Court how many women you've provided

13  psychological counselling for in problems occurring after

14  abortions?

15  A    I would say hundreds.

16  Q    And have you counselled women before they've had an

17  abortion?

18  A    Yes, I have.

19  Q    And could you tell me the number of those?

20  A    Again, in the area of hundreds.

21  Q    And have you counselled men who have experienced

22  difficulties following abortion by their wife?

23  A    Yes, I have.

24  Q    And could you tell me the number of men in that area?

25  A    At least over 100.

1    MS. MERSHIMER:  Your Honor, I would offer Dr. Rue as

2  an expert in psychological effects following abortions,

3  problem pregnancy decision making with abortions and marital

4  family relationships.

5    THE COURT:  Any objection, any questions?

6    MS. KOLBERT:  Yes, your Honor, I do have some

7  questions.

8    THE COURT:  Very well.

9    CROSS-EXAMINATION (VOIR DIRE)

10  BY MS. KOLBERT:

11  Q   Dr. Rue, it is true that you're not a psychologist; is

12  that correct?

13  A   That's correct.

14  Q   And it's also true -- let me ask you to turn to your

15  curriculum vitae, which is in the notebook in front of you

16  under Defendant's Exhibit 62 -- no, I'm sorry, it's the

17  manilla notebook.

18    Sir, it's not -- that's the plaintiff's exhibits.

19  It's the Defendant's Exhibit Number 62.

20  A   Okay.

21  Q   Did you prepare your curriculum vitae?

22  A   I did not type it, no.

23  Q   But you did prepare it and examine it before sending it

24  to plaintiff's counsel?

25  A   No, I did not.

779

Rue - Voir Dire                                    148

1  Q    Did you examine it before sending it to plaintiff's

2  counsel?

3  A    No, I did not.

4  Q    Is this a vitae that you use in other instances besides

5  court appearances?

6  A    This is my vitae, but it was sent from my Los Angeles

7  office and I am in New Hampshire at this point.

8  Q    Now I direct your attention to underneath the -- it is

9  correct that you -- I'm just a little confused about your

10  PhD. Did you receive a PhD in family psychology as your vitae

11  reports?

12  A    No, it should be listed as family relations, which is

13  what counsel just previously --

14  Q    And that is, as I understand it, from the School of Home

15  Economics at the University of North Carolina?

16  A    It's from the School of Home Economics, Department of

17  Child Development and Family Relations.

18  Q    But the PhD is a home economics PhD with a major, as

19  you've described in your resume, in family relations?

20  A    No, I don't believe that that is accurate.  It is not a

21  PhD in home economics, it is a PhD in family relations.  In

22  the Department of Child Development and Family Relations,

23  there was a joint specialization or an individual

24  specialization.

25  Q    Okay.

780

1  A    Mine is in the area of family relations.

2  Q    But you would agree that the degree was granted by the

3  School of Home Economics?

4  A    No, that is not correct.  The degree was granted by the

5  Graduate School of the University of North Carolina.

6  Q    I would like to -- so you're saying that there's no home

7  economics degree at all?

8  A    There certainly are, yes.

9  Q    But your's was not a home economics degree?

10  A    That's correct.

11  Q    I'd like to show you the commencement report from the

12  University of North Carolina at Greensboro in 1975.

13          MS. MERSHIMER:  Your Honor, could I see this

14  exhibit?

15          (Pause in proceedings.)

16  BY MS. KOLBERT:

17  Q    Can you read for me the -- what is next to your name

18  under Candidates for Degrees?

19  A    It says Home Economics.  I've not seen this before and I

20  was not present at my graduation.

21  Q    Dr. Rue, also in your resume, you stated that you are --

22  or in the presentation by counsel, it was stated that you

23  were a professor psychology -- I'm sorry -- an associate

24  professor of family relations at the School of Fine and

25  Applied Arts at the California State University at Los

781

Rue - Voir Dire                                    150

1    Angeles; is that correct?

2    A    That's correct.

3    Q    Isn't it true that you were an adjunct professor of

4    family relations at that time?

5    A    No, the adjunct position was the University -- United

6    States International University in San Diego.

7    Q    Do you remember testifying in the Hodgson -- so you're

8    saying you were a full professor of psychology at -- or of

9    family relations at California State University at Los

10   Angeles?

11   A    No, that's not correct.  I was an associate professor.

12   Q    You were not an adjunct associate professor?

13   A    I was not designated adjunct, as I recall.

14   Q    Were you a professor in a full time tenure track

15   position?

16   A    I went through all of the criteria to be evaluated as a

17   full time professor did.  I taught primarily part time and in

18   some years, it was full time.

19   Q    Do you remember testifying in the Hodgson litigation?

20   A    I do.

21   Q    Do you remember testifying at that time that you were an

22   adjunct associate professor?

23   A    I don't.

24   Q    Is it also correct that you were an adjunct associate

25   professor at the United States International University in

782

Rue - Voir Dire                                      151

1    San Diego?

2    A    I was an adjunct professor at the United States

3    International University in San Diego, yes.

4    Q    And you were at the School of Professional Psychology at

5    that time?

6    A    Yes, I was evaluating doctoral dissertation.

7    Q    And is it correct that that department of psychology

8    applied for accreditation from the American Psychological

9    Association during the time that you were there?

10   A    I am not familiar with that.

11   Q    Is it also correct that you've never performed informed

12   consent counselling?

13   A    I'm sorry?

14   Q    Have you ever performed informed consent counselling or

15   offered informed consent counselling in any way?

16   A    With respect to what?

17   Q    With respect to women seeking abortions?

18   A    I have provided crisis pregnancy counselling.

19   Q    No, my question is it's true that you've never proved

20   informed consent counselling, that is, obtained a woman's

21   informed consent prior to the performance of abortion?

22   A    Well, counsel, because I'm not a physician, I don't think

23   I could do that.

24   Q    And it's also true that you've had no experience

25   counselling women in Pennsylvania who have obtained -- who

783

Rue - Voir Dire                                    152

1   have given informed consent for abortions; is that correct?

2   A   That is correct.

3   Q   And it's also true that you've never conducted any

4   independent research about informed consent counselling

5   within Pennsylvania abortion clinics; is that correct?

6   A   That's correct.

7           MS. KOLBERT:  Your Honor, plaintiffs would object to

8   any testimony by this witness as to informed consent and

9   informed consent counselling.  We have no problem with him

10  being certified as a marriage and family therapist and an

11  expert in family relations, but that that would not go to

12  testimony as proffered by the Commonwealth as to his

13  expertise in informed consent in that interchange.

14          THE COURT:  All right, Ms. Mershimer, do you wish to

15  ask any further questions or make any comment concerning the

16  objection?

17          To qualify your witness in the area of informed

18  consent.

19          MS. MERSHIMER:  I would ask a few more questions,

20  your Honor.

21          THE COURT:  All right, why don't you proceed.

22              REDIRECT EXAMINATION (VOIR DIRE)

23  BY MS. MERSHIMER:

24  Q   You say that -- you had previously said that you have

25  provided psychological counselling for hundreds of women

784

Rue - Voir Dire                                    153

1   experiencing problems after having an abortion?

2   A    Yes, I have.

3   Q    And what did that counselling involve, what were the

4   issues?

5   A    The issues involved were an evaluation of the stessors

6   that were currently operating in that person's life, the

7   relationship context in which the pregnancy occurred, if it

8   was a minor circumstances in that person's family, the

9   psychological status of that person, her well being, crisis

10  decision making in the past, her methods for utilizing, her

11  methods in resolving those crises.

12          It also included spiritual areas of moral issues

13  that might be relevant to her decision with respect to the

14  outcome of her crisis pregnancy. The meaning of the pregnancy

15  itself for her.  We also discussed stages of fetal

16  development, psychological risks to the procedure, et cetera.

17  Q    In that crisis making decision process of counselling,

18  did you discuss information that the woman had at the time of

19  the abortion or lack of it and the effect that had on her in

20  the psychological problems afterwards?

21  A    I'm sorry, could you repeat that?

22  Q    In that -- in doing the counselling in that crisis making

23  decision process, did the counselling include infor --

24  counselling on the area of whether -- of the information that

25  had been provided to the woman before having an abortion or

785

Rue - Voir Dire                                154

1   the lack of information that had been provided to her and any

2   effect that had on her -- on after the abortion,

3   psychologically?

4   A    Yes, I did.

5   Q    And you said that you've counselled hundreds of women --

6   or I'm sorry, maybe 150 women before having an abortion?

7   A    At least.

8   Q    And in that counselling process, does that -- is there

9   areas of information that -- do you discuss infor -- is part

10  of the counselling request for information that the woman has

11  or believes is beneficial in making the decision?

12  A    I'm sorry, can you...

13  Q    Well, when you counsel the women before an abortion, what

14  are the issues or topics that are discussed?

15  A    We look at what the -- as I mentioned earlier, what the

16  pregnancy means to her.  Whether or not any of the risk

17  factors that have been identified in the psychological

18  literature are relevant to her circumstances.

19          Some risk factors, for example, are the existence of

20  prior children, any coercion, whether or not she has her

21  partner's support.  If she's a minor, the issue of her

22  parents.  Her information that she has with respect to fetal

23  stages of development, how she became pregnant.  Again, her

24  psychological well being, prior decision making in crises, et

25  cetera.

786

Rue - Voir Dire                                              155

1    MS. MERSHIMER:  Your Honor, in response to Ms.
2    Kolbert's comments, I would say that Dr. Rue is qualified to
3    talk about pieces of information that are required by the
4    Pennsylvania's act and whether it serves a beneficial purpose
5    or whether there could be psychological effects after the
6    abortion by information not being provided.

7        THE COURT:  All right, what -- outline again the
8    area of his expertise in which you wish him to state
9    opinions.

10       MS. MERSHIMER:  The psychological effects following
11   abortions, problem pregnancy decision making with abortions
12   and marital family relationships.

13       THE COURT:  All right, I will grant your motion and
14   let him testify in those areas.  And in respect to the
15   objection, it's overruled.

16       It's a matter of weight, which I will accord to his
17   testimony determined by his background and his
18   qualifications, his answers and all the factors that go into
19   an evaluation of the weight that should be given to the
20   testimony of an expert witness.  I will weigh and evaluate
21   all that in making a judgment as to his testimony.

22       Your motion is granted, shall we -- would you
23   proceed then?

24       MS. KOLBERT:  Yes, your Honor.

25       MS. MERSHIMER:  Yes, your Honor.

787

Rue - Direct

### DIRECT EXAMINATION

BY MS. MERSHIMER:

Q    Now we had just started asking some questions.  Did you begin to develop a specialty in the area of counselling women for emotional issues following abortion?

A    Yes, I did.

Q    And can you explain that specialty?

A    The specialty was in the area of helping women recover from a painful abortion experience.  What I found was women and men described a repeated involuntary grieving that was going on, an inability to put this abortion behind them.

        MS. KOLBERT:  Objection, your Honor, as to not a proper foundation yet laid about his findings.

        THE COURT:  Did you wish to lay a further foundation for this?

BY MS. MERSHIMER:

Q    You've said that you've had approximately seven -- I'm sorry -- hundreds of cases in your -- in the 15 years of experience, treating -- counselling women in the psychological problems following abortion?

A    Yes, and in addition to the treatment of post-abortion pain, I have reviewed some 239 studies in psychological aftermath of abortion, as well as done empirical research on problem pregnancy decision making.

Q    And what is involved in clinical treatment of such women?

788

Rue - Direct

1    A    First of all is the assessment of whether or not the

2    aftermath that this woman is experiencing is related to the

3    abortion or if it is related to some traumatic experience

4    that was pre-existing to the abortion.

5         Any appropriate therapy must commence with the

6    development of a trusting relationship, so the beginning

7    phases of therapy basically entail an opportunity for this

8    person to begin checking out with me, the therapist, whether

9    or not I'm hearing what she is saying or he is saying,

10   whether or not I truly care about that and whether or not I

11   have any experience in an area that this person is

12   experiencing pain in.

13        It has been my experience with a number of patients

14   that they have sought out help after an abortion to other

15   mental health practitioners and the mental health

16   practitioner says I've never heard of anything called post-

17   abortion trauma and I don't quite understand this.  In fact,

18   maybe you should change your values.  Given that, these

19   individuals then, in the early stages of therapy, are seeking

20   out an affirmation from me whether or not their pain is

21   legitimate.  And indeed, I would say to that person at the

22   beginning stages of therapy, yes, I have seen post-abortion

23   trauma.  I have seen this in some women and men and I do not

24   want you to feel isolated.

25        So the beginning stages of treatment are

788

Rue - Direct

158

establishing that important caring relationship. Beyond that, treatment entails the opportunity to fully experience the grief that is involved with the loss that an abortion presents.

These women define their abortion experience this way: They say that I did not, at the time, fully know or understand what my pregnancy meant and what the abortion would do to the pregnancy. Upon reviewing information, seeing things in the media like Life magazine this month, these individuals may begin feeling the grief that is related to the loss that this abortion caused. As that occurs, the stages of grief must be talked about, must be felt and must be resolved. That's really the second phase of treatment.

And the third phase is stabilizing any of the dimensions of post-traumatic stress that we see here in the example from Dr. Walker. Because as I have written and as I have see clinically, post-abortion trauma, as this is a trauma, follows very closely the diagnostic criteria post-traumatic stress. And these individuals need help in realizing that when they re-experience the painful aftermath of abortion that they're not alone. That this is a normal response to an abnormal situation and that this can be resolved over time.

Post-abortion trauma does not resolve itself typically spontaneously or naturally. Grief usually is best

789

Rue - Direct

resolved with a caring other and post-traumatic stress, to
the extent it is related to the abortion, requires therapy,
requires times and requires therapeutic work on the part of
the patient to resolve.

Q    And this therapy include multiple counselling sessions
with women?

A    Indeed it does.

Q    In the past five years, how many patients would you say
that you counselled in general a week?

A    My caseload generally ran between 30 and 35 patients a
week, and that's over the last 15 years. And approximately
40, sometimes 50 percent of that caseload were in the area of
post-abortion problems.

Q    Now do you have any experience in the area of problem
pregnancy decision making?

A    I do.

Q    And could you explain that experience?

A    In 1973 I was associate director of a problem pregnancy
research project in North Carolina where we looked at the
decision making process that women went through in the
consortium of agencies as far as making a decision about a
pregnancy outcome. And that report was a technical report
and written up as to problem pregnancy decision making.

Q    Do you have continued experience in counselling women in
that area?

790

Rue - Direct                                    160

1    A    Pardon me?

2    Q    And did you have continued experience in counselling

3    women in that area?

4    A    Yes, after that time, I commenced my practice in Los

5    Angels and during that time, I have worked with hundreds of

6    not only young women, but also older women who found

7    themselves in a crisis pregnancy circumstance.  And they

8    sought out my therapy and my assistance in resolving that.

9    Q    Do you have any experience in the area of marital family

10   relationships?

11   A    Yes, I do.

12   Q    Could you explain that?

13   A    I have worked with couples and families over the years,

14   both spouses together and spouses individually.  I have

15   worked with married couples with respect to crisis

16   pregnancies.  I've worked with couples who found themselves

17   involved in either psychological abuse or sexual abuse, child

18   abuse, battering, parent/child conflicts, sexual dysfunction,

19   communication disorders, various things like that.

20   Q    Now have you read Sections 3205, 3208 and 3209 of

21   Pennsylvania's Abortion Control Act?

22   A    Yes, I have.

23   Q    And could you turn to Defendant's Exhibit -- it's the

24   last book, it's the manilla tabs -- it's volume two and it's

25   the last section, marked "The Act", page seven.

791

1    A    What was the exhibit number, counsel?

2    Q    There's -- it's after Exhibit 62.

3    A    After 62.  Okay.

4    Q    Page seven, Section 3205.  Now focusing on the informed

5    consent provisions under Section 3205(a)(1)(ii), it requires

6    a physician to advise the women of the probable gestational

7    age of the fetus.  And Section 3205(a)(2)(i) requires a woman

8    to be advised that the Department of Health prints materials

9    that describe the unborn child and that she can review those

10   materials if she chooses to.

11              Have you read those provisions and reviewed them?

12   A    Yes, I have.

13   Q    And then under Section 3208(a)(2) on page 19 of the act,

14   that requires the Department of Health to have material

15   available that describes the probable anatomical and

16   physiological characteristics of the unborn child at two week

17   increments, including pictures of the fetus at two week

18   increments.  Have you reviewed this provision before today?

19   A    Yes, I have.

20   Q    Now in your experience counselling women, do you have an

21   opinion whether information on fetal development would be

22   information that some women would consider relevant in

23   choosing whether or not to have an abortion?

24   A    Yes, I do.

25   Q    What is that opinion?

Rue - Direct                                    162

1   A    My opinion is that the vast majority of the patients that

2   I have worked with that have obtained abortions that have had

3   negative reactions have said to me that they either knew

4   nothing about the fetal development at the time of the preg

5   -- of the abortion or if they did ask, they were misled in

6   the abortion counselling.  That this is nothing but a clump

7   of tissue.  It has no characteristics that could identify it

8   as human.

9        And to the extent these individuals were misled or

10  had insufficient information, I believe that informed consent

11  was not possible and I believe that the psychological

12  traumatization was worsened because they were misled into

13  believing that this was not a human fetus.

14       And so I think it's terribly important that this

15  information be voluntarily provided and that an individual

16  avail herself of information so that she can make a knowing,

17  a voluntary and intelligent decision that could effect her

18  for the rest of her life.

19  Q    In your clinical practice, have women sought therapy or

20  counselling before an abortion decision with you?

21  A    Yes, they have.

22  Q    And in your clinical practice, did you offer women

23  information about fetal development even if they did not ask

24  for it?

25  A    I introduced the topic and strongly encouraged them to

793

Rue - Direct                    163

1  educate themselves in this area if they have not done so

2  before hand.

3  Q    Now did you insist that they look at materials or just

4  make it available to them?

5  A    I strongly encouraged them.  I did not insist on it.

6  Q    Now why was that?

7  A    Well, I don't insist on many things as a psychotherapist

8  and in this area, if a person believes that she doesn't want

9  to look at pictures, doesn't want to have any information, I

10 don't feel it's my role to force that upon her.

11         On the other hand, it's certainly, I believe, well

12 within my role as a counsellor to say to her, I have worked

13 with a number of people who have been traumatized because

14 they haven't availed themselves of sufficient information to

15 make a knowledgeable decision with respect to an abortion.

16 Q    Is information regarding fetal development something that

17 should be disclosed to a woman -- or saying that the

18 information is available to be reviewed, is that something

19 that should be done or given to a woman only if she asks for

20 it?

21 A    I think that it's perfectly appropriate for her to

22 receive the information if she asks for it and that she not

23 be coerced into obtaining information.

24 Q    From your clinical experience, do you have an opinion

25 whether merely advising a woman that materials regarding just

794

Rue - Direct                                  164

1  fetal development are available and that she can decided

2  whether or not to review them is unnecessarily traumatizing

3  to the woman?

4  A    I do have an opinion.

5  Q    And what is that opinion?

6  A    My opinion that offering her the opportunity to be

7  educated with respect to biological and scientific facts,

8  this opportunity which is voluntary is certainly not going to

9  provide the basis of any psychological trauma for a person

10  considering an abortion.

11  Q    Now what --

12  A    If anything, I would say, if I could add, this will help

13  her utilize her own personal values and that those values be

14  informed and based upon some facts.

15        If, after reviewing these materials, she were to

16  believe that this is, indeed, a human fetus, then she may act

17  and decide accordingly.  If, on the other hand, after

18  reviewing these materials she makes the decision that this is

19  not a human fetus and proceeds, I think she is preventing

20  probable increased psychological damage from being misled or

21  receiving fetal -- information about fetal stages of

22  development after the abortion at some later date or in the

23  context of medical care in a wanted pregnancy later on.

24  Q    Now what other information, when you counsel women before

25  they have an abortion, what other information do you discuss

795

Rue - Direct                                    165

1   with the woman?

2   A   Well, I think I've answered that question, but we look at

3   all options.  We look at the meaning of that pregnancy for

4   her.  We look at what stressors are in her life.  Her age

5   certainly has a great deal to do with this.  If she is a

6   minor, her decision making may well be framed in fear,

7   misinformation or impulsiveness.  Very often a crisis

8   pregnancy unfolds very quickly.  By definition, it is a

9   circumstance that demands an attention -- an immediate

10  attention with respect to thinking and ultimately coming to a

11  decision.

12       The last thing I want her to feel is that she is

13  pressured by anyone into making a decision that is premature

14  to a full understanding of the facts of her circumstance and

15  the facts surrounding any option that she may elect.

16  Q   Now Section 3205 of the act also requires that a woman be

17  advised that the Department of Health publishes materials

18  that list agencies that offer alternatives to abortion, that

19  medical assistance benefits may be available for prenatal

20  care, child birth and neonatal care and that the father of an

21  unborn child is liable to assist and support of her child or

22  that information does not need to be provided in cases of

23  rape.  And if the woman chooses to receive these materials,

24  she must be provided them.

25       Are you familiar with these requirements?

7E 796

Rue - Direct                                                    166

1   A    Yes, I am.

2   Q    And in your experience counselling women, is this

3   information that some women would want to know prior to

4   deciding whether or not to have an abortion?

5   A    Yes, it is.

6   Q    Why is that?

7   A    I think this is information that many people don't know,

8   that they have the right to know.  Research by Mary

9   Cunningham Agee indicated -- she asked the question of women

10  that had obtained abortions, if you had known that there were

11  other options for you, would you have elected an abortion?

12  And 90 percent said they would not have.

13           Many young people have no understanding that the

14  alleged father could be held liable and responsible for

15  financial payments.  The whole area of options counselling is

16  terribly important, where the individual recognizes that

17  there are support services across a broad spectrum that are

18  available for her.  Very often, in the bureaucratic maze of

19  life, people don't know what support services are available.

20  And indeed, I believe they have the right to know.

21  Q    Now from your clinical experience, do you have an opinion

22  on whether making this information available to the woman

23  could be traumatic or burdensome?

24  A    I do.

25  Q    And what is that opinion?

797

1    A    I cannot foresee any circumstance where an individual

2    that is offered this information on a voluntary basis could

3    be psychologically traumatized.

4    Q    Now the Commonwealth requires the information we just

5    discussed, in addition to the nature and risk of the abortion

6    method and the medical risks associated with carrying a child

7    to term to be given to a woman 24 hours before an abortion is

8    performed.  Are you familiar with that requirement?

9    A    Yes, I am.

10    Q    Do you have an opinion on whether the 24 hour waiting

11    period is beneficial?

12    A    I do.

13    Q    And what is it?

14    A    I think time offers an opportunity to digest information.

15    It is one thing to obtain information.  It is another to

16    personalize it.  A 24 hour deliberation period is the very

17    minimum I would encourage a person to evaluate the many

18    complex factors involved in this important decision that

19    will, in one way or another, be with her for the rest of her

20    life.

21            Crisis pregnancy decision making, as I said earlier,

22    unfolds rapidly.  There is also the stigma of shame attached

23    to this.  I am a failure because I am victimized, if you

24    will, by my unwanted pregnancy.  Very often there is shock

25    involved.  There may be no prior experience with this level

798

1   of crisis decision making.  Hormonal changes are operative

2   once a woman is pregnant.  This only can compound and

3   conflict the decision making process.  All of these factors

4   mix together and create an environment where deliberation can

5   be extremely beneficial.

6           And lastly, I would add, the opportunity to reflect

7   and draw upon the support of those that love that person,

8   that perhaps know that person better than any social worker

9   of counsellor or psychologist, that's exceedingly important.

10  The 24 hour deliberation period I think is a strong

11  encouragement on the part of the state to do that.  And I

12  think it's essential for people when the decision making

13  stakes are high.

14  Q    Now if a woman knows she's pregnant for a week or two,

15  she's had a pregnancy test, she knows she's pregnant, she

16  believes she wants an abortion and she goes to an abortion

17  clinic for that procedure, is the 24 hour waiting provision

18  still beneficial, in your opinion?

19  A    Yes, I believe it is.

20  Q    Why is that?

21  A    We don't know what information this individual has based

22  her decision on. And if it is a fully informed decision, it

23  will simply be a confirmation to her that her decision is

24  right for her.  By insuring that she have, on an voluntary

25  basis, information of a biological, scientific nature, I

799

1   believe it's a way of assisting her in having adequate

2   information to make a decision and for her to check out and

3   affirm the rightness or the wrongness of a decision that she

4   may have made earlier.

5          I would also add that it has been my experience

6   clinically that women in the crisis pregnancy decision making

7   may well -- their decision may well fluctuate.  That having

8   started, at this point -- this is often true with respect to

9   adoption, I can't possibly give this child away in an

10  adoption and then over a period of time, that decision

11  changes.  There is a consideration of an abortion.  That

12  changes.  I think it's well documented in the literature that

13  across time unwantedness varies as a function of the length

14  of the pregnancy.

15  Q   Of your clinical experience and the review of literature,

16  does time play a role in the crisis pregnancy decision

17  making?

18  A   Time plays an important role in the crisis pregnancy

19  decision making.  Very often, a decision is made impulsively

20  to be rid of this crisis and a person may even simply rely on

21  a previous crisis pregnancy experience.  We know today in the

22  United States that probably 40 percent of all abortions are

23  repeat abortions.  This puts women at risk, having had an

24  abortion, to have a subsequent abortion.  Repeated multiple

25  abortions carry certain health risks, both medical as well as

800

1  psychological.

2          The time period to evaluate is this really in my

3  best interests, what is involved here, are there other

4  support services available for me, all of that is terribly

5  important in a woman making a decision that is truly informed

6  and beneficial for her.

7  Q    The example I gave you or asked you about if a woman has

8  already known she is pregnant and she goes to the abortion

9  clinic and I asked you about the 24 hour waiting period still

10 being beneficial, is it possible that she will obtain new

11 information or additional information that the clinic that

12 she didn't have before that would aid her in considering?

13 A    Yes, it is.  That's what I meant by the state would be

14 insuring a certain standard of information -- scientific

15 information on a voluntary basis that would be very helpful

16 to her.  We simply don't know what information she has

17 utilized in making that decision.

18 Q    Now could you turn to page 20 of the act, Section 3209?

19 That's a spousal notice provision.

20 A    Yes.

21 Q    And that requires that a woman give notice to her spouse,

22 but not consent, just notice, that she's about to have an

23 abortion, except in four circumstances.

24 A    Mm-hmm.

25 Q    Have you reviewed that section previously?

801

1   A   Yes, I have.

2   Q   And could you look at Defendant's Exhibit 48?

3   A   Yes.

4   Q   Now there will be testimony that Defendant's Exhibit 48

5   is the proposed certification regarding spousal notice that

6   the Department of Health will use if the spousal notice

7   provision goes in effect.  Have you reviewed that before?

8   A   Yes, I have.

9   Q   In your experience counselling married women and men, do

10  you have an opinion on whether spousal notification is

11  generally beneficial?

12  A   I do.

13  Q   And what is that opinion?

14  A   My opinion is that spousal notification is beneficial.

15  People are not perfect, neither are marriages.  Most are

16  neither so good that spousal notification is unnecessary or

17  so bad that it would be presumed harmful to the wife to

18  notify the husband with respect to the abortion.

19          In relationships in particular, people often

20  misjudge their spousal partner.  For the majority of couples,

21  communication is very important in marriage.  In fact, I

22  believe it's the bedrock of healthy communication -- of

23  healthy marriages.  It is advantageous for wives to draw upon

24  the support of their husbands in this crisis decision making

25  period.  I believe it's beneficial.  The literature is clear

962

1    that if there is a conflictual relationship, this woman is at

2    risk for psychologically later on experiencing a painful

3    aftermath from an abortion.

4            So clinically, I have seen this to be terribly

5    important.  That even if the husband were to disagree with

6    her about obtaining an abortion, that this is not bad, that

7    this is not horrible.  This is positive in that it provides

8    an open review of a decision with respect to a member of a

9    family -- potential member of the family.  And it's extremely

10   important for her to be able to bounce her ideas off of his

11   thinking and vice versa.

12           And in my opinion, it would be as equally unjust for

13   the wife to exclude him from any consideration as it would be

14   for him to exclude her from any consideration.

15   Q    In your clinical experience, have you counselled battered

16   women?

17   A    Yes, I have.

18   Q    And you reviewed literature in this area?

19   A    I've reviewed some of the literature, yes.

20   Q    Were you here when Dr. Walker testified this morning?

21   A    Yes, I was.

22   Q    Do you agree with her opinion --

23           MS. KOLBERT:  Objection, your Honor, I don't believe

24   that the witness has been certified as an expert of battery.

25           THE COURT:  I will receive the testimony and weight

803

Rue - Direct                                        173

1   and evaluate it.  Let's continue.  Overruled.

2   BY MS. MERSHIMER:

3   Q   Were you here when Dr. Walker -- I don't know if you

4   answered that question.  Were you here when Dr. Walker

5   testified this morning?

6   A   Yes.

7   Q   And do you agree with her that battered women tend to

8   deny that they are battered?

9   A   Yes, I would agree with Dr. Walker's perception of that.

10  Q   Do you agree that battered women are not likely to avail

11  themselves of the exception in Section 3209, that they do not

12  have to notify their spouse?

13  A   No, I would not agree.

14  Q   Why is that?

15  A   I believe that battered wives exist within a context of

16  denial, but that they are not happy deniers.  That they are

17  not pleased, that they are not satisfied in their life

18  circumstances.  I believe that they want help. That they

19  would seek that help out if help were there and if they felt

20  safe enough in obtaining that help.

21        Research by Richard Gelles and others indicate that

22  75 percent seek out help of battered wives.  I believe even

23  Dr. Walker, in some of her written materials, has indicated

24  that most battered wives will report, for health problems

25  will deal with health issues.  And I think that this is

804

1  terribly important.

2         In fact, I see this step where she indicates that

3  she is at risk of being battered, I see this as the

4  commencement, an opportunity for her to commence a path of

5  recovery where she no longer needs exist in denial.  She

6  doesn't -- she's not being coerced into therapy somewhere,

7  she's not being coerced into an abortion or not obtaining an

8  abortion. But she is being confronted with an open and honest

9  expression that her circumstances are indeed distressful and

10 sad, that she is battered and at risk of future battering.

11        And I think these women, with their circumstances,

12 demand a great deal of compassion on our part.  And it is my

13 hope that this would commence a path of recovery for a person

14 by acknowledging that she is at risk.

15 Q   From your clinical experience, do you believe that

16 counselling is necessary for battered women to recover?

17 A   I believe that battered wives, similar to wives of

18 alcoholics, similar to wives in dysfunctional marriages, that

19 these individuals are at great risk for reinventing the

20 relationship wheel if they don't receive proper therapy and

21 counselling to understand what psychological factors are

22 involved, first of all, in her getting herself into that

23 circumstance, secondly staying and third, reconnecting with a

24 person very similar, say, to her first husband who battered

25 her.  We see this constantly clinically.

805

Rue - Direct                                             175

1        A person is married to an alcoholic and comes right

2    back after a divorce and finds an alcoholic who now batters

3    her.  So she's a great risk without counselling for

4    reinventing a relationship that's dysfunctional and that

5    could be very painful for her.

6    Q   From your experience and review of literature, do you

7    agree that the majority of battered women will recover from

8    the battered women's syndrome spontaneously when removed from

9    the threatening environment?

10   A   No, I would strongly disagree with that and add that if

11   they are experiencing post-traumatic stress or whatever the

12   particular psychological manifestation of their symptoms is,

13   that these people need professional help to resolve their

14   crisis, to resolve their psychological impairment and to

15   better a future where they are not at risk for further

16   battering or further dysfunctional lifestyle.

17        MS. MERSHIMER:  May I have a moment to review my

18   notes, your Honor?

19        THE COURT:  Yes.

20        MS. MERSHIMER:  Thank you.

21        (Pause in proceedings.)

22        THE COURT:  Why don't we take a seven minute recess

23   at this time.

24        MS. MERSHIMER:  Thank you, your Honor.

25        (Recess taken, 3:40 p.m. to 3:55 p.m.)

806

1          THE COURT:  Shall we continue?

2          MS. MERSHIMER:  Thank you, your Honor.

3   BY MS. MERSHIMER:

4   Q   Dr. Rue, you testified that in your experience women who

5   had not been sufficiently informed prior to obtaining their

6   abortion, that they had -- that that had some sort of impact

7   on their lives; is that correct?

8   A   That's correct.

9   Q   Could you explain that impact in more detail?

10  A   Well, it could be characterized as intense grieving,

11  distancing in relationships, a mourning, a deep loss, a

12  feeling of tremendous anger and resentment that she was

13  misled.  I think generally when a woman feels she has not

14  provided informed consent and information has been

15  insufficient, I think there is generally a sense of regret

16  about what has occurred.

17          With respect to an individual who is married and she

18  has not notified her husband, had a secret abortion, did not

19  understand what the abortion really did to her pregnancy,

20  this can be a tremendously painful remembering for her and

21  can constitute the basis for a diagnosis of post-traumatic

22  stress which the husband cannot understand.  He sees his wife

23  distancing.  He sees her emotionally numb and he asks what's

24  wrong.  And she says nothing.  He says, well, you seem to be

25  different.

807

1    And of course, she is different, but she hasn't made

2    the connection herself between the manifestation of these

3    symptoms being tied to her abortion experience. And because

4    all of this interconnects and interweaves, her opportunity to

5    make a decision that is supported pre-abortion, that should

6    necessarily be support post-abortion has been truncated, not

7    only by a lack of information, but also because she doesn't

8    have a support system.

9    So I see that these individuals can suffer

10    tremendously in a psychological way if they have not received

11    sufficient informed consent.

12    Q   And do you know how long this suffering or the

13    psychological problems can last?

14    A   Well, Speckhard's study found eight to 10 years after an

15    abortion these individuals began ab-reacting, that is, having

16    negative experiences.

17    The one thing that is characteristic about post-

18    traumatic stress is that an acute reaction is not typical.

19    It's rather that individual chronically attempts to cope with

20    something that is outside the range of normal human

21    experience. The attempt to process in some way, which is

22    what the re-experiencing phase is, part two here. But more

23    characteristic is the delayed aspect of post-traumatic

24    stress.

25    Here, an individual will say I feel relief after an

808

1   abortion, but it is only months and/or years later where she

2   will begin feeling the painful aftermath in a way that can be

3   quite impairing of her relationship, of her career, of her

4   child bearing and child rearing.  This delayed aspect is

5   particularly critical.

6        And I might add that in Science magazine of 1990,

7   Dr. Adler and others reviewed some of the literature on

8   abortions aftermath and Dr. Walker referred to this today.

9   They by no means did a conclusive analysis, a systematic or

10  meta analysis of the literature.  And certainly not one that

11  we provided to Surgeon General Koop.

12       But I might add that Dr. Adler and her colleagues

13  state very clearly in that Science magazine article that the

14  long term effects of abortion are unknown.  And you see, that

15  presents a public health risk in terms of a person

16  experiencing this syndrome or depressive disorders or anxiety

17  disorders.  It presents a health risk and it's something we

18  should certainly be aware of.

19       MS. MERSHIMER:  I have no further questions, your

20  Honor.

21       THE COURT:  Cross-examination.

22       MS. KOLBERT:  Thank you, your Honor.  If you don't

23  mind, your Honor, I will stay at counsel table --

24       THE COURT:  Yes.

25       MS. KOLBERT:  -- and stand here.  I just -- there's

809