# Exhibit H

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF ALABAMA

 3                        NORTHERN DIVISION

 4

 5   PLANNED PARENTHOOD
     SOUTHEAST, INC., et al.,
 6
             Plaintiffs,
 7
         vs.                      CASE NO.:  2:13cv405-MHT
 8
     LUTHER STRANGE, et al.,
 9
             Defendants.
10

11

12                    * * * * * * * * * *

13           EXCERPT OF NONJURY TRIAL PROCEEDINGS

14              TESTIMONY OF PAUL FINE, M.D.

15                    * * * * * * * * * *

16           BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

17   DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday, May 21,

18   2014, commencing at 9:08 a.m.

19   APPEARANCES:

20
     FOR THE PLAINTIFFS:      Ms. Alexa Kolbi-Molinas
21                            Mr. Andrew David Beck
                              Ms. Susan Talcott Camp
22                            Ms. Julia Heather Kaye
                              Attorneys at Law
23                            AMERICAN CIVIL LIBERTIES UNION
                              125 Broad Street, 18th Floor
24                            New York, New York  10004-2400

25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE PLAINTIFFS:        Ms. Jennifer R. Sandman
                                Ms. Maithreyi Ratakonda
 3                              Attorneys at Law
                                PLANNED PARENTHOOD FEDERATION
 4                              OF AMERICA
                                434 West 33rd Street
 5                              New York, New York  10001

 6                              Ms. Dyanne Griffith
                                Attorney at Law
 7                              WILMER CUTLER PICKERING
                                HALE & DOOR, LLP
 8                              1875 Pennsylvania Avenue NW
                                Washington, D.C.  20006
 9
                                Mr. Randall C. Marshall
10                              Attorney at Law
                                ACLU of ALABAMA FOUNDATION, INC.
11                              P.O. Box 6179
                                Montgomery, Alabama  36106-0179
12
                                Mr. M. Wayne Sabel, Sr.
13                              Attorney at Law
                                SABEL & SABEL, P.C.
14                              2800 Zelda Road, Suite 100-5
                                Montgomery, Alabama  36106
15

16   FOR THE DEFENDANTS:        Mr. Andrew L. Brasher
                                Solicitor General
17                              STATE OF ALABAMA
                                OFFICE OF THE ATTORNEY GENERAL
18                              501 Washington Avenue
                                Montgomery, Alabama  36103
19
                                Mr. James William Davis
20                              Ms. Margaret Lindsey Fleming
                                Mr. Kyle A. Beckman
21                              Ms. Laura Elizabeth Howell
                                STATE OF ALABAMA
22                              OFFICE OF THE ATTORNEY GENERAL
                                501 Washington Avenue
23                              Montgomery, Alabama  36130

24

25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:      Ms. Patricia Elaine Ivie
                              Mr. Phillip Brian Hale
 3                            Office of General Counsel
                              STATE OF ALABAMA
 4                            DEPARTMENT OF PUBLIC HEALTH
                              RSA Tower
 5                            201 Monroe Street
                              Montgomery, Alabama  36104
 6
                     Proceedings reported stenographically;
 7                      transcript produced by computer.

 8                      * * * * * * * * * *

 9      (The following excerpt of proceedings was heard before the

10       Honorable Myron H. Thompson, United States District Judge,

11       at Montgomery, Alabama, on Wednesday, May 21, 2014,

12       commencing at 9:08 a.m.:)

13      (Call to Order of the Court)

14           THE COURT:  Proceed, counsel.

15           MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call

16   Dr. Paul Fine.

17           THE COURT:  Okay.

18           THE WITNESS:  Good morning, Your Honor.

19           THE COURT:  Good morning.

20      (The witness is sworn)

21           MS. SANDMAN:  Your Honor, if I may approach just to

22   give out the witness binders.

23           THE COURT:  Yes.  Thank you.

24           MS. SANDMAN:  And Your Honor, I did previously supply a

25   summary of his proposed expert testimony as you requested.
```

```
 1              THE COURT:  Yes.

 2              MS. SANDMAN:  I just want to make sure the Court has

 3    that.

 4              THE COURT:  Very good.  I'm reading it right now.

 5              MS. SANDMAN:  Very good.

 6              THE COURT:  Proceed.

 7              MS. SANDMAN:  Thank you, Your Honor.

 8          PAUL FINE, M.D., the witness, having been duly sworn

 9    to speak the truth, the whole truth, and nothing but the truth,

10    testified as follows:

11                        DIRECT EXAMINATION

12    BY MS. SANDMAN:

13    Q.  Dr. Fine, please introduce yourself to the Court.

14    A.  Well, good morning.  I'm Dr. Paul Fine.

15    Q.  I don't want to spend a lot on your -- a lot of time on your

16    credentials, given that the Court has your CV.

17              MS. SANDMAN:  And Your Honor, I believe Dr. Fine's CV

18    is in evidence as Exhibit 64.

19    Q.  But can you briefly describe your professional history for

20    the Court.

21    A.  Yes.  I went to George Washington University Medical School,

22    graduated in '71; did my internship and residency at Los Angeles

23    County, University of Southern California Medical Center,

24    finished that in '75.  Served active duty in the Air Force in

25    Europe from '75 to '77.  In 1977, I came to Dickinson, Texas, in
```

1  Galveston County, where I opened a private practice and

2  maintained that private practice until 1993.  I was a solo

3  practitioner.  Managed care made it impossible for me to

4  continue private practice as a solo, and I joined the faculty of

5  Baylor College of Medicine in the Department of OB-GYN and

6  Urology in 1993, where I've remained.  And in 2005, I went

7  part-time.

8       During that time, since 1984, I've been associated also with

9  Planned Parenthood in Houston.  And I've been, since 1997, the

10 medical director of Planned Parenthood Gulf Coast that

11 encompasses the Houston metropolitan area and Louisiana.

12 Q.  Dr. Fine, are you a board-certified OB-GYN?

13 A.  Yes, I am.

14 Q.  And do you perform abortions?

15 A.  Yes, I do.

16 Q.  By what methods?

17 A.  By both surgical abortion and by medication abortion.

18 Q.  And do you teach those methods as well?

19 A.  Yes, I do.

20 Q.  Does part of that teaching include what to do if there is an

21 abortion-related complication?

22 A.  Yes, it does include that.

23 Q.  And can you explain to the Court what are your

24 responsibilities as the medical director of Planned Parenthood

25 of the Gulf Coast?

1   A.   To direct the medical care at that facility for both family

2   planning and abortion care.

3   Q.   And can you explain what the relationship is between Planned

4   Parenthood of the Gulf Coast and Planned Parenthood of the

5   Southeast, which is one of the plaintiffs in this action.

6   A.   There are -- Planned Parenthood Federation of America has

7   about 67 what they call affiliates.   And these are like

8   franchises of Planned Parenthood that operate under the mantra

9   of guidelines set out by PPFA.   Planned Parenthood Southeast,

10  which is Alabama, is a separate entity, corporate entity, from

11  Planned Parenthood Gulf Coast, but both are affiliates governed

12  by Planned Parenthood Federation of America.

13  Q.   And broadly speaking, can you explain to the Court whether

14  there are conditions of affiliation?

15  A.   I'm sorry?

16  Q.   Broadly speaking, can you just explain whether there are

17  conditions of affiliation --

18  A.   Yes.

19  Q.   -- that affiliates follow?

20  A.   Yes.   To be affiliated, there are specific guidelines set

21  forth by Planned Parenthood, both administrative, their board

22  composition, the medical services that are offered -- generally,

23  family planning, sexual infection screening, breast and cancer

24  screening, well-woman exams, a wide range of health care.   And

25  these are governed by standards and guidelines promulgated

1    through PPFA by way of their national medical committee.

2    Q.  And Dr. Fine, do you perform any duties or functions for the

3    national office in addition to your role at Planned Parenthood

4    of the Gulf Coast?

5    A.   Yes.  I have been a senior research consultant with PPFA.  I

6    also serve on the executive committee of the national medical

7    committee.  The national medical committee is a group of about

8    40 experts from around the country who -- in various areas of

9    reproductive health care and medicine.  And they are the ones

10   that promulgate the -- the standards and guidelines that the --

11   each affiliate has to abide by.  Generally, nurse practitioners

12   provide most of the care at the affiliates, so these standards

13   and guidelines are followed by the nurse practitioners.

14   Q.  And Dr. Fine, do you have any appointments relating to

15   emergency medical services?

16   A.   Yes, I do.  It started in 1984.  At night, I went through

17   the police academy while I was in private practice, and I've

18   been a reserve police captain for 30 years.  Doing those duties

19   while out on patrol, I would be on scene of hundreds of car

20   accidents and stabbings and shootings and got to know the EMS

21   people.  So they wanted me to be their medical director.  So

22   I've been the medical director of EMS for three cities in

23   Galveston County since about 1990.

24   Q.  And do you also do any work for the police department?

25   A.   Yes.  As mentioned, I have been a reserve police captain for

1    a large city in Galveston County for about 30 years now.  I'm in

2    by thirtieth year.  And in that, I'm like the police surgeon,

3    but I ride on patrol and attend many of the major medical

4    emergencies.  So I see the EMS crews in action and oversee that.

5    I also helped -- taught the police how to collect a rape kit in

6    sexual assault victims and sometimes was involved with those.

7    Q.  Dr. Fine, have you been on staff at any hospitals?

8    A.  Yes.  I've been on the staff of about 15 hospitals, both

9    suburban community and urban medical center type hospitals.

10   Q.  Have you ever served on a hospital committee involved in

11   considering applications for admitting privileges?

12   A.  Yes.  When I was in private practice, the two main hospitals

13   in Galveston County I practiced at, at different times, I was

14   both the chair of the department of OB-GYN and also served on

15   the credentials committee.

16   Q.  And have you served on any other committees involved in the

17   privileging process?

18   A.  Yes.  I have also -- when I was chairman of the OB-GYN

19   department, I also served on the executive medical committee of

20   the hospitals, which also plays a role in hospital

21   credentialing.

22   Q.  Dr. Fine, based on your experiences, are you familiar with

23   the norms and standards for providing gynecological services,

24   including abortion in outpatient settings?

25   A.  Yes, I am.

1  Q.  And are you familiar with the typical practices around the

2  hospital privileging process?

3  A.  Yes, I am.

4  Q.  In addition to all of the positions that you've just

5  discussed, do you conduct research and publish in peer-reviewed

6  journals?

7  A.  Yes, I have, many times.

8  Q.  And do those appear on your CV?

9  A.  Correct.

10  Q.  And do some of those relate to abortion as well?

11  A.  Yes, they do.

12      MS. SANDMAN:  Your Honor, at this point, plaintiffs

13  would move to qualify Dr. Fine with an expert in the areas  of

14  obstetrics and gynecology with a speciality in abortion

15  practice, the provision of emergency medical services, and on

16  hospital admitting privileges process.

17      THE COURT:  Proceed.

18      MS. SANDMAN:  Thank you.

19  Q.  Dr. Fine, directing your attention to the first two

20  documents in your binder marked for identification as

21  Plaintiff's Exhibit 65 and 66, do you recognize those documents?

22  A.  Yes, I do.

23  Q.  What are they?

24  A.  The -- 65 is a statement of my opinions and the basis and

25  reasons for them, my -- my expert report.  And number 66 is my

1    rebuttal report.

2    Q.  And do those documents accurately reflect your expert

3    opinions in this case?

4    A.  Yes, they do.

5            MS. SANDMAN:  Plaintiffs would like to move Exhibit 65

6    and 66 into evidence.

7            THE COURT:  Admitted.

8            MS. SANDMAN:  Thank you, Your Honor.

9    Q.  Dr. Fine, you're here today to offer expert testimony about

10   the necessity and impact of a new Alabama requirement regarding

11   the provision of abortion; is that correct?

12   A.  Yes, that's correct.

13   Q.  And are you familiar with this new requirement?

14   A.  Yes, I am.

15   Q.  What do you understand it to be?

16   A.  It basically requires a physician providing abortion care to

17   have admitting privileges at a hospital within the statistical

18   metropolitan area.  And the admitting privileges have to

19   encompass major gynecological surgery, including the ability to

20   perform hysterectomy and laparotomy, which is where they make an

21   incision in the abdomen to fix whatever's wrong in the abdomen.

22   Q.  And based on your experience and expertise, do you believe

23   this admitting privileges requirement is necessary for the safe

24   provision of abortions?

25   A.  Absolutely not.

1  Q.  Do you believe this provision will help women in Alabama?

2  A.  Absolutely not.  It will harm women.

3  Q.  Dr. Fine, what are the methods of abortion available through

4  14-weeks of gestational age?

5  A.  Through 14 weeks of gestational age, which is early

6  abortion, is surgical abortion, which is removal of the contents

7  of the uterus using instruments.  There's no cutting or suturing

8  in a surgical abortion.  And there's medication abortion, or the

9  abortion pills, that is performed up through nine weeks of

10  gestational age.

11      Gestational age, Your Honor, is from the first day of the

12  last normal menstrual period, so nine weeks is the upper limit

13  that we can do medication abortions.

14          THE COURT:  Would you just back up a little bit for me

15  and tell me what the stages are from --

16          THE WITNESS:  Pregnancy?

17          THE COURT:  -- impregnation -- from impregnation to

18  birth, what are the different stages?

19          THE WITNESS:  Okay.  Generally, they are divided into

20  what we call trimesters.  The first trimester is generally 12 to

21  14 weeks.  The second trimester is generally from 12 to 28

22  weeks, and the last trimester is from 28 weeks to term, which is

23  40 weeks.  So each trimester is approximately three months.

24          THE COURT:  And generally, when are abortions performed

25  within those trimesters?

1          THE WITNESS:  Ninety percent of the abortions in the

2    United States are performed during the first trimester, and 60

3    percent are performed within the first eight weeks, or two

4    months.

5          THE COURT:  Is there a reason why 60 percent versus --

6    are performed within that period of time -- versus the 90

7    percent within the first term?

8          THE WITNESS:  Well, the -- the -- with the women being

9    able to do home pregnancy tests, they diagnose their pregnancies

10   earlier.  And with a large number of abortion facilities

11   available, at least prior to some of these laws, women could

12   easily access abortion when they wanted it.  And generally, if

13   it's done earlier, there's less pain involved, there's less

14   anesthesia, they're at lower risk.  So the earlier you can do

15   the abortion, the better.

16         THE COURT:  What's considered early?

17         THE WITNESS:  Early, generally first trimester through

18   12 to 14 weeks.

19         THE COURT:  Is there any difference between doing it

20   very early in that trimester and later in that -- pardon me --

21   very early in the first trimester and later in the first

22   trimester?

23         THE WITNESS:  I think later in the first trimester has

24   slightly increased risk but not a whole lot.

25         THE COURT:  What is considered later?

```
 1              THE WITNESS:  Later would be 12 to 14 weeks.
 2              THE COURT:  Now, what about the other 10 percent?
 3              THE WITNESS:  The other 10 --
 4              THE COURT:  I guess that would be within the second
 5   trimester.
 6              THE WITNESS:  Yeah, second trimester.  And generally --
 7   it varies state to state, but second trimester abortions
 8   generally are done up to approximately 20 to 22 weeks
 9   gestational age.  The longer -- the farther along the
10   gestational age, Your Honor, the more they have to dilate and
11   stretch the cervix.  And when you start getting into the second
12   trimester, you actually have to do overnight preparation of the
13   cervix with reeds that swell overnight and slowly dilate the
14   cervix.  When you have a larger volume of tissue to be removed,
15   as in the second trimester, there's also -- there's more
16   instrumentation involved.  There's a higher possibility for
17   perforation.  There's a higher possibility for retained tissue
18   that could cause a problem.  So earlier on, there's less tissue,
19   less dilation, less pain, and it's generally safer.
20              THE COURT:  Counsel, is there anything in the record
21   that would just educate me as to how a surgical abortion is
22   actually done?
23              MS. SANDMAN:  There will be momentarily, Your Honor.
24              THE COURT:  Okay.  Very good.
25   Q.  (Ms. Sandman, continuing:)  Dr. Fine, just so the record is
```

1  clear, are you aware of the gestational age to which abortion is

2  done by plaintiffs in this case?

3  A.  Yes.  Up to 14 weeks is my understanding.

4  Q.  Can you briefly explain for the Court the process by which

5  early surgical abortion, meaning through 14 weeks, occurs?

6  A.  Yes.  The process -- it's typically called, Your Honor, a

7  D&C, dilation and curettage.  And the cervix is dilated.  The

8  further along the gestational age, the more it's dilated.  And

9  then --

10          THE COURT:  What does dilation mean?

11          THE WITNESS:  Dilation means stretching of the opening.

12  The cervix, in its undilated state, is about one or two

13  millimeters, about a pencil lead in diameter.  And during the

14  first trimester, you generally will dilate it to either the size

15  of a pencil or to the size of a small finger on your hand.  And

16  then once the cervix is dilated, then there is a -- a tube, or

17  what we call cannula, plastic tube, that's either attached to a

18  syringe that causes suction or an electric machine that causes

19  suction.  And with the suctioning, the contents of the uterus

20  are removed.

21  Q.  (Ms. Sandman, continuing:)  And Dr. Fine, I believe you

22  testified earlier that the early surgical abortion is not

23  typically what's thought of as surgery.  Can you just explain

24  that to the Court.

25  A.  Yes.  It's called surgical abortion; but unlike most

1  surgery, there's no suturing, there's no cutting, there's no

2  incision.  There's no need for general anesthesia.  We're just

3  stretching the natural cervical canal opening.

4  Q.  And do you know what is commonly done for pain management

5  for early surgical abortion?

6  A.  Most of the time, the patient beforehand, maybe 30 minutes

7  before, is given either ibuprofen, which is Advil, or may be

8  given a Valium tablet to help relax her.  And then to avoid the

9  pain of stretching the cervix, we inject Novocain or lidocaine

10  into the cervix itself.  And so the patient is awake but fairly

11  comfortable, and she experiences menstrual cramps similar to

12  what she has with her menses.

13  Q.  And Dr. Fine, I think you touched on this briefly before,

14  but can you just describe what you mean by medication abortion?

15        THE COURT:  Before you get to that, what exactly does

16  it look like that's removed during a surgical abortion or a

17  medication abortion?  Is it just blood or --

18        THE WITNESS:  During --

19        THE COURT:  -- is it a small baby or what?

20        THE WITNESS:  During -- during the first approximately

21  eight weeks, it looks like menstrual blood.  Now, to confirm the

22  tissue is there and that the pregnancy has been ended, there's

23  two methods that are used.  One is they'll take the blood --

24  bloody tissue, strain it with a strainer with tap water and then

25  put it in a clear dish with a light under it, and then you can

 1  see clumps of white-looking tissue.  You don't really see an

 2  embryo, per se, until really much over nine to ten weeks.

 3            MR. DAVIS:  Excuse me, Your Honor.  I beg your pardon.

 4  I'm sorry to interrupt.  I'm having difficulty hearing the

 5  witness's response when he's turning to you.

 6            THE COURT:  Oh, you should definitely say, please speak

 7  up.

 8            MR. DAVIS:  And I'm sorry.  I'm also having trouble

 9  hearing Your Honor's questions for the same reason.

10            THE COURT:  Okay.  Very good.  Also say please speak

11  up.  I have a microphone here.

12            THE WITNESS:  Sorry.  I'll repeat.

13            THE COURT:  Go ahead.

14            THE WITNESS:  Did you hear what I -- so in the first

15  eight weeks, it's just bloody tissue with clots and some small

16  white tissue.  You don't really see an embryo up to eight weeks,

17  per se.  When you start getting nine to ten weeks and 11 and 12

18  weeks, you actually do start seeing an embryo.  And, in fact, at

19  12 weeks, you start being able to make out, you know, the actual

20  fetal parts, the embryonic parts; but at 12 weeks, the embryo is

21  about an inch long.

22  Q.  (By Ms. Sandman, continuing:)  And Dr. Fine, how long does

23  an early surgical abortion take for the actual procedure?

24  A.  If you include giving the paracervical block, anywhere from

25  three to six minutes.  If you exclude giving the paracervical

1  block, about two minutes.

2  Q.  You testified earlier about some of the different

3  gestational ages for early terminations of pregnancy.  What is

4  the earliest that a pregnancy can be diagnosed?

5  A.  With the ultrasound machines we have now, we can start

6  seeing pregnancies at approximately five weeks from the last

7  normal period, which is approximately one week after they've

8  missed their period, we can confirm an intrauterine pregnancy.

9  Q.  And at what point would the woman's pregnancy test typically

10 be positive?

11 A.  Well, with the home pregnancy tests now, they're extremely

12 sensitive.  There are pregnancy tests commercially available now

13 to women who can diagnose a pregnancy before they've even missed

14 their menses.

15 Q.  And what gestational age would that be considered to be?

16 A.  Well, the gestational age from about the time of their

17 expected menses, since gestation is from the last day of the

18 last normal period and assuming their period is four weeks

19 later, they would be of four weeks gestational age, around the

20 time of their expected menses.

21 Q.  You testified earlier that the vast majority of abortions in

22 the country happen in the first trimester.  Can you explain for

23 the Court what types of factors, in your experience, cause a

24 woman to have abortion later in pregnancy?

25 A.  There can be multiple factors.  Unfortunately, data

1  consistently shows that there is a disproportionate number of --

2  of minority women, poorly educated women, economically

3  disadvantaged women, so -- who have elective terminations of

4  pregnancy, which, unfortunately, is also a result that they

5  don't have as much access to effective contraception.

6      Your Honor, 50 percent of the pregnancies in the United

7  States are unintended.  Half of those end up in abortion.

8  But -- so -- so women may be delayed in the diagnosis.  They may

9  not be able to afford a pregnancy test, which, you know, may

10  cost 20 or $30.  They -- they may, because of the cost, not be

11  able to go in to be diagnosed at the clinic.  When a woman

12  presents to the abortion clinic, the first thing that's done is

13  to determine if they are pregnant and if they are, how far

14  along.  But those services also cost some money, so there's

15  delay.

16      There can also be delay if the woman has to travel long

17  distances to get to an abortion clinic.  Because if she's

18  economically disadvantaged, she may not have a car, may have to

19  rely on somebody else to drive her.  And in the end, the

20  decision and ability to physically go to the abortion clinic may

21  be delayed by several weeks or a month, which would put the

22  pregnancy later in gestational age once they reach the abortion

23  clinic.

24          THE COURT:  What does the term "menses" mean?

25          THE WITNESS:  I'm sorry?

1              THE COURT:  What does the term "menses" mean.

2              THE WITNESS:  Menses is the actual menstrual period.

3   Q.  (By Ms. Sandman, continuing:)  Dr. Fine, turning back

4   briefly to the types of abortion that you discussed earlier,

5   we've talked a little bit about the process of surgical

6   abortion.  Can you explain for the Court the process of a

7   medication abortion.

8   A.  Yes.  A medication abortion is basically taking two pills.

9   The first pill is the abortion pill that got -- ru486 that got

10  so much press years ago.  And that is a pill that is taken in

11  the clinic on day one.  That basically causes the embryo, which

12  is anchored to the wall of the uterus by -- by anchors, what we

13  call villi -- the ru486 causes that connection -- the lining of

14  the uterus breaks down, and the connection is lost, so the

15  embryo loses its blood supply.

16      So then they go home.  And 24 to 36 hours later, at their

17  convenience, they take a second pill, caused misoprostol, which

18  that pill causes the uterus to contract and expel the now

19  deceased embryo and empty the uterine cavity.  Generally, once

20  the woman takes that second pill at home, the spontaneous

21  miscarriage which occurs at that point will occur two to four

22  hours after she takes the pills.

23  Q.  So just to be clear, after the woman takes the first oral

24  medication at the health center, does anything else physical

25  happen to her as a part of the abortion process while she's

 1  still at the health center?

 2  A.   No.  Obviously, at the health center, she also receives

 3  extensive counseling, making sure the abortion is her choice,

 4  she's not being coerced, this is what she wants.  We try to make

 5  sure she has a provision for contraception after the abortion.

 6  But the actual abortion is taking one pill in the abortion

 7  clinic on day one.

 8  Q.   In what kind of facilities are abortions generally

 9  performed?

10  A.   In an office.

11  Q.   Do you consider abortion to be a safe procedure?

12  A.   Extremely safe.  Safer than getting a shot of penicillin.

13  Q.   And how does the risk of -- can you speak to the risk of

14  death from abortion procedures?

15  A.   Yes.  Multiple studies in the literature generally show that

16  the risk of death from abortion, elective abortion, is

17  approximately six women per one million.  Six women per one

18  million.

19          THE COURT:  Let me interrupt you again.  Is there a

20  period of time when you do a medical abortion -- pardon me --

21  medication abortion versus a surgical abortion, when it's safer

22  or not safer?

23          THE WITNESS:  We -- yes.  The medication -- the

24  literature on medication abortion shows it's efficacious up

25  through nine weeks gestational age.  Now, there's soon to be

1    published literature showing that it's actually safe at ten

2    weeks also, but the protocols by most -- by the National

3    Abortion Federation and Planned Parenthood limit medication

4    abortion up to nine weeks gestational age.  If they're over nine

5    weeks, they must have a surgical.

6              THE COURT:  When you're talking about safety, are you

7    talking about both, or are you talking about one versus the

8    other, or what?

9              THE WITNESS:  No.  They're both -- Your Honor, the

10   death rate from both -- surgical is actually higher than the

11   medical abortion.  Surgical abortion is about six women per

12   million, and medication abortion is maybe three per million.

13   And that's -- some of the deaths from medication abortion that

14   were in the paper were due to clostridia sordellii, and there

15   were like seven deaths with the medication abortion.  And there

16   were two factors that were altered.  One was the second tablet

17   used to be given vaginally.  It's no longer done.  And women,

18   after medication abortion, did not used to get prophylactic

19   antibiotics.  Now they do.  So since that's been done, the

20   mortality -- in fact, one of the larger studies on medication

21   abortion puts the death rate at about six per -- six per

22   million.  So it's -- they're both extremely safe procedures.

23             THE COURT:  Six per million versus three per million

24   doesn't mean anything to me.

25             THE WITNESS:  Correct.  It's --

1          THE COURT:  It can only be something relative to

2   something else.

3          THE WITNESS:  Obviously, if you're that one of the six

4   in a million, it's important; but generally, if you're going to

5   argue the statistical, well, is it six per million, is it eight

6   per million, is it ten per million, we're still talking about an

7   extremely rare event, fortunately.

8          THE COURT:  I don't think you understood what I was

9   asking.

10         THE WITNESS:  Okay.  I'm sorry.

11         THE COURT:  Compared to what?  Are you comparing it to

12  getting a pencillin shot?  Not penicillin.  Pardon me.

13         THE WITNESS:  The penicillin shot is one.

14         THE COURT:  Is that what you compared it to?  Okay.

15         THE WITNESS:  Uh-huh.

16         THE COURT:  Well, how many people die from penicillin

17  shots per million?

18         THE WITNESS:  Oh, approximately two to three times

19  that.  And there's also some tables out that showed your risk of

20  dying from riding a motorcycle or being in an automobile

21  accident, that those are all higher than the risk of death

22  from --

23         THE COURT:  Well, I think I'd be more interested in

24  comparing surgical or medical events rather than --

25         THE WITNESS:  Well, the risk of --

```
 1            THE COURT:  -- a motorcycle, riding a motorcycle.
 2            THE WITNESS:  The risk of dying from a colonoscopy is
 3   higher than the risk of death from having an early abortion.
 4   Q.  (By Ms. Sandman, continuing:)  Dr. Fine, can you compare the
 5   risk of death from an early abortion to the risk of death from a
 6   spontaneous miscarriage?
 7   A.   Generally, the risk of a spontaneous miscarriage -- and Your
 8   Honor, approximately 13 to 15 percent of all pregnancies end in
 9   spontaneous miscarriage for multiple reasons.  But the -- when
10   there's an elective abortion, it's a finite procedure and it's
11   done and it's completed.  When a woman has a spontaneous
12   miscarriage, sometimes she may not even know she's pregnant or
13   she may delay -- delay seeking care.  And in those
14   circumstances, there's a higher risk of hemorrhage and infection
15   with spontaneous abortion because of the delay in seeking care.
16   So the risk of spontaneous abortion (sic) in gestational age --
17   per gestational age is higher for spontaneous miscarriage than
18   it is for abortion.
19   Q.  And can you compare the risk of death from abortion to the
20   risk of death from childbirth?
21   A.   Yes.  The -- the risk of death from a live childbirth is
22   approximately 8.8 per hundred thousand.  And the risk of death
23   from abortion is six per million.  So the risk of death from
24   live childbirth, Your Honor, is 14 times greater than the risk
25   of death from abortion.  Fourteen times.
```

1  Q.  Dr. Fine --

2  A.  And that's in several studies.

3  Q.  Dr. Fine, I'd like to direct your attention to the third

4  item in your binder, which is an article by Drs. Raymond and

5  Grimes titled The Comparative Safety of Legally Induced Abortion

6  and Childbirth in the United States, published in *Obstetrics and*

7  *Gynecology*, Volume 119, in 2012.

8      Are you familiar with that study?

9  A.  Yes, I am.

10  Q.  Can you tell the Court about the study methodology and

11  whether you consider it to be reliable.

12  A.  Well, *Obstetrics and Gynecology* is a peer-reviewed journal,

13  and it's one of the most respected journals in obstetrics and

14  gynecology.  Drs. Raymond and Grimes are well respected experts

15  and researchers in reproductive health care.

16      To do this study, they actually used various methods,

17  including the -- the Centers for Disease Control Preventions

18  Pregnancy Mortality Surveillance System by the number of live

19  births as reported on birth certificates.  And that surveillance

20  system also collects death certificates and other information.

21      In addition to that, there is a -- a literature search for

22  medicine called PubMed, P-U-B-M-E-D.  And you can put search

23  words in there to try to find any literature worldwide that's

24  been published on subjects.  So they put multiple words,

25  including maternal mortality, death with abortion, death with

1    live birth, to try to get every bit of accurate information

2    about the numbers that they could.  And that's -- in this study,

3    that's where the risk of death with childbirth was 8.8 deaths

4    per hundred thousand live births and mortality to induced

5    abortion was 0.6 deaths per hundred thousand.  So childbirth, 14

6    times higher risk of death than abortion.

7    Q.  Dr. Fine, you mentioned that this study relies in part on

8    CDC data.  Are you familiar with this data source?

9    A.  Yes.

10   Q.  And do you consider it to be reliable?

11   A.  I do.  The CDC is very fastidious in tracking deaths.  They

12   have epidemiologists who -- who are detectives.  They not only

13   search state vital records, they -- they contact hospital review

14   boards.  They contact -- they do searches for anything in the

15   media about deaths.  They talk to physicians.  They talk to

16   health care providers.  They talk to citizens groups.  So

17   they're very complete in their investigation of deaths relating

18   to pregnancy, whether it's childbirth or abortion.

19   Q.  And directing your attention to the CDC abortion

20   surveillance tab in your binder, which has been marked for

21   identification as Exhibit 68 -- directing your attention to page

22   35, Table 25, what does the CDC data reflect about the mortality

23   rate from abortion?

24   A.  Let me find page 35.  I'm towards the end here.

25   Q.  I believe it's 35 of 37.

1  A.  Yes.  I'm getting there.  Generally, the CDC shows that the

2  case rate fatality rate for abortion has -- although always low,

3  for in the 1970s, the rate per hundred thousand was 0.78; but as

4  the techniques and more elective abortions were done following

5  legalization, the death rate lowered to approximately six deaths

6  per hundred thousand, which is where it's remained fairly

7  constant for the last several decades.

8          MS. SANDMAN:  Your Honor, at this time, I'd like to

9  move what's been marked for identification as Plaintiff's

10  Exhibit 68 into evidence.

11          THE COURT:  Admitted.

12  Q.  Dr. Fine, turning back to the Raymond and Grimes study you

13  were speaking of a moment ago, I'd like to draw your attention

14  to Figure 1 on page 217.  Did that study draw any conclusions

15  about abortion complications?

16  A.  Yes, it did.  Figure 1, Your Honor, is a bar graph showing

17  child -- various common complications, including hemorrhage and

18  infection.  And the dark bar graph is for childbirth, and the

19  lighter gray bar graph sitting next it to is for abortion.  And

20  in every complication relating to pregnancy, the risk of having

21  a complication with abortion is significantly, significantly

22  lower than that with live childbirth, including infection and

23  hemorrhage, which are the two most common ones that occur with

24  abortion.

25  Q.  Dr. Fine, I'd just like to back up for a moment to the

1  mortality rate that you gave a moment ago from the CDC -- CDC

2  data.  I believe that you may have dropped a digit in giving

3  that figure.  Could you just say again what the figure you gave

4  was?

5  A.  Let me look again.  I thought it was .6 per hundred thousand

6  or one in a million, but let me --

7  Q.  That -- that's correct.  Thank you.  And I apologize if I

8  misheard you in thinking that you had dropped a digit.

9       Directing your attention to the tab in your binder marked

10 Henshaw, which is a chapter from the NAF textbook titled, *The*

11 *Clinicians Guide to Medical and Surgical Abortion* by Drs.

12 Lichtenberg and others from 1999, the chapter is -- by

13 Dr. Henshaw is titled, Unintended Pregnancy and Abortion, a

14 Public Health Perspective?

15 A.  Yes, I see it.  I'm familiar with it.

16 Q.  Can you tell -- thank you.  Can you tell the Court about the

17 chapter.

18 A.  The -- this chapter is in a very authoritative textbook,

19 Your Honor, sponsored by the National Abortion Federation.  And

20 it offers both an international and historical perspective on

21 abortion care worldwide; but, more specifically, it also shows

22 that the mortality rates in the seventies and the complication

23 rates in the seventies were a little bit higher.  And after *Roe*

24 *v. Wade* and abortions were done more commonly, these

25 complication rates and mortality rates decreased significantly

1    through the years.

2    Q.   And directing your attention to page 20 of that chapter,

3    what does it conclude about the overall risk of complications

4    from a first trimester abortion?

5    A.   Well, from 1979 to '78, it was .3 major complications.   So

6    that's three per thousand that required hospital care.   And in

7    later studies, that went down to .07 percent, which is seven

8    women per 10,000, Your Honor.   So the -- as more abortions were

9    performed in the eighties and nineties, the complication rates

10   requiring hospitalization dropped dramatically.

11   Q.   And just to be clear, does the chapter reflect current data?

12   A.   Well, the chapter was published in 1999.   So it's as of

13   then.   But it's consistent with data showing a very low

14   complication rate of approximately seven per 10,000.

15   Q.   And --

16   A.   In fact, there's one more recent one that they cited that

17   showed five women per 10,000 -- .05 percent, or five women per

18   10,000, had a complication requiring hospitalization.

19   Q.   Dr. Fine, I'd like to turn now to what some of the more

20   recent literature shows.   Directing your attention to the next

21   tab in the binder, which is an article by Tracy Weitz and

22   others -- and that's W-E-I-T-Z -- titled Safety of Aspiration

23   Abortions Performed by Nurse Practitioners, Certified Nurse

24   Midwives, and Physician's Assistants under a California Legal

25   Waiver, published by the *American Journal of Public Health* in

1  2013.  Are you familiar with this study?

2  A.  Yes, I am.

3  Q.  Can you tell the Court about the study and whether you

4  consider it to be reliable.

5  A.  It's an extremely reliable study, Your Honor.  The -- the

6  purpose of the study was to compare the safety of abortion as

7  performed by physicians compared to clinicians, who included

8  nurse midwives, nurse practitioners, and physician's assistants.

9  And they followed -- the clinics that were followed were four

10  Planned Parenthood clinics in California and Northern -- Kaiser

11  Permanente of northern California.  All of these entities are

12  very fastidious in reporting complications in their data.

13      And over a two-year period, there were some 12,000 or so

14  abortions, 6,000 done by the physicians, about 6,000 done by the

15  nurse practitioners.  And the complications as -- serious

16  complications, as defined by requiring hospitalization, for the

17  physician group was .05 per hundred, which is five per 10,000.

18  Again, in the same ballpark as what was reported in the textbook

19  chapter in 1999.

20  Q.  Directing your attention to the next tab in your binder,

21  which is the last study that we'll be talking about.  That tab

22  is labeled Cleland.  This is an article by Kay Cleland,

23  C-L-E-L-A-N-D, and others titled, Significant Adverse Events and

24  Outcomes After Medical Abortion, published in *Obstetrics and*

25  *Gynecology*, Volume 121, in 2013.

```
1   A.   Let me --
2   Q.   Can you explain briefly the nature of the study and whether
3   you consider it to be reliable.
4   A.   Yes.   This is also published in the prestigious
5   peer-reviewed journal Obstetrics and Gynecology.   And, Your
6   Honor, maybe to clarify, peer-reviewed means that before a
7   manuscript can be published, it is submitted to generally three
8   independent referees to review the manuscript and critique it
9   based on the scientific methods, the statistics, the outcomes,
10  and the methodology.   And then if it's approved, it's published.
11  So this is very reliable data.
12       And this involves -- speaking to the medication abortion
13  question, this involves a study of 233,000 medication abortions
14  performed at Planned Parenthood clinics over a period of two
15  years, 2009 and 2010.   And in this study, the rate of serious
16  complications was extremely low.
17  Q.   I can direct your attention to Table 2 on page 169, if that
18  would be helpful.
19  A.   The -- the -- generally, the patients -- the number of
20  patients who went to the emergency room were approximately
21  about -- about .10 percent went to the emergency room.   And
22  about half of that, .06 percent, were admitted to the hospital.
23  So the -- the complication rate was extremely low, again, with
24  these 233,000 medication abortions.   Approximately twice the
25  number went to the emergency room but were not admitted than
```

1  those admitted.

2  Q.  Dr. Fine, I'd like to take a step back from the specific

3  figures and studies that you've been testifying about.  Can you

4  speak more generally to what these figures and studies tell you

5  about abortion safety?

6  A.  Abortion safety is -- abortion is an extremely safe

7  procedure done in the office.  The rates of complications and

8  mortality are amongst the lowest of any medical procedures done

9  in medicine.  And as we discussed, colonoscopy has a much higher

10  rate of complications.  Many of the common procedures done as

11  outpatients have higher rates of complications.  These are

12  extremely small.

13  Q.  Are you aware that the defendant's witnesses believe that

14  the numbers you rely on for the safety of abortion are not

15  reliable numbers?

16  A.  Yes.  They -- they will critique, Your Honor, the

17  statistical methods, the methodology.  And in practical terms,

18  whether we're talking about deaths of six per million or eight

19  per million or ten per million or two per million, it's

20  extremely rare.  And complications, if we're talking about six

21  per 10,000, eight per 10,000, 12 per 10,000, again, we're

22  talking about something that's very rare, fortunately.

23  Q.  And just so the record is clear, do you, in fact, believe

24  the numbers as they're reported in this literature to be

25  reliable numbers?

1  A.  Yes.  I believe they are very reliable.  And I might add

2  that they're probably, Your Honor, artificially low because, as

3  Dr. Henshaw cites in his textbook chapter, many patients do not

4  return for follow-up care.  And in his chapter, he cites only

5  one-third of the patients in some of the studies came back for

6  follow-up.  Well, patients who generally are lost to follow up

7  do not have a complication; because if they have a complication,

8  they call the clinic, they want their money back, they want the

9  clinic to pay for their hospital care or emergency room care.

10 We hear about those patients who have a complication requiring a

11 visit to the ER or to the emergency room.  So many of the

12 patients we don't hear back from or don't come back for follow

13 up were uncomplicated.  So that would increase the denominator,

14 and the actual complication rates would be much lower than those

15 published.  So I think that's a fair assumption.

16 Q.  And are you aware that the defendant's witnesses believe

17 that abortion complication rates in general are underreported?

18 A.  Yes.  They believe -- they say they are, but -- but I don't

19 think they are because patients who have complications are quick

20 to call the clinic wanting financial compensation for their

21 pain -- pain, discomfort, expenses going to the emergency room.

22 And there are many patients that on their own -- we give all

23 patients a sheet of paper with instructions what to expect, how

24 much bleeding, cramping, a 24/7 number to call us.  And -- and

25 there are patients that just get anxious.  They're having some

1    cramping.  They're bleeding a little more than they're

2    comfortable.  They don't call us.  They just go to the emergency

3    room and then incur expenses with that, where, in reality, if

4    they had called us, we would have encouraged them to come back

5    to the clinic the next morning.  And we would have evaluated

6    them there for free and taken care of the problem and reassured

7    them.

8    Q.  Dr. Fine, shifting gears a little bit, are you aware of any

9    other gynecological procedures done on an outpatient basis that

10   have risks that are similar to those of early abortion?  And I'm

11   focusing here on gynecological procedures.

12   A.  Well, diagnostic dilation and curettage, Your Honor,

13   diagnostic is where they'll actually dilate the cervix in a

14   nonpregnant uterus and remove the contents to rule out cancer or

15   some other problem that's causing abnormal heavy bleeding.

16   Spontaneous abortions are technically identical to an elective

17   abortion with a pregnancy that has bleeding and retained tissue

18   and the need to empty the uterus.  There are office

19   hysteroscopies performed, where they take a telescope and look

20   up inside the uterine cavity with a telescope looking for

21   abnormalities.  There are on office cystoscopies, where doctors

22   take a telescope and look up in the bladder.  In all of these

23   situations, there's a potential for poking a hole or perforating

24   the bladder or the uterus.

25   Q.  Dr. Fine, you made reference to spontaneous abortion.  Just

1   so that the record is clear, is that what we lay people would

2   think of as an abortion?

3   A.   I'm sorry?

4   Q.   What is a spontaneous abortion?

5   A.   Spontaneous miss -- spontaneous abortion or miscarriage is

6   that 13 to 15 percent of pregnancies where the -- either the

7   embryo is faulty or there's a problem with the lining of the

8   uterus; but basically, there is a miscarriage.  And the medical

9   term is spontaneous abortion.  The lay term is spontaneous

10  miscarriage.  And I should have used the term "miscarriage" for

11  clarity.

12  Q.   And can you explain -- can you compare the procedure that's

13  used to manage a spontaneous miscarriage in case of

14  complications with the procedure of an early surgical abortion?

15  A.   Management of the complications?  They're identical.  It

16  basically is very straightforward.  If there's tissue remaining

17  in the uterus, remove it.  If the uterus is -- the uterus is a

18  ball of muscle, Your Honor, and it contracts down, and that

19  stops bleeding.  And sometimes the uterus does not contract down

20  properly, and we give medications to cause it to contract down.

21  That occurs in miscarriage and abortion.

22       So we may give medications to cause the uterus to contract

23  down.  If there's an infection, we give antibiotics, generally

24  with antibiotic tablets on an outpatient basis.  But the

25  treatment and workup and evaluation is exactly the same for

1  spontaneous miscarriage and abortion.

2  Q.  And before we turn to management of the complications, I'd

3  like to stay for a moment with the nature of the procedures.  Is

4  there a particular procedure that's often used to -- to manage

5  the -- to manage complications from a spontaneous abortion?

6  A.  A procedure?  Generally, it's the same D&C as might be done

7  with an elective abortion, dilating the cervix if it's not

8  already dilated and emptying the contents of the uterus with

9  suction curettage.

10  Q.  And just so the record is clear, can you compare -- can you

11  explain what a D&C -- what does that stand for, what does that

12  procedure look like, and is it different in any way from the

13  procedures used for an early surgical abortion?

14  A.  D&C generally means dilating the cervix, which is stretching

15  the cervical opening, as we said earlier.  The nonpregnant

16  cervical opening, even in a pregnant uterus, is about the width

17  of a pencil lead.  And normally, we'll dilate the cervix up to

18  the size of a pencil to insert a tube into the uterus to

19  actually suction out the contents.  We might also use what's

20  called a curette, which has a dull blade, to actually scrape the

21  lining -- content of the uterus lining to remove it.  And that's

22  done in diagnostic D&Cs, where you want histologic or tissue

23  samples of the lining to rule out cancer in nonpregnant

24  patients.  But curettage can be suction or it could be with this

25  rough blade.  But there's no cutting.  There's no suturing.

1    Q.   Are you aware of any state that requires physicians who do

2    diagnostic D&Cs or surgical completion of miscarriages to have

3    admitting privileges?

4    A.   No.

5    Q.   Dr. Fine, is colonoscopy --

6    A.   In fact, I'm not aware of any procedure in medicine where

7    it's required by law that the physician performing that

8    procedure have admitting privileges.

9    Q.   Is colonoscopy a procedure that is commonly done on an

10   outpatient basis?

11   A.   Yes, it is.

12   Q.   And how do the risks of colonoscopy compare to the risks of

13   early abortion?

14   A.   Well, as we testified earlier, the risks of colonoscopy are

15   higher than that of abortion.  And it's also of interest, Your

16   Honor, that most of the physicians performing colonoscopy are

17   not surgeons; they are gastroenterologists, who are internal

18   medicine trained doctors.  And if they have a complication, such

19   as perforating the colon, which can occur, or bleeding after

20   removing a polyp, they have to call in a surgical colleague to

21   manage the complication.  They can't manage it themselves.

22   Q.   And you testified that the risks of colonoscopy are greater

23   than the risks of early abortion.  Can you be more specific?  I

24   can't remember if you gave those figures before, so I apologize

25   if you did.

```
 1   A.  Off the top of my head, I don't recall.  It's -- it's a low

 2   figure, but I believe it's in the range of maybe 1 percent, 2

 3   percent.

 4   Q.  And are you aware of any state's law that requires

 5   physicians who do colonoscopies to have admitting privileges?

 6   A.  No.

 7   Q.  Are you aware of whether procedures are sometimes done on an

 8   outpatient basis under general anesthesia?

 9   A.  Yes.  There are procedures done under general anesthesia.

10   Generally, these type procedures involve more invasiveness,

11   cutting, suturing, requiring more pain; and that's why they

12   require general anesthesia.  But they're more complicated.

13   They're more dangerous.  They're more invasive.  And that's why

14   general anesthesia is used.

15       General anesthesia can be used most commonly in ambulatory

16   surgery centers, but there is a trend in medicine for more

17   procedures to be done in the office.  And there are anesthesia

18   groups who contract with doctors' offices to come to their

19   office and provide the general anesthesia there in the office.

20   And so this is done more commonly as well.

21   Q.  And can you compare the risks of early abortion to the risks

22   of procedures that are done on an outpatient basis under general

23   anesthesia, broadly speaking?

24   A.  General anesthesia itself is one of the major reasons for

25   hospitalization after outpatient surgery.  And the reasons are
```

1  multiple, including lack of pain control.  Patients can have

2  intractable nausea or vomiting.  They can develop breathing

3  difficulties.  There are a lot of reasons why, after general

4  anesthesia, patients have to go into the hospital following

5  outpatient surgery.  And the incidence of that is much higher

6  than the hospitalization rate with abortion.

7  Q.  And turning for a moment to the underlying procedures that

8  are done under general anesthesia as opposed to the risks solely

9  from the anesthesia, can you compare that risk of the underlying

10  procedure to the risks of early abortion?

11  A.  Sure.  They're much higher.  Some of the gynecological

12  procedures that are done under general anesthesia in outpatient

13  surgery include laparoscopic and vaginal hysterectomy, which

14  used to require a three- or four-day hospital stay.  So the

15  risks are much higher.  There can be laparoscopic -- diagnostic

16  laparoscopy, Your Honor, is where they take a telescope, poke it

17  through the belly button and, with that telescope, look around

18  inside the abdominal cavity.  And they poke other instruments in

19  where they can actually do surgery, like cut scar tissue and

20  things like that, using a laparoscope.  That's done as an

21  outpatient surgery.

22     Those are more invasive.  And besides the risk of general

23  anesthesia, there's obviously much higher risk of hemorrhage and

24  infection when you're doing a hysterectomy or you're poking

25  sharp instruments through the abdominal wall, where you could

1   injure the bowel or other major blood vessels.

2   Q.  Dr. Fine, we've been talking about the rates of

3   complications from abortions.  Now I'd like to shift gears and

4   talk about what happens when a patient has a complication.

5   First, in the rare event where the complication is treated in

6   the hospital emergency room, when is the complication likely to

7   occur?

8   A.  It's going to occur hours to days after the procedure.  And

9   in the case of medication abortion, Your Honor, it will be 100

10  percent after the patient returns home because she doesn't take

11  that second pill to expel the contents until after she's

12  returned home, 24 to 36 hours after visiting the clinic.  In the

13  case of surgical abortion, generally the most common symptoms of

14  bleeding and cramping will start hours to days after the

15  procedure.  And that's also when the patient has returned home.

16  Q.  So you testified a moment ago that the most common symptoms

17  that prompt a woman to go to the emergency room are bleeding and

18  cramping.  What are the common causes of those symptoms?

19  A.  The most common causes of the bleeding and cramping can be

20  that a blood clot can form in the uterus.  Even though the

21  abortion is complete and all the tissue has been removed, the

22  uterus is a ball of muscle, it can relax, and a blood clot can

23  form in the uterus, preventing it from contracting down.  And

24  that causes bleeding.  There can be retained tissue, where

25  perhaps all the tissue was not expelled with a medication

1    abortion or with a pill -- second pill.  Or during a surgical

2    abortion, all the tissue may not have been removed.  And the

3    third thing might be infection that can cause bleeding and

4    cramping.  Those are the three most common reasons.

5    Q.  And are these complications also typical of any medical

6    situation other than abortion?

7    A.  Yes.  The exact same scenario occurs with spontaneous

8    miscarriage.

9    Q.  What are your patients directed to do if they are concerned

10   that they may be experiencing a complication from an abortion?

11   A.  As I said earlier, all of the patients are -- at all the

12   Planned Parenthood clinics and most of the abortion clinics are

13   given a fact sheet that they take home that tells them what to

14   expect in terms of bleeding and cramping and what to do for it

15   and also a 24/7 telephone number that they will be able to reach

16   someone from the clinic, who is generally a nurse who's on call.

17   And generally, the patient -- if she is worried about something

18   and needs reassurance or she's concerned about bleeding or

19   cramping, most of the time she will call the nurse on call.  As

20   I also said earlier, there are situations where the patient gets

21   anxious and she just goes directly to the local emergency room

22   nearest her house on her own accord, without contacting the

23   nurse on call.

24   Q.  In your experience, when you're speaking about the -- the

25   telephone number, the 24-hour telephone number where the patient

1    can reach the nurse on call, in your experience outside of the

2    Planned Parenthood world, are other abortion providers also

3    similar in using that system?

4    A.   Yes.   To my knowledge, they do.

5    Q.   And is that nurse in contact with the physician who provided

6    the abortion, if appropriate?

7    A.   Yes.

8    Q.   So can you walk the Court through.   A patient calls the

9    after hours number and describes the symptoms that she is

10   having.   What happens from that stage?

11   A.   The -- the nurse has a -- the nurse is trained.   She works

12   in the abortion clinic, and she's trained to ask specific

13   questions; for example, how much bleeding are you having?   And

14   generally, Your Honor, they'll -- they're try to put it relative

15   to normal menstrual bleeding that occurs in the first or second

16   day of the menstrual period.   Is it more, is it less, is it

17   equal?   How many pads are you using?   Cramping, have you tried

18   taking Advil or ibuprofen?   Has that helped?   Have you tried

19   lying down and putting a heating pad on?   Are you having nausea

20   and vomiting?

21        The nurse will make these assessments.   If it sounds like

22   it's not urgent, then most of the time, we will encourage the

23   patient to come back into the clinic the next day so we can

24   evaluate her and treat her for free.   And this evaluation and

25   treatment involves frequently doing an ultrasound to make sure

1    the uterus is empty; if she's been bleeding, checking her blood

2    count to see if she's anemic.  And these are things that are

3    done at the clinic easily without the physician being physically

4    on-site there.  If, however, on the phone call, it appears that

5    she's having excessive bleeding, more than a menstrual period,

6    passing clots, then she would general be instructed by the nurse

7    to go directly to the emergency room closest to where she is,

8    which is usually her home.  And then after that, the nurse will

9    generally advise the physician that she has advised that patient

10   to go to the emergency room.

11       Now, there may be gray areas where the nurse can't really

12   make the decision or isn't comfortable making it, and she will

13   contact the abortion physician and tell the situation, and the

14   abortion physician will make that decision whether the patient

15   should go to the emergency room right then or wait until the

16   next day to come to the clinic.

17   Q.  Now, I think your testimony on this was already clear; but

18   just to make sure, if there's any doubt in the nurse's mind of

19   what she should be doing, is that the point at which she would

20   be involving the physician?

21   A.  Yes.  Absolutely.

22          MR. DAVIS:  Your Honor, Dr. Fine can testify about --

23   if he's testifying about his experience in Texas at the clinics

24   there, of which he has personal knowledge, that's fine.  If he's

25   testifying about how protocols are designed to work, that's

1  fine.  If he's attempting to testify about how these procedures

2  are working in Alabama clinics, I object, because I don't think

3  it's been established that he has personal knowledge of whether

4  the rules are actually working that way on the ground.

5          THE COURT:  That's something you can bring out on cross

6  as to the extent of his personal knowledge and the extent that

7  he can testify about these matters.

8          MR. DAVIS:  Thank you.

9          THE WITNESS:  Could I make a comment about that, Your

10  Honor, or no?

11          THE COURT:  Why don't you wait for a question.

12          THE WITNESS:  Okay.  Okay.

13  Q.  (Ms. Sandman, continuing:)  Let's focus now on patients who

14  call the after-hours number and are advised to go to the

15  emergency room.  First, if one of your patients calls the number

16  and is told to go to the emergency room, are you informed?

17  A.  Generally, yes.

18  Q.  And can you speak more about that.

19  A.  Well, the nurse will call me and say, Patient X called.  She

20  was having bleeding with clots, very heavy bleeding, and that

21  she tried lying down, hasn't eased up; it's been going on for a

22  couple of hours.  I advised her to go to the local emergency

23  room.  I said, that is the correct thing to have done.

24  Q.  And so for the woman who calls the after-hours number and is

25  experiencing a very serious complication, just to be very clear,

1  where would you tell her to go?

2  A.  To the emergency room closest to her home.

3  Q.  And in your experience, do your patients always live near

4  the health center where they had the abortion?

5  A.  No, they do not.  Most of the time, they live an hour or

6  more away.

7  Q.  And can you speak a little bit more about the patterns that

8  you have observed in terms of patients traveling to access

9  abortion care?

10  A.  Well, the -- there's a shortage of abortion providers in

11  this country and fewer abortion clinics.  And patients are

12  generally driving longer distances to access abortion care,

13  including crossing state lines.  Now, for example, in Planned

14  Parenthood of the Gulf Coast, where I am, it's in the middle of

15  downtown Houston; but many of the patients live in suburbs that

16  are more than an hour drive away from our clinic.  And I don't

17  know if you want me to mention about the Rio Grande Valley or --

18  you know --

19  Q.  We'll get to that later.

20  A.  Okay.  It's not uncommon for women to have to drive more

21  than an hour to access an abortion clinic.

22  Q.  Dr. Fine, if one of your patients -- if you send one of your

23  patients by telephone to the emergency room, does there come a

24  point in time when you contact her?

25  A.  That I would contact --

1   Q.   The patient.

2   A.   Our clinic -- if we sent a nurse (sic) to the emergency

3   room, our clinic would attempt to contact the patient the next

4   day to see how she's doing, to encourage her to come back into

5   the clinic to be evaluated as necessary.  I personally would not

6   make that call.

7   Q.   To be clear, you testified earlier that most complications

8   that lead to treatment at a hospital arise some hours or days

9   after the patient has left the health center, so she's likely to

10  be at home.

11  A.   Correct.

12  Q.   Would you recommend that such a patient go to a hospital

13  near the health center where she got the abortion?

14  A.   No, not if she lives an hour away.  If she's having heavy

15  vaginal bleeding, she needs to go to the closest emergency room.

16  Q.   I'd like to focus now on what happens once the woman gets to

17  the emergency room.  You testified earlier that while

18  complications that require treatment at a hospital are rare, the

19  most common are bleeding and infection.  How would bleeding be

20  treated?

21  A.   Bleeding would be treated by evaluation with an ultrasound

22  to see if there's any retained tissue that needs to be removed.

23  And if there's not, then medications would be given to cause the

24  uterine muscle to contract.  They would also check the blood

25  count to see if the patient has been bleeding so much that she's

1  now becoming severely anemic and might need a blood transfusion.

2  Most of the time when the patient presents to the emergency

3  room, everything is fine, she's reassured.  And the emergency

4  room doctor tells her to follow up with the clinic the next day.

5  Q.  And the treatment that you testified to a moment ago for

6  bleeding, is this a process that emergency room physicians are

7  familiar with?

8  A.  Yes.  They're very familiar with.  Emergency room physicians

9  are trained to handle spontaneous miscarriages.  And the

10  treatment of abortion complications is identical to that for

11  spontaneous miscarriages.  As I said, 13 to 15 percent of

12  pregnancies end in first trimester miscarriages.  So it's a

13  common event, something emergency room doctors would frequently

14  see.

15  Q.  You testified earlier that the most common complications are

16  bleeding and infection.  How would infection be treated?

17  A.  Generally with antibiotic tablets.

18  Q.  And just -- just to be clear, when you say tablets, meaning

19  oral medication?

20  A.  Oral pills, yes.

21  Q.  Would the patient typically be admitted to the hospital for

22  that?

23  A.  Rarely.  In the situation where it was a severe infection,

24  high fever, severe symptoms, then they might admit the patient

25  to have intravenous antibiotics, but most of the time, oral

1  pills.

2  Q.  And in that situation, the patient would be treated at the

3  emergency room and released?

4  A.  Yes.  Sent home and instructed to follow up with the clinic

5  the next day.

6  Q.  Dr. Fine, speaking about the treatments that you just

7  testified to for infection, are these treatments that an ER

8  doctor is trained to provide?

9  A.  Yes.

10  Q.  And are these also complications -- infection, just to be

11  clear, is also a complication that would arise in the context of

12  a spontaneous miscarriage?

13  A.  Yes.  More commonly than with -- more commonly a miscarriage

14  than abortion because often the diagnosis is delayed.  The

15  patient may not have known she was pregnant, may have delayed

16  seeking care.

17  Q.  Dr. Fine, let's take the example of the patients that you

18  treat in your current practice.  Suppose that you have advised

19  one of your patients to go to the emergency room based on the

20  symptoms that she has described over the telephone.  Would you

21  meet her there yourself?

22  A.  No.

23  Q.  Would you treat her?

24  A.  No.

25  Q.  And is that the case even if you had privileges at the

1  hospital where she is?

2  A.  Correct.

3  Q.  Would you be the one to admit her if she needs to be

4  admitted?

5  A.  No.

6  Q.  Who would be the person to admit her?

7  A.  The gynecologist on call at the hospital; or if it's in the

8  case of the hospital where I have privileges, it would be one of

9  my fellow faculty members who is on call in the hospital.

10 Q.  How many doctors have privileges of some sort at the

11 hospital where you have privileges?

12 A.  Well, mine is a large city hospital run by a university, so

13 there are about -- probably 400 doctors on staff there.

14 Q.  Do you know all of those doctors?

15 A.  I know very few of them.

16 Q.  Do you know all of the emergency doctors?

17 A.  I know none of them.

18 Q.  Do you think that your communication with the doctors that

19 you know is better than with -- your communication with the

20 doctors that you do not know?

21 A.  No.  It's the same.  Doctor-to-doctor communication involves

22 giving a summary of medical events that are very precise and

23 don't require a personal relationship or personal cognizance.

24 It's very straightforward.  The only difference with a

25 communication with a doctor who I might know personally is that

1  he might ask, well, how's the wife, how's the children, which

2  would not occur doctor to doctor in a stranger, where I don't

3  know the doctor.

4  Q.  Dr. Fine, is it standard in medicine to talk to other

5  physicians that you do not know about your patients?

6  A.  Absolutely.  Doctors do it every day when they -- when they

7  consult a specialist for a problem to get help in the care of

8  their patient.  Doctors all the time are talking to people they

9  don't know -- doctors they don't know.

10  Q.  In your experience when you've been providing care in a

11  hospital, have you seen and treated patients in the emergency

12  room with complications from outpatient surgeries?

13  A.  Yes, I have.

14  Q.  And do you always communicate with the doctor who performed

15  the surgery?

16  A.  Almost never.

17  Q.  And why is that?

18  A.  Because there's no information that he could give me that

19  would change the way I'm going to evaluate and manage the

20  patient.  It's very straightforward.

21  Q.  Defendant's witnesses have expressed concerns that providers

22  travel from out of state to perform abortions.  Do you share

23  these concerns?

24  A.  Absolutely not.  These traveling abortion providers, that's

25  all they do.  And because they do a high volume of procedures,

1    they're technically excellent, with a very low complication

2    rate.  Clinics don't want to have to pay to fly in physicians to

3    perform abortions at their clinic.  And as I said, there's a

4    nationwide shortage of abortion providers.  I think at last

5    count, Your Honor, there were something like 1700 abortion

6    providers in the country.  So for clinics to operate, there are

7    no local providers who are willing to perform abortions.  They

8    have to fly physicians in to perform them.  And these are --

9    maybe OB-GYN physicians, or they may be family practice trained

10   physicians, but they're technically excellent.

11   Q.  And just to be clear, if a patient has a complication hours

12   or days off the abortion procedure, is the process, from the

13   patient perspective, any different if her doctor is in state or

14   out of state?

15   A.  No difference whatsoever.  Out-of-state doctors can easily

16   be reached on their cell phone.  All the cell phones are

17   nationwide.  They're not a long distance call.  Everyone carries

18   a cell phone.  And the -- contacting the abortion provider is as

19   easy as across the street, across the county, or three states

20   away.

21   Q.  So is there any increased risk to the woman if the doctor

22   who performed the abortion has left the state to go back to

23   where he or she lives?

24   A.  Absolutely no risk.

25   Q.  Defendant's witnesses have also expressed concerns that

1    women may hide the fact that they've had an abortion from the

2    doctor in the emergency room.  Do you share this view?

3    A.  I think most of the time, with abortion being legal now,

4    unlike the back-alley ones, women do not try to hide it.  Now,

5    certainly, it's conceivable that for whatever reason, a woman

6    may want to keep the information from getting public, and they

7    may not disclose that information.  But as I testified earlier,

8    the -- then the assumption would be that she's having a

9    spontaneous miscarriage problem, and the treatment is exactly

10   the same.  So her failure to disclose that she had an abortion

11   and that she would be treated like a spontaneous miscarriage,

12   the treatment is the same.  She would still get good care.  And

13   then the fact that she didn't disclose she had an abortion would

14   not adversely affect the care that she got.

15   Q.  Now, you testified a moment ago that in your experience,

16   most women do not hide the fact that they've had an abortion if

17   they're presenting to the emergency room.  Why is that?

18   A.  Well, the -- as I also said earlier, these patients are

19   given an information sheet with a 24/7 number.  They're also

20   encouraged and told by the nurse on call when you go to the

21   emergency room, bring that sheet of paper; that tells the

22   emergency room what medicines you've been given and instructions

23   you've been given.  And in the event they should want to contact

24   us for any reason, they'll know how to do it.  So they're given

25   that sheet of paper to bring to the emergency room.  And by

1    their bringing that sheet of paper, they're, in essence,

2    disclosing that they had a pregnancy abortion, termination.

3    Q.  Good.  Dr. Fine, would it be helpful to an emergency room

4    physician to speak with the abortion provider prior to providing

5    care to the patient?

6    A.  No.  No need.

7    Q.  And if an ER physician needs a consult with an on-call

8    OB-GYN, would such a person be available?

9    A.  Yes.  Every community hospital that has a gynecology

10   service, every specialty department within that hospital, by

11   federal law, has to have a physician on call for unassigned

12   patients who come to the emergency room.  And they have to be

13   available to respond to the emergency room within 30 minutes.

14   Q.  So just to be clear, is it likely to introduce delays to the

15   patient's care if the emergency room physician has to consult

16   with the on-call OB-GYN?

17   A.  No.  Because the emergency room physician is going to

18   immediately start doing what needs to be done.  And generally,

19   the on-call OB-GYN is readily available, again, by law.

20   Q.  One final question on this topic.  In your experience, if a

21   woman goes to a hospital for an abortion complication, does that

22   indicate that the complication was serious?

23   A.  No.  As I said earlier, many patients get nervous when they

24   have cramping and bleeding and they go to the emergency room

25   without talking to the nurse on call.  And basically, their

1  examination in the emergency room is normal.  They're reassured,

2  and they're told to follow up with our clinic.  The vast

3  majority of complications in women that present to the emergency

4  room are either normal, or those that do have a problem are

5  treated in the emergency room with antibiotics and with pills

6  and released home.  They're not admitted to the hospital.

7  Q.  Dr. Fine, before we move on to the next topic, I just wanted

8  to ask you to go back to a moment -- to one -- one item in your

9  earlier testimony.  You testified that there would be no

10  difference in the patient's care depending on -- for telephone

11  follow-up depending on whether their provider was in state or

12  out of state.  Is that also the case if the woman -- if the --

13  if a backup doctor, rather than the doctor who provided the

14  abortion, is the person available for consultation on the

15  telephone, if appropriate?

16  A.  No.  The evaluation that's common in all OB-GYN practices is

17  that there's a physician on call, who may not be the physician

18  who treated that patient.  Because the abortion complications

19  and spontaneous miscarriage are similar and common, it's very

20  straightforward for the physician on call covering for the

21  abortion doctor to make that determination and evaluate the

22  patient.  It doesn't need to be the abortion provider.  It can

23  be any physician on call.

24  Q.  Let's focus now on the situation where a woman experiences a

25  complication at the health center that requires transfer to a

1  hospital.  First, how common are such situations?

2  A.  Very rare.  Very rare.  Maybe one in a thousand.

3  Q.  How many times has this occurred in your years of providing

4  abortions?

5  A.  In over 40 years, it's happened twice.  Now, there are two

6  reasons why, Your Honor, hospital transfers from the clinic

7  occur.  The more common one is because the patient may have had

8  bleeding that is now stopped or controlled, but she lives

9  several hours away and we're uncomfortable sending her home.  We

10 would rather have her observed in a hospital setting over the

11 next 23 hours in case the bleeding might recur.  That uterine

12 muscle that contracted down and stopped the bleeding, it could

13 later relax again and cause excessive bleeding.  So many of the

14 patients that are transferred by ambulance from a clinic to a

15 hospital are really precautionary, to observe the patients.

16 But -- and there are situations where a uterine perforation

17 occurs or even giving the medications to cause the uterus to

18 contract, it still bleeds excessively, and transfer by ambulance

19 from the clinic to the hospital is required.  In my personal

20 career, twice in 40 years.

21 Q.  In the very rare case that this comes up, can you just walk

22 the Court through what the process would be.

23 A.  Well, basically, when the need is determined to -- to call

24 an ambulance -- and by the way, we would normally call them

25 earlier than later, because we don't want to wait until the

1  patient goes into shock or is losing blood pressure to call for

2  the ambulance.  If we're not controlling the bleeding, we want,

3  early on, to get that patient to a hospital to manage it there.

4      So we would call 911, and the -- the EMS teams and

5  paramedics would come to the hospital.  Now, during that time,

6  we'll have had an IV in the patient and been doing all the

7  things we would normally do.  While the ambulance is coming --

8  which typically, response times may be five to 12 minutes -- we

9  will copy the patient's medical record from our clinic so that

10  the patient will take that with her to the receiving doctor.  In

11  the meantime, we will generally request that -- if it's at our

12  place, Gulf Coast, we would request the ambulance to take the

13  patient to Ben Taub Hospital, which is our faculty university

14  hospital.  It's a tertiary care center.  And it's staffed by

15  residents and faculty.  And it's an excellent, excellent

16  hospital.  So -- excuse me -- that's where I'd want the patient

17  transferred.  Not always would the patient get taken to the

18  hospital that we ask, but we would ask that.  But the patient

19  would have her clinic record with her.

20  Q.  And do you have admitting privileges at Ben Taub Hospital?

21  A.  Yes, I do.

22  Q.  And is that why you would request the EMTs to take the

23  patient there?

24  A.  No.  I'd want the patient taken there because it's an

25  excellent hospital.  It's a tertiary care center staffed by

1  faculty and residents, and they practice cutting-edge medicine.

2  Q.  Would the EMTs necessarily follow your suggestion?

3  A.  Not always.  Not always.  And the patient -- heavy vaginal

4  bleeding scares paramedics.

5           THE COURT:  Scares what?

6           THE WITNESS:  Scares the EMT paramedics.  If you have

7  somebody with a bad laceration to the leg, Your Honor, they're

8  comfortable putting pressure on there, and they can control the

9  bleeding.  If you have a woman having heavy vaginal bleeding

10  with a miscarriage or abortion, they can't do a pelvic exam.  It

11  makes them extremely nervous.  And in that situation, they're

12  going to stop at the local hospitals.  And there are several

13  hospitals a little bit closer than Ben Taub.

14           THE COURT:  Let me know when you find a good stopping

15  place.  It's 10:30.

16           MS. SANDMAN:  Thank you, Your Honor.  I'll do just a

17  few more questions, and I'll wrap up.

18           THE COURT:  Pardon me?

19  Q.  (By Ms. Sandman, continuing:)  Dr. Fine, do you know how

20  EMTs determine where to take a patient?

21  A.  I'm sorry.  Repeat?

22  Q.  Do you know where -- excuse me.  Do you know how EMTs

23  determine where to take a patient?

24  A.  Generally, it's by protocol.  If at all possible, if the

25  patient is stable -- and by the way, I'm familiar with the

1  Alabama regulations regarding transfer that state that the EMTs

2  or the doctor on call cannot override a decision by the family

3  to go to a particular hospital unless, however, the patient is

4  unconscious or unstable.  So generally, if the patient is

5  unstable, the EMTs are going to go to the closest emergency

6  room.  If the patient is stable, they'll try to abide by the

7  wishes of the family, who may want a particular hospital because

8  they have insurance coverage there, it's in their network, or

9  they've had a good experience or a friend had a good experience

10  with that hospital.

11      There are also logistical concerns that if the particular

12  hospital is preferred, even in a stable patient, is an hour away

13  and the city only has two ambulances on call or sometimes one

14  ambulance on call, that puts that ambulance out of service while

15  they take that patient to the hospital an hour away.  So they

16  may -- the paramedics may make the decision, we just can't take

17  the patient to the hospital you want because that puts the

18  community at risk because the ambulance won't be available.

19  Q.  And in your experience, do EMTs take into consideration

20  whether the doctor making the transfer has privileges at a

21  particular hospital?

22  A.  No, they don't.  Generally, we might request a specific

23  hospital; but again, they may not take it to that hospital.

24          MS. SANDMAN:  Your Honor, this is a good place for

25  break.

1              THE COURT:  We'll take a 15-minute morning break.

2        (Recess at 10:34 a.m. until 10:53 a.m.)

3              THE CLERK:  Please remain seated.  Court is in session.

4              THE COURT:  Proceed.

5              MS. SANDMAN:   Thank you, Your Honor.

6    Q.  So Dr. Fine, you've been testifying about the process by

7    which EMTs would choose which hospital to take a patient to in

8    the very rare event of an emergency transfer.  In your

9    experience, what happens once the patient gets to the hospital

10   after an emergency -- an emergency transfer?

11   A.  She's evaluated promptly by the emergency room physician.

12   Q.  And what would the process be if any specialist is needed?

13   A.  The emergency room physician would call for the OB-GYN on

14   call for the hospital.  And --

15   Q.  Take the very --

16   A.  -- in the larger university hospitals, there would be

17   somebody in-house.

18   Q.  Take the very rare example of a patient who needs a

19   laparotomy or a hysterectomy as a result of an abortion

20   complication.  Suppose that her abortion provider has privileges

21   to do these procedures.  Would that abortion provider be the

22   best doctor to provide that care?

23   A.  Absolutely not.  Just like the abortion doctor is proficient

24   doing abortions because he does a lot of them, an abortion

25   provider who may have done one hysterectomy in three years is

1   not the person to take care of the patient.  You would want to

2   use an OB-GYN doctor in practice who does three or four

3   hysterectomies every week.

4   Q.  Dr. Fine, is it possible that a patient would be transferred

5   to a hospital without an on-call OB-GYN?

6   A.  No.  Because the emergency -- the EMTs know within their

7   service area which hospitals have emergency rooms and have

8   OB-GYN units.  Now, to clarify, you don't have to have a labor

9   and delivery to take care of a spontaneous abortion.  All

10  community hospitals have gynecology services because gynecology

11  makes money for the hospital, so there's always a gynecologist

12  on call.  And gynecologists on call, even though they might not

13  practice obstetrics, are trained, as an OB-GYN, to handle

14  spontaneous miscarriages and abortion complications.

15  Q.  Dr. Fine, would a patient get faster care if her doctor has

16  admitting privileges at the hospital where she's treated?

17  A.  Absolutely not.

18  Q.  Why not?

19  A.  Because there's a triage system that's used in the emergency

20  room, in all emergency rooms, and the sickest patients go first.

21  And if it's determined the patient needs to have surgery in some

22  of these smaller community hospitals, they only have one

23  operating room.  If that operating room is occupied by an

24  emergency appendectomy ongoing, then even if the patient needs

25  emergency surgery, they have to wait their turn in line.

1  Q.  And just to be clear, having a doctor with admitting

2  privileges at that hospital won't allow the patient to somehow

3  jump in line?

4  A.  No.

5  Q.  Typically, how quickly are patients seen by a physician when

6  they arrive at the emergency room?

7  A.  Well, they're triaged.  And if it's an ambulance transfer,

8  they would be seen within a couple of minutes.  If it's a

9  walk-in patient with a problem, they would be triaged by the

10  triage nurse.  And depending on that, it might be a few minutes,

11  or it might be half an hour if it wasn't an urgent problem.

12  As --

13  Q.  Doctor --

14  A.  Excuse me.  As you know, unfortunately, the emergency room

15  is the local community health center for many people who go to

16  the emergency room with colds and coughs and nonemergent

17  conditions.  So there is crowding in emergency rooms; and,

18  unfortunately, wait times can be long.  But in true emergencies,

19  the triage nurse makes sure that the ER doctor is aware and sees

20  the patient as quickly as possible.

21  Q.  Dr. Fine, I've asked you a lot of specific questions about

22  admitting privileges and the treatment of abortion

23  complications.  Let me ask a broader question.  Are hospital

24  privileges in any way beneficial to the treatment an abortion

25  patient receives at the hospital?

1    A.   No.

2    Q.   Are you familiar with the organization ACOG?

3    A.   Yes, I am.

4    Q.   And can you explain what that acronym stands for and what

5    the organization is?

6    A.   It's the American Congress of Obstetricians and

7    Gynecologists.  It's composed of about 47,000 board-certified

8    OB-GYNs in the country.  I'm a fellow of ACOG.

9    Q.   And does ACOG issue medical guidelines?

10   A.   Yes.  They issue medical bulletins, committee opinions on a

11   regular basis.  And those are highly regarded, almost like a --

12   a tablet of Ten Commandments.  It's the -- it's the ultimate

13   authority if ACOG gives an opinion on something.

14   Q.   Dr. Fine, do you know whether ACOG has issued a guideline on

15   how complications should be handled by physicians providing

16   abortions on an outpatient basis?

17   A.   Yes, they have issued that.

18   Q.   I'd like to turn your attention to the tab in your binder

19   marked ACOG guidelines.  And that's right after the Cleland

20   article.

21   A.   Okay.

22   Q.   Do you recognize that document?

23   A.   Maybe I don't have it.  Yes.  Guidelines for Women's Health

24   Care Resource Manual, Third Edition, by the ACOG.

25   Q.   Directing your attention to page 433, the third full

1  paragraph, could you read the first sentence of the third full

2  paragraph?

3  A.   Clinicians who perform abortions in their offices, clinics,

4  or freestanding ambulatory care facilities should have a plan to

5  provide prompt emergency services if a complication occurs and

6  should establish a mechanism for transferring patients who

7  require emergency treatment.

8  Q.   Dr. Fine, does this guideline suggest that doctors providing

9  abortions on an outpatient basis should have admitting

10  privileges?

11  A.   No.

12  Q.   Are you familiar with the organization the National Abortion

13  Federation?

14  A.   Yes, I am.

15  Q.   And what is that organization?

16  A.   National Abortion Federation is an organization that's

17  composed of abortion providers and experts in reproductive

18  medicine, and also clinics are members.  And it's a national

19  organization that is highly respected and puts -- also puts out

20  clinical guidelines that are highly respected.

21  Q.   And do you know whether the National Abortion Federation has

22  issued a guideline on how complications should be handled by

23  physicians providing abortions on an outpatient basis?

24  A.   Yes, they have issued guidelines.

25  Q.   Please turn to the tab marked NAF policy guidelines in your

1  binder.

2  A.   Yes.   2014 Clinical Policy Guidelines.

3  Q.   I'm directing your attention to page 44, Emergency

4  Procedures.   Could you read Standard 2?

5  A.   If I'm in the right NAF guidelines.

6  Q.   It's page 44.

7  A.   It's in the back.   Okay.

8  Q.   Could you read Standard 2.

9  A.   Standard 2.   Protocols for the management of medical

10  emergencies must be in place.   These protocols must include

11  indications for emergency transport and written, readily

12  available directions for contacting external emergency

13  assistance; example, an ambulance.

14  Q.   Dr. Fine, does this guideline suggest that doctors providing

15  abortions should have admitting privileges?

16  A.   No, it does not.

17  Q.   Are you aware of whether ACOG has addressed the question of

18  admitting privileges in abortion services more directly?

19  A.   They have.

20  Q.   Please turn to the tab in your binder marked for

21  identification as Exhibit 67, labeled ACOG statement.   Do you

22  recognize this document?

23  A.   Yes, I do.

24  Q.   And what do you recognize it to be?

25  A.   This is dated April 25th, 2013, Statement on State

1  Legislation Requiring Hospital Admitting Privileges For

2  Physicians Providing Abortion Services.

3  Q.  Dr. Fine, could you please read the second-to-last sentence

4  in the first paragraph?

5          MR. DAVIS:  Your Honor, we have objected to this

6  document on grounds of hearsay.

7          THE COURT:  Okay.  Let me see the document.

8          Now, let me hear your grounds.

9          MS. SANDMAN:  I'm sorry, Your Honor.  I did not hear

10  that.

11          THE COURT:  Let me hear the grounds.

12          MR. DAVIS:  The ground, Your Honor, this is a statement

13  by an organization who is not here to call to testify.  They are

14  seeking to -- well, it's a hearsay objection, Your Honor, an

15  out-of-court statement.

16          MS. SANDMAN:  Your Honor, would the Court like me to

17  speak to that?

18          THE COURT:  Let me read it first.

19      (Brief pause)

20          THE COURT:  Okay.  Now I'll hear your response to the

21  objection.  It's that this document is hearsay.

22          MS. SANDMAN:  Your Honor, Dr. Fine has already

23  testified that ACOG is the leading professional organization in

24  the field of abortion care.  So this is a reasonable document

25  for experts in his field to rely on in terms of its judgment

1  concerning the benefits of admitting privileges.

2        THE COURT:  So you wish to admit it as a document

3  relied upon by an expert?  I assume that expert being the

4  witness.

5        MS. SANDMAN:  I'm sorry, Your Honor?

6        THE COURT:  I assume that expert being the witness.

7        MS. SANDMAN:  Correct.

8        THE COURT:  Is that your reason?

9        MS. SANDMAN:  That is my reason.

10        THE COURT:  What's your response?

11        MR. DAVIS:  If that's the reason here, Judge.  I don't

12  recall him relying on the statement in the expert opinions that

13  have been disclosed to us, but I could be mistaken.

14        THE COURT:  I couldn't hear you.  You said what?

15        MR. DAVIS:  If in fact this is one of the grounds that

16  Dr. Fine -- one of the -- part of the material Dr. Fine relied

17  on in the opinions that were disclosed to us, then I withdraw my

18  objection.  I don't recall this being something he relied on in

19  his report.

20        THE COURT:  Well, do you want to cross him on that

21  issue?

22        MR. DAVIS:  I can.

23        THE COURT:  Pardon me?

24        MR. DAVIS:  I can cross him on that issue, Your Honor.

25        THE COURT:  Okay.  Very good, then.  We'll allow it in

1  subject to him being crossed on whether he relied on it, or you

2  can bring it out right now.

3  Q.  (By Ms. Sandman, continuing:)  Dr. Fine, do you recall

4  whether you relied on the ACOG statement in your expert report?

5  A.  I believe I did.

6  Q.  You can refresh your recollection with the report if you'd

7  like to.

8      (Brief pause)

9  A.  On page 10 of that document, under facts or data considered

10 in forming my opinions, is this document listed, American

11 Congress of Obstetricians and Gynecologists Statement on State

12 Legislation Requiring Admitting Privileges for Physicians

13 Providing Abortion Services, April 25th, 2013.

14 Q.  Thank you, Dr. Fine.  Dr. Fine, could you please read the

15 second-to-last sentence in the first paragraph.

16 A.  For example, ACOG opposes laws or other regulations that

17 require abortion providers to have hospital admitting

18 privileges.  ACOG also opposes facility regulations that are

19 more stringent for abortion than for other surgical procedures

20 of similar low risk.

21 Q.  Thank you, Dr. Fine.  Dr. Fine, are you aware of whether

22 ACOG has addressed the question of admitting privileges and

23 medication abortion specifically?

24 A.  I believe they have.

25 Q.  Please turn to the next tab in your binder, labeled ACOG

1    Medication Abortion Statement.  Do you recognize that statement?

2    A.  Yes.  The American College of Obstetricians and

3    Gynecologists' Analysis of the Possible FDA Mifepristone --

4    Analysis of the Possible FDA Mifepristone,

5    M-I-F-E-P-R-I-S-T-O-N-E, Restrictions, July 27, 2000.

6    Q.  Directing your attention to page 3, please read the first

7    sentence.  That's the sentence starting, Privileges at a

8    hospital.

9    A.  Privileges at a hospital are not necessary for prescribing

10   mifepristone, M-I-F-E-P-R-I-S-T-O-N-E, safely.  The complication

11   rates for mifepristone are very low, with a small number of

12   patients requiring emergency room care or hospitalization.

13   Q.  Dr. Fine, just so the record is clear, when you say

14   mifepristone, is that the same thing, in your mind, as

15   medication abortion?

16   A.  Yes.  Mifepristone is the abortion pill, or ru486, that's

17   taken in the clinic.

18   Q.  Dr. Fine, please also read the second paragraph, starting,

19   The prescribing physician.

20   A.  The prescribing physician does not need to be in the

21   emergency room or to be the admitting physician if a patient

22   requires follow-up emergency care.  Women experiencing

23   miscarriages and spontaneous abortions frequently require the

24   same services and care and appropriately receive this care at

25   their physicians' offices.

1  Q.   Finally, Dr. Fine, are you familiar with the American

2  Medical Association?

3  A.   Yes, I am.

4  Q.   And what is the American Medical Association?

5  A.   That's the largest national organization of doctors in the

6  country.  And it's composed of doctors and medical students.

7  Q.   And are you aware of whether the American Medical

8  Association has addressed the question of whether it is

9  medically appropriate to require doctors providing abortions to

10  have admitting privileges?

11  A.   They have.

12  Q.   Please turn to the tab marked AMA amicus in your binder.  Do

13  you recognize that document?

14  A.   Yes, I do.

15  Q.   And what is it?

16  A.   This is an amicus brief in the Texas case, where the ACOG,

17  the American Congress of OB-GYN, and the American Medical

18  Association filed a brief in support of opposing the need for

19  admitting privileges.

20  Q.   So just so the record is clear, this is a formal statement

21  by the American Medical Association opposing the admitting

22  privileges requirement in the context of abortion care?

23  A.   Correct.

24  Q.   Dr. Fine, are you aware that one of Planned Parenthood's

25  physicians who provides abortions is a family medicine doctor,

```
1   not an OB-GYN?

2   A.  Yes.

3   Q.  In your opinion, does a physician who needs -- excuse me.

4   Does a physician need to be an OB-GYN in order to provide

5   abortion care?

6   A.  No, they do not need to be an OB-GYN.  There are many family

7   physicians who perform abortion services in this country.  And

8   I'm aware of all the medical directors within Planned

9   Parenthood, all of who are abortion providers.  Approximately 25

10  percent, Your Honor, are family medicine trained.  They are not

11  OB-GYNs.  And they provide excellent abortion care with low

12  complication rates.

13  Q.  Can you explain the nature of the family medicine

14  speciality?

15  A.  Family medicine speciality is basically what the old GP used

16  to be, general practitioner, where they take care of everything,

17  primary care in teenagers and adults.  They don't do pediatrics.

18  And generally, if they need a specialist, then they call for

19  consultation; but they're the primary care provider.  And they

20  treat hypertension, diabetes, medical conditions, in addition to

21  providing abortions in some cases.

22  Q.  And are you aware of whether some family medicine doctors

23  obtain particular training and expertise in the provision of

24  abortion care?

25  A.  Yes, they do.  In fact, there is -- are fellowships in
```

1    family planning across the country.  There are about -- at least

2    30 of them, I believe, and growing -- the number growing.  It's

3    a two-year fellowship.  And both OB-GYNs and family medicine

4    physicians can take this two-year fellowship during which there

5    is formal abortion training.

6    Q.  Is there any clinical benefit to having an OB-GYN rather

7    than a family medicine doctor provide abortion care?

8    A.  No, none at all.

9    Q.  And do family medicine doctors provide laparotomies or

10   hysterectomies?

11   A.  No, they do not.  They're not -- they're not trained to do

12   that.

13   Q.  Dr. Fine, I'd like to change topics now and talk about

14   questions relating to the process of applying for admitting

15   privileges.  Based on your experience, can you talk about the

16   kind of factors that hospitals take into consideration when

17   deciding whether to grant privileges to a particular physician?

18   A.  Yes.  There are several factors they take into account.  One

19   is geographic, does the physician reside in the community where

20   the hospital is located.  And two, is the physician competent

21   and experienced in performing the procedures for which he wants

22   to perform or is requesting to perform at their hospital.  And

23   they're also concerned, along with that, to show competence, how

24   many of those procedures have they performed in the last couple

25   of years.

1  Q.  And from your experience, do hospitals have a stake from the

2  perspective of their own interest in what doctors they want to

3  grant privileges to?

4  A.  Sure.  Hospitals want doctors that will admit lots of

5  patients to their hospital for economic reasons.  They're very

6  interested in that.  If there's a physician who is from out of

7  town or who -- who, during the course of the last few years, has

8  hardly admitted anybody to any hospital, then they're not going

9  to grant admitting privileges.  They want doctors who are going

10  to generate income for the hospital.

11  Q.  Dr. Fine, are these requirements that you've been speaking

12  of related to quality of care?

13  A.  Not necessarily.  Now, quality of care certainly is

14  measured, and it's important.  And quality of care can be

15  measured by the numbers of procedures that a physician has done.

16  But there are physicians who are on hospital staffs who are

17  excellent technical, high-volume surgeons that do a lot of

18  hysterectomies, do a lot of surgeries; but they also have a lot

19  of potential complications, such as poor surgical judgment, not

20  recognizing complications when they occur, and poor follow up.

21      And typically, these hospitals, by peer review, tolerate

22  this because the doctor is admitting a lot of patients for the

23  hospital.  It's an income producer.  They do peer review, and

24  they document it, and they try to address it; but basically, the

25  doctor gets slapped on the wrist.

1  Q.  Dr. Fine, is there a reason that a doctor would not want to

2  apply for privileges if she believes that she won't be granted

3  privileges?

4  A.  Sure.  It's required that if a physician either applies for

5  admitting privileges to a hospital and is formally declined or

6  she submits an application and is later able to withdraw it, she

7  needs to disclose this fact on future applications for hospital

8  admission privileges.  And more specifically, if the hospital

9  formally revokes the application or refuses, that has to go in

10  the national data bank.  So it's basically a black mark on the

11  physician's professional record.

12  Q.  Dr. Fine, you testified a moment ago that this would be the

13  case that a doctor could have to report it in a future

14  application for privileges or licensure, even if she voluntarily

15  withdrew an application for privileges.  Can you speak further

16  to that?

17  A.  Yes.  The onus is on full disclosure.  The physician must be

18  open and transparent in doing this because if, in a future

19  application, they find out that she has not provided full

20  disclosure, that could work against her in getting future

21  privileges at another hospital.

22  Q.  When a doctor applies for privileges --

23  A.  And by the way, many of the hospital applications

24  specifically ask have you been denied or have you withdrawn an

25  application for privileges at another hospital.

1  Q.  When a doctor applies for privileges, can she be confident

2  that she would even be given the opportunity to voluntarily

3  withdraw her application before getting a formal denial?

4  A.  No.  More often than not, she would not be given that

5  opportunity.  They would just go through the process and deny

6  the application.

7  Q.  And is there anything about the abortion context that might

8  make that more or less likely to occur?

9  A.  Yes.  Unfortunately, there are hospital that -- hospitals

10  that, through their processes, will discriminate, if you will,

11  against physicians who provide abortion care even though that

12  abortion care is not being provided, Your Honor, in the

13  hospital.  It's being provided in an outpatient setting away

14  from the hospital, but they will still -- they will still use

15  that as a reason.  In fact, there's a very egregious example

16  that occurred in Texas where a physician in the Dallas area, who

17  is an OB-GYN and an abortion provider, already had admitting

18  privileges at a hospital.  And when the hospital found out that

19  he was an abortion provider in a clinic nearby, they sent him a

20  letter, which I have seen, actually revoking his privileges

21  because he performed abortion.  And they cited because -- in

22  their bylaws, they called this disruptive behavior, his

23  performing abortions as disruptive behavior.  So his performing

24  a constitutionally protected procedure was disruptive behavior

25  to the hospital.

1    And there's a chambers amendment that makes it a federal

2  offense to discriminate against an applicant based on race,

3  creed, religion, or abortion.  So it's amazing to me that this

4  hospital blatantly violated that and put this in writing in the

5  letter.

6  Q.  And Dr. Fine, in your experience, is it unusual for a

7  hospital to be this transparent about its reasons for a decision

8  such as this?

9  A.  Very, very unusual.

10  Q.  Dr. Fine, can you speak a little bit more to some of the

11  obstacles that might apply when a doctor is seeking privileges

12  in the context of abortion services?

13  A.  Sure.  Well, the doctor is not applying to perform abortions

14  in the hospital; but in order to get privileges, there's a

15  series of steps that have to occur.  He has to be approved by

16  the department of OB-GYN at the hospital.  Then they will make a

17  recommendation to the credentials committee, who must approve

18  it.  And then the credentials committee will make a

19  recommendation to the medical executive committee, which is made

20  up of the heads of the departments in the hospital.  And then it

21  has to be approved by the CEO of the hospital and the hospital

22  board of trustees.

23    At any one of these steps, they could deny the application

24  just because they didn't like the fact that the doctor did

25  abortions.  They could deny it for any reasons, and they don't

1  have to disclose why they denied it.  And the -- the actions of

2  these committees during the credentialing process is

3  confidential.  It can't be discovered.

4  Q.  Now, Dr. Fine, you testified a moment ago that there is a

5  law against abortion -- excuse me -- against hospitals

6  discriminating against abortion providers in deciding whether to

7  grant privileges.  In practice, do you believe that this law

8  protects abortion providers from this type of discrimination?

9  A.  It attempts to but, in reality, does nothing because the

10 credentials committee and these committees at the hospitals,

11 they don't have to disclose why they denied privileges.  I was

12 amazed -- in the eighties, when I was attending these committees

13 and chairing some of these committees, I was amazed at the good

14 old boy atmosphere that went on in those committees.  It was --

15 I was surprised.  I was shocked.  So there's a lot of

16 discrimination that can and does occur during these committee

17 deliberations.

18 Q.  Dr. Fine, can you speak at all to what you think the process

19 would be like or the -- what the likely outcome would be if a

20 doctor was seeking privileges to a religious hospital in the

21 context of a provision of abortion services?

22 A.  The -- the Catholic -- there are many Catholic hospital

23 systems that are very large and have a lot of hospitals in the

24 country.  I think it's quite obvious that any physician applying

25 for privileges at that hospital who either disclosed or was

1    found out to be an abortion provider would be promptly denied or

2    kicked out the door.

3    Q.   Dr. Fine, if a provider has privileges at one hospital, does

4    that mean that she can get them at another hospital?

5    A.   Absolutely not.  Each hospital is their own entity with

6    their own committees, and each application is considered on a

7    separate basis.

8    Q.   And in your experience, does the controversy surrounding

9    abortion affect the willingness of hospitals to grant admitting

10   privileges to abortion providers?

11   A.   It does.  Hospitals and, frankly, universities have to be

12   very careful because they are relying on donors and -- and

13   boards of trustees for financial help.  And there are people

14   that are against abortion and who might -- if they found out the

15   hospital was supportive in having abortion providers on their

16   medical staff, would stop donating money.  So it could have a

17   significant economic impact on the hospital if that were to

18   happen.

19   Q.   Dr. Fine, do you see any trends in medicine that affect

20   doctors' need to get admitting privileges?

21   A.   Well, as I -- excuse me.  As I testified earlier, there is a

22   trend more and more, Your Honor, for outpatient surgeries and

23   outpatient procedures and office procedures to be done that

24   eliminates some of the excessive cost of medical care -- medical

25   care and reduces it.  And so there's an increasing use of

1  outpatients.  And additionally, hospitals are hiring physicians

2  to work within their hospitals and take call.  For example,

3  they -- and patients with labor and delivery -- hospitals with

4  labor and delivery, they hire an OB-GYN and he's called a

5  laborest.  And his only job for 24 hours is to take care of

6  patients that come in without a doctor who need obstetrical care

7  and delivery or have a spontaneous miscarriage, et cetera.  So

8  that actually increases the availability of consultants to the

9  emergency room doctor.  Should he need an OB-GYN, there's

10 frequently one in house that's hired by the hospital.

11 Q.  You testified earlier that you're the medical director of

12 Planned Parenthood of the Gulf Coast in Texas; is that right?

13 A.  That's correct.  And Louisiana.

14 Q.  And in that capacity, are you aware of recent events

15 relating to Texas's admitting privileges law?

16 A.  Yes, I am.

17 Q.  And are these events part of the basis that you're offering

18 today for your opinion about plaintiff's ability to obtain the

19 privileges requires by the act and the consequences if they

20 cannot?

21 A.  Yes, I'm familiar.  Unfortunately, when the admitting

22 privileges law in Texas -- and by the way, the admitting

23 privileges law in Texas, Your Honor, doesn't require the ability

24 to do a hysterectomy or a laparotomy, just admitting privileges.

25 And when it was first passed and went into effect in October,

1    approximately one-third of the abortion clinics in the state had

2    to close.  Some of those doctors were able to get admitting

3    privileges.  Some of them were not able to get admitting

4    privileges.  And that harmed the patients who relied on the

5    doctors who could not get admitting privileges.

6        As a result, currently, the Rio Grande Valley, which is in

7    West Texas, encompasses 5,000 square miles, does not have a

8    single abortion clinic.  The nearest clinic that the women of

9    the Rio Grande Valley can go to now is in Corpus Christi, 150

10   miles away.

11       Come September when the rule for ambulatory surgery centers

12   goes into effect, the Corpus Christi abortion clinic will close.

13   And then the nearest abortion clinic will be San Antonio, 500

14   miles away.  So this has a definite negative impact on the

15   ability of women to obtain abortion services, more difficulty

16   finding abortion services.

17   Q.  And do you know whether these events have been harmful to

18   women in Texas?

19   A.  They have been harmful.  It's my understanding that some of

20   the clinics in Texas where these women in the Rio Grande Valley

21   are coming to are being seen later in gestational age.  As we

22   said earlier, the later the pregnancy gestational age is, the

23   higher the potential complications and risks.

24   Q.  Are you aware of the phenomenon of women attempting to

25   self-medicate to induce an abortion without going to a doctor?

1    A.  All too -- all too knowledgeable, both from the years before

2    *Roe versus Wade*, but more recently, the second pill,

3    misoprostol, M-I-S-O-P-R-O-S-T-O-L, that caused the uterus to

4    expel the contents, if it's taken alone, it can be 80 percent

5    effective in inducing a first trimester abortion.

6        And women can get this misoprostol pill from across the

7    border and other places illegally, and they take it.  And at

8    that point, if they have to go to an emergency because they're

9    bleeding or cramping, the picture is identical to a spontaneous

10   miscarriage.  So they don't have to disclose that, well, I tried

11   to induce myself and it didn't work.  They'll present as a

12   spontaneous miscarriage and will be taken care of.  And

13   unfortunately, it's my opinion that this is going to increase,

14   where women have a choice of driving 500 miles or getting some

15   pills from across the border.  And there are studies now ongoing

16   to look at this and try to document that this is in fact

17   happening.

18             THE COURT:  And what's -- is this misoprostol --

19             THE WITNESS:  Misoprostol is the second pill under the

20   medication abortion that the patient takes at home 24 to 36

21   hours later that causes the uterus to contract and expel the

22   contents, Your Honor.  And if this is taken alone without --

23             THE COURT:  That's my question.

24             THE WITNESS:  If it's -- the medication abortion has

25   two pills.  The abortion pill, ru486, that's given in the clinic

1  causes the embryo to die and detach from the lining of the

2  uterus.  The second pill, misoprostol, taken at home causes the

3  uterus to contract and expel.  If misoprostol is taken alone

4  without the abortion pill, ru486, it's still 80 percent

5  effective in inducing abortion, but not 99.5 percent like the

6  two-pill combination is.

7          THE COURT:  But there's nothing dangerous about taking

8  it alone?

9          THE WITNESS:  Well, taking it -- technically, there is

10  in that the misoprostol by itself is a teratogen and causes

11  fetal anomalies.  So if a woman takes it and it doesn't work and

12  she continues the pregnancy, there's an increased risk of a

13  fetal anomaly.

14          THE COURT:  What's fetal anomaly?

15          THE WITNESS:  Fetal anomalies meaning absent arms,

16  absent legs, flattened head, mental retardation.

17          THE COURT:  How significant is that increase?

18          THE WITNESS:  The percentage of -- is still fairly low.

19  The overall general congenital anomaly rate is about 2 to 3

20  percent.  If you've taken misoprostol, it might rise to 5

21  percent, a little bit higher.  But the other concern with taking

22  misoprostol alone is when the abortion is incomplete in that 20

23  percent, pieces can get stuck in the cervix, the same as with

24  spontaneous miscarriage, and the patient at that point

25  hemorrhages very heavily.  So women who take the misoprostol

1  alone for the abortion are at a higher risk to have significant

2  hemorrhage and even -- they wait, hoping it will pass, and then

3  infection sets in.  So they're generally at a higher risk for

4  infection and hemorrhage just like a spontaneous miscarriage

5  patient.

6          THE COURT:  Go ahead.

7  Q.  (By Ms. Sandman, continuing:)  Dr. Fine, if a woman attempts

8  to self-induce with misoprostol, in your experience, is she

9  getting monitoring from a medical professional to see whether

10 the attempted abortion has been successful?

11 A.  No.  That's -- there's no monitoring whatsoever.

12 Q.  And in your experience, is she under a doctor's care to

13 ascertain whether she's a suitable candidate to have an abortion

14 in this manner?

15 A.  No, she's not.  There's no prior evaluation.  She just

16 doesn't want the pregnancy and will not consider any medical

17 problems that she might have as potential confounders or

18 complications.

19 Q.  And is there any determination of whether the gestational

20 age of the pregnancy makes her an appropriate candidate?

21 A.  That's also correct.  She may not know exactly how far along

22 she is.  She hasn't had an ultrasound.  So the farther along in

23 pregnancy she is, the less effective the misoprostol will be in

24 causing abortion.

25 Q.  And in your -- in your opinion, do women in the Rio Grande

1   always get good misoprostol?  Is this a -- is there some sort of

2   regulation of the quality of the medication that they're

3   obtaining?

4   A.  Well, it's certainly gray market or black market

5   misoprostol, so the potential for impurity is certainly there,

6   but I don't have any firsthand knowledge of that.

7   Q.  And to your knowledge, is misoprostol also available for

8   purchase on line?

9   A.  Yes, it is.  It's -- misoprostol, the trade name is Cytotec,

10  C-Y-T-O-T-E-C.  It was originally designed, Your Honor, as a

11  drug to reduce stomach ulcers in women that take

12  anti-inflammatory agents for either menstrual cramps or

13  arthritis.  And -- and it was later found that it had properties

14  on the uterus to help with gynecological problems.  So it's also

15  used to induce term pregnancy, to induce labor.  So it is

16  available from on-line pharmacies as well.

17  Q.  And I think that your testimony is already clear on this

18  topic; but just to make sure, in your opinion, is it medically

19  appropriate for a woman to be purchasing misoprostol through

20  these gray market channels in order to attempt to self-induce an

21  abortion?

22  A.  Absolutely not.  She's putting herself in danger.

23  Q.  Turning to a different topic, from your years of working

24  with Planned Parenthood, do you have any experience in trying to

25  recruit doctors to provide abortion services?

1  A.  Yes, I do.

2  Q.  Can you describe that experience.

3  A.  Well, in prior years, prior to these restrictive laws in

4  Texas, because I've been on the faculty at Baylor for 30 years,

5  many of the graduating doctors from the residency went on and

6  practiced I had either trained in abortion or trained in OB-GYN.

7  So I knew them; they knew me.  And I could get them to work

8  part-time at our clinic.  Now, with the requirement for

9  admitting privileges, many OB-GYN physicians who are in

10  practice -- in fact, most -- do not want to work in an abortion

11  clinic out of fear that it's going to harm their practice, that

12  protestors are going to picket their office, their home --

13  picket their home, threaten them with bodily harm, threaten

14  their families.  So physicians in general practice do not

15  perform abortions for that reason.  And it's much harder to

16  recruit physicians now than it used to be.

17      Additionally, in Texas, there's a 24-hour wait where the

18  doctor has to perform the ultrasound.  So now, to do an abortion

19  today, the doctor has to take two days out of his schedule in

20  order to -- to provide abortion services for one day at the

21  clinic.

22  Q.  Dr. Fine, you've mentioned a few times in your testimony

23  that there is a nationwide shortage of abortion providers.  Can

24  you speak more to that?

25  A.  There is.  Unfortunately, although the residency review

1  committee that establishes what has to be taught in OB-GYN

2  residencies, Your Honor, requires teaching of abortion, although

3  a resident can opt out for religious reasons.  But,

4  unfortunately, only about 50 percent of the residency programs

5  in OB-GYN in the country offer abortion training.  And more

6  specifically, as tracked by the University of Southern

7  California, the southern states are especially lacking abortion

8  care.  In specifically Louisiana, Alabama, and Mississippi,

9  there's no abortion training being given to the residents.

10  Q.  You testified earlier that some doctors are afraid to

11  provide abortions.  In your experience, why is that the case?

12  A.  Because of the potential for harm to their practice by

13  protestors picketing the offices, the protestors picketing their

14  house, threats of violence.  Their names and information are put

15  on Web sites of antiabortion organizations.  They just -- they

16  just don't want to take the risk.  They're afraid or their

17  families are afraid.  Their wives don't want them to provide

18  abortions out of fear for their safety.

19  Q.  If it's so risky to be an abortion provider, Dr. Fine, why

20  do you continue do it?

21  A.  I'm old enough to have performed abortions prior to *Roe*

22  *versus Wade*.  I said I was family with self-induced abortions.

23  Well, back in the old days, in the seventies, early seventies,

24  patients either got a botched back alley abortion by some

25  untrained person or they actually put a coat hanger up inside of

1  themselves.  And they got severe infections.  They got gangrene

2  of the uterus.  And they would come in to our tertiary center at

3  Los Angles County, and we would do everything possible to save

4  their lives.  And ,you know, they died.  I will never forget the

5  look in the eye of these women who are scared and frightened and

6  desperate to end their pregnancy.  So I will never stop doing

7  abortion care.

8  Q.  Dr. Fine, I think this is already clear from your testimony;

9  but in your opinion, is it medically necessary to require that

10  all doctors that perform abortions have the admitting privileges

11  required by the act?

12  A.  Absolutely not.  It's not helpful, and it harms women.

13  Q.  And can you explain just in summary why it's not helpful?

14  A.  It's a fantasy to think that if you have admitting

15  privileges at a large hospital that the efficiency and quality

16  of care is going to be somehow improved.  That's a fantasy.

17     The reality is, Your Honor, the majority of these women seek

18  care in an emergency not where you have privileges.  They're

19  near their home, which is generally an hour or more away from

20  the clinic.  And the treatment of abortion complications is the

21  same as miscarriage complications.  It's very straightforward.

22  Emergency physicians can do that.  There's no requirement for

23  the need to have the abortion provider have admitting

24  privileges.

25     And it -- it's not in the patient's best interests if, in

1    the very rare case she needed a hysterectomy, that the abortion

2    provider would be the one to do it, which this law requires,

3    because the abortion provider may have done one hysterectomy in

4    five years.  You would want a surgeon who does hysterectomies

5    every week to do that surgery.  I would for a member of my

6    family.

7    Q.  Dr. Fine, will this requirement do anything to help women in

8    Alabama?

9    A.  Will it help women in Alabama?  No.  It will hurt women in

10   Alabama.

11   Q.  And why is that the case?

12   A.  Because the women in Alabama, just like in Texas, will have

13   longer distances to travel for abortion care.  And it's very

14   likely when they do receive abortion care, they'll be further

15   along in their gestational ages than they might have been if

16   abortion care had been readily available close to where they

17   live and work.

18        Additionally, as I said earlier, there's a disproportionate

19   share of women, Your Honor, who get abortions who are

20   economically disadvantaged.  They're poor.  They're not well

21   educated.  They're minority.  And they have a harder time

22   arranging transportation.  If they do have a job, it's hard for

23   them to get off from work to -- to find time to go to the

24   abortion clinic and drive hundreds of miles to get there.

25            MS. SANDMAN:  I pass the witness.

1          THE COURT:  How long do you think you're going to take,

2    Mr. Davis?

3          MR. DAVIS:  Your Honor, I doubt that I will finish

4    before noon.  12:15 is a possibility.

5          THE COURT:  Okay.  Because you said that we had a one

6    o'clock witness.  So how do you propose we take up the one

7    o'clock witness if you go past -- if you're not able to finish

8    by noon on this one?

9          MR. DAVIS:  The one o'clock witness, Your Honor, that

10   is the defendant's witness.  And we can tell that witness we are

11   running late.

12         THE COURT:  Okay.  Very good.  I just wanted to --

13         MR. DAVIS:  That witness is aware of that possibility.

14         THE COURT:  Very good, then.  Go ahead.

15                       CROSS-EXAMINATION

16   BY MR. DAVIS:

17   Q.  Good morning, Dr. Fine.

18   A.  Good morning, Jim.

19   Q.  We met at your deposition, if you recall.

20   A.  Yes, we did.

21   Q.  Dr. Fine, is it medically necessary to observe continuity of

22   care?

23   A.  Yes.  Continuity of care is -- is desirable.

24   Q.  It's more than desirable, isn't it?  Didn't you say in your

25   report that the most important factor in assuring a good outcome

1    for the patient, as it is for any patient who is transferred to

2    a hospital under any circumstances, is continuity of care?

3    A.  Correct.

4    Q.  Do you treat patients of yours who have had complications

5    after an abortion?

6    A.  No.

7    Q.  Send them to the emergency room?

8    A.  Yes.

9    Q.  In your view, if a woman has a complication after an

10   abortion, does continuity of care require that the abortion

11   provider treat the complications?

12   A.  No.

13   Q.  Does it require that the abortion provider take any

14   responsibility at all for the complications?

15   A.  No.

16   Q.  Does it require that anyone from the abortion clinic be

17   present at the emergency room?

18   A.  No.

19   Q.  Does it require that the emergency room doctor speak to

20   anyone at the abortion clinic?

21   A.  No.

22   Q.  Then what is continuing about that care?

23   A.  What's --

24   Q.  What is continuous except that you've got the same patient

25   in the abortion clinic and in the emergency room?

1    A.  Because the patient is presenting to the emergency room

2    hopefully on the advice of the clinic nurse on call.  And the

3    emergency room physician is adequately trained to provide that

4    continuity of care, to evaluate that patient and treat that

5    patient.  That's still continuity of care.

6    Q.  How is that continuing?  You mean simply that there's been

7    no gap in care?  The emergency room doctor doesn't know what

8    happened at the clinic under those circumstances, correct?

9    A.  This -- Jim, this type of situation commonly occurs.  There

10   are patients who may have had a hysterectomy or a major surgery

11   done in a hospital; and they have a problem later, and they'll

12   go to an emergency room not where the doctor practices.  And

13   they're treated by the emergency doctor.

14   Q.  It may be.  But that's not ideal, would you say?

15   A.   In the situation of abortion care, it's -- it does not

16   require the abortion provider to be directly involved in the

17   care.

18   Q.  Okay.

19   A.  It's very straightforward, the treatment of spontaneous

20   miscarriage and abortion complications.

21   Q.  Would it be helpful at all in your understanding of

22   continuity of care that the emergency room doctor -- that the ER

23   doctor have information about the patient's state of mind when

24   she was in the clinic?

25   A.   That's irrelevant.

1   Q.   Well, what about -- would it be helpful for the ER doctor to

2   know the patient's future reproductive goals?

3   A.   That's also irrelevant.   The ER doctor's goal is to evaluate

4   the patient's problems as they exist right then and to treat

5   them as expeditiously as possible.   Most of the time, the

6   emergency room doctor will advise the patient to reassure her,

7   and you should return to the clinic the next day for further

8   evaluation, which is continuity of care.

9   Q.   Well, and you say that.   But do you know if that's the way

10  that Alabama clinics operate?

11  A.   That's the way most abortion clinics do operate.   And I

12  would assume that that occurs in Alabama as well.

13  Q.   Do you have personal knowledge of how those procedures

14  operate among Alabama clinics?

15  A.   I do about seven years ago.

16  Q.   But not today.

17  A.   Not today.

18  Q.   Now, you have admitting privileges, right?

19  A.   Yes.

20  Q.   And you said over 15 different hospitals?

21  A.   In the course of my career, both community and urban.

22  Q.   Have those all been Texas hospitals?

23  A.   With the exception of one in California when I was a

24  resident.

25  Q.   So 14 Texas hospitals, correct?

1   A.   Correct.

2   Q.   Is Texas known as being a particularly liberal state when it

3   comes to abortion privilege -- abortion rights?

4   A.   Not these days.

5   Q.   Was it a secret to any of these hospitals that you were

6   involved in abortion care?

7   A.   Well, no, it wasn't a secret.

8   Q.   Would it harm a woman, in your view, to receive an abortion

9   from a doctor who had admitting privileges?

10  A.   Would it harm a woman?

11  Q.   Correct.

12  A.   Probably not.  It would depend on the volume of abortions

13  that that doctor did.

14  Q.   But now, the fact that the doctor had admitting

15  privileges --

16  A.   No.

17  Q.   -- that wouldn't, by itself, make a doctor --

18  A.   Correct.

19  Q.   -- unqualified.

20  A.   Correct.

21  Q.   You've testified that the mortality rates for abortion are

22  lower than the mortality rates for childbirth, correct?

23  A.   Correct.

24  Q.   What percentage of women bear children in their lifetime?

25  Do you know?

1  A.  Well, I know that 50 percent of all the pregnancies in the

2  United States are unintended.  And I believe there are about

3  three million births per year in the United States, somewhere in

4  that ballpark.  But I can't say what percentage of -- is the

5  question what percentage of women of reproductive age have

6  children?  I'm not sure I understand your question.

7  Q.  My question was simply whether you knew what percentage of

8  women bear children over the course of their life at least once.

9  A.  I would say the majority, vast majority.  Ninety percent.

10 Q.  Do you know if that includes older women?

11 A.  Yes.  Older, meaning in their forties, yes.

12 Q.  What are the normal -- or the typical characteristics of a

13 woman who presents to the clinics that you operate seeking

14 abortion care, age wise?

15 A.  All ages.  Anywhere from 14 to 50.

16 Q.  Is there any difference in treating a miscarriage -- a woman

17 who has had a miscarriage and is having excessive bleeding, for

18 example, versus a woman who is having complications from an

19 abortion and is having excessive bleeding?

20 A.  The treatment is the same.

21 Q.  Is there any difference in the blood flow in the uterus in

22 those two circumstances?

23 A.  With miscarriage or abortion?

24 Q.  In comparing the two situations, is there any difference in

25 the amount of blood flow in the uterus?

1  A.  For a given gestational age, it's the same.

2  Q.  Now, you also testified that colonoscopy bears higher risk

3  than abortion, correct?

4  A.  Correct.

5  Q.  Do you know how many doctors fly in from other states to

6  perform colonoscopies?

7  A.  Very few, because there are plenty of gastroenterologists.

8  They fly in to provide abortion care because there is a relative

9  paucity of abortion providers.

10  Q.  Do you know how many doctors who are performing

11  colonoscopies lack admitting privileges in Alabama?

12  A.  I do not.

13  Q.  In general?

14  A.  Generally, the gastroenterologists who are performing these

15  do have admitting privileges, because they seek consults in the

16  hospital.

17  Q.  Do you know if there are people who have colonoscopies, have

18  a complication, go to the ER, and then the ER doctor is unable

19  to get ahold of the treating physician?

20  A.  That -- that happens.

21  Q.  Do you know if it happens?

22  A.  I know it happens.

23  Q.  Do you know if it happens more often with colonoscopies than

24  it does with abortion care?

25  A.  Well, with abortion care, the ER doctor doesn't need to call

1  the abortion doctor.

2  Q.  Would the ER doctor need to call for someone who had

3  complications after a colonoscopy?

4  A.  I'm sorry?

5  Q.  Would the ER doctor need to call if someone had a

6  complication after a colonoscopy?

7  A.  Yes.  Because the doctor who had performed the

8  colonoscopy -- the ER doctor may not know exactly what procedure

9  was done during the colonoscopy.  Was there a polyp removed?

10 Was there concern for a perforation?  Was there bleeding?  The

11 abortion care is very -- that occurs is very straightforward and

12 standard.  Colonoscopy may not be.

13 Q.  With colonoscopy complications good continuity of care

14 requires adequate physician communication.  Agreed?

15 A.  Yes.  Physician communication.

16 Q.  But that's not important for abortion care, in your view?

17 A.  It is not.

18 Q.  Do you know how Alabama clinics use their covering physician

19 or don't use them?

20 A.  I don't know the specifics of their coverage arrangements.

21 Q.  Do you know if Alabama clinics are making any effort to

22 follow up --

23 A.  I know that -- and I can't tell you where I -- I don't

24 remember where I learned this fact, but I know that there is a

25 written agreement with PPSE for transfer of patients who have

1    emergencies to hospitals.  They have an agreement in place.  I

2    know that.

3    Q.  Do you know if they take advantage of that agreement?

4    A.  I don't think they've had to transfer any patients, to my

5    knowledge.

6    Q.  Do you know if Alabama clinics make any effort to follow up

7    with patients who have had complications?

8    A.  Alabama clinics follow?

9    Q.  Perhaps I didn't understand you correctly, Dr. Fine.  I

10   understood when you were explaining your experience in Texas,

11   you said if a patient has a complication, first you send them to

12   the emergency room, but you might follow up with them in a

13   couple of days to --

14   A.  No.  We don't first send them to the emergency room.  We

15   talk to them and try to get them to come back to the clinic.  We

16   send them to the emergency room if it seems to be a more severe

17   complication.

18   Q.  And who would treat them if they came back to the clinic?

19   A.  Either -- if there's a physician working that day in the

20   clinic, the physician would.  Or they would be evaluated by the

21   nurses by doing ultrasounds and blood tests, et cetera, and then

22   they would contact the physician to get a -- a course of action.

23   Q.  But if circumstances are such that you suggest a patient go

24   to the emergency room, your clinics will follow up with that

25   patient later and be in touch, correct?

1  A.  They'll -- they'll generally attempt to call the patient the

2  next morning, assuming they know.  Some patients go to the

3  emergency room on their own without calling the on-call nurse.

4  Q.  Do you know if Alabama clinics make any similar effort to

5  follow up?  That's my question.

6  A.  I don't know that.

7  Q.  Do you know if the doctors who provide abortions in Alabama

8  have cell phones?

9  A.  I would presume all doctors have cell phones, but I don't

10  know specifically the doctors in Alabama.  I would be amazed if

11  they did not have cell phones, just like all lawyers probably

12  have cell phones.  Two of them.

13  Q.  Do you know the complication rate among abortion patients in

14  Alabama?

15  A.  Not -- not specifically in Alabama, no.  There was one

16  reference that we used that tracked hospital transfers from

17  ambulatory surgery centers in Florida and Alabama.  And in that

18  article, the vast majority of the transfers were plastic

19  surgery.  The OB-GYN doctors had no transfers.

20  Q.  Do you know what the rate -- if there's any difference in

21  the rate of complications of clinics in Alabama who have doctors

22  with admitting privileges versus those who rely on doctors who

23  come in and out?

24  A.  I do not.

25  Q.  The studies that you cited, Dr. Fine, in your report to make

 1    estimates about complication rates and hospitalization rates,

 2    did they rely on voluntary reporting?

 3    A.   No.  Some -- they -- they relied on either CDC data or they

 4    relied -- if they involved Planned Parenthood clinics, they

 5    relied on complication rates reported by the clinics.  But they

 6    were not -- they were not self-reports.

 7    Q.   They don't rely at least in part on self-reports --

 8    self-reporting, some of them?

 9    A.   These particular studies the methodology was such that --

10    that the complication was documented by the organization or the

11    CDC or some other -- they were not self-report.

12    Q.   Do they rely on clinic reporting, any of them?

13    A.   Yes.

14    Q.   Okay.  Are you aware of any federal reporting requirement

15    for abortion clinics?

16    A.   No, not federal reporting requirements, but --

17    Q.   Do some states have reporting requirements?

18    A.   Yes, they do.

19    Q.   Do you know how many?

20    A.   I would guess about five thus far.

21    Q.   Do you know if Alabama is one of those five?

22    A.   I believe it is.

23    Q.   Dr. Fine, we can disagree over the rates of complication and

24    the rates of hospitalization, but if we assume you're right and

25    it's .3 percent, as one study said, or .05 or .06, if there are

1   nine or 10,000 abortions per year in Alabama, if those studies

2   are accurate predictors for what happens in Alabama, that's

3   still going to be six, ten, up to 30 hospitalizations a year,

4   correct?

5   A.   Possibly, yes.

6   Q.   You would agree, I'm sure, that those women deserve --

7   A.   If we're saying the hospitalization rate is about -- in the

8   published studies are about six per 10,000.  So you --

9   Q.   Well, you also cited a study that was .3 percent.  So that

10  would be 30 per 10,000.

11  A.   That was -- that was data from the seventies.

12  Q.   Well, it was good enough for you to cite in your report and

13  rely on it.

14  A.   Specifically from the seventies.  I also expanded that

15  during the subsequent decades following *Roe versus Wade,* as the

16  procedure became more refined and more were done, that the rate

17  significantly dropped from three per thousand to six per 10,000.

18  Q.   Okay.  Then let's use the latter studies, then, and say even

19  that the hospitalization rate would only be six per 10,000.

20  That's still six women who deserve good medical care, correct?

21  A.   Yes, sir.

22  Q.   Six people with names, possibly with future reproductive

23  goals.  We need to have procedures that protect them.  You would

24  agree with that?

25  A.   I think there -- there are already procedures in place that

1   protect them.

2   Q.  Okay.  Well, we're not -- you're not suggesting that we have

3   to ignore the health of those women just because there aren't

4   many of them.

5   A.  I think you're ignoring the health of the women by requiring

6   admitting privileges.  You're harming them.  You're saying you

7   want to help them.

8   Q.  Not my question.  We can disagree over what -- I'm not

9   asking your opinion on this admitting privileges requirement.

10  It is -- it's not your testimony, is it, Dr. Fine, that it is --

11  that -- that the field of medicine should ignore a risk simply

12  because it is a small risk?

13  A.  I would agree with that.

14  Q.  Is it your testimony, Dr. Fine, that there are never

15  circumstances where it would be an advantage for the emergency

16  room doctor to communicate directly with the abortion provider

17  if someone has complications after abortion and goes to the ER?

18  A.  If it's a situation where the patient goes to the ER, no.

19  If it's a situation where it's a clinic-to-hospital transfer by

20  ambulance, yes.

21  Q.  If you assume for the sake of argument, Dr. Fine, that some

22  doctors would think it would be a good thing for there to be

23  communication in that circumstance -- if you assume

24  communication would help, shouldn't the communication occur with

25  as little delay as possible?

1  A.  What communication are we referring to?

2  Q.  ER doctor to provider.

3  A.  Well, as we said, there's no need for that communication.

4  The ER doc is going to promptly start whatever treatment and

5  evaluation needs to be done.

6  Q.  Okay, then.  In the situations where even you would agree

7  that the communication would be good, let's go back to the

8  person who has a complication after a colonoscopy.  You said

9  there you might need to communicate, correct?

10 A.  Because colonoscopies are very variable, how they're done,

11 what the procedure was.  Abortion is a standard, straightforward

12 procedure that's done the same thing.  Colonoscopies are not.

13 Q.  If you have a circumstance like colonoscopies where even you

14 would agree that there needs to be communication, shouldn't that

15 communication occur with as little delay as possible?

16 A.  Not necessarily.  Ideally, yes.  But if the -- if the ER

17 doctor had a patient with rectal bleeding or a distended abdomen

18 following a colonoscopy and he couldn't promptly get ahold of

19 the physician who did it, he's going to call the general surgeon

20 consultant.  And in fact, that was my point, that the

21 gastroenterologist is not qualified or trained to take care of

22 complications from colonoscopy.  They have to call in a colon

23 surgeon.  So the ER doctor would call the general surgeon or

24 colorectal surgeon on call.

25 Q.  Do you think, Dr. Fine, that a doctor who performs an

1  elective procedure should also be trained to treat complications

2  that one can reasonably expect might result from that procedure?

3  A.  No.

4  Q.  Have you still got your notebook?

5  A.  Yes.

6  Q.  Look behind the tab of NAF guidelines, please.  And I'm

7  looking at page 1.  There are several pages with small Roman

8  numerals and the first -- letter one, it says on the top, number

9  one, Who can provide abortions.

10  A.  Which page is that on, sir?  Oh, I see it, okay.

11  Q.  Do you see that?

12  A.  Yes, I do.

13  Q.  Okay.  Do you see standard two?

14  A.  Yes.

15  Q.  I'm going to read standard two.  It says:  All practitioners

16  providing abortions must have received training to competency in

17  abortion care, including the prevention, recognition, and

18  management of complications.

19  A.  Yes.  I agree with that.

20  Q.  You don't --

21  A.  What I was referring to was the need to perform hysterectomy

22  or laparotomy.  All -- all physicians who perform abortions

23  should be able to evaluate and treat the most common

24  complications that would occur, bleeding, infection, uterine

25  atony.

1  Q.  Why?  If you're just going to send them to the emergency
2  room, why does it matter?
3  A.  You're not.  The vast majority -- the percentage of patients
4  that go to the emergency room are several per thousand.  The
5  majority of abortion complications that occur and are recognized
6  are treated in the clinic.  The patient comes back to the clinic
7  and is treated there.  They're not sent to the emergency room.
8  Q.  Okay.  Well, let's go back to communication for a second.
9  If there's a situation where communication is necessary between
10  two doctors, do you think communication is improved at all if
11  those two doctors are on the same hospital staff?
12  A.  Absolutely not.
13  Q.  Do you think it's improved at all if those communications
14  (sic) have ties to the same community?
15  A.  Absolutely not.
16  Q.  Do you think it's improved at all if those physicians are in
17  the same state?
18  A.  Absolutely not.
19  Q.  Do you think a woman who chooses to get an abortion has any
20  expectation that the doctor -- that the provider will have the
21  ability to treat complications that may arise?
22  A.  I think that the patient would expect that the clinic would
23  be available and if she had a problem, she could call them and
24  get her problem either taken care of or be referred.  But every
25  abortion patient that comes into the clinics is also aware of

1    the potential that if she has a problem after she returns home,

2    which is most commonly when the problems occur, that she might

3    have to seek emergency room care.  That's written out in

4    consents the patients sign prior to abortions.

5    Q.  In the process of getting privileges, isn't it correct that

6    a hospital tries to ensure that the applicant is qualified?

7    A.  Sure.  They try to.

8    Q.  He's a good doctor.  If you take a hundred random doctors

9    who have admitting privileges and a hundred random doctors that

10   do not, do you think either group is more or less likely to have

11   an unqualified doctor among them?

12   A.  Well, you would have to define unqualified.  As I testified

13   earlier, there are many doctors who have admitting privileges

14   who do high volumes of surgery.  The hospitals love them because

15   they bring in a lot of patients and make a lot of money, but

16   they also have complaints to the medical boards where -- for not

17   recognizing complications or not following up on care or

18   mismanagement.

19   Q.  Okay.  Well, wouldn't you agree that the privilege process

20   is likely to weed out lousy doctors?

21   A.  It does not.  Lousy?  No.  Their -- their determination of

22   quality is what's the volume of the procedure they've done in

23   the past.

24   Q.  You don't think they look at if somebody's had a dozen

25   malpractice suits in the past?

1   A.   Oh, they look at the mal- -- yes.  They look at the

2   malpractice suits.  But malpractice suits can be filed without

3   merit as well.

4   Q.   That hospital doesn't want a doctor on their staff that's

5   not able to do the things -- to give good quality care to his

6   patients or her patients, right?

7   A.   Ideally, yes.  But in reality, hospitals don't want doctors

8   on their staff who perform abortions as well.

9   Q.   Like you, who has had privileges at 15 hospitals in Texas?

10  A.   Yes.  But the majority of what I do is not strictly abortion

11  care.  I'm a urogynecologist.  I do a lot of other OB-GYN care.

12  Q.   But it hasn't been a black mark on your record that has

13  caused hospitals to deny you privileges, correct?

14  A.   No.  Because I've had an excellent record with all the other

15  surgeries and things that I've done.  These doctors applying,

16  all they do is abortions.  They don't have a track record to

17  say, well, okay, I did one hysterectomy in the last five years,

18  but I want to do hysterectomies in your hospital.

19  Q.   Does that have to be the case, that all these -- these

20  doctors doing abortions, could they expand their practice?

21  A.   They don't.  They are abortion --

22  Q.   Could they?

23  A.   No, they could not.  Because many of them have not performed

24  these procedures in many years.  They haven't delivered a baby

25  in 15 years.  They haven't -- some are family doctors.  Yes,

1  they could do family medicine.  But they chose to be an abortion

2  provider to provide a constitutionally mandated service for

3  women, and that's what they choose to do.

4  Q.  Couldn't they choose instead to follow your model, which is

5  providing comprehensive care to women which happens to include

6  abortion care, also includes admitting privileges to hospitals?

7  Then they could have the record that you have.

8  A.  No.  Because most of the physicians are worried that -- we

9  testified before that if they -- it's found out they provide

10 abortions, their offices and their homes are going to be

11 picketed and they're going to be harassed.  And they're

12 threatened, and their families are going to be threatened.

13 Q.  That's risks that they face right now, is it not?  And yet

14 they're still providing abortions.

15 A.  Yes.  Because they're dedicated to providing high quality

16 abortion care to the women.

17 Q.  You say in your report --

18        THE COURT:  Let me ask you this.  We're now five after

19 noon.  Where is a good time?

20        MR. DAVIS:  Five after -- Your Honor, 15 minutes would

21 be my estimate.

22        THE COURT:  So you want to go 15 more minutes?

23        MR. DAVIS:  I am happy to go as long as Your Honor

24 wishes.

25        THE COURT:  Well, I think we're all hungry for lunch.

1          MR. DAVIS:  I'm happy to pause.

2          THE COURT:  Okay.  Then why don't we pause now, then.

3  Thank you.  Also, you can get ready better now that you'll have

4  lunch to hone your questions.

5          MR. DAVIS:  Oh, I didn't know I had to get rid of

6  questions, Judge.

7          THE COURT:  I just said hone them.  I didn't say get

8  rid of them, although I guess honing does mean get rid of.

9  Anyway, we'll recess now until 1:05.

10         Oh, counsel, I have some questions too.  I'll go ahead

11  and pass them out so you can look at them over lunch.  And

12  either one of you can incorporate them into your questions.

13         MR. DAVIS:  Thank you.  Would Your Honor wish for our

14  report on the next witness, Dr. Thorp?

15         THE COURT:  Definitely.  You can give it to me now?

16         MR. DAVIS:  I'll give it to Mr. Green.

17         THE COURT:  Great.  Thank you.

18     (Recess at 12:07 p.m. until 1:10 p.m.)

19         THE CLERK:  Please remain seated.  Court is in session.

20         THE COURT:  Counsel, I just want to get a clarification

21  of one point.  This witness mentioned ambulatory centers,

22  legislation in Texas; is that right?

23         MR. DAVIS:  (Nods head)

24         THE COURT:  I think there was some legislation in Texas

25  requiring that these clinics meet certain ambulatory clinic

1    standards.  Is that true?

2            MS. SANDMAN:  Yes, Your Honor.

3            THE COURT:  Okay.  And the Alabama statute has the same

4    thing?

5            MS. SANDMAN:  It's not at issue in this litigation,

6    Your Honor.

7            THE COURT:  It's not at issue in this litigation.

8            MS. SANDMAN:  Correct.

9            THE COURT:  But I know that another witness brought it

10   up.  But I just wanted to get the posture, that Alabama's

11   statute has the same thing, but it's not an issue in this

12   litigation.

13           MS. SANDMAN:  Yes, Your Honor.

14           THE COURT:  But it is still an issue in the Texas

15   litigation.

16           MS. SANDMAN:  Correct.

17           THE COURT:  Okay.  I wanted that clarification.

18           MS. SANDMAN:  And the requirement -- just so the record

19   is clear, the requirements are somewhat different from each

20   other.

21           THE COURT:  Oh, they're not the same requirements

22   either?

23           MS. SANDMAN:  They come under a similar umbrella, but

24   the specifics are different.

25           THE COURT:  Oh, very good, then.

```
 1              And when you're asking questions, remember that you

 2    want to bring it down, as they say, where the goats can get it

 3    for me.  Remember, when it comes to medical testimony, I have

 4    very little knowledge.  And a little knowledge is the most

 5    dangerous knowledge because you tend to rely on it and get it

 6    wrong.  So make sure your questions really put the basics to me

 7    before you get into the more detailed stuff.

 8              MR. DAVIS:  Your Honor, concerning the next witness,

 9    who is on standby --

10              THE COURT:  Yes.

11              MR. DAVIS:  -- over lunch I spoke with Mr. White,

12    Mr. Cornelius White.

13              THE COURT:  Yes.

14              MR. DAVIS:  He asked me to let you know that when it's

15    time for that witness to dial in, he may need a few minutes to

16    test equipment.

17              THE COURT:  That will be fine.

18              MR. DAVIS:  May I proceed?

19              THE COURT:  Yes.

20    Q.  (Mr. Davis, continuing:)  Dr. Fine, good afternoon.

21    A.  Good afternoon.

22    Q.  What protocol has the FDA approved for medication abortions,

23    Dr. Fine?

24    A.  The FDA has approved the protocol where it can be given up

25    to 49 weeks' gestational age.  And the same two-pill regimen is
```

1   used, but instead of the -- the FDA regimen requires three

2   pills, or 600 milligrams, of the ru486 and requires the second

3   pill not be taken at home, but that the patient come into the

4   clinic 48 hours later and take that second pill in the clinic.

5   Q.   And what gestational age?

6   A.   And they go up to seven weeks, two weeks less than the --

7   there's an evidence-based regimen that has more recently -- for

8   years been used, is more efficacious and safer.  And then

9   there's original FDA labeling that was based on studies done

10  over a decade ago that led to the FDA approval.

11  Q.   But the FDA has approved it only up to seven weeks, correct?

12  A.   Correct.

13  Q.   And only approved a protocol where the woman will take both

14  pills in the clinic.

15  A.   Yes.  On two separate visits.  The FDA also requires the

16  patient come back.  There's actually a total of four visits that

17  the woman has to do to do the FDA protocol.

18  Q.   Would you meet the requirements of Alabama's statute,

19  Dr. Fine, if you practiced in Alabama?

20  A.   If -- given the fact that I would have admitting privileges?

21  Q.   If --

22  A.   Assuming --

23  Q.   I asked --

24  A.   -- I transplanted my situation from Texas to here?  I

25  believe I would, yes.

1  Q.  Do you know if all hospitals in Alabama have an OB-GYN on

2  call 24/7?

3  A.  Any hospitals that provide gynecological care in the

4  hospital would have one on call, yes.

5  Q.  Do you know if all hospitals in Alabama provide

6  gynecological care in the hospital?

7  A.  I do not.

8  Q.  You say in your report that referrals are common in

9  medicine, do you not?

10 A.  Yes.

11 Q.  Isn't it also common for the referring doctor to talk to the

12 specialist and to share the patient's history?

13 A.  Yes.

14 Q.  Are you familiar with the boards or credentialing committees

15 of any hospital in Birmingham, Montgomery, or Mobile, Alabama?

16 A.  No, I'm not.

17 Q.  Do you know whether they offer waivers of requirements, such

18 as residency or minimum admissions?

19 A.  I do not.

20 Q.  And do you know, assuming they did offer a waiver, that if a

21 waiver was not granted, if that's the same thing as an

22 application for privilege being denied?

23 A.  I don't know specifically whether that's the case or not.

24 Q.  Do you know if any doctors in Alabama who practice abortion

25 care have admitting privileges at a local hospital?

1  A.   Yes.   There was, as I recall, an abortion provider in

2  Huntsville who actually had a private practice, had admitting

3  privileges, worked part-time in one of the abortion clinics.

4  And basically, when it was found out, however it was found out,

5  that he was an abortion provider, they started picketing his

6  office, his home.   And he basically had to stop doing his

7  private practice and work full-time for the abortion clinic.

8  Q.   But he does have admitting privileges.   That's your

9  understanding?

10  A.   He does have admitting privileges.   To my knowledge, yes.

11  Q.   Do you know if he's the only one, or do you know if there

12  are others?

13  A.   I don't know of any others.

14  Q.   Do you know if any other doctors who perform abortions in

15  Alabama have privileges in other locations?

16  A.   Yes.   I believe Dr. Roe has privileges in Atlanta, hospital

17  privileges.

18  Q.   Do you know how many clinics are open in Texas today?

19  A.   I don't know the number, no.

20  Q.   Okay.   Do you -- do you have an approximation?

21  A.   Probably about 25, I would guess.   But none in the Rio

22  Grande Valley, that 5,000 square-mile area.

23  Q.   You said that you have some patients who travel long

24  distances, correct?

25  A.   Many patients.

1   Q.  Do you have some that cross state lines?

2   A.  Yes.

3   Q.  So -- of course, some of your patients will come from the

4   same metropolitan area, though, correct?

5   A.  Yes.

6   Q.  Do you know if -- if there are some women, Dr. Fine, who

7   will travel to another city to get an abortion even though

8   there's an abortion clinic in their hometown?

9   A.  They may.  You know, they may want to go to a clinic that

10  has a good reputation, as Planned Parenthood clinics do.  They

11  may have heard horror stories from friends about some of the --

12  some of the non Planned Parenthood clinics.  Possibly cost being

13  a factor.  There are a lot of -- of different options that women

14  decide to go to.  But usually they'll go to the closest one to

15  their home, assuming that it has a good reputation.

16  Q.  Have you ever had a patient who traveled just in an effort

17  to preserve anonymity?

18  A.  I'm sure it's happened, but I don't know specifically of any

19  cases.

20  Q.  Do you believe it would be safe, Dr. Fine, for someone who

21  was not a medical doctor to perform a surgical abortion?

22  A.  Yes.  It's been shown to be safe in the Weitz article that

23  we referenced in my report where they compared nurse

24  practitioners with physicians in California.  And they had the

25  statistically significant same rates of complications.

1   Q.   Would you -- if you were designing a protocol that would

2   permit nurse practitioners to provide surgical abortions, would

3   you require that a doctor be on premises?

4   A.   I would, if I were the medical director.

5   Q.   Why?

6   A.   Because although the actual procedure itself is technically

7   straightforward, there can be things that occur that are

8   unanticipated, such as sometimes when you give the local

9   anesthetic, a patient can have a seizure.

10  Q.   You would plan for things that could happen, correct?

11  A.   Yes.

12  Q.   Even though some of those might be rare.

13  A.   I would -- that's correct, yes.

14  Q.   Do you believe it would be safe for someone who is not a

15  doctor to administer a medical abortion?

16  A.   Yes.

17  Q.   Would you, again, require that a doctor be on premises?

18  A.   No, not with the abortion pill, because the abortion

19  actually -- the effect of the spontaneous miscarriage occurs 24

20  to 36 hours later when the patient is at home.  All that's

21  happening in the clinic is the patient takes a pill.

22  Q.   Now, medical abortions, as you've discussed, those are

23  administered with drugs, with pharmaceuticals, correct?

24  A.   Yes.

25  Q.   Could those drugs safely be administered over the counter?

```
 1  A.   No.

 2  Q.   Why not?

 3  A.   Because the -- there are certain contraindications to

 4  medication abortion, such as taking corticosteroids, people with

 5  certain lung conditions.  And the process of abortion isn't just

 6  taking the pills.  As I testified earlier, there's a whole range

 7  of counseling and making sure this is her choice and that she's

 8  not being coerced and planning for her reproductive history,

 9  making sure that she gets contraceptives after this abortion so

10  she doesn't have to come back with another unintended pregnancy.

11  So there's informed consent that's involved.  It's a process.

12  The taking of the pill is the actual medical thing that occurs,

13  but unsupervised taking of abortion pills is not in a woman's

14  best interests.

15  Q.   Preserving access to abortion care is important to you, is

16  it not?

17  A.   Sure, it is.

18  Q.   How many counties in Alabama, if you know -- what percentage

19  of counties have abortion clinics?

20  A.   I don't know that.

21  Q.   There was testimony in this trial that like 89 percent of

22  counties do not.  Does that sound right?

23  A.   Eighty-seven percent of counties in the United States do not

24  have a single abortion provider.  I do not know the figure

25  specifically for Alabama.
```

1  Q.  What would it do to access if our rules allowed

2  administration of medical abortions over the counter or if it

3  required nurse practitioners to do surgical abortions without a

4  doctor's supervision?

5  A.  I'm not sure I understand the question.

6  Q.  Wouldn't that increase access tremendously?

7  A.  That -- that could potentially, but taking the pills over

8  the counter would never happen.  You know, it's just not --

9  you're comparing apples and oranges.  It wouldn't happen.

10  Q.  It's a hypothetical.

11  A.  Hypothetically, yes, if you could get the abortion pill over

12  the counter, yes, it would increase access.

13  Q.  Then it would be available in a hundred percent of counties,

14  wouldn't it?

15  A.  Yes.

16  Q.  And yet, you would agree that it's safer for women to

17  require doctor supervision even though that would limit access.

18  A.  For surgical abortion.

19  Q.  Okay.  Either way.  You would agree that safeguarding the

20  health of women is important enough that we have procedures to

21  protect them even though they limit access.

22  A.  I think there's a balance where if the limitation of the

23  access creates such an undue burden on the patient that it

24  actually increases their risk, that's not in their best

25  interests.

1  Q.  Access is not, in and of itself, the only consideration,

2  though, correct?

3  A.  It becomes an important consideration when a 5,000

4  square-mile area doesn't have access.

5  Q.  That's Texas.  Do you know of a 5,000 square-mile area in

6  Alabama that doesn't have a clinic?

7  A.  No.

8  Q.  In your view, is there anything wrong, Dr. Fine, with a

9  doctor who performs an abortion walking away and letting the ER

10  take care of any complications?

11  A.  The -- first of all, the doctor that's walking away, the

12  clinic will still be responsible in terms of we try to encourage

13  the patient to return to the clinic if she's having any

14  problems.  And she would be taken care of, either another

15  physician who may be working there or the nurse clinicians in

16  the -- in the -- in the clinic who would contact the abortion

17  doctor for consultation.  So the clinic is not abandoning the

18  patient.  The doctor who flew in to do the procedures by

19  necessity had to fly in to do the procedures because that's the

20  only way they could get a provider to work there, because there

21  were no local doctors who were willing to provide abortions in

22  that community.

23  Q.  So is -- does that mean there's nothing wrong with a doctor

24  walking away and leaving the emergency room to take care of

25  complications?

1  A.  In the context of elective abortion, no.

2  Q.  Now, you have local privileges, as we discussed, correct?

3  A.  Yes.

4  Q.  You live and practice in the same community.

5  A.  No.  I'm -- I live 35 miles away from the hospital.

6  Q.  Same general metropolitan area.

7  A.  Same general metropolitan area, yes.

8  Q.  You would be available to your patients if they had

9  complications and needed you after the procedure, would you not?

10 A.  If -- the last part of what you said?

11 Q.  You would be available to your patients if they have

12 postabortion complications.

13 A.  I wouldn't need to be.  As I testified earlier, I would let

14 the emergency room physicians handle it and my colleagues who

15 are on call in the hospital handle it.  I would not be the ideal

16 person to handle a complication such as doing a hysterectomy.  I

17 haven't done a hysterectomy in several years.

18 Q.  There are some complications after abortion that you are

19 qualified to treat, though, are you not?

20 A.  Sure.  But they're commonly treated in the ER by the doctor

21 there.

22 Q.  Do you think, rightly or wrongly, Dr. Fine, that abortion --

23 that doctors who perform abortions, as a group, have a lesser

24 reputation among the public than other doctors?

25 A.  I think there's a negative connotation to physicians who

1   provide abortion care, yes.

2   Q.  Don't you think that would change, Dr. Fine, and that

3   abortion practitioners would be held in higher regard and that

4   more doctors would be willing to engage in that practice if

5   there were fewer doctors who walked away from patients, who

6   washed their hands of complications, and left their patients to

7   the mercy of the emergency rooms?

8   A.  No.  The negative connotation to an abortion doctor is that

9   he's a murder, not because he's not available to personally

10  handle complications because he's traveling from out of state.

11  It's about the whole issue of pro-life or not.  And that's what

12  makes abortion negative in society.

13  Q.  Is it your testimony that the itinerant nature of many

14  abortion practitioners has no effect on the public perception?

15  A.  No.

16          MR. DAVIS:  Thank you.

17          That's all the questions I have right now, Your Honor.

18          THE COURT:  Okay.  Any redirect?

19          MS. SANDMAN:  Thank you, Your Honor.

20                    REDIRECT EXAMINATION

21  BY MS. SANDMAN:

22  Q.  Dr. Fine, you described earlier how complications are

23  handled in your practice.  Do you -- as to these specific

24  complications from abortion procedures.  Do you consider that to

25  be walking away from your patients?

1  A.  No.  We try to encourage our patients to come back to the

2  clinic where possible for treatment and follow-up and

3  evaluation.  We don't -- we only tell them to go to the

4  emergency room if it's a more extreme situation where they're

5  hemorrhaging or they're having severe pain.

6  Q.  And can you speak further to the steps that are taken in

7  your practice to ensure continuity of care for your patients for

8  an abortion patient with a complication?

9  A.  Yes.  As I stated, we -- the -- the next -- we -- when we

10  find out that they were sent to an emergency room, we will call

11  the next morning that patient or their family to see how she's

12  doing, what happened, and whether she needs to come into the

13  clinic to be evaluated and have further treatment.

14  Q.  And is the physician who provided the abortion or a backup

15  physician also available to contact by telephone if the

16  emergency room physician thinks that would be helpful?

17  A.  Yes.  Absolutely.  A hundred percent of the time.

18  Q.  And do you know whether these steps that you've described

19  are typical among Planned Parenthood providers?

20  A.  I think it's true of nonabortion -- non Planned Parenthood

21  abortion clinics.  I think it's the standard within the --

22  all -- most of the abortion clinics are members of the National

23  Abortion Federation, NAF, who has similar recommendations and

24  guidelines.  And I believe most abortion if not all abortion

25  clinics follow the same procedures.

1  Q.  Dr. Fine, there was some back and forth earlier about

2  whether there could be some benefit to requiring doctors to get

3  admitting privileges because some bad doctors would be

4  eliminated.  Assume for purposes of this question that there is

5  such a benefit.  Would it be equally met if the doctor has

6  admitting privileges in another state?

7  A.  Yes, it would.  If a physician can pass muster to have

8  admitting privileges in another state, then by that argument,

9  she's not a bad doctor or he's not a bad doctor.  They're a

10 competent doctor or they wouldn't have admitting privileges, by

11 that argument.

12 Q.  Dr. Fine, the State asked you some questions about the

13 FDA-approved regimen for medication abortion.  Can you explain

14 to the Court the status of the regimen that you described

15 allowing medication abortion to be provided up until 63 days?

16 A.  Yes.  The evidence-based regimen, Your Honor, which is the

17 one that's been used in the last decade, is one pill instead of

18 three, goes up to 63 days instead of 49 days, and allows the

19 woman to take the second pill, the misoprostol, in the comfort

20 of her home rather than having to come back for an extra clinic

21 visit, take off time from work and have another clinic visit.

22 Additionally, the efficacious -- the complication rate with the

23 evidence-based regimen is lower than FDA regimen.  The only

24 reason the labeling hasn't been changed is because it would cost

25 several millions of dollars to do the paperwork and the study to

1   allow that paper -- that label change.  But the -- but the

2   evidence-based regimen is superior, more convenient, has fewer

3   complications, and is more successful than the FDA regimen which

4   was now done over 15 years ago.

5   Q.  And since you mentioned the possibility of obtaining a label

6   change, is that something that is -- who would have to set that

7   in motion?

8   A.  The -- the makers of -- of the abortion pill Mifeprex,

9   M-I-F-E-P-R-E-X, who is Danco Labs.  And they have no reason to

10  apply for that abortion change because the American Congress of

11  OB-GYN in one of their bulletins very recently and also

12  previously in 2006 stated that the evidence-based regimen is

13  safer and superior to the FDA regimen and it should are used

14  preferentially.  So since most physicians utilize the

15  evidence-based regimen -- the only physicians that don't are

16  those that are mandated in recent laws like in Texas where they

17  have to go backward in time 15 years and use an outdated, less

18  safe, less efficient FDA-mandated regimen.

19  Q.  And just so that the record is very clear, does the --

20  A.  And excuse me.  Also, Your Honor, frequent -- it's not rare

21  that FDA-approved medications and protocols are used differently

22  by physicians in practice.  It's a common practice.

23  Q.  Is that -- is that what's known at off-label use?

24  A.  Yes.  Off-label use.  It's a very common practice.  In fact,

25  the drug misoprostol, that second pill, was originally designed

1  as an antiulcer -- ulcer drug for women taking nonsteroidal

2  antiinflammatory.  So the use in obstetrics where it's widely

3  used is an off-label use.

4  Q.  And do you know whether the FDA has taken the position that

5  doctors should only provide drugs in accordance with the -- the

6  specific terms of the FDA approval?

7  A.  No.  It's commonly -- off-label use is commonly allowed.

8  The FDA brings a drug to market based on preliminary pivotal

9  data from studies that show the drug is safe.  But as a drug is

10 used in practice, there may be ways of using a drug that are

11 even more safe and more efficacious that are off-label, and that

12 is allowed.  That is good medicine.

13 Q.  And I think that -- I just want to make sure that -- that

14 this came out clearly in one of your prior answers.  Was your

15 testimony that the regimen that you described which allows

16 medication abortion until 63 days -- is that more or less

17 effective than the FDA regimen?

18 A.  Much more effective.

19         MS. SANDMAN:  If I may confer briefly, Your Honor.

20         THE COURT:  Yes.

21     (Brief pause)

22         MS. SANDMAN:  Did the Court want me to -- nothing

23 further from me, Your Honor.  Would the Court like me to read

24 your questions?

25         THE COURT:  Yes.  Why don't you show them to him, and

1    then he can just answer them.

2         MS. SANDMAN:  Oh, I can pass them?

3         THE COURT:  Yes.

4         MS. SANDMAN:  Thank you, Your Honor.

5         THE WITNESS:  Then he'll have them in writing.

6         First read the question and then answer it.

7         THE WITNESS:  Yes, Your Honor.

8         THE COURT:  Read it out loud.

9         THE WITNESS:  During a surgical abortion, how is the

10   cervix dilated, through medication or mechanical means?

11        In early surgical abortion, it's dilated with metal

12   rods that are called dilators that increase one millimeter in

13   size.  So you start with a small one and gradually go up in

14   millimeters to the size that you need.  If a patient is -- is,

15   for example, nine weeks' gestational age, we'll dilate her nine

16   millimeters.  So they're metal rods that are used.  The Cytotec

17   or misoprostol, M-I-S-O-P-R-O-S-T-O-L, also can be given two

18   hours prior to the procedure.  And that has a chemical action on

19   softening the cervix and allowing dilation with less force.

20   This is useful in women who have never had pregnancies before

21   where their cervix has never dilated with childbirth and it's

22   firmer and it's tighter.  So it makes the mechanical dilations

23   safer.  So sometimes there's a combination of both the

24   misoprostol and the metal rod.  But generally, in the first ten

25   to 11 weeks of pregnancy, the metal rods are used to dilate the

1   cervix.

2          The second question:  Is there any need to dilate the

3   cervix during a medication abortion?

4          No, because the combination of the first drug, the

5   Mifeprex, combined with the second drug, misoprostol, by itself

6   softens and dilates the cervix.  And that's one of the reasons

7   that's used sometimes to induce labor in women.  So the cervix

8   is soft and already dilated with the medication abortion

9   two-pill regimen.  And even when that fails and the patient has

10  to come back because it's incomplete and you have to suction out

11  the remaining tissue, dilation is not necessary.  The cervix is

12  already dilated from the pills.

13         The third question:  Is there a complication from

14  abortion which would require a hysterectomy?

15         Yes.  There are situations where a pregnancy can

16  implant in a cesarean scar, sometimes what we call a placenta

17  accreta, A-C-C-R-E-T-A, and that placental tissue cannot be

18  removed.  The uterus is not contracting down.  The woman

19  hemorrhages; and to save her life, you have to take the uterus

20  out.  This is very rare but sometimes can occur.

21         How large is the risk of that particular complication?

22  Extremely small.  If hospitalizations are required in five women

23  per 10,000, hysterectomy might be required in about 15 percent

24  of those women hospitalized.  Generally they're hospitalized for

25  intravenous antibiotics or to have a D&C to control the

1    bleeding.

2          Is there a complication from abortion which could

3    require a laparotomy?

4          A laparotomy is an incision in the uterus to look

5    around.  And sometimes instead of laparotomy, Your Honor,

6    they'll use laparoscopy where they'll put a telescope through a

7    maybe one-half-inch incision in the abdomen.  And using the

8    telescope, they can look around inside.  And the purpose of that

9    is if there's a suspicion of internal bleeding as might occur

10   with a uterine perforation or laceration of the cervix.  So

11   sometimes -- again, the need for a laparotomy is fairly rare.

12   Again, in percentages of women admitted to the hospital, it

13   would range in maybe 20 percent, a little more than

14   hysterectomy, but not a lot.

15         Is there -- in Cleland, et al., table two, the largest

16   portion of significant outcomes or events from medication

17   abortion is ongoing intrauterine pregnancy.

18         And that's correct, Your Honor.  In that study, the

19   ongoing pregnancy rate was 0.5 percent, as I recall.  Medication

20   abortion -- women who are consented for medication abortion are

21   told that this is 99 and a half percent effective, but it's not

22   a hundred percent.  In fact, using the FDA protocol in the

23   original published studies, there was a two percent failure rate

24   with ongoing pregnancy.  So the woman needs to know that it's

25   not a hundred percent.  And that's why it's important that with

1  medication abortion the woman come back for follow-up so we can

2  make sure the pregnancy is gone.

3          What is an ongoing intrauterine pregnancy?

4          That's where typically the medication abortion drugs

5  have not worked in that one-half of a percent.  And they come

6  back and they still feel pregnant, and there's still a viable

7  pregnancy there.  At that point, because we said one of the

8  drugs -- the second drug is potentially tetrogenic, the patients

9  are counseled they really should have a surgical completion of

10 that abortion.  Sometimes the embryo has died but the tissue is

11 still in the uterus.  And in that case, you still need to

12 evacuate the uterus.  The drug didn't completely cause

13 expulsion.  Now, in that situation, in both of those situations,

14 an ongoing pregnancy and a continuing pregnancy, if you repeat

15 the dose of the second drug, the misoprostol, 50 percent of the

16 time that will complete the abortion without having to do

17 surgery.

18         Remember, women choose medication abortion for several

19 advantages.  They don't want to have to go into a clinic around

20 the protestors if they don't have to.  They want to be able to

21 be in control of the process themselves.  They want to be in

22 their home environment when they have the miscarriage.  They

23 want to be in control more; whereas a surgical procedure, you go

24 in, have a surgical procedure done, and it's over with.  Some

25 women prefer the surgical procedure.  Other women prefer the

1    medication abortion.  In many clinics, women who are eligible

2    for the medication abortion, nine weeks and less, approximately

3    30 percent to as many as 50 percent choose to have the pill, the

4    medication abortion, rather than having a surgical procedure

5    because they like being kind of in control and they perceive the

6    process as more natural.

7            So what -- would it cause pain or other complications

8    to the women?

9            The ongoing viable pregnancy, general no symptoms,

10   other than she would continue to feel pregnant.  In the

11   situation of retained tissue, just like a spontaneous abortion,

12   that would be bleeding and cramping that would occur.  And that

13   would be diagnosed by doing an ultrasound.

14           And generally, most of the time the ongoing pregnancy

15   is discovered in the follow-up visit.  And we keep logs of the

16   medication abortions.  So if a patient doesn't show up for her

17   follow-up appointment generally a week later, we'll call and

18   keep calling saying you need to come in so we can confirm that

19   the pregnancy -- the abortion is complete and the pregnancy is

20   gone.

21           MS. SANDMAN:  Your Honor, one further question, if I

22   may.

23           THE COURT:  Any follow-up questions from you first?

24           MS. SANDMAN:  Yes, Your Honor.

25           THE COURT:  Okay.

1          MS. SANDMAN:  Just one.

2                    REDIRECT EXAMINATION

3    BY MS. SANDMAN:

4    Q.  Dr. Fine, you spoke about it being very rare that an

5    abortion complication would lead to a hysterectomy.  Is it even

6    more rare if you focus on abortions in the first trimester?

7    A.  Yes.

8    Q.  And is that true for the complication rates -- excuse me --

9    for the rate of complications that could lead to a laparotomy as

10   well?

11   A.  Yes.  The -- Your Honor, the more you have to dilate the

12   cervix bigger, then the -- and the more instrumentation you have

13   to use to remove the tissue parts, the higher the risk of

14   perforation to the uterus.  And also, the further along the

15   pregnancy is, the larger the placenta is.  And the placenta can

16   implant in the cesarean scar where it won't come out.  It's

17   called an accreta, A-C-C-R-E-T-A.  And that can cause severe

18   hemorrhage and the need for hysterectomy.  Much more common in

19   the second trimester than in the first trimester.  It's very

20   rare in the first trimester.

21          MS. SANDMAN:  No further questions.

22                    RECROSS-EXAMINATION

23   BY MR. DAVIS:

24   Q.  Dr. Fine, if a medication abortion is administered too late

25   in the process -- the protocol you have given testimony about,

1  what was the limit, gestational age?

2  A.  The evidence-based regimen is 63 days, although there is

3  data that is recently going to be presented that shows it's safe

4  through ten weeks or 70 days.

5  Q.  Okay.  Let's say that a doctor erroneously administers a

6  medication abortion at, say, 15 weeks.  How do the risks differ?

7  What risks are presented in that scenario?

8  A.  Probably none.  The abortion would either work or it would

9  not work.  Now, at 15 weeks' gestation, there is a higher chance

10  that not all the tissue might pass and some of the tissue might

11  be retained; and that would increase the risk for hemorrhage or

12  infection.  But part of the protocol is you do not do a

13  medication abortion without confirming that there is an

14  intrauterine pregnancy.  And it is by ultrasound within the

15  parameters; that is, 63 days.

16      And the ultrasounds are done transvaginally, Your Honor.

17  There's a probe that's put through the vagina that puts it in

18  close proximity to the uterus, and they can measure the

19  pregnancy age by days.  They can say it's six weeks two days.

20  It's that accurate.

21  Q.  Whatever the likelihood is that a clinic would administer it

22  at such a late stage, is it true, then, that the complications

23  that could be present are the same, it's just that the risk of

24  the complication may differ for later term?

25  A.  Well, they would not use an abortion pill beyond nine weeks.

1  So it's --

2  Q.  Just saying hypothetically.

3  A.  Hypothetically, if they didn't do their due diligence and

4  for whatever reason gave the pills to a whom who is 15 weeks'

5  pregnant, usually what will happen is it wouldn't work.

6  Q.  Okay.

7  A.  The pregnancy will continue.

8  Q.  There's been testimony from an Alabama clinic, Dr. Fine,

9  that abortion clinics sometimes have patients present who are

10  recreational drug users.  Are the risks that you've been

11  discussing -- would they be different in any way from a patient

12  who is -- is a recreational drug user?

13  A.  No.

14  Q.  No impact on risk, to your knowledge?

15  A.  Not -- not as far as abortion complications.  If you -- if

16  you are going to use oral Valium or other medications

17  beforehand, then you would want to know if -- you know, if she's

18  a user, because that could affect her tolerance.  She would need

19  more pain medicine than average.

20  Q.  Pain tolerance is how you would --

21  A.  Pain tolerance would be -- would be -- would be greater.  A

22  drug user would need more pain medicine than a nondrug user.

23  But in terms of the actual technical abortion procedure and the

24  potential complications from that abortion procedure, they would

25  be the same in a drug user versus a nondrug user.

1  Q.  You said on redirect examination that doctors from the

2  clinic that you administer would be available in the event an ER

3  doctor did wish to speak to the abortion provider; is that

4  correct?

5  A.  Correct.  Correct.

6  Q.  But haven't you also said that there's really no need for

7  that conversation to take place?

8  A.  Most of the time, the ER doctor does not attempt to contact

9  the abortion provider.

10  Q.  If the ER doctor does want such a conversation, is the ER

11  doctor just mistaken, dumb?

12  A.  No, not mistaken or dumb.  It's just -- it can be a courtesy

13  to call the surgeon.  It's a nice courtesy to do, but it's not

14  medically necessary.

15  Q.  Did you testify in the Texas litigation --

16  A.  I did.

17  Q.  -- concerning admitting privileges?

18  A.  I did.

19  Q.  Has your testimony and opinions in that case been generally

20  and materially the same as what you presented today?

21  A.  Yes, sir.

22         MR. DAVIS:  Thank you.

23         THE COURT:  Anything else from the plaintiffs?

24         MS. SANDMAN:  No, Your Honor.

25         THE COURT:  Okay.  You may step down.  Thank you.

1          THE WITNESS:  Thank you, Your Honor.

2     (End of excerpt)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25