# Exhibit I

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

PLANNED PARENTHOOD SOUTHEAST, INC., et al.,

Plaintiffs,

vs. CIVIL ACTION NO. 2:13-cv-405-MHT

LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al.,

Defendants.

* * * * * * * * * * * * *

**DEPOSITION OF JEFFREY WILLIAM HAYES,** taken pursuant to stipulation and agreement before Lyn D. Vickers, ACCR #66, Certified Court Reporter and Commissioner for the State of Alabama at Large, in the Law Offices of Bradley, Arant, Boult & Cummings, RSA Dexter Avenue Building, 445 Dexter Avenue, Suite 9075, Montgomery, Alabama, on Wednesday, October 23rd, 2013, commencing at approximately 1:55 p.m.

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

Ms. M. Gosia Spangenberg
Ms. Emily Stark
WILMER, CUTLER, PICKERING, HALE & DORR
Attorneys at Law
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Mr. Randall C. Marshall
Legal Director
ACLU Foundation of Alabama
207 Montgomery Street, Suite 910
Montgomery, Alabama 36104-3535

Mr. Andrew C. Beck
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 10004-2400

ON BEHALF OF THE DEFENDANTS:

Mr. Andrew L. Brasher
Deputy Solicitor General
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152

ON BEHALF OF THE DEPONENT:

Mr. David G. Hymer
BRADLEY, ARANT, BOULT & CUMMINGS
Attorneys at Law
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2104

* * * * * * * * * * * * *

EXAMINATION INDEX

JEFFREY WILLIAM HAYES

BY MS. SPANGENBERG . . . . . . . . . 5
BY MR. BRASHER . . . . . . . . . . . 106

EXHIBIT INDEX

| Plaintiff | | PAGE |
|---|---|---|
| 1 | Amended complaint | 12 |
| 2 | Defendants' disclosure of non-retained expert | 59 |
| 3 | Excerpt from standard book | 86 |

* * * * * * * * * * * * *

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that the deposition of **JEFFREY WILLIAM HAYES** is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Lyn D. Vickers, Certified Shorthand Reporter, ACCR #66, and Commissioner for the State of Alabama at Large, without the formality of a commission, that objections to questions other than objections as to

the form of the question need not be made at this time but may be reserved for a ruling at such time as the said deposition may be offered in evidence or used for any other purpose by either party provided for by the Statute.

It is further stipulated and agreed by and between counsel representing the parties in this case that the filing of said deposition is hereby waived and may be introduced at the trial of this case or used in any other manner by either party hereto provided for by the Statute regardless of the waiving of the filing of the same.

It is further stipulated and agreed by and between the parties hereto and the witness that the signature of the witness to this deposition is hereby not waived.

* * * * * * * * * * * * *

COURT REPORTER: Usual stipulations?

MR. BRASHER: That's fine with the state.

MS. SPANGENBERG: That's fine with us.

* * * * * * * * * * * *

**JEFFREY WILLIAM HAYES**

The witness, after having first been duly sworn to speak the truth, the whole truth and nothing but the truth testified as follows:

EXAMINATION

BY MS. SPANGENBERG:

Q. Good afternoon. My name is Gosia Spangenberg. I'm one of the attorneys representing Reproductive Health Services in this lawsuit. Also present with me are Randall Marshall, Andrew Beck, and Emily Stark. They are also attorneys for the same plaintiff, Reproductive Health Services.

Can you please state your full name?

A. Jeffrey William Hayes.

Q. And what is your current business address?

A. 1400 McFarland Boulevard North, Tuscaloosa, Alabama 35406.

Q. Before I start asking more questions, I just wanted to go over some ground rules. The court reporter will be taking your

testimony today, so it is important that we try not to speak over one another. Do you understand?

A. Sure.

Q. And because she needs to take down what we say, it's important that you give oral responses and try to avoid nodding instead of actually using your words.

A. Okay.

Q. And you're represented by counsel today, by Mr. Hymer; is that correct?

A. That's correct.

Q. And he may from time to time object to one of my questions. You should go ahead and answer my question unless he instructs you otherwise. Do you understand?

A. I do.

Q. And if at any point in time you don't understand a question, please let me know and I'll try to be more clear. Otherwise, if you go ahead and answer, I'll assume that you have understood the question.

A. Okay.

Q. If at any point in time you feel like you need a break, please let me know. If there's not a pending question, we'll go ahead and try to accommodate you; okay?

A. Okay.

Q. And do you understand that you're under oath today?

A. I do.

Q. Is there any reason why you couldn't testify truthfully and clearly today?

A. No.

Q. Are you on any medication that might inhibit your ability to testify today?

A. No. I don't think so.

MR. HYMER: The only thing I'd say is if you do have a question on privilege, you can ask me while the question is still pending. But otherwise I agree you should answer the question before asking for a break.

Q. Have you ever been deposed before?

A. Once.

Q. And what kind of a case was that?

A. It was a neighborhood association, I guess, dispute with a business that was close to the neighborhood.

Q. And where was this lawsuit?

A. Tuscaloosa.

Q. And did it end up going to trial --

A. It did.

Q. -- or did it settle?

A. It settled right as the trial began.

Q. Did you ever testify in a trial?

A. No.

Q. And what was the topic of your deposition testimony in the homeowner association case you just described?

A. Just, you know, my experience, I guess, with the -- it was noise disruption and things like that was the topic of the -- I guess the reason for the dispute. And so just, you know, my experience, my family's experience with that business.

Q. And have you ever acted as an expert in any

lawsuit?
A. No.
Q. And are you familiar with House Bill 57?
A. Not really. This is the abortion bill you're talking about?
Q. Yes.
A. Vaguely.
Q. And when did you first hear of this bill?
A. I don't think I can tell you that. Just in the newspaper, television news, radio news. At some point I think I heard some things about it.
Q. And do you recall anything specifically about it?
A. No.
Q. And was this prior to the time when you were contacted by the defendants --
A. Yes.
Q. -- in this case?
A. Yes.
Q. Are you familiar with the provision in that bill that would require abortion clinics to have staff privileges at a local hospital?

A. A little bit, yes.
Q. And how did you become familiar with that provision?
A. I think that was one of the things that I remember hearing or seeing that that was an item in the bill. But when the AG's office called me is when I -- you know, they explained a little bit what was going on.
Q. And have you reviewed the text of that bill before?
A. No.
Q. So your understanding of what's in it is what you've heard in the news reports and what the AG's office had represented to you?
A. Yes.
Q. When did you first become aware of this particular litigation?
A. I guess when the AG's office called. I may have known that there was something going on, but I can't be certain.
Q. And what did the AG's office tell you when they called you?

A. They were curious about that -- I'm the president of the Alabama Association of Surgery Centers, and so they were contacting me because I'm in that role. And they just wanted to ask some questions about what surgery centers did, how we credential physicians, what our requirements were. They asked if they could ask some questions, and I said sure.
Q. What questions specifically do you remember them asking you?
A. They wanted to know if we required physicians to have hospital privileges.
Q. And when you say we, who do you mean?
A. Surgery centers.
Q. And what --
A. In Alabama.
Q. And what did you tell them?
A. I told them, yes, I thought we did. I thought that -- I knew my facility did. I felt like that, you know, just based on experience being in the business for a while that it seemed like one of those

pretty routine things that surgery centers require their medical staffs to have hospital privileges.
Q. And was there any information that the defendants provided to you, or were they simply asking questions?
A. Just asking questions.
Q. And were all of their questions directed to the issue of staff privileges at Alabama surgery centers -- ambulatory surgery centers?
A. Yeah, I think so. I don't remember anything off the subject.
Q. And I am going to show you --

MS. SPANGENBERG: Can I please mark this as Exhibit 1.

(Plaintiff's Exhibit 1 was marked for identification.)

Q. What I am showing you is what's been marked as Exhibit 1. It's the first page of an amended complaint in the lawsuit that we are here about today.
A. Uh-huh (positive response).

Q. I wanted you to take a look at the list of plaintiffs that appear on the left-hand side of the document in sort of the first box of text. And if you could let me know if you recognize any of the names on that list.
A. Planned Parenthood, Reproductive Health Services --
Q. Right.
A. -- June Ayers. I've heard of Planned Parenthood.
Q. How have you heard of Planned Parenthood?
A. News.
Q. And are you speaking of Planned Parenthood Southeast, Incorporated specifically or just --
A. No. Just Planned Parenthood.
Q. -- Planned Parenthood, the organization generally?
A. The organization generally.
Q. And what have you heard of them?
A. That they are a -- what do you guys call it? Pro choice? Pro choice organization.

Q. Do you know what Planned Parenthood does?
A. Vaguely, yes. A little bit. I think there's --
Q. What do you think that they do?
A. Well, I think -- What I think they do is try to offer assistance and alternatives to women who are pregnant that may be considering their choices. And I guess my other thought of what they do is help support or, you know, defend abortion rights or rights to choose, however you want to word that.
Q. And do you have any impressions regarding Planned Parenthood?
A. Not really.
Q. Other than Planned Parenthood, do you recognize any of the other names?
A. I don't think so. Never heard of Reproductive Health Services, and I don't recognize the --
Q. The three names?
A. -- the RN or the other -- no.
Q. And what about the defendants that appear

right below?
A. Of course, I know that Mr. Strange is the attorney general. Ellen Brooks I don't know. Brandon Falls I don't know. Donald Williamson I do know. Ms. Rich I don't know.
Q. And Mr. Strange, do you know him personally or --
A. No.
Q. -- do you just know of him?
A. Just know him -- know of him.
Q. What about Dr. Williamson?
A. Same.
Q. Just know of him. Don't know him personally?
A. Right.
Q. And do you have any impression of either of these gentlemen?
A. It's favorable, yeah. I think Mr. Strange is doing a good job in my opinion. And Dr. Williamson, yes, I think he does a fine job as state officer.
Q. And in your professional, do you ever deal

with ADPH professionally?
A. Yeah. A little bit.
Q. And by ADPH I should clarify I mean --
A. Alabama Department of Public Health?
Q. Right.
A. Yeah.
Q. But you've never met Mr. Williamson -- or Dr. Williamson?
A. I may have met him, but -- I think I may have met him, but it's just -- that's it, you know.
Q. And other than with counsel or the defendants' attorneys, have you discussed this lawsuit with anyone?
A. No. Not -- I mean, the membership of the organization, you know, to let them know what was going on, the Alabama association, ASCs.
Q. What did you communicate to the ASCs?
A. Well, I just told them that -- you know, when the AG's office first reached out, I told them that, you know, I had gotten some questions. And then we -- you know, we

conducted a -- or I conducted a very informal poll, so they knew why I was asking those questions of them. And we had a meeting yesterday actually, a state association meeting, one of our -- the two meetings we have every year. And I brought them up to speed yesterday that I'd be doing this today.

Q. And when you say that you communicated to the ASCs, who specifically are you communicating to?

A. Our members. The administrator of a member, a facility I guess would be considered -- really the facility is the member, and the administrator would be the first representative. Sometimes you might have the director of nursing or clinical lead or medical director be a surrogate representative or a business office manager, but generally it's the administrator.

Q. And so typically there's someone on the administrative side at an ASC who is

designated to communicate with the Alabama association of ASCs?

A. Yeah.

Q. And how many ASCs are there in Alabama?

A. Oh, golly. Licensed ASCs I think it's in the thirties. 33, 39 maybe.

Q. If I told you that I've seen some statistics from the ADPH that say that there are 42 licensed ASCs, would that --

A. Could be, yeah. I think -- After I said 33, I thought it might have been 39. So that would be reasonable to -- yes.

Q. And out of those -- out of that number, how many are members of the Alabama association?

A. Well, our treasurer was not there yesterday, so you just have to give me a little room here. We think -- I could safely say between 20 and 24.

Q. So when you found out that you would be testifying at the deposition for this lawsuit, you communicated with the administrator of representatives of these

20 to 24 ASCs to let them know that you will be appearing here today?

A. Yeah. I did that yesterday.

Q. And how did you communicate with them? At the --

A. Face-to-face.

Q. -- in-person meeting?

A. Yeah.

Q. And all 20 --

A. No. We probably had --

COURT REPORTER: Wait just a minute. Would you please let her finish asking her question before you start answering?

THE WITNESS: Oh, I'm sorry.

COURT REPORTER: Would you repeat your question, please.

Q. I think I asked where you communicated in person with the 20 to 24 representatives of the ASCs that are members of the association.

A. Where?

Q. At the meeting yesterday?

A. Yes. We did at the meeting yesterday.

Q. And how many ASCs were represented at this meeting?

A. We took roll. I'm going to say 15.

Q. So at this meeting you said you would be appearing here today?

A. Yeah.

Q. And you explained why the defendants contacted you?

A. Yes.

Q. And can you tell me how you -- what you told them?

A. Sort of what we already stated, that, you know, there is a bill and a challenge of that bill or suit, I guess, and that we got contacted based on a real specific piece of the legislation that, you know, require -- that ASCs require physicians -- well, we're not part of that bill, but they -- I guess the abortion bill has something to do with physicians doing abortions being required to have privileges at a hospital. So in that regard or related to that, they asked

us what our -- you know, what our practices were. And so I told them -- you know, I answered the questions and one thing led to another and so here we are.
Q. And you said that you took an informal poll in the course of this meeting?
A. We did.
Q. And what was that poll regarding?
MR. HYMER: Just to be clear, I'm not sure it was during the course of the meeting that the poll --
A. It wasn't.
MR. HYMER: I just wanted to clear up that confusion and make sure it was clear on the record.
A. Yeah. The -- I'm sorry. What was the question?
Q. I must have misunderstood. I thought you said that you took a poll in the course of the meeting that took place yesterday.
A. Yesterday I told them what we were doing

today. Previous communications have been this is what happened. AG called us. I gave them some information. They followed up. Fast-forward to today, deposition. So the previous communications somewhere in there when the AG asked me, you know, how sure are you that most or virtually all ASCs require their physicians to have privileges, I said, well, I'm pretty sure, but, you know, I could do just a quick poll and see. And so that's when I did just an informal poll.
Q. And how did you carry out the poll?
A. Phone calls, some e-mail, I guess, and seen a few people since then. You know, this happened over -- I don't know -- a little bit of time. So all of the above, I guess.
Q. And when you did that, how many different ASCs do you think you contacted through the phone calls, the e-mail, and the in-person meetings?
A. Yeah. I'm going to say 23 to -- or 21 to 24. We'll use that number. I think 24

is -- or 23 is how many we actually have on the e-mail distribution. And so all were contacted. 18 responded. Not all that is e-mail. That's various forms and replies. But I seem to remember we had 18 people reply.
Q. Okay. So between the phone calls, the e-mails, and the in-person meetings, you got responses from 18 different ASCs?
A. Yes.
Q. And did you keep notes or other documents documenting the conversations and/or e-mails you had with these 18 ASCs?
A. I think I had a list -- a little notebook piece of paper that I kind of just put, yes, no, yes, no, yes, no.
Q. And we'll get into the --
A. Or all yeses, but not nos.
Q. We'll come back to this topic. I just wanted to go back to -- you became a witness in this case because the AG's office contacted you?
A. Yes.

Q. And who contacted you specifically?
A. Will Parker.
Q. And do you remember when that conversation took place?
A. Summertime.
Q. How did you prepare for today's deposition?
A. Well, I don't know. I mean, I guess talked with David a little bit. Talked with Andrew a couple of weeks ago -- or a week ago. Nothing -- I mean, just general stuff.
Q. What did you and Andrew talk about?
A. Just what the deposition would probably involve.
Q. Did you review any documents in the course of any of the meetings with counsel or defendants' attorney?
A. No. I mean -- No.
MR. HYMER: Just to be clear, it was a phone conversation, not a face-to-face --
A. Yeah. The first time I met him was today.
Q. So you had a phone conversation?

A. Yes.
Q. Did you do anything else to prepare for today's deposition?
A. No.
Q. And did you discuss your potential testimony with anyone other than your counsel and the ASC representatives that took place yesterday?
A. My wife.
Q. What did you tell her?
A. I had to come to Montgomery to do this.
Q. Did you discuss the substance of what you'd be testifying about with her?
A. Not really.
Q. Have you had any other involvement in this lawsuit other than preparations for this deposition?
A. No.
Q. Have you provided any documents to the defendants?
A. There's an affidavit I guess is what you call that.
Q. And when did you write this affidavit?

A. I don't know what the date would be. It was -- you know, the AG prepared it. We edited it and then returned it. I don't know the date.
Q. And what was the content of this affidavit?
A. That -- I believe it was my position that with -- maybe experience was listed in there. I don't know. But that I believed or could state with some pretty good confidence that all or virtually all of the physicians that were doing -- that had privileges in an ASC in Alabama were also privileged to -- you know, had privileges at a hospital.
Q. So the only document you remember providing to the defendants is this affidavit?
A. Yes.
Q. No other documents?
A. No.
Q. What about have you prepared any written reports aside from this affidavit?
A. No.
Q. And have you completed any documents in

connection to this lawsuit?
A. What do you mean?
Q. It sounds like you had a list of the ASCs that you contacted that you compiled?
A. Yeah. If you want to count that, yeah. It was my hand notes of, you know, counting the number of responses; yes, yes, yes, yes. So if you want to count that, yes.
Q. Have you reviewed any documents in relation to this litigation?
A. No.
Q. Can you please describe your education since high school?
A. Bachelor of science from the University of Alabama.
Q. And what year did you get this degree?
A. '85.
Q. Any other degrees?
A. No.
Q. So you're not a medical doctor?
A. No.
Q. And don't have any other health care related degrees?

A. No.
Q. Do you have any professional certificates or licenses?
A. Probably -- No. Not that -- you know, other than just courses and training courses and things like that. But nothing -- not a -- you know, probably the one that is most relevant to our industry is certified ambulatory surgery center administrator, and I don't have that.
Q. And you said you have some training in courses that you've taken. What's the subject matter of the training and courses that --
A. Any and everything. I mean, finance, human resources, management, operations, infection control, accreditation.
Q. And where have you taken these courses?
A. Internal. I've been to -- you know, within our company, our management company, the one that we have now and the previous management company we've had. I've been to seminars. I've been to University seminars

and conferences.
Q. This is something you've done over the course of your career. Is that fair to say?
A. Yes.
Q. And what about your work history? Can you give me a brief overview since high school?
A. Since high school?
Q. After high school.
A. Even college jobs?
Q. We can skip college. We can start after college. Starting in '85.
A. Yeah. My first job was with a company called Health America. They were an HMO in Birmingham. And I worked there five years, six years until they went bankrupt. Helped close them down. And then I got a job with Henderson & Walton Women's Center. It's an ob-gyn practice in Birmingham. I was there two years. I think that takes us to, what, '88, '89. I think it's '89. I left Henderson & Walton in '89 to go to Tuscaloosa, and that's where I became employed by a company that owned Tuscaloosa

Surgical Center.
Q. And what's the name of that company or what was it?
A. That company was Tasc, T-A-S-C, Incorporated. They were a management company. They owned and managed the surgery center and about a dozen other -- or about half a dozen other businesses.
Q. And when you were with Health America, the HMO, what was your role?
A. My first job was in customer service. Second job was what you would probably call today an IT coordinator. We called it MIS back in those days. And then I got -- From there I went into marketing services. I worked in the marketing department.
Q. And what was your role at the Henderson & Walter Clinic?
A. Walton, W-A-L-T-O-N.
I was kind of just -- I guess you'd call it a purchasing agent. It's a very large practice. I did purchasing, facilities, management. We had six

satellite offices, so there was a lot of facility management. And, you know, even opening up offices. We were opening up offices all around Birmingham at that time, so I did a lot of that too. I did a little marketing. Just practice management. I wasn't practice manager, but worked with the practice manager real close and Dr. Henderson.
Q. And was that clinic an ambulatory surgery --
A. No. It was an ob-gyn practice. We had 15, 18 doctors.
Q. So it was a physician like --
A. Practice.
Q. -- office-based practice?
A. Yeah. Private practice. Delivered babies and did GYN work.
Q. And in '89 you said you joined Tasc, Incorporated?
A. Right. No. That was '91. I'm sorry.
Q. And what was your role there when you first started?

A. Well, the business -- the main business that they owned and operated was Tuscaloosa Surgical Center, but they also were in -- they were almost like an incubator. They were developing. Had two or three businesses -- four or five businesses actually that we were trying to develop and open. And we already had two or three that were open. And so I worked across that whole spectrum. I worked at -- did some work for the surgery center. I did some work for the individual businesses that were open. And I also tried to help them develop the ones that were, you know, startups or to be startups.
Q. And if you could just give me a little bit more detail when you say that you did work for them. What kind of work did you do?
A. Golly. Well, for the surgery center, I think my first project was to handle an expansion project that they were doing at the time. The surgery center had grown and so they wanted to -- they were expanding by

about 30 percent, so I managed that construction project. Took about 18 months. You know, dealing with architects, contractors, regulators, buying all the furnishings, getting it open.

The other businesses, two in particular, one was a telephone answering service, and I helped manage that and run that. One was a consulting firm for physician practices, and I helped them do -- they had staff and so they just consulted with me at times. You know, human resources, finance, operations. So just -- Am I being too specific or not specific enough?

Q. No. This is fine.

A. And then, you know, the incubator projects we were always doing research, putting pro formas together, meeting with people, whether it was vendors or prospective customers or partners. You know, you name it.

Q. And so did there come a point in time when

your responsibilities changed?

A. Yes.

Q. And when did that happen?

A. '94, '95. Really '95, '96. The surgery center sold a big part of its interest to a management company. And so when we did that, we pretty much sold off the existing businesses that were up and running. And the incubators, I think we ended up shutting those down or maybe even selling some of those off that could be sold off. And so I went on the payroll full-time at that point at the surgical center.

Q. And you became --

A. I was I guess -- I don't know. I don't even remember what my title was. I worked in the business office. I worked for the administrator really and just did all types of projects for him; you know, research, analysis, any kind of little projects that they needed somebody to handle.

Q. And so do you remember what year you became the --

A. Administrator?

Q. The assistant to the administrator. You said ninety --

A. Yeah. '95, '96. And then I became -- He left the end of '96, and I got the administrator job in '97.

Q. So you've been the administrator at --

A. Since '97.

Q. And can you please describe to us your responsibilities as the administrator?

A. You know, day-to-day, week-to-week, year-to-year management and oversight of all operations, business and clinical, planning, strategic planning, all the way from picking up trash in the parking lot to putting together a five-year strategic plan, everything in between.

Q. And who do you report to in this role?

A. We have a board of seven physicians that own 70 percent of the facility. I report to them. There's a little dotted line to the vice president of operations for surgical care affiliates. That's the

management company that owns 30 percent of our facility and they have a management agreement. So -- But ours is a little different. I report to the board. SCA has oversight over me, too, if that makes any sense.

Q. And do you have people who report up to you?

A. Yes.

Q. And how many?

A. Two direct.

Q. And what does the Tuscaloosa Surgical Center do?

A. Ambulatory surgery, outpatient surgery.

Q. And what kind of surgeries?

A. We have -- Let's see. Orthopedic, ENT, general surgery, ophthalmology, plastic surgery, gastroenterology, pain management, GYN, podiatry. We don't do urology. We don't do neurosurgery, although we do some of the neurosurgical codes. No neurosurgeons are working in our place at the present time. I probably should have

answered it that way. Everything but neurosurgery and urology.

Q. And what kind of anesthesia?

A. All types. General, MAC, local, conscious sedation.

Q. And how long can patients stay at the center?

A. 23 hours, 59 minutes, 59 seconds.

Q. And that's the maximum?

A. Yes.

Q. And how many operating rooms does the center have?

A. Five ORs.

Q. And are there also procedure rooms?

A. We have four, five, six, seven -- seven procedure rooms.

Q. And what's the difference between an operating and procedure room?

A. Lots of differences. Size, HVAC, heating and cooling, ventilation, equipment, you know, the way it's outfitted. There's even -- We have one procedure room that's carpeted actually. It's for an eye

procedure. It's a laser. So it's a procedure room by the state, but you could do it in here. So all the way to a sterile operating room.

Q. And is a sterile operating room similar to what an operating room would look like at a hospital?

A. Yes.

Q. And are the procedures and surgeries that are performed in operating rooms at the center where you work procedures that are also carried out at hospitals?

A. Yeah.

Q. And how many surgical cases does the center do per year?

A. Right now we're doing -- not enough. 6,000 would be our rate.

Q. 6,000 per year?

A. Uh-huh (positive response).

Q. And how many physicians do you have who perform surgery at the center?

A. Can I give you just a ballpark?

Q. Yes. That's fine.

A. 50, 60. 50.

Q. And do they also perform procedures in other settings --

A. Yes.

Q. -- outside of the center?

A. Yes.

Q. Would they all work in Tuscaloosa or also outside of Tuscaloosa?

A. Yeah. They're all Tuscaloosa.

Q. And what happens if a patient experiences a complication at the center?

A. Well, are you meaning that results in a transfer?

Q. Let's discuss that scenario if there's a need for a hospital transfer.

A. We have a pretty specific policy. Anesthesia, of course, is -- Let me back up. Generally speaking, transfer is because of some cardiac event. It's not because of something went wrong in the surgery. I guess you could have potentially -- Yeah. You know, every now and then you're going to have -- say if you

did a colonoscopy they might discover a tumor, okay, and so they could transfer those. And no cardiac. But I'd say commonly it's going to be a cardiac event, you know, that would trigger a transfer. So anesthesia along with the surgeon gets the orders to transfer the patient. We call an ambulance company. They come. They know kind of what the protocol is. They come. We prepare all the documentation for transfer. Generally, our nurse goes with the ambulance company to the hospital to give report, hand off. We call over in advance and say, Dr. X, you know, if Dr. X is the surgeon. Dr. X is calling to admit patient Y to Dr. Z, who is cardiologist or whatever specialist they need to go to. And they'll admit them through the emergency room.

Q. And what hospitals do your patients go to?

A. There's two in Tuscaloosa. They're both the same ownership. One is DCH Regional Medical Center, and the other one is

Northport Hospital, dash, DCH.
Q. And do all your surgeons have admitting privileges at both hospitals?
A. Both? Probably so in Tuscaloosa, yeah.
Q. But you're not sure?
A. I'm pretty sure, yeah. Yeah. I would say -- I mean, I don't -- They definitely have one or the other. But I would say very likely they all have both. That's just kind of the way they've done it over the years.
Q. And does the Tuscaloosa Surgical Center require admitting privileges in both hospitals, or does it just require one or the other?
A. One or the other.
Q. And what happens if a patient experiences a complication that requires hospitalization after hours?
A. Pretty much the same process, although the -- we may not have the staff to ride along in the ambulance. But if -- Pretty much the same thing. I mean, they would

immediately contact, you know, surgeon and anesthesia. And if anesthesia is not there, of course, they consult over the phone. Generally, the surgeon is probably pretty close by. If it's a cardiac situation, I'm not sure how much they can do anyway, but they may come by. And we would call the ambulance company. Generally, our personnel, our nursing somebody staff, is close by. I'm close by. Somebody is usually there. We're required to have two nurses on duty for a patient that's staying overnight. And so -- And we have a security guard there too. So just another set of hands and, you know -- eyes and ears and hands it's good to have. So somebody gets there pretty quick.

Call the ambulance company. Do the hand-off paperwork. Make the call to the emergency room or to the hospital. Usually -- Probably a lot of times the surgeon will make that call to their -- the

person they want to be consulted, whether it's a cardiologist or thoracic surgeon or whatever.
Q. And do any of the center's patients come from outside of Tuscaloosa?
A. Oh, yes.
Q. What is the farthest that you can think of that the patients travel from?
A. On a routine basis?
Q. Sure.
A. 150 miles.
Q. And if those patients experience a complication after hours requiring a hospitalization, do they typically get treated at a hospital near their home?
A. Yeah, I guess, if there is one. You know, they may have to come back to Tuscaloosa.
Q. And are there instances where patients who are treated at the Tuscaloosa Surgical Center are treated for complications at a hospital where the surgeon who performed the surgery didn't have admitting privileges at that particular hospital?

A. Say that again.
Q. Does it happen that a patient who was treated at your center experience an after-hour or complication down the road that results in him or her being admitted to a hospital where the surgeon who had treated him does not have admitting privileges?
A. Yeah. Sure.
Q. And in those cases are the patients treated adequately?
A. I would assume so.
Q. And is the Tuscaloosa Surgical Center accredited?
A. Yes.
Q. And what organization?
A. AAAHC, American Accreditation Association of Health -- what does the C stand for? Can y'all look that up? I'm sorry. AAAHC.
Q. Just health care, I think.
A. Is it health care?
Q. I think so.
A. Okay. I should know that.

Q. And what does this accreditation entail?
A. Well, you know, now both the joint commission and AAA are very similar, I believe, in that they have all -- they have both adopted CMS's conditions for coverage and pretty much all their standards that they used to require. They each had a list of standards in a number of categories. And today I would say that their standards are pretty much -- they just take the CMS standard and adopt it and say that's the standard we want you to hit. So they have standards across all spectrums of our business operation. You know, clinical, business, performance improvement, you name it. Anything we do there's a guideline and standard what they minimally require you to obtain in order to receive their accreditation.
Q. And do they then subject you to an inspection to make sure that you fulfill those requirements, and if you do, then you become accredited by one of them?

A. Yes. Yes. Every three years.
Q. And why did you or your center choose this particular accrediting body as opposed to any other?
A. That's a good question, because we've been with both. I think at the time that we were with joint commission. It seemed like that joint commission at that time -- this was many years ago -- seemed to be going more in a hospital route or, you know, leaning more toward institutional-type review, and AAA was more ambulatory. I don't know that that's true today, but that was -- many years ago it seemed to be that's what was happening.
Q. And other than working as the administrator at the surgery center and then your role as the president of the Alabama association, do you have any other jobs?
A. No.
Q. So let's talk about the Alabama Association of Ambulatory Surgical Centers. Is there an abbreviation I can use?

A. AAASC.
Q. AAASC. And when did you become its president?
A. Two years ago. Well, that's not the first time. My current term just ended. I got reelected yesterday.
Q. Congratulations.
A. I don't know if that's the case that congratulations are in order. It's my turn basically again.
Q. So how do you become the president of --
A. You miss a meeting.

MR. HYMER: Let her finish before you answer.

THE WITNESS: Sorry.

Q. It sounds like you get elected?
A. Yeah.
Q. And you get elected by the members --
A. Yes.
Q. -- of the association?

And what are your responsibilities as president?
A. Well, we -- I guess our goal, our mission

is to provide, you know, a professional organization or professional association of surgery center administrators or medical directors or clinical leads to basically be a network of continuing education. You know, just call it an informal or formal network of colleagues that can help to figure out ways to do what we do better, whether that's through accreditation issues or regulatory issues or just business operations. You know, I guess specifically what we try to do is -- and lobbying. Of course, political, you know, action with -- whether it be state or federal. You know, we do get involved in some of that.

But primarily my job is to just try to make sure everybody is aware of the big rocks in the road, what's going on, big deadlines, regulatory changes, any other hot-button issues or even things that may be brewing. You know, sometimes they'll bubble up to me and I just spread them out because I don't always hear them. I'm just

one of 20-something people. Everybody is kind of doing what I'm doing on a daily basis. I kind of filter it -- get it, filter it, send it out to them.

We do put on a couple of meetings a year -- really three meetings a year, two that we do our own. One was yesterday, the spring -- I mean, winter and a fall meeting. Yesterday was our fall meeting. It's just Alabama members. We do educational -- you know, it's all educational content primarily. Yesterday we did a business section that was mainly legal topics. In the wintertime we'll do a clinical. And then in June we do a joint meeting with the Mississippi and Louisiana associations. We put that on. Usually, there's 150 or so people from those three states, sometimes Georgia and Florida. A few of those will come over. But that's a little bit bigger formal conference. We have speakers over the course of two days. And, you know, all ASC, industry,

educational-type stuff.

Q. Does the association ever get involved with issues that pertain to health care facilities other than ASCs?

A. Not really. You know, we could potentially get drug into some stuff if the hospitals have something going on. I think back in the nineties it seemed like there was something going on with hospitals that somehow the ASCs got drug into. But not generally.

Q. Other than that instance of a hospital-related issue, you don't recall the association being involved with, say, abortion --

A. No.

Q. -- providers?

A. Absolutely not.

Q. And are you paid as the president of the association?

A. I am.

Q. And how many employees does it have?

A. None.

Q. Do you have other colleagues that administer the association's day-to-day operations?

A. Yes.

Q. And how many people are involved?

A. Well, we have a vice president, a treasurer. The treasurer and the president do lion's share of the work. Secretary takes minutes at the meetings. It's primarily me and the treasurer.

Q. How much time in a month would you say you spend on work related to the association?

A. Oh, gosh. It's a stab in the dark. You know, 20 hours maybe.

Q. 20 hours a month?

A. 15 to 20 hours. Maybe more.

Q. So it's a minority of your time --

A. Yes.

Q. -- compared to your administrative responsibilities at the surgical center?

A. Yes.

Q. Does the association have a physical location?

A. No. I guess it's my office now. We use the mailing address either the treasurer or the president, sometimes both. It would either be -- Our treasurer is here in Montgomery, and so either one.

Q. And where are records related to the association kept?

A. I have a good bit. Probably -- I probably have whatever exists. There could be some in a previous president's facility somewhere.

Q. So the records generally are in your office at the --

A. Yes.

Q. -- surgical center?

And you said you've had some other roles at the association in prior years?

A. (Witness nods head).

Q. What other things did you do for them?

A. Every other officer position. Secretary, treasurer, vice president, past president.

Q. And how long have you been involved with the association?

A. Since ninety -- Well, I guess I didn't become administrator until '97, so technically '97. I attended some meetings and did some work for them prior to that, though. So I don't know if that is the right answer.
Q. And I think you said earlier that the association has about 20 to 24 members currently?
A. Right.
Q. Which is about half of the ASCs in Alabama?
A. Correct.
Q. And how does an ASC become a member?
A. Well, we have an application. And generally they just fill that out and, you know, membership would vote, I guess, to let them in. I'm not sure I ever recall us ever voting and denying somebody. Our bylaws do state that you have to be a multispecialty facility versus a single specialty. So we are limited to single -- excuse me -- multispecialty facilities. And I think the balance of that number --

There are quite a few single specialty centers in Alabama. Right now they're not members.
Q. So is that the sole requirement for membership to be a multispecialty ASC, or are there others?
A. You have to have a license and you have to be operating, which is -- generally you don't get a license until then. But I think that's it.
Q. How often is membership renewed?
A. Annually.
Q. There's some sort of a fee or --
A. Yes.
Q. -- paperwork that you have to submit each year? Just the fee?
A. Just a check.
Q. You said that the association sometimes does work with regulatory issues. What types of regulatory issues does the association get involved with?
A. Just the interpretation and implementation of primarily CMS standards. Everything

feeds off of that.
Q. What about lobbying, what does the association do in that area?
A. Gosh, anything from fundraising to, you know, visits to Washington, D.C. to meet with representatives, letter writing, inviting representatives to come to our facilities to educate them on what we do.
Q. Has the association done any advocacy in relation to hospital staff privilege requirements at ASCs?
A. I don't think so.
Q. Have you done any advocacy to convince the state to require that physicians at ASCs have admitting privileges?
A. No.
Q. Are you also the treasurer of the Alabama Association of Ambulatory Surgery Centers state PAC, Political Action Committee?
A. I don't know. Am I? I really don't know. I could be. I don't remember how the bylaws are set up. You're talking about state PAC? Do we still even have state

PAC? We had a state PAC and federal PAC. I think the federal PAC we dissolved. It was just a duplication of -- It was redundant. So, yes, I guess we still have the state PAC.
Q. And does the state PAC make any contributions to people running for office or people already in office?
A. To my knowledge, we never have.
Q. Does it engage in any other activities?
A. No.
Q. Are you involved with any other professional organizations?
A. Well, would you consider the national -- ASCA, Alabama -- I mean, Association of Ambulatory Surgery Centers, the national organization?
Q. Sure. What is it called again?
A. ASCA, A-S-C-A. It's Ambulatory Surgery Center Association.
Q. And how are you involved with that organization?
A. I think I'm a member through being a

member -- I'm a member through SCA, our general partner managing company.

Q. What does that organization do?

A. Pretty much everything I described to you from a state level they do it on a federal level. Just a lot more formally and they have employees and a big budget. Mainly Washington based lobbying, you know, federal lobbying.

Q. Do you have any involvement with what they do besides just being a member?

A. Well, I mean, I don't know what you mean -- if this is what you mean, but I have participated in fly-ins. Gone to Washington. I've gone to some other conferences. I think I've been to some of their conferences. They put on an annual conference every year, a big one. So other than that, I guess not.

Q. And when you say you've participated in fly-ins, what does that mean?

A. They organize these fly-ins. They invite ASC administrators and other

representatives from local -- you know, from ASCs all across the country to come in at a certain time and they organize the -- you know, the event for us to go and meet with our representatives. They schedule the meetings. They usually will go with us and introduce us to the legislative assistants or the representatives or senators themselves. They let us do the talking, but they'll at least walk us around to get us -- kind of as a navigator, if you will. Probably the wrong word to use these days. But a navigator to get us in the right building, in the right door, just kind of help us a little bit. But they'll organize it and help us, educate us about what the bill is that we're trying to help move along and kind of give us some coaching on how to speak the speak or speak the -- speak to the -- you know, the effort.

Q. And have any of these fly-ins that you've been -- that you've participated in related

to any legislation that had anything to do with admitting privileges?

A. No.

Q. Any other organizations that you're involved with?

A. No.

Q. What about activities that are outside of your profession?

A. Such as?

Q. You're not involved in any hobbies or other organizations outside of work?

A. I don't think so, no.

Q. And have you ever been convicted of a crime?

A. No.

Q. What about charged with a crime?

A. No.

Q. How about arrested?

A. No.

Q. So you understand that you're appearing here today as a potential expert for Defendants Strange, Brooks, Falls, Rich, and Williamson?

A. Yes.

(Plaintiff's Exhibit 2 was marked for identification.)

Q. I've placed before you a document with a caption in this case that's titled defendants' disclosure of non-retained expert. Have you seen this document before?

A. Yes.

Q. Is this the document that you were referring to that you called an affidavit?

A. Yes.

Q. So this is the document that you said you reviewed, made some changes to, and returned to the defendants?

A. Yes. I believe it is.

Q. Besides this document, is there any other document that you were involved with drafting that you provided to the defendants?

A. No.

MR. HYMER: I think he's confused. There was another

document. There was a document you signed.

A. Oh, yeah. Is that not this? I'm sorry. Yes. There was something I did sign.

THE WITNESS: You're right. Thank you, David.

Q. You remember this document as well?

A. Yes. I guess I do.

Q. If you can follow me on page 1. Paragraph one says that the subject matter in which Mr. Hayes may present evidence is the accreditation and regulatory standards applicable to Alabama ambulatory surgery centers and the operations of Alabama surgery center operations. Did I read that right?

A. You did.

Q. And does the statement accurately reflect the potential subject matter of your testimony in this case?

A. I think it does.

Q. Is there any subject matter that you might present evidence on that's not listed in

this paragraph?

MR. HYMER: Other than what's in the next paragraph? I'm just asking for clarification.

MS. SPANGENBERG: Right. I view paragraph two as being more specific but falling within the subject matters described in paragraph one.

Q. Other than what's listed in paragraph one and two, do you intend to offer any other testimony on any other subject --

A. No.

Q. -- in this case?

MR. HYMER: And I'll just say I don't know what either side may want to ask him, so I don't know that he has -- his intention is not to. But if he's asked a question, obviously he'll answer it if he knows the answer.

Q. But as far as you know from the defendants' counsel, there's no other testimony that they have asked you to provide in this case besides what's listed in this document?

A. That's correct.

Q. And with respect to accreditation standards applicable to Alabama ambulatory surgery centers, what qualifications do you have that make you an expert on accreditation standards?

A. I guess just the years of experience of going through accreditation surveys and preparing this.

Q. And you've gone through how many accreditation surveys in your professional career?

A. Four, five. I can't tell you.

Q. And they were both with -- some of them were with the joint commission and some of them were AAAHC; is that correct?

A. Yes.

Q. Any other accreditation standards that you are familiar with through your work?

A. You know, probably not enough to say yes.

I mean, there's another group that does primarily physician-based surgery. I can't even think of the name of the organization. But I've seen some of their standards. So I'm vaguely -- very vaguely familiar with those.

Q. The organizations with which standards you are more deeply familiar with are the two that we just discussed?

A. Yes.

Q. And your familiarity was acquired through the four or five accreditation surveys you've gone through with them?

A. Yes.

Q. Any other relevant qualifications to accreditation standards besides what we just discussed?

A. Not that I can think of.

Q. What about regulatory standards, what qualifications do you think you have that make you an expert on regulatory standards applicable to Alabama ambulatory surgery centers?

A. The same. I guess just experience.
Q. And that experience would be what specifically?
A. As administrator for -- since 1997 and being, I guess, involved in the facilities, you know, prior to that in different roles.
Q. And have you ever worked at any ASC other than the Tuscaloosa Surgical Center?
A. No.
Q. So you've just been an administrator at the one --
A. Yes.
Q. -- surgical center?
And what qualifications do you have that make you an expert on the operations of ASCs in Alabama?
MR. BRASHER: I'm just going to object to that. You're asking him for a legal conclusion.
Q. Do you have any experience operating any ASCs besides Tuscaloosa Surgical Center?
A. I've never worked directly for another facility.

Q. And so what is your experience with relation to operating Alabama ASCs?
A. Alabama ASCs?
Q. Yes.
A. Operating an Alabama ASC?
Q. What experience do you have in operating ASCs in Alabama?
A. I'm not sure I'm following you. I've worked at the Tuscaloosa Surgical Center since 1991. Is that what you're getting at?
Q. I'm asking you to tell me.
MR. HYMER: If you don't understand the question, just let her know that you don't understand.
A. I don't. I don't understand the question.
Q. So have you -- We've already talked that you've only worked at the one ASC, Tuscaloosa Surgical Center?
A. Yes.
Q. And you haven't operated ASCs outside of the state?

A. No.
Q. And the association that you're involved with, that association does not operate ASCs, do they?
A. No.
Q. And are you a lawyer?
A. No.
Q. What types of surgeries can be performed at ASCs in Alabama?
A. All the ones I named previously. Do I have to go through those again?
Q. Are there any others that you didn't list before that --
A. Yeah.
Q. What types of surgeries are those?
A. Well, neurosurgery, urology, vein, vascular. There's one center doing -- I guess you'd call it plastic surgery. It's sort of a very slim specialty in that they are taking care of patients who have had some type of bariatric procedure and have undergone extensive weight loss. Has to do with basically -- I guess you'd call that

plastic surgery. So that's probably not a new one, but that one just popped into my head because we talked about it yesterday. There's probably something I'm missing, but ...
Q. And you said before that the Tuscaloosa Surgical Center can perform surgeries that result in patient stay time up to 24 hours?
A. Correct.
Q. And that's the law for Alabama ASCs generally?
A. Yes.
Q. And what -- Can you give me examples of some surgeries that result in stay time for patients that come close to the 24-hour mark?
A. Well, it could really be any surgery that resulted in the patient having continued issues with pain management control or nausea. If there's some bleeding or something to that nature still going on, you know, so many hours -- depending on what the case is. But generally if you've

got bleeding issues still going on, that's -- you're not going to stay because you're bleeding. You know what I mean? You're going to go back or either they're going to transfer you. I'd say pain management, nausea.

Q. And are there particular types of surgery that result in longer patient stay times than others?

A. Yeah.

Q. Can you give me some examples?

A. Possibly a shoulder repair. Those could. If the patient chose not to have a pain block preoperatively, they might experience a little pain and say, oh, you know, I need better -- I need help with that longer, don't want to go home. Or the doctor may say, yeah, they probably need to stay. Lap Chole, which is removal of gallbladder through laparoscopic, some of those patients just have a lot of discomfort and management issues and they probably need to be kept overnight. We do some bariatric

procedures. About half of those patients end up staying. I mean, we've had some things as simple -- you know, something that generally would go home within an hour or two and end up staying. So you just never know. But in general it's the more complex in scope and, you know, duration of the case. Some of the plastic cases, for instance, that last three or four hours, those patients generally have a longer recovery time.

Q. And what are some examples of those plastic surgeries?

A. Breast reduction, breast augmentation, liposuction, facelift.

Q. You said that some Alabama ASCs perform neurosurgery; is that right?

A. Uh-huh (positive response).

Q. What are some examples?

A. Well, I mean, we do some of the -- you know, some of the CPT codes that fall into the neurosurgery category, like a nerve transposition. But a lot of people are

doing some back procedures that fall under the neurosurgical category. They, of course, would do nerve transpositions. Some neurosurgeons do things like carpal tunnel, you know, so -- a general orthopedist will do that. Mainly backs, spine work.

Q. And are hysterectomies also performed at Alabama ASCs?

A. Some.

Q. And Alabama ASCs, we established earlier they do sometimes use general anesthesia; correct?

A. Yes.

Q. What percentage of ASC surgeries would you say utilize general anesthesia?

A. Can we break it down a little bit? When you say surgeries -- ASC surgeries, a lot of those cases might be what we would call a conscious sedation case, which would be, you know, physician order, nurse administered anesthesia. And that's not -- that's not done with anesthesia services;

okay? And most of those are going to be procedures; okay? Not -- When I say procedure, it's really layman's term. But procedure versus a surgery. Surgery -- When you say surgery talking about an OR, sterile environment, having general surgery. Those type cases versus, say, gastroenterology, colonoscopies, and EGDs, those would be more procedural, although some require and use MAC anesthesia. And then pain management cases, a lot of those are conscious sedation and might be MAC anesthesia. So if you stick to just the operating room, the stuff that occurs in the operating room, I'd say 95 percent plus are going to be general anesthesia.

Q. And what percentage of procedures would you say are surgical procedures versus other procedural type procedures?

A. Oh, golly, I don't know. It's -- It could be 60/40; 60 surgery, 40 -- you know, I may have it backwards. I mean, the GI and the pain management that's being done these

days, it's a big volume of cases and it's made its way to the surgery centers temporarily. It's kind of leaving our back door and going to the physician's office. But it could be as much as 50/50. I don't know. That's a good question.

Q. Your best guess here today is that it would be 50/50 between surgical and procedural?

A. No. I really don't know that I have -- No. I'd say my best guess would be --

MR. HYMER: Let me just say, you're not required to guess. If you have an informed judgment, you can tell her what your informed judgment is. But I don't think it helps anybody for you to just guess at things. I could guess.

A. Yeah. It's probably closer than mine.

Q. If we can go back to the document that's been marked as Exhibit 2, and if you could look on the second page. This page

paragraph number two states that the defendants expect Mr. Hayes to testify that most doctors performing procedures at ambulatory surgical centers in Alabama have staff or admitting privileges at a local hospital. Did I read that correctly?

A. You did.

Q. And do you intend to offer this opinion in this case?

A. Yes.

Q. And are there any other opinions that you intend to offer in this case?

A. Not unless you ask me.

Q. Have the defendants asked you to offer any opinions in this case besides what's described in paragraph two?

A. No.

Q. And I know we started talking about this earlier, but if you could please give me the basis of this opinion.

A. General observation and practice of being in the ASC industry since 1991.

Q. And is whether or not doctors have

privileges something that you've talked to people about?

A. Sure.

Q. And are you referring to the most recent poll that you took, or is this something that you've talked about in other context?

A. Oh, yeah. It's in other context absolutely. I think, you know, it's one of the first things that I think -- not the first, but one -- it was very early in my starting to work at the surgical center. When you're learning everything, one of the first things you learn about credentialing is that, you know, the physician has to have hospital privileges in order to be eligible to be even considered to be on the staff at the surgery center. It's one of the first things you learn. If they don't have that, there's no reason to go to the second step.

Q. And so that's a requirement that's part of the bylaws of the Tuscaloosa Surgical Center?

A. Yes.

Q. And is that also a requirement of other surgical centers in Alabama?

A. Yes.

Q. How do you know that to be the case?

A. Well, I think the shortest answer would be they've all told me that -- or, you know, 17 of 18 have told me that here recently as a result of all this. But, you know, going back to the early years, you know, anybody that works in the business a big part of your job is to credential your medical staff. And, you know, that's about the first thing you learn is that the staff needs to have privileges at a hospital.

Q. And this is something you learned at the Tuscaloosa Surgical Center?

A. First time I heard it, yes, was there.

Q. And have you learned this from other sources as well?

A. Absolutely.

Q. And what other sources?

A. Management companies, other administrators,

accreditation agencies, consultants, regulators.
Q. And they all have a view that ASCs should have admitting privileges --
A. Yes.
Q. -- in your experience?
A. They strongly recommend it.
Q. Do they require it?
A. I don't know. I know CMS -- you know, there's language in CMS that says you either -- you know, you require that or you have a transfer agreement.
Q. So the CMS --
A. So the standards all feed off of that.
Q. So the CMS rules do not require ASCs to have admitting privileges; is that right?
A. As long as they have a transfer agreement.
Q. So they don't require admitting privileges?
MR. HYMER: I think he just answered that.
A. As long as they have a transfer agreement with a local hospital.
Q. So the CMS rules allow an ASC to have

either admitting privileges or a transfer agreement; is that right?
A. That's correct.
Q. And let's go back to the poll that you characterized -- The poll that you took of some of your ASC colleagues resulted in 18 of them responding; is that right?
A. Yes.
Q. And what did they say?
A. Yes, that they -- My question was, do you require your medical staff to have hospital privileges in order to get privileges at your ASC, yes or no. That was what I asked.
Q. And was your question specific to admitting privileges at a local hospital, or was it broader to admitting privileges at any hospital?
A. I just said hospital.
Q. And 18 ASC representatives responded that they do?
A. 17 responded that they did. One did not.
Q. Other than this poll, did you rely on any

other documents or research to come to the conclusion that we've been discussing?
A. Yeah. I have talked to a couple of people that work -- well, one in particular that I can think of that is with the Mississippi hospital system and I asked him. He's an attorney, physician, MBA. He acts as their chief medical officer. You know, I just asked him. I said, what's your -- if I asked you a question do doctors have hospital privileges that work at surgery centers, what would it be. He said, oh, yeah, that's pretty much the way it's done.
Q. And who is this person you spoke with? What's his name?
A. Mark Williams.
Q. And what does he do?
A. He's chief medical officer for -- I believe it's called Northwest -- no -- Northeast Mississippi Medical System -- Regional Medical Center maybe.
Q. Is that a hospital?
A. Yes. It's a system. They have several

campuses.
Q. And --
A. I think he's acting CEO actually right now.
Q. So does he work with ASCs?
A. Yes. He used to be our anesthesiologist.
Q. And how many ASCs does Mr. Williams work with?
A. Oh, I don't know. Over the years, I mean, he's worked with ours, a couple in Alabama. He's still active in the anesthesia group and still practices anesthesia. So he's in our facility about once a month. That's why I asked him.
Q. And other than Mr. Williams, have you had any other conversations about the state of admitting privileges at Alabama ASCs with other people?
A. No. Just the members and my wife, David. That's it.
Q. David, you're referring to your attorney?
A. Hymer, yes.
Q. And I see that in your opinion you say that most doctors have admitting privileges who

perform surgeries at Alabama ASCs. What does most mean?
A. Most means virtually all.
Q. Is it more than 70 percent?
A. I would say close to 100 percent.
Q. You are aware of at least one ASC that does not require privileges; correct?
A. Yes.
Q. And there could be others as well; correct?
A. There could be.
Q. So do you know -- How do you know that the percentage is nearly 100 percent? What's the basis of that opinion?
A. That it's -- You know that you go on green at a red light. It's just common knowledge. It's common practice that that's how our entities work. That's how we -- We have to -- I don't know if I should say this. I don't know that we have to, but I think we very much want to have our physicians maintain hospital privileges. We believe it's a necessity whether we're required or not.

Q. Now, Alabama rules do not require ASCs to have doctors who have admitting privileges; is that right?
A. That's right.
Q. They instead require that an ASC have a transfer agreement with any other hospitals; is that right?
A. That's correct.
Q. And what is a transfer agreement?
A. It's a letter that says, you know, we, hospital X, Y, Z, will accept transfers from A, B, C surgery center. Ours is really just a couple of paragraphs long. It's indefinite. You know, stated this day, automatically renews every year to infinity basically is what it says.
Q. And a transfer agreement does not impose a requirement of staff privileges, does it?
A. No.
Q. And it's independent of staff privileges?
A. Correct.
Q. So an ASC in Alabama can operate legally without having doctors with admitting

privileges at a local hospital?
A. They could.
Q. Are Alabama ASCs required to be accredited by an outside organization?
A. What does the language say on that? There's some language to that -- I don't think it's a strict requirement. I think there's some language that says they prefer, strongly recommend. It's in the ADPH guideline.
Q. Are you thinking of the rules that apply --
A. Yes.
Q. And you believe that those rules recommend but don't require accreditation by an outside organization?
A. Yes.
Q. But accreditation is voluntary in Alabama?
A. It is.
Q. We talked about the fact that there are a few different accrediting bodies. One of them you said is the AAAHC. The other is the insurance commission. Are there any other ones?

A. Yes. There are a couple of other ones. There's a physician-based one that I mentioned a minute ago. I'm sorry. I can't call the name. And then there's another accrediting body that does -- organization that does -- you know, they do multi -- do varying types of facilities.
Q. How many ASCs in Alabama are accredited by an outside organization?
A. Well, can I just speak for the membership? A hundred percent of the membership. I don't know about the single specialty centers.
Q. Do you know of ASCs in Alabama that are not accredited by an outside organization?
A. I don't know of anybody that's not accredited.
Q. And do all of these organizations require ASCs to have doctors with admitting privileges at a local hospital?
A. That's my opinion, yes.
Q. I just want to make sure you're okay. Do you need a break?

A. Could I get a glass of water?

MR. BRASHER: Let's take five minutes.

(Brief recess was taken.)

Q. One point of clarification. Does the Tuscaloosa Surgical Center have a transfer agreement with a local hospital?

A. We do.

Q. And was it just with one of the two that's in Tuscaloosa or both?

A. Both.

Q. Before we took a break, I think you testified that the accrediting bodies require ASCs to have admitting privileges -- to have physicians with admitting privileges? I'm sorry. Is that right?

A. I don't -- No. No. I don't think so. Did I say that?

Q. Do the accrediting bodies require Alabama -- I'm sorry. Strike that.

Do the accrediting bodies require ambulatory surgery centers to have

admitting privileges for their physicians in order to become accredited?

A. I believe what they require now is they use -- they adopt the CMS standard, which states either/or.

MS. SPANGENBERG: I wanted to show you this document. If you could please mark it as Exhibit 3.

(Plaintiff's Exhibit 3 was marked for identification.)

Q. Do you recognize this document?

A. What is this? AAAHC is what it looks like. Uh-huh (positive response).

Q. Do you recognize this document?

A. Yes.

Q. And what is it?

A. It looks like a -- something out of the standards book. I don't know if this is a prep or an actual survey guide that the surveyor would use, but -- or sometimes they give you -- you know, once you're done, they kind of give you this score

sheet a little bit. So the preparatory -- It could be the preparatory. I don't know. But preparatory is just like the regular survey for you to go and kind of do your self-test and go through your whole operation.

Q. So this document was authored by the Accreditation Association For Ambulatory Health Care, Incorporated?

A. Yes.

Q. And that's one of the accrediting bodies we've been talking about today?

A. That's it.

Q. So would you agree with me that this document appears to contain the standards of the accreditation for ambulatory health care for ASCs?

A. Yes.

Q. And did you provide this document to the defendants?

A. I did not.

Q. You haven't seen it before? You haven't seen this document before?

A. Yeah. I've seen these before.

Q. But you don't remember providing this to the defendants?

A. To the defendant? You know, I think -- Can I ask Andrew a question? Is that legal?

MR. BRASHER: If you can't remember, then just say you can't remember.

A. I can't remember.

Q. Is it possible that you provided this document to the defendants?

A. It's possible I provided an excerpt from either CMS reg or AAA.

Q. If you can please turn the page to the page that at the bottom is labeled as AGO 000484.

A. Okay.

Q. And about midway through the page it states there that CMS requires Medicare certified ASCs to either have a written transfer agreement with a hospital that meets the requirements of 416.41(b)(2) or ensure that all physicians performing surgery in the

ASCs have admitting privileges at a hospital that meet the requirements of 416.41(b)(2). Did I read that correctly?
A. Yes.
Q. So this is the standard that you're referring to that the accrediting bodies have adopted for ASCs in relation to privileges; correct?
A. Correct.
Q. And that accrediting bodies do not require that ASC physicians have admitting privileges at a local hospital; correct?
A. As long as you have the transfer agreement.
Q. And if you could please turn to page labeled AGO 000485. At the top there it says subchapter two, credentialing and privileging. This subchapter describes the requirements for credentialing and privileging of health care professionals to provide patient care in an accreditable organization. Did I read that right?
A. Yes.
Q. Does this section then lay out the

requirements of the AAAHC related to privileging done by the ASC for their own physicians?
A. Yes.
Q. And if you could turn, then, to the next page that's Bates labeled ending with 486, Section (g)(5). It says that the organization requires, at initial appointment and reappointment, written attestation from the applicant addressing other pertinent information which includes, but does -- but need not be limited to the denial, suspension, limitation, termination, or nonrenewal of professional privileges at any hospital, health plan, medical group, or other health care entity; is that right?
A. Yes.
Q. So would it be fair to say that a physician who has been denied privileges from a hospital, his or her career could be negatively impacted if he has been denied privileges at a hospital?

A. Their career could be impacted? I don't know. I guess it could be.
Q. Are ASCs accredited by the Accreditation Association For Ambulatory Health Care required to consider the fact that someone's privileges were denied, suspended, or revoked in determining whether or not the physician is qualified to be employed at their facility?
A. Yes.
Q. I wanted to go back a little bit to the data that we were discussing earlier today about the accreditation -- I'm sorry -- about ASCs having physicians with admitting privileges. We said that there are 42 ASCs in Alabama; right?
A. Yes.
Q. And you were able to survey 18 of them?
A. Correct.
Q. And 17 said, yes, we have physicians with admitting privileges at hospitals generally speaking?
A. Yes.

Q. And one of them specifically said they do not have admitting privileges?
A. They did. And they went on to say that a hundred percent -- even though they didn't require it, 100 percent of the medical staff had hospital privileges.
Q. Do you have any specific knowledge about the requirements of the remaining ASCs in Alabama?

MR. HYMER: I think that's already been answered.

Q. Please go ahead.

MR. HYMER: Well, I don't mind him going ahead and answering this, but I hope we're not going to start just reasking questions that have already been asked.

MS. SPANGENBERG: We're only, I think, an hour and a half into our deposition. I think it's fair to explore this opinion a little bit further.

MR. HYMER: I don't have any problem with that at all. But I just -- I don't want it to become repetitive. I feel like he's already been asked that same question maybe on multiple occasions. So all I'm asking -- I'm not telling him not to answer this question, but I'm just asking that counsel cooperate and not have the -- not have the deposition become repetitive in terms of what's asked.

MS. SPANGENBERG: Okay.

A. I can say this. I know of -- even though there's many single specialty centers -- obviously, all the single specialty centers in Alabama are not members. I do know directly, though, just through knowing who these folks are, talking to them on a fairly regular basis, that they do have the same requirement.

Q. And you know this because you have asked them that specific question?

A. Uh-huh (positive response).

Q. And when did you have those conversations?

A. Well, actually, back up. Some of it I know because I know the medical staff that's there in those single specialty centers because they're on our medical staff too. So I know what their privileges are based on us credentialing those same physicians. I know they have privileges at a hospital.

Q. And are there physicians at Alabama ASCs that you do not know personally from your work at the Tuscaloosa Surgical Center?

A. Yes.

Q. And so you do not know whether those physicians have or do not have admitting privileges?

A. That's correct.

Q. And by my math there are about 24 ASCs that you did not survey when you conducted the survey that we've been discussing; correct?

A. Yes.

Q. And you haven't had any specific conversations with any of those ASCs to determine whether they have admitting privileges?

A. Have not. Do not. Yes.

Q. And you also haven't contacted hospitals to ask whether those physicians have admitting privileges?

A. Ask a hospital if they're --

Q. For example.

A. I'm not sure I understand. Why would I ask a hospital if their physicians have admitting privileges?

Q. You haven't contacted hospitals to confirm, for example, that physicians working at an ASC have admitting privileges at the local hospital?

A. No. They wouldn't divulge that.

Q. And are you aware of physicians being denied hospital privileges because they are not able to guarantee a minimum number of hospital admissions each year?

A. I know that hospitals -- some hospitals

have differing requirements for active versus courtesy or admitting. They have different definitions. But I can't think of anybody off the top of my head that has been denied, no.

Q. Are you aware of hospitals in Alabama having a requirement that physicians admit a certain number of patients in order to have admitting privileges at that hospital?

A. Yes.

Q. And do you know how many hospitals have that requirement?

A. I don't know exactly. I think -- I think it's -- In my opinion it's -- there's some general rules, I think, or general commonalities that they all have. You know, you either have a courtesy. Some call it -- There might be -- There's almost three levels. One would be just a full-bore practicing physician that has unlimited admitting privileges. Courtesy or consulting -- some call it one, some call it the other -- where you don't have

any admitting privileges, but you're allowed to come in and consult and touch a patient and treat a patient, but you don't admit. And some of those may be -- there may be hybrids where you can only admit a certain number. It's usually a single digit, I believe, annually.

Q. Are you aware of physicians being denied hospital privileges because they perform abortions?

A. No.

Q. Are you aware of any physicians being terminated or having their admitting privileges not renewed because they perform abortions?

A. No.

Q. Are you aware of hospitals limiting admitting privileges to those physicians who reside or practice near the hospital so that they can be on call or otherwise participate as a member of the hospital?

A. Yeah. You're talking about a residential requirement, yes.

Q. So that is a requirement that's --

A. It is in Tuscaloosa.

Q. -- practiced by Alabama hospitals?

A. Yes. I think so.

Q. And you know that because of the two hospitals that you work with. They have that requirement?

A. Yes.

Q. Do you have any opinion as to whether the physicians who work for the plaintiffs in this case would be able to obtain admitting privileges at hospitals in Alabama?

A. The plaintiffs?

Q. Do you have any opinion -- Do you want me to repeat the question?

MR. HYMER: I think she's asking you do you know whether somebody on that list -- do you know any of the --

A. I don't know who they are.

MS. SPANGENBERG: Let me just ask the question again.

A. I need an interpreter.

Q. Do you have any opinion as to whether the plaintiffs' physicians would be able to obtain admitting privileges at a hospital -- a local hospital?

A. I do not.

Q. Are you being compensated for appearing on behalf of the defendants in this case?

A. I am not.

Q. And as I told you earlier, Dr. Williamson is one of the defendants in this case. And he's the state health officer and the head of the Alabama Department of Public Health; correct?

A. Yes.

Q. And the department or ADPH licenses and inspects surgical centers in Alabama?

A. Yes.

Q. So all of the members that are a part of the Alabama Association of ASCs are regulated by ADPH?

A. Yes.

Q. And ADPH also licenses, inspects Tuscaloosa Surgical Center; is that right?

A. That's right.

Q. And how often is the Tuscaloosa Surgical Center inspected by the Alabama Department of Public Health?

A. Well, there's not a set, you know, schedule. They try to get out every two years to every facility, although I think we're about -- we're almost three years out from our last survey, CMS, slash, state survey.

Q. So the last time you've been inspected was about three years ago?

A. Yes.

Q. And when do you anticipate your next inspection?

A. Could be tomorrow.

Q. How long does an inspection visit generally last?

A. Two, three days and then they'll -- they usually break it up into two phases. There's what I call the clinical side, which is where they do all the reviews of everything that's not life safety. There

might be a little bit of life safety mixed in. But usually there's a second surveyor that comes in, although you might have two or three nurses. RNs are the primary first ones that come in and do all the clinical review, charting review, operations, general operations, PI, everything, infection control. And then maybe the second day or the third day life safety surveyor will come along and they'll do your building life safety, fire safety. So that could be anywhere from a couple of days to four days unless they need to return.

Q. And does the surgical center receive notice prior to an inspection?

A. We do not.

Q. So they're all surprise inspections?

A. Yes.

Q. And the ADPH does not survey or inspect surgery centers in Alabama annually, does it?

A. They could.

Q. But they do not in practice?

A. Not now, no. I would say, no, they don't.

Q. How frequently would you say are ASCs in Alabama inspected by the department?

A. Two years. Every two years.

Q. And what materials are you required to provide to the surveyor during the inspection?

A. Anything they ask for.

Q. What are some examples of documents that they ask for?

A. Medical records, policies, procedures, sterilization records, records of drills, records of continuing education, training, you know. They've got to see that we tested the fire alarm. They've got to see that we replaced the fire extinguishers, everything in between and around.

Q. Did you have any involvement with the drafting or passage of House Bill 57 that is at issue in this litigation?

A. Is that the bill we're talking about here? 57?

Q. Yes.

A. Sorry. I didn't remember the -- No.

Q. What about the Alabama Association of Ambulatory Surgical Centers, did it have any involvement in relation to this legislation?

A. No.

Q. Were you ever contacted or consulted by anyone on any issues related to this bill prior to the state contacting you in this litigation?

A. No, ma'am.

Q. What about the association?

A. Not that I know of.

Q. Were you involved with any potential law or standard that would require hospital admitting privileges in any health care setting?

A. No.

Q. What about the association, has it had any involvement --

A. No.

Q. -- with such a law?

A. Not that I know of, no.

Q. Were you ever consulted about any potential law or standard that would require hospital admitting privileges in any health care setting?

A. No.

Q. What about the association, was it ever consulted on that topic?

A. Not that I'm aware of.

Q. Have you made any financial or other contributions to Representative Mary Sue McClurkin of Indian Springs?

A. No, ma'am.

Q. What about the Alabama Association of Surgical Centers --

A. No.

Q. -- or any of its PACs?

A. No.

Q. Have you ever been involved with an organization or group that advocates against abortion?

A. No.

Q. Have you ever provided support to any

individual group or organization that advocates against abortion?
A. No.
Q. Have you ever contributed any money to any individual, organization, or group that advocates against abortion?
A. No.
Q. Have you ever held or expressed any anti-abortion views?
A. I don't know. I'm not sure how to answer that.
Q. Do you believe that abortion should be illegal in some or all circumstances?
A. I really don't have a strong opinion one way or the other.
Q. Has the Alabama Association of Surgical Centers or any of its PACs provided any support to any individuals or organizations that advocate against abortion?
A. No.
Q. Has the Alabama Association of Ambulatory Surgical Centers or its PACs ever contributed money to any such individuals?

A. No.
MS. SPANGENBERG: If we can just take a few minute break.
(Brief recess was taken.)
MS. SPANGENBERG: We have nothing further.
MR. HYMER: He does want to read and sign. The court reporter is going to send a copy of the deposition to Andrew, who will get it to me or Jeff. And he'll read and sign and get it back to the court reporter. I don't know if you have anything, Andrew.
MR. BRASHER: I have just a few questions.

EXAMINATION

BY MR. BRASHER:
Q. Mr. Hayes, would you turn to what has been marked as Exhibit 2.
A. Here we go.
Q. Does number one and number two accurately

represent your opinions?
A. Yes.
Q. And is it a common requirement in your industry for ASCs to require physicians that perform procedures at the ASCs to have staff privileges at a hospital?
A. Yes.
Q. And that opinion is based on your experience in this industry?
A. Yes.
MR. BRASHER: That's all the questions I have.
MS. SPANGENBERG: We're done.
(Deposition was concluded at approximately 3:55 p.m.)

* * * * * * * * * * * * * * *

FURTHER DEPONENT SAITH NOT

* * * * * * * * * * * * * * *

REPORTER'S CERTIFICATE

STATE OF ALABAMA:
MONTGOMERY COUNTY:

I, Lyn D. Vickers, Certified Shorthand Reporter and Commissioner for the State of Alabama at Large, do hereby certify that I reported the deposition of:

**JEFFREY WILLIAM HAYES**

who was duly sworn by me to speak the truth, the whole truth and nothing but the truth, in the matter of:

PLANNED PARENTHOOD SOUTHEAST, INC., et al.,
Plaintiffs,
vs.
LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al.,
Defendants.
IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
Civil Action No. 2:13-cv-405-MHT

on Wednesday, October 23rd, 2013.

The foregoing 107 computer-printed pages contain a true and correct transcript of the examination of said witness by counsel for the parties set out herein. The reading and signing is hereby not waived.

I further certify that I am neither of kin nor of counsel to the parties to said cause nor in any manner interested in the results thereof.

This 13th day of November 2013.

______________________________
Lyn D. Vickers, ACCR #66
Expiration Date: 9/30/2014
Certified Court Reporter
And Commissioner for the
State of Alabama at Large

November 13, 2013

Mr. Andrew L. Brasher
Office of the Attorney General
State of Alabama
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152

In Re: Planned Parenthood Southeast, Inc., et al.
vs. Luther Strange, et al.

Dear Mr. Brasher:

Enclosed is a copy of the transcript of the deposition of Jeffrey William Hayes taken on October 23, 2013. Please have Mr. Hayes read the transcript and make any corrections on the correction sheet provided specifying the page and line number of each correction.

You will find the original signature page attached to the transcript. Even if there are no corrections, please have Mr. Hayes sign the original signature page and have his signature notarized.

Please return the signature page, correction sheet, and transcript within 30 days. The list of corrections will be attached to the original deposition and all parties will be notified of any changes.

Thank you for your prompt attention to this matter.

Sincerely,

Lyn D. Vickers
Certified Shorthand Reporter

* * * * * * * * * * * * * *

WITNESS SIGNATURE PAGE

* * * * * * * * * * * * * *

In Re: Planned Parenthood Southeast, Inc., et al.
vs. Luther Strange, et al.

I, **JEFFREY WILLIAM HAYES**, hereby certify that I have read the foregoing transcript of my deposition given on October 23rd, 2013, and it is a true and correct transcript of the testimony given by me at the time and place stated with the corrections, if any, and the reasons therefor noted on a separate sheet of paper and attached hereto.

________________________
**JEFFREY WILLIAM HAYES**

SWORN TO AND SUBSCRIBED before me this _____ day of __________________, 2013.

________________________
NOTARY PUBLIC

MY COMMISSION EXPIRES:

________________________