1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                      NORTHERN DIVISION

4

5   PLANNED PARENTHOOD
    SOUTHEAST, INC., et al.,

6
            Plaintiffs,

7
        vs.                    CASE NO.:  2:13cv405-MHT

8   LUTHER STRANGE, et al.,

9           Defendants.

10

11

12                      VOLUME II

13              * * * * * * * * * *

14              NONJURY TRIAL PROCEEDINGS

15              * * * * * * * * * *

16          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

    DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday, May 20,

17  2014, commencing at 8:46 a.m.

18  APPEARANCES:

19
    FOR THE PLAINTIFFS:     Ms. Alexa Kolbi-Molinas

20                          Mr. Andrew David Beck
                            Ms. Susan Talcott Camp

21                          Ms. Julia Heather Kaye
                            Attorneys at Law

22                          AMERICAN CIVIL LIBERTIES UNION
                            125 Broad Street, 18th Floor

23                          New York, New York  10004-2400

24

25

```
 1   APPEARANCES, Continued:

 2   FOR THE PLAINTIFFS:      Ms. Jennifer R. Sandman
                              Ms. Maithreyi Ratakonda
 3                            Attorneys at Law
                              PLANNED PARENTHOOD FEDERATION
 4                            OF AMERICA
                              434 West 33rd Street
 5                            New York, New York  10001

 6                            Ms. Dyanne Griffith
                              Attorney at Law
 7                            WILMER CUTLER PICKERING
                              HALE & DOOR, LLP
 8                            1875 Pennsylvania Avenue NW
                              Washington, D.C.  20006
 9
                              Mr. Randall C. Marshall
10                            Attorney at Law
                              ACLU of ALABAMA FOUNDATION, INC.
11                            P.O. Box 6179
                              Montgomery, Alabama  36106-0179
12
                              Mr. M. Wayne Sabel, Sr.
13                            Attorney at Law
                              SABEL & SABEL, P.C.
14                            2800 Zelda Road, Suite 100-5
                              Montgomery, Alabama  36106
15

16   FOR THE DEFENDANTS:      Mr. Andrew L. Brasher
                              Solicitor General
17                            STATE OF ALABAMA
                              OFFICE OF THE ATTORNEY GENERAL
18                            501 Washington Avenue
                              Montgomery, Alabama  36103
19
                              Mr. James William Davis
20                            Ms. Margaret Lindsey Fleming
                              Mr. Kyle A. Beckman
21                            Ms. Laura Elizabeth Howell
                              Assistant Attorneys General
22                            STATE OF ALABAMA
                              OFFICE OF THE ATTORNEY GENERAL
23                            501 Washington Avenue
                              Montgomery, Alabama  36130
24

25
```

```
 1  APPEARANCES, Continued:

 2  FOR THE DEFENDANTS:      Ms. Patricia Elaine Ivie
                             Mr. Phillip Brian Hale
 3                           Assistant Attorneys General
                             Office of General Counsel
 4                           STATE OF ALABAMA
                             DEPARTMENT OF PUBLIC HEALTH
 5                           RSA Tower
                             201 Monroe Street
 6                           Montgomery, Alabama  36104

 7           Proceedings reported stenographically;
                transcript produced by computer.
 8
                    * * * * * * * * * *
 9
                       VOLUME INDEX
10
```

```
    KENNETH BREWINGTON, M.D.
11       DIRECT BY MS. GRIFFITH                    18
         CROSS BY MR. DAVIS                        30
12       REDIRECT BY MS. GRIFFITH                  35
         RECROSS BY MR. DAVIS                      36
13
    PAUL READ
14       DIRECT BY MS. GRIFFITH                    38
         CROSS BY MS. FLEMING                      43
15       REDIRECT BY MS. GRIFFITH                  47

16  DALTON JOHNSON
         DIRECT BY MS. KAYE                        50
17       CROSS BY MR. BECKMAN                      88
         REDIRECT BY MS. KAYE                     100
18       REDIRECT BY MS. KAYE                     105
         RECROSS BY MR. BECKMAN                   107
19
    DORAN STAMPS
20       DIRECT BY MS. GRIFFITH                   109
         CROSS BY MR. DAVIS                       117
21
    ROBIN WAGES
22       DIRECT BY MS. GRIFFITH                   121
         CROSS BY MR. DAVIS                       125
23       REDIRECT BY MS. GRIFFITH                 128
         RECROSS BY MR. DAVIS                     132
24


25
```

```
 1                    VOLUME INDEX, Continued
```

```
 2  LORI FREEDMAN, Ph.D.
         DIRECT BY MS. KOLBI-MOLINAS              135
 3       CROSS BY MS. FLEMING                     155
         REDIRECT BY MS. KOLBI-MOLINAS            167
```

```
 4
 5                    *  *  *  *  *  *  *  *  *  *

 6    (The following proceedings were heard before the Honorable

 7     Myron H. Thompson, United States District Judge, at

 8     Montgomery, Alabama, on Tuesday, May 20, 2014, commencing

 9     at 8:46 a.m.:)

10    (Pursuant to oral order of the Court, any reference to an

11     anonymous doctor by name has been substituted with the

12     appropriate pseudonym)

13    (Library conference as follows:)

14         THE COURT:  Let's see.  We're all here regarding the --

15  well, this is Planned Parenthood versus Strange, Civil Action

16  13cv405.

17         We're here on the depositions.  Let's take up the

18  Buchanan deposition first.  Now, who is Barbara Buchanan?

19         MS. KOLBI-MOLINAS:  She was the former administrator of

20  the Birmingham Planned Parenthood clinic.

21         THE COURT:  Okay.  And I believe that the defendants

22  have objected to some of her -- some parts of her depositions as

23  hearsay -- or her deposition as hearsay, in particular, where

24  she supposedly repeats doctors' statements made to her.  Now,

25  it's my understanding these statements were made to her while
```

```
 1   she was the administrator of the Birmingham clinic; is that
 2   correct?
 3          MS. KOLBI-MOLINAS:  Yes.  It was while she was engaged
 4   in recruitment efforts.
 5          THE COURT:  While she was engaged in recruitment.  What
 6   year?
 7          MS. KOLBI-MOLINAS:  I think that these were between
 8   2010 and 2012.
 9          MR. BRASHER:  It's not specific in the deposition.
10          MS. KOLBI-MOLINAS:  No.  It's not specific in the
11   deposition.
12          THE COURT:  Why doesn't it just come in as things that
13   happened?
14          MR. BRASHER:  Well, what -- the plaintiffs are offering
15   this for the truth of the matter asserted.  They're offering it
16   to show that doctors would not work for her clinic for specific
17   reasons that the doctors expressed to her.  And so we're
18   objecting to it.  To the extent that it's being offered for the
19   truth of the matter asserted, it's hearsay.  In some cases, it's
20   double hearsay, because she's actually repeating what someone --
21   what some of the doctors told someone who worked for her who
22   then told her.
23          THE COURT:  Who is that, Markia Bess?
24          MR. BRASHER:  Right.
25          THE COURT:  I read that part.  But I think she makes it
```

 1   clear that while she's repeating what Markia Bess said, I think

 2   she ultimately said that she heard it herself, if I remember

 3   correctly, from reading the latter part of the deposition.

 4         MS. KOLBI-MOLINAS:  That's right.  The question is,

 5   Have you heard anyone tell -- an abortion doctor telling

 6   Ms. Bess or you.

 7         MR. BRASHER:  That was the question.

 8         THE COURT:  I don't really think there's double hearsay

 9   here.  But if she's merely saying that the doctors won't work

10   for her -- and that's true, isn't it, if she's saying it, at

11   least so far as whether you find her credible or not?

12         MR. BRASHER:  Well, to the extent that she is -- to the

13   extent they're offering this just to show that she made some

14   effort to recruit doctors, I don't think that there's a hearsay

15   problem if it's offered solely for that.  But if they're

16   offering it for the truth of the matter asserted, which is how

17   they addressed it in their summary judgment briefing, that these

18   doctors would not work for her for the specific reasons that the

19   doctors allegedly gave to her, then it's hearsay and it's

20   inadmissible.

21         THE COURT:  Why doesn't it come in, though, to show

22   that these are the reasons the doctors gave her?  Whether they

23   were in fact the reasons the doctors would refuse to work for

24   her might be debatable, but these are the articulated reasons.

25   And they explain her efforts and why she may have then ceased to

1    pursue it anymore and so forth.

2          MR. BRASHER:  Well, I mean I still think if you're

3    offering it for the truth in the sense that the doctors actually

4    did not work for her for the reasons that they allegedly told

5    her that they wouldn't work for her -- I mean I haven't heard it

6    being offered for an explanation for why she did some other

7    thing, if that makes sense.

8          THE COURT:  Well, I mean don't they explain, though,

9    that these are the reasons that the doctors gave?  Whether the

10   doctors in fact believe that may be a separate matter; but these

11   are in fact the reasons they articulated, which is the reasons

12   that are being put forward.  Whether they're real reasons or

13   whether they're whatever, they explain what the declarant said.

14   Whether you want to believe the declarant -- that is, what the

15   doctor -- that's a separate matter.  But it is the articulated

16   motive or intent or point or whatever.

17         MR. BRASHER:  Well, now, the motive -- I mean they've

18   tried to get out of the hearsay problem with saying that it's

19   motive or intent.  But that exception to the hearsay rule is the

20   motive or intent of the witness, not the motive or intent of the

21   out-of-court declarant.

22         THE COURT:  You mean the declarant.

23         MR. BRASHER:  No.  I'm saying it's the witness.  So,

24   for example, the motive and intent rule says if you can -- like

25   in a murder case, the witness can say, you know -- why did you

1    bring a -- why did you bring a weapon to the confrontation.

2    Well, because someone else told me that there would be other

3    weapons there.  Right?  That's not hearsay because the witness

4    is explaining -- using it to explain their intent or their

5    motive.

6           Here, they're offering it not for the witness's motive

7    or the witness's intent to do anything.  It's -- they're

8    offering it for the truth of the matter asserted, which is that

9    these out-of-court people that we could not depose and actually

10   are unnamed -- why or why they did not take certain actions.

11   And that's not an exception to the hearsay rule.

12          MS. KOLBI-MOLINAS:  Your Honor, the -- 803(3) says that

13   the exception for then-existing mental, emotional, or physical

14   condition, which includes motive, intent, or plan, is a

15   statement of the declarant's then-existing state of mind.  And

16   that is speaking, of course, of the declarant who's giving the

17   alleged hearsay, not the witness.  If the witness was there --

18   if it was what the witness had to say, it wouldn't be hearsay,

19   right, what the witnesses were recounting.

20          THE COURT:  Who is the declarant?  Is the declarant

21   here Dr. --

22          MS. KOLBI-MOLINAS:  The physicians that she spoke to.

23          THE COURT:  Is the declarant Dr. Buchanan or is the

24   declarant the doctors that she spoke to under the rule?

25          MS. KOLBI-MOLINAS:  I believe it's the doctors that she

1   spoke to.

2          THE COURT:  Let me see the rule there.

3          MS. KOLBI-MOLINAS:  Yes.

4          THE COURT:  So you're saying the declarant here is the

5   doctor, not her, not Dr. -- pardon me.  The declarant here is

6   the doctors who were being asked why they wouldn't work there

7   rather than Buchanan.

8          MS. KOLBI-MOLINAS:  Uh-huh.  Because she's getting in

9   the declarant's -- the question is whether or not a statement of

10  an out-of-court witness can be introduced through a witness who

11  was in court.

12         THE COURT:  803(3)

13         MS. KOLBI-MOLINAS:  Yes.

14         THE COURT:  Why isn't that correct?  The declarant's

15  then-existing state of mind, which would be here -- would be the

16  doctors' then existing state of mind, not Ms. Buchanan's.   I

17  suppose that in using your scenario about bringing the gun, if

18  someone wanted to introduce that statement that the person says

19  "I brought the gun because" and he wanted to introduce that

20  declarant's statement -- I guess in that sense it might be

21  double hearsay if he's saying I brought it because someone else

22  told me this.  But if he wanted to bring it -- I brought it

23  because I believe this, it might come in.

24         MR. BRASHER:  Your Honor, I just -- I still disagree,

25  because I don't think that they're offering this to show the

1    state of mind -- I mean they're offering it for the truth of the

2    matter asserted, which is that these doctors refused to work for

3    these specific reasons.  It's not the mental impressions of

4    the -- of the doctors or the plan.  I mean they're offering it

5    for the specific purpose of showing that these doctors refused

6    to work for these specific reasons.  And once again, these are

7    doctors that we -- are unnamed people that we can't even

8    evaluate whether these are truthful statements or whether they

9    actually happened.

10            MS. KOLBI-MOLINAS:  Your Honor --

11            THE COURT:  But isn't that an exception to the hearsay

12    rule, is that they do come in for the truth of the matter

13    asserted?

14            MR. BRASHER:  Right.  And I'm -- I don't think -- I

15    mean my understanding is that they're not actually offering

16    it -- they --

17            THE COURT:  They want to show that that in fact is the

18    motive, intent, or plan.

19            MR. BRASHER:  Right.  I'm saying I don't -- I don't

20    think this fits as a motive, intent, or plan, is my point, that

21    these doctors -- the statements that they're making are not

22    going to show their motive or their intent or their plan.  It's

23    supposedly the reasons why they refused to provide abortion

24    services for Planned Parenthood Southeast; and I don't think

25    that is a motive, intent, or a plan under the --

1          THE COURT:  It's interesting.  When you read Rule

2   803(3) fully, it says:  A statement of the declarant's

3   then-existing state of mind -- such as motive, intent, or

4   plan -- or emotional, sensory, or physical conditions -- such as

5   mental feeling, pain, or bodily health -- but not including a

6   statement of memory or belief to prove the fact remembered or

7   believed unless it relates to the validity or terms of the

8   declarant's will.

9          Here, the doctors would not be saying something based

10  on something they remembered or an event in the past, but just

11  their present-sense impression:  This is why I'm not going to do

12  this.  Which why wouldn't that be a motive?  In contrast to

13  saying, I'm not going to work here because I heard something had

14  happened to you, I heard that you-all have unclean -- an unclean

15  facility or whatever.  But instead, they're just saying, these

16  are my reasons.

17          MR. BRASHER:  Once again, I just don't think that that

18  is a then-existing mental, emotional, or physical condition that

19  falls within this exception.

20          THE COURT:  Anything else?

21          MS. KOLBI-MOLINAS:  No, sir.

22          THE COURT:  I think it comes in.  Let's talk about -- I

23  don't think there's a double hearsay problem from the

24  deposition.

25          Let's talk about the plaintiff's objections to -- is it

1  Dr. or Ms. Buchanan?

2          MS. KOLBI-MOLINAS:  Ms. Buchanan.

3          THE COURT:  Ms. Buchanan's deposition.  This is the

4  part --

5      (Brief interruption)

6          THE COURT:  Right.  This is the part where it says:

7  Have you heard about protests in Massachusetts, Georgia, and

8  elsewhere?

9          Is there any dispute that the protests have occurred in

10  Massachusetts, Georgia, and New York?

11          MS. KOLBI-MOLINAS:  Well, she says she actually doesn't

12  know about Massachusetts.

13          THE COURT:  Well, what's the problem -- I mean is it --

14  what's the big deal here, I guess is really what I'm asking.

15          MS. KOLBI-MOLINAS:  She doesn't have personal

16  knowledge.

17          THE COURT:  Everybody knows protests occur all across

18  the country.

19          MS. KOLBI-MOLINAS:  That's true.

20          THE COURT:  You can look at the news at any point in

21  time.

22          MS. KOLBI-MOLINAS:  Yeah.  Yeah.

23          THE COURT:  It comes in.  It's much ado about nothing.

24          Okay.  What's the next one?  Gray deposition.  Improper

25  opinion.

1      MS. KOLBI-MOLINAS:  Starts on 82.

2      THE COURT:  Now, who is Gray?

3      MS. KOLBI-MOLINAS:  She is the owner and administrator

4 of the clinic in Tuscaloosa.

5      THE COURT:  Okay.  I read -- well, first of all, I'm

6 looking at -- I read the part that's objected to.  And that's

7 the underlined part.  Now, the underlined means that the

8 defendants want it in; is that right?

9      MR. BRASHER:  That's correct, Your Honor.

10      THE COURT:  And the yellow means that the plaintiffs

11 want it in.

12      MR. BECKMAN:  That's correct.

13      THE COURT:  I read the entire part because I wanted

14 full context.  And I'm not sure exactly when she's moving from

15 an opinion as a mother and when she's moving -- or giving these

16 views as a clinic administrator.

17      MS. KOLBI-MOLINAS:  Well, Your Honor, the first

18 question she's asked is explicitly outside the context of the

19 provision of abortion care, right?  So the first question is:

20 Do you think it's preferable to have a procedure done by a

21 doctor?  Are you asking me strictly in the abortion field?

22 Let's start with generally speaking, not limited to the abortion

23 field.

24      I think whatever arguable expertise, you know, she may

25 be able to offer about provision of abortion care, she's

1   certainly -- she's not a physician.  She only owns one type of

2   facility.  She's not able to offer -- she's not allowed to offer

3   opinions on standard of care for any other sorts of medical

4   procedures.

5          THE COURT:  But she answers -- ultimately answers the

6   question saying:  And what about in abortion-specific context?

7   Is that preferable?  In my opinion, yes.

8          And they say -- you even want this admitted where you

9   go further.

10          MS. KOLBI-MOLINAS:  Uh-huh.

11          THE COURT:  And she talks about it as a mother.  And I

12   think that actually by including everything, I get a better

13   context of what she's saying.  I don't get it -- because "as a

14   mother" here, one might think that she's only talking about it

15   as a mother; but actually, she's putting it in contrast to what

16   it means as a clinic administrator versus as a mother.

17          I also think it gives context to the notion of this

18   whole concept of what is preferable.  You know, I'm sure

19   everybody would prefer that ambulatory care facilities be two

20   inches from a hospital.  That's preferable.  And I'm sure every

21   mother would want that and I'm sure every doctor would want

22   that.  But that doesn't mean that that's clinically necessary.

23   And this actually enlightens that viewpoint that what a mother

24   might prefer doesn't necessarily equate to what is clinically

25   necessary.  And I think to some degree, she's explaining it.

1    It's ambiguous, I'll have to say, but I think she's explaining

2    it.

3            You know, I'm actually having difficulty with this

4    whole concept of preferable.  And when you ask these questions,

5    what's preferable, as I said, you know, we would love if all

6    abortions were performed in hospitals.  I'm sure everybody would

7    prefer that.  But does that mean it's clinically necessary?

8    That's a separate question.  Would every mother prefer that

9    everything that happens to her child be performed -- yes,

10   because we never know what's going to happen.  But that doesn't

11   mean it's clinically necessary, because it just may be, for

12   economic reasons, we don't do it.  So in many ways, I was

13   enlightened by this more than anything else.

14           MS. KOLBI-MOLINAS:  Well, Your Honor, as we had

15   designated -- the part that you're talking about is the part

16   that we counterdesignated.  So I do think that if the whole

17   things goes in --

18           THE COURT:  Right.

19           MS. KOLBI-MOLINAS:  -- then the context is fine.

20           THE COURT:  Right.  And, you know, you have what's

21   preferable maybe to a mother, what's preferable to a clinic

22   administrator.  Because she goes on to say, if I'm reading it

23   correctly, that it may be that while a mother might prefer this,

24   she, as a clinic administrator, doesn't prefer it because she

25   has a covering physician who will perform some of these.  So you

1   can read it both ways.  Anything else?  I'm going to allow it

2   in.

3           What's next?  Let's see here.

4           MS. KOLBI-MOLINAS:  I think they're -- do you want to

5   stick with Gray?  There are --

6           THE COURT:  Let's see.  Smith's deposition.  I'm not

7   sure there's anything left of Gray, is there?

8           MS. KOLBI-MOLINAS:  No.  There is.  Defendant's --

9           MR. BRASHER:  Judge, there was one objection to

10  plaintiff's designation of Gloria Gray.

11          THE COURT:  What else?  I didn't see that.

12      (Off-the-record discussion)

13          MR. BRASHER:  It is the same issue as Buchanan, so I

14  think your ruling on the earlier Buchanan issue, we can --

15          THE COURT:  You're actually right.  She does.  Gloria

16  Gray.  Is that right?  Yeah.  That does present the same issue.

17      (Off-the-record discussion)

18          THE COURT:  Smith's deposition, lack of personal

19  knowledge.  Isn't Smith going to testify?

20          MS. KOLBI-MOLINAS:  Well, this -- so Smith was -- if he

21  testifies, he's only -- the parties had agreed that his original

22  deposition goes in as his testimony on those matters and that if

23  he's called to testify testimony, that he would testify about

24  the issues covered in the second deposition.

25          THE COURT:  So he's not to cover this?

1          MS. KOLBI-MOLINAS:  Right.

2          THE COURT:  And the question is the majority of doctors

3  who perform office-based surgery live in Alabama near where they

4  practice.  And you're saying he doesn't provide enough personal

5  knowledge on that.

6          MS. KOLBI-MOLINAS:  Right, Your Honor.  I mean he

7  explains in his, you know, experience as a family --

8          THE COURT:  I'll allow you to cross-examine him on

9  that.  I'll allow that in.  You can cross him on that.  Duggar

10  and -- do you pronounce it Duggar or Duggar?

11          MR. BRASHER:  Duggar.

12          THE COURT:  Duggar and Hayes.  I've looked at those.

13  Because the issue of whether, as a gatekeeper, I should allow

14  this in sort of collapses in many ways to the question as to

15  whether I find them credible as expert witnesses, I'm going to

16  reserve ruling on this for right now.

17          Okay.  Let's go in.

18      (Library conference concluded at 9:05 a.m.)

19      (Call to Order of the Court)

20          THE COURT:  Who's our next witness?

21          MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call

22  Dr. Kenneth Brewington.

23          THE COURT:  Okay.  Very good.  Has the witness been

24  sworn?

25          THE CLERK:  He has not.

```
 1            THE COURT:  The clerk will swear in the witness.
 2            THE CLERK:  What's his name again?
 3            MS. KOLBI-MOLINAS:  Kenneth Brewington.
 4            THE CLERK:  Mr. Brewington?
 5            THE WITNESS:  Yes.
 6            THE CLERK:  Will you raise your right hand, please.
 7            THE WITNESS:  Yes.
 8        (The witness is sworn)
 9            THE COURT:  Proceed.  Before we start, has the court
10   reporter tried this?  Can you hear?
11            COURT REPORTER:  I can hear, Judge.
12            THE COURT:  Very good.  Thank you.
13        (Attorney Wade "Bo" Perry, Jr., present by videoconference)
14            KENNETH BREWINGTON, M.D., the witness, having been
15   duly sworn to speak the truth, the whole truth, and nothing but
16   the truth, testified by videoconference as follows:
17                          DIRECT EXAMINATION
18   BY MS. GRIFFITH:
19   Q.  Good morning, Dr. Brewington.  My name is Dyanne Griffith.
20   Can you please introduce yourself to the Court.
21   A.  I am Kenneth Brewington.  I'm the vice president and
22   administrator of the Mobile Infirmary Medical Center in Mobile.
23   Q.  In that position, are you familiar with Mobile Infirmary's
24   policies, practices, and procedures for granting staff
25   privileges?
```

1    A.   Yes.

2    Q.   Can you turn now to what has been marked as Plaintiff's

3    Exhibit 15.   I believe you have a copy of it with you.

4    A.   Correct.

5         MS. GRIFFITH:   Mr. Green, there's a copy of Exhibit 15

6    for the Judge in volume two of plaintiff's exhibits.   There

7    should be two there.   One is for the clerks and one is for Your

8    Honor.

9      (Brief pause)

10         THE COURT:   Go ahead.

11   Q.   Mr. Brewington, are you familiar with Exhibit 15?

12   A.   Yes.

13   Q.   What is it?

14   A.   It is the physician's application for appointment to the

15   medical staff.

16   Q.   Are there any other materials --

17   A.   And the --

18   Q.   Go ahead.

19   A.   Yes, ma'am.   The -- it appears that the bylaws and rules and

20   regulations, the credentials policy are all included.

21   Q.   And these are the bylaws and policies that set forth the

22   qualifications that applicants must satisfy in order to be

23   granted staff privileges; is that correct?

24   A.   Correct.

25   Q.   Can you generally describe the process of getting privileges

1   at Mobile Infirmary starting after the hospital receives an

2   application?

3   A.   After the application is received, we spend a fair amount

4   of -- a fair amount of time trying to verify all the information

5   on the application form including background checks and calls to

6   hospitals where the physician has previously practiced,

7   obtaining letters of support from the residency director.   And

8   then it begins to go to committees, first to the departmental

9   committee, then to the credentials committee, then to the

10  medical executive committee, and then finally to the board of

11  the hospital.

12  Q.   Thank you.   What are the types of privileges that Mobile

13  Infirmary grants that would permit a physician to perform a

14  laparotomy or hysterectomy?

15  A.   Well, there are -- there are credentialing levels, which are

16  active and courtesy, and consulting that would allow that.

17  Privileges are separately granted in each speciality.

18  Q.   You said for consulting would allow the physician to perform

19  a laparotomy or hysterectomy at the hospital?

20  A.   If he was consulted by a staff member of the hospital.

21  Q.   So could the -- that physician perform a laparotomy and

22  hysterectomy?

23  A.   If that physician was consulted by an active member of the

24  staff at the hospital, yes.

25  Q.   Are there any threshold criteria for active and courtesy

1  privileges?

2  A.   Yes.   The criteria are, for active staff, 25 patient

3  contacts within a two-year period.   And for courtesy, it is ten

4  contacts within a two-year period.

5  Q.   What is a patient contact?

6  A.   It is a visit to the patient.   In the hospital, it can be an

7  emergency room contact.   It can be a referral from the emergency

8  room to a doctor's office.

9  Q.   And would --

10 A.   It does not require an admission.   It just is a contact.

11 Q.   But it requires that a physician actually see a patient in

12 the hospital.

13 A.   No.   The physician can actually see the patient in their

14 office if they're referred from the emergency room.

15 Q.   And how would that count as a patient contact for purposes

16 of Mobile Infirmary?

17 A.   Because the patient originated at the Mobile Infirmary.   For

18 instance, in the emergency room, if something was needed that

19 didn't require emergency treatment but the patient needed a

20 follow-up visit, they were referred to that physician by our

21 emergency department.

22 Q.   Okay.   So for the threshold criteria, I was actually

23 referring to the criteria that's set forth, I believe, at

24 Article 2, Section 2.A.

25 A.   Yes.

1  Q.  And what, if any, residence or locality requirements are

2  contained in these threshold criteria?

3  A.  Sorry.  I didn't understand the question.

4  Q.  What, if any, residence or locality requirements are set

5  forth as part of the threshold criteria?

6  A.  There is a 60-minute threshold for being able to come to the

7  hospital.

8  Q.  And that is for both active and courtesy privileges?

9  A.  Yes.

10 Q.  So a physician who resides more than 60 miles from Mobile

11 Infirmary could not satisfy this requirement, correct?

12 A.  That's correct.

13 Q.  So a physician that resides in Atlanta, Georgia, and worked

14 at a health center one or two days a week would not satisfy that

15 requirement; is that correct?

16 A.  That's correct.

17 Q.  And is any waiver of this requirement available?

18 A.  No, ma'am.

19 Q.  There's -- there's no waiver at Article 2, Section 2.A.2?

20 A.  I'm not sure I see where you're talking about now.  Let's

21 see.

22 Q.  So the document number that I'm referring to, at the bottom

23 right, it says 176473.4.

24 A.  Oh, I'm not --

25 Q.  And it's on page 4.  Actually, it's on page 6.

1    A.   Page 4?

2    Q.   I'll read it for you.

3    A.   All right.

4    Q.   So I believe that this says --

5    A.   Go ahead.

6    Q.   -- any individual who does not satisfy one or more of the

7    threshold eligibility criteria outlined above may request that

8    it be waived.   The individual requesting the waiver bears the

9    burden of demonstrating exceptional circumstances and that his

10   or her qualifications are equivalent to or exceed the criterion

11   in question.   Is that correct?

12          MR. PERRY:   Ask her for the page.

13   A.   I still haven't found where you're -- can we try this again?

14   Page number?

15          THE COURT:   Page --

16          MR. PERRY:   The page number of the exhibit.

17          THE COURT:   Page 6.

18   A.   What page is it?

19   Q.   So there are several different documents in the exhibit.

20   A.   Correct.

21   Q.   Yeah.   So if the document number in the bottom right-hand

22   corner --

23   A.   I found the page.

24   Q.   Okay.   But you said that this waiver does not apply to the

25   60-mile locality requirement; is that correct?

1   A.  The -- I think what I should tell you is that the waiver --

2   no waiver has been granted by the medical staff before for this.

3   Q.  And is a physician that resides in Atlanta, Georgia, and

4   works at a health center in Mobile one or two days a week

5   eligible for the waiver of this criterion?

6          MR. DAVIS:  I would object, Your Honor.  The witness

7   has testified --

8   A.  You could --

9          MR. DAVIS:  The witness has testified that other

10  bodies, including the executive committee and the board, would

11  have final say over this.

12         THE COURT:  I'll allow the question.

13  A.  Certainly a physician could request, but none has ever been

14  granted.

15         MS. GRIFFITH:  One moment, Your Honor.

16     (Brief pause)

17  Q.  Dr. Brewington, do you have the declaration that you signed

18  in this case with you?

19  A.  Yes, ma'am.

20  Q.  And if you turn to paragraph four, I'm going to read part of

21  that.  It says:  However, I understand that a physician that

22  works at Planned Parenthood Southeast's health center in Mobile,

23  Alabama, resides in Atlanta, Georgia, and only works at the

24  health center approximately one or two days per week.  Such a

25  physician would not satisfy the residency criterion contained in

1  the bylaws and could not show that his or her qualifications are

2  equal to or exceeded the criterion in question.  Such a

3  physician would not be eligible for a waiver of this criterion.

4      Did I read that correctly?

5  A.  Yes, ma'am.

6  Q.  And just for the record, I just want to confirm that on

7  page 4 of this declaration, that is your signature; is that

8  correct?

9  A.  Yes.

10 Q.  Thank you.  Okay.  So now, if you could turn to Article 2,

11 Section 2.A.1.

12 A.  Of the credentials policy or the bylaws?

13 Q.  I believe I'm looking at the same document that we were just

14 talking about with the waiver.  I think it's on the previous

15 page.

16 A.  Okay.

17 Q.  And this is subparagraph (d).

18 A.  Yes.

19 Q.  Could you read that for the Court?  I believe it refers to

20 continuous availability.

21 A.  It says:  Be available on a continuous basis, either

22 personally or by arranging appropriate coverage, to respond to

23 the needs of inpatients and emergency department patients in a

24 prompt, efficient, and conscientious manner.  Appropriate

25 coverage means coverage by a physician or oral surgeon who is a

1  member of the medical staff with speciality-specific privileges

2  equivalent to the practitioner for whom they are providing

3  coverage.  Compliance with this eligibility requirement means

4  that the practitioner must document that he or she is willing

5  and able to, one, respond within 15 minutes via phone to stat

6  pages from the medical center and respond within 30 minutes via

7  phone to all other pages and, two, appear in person to attend to

8  a patient within 60 minutes of being requested to do so.

9  Q.  Thank you.  And this requirement applies for both active and

10  courtesy privileges; is that correct?

11  A.  That is correct.

12  Q.  I'm going to refer to this as the continuous availability

13  requirement, if that is okay with you.

14  A.  Okay.

15  Q.  Does a physician who resides in Atlanta, Georgia, and works

16  at a health center in Mobile one or two days a week satisfy the

17  continuous availability requirement?

18  A.  No.

19  Q.  Is that physician eligible for a waiver of the continuous

20  availability requirement?

21  A.  It would require coverage by someone else as it -- you

22  can -- you are eligible to apply for a waiver.  Waivers have

23  never been granted by the medical staff for these situations.

24  Q.  Thank you.  Now, does the application for privileges

25  require a physician to list two physicians who will be available

1  for coverage in an emergency?

2  A.   Correct.

3  Q.   Is there any waiver for this requirement?

4  A.   I don't believe so.

5  Q.  Can you turn now to Article 2, Section 2.A.3?  It's entitled

6  Factors for Evaluation.

7  A.   Okay.

8  Q.   Can you please read for the Court subparagraph (a).

9  A.   Let's see here.  Relevant training, experience, and

10  demonstrated current competence, including medical/clinical

11  knowledge, technical and clinical skills, and clinical judgment,

12  and an understanding of the context and systems within which

13  care is provided.

14  Q.   And this is one of the factors that's evaluated as part of

15  the evaluation of an individual's application; is that correct?

16  A.   That's correct.

17  Q.   Does a physician who has no training or experience in

18  performing a laparotomy or hysterectomy have the training,

19  experience, and demonstrated current compliance to be eligible

20  for privileges at Mobile Infirmary that would permit her to

21  perform those procedures?

22  A.   If you said that she had -- that the person had no training,

23  no, they would not.

24  Q.   Are you aware of any other hospital in Mobile that would

25  grant privileges to perform laparotomy and hysterectomy to a

1   physician who has never performed or been trained to perform

2   those procedures?

3   A.   No.

4   Q.   Is a doctor who meets all of the requirements set forth in

5   Exhibit 15 guaranteed to be granted privileges at Mobile

6   Infirmary?

7   A.   Tell me about -- what is 15?  I don't know --

8        MR. PERRY:  Ask her for the page number.

9   Q.   Exhibit 15 is the application and the bylaws that we've been

10  reviewing.

11  A.   Correct.  If -- if they meet all of the criteria, it would

12  be up to the medical credentials committee to decide if they

13  would be admitted or not.  That's not a hospital decision.  The

14  hospital would only approve the decision of the medical

15  executive committee.

16  Q.   Thank you.  I'd like to go back -- we were talking at the

17  beginning about the different categories of privileges at Mobile

18  Infirmary, and we were discussing the consulting privileges.

19  Would a physician that has consulting privileges be able to

20  admit a patient?

21  A.   No.

22  Q.   And a laparotomy and hysterectomy, those are surgical

23  procedures that require a patient be admitted, correct?

24  A.   Yes.  Today.

25  Q.   Mobile Infirmary has not granted privileges, either active

1   or consulting, to a physician who does not live within 60 miles

2   of Mobile Infirmary at least since 2009; is that correct?

3   A.   That's what I believe.

4   Q.   And you are not aware of any earlier occasions on which a

5   physician that lived outside of 60 miles of Mobile was granted

6   active or courtesy privileges; is that correct?

7   A.   This -- this set of bylaws was enacted at the end of

8   2009-2010.   I'm not certain what the requirements were before

9   that.

10       MS. GRIFFITH:   Okay.   Thank you, Your Honor.   Can I

11   have a brief moment to confer with counsel?

12       THE COURT:   Yes.

13   (Brief pause)

14   Q.   Okay.   Dr. Brewington, I just have one more question.   At

15   the beginning, we were discussing the different committees that

16   review applications.   Do you know how many individuals are on

17   those committees?

18   A.   The children's and women's committee, for instance, for

19   obstetric privileges has about ten members.   The credentials

20   committee has 12 to 15 members.   The medical executive committee

21   has 13 members.

22   Q.   And are each of those members of those committees entitled

23   to a vote on whether or not to grant privileges --

24   A.   Yes.

25   Q.   -- to an applicant?

```
 1    A.   Yes.

 2              MS. GRIFFITH:   Thank you.   No further questions right

 3    now.

 4              THE COURT:   Cross?

 5                             CROSS-EXAMINATION

 6    BY MR. DAVIS:

 7    Q.   Good morning, Dr. Brewington.

 8    A.   Hello.

 9    Q.   My name is Jim Davis.   I work in the Attorney General's

10    Office, and I'm one of the lawyers for the defendants in this

11    case.   The process for granting privileges does not begin until

12    you receive an application; is that correct?

13    A.   That is correct.

14    Q.   Has the hospital received an application from any doctor

15    working with Planned Parenthood, to your knowledge?

16    A.   No, sir.

17    Q.   Would you please look at the credentials policy that you

18    were reviewing earlier, Dr. Brewington, and page 4 of that

19    credentials policy, Section 2.A.1.   And earlier --

20    A.   Yes.

21    Q.   -- do you recall discussing the geographic location

22    requirement about being located within 60 minutes of the medical

23    center?

24    A.   Yes.

25    Q.   Why does the hospital have such a requirement?
```

1  A.   I missed that.

2  Q.   Why does the hospital have such a requirement?

3  A.   For patient safety.

4  Q.   Subsection (c) says, does it not, that it's to make sure

5  that the doctor can provide timely and continuous care for their

6  patients?

7  A.   Yes.

8  Q.   Is that because the hospital believes that physician

9  availability is important for patient safety?

10 A.   Yes, it does.  It means that the medical staff believes

11 that.  These are their bylaws.

12 Q.   Okay.  Well, you've got lots of fine doctors, I'm sure, at

13 the hospital.  Well, why isn't it sufficient in the medical

14 staff's view to just let whoever happens to be at the hospital

15 see a patient?  Why do they want the doctor who's seen her in

16 the past to continue to see her?

17       MS. GRIFFITH:  Objection.

18 A.   For continuity of care.

19       THE COURT:  Yes.  What's your objection?

20       MS. GRIFFITH:  I believe that this is somewhat outside

21 the scope of the direct.  But also, I don't think Dr. Brewington

22 is here to testify as an expert on the standard of care.

23       MR. DAVIS:  He's here as someone knowledgeable about

24 the policies, and the policies themselves say that the purpose

25 is to provide timely and continuous care.  So I'm asking him

1    about this provision in the bylaws that says continuity of care

2    is important.

3              MS. GRIFFITH:   I believe he already said that he did

4    not have information about the medical decision for why that was

5    included in the bylaws.  So I think that's outside the scope of

6    his knowledge.

7              THE COURT:  Well, he can answer the question.  I'll

8    allow him to answer the question.

9    Q.   So did you say, Dr. Brewington, that continuity of care is

10   one of the bases for this requirement?

11   A.   Yes, I did.

12   Q.   Now, if you'll flip over to page 6 of that same document,

13   Dr. Brewington.  And did I understand correctly that a doctor

14   can get a waiver of some of these threshold requirements?

15   A.   A doctor can apply for a waiver.

16   Q.   Okay.

17   A.   No waiver is guaranteed.

18   Q.   Okay.  But he can apply --

19   A.   It says in (d) -- in (d), it says, no individual is entitled

20   to a waiver.

21   Q.   It does.  Who makes the decision of whether a waiver is

22   granted?

23   A.   The medical executive committee or the board.

24   Q.   Now, look at subsection (d), the one you just pointed out,

25   Dr. Brewington.  If someone does not receive a waiver, if

1    there's a determination that an individual is not entitled to a

2    waiver, that's not a denial of the -- of an appointment for

3    clinical privileges, is it?

4    A.   No.

5    Q.   In subsection (f), is it correct that an application for

6    appointment that does not satisfy an eligibility criterion is

7    not even processed until the board has determined that a waiver

8    should be granted?

9    A.   Correct.  That's the reading.

10   Q.   So if a doctor applies for privileges at the hospital,

11   requests a waiver, and the medical staff determines that that

12   doctor should not get a waiver, that's not a denial of the

13   application of privileges; is that correct?

14   A.   That is correct.

15   Q.   Now, a doctor who doesn't have training in a particular

16   area, it's always possible for that doctor to get training in an

17   area.  Would you agree with that?

18   A.   Yes.

19        MS. GRIFFITH:  Object, Your Honor.  Again, I think this

20   goes outside the scope of Mr. Brewington's --

21        MR. DAVIS:  He testified earlier that someone who

22   doesn't have training in an area might not be able to get

23   privileges, so I think I'm entitled to ask him whether or not

24   that's set in stone.

25        THE COURT:  I'll allow it.  Go ahead.

1    Q.   In the application process, Dr. Brewington, if someone who

2    applies for privileges has a malpractice action against them, is

3    that something that may be relevant to the bodies that rule on

4    the application for privileges?

5    A.   It is -- it is relevant and considered.  It's not a stop --

6    Q.   It's --

7    A.   -- in and of itself.

8    Q.   It is part of the whole body of material that would be

9    considered, though.  Would you agree?

10   A.   Yes, sir.

11   Q.   And if a doctor has been indicted, is that also one factor

12   that the medical staff at the children's and women's committee

13   and that the board might consider in terms of ruling on that

14   application?

15   A.   Yes.

16            MR. DAVIS:  If I may confer, Your Honor.

17            THE COURT:  Okay.  Redirect?

18            MS. GRIFFITH:  Mr. Davis, were you done or did you need

19   another minute?  I'm sorry.

20            MR. DAVIS:  I do not have any further questions.

21            MS. GRIFFITH:  You do not.

22            May I have a moment to confer, Your Honor?

23            THE COURT:  Yes.

24       (Brief pause)

25

1                     REDIRECT EXAMINATION

2    BY MS. GRIFFITH:

3    Q.   Now, Dr. Brewington, can I direct your attention again to

4    Article 2, Section 2.A.2?  This is the waiver of threshold

5    eligibility criterion in the bylaws.

6    A.   I'm there.

7    Q.   Okay.  So in the last sentence here, it says that a

8    physician requesting bears the burden of demonstrating

9    exceptional circumstances and that his or her qualifications are

10   equivalent to or exceed the criterion in question.

11       Did I read that correctly?

12   A.   I believe you did.

13   Q.   And so I read this to say that it's not -- the committee

14   does not have necessarily discretion to waive this if the

15   physician cannot show that her qualifications are equivalent to

16   or exceed what is set forth in these bylaws.  Is that correct?

17   A.   Yes.

18   Q.   Okay.

19   A.   I think that's right.

20   Q.   Thank you.  Are you knowledgeable about the process by which

21   OB -- obstetricians and gynecologists or family medical doctors

22   are trained to do particular procedures?

23   A.   I'm fairly familiar with that for OB-GYN, not necessarily

24   that for family practice.

25   Q.   And are you knowledgeable about what conditions a physician

1   must meet before they would be able to participate in such

2   training?

3   A.   Yes, I think so.   I'm not sure what your question is.

4   Q.   So you are not familiar with the training of a family

5   medical physician and how that individual would be trained to

6   perform these gynecological procedures of a hysterectomy and

7   laparotomy?

8   A.   No.

9          MS. GRIFFITH:   Thank you.   No further questions.

10          THE COURT:   Proceed, Mr. Davis.

11                        RECROSS-EXAMINATION

12   BY MR. DAVIS:

13   Q.   Dr. Brewington, if someone requests a waiver, can you say,

14   as you sit here today, what the ten members of the children's

15   and women's committee would consider to be exceptional

16   circumstances that would entitle a doctor to receive a waiver?

17   A.   I do not know --

18   Q.   And can you say with --

19   A.   -- what they would consider.

20   Q.   Can you say what the 13 members of the medical executive

21   committee would consider to be exceptional circumstances?

22   A.   No.

23   Q.   Can you say what -- you know, however many members of the

24   board there are, what they would consider to be exceptional

25   circumstances?

1  A.  No, sir.  I do not know.

2  Q.  And by the same token, of course, you wouldn't know what all

3  of these different doctors and members of all of these various

4  committees would consider to be equivalent to or not equivalent

5  to certain threshold requirements.

6  A.  That's true.

7          MR. DAVIS:  Thank you, Dr. Brewington.

8          MS. GRIFFITH:  No further questions, Your Honor.

9          THE COURT:  Thank you.  Any further?

10         Very good.  Thank you.

11         MS. GRIFFITH:  Nothing further, Your Honor.

12         THE COURT:  This witness is excused.

13         THE WITNESS:  Thank you.

14         THE COURT:  Thank you very much, Doctor.

15         Who's the next witness?  Is the next witness by video?

16         MS. KOLBI-MOLINAS:  Yes, Your Honor.

17         THE COURT:  Okay.  We'll take a recess while that's set

18  up.

19         MS. KOLBI-MOLINAS:  Okay.

20     (Recess at 9:43 a.m. until 10:02 a.m.)

21         THE CLERK:  Please remain seated.  Court is in session.

22         THE COURT:  Proceed, counsel.

23         THE CLERK:  You may be seated.

24         MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call Paul

25  Read from Springhill Memorial Hospital in Mobile.

```
 1              THE COURT:  Okay.  Proceed.

 2              THE CLERK:  Mr. Read.  Mr. Read.

 3              THE WITNESS:  Yes.

 4              THE CLERK:  Raise your right hand, please.

 5              THE WITNESS:  Can you hear me?

 6              THE CLERK:  Yes, sir.

 7          (Attorney John Little present by videoconference)

 8              PAUL READ, the witness, having been duly sworn to

 9   speak the truth, the whole truth, and nothing but the truth,

10   testified by videoconference as follows:

11                        DIRECT EXAMINATION

12   BY MS. GRIFFITH:

13   Q.  Good morning, Mr. Read.  My name is Dyanne Griffith, and I

14   represent the plaintiffs.  Can you please introduce yourself for

15   the Court.

16   A.  I am Paul Read, vice president and chief nursing executive

17   of Springhill Medical Center.

18   Q.  Thank you.  And are you represented by counsel here today?

19   A.  I am.

20   Q.  Counsel, for the record, could you just state your name.

21              MR. LITTLE:  John Little.

22              MS. GRIFFITH:  Thank you.

23   Q.  Mr. Read, where is Springhill Hospital located?

24   A.  It is located at 3719 Dauphin Street in Mobile, Alabama.

25   Q.  Thank you.  And are you involved with Springhill's process
```

1  of granting staff privileges?

2  A.  Yes, ma'am.

3  Q.  So you're familiar with the -- the rules governing that

4  process?

5  A.  Yes, ma'am.

6  Q.  Can you please turn to what has been marked as Plaintiff's

7  Exhibit 16?  What is this?

8  A.  That is our -- the bylaws of the medical staff of Springhill

9  Memorial Hospital.

10  Q.  And that's what sets forth the qualifications that an

11  applicant must satisfy to be granted privileges?

12  A.  That is correct.

13  Q.  Can you briefly just walk through the steps in reviewing an

14  application for privileges after you receive it?

15  A.  Sure.  Once an application is received, it is worked by the

16  credentialing personnel, which is the staff of the hospital, to

17  obtain all the appropriate information, the licensure, the board

18  certification, the history of the practice of the individual,

19  liability insurance, making sure that all the data is gathered

20  for presentation to committee.  Once all that is obtained and

21  the application is completed, it is taken to the appropriate

22  committee which would be governing that individual, whether it

23  would be family medicine, OB, pediatrics, surgery.  From there,

24  once it's reviewed, it would go to the med exec committee, the

25  medical executive committee would review it as well.  And from

1   there, it would go to the governing body.

2   Q.  Do you know how many individuals are on each of those three

3   committees that you've named?

4   A.  On the -- the medicine committee, it's four to six.  I don't

5   know the exact number.  I can give you the roundabouts for each.

6   For OB committee, it would be seven to eight positions.  Med

7   exec would be all the department chairs, so that is right at

8   eight positions.  Surgery committee would be four, I think.

9   Four.

10  Q.  Okay.

11  A.  Pediatric is typically four as well.

12  Q.  And those individuals on the relevant committees that would

13  review an application are all entitled to a vote on that

14  application?

15  A.  Yes, ma'am.

16  Q.  What type of privileges does Springhill Memorial grant that

17  would permit a doctor to admit a patient for -- to perform a

18  laparotomy and hysterectomy?

19  A.  Well, we don't grant the privileges.  The medical staff

20  grants the privileges.  But the categories would be provisional

21  and active.  They would be able to admit that.

22  Q.  And what about courtesy staff?  Is that also a category of

23  privileges?

24  A.  Yes, ma'am, but they do not have the privilege to admit.

25  They're used as consultants.

1    Q.  And what, if any, residency or locality requirements are

2    there for these categories of staff privileges?

3    A.  All of them -- they must be located within -- office or home

4    within a close proximity of the hospital.

5    Q.  And does a physician that resides in Atlanta, Georgia, and

6    works at a health center in Mobile one or two days a week

7    satisfy the requirement that they be located within a close

8    proximity to the hospital?

9        MS. FLEMING:  Objection, Your Honor.

10   A.  No, ma'am.

11       MS. FLEMING:  Objection, Your Honor.  I believe that

12   this witness has testified that these bylaws are actually the

13   bylaws of the medical staff and not the hospital, and he has not

14   testified that he is a member of the medical staff.  I'm not

15   sure that he is competent to testify, Your Honor, as to what

16   these bylaws would provide or how they should be interpreted.

17       THE COURT:  I'll allow him to testify, and you can

18   bring that out on cross.

19       MS. FLEMING:  Thank you, Your Honor.

20       THE COURT:  Go ahead.

21   Q.  (Ms. Griffith, continuing:)  Does Springhill Memorial waive

22   this locality or residence requirement for any of these three

23   categories of staff privileges?

24   A.  No, ma'am.

25   Q.  And are you aware of any occasions on which physicians have

1    been granted provisional, active, or courtesy privileges to a

2    physician who did not reside within a reasonable distance of

3    Springhill Memorial Hospital?

4    A.   No, ma'am, I am not aware.

5    Q.   Is Atlanta, Georgia, within a reasonable distance of

6    Springhill Memorial Hospital?

7    A.   No, ma'am.

8    Q.   The bylaws which are marked as Plaintiff's Exhibit 16 also

9    require an applicant to provide references; is that correct?

10   A.   Yes, ma'am, that is correct.

11   Q.   And those are references from members of the Springhill

12   Memorial active staff?

13   A.   That is correct.  Yes, ma'am.

14   Q.   And is there any waiver of this requirement?

15   A.   No, ma'am.  There is no waiver of that requirement.

16   Q.   And Exhibit 16 also requires an applicant to identify a

17   physician to provide backup coverage who is a -- on the medical

18   staff at Springhill Memorial; is that correct?

19   A.   Yes, ma'am, that is correct.

20   Q.   And is there waiver available for that requirement?

21   A.   No, ma'am.

22   Q.   And in addition to these requirements we've been discussing,

23   must a physician also demonstrate that they have training,

24   experience, and competence to perform the privileges requested?

25   A.   Yes, ma'am.  That is correct.

1    Q.  And does a physician who's board certified in family

2    medicine and who does not have training as an obstetrician or

3    gynecologist -- would -- and is not trained to -- or has any

4    experience performing a laparotomy or hysterectomy be eligible

5    for privileges to perform those procedures at Springhill?

6    A.  No, ma'am.  If that individual does not have the training or

7    the clinical experience, they would not be granted the

8    privileges.

9         MS. GRIFFITH:  Thank you.  May I have one moment to

10   confer?

11      (Brief pause)

12   Q.  So just to be clear, Mr. Read, you are not aware of any

13   family medical -- family -- any physician who's board certified

14   in family medicine who's been granted privileges to perform a

15   laparotomy or hysterectomy?

16   A.  That is correct.  I am not aware of any.

17        MS. GRIFFITH:  Thank you so much for taking time to be

18   here today.  I'm done for right now.

19        THE COURT:  Cross, Ms. Fleming?

20                     CROSS-EXAMINATION

21   BY MS. FLEMING:

22   Q.  Mr. Read, my name is Margaret Fleming, and I am an assistant

23   attorney general for the State of Alabama.  I represent the

24   defendants in this case, and I want to ask you a few questions.

25      It's my understanding you are not a member of the medical

1  staff of Springhill Memorial Hospital; is that correct?

2  A.  Yes, ma'am, that is correct.

3  Q.  Okay.  And the bylaws that you've been referring to are

4  actually the bylaws of the medical staff; is that correct?

5  A.  Yes, ma'am.  That is correct.

6  Q.  Now, it's my understanding that the bylaws do not impose a

7  minimum patient admission requirement on doctors with courtesy

8  privileges; is that correct?

9  A.  Yes, ma'am.  That is correct.

10  Q.  Also, I believe the bylaws provide that the termination,

11  granting, continuation, or modification of staff privileges

12  based on criteria unrelated to clinical qualifications,

13  professional responsibilities, or quality of care is prohibited.

14  Is that your understanding?

15  A.  Yes, ma'am.  That is my understanding.

16  Q.  All right.  Did I understand you to say, Mr. Read, that

17  doctors with courtesy privileges at Springhill Memorial cannot

18  admit patients?

19  A.  Courtesy?  I may have confused courtesy with consulting.

20  Q.  I believe --

21  A.  A courtesy can admit.

22  Q.  Yes.  Courtesy can admit; is that correct?

23  A.  Yes, ma'am.  I misspoke.  Courtesy can admit.  Consulting

24  cannot.

25  Q.  Now, the bylaws say that a doctor with courtesy privileges

1  must either be located and practice close enough to the hospital

2  facility or otherwise arrange to provide continuous care to his

3  or her patients; is that correct?

4  A.  Yes, ma'am.  That is correct.

5  Q.  And so by "otherwise arrange to provide continuous care," I

6  presume this means by having an arrangement with a backup

7  physician to provide care?

8  A.  That is correct.  That is why we require them to have call

9  coverage backup from one of the active members of the medical

10 staff.

11 Q.  Now, the process of gaining admitting privileges begins with

12 the filing of an application?

13     (Video screen goes dark)

14        MS. FLEMING:  I lost feed.

15        THE COURT:  We lost our picture.

16        THE WITNESS:  I'm here.  I just lost lighting.

17        THE COURT:  Oh, okay.  The picture was there.  It was

18 the light that went out.

19 Q.  Let me go back.  The process for gaining admitting

20 privileges begins with filing of an application; is that

21 correct?

22 A.  Yes, ma'am.  That is correct.

23 Q.  To your knowledge, has Springhill Memorial Hospital or have

24 the medical staff received an application for privileges from

25 any doctor working at Planned Parenthood?

1   A.   No, ma'am, not to my knowledge.

2   Q.   Can you describe for us the process of gaining staff

3   privileges?

4   A.   Yes, ma'am.   An application is completed.   At that time, the

5   application is worked to make sure of its completeness in

6   regards to validating all the information on there from board

7   certifications, licensures, any restrictions, any lawsuits

8   pending, anything out there that we may need to discover,

9   malpractice coverage, liability, all that sort of stuff.

10       At that point in time, once the application is deemed

11   complete, all the data has been obtained, it will be sent to the

12   appropriate committee, whether it's peds, medicine, OB, surgery,

13   whichever committee that individual would fall under, for their

14   review and their vote.   At that time, the members would review

15   it, make their determination.

16       Once they have made their determination, it goes to the

17   medical executive committee.   The medical executive committee

18   will review as well, make their determination.   When that's all

19   done, it goes to the governing board, the governing body, which

20   at that time makes the final determination.

21   Q.   Now, at some point do you have a vote in the application

22   process?

23   A.   No, ma'am.   I am not -- the hospital does not have a voting

24   member.

25   Q.   And my understanding of reading the bylaws is that there is

1  an emphasis on demonstrated ability to provide continuous care

2  to patients.  Would you agree with that?

3  A.  Oh, absolutely.  Yes, ma'am.

4  Q.  And that's done either by a physician practicing locally or

5  by arranging with another physician to cover those patients to

6  serve as backup; is that correct?

7  A.  Yes, ma'am.  That is correct.

8  Q.  And your bylaws prohibit discrimination on the basis of race

9  and gender, as I understand it -- or the bylaws of the medical

10  staff.

11  A.  That is correct.  Yes, ma'am.

12  Q.  And they also prohibit denial of privileges based on any

13  factor unrelated to patient care, physician qualifications, or

14  professional responsibility; is that correct?

15  A.  Yes, ma'am, that is correct.

16          MS. FLEMING:  That's all I have, Your Honor.

17          THE COURT:  Anything else?

18          MS. GRIFFITH:  Yes, Your Honor.  One moment to confer.

19      (Brief pause)

20                      REDIRECT EXAMINATION

21  BY MS. GRIFFITH:

22  Q.  Mr. Read, you -- are you here to testify on behalf of the

23  hospital?

24  A.  Yes, ma'am.  I'm here to testify on behalf of the hospital

25  of my knowledge of the bylaws.

1  Q.   Yes.   And you received a 30(b)(6) subpoena that you are here

2  pursuant to; is that correct?

3  A.   Yes, ma'am.

4  Q.   And can you explain how you are familiar with the bylaws?

5  A.   I am the -- one of the administrators at the hospital.   So

6  my responsibilities are to ensure that the bylaws application

7  is completed appropriately and timely and to ensure that the

8  application gets routed through the appropriate process.

9  Q.   And so you're familiar with physicians that apply and which

10  physicians are granted privileges?

11  A.   Yes, ma'am.

12  Q.   Thank you.   So with respect to courtesy privileges, my

13  understanding is that in order for a physician to be eligible

14  for courtesy privileges, they first have to complete a

15  provisional period; is that correct?

16  A.   That is correct.   For any -- for any staff member, whether

17  it's active, courtesy, consulting, or honoree, they must all

18  complete a provisional first.

19  Q.   And according to the bylaws, the provisional staff must have

20  an office or residence which are located closely enough to

21  provide appropriate continuity of care; is that correct?

22  A.   Yes, ma'am.

23  Q.   Thank you.   And to your knowledge, are -- do applicants for

24  courtesy privileges have the same coverage requirements as

25  active privileges?

1   A.  Yes -- well, I'd have to look back at my bylaws real quick,

2   if I could.  I can't answer that off the top of my head,

3   honestly.

4   Q.  Sure.

5       (Brief pause)

6   Q.  I believe that's at --

7   A.  Yes, ma'am.

8   Q.  Did you find it?

9   A.  Yes, ma'am.  I found it.  It says they must meet the general

10  qualifications for appointment.  So yes, ma'am, they would have

11  to have call coverage.

12  Q.  And so they have to provide the name of an individual who is

13  on staff at Springhill Memorial in order to qualify for courtesy

14  privileges?

15  A.  That is correct.  Yes, ma'am.

16  Q.  Mr. Read, are you aware of any physician who has been

17  granted privileges who had no expectation that she would admit

18  patients to the hospital?

19  A.  No, ma'am.

20          MS. GRIFFITH:  Thank you.  I have nothing further.

21          THE COURT:  Cross?

22          MS. FLEMING:  No further cross, Your Honor.

23          THE COURT:  Thank you.  Thank you very much.  You are

24  excused.

25          THE WITNESS:  Thank you.

```
 1              MS. GRIFFITH:  Thank you, Mr. Read.

 2              THE COURT:  Next witness.

 3              MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call Dalton

 4    Johnson, the owner and administrator of the clinic -- abortion

 5    clinic in Huntsville.

 6              DALTON JOHNSON, the witness, having been duly sworn to

 7    speak the truth, the whole truth, and nothing but the truth,

 8    testified as follows:

 9                          DIRECT EXAMINATION

10    BY MS. KAYE:

11    Q.  Please introduce yourself to the Court.

12    A.  Dalton Johnson.

13    Q.  What is your profession?

14    A.  I am the administrator, slash, owner of the Alabama Women's

15    Center for Reproductive Alternatives.

16    Q.  May I refer to the Alabama Women's Center for Reproductive

17    Alternatives as the center?

18    A.  Yes.

19    Q.  Are you a plaintiff in this case, Mr. Johnson?

20    A.  No, I am not.

21    Q.  What is your educational background, starting with any post

22    high school degrees?

23    A.  I went to -- started off school at a small liberal arts

24    college out of high school called DePauw, with a W, not to be

25    confused with DePaul, with an L, in Chicago.  I did two years
```

1   there, sat out for a year and did an internship with a family

2   practice physician to make sure that the medical field is the --

3   my choice of career.  Finished up -- came down to Huntsville,

4   Alabama, finished up school in 1998, got a dual degree in

5   biology, slash, medical technology and completed an MBA,

6   Master's of Business Administration, in 2001.

7   Q.  And where did you complete both of those degrees in Alabama?

8   A.  Alabama A&M University.

9   Q.  Did you work anywhere while you were in school?

10  A.  I worked for the -- for the university while I was in

11  school.  I started -- the second semester I was at Alabama A&M,

12  I started off as the work study student for the -- at the time,

13  it was the vice president's wife at the university.  And as I

14  continued through school, I continued to work for her full-time

15  all the way until I graduated.  When I graduated, I became her

16  administrative assistant and continued on all the way until I

17  completed my master's degree.

18  Q.  For how long have you been the owner and administrator of

19  the center?

20  A.  Since 2001.

21  Q.  Did you open the center by yourself?

22  A.  No.  The center was cofounded with a physician named

23  Dr. Carl Palmer.

24  Q.  Is Dr. Palmer still affiliated with the center?

25  A.  No.  Dr. Palmer passed away unexpectedly Father's Day 2004.

1   Q.   Are you currently the center's sole owner?

2   A.   Yes, I am.

3   Q.   Are you familiar with HB 57, the abortion-related

4   legislation enacted in Alabama in 2013?

5   A.   Yes, I am.

6   Q.   Are you aware that the plaintiffs in this case are

7   challenging one provision of that law?

8   A.   Yes, I am.

9   Q.   What do you understand that challenged provision to require?

10  A.   Basically, it takes away the ability to just have a covering

11  physician to provide emergency coverage and continuity of care.

12  They want every physician that does procedures at the clinic to

13  have admitting privileges at a local hospital.

14  Q.   Where is the center located?

15  A.   In Huntsville, Alabama.

16  Q.   What kind of a business is it?

17  A.   It's an abortion, slash, family planning clinic.

18  Q.   What services does the center provide?

19  A.   It provides medical and surgical abortions, women's health

20  services, such as annual exams, Pap smears, helping women with

21  birth control, and so on and so forth.

22  Q.   What does being the center's administrator involve?

23  A.   It's quite -- quite a busy job.  I have to oversee the --

24  the day-to-day operations of the clinic.  I am responsible for

25  hiring staff, hiring physicians, overseeing the daily operations

1  of the -- of the facility.

2  Q.  Who at the center is responsible for ensuring that the

3  clinic complies with all relevant federal and state laws?

4  A.  Myself and the -- the medical director.

5  Q.  What does that involve?

6  A.  A whole laundry list of things.  I mean we have to deal with

7  everything from keeping up with all the constant legislation

8  that keeps coming down from the Legislature, dealing with the

9  maintenance of the clinic, keeping up with all federal, state

10  laws, dealing with OSHA, CLIA, CDC.  Just the -- it's a

11  never-ending -- never-ending tale.

12     I have been working at the clinic since 2001.  And since

13  Dr. Palmer's death in 2004, I've only had one vacation for more

14  than a week in that whole time because as administrator of a

15  clinic, your whole life is dedicated to making sure that the

16  clinic is running as safely as possible.  Because as an

17  administrator in this type of business, you know what's at

18  stake.

19  Q.  I'd like to focus on some of those regulatory requirements

20  for a moment.  Can you please give some examples of the

21  regulations that apply to the center only because it is an

22  abortion clinic?

23  A.  The 24 -- well, just as of May the 10th, the 48-hour waiting

24  period law.  Making sure that the minors have the proper

25  informed consent.  Dealing with the paperwork, as far as the

1    birth certificates.  And it even comes down to the clinic

2    schedules, turning your schedule in to the Alabama Department of

3    Public Health.  Dealing with, you know, physicians having

4    privileges at -- at the local hospitals and arranging the

5    emergency care for that.

6    Q.  What are some regulations that you are responsible for

7    complying with that apply generally to health care centers, not

8    just abortion clinics?

9    A.  I would say OSHA, HIPAA, CDC guidelines, CLIA guidelines.

10   Q.  Does being an abortion clinic impact in any way your ability

11   to comply with these neutral state laws?

12   A.  Yes.  Just for an example, even having my equipment

13   serviced.  Dr. Palmer had his equipment serviced for 20 years by

14   the same medical equipment servicer that services medical

15   equipments annually.  And after about two or three years after

16   we opened, the medical servicer said he would no longer service

17   our clinic.

18       So just even having like, say, for instance, my autoclave

19   repaired, if that goes out, I have to use somebody from out of

20   state.  So they travel over a hundred miles, come to me, look at

21   the problem.  They normally never have the part there on the

22   truck, so they have to go back, arrange another follow-up

23   appointment to put it in.  And you're talking -- they charge me

24   $250 one way.  So that's $500 just for them to come down and

25   look at it, and it could be something as simple as a fuse.  And

1    then -- so it might be a -- a $5, $10 part, and I'm stuck with a

2    thousand dollar bill where if it was not an abortion clinic or

3    abortions weren't performed there, then they -- you know, you're

4    looking at maybe just a hundred dollar service call or less and

5    just the price of the fuse, even down to --

6        People don't realize -- hiring a plumber.  In your mind, you

7    have to strategically think, okay, what day are the protestors

8    not going to be out there so they won't harass this man.  And

9    you know, I'm always straight up and honest and tell people,

10   hey, you know, you're coming to the local abortion clinic.  You

11   know, and you try to, you know, tell them straight up so they

12   won't be surprised.

13       But, you know, even -- I had my water heater replaced at my

14   house.  And thank God I can just look in the phone book and call

15   Mr. Rooter and don't have to go through this whole story and go

16   through this whole thing of planning out how to get the plumber

17   in so he won't get harassed.  And it's to the point that you

18   don't even worry about how much it costs.  You're just glad that

19   they're there to -- they're there to cover and supply services.

20           MR. BECKMAN:  Objection, Your Honor.  Is there a

21   question on board at this point?

22           MS. KAYE:  Yes.  Mr. Johnson is responding to a

23   question about his interactions with vendors and inability to

24   comply with neutral state laws.

25           MR. BECKMAN:  Our objection is simply that this has

1    veered more into a narrative at this point.

2              MS. KAYE:  I can ask a follow-up question.

3              THE COURT:  Why don't you ask a follow-up question,

4    then.

5    Q.  Mr. Johnson, the equipment certification company that you

6    mentioned that refused to work with you, had you told them what

7    kind of business you were running?

8    A.  Yes.

9    Q.  And so they had previously worked for Dr. Palmer; is that

10   correct?

11   A.  Serviced him for 20 years.

12   Q.  So what changed there?

13   A.  Because of the -- this was an abortion clinic, and they

14   didn't want to deal with harassment coming into the clinic.

15   They'll get the number -- the pro-life people will get the

16   numbers off the trucks and harass anybody who comes in there

17   because they say they're in support of an abortion clinic.

18   Q.  Are there any abortion clinics in Huntsville besides the

19   center?

20   A.  No.

21   Q.  How long has the center been the only abortion clinic in

22   Huntsville?

23   A.  When we opened in 2001, there was two other clinics.  There

24   was one on Longwood that had been open since 1978.  That one

25   closed within two to three years of us being open.  And then

1   Planned Parenthood closed probably about five years ago.

2   Q.  Do you remember the last time a new abortion clinic opened

3   anywhere in Alabama?

4   A.  I can't remember the last time an abortion clinic opened

5   anyplace in the United States.  Our numbers are dwindling.  I

6   think when I started in this business there was 12 clinics, and

7   now we're down to -- to five.

8   Q.  How many physicians currently provide abortions at the

9   center?

10  A.  I have three physicians at my clinic.

11  Q.  Do any of those physicians have admitting privileges at a

12  local hospital?

13  A.  Two of them do.

14  Q.  I'd like to talk to you a bit about the history of the

15  clinic and, in particular, your experiences recruiting

16  physicians.  Can you please open your binder and turn to the

17  first document, which is marked as Plaintiff's Exhibit Number 1.

18  This document contains a list of doctors and the pseudonyms by

19  which we're referring to them in this trial.  Please only use

20  their pseudonym moving forward, not their real name.  Do you

21  understand?

22  A.  Yes, ma'am.

23  Q.  Thank you.  Whose idea was it to open the center in 2001?

24  A.  Dr. Carl Palmer.

25  Q.  What kind of a practice did Dr. Palmer have at that time?

1  A.   He had a full obstetrics and gynecological practice.

2  Q.   When you first opened the center in 2001, where was it

3  located?

4  A.   It was located in his private office.

5  Q.   Why did you choose to open a center in the same building as

6  Dr. Palmer's private OB-GYN practice?

7  A.   We originally weren't planning to open it there.

8  Q.   So what led you to that decision?

9  A.   He originally -- and that was part of him bringing me into

10  the business, is we originally were planning to lease space and

11  open the clinic in a separate building.  Because we were aware

12  of the protests that took place at the -- the local abortion

13  clinic on Longwood, and so he did not want to expose his --

14  his -- his private patients to that -- to the harassment of

15  the -- of the protestors.

16      So we hired -- I guess contracted a couple of local

17  commercial real estate brokers into finding space that would be

18  suitable to have the clinic in, because even back then, we had

19  to meet certain structural and architectural things that had to

20  be approved by the State.  We had to come up to -- called

21  business occupancy class.  And so I'd say we probably looked at

22  different -- probably about 50 different properties, and we

23  narrowed it down to about -- about ten.

24  Q.   Did you voice your interest in those ten or so properties?

25  A.   Yes, we did.

1   Q.   And did any of those prospects work out?

2   A.   No.  Dr. Palmer wanted -- told us we needed to be honest

3   about what type of business was going in the -- in the facility

4   that we were trying to -- to lease.  And as soon as we would sit

5   down with the realtor or the owner of the property and we would

6   tell them that an abortion clinic was going in there, they --

7   they wouldn't lease to us.  So it got to the point that

8   Dr. Palmer wouldn't even go to the meetings anymore with the

9   realtors because he already knew the -- already knew the answer.

10  And so we ended up getting -- had to get his private practice

11  license as the clinic.

12  Q.   For how long did you look for a separate building before

13  giving up?

14  A.   That was about a six-month ordeal.

15  Q.   Did Dr. Palmer maintain his private OB-GYN practice after

16  you and he opened the center in the same building?

17  A.   He did for a while.  And -- but after the protestors found

18  out that we opened up, the protestors started protesting his

19  private office and the clinic.  And even though we would try to

20  move the private patients to nonprotest days, they would change

21  the days and basically, you know, harass the patients, would

22  show -- term patients coming in, and they would hold up posters

23  of third-trimester terminations to the patients.  And so at --

24  eventually, we decided we had to discontinue his obstetrical

25  part of his practice and just continue with the abortion clinic

1  and the GYN portion of his office -- of his practice.

2  Q.  Did any physicians besides Dr. Palmer work at the center

3  before 2004?

4  A.  No.

5  Q.  Had any other local physician ever expressed interest in

6  working at the center?

7  A.  No.

8  Q.  At the time that Dr. Palmer passed away, did you know of any

9  other physicians willing to provide abortions at the center?

10 A.  No.

11 Q.  Who was the first provider that you hired after Dr. Palmer

12 passed away?  And please do consult the list in front of you for

13 pseudonyms.

14 A.  The first provider I hired was Dr. A.

15 Q.  How did you come to hire Dr. A?

16 A.  One of the nurse practitioners that worked at Dr. Palmer's

17 office at the time of his death also worked at Planned

18 Parenthood at some point and knew of Dr. A.  And she said that

19 she would try to give me --

20       MR. BECKMAN:  Objection, Your Honor.  This is

21 nonresponsive hearsay.

22       MS. KAYE:  Your Honor, Mr. Johnson is just explaining

23 how he was able to get in touch with Dr. A.  We're not

24 introducing it for the truth of the fact the nurse practitioner

25 knew Dr. A.

1          THE COURT:  Well, I really don't know what he was about

2    to say, but I think you are just introducing it to show the

3    events that led up to --

4          MS. KAYE:  His hiring.

5          THE COURT:  -- his getting Dr. A.  I'll allow this.  Go

6    ahead.

7          MS. KAYE:  Thank you.

8    A.  So I got -- a nurse practitioner at the time that worked at

9    Dr. Palmer's private office put me in contact with Dr. A.

10   Q.  And did you reach out to him?

11   A.  Yes, I did.

12   Q.  And did he agree to take on the job immediately?

13   A.  No, not right off.  He was very apprehensive.  At this time,

14   he was part of a medical group in California.  I tried to kind

15   of -- not pull -- I guess pull on his heartstrings.  I told him

16   about -- a little bit about my background, about me losing my

17   business partner unexpectedly, about how I was trying to, you

18   know, keep the business going and I didn't have any providers.

19   And after an in-depth conversation, he just told me that he'd

20   get back to me and he -- he would think about it.

21   Q.  So then what happened?

22   A.  After I guess -- after some time -- I can't remember whether

23   I called him back or he called me -- he said that -- that he

24   would give me two dates and that he would see how it -- see how

25   it goes.  But he wasn't making any promises.

1    Q.   After he came for those -- did he come for those first two

2    dates?

3    A.   Yes.

4    Q.   And after he came, did he agree to work with you regularly?

5    A.   Yes.  He would take the -- the -- he would take the red-eye

6    out of LAX Friday night after getting off of call, would fly

7    overnight, would either come fly into -- change planes either in

8    Texas -- in Houston or Atlanta, and then would drive up to the

9    clinic Saturday morning for clinic.

10   Q.   When Dr. A started with you, did he have admitting

11   privileges at any local hospitals in -- or any hospitals in

12   Alabama at all?

13   A.   No.  He wasn't living in Alabama at the time.  He was living

14   in -- in California.

15   Q.   Did you hire any other physicians after hiring Dr. A?

16   A.   Well, after I hired Dr. A, that was only one piece of the

17   puzzle.  I knew that I needed a covering physician.  So I went

18   through the process of trying to find a covering physician in

19   the community, in the -- in Huntsville to provide emergency

20   coverage to the clinic.

21   Q.   What steps did you take to try to find this covering

22   physician?

23   A.   I sent out a -- a letter to every physician -- every OB-GYN

24   physician in a 30-mile radius, which constituted Huntsville and

25   Decatur.  Every OB-GYN.  Not just to the group, but every

1  physician in that group, which was, I would say, about 40 to 50
2  physicians that I reached out to.
3  Q.  And what were you asking them in that letter?
4  A.  I broke it down to three different things.  I explained
5  the -- the plight of me losing Dr. Palmer and him dying
6  unexpectedly.  So I broke it down to if any physicians were
7  interested in -- to performing abortions at the -- at the
8  clinic; or at that time, I also needed a medical director, if
9  they were interested in being the medical director of the
10  clinic; and then also if they were interested in providing
11  emergency coverage, being the backup physician to the clinic.
12  So I tried to -- to break it down into three different parts so
13  just in case a physician wasn't interested in doing abortions,
14  they might interested -- be interested in being the medical
15  director or being the covering physician.
16  Q.  And how many physicians did you say that you reached out to,
17  approximately?
18  A.  Roughly 40 to 50.
19  Q.  How many responses did you receive?
20  A.  Zero.
21  Q.  So how did you end up finding a backup doctor?
22  A.  After I sent out the letter and got no responses, I think it
23  was of the advice of my sister.  She says, you know, you've got
24  to, you know, really try to reach out to people.  So I thought
25  about Dr. Palmer's friends and who -- since he was an OB-GYN, he

1   had to have covering physicians, and they would cover for each

2   other.   And so I started to pick up the phone and reach out to

3   those people that I knew individually and reached out and called

4   them.

5   Q.   Did you have any success with that effort?

6   A.   Yes, I did.

7   Q.   Who did you ultimately find to work as your backup doctor?

8   A.   I reached out and -- reached out to Dr.  -- to H1.  He was

9   maybe about the second or third physician of Dr. Palmer's

10  friends that I knew.  And so I contacted Dr. H1.

11  Q.   Did he say yes immediately?

12  A.   No.  He was very apprehensive due to the fact that he had

13  a -- had family.  He had three boys with him there and a wife,

14  and so he was extremely apprehensive.  I met with him.  I talked

15  with him on the phone, met with him for lunch a couple of times.

16  And then I met with him and his wife for dinner and expressed to

17  him the urgency.  Because I -- at that point, I had a physician

18  to do the procedures, but if I did not have arranged backup

19  coverage and a medical director, I was going to have to turn in

20  my license the next day to the Department of Public Health.

21  Q.   Did he tell you in particular why he was hesitant about

22  taking the job in addition to mentioning that he had children?

23  A.   Due to the -- the protestors.  He saw the effect that it

24  took on Dr. Palmer's private practice and how he had to

25  discontinue his obstetrical part of his practice.  And -- but I

```
1    expressed to him that if he just signed on being the -- the
2    medical director and backup physician, that his information
3    would not be released.  Because in the rules and regulations, it
4    says that no information can be released unless it's a court
5    order or unless it comes up in deficiency reports.  And I told
6    him that his information wouldn't be released unless there was a
7    complication, which are rare.  We -- Dr. Palmer and I only had
8    one simple perforation in the four years that we worked
9    together.  And that's -- unless he was -- unless there was a
10   complication -- of course, he would be the physician of record
11   at the hospital, but those were -- were really, really rare.
12   And so he signed on as being the medical director and the
13   covering physician only.
14   Q.  To be clear, was Dr. H1 originally hired to perform
15   abortions at all?
16   A.  No.  Originally just him and his wife agreed to -- that he
17   would just be the covering physician and medical director only.
18   Q.  Did Dr. H1 at any point begin providing abortions at the
19   center?
20   A.  Yes.  Within four to six months of him being the medical
21   director and backup physician to the clinic, somehow it got out,
22   which I felt totally bad about, because I gave this man, you
23   know, my word and my -- and they started protesting his private
24   practice.  And so he had a mass exodus of patients from his
25   practice.  He had to pull his kids from -- from Catholic school
```

1    due to the harassment.  And at that point, he started doing

2    terminations at the clinic.

3    Q.  I'm not sure I understand the link there.  So why, if he was

4    being -- if his private practice was experiencing these

5    protests, why did that lead him to perform more abortions?

6    A.  Due to the -- due to the economics.  He had three children.

7    He -- they pretty much -- the protestors pretty much destroyed

8    his -- the obstetrical part of his practice.  And so he had no

9    choice but to start doing terminations.

10   Q.  Did you see those protests yourself?

11   A.  Yes.  I would go by and see and monitor them, see how many

12   there was.  And I would see them quite regularly outside his --

13   his private office.

14   Q.  Can you describe them for the Court.

15   A.  Same thing -- same group of protestors that were at the

16   clinic.  It would be anywhere between three to 12 at that time

17   holding signs with third trimester termination abortion

18   pictures.  Dr. H1 (pseudonym substitution) is the reason why

19   the -- the clinic is able to operate, so on and so forth.

20   Q.  How do you know that these protests were linked to his

21   information and the fact that he was serving as your backup

22   doctor being released?

23   A.  I'm sorry.  Can you repeat the question?

24   Q.  Yes.  I phrased that poorly.  How do you know that these

25   protests began because the fact that he was serving as your

1    backup provider became public?

2    A.   From talking with the local abortion organizer, Reverend

3    James Henderson, you know, he talked with us and said that if

4    Dr. H1 was going to continue to provide backup care and be the

5    medical director or have any affiliation with the clinic

6    whatsoever, that they were going to protest his private

7    practice.

8    Q.   Does Dr. H1 still work at the center?

9    A.   Yes, he does.

10   Q.   Does he currently have privileges at a local hospital?

11   A.   Yes, he does.

12   Q.   Which one or ones?

13   A.   Crestwood Medical Center.

14   Q.   Do you know how he keeps those privileges?

15   A.   He still has a GYN practice, and so he keeps those

16   privileges by performing hysterectomies, tubal ligations, and

17   doing general GYN surgical procedures.

18   Q.   Where does he perform those GYN procedures?

19   A.   At Crestwood Medical Center.

20   Q.   Please turn again to the list of doctors in your binder.  Do

21   you see anyone else on that list who has worked or who currently

22   works for the center besides Drs. A and H1?

23   A.   Dr. Roe and Dr. H -- H2.

24   Q.   When did Dr. Roe work for you?

25   A.   Dr. Roe worked for me about 2005, 2006.

1  Q.   Did Dr. Roe have admitting privileges in Huntsville at the

2  time that she worked for you?

3  A.   No.   She lived in Birmingham, Alabama, so she had privileges

4  at UAB.

5  Q.   Have any other doctors ever worked for your clinic besides

6  Dr. Palmer, Dr. A, Dr. Roe, and Drs. H1 and H2?

7  A.   No.

8  Q.   Does Dr. H2 currently provide abortions at the center?

9  A.   Yes.

10  Q.   How often?

11  A.   Weekly.   About one day a week.

12  Q.   Does she have a private practice in addition to working at

13  the center?

14  A.   Yes, she does.

15  Q.   Where?

16  A.   She has a practice in Huntsville and a practice in Opelika,

17  Alabama.

18  Q.   Have you been to her private practice in Huntsville?

19  A.   Yes, I have.

20  Q.   Under what circumstances?

21  A.   I go there to lend support to her.   They have started

22  protesting her private practice, and so I go there to monitor

23  the -- the number of protestors and to just lend general moral

24  support.   I see kind of it going the same way where they're --

25  the way of Dr. Palmer's private practice, Dr. H1's private

1   practice.  And hopefully that she -- she will be able to

2   continue.  But they are following the same pattern of attacking

3   the physicians that work at the clinic.

4   Q.  Can you describe the kinds of antiabortion protest activity

5   that you've observed outside Dr. H2's private office.

6   A.  Same thing.  They hold up signs saying that Dr. H2 is a

7   murderer, that she kills babies.  You have -- you have to

8   understand what type of situation this is.  You have people that

9   are -- leave out of our hospital to -- leave out of the office

10  to go deliver at the -- leave out of the office, go deliver at

11  the hospital.  I mean these people are full-term patients.  They

12  have no intent on terminating their pregnancy.  They're going in

13  there for obstetrical care with their husbands, and they're

14  having to go through this harassment going in to -- just for an

15  OB visit.  It's -- it's really -- it's really sad.

16  Q.  In what year did you first hire Dr. H2?

17  A.  I hired her back in 2006-2007.

18  Q.  Did Dr. H2 have admitting privileges in Huntsville when you

19  first hired her?

20  A.  No.  She resided in Birmingham, Alabama.  She had privileges

21  at UAB Medical Center.

22  Q.  Does Dr. H2 currently have admitting privileges in

23  Huntsville?

24  A.  Yes.

25  Q.  Where?

1  A.   At Crestwood Medical Center and Huntsville Hospital.

2  Q.   When did Dr. H2 get those privileges?

3  A.   She got privileges at Crestwood Medical Center maybe around

4  August 2013, Huntsville Hospital around January 2014.

5  Q.   Did you assist her in applying for those privileges?

6  A.   Yes, I did.

7  Q.   When did she apply for privileges at Huntsville Hospital?

8  A.   She applied for privileges -- she submitted the applications

9  at the same time.   And that was probably back in February of

10  2013.

11  Q.   And when did she ultimately receive those privileges at

12  Huntsville?

13  A.   Almost a year later.

14  Q.   For how many years did Dr. H2 work for you before she got

15  privileges at a local hospital in Huntsville?

16  A.   Seven to eight.

17  Q.   Are you aware of any protest activity occurring at either of

18  those hospitals in Huntsville relating to your providers?

19  A.   Yes.

20  Q.   Can you tell us what you've seen.

21  A.   They protest Crestwood Medical Center on a regular -- they

22  have -- I've seen everything from billboards on one of the major

23  streets announcing the protests, that they're having a protest

24  to support life at Crestwood.   They have big media events where

25  they have state senators come down and speak in front of the

1    hospital and -- stating that the -- since these two physicians

2    have privileges there, that they are supporting the abortion

3    industry and somehow are connected with the clinic just because

4    the two physicians that work at my clinic have privileges there.

5    Q.   Please turn to the document in your binder marked as

6    Plaintiff's Exhibit Number 51.  Have you seen this before?

7    A.   Yes, I have.

8    Q.   Can you please describe for the Court what it is.

9    A.   It is an open letter to North Alabama Community.  And it is

10   addressed to all doctors; Dr. Pam Hudson, CEO of Crestwood

11   Medical Center; Crestwood Medical Center Director of Public

12   Relations, Lori Light; Huntsville Times; Community Health

13   Systems, owner of Crestwood.

14   Q.   Where have you seen this document before?

15   A.   I've seen it in my office.  The physicians -- any

16   correspondence that they get or pick up that are on their cars,

17   that are put on their -- on the cars around Crestwood, they'll

18   bring them into the office.

19   Q.   Can you describe generally what this document is attempting

20   to communicate?

21   A.   This document says:  Crestwood Medical Center --

22            MR. BECKMAN:  Objection, Your Honor.  This is a

23   document that we have objected to on our objection list.  We

24   have objected on the grounds of hearsay.

25            THE COURT:  This is the -- what exhibit number?

 1             MR. BECKMAN:  It's Plaintiff's Exhibit 51.

 2             THE COURT:  Okay.  I think I have it right here.  Yes.

 3    I've already looked at it.  What are your grounds?

 4             MR. BECKMAN:  Our grounds are hearsay, Your Honor.

 5    It's not even signed.  We believe they're trying to admit it for

 6    the truth of the matter asserted, and it just doesn't have any

 7    definite value in that regard.

 8             MS. KAYE:  Your Honor, we don't introduce it for the

 9    truth of the matter --

10             THE COURT:  Okay.  Well, let me hear the questions

11    surrounding the document so I can see how it -- how it came

12    about or what.

13             MS. KAYE:  Of course.

14             THE COURT:  I'll allow it in for that limited purpose

15    initially.

16             MS. KAYE:  Your Honor, I hoped only that Mr. Johnson,

17    who's already mentioned that he has seen this flyer as part of

18    the protest activity outside Crestwood, that he could describe

19    it to show only the effect on the listener and to show only what

20    his doctors are perceiving in terms of how they are being

21    protested in the community.

22             THE COURT:  Okay.  Now, you saw this outside your

23    center?

24             THE WITNESS:  Yes.

25             THE COURT:  Okay.  Where?

```
 1              THE WITNESS:  They hand them out.

 2              THE COURT:  How often?

 3              THE WITNESS:  Whenever there's a rally or protest,

 4    they'll generate a -- like this document or one similar to it.

 5    And --

 6              THE COURT:  How often is that?

 7              THE WITNESS:  At Crestwood, they normally do it, I

 8    would say, about quarterly.

 9              THE COURT:  Every three months?

10              THE WITNESS:  About every three months.

11              THE COURT:  How close to the center?

12              THE WITNESS:  Crestwood is about five minutes from --

13    from the clinic.

14              THE COURT:  Crestwood is five minutes from your clinic?

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Have these documents ever been circulated

17    at your clinic?

18              THE WITNESS:  Yes.

19              THE COURT:  How often was a document like this --

20              THE WITNESS:  This -- well, this particular document,

21    only around when they're getting ready to protest Crestwood

22    Medical Center.

23              THE COURT:  I see.

24              THE WITNESS:  Like -- so they started again when Dr. H2

25    was applying for privileges.  And then shortly after receiving
```

1    them --

2              THE COURT:  I see what you're saying.  Right.

3              THE WITNESS:  -- that's when they --

4              THE COURT:  Okay.  Now, your objection is what, now?

5              MR. BECKMAN:  Our objection is on the basis of hearsay,

6    Your Honor.  We don't even know who authored this document, and

7    we can't exactly cross on that.

8              THE COURT:  Okay.  I don't think the document is being

9    introduced for the truth of the matter asserted but rather to

10   show the climate that surrounds the hospital.  In fact, I doubt

11   that the plaintiffs would want it introduced for the truth of

12   the matter asserted, things like the actions of -- that are

13   occurring are not consistent with the type of health care

14   facility we believe Crestwood to be.  In fact, I think they want

15   to show something quite to the contrary than the truth of the

16   matter asserted.  So I'll allow it in to show the climate.

17             MR. BECKMAN:  Thank you, Your Honor.

18             MS. KAYE:  Thank you.

19             THE COURT:  Overruled.

20   Q.  (Ms. Kaye, continuing:)  Mr. Johnson, let's actually set

21   that flyer aside for the moment and talk briefly about your

22   patients.  Does your job require you to interact with the

23   patients at your clinic?

24   A.  Yes, it does.

25   Q.  How so?

1    A.   I do everything from working the front desk to taking

2    telephone calls, assisting -- doing ultrasounds, assisting with

3    the procedures as far as assisting the physician, escorting the

4    patients out of the clinic, walking them out.  You know, I know

5    it's a hard thing for them to go through, so I would try to keep

6    a real upbeat atmosphere in our office.  And so I want to be

7    there to -- to lend as much support as I can to the patients

8    that come into the facility.

9    Q.   How often, on average, do your patients call to reschedule

10   appointments?

11   A.   Quite -- quite frequently.

12   Q.   What are the typical circumstances around those rescheduled

13   appointments?

14   A.   Everything from not having a valid picture -- state-issued

15   ID or passport to validate their age or the informed consent

16   documents to transportation, which is -- which is a big issue.

17   Child care, arranging child care, getting off from work, work

18   schedule, and then financial.

19   Q.   When your patients reschedule an appointment, how much time

20   typically passes before they are ultimately able to make it in,

21   if at all?

22   A.   It varies from a few days to a couple of months.

23   Q.   Do you ever give out discounts to patients?

24   A.   Yes.

25   Q.   How often?

1  A.  We are limited and able to do so because of the -- the

2  margins are so small.  But if the patient is somewhat short,

3  we'll try to, you know, meet them halfway and try to work with

4  them as much as we can.  But due to the fact that the overhead

5  in this business is so high, I'm not able to do that as much as

6  I would like to.

7  Q.  Do you ever have patients who show up at the clinic but are

8  unable to pay?

9  A.  Yes.

10  Q.  How often?

11  A.  Weekly.  And, you know, we try to -- to work with them as

12  much as -- as much as we can, but not in every case.

13  Q.  Does Dr. A still work at the center?

14  A.  Yes.  Dr. A is -- yes, he does.

15  Q.  Has he been working for you consistently since 2004?

16  A.  He has been working with me since 2004.  Even with the

17  extreme distances that he travels from, you know, taking the

18  red-eye out of LAX and everything, he's never missed -- never

19  missed a day.

20  Q.  How often does Dr. A currently work at the center?

21  A.  Now he comes -- he'll come in for a month where he'll work

22  like four consecutive weekends.  And then he'll be gone for a

23  week to six weeks at a time, then come back.

24  Q.  Where does Dr. A live now?

25  A.  Lagos, Nigeria.

1   Q.   Who pays for his travel from Nigeria to Alabama to work at

2   the clinic?

3   A.   Originally when he retired from his group in California, I

4   used to pay for his -- his flights from Lagos to the States and

5   then would take care of his travel and lodging, rental car,

6   hotel, meals while he was in the States.   However, due to my

7   increased cost of overhead, I am -- I'm no longer able to -- to

8   do that.   So I just take care of his -- his travel while he's in

9   the States.

10  Q.   Based on what you have observed of his work, how would you

11  describe Dr. A's competence as a physician?

12  A.   He's my most experienced physician.   He's been practicing

13  medicine for almost as many years as I've been, you know, in

14  this world.   His complication rate speaks to that.   I mean

15  he's -- he's an excellent physician.

16  Q.   If HB 57 takes effect, will Dr. A be able to continue

17  providing abortions at the center?

18  A.   No.   And that's going to be a shame that I would lose my

19  most experienced physician over -- over this.   It will

20  definitely be a loss to the clinic and to the women.

21  Q.   I'd like to return briefly to 2001 when you and Dr. Palmer

22  cofounded the center.   I believe you said that it was

23  Dr. Palmer's idea to open it; is that right?

24  A.   Yes, it was.

25  Q.   Before 2001, had you done any work relating to abortion?

1   A.   No.   I was -- all my medical training and experience was in

2   family practice.

3   Q.   Had you ever intended to do any work relating to abortion?

4   A.   No.

5   Q.   When Dr. Palmer first suggested the idea of opening an

6   abortion clinic, did you have any concerns?

7   A.   I had concerns; but my parents, they definitely had

8   concerns.   Dr. Palmer, when we decided to go into business

9   together, he asked to -- to have a meeting with my parents.   And

10  he sat down -- and they came into Huntsville and sat down and

11  talked to him about going into business, what type of business

12  it was, the -- the possible risk involved in going into this

13  type of business.   Because Dr. Palmer had children.   And so he

14  sat down and talked with my parents and my sister.

15  Q.   To be clear, when you said that you had concerns, what kind

16  of concerns were those?

17  A.   Well, we started applying for the license late '99, 2000.

18  And that was right on the heels of the -- the murder of the

19  police officer from the bomb in Birmingham for the clinic

20  getting blown up and from the maiming of the nurse there.   And

21  so that was still -- that was still pretty fresh.

22  Q.   Did Dr. Palmer tell you anything about his experience

23  providing abortions in Alabama that impacted your feelings about

24  safety for better or worse?

25  A.   Yes.   Dr. Palmer, when he first opened his practice after

1   returning from -- from residency, he used to work at the clinic

2   on Longwood for a short period of time but had to cease because

3   of the threats of violence towards his family.  They threw a

4   brick through his window at his house.  And so and due to the

5   threats, he had to -- to discontinue performing procedures there

6   until his children were out of the house and in college.

7   Q.  What ultimately resolved your safety concerns and led you to

8   move forward with the plan to open the clinic?

9   A.  I prayed on it.  Dr. Palmer giving me a sense of -- of

10  concern and safety that this is a needed service and just that

11  it was the right thing -- it was the right thing to do.  And so

12  I decided to -- to move forward.

13  Q.  Had you ever been to an abortion clinic before you and

14  Dr. Palmer opened the center?

15  A.  No.

16  Q.  When was your first time inside an abortion clinic?

17  A.  As we got closer to going through the licensing process of

18  the clinic, I told Dr. Palmer that I would really like to see

19  the inside of a functioning clinic so I could see what type of

20  equipment they had, how they were -- how they were staffed, just

21  their kind of routine and just kind of get a -- a general feel

22  of the -- of the business since I had not worked in that area of

23  the -- of the medical field.  So there was a physician that was

24  out on some type of medical leave from one of the Birmingham

25  clinics, and so he arranged to go down there and cover that

1    physician and perform procedures there and also, you know,

2    included me in that process so I could go and see the inside of

3    the clinic and how it -- how it operated.  And the administrator

4    agreed to that.

5    Q.  What was that experience like for you?

6    A.  It was -- it was something.  Going -- as you would -- as I

7    was getting closer to Birmingham, it was like going to -- for a

8    root canal or a big test.  You have this feeling of the unknown.

9    And then pulling up and seeing all the protestors yelling at you

10   and everything else, to this day, it still -- still leaves a

11   mark.

12   Q.  Do you take any personal security precautions?

13   A.  Yes, I do.

14   Q.  Can you tell us about them to the extent that you feel

15   comfortable doing so?

16   A.  I have a really good alarm system on my house.  I carry a

17   firearm every place that I am legally able to.  I try to change

18   up my routine as much as possible, although that's pretty hard

19   when you're the administrator of the clinic, because you're

20   there all the time.  I change my -- even the grocery store I go

21   to.  I used to go to one grocery store that was south of town

22   that I liked to go to.  And dealing with the harassment from

23   the -- the protestors in the grocery store -- they must live on

24   that side of town -- I had to -- I go to a whole different

25   grocery store now.  So it's just -- you just try to do what you

1    can do.

2    Q.  Has the center ever been subject to protests?

3    A.  All the time.

4    Q.  When you say all the time, what do you mean?

5    A.  Well, for example, you know, it's been times during the 40

6    days and 40 nights through prayer that they're out there from

7    six in the morning to six at night.  We have mass protests where

8    they'll shut down the street in front of the office and have up

9    to 150, 200 protestors out in front of the office.  And on

10   normally every clinic day, there is protestors out there.

11   Q.  Has the size and intensity of these protests changed in any

12   way in recent years?

13   A.  I think as they have closed clinics down, they are

14   intensifying on the clinics that are left.  So where it used to

15   be less than ten out -- at a time outside of the practice when

16   Dr. Palmer and I started, now it's -- you know, that's pretty

17   much kind of a standard number on a clinic day.  And then, like

18   I said, it goes into the hundreds of -- of protestors outside

19   the clinic.

20   Q.  When these protests are going on, is it possible to enter

21   the clinic without observing the protestors?

22   A.  No.  The way my facility is set up is I'm sandwiched in

23   between two properties, the Blount Hospitality House, which is

24   kind of like the Ronald McDonald House where patients that

25   are -- say a family member, you know, can't afford a hotel; they

1  can go there.  And they do that for both of the hospitals.  So

2  they built all the way up to my property line.  So there's that,

3  there's the driveway, there's my building.  And so they have to

4  go down the driveway to get into my facility.  I have limited

5  parking in the rear, so we have an additional parking down the

6  street at a -- at an office that has graciously let us park

7  there.  And so the patients have to walk down the sidewalks and

8  go through the protestors.

9  Q.  When you're inside the clinic, can you hear the protestors?

10 A.  Yes.  They use amplified means of protesting.  And even

11 though, you know, we call the police out there in the city to

12 measure the amount of sound, they'll cut it down and then cut it

13 right back up once they leave.  So we have music going on inside

14 the facility to try to drown it out so the patients don't hear

15 it as -- as much.

16 Q.  Has the center ever been targeted by antiabortion groups in

17 any way other than protests?

18 A.  Phone calls.  Letters.  Get hate mail consistently on a

19 weekly basis.

20 Q.  Can you share some examples of the messages those letters

21 contain or phone calls?

22 A.  I get one letter -- it's back to weekly now -- from Donald

23 McCants.  He used to send a letter with some pro-life thing, you

24 know, God hates murderers, on the front of it and then would

25 have a -- a letter folded up where it would just be empty pieces

1    of paper, whatever that's supposed to mean.  Then letters, you
2    know, from -- you know, you're going to hell.  God hates baby
3    killers.  Your mother didn't kill you.  The list goes on and on.
4    And so the FBI comes by as a courtesy call about once a year,
5    and so I turn the -- the worst of those over to them.  But, you
6    know, I have a half a file drawer full of them since 2001.
7    Q.   Does HB 57 impose any requirement besides the admitting
8    privileges requirement that have impacted your business?
9    A.   Yes, it has.
10   Q.   Can you tell us about those.
11   A.   The main provision in the law is the ambulatory care
12   provision.  Even though we have done extensive construction to
13   my office originally when we got licensed in 2001 to bring it up
14   to building occupancy, the facility I'm in now has not been able
15   to meet the ambulatory care requirements.  We have submitted
16   plans to the Department of Public Health, and those plans have
17   not been approved.  Even though my building is a small
18   facility -- it's 3,000 square feet -- 2,000 -- all the clinical,
19   waiting room, all the patient care is done on the first level.
20   The other thousand square feet is just my private office and
21   storage upstairs.  They have not been willing or able to approve
22   facilities to meet those requirements.
23        I have two staircases that exit from the upstairs.  They
24   said that those are not sufficient.  We have tried to make plans
25   for one of them encasing it in a firebox and all that, but that

1   has not been able to meet a code.  I have another staircase that

2   comes down and exits to the back door, but they're saying that

3   I'll have to replace both of my staircases, install a sprinkler

4   system.

5       And just the architect has come to the -- the realization

6   that with the time constraints and the amount of money that

7   would cost, that there's just no way we can get the -- the

8   facility at 612 Madison up to ambulatory care requirements.

9   Even though the fire marshal came in and gave us a waiver on

10  things -- there's provisions in the code that says if your local

11  fire marshal comes in and does an inspection, that you can be

12  waived on certain things -- the Alabama Department of Public

13  Health overrode that.  So we will not be able to be licensed in

14  the current facility that I'm in as ambulatory care.

15  Q.  If you can't afford to make the necessary renovations in

16  order to make your current facility compliant with the law, how

17  will you keep it open?

18  A.  I --

19          MR. BECKMAN:  Objection, Your Honor, on relevance

20  grounds.  What does this have to do with the staff privileges

21  requirement at issue?

22          MS. KAYE:  Your Honor, may I respond?

23          THE COURT:  Yes.

24          MS. KAYE:  The question of whether Mr. Johnson will be

25  able to keep his clinic open is certainly relevant to the

```
 1   effects claim in this case because it impacts the availability

 2   of abortion services moving forward.  And second of all,

 3   defendants have argued that if plaintiffs' clinics close, new

 4   clinics are likely to spring up in their case.  So the -- the

 5   burdens that are imposed on the current clinic owners is also

 6   relevant to the likelihood of that actually happening.

 7           THE COURT:  Overruled.

 8   Q.  (Ms. Kaye, continuing:)  Please continue.

 9   A.  Basically, I've gone out on a limb and have purchased

10   another building about -- I guess we closed about -- about three

11   to four weeks ago.  Will I be able to get that licensed and up

12   to code by the time July the 1st runs -- comes around?  I don't

13   know.

14       The building was -- it was just pure luck that I was able to

15   find a building that was built as an ambulatory care facility

16   for Huntsville Hospital.  And it was just a blind luck that that

17   building was -- was up for -- for lease and I was able to lease

18   it.  But -- and also purchase the building.  Because due to the

19   harassment of the protestors, I know that there's no way that

20   you can lease a facility of this type.  You have to literally

21   own the real estate so you won't -- your lessor won't succumb to

22   the pressures of the protestors and pull your lease.

23   Q.  What did you lease this building for?

24   A.  Originally, Dr. H2 was looking for medical space.  And I was

25   on my way to the dentist.  It's on a totally different side of
```

1   town.  I never go on this side of town.  I never go -- come from

2   that way.  And ran into the facility.  So we leased the facility

3   for the private practice and also kind of realizing at the time

4   that it was actually built as a -- as an ambulatory care center.

5   But I just really talked with my architect.  In the beginning,

6   we didn't foresee any problem getting my clinic up to ambulatory

7   care status or standards.

8   Q.  Moving forward, will you be running the center out of the

9   same office as Dr. H2's private practice?

10  A.  No.  She's finding other space.  She's moving her practice

11  to another location.

12  Q.  Why?

13  A.  Because of the -- because of the protestors.  They are

14  protesting her now on a weekly basis.  It would only get worse

15  if the clinic was housed in there.

16  Q.  How are you able to afford to purchase a new building?

17  A.  I've gone out a whole lot further than I should.  But I

18  believe in a woman's right to choose.  And I -- if I have to

19  walk away from this business and from the career that I've

20  chosen, I can honestly say that I've done everything possible to

21  try to keep it going.  I just don't want to -- I don't want to

22  throw in the towel.  I believe in a woman's right to choose.

23  Q.  What do you find to be the main challenges of administering

24  and owning an abortion clinic in Alabama?

25  A.  Just when you think you have one set of -- of hurdles taken

1    care of and problems fixed and things settle down, the

2    Legislature just keeps on coming.  You don't get a break.  No

3    other business goes through this type of regulated type of --

4    especially health care -- type of regulations that just keeps on

5    coming, keeps on coming.  They're just doing everything they can

6    to try to put you out of business.

7    Q.  Why do you continue to do this work?

8    A.  Because I believe in a woman's right to choose.  I do it for

9    my sister, for my -- for my daughter.  If -- you know, what is

10   the point of it being legal if there's nobody here to perform

11   it?  I'm 40 years old, and I am the youngest clinic owner in the

12   state of Alabama.  It's -- it's no good if it's -- if the access

13   is not there.

14   Q.  Mr. Johnson, as you're aware, you run one of only two

15   clinics in Alabama with -- that employs providers who currently

16   have staff privileges at a local hospital.  Did you choose to

17   adopt that business model?

18   A.  No.  That came out of luck and -- and the protestors in

19   Huntsville.  Dr. -- pardon me -- Dr. H1 originally didn't sign

20   on to do procedures.  He signed on as medical director and

21   covering physician only.  Due to the protests at his office,

22   that forced him -- and the hit that it took on his private

23   practice, that forced him to -- to make up that income and

24   provide for his family and do procedures.

25   Q.  Do you believe that having providers with admitting

1  privileges on staff is necessary in order to provide competent

2  patient care?

3  A.   It's nice, but it's just like any other medical practice.

4  You can go to your OB-GYN for every visit and see them.  They

5  could be off that -- that weekend that you deliver and somebody

6  else delivers for them.  Having a -- a covering physician still

7  keeps together the continuity of care.

8           MS. KAYE:  No further questions, Your Honor.

9           THE COURT:  Cross?

10          MR. BECKMAN:  Yes, Your Honor.

11          THE COURT:  How long do you think you'll take?

12          MR. BECKMAN:  Twenty minutes, maybe.

13          THE COURT:  Okay.  Go ahead.

14                        CROSS-EXAMINATION

15  BY MR. BECKMAN:

16  Q.   Mr. Johnson, your clinic already meets the staff privileges

17  requirements set out in HB 57, doesn't it?

18  A.   For the time being.

19  Q.   Your clinic would have met this requirement even five years

20  ago, wouldn't it have?

21  A.   Yes, but that would have me down to one physician.

22  Q.   And this standard of care -- so this standard of care isn't

23  something your clinic just recently achieved.

24  A.   Having a physician that --

25  Q.   This standard of care, the continuity of care set out in HB

1    57.

2    A.   Yeah.   I always had a physician with -- that had privileges.

3    Q.   And your clinic, since at least 2010, has advertised on its

4    Web site that it employs a local physician, doesn't it?

5    A.   Yes, it does.

6    Q.   And that this local physician has staff privileges at a

7    local hospital, correct?

8    A.   Yes, he does.

9    Q.   And that this local physician will be available in case any

10   unforeseen complications arise.

11   A.   Yes.   He is.

12   Q.   And you would agree with me that unforeseen complications or

13   problems, regardless of what the doctor does, can arise

14   during -- during an abortion procedure.

15   A.   Rarely.

16   Q.   And that's one of the reasons why your clinics inform -- why

17   your clinic informs all of its patients about the risk of

18   injury?

19   A.   Yes.

20   Q.   About the risk of hospitalization?

21   A.   Yes, sir.

22   Q.   About the risk of death?

23   A.   Yes, sir.

24   Q.   And you would agree with me that having this local physician

25   on staff with staff privileges ensures the highest level of

1    care?

2    A.  I would agree that having a physician with -- that covers

3    the clinic provides the highest standard of care.  Yes, it does.

4    Q.  And you like employing a physician on staff at a local

5    hospital.

6    A.  It's -- it's good for me.  It's bad for them due to the

7    protestors.

8    Q.  Now, your clinic has put this highest level of care into

9    practice before with some of your patients, haven't you?

10   A.  I'm sorry.  What was the question?

11   Q.  Well, for example, just last summer, your clinic had a

12   patient experience a complication during a follow-up visit.

13   A.  Yes.

14   Q.  This woman was bleeding a bit too much during a re-suction,

15   correct?

16   A.  That's correct.

17   Q.  Essentially, what was going on was that she had had a

18   medical abortion some time recently before then?

19   A.  Yes, sir.

20   Q.  And she was bleeding a bit too much because she hadn't

21   passed everything.

22   A.  Yes, sir.

23   Q.  And she had recently had a C-section, correct?

24   A.  That's correct.

25   Q.  Now, you used -- you referenced a Dr. H2 earlier.  That has

1  also been known as -- she has also been known as Dr. P2, hasn't

2  she?

3  A.  Yes, sir.

4  Q.  And it was Dr. -- I'm going to call her P2 because that's

5  what my notes say.

6  A.  Okay.

7  Q.  But Dr. P2, she was there treating this woman at your

8  clinic, correct?

9  A.  Yes, she was.

10  Q.  She was there to evaluate the situation when this

11  complication arose?

12  A.  Yes.

13  Q.  And Dr. P2 decided it was best to transfer the patient to

14  her local hospital at Crestwood, correct?

15  A.  Yes.

16  Q.  Because Dr. P2 had privileges there, she was able to

17  continue seeing this woman at Crestwood.

18  A.  Yes, she was.

19  Q.  Now, this woman stayed the night at Crestwood and was

20  released the next day, wasn't she?

21  A.  Yes, she was.

22  Q.  Is it fair to say that Crestwood had the necessary

23  facilities and tools to ensure that this patient, in her

24  unforeseen complication, didn't get any worse?

25  A.  Yes, they did.

1  Q.  Now, that's a clinic -- that's a situation where your clinic

2  followed through on providing the highest standard of care that

3  you've set out on your Web site.

4  A.  Yes, sir.

5  Q.  And the patient turned out to be okay, didn't she?

6  A.  Yes, sir.

7  Q.  Now, you actually employ another doctor with staff

8  privileges at Crestwood as well, don't you?

9  A.  Yes, I do.

10 Q.  And this is Dr. H1.  Am I correct that Dr. H1 lives in the

11 Huntsville area?

12 A.  Yes, he does.

13 Q.  Now, we've talked about these protests at Crestwood

14 Hospital, and you're aware of some of these protestors' attempts

15 to get Crestwood to deny H1's privileges.

16 A.  Yes.

17 Q.  But Crestwood Hospital did not deny those privileges, did

18 they?

19 A.  No.

20 Q.  Crestwood Hospital has not revoked any of the privileges of

21 your doctors.

22 A.  Not at this time.

23 Q.  And it has since granted privileges to another one of your

24 doctors since it initially protested (sic) H1's privileges.

25 A.  Yes, they have.

1   Q.   And that would be referring to P2, slash, H2, right?

2   A.   That's correct.

3   Q.   Now, you're aware that Crestwood Hospital has taken the

4   position that it cannot legally revoke the privileges --

5          MS. KAYE:   Objection, Your Honor.   This calls for

6   hearsay.

7          THE COURT:   Are you --

8          MR. BECKMAN:   I'm just asking if he's aware of their

9   position at Crestwood Hospital in relation to his clinic and his

10  doctors.

11         THE COURT:   I'll allow this.   Let me see where you're

12  going.

13  Q.   (Mr. Beckman, continuing:)   Are you aware that Crestwood

14  Hospital has taken the position that it cannot legally revoke

15  the privileges of licensed, lawful, credentialed doctors for

16  issues that don't bear on their care?

17  A.   Yes.   I've read it in the paper, in the statements in the

18  media.

19  Q.   Now, you testified earlier about Dr. A, another one of your

20  clinic's doctors.   Yes?

21  A.   Yes, sir.

22  Q.   And you don't know for certain whether or not Dr. A could

23  get privileges at Crestwood or at Huntsville Hospital, do you?

24  A.   He doesn't live there.   He lives in Lagos, Nigeria, so I

25  know he's not going to be able to get privileges.

1  Q.  But you don't know for certain -- you haven't read all of

2  these hospitals' bylaws, have you?

3  A.  I haven't read the files, but I've read the bylaws for

4  Crestwood and Huntsville.  And I've helped Dr. H2 get

5  credentialed at those hospitals.  So I'm somewhat familiar with

6  the process.

7  Q.  Now, you said earlier that Dr. A was one of your more

8  experienced doctors.

9  A.  Yes, he is.

10 Q.  Now, didn't you also say that he would come in for a weekend

11 or two and then be gone for six to eight weeks?

12 A.  Yes.

13 Q.  And you've testified -- I'm not sure if it was today or

14 previously -- that you perform procedures two or three days a

15 week at your clinic.

16 A.  That's correct.

17 Q.  So if Dr. A is gone for as long as eight weeks and if you

18 perform three procedure days in a given week, that could be as

19 many as 24 procedure days where Dr. A is not present.  Yes?

20 A.  Correct.

21 Q.  And if you perform roughly 20 procedures a day, 24 times 20,

22 you're well over 400 procedures where Dr. A is not present.

23 A.  That's correct.

24 Q.  Now, when your clinic originally opened with the late

25 Dr. Palmer, he had privileges at Huntsville Hospital, didn't he?

1    A.   Yes, he did.

2    Q.   So back in the early 2000s, Dr. Palmer could have taken an

3    abortion patient who experienced a complication and treated her

4    at Huntsville Hospital?

5    A.   Yes, sir.

6    Q.   There wasn't any law at that time that required him to have

7    those privileges, but he did have them.

8    A.   Yes, he did.

9    Q.   And your clinic's model of patient care made that option

10   available when it was necessary.

11   A.   Yes.

12   Q.   And Dr. Palmer did in fact take patients, at least one

13   patient, to Huntsville Hospital when it became necessary, didn't

14   he?

15   A.   He had one complication, one complication in the four years

16   that we worked together.

17   Q.   Now, I believe it was your testimony that P2 also has

18   privileges now at Huntsville Hospital.

19   A.   Yes.

20   Q.   That's H2.

21   A.   Yeah.

22   Q.   Yeah.   And I believe it was testimony that you've previously

23   given that the only reason Dr. P1 does not have privileges at

24   Huntsville Hospital is because he's not board certified; is that

25   correct?

1    A.   That's correct.

2    Q.   So now, earlier, when you testified to it being luck that

3    you've had abortion doctors with staff privileges, you wouldn't

4    just be referring to Dr. P1 or P2.  You would have to go all the

5    way back to what started with Dr. Palmer when he had privileges

6    when the clinic opened.

7    A.   Yes.  He had a full obstetrical-gynecological practice.

8    Q.   Now, of the five abortion clinics in this state, you've

9    testified that you think your clinic has some of the worst

10   protests, haven't you?

11   A.   Yes.

12   Q.   And you take reasonable precautions to protect yourself and

13   the women who visit your clinic?

14   A.   Yes, I do.

15   Q.   But within the last year, isn't it true that you've

16   discontinued employing a single off-duty Huntsville police

17   officer on procedure days?

18   A.   Yes, I have.

19   Q.   Now, you did that because a pro-choice group now comes out

20   on clinic days, don't they?

21   A.   Yes, they do.

22   Q.   And you've testified that there are approximately 25 members

23   in that group?

24   A.   Yes, there is.

25   Q.   And that on a given procedure day, there are a rotating

1    group of around ten that show up each day?

2    A.   That's correct.

3    Q.   Now, if we set aside the bigger protest days when they get a

4    permit to come out and protest, would you agree that there's

5    normally around the same amount of pro-choice protestors as

6    there are pro-life protestors outside of your clinic?

7    A.   Close to it.

8    Q.   Now, you've testified that these pro-choice I guess we'll

9    call them supporters have done a good job of filling in for what

10   role the off-duty officer used to perform.

11   A.   They videotape and have really helped with monitoring the --

12   the protestors.  And -- and so now that they know that they're

13   on camera, they try to I guess abide by the -- the laws as far

14   as not blocking the sidewalk and everything else.  Because

15   they'll take that to the -- the city legal and -- to put

16   pressure on them to get their permit pulled, although that has

17   not happened as of yet.

18   Q.   So you don't believe that losing that officer's presence has

19   endangered you or the women who visit your clinic?

20   A.   I think that having them there with the amount of -- with

21   them videotaping and also with their ability to -- to call the

22   police is just as good as the officer.  With the officer, he was

23   more of a neutral person.  He would just sit there just to make

24   sure that the -- the sidewalk wasn't being blocked, but he did

25   nothing about the noise value or, you know, them harassing a

1    patient all the way down the sidewalk.  He would sit in his car.

2        And also, too, it was an additional expense for me.  For

3    five, six years, that officer -- those officers on those clinic

4    days, that came out of the clinic's -- out of my pocket.  And so

5    I was spending anywhere between a thousand and $1500 a month

6    just on having an officer there.

7    Q.  So you would agree, then, that there are at least some areas

8    or components in which your clinic's operations have improved by

9    replacing a police officer with some volunteers?

10   A.  Yes.  They do help the women getting into the clinic.  Try

11   to make it as easy as possible for them.

12   Q.  And now, before and after this pro-choice -- this pro-choice

13   group started coming out to your clinic, your clinic has been

14   able to maintain operations.

15   A.  Yes, for the time being.

16   Q.  Has been able to continue performing abortions for the women

17   who have desired them, correct?

18   A.  That's correct.

19   Q.  Your clinic has been able to continue with the model of care

20   that Dr. Palmer and you started, which is to say employing local

21   physicians with staff privileges at local hospitals.

22   A.  Yes, although that can end if I don't -- come July the 1st

23   if the new facility does not get licensed.

24   Q.  I'm sorry.  I couldn't quite hear what you said.

25   A.  I said that could possibly end come July the 1st if my new

1  facility does not get licensed.  I would have to close.

2  Q.  Now, you're aware that Dr. H2, Dr. P2, was recently indicted

3  for Medicaid fraud?

4  A.  Dr. who, now?

5  Q.  H2, slash, P2.

6  A.  Yes.  I was aware of that.

7  Q.  And you're still currently employing Dr. H2, slash, P2,

8  correct?

9  A.  Yes.  That has nothing to do with their ability to provide

10  care to my patients.  From what I understand in the article,

11  it's over a thousand physicians and clinics across the United

12  States that had bought particular devices from this company and

13  that they were holding themselves out there as a FDA-licensed

14  facility.  And so I -- you know, it was just kind of ironic that

15  out of these thousand physicians that had bought devices from

16  this clinic, that three to four weeks before this trial, my

17  physician gets indicted.

18  Q.  Now, you testified earlier that Dr. Palmer had had one

19  complication with you.  Isn't it correct that you've had six

20  different women since that time go to local hospitals for

21  unforeseen complications that could have or in some scenarios

22  they certainly probably weren't the fault of the doctors.  Yes?

23  A.  That's correct.

24        MR. BECKMAN:  If I may have a moment to confer, Your

25  Honor.

1          THE COURT:  Yes.

2     (Brief pause)

3  Q.  Now, Mr. Johnson, are you aware that this indictment of the

4  doctor came from the federal government and not the state

5  government that's here today?

6  A.  Yes, I am.

7  Q.  Okay.  I just want that to be clear.  And I just want it to

8  be clear as well that when I have said Dr. P1 earlier, it has

9  meant Dr. H1 in all those instances.  Are you clear about that?

10 H2 is P2, but H1 is not P1.

11 A.  Yes.

12          MR. BECKMAN:  I have no further questions, Your Honor.

13          THE COURT:  Any further redirect?

14          MS. KAYE:  Yes.

15                    REDIRECT EXAMINATION

16 BY MS. KAYE:

17 Q.  Mr. Johnson, why do you advertise on your Web site that you

18 employ providers who have staff privileges?

19 A.  Letting them know that I am up to the state standard of

20 having a covering physician that was able to provide emergency

21 care to the patients 24 hours a day, seven days a week.

22 Q.  You said earlier that having providers with staff privileges

23 is good for you, the -- you being you, though it's bad for the

24 providers because they're harassed.  What did you mean when you

25 said it's good for you?  What benefit do you receive?

1  A.  Well, it's good for me because I do have the ability to add

2  extra clinic days onto the schedule because they are local.  But

3  however, if I did not have physicians that performed the

4  procedures, I would go back to the original structure that I had

5  after Dr. Palmer died with just the covering physician and then

6  out-of-town physicians coming in to perform the procedures.

7  Q.  Do you believe that having a covering physician who does not

8  regularly perform abortions at the center but is available in

9  case of emergency is adequate to provide competent patient care?

10  A.  Yes.  Complications from elective terminations are so rare.

11  For my clinic, seven complications out of 15,000 procedures,

12  that is an extremely low complication rate.  So having a

13  contract with a covering physician that will be able to -- to

14  take care of a possible complication is more than sufficient.

15  Q.  If one of your patients were in an emergency situation and

16  went to a hospital outside of Huntsville, do you believe they

17  would get adequate care?

18  A.  Yes.

19  Q.  Are you required to inform patients of risks that could

20  potentially occur from an abortion, or do you just choose to do

21  that on your own volition?

22  A.  I'm sorry.  What, now?  What's the question?

23  Q.  Are you required to inform patients about potential risks

24  from abortion, or do you just do that because you --

25  A.  No.  We're required to.  We list all possible complications.

1  And we -- the -- whoever's doing the counseling, the registered

2  nurse or the physician, goes through those and explains the

3  possible complications that are -- could happen from an elective

4  termination.

5  Q.  After Dr. Palmer passed away, was there a period when your

6  primary physician, the physician who was performing abortions at

7  the center, did not have staff privileges and you were relying

8  on having a covering physician?

9  A.  What was the question again?

10  Q.  Was there ever a period when you were relying on a covering

11  physician because you didn't have anyone on staff with admitting

12  privileges at a local hospital?

13  A.  Well, originally that's what Dr. H1 was hired as, was a

14  covering physician.  So Dr. A originally did all of my

15  procedures.  And then I hired Dr. Roe; but then due to the

16  harassment, Dr. H1 started doing procedures.  But that's

17  originally -- after Dr. Palmer died, that's how -- the structure

18  that I was going to -- to use for my -- for my practice.

19        MS. KAYE:  One moment, please, Your Honor.

20     (Brief pause)

21        MS. KAYE:  No further questions.

22        THE COURT:  Any further cross?

23        MR. BECKMAN:  No further questions, Your Honor.

24        THE COURT:  Okay.  We're going to take our lunch break

25  at this time.  I have just a few questions for this witness, but

```
 1   I'd like to ask them after lunch.  So we'll start back at one
 2   o'clock.
 3          MS. KAYE:  Thank you, Your Honor.
 4      (Recess at 11:49 a.m. until 1:04 p.m.)
 5          THE CLERK:  Please remain seated.  Court is in session.
 6   Remain seated.
 7          THE COURT:  Counsel, you have in your hands my
 8   questions for the witness.  I'm going to ask the witness to read
 9   each question and then answer it.
10          THE WITNESS:  How many abortions do Drs. H1 and H2
11   provide at your clinic on a weekly basis?
12          I would say that that roughly probably would be between
13   20 to 30.  It kind of fluctuates.
14          THE COURT:  Per doctor or all together?
15          THE WITNESS:  Together.  Together.
16          THE COURT:  Together.
17          THE WITNESS:  How many -- how many more abortions would
18   they be able to provide should patients from Montgomery,
19   Birmingham, Mobile begin traveling to your clinic?
20          That's what I don't know.  Because if I lose Dr. A, who
21   does a significant amount of the procedures when he's here, if
22   H2's private practice picks up and she becomes busier, then she
23   might only be able to just keep the one day, which we could only
24   do about, at the most, 30 procedures in a day.
25          Are you aware --
```

1    THE COURT:  So what are you saying?  I'm not following

2  this.

3    THE WITNESS:  That -- how many -- how many more

4  abortions would they be able to provide should the patients --

5  only -- we can only average -- we average about maybe 30

6  patients per day.  And so if Dr. H2's practice picks up, she

7  might not be able to pick up another day where she can do like

8  another 30 patients in a day.  So we could add more days on, but

9  I just can't guarantee that H1 and H2 -- well, H1 would probably

10  be able to give me some more days, but I can't guarantee that H2

11  would.  And they would have to pick up the slack of A -- Dr. A's

12  days that he's not available.

13    THE COURT:  Go ahead.

14    THE WITNESS:  Are you aware of the age of the doctor at

15  the Tuscaloosa clinic?

16    Yes, I am.  I've met with the doctor at the Tuscaloosa

17  clinic, and I know he's -- I think he's 74.  And so I know that

18  he won't be able to continue for too much longer, although he's

19  probably in better health than I am.

20    THE COURT:  Okay.

21    THE WITNESS:  Are you aware of any plans to continue

22  operations at the Tuscaloosa clinic after that doctor retires?

23    I know that --

24    THE COURT:  Do you have any personal knowledge, I

25  should say.

1          THE WITNESS:  No.

2          THE COURT:  Okay.

3          THE WITNESS:  I know that Dr. -- the doctor at the

4   Tuscaloosa clinic and the administrator have been together at

5   that clinic for 20 years.  She's not an older woman, but she's

6   towards the end of her career.  And so I'm not sure if another

7   doctor would come in and take his place.  I know that's the only

8   doctor that she has.

9          If the Tuscaloosa clinic closes, how many of the

10  abortions that are currently performed there could you

11  accommodate at your clinic?

12          At my current location, I average anywhere -- I've gone

13  down to where I've done as least in recent years as 1300 up to

14  as many as 1700, almost 1800.  I've always said that 2,000 would

15  be my max at that particular clinic that I could accommodate.

16          THE COURT:  Okay.  Any follow-up questions from either

17  side?

18          MS. KAYE:  One moment, please, Your Honor.

19                    REDIRECT EXAMINATION

20  BY MS. KAYE:

21  Q.  Mr. Johnson, I just want to clarify the effect of the law.

22  If the law were to cause the Montgomery, Mobile, and Birmingham

23  clinics to close, would you see an increase in patients and also

24  a decrease in the number of providers that you have?

25  A.  Yes.  Because I would be down to two providers.  And one of

1    those providers has a full OB-GYN practice, so I'm not sure what

2    their availability would be as far as clinic days.  Because as

3    her practice gets busier, she would have to add more days onto

4    her schedule.

5            THE COURT:  Now, why would her practice get busier?

6    Maybe that's not what I'm -- I'm not following that.

7            THE WITNESS:  I'm saying that hopefully her practice

8    would get busier if -- and so we wouldn't be able to add any

9    more days onto the practice.

10   Q.  (Ms. Kaye, continuing:)  And when you are referring to

11   Dr. H2's practice, are you referring to her private OB-GYN

12   practice?

13   A.  Practice in Huntsville and Opelika.

14   Q.  When did she start that private OB-GYN practice in

15   Huntsville?

16   A.  Back in August.

17   Q.  So less than a year ago.

18   A.  Right.

19   Q.  So when you're referring to your hopes that it will grow in

20   the number of patients that she has, is that related to the fact

21   that it's a new practice?

22   A.  It's a new practice and also she still has commitments down

23   in Opelika that she still goes down there and sees patients

24   there one to two days a week.  So she's down there taking care

25   of those patients, and then she has her own private practice in

1    Huntsville.  So --

2    Q.  If the law takes effect, would Dr. A be able to continue to

3    provide any abortions at your center?

4    A.  No.

5            MS. KAYE:  Thank you.

6            THE COURT:  Anything else?

7            MR. BECKMAN:  Yes, Your Honor.

8            THE COURT:  Go ahead.

9            MR. BECKMAN:  Just one moment.

10           THE COURT:  Certainly.

11                      RECROSS-EXAMINATION

12   BY MR. BECKMAN:

13   Q.  Mr. Johnson, is it correct that Dr. H2 still has privileges

14   in Opelika?

15   A.  No, she does not.

16           MR. BECKMAN:  Thank you, Mr. Johnson.

17           THE COURT:  Anything else from this witness?

18           You may step down.

19           MS. KAYE:  Thank you, Your Honor.

20           THE COURT:  Next witness.

21           MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call Doran

22   Stamps from Princeton Baptist in Birmingham.  This should be on

23   the video.

24           THE COURT:  Are we ready to proceed?

25           CLERK WEBER:  Anthony, do you have the contact number?

1        THE COURT:  Is there a problem here?

2        THE CLERK:  Contact?

3        CLERK WEBER:  They have to dial in.

4        Do you guys have the contact number for them to dial

5   in?

6        MS. GRIFFITH:  Oh, I'm sorry.  They haven't dialed in

7   yet?

8        CLERK WEBER:  They have to dial in.

9        MR. MARSHALL:  They told me that they're on standby.

10        CLERK WEBER:  They have to dial in.

11    (Brief pause)

12        THE COURT:  We'll take a recess while we work this out.

13    (Recess at 1:13 p.m. until 1:26 p.m.)

14        THE CLERK:  Please remain seated.  Court is in session.

15        THE COURT:  Proceed.

16        MS. GRIFFITH:  Good afternoon, Ms. Stamps, my name is

17   Dyanne -- oh, sorry.

18        THE CLERK:  Ms. Stamps.

19        THE WITNESS:  Yes.

20        THE CLERK:  Can you raise your right hand, please.

21    (Attorney Edward A. Hosp present by videoconference)

22        **DORAN STAMPS**, the witness, having been duly sworn to

23   speak the truth, the whole truth, and nothing but the truth,

24   testified by videoconference as follows:

25

1                    DIRECT EXAMINATION

2    BY MS. GRIFFITH:

3    Q.  Good afternoon, Ms. Stamps.  My name is Dyanne Griffith.

4    Thank you for taking time to join us this afternoon.  Could you

5    please introduce yourself to the Court.

6              MR. HOSP:  I apologize.  This is Ted Hosp with Maynard

7    Cooper.  There is another witness in this room.  Has the rule

8    been invoked?

9              MS. GRIFFITH:  Yes.

10             MS. KOLBI-MOLINAS:  Yes.

11             MR. HOSP:  Okay.  We'll come get you.

12             Okay.  They're leaving the courtroom now.

13             MS. GRIFFITH:  Okay.  Mr. Hosp, could you introduce

14   yourself for the record.

15             MR. HOSP:  I apologize.  My name is Ted Hosp.  I'm an

16   attorney with Maynard Cooper & Gale, and we represent Princeton

17   Baptist.

18             MS. GRIFFITH:  Thank you.

19   Q.  (Ms. Griffith, continuing:)  Ms. Stamps, where are you

20   currently employed?

21   A.  At Princeton Baptist Medical Center.

22   Q.  Where is that facility located?

23   A.  At 701 Princeton Avenue, Birmingham, Alabama.

24   Q.  What position do you hold at Princeton Baptist?

25   A.  I'm director of risk management and compliance.

1  Q.   And in that position, are you familiar with Princeton

2  Baptist's policies, procedures, and practices regarding granting

3  staff privileges?

4  A.   Yes, I am.

5  Q.   Can you describe generally the process of granting staff

6  privileges at Princeton Baptist after you receive an

7  application.

8  A.   Once the application is received, it would be reviewed by

9  the department chair or department that the privileges are being

10  applied for.  The credentials office also verifies information

11  in the application.  That information is processed and in a

12  report to the credentials committee who reviews this and sends

13  their recommendation on to the board of trustees.

14  Q.   And for those committees that review the application, how

15  many members are on those committees?

16  A.   I am not certain of that.

17  Q.   Do you know an approximate number?

18  A.   I don't.

19  Q.   Would you say that there are fewer than ten individuals on

20  each of those committees?

21  A.   I really don't know a number.

22  Q.   Can you turn to what has been marked as Plaintiff's

23  Exhibit 6.

24  A.   Okay.

25  Q.   Are you familiar with Exhibit 6?

```
 1              THE COURT:  Do I have those exhibits?
 2              MS. GRIFFITH:  Yes.  In the volume one binder that we
 3    had this morning.  It has Exhibits 1 through 10 in it.  Is it
 4    out there?
 5    A.  Yes.  I'm familiar with the bylaws.
 6         (Brief interruption)
 7    Q.  I apologize, Ms. Stamps.  So what did you say that this
 8    document was again?
 9    A.  It appears to be the bylaws for the hospital and also a
10    privilege delineation form for obstetrics and gynecology.
11    Q.  And this is the document that governs the staff privileges
12    process?
13    A.  Yes.
14    Q.  What type of privileges does Princeton Baptist grant that
15    would permit a doctor to admit a patient to perform a laparotomy
16    and hysterectomy?
17    A.  It would be active privileges or courtesy privileges.
18    Q.  What, if any, residence requirements does Princeton Baptist
19    have for applicants for staff privileges?
20    A.  They have to reside within a reasonable closeness to the
21    hospital.
22    Q.  Is a waiver of this requirement available?
23    A.  No.
24    Q.  Has Princeton Baptist ever granted privileges to a physician
25    that resides in Atlanta, Georgia, and works at a health center
```

1    in Birmingham one or two days a week?

2    A.   No.

3    Q.   Does a physician that resides in Atlanta, Georgia, and works

4    at a health center in Birmingham one or two days a week satisfy

5    the requirement -- the residency requirement you identified?

6    A.   No.

7    Q.   Since 2009, has Princeton Baptist granted admitting

8    privileges to an applicant that did not reside within a

9    reasonable distance of the hospital?

10   A.   No, not that I'm aware of.

11   Q.   And are you aware of any earlier instance in which Princeton

12   Baptist granted admitting privileges to a physician who did not

13   reside within a reasonable distance of the hospital?

14   A.   No.

15   Q.   How many obstetricians and gynecologists has Princeton

16   Baptist granted active or courtesy privileges to in the past

17   five years?

18   A.   I believe five.

19   Q.   And at the time that they applied, how far from the hospital

20   did these physicians either reside or intend to relocate to?

21   A.   I don't understand your question.

22   Q.   So when these five obstetricians and gynecologists applied,

23   how far from the hospital did they either reside at the time

24   that they applied or intend to relocate to at the time that they

25   applied?

1   A.   None lived any further than 26 miles from the hospital.

2   Q.   And just to be clear, that's for physicians applying for

3   both active and courtesy privileges, correct?

4   A.   Yes.

5   Q.   How many gynecologists or obstetricians currently have

6   active or courtesy privileges at Princeton Baptist?

7   A.   I don't know that number.

8   Q.   Do you know how far from the hospital those physicians live?

9   A.   There are none on our staff that live further than 26 miles

10  from the hospital that I'm aware of.

11  Q.   And that's both for courtesy and active privileges?

12  A.   Yes.

13  Q.   What, if any, admissions requirements does Princeton Baptist

14  have?

15  A.   Could you maybe be a little bit more specific?

16  Q.   Does Princeton Baptist have any minimum admissions

17  requirements that it imposes for any categories of staff

18  privileges?

19  A.   For active staff, they have to admit or do procedures on a

20  minimum of 48 patients in a year's time.

21  Q.   And are there any waivers for this minimum admissions

22  requirement?

23  A.   No, not that I'm aware of.  If they are active at the

24  hospital but maybe don't meet the procedure requirements, it's

25  possible that they might remain active.

1    Q.  And are you aware of this happening, any occasions on which

2    this has happened?

3    A.  No, I'm not.

4    Q.  Does Princeton Baptist grant active privileges to a

5    physician who does not perform any procedures at or admit at

6    least 48 patients a year to Princeton Baptist?

7    A.  Not that I'm aware of.

8    Q.  You mentioned before that Princeton Baptist has a category

9    of courtesy privileges.  What, if any, provisional period must

10   an applicant for courtesy privileges complete?

11   A.  They have to complete a year's provisional period.

12   Q.  And during that provisional period, what proctoring must an

13   applicant undergo?

14   A.  The proctoring is based on what the department designates as

15   appropriate.  And it can be anything from direct observation to

16   review of records, that sort of thing.

17   Q.  So the department or the hospital could determine that

18   direct observation was necessary to complete the proctoring

19   requirement?

20   A.  Yes, they could.

21   Q.  Are there any waivers available for the proctoring

22   requirement?

23   A.  Not that I'm aware of.

24   Q.  So the proctoring in this provisional period, that requires

25   a review of care of patients; is that right?

1   A.   Yes.

2   Q.   And now I'm going to turn now to Exhibit 6 and paragraph

3   6.3.3, which I believe sets forth the proctoring requirement.

4   So I believe that's on page 22 to 23 of Exhibit 6.

5   A.   All right.

6   Q.   Okay.   Ms. Stamps, so this is on page 23.   Part of the way

7   down the paragraph, it says:   In the event medical staff is

8   divided into departments, each appointee or recipient of new

9   clinical privileges shall be assigned to a department where his

10   performance shall be observed by the chairman of the department

11   or such chairman's designee and may be observed by a committee

12   of the department members appointed by the chairman during the

13   period of proctoring specified in the department's rules and

14   regulations.

15        Did I read that accurately?

16   A.   Yes.

17   Q.   And this is the section that defines the proctoring

18   requirement that is part of the provisional period that an

19   applicant must complete?

20   A.   Let me look for just a minute.

21   Q.   So in case it's helpful, I believe that the provisional term

22   is set forth in 4.3.3 that refers to this Section 6.3.

23   A.   Yes.

24   Q.   So that's correct, that it's the proctoring period required

25   during the provisional term?

1  A.  Yes.

2  Q.  Thank you.  Now, Ms. Stamps, we are talking here about

3  courtesy privileges.  And a physician who is seeking courtesy

4  privileges I understand must also be a member in good standing

5  of the active medical staff at another licensed hospital where

6  he or she actively participates in a patient review care program

7  and other maintenance activities; is that correct?

8  A.  Yes.

9  Q.  And the patient review care program and other quality

10  maintenance activities, that includes supervising, subject to

11  and within the framework of a general duty of accountability to

12  the board, quality and appropriateness of patient care rendered

13  by all practitioners and limited licensed professionals

14  authorized to practice in the hospital; is that correct?

15  A.  I think that would be the responsibility of a physician on

16  our staff.

17  Q.  And do you believe -- should you -- yes.  Thank you.  And

18  are any waivers available for that requirement?

19  A.  No.

20  Q.  Does Princeton Baptist have any coverage requirements for

21  active and courtesy staff?

22  A.  They require physicians to have appropriate coverage for

23  when they are not available.

24  Q.  Does the covering physician have to be on the staff at

25  Princeton Baptist?

1  A.  Yes.

2  Q.  Are any waivers available for this requirement?

3  A.  Not that I'm aware of.

4  Q.  Are you aware of any occasions on which a waiver to this

5  requirement has been granted?

6  A.  No.

7  Q.  Is an applicant required to disclose the Princeton Baptist

8  physician with whom they've made arrangements for coverage?

9  A.  Yes, they are.  If they're on call, they are required to

10  disclose to us who's going to be taking call for them.

11  Q.  Are they required to disclose that on the application for

12  privileges?

13  A.  No, not that I'm aware of.

14       MS. GRIFFITH:  I'd like one moment to confer with

15  counsel.

16     (Brief pause)

17       MS. GRIFFITH:  I tender the witness.  No further

18  questions at this time.

19       Thank you very much, Ms. Stamps.

20       THE COURT:  Cross?

21       MR. DAVIS:  May I proceed, Your Honor?

22       THE COURT:  Yes.

23                    CROSS-EXAMINATION

24  BY MR. DAVIS:

25  Q.  Good afternoon, Ms. Stamps.  My name is Jim Davis.  I'm one

1    of the lawyers for the defendants in this case.  Would you

2    refer, please, to page 8 of the exhibit you've been reviewing.

3    A.   Yes.

4    Q.   In Section 4.2.1 near the bottom of page 8, in subparagraph

5    two, how does the geographic requirement read in the bylaws,

6    Ms. Stamps?

7    A.   It says that they have offices or residence which in the

8    opinion of the medical executive committee are located closely

9    enough to the hospital to provide appropriate continuity of

10   quality of care to their patients.

11   Q.   So first of all, this is either the doctor's office or

12   residence, correct?

13   A.   It does say offices or residences.

14   Q.   And the body that decides whether or not the office or

15   residence is close enough is the medical executive committee; is

16   that correct?

17   A.   Yes.

18   Q.   So when you responded to plaintiff's question earlier and

19   said whether or not something was a reasonable distance away, is

20   it true that you were giving your personal opinion about that

21   matter?

22   A.   I was basing my opinion on our bylaws.

23   Q.   Okay.  But you ultimately would not be the one to decide

24   whether an office or residence was located sufficiently closely

25   enough for a doctor to get privileges; is that correct?

1    A.   That's correct.   I would not.

2    Q.   And the issue, it says, for the medical executive committee

3    is whether the office or residence is close enough to provide

4    appropriate continuity of care; is that correct?

5    A.   That's correct.

6    Q.   So if the medical committee decides that a doctor is close

7    enough to provide continuity of quality of care to patients,

8    then they would determine that this provision is met; is that

9    correct?

10   A.   I don't know what they would determine.   I can't speak for

11   that committee.

12   Q.   Okay.   Now, you do have a -- a category of privileges for

13   courtesy staff that we've discussed, correct?

14   A.   Yes.

15   Q.   Is it true that the courtesy staff category has a lower --

16   has lower expectations for annual admissions?

17   A.   They can admit or do procedures on less than 48 patients a

18   year or 48 procedures a year.

19   Q.   Fewer than that number, correct?

20   A.   Yes.

21   Q.   Is submitting an application a necessary first step of the

22   process for a doctor to obtain privileges?

23   A.   Yes.

24   Q.   To your knowledge, has anyone with Planned Parenthood

25   applied for privileges at Princeton?

1   A.   Not to my knowledge.

2   Q.   Can you say how the board or the medical executive committee

3   would rule if one of them did apply for privileges?

4   A.   No.   I don't know how they would rule.

5   Q.   Do you know, Ms. Stamps, if a doctor -- if a doctor's

6   malpractice experience is relevant to the process, if that is

7   something that the medical executive committee would consider?

8   A.   Yes, it is.

9   Q.   Do you know if a doctor having been indicted, if that would

10  be something that the medical executive committee would consider

11  as part of the process?

12  A.   I know that part of the process is querying the national

13  practitioner data bank.

14  Q.   And would that data bank have information on a doctor's

15  malpractice experience and/or indictments?

16  A.   Yes, it would.

17          MR. DAVIS:   Thank you, Ms. Stamps.

18          MS. GRIFFITH:   Your Honor, may I have one minute to

19  confer with counsel?

20          THE COURT:   Yes.

21      (Brief pause)

22          MS. GRIFFITH:   No further questions, Your Honor.

23          THE COURT:   Anything from either side?

24          Thank you very much.   The witness is excused.

25          THE WITNESS:   Thank you.

```
1              MR. HOSP:  This is -- this is Ted Hosp again.  I'm
2   going to go outside and get the next witness.
3      (Brief pause)
4              THE CLERK:  Ms. Wages.
5              THE WITNESS:  Yes.
6              THE CLERK:  Raise your right hand, please.
7          ROBIN WAGES, the witness, having been duly sworn to
8   speak the truth, the whole truth, and nothing but the truth,
9   testified by videoconference as follows:
10                       DIRECT EXAMINATION
11  BY MS. GRIFFITH:
12  Q.  Good afternoon, Ms. Wages.  My name is Dyanne Griffith, and
13  I'm one of the attorneys representing the plaintiffs.  Thank you
14  for taking time to join us today.  Can you please introduce
15  yourself to the Court.
16  A.  My name is Robin Wages.
17  Q.  And are you represented --
18  A.  I'm director of Medical -- I'm sorry.  Director of Medical
19  West in Bessemer.
20  Q.  Thank you.  And are you represented by counsel today?
21              MS. CARTER:  No, she's not.  I'm the compliance officer
22  at Medical West.  My name is Amy Carter.
23              MS. GRIFFITH:  Okay.  Thank you.
24  Q.  Where is Bessemer, Alabama, located relative to Birmingham?
25  A.  It's, well, south of Birmingham.
```

1    Q.   I'm sorry.  Can you say that again?

2    A.   It's south of Birmingham, downtown Birmingham.

3    Q.   And about how far away?

4    A.   It's about 20 miles, maybe, from downtown.

5    Q.   Thank you.  What is your position at Medical West?

6    A.   I manage the medical staff services department.  I am

7    contracted to run that department.

8    Q.   In that position, are you familiar with Medical West's

9    policies, procedures, and practices for granting staff

10   privileges?

11   A.   Yes.

12   Q.   Can you turn now to what has been marked as Plaintiff's

13   Exhibit 8.

14   A.   Yes.

15   Q.   Are you familiar with this document that is marked as

16   Plaintiff's Exhibit 8?

17   A.   I am.

18   Q.   What is it?

19   A.   The application for membership to the medical staff.

20   Q.   And it's an application.  Is it -- and bylaws?  Is that what

21   you said?

22   A.   Application, yes.  There's several documents in there.

23   Application and medical staff bylaws.

24   Q.   Thank you.  And is this the -- and is Exhibit 8 the document

25   that governs the process for granting staff privileges?

1  A.   Yes.

2  Q.   And can you briefly describe what the process is after

3  Medical West receives an application.

4  A.   We verify credentials based on the information the physician

5  has given me.   We do source verification, checking license,

6  board certification, those kind of things.

7  Q.   And after all that is verified, does it then go on to a

8  committee for review?

9  A.   It goes to credentials committee, yes.

10 Q.   Is that the first committee that reviews it?

11 A.   It is.

12 Q.   And where does it go after the credentials committee?

13 A.   To our medical executive committee.

14 Q.   And after that?

15 A.   The board level.

16 Q.   And is the board the one that makes the ultimate decision

17 about granting privileges?

18 A.   Yes.

19 Q.   And do you know how many individuals are on the committees

20 that you identified?

21 A.   Total or each one?

22 Q.   Each one, if you know that information.

23 A.   There are six on the credentials committee.   There are eight

24 on the MEC, medical exec committee.   And I do not have the

25 number of the number on the board.

1  Q.  And to your knowledge, do each of those individuals get a

2  vote on whether or not to grant privileges to an applicant?

3  A.  Yes.

4  Q.  What type of privileges does Medical West grant that would

5  permit a doctor to admit a patient to perform a laparotomy and

6  hysterectomy?

7  A.  They're OB-GYN privileges.

8  Q.  In terms of categories, would that be active staff

9  privileges, courtesy staff privileges?

10  A.  It can be both active or courtesy.

11  Q.  And what, if any, residence requirements does Medical West

12  have for applicants for staff privileges?

13  A.  That they have completed a residency program in their

14  speciality.

15  Q.  Do they have any particular geographic location

16  requirements?

17  A.  I'd have to read the exact wording, but we have a -- excuse

18  me just a moment.  They have to be within a geographical

19  location that is such that they're able to render continuing

20  care to the patient.

21  Q.  And how many obstetricians and gynecologists has Medical

22  West granted active or courtesy privileges to in the past five

23  years?

24  A.  Six.

25  Q.  Have any of those six individuals lived outside the state of

1    Alabama?

2    A.   No.

3    Q.   Have any of them lived outside Birmingham and the

4    surrounding area?

5    A.   They live in the suburbs of Birmingham.

6    Q.   Okay.

7    A.   Birmingham/Hoover area.

8         MS. GRIFFITH:   Thank you.   I have no further questions

9    at this time.

10        MR. DAVIS:   May I proceed, Your Honor?

11        THE COURT:   Yes.

12                      CROSS-EXAMINATION

13   BY MR. DAVIS:

14   Q.   Good afternoon, ma'am.

15   A.   Good afternoon.

16   Q.   My name is Jim Davis, and I represent the defendants in this

17   case.   The paragraph you were just reading concerning geographic

18   location, is that the paragraph found on page 6 of that

19   document?

20   A.   Yes.

21   Q.   Section 2.1, basic qualifications?

22   A.   Yes.

23   Q.   And it says, does it not, at the end of that paragraph that

24   the applicant's geographical location must be such that he is

25   able to render continuing care to his patients, correct?

1   A.   Correct.

2   Q.   Does that mean the doctor's residence must be close enough

3   or his office must be close enough, or do you know one way or

4   the other what the medical executive committee would decide?

5   A.   I do not know what they would decide.

6   Q.   Okay.  And that is the body that would decide whether or not

7   the doctor's office or residence was close enough, correct?

8   A.   Correct.

9   Q.   But it appears, does it not, that the standard is whether or

10  not the doctor is able to render continuing care.  Would you

11  agree?

12  A.   Correct.  Yes.

13  Q.   So if the medical executive committee decides that a

14  doctor's office or residence is close enough that the doctor can

15  render continuing care, then they would satisfy this provision.

16  A.   Yes.

17  Q.   And if the medical executive committee and board decide that

18  the office or residence is not close enough and the doctor

19  cannot render continuing care, then the applicant would not

20  satisfy this position; is that correct?

21  A.   To my knowledge, yes.

22  Q.   Dealing with the category of courtesy medical staff on page

23  11 of that document -- well, first of all, ma'am, in Section 3

24  on page 11 near the top dealing with active medical staff, do

25  you see where there is a geographic location in that paragraph

1    that's just like the one we read from page 8?

2    A.   Yes.

3    Q.   And do you see a similar geographic location requirement in

4    Section 4 dealing with courtesy medical staff?

5    A.   No.

6    Q.   And is there a minimum admission requirement for courtesy

7    medical staff?

8    A.   There is.

9    Q.   What is the minimum?

10   A.   Well, it's not a minimum.  They can't admit more than ten.

11   Q.   So there's a maximum of ten, correct?

12   A.   Yes.

13   Q.   Is there a minimum requirement?

14   A.   No.

15   Q.   Must someone submit an application to the hospital in order

16   to be considered for privileges?

17   A.   Yes.

18   Q.   Has anyone from Planned Parenthood submitted an application

19   for privileges to your hospital?

20   A.   No.

21   Q.   Is an applicant's malpractice experience something that the

22   medical executive committee and board would consider as part of

23   the process?

24   A.   Yes.

25   Q.   If a doctor or applicant had been indicted, is that

1   something that the medical executive committee or board would

2   consider as part of the process?

3   A.   Yes.

4   Q.   And it is, am I correct, the medical executive committee and

5   board that would make the final decision on all of these issues?

6   A.   Yes, it is.

7   Q.   Can we know today what would happen if a doctor from Planned

8   Parenthood did submit an application for privileges?

9   A.   I'm sorry.  Can you ask me that again?

10  Q.   Would you repeat that, please?

11  A.   Can you ask me that again, please?

12  Q.   Certainly.  Okay.  Do you know what the medical executive

13  committee or the board would decide if someone from Planned

14  Parenthood applied for privileges?

15  A.   No.  I have no way of knowing that.

16          MR. DAVIS:  Thank you.  No further questions, Your

17  Honor.

18          MS. GRIFFITH:  Just one minute, please.

19      (Brief pause)

20                      REDIRECT EXAMINATION

21  BY MS. GRIFFITH:

22  Q.   Ms. Stamps, if you could look at Exhibit 8 --

23  A.   Ms. Wages.

24  Q.   -- this is Section 2, subparagraph one, basic

25  qualifications.  I believe this is the paragraph you were

1  looking at that discusses the geographical location

2  requirements.

3  A.   Yes.

4  Q.   And does this requirement apply equally to applicants for

5  active and courtesy staff privileges?

6  A.   We have it for active staff.   It doesn't list that specific

7  under courtesy staff.

8  Q.   So this -- this section here, Section 2 that precedes both

9  Sections 3 and 4 does not apply equally to both of those

10  sections?

11  A.   We would follow whatever was written in the bylaws.

12  Q.   Right.   So I've looked at the bylaws.   And on page 6, this

13  is in Article 3, Section 2, subparagraph (1), basic

14  qualifications.

15  A.   Yes.

16  Q.   And I see a geographical location requirement there.

17  A.   Right.

18  Q.   And this does not appear to distinguish between courtesy and

19  active staff privileges.   Is that correct?

20  A.   You're correct.   Yes.   That is accurate.

21  Q.   Thank you.   Ms. Wages, are you aware of whether, during the

22  application process, Medical West has deemed the geographic

23  location requirement to be met by an applicant who lives out of

24  the state?

25  A.   Have -- could you say that one more time, please?

1    Q.   Are you aware of an individual who lives out of state being

2    deemed to have satisfied the geographic location requirement?

3    A.   That's on staff?

4    Q.   Yes, ma'am.

5    A.   Yes.

6    Q.   In what circumstances did that happen?

7    A.   We have telemedicine radiology and hospitalists.

8    Q.   And what is telemedicine radiology?

9    A.   They're radiologists that cover basically from -- through

10   the Internet or -- a system that are out of state that read --

11   first read X-rays.

12   Q.   And those are radiologists, correct, not physicians with

13   staff privileges?

14   A.   Right.  That is correct.

15   Q.   And by the name of the teleradiology, that implies that

16   they're providing these services from afar.  Is that accurate?

17   A.   That is accurate.

18   Q.   And then you mentioned the other category was a hospitalist;

19   is that correct?

20   A.   Yes.

21   Q.   And is a hospitalist actually an employee of the hospital?

22   A.   They are contracted.

23   Q.   And do they work a set shift?

24   A.   Yes, they do.

25   Q.   And so just to be clear, when a hospitalist's shift ends and

1    another hospitalist -- then another hospitalist's shift starts;

2    is that correct?

3    A.  Yes, it is.

4    Q.  So one thing you were talking about was the idea of an

5    office satisfying a geographical location requirement.  And are

6    you aware of any circumstances in which Medical West has deemed

7    an office to satisfy this geographic location requirement when a

8    physician is only at that office one day a week and no other

9    physicians are there the other days of the week?

10   A.  I am not aware of that.

11   Q.  The continuing care -- so in the geographical location

12   requirement -- requirement for continuing care, have you ever

13   deemed this requirement to be met for purposes of satisfying the

14   geographical location by a physician simply by talking to

15   patients on the telephone and referring them to the ER?

16   A.  Not that I'm aware of.

17         MS. GRIFFITH:  May I have a moment to confer, Your

18   Honor?

19         THE COURT:  Yes.

20      (Brief pause)

21   Q.  Ms. Wages, aside from the examples of the teleradiologists

22   and hospitalists that we discussed, are you aware of any other

23   doctor that has been deemed to meet the geographical location

24   requirement that lives out of state?

25   A.  No.

MS. GRIFFITH: Thank you.

RECROSS-EXAMINATION

BY MR. DAVIS:

Q. Ma'am, are you aware of any doctor who's lived out of state, not in the radiology department, that has applied for privileges?

A. No.

Q. Now, if I understood you correctly, you said that there was no distinction if the paragraph on page 6 applies to active or courtesy privileges. Is it you who would decide whether this applies to both categories, or is it the medical executive committee and board who would decide?

A. The executive committee and the board would decide that.

Q. And then if I understood you correctly, you said you're not aware of a situation where it was determined that the geographic location was met and the continuity of care was provided if a doctor spoke to a patient on the phone and referred them to the emergency room. Was that your testimony?

A. Yes.

Q. Is that because a doctor merely talking to a patient on the phone and sending them to the emergency room is not continuity of care?

MS. GRIFFITH: Objection, Your Honor. I don't believe this witness is competent to testify to what continuity of care means outside the context of the specific bylaws.

1          THE COURT:  Ask her if she does.

2    Q.  Do you know what continuity of care means, ma'am?

3    A.  Yes.

4    Q.  What do you understand it to mean?

5    A.  The follow-through with the patient from the start of care

6    till they're stable or otherwise managed.

7          MR. DAVIS:  I'm satisfied with that, Your Honor.  I

8    have no further questions.

9          THE COURT:  Very good.  Anything else for this witness?

10         MS. GRIFFITH:  No, Your Honor.

11         THE COURT:  Very good.

12         MR. DAVIS:  Thank you.

13         THE COURT:  Thank you very much.  And the witness is

14   excused.

15         THE WITNESS:  Thank you.

16         THE COURT:  Hold on just a second.  Will the witness

17   hold on just a second?

18         THE WITNESS:  Yes, sir.

19      (Brief pause)

20         THE COURT:  Counsel, would you look at these questions.

21      (Brief pause)

22         THE COURT:  Would one of you mind posing those

23   questions for me?  It doesn't make any difference who it is.  Go

24   ahead.

25         MS. GRIFFITH:  Do you want to?

1        MR. DAVIS:  I'm happy to, but it's your witness.

2        MS. GRIFFITH:  Ms. Wages, we discussed some

3    hospitalists who you mentioned lived out of state.  Where do

4    those hospitalists live?

5        THE WITNESS:  Give me just a moment and I'll tell you.

6    I have one in Atlanta, Georgia, and one in Marietta, Georgia.

7        MS. GRIFFITH:  How do you provide continuity of care to

8    patients who are seen by those hospitalists?

9        THE WITNESS:  The hospitalists, again, cover a specific

10   period of time, and they remain in-house at all times during

11   that shift.

12       MS. GRIFFITH:  When complications arise from procedures

13   undertaken by the hospitalists at your hospital, how are those

14   dealt with?

15       THE WITNESS:  The hospitalist is on call to handle it

16   or is there to handle it.

17       MS. GRIFFITH:  Thank you.

18       THE COURT:  Any follow-up questions?

19       MS. GRIFFITH:  None from me, Your Honor.

20       THE COURT:  Thank you.  The witness is excused.  Thank

21   you.

22       THE WITNESS:  Thank you.

23       THE COURT:  Next witness.

24       MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call

25   Dr. Lori Freedman.  We won't need the video anymore.

```
 1              THE COURT:  Very good.  Is this your last witness

 2  today?

 3              MS. KOLBI-MOLINAS:  Yes.

 4              THE CLERK:  Raise your right hand.

 5      (The witness is sworn)

 6              MS. KOLBI-MOLINAS:  The witness hasn't been sworn.

 7              THE COURT:  Proceed.

 8              MS. KOLBI-MOLINAS:  The witness hasn't been --

 9              THE COURT:  Oh, sworn.  Go ahead.

10              THE CLERK:  I have.  She's been sworn.

11              MS. KOLBI-MOLINAS:  Oh, you swore her?  I didn't even

12  see that.  Sorry.  I don't know where I was.

13              LORI FREEDMAN, Ph.D., the witness, having been duly

14  sworn to speak the truth, the whole truth, and nothing but the

15  truth, testified as follows:

16                        DIRECT EXAMINATION

17  BY MS. KOLBI-MOLINAS:

18  Q.  Dr. Freedman, could you please tell the Court your

19  educational background.

20  A.  I received a master's in sociology at the University of

21  California-Davis, and I also got my Ph.D. there in sociology.

22  Q.  And where are you currently employed?

23  A.  I work at the University of California San Francisco in the

24  Department of Obstetrics and Gynecology and Reproductive

25  Sciences.
```

1  Q.  And what is your title?

2  A.  Assistant professor.

3  Q.  Is that a teaching position?

4  A.  It's a research position primarily, and I do some teaching.

5  Q.  And where is your research housed within the university?

6  A.  I conduct research at a program called ANSIRH.  It stands

7  for Advancing New Standards in Reproductive Health, and it's a

8  program of the Bixby Center for Global Reproductive Health,

9  which is a large, interdisciplinary research group.

10  Q.  What kind of researchers and scientists work at ANSIRH?

11  A.  ANSIRH is interdisciplinary.  It has demographers,

12  sociologists like myself, epidemiologists, some psychologists,

13  and people in the field of public health.

14  Q.  What sort of research do you conduct?

15  A.  I conduct qualitative research, mostly focused on how the

16  politics of abortion affect medical practice on an everyday

17  level.

18  Q.  What's the difference between qualitative and quantitative

19  research?

20  A.  So quantitative research is used in social science and in

21  other scientific studies, and it's measuring how common a

22  certain phenomena is or how -- using basically numbers and

23  statistical analysis, looking at isolated variables and then

24  trying to correlate those associations with other isolated

25  variables, the strength of those associations, and ultimately

1   the prevalence of the phenomenon.

2       In qualitative research, the data are relatively different.

3   It's interviews, usually notes, basically text.  And so that can

4   be very lengthy documents where we're analyzing what people say,

5   the meaning of what people say, and the meaning of those

6   experiences.

7   Q.   What's the relationship between qualitative and quantitative

8   research?

9   A.   Qualitative research -- let me see.  Both are -- both are

10  used in the medical and social scientific research world.  And

11  as I said, quantitative research is trying to understand sort of

12  prevalence or associations of particular social factors.  And

13  they tend to test hypothesis or hypotheses using quantitative

14  research, meaning you know what you're trying to prove or

15  disprove.  In qualitative research, we approach a research

16  question with -- without a predetermined answer.  And we're

17  trying to understand why something is happening that we're

18  seeing in -- often in quantitative research, why something is

19  common, and trying to understand maybe the range of experience

20  within that particular question.

21  Q.   Could you explain the methodology you apply in your

22  research.

23  A.   Generally, or do you want me to talk about a particular

24  study?

25  Q.   Generally.

1  A.   Okay.   Generally.   I -- I do mostly interview-based

2  research.   So that means I -- based upon the kind of question

3  I'm trying to answer, I recruit a particular sample of people;

4  and I try to make sure that the sample is fitting for the

5  research question.   And then I conduct private interviews with

6  those people and ask them very open-ended questions, try to get

7  them to talk about their experience in their own words.

8     And those interviews are then transcribed, and they turn

9  into hundreds of pages of data.   And I put those transcriptions

10  into a qualitative data analysis software program, and I go

11  through and I read them line by line and code them according to

12  the kinds of themes that arise in the data.   And I ultimately

13  look for a certain saturation of repeated themes coming up over

14  and over in the interviews and no new themes coming up, and

15  that's when I know I've done enough interviews for that

16  particular research question.   And then that data is analyzed

17  and written up.

18  Q.   Is qualitative research recognized as legitimate scientific

19  research?

20  A.   Yes.   You can find qualitative studies in most -- most

21  medical journals and most -- it's very strong in most social

22  sciences.

23  Q.   What is medical sociology?

24  A.   Medical sociology is the study of the social world of

25  medicine basically looking at topics within health and illness.

1    And it's -- it's just a focused substantive area within

2    sociology.

3    Q.  What are some of the current areas that you focus on in your

4    research?

5    A.  I have three ongoing -- maybe more -- studies.  Sorry.  And

6    one of the largest studies I'm doing right now has to do with

7    Catholic hospital care, which has a very specific doctrine that

8    is applied in especially obstetrics and gynecology context.  So

9    I look at how the Catholic doctrine affects care on the ground

10   in hospitals in everyday ways, and I do interviews with patients

11   and physicians about that.

12       I have a study that's looking at the impact of a law change

13   in California looking at how the expansion of the pool of

14   abortion providers to include nurse practitioners, physician's

15   assistants, and certified nurse midwives is playing out on the

16   ground, whether those clinicians are continuing to practice and

17   what kind of barriers they may be facing.

18       And I have a study about how hospitals regulate abortion

19   practice, what kinds of parameters they put around which

20   abortions can happen within the hospital and which ones cannot.

21   Q.  Have you published in any of these studies?

22   A.  I have published on -- regarding the Catholic hospital

23   research, I have three peer-reviewed publications.  One that

24   came with my dissertation research was published in the *American*

25   *Journal of Public Health*, which is a peer-reviewed journal.

1  More recently with this second set of interviews I did on this

2  topic, I published in the *American Journal of Bioethics and*

3  *Humanities* in December of 2013, also a peer-reviewed journal,

4  and then most recently had a paper accepted at the --

5  *Contraception*, another peer-reviewed journal.

6  Q.  What was that paper?

7  A.  Oh, that paper was about tubal ligation in Catholic

8  hospitals.

9  Q.  In sociology, is there a literature around stigma?

10  A.  Yes.  There is literature around stigma.  In 1963, the

11  seminal work in this area was written by Erving Goffman in a

12  book called *Stigma:  Notes on the Management of Spoiled*

13  *Identity*.  And in that book, he kind of set forth the definition

14  that inspired decades of study of stigma.  And he defined stigma

15  as something that taints a person.  It's sort of a mark that is

16  discrediting and changes the way that person is valued in

17  society, somehow discounts the person and makes them, in a

18  sense, appear less than -- less than what they were.

19      And he was interested in how people coped with stigmas like

20  facial deformations or being institutionalized for mental

21  illness and a really wide range of diseases that were very

22  stigmatizing, and he wanted to know how people managed their

23  identities.  And since then, there's been a lot of studies on

24  various topics, like coping about identity around HIV, around

25  leprosy, around obesity.  Various topics where people in

1    society, where they struggle to manage their identity and their

2    positive value.

3    Q.   And are you generally familiar with this literature?

4    A.   Yes.

5    Q.   What was the focus of your doctoral research, Dr. Freedman?

6    A.   So my doctoral research looked at why -- it followed up on a

7    large quantitative study that showed that even though more

8    physicians were starting to get abortion training in the late

9    nineties and early 2000s, only 22 percent of OB-GYNs had done an

10   abortion in the previous year to that study.  And the

11   researchers doing this quantitative investigation actually were

12   from the University of California San Francisco.  They had this

13   number of only 22 percent, but they had really no -- really no

14   reason -- no understanding of why.  Why weren't doctors

15   continuing -- if they were getting the training, why weren't

16   they continuing to do abortions once they left residency

17   training.

18        So I was following up on that question, and I -- I designed

19   a study, a qualitative study, to try to get in-depth knowledge

20   and understanding of what happened to doctors after they left

21   residency training.  So I -- I recruited graduates of four

22   residency programs in the United States, one in the South, one

23   in the Northeast, one in the Midwest, and one in the West.  And

24   I was trying to get a geographically diverse sample.  And I

25   recruited physicians who were -- OB-GYN physicians who were five

1   to ten years out of residency, so they would have a fair amount

2   of experience in practice in the real world.

3        And so I -- I interviewed them at length about what had

4   happened in their practice since residency.  And many of them

5   had really wanted to keep providing abortions once they left,

6   but there are various barriers that they faced in their group

7   practices and in their hospitals and just in their communities

8   that kept them from doing so.

9   Q.  Did you identify any specific residency programs for your

10  research?

11  A.  Did I identify them in the -- in the --

12  Q.  No, no, no.  I'm sorry.  Did you pick them based on any

13  specific criteria?

14  A.  Oh.  Well, I focused on -- I selected these four in

15  particular because they had what is called opt-out or routine

16  abortion training, meaning that they were programs that had

17  strong sort of integrated abortion training as a sort of normal

18  aspect of their training.  And I wanted to talk to these

19  physicians, because I wanted to talk to your everyday OB-GYNs.

20  I wanted to talk to people that weren't highly politicized such

21  that they had to like really struggle to find abortion training.

22  I wanted it to be a matter of course and yet for it not to be

23  thought of as exceptional so that they would be perhaps more

24  likely to think it would be a normal part of their practice

25  going out into the world.

1    And so if even these everyday OB-GYNs who were getting

2    strong training were not doing abortions, I wanted to know why,

3    beyond the kind of usual suspects of being afraid that they

4    might get shot or being, you know, morally conflicted, which I

5    felt like since they had already gone through their abortion

6    training, they had at least resolved some of those -- those

7    questions, because they had been doing hundreds of abortions

8    during residency.

9    Q.   Was this research published?

10   A.   Yes.   I published three articles from the research that were

11   all in peer-reviewed journals.   One was the one I initially

12   mentioned on Catholic hospital care, because that came up a lot

13   in the study, and that was in the *American Journal of Public

14   Health*.   One was in *Perspectives on Sexual and Reproductive

15   Health*, and one was in *Contraception*.   And then the entire

16   dissertation was published as a book with Vanderbilt University

17   Press which is also a peer-reviewed press.

18   Q.   Is yours the only literature published in this area?

19   A.   No.   I mean broadly speaking, there's a lot of interest in

20   OB-GYN training and abortion provision.   Dr. Carole Joffe has

21   written two books in the field of sociology about physicians'

22   experiences with abortion in medicine, one in '95 called *Doctors

23   of Conscience:   The Struggle to Provide Abortion Before and

24   After Roe v. Wade,* and then another one more recently called

25   *Dispatches From the Abortion Wars*.   But there's also a lot of --

1  a lot of articles in the medical literature that chronicle the

2  training and attitudes and a variety of things.

3  Q.  On what subjects do you intend to offer opinions in this

4  case?

5  A.  I intend to offer opinions about abortion stigma and the

6  effect of stigma on abortion provision.

7  Q.  Could you please look in the folder that you have at

8  Plaintiff's Exhibit 52.

9  A.  Uh-huh.

10  Q.  Do you recognize that document?

11  A.  Yes.  It's my CV.

12  Q.  And is this an accurate summary of your education and

13  experience?

14  A.  It is up until August 2013, when this was, I believe,

15  printed or -- or furnished.  And I have given -- I mean I've

16  published more things since then, two -- two more peer-reviewed

17  articles.

18  Q.  Are you a member of any professional associations?

19  A.  I am a member of the American Society for Bioethics and

20  Humanities, and I'm a member of the American Sociological

21  Association and of the Society For Family Planning.

22       MS. KOLBI-MOLINAS:  Your Honor, we tender Dr. Freedman

23  as an expert in medical sociology pursuant to Federal Rule of

24  Evidence 702.

25       THE COURT:  Proceed.

1  Q.   Dr. Freedman, can you please look at Plaintiff's Exhibits 53

2  and 54 that are in your folder.

3  A.   Yes.

4  Q.   And what are these?

5  A.   They are my statement or my -- and my supplemental

6  statement.

7  Q.   Could you read what they are on the --

8  A.   Oh, I'm sorry.  My expert report.  Sorry.  And my

9  supplemental report.

10 Q.   Thank you.  Dr. Freedman, what is the basis for stigma

11 against abortion providers?

12 A.   Abortion provision has a long and complicated history.  And

13 before abortion was legal, there were many abortions happening

14 anyway and -- illegally.  And often when they went badly, women

15 got hurt.  And generally, there -- people regarded those doing

16 illegal abortions as -- they often called them abortionists or

17 butchers, back-alley butchers, quacks.  They were associated

18 with criminality, greed, illicit behavior, harm to women.

19     So there's this complex legacy of the prelegalization

20 abortionist that follows this area of medicine.  And the people

21 who went on to provide abortion after legalization not only had

22 that difficult sort of stigma and history to contend with, but

23 it was sort of amplified by the antiabortion movement, which

24 worked with images of abortionists, butchers, this very negative

25 and sort of harmful imagery.

1   Q.   What was the mainstream medical reaction when abortion was

2   legalized in 1973?

3   A.   The mainstream medical reaction was complex.   While there

4   were many doctors within medicine, especially those who worked

5   to repeal the abortion laws, that were very supportive of

6   abortion, once it was actually legalized, abortion wasn't

7   actually brought into private practices and hospitals to a great

8   extent.   It was really -- stayed marginalized and segregated

9   from everyday OB-GYN care because clinics rose up to meet the

10   demand for abortion and the mainstream medical institutions did

11   not.   And so the -- the segregation of abortion care kind of

12   further intensified that notion that abortion was somehow

13   separate or abnormal from medical care.

14   Q.   Does the current data show a shortage of physicians willing

15   to provide abortions in the United States?

16   A.   It -- the current data shows an incredible geographic

17   disparity.   While there have been dwindling numbers of abortion

18   providers, if you look closely at what's going on, even though

19   on a -- I want to say -- at a -- on a national level, 89 percent

20   of counties have no abortion providers.   So there certainly is a

21   geographic problem.   If you go to large cities, especially in

22   liberal areas, there are usually plenty of abortion services.

23   If you go to smaller cities or more conservative areas, there's

24   far fewer and women have to travel farther to get to abortion

25   services.

1  Q.  Have there been any studies that look at the percentages of

2  OB-GYNs providing abortions in different regions of the country?

3  A.   Yes.   There has been a more recent study than the one I

4  mentioned that inspired my research from Steinauer that more

5  recently Debra Stulberg and her colleagues at the University of

6  Chicago published.  It was 2011 in *Obstetrics & Gynecology*.

7  They published a study that looked at a physician -- physician

8  abortion provision, basically.  And they found that 14 percent

9  of OB-GYNs in the U.S. do provide at least some abortions and

10  that that could be anything from all types of abortions to I do

11  one per year for only fetal anomalies.  So 14 percent do some

12  abortion.  And within that, they broke out regions of the

13  country.  And it showed that in the South, only 8 percent of

14  OB-GYNs do any abortion at all and that -- in contrast to the

15  Northeast, that has 26 percent of OB-GYNs who do any abortions

16  at all.

17  Q.  How does abortion stigma present an obstacle to finding

18  doctors to provide abortions?

19  A.  Abortion stigma provides an obstacle in a variety of ways.

20  It can present itself directly to the provider, or it can kind

21  of manifest institutionally and through policies and practices.

22  I -- in my research, one of the things that came up a lot was

23  this kind of notion of a cautionary tale where doctors would

24  talk about, well, when I started practicing in this community,

25  everyone warned me that this other guy, this other OB-GYN, used

1    to do abortions and he got run of town or everybody labeled him

2    as an abortionist; and I don't want to be that person.  So there

3    were a lot of cautionary tales passed around of the bad things

4    that happen if you were associated with abortion and, in

5    particular, the bad things that happened to your own practice

6    and your likelihood of succeeding in that particular medical

7    environment.  This was especially strong in the small and

8    midsized cities that were not near, you know, huge population

9    centers.

10   Q.  Did you have any examples from your research of physicians

11   who felt deterred from providing abortion because of these

12   cautionary tales?

13   A.   Yeah.  I -- one in particular comes to mind that there was a

14   physician that had provided abortion after residency in his --

15   in a big private practice group in a large city, and then he

16   moved to be near family to a smaller city and really was afraid.

17   He had heard the cautionary tales of what happened and heard

18   people talk disparagingly about abortion providers, and he was

19   afraid to provide.  And he was starting his own practice, and he

20   was very scared about its survival in that town.

21       And so he told me the cautionary tales he heard, and he told

22   me that the local abortion clinic actually called him -- they

23   had heard he had moved to town through their network -- saying

24   that they thought perhaps he was the one who could take over as

25   the medical director in their -- in their city because their

1  traveling physician, they anticipated, would retire and stop

2  coming eventually.  But he -- he told them that he couldn't,

3  that he was afraid.  He was afraid to be known as what he said,

4  Dr. Abortion Provider, the only one in town.  And he was afraid

5  that it would do his practice into the ground and that he would

6  not be able to provide for his family and that he wouldn't

7  succeed.

8      And I mean that was -- that was kind of -- in this

9  situation, he was practicing on his own.  But I -- I heard a lot

10  of similar anecdotes from people who were practicing in large

11  groups as well.  Like one of the -- another doctor from a

12  different part of the country but also kind of a midsized city,

13  he was telling me it's all about -- for him, he said, you know,

14  it's all about reputation.  And their private practices are very

15  concerned about it.  In his town, there were just two large

16  OB-GYN practices.  And he said, you know -- he said something

17  like, who cares if, you know, one or two or a hundred thousand

18  people think you're an abortion -- you know, you're an

19  abortionist if you've got 2.4 million to choose from like in a

20  city like LA or Phoenix.  But in his city, you know, that would

21  be detrimental to the practice if people started to regard them

22  as the abortion providers.

23  Q.  Even if a doctor can provide or feels he or she can provide

24  abortions in their own practice, why can't they provide at

25  clinics?

1  A.  Some doctors that I spoke with who tried to do that didn't
2  have success because sometimes they need to -- to get their
3  approval -- I mean for collegiality, they probably always need
4  to run it by their colleagues.  And it seemed to me that all the
5  doctors I spoke with did want to make sure that their colleagues
6  knew they were providing abortion if they were going to do that.
7      But in one of the areas where I did interviews, I
8  interviewed five people; and four of them had been approached by
9  the abortion clinic, who was desperate to find a new abortion
10 provider because -- this is a different one than I was talking
11 about before.  But they -- this small abortion clinic had relied
12 upon the nearby residency program to provide abortion providers.
13 And the residency had newly had to come into compliance with the
14 new 80-hour workweek limit, which is a law that was, I think,
15 passed around -- several years ago; and because of that, the
16 residents didn't have time anymore to moonlight.  And they were
17 using the malpractice coverage of the university when the
18 residents came to do abortions, so the clinic was now without a
19 provider and without malpractice.  And it was such a small
20 clinic, it was really hard for it to run -- to hold its own
21 malpractice insurance.
22     So each of the doctors that I spoke with -- like I said,
23 four were asked to -- to consider working in the clinic, and
24 they all said no.  And -- and a -- only a couple of them had the
25 nerve to bring it up with their colleagues, but they were told,

1   no way.  We wouldn't let you -- we don't want association with

2   the clinic, number one, and we don't want you using our

3   malpractice coverage over there.  You know, we have a say in

4   this.

5   Q.  Are there any factors that can mitigate abortion stigma?

6   A.  It seemed that people who worked in large cities were more

7   comfortable.  And that is because stigma is mitigated by being

8   either less visible and noticeable or by being normalized.  And

9   so in a large area or a more liberal or let's say

10  supportive-of-abortion-rights area, they -- they can find that

11  they don't -- that there are other providers besides themselves,

12  so they're not just the lone abortion provider.  There are more

13  like them.  That makes them less visible and less focused upon,

14  and they feel more comfortable.  And also, if more people are

15  supporting and you have more colleagues like yourself, it's just

16  more normalized, more accepted.

17  Q.  Dr. Freedman, have you reviewed any documents relating to

18  this case?

19  A.  Yes, I have.  I've reviewed some deposition transcripts and

20  testimonies.  I have reviewed the -- those of Staci Fox, Kiwana

21  Brooks, Dr. Roe, Dr. P1.  Who else?  Gloria Gray and -- there

22  were seven.

23  Q.  Did you review June Ayers'?

24  A.  Yes.  Yes, I did.

25  Q.  Did you review Dalton Johnson's?

1  A.  Yes, I did.

2  Q.  And have you been sitting in on the testimony that was given

3  by June Ayers, Staci Fox, and Dalton Johnson in this trial?

4  A.  Yes.  I saw all their testimonies.

5  Q.  And so what have you found from reading these transcripts

6  and from listening to the testimony here?

7  A.  Well, I've observed that what's going on with abortion

8  provision in Alabama is very similar to the findings in my

9  research, both what people talked about happening to their

10  colleagues and what they feared would happen if they became

11  associated with abortion.  So it seemed that -- it seems that

12  the environment around abortion provision is very similar to

13  some of the places where the doctors I interviewed were working.

14  Q.  And what sort of parallels did you see with your research?

15  A.  I really felt that the -- the concept of the cautionary

16  tales I was hearing about abortion providers being -- or sorry.

17  Let me say this again.  That -- about OB-GYNs having their

18  practice ruined by association with abortion, that concept

19  was -- kind of came to reality in some of the stories that --

20  especially that Dalton Johnson talked about with Dr. Palmer's

21  obstetric practice being sort of, I don't know, decimated by

22  the -- by the protestors and then Dr. H1's practice being ruined

23  by the protestors as well and being forced essentially out of

24  OB-GYN care.

25      And this was a really common theme in my book, that doctors

1    felt that they would have to choose between having an OB-GYN

2    practice and doing abortions, that they couldn't do both, that

3    they had to make this unpalatable choice between everything that

4    they had been trained to do thus far and the diverse practice of

5    delivering babies, of gynecological care, and abortion care.

6    And they didn't want to be forced into making that choice.   And

7    in the testimonies we have heard that -- especially in the case

8    of Dr. H1, he was -- he was clearly forced into making that

9    choice.

10   Q.   And what does the role of -- what do the role of protestors

11   play in how this stigma affects abortion provision?

12   A.   Well, I mean very specifically in the case of Dr. Palmer and

13   Dr. H1, the protestors were antagonizing and making the patients

14   uncomfortable and putting a shroud of sort of taint around those

15   particular doctors.   And as we talked about before, there's such

16   a stigma sort of surrounding abortion providers and physicians

17   who are sort of tainted as less than good physicians once they

18   begin -- once they begin being associated with abortion

19   providers -- with abortion in general in really I guess

20   conservative -- politically conservative areas.

21   Q.   And what's the connection between these cautionary tales and

22   plaintiffs' difficulty finding new doctors?

23   A.    Well, I think that's why Dalton Johnson and June Ayers

24   weren't able to get any responses from their efforts to reach

25   out to the OB-GYN community.   They asked every OB-GYN within

1   reach and got nothing or got some slightly negative feedback.

2   So I do believe that it's not because all OB-GYNs are opposed to

3   abortion.

4       We know from research about OB-GYN's attitudes that 60

5   percent of OB-GYNs are supportive of abortion for contraceptive

6   failure.  Eighty-four percent are supportive of abortion for

7   cardiac problems.  There's -- a far majority of OB-GYNs have

8   some support for abortion rights and moral -- and don't have a

9   moral objection to abortion.  So that gap -- the gap between the

10  far majority being in support of abortion and only, you know,

11  eight percent potentially ever doing any abortions is -- you

12  know, much of that is stigma.

13  Q.  Are the factors that mitigate stigma present in Alabama?

14  A.  I would say not very much because in Alabama, each town that

15  has an abortion provider only has one, so each abortion provider

16  is highly visible.  With all the protestor activity, they're

17  even more visible, so really not easy to -- to take the focus

18  off of the stigma.  And there's really less and less

19  normalization with all the protesting and all the vocalness and

20  all the OB-GYNs wanting distance -- so many wanting distance

21  from the -- from abortion.  It really doesn't lend itself to

22  normalization.

23  Q.  What percentage of abortions are performed in freestanding

24  clinics?

25  A.  I believe 94 percent of abortions are performed in

1  freestanding clinics.

2  Q.  Why is that relevant to the issue of stigma?

3  A.  Well, that means that ninety -- even though this procedure

4  is incredibly safe and incredibly simple compared to all the

5  OB-GYN procedures out there, it's only done in these very

6  distinct facilities and not at all integrated into the rest of

7  OB-GYN care.  The -- it means that abortion care stays highly

8  segregated and marginalized from medicine.

9       MS. KOLBI-MOLINAS:  One moment, Your Honor.

10     (Brief pause)

11       MS. KOLBI-MOLINAS:  Your Honor, I just want to move to

12  introduce the Exhibits 53 and 54 into evidence, her expert

13  report and supplemental expert report.

14       THE COURT:  Now, I understand there's a challenge to

15  this witness; is that correct?

16       MS. FLEMING:  Yes, Your Honor.  I'm sorry.

17       THE COURT:  I'll admit those exhibits subject to the

18  challenge.

19       MS. KOLBI-MOLINAS:  No further questions, Your Honor.

20       THE COURT:  Very good.

21                      CROSS-EXAMINATION

22  BY MS. FLEMING:

23  Q.  Hello, Dr. Freedman.  My name is Margaret Fleming, and I'm

24  an assistant attorney general for the State of Alabama.  And I

25  have a few questions for you.

```
 1   A.   Okay.

 2   Q.   It's my understanding that your expert report rests

 3   primarily on a qualitative study done of 30 doctors who received

 4   abortion training during their residency programs and another

 5   qualitative study of 31 doctors who worked in Catholic

 6   hospitals; is that correct?

 7   A.   Yes.  I -- yeah.

 8   Q.   And it's from this limited pool of doctors --

 9   A.   Oh, I'm sorry.  I'm sorry.  It's also -- I mean I also bring

10   in my knowledge of the field generally.  It's not entirely based

11   on just my own studies.

12   Q.   Correct.  But I'm talking about the studies that you have

13   done on this particular --

14   A.   Those are -- I've done those studies.  Yeah.  The one with

15   30 doc graduates also had ten extra recorded interviews, so it's

16   actually based on 40 interviews total.

17   Q.   And based on that, you have drawn some general conclusions

18   about abortion practice in Alabama; is that correct?

19   A.   I have -- the conclusions that I have drawn about Alabama

20   were making connections between my research and the deposition

21   transcripts and the testimonies.

22   Q.   Have you done any research specific to the state of Alabama?

23   A.   No.

24   Q.   Have you done a national study that would encompass more

25   than the doctors that you've told us about?
```

1    A.  Well, this was a national study.  It chose four regions -- I

2    focused -- and those -- those physicians kind of spiraled out

3    from their residency programs, so there were several states

4    represented.  So it's not a quantitative study, if that's what

5    you're asking.  It did -- was based on national quantitative

6    research that the research question came from.

7    Q.  How many states were represented in your national study?

8    A.  You know, I can't remember.  Sorry.  But I -- I think at

9    least 15.  It might be in here.  Do you think it's in there?

10   No.  Okay.  I'm not sure exactly.  Sorry.

11   Q.  Okay.  Less than half of the states were represented in your

12   national study?

13   A.  Well, I don't know.  That's the problem.  I would need to go

14   through and count.  But I wouldn't -- because qualitative

15   research isn't -- I wouldn't -- if I talked to one or two

16   doctors per state, it wouldn't have meant that I claimed to be

17   saying a conclusion about the state.  We were -- I was trying to

18   look at trends that emerge no matter where the person was.  And

19   I got a geographically diverse sample.

20   Q.  All right.  And I believe based on the information that your

21   attorney handed to us before you testified, the stigma, the

22   trends that you identified included explicit restrictions on

23   performing abortions in private practices and hospitals?

24   A.  Explicit restrictions and sometimes not explicit.

25   Q.  Okay.  Well, what I'm looking at says explicit restrictions

1   on performing abortions in their private practices and

2   hospitals.  Is that correct?

3   A.  Yeah.  There were some in the study.  Yes.  Yes.

4   Q.  Are there any of those particular to Alabama that you're

5   aware of?

6   A.  I haven't done research in Alabama, so it would be -- the

7   comparable things were policies in hospitals.  So if somebody

8   were to inquire in hospitals, they could ask, or group practice

9   policies.

10  Q.  So you haven't heard all of the testimony that's been

11  presented during the course of these proceedings.

12  A.  Are you referring to the hospital ones?

13  Q.  Correct.

14  A.  Well, we didn't ask them those questions.  We didn't ask

15  them do you allow abortions in your hospital.

16  Q.  Right.  But I believe you testified previously that your

17  testimony here today is -- is in reliance in part on the

18  testimony that's been given previously in this trial; is that

19  correct?

20  A.  In part -- yes.  I mean I said that I've reviewed those

21  transcripts, yes.

22  Q.  But not all the transcripts of all the evidence offered in

23  this trial, correct?

24  A.  Probably not.  Right?  No.

25  Q.  And who's -- what evidence did you review?

1  A.   I interviewed the -- I mean I reviewed the transcripts of

2  Staci Fox, Gloria Gray, Kiwana Brooks, Dr. Roe, Dalton Johnson,

3  P1.  Is that seven?  There are seven.

4  Q.   But not hospital transcripts.

5  A.   Unh-unh.

6  Q.   So you didn't hear the representative from Springhill

7  Hospital say that there are no restrictions on granting doctors

8  admitting privileges that do not relate to patient care, for

9  example.

10  A.   I don't know.  But I -- I don't -- I'm not making any claims

11  about the admitting privileges policies.

12  Q.   Okay.  And again, I'm looking at what your attorneys handed

13  before you took the stand.  It said that you had identified

14  explicit restrictions on performing abortions in private

15  practices and hospitals; is that correct?

16  A.   Explicit.  Yeah.  Sometimes explicit.

17  Q.   But you're not aware of any explicit restrictions from any

18  hospitals in Alabama about --

19  A.   Do you have any Catholic hospitals in Alabama?

20  Q.   I'm sorry, but you're not allowed to ask.

21  A.   I can't ask you?  Well, if you have Catholic hospitals in

22  Alabama, there are explicit restrictions on abortion.

23  Q.   Other than a Catholic hospital, are you aware of any other

24  restrictions --

25  A.   Well, I haven't done any studies on Alabama, so no.

1  Q.  And you also identified restrictions on moonlighting at

2  abortion clinics?

3  A.  In my research, yes.

4  Q.  All right.  Do you know of any restrictions on moonlighting

5  in abortion clinics that apply to doctors in Alabama?

6  A.  Nothing specifically.  No.

7  Q.  Now, you mentioned that the -- part of the reason for the

8  stigma associated with abortion has to do with a history of

9  criminal conduct; is that correct?

10 A.  Uh-huh.  I -- the stigma, yes, borne out of prelegalization

11 imagery.

12 Q.  And how does criminal conduct cause stigma?

13 A.  How does it cause stigma?  Do you want me to go through what

14 I want through before?

15 Q.  No.  You've just said that part of the stigma associated

16 with abortion comes out of the history of engaging in criminal

17 conduct.  Is that correct?

18 A.  Not exactly.  What I was saying was before abortion was

19 legal, when women had illegal abortions, there was a very

20 negative association with the person who provided that illegal

21 abortion and that that -- that association has been attached to

22 the current physician who provides abortions.  So it's -- it's a

23 carryover from those days.

24 Q.  Is part of that stigma the fact that abortion was illegal

25 and this was an illegal activity?

1    A.   Part of it.

2    Q.   And so would you say that criminal activity on the premises

3    of an abortion clinic would contribute to stigma associated with

4    that clinic?

5    A.   You mean like when people violate the FACE Act or something

6    like that?

7    Q.   No.   I mean like when a staff person at an abortion clinic

8    sells abortion-inducing drugs in the parking lot of a clinic

9    illegally.   Would that have a negative --

10   A.   You're asking if it would have a negative effect on it?

11   Q.   Yes.

12   A.   I'm sure that that is not a positive PR experience to --

13   Q.   So that would also -- that would contribute to the negative

14   stigma associated with abortion in that community.

15   A.   Oh, sure.

16   Q.   Would the same thing be true of an abortion provider who was

17   indicted by the federal government on criminal charges?   Would

18   the same be true?

19   A.   With -- whether that -- that Medicaid charge that was

20   referred to for H2 would be -- you think that would attach to

21   the clinic even though it was something about a product she

22   bought?

23   Q.   No.   I'm saying would that attach to the abortion provider

24   and to abortion generally in the state.

25   A.   If there's a lot of -- yeah.   I suppose if a lot of news

1  coverage makes her out to be really negative, I suppose that

2  would probably attach, yeah.

3  Q.  Now, can things be done to lessen stigma within a society?

4  A.  Yes.

5  Q.  If there is a stigma associated with abortion providers, for

6  example, that connects them with a time when abortions were

7  performed by people labeled butchers that weren't even doctors

8  that were not part of the medical community, could that stigma

9  be lessened by bringing abortion into the mainstream within the

10  medical community?

11  A.  It could possibly, if it were successful.

12  Q.  Would providing continuous care to patients, to abortion

13  patients, be part of that mainstreaming, in your opinion?

14  A.  What do you mean by continuous care?

15  Q.  Being able to provide continuous care rather than having an

16  abortion provider that flies in, performs an abortion, and

17  leaves and leaves any emergency procedure to an emergency

18  physician, for example, would having physicians on premises

19  providing continuous care help lessen the stigma?

20  A.  That's a difficult question.  I've heard about doctors

21  following patients to the hospital -- and this didn't come up in

22  my research; it's something I've heard -- read about -- and

23  being treated really badly in the hospital because of the stigma

24  of abortion provision and having very difficult interactions

25  with nurses and doctors.  So I -- at the very beginning of

1  trying to bring abortion providers into a hospital that's very

2  hostile towards abortion providers, that might not be actually

3  very stigma-reducing initially.  I don't know how the grand

4  culture change would happen.

5  Q.  Well, and let's look past initially, because I recognize

6  that initially, anytime you have change, there's going to be --

7  there are going to be waves.  But would you not agree with me

8  that having abortion providers providing continuous care for

9  patients that is on par with other medical providers in the

10 community would be a step toward achieving mainstreaming for

11 abortion providers?

12 A.  I'm not sure that I agree with you.  And I also see that the

13 medical community is going into a hospital system a whole lot

14 more, and there's a lot of transferring care of patients.  So I

15 don't know that all patients get to get followed by the same

16 doctor.  There's often a transfer of care.  So as long as the

17 transfer is done really respectfully and responsibly, I think

18 that that is good care.

19 Q.  So you don't think that abortion providers should be held at

20 the same standard of care as other physicians in the community.

21 A.  Well, you're saying that the standard of care is that the

22 abortion provider has to go provide the care themselves.  But I

23 don't necessarily agree with that.

24 Q.  Do you -- are you aware that physicians in other ambulatory

25 care facilities in the state of Alabama have admitting

1  privileges and can follow their patients into hospitals?

2  A.  All of them?

3  Q.  I believe all of them, Doctor, except for abortion

4  providers.

5  A.  I was not aware that all physicians in ambulatory surgery

6  centers --

7  Q.  Assuming that to be the case, Doctor, would you agree that

8  requiring abortion providers to also have admitting privileges

9  so that they could follow their patients in hospitals would help

10  to lessen the stigma associated with abortion?

11  A.  Not if it means all the abortion clinics go out of business.

12  I think that this is a practical issue.  I mean you can't make a

13  law that will make the care impossible to give.

14  Q.  Would paying OB-GYNs or doctors who perform abortions a fee

15  that's on par with what other doctors receive for comparable

16  medical procedures help to mainstream abortion in your opinion?

17  A.  You're saying the cost is suppressed that -- I'm sorry.  I

18  don't -- I don't understand.  Will you ask again?

19  Q.  Would paying abortion providers a fee that is on par with

20  the fee paid to nonabortion providers for similar medical

21  procedures help to mainstream or bring abortion into the

22  mainstream in the medical community?

23  A.  You mean if abortion providers were paid more per abortion

24  procedure?  Simply make -- would just making it a more lucrative

25  job make it a more mainstreamed thing, you're asking?

1  Q.  No.  What I'm asking is is there -- is part of the stigma,

2  perhaps, that still attains to abortion providers -- is part of

3  that stigma due to the fact that abortion providers receive less

4  money for performing a medical procedure than nonabortion

5  providers?  Would a disparity in that amount contribute to the

6  stigma associated with medical -- with abortion providers?

7  A.  I really don't know.  I don't know if I can answer that

8  question.  I just don't know.

9  Q.  Don't know?  And you cannot opine about the percentage of

10  doctors in Alabama who would do abortions but for the stigma.

11  A.  I don't have a percentage, no.  No one has done that

12  research.

13  Q.  And you don't know whether residency programs in Alabama

14  provide abortion training?

15  A.  Oh.  Do I know if residency programs?  Is that what you

16  asked me?

17  Q.  Yes.

18  A.  I don't know.  Sorry.  I think so, but I don't know.

19  Q.  Are you aware that the administrator of the Tuscaloosa

20  clinic has testified in deposition that protests and stigma did

21  not have any effect on Dr. Payne?

22  A.  No, I'm not aware.

23  Q.  And you discussed protests at Crestwood Hospital in

24  Huntsville.  But are you aware that Crestwood Hospital, even in

25  spite of those protests, renewed privileges for the abortion

1    provider?

2    A.  I learned that here.  Yes.

3    Q.  Are you aware that Crestwood Hospital has publicly stated in

4    response to protestors that it did not intend to and could not

5    legally revoke the privileges of any physician for an issue that

6    had no bearing on their competency or their work or practice at

7    the hospital?

8    A.  I've learned that.  Yes.

9    Q.  Yes, you know that?

10   A.  Now I do.

11        MS. FLEMING:  May I have a moment to confer, Your

12   Honor?

13        THE COURT:  Yes, you may.

14      (Brief pause)

15   Q.  Do you know of any other medical field within Alabama that

16   allows the use of itinerant doctors to the extent of abortion

17   clinics?

18   A.  I'm sorry.  Itinerant what?

19   Q.  Itinerant doctors or physicians.  Do you know of any

20   other --

21   A.  Is that the one you're talking about for people who come in

22   and work and then leave --

23   Q.  Correct.

24   A.  -- for other people who do like specialized procedures?

25   Q.  Correct.

1    A.   I don't know.

2         MS. FLEMING:   That's all I have, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MS. KOLBI-MOLINAS:

5    Q.   Dr. Freedman, you were asked whether it would mitigate

6    stigma to force abortion providers to have privileges because

7    doctors at ambulatory surgical centers have privileges; is that

8    correct?

9    A.   Yes.   That was the question.

10   Q.   Are you aware that doctors doing office-based surgery can

11   and do perform surgery in Alabama without privileges?

12   A.   I was not aware.   But I'm not surprised, because that seems

13   to be the way health care is moving.

14   Q.   And so would you agree that abortion providers aren't unique

15   in this regard of not always having admitting privileges --

16       (The court reporter interrupts for clarification)

17   Q.   And would you agree that abortion providers aren't unique in

18   this regard of not always having admitting privileges at a local

19   hospital?

20   A.   I would agree.

21        MS. FLEMING:   Objection, Your Honor.   She's testified

22   that she doesn't have that knowledge.

23        THE COURT:   Okay.   Only if you have the knowledge.

24        THE WITNESS:   Okay.

25        THE COURT:   Do you have it?

1          THE WITNESS:  Well, of Alabama in particular, I did not

2  until she gave it to me.

3          THE COURT:  Okay.

4          THE WITNESS:  Sorry.

5  A.  But in general, yes, I would agree, and for other states.  I

6  mean I'm aware that people do procedures in their offices that

7  do not have hospital privileges in general.

8  Q.  And do those physicians or practices face the same kind of

9  stigma that abortion providers do?

10  A.  I don't think any field faces the same stigma that abortion

11  providers do.

12          MS. KOLBI-MOLINAS:  No further questions.

13          THE COURT:  Anything else from this witness?

14          MS. FLEMING:  No recross, Your Honor.

15          THE COURT:  Thank you.  You may step down.

16          We have no more witnesses?  How are we progressing?

17          MS. KOLBI-MOLINAS:  Well, we could take up objections

18  on exhibits if you wanted to, but --

19          THE COURT:  I rather agree with Mr. Davis.  That's just

20  spinning our wheels.

21          MS. KOLBI-MOLINAS:  To wait till the end?  Tomorrow has

22  some video people, so I mean we're on schedule.

23          THE COURT:  We're on schedule.  The problem is I wish

24  we had witnesses so we could be ahead of schedule in case it

25  slows down later.  Will you go a full day tomorrow?

```
 1          MS. KOLBI-MOLINAS:  Yes.
 2          THE COURT:  Well, I want you to do a better job of
 3  making sure that we fill up the day.
 4          MS. KOLBI-MOLINAS:  Yes, Your Honor.
 5          THE COURT:  Yes, Mr. Davis?
 6          MR. DAVIS:  Your Honor, speaking of tomorrow, just to
 7  give the Court some advance notice, Dr. Fine, plaintiff's
 8  expert, will testify in the morning.  Then plaintiffs have
 9  graciously agreed for us to take Dr. John Thorp out of turn in
10  the afternoon.
11          THE COURT:  Right.
12          MR. DAVIS:  We have scheduled him for a time certain.
13  We have estimated about one o'clock in the afternoon.  I might
14  be able to adjust that some if plaintiffs or the Court had a
15  different notion; but the way it's been arranged, we sort of
16  need an idea.
17          THE COURT:  How many witnesses do we have tomorrow
18  morning?
19          MS. KOLBI-MOLINAS:  One, Your Honor.
20          THE COURT:  Okay.  And you're certain he'll take -- he
21  or she will take the full morning?
22          MS. KOLBI-MOLINAS:  I'm fairly confident he will.
23          MR. DAVIS:  I would agree that that would be -- that
24  expert will be longer than normal.
25          THE COURT:  Your concern is the expert may take longer?
```

 1          MR. DAVIS:  No, I'm not concerned either way.  It's

 2  fine if it runs long.  If for -- unexpectedly Dr. Fine were to

 3  finish -- if we were to finish with him at 10:30, I still will

 4  not be ready to go until around one p.m.

 5          THE COURT:  I see what you're saying.  Yes.  I

 6  understand.  And only one witness tomorrow afternoon, too, your

 7  witness?

 8          MR. DAVIS:  Two.

 9          THE COURT:  Two witnesses.

10          MR. DAVIS:  After Dr. Thorp completes, we will have a

11  short witness, Dr. George Smith.

12          THE COURT:  And how long do you expect your witness to

13  take, the long witness, the one o'clock witness?

14          MR. DAVIS:  I would say most of the afternoon.  And

15  then Dr. Smith will be very brief.

16          This is Mr. Seale, who is counsel for Dr. Smith, and

17  says he could be here earlier, possibly.

18          THE COURT:  Is Dr. Smith here today?  Is he -- is

19  Dr. Smith here today?

20          MR. SEALE:  No, Your Honor, he's not.  He'll be in town

21  tonight.  He's got a Board of Medical Examiners meeting

22  tomorrow.

23          THE COURT:  I see.  Okay.

24          MR. DAVIS:  He practices in Lineville, Your Honor, and

25  will be in town tomorrow for the day.  So if -- whatever time we

1    finish with Dr. Thorp in the afternoon, we can assure Your Honor

2    that there will be very little gap before Dr. Smith will be

3    available.

4            THE COURT:  Okay.

5            MR. DAVIS:  And I'm quite confident we can finish in

6    the afternoon with those two witnesses.

7            THE COURT:  Very good, then.  We'll start back at nine

8    tomorrow, then.

9        (Evening recess at 3:09 p.m.)

10                        * * * * * * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2           I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4           This 2nd day of June, 2014.

5

6                              /s/ Risa L. Entrekin
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25