```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE MIDDLE DISTRICT OF ALABAMA

 3                            NORTHERN DIVISION

 4

 5   PLANNED PARENTHOOD
     SOUTHEAST, INC., et al.,
 6
             Plaintiffs,
 7
         vs.                         CASE NO.:  2:13cv405-MHT
 8
     LUTHER STRANGE, et al.,
 9
             Defendants.
10

11

12
                             VOLUME III
13
                       * * * * * * * * * *
14
                     NONJURY TRIAL PROCEEDINGS
15
                       * * * * * * * * * *
16
             BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES
17
     DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday, May 21,
18
     2014, commencing at 9:08 a.m.
19
     APPEARANCES:
20
     FOR THE PLAINTIFFS:     Ms. Alexa Kolbi-Molinas
21                           Mr. Andrew David Beck
                             Ms. Susan Talcott Camp
22                           Ms. Julia Heather Kaye
                             Attorneys at Law
23                           AMERICAN CIVIL LIBERTIES UNION
                             125 Broad Street, 18th Floor
24                           New York, New York  10004-2400

25
```

```
 1  APPEARANCES, Continued:

 2  FOR THE PLAINTIFFS:      Ms. Jennifer R. Sandman
                             Ms. Maithreyi Ratakonda
 3                           Attorneys at Law
                             PLANNED PARENTHOOD FEDERATION
 4                           OF AMERICA
                             434 West 33rd Street
 5                           New York, New York  10001

 6                           Ms. Dyanne Griffith
                             Attorney at Law
 7                           WILMER CUTLER PICKERING
                             HALE & DOOR, LLP
 8                           1875 Pennsylvania Avenue NW
                             Washington, D.C.  20006
 9
                             Mr. Randall C. Marshall
10                           Attorney at Law
                             ACLU of ALABAMA FOUNDATION, INC.
11                           P.O. Box 6179
                             Montgomery, Alabama  36106-0179
12
                             Mr. M. Wayne Sabel, Sr.
13                           Attorney at Law
                             SABEL & SABEL, P.C.
14                           2800 Zelda Road, Suite 100-5
                             Montgomery, Alabama  36106
15

16  FOR THE DEFENDANTS:      Mr. Andrew L. Brasher
                             Solicitor General
17                           STATE OF ALABAMA
                             OFFICE OF THE ATTORNEY GENERAL
18                           501 Washington Avenue
                             Montgomery, Alabama  36103
19
                             Mr. James William Davis
20                           Ms. Margaret Lindsey Fleming
                             Mr. Kyle A. Beckman
21                           Ms. Laura Elizabeth Howell
                             Assistant Attorneys General
22                           STATE OF ALABAMA
                             OFFICE OF THE ATTORNEY GENERAL
23                           501 Washington Avenue
                             Montgomery, Alabama  36130
24

25
```

1
  APPEARANCES, Continued:

2
  FOR THE DEFENDANTS:    Ms. Patricia Elaine Ivie

3
                            Mr. Phillip Brian Hale

                            Assistant Attorneys General

4
                            Office of General Counsel

                            STATE OF ALABAMA

5
                            DEPARTMENT OF PUBLIC HEALTH

                            RSA Tower

6
                            201 Monroe Street

                            Montgomery, Alabama  36104

7
            Proceedings reported stenographically;

8
              transcript produced by computer.

9
                * * * * * * * * * *

10
                  VOLUME INDEX

11
  PAUL FINE, M.D.

      DIRECT BY MS. SANDMAN                  4

12
      CROSS BY MR. DAVIS                  88

      REDIRECT BY MS. SANDMAN           119

13
      REDIRECT BY MS. SANDMAN           128

      RECROSS BY MR. DAVIS             129

14
  GEORGE SMITH, JR., M.D.

15
      DIRECT BY MS. HOWELL             137

      CROSS BY MR. MARSHALL           151

16

17
               * * * * * * * * * *

18
   (The following proceedings were heard before the Honorable

19
   Myron H. Thompson, United States District Judge, at

20
   Montgomery, Alabama, on Wednesday, May 21, 2014, commencing

21
   at 9:08 a.m.:)

22
   (Call to Order of the Court)

23
       THE COURT:  Proceed, counsel.

24
       MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call

25
  Dr. Paul Fine.

1          THE COURT:  Okay.

2          THE WITNESS:  Good morning, Your Honor.

3          THE COURT:  Good morning.

4     (The witness is sworn)

5          MS. SANDMAN:  Your Honor, if I may approach just to

6   give out the witness binders.

7          THE COURT:  Yes.  Thank you.

8          MS. SANDMAN:  And Your Honor, I did previously supply a

9   summary of his proposed expert testimony as you requested.

10         THE COURT:  Yes.

11         MS. SANDMAN:  I just want to make sure the Court has

12  that.

13         THE COURT:  Very good.  I'm reading it right now.

14         MS. SANDMAN:  Very good.

15         THE COURT:  Proceed.

16         MS. SANDMAN:  Thank you, Your Honor.

17         **PAUL FINE, M.D.**, the witness, having been duly sworn

18  to speak the truth, the whole truth, and nothing but the truth,

19  testified as follows:

20                          DIRECT EXAMINATION

21  BY MS. SANDMAN:

22  Q.  Dr. Fine, please introduce yourself to the Court.

23  A.  Well, good morning.  I'm Dr. Paul Fine.

24  Q.  I don't want to spend a lot on your -- a lot of time on your

25  credentials, given that the Court has your CV.

1           MS. SANDMAN:  And Your Honor, I believe Dr. Fine's CV

2    is in evidence as Exhibit 64.

3    Q.  But can you briefly describe your professional history for

4    the Court.

5    A.  Yes.  I went to George Washington University Medical School,

6    graduated in '71; did my internship and residency at Los Angeles

7    County, University of Southern California Medical Center,

8    finished that in '75.  Served active duty in the Air Force in

9    Europe from '75 to '77.  In 1977, I came to Dickinson, Texas, in

10   Galveston County, where I opened a private practice and

11   maintained that private practice until 1993.  I was a solo

12   practitioner.  Managed care made it impossible for me to

13   continue private practice as a solo, and I joined the faculty of

14   Baylor College of Medicine in the Department of OB-GYN and

15   Urology in 1993, where I've remained.  And in 2005, I went

16   part-time.

17        During that time, since 1984, I've been associated also with

18   Planned Parenthood in Houston.  And I've been, since 1997, the

19   medical director of Planned Parenthood Gulf Coast that

20   encompasses the Houston metropolitan area and Louisiana.

21   Q.  Dr. Fine, are you a board-certified OB-GYN?

22   A.  Yes, I am.

23   Q.  And do you perform abortions?

24   A.  Yes, I do.

25   Q.  By what methods?

1  A.   By both surgical abortion and by medication abortion.

2  Q.   And do you teach those methods as well?

3  A.   Yes, I do.

4  Q.   Does part of that teaching include what to do if there is an

5  abortion-related complication?

6  A.   Yes, it does include that.

7  Q.   And can you explain to the Court what are your

8  responsibilities as the medical director of Planned Parenthood

9  of the Gulf Coast?

10  A.   To direct the medical care at that facility for both family

11  planning and abortion care.

12  Q.   And can you explain what the relationship is between Planned

13  Parenthood of the Gulf Coast and Planned Parenthood of the

14  Southeast, which is one of the plaintiffs in this action.

15  A.   There are -- Planned Parenthood Federation of America has

16  about 67 what they call affiliates.  And these are like

17  franchises of Planned Parenthood that operate under the mantra

18  of guidelines set out by PPFA.  Planned Parenthood Southeast,

19  which is Alabama, is a separate entity, corporate entity, from

20  Planned Parenthood Gulf Coast, but both are affiliates governed

21  by Planned Parenthood Federation of America.

22  Q.   And broadly speaking, can you explain to the Court whether

23  there are conditions of affiliation?

24  A.   I'm sorry?

25  Q.   Broadly speaking, can you just explain whether there are

1   conditions of affiliation --

2   A.   Yes.

3   Q.   -- that affiliates follow?

4   A.   Yes.   To be affiliated, there are specific guidelines set

5   forth by Planned Parenthood, both administrative, their board

6   composition, the medical services that are offered -- generally,

7   family planning, sexual infection screening, breast and cancer

8   screening, well-woman exams, a wide range of health care.   And

9   these are governed by standards and guidelines promulgated

10  through PPFA by way of their national medical committee.

11  Q.   And Dr. Fine, do you perform any duties or functions for the

12  national office in addition to your role at Planned Parenthood

13  of the Gulf Coast?

14  A.   Yes.   I have been a senior research consultant with PPFA.   I

15  also serve on the executive committee of the national medical

16  committee.   The national medical committee is a group of about

17  40 experts from around the country who -- in various areas of

18  reproductive health care and medicine.   And they are the ones

19  that promulgate the -- the standards and guidelines that the --

20  each affiliate has to abide by.   Generally, nurse practitioners

21  provide most of the care at the affiliates, so these standards

22  and guidelines are followed by the nurse practitioners.

23  Q.   And Dr. Fine, do you have any appointments relating to

24  emergency medical services?

25  A.   Yes, I do.   It started in 1984.   At night, I went through

1  the police academy while I was in private practice, and I've

2  been a reserve police captain for 30 years.  Doing those duties

3  while out on patrol, I would be on scene of hundreds of car

4  accidents and stabbings and shootings and got to know the EMS

5  people.  So they wanted me to be their medical director.  So

6  I've been the medical director of EMS for three cities in

7  Galveston County since about 1990.

8  Q.  And do you also do any work for the police department?

9  A.  Yes.  As mentioned, I have been a reserve police captain for

10  a large city in Galveston County for about 30 years now.  I'm in

11  my thirtieth year.  And in that, I'm like the police surgeon,

12  but I ride on patrol and attend many of the major medical

13  emergencies.  So I see the EMS crews in action and oversee that.

14  I also helped -- taught the police how to collect a rape kit in

15  sexual assault victims and sometimes was involved with those.

16  Q.  Dr. Fine, have you been on staff at any hospitals?

17  A.  Yes.  I've been on the staff of about 15 hospitals, both

18  suburban community and urban medical center type hospitals.

19  Q.  Have you ever served on a hospital committee involved in

20  considering applications for admitting privileges?

21  A.  Yes.  When I was in private practice, the two main hospitals

22  in Galveston County I practiced at, at different times, I was

23  both the chair of the department of OB-GYN and also served on

24  the credentials committee.

25  Q.  And have you served on any other committees involved in the

1  privileging process?

2  A.   Yes.  I have also -- when I was chairman of the OB-GYN

3  department, I also served on the executive medical committee of

4  the hospitals, which also plays a role in hospital

5  credentialing.

6  Q.   Dr. Fine, based on your experiences, are you familiar with

7  the norms and standards for providing gynecological services,

8  including abortion in outpatient settings?

9  A.   Yes, I am.

10  Q.   And are you familiar with the typical practices around the

11  hospital privileging process?

12  A.   Yes, I am.

13  Q.   In addition to all of the positions that you've just

14  discussed, do you conduct research and publish in peer-reviewed

15  journals?

16  A.   Yes, I have, many times.

17  Q.   And do those appear on your CV?

18  A.   Correct.

19  Q.   And do some of those relate to abortion as well?

20  A.   Yes, they do.

21         MS. SANDMAN:  Your Honor, at this point, plaintiffs

22  would move to qualify Dr. Fine AS an expert in the areas of

23  obstetrics and gynecology with a speciality in abortion

24  practice, the provision of emergency medical services, and on

25  hospital admitting privileges process.

1          THE COURT:  Proceed.

2          MS. SANDMAN:  Thank you.

3    Q.  Dr. Fine, directing your attention to the first two

4    documents in your binder marked for identification as

5    Plaintiff's Exhibit 65 and 66, do you recognize those documents?

6    A.  Yes, I do.

7    Q.  What are they?

8    A.  The -- 65 is a statement of my opinions and the basis and

9    reasons for them, my -- my expert report.  And number 66 is my

10   rebuttal report.

11   Q.  And do those documents accurately reflect your expert

12   opinions in this case?

13   A.  Yes, they do.

14          MS. SANDMAN:  Plaintiffs would like to move Exhibit 65

15   and 66 into evidence.

16          THE COURT:  Admitted.

17          MS. SANDMAN:  Thank you, Your Honor.

18   Q.  Dr. Fine, you're here today to offer expert testimony about

19   the necessity and impact of a new Alabama requirement regarding

20   the provision of abortion; is that correct?

21   A.  Yes, that's correct.

22   Q.  And are you familiar with this new requirement?

23   A.  Yes, I am.

24   Q.  What do you understand it to be?

25   A.  It basically requires a physician providing abortion care to

1   have admitting privileges at a hospital within the statistical

2   metropolitan area.  And the admitting privileges have to

3   encompass major gynecological surgery, including the ability to

4   perform hysterectomy and laparotomy, which is where they make an

5   incision in the abdomen to fix whatever's wrong in the abdomen.

6   Q.  And based on your experience and expertise, do you believe

7   this admitting privileges requirement is necessary for the safe

8   provision of abortions?

9   A.  Absolutely not.

10  Q.  Do you believe this provision will help women in Alabama?

11  A.  Absolutely not.  It will harm women.

12  Q.  Dr. Fine, what are the methods of abortion available through

13  14-weeks of gestational age?

14  A.  Through 14 weeks of gestational age, which is early

15  abortion, is surgical abortion, which is removal of the contents

16  of the uterus using instruments.  There's no cutting or suturing

17  in a surgical abortion.  And there's medication abortion, or the

18  abortion pills, that is performed up through nine weeks of

19  gestational age.

20      Gestational age, Your Honor, is from the first day of the

21  last normal menstrual period, so nine weeks is the upper limit

22  that we can do medication abortions.

23          THE COURT:  Would you just back up a little bit for me

24  and tell me what the stages are from --

25          THE WITNESS:  Pregnancy?

1          THE COURT:  -- impregnation -- from impregnation to

2     birth, what are the different stages?

3          THE WITNESS:  Okay.  Generally, they are divided into

4     what we call trimesters.  The first trimester is generally 12 to

5     14 weeks.  The second trimester is generally from 12 to 28

6     weeks, and the last trimester is from 28 weeks to term, which is

7     40 weeks.  So each trimester is approximately three months.

8          THE COURT:  And generally, when are abortions performed

9     within those trimesters?

10          THE WITNESS:  Ninety percent of the abortions in the

11     United States are performed during the first trimester, and 60

12     percent are performed within the first eight weeks, or two

13     months.

14          THE COURT:  Is there a reason why 60 percent versus --

15     are performed within that period of time -- versus the 90

16     percent within the first term?

17          THE WITNESS:  Well, the -- the -- with the women being

18     able to do home pregnancy tests, they diagnose their pregnancies

19     earlier.  And with a large number of abortion facilities

20     available, at least prior to some of these laws, women could

21     easily access abortion when they wanted it.  And generally, if

22     it's done earlier, there's less pain involved, there's less

23     anesthesia, they're at lower risk.  So the earlier you can do

24     the abortion, the better.

25          THE COURT:  What's considered early?

1          THE WITNESS:  Early, generally first trimester through

2     12 to 14 weeks.

3          THE COURT:  Is there any difference between doing it

4     very early in that trimester and later in that -- pardon me --

5     very early in the first trimester and later in the first

6     trimester?

7          THE WITNESS:  I think later in the first trimester has

8     slightly increased risk but not a whole lot.

9          THE COURT:  What is considered later?

10         THE WITNESS:  Later would be 12 to 14 weeks.

11         THE COURT:  Now, what about the other 10 percent?

12         THE WITNESS:  The other 10 --

13         THE COURT:  I guess that would be within the second

14     trimester.

15         THE WITNESS:  Yeah, second trimester.  And generally --

16     it varies state to state, but second trimester abortions

17     generally are done up to approximately 20 to 22 weeks

18     gestational age.  The longer -- the farther along the

19     gestational age, Your Honor, the more they have to dilate and

20     stretch the cervix.  And when you start getting into the second

21     trimester, you actually have to do overnight preparation of the

22     cervix with reeds that swell overnight and slowly dilate the

23     cervix.  When you have a larger volume of tissue to be removed,

24     as in the second trimester, there's also -- there's more

25     instrumentation involved.  There's a higher possibility for

1   perforation.  There's a higher possibility for retained tissue

2   that could cause a problem.  So earlier on, there's less tissue,

3   less dilation, less pain, and it's generally safer.

4        THE COURT:  Counsel, is there anything in the record

5   that would just educate me as to how a surgical abortion is

6   actually done?

7        MS. SANDMAN:  There will be momentarily, Your Honor.

8        THE COURT:  Okay.  Very good.

9   Q.  (Ms. Sandman, continuing:)  Dr. Fine, just so the record is

10  clear, are you aware of the gestational age to which abortion is

11  done by plaintiffs in this case?

12  A.  Yes.  Up to 14 weeks is my understanding.

13  Q.  Can you briefly explain for the Court the process by which

14  early surgical abortion, meaning through 14 weeks, occurs?

15  A.  Yes.  The process -- it's typically called, Your Honor, a

16  D&C, dilation and curettage.  And the cervix is dilated.  The

17  further along the gestational age, the more it's dilated.  And

18  then --

19        THE COURT:  What does dilation mean?

20        THE WITNESS:  Dilation means stretching of the opening.

21  The cervix, in its undilated state, is about one or two

22  millimeters, about a pencil lead in diameter.  And during the

23  first trimester, you generally will dilate it to either the size

24  of a pencil or to the size of a small finger on your hand.  And

25  then once the cervix is dilated, then there is a -- a tube, or

1   what we call cannula, plastic tube, that's either attached to a

2   syringe that causes suction or an electric machine that causes

3   suction.  And with the suctioning, the contents of the uterus

4   are removed.

5   Q.  (Ms. Sandman, continuing:)  And Dr. Fine, I believe you

6   testified earlier that the early surgical abortion is not

7   typically what's thought of as surgery.  Can you just explain

8   that to the Court.

9   A.  Yes.  It's called surgical abortion; but unlike most

10  surgery, there's no suturing, there's no cutting, there's no

11  incision.  There's no need for general anesthesia.  We're just

12  stretching the natural cervical canal opening.

13  Q.  And do you know what is commonly done for pain management

14  for early surgical abortion?

15  A.  Most of the time, the patient beforehand, maybe 30 minutes

16  before, is given either ibuprofen, which is Advil, or may be

17  given a Valium tablet to help relax her.  And then to avoid the

18  pain of stretching the cervix, we inject Novocain or lidocaine

19  into the cervix itself.  And so the patient is awake but fairly

20  comfortable, and she experiences menstrual cramps similar to

21  what she has with her menses.

22  Q.  And Dr. Fine, I think you touched on this briefly before,

23  but can you just describe what you mean by medication abortion?

24          THE COURT:  Before you get to that, what exactly does

25  it look like that's removed during a surgical abortion or a

1   medication abortion?  Is it just blood or --

2           THE WITNESS:  During --

3           THE COURT:  -- is it a small baby or what?

4           THE WITNESS:  During -- during the first approximately

5   eight weeks, it looks like menstrual blood.  Now, to confirm the

6   tissue is there and that the pregnancy has been ended, there's

7   two methods that are used.  One is they'll take the blood --

8   bloody tissue, strain it with a strainer with tap water and then

9   put it in a clear dish with a light under it, and then you can

10  see clumps of white-looking tissue.  You don't really see an

11  embryo, per se, until really much over nine to ten weeks.

12          MR. DAVIS:  Excuse me, Your Honor.  I beg your pardon.

13  I'm sorry to interrupt.  I'm having difficulty hearing the

14  witness's response when he's turning to you.

15          THE COURT:  Oh, you should definitely say, please speak

16  up.

17          MR. DAVIS:  And I'm sorry.  I'm also having trouble

18  hearing Your Honor's questions for the same reason.

19          THE COURT:  Okay.  Very good.  Also say please speak

20  up.  I have a microphone here.

21          THE WITNESS:  Sorry.  I'll repeat.

22          THE COURT:  Go ahead.

23          THE WITNESS:  Did you hear what I -- so in the first

24  eight weeks, it's just bloody tissue with clots and some small

25  white tissue.  You don't really see an embryo up to eight weeks,

1   per se.  When you start getting nine to ten weeks and 11 and 12

2   weeks, you actually do start seeing an embryo.  And, in fact, at

3   12 weeks, you start being able to make out, you know, the actual

4   fetal parts, the embryonic parts; but at 12 weeks, the embryo is

5   about an inch long.

6   Q.  (By Ms. Sandman, continuing:)  And Dr. Fine, how long does

7   an early surgical abortion take for the actual procedure?

8   A.  If you include giving the paracervical block, anywhere from

9   three to six minutes.  If you exclude giving the paracervical

10  block, about two minutes.

11  Q.  You testified earlier about some of the different

12  gestational ages for early terminations of pregnancy.  What is

13  the earliest that a pregnancy can be diagnosed?

14  A.  With the ultrasound machines we have now, we can start

15  seeing pregnancies at approximately five weeks from the last

16  normal period, which is approximately one week after they've

17  missed their period, we can confirm an intrauterine pregnancy.

18  Q.  And at what point would the woman's pregnancy test typically

19  be positive?

20  A.  Well, with the home pregnancy tests now, they're extremely

21  sensitive.  There are pregnancy tests commercially available now

22  to women who can diagnose a pregnancy before they've even missed

23  their menses.

24  Q.  And what gestational age would that be considered to be?

25  A.  Well, the gestational age from about the time of their

1  expected menses, since gestation is from the last day of the

2  last normal period and assuming their period is four weeks

3  later, they would be of four weeks gestational age, around the

4  time of their expected menses.

5  Q.  You testified earlier that the vast majority of abortions in

6  the country happen in the first trimester.  Can you explain for

7  the Court what types of factors, in your experience, cause a

8  woman to have abortion later in pregnancy?

9  A.  There can be multiple factors.  Unfortunately, data

10  consistently shows that there is a disproportionate number of --

11  of minority women, poorly educated women, economically

12  disadvantaged women, so -- who have elective terminations of

13  pregnancy, which, unfortunately, is also a result that they

14  don't have as much access to effective contraception.

15       Your Honor, 50 percent of the pregnancies in the United

16  States are unintended.  Half of those end up in abortion.

17  But -- so -- so women may be delayed in the diagnosis.  They may

18  not be able to afford a pregnancy test, which, you know, may

19  cost 20 or $30.  They -- they may, because of the cost, not be

20  able to go in to be diagnosed at the clinic.  When a woman

21  presents to the abortion clinic, the first thing that's done is

22  to determine if they are pregnant and if they are, how far

23  along.  But those services also cost some money, so there's

24  delay.

25       There can also be delay if the woman has to travel long

```
 1    distances to get to an abortion clinic.  Because if she's
 2    economically disadvantaged, she may not have a car, may have to
 3    rely on somebody else to drive her.  And in the end, the
 4    decision and ability to physically go to the abortion clinic may
 5    be delayed by several weeks or a month, which would put the
 6    pregnancy later in gestational age once they reach the abortion
 7    clinic.
 8            THE COURT:  What does the term "menses" mean?
 9            THE WITNESS:  I'm sorry?
10            THE COURT:  What does the term "menses" mean.
11            THE WITNESS:  Menses is the actual menstrual period.
12    Q.  (By Ms. Sandman, continuing:)  Dr. Fine, turning back
13    briefly to the types of abortion that you discussed earlier,
14    we've talked a little bit about the process of surgical
15    abortion.  Can you explain for the Court the process of a
16    medication abortion.
17    A.  Yes.  A medication abortion is basically taking two pills.
18    The first pill is the abortion pill that got -- ru486 that got
19    so much press years ago.  And that is a pill that is taken in
20    the clinic on day one.  That basically causes the embryo, which
21    is anchored to the wall of the uterus by -- by anchors, what we
22    call villi -- the ru486 causes that connection -- the lining of
23    the uterus breaks down, and the connection is lost, so the
24    embryo loses its blood supply.
25        So then they go home.  And 24 to 36 hours later, at their
```

1    convenience, they take a second pill, caused misoprostol, which

2    that pill causes the uterus to contract and expel the now

3    deceased embryo and empty the uterine cavity.  Generally, once

4    the woman takes that second pill at home, the spontaneous

5    miscarriage which occurs at that point will occur two to four

6    hours after she takes the pills.

7    Q.  So just to be clear, after the woman takes the first oral

8    medication at the health center, does anything else physical

9    happen to her as a part of the abortion process while she's

10   still at the health center?

11   A.  No.  Obviously, at the health center, she also receives

12   extensive counseling, making sure the abortion is her choice,

13   she's not being coerced, this is what she wants.  We try to make

14   sure she has a provision for contraception after the abortion.

15   But the actual abortion is taking one pill in the abortion

16   clinic on day one.

17   Q.  In what kind of facilities are abortions generally

18   performed?

19   A.  In an office.

20   Q.  Do you consider abortion to be a safe procedure?

21   A.  Extremely safe.  Safer than getting a shot of penicillin.

22   Q.  And how does the risk of -- can you speak to the risk of

23   death from abortion procedures?

24   A.  Yes.  Multiple studies in the literature generally show that

25   the risk of death from abortion, elective abortion, is

 1  approximately six women per one million.  Six women per one

 2  million.

 3          THE COURT:  Let me interrupt you again.  Is there a

 4  period of time when you do a medical abortion -- pardon me --

 5  medication abortion versus a surgical abortion, when it's safer

 6  or not safer?

 7          THE WITNESS:  We -- yes.  The medication -- the

 8  literature on medication abortion shows it's efficacious up

 9  through nine weeks gestational age.  Now, there's soon to be

10  published literature showing that it's actually safe at ten

11  weeks also, but the protocols by most -- by the National

12  Abortion Federation and Planned Parenthood limit medication

13  abortion up to nine weeks gestational age.  If they're over nine

14  weeks, they must have a surgical.

15          THE COURT:  When you're talking about safety, are you

16  talking about both, or are you talking about one versus the

17  other, or what?

18          THE WITNESS:  No.  They're both -- Your Honor, the

19  death rate from both -- surgical is actually higher than the

20  medical abortion.  Surgical abortion is about six women per

21  million, and medication abortion is maybe three per million.

22  And that's -- some of the deaths from medication abortion that

23  were in the paper were due to clostridia sordellii, and there

24  were like seven deaths with the medication abortion.  And there

25  were two factors that were altered.  One was the second tablet

1   used to be given vaginally.  It's no longer done.  And women,

2   after medication abortion, did not used to get prophylactic

3   antibiotics.  Now they do.  So since that's been done, the

4   mortality -- in fact, one of the larger studies on medication

5   abortion puts the death rate at about six per -- six per

6   million.  So it's -- they're both extremely safe procedures.

7          THE COURT:  Six per million versus three per million

8   doesn't mean anything to me.

9          THE WITNESS:  Correct.  It's --

10         THE COURT:  It can only be something relative to

11  something else.

12         THE WITNESS:  Obviously, if you're that one of the six

13  in a million, it's important; but generally, if you're going to

14  argue the statistical, well, is it six per million, is it eight

15  per million, is it ten per million, we're still talking about an

16  extremely rare event, fortunately.

17         THE COURT:  I don't think you understood what I was

18  asking.

19         THE WITNESS:  Okay.  I'm sorry.

20         THE COURT:  Compared to what?  Are you comparing it to

21  getting a pencillin shot?  Not penicillin.  Pardon me.

22         THE WITNESS:  The penicillin shot is one.

23         THE COURT:  Is that what you compared it to?  Okay.

24         THE WITNESS:  Uh-huh.

25         THE COURT:  Well, how many people die from penicillin

1   shots per million?

2         THE WITNESS:  Oh, approximately two to three times

3   that.  And there's also some tables out that showed your risk of

4   dying from riding a motorcycle or being in an automobile

5   accident, that those are all higher than the risk of death

6   from --

7         THE COURT:  Well, I think I'd be more interested in

8   comparing surgical or medical events rather than --

9         THE WITNESS:  Well, the risk of --

10        THE COURT:  -- a motorcycle, riding a motorcycle.

11        THE WITNESS:  The risk of dying from a colonoscopy is

12  higher than the risk of death from having an early abortion.

13  Q.  (By Ms. Sandman, continuing:)  Dr. Fine, can you compare the

14  risk of death from an early abortion to the risk of death from a

15  spontaneous miscarriage?

16  A.  Generally, the risk of a spontaneous miscarriage -- and Your

17  Honor, approximately 13 to 15 percent of all pregnancies end in

18  spontaneous miscarriage for multiple reasons.  But the -- when

19  there's an elective abortion, it's a finite procedure and it's

20  done and it's completed.  When a woman has a spontaneous

21  miscarriage, sometimes she may not even know she's pregnant or

22  she may delay -- delay seeking care.  And in those

23  circumstances, there's a higher risk of hemorrhage and infection

24  with spontaneous abortion because of the delay in seeking care.

25  So the risk of spontaneous abortion (sic) in gestational age --

1   per gestational age is higher for spontaneous miscarriage than
2   it is for abortion.
3   Q.   And can you compare the risk of death from abortion to the
4   risk of death from childbirth?
5   A.   Yes.   The -- the risk of death from a live childbirth is
6   approximately 8.8 per hundred thousand.  And the risk of death
7   from abortion is six per million.  So the risk of death from
8   live childbirth, Your Honor, is 14 times greater than the risk
9   of death from abortion.  Fourteen times.
10  Q.   Dr. Fine --
11  A.   And that's in several studies.
12  Q.   Dr. Fine, I'd like to direct your attention to the third
13  item in your binder, which is an article by Drs. Raymond and
14  Grimes titled "The Comparative Safety of Legally Induced
15  Abortion and Childbirth in the United States," published in
16  *Obstetrics & Gynecology*, Volume 119, in 2012.
17       Are you familiar with that study?
18  A.   Yes, I am.
19  Q.   Can you tell the Court about the study methodology and
20  whether you consider it to be reliable.
21  A.   Well, *Obstetrics & Gynecology* is a peer-reviewed journal,
22  and it's one of the most respected journals in obstetrics and
23  gynecology.  Drs. Raymond and Grimes are well respected experts
24  and researchers in reproductive health care.
25       To do this study, they actually used various methods,

1  including the -- the Centers for Disease Control Preventions

2  Pregnancy Mortality Surveillance System by the number of live

3  births as reported on birth certificates.  And that surveillance

4  system also collects death certificates and other information.

5      In addition to that, there is a -- a literature search for

6  medicine called PubMed, P-U-B-M-E-D.  And you can put search

7  words in there to try to find any literature worldwide that's

8  been published on subjects.  So they put multiple words,

9  including maternal mortality, death with abortion, death with

10  live birth, to try to get every bit of accurate information

11  about the numbers that they could.  And that's -- in this study,

12  that's where the risk of death with childbirth was 8.8 deaths

13  per hundred thousand live births and mortality to induced

14  abortion was 0.6 deaths per hundred thousand.  So childbirth, 14

15  times higher risk of death than abortion.

16  Q.  Dr. Fine, you mentioned that this study relies in part on

17  CDC data.  Are you familiar with this data source?

18  A.  Yes.

19  Q.  And do you consider it to be reliable?

20  A.  I do.  The CDC is very fastidious in tracking deaths.  They

21  have epidemiologists who -- who are detectives.  They not only

22  search state vital records, they -- they contact hospital review

23  boards.  They contact -- they do searches for anything in the

24  media about deaths.  They talk to physicians.  They talk to

25  health care providers.  They talk to citizens groups.  So

1   they're very complete in their investigation of deaths relating

2   to pregnancy, whether it's childbirth or abortion.

3   Q.  And directing your attention to the CDC abortion

4   surveillance tab in your binder, which has been marked for

5   identification as Exhibit 68 -- directing your attention to page

6   35, Table 25, what does the CDC data reflect about the mortality

7   rate from abortion?

8   A.  Let me find page 35.  I'm towards the end here.

9   Q.  I believe it's 35 of 37.

10  A.  Yes.  I'm getting there.  Generally, the CDC shows that the

11  case rate fatality rate for abortion has -- although always low,

12  for in the 1970s, the rate per hundred thousand was 0.78; but as

13  the techniques and more elective abortions were done following

14  legalization, the death rate lowered to approximately six deaths

15  per hundred thousand, which is where it's remained fairly

16  constant for the last several decades.

17       MS. SANDMAN:  Your Honor, at this time, I'd like to

18  move what's been marked for identification as Plaintiff's

19  Exhibit 68 into evidence.

20       THE COURT:  Admitted.

21  Q.  Dr. Fine, turning back to the Raymond and Grimes study you

22  were speaking of a moment ago, I'd like to draw your attention

23  to Figure 1 on page 217.  Did that study draw any conclusions

24  about abortion complications?

25  A.  Yes, it did.  Figure 1, Your Honor, is a bar graph showing

1   child -- various common complications, including hemorrhage and

2   infection.  And the dark bar graph is for childbirth, and the

3   lighter gray bar graph sitting next it to is for abortion.  And

4   in every complication relating to pregnancy, the risk of having

5   a complication with abortion is significantly, significantly

6   lower than that with live childbirth, including infection and

7   hemorrhage, which are the two most common ones that occur with

8   abortion.

9   Q.  Dr. Fine, I'd just like to back up for a moment to the

10  mortality rate that you gave a moment ago from the CDC -- CDC

11  data.  I believe that you may have dropped a digit in giving

12  that figure.  Could you just say again what the figure you gave

13  was?

14  A.  Let me look again.  I thought it was .6 per hundred thousand

15  or one in a million, but let me --

16  Q.  That -- that's correct.  Thank you.  And I apologize if I

17  misheard you in thinking that you had dropped a digit.

18      Directing your attention to the tab in your binder marked

19  Henshaw, which is a chapter from the NAF textbook titled, *The

20  Clinician's Guide to Medical and Surgical Abortion* by Drs.

21  Lichtenberg and others from 1999, the chapter is -- by

22  Dr. Henshaw is titled, Unintended Pregnancy and Abortion, a

23  Public Health Perspective.

24  A.  Yes, I see it.  I'm familiar with it.

25  Q.  Can you tell -- thank you.  Can you tell the Court about the

1    chapter.

2    A.   The -- this chapter is in a very authoritative textbook,

3    Your Honor, sponsored by the National Abortion Federation.   And

4    it offers both an international and historical perspective on

5    abortion care worldwide; but, more specifically, it also shows

6    that the mortality rates in the seventies and the complication

7    rates in the seventies were a little bit higher.   And after *Roe*

8    *v. Wade* and abortions were done more commonly, these

9    complication rates and mortality rates decreased significantly

10   through the years.

11   Q.   And directing your attention to page 20 of that chapter,

12   what does it conclude about the overall risk of complications

13   from a first trimester abortion?

14   A.   Well, from 1979 to '78, it was .3 major complications.   So

15   that's three per thousand that required hospital care.   And in

16   later studies, that went down to .07 percent, which is seven

17   women per 10,000, Your Honor.   So the -- as more abortions were

18   performed in the eighties and nineties, the complication rates

19   requiring hospitalization dropped dramatically.

20   Q.   And just to be clear, does the chapter reflect current data?

21   A.   Well, the chapter was published in 1999.   So it's as of

22   then.   But it's consistent with data showing a very low

23   complication rate of approximately seven per 10,000.

24   Q.   And --

25   A.   In fact, there's one more recent one that they cited that

1  showed five women per 10,000 -- .05 percent, or five women per

2  10,000, had a complication requiring hospitalization.

3  Q.   Dr. Fine, I'd like to turn now to what some of the more

4  recent literature shows.  Directing your attention to the next

5  tab in the binder, which is an article by Tracy Weitz and

6  others -- and that's W-E-I-T-Z -- titled "Safety of Aspiration

7  Abortions Performed by Nurse Practitioners, Certified Nurse

8  Midwives, and Physician's Assistants under a California Legal

9  Waiver," published by the *American Journal of Public Health* in

10  2013.  Are you familiar with this study?

11  A.   Yes, I am.

12  Q.   Can you tell the Court about the study and whether you

13  consider it to be reliable.

14  A.   It's an extremely reliable study, Your Honor.  The -- the

15  purpose of the study was to compare the safety of abortion as

16  performed by physicians compared to clinicians, who included

17  nurse midwives, nurse practitioners, and physician's assistants.

18  And they followed -- the clinics that were followed were four

19  Planned Parenthood clinics in California and Northern -- Kaiser

20  Permanente of Northern California.  All of these entities are

21  very fastidious in reporting complications in their data.

22       And over a two-year period, there were some 12,000 or so

23  abortions, 6,000 done by the physicians, about 6,000 done by the

24  nurse practitioners.  And the complications as -- serious

25  complications, as defined by requiring hospitalization, for the

 1  physician group was .05 per hundred, which is five per 10,000.

 2  Again, in the same ballpark as what was reported in the textbook

 3  chapter in 1999.

 4  Q.  Directing your attention to the next tab in your binder,

 5  which is the last study that we'll be talking about.  That tab

 6  is labeled Cleland.  This is an article by Kay Cleland,

 7  C-L-E-L-A-N-D, and others titled "Significant Adverse Events and

 8  Outcomes After Medical Abortion" published in *Obstetrics &*

 9  *Gynecology*, Volume 121, in 2013.

10  A.  Let me --

11  Q.  Can you explain briefly the nature of the study and whether

12  you consider it to be reliable.

13  A.  Yes.  This is also published in the prestigious

14  peer-reviewed journal *Obstetrics & Gynecology*.  And, Your Honor,

15  maybe to clarify, peer-reviewed means that before a manuscript

16  can be published, it is submitted to generally three independent

17  referees to review the manuscript and critique it based on the

18  scientific methods, the statistics, the outcomes, and the

19  methodology.  And then if it's approved, it's published.  So

20  this is very reliable data.

21      And this involves -- speaking to the medication abortion

22  question, this involves a study of 233,000 medication abortions

23  performed at Planned Parenthood clinics over a period of two

24  years, 2009 and 2010.  And in this study, the rate of serious

25  complications was extremely low.

1  Q.  I can direct your attention to Table 2 on page 169, if that

2  would be helpful.

3  A.  The -- the -- generally, the patients -- the number of

4  patients who went to the emergency room were approximately

5  about -- about .10 percent went to the emergency room.  And

6  about half of that, .06 percent, were admitted to the hospital.

7  So the -- the complication rate was extremely low, again, with

8  these 233,000 medication abortions.  Approximately twice the

9  number went to the emergency room but were not admitted than

10  those admitted.

11  Q.  Dr. Fine, I'd like to take a step back from the specific

12  figures and studies that you've been testifying about.  Can you

13  speak more generally to what these figures and studies tell you

14  about abortion safety?

15  A.  Abortion safety is -- abortion is an extremely safe

16  procedure done in the office.  The rates of complications and

17  mortality are amongst the lowest of any medical procedures done

18  in medicine.  And as we discussed, colonoscopy has a much higher

19  rate of complications.  Many of the common procedures done as

20  outpatients have higher rates of complications.  These are

21  extremely small.

22  Q.  Are you aware that the defendant's witnesses believe that

23  the numbers you rely on for the safety of abortion are not

24  reliable numbers?

25  A.  Yes.  They -- they will critique, Your Honor, the

1   statistical methods, the methodology.  And in practical terms,

2   whether we're talking about deaths of six per million or eight

3   per million or ten per million or two per million, it's

4   extremely rare.  And complications, if we're talking about six

5   per 10,000, eight per 10,000, 12 per 10,000, again, we're

6   talking about something that's very rare, fortunately.

7   Q.  And just so the record is clear, do you, in fact, believe

8   the numbers as they're reported in this literature to be

9   reliable numbers?

10  A.  Yes.  I believe they are very reliable.  And I might add

11  that they're probably, Your Honor, artificially low because, as

12  Dr. Henshaw cites in his textbook chapter, many patients do not

13  return for follow-up care.  And in his chapter, he cites only

14  one-third of the patients in some of the studies came back for

15  follow-up.  Well, patients who generally are lost to follow-up

16  do not have a complication; because if they have a complication,

17  they call the clinic, they want their money back, they want the

18  clinic to pay for their hospital care or emergency room care.

19  We hear about those patients who have a complication requiring a

20  visit to the ER or to the emergency room.  So many of the

21  patients we don't hear back from or don't come back for

22  follow-up were uncomplicated.  So that would increase the

23  denominator, and the actual complication rates would be much

24  lower than those published.  So I think that's a fair

25  assumption.

1    Q.  And are you aware that the defendant's witnesses believe

2    that abortion complication rates in general are underreported?

3    A.  Yes.  They believe -- they say they are, but -- but I don't

4    think they are because patients who have complications are quick

5    to call the clinic wanting financial compensation for their

6    pain -- pain, discomfort, expenses going to the emergency room.

7    And there are many patients that on their own -- we give all

8    patients a sheet of paper with instructions what to expect, how

9    much bleeding, cramping, a 24/7 number to call us.  And -- and

10   there are patients that just get anxious.  They're having some

11   cramping.  They're bleeding a little more than they're

12   comfortable.  They don't call us.  They just go to the emergency

13   room and then incur expenses with that, where, in reality, if

14   they had called us, we would have encouraged them to come back

15   to the clinic the next morning.  And we would have evaluated

16   them there for free and taken care of the problem and reassured

17   them.

18   Q.  Dr. Fine, shifting gears a little bit, are you aware of any

19   other gynecological procedures done on an outpatient basis that

20   have risks that are similar to those of early abortion?  And I'm

21   focusing here on gynecological procedures.

22   A.  Well, diagnostic dilation and curettage, Your Honor,

23   diagnostic is where they'll actually dilate the cervix in a

24   nonpregnant uterus and remove the contents to rule out cancer or

25   some other problem that's causing abnormal heavy bleeding.

1    Spontaneous abortions are technically identical to an elective

2    abortion with a pregnancy that has bleeding and retained tissue

3    and the need to empty the uterus.  There are office

4    hysteroscopies performed, where they take a telescope and look

5    up inside the uterine cavity with a telescope looking for

6    abnormalities.  There are office cystoscopies, where doctors

7    take a telescope and look up in the bladder.  In all of these

8    situations, there's a potential for poking a hole or perforating

9    the bladder or the uterus.

10   Q.  Dr. Fine, you made reference to spontaneous abortion.  Just

11   so that the record is clear, is that what we lay people would

12   think of as an abortion?

13   A.  I'm sorry?

14   Q.  What is a spontaneous abortion?

15   A.  Spontaneous miss -- spontaneous abortion or miscarriage is

16   that 13 to 15 percent of pregnancies where the -- either the

17   embryo is faulty or there's a problem with the lining of the

18   uterus; but basically, there is a miscarriage.  And the medical

19   term is spontaneous abortion.  The lay term is spontaneous

20   miscarriage.  And I should have used the term "miscarriage" for

21   clarity.

22   Q.  And can you explain -- can you compare the procedure that's

23   used to manage a spontaneous miscarriage in case of

24   complications with the procedure of an early surgical abortion?

25   A.  Management of the complications?  They're identical.  It

 1   basically is very straightforward.  If there's tissue remaining

 2   in the uterus, remove it.  If the uterus is -- the uterus is a

 3   ball of muscle, Your Honor, and it contracts down, and that

 4   stops bleeding.  And sometimes the uterus does not contract down

 5   properly, and we give medications to cause it to contract down.

 6   That occurs in miscarriage and abortion.

 7       So we may give medications to cause the uterus to contract

 8   down.  If there's an infection, we give antibiotics, generally

 9   with antibiotic tablets on an outpatient basis.  But the

10   treatment and workup and evaluation is exactly the same for

11   spontaneous miscarriage and abortion.

12   Q.  And before we turn to management of the complications, I'd

13   like to stay for a moment with the nature of the procedures.  Is

14   there a particular procedure that's often used to -- to manage

15   the -- to manage complications from a spontaneous abortion?

16   A.  A procedure?  Generally, it's the same D&C as might be done

17   with an elective abortion, dilating the cervix if it's not

18   already dilated and emptying the contents of the uterus with

19   suction curettage.

20   Q.  And just so the record is clear, can you compare -- can you

21   explain what a D&C -- what does that stand for, what does that

22   procedure look like, and is it different in any way from the

23   procedures used for an early surgical abortion?

24   A.  D&C generally means dilating the cervix, which is stretching

25   the cervical opening, as we said earlier.  The nonpregnant

1    cervical opening, even in a pregnant uterus, is about the width

2    of a pencil lead.  And normally, we'll dilate the cervix up to

3    the size of a pencil to insert a tube into the uterus to

4    actually suction out the contents.  We might also use what's

5    called a curette, which has a dull blade, to actually scrape the

6    lining -- content of the uterus lining to remove it.  And that's

7    done in diagnostic D&Cs, where you want histologic or tissue

8    samples of the lining to rule out cancer in nonpregnant

9    patients.  But curettage can be suction or it could be with this

10   rough blade.  But there's no cutting.  There's no suturing.

11   Q.  Are you aware of any state that requires physicians who do

12   diagnostic D&Cs or surgical completion of miscarriages to have

13   admitting privileges?

14   A.  No.

15   Q.  Dr. Fine, is colonoscopy --

16   A.  In fact, I'm not aware of any procedure in medicine where

17   it's required by law that the physician performing that

18   procedure have admitting privileges.

19   Q.  Is colonoscopy a procedure that is commonly done on an

20   outpatient basis?

21   A.  Yes, it is.

22   Q.  And how do the risks of colonoscopy compare to the risks of

23   early abortion?

24   A.  Well, as we testified earlier, the risks of colonoscopy are

25   higher than that of abortion.  And it's also of interest, Your

1  Honor, that most of the physicians performing colonoscopy are

2  not surgeons; they are gastroenterologists, who are internal

3  medicine trained doctors.  And if they have a complication, such

4  as perforating the colon, which can occur, or bleeding after

5  removing a polyp, they have to call in a surgical colleague to

6  manage the complication.  They can't manage it themselves.

7  Q.  And you testified that the risks of colonoscopy are greater

8  than the risks of early abortion.  Can you be more specific?  I

9  can't remember if you gave those figures before, so I apologize

10  if you did.

11  A.  Off the top of my head, I don't recall.  It's -- it's a low

12  figure, but I believe it's in the range of maybe 1 percent, 2

13  percent.

14  Q.  And are you aware of any state's law that requires

15  physicians who do colonoscopies to have admitting privileges?

16  A.  No.

17  Q.  Are you aware of whether procedures are sometimes done on an

18  outpatient basis under general anesthesia?

19  A.  Yes.  There are procedures done under general anesthesia.

20  Generally, these type procedures involve more invasiveness,

21  cutting, suturing, requiring more pain; and that's why they

22  require general anesthesia.  But they're more complicated.

23  They're more dangerous.  They're more invasive.  And that's why

24  general anesthesia is used.

25      General anesthesia can be used most commonly in ambulatory

1    surgery centers, but there is a trend in medicine for more

2    procedures to be done in the office.  And there are anesthesia

3    groups who contract with doctors' offices to come to their

4    office and provide the general anesthesia there in the office.

5    And so this is done more commonly as well.

6    Q.  And can you compare the risks of early abortion to the risks

7    of procedures that are done on an outpatient basis under general

8    anesthesia, broadly speaking?

9    A.  General anesthesia itself is one of the major reasons for

10   hospitalization after outpatient surgery.  And the reasons are

11   multiple, including lack of pain control.  Patients can have

12   intractable nausea or vomiting.  They can develop breathing

13   difficulties.  There are a lot of reasons why, after general

14   anesthesia, patients have to go into the hospital following

15   outpatient surgery.  And the incidence of that is much higher

16   than the hospitalization rate with abortion.

17   Q.  And turning for a moment to the underlying procedures that

18   are done under general anesthesia as opposed to the risks solely

19   from the anesthesia, can you compare that risk of the underlying

20   procedure to the risks of early abortion?

21   A.  Sure.  They're much higher.  Some of the gynecological

22   procedures that are done under general anesthesia in outpatient

23   surgery include laparoscopic and vaginal hysterectomy, which

24   used to require a three- or four-day hospital stay.  So the

25   risks are much higher.  There can be laparoscopic -- diagnostic

1  laparoscopy, Your Honor, is where they take a telescope, poke it

2  through the belly button and, with that telescope, look around

3  inside the abdominal cavity.  And they poke other instruments in

4  where they can actually do surgery, like cut scar tissue and

5  things like that, using a laparoscope.  That's done as an

6  outpatient surgery.

7       Those are more invasive.  And besides the risk of general

8  anesthesia, there's obviously much higher risk of hemorrhage and

9  infection when you're doing a hysterectomy or you're poking

10  sharp instruments through the abdominal wall, where you could

11  injure the bowel or other major blood vessels.

12  Q.  Dr. Fine, we've been talking about the rates of

13  complications from abortions.  Now I'd like to shift gears and

14  talk about what happens when a patient has a complication.

15  First, in the rare event where the complication is treated in

16  the hospital emergency room, when is the complication likely to

17  occur?

18  A.  It's going to occur hours to days after the procedure.  And

19  in the case of medication abortion, Your Honor, it will be 100

20  percent after the patient returns home because she doesn't take

21  that second pill to expel the contents until after she's

22  returned home, 24 to 36 hours after visiting the clinic.  In the

23  case of surgical abortion, generally the most common symptoms of

24  bleeding and cramping will start hours to days after the

25  procedure.  And that's also when the patient has returned home.

1    Q.  So you testified a moment ago that the most common symptoms

2    that prompt a woman to go to the emergency room are bleeding and

3    cramping.  What are the common causes of those symptoms?

4    A.  The most common causes of the bleeding and cramping can be

5    that a blood clot can form in the uterus.  Even though the

6    abortion is complete and all the tissue has been removed, the

7    uterus is a ball of muscle, it can relax, and a blood clot can

8    form in the uterus, preventing it from contracting down.  And

9    that causes bleeding.  There can be retained tissue, where

10   perhaps all the tissue was not expelled with a medication

11   abortion or with a pill -- second pill.  Or during a surgical

12   abortion, all the tissue may not have been removed.  And the

13   third thing might be infection that can cause bleeding and

14   cramping.  Those are the three most common reasons.

15   Q.  And are these complications also typical of any medical

16   situation other than abortion?

17   A.  Yes.  The exact same scenario occurs with spontaneous

18   miscarriage.

19   Q.  What are your patients directed to do if they are concerned

20   that they may be experiencing a complication from an abortion?

21   A.  As I said earlier, all of the patients are -- at all the

22   Planned Parenthood clinics and most of the abortion clinics are

23   given a fact sheet that they take home that tells them what to

24   expect in terms of bleeding and cramping and what to do for it

25   and also a 24/7 telephone number that they will be able to reach

1    someone from the clinic, who is generally a nurse who's on call.

2    And generally, the patient -- if she is worried about something

3    and needs reassurance or she's concerned about bleeding or

4    cramping, most of the time she will call the nurse on call.  As

5    I also said earlier, there are situations where the patient gets

6    anxious and she just goes directly to the local emergency room

7    nearest her house on her own accord, without contacting the

8    nurse on call.

9    Q.   In your experience, when you're speaking about the -- the

10   telephone number, the 24-hour telephone number where the patient

11   can reach the nurse on call, in your experience outside of the

12   Planned Parenthood world, are other abortion providers also

13   similar in using that system?

14   A.   Yes.  To my knowledge, they do.

15   Q.   And is that nurse in contact with the physician who provided

16   the abortion, if appropriate?

17   A.   Yes.

18   Q.   So can you walk the Court through.  A patient calls the

19   after-hours number and describes the symptoms that she is

20   having.  What happens from that stage?

21   A.   The -- the nurse has a -- the nurse is trained.  She works

22   in the abortion clinic, and she's trained to ask specific

23   questions; for example, how much bleeding are you having?  And

24   generally, Your Honor, they'll -- they'll try to put it relative

25   to normal menstrual bleeding that occurs in the first or second

 1   day of the menstrual period.  Is it more, is it less, is it

 2   equal?  How many pads are you using?  Cramping, have you tried

 3   taking Advil or ibuprofen?  Has that helped?  Have you tried

 4   lying down and putting a heating pad on?  Are you having nausea

 5   and vomiting?

 6       The nurse will make these assessments.  If it sounds like

 7   it's not urgent, then most of the time, we will encourage the

 8   patient to come back into the clinic the next day so we can

 9   evaluate her and treat her for free.  And this evaluation and

10   treatment involves frequently doing an ultrasound to make sure

11   the uterus is empty; if she's been bleeding, checking her blood

12   count to see if she's anemic.  And these are things that are

13   done at the clinic easily without the physician being physically

14   on-site there.  If, however, on the phone call, it appears that

15   she's having excessive bleeding, more than a menstrual period,

16   passing clots, then she would generally be instructed by the

17   nurse to go directly to the emergency room closest to where she

18   is, which is usually her home.  And then after that, the nurse

19   will generally advise the physician that she has advised that

20   patient to go to the emergency room.

21       Now, there may be gray areas where the nurse can't really

22   make the decision or isn't comfortable making it, and she will

23   contact the abortion physician and tell the situation, and the

24   abortion physician will make that decision whether the patient

25   should go to the emergency room right then or wait until the

1  next day to come to the clinic.

2  Q.  Now, I think your testimony on this was already clear; but

3  just to make sure, if there's any doubt in the nurse's mind of

4  what she should be doing, is that the point at which she would

5  be involving the physician?

6  A.  Yes.  Absolutely.

7        MR. DAVIS:  Your Honor, Dr. Fine can testify about --

8  if he's testifying about his experience in Texas at the clinics

9  there, of which he has personal knowledge, that's fine.  If he's

10  testifying about how protocols are designed to work, that's

11  fine.  If he's attempting to testify about how these procedures

12  are working in Alabama clinics, I object, because I don't think

13  it's been established that he has personal knowledge of whether

14  the rules are actually working that way on the ground.

15        THE COURT:  That's something you can bring out on cross

16  as to the extent of his personal knowledge and the extent that

17  he can testify about these matters.

18        MR. DAVIS:  Thank you.

19        THE WITNESS:  Could I make a comment about that, Your

20  Honor, or no?

21        THE COURT:  Why don't you wait for a question.

22        THE WITNESS:  Okay.  Okay.

23  Q.  (Ms. Sandman, continuing:)  Let's focus now on patients who

24  call the after-hours number and are advised to go to the

25  emergency room.  First, if one of your patients calls the number

1  and is told to go to the emergency room, are you informed?

2  A.   Generally, yes.

3  Q.   And can you speak more about that.

4  A.   Well, the nurse will call me and say, Patient X called.   She

5  was having bleeding with clots, very heavy bleeding, and that

6  she tried lying down, hasn't eased up; it's been going on for a

7  couple of hours.   I advised her to go to the local emergency

8  room.   I said, that is the correct thing to have done.

9  Q.   And so for the woman who calls the after-hours number and is

10  experiencing a very serious complication, just to be very clear,

11  where would you tell her to go?

12  A.   To the emergency room closest to her home.

13  Q.   And in your experience, do your patients always live near

14  the health center where they had the abortion?

15  A.   No, they do not.   Most of the time, they live an hour or

16  more away.

17  Q.   And can you speak a little bit more about the patterns that

18  you have observed in terms of patients traveling to access

19  abortion care?

20  A.   Well, the -- there's a shortage of abortion providers in

21  this country and fewer abortion clinics.   And patients are

22  generally driving longer distances to access abortion care,

23  including crossing state lines.   Now, for example, in Planned

24  Parenthood of the Gulf Coast, where I am, it's in the middle of

25  downtown Houston; but many of the patients live in suburbs that

1  are more than an hour drive away from our clinic.  And I don't

2  know if you want me to mention about the Rio Grande Valley or --

3  you know --

4  Q.  We'll get to that later.

5  A.  Okay.  It's not uncommon for women to have to drive more

6  than an hour to access an abortion clinic.

7  Q.  Dr. Fine, if one of your patients -- if you send one of your

8  patients by telephone to the emergency room, does there come a

9  point in time when you contact her?

10 A.  That I would contact --

11 Q.  The patient.

12 A.  Our clinic -- if we sent a nurse (sic) to the emergency

13 room, our clinic would attempt to contact the patient the next

14 day to see how she's doing, to encourage her to come back into

15 the clinic to be evaluated as necessary.  I personally would not

16 make that call.

17 Q.  To be clear, you testified earlier that most complications

18 that lead to treatment at a hospital arise some hours or days

19 after the patient has left the health center, so she's likely to

20 be at home.

21 A.  Correct.

22 Q.  Would you recommend that such a patient go to a hospital

23 near the health center where she got the abortion?

24 A.  No, not if she lives an hour away.  If she's having heavy

25 vaginal bleeding, she needs to go to the closest emergency room.

1  Q.  I'd like to focus now on what happens once the woman gets to

2  the emergency room.  You testified earlier that while

3  complications that require treatment at a hospital are rare, the

4  most common are bleeding and infection.  How would bleeding be

5  treated?

6  A.  Bleeding would be treated by evaluation with an ultrasound

7  to see if there's any retained tissue that needs to be removed.

8  And if there's not, then medications would be given to cause the

9  uterine muscle to contract.  They would also check the blood

10  count to see if the patient has been bleeding so much that she's

11  now becoming severely anemic and might need a blood transfusion.

12  Most of the time when the patient presents to the emergency

13  room, everything is fine, she's reassured.  And the emergency

14  room doctor tells her to follow up with the clinic the next day.

15  Q.  And the treatment that you testified to a moment ago for

16  bleeding, is this a process that emergency room physicians are

17  familiar with?

18  A.  Yes.  They're very familiar with.  Emergency room physicians

19  are trained to handle spontaneous miscarriages.  And the

20  treatment of abortion complications is identical to that for

21  spontaneous miscarriages.  As I said, 13 to 15 percent of

22  pregnancies end in first trimester miscarriages.  So it's a

23  common event, something emergency room doctors would frequently

24  see.

25  Q.  You testified earlier that the most common complications are

1  bleeding and infection.  How would infection be treated?

2  A.  Generally with antibiotic tablets.

3  Q.  And just -- just to be clear, when you say tablets, meaning

4  oral medication?

5  A.  Oral pills, yes.

6  Q.  Would the patient typically be admitted to the hospital for

7  that?

8  A.  Rarely.  In the situation where it was a severe infection,

9  high fever, severe symptoms, then they might admit the patient

10  to have intravenous antibiotics, but most of the time, oral

11  pills.

12  Q.  And in that situation, the patient would be treated at the

13  emergency room and released?

14  A.  Yes.  Sent home and instructed to follow up with the clinic

15  the next day.

16  Q.  Dr. Fine, speaking about the treatments that you just

17  testified to for infection, are these treatments that an ER

18  doctor is trained to provide?

19  A.  Yes.

20  Q.  And are these also complications -- infection, just to be

21  clear, is also a complication that would arise in the context of

22  a spontaneous miscarriage?

23  A.  Yes.  More commonly than with -- more commonly a miscarriage

24  than abortion because often the diagnosis is delayed.  The

25  patient may not have known she was pregnant, may have delayed

1  seeking care.

2  Q.  Dr. Fine, let's take the example of the patients that you

3  treat in your current practice.  Suppose that you have advised

4  one of your patients to go to the emergency room based on the

5  symptoms that she has described over the telephone.  Would you

6  meet her there yourself?

7  A.  No.

8  Q.  Would you treat her?

9  A.  No.

10  Q.  And is that the case even if you had privileges at the

11  hospital where she is?

12  A.  Correct.

13  Q.  Would you be the one to admit her if she needs to be

14  admitted?

15  A.  No.

16  Q.  Who would be the person to admit her?

17  A.  The gynecologist on call at the hospital; or if it's in the

18  case of the hospital where I have privileges, it would be one of

19  my fellow faculty members who is on call in the hospital.

20  Q.  How many doctors have privileges of some sort at the

21  hospital where you have privileges?

22  A.  Well, mine is a large city hospital run by a university, so

23  there are about -- probably 400 doctors on staff there.

24  Q.  Do you know all of those doctors?

25  A.  I know very few of them.

1  Q.  Do you know all of the emergency doctors?

2  A.  I know none of them.

3  Q.  Do you think that your communication with the doctors that

4  you know is better than with -- your communication with the

5  doctors that you do not know?

6  A.  No.  It's the same.  Doctor-to-doctor communication involves

7  giving a summary of medical events that are very precise and

8  don't require a personal relationship or personal cognizance.

9  It's very straightforward.  The only difference with a

10 communication with a doctor who I might know personally is that

11 he might ask, well, how's the wife, how's the children, which

12 would not occur doctor to doctor in a stranger, where I don't

13 know the doctor.

14 Q.  Dr. Fine, is it standard in medicine to talk to other

15 physicians that you do not know about your patients?

16 A.  Absolutely.  Doctors do it every day when they -- when they

17 consult a specialist for a problem to get help in the care of

18 their patient.  Doctors all the time are talking to people they

19 don't know -- doctors they don't know.

20 Q.  In your experience when you've been providing care in a

21 hospital, have you seen and treated patients in the emergency

22 room with complications from outpatient surgeries?

23 A.  Yes, I have.

24 Q.  And do you always communicate with the doctor who performed

25 the surgery?

1  A.   Almost never.

2  Q.   And why is that?

3  A.   Because there's no information that he could give me that

4  would change the way I'm going to evaluate and manage the

5  patient.   It's very straightforward.

6  Q.   Defendant's witnesses have expressed concerns that providers

7  travel from out of state to perform abortions.   Do you share

8  these concerns?

9  A.   Absolutely not.   These traveling abortion providers, that's

10  all they do.   And because they do a high volume of procedures,

11  they're technically excellent, with a very low complication

12  rate.   Clinics don't want to have to pay to fly in physicians to

13  perform abortions at their clinic.   And as I said, there's a

14  nationwide shortage of abortion providers.   I think at last

15  count, Your Honor, there were something like 1700 abortion

16  providers in the country.   So for clinics to operate, there are

17  no local providers who are willing to perform abortions.   They

18  have to fly physicians in to perform them.   And these are --

19  maybe OB-GYN physicians, or they may be family practice trained

20  physicians, but they're technically excellent.

21  Q.   And just to be clear, if a patient has a complication hours

22  or days after the abortion procedure, is the process, from the

23  patient perspective, any different if her doctor is in state or

24  out of state?

25  A.   No difference whatsoever.   Out-of-state doctors can easily

1   be reached on their cell phone.  All the cell phones are

2   nationwide.  They're not a long-distance call.  Everyone carries

3   a cell phone.  And the -- contacting the abortion provider is as

4   easy as across the street, across the county, or three states

5   away.

6   Q.  So is there any increased risk to the woman if the doctor

7   who performed the abortion has left the state to go back to

8   where he or she lives?

9   A.  Absolutely no risk.

10  Q.  Defendant's witnesses have also expressed concerns that

11  women may hide the fact that they've had an abortion from the

12  doctor in the emergency room.  Do you share this view?

13  A.  I think most of the time, with abortion being legal now,

14  unlike the back-alley ones, women do not try to hide it.  Now,

15  certainly, it's conceivable that for whatever reason, a woman

16  may want to keep the information from getting public, and they

17  may not disclose that information.  But as I testified earlier,

18  the -- then the assumption would be that she's having a

19  spontaneous miscarriage problem, and the treatment is exactly

20  the same.  So her failure to disclose that she had an abortion

21  and that she would be treated like a spontaneous miscarriage,

22  the treatment is the same.  She would still get good care.  And

23  then the fact that she didn't disclose she had an abortion would

24  not adversely affect the care that she got.

25  Q.  Now, you testified a moment ago that in your experience,

1    most women do not hide the fact that they've had an abortion if

2    they're presenting to the emergency room.  Why is that?

3    A.  Well, the -- as I also said earlier, these patients are

4    given an information sheet with a 24/7 number.  They're also

5    encouraged and told by the nurse on call when you go to the

6    emergency room, bring that sheet of paper; that tells the

7    emergency room what medicines you've been given and instructions

8    you've been given.  And in the event they should want to contact

9    us for any reason, they'll know how to do it.  So they're given

10   that sheet of paper to bring to the emergency room.  And by

11   their bringing that sheet of paper, they're, in essence,

12   disclosing that they had a pregnancy abortion, termination.

13   Q.  Good.  Dr. Fine, would it be helpful to an emergency room

14   physician to speak with the abortion provider prior to providing

15   care to the patient?

16   A.  No.  No need.

17   Q.  And if an ER physician needs a consult with an on-call

18   OB-GYN, would such a person be available?

19   A.  Yes.  Every community hospital that has a gynecology

20   service, every specialty department within that hospital, by

21   federal law, has to have a physician on call for unassigned

22   patients who come to the emergency room.  And they have to be

23   available to respond to the emergency room within 30 minutes.

24   Q.  So just to be clear, is it likely to introduce delays to the

25   patient's care if the emergency room physician has to consult

1   with the on-call OB-GYN?

2   A.   No.   Because the emergency room physician is going to

3   immediately start doing what needs to be done.   And generally,

4   the on-call OB-GYN is readily available, again, by law.

5   Q.   One final question on this topic.   In your experience, if a

6   woman goes to a hospital for an abortion complication, does that

7   indicate that the complication was serious?

8   A.   No.   As I said earlier, many patients get nervous when they

9   have cramping and bleeding and they go to the emergency room

10  without talking to the nurse on call.   And basically, their

11  examination in the emergency room is normal.   They're reassured,

12  and they're told to follow up with our clinic.   The vast

13  majority of complications in women that present to the emergency

14  room are either normal, or those that do have a problem are

15  treated in the emergency room with antibiotics and with pills

16  and released home.   They're not admitted to the hospital.

17  Q.   Dr. Fine, before we move on to the next topic, I just wanted

18  to ask you to go back to a moment -- to one -- one item in your

19  earlier testimony.   You testified that there would be no

20  difference in the patient's care depending on -- for telephone

21  follow-up depending on whether their provider was in state or

22  out of state.   Is that also the case if the woman -- if the --

23  if a backup doctor, rather than the doctor who provided the

24  abortion, is the person available for consultation on the

25  telephone, if appropriate?

1  A.   No.   The evaluation that's common in all OB-GYN practices is

2  that there's a physician on call, who may not be the physician

3  who treated that patient.   Because the abortion complications

4  and spontaneous miscarriage are similar and common, it's very

5  straightforward for the physician on call covering for the

6  abortion doctor to make that determination and evaluate the

7  patient.   It doesn't need to be the abortion provider.   It can

8  be any physician on call.

9  Q.   Let's focus now on the situation where a woman experiences a

10 complication at the health center that requires transfer to a

11 hospital.   First, how common are such situations?

12 A.   Very rare.   Very rare.   Maybe one in a thousand.

13 Q.   How many times has this occurred in your years of providing

14 abortions?

15 A.   In over 40 years, it's happened twice.   Now, there are two

16 reasons why, Your Honor, hospital transfers from the clinic

17 occur.   The more common one is because the patient may have had

18 bleeding that is now stopped or controlled, but she lives

19 several hours away and we're uncomfortable sending her home.   We

20 would rather have her observed in a hospital setting over the

21 next 23 hours in case the bleeding might recur.   That uterine

22 muscle that contracted down and stopped the bleeding, it could

23 later relax again and cause excessive bleeding.   So many of the

24 patients that are transferred by ambulance from a clinic to a

25 hospital are really precautionary, to observe the patients.

1   But -- and there are situations where a uterine perforation

2   occurs or even giving the medications to cause the uterus to

3   contract, it still bleeds excessively, and transfer by ambulance

4   from the clinic to the hospital is required.  In my personal

5   career, twice in 40 years.

6   Q.  In the very rare case that this comes up, can you just walk

7   the Court through what the process would be.

8   A.  Well, basically, when the need is determined to -- to call

9   an ambulance -- and by the way, we would normally call them

10  earlier than later, because we don't want to wait until the

11  patient goes into shock or is losing blood pressure to call for

12  the ambulance.  If we're not controlling the bleeding, we want,

13  early on, to get that patient to a hospital to manage it there.

14      So we would call 911, and the -- the EMS teams and

15  paramedics would come to the hospital.  Now, during that time,

16  we'll have had an IV in the patient and been doing all the

17  things we would normally do.  While the ambulance is coming --

18  which typically, response times may be five to 12 minutes -- we

19  will copy the patient's medical record from our clinic so that

20  the patient will take that with her to the receiving doctor.  In

21  the meantime, we will generally request that -- if it's at our

22  place, Gulf Coast, we would request the ambulance to take the

23  patient to Ben Taub Hospital, which is our faculty university

24  hospital.  It's a tertiary care center.  And it's staffed by

25  residents and faculty.  And it's an excellent, excellent

1    hospital.   So -- excuse me -- that's where I'd want the patient

2    transferred.   Not always would the patient get taken to the

3    hospital that we ask, but we would ask that.   But the patient

4    would have her clinic record with her.

5    Q.   And do you have admitting privileges at Ben Taub Hospital?

6    A.   Yes, I do.

7    Q.   And is that why you would request the EMTs to take the

8    patient there?

9    A.   No.   I'd want the patient taken there because it's an

10   excellent hospital.   It's a tertiary care center staffed by

11   faculty and residents, and they practice cutting-edge medicine.

12   Q.   Would the EMTs necessarily follow your suggestion?

13   A.   Not always.   Not always.   And the patient -- heavy vaginal

14   bleeding scares paramedics.

15          THE COURT:   Scares what?

16          THE WITNESS:   Scares the EMT paramedics.   If you have

17   somebody with a bad laceration to the leg, Your Honor, they're

18   comfortable putting pressure on there, and they can control the

19   bleeding.   If you have a woman having heavy vaginal bleeding

20   with a miscarriage or abortion, they can't do a pelvic exam.   It

21   makes them extremely nervous.   And in that situation, they're

22   going to stop at the local hospitals.   And there are several

23   hospitals a little bit closer than Ben Taub.

24          THE COURT:   Let me know when you find a good stopping

25   place.   It's 10:30.

1        MS. SANDMAN:  Thank you, Your Honor.  I'll do just a

2  few more questions, and I'll wrap up.

3        THE COURT:  Pardon me?

4  Q.  (By Ms. Sandman, continuing:)  Dr. Fine, do you know how

5  EMTs determine where to take a patient?

6  A.  I'm sorry.  Repeat?

7  Q.  Do you know where -- excuse me.  Do you know how EMTs

8  determine where to take a patient?

9  A.  Generally, it's by protocol.  If at all possible, if the

10 patient is stable -- and by the way, I'm familiar with the

11 Alabama regulations regarding transfer that state that the EMTs

12 or the doctor on call cannot override a decision by the family

13 to go to a particular hospital unless, however, the patient is

14 unconscious or unstable.  So generally, if the patient is

15 unstable, the EMTs are going to go to the closest emergency

16 room.  If the patient is stable, they'll try to abide by the

17 wishes of the family, who may want a particular hospital because

18 they have insurance coverage there, it's in their network, or

19 they've had a good experience or a friend had a good experience

20 with that hospital.

21     There are also logistical concerns that if a particular

22 hospital that's preferred, even in a stable patient, is an hour

23 away and the city only has two ambulances on call or sometimes

24 one ambulance on call, that puts that ambulance out of service

25 while they take that patient to the hospital an hour away.  So

1  they may -- the paramedics may make the decision, we just can't

2  take the patient to the hospital you want because that puts the

3  community at risk because the ambulance won't be available.

4  Q.  And in your experience, do EMTs take into consideration

5  whether the doctor making the transfer has privileges at a

6  particular hospital?

7  A.  No, they don't.  Generally, we might request a specific

8  hospital; but again, they may not take it to that hospital.

9       MS. SANDMAN:  Your Honor, this is a good place for a

10  break.

11       THE COURT:  We'll take a 15-minute morning break.

12     (Recess at 10:34 a.m. until 10:53 a.m.)

13       THE CLERK:  Please remain seated.  Court is in session.

14       THE COURT:  Proceed.

15       MS. SANDMAN:  Thank you, Your Honor.

16  Q.  So Dr. Fine, you've been testifying about the process by

17  which EMTs would choose which hospital to take a patient to in

18  the very rare event of an emergency transfer.  In your

19  experience, what happens once the patient gets to the hospital

20  after an emergency -- an emergency transfer?

21  A.  She's evaluated promptly by the emergency room physician.

22  Q.  And what would the process be if any specialist is needed?

23  A.  The emergency room physician would call for the OB-GYN on

24  call for the hospital.  And --

25  Q.  Take the very --

1  A.  -- in the larger university hospitals, there would be

2  somebody in-house.

3  Q.  Take the very rare example of a patient who needs a

4  laparotomy or a hysterectomy as a result of an abortion

5  complication.  Suppose that her abortion provider has privileges

6  to do these procedures.  Would that abortion provider be the

7  best doctor to provide that care?

8  A.  Absolutely not.  Just like the abortion doctor is proficient

9  doing abortions because he does a lot of them, an abortion

10 provider who may have done one hysterectomy in three years is

11 not the person to take care of the patient.  You would want to

12 use an OB-GYN doctor in practice who does three or four

13 hysterectomies every week.

14 Q.  Dr. Fine, is it possible that a patient would be transferred

15 to a hospital without an on-call OB-GYN?

16 A.  No.  Because the emergency -- the EMTs know within their

17 service area which hospitals have emergency rooms and have

18 OB-GYN units.  Now, to clarify, you don't have to have a labor

19 and delivery to take care of a spontaneous abortion.  All

20 community hospitals have gynecology services because gynecology

21 makes money for the hospital, so there's always a gynecologist

22 on call.  And gynecologists on call, even though they might not

23 practice obstetrics, are trained, as an OB-GYN, to handle

24 spontaneous miscarriages and abortion complications.

25 Q.  Dr. Fine, would a patient get faster care if her doctor has

1    admitting privileges at the hospital where she's treated?

2    A.  Absolutely not.

3    Q.  Why not?

4    A.  Because there's a triage system that's used in the emergency

5    room, in all emergency rooms, and the sickest patients go first.

6    And if it's determined the patient needs to have surgery in some

7    of these smaller community hospitals, they only have one

8    operating room.  If that operating room is occupied by an

9    emergency appendectomy ongoing, then even if the patient needs

10   emergency surgery, they have to wait their turn in line.

11   Q.  And just to be clear, having a doctor with admitting

12   privileges at that hospital won't allow the patient to somehow

13   jump in line?

14   A.  No.

15   Q.  Typically, how quickly are patients seen by a physician when

16   they arrive at the emergency room?

17   A.  Well, they're triaged.  And if it's an ambulance transfer,

18   they would be seen within a couple of minutes.  If it's a

19   walk-in patient with a problem, they would be triaged by the

20   triage nurse.  And depending on that, it might be a few minutes,

21   or it might be half an hour if it wasn't an urgent problem.

22   As --

23   Q.  Doctor --

24   A.  Excuse me.  As you know, unfortunately, the emergency room

25   is the local community health center for many people who go to

1   the emergency room with colds and coughs and nonemergent

2   conditions.  So there is crowding in emergency rooms; and,

3   unfortunately, wait times can be long.  But in true emergencies,

4   the triage nurse makes sure that the ER doctor is aware and sees

5   the patient as quickly as possible.

6   Q.   Dr. Fine, I've asked you a lot of specific questions about

7   admitting privileges and the treatment of abortion

8   complications.  Let me ask a broader question.  Are hospital

9   privileges in any way beneficial to the treatment an abortion

10  patient receives at the hospital?

11  A.   No.

12  Q.   Are you familiar with the organization ACOG?

13  A.   Yes, I am.

14  Q.   And can you explain what that acronym stands for and what

15  the organization is?

16  A.   It's the American Congress of Obstetricians and

17  Gynecologists.  It's composed of about 47,000 board-certified

18  OB-GYNs in the country.  I'm a fellow of ACOG.

19  Q.   And does ACOG issue medical guidelines?

20  A.   Yes.  They issue medical bulletins, committee opinions on a

21  regular basis.  And those are highly regarded, almost like a --

22  a tablet of Ten Commandments.  It's the -- it's the ultimate

23  authority if ACOG gives an opinion on something.

24  Q.   Dr. Fine, do you know whether ACOG has issued a guideline on

25  how complications should be handled by physicians providing

1  abortions on an outpatient basis?

2  A.  Yes, they have issued that.

3  Q.  I'd like to turn your attention to the tab in your binder

4  marked ACOG guidelines.  And that's right after the Cleland

5  article.

6  A.  Okay.

7  Q.  Do you recognize that document?

8  A.  Maybe I don't have it.  Yes.  Guidelines for Women's Health

9  Care Resource Manual, Third Edition, by the ACOG.

10  Q.  Directing your attention to page 433, the third full

11  paragraph, could you read the first sentence of the third full

12  paragraph?

13  A.  Clinicians who perform abortions in their offices, clinics,

14  or freestanding ambulatory care facilities should have a plan to

15  provide prompt emergency services if a complication occurs and

16  should establish a mechanism for transferring patients who

17  require emergency treatment.

18  Q.  Dr. Fine, does this guideline suggest that doctors providing

19  abortions on an outpatient basis should have admitting

20  privileges?

21  A.  No.

22  Q.  Are you familiar with the organization the National Abortion

23  Federation?

24  A.  Yes, I am.

25  Q.  And what is that organization?

1   A.   National Abortion Federation is an organization that's

2   composed of abortion providers and experts in reproductive

3   medicine, and also clinics are members.  And it's a national

4   organization that is highly respected and puts -- also puts out

5   clinical guidelines that are highly respected.

6   Q.   And do you know whether the National Abortion Federation has

7   issued a guideline on how complications should be handled by

8   physicians providing abortions on an outpatient basis?

9   A.   Yes, they have issued guidelines.

10  Q.   Please turn to the tab marked NAF policy guidelines in your

11  binder.

12  A.   Yes.  2014 Clinical Policy Guidelines.

13  Q.   I'm directing your attention to page 44, Emergency

14  Procedures.  Could you read Standard 2?

15  A.   If I'm in the right NAF guidelines.

16  Q.   It's page 44.

17  A.   It's in the back.  Okay.

18  Q.   Could you read Standard 2.

19  A.   Standard 2.  Protocols for the management of medical

20  emergencies must be in place.  These protocols must include

21  indications for emergency transport and written, readily

22  available directions for contacting external emergency

23  assistance; example, an ambulance.

24  Q.   Dr. Fine, does this guideline suggest that doctors providing

25  abortions should have admitting privileges?

1  A.   No, it does not.

2  Q.   Are you aware of whether ACOG has addressed the question of

3  admitting privileges in abortion services more directly?

4  A.   They have.

5  Q.   Please turn to the tab in your binder marked for

6  identification as Exhibit 67, labeled ACOG statement.  Do you

7  recognize this document?

8  A.   Yes, I do.

9  Q.   And what do you recognize it to be?

10  A.   This is dated April 25th, 2013, Statement on State

11  Legislation Requiring Hospital Admitting Privileges For

12  Physicians Providing Abortion Services.

13  Q.   Dr. Fine, could you please read the second-to-last sentence

14  in the first paragraph?

15       MR. DAVIS:  Your Honor, we have objected to this

16  document on grounds of hearsay.

17       THE COURT:  Okay.  Let me see the document.

18       Now, let me hear your grounds.

19       MS. SANDMAN:  I'm sorry, Your Honor.  I did not hear

20  that.

21       THE COURT:  Let me hear the grounds.

22       MR. DAVIS:  The ground, Your Honor, this is a statement

23  by an organization who is not here to call to testify.  They are

24  seeking to -- well, it's a hearsay objection, Your Honor, an

25  out-of-court statement.

1          MS. SANDMAN:  Your Honor, would the Court like me to

2    speak to that?

3          THE COURT:  Let me read it first.

4      (Brief pause)

5          THE COURT:  Okay.  Now I'll hear your response to the

6    objection.  It's that this document is hearsay.

7          MS. SANDMAN:  Your Honor, Dr. Fine has already

8    testified that ACOG is the leading professional organization in

9    the field of abortion care.  So this is a reasonable document

10   for experts in his field to rely on in terms of its judgment

11   concerning the benefits of admitting privileges.

12         THE COURT:  So you wish to admit it as a document

13   relied upon by an expert?  I assume that expert being the

14   witness.

15         MS. SANDMAN:  I'm sorry, Your Honor?

16         THE COURT:  I assume that expert being the witness.

17         MS. SANDMAN:  Correct.

18         THE COURT:  Is that your reason?

19         MS. SANDMAN:  That is my reason.

20         THE COURT:  What's your response?

21         MR. DAVIS:  If that's the reason you're -- I don't

22   recall him relying on the statement in the expert opinions that

23   have been disclosed to us, but I could be mistaken.

24         THE COURT:  I couldn't hear you.  You said what?

25         MR. DAVIS:  If in fact this is one of the grounds that

1  Dr. Fine -- one of the -- part of the material Dr. Fine relied

2  on in the opinions that were disclosed to us, then I withdraw my

3  objection.  I don't recall this being something he relied on in

4  his report.

5        THE COURT:  Well, do you want to cross him on that

6  issue?

7        MR. DAVIS:  I can.

8        THE COURT:  Pardon me?

9        MR. DAVIS:  I can cross him on that issue, Your Honor.

10        THE COURT:  Okay.  Very good, then.  We'll allow it in

11  subject to him being crossed on whether he relied on it, or you

12  can bring it out right now.

13  Q.  (By Ms. Sandman, continuing:)  Dr. Fine, do you recall

14  whether you relied on the ACOG statement in your expert report?

15  A.  I believe I did.

16  Q.  You can refresh your recollection with the report if you'd

17  like to.

18     (Brief pause)

19  A.  On page 10 of that document, under facts or data considered

20  in forming my opinions, is this document listed, American

21  Congress of Obstetricians and Gynecologists Statement on State

22  Legislation Requiring Admitting Privileges for Physicians

23  Providing Abortion Services, April 25th, 2013.

24  Q.  Thank you, Dr. Fine.  Dr. Fine, could you please read the

25  second-to-last sentence in the first paragraph.

1    A.  For example, ACOG opposes laws or other regulations that

2    require abortion providers to have hospital admitting

3    privileges.  ACOG also opposes facility regulations that are

4    more stringent for abortion than for other surgical procedures

5    of similar low risk.

6    Q.  Thank you, Dr. Fine.  Dr. Fine, are you aware of whether

7    ACOG has addressed the question of admitting privileges and

8    medication abortion specifically?

9    A.  I believe they have.

10   Q.  Please turn to the next tab in your binder, labeled ACOG

11   Medication Abortion Statement.  Do you recognize that statement?

12   A.  Yes.  The American College of Obstetricians and

13   Gynecologists' Analysis of the Possible FDA Mifepristone --

14   Analysis of the Possible FDA Mifepristone,

15   M-I-F-E-P-R-I-S-T-O-N-E, Restrictions, July 27, 2000.

16   Q.  Directing your attention to page 3, please read the first

17   sentence.  That's the sentence starting, Privileges at a

18   hospital.

19   A.  Privileges at a hospital are not necessary for prescribing

20   mifepristone, M-I-F-E-P-R-I-S-T-O-N-E, safely.  The complication

21   rates for mifepristone are very low, with a small number of

22   patients requiring emergency room care or hospitalization.

23   Q.  Dr. Fine, just so the record is clear, when you say

24   mifepristone, is that the same thing, in your mind, as

25   medication abortion?

1    A.   Yes.  Mifepristone is the abortion pill, or ru486, that's

2    taken in the clinic.

3    Q.   Dr. Fine, please also read the second paragraph, starting,

4    The prescribing physician.

5    A.   The prescribing physician does not need to be in the

6    emergency room or to be the admitting physician if a patient

7    requires follow-up emergency care.  Women experiencing

8    miscarriages and spontaneous abortions frequently require the

9    same services and care and appropriately receive this care at

10   their physicians' offices.

11   Q.   Finally, Dr. Fine, are you familiar with the American

12   Medical Association?

13   A.   Yes, I am.

14   Q.   And what is the American Medical Association?

15   A.   That's the largest national organization of doctors in the

16   country.  And it's composed of doctors and medical students.

17   Q.   And are you aware of whether the American Medical

18   Association has addressed the question of whether it is

19   medically appropriate to require doctors providing abortions to

20   have admitting privileges?

21   A.   They have.

22   Q.   Please turn to the tab marked AMA amicus in your binder.  Do

23   you recognize that document?

24   A.   Yes, I do.

25   Q.   And what is it?

1  A.  This is an amicus brief in the Texas case, where the ACOG,

2  the American Congress of OB-GYN, and the American Medical

3  Association filed a brief in support of opposing the need for

4  admitting privileges.

5  Q.  So just so the record is clear, this is a formal statement

6  by the American Medical Association opposing the admitting

7  privileges requirement in the context of abortion care?

8  A.  Correct.

9  Q.  Dr. Fine, are you aware that one of Planned Parenthood's

10 physicians who provides abortions is a family medicine doctor,

11 not an OB-GYN?

12 A.  Yes.

13 Q.  In your opinion, does a physician who needs -- excuse me.

14 Does a physician need to be an OB-GYN in order to provide

15 abortion care?

16 A.  No, they do not need to be an OB-GYN.  There are many family

17 physicians who perform abortion services in this country.  And

18 I'm aware of all the medical directors within Planned

19 Parenthood, all of who are abortion providers.  Approximately 25

20 percent, Your Honor, are family medicine trained.  They are not

21 OB-GYNs.  And they provide excellent abortion care with low

22 complication rates.

23 Q.  Can you explain the nature of the family medicine

24 speciality?

25 A.  Family medicine speciality is basically what the old GP used

1    to be, general practitioner, where they take care of everything,

2    primary care in teenagers and adults.  They don't do pediatrics.

3    And generally, if they need a specialist, then they call for

4    consultation; but they're the primary care provider.  And they

5    treat hypertension, diabetes, medical conditions, in addition to

6    providing abortions in some cases.

7    Q.  And are you aware of whether some family medicine doctors

8    obtain particular training and expertise in the provision of

9    abortion care?

10   A.  Yes, they do.  In fact, there is -- are fellowships in

11   family planning across the country.  There are about -- at least

12   30 of them, I believe, and growing -- the number growing.  It's

13   a two-year fellowship.  And both OB-GYNs and family medicine

14   physicians can take this two-year fellowship during which there

15   is formal abortion training.

16   Q.  Is there any clinical benefit to having an OB-GYN rather

17   than a family medicine doctor provide abortion care?

18   A.  No, none at all.

19   Q.  And do family medicine doctors provide laparotomies or

20   hysterectomies?

21   A.  No, they do not.  They're not -- they're not trained to do

22   that.

23   Q.  Dr. Fine, I'd like to change topics now and talk about

24   questions relating to the process of applying for admitting

25   privileges.  Based on your experience, can you talk about the

1 kind of factors that hospitals take into consideration when

2 deciding whether to grant privileges to a particular physician?

3 A.   Yes.   There are several factors they take into account.   One

4 is geographic, does the physician reside in the community where

5 the hospital is located.   And two, is the physician competent

6 and experienced in performing the procedures for which he wants

7 to perform or is requesting to perform at their hospital.   And

8 they're also concerned, along with that, to show competence, how

9 many of those procedures have they performed in the last couple

10 of years.

11 Q.   And from your experience, do hospitals have a stake from the

12 perspective of their own interest in what doctors they want to

13 grant privileges to?

14 A.   Sure.   Hospitals want doctors that will admit lots of

15 patients to their hospital for economic reasons.   They're very

16 interested in that.   If there's a physician who is from out of

17 town or who -- who, during the course of the last few years, has

18 hardly admitted anybody to any hospital, then they're not going

19 to grant admitting privileges.   They want doctors who are going

20 to generate income for the hospital.

21 Q.   Dr. Fine, are these requirements that you've been speaking

22 of related to quality of care?

23 A.   Not necessarily.   Now, quality of care certainly is

24 measured, and it's important.   And quality of care can be

25 measured by the numbers of procedures that a physician has done.

1   But there are physicians who are on hospital staffs who are

2   excellent technical, high-volume surgeons that do a lot of

3   hysterectomies, do a lot of surgeries; but they also have a lot

4   of potential complications, such as poor surgical judgment, not

5   recognizing complications when they occur, and poor follow up.

6        And typically, these hospitals, by peer review, tolerate

7   this because the doctor is admitting a lot of patients for the

8   hospital.  It's an income producer.  They do peer review, and

9   they document it, and they try to address it; but basically, the

10  doctor gets slapped on the wrist.

11  Q.  Dr. Fine, is there a reason that a doctor would not want to

12  apply for privileges if she believes that she won't be granted

13  privileges?

14  A.  Sure.  It's required that if a physician either applies for

15  admitting privileges to a hospital and is formally declined or

16  she submits an application and is later able to withdraw it, she

17  needs to disclose this fact on future applications for hospital

18  admission privileges.  And more specifically, if the hospital

19  formally revokes the application or refuses, that has to go in

20  the national data bank.  So it's basically a black mark on the

21  physician's professional record.

22  Q.  Dr. Fine, you testified a moment ago that this would be the

23  case that a doctor could have to report it in a future

24  application for privileges or licensure, even if she voluntarily

25  withdrew an application for privileges.  Can you speak further

1  to that?

2  A.  Yes.  The onus is on full disclosure.  The physician must be

3  open and transparent in doing this because if, in a future

4  application, they find out that she has not provided full

5  disclosure, that could work against her in getting future

6  privileges at another hospital.

7  Q.  When a doctor applies for privileges --

8  A.  And by the way, many of the hospital applications

9  specifically ask have you been denied or have you withdrawn an

10  application for privileges at another hospital.

11  Q.  When a doctor applies for privileges, can she be confident

12  that she would even be given the opportunity to voluntarily

13  withdraw her application before getting a formal denial?

14  A.  No.  More often than not, she would not be given that

15  opportunity.  They would just go through the process and deny

16  the application.

17  Q.  And is there anything about the abortion context that might

18  make that more or less likely to occur?

19  A.  Yes.  Unfortunately, there are hospital that -- hospitals

20  that, through their processes, will discriminate, if you will,

21  against physicians who provide abortion care even though that

22  abortion care is not being provided, Your Honor, in the

23  hospital.  It's being provided in an outpatient setting away

24  from the hospital, but they will still -- they will still use

25  that as a reason.  In fact, there's a very egregious example

1   that occurred in Texas where a physician in the Dallas area, who

2   is an OB-GYN and an abortion provider, already had admitting

3   privileges at a hospital.  And when the hospital found out that

4   he was an abortion provider in a clinic nearby, they sent him a

5   letter, which I have seen, actually revoking his privileges

6   because he performed abortion.  And they cited because -- in

7   their bylaws, they called this disruptive behavior, his

8   performing abortions as disruptive behavior.  So his performing

9   a constitutionally protected procedure was disruptive behavior

10  to the hospital.

11      And there's a chambers amendment that makes it a federal

12  offense to discriminate against an applicant based on race,

13  creed, religion, or abortion.  So it's amazing to me that this

14  hospital blatantly violated that and put this in writing in the

15  letter.

16  Q.  And Dr. Fine, in your experience, is it unusual for a

17  hospital to be this transparent about its reasons for a decision

18  such as this?

19  A.  Very, very unusual.

20  Q.  Dr. Fine, can you speak a little bit more to some of the

21  obstacles that might apply when a doctor is seeking privileges

22  in the context of abortion services?

23  A.  Sure.  Well, the doctor is not applying to perform abortions

24  in the hospital; but in order to get privileges, there's a

25  series of steps that have to occur.  He has to be approved by

 1   the department of OB-GYN at the hospital.  Then they will make a

 2   recommendation to the credentials committee, who must approve

 3   it.  And then the credentials committee will make a

 4   recommendation to the medical executive committee, which is made

 5   up of the heads of the departments in the hospital.  And then it

 6   has to be approved by the CEO of the hospital and the hospital

 7   board of trustees.

 8       At any one of these steps, they could deny the application

 9   just because they didn't like the fact that the doctor did

10   abortions.  They could deny it for any reasons, and they don't

11   have to disclose why they denied it.  And the -- the actions of

12   these committees during the credentialing process is

13   confidential.  It can't be discovered.

14   Q.  Now, Dr. Fine, you testified a moment ago that there is a

15   law against abortion -- excuse me -- against hospitals

16   discriminating against abortion providers in deciding whether to

17   grant privileges.  In practice, do you believe that this law

18   protects abortion providers from this type of discrimination?

19   A.  It attempts to but, in reality, does nothing because the

20   credentials committee and these committees at the hospitals,

21   they don't have to disclose why they denied privileges.  I was

22   amazed -- in the eighties, when I was attending these committees

23   and chairing some of these committees, I was amazed at the good

24   old boy atmosphere that went on in those committees.  It was --

25   I was surprised.  I was shocked.  So there's a lot of

1   discrimination that can and does occur during these committee

2   deliberations.

3   Q.   Dr. Fine, can you speak at all to what you think the process

4   would be like or the -- what the likely outcome would be if a

5   doctor was seeking privileges to a religious hospital in the

6   context of a provision of abortion services?

7   A.   The -- the Catholic -- there are many Catholic hospital

8   systems that are very large and have a lot of hospitals in the

9   country.  I think it's quite obvious that any physician applying

10  for privileges at that hospital who either disclosed or was

11  found out to be an abortion provider would be promptly denied or

12  kicked out the door.

13  Q.   Dr. Fine, if a provider has privileges at one hospital, does

14  that mean that she can get them at another hospital?

15  A.   Absolutely not.  Each hospital is their own entity with

16  their own committees, and each application is considered on a

17  separate basis.

18  Q.   And in your experience, does the controversy surrounding

19  abortion affect the willingness of hospitals to grant admitting

20  privileges to abortion providers?

21  A.   It does.  Hospitals and, frankly, universities have to be

22  very careful because they are relying on donors and -- and

23  boards of trustees for financial help.  And there are people

24  that are against abortion and who might -- if they found out the

25  hospital was supportive in having abortion providers on their

1   medical staff, would stop donating money.  So it could have a

2   significant economic impact on the hospital if that were to

3   happen.

4   Q.  Dr. Fine, do you see any trends in medicine that affect

5   doctors' need to get admitting privileges?

6   A.  Well, as I -- excuse me.  As I testified earlier, there is a

7   trend more and more, Your Honor, for outpatient surgeries and

8   outpatient procedures and office procedures to be done that

9   eliminates some of the excessive cost of medical care -- medical

10  care and reduces it.  And so there's an increasing use of

11  outpatients.  And additionally, hospitals are hiring physicians

12  to work within their hospitals and take call.  For example,

13  they -- and patients with labor and delivery -- hospitals with

14  labor and delivery, they hire an OB-GYN and he's called a

15  laborest.  And his only job for 24 hours is to take care of

16  patients that come in without a doctor who need obstetrical care

17  and delivery or have a spontaneous miscarriage, et cetera.  So

18  that actually increases the availability of consultants to the

19  emergency room doctor.  Should he need an OB-GYN, there's

20  frequently one in house that's hired by the hospital.

21  Q.  You testified earlier that you're the medical director of

22  Planned Parenthood of the Gulf Coast in Texas; is that right?

23  A.  That's correct.  And Louisiana.

24  Q.  And in that capacity, are you aware of recent events

25  relating to Texas's admitting privileges law?

1  A.  Yes, I am.

2  Q.  And are these events part of the basis that you're offering

3  today for your opinion about plaintiff's ability to obtain the

4  privileges requires by the act and the consequences if they

5  cannot?

6  A.  Yes, I'm familiar.  Unfortunately, when the admitting

7  privileges law in Texas -- and by the way, the admitting

8  privileges law in Texas, Your Honor, doesn't require the ability

9  to do a hysterectomy or a laparotomy, just admitting privileges.

10  And when it was first passed and went into effect in October,

11  approximately one-third of the abortion clinics in the state had

12  to close.  Some of those doctors were able to get admitting

13  privileges.  Some of them were not able to get admitting

14  privileges.  And that harmed the patients who relied on the

15  doctors who could not get admitting privileges.

16      As a result, currently, the Rio Grande Valley, which is in

17  West Texas, encompasses 5,000 square miles, does not have a

18  single abortion clinic.  The nearest clinic that the women of

19  the Rio Grande Valley can go to now is in Corpus Christi, 150

20  miles away.

21      Come September when the rule for ambulatory surgery centers

22  goes into effect, the Corpus Christi abortion clinic will close.

23  And then the nearest abortion clinic will be San Antonio, 500

24  miles away.  So this has a definite negative impact on the

25  ability of women to obtain abortion services, more difficulty

1  finding abortion services.

2  Q.  And do you know whether these events have been harmful to

3  women in Texas?

4  A.  They have been harmful.  It's my understanding that some of

5  the clinics in Texas where these women in the Rio Grande Valley

6  are coming to are being seen later in gestational age.  As we

7  said earlier, the later the pregnancy gestational age is, the

8  higher the potential complications and risks.

9  Q.  Are you aware of the phenomenon of women attempting to

10 self-medicate to induce an abortion without going to a doctor?

11 A.  All too -- all too knowledgeable, both from the years before

12 *Roe versus Wade*, but more recently, the second pill,

13 misoprostol, M-I-S-O-P-R-O-S-T-O-L, that caused the uterus to

14 expel the contents, if it's taken alone, it can be 80 percent

15 effective in inducing a first trimester abortion.

16     And women can get this misoprostol pill from across the

17 border and other places illegally, and they take it.  And at

18 that point, if they have to go to an emergency because they're

19 bleeding or cramping, the picture is identical to a spontaneous

20 miscarriage.  So they don't have to disclose that, well, I tried

21 to induce myself and it didn't work.  They'll present as a

22 spontaneous miscarriage and will be taken care of.  And

23 unfortunately, it's my opinion that this is going to increase,

24 where women have a choice of driving 500 miles or getting some

25 pills from across the border.  And there are studies now ongoing

1   to look at this and try to document that this is in fact

2   happening.

3          THE COURT:  And what's -- is this misoprostol --

4          THE WITNESS:  Misoprostol is the second pill under the

5   medication abortion that the patient takes at home 24 to 36

6   hours later that causes the uterus to contract and expel the

7   contents, Your Honor.  And if this is taken alone without --

8          THE COURT:  That's my question.

9          THE WITNESS:  If it's -- the medication abortion has

10  two pills.  The abortion pill, ru486, that's given in the clinic

11  causes the embryo to die and detach from the lining of the

12  uterus.  The second pill, misoprostol, taken at home causes the

13  uterus to contract and expel.  If misoprostol is taken alone

14  without the abortion pill, ru486, it's still 80 percent

15  effective in inducing abortion, but not 99.5 percent like the

16  two-pill combination is.

17         THE COURT:  But there's nothing dangerous about taking

18  it alone?

19         THE WITNESS:  Well, taking it -- technically, there is

20  in that the misoprostol by itself is a teratogen and causes

21  fetal anomalies.  So if a woman takes it and it doesn't work and

22  she continues the pregnancy, there's an increased risk of a

23  fetal anomaly.

24         THE COURT:  What's fetal anomaly?

25         THE WITNESS:  Fetal anomalies meaning absent arms,

1    absent legs, flattened head, mental retardation.

2            THE COURT:  How significant is that increase?

3            THE WITNESS:  The percentage of -- is still fairly low.

4    The overall general congenital anomaly rate is about 2 to 3

5    percent.  If you've taken misoprostol, it might rise to 5

6    percent, a little bit higher.  But the other concern with taking

7    misoprostol alone is when the abortion is incomplete in that 20

8    percent, pieces can get stuck in the cervix, the same as with

9    spontaneous miscarriage, and the patient at that point

10   hemorrhages very heavily.  So women who take the misoprostol

11   alone for the abortion are at a higher risk to have significant

12   hemorrhage and even -- they wait, hoping it will pass, and then

13   infection sets in.  So they're generally at a higher risk for

14   infection and hemorrhage just like a spontaneous miscarriage

15   patient.

16           THE COURT:  Go ahead.

17   Q.  (By Ms. Sandman, continuing:)  Dr. Fine, if a woman attempts

18   to self-induce with misoprostol, in your experience, is she

19   getting monitoring from a medical professional to see whether

20   the attempted abortion has been successful?

21   A.  No.  That's -- there's no monitoring whatsoever.

22   Q.  And in your experience, is she under a doctor's care to

23   ascertain whether she's a suitable candidate to have an abortion

24   in this manner?

25   A.  No, she's not.  There's no prior evaluation.  She just

1   doesn't want the pregnancy and will not consider any medical

2   problems that she might have as potential confounders or

3   complications.

4   Q.   And is there any determination of whether the gestational

5   age of the pregnancy makes her an appropriate candidate?

6   A.   That's also correct.   She may not know exactly how far along

7   she is.   She hasn't had an ultrasound.   So the farther along in

8   pregnancy she is, the less effective the misoprostol will be in

9   causing abortion.

10  Q.   And in your -- in your opinion, do women in the Rio Grande

11  always get good misoprostol?   Is this a -- is there some sort of

12  regulation of the quality of the medication that they're

13  obtaining?

14  A.   Well, it's certainly gray market or black market

15  misoprostol, so the potential for impurity is certainly there,

16  but I don't have any firsthand knowledge of that.

17  Q.   And to your knowledge, is misoprostol also available for

18  purchase on line?

19  A.   Yes, it is.   It's -- misoprostol, the trade name is Cytotec,

20  C-Y-T-O-T-E-C.   It was originally designed, Your Honor, as a

21  drug to reduce stomach ulcers in women that take

22  anti-inflammatory agents for either menstrual cramps or

23  arthritis.   And -- and it was later found that it had properties

24  on the uterus to help with gynecological problems.   So it's also

25  used to induce term pregnancy, to induce labor.   So it is

1    available from on-line pharmacies as well.

2    Q.   And I think that your testimony is already clear on this

3    topic; but just to make sure, in your opinion, is it medically

4    appropriate for a woman to be purchasing misoprostol through

5    these gray market channels in order to attempt to self-induce an

6    abortion?

7    A.   Absolutely not.  She's putting herself in danger.

8    Q.   Turning to a different topic, from your years of working

9    with Planned Parenthood, do you have any experience in trying to

10   recruit doctors to provide abortion services?

11   A.   Yes, I do.

12   Q.   Can you describe that experience.

13   A.   Well, in prior years, prior to these restrictive laws in

14   Texas, because I've been on the faculty at Baylor for 30 years,

15   many of the graduating doctors from the residency went on and

16   practiced I had either trained in abortion or trained in OB-GYN.

17   So I knew them; they knew me.  And I could get them to work

18   part-time at our clinic.  Now, with the requirement for

19   admitting privileges, many OB-GYN physicians who are in

20   practice -- in fact, most -- do not want to work in an abortion

21   clinic out of fear that it's going to harm their practice, that

22   protestors are going to picket their office, their home --

23   picket their home, threaten them with bodily harm, threaten

24   their families.  So physicians in general practice do not

25   perform abortions for that reason.  And it's much harder to

1   recruit physicians now than it used to be.

2        Additionally, in Texas, there's a 24-hour wait where the

3   doctor has to perform the ultrasound.  So now, to do an abortion

4   today, the doctor has to take two days out of his schedule in

5   order to -- to provide abortion services for one day at the

6   clinic.

7   Q.  Dr. Fine, you've mentioned a few times in your testimony

8   that there is a nationwide shortage of abortion providers.  Can

9   you speak more to that?

10  A.  There is.  Unfortunately, although the residency review

11  committee that establishes what has to be taught in OB-GYN

12  residencies, Your Honor, requires teaching of abortion, although

13  a resident can opt out for religious reasons.  But,

14  unfortunately, only about 50 percent of the residency programs

15  in OB-GYN in the country offer abortion training.  And more

16  specifically, as tracked by the University of Southern

17  California, the southern states are especially lacking abortion

18  care.  In specifically Louisiana, Alabama, and Mississippi,

19  there's no abortion training being given to the residents.

20  Q.  You testified earlier that some doctors are afraid to

21  provide abortions.  In your experience, why is that the case?

22  A.  Because of the potential for harm to their practice by

23  protestors picketing the offices, the protestors picketing their

24  house, threats of violence.  Their names and information are put

25  on Web sites of antiabortion organizations.  They just -- they

1   just don't want to take the risk.  They're afraid or their

2   families are afraid.  Their wives don't want them to provide

3   abortions out of fear for their safety.

4   Q.  If it's so risky to be an abortion provider, Dr. Fine, why

5   do you continue to do it?

6   A.  I'm old enough to have performed abortions prior to *Roe*

7   *versus Wade*.  I said I was familiar with self-induced abortions.

8   Well, back in the old days, in the seventies, early seventies,

9   patients either got a botched back-alley abortion by some

10  untrained person or they actually put a coat hanger up inside of

11  themselves.  And they got severe infections.  They got gangrene

12  of the uterus.  And they would come in to our tertiary center at

13  Los Angles County, and we would do everything possible to save

14  their lives.  And, you know, they died.  I will never forget the

15  look in the eye of these women who are scared and frightened and

16  desperate to end their pregnancy.  So I will never stop doing

17  abortion care.

18  Q.  Dr. Fine, I think this is already clear from your testimony;

19  but in your opinion, is it medically necessary to require that

20  all doctors that perform abortions have the admitting privileges

21  required by the act?

22  A.  Absolutely not.  It's not helpful, and it harms women.

23  Q.  And can you explain just in summary why it's not helpful?

24  A.  It's a fantasy to think that if you have admitting

25  privileges at a large hospital that the efficiency and quality

1  of care is going to be somehow improved.  That's a fantasy.

2      The reality is, Your Honor, the majority of these women seek

3  care in an emergency room not where you have privileges.

4  They're near their home, which is generally an hour or more away

5  from the clinic.  And the treatment of abortion complications is

6  the same as miscarriage complications.  It's very

7  straightforward.  Emergency physicians can do that.  There's no

8  requirement for the need to have the abortion provider have

9  admitting privileges.

10     And it -- it's not in the patient's best interests if, in

11 the very rare case she needed a hysterectomy, that the abortion

12 provider would be the one to do it, which this law requires,

13 because the abortion provider may have done one hysterectomy in

14 five years.  You would want a surgeon who does hysterectomies

15 every week to do that surgery.  I would for a member of my

16 family.

17 Q.  Dr. Fine, will this requirement do anything to help women in

18 Alabama?

19 A.  Will it help women in Alabama?  No.  It will hurt women in

20 Alabama.

21 Q.  And why is that the case?

22 A.  Because the women in Alabama, just like in Texas, will have

23 longer distances to travel for abortion care.  And it's very

24 likely when they do receive abortion care, they'll be further

25 along in their gestational ages than they might have been if

1  abortion care had been readily available close to where they

2  live and work.

3      Additionally, as I said earlier, there's a disproportionate

4  share of women, Your Honor, who get abortions who are

5  economically disadvantaged.  They're poor.  They're not well

6  educated.  They're minority.  And they have a harder time

7  arranging transportation.  If they do have a job, it's hard for

8  them to get off from work to -- to find time to go to the

9  abortion clinic and drive hundreds of miles to get there.

10         MS. SANDMAN:  I pass the witness.

11         THE COURT:  How long do you think you're going to take,

12  Mr. Davis?

13         MR. DAVIS:  Your Honor, I doubt that I will finish

14  before noon.  12:15 is a possibility.

15         THE COURT:  Okay.  Because you said that we had a one

16  o'clock witness.  So how do you propose we take up the one

17  o'clock witness if you go past -- if you're not able to finish

18  by noon on this one?

19         MR. DAVIS:  The one o'clock witness, Your Honor, that

20  is the defendant's witness.  And we can tell that witness we are

21  running late.

22         THE COURT:  Okay.  Very good.  I just wanted to --

23         MR. DAVIS:  That witness is aware of that possibility.

24         THE COURT:  Very good, then.  Go ahead.

25

```
 1                    CROSS-EXAMINATION
 2   BY MR. DAVIS:
 3   Q.  Good morning, Dr. Fine.
 4   A.  Good morning, Jim.
 5   Q.  We met at your deposition, if you recall.
 6   A.  Yes, we did.
 7   Q.  Dr. Fine, is it medically necessary to observe continuity of
 8   care?
 9   A.  Yes.  Continuity of care is -- is desirable.
10   Q.  It's more than desirable, isn't it?  Didn't you say in your
11   report that the most important factor in assuring a good outcome
12   for the patient, as it is for any patient who is transferred to
13   a hospital under any circumstances, is continuity of care?
14   A.  Correct.
15   Q.  Do you treat patients of yours who have had complications
16   after an abortion?
17   A.  No.
18   Q.  Send them to the emergency room?
19   A.  Yes.
20   Q.  In your view, if a woman has a complication after an
21   abortion, does continuity of care require that the abortion
22   provider treat the complications?
23   A.  No.
24   Q.  Does it require that the abortion provider take any
25   responsibility at all for the complications?
```

1    A.   No.

2    Q.   Does it require that anyone from the abortion clinic be

3    present at the emergency room?

4    A.   No.

5    Q.   Does it require that the emergency room doctor speak to

6    anyone at the abortion clinic?

7    A.   No.

8    Q.   Then what is continuing about that care?

9    A.   What's --

10   Q.   What is continuous except that you've got the same patient

11   in the abortion clinic and in the emergency room?

12   A.   Because the patient is presenting to the emergency room

13   hopefully on the advice of the clinic nurse on call.  And the

14   emergency room physician is adequately trained to provide that

15   continuity of care, to evaluate that patient and treat that

16   patient.  That's still continuity of care.

17   Q.   How is that continuing?  You mean simply that there's been

18   no gap in care?  The emergency room doctor doesn't know what

19   happened at the clinic under those circumstances, correct?

20   A.   This -- Jim, this type of situation commonly occurs.  There

21   are patients who may have had a hysterectomy or a major surgery

22   done in a hospital; and they have a problem later, and they'll

23   go to an emergency room not where the doctor practices.  And

24   they're treated by the emergency doctor.

25   Q.   It may be.  But that's not ideal, would you say?

1  A.  In the situation of abortion care, it's -- it does not

2  require the abortion provider to be directly involved in the

3  care.

4  Q.  Okay.

5  A.  It's very straightforward, the treatment of spontaneous

6  miscarriage and abortion complications.

7  Q.  Would it be helpful at all in your understanding of

8  continuity of care that the emergency room doctor -- that the ER

9  doctor have information about the patient's state of mind when

10  she was in the clinic?

11  A.  That's irrelevant.

12  Q.  Well, what about -- would it be helpful for the ER doctor to

13  know the patient's future reproductive goals?

14  A.  That's also irrelevant.  The ER doctor's goal is to evaluate

15  the patient's problems as they exist right then and to treat

16  them as expeditiously as possible.  Most of the time, the

17  emergency room doctor will advise the patient to reassure her,

18  and you should return to the clinic the next day for further

19  evaluation, which is continuity of care.

20  Q.  Well, and you say that.  But do you know if that's the way

21  that Alabama clinics operate?

22  A.  That's the way most abortion clinics do operate.  And I

23  would assume that that occurs in Alabama as well.

24  Q.  Do you have personal knowledge of how those procedures

25  operate among Alabama clinics?

1  A.  I do about seven years ago.

2  Q.  But not today.

3  A.  Not today.

4  Q.  Now, you have admitting privileges, right?

5  A.  Yes.

6  Q.  And you said over 15 different hospitals?

7  A.  In the course of my career, both community and urban.

8  Q.  Have those all been Texas hospitals?

9  A.  With the exception of one in California when I was a

10 resident.

11 Q.  So 14 Texas hospitals, correct?

12 A.  Correct.

13 Q.  Is Texas known as being a particularly liberal state when it

14 comes to abortion privilege -- abortion rights?

15 A.  Not these days.

16 Q.  Was it a secret to any of these hospitals that you were

17 involved in abortion care?

18 A.  Well, no, it wasn't a secret.

19 Q.  Would it harm a woman, in your view, to receive an abortion

20 from a doctor who had admitting privileges?

21 A.  Would it harm a woman?

22 Q.  Correct.

23 A.  Probably not.  It would depend on the volume of abortions

24 that that doctor did.

25 Q.  But now, the fact that the doctor had admitting

1  privileges --

2  A.  No.

3  Q.  -- that wouldn't, by itself, make a doctor --

4  A.  Correct.

5  Q.  -- unqualified.

6  A.  Correct.

7  Q.  You've testified that the mortality rates for abortion are

8  lower than the mortality rates for childbirth, correct?

9  A.  Correct.

10  Q.  What percentage of women bear children in their lifetime?

11  Do you know?

12  A.  Well, I know that 50 percent of all the pregnancies in the

13  United States are unintended.  And I believe there are about

14  three million births per year in the United States, somewhere in

15  that ballpark.  But I can't say what percentage of -- is the

16  question what percentage of women of reproductive age have

17  children?  I'm not sure I understand your question.

18  Q.  My question was simply whether you knew what percentage of

19  women bear children over the course of their life at least once.

20  A.  I would say the majority, vast majority.  Ninety percent.

21  Q.  Do you know if that includes older women?

22  A.  Yes.  Older, meaning in their forties, yes.

23  Q.  What are the normal -- or the typical characteristics of a

24  woman who presents to the clinics that you operate seeking

25  abortion care, age wise?

1  A.  All ages.  Anywhere from 14 to 50.

2  Q.  Is there any difference in treating a miscarriage -- a woman

3  who has had a miscarriage and is having excessive bleeding, for

4  example, versus a woman who is having complications from an

5  abortion and is having excessive bleeding?

6  A.  The treatment is the same.

7  Q.  Is there any difference in the blood flow in the uterus in

8  those two circumstances?

9  A.  With miscarriage or abortion?

10 Q.  In comparing the two situations, is there any difference in

11 the amount of blood flow in the uterus?

12 A.  For a given gestational age, it's the same.

13 Q.  Now, you also testified that colonoscopy bears higher risk

14 than abortion, correct?

15 A.  Correct.

16 Q.  Do you know how many doctors fly in from other states to

17 perform colonoscopies?

18 A.  Very few, because there are plenty of gastroenterologists.

19 They fly in to provide abortion care because there is a relative

20 paucity of abortion providers.

21 Q.  Do you know how many doctors who are performing

22 colonoscopies lack admitting privileges in Alabama?

23 A.  I do not.

24 Q.  In general?

25 A.  Generally, the gastroenterologists who are performing these

1   do have admitting privileges, because they seek consults in the

2   hospital.

3   Q.  Do you know if there are people who have colonoscopies, have

4   a complication, go to the ER, and then the ER doctor is unable

5   to get ahold of the treating physician?

6   A.  That -- that happens.

7   Q.  Do you know if it happens?

8   A.  I know it happens.

9   Q.  Do you know if it happens more often with colonoscopies than

10  it does with abortion care?

11  A.  Well, with abortion care, the ER doctor doesn't need to call

12  the abortion doctor.

13  Q.  Would the ER doctor need to call for someone who had

14  complications after a colonoscopy?

15  A.  I'm sorry?

16  Q.  Would the ER doctor need to call if someone had a

17  complication after a colonoscopy?

18  A.  Yes.  Because the doctor who had performed the

19  colonoscopy -- the ER doctor may not know exactly what procedure

20  was done during the colonoscopy.  Was there a polyp removed?

21  Was there concern for a perforation?  Was there bleeding?  The

22  abortion care is very -- that occurs is very straightforward and

23  standard.  Colonoscopy may not be.

24  Q.  With colonoscopy complications good continuity of care

25  requires adequate physician communication.  Agreed?

1    A.   Yes.   Physician communication.

2    Q.   But that's not important for abortion care, in your view?

3    A.   It is not.

4    Q.   Do you know how Alabama clinics use their covering physician

5    or don't use them?

6    A.   I don't know the specifics of their coverage arrangements.

7    Q.   Do you know if Alabama clinics are making any effort to

8    follow up --

9    A.   I know that -- and I can't tell you where I -- I don't

10   remember where I learned this fact, but I know that there is a

11   written agreement with PPSE for transfer of patients who have

12   emergencies to hospitals.  They have an agreement in place.  I

13   know that.

14   Q.   Do you know if they take advantage of that agreement?

15   A.   I don't think they've had to transfer any patients, to my

16   knowledge.

17   Q.   Do you know if Alabama clinics make any effort to follow up

18   with patients who have had complications?

19   A.   Alabama clinics follow?

20   Q.   Perhaps I didn't understand you correctly, Dr. Fine.  I

21   understood when you were explaining your experience in Texas,

22   you said if a patient has a complication, first you send them to

23   the emergency room, but you might follow up with them in a

24   couple of days to --

25   A.   No.  We don't first send them to the emergency room.  We

1    talk to them and try to get them to come back to the clinic.  We

2    send them to the emergency room if it seems to be a more severe

3    complication.

4    Q.  And who would treat them if they came back to the clinic?

5    A.  Either -- if there's a physician working that day in the

6    clinic, the physician would.  Or they would be evaluated by the

7    nurses by doing ultrasounds and blood tests, et cetera, and then

8    they would contact the physician to get a -- a course of action.

9    Q.  But if circumstances are such that you suggest a patient go

10   to the emergency room, your clinics will follow up with that

11   patient later and be in touch, correct?

12   A.  They'll -- they'll generally attempt to call the patient the

13   next morning, assuming they know.  Some patients go to the

14   emergency room on their own without calling the on-call nurse.

15   Q.  Do you know if Alabama clinics make any similar effort to

16   follow up?  That's my question.

17   A.  I don't know that.

18   Q.  Do you know if the doctors who provide abortions in Alabama

19   have cell phones?

20   A.  I would presume all doctors have cell phones, but I don't

21   know specifically the doctors in Alabama.  I would be amazed if

22   they did not have cell phones, just like all lawyers probably

23   have cell phones.  Two of them.

24   Q.  Do you know the complication rate among abortion patients in

25   Alabama?

1   A.   Not -- not specifically in Alabama, no.   There was one

2   reference that we used that tracked hospital transfers from

3   ambulatory surgery centers in Florida and Alabama.   And in that

4   article, the vast majority of the transfers were plastic

5   surgery.   The OB-GYN doctors had no transfers.

6   Q.   Do you know what the rate -- if there's any difference in

7   the rate of complications of clinics in Alabama who have doctors

8   with admitting privileges versus those who rely on doctors who

9   come in and out?

10  A.   I do not.

11  Q.   The studies that you cited, Dr. Fine, in your report to make

12  estimates about complication rates and hospitalization rates,

13  did they rely on voluntary reporting?

14  A.   No.   Some -- they -- they relied on either CDC data or they

15  relied -- if they involved Planned Parenthood clinics, they

16  relied on complication rates reported by the clinics.   But they

17  were not -- they were not self-reports.

18  Q.   They don't rely at least in part on self-reports --

19  self-reporting, some of them?

20  A.   These particular studies the methodology was such that --

21  that the complication was documented by the organization or the

22  CDC or some other -- they were not self-report.

23  Q.   Do they rely on clinic reporting, any of them?

24  A.   Yes.

25  Q.   Okay.   Are you aware of any federal reporting requirement

1    for abortion clinics?

2    A.   No, not federal reporting requirements, but --

3    Q.   Do some states have reporting requirements?

4    A.   Yes, they do.

5    Q.   Do you know how many?

6    A.   I would guess about five thus far.

7    Q.   Do you know if Alabama is one of those five?

8    A.   I believe it is.

9    Q.   Dr. Fine, we can disagree over the rates of complication and

10   the rates of hospitalization, but if we assume you're right and

11   it's .3 percent, as one study said, or .05 or .06, if there are

12   nine or 10,000 abortions per year in Alabama, if those studies

13   are accurate predictors for what happens in Alabama, that's

14   still going to be six, ten, up to 30 hospitalizations a year,

15   correct?

16   A.   Possibly, yes.

17   Q.   You would agree, I'm sure, that those women deserve --

18   A.   If we're saying the hospitalization rate is about -- in the

19   published studies are about six per 10,000.  So you --

20   Q.   Well, you also cited a study that was .3 percent.  So that

21   would be 30 per 10,000.

22   A.   That was -- that was data from the seventies.

23   Q.   Well, it was good enough for you to cite in your report and

24   rely on it.

25   A.   Specifically from the seventies.  I also expanded that

1  during the subsequent decades following *Roe versus Wade,* as the

2  procedure became more refined and more were done, that the rate

3  significantly dropped from three per thousand to six per 10,000.

4  Q.  Okay.  Then let's use the latter studies, then, and say even

5  that the hospitalization rate would only be six per 10,000.

6  That's still six women who deserve good medical care, correct?

7  A.  Yes, sir.

8  Q.  Six people with names, possibly with future reproductive

9  goals.  We need to have procedures that protect them.  You would

10 agree with that?

11 A.  I think there -- there are already procedures in place that

12 protect them.

13 Q.  Okay.  Well, we're not -- you're not suggesting that we have

14 to ignore the health of those women just because there aren't

15 many of them.

16 A.  I think you're ignoring the health of the women by requiring

17 admitting privileges.  You're harming them.  You're saying you

18 want to help them.

19 Q.  Not my question.  We can disagree over what -- I'm not

20 asking your opinion on this admitting privileges requirement.

21 It is -- it's not your testimony, is it, Dr. Fine, that it is --

22 that -- that the field of medicine should ignore a risk simply

23 because it is a small risk?

24 A.  I would agree with that.

25 Q.  Is it your testimony, Dr. Fine, that there are never

1    circumstances where it would be an advantage for the emergency

2    room doctor to communicate directly with the abortion provider

3    if someone has complications after abortion and goes to the ER?

4    A.  If it's a situation where the patient goes to the ER, no.

5    If it's a situation where it's a clinic-to-hospital transfer by

6    ambulance, yes.

7    Q.  If you assume for the sake of argument, Dr. Fine, that some

8    doctors would think it would be a good thing for there to be

9    communication in that circumstance -- if you assume

10   communication would help, shouldn't the communication occur with

11   as little delay as possible?

12   A.  What communication are we referring to?

13   Q.  ER doctor to provider.

14   A.  Well, as we said, there's no need for that communication.

15   The ER doc is going to promptly start whatever treatment and

16   evaluation needs to be done.

17   Q.  Okay, then.  In the situations where even you would agree

18   that the communication would be good, let's go back to the

19   person who has a complication after a colonoscopy.  You said

20   there you might need to communicate, correct?

21   A.  Because colonoscopies are very variable, how they're done,

22   what the procedure was.  Abortion is a standard, straightforward

23   procedure that's done the same thing.  Colonoscopies are not.

24   Q.  If you have a circumstance like colonoscopies where even you

25   would agree that there needs to be communication, shouldn't that

1   communication occur with as little delay as possible?

2   A.  Not necessarily.  Ideally, yes.  But if the -- if the ER

3   doctor had a patient with rectal bleeding or a distended abdomen

4   following a colonoscopy and he couldn't promptly get ahold of

5   the physician who did it, he's going to call the general surgeon

6   consultant.  And in fact, that was my point, that the

7   gastroenterologist is not qualified or trained to take care of

8   complications from colonoscopy.  They have to call in a colon

9   surgeon.  So the ER doctor would call the general surgeon or

10  colorectal surgeon on call.

11  Q.  Do you think, Dr. Fine, that a doctor who performs an

12  elective procedure should also be trained to treat complications

13  that one can reasonably expect might result from that procedure?

14  A.  No.

15  Q.  Have you still got your notebook?

16  A.  Yes.

17  Q.  Look behind the tab of NAF guidelines, please.  And I'm

18  looking at page 1.  There are several pages with small Roman

19  numerals and the first -- letter one, it says on the top, number

20  one, Who can provide abortions.

21  A.  Which page is that on, sir?  Oh, I see it, okay.

22  Q.  Do you see that?

23  A.  Yes, I do.

24  Q.  Okay.  Do you see standard two?

25  A.  Yes.

1   Q.   I'm going to read standard two.  It says:  All practitioners

2   providing abortions must have received training to competency in

3   abortion care, including the prevention, recognition, and

4   management of complications.

5   A.   Yes.  I agree with that.

6   Q.   You don't --

7   A.   What I was referring to was the need to perform hysterectomy

8   or laparotomy.  All -- all physicians who perform abortions

9   should be able to evaluate and treat the most common

10  complications that would occur, bleeding, infection, uterine

11  atony.

12  Q.   Why?  If you're just going to send them to the emergency

13  room, why does it matter?

14  A.   You're not.  The vast majority -- the percentage of patients

15  that go to the emergency room are several per thousand.  The

16  majority of abortion complications that occur and are recognized

17  are treated in the clinic.  The patient comes back to the clinic

18  and is treated there.  They're not sent to the emergency room.

19  Q.   Okay.  Well, let's go back to communication for a second.

20  If there's a situation where communication is necessary between

21  two doctors, do you think communication is improved at all if

22  those two doctors are on the same hospital staff?

23  A.   Absolutely not.

24  Q.   Do you think it's improved at all if those communications

25  (sic) have ties to the same community?

1  A.  Absolutely not.

2  Q.  Do you think it's improved at all if those physicians are in

3  the same state?

4  A.  Absolutely not.

5  Q.  Do you think a woman who chooses to get an abortion has any

6  expectation that the doctor -- that the provider will have the

7  ability to treat complications that may arise?

8  A.  I think that the patient would expect that the clinic would

9  be available and if she had a problem, she could call them and

10  get her problem either taken care of or be referred.  But every

11  abortion patient that comes into the clinics is also aware of

12  the potential that if she has a problem after she returns home,

13  which is most commonly when the problems occur, that she might

14  have to seek emergency room care.  That's written out in

15  consents the patients sign prior to abortions.

16  Q.  In the process of getting privileges, isn't it correct that

17  a hospital tries to ensure that the applicant is qualified?

18  A.  Sure.  They try to.

19  Q.  He's a good doctor.  If you take a hundred random doctors

20  who have admitting privileges and a hundred random doctors that

21  do not, do you think either group is more or less likely to have

22  an unqualified doctor among them?

23  A.  Well, you would have to define unqualified.  As I testified

24  earlier, there are many doctors who have admitting privileges

25  who do high volumes of surgery.  The hospitals love them because

1  they bring in a lot of patients and make a lot of money, but

2  they also have complaints to the medical boards where -- for not

3  recognizing complications or not following up on care or

4  mismanagement.

5  Q.  Okay.  Well, wouldn't you agree that the privilege process

6  is likely to weed out lousy doctors?

7  A.  It does not.  Lousy?  No.  Their -- their determination of

8  quality is what's the volume of the procedure they've done in

9  the past.

10  Q.  You don't think they look at if somebody's had a dozen

11  malpractice suits in the past?

12  A.  Oh, they look at the mal- -- yes.  They look at the

13  malpractice suits.  But malpractice suits can be filed without

14  merit as well.

15  Q.  That hospital doesn't want a doctor on their staff that's

16  not able to do the things -- to give good quality care to his

17  patients or her patients, right?

18  A.  Ideally, yes.  But in reality, hospitals don't want doctors

19  on their staff who perform abortions as well.

20  Q.  Like you, who has had privileges at 15 hospitals in Texas?

21  A.  Yes.  But the majority of what I do is not strictly abortion

22  care.  I'm a urogynecologist.  I do a lot of other OB-GYN care.

23  Q.  But it hasn't been a black mark on your record that has

24  caused hospitals to deny you privileges, correct?

25  A.  No.  Because I've had an excellent record with all the other

 1   surgeries and things that I've done.  These doctors applying,

 2   all they do is abortions.  They don't have a track record to

 3   say, well, okay, I did one hysterectomy in the last five years,

 4   but I want to do hysterectomies in your hospital.

 5   Q.  Does that have to be the case, that all these -- these

 6   doctors doing abortions, could they expand their practice?

 7   A.  They don't.  They are abortion --

 8   Q.  Could they?

 9   A.  No, they could not.  Because many of them have not performed

10   these procedures in many years.  They haven't delivered a baby

11   in 15 years.  They haven't -- some are family doctors.  Yes,

12   they could do family medicine.  But they chose to be an abortion

13   provider to provide a constitutionally mandated service for

14   women, and that's what they choose to do.

15   Q.  Couldn't they choose instead to follow your model, which is

16   providing comprehensive care to women which happens to include

17   abortion care, also includes admitting privileges to hospitals?

18   Then they could have the record that you have.

19   A.  No.  Because most of the physicians are worried that -- we

20   testified before that if they -- it's found out they provide

21   abortions, their offices and their homes are going to be

22   picketed and they're going to be harassed.  And they're

23   threatened, and their families are going to be threatened.

24   Q.  That's risks that they face right now, is it not?  And yet

25   they're still providing abortions.

1  A.  Yes.  Because they're dedicated to providing high quality

2  abortion care to the women.

3  Q.  You say in your report --

4        THE COURT:  Let me ask you this.  We're now five after

5  noon.  Where is a good time?

6        MR. DAVIS:  Five after -- Your Honor, 15 minutes would

7  be my estimate.

8        THE COURT:  So you want to go 15 more minutes?

9        MR. DAVIS:  I am happy to go as long as Your Honor

10  wishes.

11       THE COURT:  Well, I think we're all hungry for lunch.

12       MR. DAVIS:  I'm happy to pause.

13       THE COURT:  Okay.  Then why don't we pause now, then.

14  Thank you.  Also, you can get ready better now that you'll have

15  lunch to hone your questions.

16       MR. DAVIS:  Oh, I didn't know I had to get rid of

17  questions, Judge.

18       THE COURT:  I just said hone them.  I didn't say get

19  rid of them, although I guess honing does mean get rid of.

20  Anyway, we'll recess now until 1:05.

21       Oh, counsel, I have some questions too.  I'll go ahead

22  and pass them out so you can look at them over lunch.  And

23  either one of you can incorporate them into your questions.

24       MR. DAVIS:  Thank you.  Would Your Honor wish for our

25  report on the next witness, Dr. Thorp?

```
 1           THE COURT:  Definitely.  You can give it to me now?
 2           MR. DAVIS:  I'll give it to Mr. Green.
 3           THE COURT:  Great.  Thank you.
 4      (Recess at 12:07 p.m. until 1:10 p.m.)
 5           THE CLERK:  Please remain seated.  Court is in session.
 6           THE COURT:  Counsel, I just want to get a clarification
 7  of one point.  This witness mentioned ambulatory centers,
 8  legislation in Texas; is that right?
 9           MR. DAVIS:  (Nods head)
10           THE COURT:  I think there was some legislation in Texas
11  requiring that these clinics meet certain ambulatory clinic
12  standards.  Is that true?
13           MS. SANDMAN:  Yes, Your Honor.
14           THE COURT:  Okay.  And the Alabama statute has the same
15  thing?
16           MS. SANDMAN:  It's not at issue in this litigation,
17  Your Honor.
18           THE COURT:  It's not at issue in this litigation.
19           MS. SANDMAN:  Correct.
20           THE COURT:  But I know that another witness brought it
21  up.  But I just wanted to get the posture, that Alabama's
22  statute has the same thing, but it's not an issue in this
23  litigation.
24           MS. SANDMAN:  Yes, Your Honor.
25           THE COURT:  But it is still an issue in the Texas
```

1  litigation.

2          MS. SANDMAN:  Correct.

3          THE COURT:  Okay.  I wanted that clarification.

4          MS. SANDMAN:  And the requirement -- just so the record

5  is clear, the requirements are somewhat different from each

6  other.

7          THE COURT:  Oh, they're not the same requirements

8  either?

9          MS. SANDMAN:  They come under a similar umbrella, but

10  the specifics are different.

11          THE COURT:  Oh, very good, then.

12          And when you're asking questions, remember that you

13  want to bring it down, as they say, where the goats can get it

14  for me.  Remember, when it comes to medical testimony, I have

15  very little knowledge.  And a little knowledge is the most

16  dangerous knowledge because you tend to rely on it and get it

17  wrong.  So make sure your questions really put the basics to me

18  before you get into the more detailed stuff.

19          MR. DAVIS:  Your Honor, concerning the next witness,

20  who is on standby --

21          THE COURT:  Yes.

22          MR. DAVIS:  -- over lunch I spoke with Mr. White,

23  Mr. Cornelius White.

24          THE COURT:  Yes.

25          MR. DAVIS:  He asked me to let you know that when it's

 1  time for that witness to dial in, he may need a few minutes to

 2  test equipment.

 3           THE COURT:  That will be fine.

 4           MR. DAVIS:  May I proceed?

 5           THE COURT:  Yes.

 6  Q.  (Mr. Davis, continuing:)  Dr. Fine, good afternoon.

 7  A.  Good afternoon.

 8  Q.  What protocol has the FDA approved for medication abortions,

 9  Dr. Fine?

10  A.  The FDA has approved the protocol where it can be given up

11  to 49 weeks (sic) gestational age.  And the same two-pill

12  regimen is used, but instead of the -- the FDA regimen requires

13  three pills, or 600 milligrams, of the ru486 and requires the

14  second pill not be taken at home, but that the patient come into

15  the clinic 48 hours later and take that second pill in the

16  clinic.

17  Q.  And what gestational age?

18  A.  And they go up to seven weeks, two weeks less than the --

19  there's an evidence-based regimen that has more recently -- for

20  years been used, is more efficacious and safer.  And then

21  there's original FDA labeling that was based on studies done

22  over a decade ago that led to the FDA approval.

23  Q.  But the FDA has approved it only up to seven weeks, correct?

24  A.  Correct.

25  Q.  And only approved a protocol where the woman will take both

1    pills in the clinic.

2    A.    Yes.    On two separate visits.    The FDA also requires the

3    patient come back.    There's actually a total of four visits that

4    the woman has to do to do the FDA protocol.

5    Q.    Would you meet the requirements of Alabama's statute,

6    Dr. Fine, if you practiced in Alabama?

7    A.    If -- given the fact that I would have admitting privileges?

8    Q.    If --

9    A.    Assuming --

10   Q.    I asked --

11   A.    -- I transplanted my situation from Texas to here?    I

12   believe I would, yes.

13   Q.    Do you know if all hospitals in Alabama have an OB-GYN on

14   call 24/7?

15   A.    Any hospitals that provide gynecological care in the

16   hospital would have one on call, yes.

17   Q.    Do you know if all hospitals in Alabama provide

18   gynecological care in the hospital?

19   A.    I do not.

20   Q.    You say in your report that referrals are common in

21   medicine, do you not?

22   A.    Yes.

23   Q.    Isn't it also common for the referring doctor to talk to the

24   specialist and to share the patient's history?

25   A.    Yes.

1   Q.  Are you familiar with the boards or credentialing committees

2   of any hospital in Birmingham, Montgomery, or Mobile, Alabama?

3   A.  No, I'm not.

4   Q.  Do you know whether they offer waivers of requirements, such

5   as residency or minimum admissions?

6   A.  I do not.

7   Q.  And do you know, assuming they did offer a waiver, that if a

8   waiver was not granted, if that's the same thing as an

9   application for privilege being denied?

10  A.  I don't know specifically whether that's the case or not.

11  Q.  Do you know if any doctors in Alabama who practice abortion

12  care have admitting privileges at a local hospital?

13  A.  Yes.  There was, as I recall, an abortion provider in

14  Huntsville who actually had a private practice, had admitting

15  privileges, worked part-time in one of the abortion clinics.

16  And basically, when it was found out, however it was found out,

17  that he was an abortion provider, they started picketing his

18  office, his home.  And he basically had to stop doing his

19  private practice and work full-time for the abortion clinic.

20  Q.  But he does have admitting privileges.  That's your

21  understanding?

22  A.  He does have admitting privileges.  To my knowledge, yes.

23  Q.  Do you know if he's the only one, or do you know if there

24  are others?

25  A.  I don't know of any others.

1  Q.  Do you know if any other doctors who perform abortions in

2  Alabama have privileges in other locations?

3  A.  Yes.  I believe Dr. Roe has privileges in Atlanta, hospital

4  privileges.

5  Q.  Do you know how many clinics are open in Texas today?

6  A.  I don't know the number, no.

7  Q.  Okay.  Do you -- do you have an approximation?

8  A.  Probably about 25, I would guess.  But none in the Rio

9  Grande Valley, that 5,000 square-mile area.

10  Q.  You said that you have some patients who travel long

11  distances, correct?

12  A.  Many patients.

13  Q.  Do you have some that cross state lines?

14  A.  Yes.

15  Q.  So -- of course, some of your patients will come from the

16  same metropolitan area, though, correct?

17  A.  Yes.

18  Q.  Do you know if -- if there are some women, Dr. Fine, who

19  will travel to another city to get an abortion even though

20  there's an abortion clinic in their hometown?

21  A.  They may.  You know, they may want to go to a clinic that

22  has a good reputation, as Planned Parenthood clinics do.  They

23  may have heard horror stories from friends about some of the --

24  some of the non Planned Parenthood clinics.  Possibly cost being

25  a factor.  There are a lot of -- of different options that women

1   decide to go to.  But usually they'll go to the closest one to

2   their home, assuming that it has a good reputation.

3   Q.  Have you ever had a patient who traveled just in an effort

4   to preserve anonymity?

5   A.  I'm sure it's happened, but I don't know specifically of any

6   cases.

7   Q.  Do you believe it would be safe, Dr. Fine, for someone who

8   was not a medical doctor to perform a surgical abortion?

9   A.  Yes.  It's been shown to be safe in the Weitz article that

10  we referenced in my report where they compared nurse

11  practitioners with physicians in California.  And they had the

12  statistically significant same rates of complications.

13  Q.  Would you -- if you were designing a protocol that would

14  permit nurse practitioners to provide surgical abortions, would

15  you require that a doctor be on premises?

16  A.  I would, if I were the medical director.

17  Q.  Why?

18  A.  Because although the actual procedure itself is technically

19  straightforward, there can be things that occur that are

20  unanticipated, such as sometimes when you give the local

21  anesthetic, a patient can have a seizure.

22  Q.  You would plan for things that could happen, correct?

23  A.  Yes.

24  Q.  Even though some of those might be rare.

25  A.  I would -- that's correct, yes.

1  Q.  Do you believe it would be safe for someone who is not a

2  doctor to administer a medical abortion?

3  A.  Yes.

4  Q.  Would you, again, require that a doctor be on premises?

5  A.  No, not with the abortion pill, because the abortion

6  actually -- the effect of the spontaneous miscarriage occurs 24

7  to 36 hours later when the patient is at home.  All that's

8  happening in the clinic is the patient takes a pill.

9  Q.  Now, medical abortions, as you've discussed, those are

10  administered with drugs, with pharmaceuticals, correct?

11  A.  Yes.

12  Q.  Could those drugs safely be administered over the counter?

13  A.  No.

14  Q.  Why not?

15  A.  Because the -- there are certain contraindications to

16  medication abortion, such as taking corticosteroids, people with

17  certain lung conditions.  And the process of abortion isn't just

18  taking the pills.  As I testified earlier, there's a whole range

19  of counseling and making sure this is her choice and that she's

20  not being coerced and planning for her reproductive history,

21  making sure that she gets contraceptives after this abortion so

22  she doesn't have to come back with another unintended pregnancy.

23  So there's informed consent that's involved.  It's a process.

24  The taking of the pill is the actual medical thing that occurs,

25  but unsupervised taking of abortion pills is not in a woman's

1  best interests.

2  Q.  Preserving access to abortion care is important to you, is

3  it not?

4  A.  Sure, it is.

5  Q.  How many counties in Alabama, if you know -- what percentage

6  of counties have abortion clinics?

7  A.  I don't know that.

8  Q.  There was testimony in this trial that like 89 percent of

9  counties do not.  Does that sound right?

10  A.  Eighty-seven percent of counties in the United States do not

11  have a single abortion provider.  I do not know the figure

12  specifically for Alabama.

13  Q.  What would it do to access if our rules allowed

14  administration of medical abortions over the counter or if it

15  required nurse practitioners to do surgical abortions without a

16  doctor's supervision?

17  A.  I'm not sure I understand the question.

18  Q.  Wouldn't that increase access tremendously?

19  A.  That -- that could potentially, but taking the pills over

20  the counter would never happen.  You know, it's just not --

21  you're comparing apples and oranges.  It wouldn't happen.

22  Q.  It's a hypothetical.

23  A.  Hypothetically, yes, if you could get the abortion pill over

24  the counter, yes, it would increase access.

25  Q.  Then it would be available in a hundred percent of counties,

1  wouldn't it?

2  A.   Yes.

3  Q.   And yet, you would agree that it's safer for women to

4  require doctor supervision even though that would limit access.

5  A.   For surgical abortion.

6  Q.   Okay.  Either way.  You would agree that safeguarding the

7  health of women is important enough that we have procedures to

8  protect them even though they limit access.

9  A.   I think there's a balance where if the limitation of the

10 access creates such an undue burden on the patient that it

11 actually increases their risk, that's not in their best

12 interests.

13 Q.   Access is not, in and of itself, the only consideration,

14 though, correct?

15 A.   It becomes an important consideration when a 5,000

16 square-mile area doesn't have access.

17 Q.   That's Texas.  Do you know of a 5,000 square-mile area in

18 Alabama that doesn't have a clinic?

19 A.   No.

20 Q.   In your view, is there anything wrong, Dr. Fine, with a

21 doctor who performs an abortion walking away and letting the ER

22 take care of any complications?

23 A.   The -- first of all, the doctor that's walking away, the

24 clinic will still be responsible in terms of we try to encourage

25 the patient to return to the clinic if she's having any

1    problems.  And she would be taken care of, either another

2    physician who may be working there or the nurse clinicians in

3    the -- in the -- in the clinic who would contact the abortion

4    doctor for consultation.  So the clinic is not abandoning the

5    patient.  The doctor who flew in to do the procedures by

6    necessity had to fly in to do the procedures because that's the

7    only way they could get a provider to work there, because there

8    were no local doctors who were willing to provide abortions in

9    that community.

10   Q.  So is -- does that mean there's nothing wrong with a doctor

11   walking away and leaving the emergency room to take care of

12   complications?

13   A.  In the context of elective abortion, no.

14   Q.  Now, you have local privileges, as we discussed, correct?

15   A.  Yes.

16   Q.  You live and practice in the same community.

17   A.  No.  I'm -- I live 35 miles away from the hospital.

18   Q.  Same general metropolitan area.

19   A.  Same general metropolitan area, yes.

20   Q.  You would be available to your patients if they had

21   complications and needed you after the procedure, would you not?

22   A.  If -- the last part of what you said?

23   Q.  You would be available to your patients if they have

24   postabortion complications.

25   A.  I wouldn't need to be.  As I testified earlier, I would let

1   the emergency room physicians handle it and my colleagues who

2   are on call in the hospital handle it.  I would not be the ideal

3   person to handle a complication such as doing a hysterectomy.  I

4   haven't done a hysterectomy in several years.

5   Q.  There are some complications after abortion that you are

6   qualified to treat, though, are you not?

7   A.  Sure.  But they're commonly treated in the ER by the doctor

8   there.

9   Q.  Do you think, rightly or wrongly, Dr. Fine, that abortion --

10  that doctors who perform abortions, as a group, have a lesser

11  reputation among the public than other doctors?

12  A.  I think there's a negative connotation to physicians who

13  provide abortion care, yes.

14  Q.  Don't you think that would change, Dr. Fine, and that

15  abortion practitioners would be held in higher regard and that

16  more doctors would be willing to engage in that practice if

17  there were fewer doctors who walked away from patients, who

18  washed their hands of complications, and left their patients to

19  the mercy of the emergency rooms?

20  A.  No.  The negative connotation to an abortion doctor is that

21  he's a murderer, not because he's not available to personally

22  handle complications because he's traveling from out of state.

23  It's about the whole issue of pro-life or not.  And that's what

24  makes abortion negative in society.

25  Q.  Is it your testimony that the itinerant nature of many

1    abortion practitioners has no effect on the public perception?

2    A.   No.

3          MR. DAVIS:   Thank you.

4          That's all the questions I have right now, Your Honor.

5          THE COURT:   Okay.   Any redirect?

6          MS. SANDMAN:   Thank you, Your Honor.

7                    REDIRECT EXAMINATION

8    BY MS. SANDMAN:

9    Q.   Dr. Fine, you described earlier how complications are

10   handled in your practice.   Do you -- as to these specific

11   complications from abortion procedures.   Do you consider that to

12   be walking away from your patients?

13   A.   No.   We try to encourage our patients to come back to the

14   clinic where possible for treatment and follow-up and

15   evaluation.   We don't -- we only tell them to go to the

16   emergency room if it's a more extreme situation where they're

17   hemorrhaging or they're having severe pain.

18   Q.   And can you speak further to the steps that are taken in

19   your practice to ensure continuity of care for your patients for

20   an abortion patient with a complication?

21   A.   Yes.   As I stated, we -- the -- the next -- we -- when we

22   find out that they were sent to an emergency room, we will call

23   the next morning that patient or their family to see how she's

24   doing, what happened, and whether she needs to come into the

25   clinic to be evaluated and have further treatment.

1  Q.  And is the physician who provided the abortion or a backup

2  physician also available to contact by telephone if the

3  emergency room physician thinks that would be helpful?

4  A.  Yes.  Absolutely.  A hundred percent of the time.

5  Q.  And do you know whether these steps that you've described

6  are typical among Planned Parenthood providers?

7  A.  I think it's true of nonabortion -- non Planned Parenthood

8  abortion clinics.  I think it's the standard within the --

9  all -- most of the abortion clinics are members of the National

10  Abortion Federation, NAF, who has similar recommendations and

11  guidelines.  And I believe most abortion if not all abortion

12  clinics follow the same procedures.

13  Q.  Dr. Fine, there was some back and forth earlier about

14  whether there could be some benefit to requiring doctors to get

15  admitting privileges because some bad doctors would be

16  eliminated.  Assume for purposes of this question that there is

17  such a benefit.  Would it be equally met if the doctor has

18  admitting privileges in another state?

19  A.  Yes, it would.  If a physician can pass muster to have

20  admitting privileges in another state, then by that argument,

21  she's not a bad doctor or he's not a bad doctor.  They're a

22  competent doctor or they wouldn't have admitting privileges, by

23  that argument.

24  Q.  Dr. Fine, the State asked you some questions about the

25  FDA-approved regimen for medication abortion.  Can you explain

1  to the Court the status of the regimen that you described

2  allowing medication abortion to be provided up until 63 days?

3  A.   Yes.   The evidence-based regimen, Your Honor, which is the

4  one that's been used in the last decade, is one pill instead of

5  three, goes up to 63 days instead of 49 days, and allows the

6  woman to take the second pill, the misoprostol, in the comfort

7  of her home rather than having to come back for an extra clinic

8  visit, take off time from work and have another clinic visit.

9  Additionally, the efficacious -- the complication rate with the

10  evidence-based regimen is lower than FDA regimen.   The only

11  reason the labeling hasn't been changed is because it would cost

12  several millions of dollars to do the paperwork and the study to

13  allow that paper -- that label change.   But the -- but the

14  evidence-based regimen is superior, more convenient, has fewer

15  complications, and is more successful than the FDA regimen which

16  was now done over 15 years ago.

17  Q.   And since you mentioned the possibility of obtaining a label

18  change, is that something that is -- who would have to set that

19  in motion?

20  A.   The -- the makers of -- of the abortion pill Mifeprex,

21  M-I-F-E-P-R-E-X, who is Danco Labs.   And they have no reason to

22  apply for that abortion change because the American Congress of

23  OB-GYN in one of their bulletins very recently and also

24  previously in 2006 stated that the evidence-based regimen is

25  safer and superior to the FDA regimen and it should be used

1    preferentially.  So since most physicians utilize the

2    evidence-based regimen -- the only physicians that don't are

3    those that are mandated in recent laws like in Texas where they

4    have to go backward in time 15 years and use an outdated, less

5    safe, less efficient FDA-mandated regimen.

6    Q.  And just so that the record is very clear, does the --

7    A.  And excuse me.  Also, Your Honor, frequent -- it's not rare

8    that FDA-approved medications and protocols are used differently

9    by physicians in practice.  It's a common practice.

10   Q.  Is that -- is that what's known at off-label use?

11   A.  Yes.  Off-label use.  It's a very common practice.  In fact,

12   the drug misoprostol, that second pill, was originally designed

13   as an antiulcer -- ulcer drug for women taking a nonsteroidal

14   antiinflammatory.  So the use in obstetrics where it's widely

15   used is an off-label use.

16   Q.  And do you know whether the FDA has taken the position that

17   doctors should only provide drugs in accordance with the -- the

18   specific terms of the FDA approval?

19   A.  No.  It's commonly -- off-label use is commonly allowed.

20   The FDA brings a drug to market based on preliminary pivotal

21   data from studies that show the drug is safe.  But as a drug is

22   used in practice, there may be ways of using a drug that are

23   even more safe and more efficacious that are off-label, and that

24   is allowed.  That is good medicine.

25   Q.  And I think that -- I just want to make sure that -- that

1  this came out clearly in one of your prior answers.  Was your

2  testimony that the regimen that you described which allows

3  medication abortion until 63 days -- is that more or less

4  effective than the FDA regimen?

5  A.  Much more effective.

6          MS. SANDMAN:  If I may confer briefly, Your Honor.

7          THE COURT:  Yes.

8      (Brief pause)

9          MS. SANDMAN:  Did the Court want me to -- nothing

10 further from me, Your Honor.  Would the Court like me to read

11 your questions?

12         THE COURT:  Yes.  Why don't you show them to him, and

13 then he can just answer them.

14         MS. SANDMAN:  Oh, I can pass them?

15         THE COURT:  Yes.

16         MS. SANDMAN:  Thank you, Your Honor.

17         THE WITNESS:  Then he'll have them in writing.

18         First read the question and then answer it.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  Read it out loud.

21         THE WITNESS:  During a surgical abortion, how is the

22 cervix dilated, through medication or mechanical means?

23         In early surgical abortion, it's dilated with metal

24 rods that are called dilators that increase one millimeter in

25 size.  So you start with a small one and gradually go up in

 1   millimeters to the size that you need.  If a patient is -- is,

 2   for example, nine weeks gestational age, we'll dilate her nine

 3   millimeters.  So they're metal rods that are used.  The Cytotec

 4   or misoprostol, M-I-S-O-P-R-O-S-T-O-L, also can be given two

 5   hours prior to the procedure.  And that has a chemical action on

 6   softening the cervix and allowing dilation with less force.

 7   This is useful in women who have never had pregnancies before

 8   where their cervix has never dilated with childbirth and it's

 9   firmer and it's tighter.  So it makes the mechanical dilations

10   safer.  So sometimes there's a combination of both the

11   misoprostol and the metal rod.  But generally, in the first ten

12   to 11 weeks of pregnancy, the metal rods are used to dilate the

13   cervix.

14        The second question:  Is there any need to dilate the

15   cervix during a medication abortion?

16        No, because the combination of the first drug, the

17   Mifeprex, combined with the second drug, misoprostol, by itself

18   softens and dilates the cervix.  And that's one of the reasons

19   that's used sometimes to induce labor in women.  So the cervix

20   is soft and already dilated with the medication abortion

21   two-pill regimen.  And even when that fails and the patient has

22   to come back because it's incomplete and you have to suction out

23   the remaining tissue, dilation is not necessary.  The cervix is

24   already dilated from the pills.

25        The third question:  Is there a complication from

1   abortion which would require a hysterectomy?

2          Yes.   There are situations where a pregnancy can

3   implant in a cesarean scar, sometimes what we call a placenta

4   accreta, A-C-C-R-E-T-A, and that placental tissue cannot be

5   removed.   The uterus is not contracting down.   The woman

6   hemorrhages; and to save her life, you have to take the uterus

7   out.   This is very rare but sometimes can occur.

8          How large is the risk of that particular complication?

9   Extremely small.   If hospitalizations are required in five women

10   per 10,000, hysterectomy might be required in about 15 percent

11   of those women hospitalized.   Generally they're hospitalized for

12   intravenous antibiotics or to have a D&C to control the

13   bleeding.

14          Is there a complication from abortion which could

15   require a laparotomy?

16          A laparotomy is an incision in the uterus to look

17   around.   And sometimes instead of laparotomy, Your Honor,

18   they'll use laparoscopy where they'll put a telescope through a

19   maybe one-half-inch incision in the abdomen.   And using the

20   telescope, they can look around inside.   And the purpose of that

21   is if there's a suspicion of internal bleeding as might occur

22   with a uterine perforation or laceration of the cervix.   So

23   sometimes -- again, the need for a laparotomy is fairly rare.

24   Again, in percentages of women admitted to the hospital, it

25   would range in maybe 20 percent, a little more than

1    hysterectomy, but not a lot.

2          Is there -- in Cleland, et al., table two, the largest

3    portion of significant outcomes or events from medication

4    abortion is ongoing intrauterine pregnancy.

5          And that's correct, Your Honor.  In that study, the

6    ongoing pregnancy rate was 0.5 percent, as I recall.  Medication

7    abortion -- women who are consented for medication abortion are

8    told that this is 99 and a half percent effective, but it's not

9    a hundred percent.  In fact, using the FDA protocol in the

10   original published studies, there was a two percent failure rate

11   with ongoing pregnancy.  So the woman needs to know that it's

12   not a hundred percent.  And that's why it's important that with

13   medication abortion the woman come back for follow-up so we can

14   make sure the pregnancy is gone.

15         What is an ongoing intrauterine pregnancy?

16         That's where typically the medication abortion drugs

17   have not worked in that one-half of a percent.  And they come

18   back and they still feel pregnant, and there's still a viable

19   pregnancy there.  At that point, because we said one of the

20   drugs -- the second drug is potentially teratogenic, the

21   patients are counseled they really should have a surgical

22   completion of that abortion.  Sometimes the embryo has died but

23   the tissue is still in the uterus.  And in that case, you still

24   need to evacuate the uterus.  The drug didn't completely cause

25   expulsion.  Now, in that situation, in both of those situations,

1    an ongoing pregnancy and a continuing pregnancy, if you repeat

2    the dose of the second drug, the misoprostol, 50 percent of the

3    time that will complete the abortion without having to do

4    surgery.

5         Remember, women choose medication abortion for several

6    advantages.  They don't want to have to go into a clinic around

7    the protestors if they don't have to.  They want to be able to

8    be in control of the process themselves.  They want to be in

9    their home environment when they have the miscarriage.  They

10   want to be in control more; whereas a surgical procedure, you go

11   in, have a surgical procedure done, and it's over with.  Some

12   women prefer the surgical procedure.  Other women prefer the

13   medication abortion.  In many clinics, women who are eligible

14   for the medication abortion, nine weeks and less, approximately

15   30 percent to as many as 50 percent choose to have the pill, the

16   medication abortion, rather than having a surgical procedure

17   because they like being kind of in control and they perceive the

18   process as more natural.

19        So what -- would it cause pain or other complications

20   to the women?

21        The ongoing viable pregnancy, generally no symptoms,

22   other than she would continue to feel pregnant.  In the

23   situation of retained tissue, just like a spontaneous abortion,

24   that would be bleeding and cramping that would occur.  And that

25   would be diagnosed by doing an ultrasound.

1        And generally, most of the time the ongoing pregnancy

2   is discovered in the follow-up visit.  And we keep logs of the

3   medication abortions.  So if a patient doesn't show up for her

4   follow-up appointment generally a week later, we'll call and

5   keep calling saying you need to come in so we can confirm that

6   the pregnancy -- the abortion is complete and the pregnancy is

7   gone.

8        MS. SANDMAN:  Your Honor, one further question, if I

9   may.

10       THE COURT:  Any follow-up questions from you first?

11       MS. SANDMAN:  Yes, Your Honor.

12       THE COURT:  Okay.

13       MS. SANDMAN:  Just one.

14                   REDIRECT EXAMINATION

15  BY MS. SANDMAN:

16  Q.  Dr. Fine, you spoke about it being very rare that an

17  abortion complication would lead to a hysterectomy.  Is it even

18  more rare if you focus on abortions in the first trimester?

19  A.  Yes.

20  Q.  And is that true for the complication rates -- excuse me --

21  for the rate of complications that could lead to a laparotomy as

22  well?

23  A.  Yes.  The -- Your Honor, the more you have to dilate the

24  cervix bigger, then the -- and the more instrumentation you have

25  to use to remove the tissue parts, the higher the risk of

1  perforation to the uterus.  And also, the further along the

2  pregnancy is, the larger the placenta is.  And the placenta can

3  implant in the cesarean scar where it won't come out.  It's

4  called an accreta, A-C-C-R-E-T-A.  And that can cause severe

5  hemorrhage and the need for hysterectomy.  Much more common in

6  the second trimester than in the first trimester.  It's very

7  rare in the first trimester.

8          MS. SANDMAN:  No further questions.

9                  RECROSS-EXAMINATION

10 BY MR. DAVIS:

11 Q.  Dr. Fine, if a medication abortion is administered too late

12 in the process -- the protocol you have given testimony about,

13 what was the limit, gestational age?

14 A.  The evidence-based regimen is 63 days, although there is

15 data that is recently going to be presented that shows it's safe

16 through ten weeks or 70 days.

17 Q.  Okay.  Let's say that a doctor erroneously administers a

18 medication abortion at, say, 15 weeks.  How do the risks differ?

19 What risks are presented in that scenario?

20 A.  Probably none.  The abortion would either work or it would

21 not work.  Now, at 15 weeks' gestation, there is a higher chance

22 that not all the tissue might pass and some of the tissue might

23 be retained; and that would increase the risk for hemorrhage or

24 infection.  But part of the protocol is you do not do a

25 medication abortion without confirming that there is an

1    intrauterine pregnancy.  And it is by ultrasound within the

2    parameters; that is, 63 days.

3        And the ultrasounds are done transvaginally, Your Honor.

4    There's a probe that's put through the vagina that puts it in

5    close proximity to the uterus, and they can measure the

6    pregnancy age by days.  They can say it's six weeks two days.

7    It's that accurate.

8    Q.  Whatever the likelihood is that a clinic would administer it

9    at such a late stage, is it true, then, that the complications

10   that could be present are the same, it's just that the risk of

11   the complication may differ for later term?

12   A.  Well, they would not use an abortion pill beyond nine weeks.

13   So it's --

14   Q.  Just saying hypothetically.

15   A.  Hypothetically, if they didn't do their due diligence and

16   for whatever reason gave the pills to a woman who is 15 weeks

17   pregnant, usually what will happen is it wouldn't work.

18   Q.  Okay.

19   A.  The pregnancy will continue.

20   Q.  There's been testimony from an Alabama clinic, Dr. Fine,

21   that abortion clinics sometimes have patients present who are

22   recreational drug users.  Are the risks that you've been

23   discussing -- would they be different in any way from a patient

24   who is -- is a recreational drug user?

25   A.  No.

1  Q.  No impact on risk, to your knowledge?

2  A.  Not -- not as far as abortion complications.  If you -- if

3  you are going to use oral Valium or other medications

4  beforehand, then you would want to know if -- you know, if she's

5  a user, because that could affect her tolerance.  She would need

6  more pain medicine than average.

7  Q.  Pain tolerance is how you would --

8  A.  Pain tolerance would be -- would be -- would be greater.  A

9  drug user would need more pain medicine than a nondrug user.

10 But in terms of the actual technical abortion procedure and the

11 potential complications from that abortion procedure, they would

12 be the same in a drug user versus a nondrug user.

13 Q.  You said on redirect examination that doctors from the

14 clinic that you administer would be available in the event an ER

15 doctor did wish to speak to the abortion provider; is that

16 correct?

17 A.  Correct.  Correct.

18 Q.  But haven't you also said that there's really no need for

19 that conversation to take place?

20 A.  Most of the time, the ER doctor does not attempt to contact

21 the abortion provider.

22 Q.  If the ER doctor does want such a conversation, is the ER

23 doctor just mistaken, dumb?

24 A.  No, not mistaken or dumb.  It's just -- it can be a courtesy

25 to call the surgeon.  It's a nice courtesy to do, but it's not

1    medically necessary.

2    Q.  Did you testify in the Texas litigation --

3    A.  I did.

4    Q.  -- concerning admitting privileges?

5    A.  I did.

6    Q.  Has your testimony and opinions in that case been generally

7    and materially the same as what you presented today?

8    A.  Yes, sir.

9         MR. DAVIS:  Thank you.

10        THE COURT:  Anything else from the plaintiffs?

11        MS. SANDMAN:  No, Your Honor.

12        THE COURT:  Okay.  You may step down.  Thank you.

13        THE WITNESS:  Thank you, Your Honor.

14        THE COURT:  Where are we with regard to the next

15   witness?

16        MR. DAVIS:  I believe they're checking, Your Honor.

17        THE COURT:  Okay.  So you need a break now to set up

18   everything; is that right?

19        MR. DAVIS:  Yes, there would need to be a break now.

20        THE COURT:  Okay.  Very good.  How long?

21        MR. DAVIS:  How long?  Give us -- give us five minutes,

22   and then I'll let Mr. Green know, if that's sufficient.

23        THE COURT:  Very good.  We'll take ten minutes, then.

24     (Recess at 1:47 p.m. until 2:45 p.m.)

25        THE CLERK:  Please remain seated.  Court is in session.

1       THE COURT:  Counsel, I understand we're having some

2  difficulty with the next witness.  Mr. Davis, why don't you put

3  in the record what the problem is.

4       MR. DAVIS:  Yes, Your Honor.  This witness was

5  scheduled to testify remotely.  There had been some testing of

6  the equipment, but it simply could not be made to work this

7  afternoon.  We would like to -- would ask the Court's indulgence

8  to let us reschedule this witness.  We would also -- we may even

9  ask for the Court's assistance, instead of him testifying

10 remotely, that it be at a federal courthouse so that we'll have

11 more control over the technology.

12      THE COURT:  That type of thing, just check with my IT

13 people.

14      MR. DAVIS:  We will.

15      THE COURT:  And we'll do everything we can to

16 facilitate his testifying in a way that we can all watch and

17 hear.

18      MR. DAVIS:  We are as sorry as we can be, Your Honor.

19      THE COURT:  Well, these things happen.

20      MR. DAVIS:  We want to work with plaintiffs to make

21 sure they're not prejudiced in this.

22      THE COURT:  Right.  Right.

23      I understand, Mr. White, that that's correct; is that

24 correct?

25      CLERK WHITE:  That is correct, Your Honor.

1    THE COURT:  And we'll facilitate maybe the witness

2  being at a courthouse or somewhere else so that maybe we won't

3  have this problem?

4    CLERK WHITE:  That is correct.

5    THE COURT:  And I understand you think the problem is

6  at the other end?

7    CLERK WHITE:  Yes, it is.

8    THE COURT:  Because you have already tested it from

9  this end.

10    CLERK WHITE:  Yes, we have.  We've thoroughly tested

11  it.

12    THE COURT:  Okay.  How long will this witness's

13  testimony take?

14    MR. DAVIS:  This is an expert witness, Your Honor.  My

15  estimate is the direct exam will take between an hour and an

16  hour and 15 minutes.  This is the defendant's expert on medical

17  necessity.

18    THE COURT:  In light of the dates that I gave you, do

19  you have a suggested date?

20    MR. DAVIS:  I do not, Your Honor.  Because this is all

21  such a new situation, we would need to speak with Dr. Thorp

22  about his availability on the dates that the Court has

23  available.

24    THE COURT:  Okay.  Very good.

25    MR. DAVIS:  We assure you we will work as promptly as

1    we can.

2         THE COURT:  Okay.  Now, I understand the other witness

3    is on the way?

4         MR. DAVIS:  That is correct.

5         THE COURT:  And how far away is that witness?

6         MR. DAVIS:  He is -- he was already in town at the

7    offices of the Board of Medical Examiners, which is not far.  So

8    he may be even in the building, Your Honor.

9         THE COURT:  Okay.  While we have this hiatus in the

10   trial, there is a matter I'd like to take up with you-all.  And

11   you can get the citations to these cases from my law clerks in

12   case you don't get them down as quickly as I recite them.  But

13   one of the legal issues that the Court needs to resolve is the

14   question of whether and how to take into account the

15   availability of abortion clinics outside the borders of Alabama

16   or the border of Alabama.

17        There are some cases that supposedly address this issue

18   in other contexts.  For instance, as a defense to an equal

19   protection claim, there's a question about access to another

20   state.  As a defense to a First Amendment claim, there was an

21   issue about the access to a nearby city.  And I think the thing

22   that really comes to mind is as a defense to a Second Amendment

23   claim, there was a question about access to a nearby city.  And

24   in these cases I think the courts rejected looking at the

25   accessibility issue outside of the terrain at issue.

1          And I'm going to give you the citations, and I want

2    both sides to address it.  *Gaines versus Canada*.  It's a 1938

3    Supreme Court case found at 305 U.S. 337.  *Schad*, S-C-H-A-D,

4    *versus Borough of Mt. Ephraim*, E-P-H-R-A-I-M, found -- it's a

5    1981 Supreme Court case found at 452 U.S. 61.  And finally,

6    *Ezell*, E-Z-E-L-L, *versus City of Chicago*, a 2011 Seventh Circuit

7    case found at 651 F.3d 684.  And I believe the last one is a

8    Second Amendment gun case.

9          When do the plaintiffs think they can get something to

10   me regarding this issue in light of these cases, looking at this

11   issue in other contexts?

12         MS. KOLBI-MOLINAS:  We could get something by Friday,

13   Your Honor.

14         THE COURT:  By Friday?

15         MS. KOLBI-MOLINAS:  Yeah.

16         THE COURT:  Okay.  When would you like to respond,

17   defendants?

18         MR. DAVIS:  How about Tuesday, Your Honor?

19         THE COURT:  Tuesday would be fine.  Obviously, if you

20   find other cases in other parallel contexts, include those as

21   well.  You're not just limited to just these three cases, nor

22   are you limited to just these three contexts.

23         Okay.  Thank you very much.  As soon as the witness

24   arrives, we'll get started.

25         MR. DAVIS:  Thank you, Your Honor.

1        (Recess at 2:50 p.m. until 2:55 p.m.)

2            THE CLERK:  Please remain seated.  Court is in session.

3            Stand up, please.

4        (The witness is sworn)

5            THE COURT:  Mr. Davis, our videoconferencing skills are

6    in their infancy, and we learned a big lesson today about only

7    doing them at the courthouse or somewhere like that with an IT

8    person present.  I'm telling you this only because we've also

9    learned.

10            MR. DAVIS:  I appreciate that.  I hope you understand

11   that we are by no means unsatisfied with the support we have

12   gotten from Mr. White and others.  They have been tremendous.

13            THE COURT:  Well, we're in the learning stage.  So

14   we're sharing this and will be talking about the technical

15   aspect of it in the weeks to come to make sure that in the

16   future, as we get better at it, we'll get better.

17            MR. DAVIS:  We thank you again for your understanding.

18            THE COURT:  Very good.  Thank you.  Proceed.

19            MS. HOWELL:  Good afternoon, Your Honor.

20            **GEORGE SMITH, JR., M.D.**, the witness, having been duly

21   sworn to speak the truth, the whole truth, and nothing but the

22   truth, testified as follows:

23                          DIRECT EXAMINATION

24   BY MS. HOWELL:

25   Q.  Dr. Smith, would you please introduce yourself to the Court.

1    A.   My name is George Smith, Jr.   I'm the chairman of the Board

2    of Medical Examiners.

3    Q.   Okay.   And what does the Board of Medical Examiners do?

4    A.   It licenses and regulates and disciplines physicians and

5    physician's assistants in Alabama.

6    Q.   And to be perfectly clear, does the board have any

7    involvement in the operations of abortion clinics in Alabama?

8    A.   No.

9    Q.   So your only involvement, if any, with an abortion clinic

10   would be related to the conduct of the clinic's physicians; is

11   that correct?

12   A.   That is correct.

13   Q.   And would the responsibilities of a medical director of an

14   abortion clinic be within the board's purview if she was a

15   physician?

16   A.   Yes.

17   Q.   Okay.   I'm going to refer to the Board of Medical Examiners

18   as the board.   Is that all right by you?

19   A.   Yes.

20   Q.   And you'll understand what I mean?

21   A.   Yes, ma'am.

22   Q.   Okay.   Does the board have rules about the maintenance of

23   medical records?

24   A.   Yes.

25   Q.   Why does the board have those rules?

1    A.   To try to make sure that there is continuity of care when

2    physicians leave their practice or patients change physicians or

3    whatever circumstance happens with our people moving around.

4    Q.   Are you familiar with the rules that govern medical records?

5    A.   I'm familiar, not -- they're not memorized.

6    Q.   All right.

7            MS. HOWELL:  Your Honor.

8            THE COURT:  Yes.

9            MS. HOWELL:  I would like -- I would like to ask the

10   Court to take judicial notice of a section of the Alabama

11   Administrative Code, which I do have a copy for Your Honor.

12           THE COURT:  Right.  Well, I will take judicial notice

13   of all of the laws and the administrative provisions of Alabama

14   that are relevant.  Just let me see it if you want me to look at

15   it.

16           MS. HOWELL:  Yes, sir.  If I might approach?

17           THE COURT:  Certainly.

18           MS. HOWELL:  May I approach the witness?

19           THE COURT:  Yes.

20           THE WITNESS:  I brought my glasses.

21   Q.   (Ms. Howell, continuing:)  Dr. Smith, can you tell the Court

22   what I've just handed you.

23   A.   It is a portion of the Alabama Board of Medical Examiners'

24   Administrative Code.

25   Q.   Okay.  And would I be correct in saying that this is Section

1  540-X-9?

2  A.   Yes, ma'am.

3  Q.   All right.  Would you please flip to the page that has been

4  tabbed in green on your copy.  And if I could get you to read

5  aloud subsection (3) of --

6         THE COURT:   Subsection (3) of what?

7         MS. HOWELL:   Of -- sorry.  Of this particular section.

8  It's 540-X-9-.10, subsection (3).

9         THE COURT:   Right.  I have it here.

10  A.   Under transfer or disposal?

11  Q.   Yes, sir.

12  A.   When a physician retires, terminates employment, or

13  otherwise leaves a medical practice, he or she is responsible

14  for ensuring that active patients receive reasonable

15  notification and are given the opportunity to arrange for the

16  transfer of their medical records.  A physician or physician

17  group should not withhold information from a departing physician

18  which is necessary for notification of patients.  A physician or

19  the estate of a deceased physician transferring medical records

20  in connection with the sale of a medical practice should notify

21  the physician's active patients that the records are being

22  transferred and should provide the patient with information

23  sufficient to secure the transfer of the medical record.

24  Q.   So having read this subsection, can you tell me as a member

25  of the board if a doctor were to stop providing services at an

1    abortion clinic because the clinic closed temporarily, would the

2    section you just read apply?

3    A.   Yes.

4    Q.   Why?

5    A.   Because it's a -- it is a physician practice.

6    Q.   Okay.  Could you elaborate on that?

7    A.   Well, a clinic of whatever nature providing medical services

8    is a clinic.  A physician practice -- a physician practices

9    there.  And thus, if they terminate their services, then I would

10   be -- would be -- think that this section would hold to them.

11          MS. HOWELL:  Your Honor, I'm about to read what I -- I

12   think you had asked us to warn you might be a potentially

13   objectionable hypothetical.

14          THE COURT:  Say that again.

15          MS. HOWELL:  I think you had asked us to give you a

16   little bit of warning --

17          THE COURT:  Right.

18          MS. HOWELL:  -- if we were going to ask questions like

19   this.

20          THE COURT:  Okay.

21   Q.   So Dr. Smith, if a clinic closed and patients were not

22   notified, would that cause the board concerns about continuity

23   of care?

24   A.   Yes.

25   Q.   Why?

1   A.   Because the patients are, again, supposed to be notified if

2   their physician is not available.

3   Q.   And if a patient from that closed clinic showed up at

4   another clinic for follow-up care and that follow-up clinic

5   wasn't able to get in touch with the original clinic, would that

6   raise concerns among members of the board for continuity of

7   care?

8   A.   Yes, it would.

9   Q.   And again, why?

10  A.   Because they -- they would need history and records in order

11  to provide better continuity of care.

12  Q.   All right.  And this is the last in that sequence of

13  questions.  If a patient is referred or transferred to another

14  physician, why would the board consider it important that the

15  new physician have access to the patient's existing medical

16  records?

17  A.   So they can see what's been done and what's been diagnosed.

18  So they don't have to repeat -- or reinvent the wheel, as we

19  say.

20  Q.   And why would repetition be a bad thing?

21  A.   Well, for one thing, it would be costly.  And second, it

22  might -- could be dangerous to repeat the same tests that have

23  been done again.

24  Q.   How so?

25  A.   Well, if you've had a surgical procedure, you would want to

1  be able to know the results and the pathology and the -- what

2  had been done before, what was seen before, prior to doing it

3  again.

4  Q.  Are accurate patient records important to the board?

5  A.  They're very important.

6  Q.  Why?

7  A.  It's how we judge the medical care that's given.

8  Q.  Could you elaborate on that?

9  A.  Well, your medical record is how -- it reflects on what is

10 done to the patient, the diagnosis, and the treatment.  And it

11 needs to be accurate so, one, the patient will know, if they

12 take their records to another doctor, what's been done in the

13 past; but also, insurance claims, diagnoses, the consultations,

14 et cetera, they all have to have an accurate medical record in

15 order to function correctly.

16 Q.  Dr. Smith, I might have asked this question in a different

17 form before, but why do the board's rules require that patients

18 be notified if a medical office closes?

19 A.  So they would have an opportunity to arrange care.

20 Q.  Okay.  And how does that notification benefit the patient?

21 A.  It allows them to have a chance to come -- usually come to

22 get their records and allow -- to try to find another provider.

23 Q.  And my last question on this subject area is should a

24 physician document referrals in the patient's medical records?

25 A.  Yes.

1  Q.   Why?

2  A.   Because that way third-party reviewers or -- it's just part

3  of the care.   It's a routine part of the medical record.

4  Q.   I want to turn now to the board's rules that concern patient

5  follow-up care.

6          MS. HOWELL:   And, Your Honor, this is again another

7  section of the Alabama Administrative Code.

8          THE COURT:   You don't have that tabbed, though, do you?

9          MS. HOWELL:   No, sir.

10          THE COURT:   Okay.   So what are we looking at?   Oh, you

11  have it.   This is not in the --

12          MS. HOWELL:   Yes.   Sorry.

13          THE COURT:   Okay.   I'm sorry.   I see now.   You want to

14  hand it to me separately.   Very good.   Thank you.

15          MS. HOWELL:   I thought it might actually be easier that

16  way, but I was wrong.

17          THE COURT:   I hope the other lawyers are as organized

18  as you are.

19          MS. HOWELL:   Probably more so, actually.

20  Q.   (Ms. Howell, continuing:)   Dr. Smith, could you tell me what

21  I've just handed you.

22  A.   Administrative code from the Board of Medical Examiners

23  540-X-10, Office-Based Surgery.

24          MS. HOWELL:   And Your Honor, I would like to note this

25  has already been introduced into the record as part of Document

1  201-1.

2         THE COURT:  Very good.

3         MS. HOWELL:  It was Exhibit 3 to his first deposition.

4  Q.  All right.  Dr. Smith, if you could flip to the page that's

5  been tabbed again in green.  And that is page 10-4.

6  A.  Item (g)?

7  Q.  Yes.

8  A.  Okay.

9  Q.  All right.  So this is Administrative Code Section

10 540-X-10-.01(g).  And if I could get you to read that subsection

11 aloud.

12 A.  Follow-up care.  As with any surgical treatment or

13 procedure, follow-up care by the responsible surgeon is a

14 requirement.  Arrangements shall be made for follow-up care and

15 for treatment of complications outside normal business hours.

16 The patient or responsible adult should be aware of these

17 arrangements and of any medication prescribed after the

18 procedure.

19 Q.  All right.  Dr. Smith, why does the board call proper

20 follow-up care a requirement in these rules?

21 A.  Because if you do a procedure, you should have a procedure

22 for follow-up if there's an emergency or a complication.  And

23 that's why it's a requirement.

24 Q.  So this helps the doctor track the patient's progress.

25 A.  Well, it makes sure that the patient is taken care of if

1  something occurs outside of normal hours.

2  Q.  Okay.  And why do the board's rules state that follow-up

3  care is to be given by the surgeon that performed the procedure?

4  A.  It's the board's feeling that the person that does the

5  procedure is responsible if there's a complication.

6         MS. HOWELL:  Your Honor, I'm about to read another

7  potentially objectionable hypothetical.

8         THE COURT:  Okay.

9  Q.  Dr. Smith, if a patient were not informed of a change in an

10 office's follow-up care procedures, would the board view that as

11 a problem, given the requirements set out in the code provision

12 that you just read?

13 A.  We would be concerned.

14 Q.  Why?

15 A.  Because we feel like it's very important that patients know

16 what they're supposed to do at all times in terms of

17 complications or treatment after they have procedures or any

18 kind of care.

19 Q.  Dr. Smith, I'm going to show you one final exhibit.  This is

20 Defendant's Exhibit 25, which is an uncontested exhibit.

21         MS. HOWELL:  Your Honor, if I might approach?

22         THE COURT:  Yes.

23         Now, these administrative code sections are part of the

24 record.  Oh, you actually have them marked as exhibits?

25         MS. HOWELL:  No, sir.  Sorry.  That marking is from

1    Dr. Smith's earlier deposition.

2            THE COURT:  Are these administrative code sections on

3    line or --

4            MS. HOWELL:  Yes.

5            THE COURT:  -- how can the Court get access to them?

6            MS. HOWELL:  I apologize.  I can find a direct link for

7    the Court and send it to you.

8            THE COURT:  Either that or mark them as exhibits.

9    Obviously, I can get to the code pretty easily.  I just want to

10   make sure I can get to the administrative code.  That is, I can

11   get to the statutory code.  I want to make sure I can get to the

12   administrative code or any other court can get to the

13   administrative code.

14           MS. HOWELL:  Absolutely.

15   Q.  (Ms. Howell, continuing:)  Dr. Smith, as I mentioned before,

16   this is Defendant's Exhibit 25.  If you could flip to the third

17   page.  Do you recognize this document?

18   A.  I saw it at my last deposition.

19   Q.  And have you read it before?

20   A.  Yes.

21   Q.  So you're familiar with its contents.

22   A.  Yes.

23   Q.  To the extent the problems in this report implicate the

24   conduct of physicians working at that particular clinic, would

25   the board be concerned about continuity of care for patients

1  seen at that clinic around the time the incidents in the report

2  occurred?

3         MR. MARSHALL:  Your Honor, plaintiffs object to this

4  line of questioning in specific to this document that has been

5  introduced.  Here's the basis of our concern.  Ms. Staci Fox of

6  Planned Parenthood testified earlier in this trial that Planned

7  Parenthood had sent a complaint to the department of nursing

8  regarding the conduct of a nurse at the Birmingham clinic and

9  sent a copy of that complaint to the Board of Medical Examiners.

10        Now, the medical -- the Board of Medical Examiners, the

11  chairman, is being questioned on matters that may already be

12  before his board or which may, in the future, go before his

13  board.  And we think that it is highly improper to try and

14  elicit conclusions from the chairman of the Board of Medical

15  Examiners when his impartiality could then later be called into

16  question if there's any proceeding involving the medical

17  director of this clinic.  We think -- we think that this is a

18  matter of due process rights for Planned Parenthood and their

19  medical director that this testimony not be drawn out in order

20  to color Dr. Smith's later responsibilities as chairman of the

21  Board of Medical Examiners.

22        THE COURT:  Were these questions asked during the

23  deposition?

24        MR. MARSHALL:  Well, I'm not exactly sure.  There --

25  there were not -- both of us questioned him about the statement

1  of deficiencies, but --

2       THE COURT:  My question, though, is were the questions

3  that you understand defense counsel to be about to ask asked

4  during the deposition of this witness?

5       MR. MARSHALL:  I -- I could be corrected, but I don't

6  think this particular question -- there was questions about

7  whether a -- if a medical director did not do his duties, that

8  would be a concern to the Board of Medical Examiners.  As

9  counsel gets into the specific allegations contained in the

10  statement of deficiencies, I don't believe that those were asked

11  one by one during the depositions.  Moreover, I attempted to

12  question Dr. Smith about whether there was an investigation of

13  the medical director and whether that was ongoing before the

14  board.  And on instructions of counsel, Dr. Smith declined to

15  answer any questions because of the confidentiality of

16  investigatory materials of the Board of Medical Examiners.

17       THE COURT:  What's your response?

18       MS. HOWELL:  My response is actually that that was my

19  final question.  I did not intend to go into any further detail

20  about the incident report.

21       THE COURT:  Would you state the question again?

22       MS. HOWELL:  Sure.

23       THE COURT:  I can find it here.  Let's see.  Just to

24  refresh me.  Probably restate it faster than I can find it.

25       MS. HOWELL:  Okay.  The question was to the extent the

1   problems in the report that he was just handed as Defendant's

2   Exhibit 25 implicate the conduct of physicians working at that

3   particular clinic, would the board be concerned about the

4   continuity of care for patients seen at that clinic around the

5   time the incidents occurred.

6            THE COURT:  Now, how does that question differ from the

7   questions to which there were objections in the deposition?

8            MS. HOWELL:  I'm -- I'm not sure that I asked --

9            THE COURT:  That is, would it go into confidentiality

10  of an investigation and so forth or not?

11           MS. HOWELL:  Well, Your Honor, all I wanted to know was

12  if the situations there were in the vein that the board would be

13  concerned about.  That was all that I was aiming to elicit as

14  far as testimony goes.

15           MR. MARSHALL:  And if they are in a vein of concern to

16  the board, then I think that underscores the plaintiff's concern

17  that this is a matter that may well be within the jurisdiction

18  or alleged to be within the jurisdiction of the Board of Medical

19  Examiners.  And he's being asked to make prejudgment as to those

20  matters here in his testimony.

21           MS. HOWELL:  Your Honor, I think I'll just save us all

22  the time and withdraw the question.

23           THE COURT:  Okay.  Very good.

24           MS. HOWELL:  Thank you very much, Dr. Smith.

25           THE WITNESS:  Yes, ma'am.

1        MS. HOWELL:   No further questions.

2                        CROSS-EXAMINATION

3   BY MR. MARSHALL:

4   Q.   Good afternoon, Dr. Smith.

5   A.   Yes, sir.

6   Q.   My name is Randall Marshall.   We've met before.

7   A.   Yes, sir.   Several times.

8   Q.   Having looked at the document that counsel just gave you,

9   the statement of deficiencies, I'm not going to ask you about

10  that document; but I do want to ensure that we have the record

11  as to what the board's responsibilities are versus the clinic as

12  opposed to the medical director.   So Doctor, your professional

13  duties with the board have never involved visiting a Planned

14  Parenthood clinic in Birmingham, correct?

15  A.   Correct.

16  Q.   And nor would anybody from the board have done that either,

17  correct?

18  A.   Ever?   I don't know.

19  Q.   Nobody that you're aware of.

20  A.   Not that I'm aware of.

21  Q.   Okay.   And the Board of Medical Examiners does not have any

22  responsibilities with respect to the licensing of the Planned

23  Parenthood clinic in Birmingham, correct?

24  A.   Correct.

25  Q.   Nor with any abortion clinic in Alabama, right?

1  A.  Correct.

2  Q.  And Dr. Smith, you would not consider yourself to be an

3  expert with regard to abortions, correct?

4  A.  Correct.

5  Q.  Or abortion care.

6  A.  Correct.

7  Q.  And you don't have any personal knowledge about anything

8  that may have happened at the Planned Parenthood clinic in

9  Birmingham, do you?

10  A.  That is correct.

11  Q.  Now, Dr. Smith, the board determines who is qualified to be

12  a licensed physician in Alabama, correct?

13  A.  That is correct.

14  Q.  And living in the state of Alabama is not a qualification to

15  be licensed to practice in Alabama, is it?

16  A.  That's correct.

17  Q.  And so a physician licensed in Alabama who lives outside the

18  state, travels to Alabama to perform a medical procedure, that

19  physician is fully entitled to do so within the rules of the

20  board, correct?

21  A.  Yes, sir.

22  Q.  Now, Dr. Smith, all physicians who perform office-based

23  surgery in Alabama don't live in Alabama, do they?

24  A.  Probably not.

25  Q.  Okay.  In fact, you have heard about or are aware of

1  office-based physicians that fly into the state, perform

2  office-based surgery, and immediately leave the state after the

3  surgery, correct?

4  A.  I would say I don't know any particular instances except for

5  the obvious one.

6  Q.  Well, you testified in an earlier deposition that in fact

7  you had heard of such practice.  Do you recall that testimony?

8  A.  No, sir.

9       MR. MARSHALL:  I'm looking at page 71 of Dr. Smith's

10  October 16th, 2013, deposition.  And that has been submitted to

11  the Court.

12  Q.  I'm going to read starting on line 12, Dr. Smith.  Question:

13  Are there offices -- to the best of your understanding, are

14  there office-based physicians that fly into the state of

15  Alabama, perform office-based surgery, and immediately leave the

16  state of Alabama after performing the surgery?  Answer:  I hear

17  there are.

18     Do you recall that testimony, Dr. Smith?

19  A.  No, sir.  I think we were talking about abortion clinics

20  that day, so that's why -- I certainly know that.  That's what

21  happens there.

22  Q.  Well, the subject of the -- the examination at your original

23  deposition was office-based surgery, was it not?

24  A.  Yes, sir.  But you asked me if I know of a specific

25  incident, and I do not.  That was the question.

1    Q.  But it strikes you as certainly possible and plausible that

2    in Alabama, a licensed physician who lives outside the state

3    could come and do any kind of an office-based procedure and then

4    leave, correct?

5    A.  Yes, sir.

6    Q.  And the board has not addressed that practice in any way

7    through its rules, has it?

8    A.  No.

9    Q.  Now, Dr. Smith, the board has never seen fit to impose a

10   staff privileges requirement on office-based surgery; isn't that

11   correct?

12   A.  That is correct.

13   Q.  And that's true regardless of how dangerous the procedure

14   being performed in the office is?

15   A.  There is no requirement for staff privileges.

16   Q.  And even though office-based surgery in the state of Alabama

17   has occasionally resulted in death, that's still true.  There's

18   no admitting privileges requirement, correct?

19   A.  That is correct.

20        MR. MARSHALL:  One moment, Your Honor.

21     (Brief pause)

22        MR. MARSHALL:  No further questions, Your Honor.

23        MS. HOWELL:  Your Honor, I don't actually have any

24   redirect questions for Dr. Smith.

25        THE COURT:  Okay.

 1          MS. HOWELL:  But I did want to -- if the Court was

 2  interested in the Web address of the administrative code --

 3          THE COURT:  Would you just file it as a document?

 4          MS. HOWELL:  Absolutely.

 5          THE COURT:  That will be easier than reading it into

 6  the record.  What's your next exhibit in line?

 7          MS. HOWELL:  I'm sorry?

 8          THE COURT:  What's your next exhibit in line?  What is

 9  your next number?  What's the number of your next exhibit?

10          Do you have one, Mr. Davis?  Why don't we just call it

11  Court's Exhibit 1.

12          MR. DAVIS:  It would be Defendant's Exhibit 79, Your

13  Honor, but --

14          THE COURT:  We'll just call it Court's Exhibit 1.  Mark

15  it as Court's Exhibit 1.  And that will be a link to the

16  administrative code for Alabama.  Just either write it on a

17  piece of paper and hand it to the clerk or type it out or

18  whatever.

19          MS. HOWELL:  Thank you very much, Your Honor.

20          THE COURT:  Thank you.

21          MS. HOWELL:  Thank you, Dr. Smith.

22          MS. KOLBI-MOLINAS:  Your Honor --

23          THE COURT:  Yes.

24          MS. KOLBI-MOLINAS:  -- might I have a moment to raise

25  something with the Court?

```
1              THE COURT:  Okay.  Do we need this witness?

2              MS. KOLBI-MOLINAS:  No.

3              THE COURT:  Okay.  You may step down.

4         Yes.

5              MS. KOLBI-MOLINAS:  So, Your Honor, the trial is moving

6    quicker than plaintiffs had expected.  And --

7              THE COURT:  Say that again.

8              MS. KOLBI-MOLINAS:  The trial is moving faster than

9    plaintiffs had expected.

10             THE COURT:  Right.

11             MS. KOLBI-MOLINAS:  And we have tried to move witnesses

12   around to save time, but we're afraid that -- there are two

13   witnesses we just can't move.  So we are concerned we may end

14   early Thursday and Friday.

15             THE COURT:  Okay.

16             MS. KOLBI-MOLINAS:  Now, maybe, perhaps -- I don't know

17   if that works for Dr. Thorp, but we just wanted to let the Court

18   know.  We're very sorry.

19             THE COURT:  Very good.  How early Thursday and Friday

20   so that Mr. Davis will know whether he can fit in Dr. Thorp?

21        Is it Dr. Thorp?

22             MR. DAVIS:  Correct.  Dr. Thorp.

23             MS. KOLBI-MOLINAS:  I mean I think tomorrow could be

24   done by -- well, I think it would go a little after lunch, but

25   probably not much after lunch.
```

1          THE COURT:  Okay.  The only thing about Dr. Thorp is if

2    we set it up with a courthouse, that may take a little while

3    longer just to make the logistical arrangements.

4          But Anthony, get with the IT people and Mr. Davis to

5    see if we can do it as quickly as possible.

6          MR. DAVIS:  And Your Honor, this will bear further

7    phone calls with Dr. Thorp as well.  As I stand here, I simply

8    do not know what his schedule is.

9          THE COURT:  That's what I mean.  Well, you're going to

10   call him.

11         MR. DAVIS:  Yes.

12         THE COURT:  But I'm just saying, though, that the

13   closer it is to today, there's the added complication of setting

14   something up with another courthouse or another place that has

15   the technology that's needed.

16         MR. DAVIS:  Agreed.

17         THE COURT:  And what about -- let's see.  Today is

18   Wednesday?  Okay.  And what about Friday?

19         MS. KOLBI-MOLINAS:  So Friday, we have a physician who

20   is performing procedures in the morning, so he will have to be

21   here around one o'clock.  So I think that -- I can't imagine

22   later than three.

23         THE COURT:  But we don't have witnesses for the morning

24   on Friday?

25         MS. KOLBI-MOLINAS:  Yes.

 1              THE COURT:  Okay.  So you think you'll go all day

 2    Friday?

 3              MS. KOLBI-MOLINAS:  I don't think we'll go all day

 4    Friday.  We have one witness for the morning; and unfortunately,

 5    we can't move the other one back.  So there may be dead time

 6    between lunch and one o'clock.  But then that witness won't take

 7    all afternoon.

 8              THE COURT:  Won't take all afternoon?  So we should

 9    finish early Friday, is what you're saying.

10              MS. KOLBI-MOLINAS:  Yes.  Yes.

11              THE COURT:  What about Tuesday?

12              MS. KOLBI-MOLINAS:  Tuesday, we are not putting any

13    witnesses on.

14              THE COURT:  Is anyone putting witnesses on on Tuesday?

15              MR. DAVIS:  We are, Your Honor.  We have two experts

16    scheduled to testify.  We will be working with Mr. White about

17    moving them to federal courthouses.  Dr. Anderson will testify

18    at nine in the morning, and Dr. Uhlenberg, we have him scheduled

19    to begin at one in the afternoon.

20              THE COURT:  Will they take all day?

21              MR. DAVIS:  Dr. Anderson will take -- since he

22    addresses medical -- because he addresses medical necessity, I

23    expect it to be most of the morning.  Dr. Uhlenberg I doubt will

24    take all day.  And we're not calling Dr. Harvey, a witness that

25    was on our list, for that day.

1        THE COURT:  What about Wednesday?

2        MS. KOLBI-MOLINAS:  Wednesday we have one witness in

3   the morning scheduled at a courthouse in Delaware.  And that

4   will not take all morning.

5        THE COURT:  And that's the only witness you have?

6        MS. KOLBI-MOLINAS:  Yes, Your Honor.

7        THE COURT:  And the following Thursday does anyone have

8   a witness?

9        MR. DAVIS:  We do.  On June 5th, we have Dr. Keyes, an

10  expert witness.

11        THE COURT:  Is that Thursday, June 5th?

12        MR. DAVIS:  It is Thursday, June 5th, is what I have

13  down.

14        THE COURT:  Okay.  And just that one witness.  And how

15  long will that witness take?

16        MR. DAVIS:  Not the morning.  I -- I doubt that will

17  take all the morning.

18        THE COURT:  Okay.  And what about Friday?

19        MR. DAVIS:  None.  We have gone through all our

20  witnesses.  We also have -- Wednesday, in addition to Ms. Moore,

21  a plaintiff's witness, we have two fact witnesses that it may be

22  possible for us to call them Tuesday instead.  They are local.

23  But those two witnesses will be either Tuesday or Wednesday.  We

24  don't expect the two of them together to take a half a day.

25        THE COURT:  Very good.  So we can have the closing

1    arguments on Friday.

2              MS. KOLBI-MOLINAS:  Yes, Your Honor.  I just wanted

3    to -- also, we may need to call a rebuttal witness --

4              THE COURT:  Oh, okay.

5              MS. KOLBI-MOLINAS:  -- but I think that will happen on

6    the 5th.  I think that could happen on the 5th.

7              And I think you only have one witness on the 5th,

8    right?

9              MR. DAVIS:  We only have one witness on the 5th.  That

10   is correct.  And then we still have Dr. Thorp to --

11             THE COURT:  To work in.

12             MS. KOLBI-MOLINAS:  To figure out.

13             MR. DAVIS:  -- figure out.

14             THE COURT:  Right.  So I don't see why we can't have

15   closing arguments on Friday.  That would be the 6th.  I have

16   another trial starting the following Monday.

17             MR. DAVIS:  We do not at this moment see any reason why

18   that would not work, Your Honor; and we will work toward that

19   end.

20             THE COURT:  Okay.  Very good.  Okay.  Thank you-all

21   very much.

22             MS. KOLBI-MOLINAS:  Thank you.

23             THE COURT:  We're in recess until tomorrow at -- what

24   time is the first witness?  Nine o'clock?

25             MS. KOLBI-MOLINAS:  Yes, Your Honor.

1        THE COURT:  Very good.  Nine o'clock it is, tomorrow.

2     (Proceedings concluded at 3:28 p.m.)

3               * * * * * * * * * *

4               COURT REPORTER'S CERTIFICATE

5        I certify that the foregoing is a correct transcript

6  from the record of proceedings in the above-entitled matter.

7        This 3rd day of June, 2014.

8

9                         /s/ Risa L. Entrekin
                          Registered Diplomate Reporter
10                        Certified Realtime Reporter
                          Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25