```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF ALABAMA

 3                       NORTHERN DIVISION

 4

 5  PLANNED PARENTHOOD
    SOUTHEAST, INC., et al.,
 6
            Plaintiffs,
 7
        vs.                    CASE NO.:  2:13cv405-MHT
 8
    LUTHER STRANGE, et al.,
 9
            Defendants.
10

11

12

13                          VOLUME IV

14              * * * * * * * * * *

15              NONJURY TRIAL PROCEEDINGS

16              * * * * * * * * * *

17          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

18  DISTRICT JUDGE, at Montgomery, Alabama, on Thursday, May 22,

19  2014, commencing at 9:10 a.m.

20  APPEARANCES:

21  FOR THE PLAINTIFFS:      Ms. Alexa Kolbi-Molinas
                             Mr. Andrew David Beck
22                           Ms. Susan Talcott Camp
                             Ms. Julia Heather Kaye
23                           Attorneys at Law
                             AMERICAN CIVIL LIBERTIES UNION
24                           125 Broad Street, 18th Floor
                             New York, New York  10004-2400
25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE PLAINTIFFS:      Ms. Jennifer R. Sandman
                              Ms. Maithreyi Ratakonda
 3                            Attorneys at Law
                              PLANNED PARENTHOOD FEDERATION
 4                            OF AMERICA
                              434 West 33rd Street
 5                            New York, New York  10001

 6                            Ms. Dyanne Griffith
                              Attorney at Law
 7                            WILMER CUTLER PICKERING
                              HALE & DOOR, LLP
 8                            1875 Pennsylvania Avenue NW
                              Washington, D.C.  20006
 9
                              Mr. Randall C. Marshall
10                            Attorney at Law
                              ACLU of ALABAMA FOUNDATION, INC.
11                            P.O. Box 6179
                              Montgomery, Alabama  36106-0179
12
                              Mr. M. Wayne Sabel, Sr.
13                            Attorney at Law
                              SABEL & SABEL, P.C.
14                            2800 Zelda Road, Suite 100-5
                              Montgomery, Alabama  36106
15

16   FOR THE DEFENDANTS:      Mr. Andrew L. Brasher
                              Solicitor General
17                            STATE OF ALABAMA
                              OFFICE OF THE ATTORNEY GENERAL
18                            501 Washington Avenue
                              Montgomery, Alabama  36103
19
                              Mr. James William Davis
20                            Ms. Margaret Lindsey Fleming
                              Mr. Kyle A. Beckman
21                            Ms. Laura Elizabeth Howell
                              Assistant Attorneys General
22                            STATE OF ALABAMA
                              OFFICE OF THE ATTORNEY GENERAL
23                            501 Washington Avenue
                              Montgomery, Alabama  36130
24

25
```

```
 1
     APPEARANCES, Continued:
 2
     FOR THE DEFENDANTS:      Ms. Patricia Elaine Ivie
 3                            Mr. Phillip Brian Hale
                              Assistant Attorneys General
 4                            Office of General Counsel
                              STATE OF ALABAMA
 5                            DEPARTMENT OF PUBLIC HEALTH
                              RSA Tower
 6                            201 Monroe Street
                              Montgomery, Alabama  36104
 7
                  Proceedings reported stenographically;
 8                   transcript produced by computer.

 9                      * * * * * * * * * *

10                          VOLUME INDEX

11   MARY ROE, M.D.
          DIRECT BY MS. SANDMAN                      10
12        CROSS BY MS. FLEMING                       71
          REDIRECT BY MS. SANDMAN                   132
13        RECROSS BY MS. FLEMING                    145
          REDIRECT BY MS. SANDMAN                   149
14
     ROBIN PATE
15        DIRECT BY MS. GRIFFITH                    150
          CROSS BY MS. FLEMING                      159
16
     BENJAMIN BLAINE BROWN, III
17        DIRECT BY MS. GRIFFITH                    161
          CROSS BY MS. FLEMING                      172
18
     DR. P1
19        DIRECT BY MS. RATAKONDA                   176
          CROSS BY MR. BECKMAN                      197
20        REDIRECT BY MS. RATAKONDA                 207
          RECROSS BY MR. BECKMAN                    209
21
                        * * * * * * * * * *
22

23

24

25
```

```
 1      (The following proceedings was heard before the Honorable

 2       Myron H. Thompson, United States District Judge, at

 3       Montgomery, Alabama, on Thursday, May 22, 2014, commencing

 4       at 9:10 a.m.:)

 5      (Pursuant to oral order of the Court, any reference to an

 6       anonymous doctor by name has been substituted with the

 7       appropriate pseudonym)

 8      (Call to Order of the Court)

 9          THE COURT:  Plaintiffs, what's set for today?

10          MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call

11  Dr. Mary Roe.

12          THE COURT:  Very good.

13          MS. FLEMING:  Your Honor, may I address a point before

14  we begin?

15          THE COURT:  Yes.

16          MS. FLEMING:  I understand that the plaintiffs intend

17  to call three doctors, Dr. Mary Roe, Dr. A, and also Dr. P1, who

18  prefer to testify anonymously.

19          THE COURT:  Yes.

20          MS. FLEMING:  And that a screen has been erected in the

21  courtroom that would screen those witnesses from the parties and

22  their counsel?

23          THE COURT:  Yes.

24          MS. FLEMING:  Is that correct?

25          THE COURT:  Yes.
```

1          MS. FLEMING:  Will that screen be parted so that Your

2    Honor can view the witness?

3          THE COURT:  Yes.  I understand that I will be able to

4    see the witness.

5          MS. FLEMING:  Your Honor, we would respectfully object.

6    The ABA Rules of Judicial -- Model Rules of Judicial Conduct

7    prohibit any sort of ex parte communication with the Court and

8    the witness outside the presence of the parties and their

9    counsel.  And in this particular case, Your Honor, if the screen

10   is parted so that Your Honor views the witness, all sorts of

11   nonverbal communications will be communicated to the Court that

12   we, as parties and counsel, would not be privy to.

13         THE COURT:  I have two questions.

14         MS. FLEMING:  Yes.

15         THE COURT:  Number one is I thought that you-all came

16   over to look at all of this last week, including the -- the

17   curtain or screen, and I thought this had the approval of

18   everyone.  That's why I had everyone come over, so that I could

19   take care of this prior to the trial.  So I'm kind of concerned

20   as to why am I hearing this this morning, when I thought that

21   everyone had seen this and I thought it had met everyone's

22   approval.

23         MS. FLEMING:  Well, Your Honor, until just a moment

24   ago, that curtain was drawn so it would screen the witness from

25   the Court as well.

1          THE COURT:  Oh, no, no, no.  It's supposed to -- I'm

2    supposed to be able to see the witness.

3          MS. FLEMING:  Well, but until just a moment ago, Your

4    Honor, the curtain was drawn so that the witness would be

5    screened from the Court as well.

6          THE COURT:  Right.

7          MS FLEMING:  So we viewed that and I've seen that

8    before; but until a moment ago, that curtain was closed, so the

9    potential for ex parte communication would not have been

10   possible.

11         THE COURT:  I'm not following you.  What did you think

12   was going to happen when you came here last week?

13         MS. FLEMING:  That the curtain would be drawn all the

14   way, Your Honor, so that the witness would be screened from

15   parties, counsel, and the Court.

16         THE COURT:  Oh, you thought it would -- the witness

17   would be screened from the Court as well.

18         MS. FLEMING:  Yes, Your Honor.

19         MR. MARSHALL:  If I could --

20         THE COURT:  Okay.  Now I understand.

21         MR. MARSHALL:  Your Honor, I was here on Friday, and it

22   was explicitly made known that the curtain would be positioned

23   so that Your Honor could view the witness.  That was

24   specifically talked about on Friday.  And my understanding,

25   everyone agreed.

1        THE COURT:  Well, you know, this is -- okay.  Is there

2   a problem from the plaintiffs with defense counsel seeing the

3   witness?

4        MS. KOLBI-MOLINAS:  No, Your Honor.

5        THE COURT:  Well, why don't we make it so defense

6   counsel can see the witness.

7        MS. FLEMING:  Perfect, Your Honor.

8        THE COURT:  My suggestion is this.  Do you wish to --

9   who's going to be examining this witness?

10        MS. SANDMAN:  I am, Your Honor --

11        THE COURT:  You are?

12        MS. SANDMAN:  -- for this witness and Ms. Ratakonda for

13   the second witness.

14        THE COURT:  Who will be examining the witness for the

15   defendant?

16        MS. FLEMING:  I will, Your Honor.

17        THE COURT:  You may go over here, and you can see

18   everybody I see.  How about that?

19        MS. FLEMING:  Thank you, Your Honor.

20        THE COURT:  And is there a chair over there for you?

21        MS. FLEMING:  Is it possible that I would examine the

22   witness from there?

23        THE COURT:  Would you like to if we can set up a mike?

24   I don't see a problem with that either.

25        MS. FLEMING:  I would like to be able to see the

1    witness and see the witness respond --

2              THE COURT:  Or I can let you come over here, and you

3    can actually see what I see.  Either way.

4              MS. FLEMING:  That's perfect, Your Honor, as long as

5    I'm able to see what the Court sees.

6              THE COURT:  Okay.  Why don't we try -- well, will you

7    pull the curtain back right now so we'll see what I'm going to

8    see.

9              MS. KOLBI-MOLINAS:  Your Honor, may plaintiffs' counsel

10   then be able to see the witness when I'm examining?

11             THE COURT:  Yes.  Yes.

12             MS. KOLBI-MOLINAS:  Thank you, Your Honor.

13             THE COURT:  Why don't we pull the curtain back so we

14   will see what I'm going to see.

15             Okay.  Now, can someone just take this screen down?

16   And you can both come over here.

17             MS. KOLBI-MOLINAS:  Thank you, Your Honor.

18             THE COURT:  Now, you're going to have to speak loudly

19   because there are no mikes over there.

20             Can someone just lift that down?

21             Let's see.  If counsel will come over here now.

22             Anthony, can you just take my screen and put it up

23   here.

24             THE CLERK:  Yes, sir.

25             THE COURT:  Yes.  And why don't we take the other

1  screen and put it down here.

2          MS. SANDMAN:  Your Honor, can I make a request?

3          THE COURT:  Yes.

4          MS. SANDMAN:  If it would be acceptable to the Court,

5  perhaps I could stand here while examining her and use this

6  mike?

7          THE COURT:  That will be fine.

8          MS. SANDMAN:  Thank you.

9     (Brief interruption)

10         THE COURT:  Okay.  Now, can you-all --

11         Why don't we take that one down too.

12         Can you-all see the witness?

13         MS. SANDMAN:  Not yet.  Is she there?

14         THE COURT:  Well, he's in front of her.

15         MS. SANDMAN:  If I stand here, Your Honor, I cannot.

16         THE COURT:  Okay.  I think we can open the curtain just

17  a little bit more.

18         MS. SANDMAN:  Actually, I think that if she was more --

19  if Your Honor wouldn't mind moving the binder that's sitting

20  right there.

21         THE COURT:  Oh.  Oh, okay.  Certainly.  And the water

22  thing perhaps, too.

23         Ms. Fleming, why don't you come over here so we can

24  make sure that you can see the witness.

25         MS. SANDMAN:  Your Honor, would it be acceptable for me

```
 1  to stand here because that gives me enough I can see her.

 2          THE COURT:  Yes, that's fine.

 3          Ms. Fleming?

 4          MS. FLEMING:  I'm sorry, Your Honor.

 5          THE COURT:  Would you come over here just so we can

 6  make sure you can see the witness.

 7          Can you see the witness?

 8          MS. FLEMING:  Yes, I can, Your Honor.  Thank you.

 9          THE COURT:  Very good.  Then that solves that problem.

10      (The witness is sworn)

11          THE COURT:  Counsel, you-all get to see what's behind

12  the bench, including my Tylenol.

13          MS. FLEMING:  I may ask for some, Your Honor.

14          MS. SANDMAN:  Your Honor, I do have the witness

15  statement to pass out as well, if the Court would like it.

16          THE COURT:  Very good.  Proceed.

17          MS. SANDMAN:  Thank you.

18          MARY ROE, M.D., the witness, having been duly sworn to

19  speak the truth, the whole truth, and nothing but the truth,

20  testified as follows:

21                          DIRECT EXAMINATION

22  BY MS. SANDMAN:

23  Q.  Dr. Roe, please introduce yourself to the Court.

24  A.  I am Dr. Roe.  I am the affiliate medical director for

25  Planned Parenthood Southeast.
```

1  Q.  And Dr. Roe, why are you using a pseudonym?

2  A.  I'm using a pseudonym to protect my identity and to protect

3  my family as well as my employers.

4  Q.  And just so the record is clear, is that why you're

5  testifying behind a screen?

6  A.  Yes, it is.

7       MS. SANDMAN:  So the Court is aware, Dr. Roe's CV is in

8  evidence under seal as Plaintiff's Exhibit 42.

9  Q.  Dr. Roe, I won't spend a lot of time on your credentials,

10  given that the Court has your CV, but can you briefly describe

11  your professional history?

12  A.  I attended medical school in South Florida.  I did a general

13  surgery internship in the Midwest, and I did an obstetrical and

14  gynecological residency in the Northeast.  I then moved to

15  Alabama, where I received my master's in public health; and I

16  was on faculty at UAB.  And I left teaching to go into private

17  practice in Georgia, and I returned recently to teaching and

18  working for Planned Parenthood Southeast.

19  Q.  And are you a member of any professional organizations?

20  A.  I'm a fellow of the American Congress of Obstetrics and

21  Gynecology, and I am a diplomate of the American Board of

22  Obstetrics and Gynecology.  And I'm also a member of the Artemis

23  Medical Society, which is a society for women physicians of

24  color.

25  Q.  And are you a board-certified OB-GYN?

1  A.  Yes, I am.

2  Q.  Do you perform abortions?

3  A.  Yes, I do.

4  Q.  By what methods?

5  A.  I perform both medical and surgical abortions.

6  Q.  And in addition to your work as PPSE's medical director, are

7  you currently working anywhere else?

8  A.  Yes, I am.  I am on clinical staff at a medical school in

9  Georgia.

10  Q.  And by the way, if I say Planned Parenthood, do you also

11  understand me to be referring to PPSE?

12  A.  Yes.

13       MR. DAVIS:  Your Honor, is it possible to increase the

14  volume in the gallery?

15       THE COURT:  We can try.

16       Can you, Anthony?

17       THE CLERK:  The volume over here?

18       MR. DAVIS:  Just in general.

19       THE COURT:  He's having difficulty hearing the witness?

20       MR. DAVIS:  Yes, Your Honor.  It's obviously more

21  important that the counsel holding the exam can hear her, but --

22       THE COURT:  Right.

23       MR. DAVIS:  -- we are having a problem.

24    (Brief pause)

25       THE COURT:  Proceed.

```
 1              MS. SANDMAN:   Thank you.
 2   Q.  Dr. Roe, what is the approximate split of your time between
 3   your duties at Planned Parenthood and your duties at the medical
 4   school?
 5   A.  About fifty-fifty.
 6   Q.  And is the name of the medical school where you teach
 7   reflected on your CV?
 8   A.  Yes, it is.
 9   Q.  Could you be more specific about what you teach at the
10   medical school?
11   A.  I teach general obstetrics and gynecological care, women's
12   preventive health.  I teach medical students and residents how
13   to take care of women during pregnancy and postpartum.  I teach
14   vaginal delivery.  I teach outpatient GYN care.  I teach GYN
15   surgery, both minor and major surgery.
16   Q.  You testified that you provide both surgical and medication
17   abortion.  Do you teach those methods at the medical school as
18   well?
19   A.  Yes, I do.
20   Q.  And does part of that teaching include what to do if there
21   is an abortion-related complication?
22   A.  I teach both residents and medical students how to counsel
23   patients who are seeking abortion services, how to perform
24   abortion services, and how to manage complications.
25       (The court reporter interrupts for clarification)
```

1       (Brief interruption)

2           MS. FLEMING:  Pardon me, Your Honor.  While we're

3    stopped, it appears to me that the witness may be reading.  And

4    I can't tell if she has a document in front of her.

5           THE COURT:  Do you have a document in front of you?  I

6    think it's the exhibit book.  Is that right?

7           THE WITNESS:  Yes, sir.

8           THE COURT:  Would you like to go look at it?

9           MS. FLEMING:  There's not another document?  I'm sorry.

10          THE COURT:  Is there another document?

11          THE WITNESS:  No, sir.

12          THE COURT:  Very good.

13          MS. FLEMING:  Thank you, Your Honor.

14          MS. SANDMAN:  And just while we're paused, ma'am, if

15   you would let us know, please, as you just did, if you have any

16   difficulty hearing.  We want to make sure the record is

17   complete.

18          COURT REPORTER:  Thank you.  Just go slower.  That's

19   all I need.

20          MS. SANDMAN:  Thank you.

21   Q.  (Ms. Sandman, continuing:)  Dr. Roe, I believe that you were

22   just speaking about -- the question had been whether you --

23   whether your teaching at the medical school includes the

24   management of abortion-related complications.

25   A.  Yes, it does.

1  Q.  And do you see patients as part of your work at the medical

2  school?

3  A.  Yes, I do.  I provide general obstetric and gynecological

4  care.

5  Q.  What types of services -- could you be more specific about

6  the types of services you provide for your patients?

7  A.  I provide prenatal care.  I do deliveries, both vaginal and

8  surgical deliveries.  I do women's preventive health.  I provide

9  management of GYN problems.

10        MS. SANDMAN:  Your Honor, plaintiffs move to qualify

11  Dr. Roe as an expert in the areas of obstetrics and gynecology

12  and the specialty of abortion practice.

13        THE COURT:  Proceed.

14  Q.  Dr. Roe, where do you live?

15  A.  I live in metro Atlanta.

16  Q.  And do you have admitting privileges at any hospitals in

17  Alabama?

18  A.  I do.  I have privileges at two teaching hospitals and one

19  private hospital.

20  Q.  And are the hospitals where you have privileges identified

21  on your CV?

22  A.  Yes, they are.

23  Q.  Can you explain to the Court the context in which you

24  provide care at these hospitals?

25  A.  I am generally at those hospitals when I'm on call on labor

1    and delivery, and I'm covering the labor and delivery floor.   If

2    I have a patient who goes into labor, then I'm attending to

3    those patients in those hospitals.   If I have a patient who

4    needs management of her GYN problem as -- in the hospital, then

5    I'm at those hospitals.

6    Q.   And how frequently do you provide care at these hospitals?

7    A.   On a weekly basis.

8    Q.   Do you have admitting privileges at any hospitals other than

9    in Atlanta?

10   A.   No, I don't.

11   Q.   Focusing now on your role as Planned Parenthood's medical

12   director, please tell the Court what that entails.

13   A.   I am responsible for maintaining the quality of care that we

14   provide using medical-based evidence guidelines that are handed

15   out to us by the national federation.   I am in charge of

16   on-boarding our clinicians and physicians.   I'm also in charge

17   of their annual evaluation.   I also work with them to provide

18   continuing medical education.

19   Q.   And does that include responsibility for the quality and

20   provision of abortion services?

21   A.   Yes, it does.

22   Q.   In what states does Planned Parenthood of the Southeast have

23   health centers?

24   A.   We have health centers in Georgia, Alabama, and in

25   Mississippi.

1   Q.   In addition to your responsibilities as medical director, do

2   you also provide direct medical services for Planned Parenthood

3   Southeast?

4   A.   Yes, I do.

5   Q.   And could you be more specific about the types of services

6   that you provide.

7   A.   I provide general outpatient GYN services, family planning,

8   women's preventive health, STD screening.   And I also provide

9   abortion services.

10  Q.   And when you say abortion services, is that both medication

11  and surgical?

12  A.   Yes.

13  Q.   And do you provide these services at Planned Parenthood in

14  Alabama?

15  A.   Yes, I do.

16  Q.   At which health centers in Alabama do you provide them?

17  A.   I primarily work in the Birmingham health center, but I also

18  work in the Mobile health center.

19  Q.   Do you provide any direct medical services for Planned

20  Parenthood Southeast outside of Alabama?

21  A.   Yes.   I provide services in our health center in Georgia,

22  both in metro Atlanta and in Augusta.

23  Q.   Dr. Roe, are your health centers in Alabama required to have

24  agreements in place with a backup or covering physician?

25  A.   Yes, they are.

1   Q.   And can you explain what is required in those agreements?

2   A.   We are required to have backup physicians in the cities

3   where those health centers are located who have admitting

4   privileges and can perform GYN surgery, including hysterectomy,

5   laparoscopy.

6   Q.   And do you have such agreements in place for your health

7   centers in Mobile and Birmingham?

8   A.   Yes, we do.

9   Q.   Dr. Roe, I'd like to shift gears now to ask you to talk

10  about how complications are handled at Planned Parenthood

11  Southeast.  First, could you be more specific about the types of

12  abortion that Planned Parenthood provides in Alabama?

13  A.   We provide medical abortion and surgical abortion.

14  Q.   And how late in gestational age does Planned Parenthood

15  provide surgical abortions in Alabama?

16  A.   Fourteen weeks and six days.

17  Q.   And at what gestational age are most of your abortions

18  provided?

19  A.   Most of the abortions we provide are in the first trimester,

20  up to 12 weeks' gestation.

21  Q.   Are patients under sedation during the procedure?

22  A.   All of our patients receive ibuprofen.  They're offered the

23  option of receiving Valium.  And they all also receive a local

24  anesthetic, lidocaine.

25  Q.   Is abortion a safe procedure?

1  A.  Yes, it is.

2  Q.  And is that particularly true for abortion early in

3  pregnancy?

4  A.  Yes, it is.

5  Q.  If a patient has a complication, when is it most likely to

6  occur?

7  A.  It's likeliest to occur after the patient has left the

8  health center.

9  Q.  And are Planned Parenthood patients given instructions about

10  what to expect after the procedure?

11  A.  Our patients are extensively counseled.  They're given

12  instruction prior to their procedure.  They're given written

13  instructions after their procedure, before they leave the health

14  center, and I personally review the instructions with those

15  patients as well.

16  Q.  And focusing on the instructions that are given to the

17  patient to leave with after the procedure or after the

18  medication abortion, can you tell the Court what information is

19  contained in those instructions.

20  A.  We provide our patients both written and illustrated

21  information.  We provide them information on what to expect,

22  what the common side effects of those medications are, how to

23  handle -- how to identify when -- what complication requires

24  them to call immediately, how to handle their pain medication.

25      They also receive a number to call after hours.  And I

1   always insist on letting them know to call even if they think

2   they need to call.  And I remind them that the number is a --

3   is -- they can reach us 24 hours a day seven days a week.

4   Q.  And how is it that patients -- can you explain further how

5   it is that patients are able to reach you 24 hours a day seven

6   days a week?

7   A.  During the daytime operating hours, the patients are able to

8   reach us through the call center; and once the call center

9   identifies the patient, they route the patient to the health

10  center, where a nurse will talk to them or a clinician.  And

11  after hours, they will -- they're routed to the on-call nurse,

12  and the on-call nurse will evaluate the patient.  And that is

13  how they reach us 24/7.

14  Q.  So a patient calls the number and describes the symptoms

15  that she is having.  What happens next?

16  A.  What will happen is the nurse will ask the patient more

17  questions to elicit better information about what is going on

18  with the patient.  And the nurse will then assess the patient

19  and, depending on her assessment, will make recommendations to

20  the patient.

21  Q.  And what will most patients be recommended to do?

22  A.  Most patients just need reassurance.  And they need some

23  help with making sure they're taking their pain medication

24  accurately.

25  Q.  And what happens if the patient does need some form of

1   follow-up care?  What are most patients in that category advised

2   to do?

3   A.  If the patient needs follow-up care, the majority of our

4   patients are told to follow up in the health center.

5   Q.  And can you outline for the Court what are some of the

6   typical treatments that a patient might get if she's instructed

7   to return to the health center for further care?

8   A.  So when the patient is instructed to follow up in the health

9   center, the patient will be evaluated again by the nurse, who

10  will elicit more information from the patient.  The patient's

11  vital signs will be taken; and if needed, the patient will have

12  an ultrasound.  And then the nurse will call me or the physician

13  attached to that health center and will review the information

14  with that provider, and the provider will then give management

15  instructions.

16  Q.  And just so the record is very clear, I take it that

17  that's -- that that system applies including when you or another

18  physician is not personally in the health center that day.

19  A.  Exactly.

20  Q.  Suppose a woman calls the number and is experiencing a more

21  serious complication.  Where would she be instructed to go?

22  A.  To her nearest emergency room.

23  Q.  And in this scenario, are you notified?

24  A.  Yes.  What will happen, the nurse will evaluate the patient.

25  The nurse will give the patient some instruction and will call

1   me to run the information and will confirm the management with

2   me and then will call the patient back and give the patient

3   final instructions on what to do.

4   Q.  And if the patient is advised to go to the emergency room,

5   do you follow up with her?

6   A.  We follow up with the patient within 24 hours.  The nurse on

7   call has a form that she uses to keep track of the conversation

8   that she had with the patient as well as the patient's symptoms

9   and the instructions that were given to the patient.  And she

10  faxed that form -- she faxes that form to the health center so

11  that the health center manager, the nurse, and the clinician who

12  are in the health center that day are able to call the patient

13  and follow up with the patient and also make sure the

14  documentation is placed in the patient's chart.

15  Q.  Dr. Roe, how often does it happen that a patient is directed

16  to go to the emergency room?

17  A.  It's rare.

18  Q.  Can you be more specific about how frequent it is that

19  Planned Parenthood's patients in Alabama over the past several

20  years have received treatment at a hospital?

21  A.  In 2013, out of about 2300 abortions that were performed,

22  three patients were directed to go to the -- to the hospital.

23  And that number also includes patients who chose to go to the

24  emergency room without letting us know.

25  Q.  And do you have information for a few earlier years as well?

1  A.   In 2010, we performed about 2300 abortions, and 11 patients

2  were seen in the hospital.   In 2011, we performed about 2200

3  abortions, and seven patients were referred or self-referred to

4  the hospital.   In 2012, we performed about 2300 abortions, and

5  three patients were either referred or self-referred themselves

6  to the emergency room.

7  Q.   In your experience, do your patients always live near the

8  health center where they have an abortion?

9  A.   Unfortunately, no, they don't.   Some women have to travel up

10  to four or five hours.

11  Q.   And for a patient who traveled to reach the health center,

12  would she be instructed to go to a hospital near the health

13  center where she had the abortion?

14  A.   That would not be the clinical -- clinically safe thing to

15  do for that patient.   We always tell the patients to go to the

16  nearest emergency room so that they can be seen in a timely

17  fashion.

18  Q.   Dr. Roe, you testified earlier that you have admitting

19  privileges in Atlanta.   Suppose you had an abortion patient in

20  Atlanta who called the after-hours number and was referred to

21  the emergency room.   Would she be told to go to the hospital

22  where you have admitting privileges?

23  A.   No, if it's not the safest thing for the patient.   We have

24  to do what's the safest thing for the patient, so we always tell

25  them to go to the nearest emergency room.

1    Q.   And suppose that she did end up at an emergency room where

2    you had admitting privileges.  Would you meet her there?

3    A.   No, I would not.

4    Q.   Why not?

5    A.   The -- when the patients arrive in the emergency room,

6    emergency room physicians are trained to evaluate and assess and

7    manage the patients.  And so there would be no need for me to

8    meet her there, because there would be a qualified physician to

9    do the -- to take care of her.

10   Q.   Would there be any benefit to the patient from having you

11   meet her there?

12   A.   No, there would not.

13   Q.   Thinking about the hospitals where you have admitting

14   privileges, have you ever been called in to treat a complication

15   from one of your abortion patients?

16   A.   No, I have not.

17   Q.   Let's focus now on the situation where a woman experiences a

18   complication from an abortion at the health center that requires

19   transfer to a hospital.  First, in your many years of providing

20   abortions, have you ever had this happen with a patient?

21   A.   No, I have not.

22   Q.   And how many years have you been providing abortion

23   services?

24   A.   Over ten years.

25   Q.   Do you know how many times Planned Parenthood of the

1  Southeast has had a patient transferred to a hospital in Alabama

2  because of an abortion complication?

3  A.   Twice since 2006.

4  Q.   And has that ever happened in the time since you have been

5  medical director?

6  A.   I have been medical director since 2011, and it has not

7  happened since I've been the medical director.

8  Q.   So in the extraordinarily rare instance of a patient who

9  needs to be transferred from the health center to the hospital

10  for an abortion complication, what would you do?

11  A.   We would assess the patient.   I would stabilize the patient.

12  While doing so, I would ask the health center manager to call

13  911 to secure ambulance transport.   Also, we have to make

14  sure -- I have to make sure that everything is being documented.

15  I would give a copy of the documentation of the care we provided

16  to the patient to the transport assistant.   And then I would

17  call the emergency room where this patient is being transported

18  to help in getting -- obtaining that information from EMS.   And

19  I would speak to the emergency room physician and explain to him

20  what was -- what's going on with the patient, what we've done to

21  stabilize the patient, so that they can take -- pick up the care

22  where we have left off.

23  Q.   Now, suppose this situation arose in Atlanta, where you do

24  have admitting privileges.   Would you try to have the patient

25  seen -- sent to one of the hospitals where you have privileges?

1  A.   No.   I always put the patient's safety first.   So the

2  patient would be transported to the nearest emergency room.

3  Q.   And at the end of the day, would that be your decision,

4  where the patient is transferred by ambulance?

5  A.   No, that's not my decision.   The decision is made by EMS.

6  They're the emergency service personnel.   They will assess the

7  patient, and they will know best which hospital was equipped to

8  provide the appropriate care that is closest to our health

9  center.

10  Q.   Suppose the patient did end up being sent to a hospital

11  where you have admitting privileges.   Would you go with that

12  patient?

13  A.   I would not be able to go with that patient because there

14  would be other patients in the health center also waiting for me

15  to care for them.   And once the patient is transported with

16  emergency personnel and I have communicated with the emergency

17  room, I know that the patient will get the care that she needs

18  when she gets to the emergency room.

19  Q.   And would you treat the patient?

20  A.   No, I would not.   She would be taken care of by the

21  emergency room physician.   At that point, she becomes his

22  patient.   He will make his assessment and will be able to

23  provide the care that the patient needs.

24  Q.   Would there be any clinical benefit to the patient from

25  having you be the doctor to treat that patient?

1   A.   I'm sorry.  Can you repeat the question?

2   Q.   Yes.  Would there be any clinical benefit to the patient

3   from having you be the doctor to treat her?

4   A.   No.  There would be no clinical benefit.

5   Q.   Dr. Roe, I only have one more question on this topic.  Just

6   to be clear, if you had admitting privileges at a hospital in

7   Alabama, would any patient receive care any differently than

8   they do currently?

9   A.   No, they would not.

10  Q.   Dr. Roe, are you familiar with the admitting privileges

11  requirement at issue in this case?

12  A.   Yes, I am.

13  Q.   And what do you understand it to require?

14  A.   My understanding is that it requires for physicians

15  providing abortion services in the state of Alabama to have

16  admitting privileges at a hospital within 30 miles of that

17  health center in the city where they are.

18  Q.   And to your understanding, is there a requirement that

19  physicians have privileges to do specific procedures?

20  A.   Yes.  Physicians are required to have privileges to

21  provide -- to perform hysterectomy, diagnostic operative

22  laparoscopy, and D&C.

23  Q.   And if I speak of the act, is that requirement what you

24  understand me to refer to?

25  A.   Yes.

```
 1   Q.   Do you have privileges at any hospital in Alabama?
 2   A.   No, I do not.
 3   Q.   Was there ever a time when you had such privileges?
 4   A.   When I was on staff and faculty at UAB, I had privileges in
 5   several hospitals in Birmingham.
 6   Q.   And where were you living at that time?
 7   A.   I lived in Birmingham.
 8   Q.   And just to be clear, when you used to live in Birmingham,
 9   where were you working?
10   A.   I was working at UAB.
11   Q.   And what was your position there?
12   A.   I was a faculty -- teaching faculty at UAB.  I started out
13   as an instructor, and I was promoted to assistant professor.
14   Q.   And what did you teach there?
15   A.   I taught general obstetrics and gynecology, preventive
16   women's health, prenatal care, obstetrical care, general GYN and
17   outpatient GYN management, GYN surgery, laparoscopy.
18   Q.   And how long did you do that for?
19   A.   I worked there for four years.
20   Q.   When you were teaching at UAB, did you treat patients?
21   A.   Yes, I did.
22   Q.   And can you tell the Court the range of services that you
23   were providing?
24   A.   When I saw patients, I was the attending physician
25   overseeing the OB urgent care triage.  So I provided obstetrical
```

1  urgent care.  I did prenatal services.  I did deliveries.  I did

2  general GYN surgery, general GYN outpatient management.

3  Q.  And in the course of that work, were you providing care at a

4  hospital on a regular basis?

5  A.  Yes.  I provided care at University Hospital associated with

6  UAB, Cooper Green Hospital, which at the time UAB had a contract

7  with, as well as Carraway Hospital.

8  Q.  And just to be clear, were all three hospitals at that

9  time -- had some affiliation with UAB?

10  A.  Yes.  The care that I provided was due to the affiliation

11  with UAB.

12  Q.  And at this stage, were you also working for Planned

13  Parenthood?

14  A.  Yes.  I worked for Planned Parenthood of Alabama at that

15  time.

16  Q.  Now, I think your testimony on this subject is already

17  clear; but just to be sure, did you have admitting privileges at

18  all three hospitals?

19  A.  Yes, I did.

20  Q.  Dr. Roe, why did you leave Birmingham?

21  A.  I met my husband, I had a child, and I decided that I did

22  not want to raise my children in Birmingham.

23  Q.  And when did you move?

24  A.  I moved in 2006.

25  Q.  And just to be clear, do you provide any medical services in

1   Birmingham now other than the abortion and family planning

2   services that you provide once a week for PPSE?

3   A.   No, I do not.

4   Q.   Do you think that you can get admitting privileges now at

5   any hospital in Birmingham that would meet the act's

6   requirements?

7   A.   No, I cannot.

8   Q.   Why not?

9   A.   Because I -- after reviewing the applications for those

10  hospitals, I can't meet either one or several of their

11  requirements in order to be granted privileges.

12  Q.   And can you just -- we'll get to the more specific

13  requirements a little bit later in your testimony, but can you

14  just give an overview of the types of requirements that you

15  don't meet?

16  A.   There are generally admitting requirements, number of

17  patients that need to be admitted, location of either residence

18  and/or office.   There are some support documents that are

19  required that generally I cannot meet.

20  Q.   We'll come back -- excuse me.   And just to be clear, do you

21  have an understanding of whether you can obtain admitting

22  privileges now at any hospital in Mobile that would meet the

23  act's requirements?

24  A.   No, I cannot.

25  Q.   And why is that?

1   A.   Because, again, I do not live in Mobile, and I do not have

2   the -- I don't admit enough patients to meet their requirement

3   nor would I be able to.  And there are also location

4   requirements for both office and/or residence.

5   Q.   Dr. Roe, have you taken any steps to try to obtain admitting

6   privileges in Alabama?

7   A.   Yes, I have.  Prior to the act becoming law, we -- I started

8   looking for the possibility of obtaining privileges.

9   Q.   And why did you try to obtain admitting privileges at that

10  stage?

11  A.   Because at that stage, there was no doubt that that

12  particular act would come to pass.  And I felt that it would be

13  smarter to try to obtain privileges before it became an issue of

14  contention.

15  Q.   And what steps did you take at that stage?

16  A.   I approached both the house staff office at Cooper Green and

17  I approached the UAB Department of OB -- Obstetrics and

18  Gynecology because I had previous relationships with them and

19  they had files on me, and so I felt that those would be the

20  least complicated places to start because of previous

21  relationships.

22  Q.   And focusing first on Cooper Green, what steps did you take

23  there and what was the result?

24  A.   I called the house staff office, and I spoke to the lady who

25  was in charge of the house staff office.  She recognized me.

```
 1  She sent me an application.  And at the time, Cooper Green was
 2  going through its own changes.  And before I could even start
 3  with the process, it stopped providing inpatient services, then
 4  it stopped providing outpatient services, and then it just shut
 5  down.
 6  Q.  So just to be clear, was getting admitting privileges an
 7  option at Cooper Green at that point?
 8  A.  I'm sorry.  I don't understand the question.
 9  Q.  Just to be clear, at that point, did you still have the
10  option of getting admitting privileges at Cooper Green?
11  A.  No, I did not.
12  Q.  And then turning to the steps that you took in connection
13  with UAB, can you explain to the Court what you did.
14  A.  Well, at teaching hospitals, in order to have admitting
15  privileges, you have to be a faculty on staff at that -- at that
16  medical school.  And so I approached it by trying to get a
17  volunteer appointment in the department of obstetrics and
18  gynecology, spoke to several faculty and explained to them what
19  I could bring to their educational program, including a long
20  conversation with the chairman.  They all were very
21  understanding, but they all -- they all felt that this was not
22  a -- a relationship that they wanted to pursue.
23  Q.  And just to be clear, when you say this would have been a
24  volunteer position, that would have been an unpaid position that
25  you were seeking?
```

1    A.   Yes.

2    Q.   And when you say that this was not -- they indicated this

3    was not a relationship that they were -- would be comfortable

4    with, did you understand that they were referring to a

5    relationship with you or with Planned Parenthood, or what were

6    they referring to?

7    A.   They did not want a relationship with Planned Parenthood.

8    Q.   And did you have an understanding of their reasons for that

9    decision?

10   A.   They did not want the -- the -- they did not want the

11   political contention that comes with having a relationship with

12   Planned Parenthood.   They are a state-funded institution, and

13   they have a mission and bylaws that they have to abide by.

14   Q.   And how do you know that that was their reasons?

15   A.   Again, I had a long conversation with the chairman, who was

16   very respectful but very steadfast in his decision that he did

17   not want to have -- he did not want to have a relationship with

18   Planned Parenthood.

19   Q.   Dr. Roe, were you surprised that you were not able to get a

20   faculty appointment at UAB?

21   A.   No, I was not surprised.   Unfortunately, abortion is taken

22   out of context of the care that we provide to women and is a

23   very contentious topic, and I understood their position.

24   Q.   And Dr. Roe, you testified earlier that you used to have a

25   relationship with UAB.   You were on faculty there and were able

1   to obtain admitting privileges in that way.  What has changed

2   since that time?

3   A.  When I was on faculty at UAB, we had a different chair.  And

4   the political climate was different, both in Alabama and across

5   the United States, and women's reproductive health and

6   reproductive rights were not such a hot topic of political

7   contention.

8   Q.  Do the meetings that you had with UAB affect your assessment

9   of your chances of being able to get privileges at other

10  hospitals?

11  A.  Yes.  I felt that if an institution where I was known and I

12  had a previous relationship -- if they were not willing to allow

13  me to have a voluntary appointment and work with them, the

14  likelihood of being able to obtain privileges at an in- -- at a

15  hospital where I had no previous or established relationship

16  would be that much harder.

17  Q.  Focusing now on the stage after the act passed, did you take

18  any steps -- any other steps to try to get admitting privileges

19  in Birmingham?

20  A.  Yes.  I worked with our health center managers, regional

21  director, and we also received some help from Planned Parenthood

22  national office to obtain an application and information about

23  privileging application at hospitals in Birmingham and in

24  Mobile.

25  Q.  And just to be clear, did you initially look at all of the

1  hospitals?

2  A.   No.   When I knew that this act was going to pass, I looked

3  at it as a physician taking care of patients.   And so I

4  approached it by looking at hospitals that were closest to the

5  health center, because that's what made clinical sense in terms

6  of the patients' safety.

7  Q.   And at some stage, did you evaluate your eligibility for all

8  of the hospitals in Birmingham and Mobile?

9  A.   Yes, I did.

10  Q.   And what did you conclude?

11  A.   That I was unable to meet the requirement for staff

12  privileges at all those hospitals.

13  Q.   Now, I just want to go back to one thing you said a moment

14  ago, Dr. Roe.   You were saying that you thought about this --

15  when you were deciding which hospitals to look at initially, you

16  thought about it from a clinical perspective and looked at the

17  closest hospitals because that's what would make clinical sense

18  to you; but just to be clear, did anything about this

19  requirement make clinical sense to you?

20          MS. FLEMING:   Objection, Your Honor.   Leading.

21          THE COURT:   I'll allow that.

22  A.   I'm sorry.   Could you repeat the question?

23  Q.   You testified a moment ago that when you were initially

24  deciding which applications to look at to -- to look at in order

25  to see whether you could get privileges that meet the act's

1    requirement, you focused on the hospitals that were the closest

2    to you because that's what made clinical sense to you; but just

3    to be clear, does anything about the act's requirement make

4    clinical sense to you?

5         MS. FLEMING:  Objection.

6         THE COURT:  Objection is overruled.

7    A.  No.

8         MS. SANDMAN:  Did you get her answer?

9         COURT REPORTER:  Yes.

10        MS. SANDMAN:  Thank you.

11        Your Honor, I would beg the Court's indulgence for a

12   moment.  When I was shifting locations, I left my binder behind.

13   May I get it?

14        THE COURT:  Fine.

15        MS. SANDMAN:  Thank you.

16     (Brief pause)

17        MS. SANDMAN:  Thank you, Your Honor.  I apologize.

18   Q.  (Ms. Sandman, continuing:)  Dr. Roe, I'm going to ask you

19   questions about the specific bylaws for each hospital now.  I'd

20   like to direct your attention to what's been marked for

21   identification as Plaintiff's Exhibit 2, which is a summary of

22   the hospital bylaws for Birmingham and Mobile.  This is a

23   summary that contains quotations from the relevant sections of

24   the bylaws for each hospital.

25        MS. SANDMAN:  I know there was an objection to this

1  exhibit.

2          MS. FLEMING:  Yes.

3          THE COURT:  What -- just a minute.

4          MS. SANDMAN:  This is Plaintiff's Exhibit 2.  And it's

5  also in the witness binder, Your Honor, for your convenience.

6          THE COURT:  And this is plaintiff's exhibit what?

7          MS. SANDMAN:  Two.

8          THE COURT:  Just a minute.

9          MS. SANDMAN:  And it's marked in your witness binder as

10  the hospital chart or perhaps bylaws chart.

11          THE COURT:  Is this 42 or 2?

12          MS. SANDMAN:  Two.

13          THE COURT:  Is this Dr. Roe?

14          MS. SANDMAN:  Dr. Roe.  I -- I'm not sure that there's

15  an exhibit number on the label on your chart, but it says bylaws

16  chart.

17          THE COURT:  Okay.  I'm not sure -- it's not Exhibit 2;

18  but anyway, it does say hospital chart.

19          Okay.  Now, what's the objection?

20          MS. FLEMING:  Yes, Your Honor.  This exhibit is

21  actually a document I understand prepared by counsel.

22          Is that right?

23          MS. SANDMAN:  That is correct.

24          MS. FLEMING:  That purports to be a summary of

25  different documents that have been introduced into evidence,

1  Your Honor.  I'm --

2          THE COURT:  I will consider it as secondary evidence,

3  which means that I will ignore it to the extent that there's not

4  primary evidence that supports it.  In other words, it amounts

5  to argument is really what it comes down to.

6          MS. FLEMING:  A demonstrative aid, Your Honor.

7          THE COURT:  It's just demonstrative, yes.

8          MS. FLEMING:  Certainly.

9          MS. SANDMAN:  Your Honor --

10          THE COURT:  With that understanding, I'll admit it.

11          MS. SANDMAN:  Your Honor, just one further thought on

12  that, if I may.  We would also offer that as pursuant to Rule

13  1006 as a summary of voluminous records just to aid in the

14  Court's assistance.

15          THE COURT:  I think that it all amounts to the same

16  thing.

17          MS. SANDMAN:  Very good, Judge.

18  Q.  Directing your --

19          THE COURT:  I assume these records are in evidence; is

20  that right?

21          MS. SANDMAN:  They are, Your Honor.

22          THE COURT:  Right.

23          MS. SANDMAN:  My -- my only concern is just to expedite

24  the testimony.  I would prefer not to have to bore the Court by

25  giving the full bylaws citation for each section I'm asking for

1    her to rely on.  So that's why I wanted to make sure that the

2    chart would also be in evidence so that it would be clear what

3    section she was referring to if a question ever came up.

4            THE COURT:  Right.  And I'm assuming the footnotes down

5    here are the actual citations to the bylaws.

6            MS. SANDMAN:  Correct.

7            THE COURT:  So you don't have to go through that.

8            MS. SANDMAN:  Very good, Judge.  Thank you.

9            THE COURT:  Very good.  Go ahead.

10   Q.  (Ms. Sandman, continuing:)  Dr. Roe, looking at the first

11   column, the minimum patient contacts requirement for active

12   staff.  And this is for Brookwood Medical Center.  Can you meet

13   that requirement?

14   A.  No, I cannot meet that requirement.

15   Q.  And why is that?

16   A.  Because having hospital privileges is a professional

17   relationship that physicians establish with a hospital to

18   provide inpatient care.  And we provide -- at Planned

19   Parenthood, we provide outpatient care.  And so there is no way

20   that I could meet admitting an average of five patients a month.

21   Q.  And looking at the geographic requirements, the location

22   requirement in the next column, can you meet these for either

23   active or courtesy staff?

24   A.  No, I cannot.

25   Q.  And why is that?

1    A.    Because I do not live in Birmingham.

2    Q.    And Dr. Roe, just to be clear, do you have an office

3    location in Birmingham?

4    A.    Yes, I do.  But I am at that office one day a week.  And in

5    the sense that when you admit a patient to do a hysterectomy or

6    myomectomy, in that context, you would be required to see your

7    patient before, during, and after the care that you provided in

8    the hospital.  And since I'm in the office one day a week, I

9    would not be able to meet that requirement.

10   Q.    Moving on to the coverage requirements, can you meet those

11   requirements for active and courtesy staff?

12   A.    No.  I would not be able to meet those requirements.  It

13   would be impossible to find a physician willing to provide

14   coverage for me, which then would mean that they would have a

15   relationship with Planned Parenthood.

16   Q.    And when you say that it would be impossible, what's your

17   basis for saying that?

18   A.    Physicians in the community are not interested in having a

19   relationship with Planned Parenthood because of the impact it

20   can have on their standing in their community, the impact it can

21   have on their business, their ability to take care of their

22   patients.  And so they're not willing to have a relationship

23   with us.

24   Q.    And do you know any physicians at Brookwood who could

25   conceivably be willing?

1   A.   No, I do not.

2   Q.   In the next column, can you meet the assignment and

3   emergency department requirements for active or courtesy staff?

4   A.   No.   I would not be able to meet those requirements because

5   I don't live in Birmingham.

6   Q.   Now, as you can see in this last column, as a courtesy staff

7   member at Brookwood, you would also be required to be an active

8   member of at least one other hospital in the greater Birmingham

9   area.   Can you meet this requirement?

10  A.   No, I cannot.

11  Q.   Moving on to the next page, you will see requirements for

12  Medical West.   Can you meet the minimum patient contact

13  requirements for active staff?

14  A.   No, I cannot.

15  Q.   And is that for the same reasons that you stated before?

16  A.   Yes.

17  Q.   What about the requirement on geographic location?

18  A.   I would not be able to meet those requirements either, for

19  the same reason.

20  Q.   Turning to the next page for Princeton Baptist, can you meet

21  the minimum patient contact requirements for active staff?

22  A.   No.   I would not be able to.

23  Q.   How about the location requirements for active staff?

24  A.   Again, because I do not live in Birmingham, I would not be

25  able to meet those requirements; and because I'm not in our

1  office on a frequent enough basis, I would not be able to meet

2  those requirements.

3  Q.  Dr. Roe, I do have one further question there.  In looking

4  at the language, it speaks specifically to being located closely

5  enough to the hospital to provide appropriate continuity of

6  quality of care.  Do you believe that you in fact do provide

7  such care?

8  A.  Absolutely.

9  Q.  Does that change your mind as to whether you would be able

10  to meet this location requirement?

11  A.  No, it does not.  Again, the hospital admitting privilege

12  bylaw are in the context of providing inpatient hospital care.

13  And in that context, because I am not in my office more than one

14  day a week, I would not be able to meet those bylaws.

15  Q.  What about the evaluation requirements for active and

16  courtesy staff?

17  A.  I would not be able to meet that requirement because I would

18  not be able to admit enough patients to do enough surgery to be

19  able to be proctored.

20  Q.  In the last Princeton Baptist column, there is one

21  additional requirement for courtesy staff related to

22  participation in a patient care review program and other quality

23  maintenance activities at the hospital where you will currently

24  hold privileges.  Can you meet this requirement?

25  A.  No, I cannot.

1   Q.   And why is that?

2   A.   I currently do not participate in quality maintenance

3   activities.

4   Q.   And just to be clear, when you say you don't participate,

5   could you explain to the Court what you mean by that?

6   A.   I personally am not on the QR or quality -- quality and risk

7   assessment management in any -- at any of the hospitals where I

8   currently hold privileges.   My records are reviewed by the

9   committee, as any other physician in that hospital's, but I am

10  not on that committee myself.

11  Q.   Dr. Roe, in addition to the bylaws requirements, is there

12  any other reason you would not be able to get privileges at

13  Princeton Baptist?

14  A.   Princeton Baptist is a religious institution.   And religious

15  institutions, they stand by and hold fast by their mission and

16  values.   I trained at a religious institution as a resident,

17  OB-GYN resident, and I know that their mission and values are

18  very important to the way they conduct business and provide

19  care.

20       I remember as a third-year resident, we had an obstetrical

21  patient who presented with severe preeclampsia and was only 18

22  weeks' gestation, so the fetus was not viable yet.   And

23  unfortunately for that woman, she was getting sicker very

24  quickly and potentially was -- her life was -- was threatened;

25  and the only way to take care of her and to save her life was to

1    terminate the pregnancy.  And so once that assessment was made,

2    our director of obstetrics approached the Sisters of Charity and

3    explained to them what was going on with the patient.  The

4    director of obstetrics was there with our perinatologist, who

5    was our chairman.  And the Sisters of Charity understood the

6    situation and held fast that we could not terminate the

7    pregnancy.  We could transfer the patient to another hospital,

8    but we could not terminate the pregnancy in their hospital.

9        So what we ended up doing was calling the city hospital, and

10   the patient was transported.  And our director of obstetrics

11   transported the patient with EMS just in case that patient

12   started seizing in EMS.  And once -- as soon as she got to the

13   city hospital, she was taken to the operating room, where the

14   pregnancy was terminated.

15   Q.  And is this experience a factor in your willingness to apply

16   for privileges at a religious hospital?

17   A.  Yes, it is.  They have their missions and values, and I

18   respect that.  And I know that they hold fast to it, and I

19   respect that as well.

20   Q.  The next page contains requirements for privileges at Shelby

21   Baptist.  Can you meet the minimum patient requirements for

22   active staff?

23   A.  No, I cannot.

24   Q.  Can you meet the location requirements for active and

25   courtesy staff?

 1  A.   No, I cannot.   I do not plan on moving within 45 minutes of
 2  Shelby Baptist.
 3  Q.   What about the evaluation requirements for active and
 4  courtesy staff?
 5  A.   No.   I would not be able to meet those requirements either.
 6  Q.   And why is that?
 7  A.   Because, again, I would not do enough inpatient GYN surgery
 8  to be able to be proctored.
 9  Q.   Can you provide the emergency service coverage that is
10  required for active and courtesy staff in the last column?
11  A.   No.   I would not be able to because I do not live in the --
12  within 45 minutes of Shelby Baptist.
13  Q.   And finally, are you a member of the active staff at another
14  Alabama hospital, as is required for courtesy staff?
15  A.   No, I am not.
16  Q.   Dr. Roe, we've been talking about some of the bylaws
17  requirements for Shelby Baptist.   Aside from these bylaws, is
18  there any other reason you do not believe that you could get
19  privileges there?
20  A.   Again, Shelby Baptist is a religious mission-based hospital,
21  and so that also -- that also makes me believe that I would not
22  be able to obtain privileges there.
23  Q.   Let's turn to the next page, St. Vincent's Birmingham.   Can
24  you meet the minimum patient contact requirement for active
25  staff?

1   A.   No.   I would not be able to.

2   Q.   What about the requirement regarding office or residence

3   location for active staff?

4   A.   I would not be able to meet those requirements.   Albeit that

5   our office is close to St. Vincent's, I am not in my office on a

6   regular enough basis.   I am only there once a week.   Therefore,

7   I would not be able to meet that requirement.

8   Q.   And what about the requirements for courtesy staff?

9   A.   No.   I would not be able to meet that.

10  Q.   What about the coverage requirements for active and courtesy

11  staff?

12  A.   I would not be able to meet that requirement either.

13  Q.   Can you meet the evaluation requirements for active and

14  courtesy staff?

15  A.   No.   I would not be able to.

16  Q.   And what about the last column for this hospital, for active

17  staff?

18  A.   No.   I would not be able to.

19  Q.   Finally, looking at the religious-based language column --

20  I'll give you a moment to review that.

21      (Brief pause)

22  Q.   Does that give you any additional reason to believe that you

23  could not get privileges at this moment?

24  A.   Yes.

25  Q.   And actually, Dr. Roe, I'll ask you to go ahead and read the

1  items after the first and second bullet points into the record.

2  A.  On a personal basis, we feel that an individual's personal

3  conduct is, in general, his own private matter; but we are a

4  church-related institution; and we expect that your actions will

5  not be in conflict with the mission, vision, and values of

6  St. Vincent's Hospital.  If you were unable to function under

7  those circumstances, it is better that you withdraw.

8  Q.  Does that give you any additional reason to believe you

9  could not get privileges at this hospital?

10  A.  Yes.  It reinforces my belief that they would not be able to

11  give me admitting privileges.

12  Q.  Let's move on to St. Vincent's Blount.  Can you meet the

13  location requirements for active staff?

14  A.  No.  I would not be able to.

15  Q.  What about for courtesy staff?

16  A.  No.  I would not be able to.

17  Q.  Can you meet the evaluation requirements -- excuse me -- the

18  evaluation requirements for active and courtesy staff?

19  A.  No.  I would not be able to.

20  Q.  Can you meet the requirements for active and courtesy staff

21  in the last column?

22  A.  No.  I would not be able to.

23  Q.  Turning to St. Vincent's East on the next page, can you meet

24  the minimum patient contacts requirements for active staff?

25  A.  No.  I would not be able to.

1  Q.   What about the location requirements?

2  A.   No.   I would not be able to.

3  Q.   And what about the evaluation requirements for active and

4  courtesy staff?

5  A.   No.   I would not be able to.

6  Q.   And finally, what about the requirement in the last column

7  for active staff?

8  A.   No.   I would not be able to because I do not live close

9  enough.   I do not live in Birmingham.   I live in Atlanta.

10  Q.   Let's turn now to Trinity Medical Center's requirements on

11  the next page.   Can you meet the patient contacts requirements

12  for active staff?

13  A.   No.   I would not be able to.

14  Q.   And what about the location requirements for active and

15  courtesy staff?

16  A.   No.   I would not be able to.

17  Q.   Please look at the next column, the religion-based language

18  for active and courtesy staff.   And I would like, again, to ask

19  you to read that language into the record.

20  A.   In accordance with the values that have always been the

21  foundation of Trinity Medical Center, we aver in the sanctity of

22  human life and believe that unborn children should be protected.

23  Medical or surgical abortions shall not be performed except in

24  the following situations.   In the course of pregnancy,

25  occasionally situations arise in which the death of the mother

1  is likely and the fetus is deemed by the physician to be too

2  premature for extrauterine survival.

3  Q.  Does that language affect your willingness to apply for

4  privileges at Trinity Medical Center?

5  A.  Yes.  I do not meet their requirement.

6  Q.  Now, just to be clear, that requirement is directed at care

7  provided within the hospital, correct?

8  A.  Yes, it is.

9  Q.  But in your -- does this affect -- do you have a view as to

10  whether this would also affect the hospital's willingness to

11  grant you providers (sic) as an abortion provider who provides

12  abortions at a health center outside of the hospital?

13  A.  Yes.  Because I believe that this reflects the direct

14  mission and values of Trinity Medical Center.

15  Q.  And finally, Dr. Roe, can you meet the requirements for

16  courtesy staff in the final column?

17  A.  No.  I would not be able to.

18  Q.  Turning to the next page for UAB Health System, can you meet

19  the requirements for active and courtesy staff at UAB?

20  A.  No, I cannot.

21  Q.  And why is that?

22  A.  Because I am not an appointed member of the faculty.

23  Q.  Dr. Roe, let's move on now to the Mobile hospitals.  Can you

24  meet the minimum patient contact requirements for active and

25  courtesy staff at Mobile Infirmary?

1   A.   No.   I would not be able to.

2   Q.   What about the location requirements for active and courtesy

3   staff?

4   A.   No.   I would not be able to because I do not live in Mobile.

5   Q.   And can you meet the coverage requirements for active and

6   courtesy staff?

7   A.   No.   I would not be able to.

8   Q.   On the next page are the requirements for Providence

9   Hospital.   Can you meet the patient contact requirements for

10   active staff?

11   A.   No.   I would not be able to.

12   Q.   What about the location requirements for active staff?

13   A.   No.   I would not be able to.

14   Q.   And what about the location requirements for courtesy staff?

15   A.   No.   I would not be able to.

16   Q.   What about the coverage requirements for active and courtesy

17   staff?

18   A.   I would not be able to meet that either.

19   Q.   Do you know any physicians who have privileges at this

20   hospital?

21   A.   No, I do not.

22   Q.   Please look at the next column, the religion-based language

23   for active and courtesy staff.   And again I would ask you to

24   read that language into the record.

25   A.   Only physicians who meet the following criteria may be

1    considered for membership:  are determined to, one, adhere to

2    the ethics of their respective professions as well as the

3    ethical and religious directives for Catholic Health Care

4    Services.

5    Q.   Does this language affect your willingness to apply for

6    privileges at Trinity Medical Center?

7    A.   Yes, it does.

8    Q.   And why is that?

9    A.   Because they're a religious hospital, and they adhere to

10   their mission and values.  And I would not be able to meet their

11   criteria based on their mission and values.

12   Q.   Moving on to Springhill on the next page, can you meet the

13   patient contacts requirement for active staff?

14   A.   No.  I would not be able to.

15   Q.   Can you meet the location requirements for active staff or

16   courtesy staff?

17   A.   No.  I would not be able to.

18   Q.   Can you meet the coverage requirements for active and

19   courtesy staff?

20   A.   No.  I would not be able to.

21   Q.   Can you meet the evaluation requirements for active and

22   courtesy staff?

23   A.   No.  I would not be able to.

24   Q.   And finally, looking at the references requirement for

25   active and courtesy staff in the last column, can you meet

1  those?

2  A.   No.   I would not be able to.

3  Q.   Do you know any active staff members at Springhill?

4  A.   No, I do not.

5  Q.   Finally, the last hospital in Mobile is USA.   Can you meet

6  the minimum patient contacts requirement for courtesy and active

7  staff?

8  A.   No.   I would not be able to.

9  Q.   And I should be clear that for the record, I'm referring to

10  the University of South Alabama Children's and Women's Hospital

11  when I say USA.   Can you meet the coverage requirements for

12  active and courtesy staff?

13  A.   No.   I would not be able to.

14  Q.   Dr. Roe, to be clear, we have just discussed the bylaws

15  requirements for 13 hospitals.   Have you applied for privileges

16  at any of these hospitals?

17  A.   No, I have not applied for privileges at these hospitals.

18  Q.   Why not?

19  A.   Because applying for privileges is part of your professional

20  requirement.   It's not a membership.   It's something that you do

21  in the process of providing inpatient GYN care to your patients.

22  And to apply for these hospitals and not knowing -- knowingly

23  not meeting their requirement could possibly have a negative

24  effect on my professional career.

25  Q.   Can you explain what you mean by a negative effect on your

1    professional career?  What is the risk that you would be taking?

2    A.   When you apply for privileges, because it's a professional

3    relationship that you establish, if you are denied or if you

4    have to withdraw, there is the potential that this may be

5    reported to the national practitioner database.  And once it's

6    reported to the national practitioner database, every time you

7    have to reapply for your license, every time you have to apply

8    for a DEA number, every time you have to apply for privileges or

9    reapply for privileges, that information will come up and you

10   will have to explain to the respective committees or respective

11   institution why it happened.

12   Q.   And what do you believe would happen if it was reported to

13   another hospital that you applied for hospital privileges in

14   Birmingham or Mobile and were denied?

15   A.   They would question my professionalism, knowing that I

16   applied for privileges at a hospital institution where I knew I

17   did not meet the requirement and yet pursued it anyway.

18   Q.   And does this concern also apply to your medical license?

19   A.   Yes.  Yes, it does.

20   Q.   But for either the hospitals or your license, wouldn't you

21   have the opportunity to explain why you were denied?

22   A.   The privileging process is something that happens behind

23   closed doors.  So as a physician, you fill out your application,

24   you get all your support documentation, and you send in -- you

25   send it in to the committee that evaluates your standing and

 1   whether you meet their requirements to receive staff privileges.

 2   When you do have the opportunity to explain yourself, it's

 3   usually written.  Either way, they will look at you unfavorably,

 4   knowing that, professionally, you did not take into account to

 5   respect the bylaws of the hospitals and you casually applied for

 6   privileges at all hospitals even when you knew you could not

 7   meet the bylaws.

 8   Q.  And what if you explained to them that you only did that

 9   because you wanted to be able to continue providing abortion

10   services?  Would that help?

11   A.  No.  Because again, unfortunately, abortion services, taken

12   out of the context of providing women's health and providing

13   women access to their reproductive health, is a politically

14   contentious topic.  And the hospitals do not want to have the

15   type of -- do not want to be engaged in that type of political

16   contentiousness.

17   Q.  What if you were told that you did not meet some of the

18   requirements for admitting privileges, told by a hospital, and

19   you then withdrew your application for privileges?  Would this

20   protect you from having to report that you tried unsuccessfully

21   to get privileges?

22        MS. FLEMING:  I -- I'm going to object, Your Honor.

23   That calls for speculation on the part of the witness.

24        THE COURT:  Would you repeat your question again.

25        MS. SANDMAN:  Suppose that you were told by one of the

1  hospitals that you did not meet some requirement for admitting

2  privileges and you then withdrew your application.  Would this

3  protect you from having to report that you tried unsuccessfully

4  to get privileges.

5          THE COURT:  I'll allow that.  Overruled.

6  A.  No, it would not protect me.  Again, it's a -- it's a matter

7  of establishing your professionalism.  It is a professional

8  relationship.  And in some situations, for some hospitals, they

9  require that you disclose any application that was made, whether

10 it was denied or withdrawn.

11 Q.  Dr. Roe, please turn to the tab in your binder marked

12 Princeton Baptist application.

13         MS. SANDMAN:  And Your Honor, this is just an excerpt

14 from the larger exhibit that has been admitted into evidence.

15 Q.  Do you recognize this document?

16 A.  Yes, I do.

17 Q.  And what is it?

18 A.  It is the -- the staff privilege application for Princeton

19 Baptist.

20 Q.  Directing your attention to the page with the flag, can you

21 read the highlighted section.

22 A.  Have you ever withdrawn an application for appointment,

23 reappointment, clinical privileges, or MCO panel, contracting

24 provider status or resigned before a decision was made by a

25 governing board, whether voluntarily or involuntarily.

1  Q.   So Dr. Roe, to your understanding, if you withdrew your

2  application to another hospital and then applied to Princeton

3  Baptist, would you, in fact, have to answer yes to this

4  question?

5  A.   Yes, I would.

6  Q.   Please turn to the tab in your binder marked St. Vincent's

7  East application.   Do you recognize this document?

8  A.   Yes.

9  Q.   Please turn to the page with the flag and read the

10  highlighted section on page 6.

11  A.   Have you ever voluntarily or involuntarily withdrawn an

12  application for privileges at any hospital.

13  Q.   And again, if you were to apply in the future to a hospital

14  that had language on its application similar to this, would you

15  have to answer yes to that question if you applied for

16  privileges in Birmingham or Mobile and then withdrew that

17  application?

18  A.   Yes, I would.

19  Q.   Dr. Roe, one more question on voluntary withdrawals.

20  Suppose you voluntarily withdrew an application for privileges.

21  Would you trust the hospital not to decide to report it to the

22  national practitioner database anyway?

23  A.   Again, the process is a closed-door process.   And once your

24  application and supporting documentation is turned in, you have

25  no control over what happens behind closed doors.   I have no --

1   no way of knowing how the hospital would report or choose to

2   report whether they denied my application.  And if there is one

3   member on that committee who feels strongly about abortion

4   services, that member may be the deciding factor in how the

5   hospital chooses to report that they denied my application.

6   Q.  And would you have the same concern if you applied for

7   waivers from some of the hospital requirements in the bylaws and

8   were denied?

9   A.  Yes.

10  Q.  Dr. Roe, is the fact that you would be applying for

11  admitting privileges in connection with the abortion services

12  that you provide a factor in your decision about whether you're

13  willing to apply?

14  A.  Yes.  Because, again, it's, unfortunately, a point of

15  contention and hospitals do not want to be associated with that.

16  Q.  Are you aware that there is a law that prohibits hospitals

17  from discriminating against abortion providers when they apply

18  for admitting privileges?

19  A.  Yes, I am.

20  Q.  Do you think that protects you from such discrimination?

21  A.  Unfortunately, no, it doesn't.

22  Q.  Why not?

23  A.  Because, again, the process is a closed-door process.  What

24  happens behind closed doors is -- I am not privy to it.  And

25  that's for any situation when you apply for staff privileges.

1    If there is one member on that committee who, again, feels very

2    strongly about abortion care and abortion services, that person

3    may be the deciding factor or the deciding voice on how and what

4    happens to my application.  And that's not a professional risk

5    that I'm willing to take.

6    Q.  Dr. Roe, you testified earlier that part of your inability

7    to get admitting privileges in Birmingham stems from the fact

8    that you live in Atlanta.  Are you willing to move back to

9    Birmingham?

10   A.  No, I'm not willing to move back to Birmingham.

11   Q.  And just so the record is clear, are you willing to move to

12   Mobile?

13   A.  No, I'm not willing to move to Mobile.

14   Q.  Turning to a different topic, as medical director, are you

15   familiar with the other physician who provides abortion services

16   for PPSE in Alabama?

17   A.  Yes, I am.

18   Q.  And who is that?  And if you need to reference your

19   pseudonym list, please do.

20   A.  Dr. P1.

21   Q.  Is Dr. P1 an OB-GYN?

22   A.  No.  Dr. P1 is a family medicine physician.

23   Q.  And can family medicine physicians perform hysterectomies or

24   laparotomies?

25   A.  No.  It's not part of their residency training.

1   Q.   Is this an issue in terms of their ability to provide safe

2   abortion services?

3   A.   No, it's not.  As a matter of fact, there are studies that

4   show that they are much more compassionate at providing abortion

5   services.

6   Q.   And is there any difference in the quality of abortion care

7   provided by a family medicine doctor as opposed to an OB-GYN?

8   A.   Absolutely not.

9   Q.   I'd like to shift gears now to a different topic.  Dr. Roe,

10  in your work for PPSE in Birmingham, have you encountered any

11  antiabortion protests?

12  A.   Yes.  I -- I encounter protests every time I go to work in

13  the clinics in Alabama and in Mobile.  The activity is anything

14  from jeering, shouting, people trying to take pictures of my

15  license plate, people screaming at me, people trying to take

16  pictures of me.  I've been threatened and I've been followed.

17  Q.   Have you ever had a protestor call you by name?

18  A.   Earlier this year when I arrived to our Birmingham health

19  center, one of the protestors called me out by name.  And they

20  told me that -- they asked me if my patients in Atlanta knew

21  that I was killing women in Alabama and that they were coming

22  for me in Atlanta.

23  Q.   Did you understand this to be a threat?

24  A.   There was no other way for me to interpret it.

25  Q.   What were you afraid would happen?

1   A.   Every time I go to work, whether it's in Birmingham or

2   Mobile, I'm always afraid that there will be somebody who is in

3   the crowd who is passionate enough about the topic that they're

4   willing to shoot.   I worry about my children.   I worry about my

5   husband, my extended family.   I worry about the professional

6   relationships that I have established.

7   Q.   Dr. Roe, have you ever known an abortion provider in Alabama

8   to stop providing abortions here as a direct result of some

9   actions by a protestor?

10  A.   Yes, I have.

11  Q.   Please tell the Court about that.

12  A.   I have known two providers, Dr. P3 and Dr. P7, who have both

13  stopped providing abortion services in Alabama due to protestor

14  activity.   For Dr. P3, in her situation, somehow all her

15  professional and personal information, including Social Security

16  number, were leaked onto the Internet.   And for her, it was sort

17  of the -- the last straw, and she chose to leave Alabama and

18  stop providing abortion services in Alabama.

19       For Dr. P7 --

20  Q.   Actually, Dr. Roe, before you move on to Dr. P7, how do you

21  know that about Dr. P3?

22  A.   I spoke to her.

23  Q.   And is that -- just to be clear, is that what she told you?

24  A.   Yes.

25  Q.   And do you know if, in fact, she stopped providing abortions

1  in Alabama as a result?

2  A.  Yes.

3  Q.  Now, you started to tell the story of what happened with

4  Dr. P7 a moment ago.  Please go ahead with that.

5  A.  Dr. P7 I know from working in private practice with Dr. P7.

6  And he used to provide abortion services for Planned Parenthood

7  and another freestanding abortion health center.  And due to the

8  protestor activity, he was -- his -- his employment, his main

9  employment, was traced back.  And the protests -- a protestor

10  sent a letter to the company that owned the practice where he

11  worked; and that triggered an investigation, where the decision

12  came down to him being told that he needed to stop providing

13  abortion services or he might lose his position with the -- with

14  the practice.

15  Q.  And how do you know that?

16  A.  He called me to tell me about the investigation and to also

17  forewarn me that I would be receiving a phone call as well.

18         MS. FLEMING:  Your Honor, I'll object.  It's now

19  obvious that the witness is testifying as to hearsay evidence.

20         MS. SANDMAN:  Your Honor, she's an expert witness.  And

21  this is part of the basis for her opinion that should the law be

22  allowed to go into effect, PPSE would not be able to recruit

23  additional doctors, local doctors, to provide abortion services.

24         THE COURT:  Response?

25         MS. FLEMING:  For that purpose, Your Honor, I think

1  it's appropriate.

2          THE COURT:  Go ahead.

3          MS. SANDMAN:  Can you read the last question back?

4          COURT REPORTER:  Sure.

5          MS. SANDMAN:  Thank you.

6          THE COURT:  Let me know when you find a good place to

7  have our morning break at 10:30.

8          MS. SANDMAN:  Thank you, Your Honor.  Actually, after

9  this story, we could do that.

10          THE COURT:  This is a good time?

11          MS. SANDMAN:  If she could just complete the

12  description of what happened to Dr. P7.

13          THE COURT:  Go ahead.  Yes.

14          MS. SANDMAN:  And we'll break after that.

15          COURT REPORTER:  Well, the last question was, "And how

16  do you know that?"

17          Would you like me to go back further?

18          MS. SANDMAN:  Yes, please.  Thank you.

19          COURT REPORTER:  Question:  Now, you started to tell

20  the story of what happened with Dr. P7 a moment ago.  Please go

21  ahead with that.

22  Q.  (Ms. Sandman, continuing:)  And Dr. Roe, I believe that you

23  had just described what happened with Dr. P7.  How did you know

24  that?

25  A.  Dr. P7 called me and told me what happened.

1  Q.   And do you know if he -- do you know what he eventually

2  decided to do?

3  A.   He decided to stop providing abortion services in Alabama.

4  Q.   And did he tell you the reason for that decision?

5  A.   Yes, he did.

6  Q.   And what was the reason?

7  A.   He did not want to put his main employment in jeopardy.

8  Q.   And did there come a time when the private practice also had

9  a conversation with you on this topic?

10  A.   Yes.   The medical director called me and asked me what I did

11  for Planned Parenthood, and I told him that I was the medical

12  director for Planned Parenthood Southeast.   And that was the

13  conversation that I had with him.

14  Q.   And did he tell you -- did he give you any -- did he speak

15  to you about whether you provide abortion services?

16  A.   What he told me was that if -- if the main office was made

17  aware that I was doing more than being the medical director for

18  Planned Parenthood Southeast, that I would be at risk for also

19  losing my employment.

20  Q.   And did you think about stopping providing abortions at that

21  stage?

22  A.   Yes, I did.

23  Q.   But what did you ultimately decide?

24  A.   I decided to continue working for Planned Parenthood

25  Southeast, and I stopped working for my former employer.

1          MS. SANDMAN:  Your Honor, this is probably a good

2   breaking point.

3          THE COURT:  Very good.  We'll take a 15-minute recess.

4   Then we'll come back.

5      (Recess at 10:31 a.m. until 10:50 a.m.)

6          THE CLERK:  Please remain seated.  Court is in session.

7          THE COURT:  Proceed.

8          MS. SANDMAN:  Thank you, Your Honor.  If we could

9   just -- oh, I see it's happening.  I was going to say if we

10  could just adjust the curtain again.  That's fine.  Thank you.

11  Q.  (Ms. Sandman, continuing:)  Dr. Roe, back to the more

12  general topic of protestor activities.  Have you ever been

13  followed by a protestor?

14  A.  Yes.  Earlier this year when I was leaving the health center

15  late, I got the impression that I was followed but dismissed it

16  because it had never happened before.  I got on the highway to

17  head home, and I noticed that a car was tailing me.  And so I

18  switched lanes thinking the car needed to pass, and the car

19  switched lanes with me.  And I realized that every time I

20  switched lane, whatever I did, the car was matching my moves.

21  At that point, I realized the car was following me, so I called

22  our then director of patient services and explained to the

23  person what was going on.  She gave me some instructions to try

24  to evade the car, which I followed through, and was able to

25  evade the car.

1  Q.  And just to be clear, what health center were you leaving

2  when this happened?

3  A.  The Birmingham health center.

4  Q.  Dr. Roe, would you repeat that answer.

5  A.  The Birmingham health center.

6  Q.  Did you believe that you were in physical danger?

7  A.  I couldn't interpret it any other way.  I doubt that they

8  would have followed me all the way to Atlanta.

9  Q.  What were you afraid would happen?

10  A.  I was afraid that they would try to run me over or maybe

11  possibly have me crash in a ditch or something.

12  Q.  Have you requested any security as a result of the

13  antiabortion activity that you have encountered?

14  A.  Yes.  From the incident when the protestor called me out by

15  name and said that they were coming for me in Atlanta, I asked

16  for -- from both our director of patient services at the time

17  and our director of quality to -- to help me with some

18  protection.  I know that they both spoke to both the FBI and

19  local law enforcement where I live in metro Atlanta, and I know

20  that the law enforcement in metro Atlanta has been keeping an

21  eye, driving by my house.  They have stopped at my house just to

22  check on us.  I also had a security system installed at my

23  house.  So those were the measures that I've taken.

24  Q.  And can you speak more broadly to the security precautions

25  that you take because of antiabortion activity?

1  A.  I change my hair every time I go to work.  Sometimes I wear

2  my husband's clothes.  He's about a foot taller than I am and at

3  least a hundred pounds heavier than I am, so the bulkiness of

4  his clothes allows me to hide myself a little bit better.

5  During the winter, I wear a scarf and I pull it over my face so

6  that you can only see my eyes when I walk in the health center.

7  In the spring and summer, when I get out of my car, I always

8  make sure to look around.  I always keep my back to the entrance

9  where the protestors are.  I always keep my face down.  I always

10  dress down; and because I always dress down, sometimes they

11  assume that I'm the person who's coming in to clean or I'm just

12  a student.  And if I don't answer, which I don't, then it allows

13  them to continue on that -- with that idea.  Sometimes I'll park

14  my car away from the health center, and someone will come and

15  pick me up.  I always rent a different car.  I never come the

16  same route.  I always scan the car when I get out of my car.

17  Q.  Dr. Roe, you've been speaking about some specific incidents

18  and security measures, and I think this is clear from what

19  you've said, but I just want to make sure.  Are you afraid of

20  being physically attacked?

21  A.  Yes.  I'm afraid every time I go to work.  I think

22  physicians who choose to provide abortion services are -- as

23  part of reproductive health care -- are acutely aware that there

24  is a chance every time they go to work, that they might not come

25  home at night.

1   Q.   Do you know whether other doctors in the medical community

2   in Birmingham and Mobile are aware of the threats and harassment

3   that abortion providers face?

4   A.   I'm sure they are because every time the harassment

5   escalates and somebody gets hurt or someone is killed, then

6   information is on the news.  It's national news.  So providers

7   are fully aware, not just in the Birmingham community but in any

8   community, of what it entails to provide abortion services.

9   Q.   Over your years of work for PPSE, have you had conversations

10  with other doctors about being involved in some way with Planned

11  Parenthood's work in Alabama?

12  A.   I have.  And their main concern is about their security, and

13  it's about making sure that the information is not -- does not

14  get back to their employer because they don't know whether their

15  employer would support the idea that they want to provide

16  abortion services.

17  Q.   And when you say their employer, can you just explain for

18  the Court what you mean by that.

19  A.   If they're in a private practice with other physicians,

20  they're not sure if the other physicians would support their

21  decision to work with Planned Parenthood.  If they're in a

22  practice that belongs to a larger company, they have to abide by

23  the bylaws of that company and the rules of that company; and

24  they're not sure that that company would support that they

25  provide abortion services outside of -- outside of their

1  employment.

2  Q.  Dr. Roe, have you ever thought about stopping providing

3  abortion services because of the protestors or because of the

4  harassment?

5  A.  I think about it very often.  Every time I go to work, I --

6  I question my decision to continue working.

7  Q.  And why do you decide to continue providing abortions?

8  A.  My parents are not from here, and I was not raised here.

9  When my mom was young, she had an abortion and she almost died.

10 I grew up knowing that my reproductive health rights were mine,

11 and I want to make sure that my daughter has that same -- has

12 those same rights.  And I feel that the women that we take care

13 of are women who are in very difficult situations, having to

14 make very difficult decisions.  And I don't feel that I could

15 turn my back on them.

16 Q.  And if you stopped, do you believe that there is anyone

17 available to take your place?

18 A.  I have not met that person yet.

19 Q.  Dr. Roe, you testified earlier that Dr. P9 is your backup

20 doctor in Birmingham as required by the ADPH regulations.  Can

21 you talk about how he came to be your backup doctor?

22 A.  After Dr. P11 withdrew from being our backup physician, I

23 approached Dr. P9 due to the previous relationship that I had

24 with Dr. P9 from working at UAB.  And I explained to him what

25 the -- what we needed.  I also went over our complication rates

1  and all clinical pertinent information and asked him if he would

2  be our backup physician.  And he accepted to do so.

3  Q.  If he stops being willing to be your backup provider, do you

4  know another doctor who would be willing to take his place?

5  A.  No.

6  Q.  Do you think that you would be able to find one?

7  A.  No.

8  Q.  And why is that?

9  A.  Physicians in the community do not want to have a

10  relationship with Planned Parenthood.  They do not want to be

11  perceived as supporting abortion services because of the

12  possible impact on their ability to provide care and to manage

13  their own private practice.  They don't want their personal

14  patients to be harassed by protestors.  They don't want their

15  standing in the community and their professional -- their

16  professional standing to be affected by working with Planned

17  Parenthood.

18  Q.  And before Dr. P9, who was your backup -- before Dr. P9, I

19  believe you testified that Dr. P11 was your backup doctor in

20  Birmingham.

21  A.  Yes.

22  Q.  And why did he stop being your backup, if you know?

23  A.  He stopped being our backup when UAB drew back from having a

24  relationship with Planned Parenthood Southeast.

25  Q.  And do you know why he made that decision?

1   A.   Again, they do not want to have any kind of fallout from

2   being perceived as supporting abortion services or having a

3   relationship with Planned Parenthood.

4   Q.   Focusing for a moment on Mobile, do you know who the backup

5   doctor is there?

6   A.   Yes.   Dr. P10 is our backup provider.

7   Q.   And if he stops being your backup doctor, do you know

8   another doctor who would be willing to take his place?

9   A.   No, I do not.

10  Q.   Do you think you could find one?

11  A.   No.   I would not be able to.

12  Q.   You testified earlier that part of the reason that you

13  cannot get admitting privileges in Birmingham or Mobile is that

14  you don't live in those communities or treat patients in

15  hospitals there.   Have you personally been involved in efforts

16  to recruit any individual local doctors to provide abortions

17  there?

18  A.   There have been no physicians to recruit.

19  Q.   Is it possible that there are doctors who live in Mobile or

20  Birmingham who are willing to provide abortion services but you

21  have not asked them whether they're willing to come and work for

22  you?

23  A.   I do not know of any such physicians.

24  Q.   Would you know?

25  A.   No, I don't know.   There are none.

1  Q.  Dr. Roe, one final question.  And I believe we've covered

2  this already; but in your opinion, is it medically necessary to

3  require that all doctors that perform abortions have the

4  admitting privileges required by the act?

5  A.  No, it's not necessary.  That does not increase the

6  patient -- patient safety.

7  Q.  Will PPSE be able to continue providing abortions in Alabama

8  if this law goes into effect?

9  A.  No.  We will not be able to.

10  Q.  Would this requirement help women in any way?

11  A.  No, it would not.

12       MS. SANDMAN:  No further questions, Your Honor.

13       THE COURT:  Okay.  Do you have a lot of papers there

14  you need to work with?

15       MS. FLEMING:  If I may, I'll just use the chair, Your

16  Honor.

17       THE COURT:  That will be fine.

18                      CROSS-EXAMINATION

19  BY MS. FLEMING:

20  Q.  Good morning, Dr. Roe.  I'm Margaret Fleming, and I'm an

21  Assistant Attorney General for the State of Alabama.  And I have

22  a few questions for you.  It's my understanding that you lived

23  in Birmingham until -- until 2006; is that correct?

24  A.  Yes, ma'am.

25  Q.  And you now live in Atlanta and have admitting privileges at

1   one or more hospitals there?

2   A.  Yes, ma'am.

3   Q.  How many hospitals do you have admitting privileges --

4   A.  Three.

5   Q.  -- in Atlanta?  I'm sorry.  Did you hear me, Dr. Roe?

6   A.  Yes, ma'am.  I have admitting privileges at three hospitals.

7   Q.  In three hospitals?

8   A.  Yes, ma'am.

9   Q.  And it's my understanding that you spend 50 percent of your

10  time working for Planned Parenthood Southeast; is that correct?

11  A.  Yes.

12  Q.  You are the medical director for how many clinics?

13  A.  Eight health centers.

14  Q.  I'm sorry?

15  A.  Eight.

16  Q.  Eight.  Do you travel in your role as medical director?

17  A.  Yes, I do.

18  Q.  And where do you travel?

19  A.  I travel to all of our health centers.

20  Q.  And that would include travel to Birmingham, Alabama,

21  Mobile, Alabama, as well as Augusta, Georgia?

22  A.  Yes, ma'am.

23  Q.  And I take it when you're traveling to those locations,

24  you're not present in your practice in Atlanta; is that correct?

25  A.  I'm sorry.  I did not understand your question.

1  Q.  I said I take it while you are on the road and traveling to

2  those various locations, you are not also present in Atlanta.

3  A.  Yes, ma'am.

4  Q.  Yes, meaning you're not?

5  A.  No, I'm not.

6  Q.  Now, are you able to provide continuing care to your

7  patients in Atlanta even though you travel?

8  A.  Yes, I am.

9  Q.  And in fact, in working for Planned Parenthood, again, you

10  are working spending 50 percent of your time as medical director

11  for Planned Parenthood; is that correct?

12  A.  Yes.

13  Q.  And you were -- when you moved to Birmingham in 2002, were

14  you working for UAB at that time?

15  A.  Yes, I was.

16  Q.  And you were on staff at UAB; is that correct?

17  A.  Yes.

18  Q.  And had admitting privileges at UAB Hospital; is that

19  correct?

20  A.  Yes.

21  Q.  And you were also working for Planned Parenthood in

22  Birmingham; is that correct?

23  A.  Yes.

24  Q.  It's my understanding that UAB actually arranged for you to

25  have this cooperative working relationship with Planned

1   Parenthood; is that correct?

2   A.   My chairman at UAB at the time arranged for that

3   relationship, yes.

4   Q.   And did she also work at Planned Parenthood at one time?

5   A.   My chairman was a gentleman.  He did not work at Planned

6   Parenthood.

7   Q.   Did -- maybe I have this backwards.  Did your predecessor at

8   Planned Parenthood also have an affiliation with UAB?

9   A.   Yes, she did.

10  Q.   Did she have admitting privileges, to your knowledge?

11  A.   Yes, she had admitting privileges as well.

12  Q.   And did she perform abortions as well?

13  A.   I do not know.

14  Q.   While you were employed at the clinic in Birmingham, did you

15  perform abortions?

16  A.   Yes, I did.

17  Q.   At the same time you had admitting privileges at UAB?

18  A.   Yes, I did.

19  Q.   Now, is there anyone else, to your knowledge, affiliated

20  with Planned Parenthood who is -- who now works at UAB?

21  A.   No, there is no one.

22  Q.   Is there anyone working at UAB on faculty or staff that

23  previously worked at Planned Parenthood?

24  A.   I'm not sure I understand your question.

25  Q.   Isn't it true that faculty at -- current faculty at UAB

1  include a previous medical director for Planned Parenthood in

2  Texas?

3  A.  I'm still not understanding your question.  I'm sorry.

4  Q.  Do you know whether anyone on faculty at UAB has a prior

5  affiliation with Planned Parenthood?

6  A.  Yes.

7  Q.  And who is that?

8  A.  I do not recall the physician's name.

9  Q.  But it is a physician that's currently working at UAB that

10  has a past affiliation with Planned Parenthood; is that correct?

11  A.  Yes.

12  Q.  Do you know whether this particular individual performed

13  abortions at one time?

14  A.  I have not worked with this individual.  I do not know what

15  they did.

16  Q.  And let me go back.  It's also true that while you were an

17  OB-GYN with staff privileges at UAB Hospital, you also had

18  privileges at Cooper Green and Carraway Hospitals?

19  A.  Yes.

20  Q.  Now, you actually moved to Atlanta from Birmingham for

21  personal reasons that were unrelated to abortion; is that

22  correct?

23  A.  Yes.

24  Q.  And your husband continues to work in Birmingham at the

25  present time?

1    A.   Yes.

2    Q.   Has anyone at Planned Parenthood discussed with you the

3    possibility of your returning to live in Birmingham, where your

4    husband works?

5    A.   No.

6    Q.   Has anyone at Planned Parenthood offered you any financial

7    incentive to move back to Birmingham or to move to Mobile?

8    A.   No, they have not.  They are very clear that I do not wish

9    to move back to Birmingham.

10   Q.   Are you saying, Dr. Roe, that there is no amount of money

11   that would incent you to move to Birmingham or to Mobile even on

12   a part-time basis?

13   A.   No, ma'am.  I do not want to raise my children in

14   Birmingham, Alabama.  Again, I am not from here.  And when I

15   moved here in 2002, this was the first time that I encountered a

16   situation where patients did not want to allow me to take care

17   of them because of my color.  I want my children to be raised in

18   a situation where they do not have to worry that their color

19   will define who they're going to become.

20   Q.   Have you ever lived in Mobile, Alabama?

21   A.   No, I have not.

22   Q.   How often have you visited Mobile, Alabama?

23   A.   I am there every other month.

24   Q.   In your capacity as medical director?

25   A.   Yes, ma'am.

1  Q.  Is it true that protests -- abortion protests in Alabama are

2  not meaningfully different than protests at other states, such

3  as Georgia?

4  A.  We do not have the same type of protestor activity in

5  Georgia.

6  Q.  I'm sorry, Dr. Roe.  I could not understand you.  Would you

7  repeat your response?

8  A.  We do not have the same -- the same type of protestor

9  activity in Georgia.  The protestor activity that we have in

10  Alabama is louder, stronger, and much more harassing.

11      MS. FLEMING:  Ms. Killough, would you pull up Dr. Roe's

12  deposition at page 81.

13      And could I ask opposing counsel to review that page as

14  well to make sure there's nothing sensitive on that page before

15  we publish it?

16    (Brief pause)

17      MS. SANDMAN:  That's fine.  Thank you.

18  Q.  (Ms. Fleming, continuing:)  Dr. Roe, let me refer you to --

19  can you see your deposition on the screen, Dr. Roe?

20  A.  Yes, ma'am.

21  Q.  Do you remember when that deposition was taken?

22  A.  I do not remember the exact date, but I remember when it was

23  taken.

24  Q.  Were you sworn to tell the truth at that time?

25  A.  Yes, I was.

1   Q.  Let me refer you to the question that begins at line 13 of

2   your deposition.  And you were asked:  Are the protests in the

3   Georgia clinics meaningfully different from the protests in the

4   Alabama clinics?

5   A.  Yes.

6   Q.  What was your response?

7   A.  At the time, it was no.

8   Q.  And the question was, It's about the same.  Is that correct?

9   A.  Yes, ma'am.

10  Q.  And your answer was?

11  A.  Yes.

12  Q.  You don't recall when your deposition was taken?

13  A.  I do not remember the exact date, no, ma'am.

14  Q.  Has it been in the last 12 months?

15  A.  I honestly don't remember.

16          MS. FLEMING:  Could we have the first page of the

17  deposition, please, or whatever date -- whatever page shows the

18  date, please.

19          THE COURT:  Why don't you just say what the date is so

20  we'll all know.

21  Q.  According to your deposition, your deposition was taken in

22  September of 2013.  Is that right?

23  A.  Yes, ma'am.

24  Q.  Does that sound correct to you?

25  A.  Yes, ma'am.

1  Q.  Is it true that your private practice has never been

2  picketed because of abortion?

3  A.  No, it's not -- yes, that's true.

4  Q.  And would you agree with me, Doctor, that continuity of care

5  is the most important thing to ensure a good outcome for a

6  patient with complications?

7  A.  Yes.

8  Q.  In your role as medical director for Planned Parenthood

9  Southeast, I believe you testified there are eight clinics under

10  your supervision; is that correct?

11  A.  Yes, ma'am.

12  Q.  As medical director, are you responsible for supervising all

13  clinical functions and ensuring that the facility meets the

14  requirements of Alabama Department of Public Health rules and

15  all professional standards of care?

16  A.  I'm not sure I understand your question.

17  Q.  Well, and that's a little confusing.  With respect to the

18  two Alabama clinics, are you responsible for supervising all

19  clinical functions and ensuring that the facility meets the

20  requirements of Alabama Department of Public Health rules and

21  all professional standards of care?

22  A.  I am responsible for the clinical services.  I work with the

23  administration to make sure that the administrative portion of

24  meeting the Alabama Department of Health rules are met and

25  enforced, but I am not solely responsible, no, ma'am.

1   Q.  But would you agree that you are primarily responsible for

2   supervising all clinical functions and ensuring that the

3   facility meets the requirements of public health rules and

4   professional standards of care?

5   A.  No, ma'am.  I am responsible for the clinicians.  I am

6   responsible for the health care providers.  I work with our

7   director of quality assessment and risk management to make sure

8   that we meet all the health department rules and enforce the

9   codes that need to be met.

10  Q.  Dr. Roe, are you familiar with the rules of the Alabama

11  Department of Public Health?

12  A.  I am familiar with those pertaining with the supervision and

13  provision of services by clinicians and physicians.

14  Q.  I want to show you what's marked as Defendant's Exhibit --

15  or Plaintiff's Exhibit 4 and refer you specifically to the

16  paragraph -- let's see if I have the full cite -- 420-5-1-.02.5

17  for personnel, and subsection (c) entitled, Medical Director.

18          MS. SANDMAN:  Do you have a copy of that?

19          MS. FLEMING:  No.  I'm sorry.  It should be on the

20  screen.  It's published up here.

21  Q.  (Ms. Fleming, continuing:)  And under -- under that

22  subsection, does the -- do the rules of the Alabama Department

23  of Public Health provide each abortion facility shall have a

24  medical director who shall be responsible for supervising all

25  clinical functions and ensuring that the facility meets the

1  requirements of these rules and all professional standards of

2  care?

3  A.   Correct.

4          MS. KOLBI-MOLINAS:  Excuse me.  May I just -- that's

5  actually not Plaintiff's Exhibit 4.  I think that sticker must

6  be from a former deposition, but it's not Plaintiff's Exhibit 4.

7          MS. FLEMING:  And I apologize.  Do we know what the

8  correct --

9          TECHNICIAN:  Plaintiff's 74.

10          MS. FLEMING:  I'm sorry?

11          MR. DAVIS:  It's part of Plaintiff's 74.

12          THE COURT:  74.

13          MS. FLEMING:  It's part of Plaintiff's Exhibit 74.  I

14  apologize, Your Honor, for the confusion.

15          THE COURT:  Go ahead.

16          MS. KOLBI-MOLINAS:  Sorry, but I don't know what

17  you're -- our Plaintiff's Exhibit 74 is a journal article from

18  the *Journal of Policy Analysis and Management*.

19          MR. DAVIS:  Our numbering is off on the list.  My

20  apologies.  We'll clear this up.  But it's part of the -- an

21  exhibit to the deposition of Dr. Williamson, I believe.

22          MS. KOLBI-MOLINAS:  Oh, I -- okay.  That's what it is.

23          MR. DAVIS:  We'll get this straightened out and inform

24  the Court.

25          MS. FLEMING:  And I'm not sure it needs to be an

1  exhibit.  The rules of the Department of Public Health are made

2  a part of the Alabama Administrative Code.

3          THE COURT:  Very good.  Have you made clear what

4  section of the code you're now reading from?

5          MS. FLEMING:  I believe so.  Is everyone clear?  It's

6  Chapter 420-5-1-.02, parenthetical 5, parenthetical C.

7          THE COURT:  Very good.

8  Q.  (Ms. Fleming, continuing:)  Would you agree with me, then,

9  Dr. Roe, that you are responsible for supervising all clinical

10  functions and ensuring that the Alabama clinics meet the

11  requirements of Department of Public Health rules and all

12  professional standards of care?

13  A.  Yes.

14  Q.  In fact, you have ultimate responsibility for the

15  development and implementation of all protocols and policies

16  used by those two clinics; is that correct?

17  A.  Yes.

18  Q.  And are you responsible as medical director to ensure that

19  all clinical staff, including both facility and outside covering

20  physicians associated with the facilities, are competent, as

21  required by these rules and professional standards of care?

22  A.  Yes.

23  Q.  Now, how many times in 2013, Dr. Roe, did you actually

24  observe the outside covering physician for the Birmingham

25  clinic?

1    A.   I have not.

2    Q.   Have you ever observed him?

3    A.   I have worked with him, but I have not observed him in 2013.

4    Q.   How many days per week do you actually observe clinical

5    staff at the Birmingham clinic?

6    A.   A minimum of once a week.

7    Q.   What about the Mobile clinic?   How many times in 2013 did

8    you actually observe the outside covering physician for the

9    Mobile clinic?

10   A.   I have not.

11   Q.   Have you ever observed that physician?

12   A.   I have not.

13   Q.   And how many days per week do you actually observe the

14   clinical staff in Mobile?

15   A.   I observe them once every other month.

16   Q.   Once every other month?

17   A.   At minimum, the clinical staff, yes.   Are you referring to

18   the physician or solely the clinical staff?

19   Q.   The clinical staff.

20   A.   At minimum, once a month, yes, ma'am.

21   Q.   I'm sorry.   Did you say once a month or once every two

22   months?

23   A.   Once every other month.   Excuse me.

24   Q.   So six times a year you visit Mobile, at a minimum?

25   A.   At a minimum, yes, ma'am.

1   Q.   How many staff are employed at each of those two clinics?

2   A.   Four staff in Mobile, four staff in Birmingham, including

3   the health center manager.

4   Q.   Now, Dr. Roe, are you -- are you referring to a document in

5   order to come up with those numbers?

6   A.   No, I'm not referring to any document.  I'm going solely by

7   memory, ma'am.

8   Q.   Now, when did you last evaluate the staff at the Birmingham

9   clinic?

10   A.   I was with the staff in the Birmingham clinic two weeks ago,

11   ma'am.

12   Q.   That clinic is not open at the present, however.  Is that

13   correct?

14   A.   They are not.

15   Q.   How often did you evaluate the staff at the Birmingham

16   clinic in 2013?

17   A.   I'm not sure I understand your question.

18   Q.   Do you perform staff evaluations for clinical staff?

19   A.   We perform yearly evaluations.

20   Q.   You do?

21   A.   As part of a group, the management team evaluates the staff.

22   And we perform yearly evaluations, yes, ma'am.

23   Q.   And when did you perform that yearly evaluation in 2013?

24   A.   I honestly don't recall.

25   Q.   Are you required to evaluate each physician at the clinic

1   annually?

2   A.   Yes.   Yes, I am.

3   Q.   And do you -- is there an evaluation form that you are

4   supposed to sign?

5   A.   Yes.

6   Q.   Can you tell me why it is that the -- a surveyor recently

7   discovered that evaluation forms were not completed for

8   physicians in 2010, '11, '12, and '13, I believe?

9   A.   I'm not sure what was presented to the surveyor, but the --

10  I personally know that I have surveyed the physicians in 2011,

11  2012, and in 2013.

12  Q.   And you were responsible for doing so as medical director;

13  is that correct?

14  A.   Yes, ma'am, I was.

15  Q.   Were you present in the Birmingham clinic on the day that

16  one of your nurses sold abortion-inducing drugs illegally in the

17  parking lot?

18  A.   No, ma'am, I was not.

19  Q.   When did you first learn of that incident?

20  A.   Late November, December 2013.

21  Q.   And how did you learn of it?

22  A.   I was informed by our then director of patient services.

23  Q.   And who is that?   Not the name.   I'm not asking for the

24  name, but I'm asking what is that -- where does that person

25  work?

1  A.  That person is based out of our administrative office in

2  Atlanta.

3  Q.  So someone in Atlanta informed you about an event that

4  happened at the Birmingham clinic where you are medical

5  director?

6  A.  Yes, ma'am.

7  Q.  Now, would you say that that event was a breach of the

8  standard of care for patients?

9  A.  That event is not related to standard of care for patients.

10  It does not involve care.

11  Q.  So you would not consider someone who purchased an abortion

12  drug from someone at your clinic to be a patient of the clinic?

13  A.  Someone who sold drugs to the patient illegally is not

14  providing care.  She is committing an illegal act.

15  Q.  I understand that.  But would you consider her doing so, her

16  commission of that illegal act, to be a breach of the

17  appropriate standard of care?

18  A.  I'm not sure I understand the question, ma'am.  That is not

19  standard of care.  She's committing an illegal act.

20  Q.  Are your registered nurses held to any particular standard

21  of care?

22  A.  They're held to the standard of care by the board of

23  nursing.

24  Q.  So there is a standard of care for your registered nurses as

25  well as your physicians; is that correct?

1    A.   Yes, there is.

2    Q.   And I'm asking you, since you're here as medical director

3    and also as an expert in this, can you tell me whether this

4    particular incident by a registered nurse employed by your

5    Birmingham clinic breached the relevant standard of care?

6    A.   And I'm sorry.   The only answer I can give you is that she

7    was not providing care; she was committing an illegal act.

8    Therefore, it's not part of standard of care.

9    Q.   And so is it your testimony that you were no -- in no way

10   responsible for that incident?

11   A.   I am not responsible for that nurse's act.   She's committing

12   an illegal act.

13   Q.   Have you been held accountable in any way by Planned

14   Parenthood of the Southeast for that incident?

15   A.   I was not present when that incident occurred.   I was

16   investigated.   They asked me questions.   And once I answered my

17   questions, that was the end of my -- my -- my questioning in the

18   investigation.

19   Q.   To your knowledge, Dr. Roe, was that sale an isolated

20   incident?

21   A.   To my knowledge, yes, ma'am.

22   Q.   Was there any other conduct that occurred at the Birmingham

23   clinic that influenced Planned Parenthood's decision to close

24   that clinic?

25   A.   I was not a part of that decision-making process.

1   Q.  As medical director, you were not consulted in the decision
2   to close the Birmingham clinic?
3   A.  No, ma'am.  That decision was an administrative-made
4   decision.
5   Q.  Were you consulted in any way on how to provide continuing
6   care to the patients who had been treated recently at the
7   Birmingham clinic --
8   A.  Yes, I was.
9   Q.  -- before it closed?
10      (Brief pause)
11  Q.  I'm sorry, Dr. Roe.  Did you understand my question?
12  A.  Yes, ma'am.  I answered your question.
13  Q.  I'm sorry.  I did not hear your response.
14  A.  Yes, I was.
15  Q.  And how did you ensure that continuity of care was provided
16  when the clinic -- after the clinic was closed?
17  A.  For our medical abortion patients' services, we stopped
18  providing medical abortion two weeks prior to the closure of the
19  health center to ensure that the patients who received medical
20  abortion would have the opportunity to return to the clinic for
21  their follow-up care.  We made sure to call all the patients who
22  had not followed up.
23      For the surgical abortion patients, our system remained in
24  place.  We still have a nurse on call that has never stopped.
25  We still have a physician on call that has never stopped.  All

1   patients who had a surgical abortion prior to the health center

2   closing were given the same information and same instruction.

3   They were given the number for them to call if they -- should

4   they experience any complication or should they have any

5   questions.

6   Q.   Now, I believe you testified earlier that if a patient had

7   complications, that the patient would be told to return to the

8   center for evaluation.   Is that correct?

9   A.   Yes, ma'am.

10  Q.   And were these patients given some place that they could go

11  to for follow-up care?

12  A.   I'm sorry.   Which patients, ma'am?

13  Q.   The patients who had abortions prior to the closing of your

14  Birmingham clinic.

15  A.   The patients were given the same directions that they

16  were -- that all our other patients are always given.   The

17  patients were also told that if they needed to follow up, they

18  could follow up with our health center in Mobile or they could

19  follow up in Tuscaloosa or in Huntsville, where there are other

20  abortion health centers.

21  Q.   Were there arrangements made with these centers in advance

22  to handle patients?

23  A.   I know that at the health center in -- both the health

24  centers in Tuscaloosa and Huntsville were aware.   And we did not

25  make any prior arrangements as it's on an as-needed basis.

1   Q.  Are you aware that one of your patients presented herself at

2   the Tuscaloosa clinic, and the Tuscaloosa clinic was unable to

3   obtain medical records from your facility?

4   A.  I am aware that there were attempts to obtain a medical

5   record and that there was miscommunication and that it was

6   difficult to obtain those records.

7   Q.  And tell me, Dr. Roe, what -- when was the last date that

8   surgical abortions were performed in the Birmingham clinic?

9   A.  January 10th, 2014.

10  Q.  And when did that clinic close?

11  A.  That was the last day that I was at the health center, and

12  that's the last day that services were provided, ma'am.

13  Q.  So the clinic, in essence, closed on January 10th when the

14  last surgical abortion was performed?

15  A.  That is the last day that services were provided, yes,

16  ma'am.

17  Q.  Now, when were the doors of the clinic locked?

18  A.  I was not present when that occurred, ma'am.

19  Q.  As medical director, are you --

20          THE COURT:  Hold on.

21          MS. FLEMING:  Pardon me.

22      (Brief pause)

23          THE COURT:  Go ahead.

24  Q.  As medical director, you are unaware of the date that the

25  doors were locked in the Birmingham clinic; is that correct?

1  A.  I don't remember the date that the doors were locked.  No,

2  ma'am.

3  Q.  If I tell you that the doors were locked on January the

4  17th, according to our records, does that sound correct to you?

5  A.  Yes, ma'am.

6  Q.  Can you tell me what -- you've said, I believe, that the

7  patients who presented themselves to your clinic on January 10th

8  and obtained surgical abortions were given the same instructions

9  as other patients for follow-up care.

10  A.  Yes, ma'am.  They had access to our nurse on call.  They

11  were given the same instructions for pain management.  They were

12  given the same instructions for what to be on the lookout for

13  from a symptomatic perspective.  They were told that if they had

14  any question, concerns, if they felt -- if they thought they had

15  questions, they needed to call the nurse on call.  The nurse on

16  call would then triage them and speak to them and would help

17  them manage their complaint.

18  Q.  Were they told that they could return to the clinic for

19  follow-up care?

20  A.  No, ma'am.  We explained to the patient that if they needed

21  to have follow-up care, that they would be able to either come

22  to us in Mobile or that they would be able to go to Tuscaloosa

23  or to Huntsville.

24  Q.  And you're speaking now of the patients that received care

25  on January the 10th; is that correct?

1    A.   Yes, ma'am.

2    Q.   When was the decision made to close the clinic?

3    A.   I'm sorry, ma'am.  I was not a part of that decision.  I'm

4    not sure of the exact time that that decision was made.

5    Q.   Can you tell me when you began advising patients to go to

6    Tuscaloosa for follow-up care or to Mobile rather than coming to

7    your clinic?

8    A.   That occurred in January 2010 -- 2014.  Excuse me.

9    Q.   When in January, if you recall?

10   A.   The last day of service was January 10th, and so it occurred

11   during that time period.

12   Q.   So a patient that received an abortion in December of 2013

13   would have expected to be able to return to your clinic in

14   Birmingham for follow-up care; is that correct?

15   A.   Yes, ma'am.

16   Q.   And if she had returned for follow-up care three weeks

17   postabortion, would she have found the doors of your clinic

18   locked?

19   A.   Those patients were called so that they would not find the

20   doors of the clinic locked.

21   Q.   Did you personally call those patients, Doctor?

22   A.   I did not personally call those patients.  That task was

23   delegated to -- to our health center manager.

24   Q.   Is that person still working for your clinic?

25   A.   No, ma'am.

1   Q.  Was that one of the people that was fired as a result of

2   the -- of this same incident?

3   A.  I'm sorry.  Can you please repeat your question?

4   Q.  Was that person fired as a result of the sale of the

5   abortion-inducing drug in the parking lot?

6   A.  Yes, ma'am.

7   Q.  So you delegated to one of the people that was fired by

8   Planned Parenthood Southeast the responsibility for contacting

9   patients to ensure continuity of care?

10  A.  Under the supervision of our director of patient services,

11  under the supervision of our nurse at the time.  The phone calls

12  were made so that all patients could be reached expediently, so

13  all patients could be assured of the ability of coming back to

14  receive their follow-up care.

15  Q.  I'm sorry, Doctor.  That's not responsive to my question.

16  My question to you is did you delegate to one of the individuals

17  who was fired by Planned Parenthood Southeast as a result of the

18  sale of abortion-inducing drugs in the parking lot

19  responsibility for ensuring continuity of patient care.

20  A.  She was not responsible for ensuring continuity of care.

21  She was responsible for calling the patient and asking the

22  patient to come back to the clinic.

23  Q.  Was she responsible for notifying the patient that your

24  doors were going to be locked from then on until -- and

25  basically locked until further notice?

1  A.  She was responsible for asking the patient to come back to

2  the health center prior to us having -- prior to us stopping

3  services.  Yes, ma'am.

4  Q.  Did your staff -- were all the staff at the Birmingham

5  clinic fired?

6  A.  Yes, ma'am.

7  Q.  Except for you as medical director?

8  A.  Yes, ma'am.

9  Q.  Are you aware that -- although you are representing that

10  those phone calls to patients were made, are you aware that

11  there is nothing in your patient records to indicate those calls

12  were ever made?

13  A.  Yes, ma'am.

14  Q.  You are aware of that?

15  A.  Yes, ma'am.

16  Q.  So you don't know for a fact that those calls to patients

17  were made; is that correct?

18  A.  It was not documented, but I know that the calls were made.

19  Q.  Were you present when they were made, Doctor?

20  A.  No, ma'am.  However, I was in the clinic on January 9th, and

21  some of the patients who were called were -- presented to the

22  clinic on January 9th.

23  Q.  Now, Dr. Roe, do you help to hire doctors for the clinic?

24  A.  I'm not sure I understand the question, ma'am.

25  Q.  Do you have any role in hiring doctors for the clinic,

1   abortion providers for your clinic in Birmingham?

2   A.  I facilitate the on-boarding of the hiring of the

3   physicians.

4   Q.  I'm sorry, Doctor.  I was talking over you.  I didn't mean

5   to.  Would you tell me your answer again, please.

6   A.  I facilitate the on-boarding of patient -- of physicians who

7   are hired.

8   Q.  And by facilitate, what does your role entail?

9   A.  I go over their medical standards and guidelines, and I also

10  spend a minimum of 30 to 60 days proctoring these physicians.

11  Q.  What do they need to show in order to be hired by you?

12  A.  I'm sorry.  Could you be more specific?

13  Q.  What are your criteria for reviewing the qualifications of

14  these physicians?

15  A.  We use the same criteria that are used by other health care

16  facilities.  We ensure that we have information regarding their

17  training, that they completed their training, both medical

18  school and residency.  We also make sure that they are licensed

19  and that they have an active license to practice medicine.  We

20  also conduct a search to make sure that we're aware of any

21  malpractice history that they may have or not have.  And we use

22  the national practitioner database, just like other health care

23  entities.

24  Q.  Have you ever rejected a physician as unqualified?

25  A.  We do not have a lot of physicians who come to work for

1    Planned Parenthood.

2    Q.   That was not my question, Doctor.  Have you ever rejected a

3    physician as unqualified?

4    A.   No, we have not.

5    Q.   Is it true that doctors who perform abortions at your

6    clinics in Birmingham and Mobile generally arrive in the

7    metropolitan area of the clinic on the day of the procedure or

8    the evening before the procedure?

9    A.   Yes.

10   Q.   And is it true that those doctors also leave the

11   metropolitan area of the clinic on the day of the procedure?

12   A.   Yes.

13   Q.   After staying in Birmingham or Mobile for as little as four

14   to five hours; is that correct?

15   A.   They stay until the last patient is seen and taken care of

16   and discharged.

17   Q.   Now, after the Planned Parenthood doctors are gone from

18   Mobile and Birmingham, are you required to contract with an

19   outside covering physician who is available to provide emergency

20   care for patients?

21   A.   We have a current covering physician in both Birmingham and

22   Mobile.

23   Q.   You have -- I'm sorry.  You have what?

24   A.   A covering physician in both Birmingham and Mobile.

25   Q.   All right.  And are you required to contract with an outside

 1  covering physician who is available to provide emergency care

 2  for patients?

 3  A.   Yes.

 4  Q.   Does the Birmingham clinic have a contract with an outside

 5  covering physician?

 6  A.   Yes.

 7  Q.   And what base fee does Planned Parenthood pay the covering

 8  physician?

 9  A.   These are voluntary positions, ma'am.

10  Q.   He's a volunteer --

11  A.   Yes, ma'am.

12  Q.   -- did you say?

13  A.   They are volunteers, yes, ma'am.

14  Q.   Does Planned Parenthood pay the covering physician a fee for

15  each patient referred?

16  A.   No, ma'am, we do not.

17  Q.   He's expected to be a volunteer in seeing patients; is that

18  correct?

19  A.   Yes, ma'am.

20  Q.   Has Planned Parenthood paid anything to your Birmingham

21  covering physician in the past year for medical emergencies?

22  A.   No.

23  Q.   Since you have been medical director, has Planned Parenthood

24  paid anything to its Birmingham covering physician?

25  A.   No, we have not.

1  Q.  Does -- now, you are responsible for the development and

2  implementation of all protocols and policies used by Birmingham

3  and Mobile clinics, correct?

4  A.  Yes, ma'am.

5  Q.  Does the Birmingham clinic have an established protocol for

6  handling patient emergencies?

7  A.  Yes, ma'am.

8  Q.  Based on that protocol, when is a patient referred to the

9  outside covering physician?

10  A.  I'm not sure I understand the question you're asking.

11  Q.  You said you have an established protocol for handling

12  patient emergencies, correct?

13  A.  Yes, ma'am.

14  Q.  And I said based on that protocol, when is it that a patient

15  is referred to your outside covering physician?

16  A.  I'm still not sure I understand your question, but the

17  patients that are -- that we refer -- when we have to refer a

18  patient outside, we refer the patient based on the safety of the

19  patient, not on -- based on the covering physician.

20  Q.  So do you ever refer a patient to your covering physician,

21  Doctor?

22  A.  The patients that I have referred are not patients who -- in

23  the context of abortion care.  These are patients who came in to

24  be evaluated for their preabortion services.  If the patient is

25  found to have an ectopic pregnancy, that patient will be

1    referred to the covering physician.  If the patient is found to
2    have a pregnancy that they want to continue, that patient will
3    be referred to the covering physician.
4    Q.  But it is not your protocol to refer patients to your
5    outside covering physician in the event of complications arising
6    from an abortion?
7    A.  If that is not the safest thing for the patient, then I will
8    not refer the patient to the covering physician.  In the event
9    of a complication arising as part of the patient's care in the
10   clinic, my duty is to the patient first and to get that patient
11   to the nearest emergency room so that that patient will receive
12   the care they need.
13   Q.  Is it not appropriate in some circumstances, Doctor, for a
14   patient with abortion complications to actually see a physician
15   rather than presenting to the emergency room?
16   A.  No, ma'am.  If there's a complication that requires that
17   that patient be seen in the emergency room, that patient needs
18   to be in the hospital, where they can be evaluated quickly, they
19   can be stabilized, and they can be taken care of.
20   Q.  What are the types of complications that one can get from an
21   abortion, Doctor?
22   A.  Complications include bleeding, infection, cervical
23   laceration, uterine perforations.
24   Q.  And even if a doctor performs an abortion properly, there
25   can be complications?  Yes?

1   A.   Any surgery that is performed will carry complication, yes,
2   ma'am.
3   Q.   And there can also be complications if a surgeon doesn't
4   perform the operation properly; is that correct?
5   A.   Yes, ma'am.
6   Q.   Now, it's your testimony Planned Parenthood clinics have an
7   after hours answering service that will patch calls through to a
8   nurse; is that correct?
9   A.   Yes, ma'am.
10  Q.   And it's the nurse that assesses the patients and lets you
11  know if the nurse believes that there's a medical necessity or
12  emergency?
13  A.   Yes.  Yes, ma'am.
14  Q.   Now, when that happens, do you talk to the patient?
15  A.   Depending on the condition of the patient, yes, ma'am.
16  Q.   Do you ever instruct the patient to come back to the clinic
17  for follow-up?
18  A.   Yes, I have.  Yes, ma'am.
19  Q.   But it's your practice, if a patient has an emergency
20  condition, to refer that patient to the emergency room.
21  A.   If my evaluation of the patient I am -- warrants that, yes,
22  ma'am.
23  Q.   But you would not contact the clinic's backup physician.
24  A.   I have to go by my evaluation of the patient and do what is
25  safest for the patient.

1  Q.  I understand that, Doctor, but would you or would you not

2  contact the backup physician?

3  A.  In what context?  I'm sorry.  I'm not sure I'm following

4  you.

5  Q.  In the context of a patient that has one of the emergency

6  conditions that you have identified for us.

7  A.  I'm sorry.  I'm still not following you.  I apologize.

8  Q.  Doctor, you've testified that you are responsible for

9  developing emergency protocol, correct?

10  A.  Yes.

11  Q.  All right.  According to that emergency protocol, if you

12  feel a patient needs emergency care, where do you refer them?

13  A.  If the patient calls after hours and I feel that the patient

14  needs emergency care, I refer the patient to the emergency room.

15  Q.  My question was do you ever refer them to the backup

16  covering physician.

17  A.  If the patient's status warrants for the patient to be seen

18  in the hospital and transferred to the emergency room, I'm going

19  to refer the patients to -- the patient to the emergency room,

20  not refer the patient to the backup covering physician.

21  Q.  After referring the patient to the emergency room, would you

22  contact the backup physician?

23  A.  Yes.  I would let them know what happened.

24  Q.  In every case, that is your protocol?

25  A.  If the patient's management is one that requires hospital

1    admission, hospital stay, I will call the backup provider to let

2    him know about the complication that arose and how the patient

3    was managed.

4    Q.  Is the backup physician then expected to follow the patient

5    to the emergency room?

6    A.  Once the hospital -- that patient is in the emergency room,

7    that patient will be managed by the emergency room physician.

8    Q.  So is it your testimony that your backup physician has no

9    role in follow-up patient care?

10   A.  I'm not sure I understand your question.

11   Q.  Well, Doctor, I believe you've just said that in the event

12   of emergency, you would send a patient to the emergency room and

13   you would contact the backup physician to let him know you had

14   done so.  According to your protocol, what responsibility does

15   the backup physician then have?

16   A.  If the patient is in the -- is in the hospital and the

17   patient ends up having a stay in the hospital, then the backup

18   physician -- if the backup physician has privileges at that

19   hospital, then he would be able to follow the patient at that

20   hospital.

21   Q.  He would be able to, but what is your protocol?  Is he

22   required to?

23   A.  No.

24   Q.  Is he required to follow up with a patient in the hospital,

25   Doctor?

1  A.   No, he is not required to.

2  Q.   And this does happen, does it not, Doctor?

3  A.   I'm sorry.   What happens?

4  Q.   It does happen that patients have emergencies and require

5  medical attention in a hospital?

6  A.   Yes.   It can happen, yes, ma'am.

7  Q.   I believe in February of 2011, a patient called the

8  Birmingham clinic and complained of cramps, the nurse called

9  you, and you instructed the nurse to have the patient go to the

10  nearest emergency room.   Do you recall that incident?

11  A.   No, ma'am.

12  Q.   Do you recall an incident the week before your deposition

13  where a plaintiff (sic) called the after hours answering service

14  at the Birmingham clinic to complain of bleeding, the nurse

15  called you, and you instructed the nurse to have the patient go

16  to the nearest emergency room?

17  A.   No, ma'am.   I would have to have the patient's medical

18  record in front of me.

19  Q.   So is it a fairly common occurrence that a nurse will call

20  you and you will instruct the nurse to have the patient go to

21  the emergency room?

22  A.   No, it is not a common occurrence, ma'am.

23  Q.   But it's not memorable enough for you to have any

24  independent recollection of the event?

25  A.   Not on a precise basis with the questions that you're

1  asking.  In order to answer those questions, I would have to

2  have the medical record to answer your questions accurately.

3  Q.  But you have no independent recollection of that event that

4  I've just described that happened a week before your deposition,

5  less than a year ago?

6  A.  No, ma'am, I do not.

7  Q.  Is it your expectation that emergency room personnel will

8  assume responsibility for care of your patients once the patient

9  gets to the emergency room?

10  A.  It is their obligation to proceed to provide care for any

11  patient that comes through the emergency room, whether those

12  patients are affiliated with us or with anybody else.

13  Q.  After a patient goes to the emergency room, I believe you've

14  testified that your protocol is that someone from your clinic

15  would call the patient a day or two later just to find out what

16  happened at the emergency room.

17  A.  We call the patient 24 hours after -- after they were

18  triaged and referred to the emergency room, yes, ma'am.

19  Q.  And you believe that this follow-up call to the patient is

20  adequate to ensure continuity of care for a patient who has an

21  emergency?

22  A.  I'm not sure I understand the context in which you're using

23  continuity of care.

24      MS. FLEMING:  Could I have page 94 of Dr. Roe's

25  deposition?

1          I believe it's all right if I publish.

2   Q.  Dr. Roe, do you see page 20 -- page 94 of your deposition?

3   A.  Yes.

4   Q.  Let me look -- follow down with me, if you would, to line 5.

5   And the question is:  And so when you talk about continuity of

6   care in connection with those patients, what do you mean?

7   Referring to emergency room patients.

8       And what was your response?

9   A.  When we refer a patient to the emergency room, we will

10  follow up with the patient within 24 to 48 hours to find out,

11  number one, how they are doing; number two, what care they

12  received in the emergency room.

13  Q.  And so my question to you is, is this follow-up call what

14  you believe ensures continuity of care for your patients?

15  A.  It allows us to follow up with the care that the patient

16  receives so that when the patient does come back to the health

17  center, we have all the information necessary to provide the

18  appropriate care.  Yes, ma'am.

19  Q.  Dr. Roe, is it standard medical practice for a doctor not to

20  make contact with an ER physician when they advise a patient to

21  go to the ER?

22  A.  Yes, ma'am.

23          MS. FLEMING:  Could I have page 46, please.

24  Q.  Let me refer you to your deposition beginning at -- on page

25  46, at line 4.  The question was:  Is it standard medical

1  practice for a doctor not to make contact with an ER physician

2  when they advise a patient to go to the ER?

3  A.   Yes.

4  Q.   And your answer was, I'm not sure how to answer your

5  question.   It's a yes or no question.

6      Read your answer beginning at line 10.

7          MS. SANDMAN:   I'm sorry.   What page are you on?

8          MS. FLEMING:   This is page 49.

9          MS. SANDMAN:   Thank you.

10  Q.   The answer beginning at line 10, Dr. Roe, would you read

11  that for us, please.

12  A.   It's not a yes or no question.   It depends on the patient's

13  medical condition.   It depends on the patient's resources.   It

14  depends on the patient's acuity -- acuity of the condition of

15  the patient.   So it's a medical evaluation and a medical call.

16  If the call -- the medical evaluation warrants a call, then the

17  call needs to be made regardless.   If the evaluation doesn't

18  warrant the call, then I will refer the patient and the

19  emergency room physician will take care of the patient.

20  Q.   And so in your judgment, it's a medical judgment on whether

21  to refer a patient -- or whether to make contact with an ER

22  physician when you refer a patient to the ER?

23  A.   Yes, ma'am.   I stand by -- by the answer that I gave then.

24  Q.   Can you tell me how a patient's resources figure into your

25  medical judgment, Doctor?

1   A.   When we evaluate the patient -- when I evaluate the patients

2   over the phone, my primary concern is the patient's health,

3   stability, and what symptom the patient is having.  Depending on

4   the patient's evaluation, then I'll be able to give the patient

5   the proper instructions.  The resources would factor not in

6   whether the patient is referred to the emergency room but as to

7   what the patient has access to, like if the patient needed pain

8   medication.  But if the patient needs to go to the emergency

9   room, the patient will be referred to the emergency room

10  regardless of what resources the patient has access to.

11  Q.   Can you tell me, Doctor, why when asked is it standard

12  practice for a doctor not to make contact with an ER physician

13  when they advise a patient to go to the ER, you responded, it

14  depends on the patient's resources?

15  A.   I honestly don't recall -- remember my exact train of

16  thought at the time, no, ma'am.

17  Q.   In your opinion, would it ever be appropriate to make a

18  medical decision based on the availability or nonavailability of

19  a patient's resources when there's a complication arising from a

20  procedure that you as a physician have performed?

21  A.   If my patient has a complication arising from a procedure

22  that I have performed and I evaluate my patient and I find that

23  the patient needs emergency medical care, I will refer that

24  patient for emergency medical care, no matter what the

25  circumstances.

1  Q.  So in this case, your testimony was not true.  Is that

2  correct?

3  A.  In this case, ma'am, I'm saying that I do not recall the

4  train of thought that I had when I answered the question at the

5  time.

6  Q.  But your testimony now is it would not be appropriate to

7  consider a patient's resources in determining whether to make

8  the referral or what doctor that you would call?

9  A.  No, ma'am.  I would evaluate the patient's medical

10 condition.  That is what determines the management that I will

11 take for my patient, any patient, whether it's a patient that I

12 see here or anywhere else.

13 Q.  Does your decision on whether to contact your covering

14 physician have anything to do with the patient's financial

15 resources, Doctor?

16 A.  Absolutely not, ma'am.

17 Q.  Does Planned Parenthood Southeast discriminate on the basis

18 of financial wealth in determining what emergency care to

19 provide to its patients?

20 A.  Absolutely not.

21 Q.  Is it true that patients seen at Planned Parenthood

22 Southeast Alabama clinics usually come from out of state or from

23 two -- two or three hours away from the clinic?

24 A.  Yes, ma'am.  We have patients who do have to travel long

25 distances, sometimes from out of state, to receive our services.

1   Q.   Now, not sometimes, Doctor.  Do they usually come from out

2   of state or from two or three hours away from the clinic?

3   A.   We have patients that do come from out of state.  We have

4   patients that travel two or three or more hours to come to

5   our center -- to come to our health centers.

6   Q.   Yes, Doctor.  But my question is do they usually come from

7   out of state or from two or three hours away from the clinic?

8   A.   I'm sorry, ma'am.  I'm unable to answer the question any

9   other way.

10  Q.   Well, is it true or false that they usually come from two or

11  three hours away from the clinic, Doctor?

12  A.   It is true that we have patients who will come from two to

13  three hours away, yes, ma'am.

14  Q.   Do you understand what the word "usually" means, doctor?

15  A.   Sometimes, often.  Yes.

16  Q.   Does it mean more than half the time?  If something usually

17  happens, does that mean it happens more than 50 percent of the

18  time?

19  A.   It happens at least 50 percent of the time.

20  Q.   I'm sorry, Doctor?

21  A.   It happens at least 50 percent of the time.

22  Q.   All right.  And would you say that your patients at the

23  Alabama clinics usually come from out of state or from two or

24  three hours away from the clinic?

25  A.   We have a significant number of patients that do come from

```
 1   out of state or travel two to three hours, yes, ma'am.
 2            MS. FLEMING:   Could I have page 93 of Dr. Roe's
 3   deposition, please.
 4   Q.  Dr. Roe, let me refer you to the question that begins at
 5   line 18 on page 93.  And this was in the context of providing
 6   emergency room care.  Actually, if you back up to the question
 7   before it, page -- at line 10, Mr. Brasher -- this is -- was a
 8   question by your own attorneys at your deposition.  And they
 9   said -- Mr. Brasher asked you a number of questions about
10   sending patients to an emergency room if you received a call
11   from a patient after she had been discharged from the health
12   center.  If you have to refer a patient to the emergency room,
13   do you know which emergency room that patient is going to visit?
14       And your answer was?
15   A.  No, I don't.
16   Q.  And the next question was:  Why not?
17       Would you read your answer?
18   A.  Because the patient that we care for usually will come from
19   out of state or from two to three hours away from the clinic, so
20   they could be anywhere in the state.
21   Q.  I'm sorry.  Would you -- would you say that again?  I did
22   not understand.
23   A.  Because the patient that we care for usually will come from
24   out of state or from two to three hours away from the clinic, so
25   they could be anywhere in the state.
```

```
 1              MS. FLEMING:  Thank you, Doctor.
 2              THE COURT:  Let me know when you find a good stopping
 3     place.  It's noon.
 4              MS. FLEMING:  This -- this is as good as any, Your
 5     Honor.
 6              THE COURT:  I thought it might be.  Why don't we come
 7     back at 1:10.
 8              Before we recess, how are we progressing, plaintiffs?
 9              MS. KOLBI-MOLINAS:  I don't know how much more of the
10     cross there is, but then we have one more doctor witness and
11     then the two hospitals from Montgomery, which tend to be pretty
12     short.  So three p.m.
13              THE COURT:  Do we have any more videoconferencing?
14              MS. KOLBI-MOLINAS:  No.
15              THE COURT:  Okay.  And the other doctor will be
16     anonymous as well?
17              MS. KOLBI-MOLINAS:  Yes, Your Honor.
18              THE COURT:  Can you give us just an estimate as to how
19     much longer you think you'll be?
20              MS. FLEMING:  With this witness, Your Honor, I would
21     think no more than 15 minutes.
22              THE COURT:  Oh, okay, then.  Do you anticipate any
23     redirect?
24              MS. SANDMAN:  I do, Your Honor.
25              THE COURT:  About how long?
```

1         MS. SANDMAN:  Perhaps 15 minutes as well.

2         THE COURT:  Fifteen?  Okay.  Good.  We'll start back at

3  1:10.

4     (Recess at 12:05 p.m. until 1:14 p.m.)

5         THE CLERK:  Please remain seated.  Court is in session.

6         THE COURT:  Proceed.

7  Q.  (Ms. Fleming, continuing:)  Dr. Roe, returning for a

8  moment --

9         MS. KOLBI-MOLINAS:  Your Honor.  Your Honor, I'm so

10  sorry, but Ms. Sandman is not here.  We're looking for her.

11         THE COURT:  Oh.

12         MS. FLEMING:  Oh, my -- the lawyer that has the witness

13  is not here?

14         THE COURT:  Yes.  We've missed plaintiff's counsel is

15  the problem.

16         MS. KOLBI-MOLINAS:  She's coming.  Sorry, Your Honor.

17         MR. DAVIS:  Your Honor, while we're waiting, I have an

18  update on scheduling Dr. Thorp --

19         THE COURT:  Great.

20         MR. DAVIS:  -- if you'd like to take that up.

21         THE COURT:  Yes.

22         MR. DAVIS:  Dr. Thorp is available to testify from a

23  federal courthouse in Raleigh on June the 5th.

24         THE COURT:  Okay.

25         MR. DAVIS:  Right now we have one witness scheduled

1   that day, Dr. Keyes in the morning.  Dr. Thorp could testify

2   that afternoon, which even if plaintiffs choose to call a

3   rebuttal witness, that still leaves us on track for closing on

4   June 6th.

5         THE COURT:  Very good.  Well, why don't you-all, on

6   Monday, get a revised schedule to me as to who's going to be

7   testifying when.  Just bring me up to date.  Just file it with

8   the Court, just a joint schedule.

9         MR. DAVIS:  Would Tuesday morning be -- Monday --

10        THE COURT:  I'm sorry.  You're right.  Tuesday morning.

11  Monday is a holiday, isn't it?

12        MR. DAVIS:  We'll get that together for you.

13        THE COURT:  Okay.  I hope she's okay.

14        MS. KOLBI-MOLINAS:  She is.  She recently had a child

15  and so --

16        THE COURT:  Oh.  Then I fully understand.

17        MS. KOLBI-MOLINAS:  Thank you, Your Honor.

18     (Brief pause)

19        MS. SANDMAN:  Your Honor, I sincerely apologize.

20        THE COURT:  That's okay.  That's the one advantage of

21  being a judge.  I can go to all of my -- I could go to all of my

22  children's programs and everything else and didn't have a judge

23  to tell me I couldn't.  No one knew why I suddenly recessed at

24  ten in the morning.  Go ahead.

25  Q.  (Ms. Fleming, continuing:)  Dr. Roe, returning for just a

1   moment to the subject of the Birmingham closure, do you know,

2   were the people who allegedly called the patients to tell them

3   about the closure and about follow-up care, were they -- did you

4   instruct them to say anything particular to the patients?

5   A.   Other than the routine follow-up and the information they

6   needed for their care.

7   Q.   Were they told where to go for follow-up?

8   A.   The patients that were seen were surgical patients.

9   Q.   Correct.

10  A.   We don't assume that they need to be followed up unless the

11  patient calls and has a complication.

12  Q.   I --

13  A.   Patients are aware that they can follow up if they so

14  desire.   Patients were given the opportunity to find out that

15  they could go to the Mobile health center or they could go to

16  Tuscaloosa or they could go to Huntsville.

17  Q.   Correct.   Now, when you discharge patients after their

18  procedure, you don't set up for them a follow-up appointment

19  automatically?

20  A.   Surgical abortion patients have the opportunity to come back

21  if they so desire.   From a clinical perspective, there is no

22  need for them to follow up unless something arised after they

23  have left the clinic; but they always have the opportunity to

24  follow up.

25  Q.   Right.   But my question to you is you do not automatically

1    set up an appointment for them for follow-up?  Is that correct?

2    A.  It is not standard of care for them to have to follow up in

3    the clinic.  They have the opportunity if they so desire.  The

4    patients who want to follow up are given a follow-up

5    appointment.

6    Q.  Were -- were any patients given follow-up appointments in

7    Tuscaloosa or Mobile, to your knowledge?

8    A.  No, ma'am.

9    Q.  Now, with respect to your own staff privileges in Atlanta,

10   you were able to obtain staff privileges even though you spent

11   50 percent of your time working for Planned Parenthood of the

12   Southeast, correct?

13   A.  Yes, ma'am.

14   Q.  When did you apply for privileges in Atlanta?

15   A.  I applied for privileges in the context of the care that I

16   provided for the academic institution with which I work and in

17   the context of the private practice for whom I used to work.

18   Q.  Did you know it was possible that a member of the committee

19   of that particular hospital might oppose your application

20   because of your ties to Planned Parenthood?

21   A.  Yes, it was possible.

22   Q.  But that fear did not keep you from making an application in

23   that case?

24   A.  Because when I applied for privileges, it was in the context

25   of the professional relationship that I was establishing.  And

1   the purpose of the privilege was to provide GYN care to patients

2   who needed inpatient surgery, not merely for follow-up care or

3   for emergency care.  It was specifically to admit patients to

4   have GYN surgery, hysterectomy, myomectomy, laparoscopy, to

5   treat their GYN pathology.

6   Q.  Yes, Doctor.  But my question to you was the fear that your

7   application might be denied did not prevent you from trying to

8   get privileges; isn't that correct?

9   A.  I met their requirement, both location and the ability to

10  admit enough patients.  So no, my ties to Planned Parenthood

11  became secondary because I was able to meet all their

12  requirements.

13  Q.  And let me be clear.  You have testified that -- that when

14  you perform an abortion and you later send a patient to the ER,

15  you don't call the ER to let them know your patient is coming

16  in; is that correct?

17  A.  It depends on the context in which the patient is referred

18  to the emergency room.

19  Q.  Do you have a protocol, Doctor, at the Birmingham or Mobile

20  clinic that would require that the person performing an abortion

21  follow up with an emergency room doctor if the patient is

22  referred to the emergency room?

23  A.  No, we do not have that protocol.  The decision is made

24  based on the patient's clinical status.  It's a clinical

25  management decision.

1    Q.   And as with any surgical procedure, the physician performing

2    the procedure, an abortion procedure, is responsible for that

3    procedure and for assuring that adequate follow-up care is

4    provided.   Is that correct?

5    A.   Yes, ma'am.

6    Q.   And in order to facilitate continuity of patient care, is

7    the facility physician required to contact and communicate with

8    any physician rendering care for complications arising from the

9    abortion procedure?

10   A.   It is a clinical decision that the provider makes at the

11   time that he or she evaluates the patient.   If, in the patient's

12   evaluation, the physician feels that that is called for, the

13   physician will make that decision.   If the physician evaluates

14   the patient and feels that that is not called for, the physician

15   will not call the emergency room.   It is a clinical decision,

16   not a protocol decision.

17   Q.   So --

18   A.   It has to be based on the patient's safety and ensuring that

19   the patient is safely taken care of.

20   Q.   Right.   So you're telling me that contact with the ER

21   physician is optional for the abortion provider?

22   A.   I'm not saying it's optional, ma'am.   I'm saying that it is

23   part of the decision that the physician has to make for the

24   patient when he or she is evaluating the patient.

25   Q.   Well, and by optional, is there anything in your procedures

1   at the Birmingham or Mobile clinics that require a physician to

2   make such a contact?

3   A.   It depends on the complication that it requires for the

4   physician to refer that patient to the emergency room.

5   Q.   So I believe your answer is, no, there is not anything that

6   would require it in all cases?

7   A.   I'm sorry, ma'am.  I cannot give you a yes or a no answer to

8   that question.  It's a clinical management decision.

9   Q.   So if it's a clinical management decision, Doctor, are you

10  telling me that you leave it to the professional judgment of the

11  physician and you do not require that contact?

12  A.   Yes, ma'am.

13  Q.   Do you know whether the rules of the Department of Public

14  Health in Alabama require that a physician performing an

15  abortion make contact with an emergency care physician in the

16  event of an emergency?

17     (Brief pause)

18  A.   I am reading --

19  Q.   I'm sorry.  Did you hear --

20  A.   I'm sorry.  I'm not sure I understand your question.  I am

21  reading the policy that you have in front of me.  I'm not sure I

22  understand your question.

23  Q.   All right.  Well, let -- I was asking you a question before

24  I ask about the policy, but let's go to the policy.

25          MS. FLEMING:  And counsel, I'm referring to the rules

1  of the department at 420-5-1-.03, entitled Patient Care,

2  paragraph (1).

3  Q.  Doctor, if you look about halfway through that paragraph,

4  there's a sentence that says:  In order to facilitate continuity

5  of patient care, the facility physician shall contact and

6  communicate with any physician rendering care for complications

7  arising from the abortion as soon as he or she is informed of

8  the existence of such complications.

9     Did I read that correctly?

10  A.  Yes, ma'am.

11  Q.  All right.  And it's your testimony that you do not have an

12  established protocol either in Birmingham or in Mobile

13  consistent with that.  Is that your testimony?

14  A.  I'm sorry.  I'm not understanding in which context.  The way

15  I -- I understand it and the way that we follow our procedure

16  and protocol, if a patient is identified in the -- in the

17  facility as having a complication that requires for that patient

18  to be sent to the emergency room, part of our protocol is to

19  call the emergency room physician in order to make sure that

20  they have the appropriate information to take care of that

21  patient as that patient is being transferred to the emergency

22  room.

23  Q.  That's your transfer position, correct, Doctor?

24  A.  Yes, ma'am.

25  Q.  This does not necessarily refer only to a transfer, though,

1  does it?  Doesn't this say that to facilitate continuity of

2  patient care, the facility physician shall contact and

3  communicate with any physician rendering care for complications

4  arising from the abortion as soon as he or she is informed of

5  the complication?  That would suggest -- suggest to me, doesn't

6  it, Doctor, that what we are talking about is an after-hours

7  emergency where the physician is told that there is an emergency

8  and perhaps the patient is referred to the emergency room.

9  Would this not require that physician to call the emergency room

10 as soon as he or she learns there is a complication?

11 A.  When we -- when the patient calls and the patient is

12 evaluated in the -- by phone, when we refer the patient to the

13 emergency room, the patient is referred to the emergency room so

14 that the emergency room physician can evaluate the patient

15 physically and in person, so that the emergency room physician

16 can assess whether there is such a complication.  Most of the

17 patients who call in the after hour -- who calls us after -- who

18 call us after hour are patients who need reassurance, need pain

19 management.  And so the assessment as to whether there is a

20 complication is done by the emergency room physician.

21     In order for us to provide safety and proper care for the

22 patient, if, based on the question that we have, we feel the

23 patient needs to be seen further and quickly, then we'll refer

24 the patient to the emergency room.  At that point, the emergency

25 room physician will be able to evaluate the patient and assess

1    exactly what is going on with the patient.

2    Q.  Yes, Doctor.  I understand that is your protocol.  And I

3    noticed that in describing it, you made no mention of a contact

4    between the abortion provider and the emergency room physician.

5    And my question to you is these rules require such a contact,

6    and it appears to me that your protocol does not.  Is that

7    correct?

8    A.  We call the emergency room physician when it is called for

9    in the context of providing care.

10   Q.  But not in every case.

11   A.  No, ma'am, not in every case.

12   Q.  And in this particular paragraph, the rules of the

13   Department of Public Health say that the facility physician

14   shall contact and communicate with any physician rendering care

15   for the complications arising from an abortion.  Isn't that what

16   the rules say, Doctor?

17   A.  Yes, ma'am.

18   Q.  So your protocol is inconsistent with the rules of the

19   Alabama Department of Public Health in this instance.

20   A.  I mean, as I read the protocol, it says to facilitate and

21   cooperate with any physician rendering care.  And we facilitate

22   and cooperate with all physicians in order to render care.

23   Q.  Does it not say that the facility physician shall contact

24   and communicate with any physician rendering care?

25   A.  Yes.  Yes, ma'am.  Yes, it does.

1  Q.  All right.  And does shall, in your judgment, mean every

2  case?

3      (Brief pause)

4  Q.  Would that indicate this should be done in every case,

5  Doctor?

6      (Brief pause)

7  A.  Yes, ma'am.

8  Q.  So your own protocol is inconsistent with the rules of the

9  Alabama Department of Public Health in this instance.  Is that

10  correct?

11  A.  Yes, ma'am.

12  Q.  And Dr. Roe, you are licensed in Alabama; is that correct?

13  A.  Yes, ma'am.

14  Q.  And in Georgia?

15  A.  Yes, ma'am.

16  Q.  Are you licensed in any other states?

17  A.  No, ma'am.

18  Q.  And are those -- were those applications -- I assume you

19  applied for a license in those jurisdictions.

20  A.  Yes, I did.

21  Q.  Were those applications identical?

22  A.  I don't remember.

23  Q.  Are you responsible in Alabama to the Alabama Board of

24  Medical Examiners?

25  A.  Yes, ma'am.

1  Q.   Are they the governing institution?

2  A.   For my license, yes, ma'am.

3  Q.   And who is the institution to whom you report in Georgia

4  with respect to your license there?

5  A.   Georgia Medical Examiners.

6  Q.   Are there standards published by the Alabama Board of

7  Medical Examiners?

8  A.   I'm sorry.  Can you repeat your question?

9  Q.   Are the standards of the Alabama Board of Medical Examiners

10  for physicians published?

11  A.   Yes.

12  Q.   And are they published in Georgia as well, the Georgia

13  standards?

14  A.   Yes, ma'am.

15  Q.   And are those standards identical in every respect?

16  A.   I do not know, ma'am.  I have not compared them.

17  Q.   Would you agree with me that the standard of care in Alabama

18  is subject to state regulation and control?

19  A.   I'm not sure if I understand your question.  I'm not sure

20  that standard of care is established by -- by -- solely by the

21  Board of Medical Examiners in the state of Alabama.  I'm not

22  sure I understand your question or the context of the question.

23  I'm sorry.

24  Q.   Let me rephrase it, then, Doctor.  Thank you.  Would you

25  agree with me that the Alabama Board of Medical Examiners is

1    responsible, at least in part, in establishing the standard of

2    care for physicians in the state?

3    A.   Yes, ma'am.

4    Q.   I'm sorry.  Was that a yes?

5    A.   Yes, ma'am.

6    Q.   And as a physician licensed in Alabama, you're subject to

7    those regulations and controls.

8    A.   Yes, ma'am.

9    Q.   When -- when you spoke with people at the University of

10   Alabama in Birmingham, did they express any concern to you --

11   and this is recently.  You said that you had some conversations

12   recently with respect to staff privileges; is that correct?

13   A.   Two years ago or a year and a half ago.

14   Q.   Did they express any concern at that time over the way

15   Planned Parenthood of the Southeast handles emergency care in

16   Alabama?

17   A.   Those conversations were never -- the conversation about how

18   we cared for our patients were never -- were never explored.

19   Q.   So there was no discussion about that?

20   A.   Not that I can recall.

21   Q.   Was there any discussion about the itinerant nature of

22   abortion providers in Alabama?

23   A.   The discussion never got this far, ma'am.  The discussion

24   was solely about whether they would be willing to provide --

25   give me a volunteer appointment and what it would entail.  And

1   that was truly the nature of those conversations.

2   Q.  Was there any discussion, Doctor, about Planned Parenthood

3   possibly expanding its array of services to patients in the

4   Birmingham area?

5   A.  I honestly don't recall.  I'm sorry.

6   Q.  You don't recall any recommendations about expanding

7   services to patients that would allow doctors to obtain

8   privileges?

9   A.  I mean we don't solely offer abortion care.  We offer family

10  planning.  We offer Pap smears.  We offer STD screening.  And so

11  that's why I'm not -- I'm not quite sure what con- -- what

12  question you're asking me.

13  Q.  Well, abortion is the only surgical procedure currently

14  offered at the Planned Parenthood clinic in Birmingham; is that

15  correct?

16  A.  We also offer colposcopy, which is a minor surgical

17  procedure.

18  Q.  Any other surgical procedures that you perform there?

19  A.  No, ma'am.

20  Q.  Was there any discussion with the University of Alabama in

21  Birmingham Hospital about Planned Parenthood possibly expanding

22  its array of surgical procedures for patients in an effort to

23  gain hospital admission privileges?

24  A.  I honestly don't recall having -- I -- I don't remember.

25  Q.  Is it ever preferable to perform an abortion in an

1   in-hospital setting due to medical complications or patient

2   comfort?

3   A.  No, ma'am.

4   Q.  No, it is not?

5   A.  Abortion is a safe outpatient procedure, ma'am.

6   Q.  Is it true that abortion providers are paid less for work

7   that is on par with OB-GYN procedures?  Let me give you an

8   example.  A D&C, Doctor, do you receive a fee for performing a

9   D&C in Georgia?

10  A.  I'm not sure the context in which you're framing the

11  question.  Would you mind framing it for me?

12  Q.  Yes.  I'll be happy to.  I understand that you also have an

13  OB-GYN practice in Georgia; is that correct?

14  A.  Yes, ma'am.

15  Q.  I'm sorry?

16  A.  Yes, ma'am.

17  Q.  Do you perform D&Cs as part of that process or part of your

18  practice?

19  A.  As part of patient care, if it calls for it, yes, I do.

20  Q.  Do you know what you charge to perform that procedure,

21  Doctor?

22  A.  No, ma'am, I do not.

23  Q.  Do you know whether it is more or less than you are paid to

24  perform an abortion procedure or that you pay your abortion

25  providers in Birmingham to perform an abortion?

1    A.  I -- I would have no frame of reference, ma'am.  I'm sorry.

2    I -- in the private practice, the patient comes.  The patients

3    will generally use their insurance if they have insurance, and

4    our billing staff will take care of making sure that everything

5    is appropriately coded, and the insurance will pay for the

6    patient's procedure.  That is the context in which it works in

7    private practice.

8        In the context of the care that we provide at our abortion

9    facility, most patients will not use their insurance and so they

10   pay their -- they pay the service out-of-pocket.  And therefore,

11   the context in which the physician is paid then changes.

12   Q.  So, Doctor, it's your testimony that you don't know whether

13   there is any disparity in what you would receive as a private

14   physician for a D&C procedure and what Planned Parenthood would

15   pay for an abortion?

16   A.  What I'm saying is the context is different, and so I have

17   no -- I do not have a frame of reference to compare the two,

18   because those are two different contexts in which the patient's

19   care is -- is being billed for or paid for.

20   Q.  Doctor, do you know what Planned Parenthood in Birmingham

21   pays abortion providers for an abortion procedure?

22   A.  Yes, ma'am.

23   Q.  You do?  And what is that?

24           MS. SANDMAN:  Your Honor, I believe that that

25   information, when it's been filed in this case previously, has

1    been under seal.  If I'm wrong about that, I apologize.

2         MS. FLEMING:  You are wrong.  It was filed recently

3    with the stipulations of the parties.  So it has been released

4    to the public, Your Honor.

5         MS. SANDMAN:  She's right.

6         THE COURT:  Go ahead, then.

7    Q.  Can you tell us, Dr. Roe, what it is that is paid?

8         MS. FLEMING:  Am I not -- am I correct, counsel?

9         MR. DAVIS:  My understanding is that it's part of the

10   parties' stipulations.

11        MS. FLEMING:  All right.

12   Q.  Doctor, what is -- what -- what does your organization pay

13   an abortion provider for an abortion procedure?

14   A.  $70 for a first trimester procedure, and I think it's $100

15   for a second trimester procedure.

16   Q.  Now, I'm not a doctor, and please correct me if I'm wrong.

17   But from listening to testimony, it seems that the procedure

18   that is done to perform an early abortion is similar to a D&C.

19   Is that correct, Doctor?

20   A.  It is the exact same procedure.

21   Q.  All right.  Do you have any idea, Doctor, whether you

22   receive more than $70 to perform a D&C?

23   A.  I'm sorry.  In what context?

24   Q.  In the context of your own private medical practice, Doctor.

25   A.  No, ma'am.  I don't compare the two.  Those are two separate

1  contexts.

2  Q.  But you've just testified they're identical procedures; is

3  that correct?

4  A.  Yes, ma'am.  They're identical procedures.  In the private

5  practice, it is taken care of through the patient's medical

6  insurance and through billing.  I do not get paid per patient or

7  per procedure.

8  Q.  Now, Doctor, would you agree that abortions are performed

9  under extreme conditions in the context of -- you've testified,

10  I believe, already that abortion providers in Alabama coming to

11  Birmingham perform abortions, risking violence on some

12  occasions.  Would you say that's true?

13  A.  Yes, ma'am.

14  Q.  So can you explain to me why Planned Parenthood would offer

15  doctors performing such a risky procedure -- or a procedure that

16  would place their own health and safety at risk -- why they

17  would choose to compensate doctors performing that procedure at

18  a rate that is less than what a private physician would make to

19  perform the same identical procedure in a private medical

20  practice?

21  A.  We don't do it for the money, ma'am.  We do it because we

22  want to provide these women the opportunity to have safe care.

23  We provide standard of care.  We provide compassionate care.

24  And we don't do it for the money.

25  Q.  Doctor, I certainly understand that you don't.  And I think

1  based on the fee, I can't imagine anyone would.  But my question

2  to you is do you think it is reasonable for Planned Parenthood

3  to expect doctors to perform this identical procedure for much

4  less than they would make performing an identical procedure in

5  the private sector for a private medical practice.

6  A.  I don't -- I don't think it's a matter of expectation.

7  Planned Parenthood is a nonprofit organization.  The -- the care

8  that we provide, we try to maintain the cost of the care so that

9  the patient -- the women that we take care of are able to afford

10  the care.  And so in order to maintain that, that means that

11  everybody, including the physician, have to be willing to

12  provide that care knowing that they will not get remunerated as

13  if they were in private practice.

14      In the same way, as a teaching physician, I make much less

15  than my colleagues in private practice, knowing that what I do,

16  I do not because of the money.  I do it because I want to teach

17  the residents and the medical students.  And so it's a choice

18  that we make as physicians.

19  Q.  I -- I understand that, Doctor.  But there has been

20  testimony that there is an apparent shortage of abortion

21  providers.  Is that your understanding?

22  A.  Yes, ma'am, there is.

23  Q.  Do you think the shortage of abortion providers has anything

24  to do with the rate of compensation given to abortion providers?

25  A.  No, ma'am, it doesn't.  Those physicians who want to provide

1  abortion services will come regardless of what the pay

2  ultimately ends up being.  The shortage is related to being able

3  to ensure that they are safe, that they will not -- their

4  professional standing will not be put at risk.

5  Q.  So you're saying that there are doctors that will come to

6  perform abortions in Alabama?

7  A.  Not in Alabama.  You -- you did not put a context around the

8  question, so I apologize if I have misled you, ma'am.  Not in

9  Alabama.  I have not had any physician thus far come to Alabama,

10  no, ma'am.

11  Q.  My question to you was do you think that the rate of

12  compensation has anything to do with that failure of doctors to

13  be willing to come to Alabama.

14  A.  No, ma'am.  Thank you for reframing the question.  And the

15  answer to your question is no.

16            MS. FLEMING:  That's all I have, Your Honor.

17            THE COURT:  Very good.

18            MS. FLEMING:  May I consult for just one moment, Your

19  Honor?

20            THE COURT:  Yes, you may.  Before you sit down, you

21  may.

22            MS. FLEMING:  That's all I have, Your Honor.

23            THE COURT:  Okay.

24            MS. SANDMAN:  If I may confer as well, Your Honor.

25            THE COURT:  Yes.

1     (Brief pause)

2                      REDIRECT EXAMINATION

3    BY MS. SANDMAN:

4    Q.  Dr. Roe, you were asked some questions about the Alabama

5    reg -- excuse me -- regulation on the circumstances under which

6    a doctor should call -- an abortion-providing doctor should call

7    the emergency room doctor when a patient complication is being

8    handled.  You provide health services in a number of different

9    states; is that right?

10   A.  Yes, ma'am.

11   Q.  And in general, your practices in how to handle patient

12   complications are determined by what is clinically medically

13   appropriate; is that right?

14   A.  Yes, ma'am.

15   Q.  And are you the person who is primarily responsible for

16   reviewing the regulations in Alabama to determine whether your

17   policies need to be adjusted in order to ensure full compliance

18   with those state-specific obligations?  Is that -- is that --

19   are you the person primarily responsible for that?

20   A.  No, ma'am.  I do it in conjunction with our director of

21   quality and risk assessment.

22   Q.  And does the ADPH review Planned Parenthood's policies and

23   procedures as part of the inspection process?

24   A.  Yes, ma'am.  Every time they have come, they have reviewed

25   our policies and procedures manual.

1  Q.  And has the ADPH ever told you that Planned Parenthood's

2  policies and procedures on the circumstances under which an

3  abortion doctor should contact the emergency room doctor when

4  the patient is referred are not adequate?

5  A.  No, ma'am.

6  Q.  If, in fact, it's determined that your policies and

7  procedures are not in compliance with that aspect of the

8  regulation, are you willing to change the Planned Parenthood

9  policies and procedures?

10 A.  Absolutely.

11 Q.  And just to be very clear, the policies and procedures as

12 they currently stand, is it your testimony that those are

13 medically and clinically appropriate?

14 A.  Yes, ma'am.

15 Q.  Now, you were asked some questions about whether, as the

16 medical director, you are ultimately responsible for supervising

17 clinical functions and ensuring that the clinic meets the

18 requirements of the rules.  And just to be clear, are you the

19 primary person responsible for operational matters on a

20 day-to-day basis?

21 A.  No, ma'am, I'm not.

22 Q.  And thinking back to the Birmingham closure, I'm not asking

23 for a person's name but, in general, what are the positions of

24 the people who would have been primarily responsible for that?

25 A.  I'm sorry.  Can you repeat your question?

1  Q.  Yes.  I apologize.  That was a long question.  Without

2  asking for specific names but just thinking about the general

3  roles and positions and thinking about the Birmingham health

4  center before it was closed, who are the people who would have

5  been primarily responsible for operational matters on a

6  day-to-day basis?

7  A.  The health center manager and the director of patient

8  services.

9  Q.  And are those positions that turned over at the time of the

10  health center -- the decision to suspend services at the health

11  center?

12  A.  I'm sorry.  Can you repeat again?

13  Q.  There was some testimony earlier that at the time of the

14  decision to suspend services at the health center, some staff

15  were let go.  Are those positions among the staff who were let

16  go?

17  A.  Yes, ma'am.

18  Q.  Now, you were asked whether you have ever observed the

19  outside covering physician in Birmingham or Mobile.  Just to be

20  very clear, are those doctors who actually provide services at

21  your health centers?

22  A.  No, they do not provide health services at our health

23  centers.

24  Q.  And again in connection with the ADPH inspections of your

25  health centers, have you ever been instructed to observe your

1  outside covering physicians?

2  A.  No, I was not instructed.

3  Q.  Have you ever been told that ADPH had any issues with the

4  way that you were currently maintaining your relationships with

5  the outside covering physicians?

6  A.  No, ma'am, I was not.

7  Q.  Now, you were also asked whether you ever rejected a doctor

8  applicant as unqualified.  As the medical director, are you

9  confident that you and Dr. P1 are qualified physicians?

10  A.  Yes, I am.

11  Q.  What about the other doctors who have provided services for

12  Planned Parenthood in Alabama during your time as medical

13  director?  Are you also confident that they were qualified

14  physicians?

15  A.  Yes, ma'am, I am.

16  Q.  Have you ever signed off on the hiring of a doctor you

17  believed to be unqualified?

18  A.  I'm sorry?

19  Q.  Have you ever signed off on the hiring of a doctor that you

20  believed to be unqualified?

21  A.  No, I have not.

22  Q.  You were asked some questions about your deposition

23  testimony, that your patients usually come from out of state or

24  two to three hours away.  Thinking back to the time that you

25  gave that deposition testimony, were you intending to give a

1   precise figure?

2   A.   No, I was not intending to give a precise figure.

3   Q.   When you used the word "usually," were you intending to

4   specify more than half?

5           MS. FLEMING:  Objection, Your Honor.  This is leading.

6           THE COURT:  Pardon me?

7           MS. FLEMING:  She's leading the witness, Your Honor.

8           THE COURT:  Yes.  I'll sustain that.

9   Q.   (Ms. Sandman, continuing:)  When you used the word

10  "usually," do you remember what was in your mind?

11  A.   I remember thinking that in the Birmingham health center, we

12  had women who came from Birmingham, we had women who came from

13  Mississippi, we had women who came from North Alabama, South

14  Alabama.  We had women who came from the -- right over the

15  border between Georgia and Alabama, because Birmingham was

16  closer to them than Atlanta.  But I was not thinking of a

17  particular number representative of the number of women who come

18  to the health center.

19  Q.   You were asked questions about the circumstances under which

20  you would involve your backup doctor in patients' care.  Do your

21  backup physicians have privileges at every hospital in

22  Birmingham and Mobile?

23  A.   No.  Our backup doctor's privilege is within the context of

24  the professional relationship that they have with the hospital

25  where they predominantly provide inpatient GYN surgery.  So they

1  have their staff privileges based on their professional

2  relationship.

3  Q.  And just to be clear, if you had a patient who needed to be

4  transferred to the hospital during a procedure, what hospital

5  would you send her to?

6  A.  I would send the patient to the hospital that would be

7  closest to the health center because that would be in the best

8  interests and safety of the patient.

9  Q.  And is that the hospital where your backup doctor has

10  privileges?

11  A.  No, it's not.

12  Q.  Would there be any clinical benefit to your patient from

13  having the backup physician be the person to treat her?

14  A.  No.  The patient needs to be taken care of.  The benefit

15  comes from providing evidence-based quick medical care at the

16  facility that's the closest to the patient, where she can be

17  evaluated, stabilized, and taken care of.

18  Q.  And just to be clear, have you had any patient transfers as

19  your time -- in your time as medical director?

20  A.  No.  I have not had any patient transferred under my tenure

21  as medical director.

22  Q.  Turning to patients who have a complication after they have

23  left the clinic, such as bleeding or cramping, and a patient

24  who, for that reason, is directed to go to the emergency room.

25  Where would you tell that patient to go?

1  A.   I would tell that patient to go to the nearest emergency

2  room to where that patient is located.

3  Q.   And would your backup physician necessarily have privileges

4  at that hospital?

5  A.   No, they would not.

6  Q.   Would it be beneficial to your patient to tell them to,

7  instead, go to the emergency room where the backup physician has

8  privileges?

9  A.   It would not be in the best interests of the patient.   If

10  the patient is being referred for bleeding, then that patient

11  needs to be seen as quickly as possible.

12  Q.   You testified that if a patient is advised to go to the

13  emergency room, you would call her the next day to find out what

14  happened.   Does that phone call clinically benefit the patient?

15  A.   It does not clinically benefit the patient.   It is our way

16  of making sure that we assess the -- how the patient is doing

17  after having made that phone call, and it is our way of showing

18  the patient that we're here for the patient and that we care.

19  Q.   So just to be sure I understand what you're saying, would it

20  be fair to say that that's more for relationship reasons than

21  for clinical reasons?

22  A.   Yes, ma'am.

23  Q.   Turning to the topic of the -- the incidents that happened

24  in Birmingham, first, with the sale of the medication abortion

25  drugs by a nurse in the parking lot, does that staff member

1    still work for PPSE?

2    A.   No.   That staff member no longer works for PPSE.

3    Q.   And just to be clear, was she allowed to do what she did

4    under the Planned Parenthood protocols?

5    A.   No.   She was not allowed to do what she did.   She did so on

6    her own volition.

7    Q.   If you lived in Birmingham and worked there full-time, would

8    you have been in the parking lot when that incident took place?

9            MS. FLEMING:   Objection, Your Honor.   This calls for

10   speculation.

11           THE COURT:   Overruled.

12   A.   I would not have been in the parking lot when that incident

13   occurred.   And the private practice that I worked at -- that I

14   formerly worked for, there were two instances where a medical

15   assistant was found out to be forging physician's signature and

16   selling narcotics.   The only reason we found out about it is

17   because the pharmacy called due to the number of pills that were

18   on the prescription, and an investigation was then started and

19   the patient -- the person was identified, interviewed, and

20   subsequently fired.   So no.   It can happen even when you have

21   somebody there five days a week.

22   Q.   So just to be clear, this -- the events that you just

23   related, that was in a practice where there was a physician on

24   the premises five days a week?

25   A.   Yes.   There were services five days a week, nine to five.

1  Physicians, nurses, office manager were there on a daily basis.

2  Q.  And focusing on the incident that happened in your health

3  center in Birmingham, if you lived and worked in Birmingham

4  full-time, could you have done anything differently to prevent

5  this from happening?

6  A.  Again, we hire an individual.  And they are aware of our

7  code of conduct.  They're aware of our mission and values.  We

8  cannot guarantee that the person is going to be honest when we

9  hire them.  And so my being there nine to five every day would

10 not have been a deterrent to that person doing something illegal

11 if that's what the person had in their mind to do.

12 Q.  And this is my last question on this topic.  If you had

13 admitting privileges at a local hospital, would anything about

14 this incident have been different?

15 A.  No, ma'am.

16 Q.  Now, you were also asked some questions about how you

17 provided for patient continuity of care when Planned Parenthood

18 first suspended services in Birmingham.  Focusing on your

19 patients who had abortions on the final clinic days, before they

20 had the abortion, were they told that the Birmingham location

21 would be suspending services?

22         MS. FLEMING:  Objection, Your Honor.  Leading.

23         THE COURT:  I'll allow that objection -- I mean I'll

24 allow that question.

25 Q.  You can answer, Dr. Roe.

1    A.   I'm sorry.  Can you repeat the question?

2    Q.   Of course.  Focusing on your patients who had abortions on

3    the final clinic days, before they had the abortion, were they

4    told that the Birmingham location would be suspending services?

5            MS. FLEMING:   Same objection.

6    A.   Yes.

7            THE COURT:   Right.   Objection overruled.

8    Q.   And what provisions did you make for their follow-up care?

9    A.   Our after hours on line -- our after hours call service was

10   still functioning.   The physician on call was still available

11   24/7.  The patients were also told that if they needed follow-up

12   that required them to be seen in the health center, that they

13   could come to the -- they could go to the Mobile health center

14   or to Tuscaloosa or to Huntsville.

15   Q.   So just to be clear, if a Birmingham patient called that

16   call center line, where would that telephone be ringing?

17   A.   It would be ringing in our administrative -- administrative

18   office in Atlanta where the call center is located.

19   Q.   And again, just to be clear, was there anything at all that

20   was different from a patient perspective in terms of the

21   interactions that they could have in the event of a

22   complication?

23   A.   Other than the location where they were being redirected,

24   no, ma'am.

25   Q.   Now, there was also some back and forth about when the doors

1  were locked in Birmingham.  Just to be clear, were

2  administrative staff still present at the Birmingham health

3  center during the period of suspended services?

4  A.  Yes.  It was part of the decision and the plan to have

5  administrative staff available on a weekly basis to help with

6  any medical records that might be needed to provide patient care

7  but also to have a presence in the health center.

8  Q.  Now, there was also some discussion about how patients who

9  had abortions in December would not be able to get follow-up

10  care in Birmingham during the closure.  So again, for those

11  patients, was there a system in place for them to be able to

12  speak with a nurse as needed?

13  A.  Yes.  The system was in place.  We also made sure to attempt

14  to -- we also attempted to contact everyone to make sure that

15  they would have the opportunity to come before the last day of

16  service.  But the system for the on-call nurse and the physician

17  on call were both available to all -- to all of our Birmingham

18  patients.

19  Q.  So am I understanding correctly, then, that the only aspect

20  of patient care that would be affected would be their ability

21  for the -- for however many patients actually needed in-person

22  follow-up care, their ability to get follow-up care in

23  Birmingham rather than at a different location?

24          MS. FLEMING:  Objection.  Leading.

25          THE COURT:  I'll allow it.  Go ahead.

1  A.  Yes, ma'am.

2  Q.  And can you give any estimate of how many patients would

3  fall into that category?

4  A.  I'm sorry.  An estimate of what?

5  Q.  Of how many patients -- from your patients that were seen in

6  December, how many patients are likely to have actually needed

7  follow-up care in person?

8          MS. FLEMING:  Objection.  That calls for speculation.

9  Q.  If you know.

10          THE COURT:  I'll allow it if she knows.  If she can

11  make a reasonable estimate, I'll allow it.

12  A.  It would be an extremely small percentage.  I don't want

13  to -- I would -- I don't want to take a guess, but it would be

14  an extremely small percentage.

15  Q.  And if any patient was in this situation, where would she be

16  directed to go?

17  A.  Once the patient is evaluated, we would get -- direct the

18  patient to the health center that would be easiest for her to --

19  to access.  If it was easier for her to go to Tuscaloosa, then

20  we would suggest she go to Tuscaloosa, or Huntsville or Mobile.

21  So we would speak to the patient, evaluate what's going on, and

22  give her direction so she can seek care most appropriately for

23  her -- for her location.

24  Q.  Two final questions on this topic.  Suppose that you lived

25  and worked in Birmingham full-time.  Would that have made any

1  difference in the decision to terminate staff and close the

2  health center temporarily?

3  A.  No, it would not have.

4  Q.  And suppose you had admitting privileges at a local

5  hospital.  Would anything about the situation have been

6  different?

7  A.  No, it would not have.

8  Q.  Dr. Roe, there was some discussion earlier of whether you

9  take patient resources into consideration when deciding to what

10  emergency room to send your patients in the event of a

11  complication.  Do you sometimes take a patient's insurance

12  status into consideration?

13  A.  To send them to the emergency room?

14  Q.  In considering what hospital to suggest that she go to.

15  A.  No, absolutely not.  The only thing that I take into

16  consideration if a patient needs to go to the emergency room is

17  the patient status and the care that they need.

18  Q.  You were asked some questions -- sorry.  I beg your pardon.

19        MS. SANDMAN:  If I may have a moment to confer, Your

20  Honor.

21        THE COURT:  Yes.

22     (Brief pause)

23        MS. SANDMAN:  No further questions.

24        MS. FLEMING:  Very brief.

25        THE COURT:  Yes.

1                          RECROSS-EXAMINATION

2    BY MS. FLEMING:

3    Q.   Dr. Roe, is it true that after the Birmingham clinic closed,

4    that the doors were locked?

5    A.   Yes, ma'am.

6    Q.   And a sign was placed on the door that referred people who

7    presented themselves to the clinic to Planned Parenthood clinics

8    in Atlanta, Marietta, and Mobile; is that correct?

9    A.   I did not see the sign, ma'am.  So I'm sorry, I cannot -- I

10   can't speak on it.

11   Q.   You never saw the sign that was placed on the door?

12   A.   No, ma'am.  I did not see the sign.

13   Q.   And as medical director, you did not approve that sign?

14   A.   I don't know that that sign required my approval.  I'm sorry

15   if I misunderstand the question.

16   Q.   As medical director, you have ultimate responsibility for

17   ensuring that patients are cared for, do you not, Doctor?

18   A.   Yes.  Yes, ma'am, I do.

19   Q.   And you have ultimate responsibility for the development and

20   implementation of all protocols and policies used at that

21   facility, correct?

22   A.   Yes, ma'am.

23             MS. FLEMING:  May I confer, Your Honor?

24             THE COURT:  Yes.

25             MS. FLEMING:  Nothing further, Your Honor.

```
 1            THE COURT:  Okay.  Anything else?

 2            MS. SANDMAN:  No, Your Honor.

 3            THE COURT:  Okay.  Thank you.  Just a minute, counsel.

 4      (Brief pause)

 5            THE COURT:  Who's up next, counsel?  I still need the

 6   witness.  Who's up next?

 7            MS. KOLBI-MOLINAS:  Your Honor, we're going to call

 8   Robin Pate from Jackson Hospital.  As usual, I've misjudged the

 9   time things take, and so the hospitals have been waiting.  So

10   we're going to put them on before Dr. P1.  At least Robin.

11            THE COURT:  Very good.  I have some questions for

12   Dr. Roe as well.  And I just need about three or four minutes to

13   refine them.  We'll take a three- or four-minute recess, and

14   we'll come back.

15      (Recess at 2:07 p.m. until 2:11 p.m.)

16            THE CLERK:  Please remain seated.  Court is in session.

17            THE COURT:  I have some questions that I'm going to put

18   to the witness.  I'm going to hand them to her now.

19            Josh, would you hand them to her, please.

20            And I ask the witness to read the question and then

21   answer it.  Each question, that is.

22            THE WITNESS:  Do you want me to start now, Your Honor?

23            THE COURT:  Yes.  The first question, then answer it,

24   and the second question and then answer it.  No.  Read it out

25   loud.  Sorry.
```

1          THE WITNESS:  You testified earlier that you would seek

2    to involve the covering physician if a patient required

3    admission to a hospital rather than emergency treatment.  Has

4    that occurred in your time with Planned Parenthood Southeast?

5          No, it has not occurred.

6          THE COURT:  Go ahead.

7          THE WITNESS:  In the event that a Planned Parenthood

8    patient experienced complications requiring a laparotomy, who

9    would perform that procedure?

10         The patient would be transferred to the emergency room,

11   where the emergency room physician would evaluate and assess the

12   patient.  And the emergency physician would then call the GYN

13   physician on call for that hospital's emergency room, and that

14   person would perform the laparotomy necessary to manage the

15   complication.

16         In the event that a Planned Parenthood patient

17   experienced complications requiring a hysterectomy, who would

18   perform that procedure?

19          In that situation, similar to that first -- the second

20   question, the patient would arrive to the emergency room, where

21   the patient would be evaluated and stabilized by the emergency

22   room physician.  The emergency room physician would call the GYN

23   physician on call for the emergency room of that hospital, and

24   that GYN physician would then take care of the patient and

25   perform the hysterectomy, if that is what was required.

1          Considering not only abortions that PPSE provides but

2     also, for example, medically necessary --

3        (The court reporter interrupts for clarification)

4          THE COURT:  A little slower.

5          THE WITNESS:  Sorry.

6          Considering not only abortions that PPSE provides but

7     also, for example, medically necessary late-term abortions, are

8     there situations when hospitals should be done -- when abortions

9     should be done in hospitals?

10         No.

11         Does PPSE offer any of those abortions for which there

12    would be medically benefit -- medical benefits to performing the

13    procedure in the hospital?

14         No, we do not offer these abortions.

15         Are PPSE staff other than doctors subject to harassment

16    as well?  If so, it is in the same extent?

17         I know that our nursing staff has been harassed, but

18    it's not in the same extent that the physicians are harassed.

19         THE COURT:  Any follow-up questions from plaintiffs?

20         MS. SANDMAN:  If I may confer for just a moment, Your

21    Honor.

22         THE COURT:  Yes.

23       (Brief pause)

24         MS. SANDMAN:  Thank you, Your Honor.

25

1                    REDIRECT EXAMINATION

2  BY MS. SANDMAN:

3  Q.   Dr. Roe, just to be clear, are there situations where a

4  patient's preexisting medical condition might make it medically

5  appropriate for an abortion to be in the hospital, not because

6  of the risk of the abortion, per se, but because of the

7  preexisting medical condition?

8  A.   If the patient's preexisting condition -- if the patient's

9  preexisting condition warrants a hospital admission, then the --

10 the procedure would be performed in the hospital, not because of

11 the abortion but because of the patient's preexisting condition.

12 Q.   And one further clarification.  In the event of an emergency

13 transfer, a transfer to the hospital during -- during an

14 abortion procedure as a result of a complication, where would

15 you send that patient?

16 A.   I'm sorry?

17 Q.   If you had a patient who needed to be transferred to a

18 hospital from an abortion complication while she was still

19 present in your health center, where would you send that

20 patient?

21 A.   I would send that patient to the nearest hospital so that

22 patient could be taken care of in a timely fashion.

23 Q.   And is that true even if that's not the hospital where your

24 backup physician has privileges?

25 A.   Absolutely.  It's about making sure that the patient is

1    taken care of quickly and safely.

2              MS. SANDMAN:  Nothing further, Your Honor.

3              MS. FLEMING:  Nothing, Your Honor.

4              THE COURT:  Okay.  Thank you.

5              Thank you.

6              Next witness.

7              MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call Robin

8    Pate.

9              THE CLERK:  Raise your right hand.

10        (The witness is sworn)

11             THE COURT:  Proceed.

12             **ROBIN PATE**, the witness, having been duly sworn to

13   speak the truth, the whole truth, and nothing but the truth,

14   testified as follows:

15                         DIRECT EXAMINATION

16   BY MS. GRIFFITH:

17   Q.  Good afternoon, Ms. Pate.  Thank you for taking your time to

18   be here today.  If you could, please introduce yourself to the

19   Court.

20   A.  My name is Robin Pate.

21   Q.  Where are you currently employed?

22   A.  Jackson Hospital and Clinic here in Montgomery.

23   Q.  And what is your position at Jackson Hospital?

24   A.  I'm the medical staff coordinator.

25   Q.  In that position, are you familiar with the process by which

1   Jackson Hospital grants staff privileges?

2   A.  Yes, ma'am.

3           MS. GRIFFITH:  Your Honor, may I approach the witness?

4           THE COURT:  Yes.

5           MS. GRIFFITH:  I'm going to be handing the witness what

6   has been marked as Plaintiff's Exhibit 3.  It's contained in

7   Volume I of plaintiff's exhibits, which we've previously

8   provided the Court.

9           THE WITNESS:  Thank you.

10          MS. GRIFFITH:  And this exhibit has already been

11  admitted.

12  Q.  Now, Ms. Pate, are you familiar with Exhibit 3?

13  A.  Yes, ma'am.

14  Q.  And can you tell the Court what it is.

15  A.  It is our privilege delineation form for OB-GYN.  It looks

16  like it's part of our bylaws, medical staff bylaws.  And also

17  it's the medical staff application.

18  Q.  So these are portions of the document that governs the staff

19  privileges process at Jackson Hospital; is that correct?

20  A.  Yes, ma'am.

21  Q.  Can you give us an overview of the steps in the process for

22  granting privileges after Jackson Hospital receives an

23  application?

24  A.  Once the application is received, it comes to the medical

25  staff office and I process that application.  Do I need to tell

1    you the -- part of the process?

2    Q.  No.  Just a general overview.

3    A.  Okay.

4    Q.  So --

5    A.  The application is processed.  Once the application is

6    complete, then all the documents are sent to the department

7    chair for review.  And he reviews the credentialing file; he

8    makes a recommendation; and then that recommendation is carried

9    to the credentials committee, where they do a review.  They make

10   a recommendation to the medical executive committee, where they

11   review; and then they make -- the medical executive committee

12   makes recommendation to the board of trustees, who has final

13   approval.

14   Q.  And do you know how many members are on each of those

15   committees that you identified?

16   A.  Approximately.

17   Q.  If you could tell the Court approximately how many

18   individuals are on each of those committees.

19   A.  Okay.  The credentials committee, there is approximately

20   seven or eight.  Medical executive committee, I would say about

21   11.

22   Q.  And each of those individuals has an opportunity to review

23   and vote or give their input on the application; is that

24   correct?

25   A.  Yes, ma'am.

1    Q.   Are you familiar with what type of privileges Jackson

2    Hospital grants that would permit a doctor to admit a patient to

3    perform a laparotomy and hysterectomy?

4    A.   That would be GYN privileges.

5    Q.   In terms of the category, would that be active and courtesy

6    staff privileges?

7    A.   Active and courtesy has nothing to do with privileges.

8    That's just a membership status.

9    Q.   So that is the status.

10   A.   Correct.   Privileges are privileges.

11   Q.   And are there any other statuses that Jackson Hospital gives

12   out in terms of the privileging process?

13   A.   Any other -- can you say -- any other membership statuses?

14   Q.   Yeah.   Other than active and courtesy privileges.

15   A.   Consulting.

16   Q.   And would a physician that has consulting privileges be able

17   to admit a patient to Jackson Hospital?

18   A.   No, ma'am.

19   Q.   Now, before a physician becomes an active or courtesy staff

20   member, do they have to complete a provisional period?

21   A.   Yes.

22   Q.   What must a physician demonstrate while -- during this

23   provisional period?

24   A.   Can I -- can I back up to your question?

25   Q.   Please.

1    A.   They can declare -- when a physician applies, they can

2    declare active staff or courtesy staff; but it's at the end of

3    that provisional year, depending on activity, is when they may

4    be able to remain active staff or they may go to courtesy.

5    Q.   Thank you for that clarification.  So while they are on this

6    provisional status, what must a physician demonstrate in order

7    to be moved to the active or courtesy staff?

8    A.   Well, they typically have to demonstrate some activity there

9    so there's the ability for a review to be done.

10   Q.   So successful completion of this period requires a

11   sufficient caseload so that the hospital can have confidence in

12   the doctor's ability to exercise the specific privileges

13   requested?

14   A.   Yes, ma'am.

15   Q.   Now, what, if any, minimum patient contact requirements does

16   Jackson Hospital have?

17   A.   For a membership category?

18   Q.   Yes, ma'am.

19   A.   Only for active staff membership, and that would be 48 per

20   year.

21   Q.   And can you tell us what a patient contact is?

22   A.   It would be a -- something done inpatient, outpatient, in

23   one of the treatment facilities.

24   Q.   Does a physician who does not regularly perform procedures

25   at or admit at least 48 patients per year to Jackson Hospital

1   satisfy this minimum contacts requirement?

2   A.   No.   It would have to be at our facility.

3   Q.   And can you tell us what, if any, emergency department

4   coverage requirements are imposed on applicants with courtesy

5   privileges?

6   A.   Every physician, as a basic responsibility of membership, is

7   required to participate in the call schedule.   And then it's

8   really up to the departments to determine how that call schedule

9   is going to be developed.

10  Q.   Do you have a sense of the minimum number of days per month

11  that a physician would generally be expected to fulfill an on

12  call requirement in the obstetrics and gynecology department?

13  A.   Well, there's probably about -- can I count how many are

14  taking call to try and do that?   Okay.   There's eight physicians

15  that take call, OB-GYN call.   So three-plus days a month.

16  Q.   Thank you.   Are courtesy staff members also required to

17  engage in the active practice of medicine in another clinical

18  setting?

19  A.   Other than Jackson Hospital?

20  Q.   Yes, ma'am.   For courtesy staff members.

21  A.   They could practice only at Jackson.

22  Q.   So they would not need to -- if you -- I think -- if you

23  could turn to Section 3.E, I believe, of the bylaws.

24  A.   What page are you on in my packet?   Do you know?

25  Q.   Yeah.   Let me --

1      (Brief pause)

2  A.  On page 16?  Is that what you're pulling from?  Under

3  Section 3.E --

4  Q.  Yes.  That's correct.  On page 16.

5  A.  Okay.  They have to be in active practice somewhere.  It

6  doesn't have to be an active practice at Jackson.

7  Q.  And as used in this section, does clinical setting mean

8  hospital?

9  A.  It could mean an office.  You may have someone -- are we

10  talking only OB-GYN?

11  Q.  Yes.  Specifically.

12  A.  It's typically always been in the hospital.  I do not know

13  of an OB-GYN who practices strictly in the office.

14  Q.  What, if any, residence or locality requirements does

15  Jackson Hospital have for applicants for staff privileges?

16  A.  We ask that they be located closely enough to the facility

17  so they are able to provide continuous care to their patients.

18  Q.  And in practice, does Jackson use any sort of metric to

19  determine whether or not a physician is located closely enough

20  to provide that care?

21  A.  There's -- there's not a set mileage marker or set time.

22  It's kind of just understood.  I would say 30-ish, about 30

23  minutes.

24  Q.  Now, since 2009, do you know how many physicians have held

25  privileges at Jackson Hospital in gynecology?

1    A.   Probably a little over 40.

2    Q.   Do all those physicians live within a 30-minute drive from

3    the hospital?

4    A.   Since 2009?

5    Q.   Yes, ma'am.

6    A.   No.

7    Q.   Do you know how many have resided more than 30 miles from --

8    or a 30-minute drive from the hospital?

9    A.   There have probably been several, but those several have

10   backup coverage.   They've had groups in Montgomery who have

11   provided backup for them.

12   Q.   So by several, do you mean more than -- fewer than five?

13   Fewer than ten?

14   A.   Oh, golly.   Probably right around five.

15   Q.   Okay.   So -- so out of 40, you think around five maybe live

16   more than -- more than 30 minutes away.   So the vast majority

17   were within that 30 mile -- minute radius?

18   A.   Absolutely.   Absolutely.

19   Q.   Now, you mentioned that the other six had backup physicians

20   in their practice; is that correct?

21   A.   You mean the five-ish that live outside?

22   Q.   Correct.

23   A.   Yes, they do.

24   Q.   And even though they live more than 30 minutes away, do

25   those physicians continue to perform procedures at Jackson

1  Hospital and use the facility?

2  A.  Yes.

3  Q.  So they treat patients in the hospital even though they have

4  this backup arrangement.

5  A.  Yes.

6  Q.  Now, I understand that the bylaws require physicians to

7  demonstrate current competence.  Is that accurate?

8  A.  Uh-huh.

9  Q.  And are there any specific requirements in order to receive

10 gynecological privileges?

11 A.  Yes, ma'am.

12 Q.  And what are those?

13 A.  For initial appointment?

14 Q.  Yes.

15 A.  For initial appointment, it is -- they have to provide

16 documentation of at least 25 GYN procedures in the past 12

17 months.

18 Q.  And are you aware of any physician that has satisfied this

19 requirement by performing only abortions in the previous 12

20 months?

21 A.  No, ma'am.

22         MS. GRIFFITH:  I have no further questions at this

23 time.

24         THE COURT:  Cross.

25

```
 1                    CROSS-EXAMINATION
 2   BY MS. FLEMING:
 3   Q.  Ms. Pate, my name is Margaret Fleming, and I'm an Assistant
 4   Attorney General for the State of Alabama.  I represent the
 5   defendants in this case.  And I have just a few questions to ask
 6   you.
 7       Does the process for a physician to gain admitting
 8   privileges with Jackson Hospital begin with the filing of an
 9   application?
10   A.  Yes, ma'am.
11   Q.  Are you aware of any physician performing abortions at the
12   Reproductive Health Services facility who has submitted such an
13   application?
14   A.  No, ma'am.  I've not received anything.
15   Q.  And the reason for the distance requirement is to ensure
16   that a physician can provide timely and continuous care to his
17   or her patients; is that correct?
18   A.  Yes, ma'am.  Yes, ma'am.
19   Q.  Did -- and I may have misunderstood you, Ms. Pate, but I
20   understood you to testify that doctors with courtesy staff
21   privileges may not admit patients to the hospital?
22   A.  No.  They can admit.
23   Q.  They can admit patients to the hospital with courtesy staff
24   privileges.
25   A.  With -- with privileges.
```

1  Q.  Correct.

2  A.  Courtesy -- privileges and this membership is two different

3  things.  Yes.

4  Q.  But courtesy staff are allowed to admit --

5  A.  Yes.

6  Q.  -- patients in the same manner as active staff.

7  A.  Yes, ma'am.

8  Q.  And I believe that the bylaws at Jackson Hospital expressly

9  provide doctors with courtesy privileges do not have to

10  regularly admit patients.

11  A.  No, they don't.

12          MS. FLEMING:  That's all I have, Your Honor.

13          MS. GRIFFITH:  I have no further questions.

14          THE COURT:  Thank you.

15          Just one question, which you can answer from right

16  there.  Of the doctors who live -- what is it?  More than 30

17  miles away?

18          THE WITNESS:  I'm sorry.  Say again?

19          THE COURT:  Of the doctors who live more than 30 miles

20  away, do you know how far away they live and where they live?

21          THE WITNESS:  Some -- some, it might be 35.  It might

22  be 40.  We had a physician one time that lived probably an hour,

23  but he had a group in town covering him.

24          THE COURT:  But within an hour is usually -- they all

25  live within an hour?

```
 1              THE WITNESS:  Oh, absolutely.

 2              THE COURT:  Anything else?

 3              Thank you.

 4              THE WITNESS:  Thank you.

 5              MS. GRIFFITH:  Your Honor, we call as our next witness

 6    Blaine Brown from Baptist Health.

 7              THE COURT:  Very good.

 8         (The witness is sworn)

 9              BENJAMIN BLAINE BROWN, III, the witness, having been

10    duly sworn to speak the truth, the whole truth, and nothing but

11    the truth, testified as follows:

12                            DIRECT EXAMINATION

13    BY MS. GRIFFITH:

14    Q.  Good afternoon, Mr. Brown.  Thank you so much for coming

15    this afternoon, and we apologize for the slight wait.  My name

16    is Dyanne Griffith, and I am one of the attorneys representing

17    the plaintiffs.

18         Can you please introduce yourself to the Court?

19    A.  My name -- my full name is Benjamin Blaine Brown, III.  I am

20    vice president and general counsel for the health care authority

21    for Baptist Health here in Montgomery.  We operate Baptist

22    Medical Center South, Baptist Medical Center East, and the

23    Prattville Hospital.

24    Q.  And where are those facilities located?

25    A.  Baptist Medical Center South and Baptist Medical Center East
```

1    are here in Montgomery, and Prattville Baptist Hospital is in

2    downtown Prattville.

3    Q.   And how far away is Prattville from Montgomery?

4    A.   Approximately 30-some miles.

5    Q.   So in the relatively close area.

6    A.   Yeah.  Oh, yes.

7    Q.   If I refer to these hospitals collectively as Baptist

8    Health, will you understand what I mean?

9    A.   Oh, certainly.

10   Q.   In your position, are you familiar with the process by which

11   Baptist Health grants staff privileges?

12   A.   Yes, I am.

13           MS. GRIFFITH:  Your Honor, may I approach the witness?

14           THE COURT:  Yes.

15           MS. GRIFFITH:  Defendants, I'm going to be handing the

16   witness Exhibit 5.

17           Your Honor, I believe you have the Volume I of the

18   binder that contains Plaintiff's Exhibit 5.

19           THE COURT:  Okay.  Very good.

20   Q.   Mr. Brown, are you familiar with Plaintiff's Exhibit 5?

21   A.   Yes, ma'am.

22   Q.   What is it?

23   A.   It is the response to a subpoena to us, and it contains

24   copies of the information regarding privileges and application

25   for privileges, the actual privilege list, and copies of

1   policies and procedures.

2   Q.   So these are portions of the document that governs granting

3   of staff privileges at Baptist Health; is that correct?

4   A.   Yes.

5   Q.   Can you walk us generally through the processes -- or the

6   steps for granting privileges after Baptist Health receives an

7   application.

8   A.   Certainly.   When an application comes in, the first thing

9   that the central verification office does is we have individuals

10   there whose job it is to go through the application to make sure

11   the applicant meets the basic requirements that we have.   First

12   of all, we look to see that the individual has a practice that

13   is located within the service area, the general area of

14   Montgomery for a Montgomery hospital and Prattville for a

15   Prattville hospital; that they also live within that area; that

16   they have an Alabama license; that they have a current DEA

17   number.   And then we go through and verify that they are board

18   certified and that they have graduated from an accredited

19   residency program.   Assuming all of that is in the package --

20   also -- excuse me.   I failed to add that they have the

21   appropriate malpractice insurance.

22       Then once that's done, then we would basically assume that

23   particular application to be complete.   Now, when I say

24   complete, that means that all of the documentation requested in

25   the application is filled out, including prior experience of

1  practice, educational experience, et cetera.  Then it goes

2  through, and we make checks.  We go back and check with the

3  various hospitals where they've worked.  We check with their

4  references.  We do a very thorough review, including the

5  national data bank.  If they've had any past malpractice issues,

6  we look at those; we get information about those.

7      All of that is put together and reviewed.  And once that's

8  done, the completed application is then presented to our

9  credentials committee, which meets every month.  And they then

10  go through it; and they will look through all aspects of it, up

11  to and including the individual privileges being requested.

12  They will look to be certain that the individual has the

13  training to back up the request for specific privileges.  And if

14  there is some question about a time frame or the number of

15  procedures they might have done, then they may be required to be

16  proctored or to go back and obtain specific training in that

17  particular procedure.

18      Once it passes through the credentials committee, the

19  application is then forwarded with either an affirmative or

20  questionable or whatever decision they make -- or conditional,

21  even.  We may be waiting for some little piece of information.

22  It then goes to the medical executive committee.  The medical

23  executive committee will then make a decision on it.  From

24  there, it would go to the board, and the board would make the

25  final decision.

1   Q.   So it sounds like a pretty burdensome process.

2   A.   It is.  But we feel it's absolute necessary to be certain

3   that we are getting the best doctors and that we do not have

4   physicians who may have had some past history or problem that

5   would potentially cause problems for our patients.

6   Q.   Are you aware of the hospital undertaking this process for a

7   physician who could not say with certainty that she would use a

8   facility?

9   A.   One of the requirements we have -- and it's very -- stated

10  in our basic information we send out with the application -- is

11  the fact that we are required to evaluate a patient -- excuse

12  me -- a physician who is coming onto the staff.  The first year

13  of their being on the medical staff is referred to as their

14  provisional year.  And during that year, we use that time to

15  observe the patient -- excuse me -- the physician.  Each patient

16  that the physician treats, we go through that file very

17  carefully and review everything that's done to make sure that

18  the physician is providing quality medicine.  We also interview

19  individuals that work with that physician, the particular head

20  of that department.

21      And at the end of that one year, they can advance from there

22  to the courtesy or active staffs with the caveat that if they

23  have not had one -- at least one patient contact in the hospital

24  within that one-year period -- by patient contact, we mean

25  either they have admitted a patient, treated a patient in the

1  outpatient, treated a patient in the emergency room, or

2  consulted on a patient -- then they do not qualify to go any

3  further.  At that time, they are then automatically moved from

4  the provisional staff to what we call the consulting staff,

5  where you have no privileges.  You have virtually nothing except

6  the ability to, one, come into the hospital and see your

7  patient; two, read the chart, but you can't enter anything into

8  the chart.  Because we have to have the ability to determine the

9  quality and qualifications of that physician based on his

10  experience in his or her practice.

11  Q.  Is there a difference between a consulting staff and a

12  referral staff?

13  A.  Yes, there is.  Consulting staff is a staff that was

14  actually put together a number of years ago for physicians that

15  can only practice on a specific type of patient.  And by that, I

16  mean where we have physicians who are in the public service

17  corps and they worked in a federal health clinic.  If they had a

18  patient that came in, they could work -- they could provide care

19  for that patient; but they were not allowed, because of their

20  insurance coverage, to provide care for anybody else.

21      Also we had -- we have had physicians from out of town, who

22  did not live here, who came here to provide certain clinics for

23  us, but they did not have admitting privileges, but they might

24  provide specific services not available in Montgomery.  These

25  are very specialized services that we don't have and can't get

1   here.  They could come in and provide those services or see

2   their patients but, again, no admitting privileges.  And we

3   created that just for that purpose, so that we could provide

4   that service here even though we couldn't -- they wouldn't be on

5   the staff, as such.

6   Q.  So just to be clear, a member of the referral staff or

7   consulting staff would not be allowed to admit a patient to

8   perform a laparotomy or hysterectomy?

9   A.  Yes, ma'am.  That is absolutely correct.

10  Q.  I'd like to step back to the burdensome privileging process

11  that we were discussing earlier.  You mentioned, I think, at

12  least two committees that the application had to go through.  Do

13  you know how many members are on each of those committees?

14  A.  There are approximately -- it varies.  The credentials

15  committee has between eight and 12 members, depending on if

16  someone has dropped off.  I personally advise both the

17  credentials committee and the medical executive committee.  The

18  medical executive committee has approximately 15 members.

19  Q.  And each of those members gives input on each application

20  that is reviewed?

21  A.  They do.  They all review them.  We go over them with them.

22  They receive information packages in advance to look at so that

23  they'll know what we've done.  And the chairman of the

24  credentials committee presents a presentation at the med exec.

25  He goes through those and presents any information that we feel

IV-168

```
 1   they need to know about the physician.  If there's a particular
 2   problem or issue that might have come up or that we've
 3   discovered, that's brought to their attention and they review it
 4   at that time.
 5   Q.   Now, when you receive an application -- and the first step
 6   was the verification of the basic requirements set forth in the
 7   bylaws.
 8   A.   Yeah.
 9   Q.   Is it your general expectation that before a physician
10   submits an application, that they have read through the
11   application and associated materials and satisfied themselves
12   that they can meet those requirements?
13   A.   I would expect a physician to do just that.  Obviously, you
14   don't want to make an application and have us have to reject an
15   application, because that is reportable to the national data
16   bank.  So as a physician who is applying, it is in the
17   physician's best interest to go through everything and make sure
18   that they meet all the criteria because, again, it's not -- it's
19   not beneficial to them to -- to submit something that's going to
20   be rejected.
21   Q.   Now, we were talking before about the different categories
22   of privileges.  And we discussed referral and consulting
23   privileges.  And I understand the other types of privileges are
24   active and courtesy; is that correct?
25   A.   Let me -- let me correct that.  The designation of
```

1   provisional, courtesy, and active are designations of the actual

2   membership of the physician.  Privilege is the specific

3   procedures or care that a physician can offer to patients.  We

4   tend to use them together because that's the way we understand

5   it; but to be certain, privileges are the specific procedures or

6   processes that a doctor can go through, be they diagnostic or

7   invasive, to provide care for the patient.

8        Membership is the actual physical membership and the ability

9   to vote and not vote.  An active staff member has a vote on the

10  medical staff.  Provisional and courtesy have no vote.  That's

11  the basic difference.

12  Q.  Now, I understand that it used to be the case perhaps ten or

13  15 years ago that courtesy privileges were granted in the -- in

14  the normal course of events.  Is that still the case?

15  A.  No.  And it was a little longer than that.  I've been -- I

16  have been general counsel for Baptist Health for -- well, it

17  will be 28 years this July.  When I first came to Baptist

18  Health, it was easier -- a little more lax, shall we say.  I

19  don't want to say easy.  It was a little more lax in the manner

20  in which credentials were approved, reviewed.  And that was not

21  just at Baptist.  That was universally throughout the country.

22       Over the years, we made a number of changes because we

23  recognized that we needed to do a better job of identifying

24  physicians.  We knew more and more that there were physicians

25  with issues and that they might have occasion to try to move

1  from one side of the country to the other to avoid those issues.

2      We therefore began a little over 20 -- probably 23 or 24

3  years ago, we created the credentials committee at Baptist.  It

4  was just the one Baptist Hospital then.  But we created that

5  credentials committee.  It has been active since that time.  And

6  over the years, we have continued to ratchet down on the

7  complexity and the -- the amount of information that we require

8  for a physician to get on staff.

9  Q.  So during this provisional period, you were referring to, I

10  think, what you were just discussing, which is the necessity of

11  the hospital to confirm for itself that the physician is

12  competent to provide services at the hospital.

13  A.  Correct.

14  Q.  Now, I believe that you said that they needed to have a

15  minimum of one patient encounter during the provisional period.

16  A.  Yes.

17  Q.  In your experience, how many physicians have been able to

18  successfully complete this provisional period by just performing

19  one procedure or seeing one patient at the hospital?

20  A.  I cannot tell you that I know of a physician that has just

21  seen one.

22  Q.  So generally, the expectation is more than one patient

23  encounter in order for the hospital to fulfill its obligations

24  to observe?

25  A.  The expectation of a physician asking for privileges is that

 1  that physician intends to utilize the hospital to provide care

 2  to his or her patients.  That would -- that is the expectation.

 3  In years -- and many, many years past, physicians may have

 4  requested privileges at -- and membership at different hospitals

 5  because it was felt to be a -- look good on their resume.

 6  That's no longer the case.  Now they tend to keep privileges

 7  only at those facilities where they're going to practice.  And

 8  practicing at multiple facilities is an awful difficult chore

 9  for any physician, just to try to move around and see patients

10  at different places.

11  Q.  I'm going to move now to talking about another requirement

12  that I understand Baptist Health has.  And I believe that's a

13  geographic requirement.

14  A.  Yes, ma'am.

15  Q.  And what is that?

16  A.  We generally hold that a physician needs to be -- needs to

17  have his or her practice within the community and to live in the

18  community.  The purpose of that primarily is to make sure that

19  any physician whose particular specialty requires them to be on

20  call would be available to answer that call within 30 minutes,

21  which, although it's not written, CMS and the Joint Commission

22  and everyone else that regulates us generally will tell you is

23  considered to be the maximum time that it should take for a

24  physician to come in on an emergent patient.

25  Q.  And are obstetricians and gynecologists required to be on

1  call at Baptist Health?

2  A.   Absolutely.

3  Q.   So are there any OB-GYNs currently on staff at Baptist

4  Health that live more than an hour from the hospital?

5  A.   To my knowledge -- I'm not certain of any of them that would

6  live outside the 30-minute time frame unless that particular

7  physician had reached an age where they had been excused from

8  providing ER call.  The departments are allowed to excuse

9  physicians based upon age.  And the general consensus is that

10 age 55, you are -- your amount of call is reduced somewhat.  At

11 age 60, it reduces some more.  And after age 65, you don't --

12 you're generally allowed to get off call altogether because of

13 the burden.

14      MS. GRIFFITH:  Thank you.  I have no further questions

15 at this time.

16                  CROSS-EXAMINATION

17 BY MS. FLEMING:

18 Q.   Mr. Brown -- you are Mr. Brown, not Dr. Brown, correct?

19 A.   Yes.  Mister.  Thank you.

20 Q.   Mr. Brown, I'm Margaret Fleming.  I'm an Assistant Attorney

21 General for the State of Alabama.  I represent the defendants.

22 And I just want to ask you a few questions, if I might.

23      The process for a physician to gain admitting privileges

24 begins with the filing of an application; is that correct?

25 A.   Yes, ma'am.  Yes, ma'am.

1  Q.  And are you aware of any physician performing abortions at

2  Reproductive Health Services who has submitted such an

3  application?

4  A.  Yes, ma'am.  My office actually received a request by e-mail

5  for an application.  I do not process applications out of my

6  office.  I sent that request over to our central verification

7  office and directed them to send out an application package in

8  response to that request.  To my knowledge, though, we never had

9  an application come back.

10  Q.  All right.  Now, is the reason for the distance requirement

11  to ensure that a physician can provide timely and continuous

12  care to his or her patients?

13  A.  Yes, ma'am.  And primarily, it has to do with the -- the

14  issue of coming in for an emergent patient.  If his or her

15  patient were to have to be in the hospital and have an emergency

16  or have an emergency at home and have to come into the emergency

17  room and be treated, it's considered to be a minimum of --

18  excuse me -- it's considered that any longer than 30 minutes is

19  too long for them -- for a doctor to be able to come in and take

20  care of the patient.  It's considered that we can stabilize the

21  patient for at least 30 minutes to give them that opportunity to

22  come in.

23  Q.  Mr. Brown, do you have any doctors that are on staff that

24  perform surgical procedures in outpatient surgical facilities?

25  A.  Yes, we do.

1  Q.  And if a complication arises from someone performing such a

2  procedure, would that physician be expected to follow that

3  patient into the hospital?

4  A.  Yes, ma'am.  I can speak -- I am speaking now for our own

5  surgery center.  We have an interest in the Montgomery Surgical

6  Center, LLC, which is located adjacent to the East Hospital.

7  Physicians who are members and owners or who practice in that

8  facility are required to have a hospital affiliation where they

9  could take a patient and treat a patient if there were a

10 complication either during the surgery, which required something

11 more than could be offered at the surgery center, or had a

12 subsequent issue come up after the fact.

13         MS. FLEMING:  That's all I have, Your Honor.

14         THE COURT:  Any further direct?

15         MS. GRIFFITH:  No further questions, Your Honor.

16         THE COURT:  Thank you.

17         Thank you.  You may step down.

18         THE WITNESS:  Thank you, sir.

19         THE COURT:  Next witness.

20         MS. KOLBI-MOLINAS:  Your Honor, plaintiffs call Dr. P1.

21         THE COURT:  P1.

22         MS. KOLBI-MOLINAS:  And the marshals say they need two

23 minutes.

24         THE COURT:  Okay.  Well, why don't we take a recess at

25 this time.  How long will this witness take?

1          MS. KOLBI-MOLINAS:  Forty-five minutes for the direct.

2          THE COURT:  Okay.  Very good.  Is this your last

3   witness for the day?

4          MS. KOLBI-MOLINAS:  (Nods head)

5          THE COURT:  We'll take a 15 minute recess, and we'll

6   come back and take this witness.

7          MS. SANDMAN:  Your Honor, I just had one question.

8          THE COURT:  Yes.

9          MS. SANDMAN:  Would it be acceptable to the Court if

10  when Ms. Ratakonda is putting on the direct, if I sat in the

11  jury box so I could pass her notes?

12         THE COURT:  Oh, definitely.  Yes, yes, yes.  That's

13  fine.

14         MS. SANDMAN:  Thank you.

15         THE COURT:  You want your cocounsel to be in the jury

16  box is what you're saying?

17         MS. RATAKONDA:  Yes.

18         THE COURT:  Oh, that's fine, then.  And you-all have

19  the same option.  If you want to move over here, you can move

20  over here in groups.  You don't -- you're not restricted to one

21  lawyer.

22     (Recess at 3:00 p.m. until 3:21 p.m.)

23         THE CLERK:  Please remain seated.  Court is in session.

24         THE COURT:  Proceed.

25         MS. RATAKONDA:  Can we have the curtains opened, Your

1   Honor?

2           THE COURT:  Pardon me?

3           MS. RATAKONDA:  The curtains to the witness.

4           THE COURT:  Yes.  We need to open the curtain.

5       (The witness is sworn)

6           THE COURT:  Proceed.

7           **DR. P1**, the witness, having been duly sworn to speak

8   the truth, the whole truth, and nothing but the truth, testified

9   as follows:

10                      DIRECT EXAMINATION

11  BY MS. RATAKONDA:

12  Q.  Good afternoon, Dr. P1.

13  A.  Good afternoon.

14  Q.  Please introduce yourself to the Court.

15  A.  Okay.  Can you speak a little bit louder for me?

16  Q.  Sure.  Please introduce yourself to the Court.

17  A.  I'm Dr. P1.  I'm a family physician.  And I practice in

18  Alabama, Georgia, and Virginia.

19  Q.  And at which health center do you provide services in

20  Alabama?

21  A.  At the Mobile and Birmingham clinics.

22  Q.  And which clinic do you primarily provide services at?

23  A.  Primarily at Mobile.

24  Q.  And why are you using a pseudonym today in court?

25  A.  Well, I have folks who don't agree with the work that I do,

 1   and I do it as a safety precaution.

 2   Q.  And is that also why you're testifying behind a screen?

 3   A.  That is correct.

 4   Q.  Dr. P1, where do you currently live?

 5   A.  I live in Georgia.

 6   Q.  And how long have you lived in Georgia?

 7   A.  Off and on, for about 30 years, with the exception of my

 8   medical training.

 9          MS. RATAKONDA:  And so the Court is aware, Dr. P1's CV

10   is under seal as evidence in Exhibit 44.

11          THE COURT:  Okay.  Have I admitted it?

12          MS. RATAKONDA:  I -- I believe so, Your Honor.

13          MS. KOLBI-MOLINAS:  Yes.

14          THE COURT:  Okay.  Well, it's admitted if I haven't.

15   Q.  (Ms. Ratakonda, continuing:)  Okay.  Dr. P1, I won't spend a

16   lot of time on your credentials because the Court has your CV,

17   but can you please briefly describe your educational background?

18   A.  Yes.  I graduated college in Georgia, medical school in

19   Georgia, and my residency was completed in Georgia as well.  I

20   then went to a fellowship program at Women's Health and

21   Reproductive Studies in Upstate New York.

22   Q.  And are the names of your college and medical school

23   reflected on your CV?

24   A.  I'm sorry.  Can you repeat the question?

25   Q.  Are the names of your college and medical school reflected

1  on your CV?

2  A.  That is correct.

3  Q.  Did you take any electives in medical school?

4  A.  I did.

5  Q.  And what were those?

6  A.  They included rotations in OB-GYN and women's health.

7  Q.  And you stated that after medical school, you attended a

8  fellowship?

9  A.  That's correct.

10  Q.  And what specialized training did you receive in this

11  fellowship?

12  A.  Most of my training was in abortion and contraceptive health

13  care.

14  Q.  Can you please explain the family medicine specialty.

15  A.  Yeah.  Family medicine is a pretty broad specialty.  We

16  treat men, women, adults, children.  We do deliveries.  We do

17  the whole spectrum of health care.

18  Q.  And is OB-GYN training part of the family medicine

19  specialty?

20  A.  That is correct.

21  Q.  As a family medicine doctor, can you perform hysterectomies

22  or laparotomies?

23  A.  I do not.

24  Q.  Do family medicine doctors usually perform hysterectomies or

25  laparotomies?

1   A.   They do not.

2   Q.   What would you have to do in order to perform these

3   procedures?

4   A.   Attend an OB-GYN residency.

5   Q.   When did you first start working for Planned Parenthood

6   affiliates?

7   A.   The first affiliate I worked for was in 2008.

8   Q.   And where was that?  The general area.

9   A.   That was in Virginia.

10   Q.   When did you start working at the Mobile health center?

11   A.   I went to Mobile in 2010.

12   Q.   And where are you currently licensed to practice medicine?

13   A.   I am licensed in Alabama, Georgia, and Virginia.

14   Q.   Let's start with Georgia.  Where do you provide services

15   currently in Georgia?

16   A.   I work at two of the Planned Parenthood affiliates there.  I

17   also work in the family medicine clinic as part of one of the

18   health systems there, as part of the faculty at one of the

19   medical schools.  And I also work at another center, where I do

20   some research at a women's health center.

21   Q.   And when you talk about your research, what general field is

22   this research in?

23   A.   Generally in women's health.  Primarily in medical abortion

24   care.  Sometimes GYN -- one of the studies involves some GYN

25   services.

1   Q.   And where do you work in Virginia?

2   A.   I'm sorry.  Where do I work where?

3   Q.   In Virginia.

4   A.   In Virginia, I work in the Norfolk area.

5   Q.   And do you teach residents in Virginia?

6   A.   I do.  I teach medical students and OB-GYN residents on a

7   weekly basis.  They work with me in the clinic there.

8   Q.   And what topics do you teach these residents and medical

9   students on?

10  A.   Surgical, medical abortion care as well as contraception --

11  contraceptive care as well.

12  Q.   And finally, where do you work in Alabama?

13  A.   In Alabama?  Mobile.

14  Q.   And why are you flying -- willing to fly in to provide

15  services in Mobile?

16  A.   At the time when I was approached about that position, I was

17  told they had a lot of difficulty finding anyone local who's

18  willing to work there.  In fact, I didn't think I was going to

19  accept that position; but once I went there and I saw the need,

20  I -- I eventually did come on to work there.

21  Q.   To your knowledge, are there other physicians in Mobile,

22  either at a clinic, a private practice, or a hospital that

23  provide abortions?

24  A.   In the Mobile area?

25  Q.   Yes.

1    A.   No.   I do not know of any.

2    Q.   Do you have personal knowledge of staff at PPSE attempting

3    to find physicians to provide abortions in the Mobile area?

4    A.   I'm sorry.   Could you just say that one more time and a

5    little closer to the mike for me?

6    Q.   Sure.   Do you have personal knowledge of staff at PPSE

7    attempting to find local physicians to provide abortions?

8    A.   That is correct.   I -- at -- when I was approached about

9    that job, I was told that they had had some difficulty.   And

10   informally, I asked colleagues did they know folks in the area

11   who might be willing to work.   And again, no one's been able to

12   find anyone who's willing to do that.

13   Q.   And have you yourself tried to reach out to local

14   physicians, either directly or indirectly, about abortion

15   services -- providing abortion services in Mobile?

16   A.   Yes.   Similar to my previous answer, I usually go to

17   conferences throughout the year.   I've talked to several

18   colleagues.   I've asked them if they know someone in the Mobile

19   area or anyone who's nearby who would be willing to help us out

20   at the clinic.   So far, the response has been no.

21   Q.   Are you yourself willing to move to Mobile?

22   A.   No, I'm not.

23   Q.   And why not?

24   A.   My career opportunities are a little more diverse, and there

25   are a few more opportunities in the area where I currently live.

1  Q.   And I believe you might have testified about this

2  previously, but what types of abortions do you provide at the

3  Mobile health center?

4  A.   Surgical and medical abortion.

5  Q.   And around what gestational age are the majority of

6  abortions in Mobile?

7  A.   The majority of women who come in to see us are 12 weeks or

8  less.   I do provide services up to 14.5, but that's a

9  minority -- minor portion of the work I do there.

10 Q.   How many years have you been providing abortion services?

11 A.   I started providing in 2003, so that's 11 years.

12 Q.   And approximately how many abortions would you estimate

13 you've provided altogether?

14 A.   I would say, on average, I see about 80 to a hundred women a

15 week.   And I've been doing that consistently for the last eight

16 years or so.

17 Q.   And in the 11 years you've been providing abortions, have

18 you ever had a patient transferred to a hospital for a

19 complication resulting from an abortion procedure?

20 A.   I have not.

21 Q.   Dr. P1, please turn to the tab labeled Exhibit 1 in your

22 binder.   Do you recognize this document?

23 A.   Yes.

24 Q.   Dr. P1, are you aware of a requirement in Alabama law that

25 abortion clinics must have a covering physician who has staff

1  privileges at a local hospital?

2  A.  I am aware.

3  Q.  And do you have such an arrangement in place in Mobile?

4  A.  I do.

5  Q.  And looking at the document marked Exhibit 1, who on this

6  list is the covering physician for the Mobile clinic?  And

7  please use the physician's pseudonym.

8  A.  Dr. P10.

9  Q.  Thank you.  Dr. P1, do you currently have privileges at any

10 hospital?

11 A.  I do.  I have privileges in Atlanta.

12 Q.  And is the name of the hospital at which you have privileges

13 reflected on your CV?

14 A.  Yes, it is.

15 Q.  Why do you have privileges at this hospital?

16 A.  I'm on the teaching faculty at one of the local medical

17 schools; and that is a requirement of that position, that the

18 faculty have privileges at the hospital where the residents and

19 the students are being trained.  So that's essentially a

20 relationship between the hospital and the medical school.

21 Q.  Have you previously had privileges at any other hospitals?

22 A.  Yes.  I've had privileges at a hospital in New York when I

23 was in fellowship.  I had privileges at hospitals where I worked

24 in the emergency room on the weekends.

25 Q.  And why do you no longer have privileges at these hospitals?

1  A.  I'm no longer actively practicing at any of those locations.

2  Q.  Are you actively treating patients or admitting patients at

3  these hospitals?

4  A.  I'm not.

5  Q.  Are you aware of the admitting privileges requirement at

6  issue in this case?

7  A.  I'm sorry.  Say that again.

8  Q.  Sure.  Are you aware of the admitting privileges requirement

9  that's at issue in this case?

10 A.  Yes, I am.

11 Q.  What do you understand it to require?

12 A.  That the physician have admitting privileges in the area

13 where they are practicing as well as privileges that include

14 hysterectomy and laparotomy.

15 Q.  And specifically, what type of physicians?

16 A.  Physicians who are providing abortion services.

17 Q.  Can you get the privileges that are required?

18 A.  I cannot.

19 Q.  Why not?

20 A.  I don't perform hysterectomies.  I don't perform

21 laparotomies.  And I don't live in the Mobile area.

22 Q.  Have you ever performed a hysterectomy or a laparotomy?

23 A.  I have not.

24 Q.  And in the 11 years you've been providing abortion services,

25 has a patient for whom you've provided an abortion procedure

1  ever required a hysterectomy or a laparotomy?

2  A.  None.

3  Q.  Is it possible that an abortion patient of yours required a

4  hysterectomy or a laparotomy and you didn't know about it?

5  A.  No.  That's very unlikely that a physician would admit one

6  of my patients for a procedure and not notify me of that kind of

7  serious complication.

8  Q.  I'd like to turn now to the specific bylaws requirements for

9  the hospitals in Mobile.  Dr. P1, please turn to the tab labeled

10  hospital chart in your witness binder.

11         MR. BECKMAN:  Your Honor, if I may, we objected to this

12  document's admission earlier today, but I believe we -- as we

13  agreed earlier, we would be okay with it if it's used as a

14  demonstrative aid.

15         THE COURT:  Okay.  Very good.  Proceed.

16  Q.  (Ms. Ratakonda, continuing:)  Dr. P1, please turn to the

17  page listing the requirements for Mobile Infirmary, and let me

18  know when you've found the page.

19  A.  I have that page.

20  Q.  Okay.  Can you meet the minimum patient contact requirements

21  for active staff or courtesy staff at this hospital?

22  A.  What I'm reading says it requires 25 patient contacts per

23  year, and I cannot meet that requirement.

24  Q.  And what about for courtesy staff?

25  A.  Ten to 20 -- or fewer than 25.  I cannot meet that

1    requirement.

2    Q.  And have you ever admitted even one of your abortion

3    patients to a hospital?

4    A.  Not in Mobile.  No, I have not.

5    Q.  What about the location requirements for active and courtesy

6    staff at this hospital?  Can you meet those requirements?

7    A.  I do not live within 60 minutes.  Our office might be

8    located within that -- is located within that distance, but I

9    don't have -- meet the residency requirement.  And the second

10   bullet says I must be there on a continual basis.  I don't live

11   in Mobile and don't have a relationship with a physician there

12   who would provide coverage in my absence.

13   Q.  And Dr. P1, can you meet the -- the coverage requirements

14   for active and courtesy staff at Mobile Infirmary?

15   A.  No, I cannot.

16   Q.  Why not?

17   A.  Again, I don't have relationships with two members of the

18   medical staff or anyone in the community who would help meet

19   that requirement.

20   Q.  And if you can turn to the next page, these are the

21   requirements for Providence Hospital.

22   A.  I have it.

23   Q.  Can you meet the patient contact requirements for active

24   staff at Providence?

25   A.  No, I cannot.

1   Q.   And what about the location requirements?

2   A.   It's unclear what they mean by closely approximated to the

3   hospital, but I don't live in Mobile, so I would not meet the

4   residency requirement.  I'm not sure if they would accept the

5   office as being close enough to the hospital.

6   Q.   Dr. P1, let's start with -- do you believe that you provide

7   continuity of care to your patients?

8   A.   Absolutely.

9   Q.   So would you -- do you think that is the same as the

10  continuous care requirement for Providence Hospital listed in

11  the location requirements column?

12  A.   What I read here, it says that I have to be physically

13  present.  What I understand to be continuity of care in my

14  practice has been maintaining contact with the patient and their

15  providers throughout the course of their care, either by --

16  usually by telephone if I'm not physically present.

17  Q.   So although you've testified you do provide continuous care

18  for your patients, can you meet this location requirement for

19  Providence Hospital?

20  A.   I cannot.

21  Q.   And Dr. P1, you testified that you weren't sure what they

22  mean by either -- the office requirement under location

23  requirements.  How often are you at the Mobile health center?

24  A.   I'm there one or two days each week.

25  Q.   And by being there one or two days each week, do you believe

1  that you can meet the location requirement for offices for -- at

2  Providence Hospital?

3  A.   Not if it requires that I be there on a continual basis, no.

4  Q.   Thank you.   Let's turn to the coverage requirements at

5  Providence Hospital.   Can you meet those requirements?

6  A.   I cannot.

7  Q.   And finally, the last column has some religion-based

8  language.   Are you willing to apply to a religiously affiliated

9  hospital?

10  A.   In this case, I can -- I would not.

11  Q.   And why not?

12  A.   It's a Catholic hospital.   And they have publicly spoken out

13  against abortion, and it's unlikely that I would obtain

14  privileges at that facility.

15  Q.   Let's turn next to the requirements for Springhill Memorial

16  Hospital.   Can you meet the minimum patient contact requirements

17  at Springhill for active staff?

18  A.   Regularly admit/attend patients in the hospital.   I don't

19  have patients that I admit in Mobile or in Alabama.   And

20  regularly involved in the staff.   I'm not sure what they mean by

21  that; but to participate in the staff, I would have to be in

22  Mobile to be active.   So I cannot meet that requirement.

23  Q.   What about the location requirements at Springhill for

24  active and courtesy staff?

25  A.   For the same reasons as earlier, I don't live there, I would

1  not be able to meet that requirement.

2  Q.  What about the coverage requirements at Springhill for

3  active and courtesy staff?

4  A.  Again, that would require a relationship with local

5  physicians and -- who would be willing to provide that backup

6  coverage.  And I do not have that relationship.

7  Q.  Let's turn to the evaluation requirements at Springhill

8  Hospital.  Can you meet those requirements?

9  A.  I cannot.

10 Q.  And why not?

11 A.  To evaluate me in -- it looks like they want to evaluate me

12 during procedures to assess competency.  And I don't admit, and

13 I don't perform the surgical procedures that are required under

14 this -- this new ruling, so I cannot meet that requirement.

15 Q.  Can you meet the references requirements for active and

16 courtesy staff at Springhill?

17 A.  Again, I don't have relationship with physicians who would

18 support me on that requirement.

19 Q.  Finally, let's turn to USA Hospital, which is the University

20 of South Alabama Children's and Women's Hospital.

21 A.  Okay.

22 Q.  Can you meet the minimum patient contacts requirements for

23 active or courtesy staff?

24 A.  It requires 15 contacts, and I do not have any contacts in

25 Mobile for admission.  So no, I cannot meet that requirement.

1  Q.  And what about for courtesy staff, which requires five

2  patient contacts?

3  A.  I haven't even had one, so I cannot meet that requirement.

4  Q.  Can you meet the coverage requirements at USA Hospital for

5  active and courtesy staff?

6  A.  No, I cannot.

7  Q.  If you don't meet a hospital's stated requirements, are you

8  willing to apply for privileges at that hospital?

9  A.  I am not.

10  Q.  And why not?

11  A.  The repercussions from doing that are -- there's just some

12  negative feedback in doing that.  If you apply for -- if you

13  indicate on an application for privileges or if you indicate it,

14  as we must do, for renewal of our licenses, the question is

15  asked, have you ever applied and been denied, have you ever

16  applied and withdrawn an application.  And that requires an

17  explanation that could be seen as negative on any future

18  opportunities.

19  Q.  Let's turn briefly to the way complications are handled in

20  your practice.

21  A.  Okay.

22  Q.  You testified earlier that you've never had a patient who

23  had to be transferred to the hospital for a complication

24  resulting from an abortion procedure; is that right?

25  A.  That is correct.

1   Q.  When your abortion patients have bleeding or cramping or

2   other symptoms that concern them after they're sent home, what

3   are they directed to do?

4   A.  When they're in the clinic, all of the patients are given a

5   phone number, a 24-hour contact number.  And if there's any

6   questions, concerns, complications they feel they want to

7   address, they are to call that number.  And they'll be in

8   contact with the nurse or triage staff, who then is in contact

9   with me as need be.

10  Q.  And for the patients who contact the nurse, are most such

11  patients referred to the ER?

12  A.  Are most of the patients who call referred to the ER?

13  Q.  Yes.

14  A.  No.  Very rarely.

15  Q.  So what happens with most patients who call?

16  A.  Most of the calls are situations that can be handled over

17  the phone.  It's bleeding, minor bleeding, nausea, vomiting; is

18  my fever an issue.  Those are things that we can manage over the

19  phone.  They don't usually even require a return to the clinic.

20  Q.  So if patients are sent to the ER, what factors determine

21  which ER they are sent to?

22  A.  Primarily, where they are and their distance between them

23  and the nearest facility.  We have patients who travel to our

24  clinic from other areas.

25  Q.  Are there any other factors that determine which ER they are

 1  sent to?

 2  A.   Yes.  Usually patients just have -- patients have

 3  preferences.   They know where they want to go.   And if they have

 4  a choice among hospitals wherever they are, they usually go to

 5  the one that they have some familiar relationship with or

 6  previous relationship with.

 7  Q.   And do -- does the patient's preference depend on where they

 8  think their physician has privileges?

 9  A.   No.  A lot of our patients that I see don't even have

10  primary care physicians.   They usually go -- sometimes they've

11  been there before for some kind of emergency care.   They've had

12  babies there.   So they have some other relationship; their

13  family knows the hospital.   So they will go where they are

14  familiar.

15  Q.   So in an emergency situation, what -- what is the most

16  important factor in determining which ER the patient is sent to?

17  A.   The nearest facility where the patient can be treated

18  appropriately.

19  Q.   Do you -- do you provide abortions in the Atlanta area,

20  where you have admitting privileges at a hospital?

21  A.   I do, but that relationship is not -- I don't have

22  privileges because of my abortion work.   I have privileges at

23  the hospital because of my teaching work.

24  Q.   Okay.   And when Atlanta-based abortion patients of yours

25  have complications after leaving the health center, are they

1  always sent to the ER of the hospital where you have privileges?

2  A.  No.

3  Q.  Has a patient of yours ever ended up at the ER of the

4  Atlanta hospital where you have privileges?

5  A.  Yes, I have had patients to go to the ER.

6  Q.  And in these cases, did you go to the ER to treat the

7  patient?

8  A.  I did not.

9  Q.  Why not?

10 A.  In Atlanta, we have wonderful colleagues in the facilities,

11 who are able to manage the patients once they arrive.

12 Q.  Is there any clinical benefit to the patient from you going

13 to the hospital to treat the patient?

14 A.  The patient outcome is essentially the same.  It's always

15 the same.  The physicians know what to do.

16 Q.  Do you follow up with any patients of yours who are referred

17 to the ER?

18 A.  Always.

19 Q.  How do you do so?

20 A.  Usually I'm notified by the -- if they're in the ER for any

21 serious complication, if that were to happen, I'd be notified by

22 the ER physician.  And if it's a call that the nurse triaged or

23 the staff triaged, then there's a documentation of that call;

24 and then I or the nurse will follow up the following day or the

25 next clinic day.

1  Q.  So is anything different for your patients by you having

2  privileges in Atlanta but not in Mobile?

3  A.  Is there any difference in their outcome?

4  Q.  Yes.

5  A.  No.

6  Q.  Shifting gears a little bit, Dr. P1, in your experience as

7  an abortion provider, have you come across patients who have

8  purchased medication abortion pills illegally?

9  A.  I have.

10  Q.  And can you talk more about that?

11  A.  I have treated patients who have come in, some with

12  bleeding, some with incomplete terminations, who tell me they

13  were able to access the pills either through the Internet or

14  they have folks who were able to travel out of the country and

15  bring them into the country and for resale.

16  Q.  And how often do you come across these patients?

17  A.  The ones that tell me, a few a year, maybe three to four per

18  year.

19  Q.  And what are the common complications that these patients

20  experience?

21  A.  One of two extremes.  Either they experience no bleeding and

22  the pregnancy is still retained, or they have excessive bleeding

23  and they're coming in to have it managed.

24  Q.  So with these complications in mind, why do these patients

25  take these pills?

1   A.   I think for many of the women, finances are a factor.

2   Taking off time from work is a factor.  Accessing a clinic near

3   them is a factor.  So it's easier, I think, for them to take --

4   in their minds, it may be easier for them just to try a closer

5   solution to home and then, if that doesn't work, move on to the

6   next step.

7   Q.   Do some of these patients -- are some of these patients in

8   close proximity to a health center where they can obtain

9   medication abortion pills?

10  A.   In the one case that I'm thinking of, I was actually in our

11  Atlanta clinic when the young woman told me she had taken the

12  pills.  She lived in an outlying suburban area, but it's less

13  than an hour away from the clinic.

14  Q.   So if she was in proximity to the clinic, why did she choose

15  to obtain these pills?

16          MR. BECKMAN:  Objection, Your Honor.  This is -- would

17  be speculation, any answer that she would give.

18          THE COURT:  Unless she knows.  Is she just guessing or

19  what?

20          MS. RATAKONDA:  I believe she knows.  She has personal

21  knowledge, yes.

22          THE COURT:  Go ahead.

23  Q.   (Ms. Ratakonda, continuing:)  Please answer the question,

24  Dr. P1.

25  A.   And the question was?  Can you repeat the question?

 1  Q.   Sure.  Even though this patient was in close proximity to a

 2  clinic, why did she obtain these pills and take these pills

 3  illegally?

 4  A.   It was cheaper than what the clinic was charging.

 5  Q.   Do you see protestors at the Mobile clinic?

 6  A.   Yes, I do.  Every week.

 7  Q.   How often are there protestors at this clinic?

 8  A.   Usually every time they think the clinic is open, they're

 9  there.

10  Q.   Do the protestors recognize you as an abortion provider?

11  A.   Oh, yes.  They know I'm a provider.  They call me by name.

12  Q.   And what else do the protestors do?

13  A.   A variety of things.  They call me by name.  They call me by

14  other names, a baby killer.  I have some clinics where they have

15  my picture on posters, where I live, those types of things.

16  Q.   How does this affect you?

17  A.   It makes me cautious, that on top of the fact that I've

18  worked in two facilities where the physicians have -- physicians

19  or staff have been murdered.

20  Q.   Can you speak more about that?

21  A.   I worked in a clinic in New York where the physician was

22  murdered after hours, in his home.  And when I came to Alabama,

23  I worked in a clinic where a staff person was killed by a

24  bombing.  One of the faculty where I trained in New York, her

25  clinic was fire bombed.  And she was actually part of the

1    faculty where our clinic was being reestablished.

2    Q.  Do you take any precautions because of these activities?

3    A.  Always.  Always.  I usually don't use the same car twice.  I

4    rent a car every week.  Some other precautions, P.O. box for my

5    mail.  I don't like packages coming to my house.  Some other

6    precautions such as that.

7    Q.  Dr. P1, why do you continue to provide abortion services?

8    A.  Because the women continue to come.  The services are

9    needed, and the women are seeking out those services.  And I'd

10   rather they seek it out in a place where they're going to get

11   safe and respectable care as opposed to some of the other

12   resources that they resort to.

13          MS. RATAKONDA:  Thank you.  No further questions.

14          THE COURT:  Cross?

15          MR. BECKMAN:  Yes, Your Honor.

16                        CROSS-EXAMINATION

17   BY MR. BECKMAN:

18   Q.  Hello, Dr. P1.  My name is Kyle Beckman.  I'm an attorney

19   with the State of Alabama representing the defendants.  And I'm

20   going to ask you a few questions, if that's all right.

21   A.  And I'm sorry.  Can you speak into the mike?  It's a bit of

22   an echo from where I am.

23   Q.  Sure.  If you could speak a little more slowly for me, since

24   we're on the subject, that would be helpful.

25   A.  Okay.

1   Q.   Can you hear me all right now?

2   A.   Yes, I can.

3   Q.   Now, Dr. P1, you agree that complications do arise from

4   abortions, don't you?

5   A.   That is a possibility, yes.

6   Q.   And you would agree that even highly qualified doctors can

7   encounter complications when treating patients, correct?

8   A.   That is correct.

9   Q.   Now, sometimes these complications will be the fault of the

10  doctor.   Sometimes they won't be.   Yes?

11  A.   Sometimes the complications are what?

12  Q.   Sometimes the complications would be through a fault of the

13  doctor, and sometimes they would not.   Correct?

14  A.   As with any procedure, obviously, yes.

15  Q.   Now, complications from an abortion can include abnormal

16  bleeding, infections, perforation, tears, cervical lacerations.

17  Those are all complications.   Yes?

18  A.   Yes.   They can be.

19  Q.   Would it be fair to say that an abortion clinic does not

20  have the same resources and tools as an ER hospital?

21  A.   That's correct.

22  Q.   And it would be true that there are some complications and

23  situations that will require those tools and resources which are

24  provided only at hospitals.   Yes?

25  A.   The majority of complications that occur with abortion would

1   be treated the same in the ER as in any other facility.  There

2   are some things that happen after hours, I think, is why

3   patients end up in the ER, but not -- not so much because the

4   clinic can't treat those complications.

5   Q.   For instance, if a woman is having very heavy bleeding and

6   needs to be monitored more closely, that would be a situation

7   when you might transfer her to the hospital.  Yes?

8   A.   That would be a possibility.

9   Q.   And although rare, you would agree that this can happen

10  mid-procedure, during the middle of a follow-up exam at your

11  clinic?

12  A.   During the middle of what?

13  Q.   Although it may be rare, you would agree that a complication

14  can arise mid-procedure, during the middle of a follow-up exam

15  at your clinic.  Yes?

16  A.   During the middle of a follow-up exam?  Is that what you

17  asked me?

18  Q.   Yes.  If a lady had a problem, came back into your clinic,

19  you're evaluating whatever problem that she has, it could happen

20  in the middle of that situation where she's presented to your

21  clinic and you say, you need to be transferred to a hospital.

22  A.   I've not seen a situation where a patient had been -- we've

23  seen the patient, the patient's gone home, she's coming back for

24  a follow-up, and we determine she needs to go to a hospital now.

25  I -- I -- I'm trying to think of a situation where I would do

 1  that.  If it were a bleeding complication, I'm going to handle

 2  that in the clinic.

 3  Q.  No matter how heavy the bleeding is, you're going to handle

 4  it in your clinic?

 5  A.  If she's -- you're describing a follow-up, correct?  And

 6  usually, patients come back to us for routine follow-up -- let's

 7  say for a medical abortion.  That's a week or so afterwards.

 8  And I don't know of any situation where the patient has bled

 9  that heavily at a follow-up visit that I would send her to a

10  hospital from there.  I'm going to treat her there in the

11  clinic.  The usual treatment for that situation is an

12  aspiration.

13  Q.  All right.  Perhaps I used the wrong word and should not

14  have said follow-up exam.  It could be a situation where a woman

15  has presented simply with a problem and it would not be her

16  scheduled follow-up exam.  She's come back to the clinic because

17  she has a complication.  I'm simply asking is it possible that

18  you would transfer that woman to the hospital in some situation.

19  A.  If the patient needed a transport, I would transport the

20  patient to a hospital.  That's a possibility.  I have not had

21  any situations like the one you're describing.

22  Q.  Now, in that scenario, would you agree with me that it would

23  not do any harm to the patient if you accompanied her to the

24  hospital?

25  A.  Would it harm the patient?

1  Q.  If you went with her, yes, would it harm the patient?

2  A.  That's an odd question.  Would it harm her?  No.

3  Q.  Now, you would agree with me that not all doctors are

4  qualified to perform abortions, wouldn't you?

5  A.  Not all doctors are qualified -- I'm repeating your question

6  to be sure I understand.  Not all doctors are qualified?

7  Q.  Yes.  To perform abortions.

8  A.  No, not all doctors are qualified to perform abortions.

9  Q.  They don't all have the skills necessary, correct?

10  A.  Not all physicians have received abortion training.

11  Q.  Now, you have received training through your -- your

12  reproductive health training fellowship.  Yes?

13  A.  That's correct.

14  Q.  And now, you've worked at the clinic, I believe I heard,

15  since 2003.  So you've had 11 years' worth of training.

16  A.  Correct.

17  Q.  Now, is it that experience, would it be fair to say, that

18  forms the basis for why you testified previously that your

19  experience in abortion helps you diagnose complications arising

20  from an abortion?

21  A.  Are you asking my -- if my experience allows me to diagnose

22  complications?

23  Q.  Sort of.  Let me -- let me say that one more time.  Is your

24  reproductive health training and the 11 years that you've

25  performed abortions -- is that the basis for why you previously

1   testified in this case that your experience in abortion helps

2   you diagnose complications arising from an abortion?

3   A.   That is correct.

4   Q.   Now, if one of your patients had a complication, goes into

5   the ER either at your direction or not but, either way, without

6   you, the first thing that ER is going to need to do is to

7   evaluate and diagnose her, correct?

8   A.   Correct.

9   Q.   Now, would it be fair to say that not all ER doctors are

10  going to have the same abortion experience that you have?

11  A.   Well, their experience is not -- with abortion isn't the

12  primary issue in that -- in that instance.   Right then their

13  concern -- their concern would be can they manage what the

14  common complications are, which is bleeding, which is very

15  similar with what women present with whether they had an

16  abortion or not, often presenting the same way if they've had a

17  miscarriage.

18  Q.   Okay.   I heard you say manage.   And I want to step back a

19  little bit, and I want to ask you about diagnosis, still.   And I

20  want to know if you agree that not all doctors in the emergency

21  room have the same abortion experience that you have.

22  A.   Not all -- I don't know if all ED physicians have had

23  abortion training specifically.

24  Q.   I'm sorry.   Can you repeat that?   I didn't quite catch that.

25  A.   I don't know that all emergency room physicians have had

1    abortion training specifically.

2    Q.   Okay.  Now, without discussing whether or not ER doctors can

3    diagnose and treat abortion complications, would you agree that

4    unless those ER doctors have the same or similar experience with

5    abortions that you have, they are not going to be helped in the

6    same way that your experience helps you diagnose?

7    A.   I disagree.

8    Q.   On what basis?

9    A.   Again, the common complications that -- an abortion

10   complication a patient will present with is bleeding.  And I'm

11   more than sure that an ER physician knows what to -- what to do

12   about vaginal bleeding.

13   Q.   Well, my question is a bit more nuanced than that.  Let me

14   say that one more time.  I'm not asking whether or not they can

15   treat or diagnose.  What I'd like you to answer is whether you

16   agree with me that those emergency room doctors are not going to

17   be helped in the same way that you have testified previously

18   that you were helped in diagnosing abortion because you've had

19   experience in abortion care?

20   A.   I'm sorry.  I don't know what you mean by helped.  Can you

21   just be a bit more clear?

22   Q.   Well, it was originally your word, so I'm actually needing

23   to look to you a little bit here too.  You testified previously

24   that your experience in abortion care helps you diagnose

25   complications arising from an abortion.  Now, we agree that not

1  all doctors have the same experience in abortion care that you

2  have.  We agree that you've previously said this.  So what I'm

3  asking is if they don't have the same experience that you have,

4  they're not going to be helped in the same way that you said you

5  were helped.

6  A.  Who's not going to be helped?

7  Q.  The emergency room doctors.

8  A.  I'm sorry.  I'm not -- I'm not being -- I just don't

9  understand what your question is.  They're not going to be

10  helped.  I don't understand that.

11  Q.  Are you aware that you previously testified in this case

12  that the requirement that a doctor who performs an abortion have

13  a relationship to a local hospital can add something to

14  continuity of care?

15  A.  Did I testify to that fact?

16  Q.  Yes.  Are you aware of that?

17  A.  Yes.

18  Q.  Now, if a hospital has an OB-GYN on staff, that's not a

19  position that you would qualify for, correct?

20  A.  Would I qualify for a position as an OB-GYN?

21  Q.  Yes.

22  A.  No.

23  Q.  Now, is it possible that a hospital would hire someone for

24  that position who only had your qualifications?

25  A.  Say that one more time for me.

1  Q.  A hospital would not hire someone for its on-staff OB-GYN

2  position with the same qualifications as you, correct?

3  A.  Not that I am aware of.  I don't know of a hospital that

4  would.

5  Q.  You said earlier that you are the only doctor performing

6  abortions in Alabama -- in Mobile, aren't you?

7  A.  I'm one of two.  Dr. Roe (pseudonym substitution) -- Dr. P10

8  (pseudonym substitution), she also provides there as well.

9  Q.  Now, Planned Parenthood has never offered you any financial

10  incentive to move to Mobile, have they?

11  A.  No.

12  Q.  Do you consider the location of your office or residence to

13  be such that you can provide appropriate continuity of care to

14  your patients?

15  A.  Yes, I do.

16  Q.  Now, you would agree that your being closer to those

17  patients would only be a positive thing, though, correct?

18  A.  Not to the outcome of their health care.  It's nice to have

19  those relationships in the community and that the physicians

20  know the quality of the work I perform there, but it doesn't

21  change how the patients are -- their outcome.

22  Q.  You only perform procedures one day a week in Mobile.  Yes?

23  A.  Sometimes two.

24  Q.  I believe you testified, is it not correct, in your

25  deposition that it's not been since at least 2010 that you've

1  performed procedures two days a week in Mobile?  Is that not

2  true?

3  A.  I'm sorry.  Say that again, sir.

4  Q.  Is it not true that it has been since at least 2010 that you

5  have performed procedures twice a week in Mobile?

6  A.  Not every week, but there are some weeks that I'm there two

7  days a week.

8  Q.  You don't have any knowledge of how often they perform

9  abortion procedures in Pensacola, do you?

10  A.  I do not.

11  Q.  Has it been your experience that the protests that you

12  testified about are centered around the clinics where you have

13  worked?

14  A.  I'm sorry.  Repeat the question.

15  Q.  It would be accurate to say that your experience with

16  protests are that they have been centered around the clinics

17  where you work?

18  A.  That I experienced protestors?

19  Q.  Yes.  That they have been centered around the clinics where

20  you work.

21  A.  Yes.

22  Q.  Now, you've never been harassed, for instance, by these

23  protestors at the university where you work, correct?

24  A.  Which university?

25  Q.  The one where you currently teach and are on staff.

1   A.  I do not.  I don't have protestors there.

2   Q.  But you have been protested in Georgia, have you not?

3   A.  Yes.

4   Q.  And you would agree that the protests in Alabama are not

5   meaningfully different from protests in other states?

6   A.  Are they not what different?

7   Q.  Meaningfully.

8   A.  I think the Alabama protestors are a bit more vocal than the

9   ones I've experienced in other states.

10  Q.  It would be correct, though, that when you mentioned earlier

11  about posters being up, that that was in Virginia, not Alabama,

12  correct?

13  A.  The posters with my picture were in Virginia, yes.

14          MR. BECKMAN:  No further questions, Your Honor.

15          THE COURT:  Any further direct?

16          MS. RATAKONDA:  One moment, Your Honor.

17      (Brief pause)

18                      REDIRECT EXAMINATION

19  BY MS. RATAKONDA:

20  Q.  Dr. P1, are ER doctors able to diagnose complications from

21  an abortion?

22  A.  ER doctors?

23  Q.  Yes.

24  A.  Can they diagnose complications?

25  Q.  From an abortion procedure.

1    A.   Yes.

2    Q.   And do ER doctors need abortion training in order to

3    diagnose and treat abortion complications?

4    A.   No, it's not required.   The common complications are

5    bleeding, and bleeding is bleeding.   They're going to treat

6    accordingly.

7    Q.   When a physician has a relationship with a local hospital,

8    does that change the care that a patient receives?

9    A.   It does not.

10   Q.   So standing here today, do you think that the backup

11   physician requirement is necessary or helpful to continue --

12   continuity of care?

13   A.   When you say the backup physician, do you mean the one that

14   the clinic lists -- has to have for a backup, or do you mean the

15   one who covers me when I am away from the clinic?

16   Q.   I'm talking about the relationship that the clinic has

17   with -- as you testified earlier, with Dr. P10 (pseudonym

18   substitution) -- or Dr. P10?

19   A.   Does that change the outcome of the patient's care?

20   Q.   Yes.

21   A.   No.

22        MS. RATAKONDA:   And Your Honor, I just wanted to raise

23   one thing.   There is a question about Dr. P1's CV being admitted

24   into evidence.

25        THE COURT:   Yes.

1          MS. RATAKONDA:  I believe there was an objection to

2    that.  Was there not?  No?  It was withdrawn?

3          MR. BECKMAN:  I'm sure it was on foundation grounds

4    probably.

5          MR. DAVIS:  With all of the experts' CVs, we only

6    objected to a couple witnesses' various CVs.  We only objected

7    until they were able to testify and put in the binder.

8          MS. RATAKONDA:  Okay.

9          THE COURT:  It's admitted.

10          MS. RATAKONDA:  Thank you.

11          THE CLERK:  Which one is that?

12          MS. RATAKONDA:  Dr. P1's CV.

13          THE COURT:  What number, he's asking.

14          MS. RATAKONDA:  Oh.  Exhibit 44.

15          MR. BECKMAN:  If I could just have one moment.

16          THE COURT:  Yes.

17       (Brief pause)

18                          RECROSS-EXAMINATION

19    BY MR. BECKMAN:

20    Q.  Dr. P1, I just want to be clear that you're not an expert in

21    any subject here today, are you?

22    A.  I'm not a what?

23    Q.  An expert.

24    A.  In --

25          THE COURT:  I think that could be a confusing question.

1   I think the question might be just to plaintiffs' counsel, are

2   they putting her forward as an expert on anything other than

3   that she's a doctor.

4   Q.  You haven't been told today that you're putting -- you're

5   being put forward by plaintiffs as one of their experts, have

6   you?  You're just here to testify about your experiences.  Yes?

7   A.  Correct.

8           MR. BECKMAN:  We have no further questions, Your Honor.

9           THE COURT:  The witness is excused.  Thank you.

10          Counsel, is that it for today?

11          MS. KOLBI-MOLINAS:  Yes, Your Honor.

12          THE COURT:  Okay.  And what about tomorrow?

13          MS. KOLBI-MOLINAS:  Tomorrow we have a witness in the

14   morning, and then we have the -- a physician -- another

15   physician in the afternoon, but he's doing procedures in the

16   morning so he won't be able to be here until the afternoon.

17          THE COURT:  Okay.  Do we have any by video or are all

18   these live?

19          MS. KOLBI-MOLINAS:  All of them are live.

20          THE COURT:  Very good.  Thank you.  Any more anonymous

21   witnesses?

22          MS. KOLBI-MOLINAS:  Yes.  The one in the afternoon.

23          THE COURT:  The one in the afternoon.

24          Okay.  Court is in recess until nine.

25          MR. DAVIS:  May I ask a question, Your Honor?

1          THE COURT:  Yes.

2          MR. DAVIS:  Would it be helpful to the Court if we

3   filed an exhibit with a link to the department's regulations?

4          THE COURT:  In contrast to the administrative code?

5          MR. DAVIS:  It would -- yes, the administrative code

6   that was being discussed in testimony today.

7          THE COURT:  Is that different from the administrative

8   code, the regulations?

9          MR. DAVIS:  No, it is not.

10          THE COURT:  I thought we already had an exhibit that

11   has a link to the administrative code.

12          MR. DAVIS:  For the department regulations?  Is that --

13   that was for the Board of Medical Examiners, Your Honor.

14          THE COURT:  Right.  Oh, I see.

15          MR. DAVIS:  This is for the Department of Public

16   Health's code as it applies to abortion clinics.

17          THE COURT:  Oh.  Okay.  Yes.  Yes, that would be

18   helpful.  Yes.

19          MR. DAVIS:  Second, may we have leave in a few days to

20   file a summary of the hospital bylaws of the same matters that

21   plaintiffs have presented, just with some complementary

22   provisions?

23          THE COURT:  Yes.  That will be fine.

24          MR. DAVIS:  Thank you.

25          THE COURT:  Court is in recess until nine.

1      (Evening recess at 4:13 p.m.)

2                    * * * * * * * * * *

3                 COURT REPORTER'S CERTIFICATE

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6          This 3rd day of June, 2014.

7

8                              /s/ Risa L. Entrekin
                               Registered Diplomate Reporter
9                              Certified Realtime Reporter
                               Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25