1                IN THE UNITED STATES DISTRICT COURT

2                FOR THE MIDDLE DISTRICT OF ALABAMA

3                        NORTHERN DIVISION

4

5    PLANNED PARENTHOOD
     SOUTHEAST, INC., et al.,
6
             Plaintiffs,
7
         vs.                      CASE NO.:  2:13cv405-MHT
8
     LUTHER STRANGE, et al.,
9
             Defendants.
10

11
                            VOLUME V
12
                    * * * * * * * * * *
13
                    NONJURY TRIAL PROCEEDINGS
14
                    * * * * * * * * * *
15
             BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES
16
     DISTRICT JUDGE, at Montgomery, Alabama, on Friday, May 23, 2014,
17
     commencing at 9:02 a.m.
18
     APPEARANCES:
19
     FOR THE PLAINTIFFS:      Ms. Alexa Kolbi-Molinas
20                            Mr. Andrew David Beck
                              Ms. Susan Talcott Camp
21                            Ms. Julia Heather Kaye
                              Attorneys at Law
22                            AMERICAN CIVIL LIBERTIES UNION
                              125 Broad Street, 18th Floor
23                            New York, New York  10004-2400

24

25

```
 1  APPEARANCES, Continued:

 2  FOR THE PLAINTIFFS:        Ms. Jennifer R. Sandman
                               Ms. Maithreyi Ratakonda
 3                             Attorneys at Law
                               PLANNED PARENTHOOD FEDERATION
 4                             OF AMERICA
                               434 West 33rd Street
 5                             New York, New York  10001

 6                             Ms. Dyanne Griffith
                               Attorney at Law
 7                             WILMER CUTLER PICKERING
                               HALE & DOOR, LLP
 8                             1875 Pennsylvania Avenue NW
                               Washington, D.C.  20006
 9
                               Mr. Randall C. Marshall
10                             Attorney at Law
                               ACLU of ALABAMA FOUNDATION, INC.
11                             P.O. Box 6179
                               Montgomery, Alabama  36106-0179
12
                               Mr. M. Wayne Sabel, Sr.
13                             Attorney at Law
                               SABEL & SABEL, P.C.
14                             2800 Zelda Road, Suite 100-5
                               Montgomery, Alabama  36106
15

16  FOR THE DEFENDANTS:        Mr. Andrew L. Brasher
                               Solicitor General
17                             STATE OF ALABAMA
                               OFFICE OF THE ATTORNEY GENERAL
18                             501 Washington Avenue
                               Montgomery, Alabama  36103
19
                               Mr. James William Davis
20                             Ms. Margaret Lindsey Fleming
                               Mr. Kyle A. Beckman
21                             Ms. Laura Elizabeth Howell
                               Assistant Attorneys General
22                             STATE OF ALABAMA
                               OFFICE OF THE ATTORNEY GENERAL
23                             501 Washington Avenue
                               Montgomery, Alabama  36130
24

25
```

```
 1   APPEARANCES, Continued:

 2   FOR THE DEFENDANTS:      Ms. Patricia Elaine Ivie
                              Mr. Phillip Brian Hale
 3                            Assistant Attorneys General
                              Office of General Counsel
 4                            STATE OF ALABAMA
                              DEPARTMENT OF PUBLIC HEALTH
 5                            RSA Tower
                              201 Monroe Street
 6                            Montgomery, Alabama  36104

 7             Proceedings reported stenographically;
                  transcript produced by computer.
 8
                        * * * * * * * * * *
 9
                          EXAMINATION INDEX
10

11   STANLEY HENSHAW, Ph.D.
          DIRECT BY MR. BECK                          6
12        CROSS BY MS. FLEMING                       47
          REDIRECT BY MR. BECK                       72
13
     DR. A
14        DIRECT BY MS. CAMP                         77
          CROSS BY MR. DAVIS                        107
15

16                      * * * * * * * * * *

17      (The following proceedings were heard before the Honorable

18       Myron H. Thompson, United States District Judge, at

19       Montgomery, Alabama, on Friday, May 23, 2014, commencing at

20       9:02 a.m.:)

21       (Library conference, as follows:)

22            THE CLERK:  Please remain seated.  Court is in session.

23            THE COURT:  Counsel, I understand that there has been

24   some use of doctors' names whose names should have

25   been pseudonyms.  Is that correct?
```

1          MS. KOLBI-MOLINAS:  Yes.

2          THE COURT:  The court reporter just wants to know what

3    to do.  I understand that the court reporter will redact the

4    transcripts at certain points to remove things that are

5    confidential; for instance, if someone should use a Social

6    Security number or a child's name.  I think the court reporter

7    doesn't know what name to replace the doctor's name with because

8    she doesn't know the pseudonym.  I'm going to leave it up to

9    you-all to get with the court reporter and come up with a way to

10   do this.  Anyone have any objection?

11         MR. DAVIS:  No objection, Judge.  Has this just been

12   witnesses who have used the name?

13         MS. KOLBI-MOLINAS:  Yes.

14         MR. DAVIS:  We haven't slipped up, have we?

15         MS. KOLBI-MOLINAS:  No.

16         MR. DAVIS:  Okay.  Good.

17         THE COURT:  Just witnesses have used the name.  Very

18   good.  And I believe we have the index to show the doctors'

19   names.

20         MS. SANDMAN:  Actually, Your Honor, just so that the

21   record is clear on this, there was one inadvertent disclosure by

22   an attorney, but it was an attorney on our side.

23         THE COURT:  Well, whatever it is.  I have actually

24   wondered whether I did it.  It can happen.  But I don't think

25   anyone's blaming anyone.  But anyway, get with the court

```
 1  reporter and make sure that the substitution is made by

 2  agreement of the parties.

 3          MS. KOLBI-MOLINAS:  Thank you.

 4          THE COURT:  And it is so ordered.

 5          MS. FLEMING:  Your Honor.

 6          THE COURT:  Yes.

 7          MS. FLEMING:  And this is being particular, but might

 8  we have an indication in the record?  We certainly don't want

 9  the name disclosed, but can there be some sort of notation to

10  the effect that the identity of the doctor was inadvertently

11  spoken and that we have --

12          THE COURT:  How would you like to do this?

13          MS. FLEMING:  Well, just with an asterisk by that name.

14  Substituting the pseudonym but with an asterisk that says that

15  the name of the actual doctor was presented --

16          THE COURT:  Why don't we just put brackets around

17  substitution and that -- you-all will know there's been a

18  substitution.

19          MS. FLEMING:  Just as long as the record is clear that

20  that was done.  And it --

21          THE COURT:  I -- why don't you get with the court

22  reporter and see if you-all can work this out.

23          MS. FLEMING:  Thank you, Your Honor.

24          THE COURT:  If you can't, then come back to me.  Okay.

25  Very good.
```

```
 1              Thank you.  We'll get started.
 2       (End of library conference)
 3       (The witness is sworn)
 4       (Call to Order of the Court)
 5              THE COURT:  I understand that the witness has already
 6    been sworn.  You may proceed.
 7              MR. BECK:  Yes, Your Honor.  Plaintiffs call
 8    Dr. Stanley Henshaw.  And Your Honor, I have some of the
 9    exhibits that I'll be using during this examination to hand to
10    you and the witness.
11              THE COURT:  Very good.
12              MR. BECK:  And I promise not to read aloud the
13    description of this particular witness this time.
14              THE COURT:  Very good.
15              STANLEY HENSHAW, Ph.D., the witness, having been duly
16    sworn to speak the truth, the whole truth, and nothing but the
17    truth, testified as follows:
18                         DIRECT EXAMINATION
19    BY MR. BECK:
20    Q.  Dr. Henshaw, could you please describe your educational
21    background.
22    A.  Yes.  I have a bachelor's degree from Harvard College and a
23    Ph.D. in sociology from Columbia University.
24    Q.  What field has been the focus of your career?
25    A.  My career for the last 35 years has been focused in
```

1  reproductive epidemiology.

2  Q.  And what is reproductive epidemiology?

3  A.  Well, it's the statistical study of patterns, causes, and

4  effects of reproductive behavior, particularly behavior related

5  to fertility.

6  Q.  And I believe you said you had a Ph.D. in sociology.  Is

7  that the name -- the field in which you got your Ph.D.?

8  A.  That's correct.

9  Q.  How does your background in sociology or your education in

10  sociology relate to your work in reproductive epidemiology?

11  A.  Well, first, demography is one component of sociology.  And

12  I had training in demography in my Ph.D. program.  Reproductive

13  epidemiology is closely related to demography, so those are

14  relevant.  The training I received involved, of course, in

15  addition to demography, study design, data analysis, statistics,

16  the interpretation of the results of studies.

17  Q.  When did you begin working in the field of reproductive

18  epidemiology?

19  A.  When I joined the Alan Guttmacher Institute in 1979.

20  Q.  And could you tell the Court what the Alan Guttmacher

21  Institute is.

22  A.  Its name is changed now to the Guttmacher Institute.  It was

23  the Alan Guttmacher Institute when I joined.  It's a nonprofit

24  organization devoted to research, public education in -- on

25  reproductive health issues.

1  Q.  And what positions have you held at the institute?

2  A.  I -- I joined as a senior research associate.  I became the

3  deputy director of research in 1985.  And in the year 2000, I

4  retired from my full-time position and then became a senior

5  fellow, which involved basically consulting and a part-time

6  position.

7  Q.  And if I refer to the Guttmacher Institute as the institute,

8  will you understand what I'm referring to?

9  A.  Yes.

10  Q.  Where are you currently employed?

11  A.  I'm sorry?

12  Q.  Where are you currently employed?

13  A.  My hearing is bad, and the room is echoing.

14  Q.  I apologize.  What is your current occupation?

15  A.  Oh.  I am retired.  I do a little bit of consulting.

16  Q.  And can you tell us what kind of consulting work you do?

17  A.  Well, I'm still doing a little statistical work for the

18  Guttmacher Institute.  And the other things I do now are

19  reviewing research proposals for two organizations, a university

20  and the Society of Family Planning.

21  Q.  And what were your duties as the deputy director of research

22  at Guttmacher?

23  A.  I designed and conducted research, data collection, analyzed

24  the results, and wrote up research reports and supervised and

25  helped other researchers in the institute doing similar

1    research.

2    Q.  And did the research that you conducted include both

3    descriptive and causal studies?

4    A.  Yes.  We did all kinds of research.

5    Q.  And has any of your work related to analyzing the effects of

6    legal restrictions on abortion?

7    A.  Yes.  I have done research on the effects of legal

8    restrictions.  I worked on a project that involved looking at

9    the consequences of a law that required women to make two trips

10   to a clinic in order to access abortion services.  And another

11   example had to do with the effects of parental involvement for

12   minors seeking abortions.

13   Q.  And have you authored any publications?

14   A.  Have I what?

15   Q.  Have you authored any publications?

16   A.  Yes.  I have authored over 20 -- over a hundred

17   publications.

18   Q.  And have those been published in peer-reviewed journals?

19   A.  The large majority of them were published in peer --

20   peer-reviewed journals.  I've also authored book chapters,

21   textbook chapters, and encyclopedia entries.

22   Q.  And what are the subjects of those -- broadly speaking, what

23   are the subjects of those book chapters and encyclopedia

24   entries?

25   A.  Well, they almost all have to do with abortion services, the

1   statistics involving abortion and family planning services, and,
2   for example, the characteristics of women having abortions, all
3   those epidemiology related to abortion.
4   Q.  And can you name some of the peer-reviewed journals in which
5   your studies have been published?
6   A.  Well, I published articles in the *Journal of the American*
7   *Medical Association* and the *Perspectives in Sexual and*
8   *Reproductive Health*, a journal called *Population Research and*
9   *Policy Review*, and a journal called *Journal of Public Health*
10  *Policy*, and a number of other journals.
11  Q.  Now, in addition to these publications -- sorry.  You've
12  already answered that question.  Is there literature in your
13  field on the effects of legal restrictions on abortion?
14  A.  Yes.  There have been quite a few studies of the effects of
15  various abortion restrictions.
16  Q.  And are you familiar with that research?
17  A.  Yes.  I'm familiar with them.  I've done literature reviews
18  of three different kinds of restrictions of abortion.
19  Q.  And can you tell the Court -- is there a reason why you're
20  familiar with that research?
21  A.  Well, I'm interested in abortion services and accessibility.
22  Restrictions have an impact in some cases on the accessibility
23  of abortion services and family planning services.  So I have
24  done -- tried to keep up with the research in those fields.
25  Q.  And it was -- was it part of your responsibilities at

1   Guttmacher to keep on top of the research in that field?

2   A.   Yes, it was.

3   Q.   Dr. Henshaw, have you been a reviewer for any professional

4   journals?

5   A.   Yes.   I frequently review manuscripts that are submitted to

6   journals for publication.

7   Q.   And can you identify some of the journals for which you've

8   served as a reviewer?

9   A.   Well, again, the *Journal of the American Medical*

10  *Association*, *American Journal of Epidemiology*, *American Journal*

11  *of Public Health*, *Demography*, many other journals listed on my

12  resume.

13  Q.   And generally speaking, what is your role as a reviewer for

14  those journals?

15  A.   Well, the basic purpose is to advise the journal on whether

16  the manuscript should be published or not; but in more detail,

17  to advise the author and the journal about revisions that should

18  be made to make a better article.   So what you do is assess the

19  data that the -- the study was based on, the -- the research

20  design, the analysis of the data, and the conclusions drawn from

21  the data to make sure they are appropriate.

22  Q.   Dr. Henshaw, have you previously testified as an expert

23  witness?

24  A.   Yes.   I've testified in maybe 15 or 20 cases.

25  Q.   And has your testimony been accepted by other courts as

1  appropriate expert testimony?

2  A.  Yes.  In every case, my testimony was accepted as an expert

3  witness.

4  Q.  Dr. Henshaw, do you have a binder in front of you?  Could

5  you please open that binder to tab A and look at what's been

6  marked as Plaintiff's Exhibit Number 60.  Do you recognize that

7  document?

8  A.  Yes.  That's my CV from last summer.

9  Q.  And does that document reflect your qualifications,

10  education, and experience, at least as of last summer?

11  A.  Yes, it does.

12  Q.  And are there any additions to that document that are

13  relevant here?

14  A.  I believe there are a couple of publications that could be

15  added since that time.  And my position with the Guttmacher

16  Institute has changed.  I'm now simply a consultant.  I'm no

17  longer a senior fellow.

18      MR. BECK:  Your Honor, we tender Dr. Henshaw as an

19  expert in reproductive epidemiology pursuant to Federal Rule

20  702.

21      THE COURT:  Proceed.

22  Q.  Dr. Henshaw, could you turn to the next tab in the binder

23  and look at Plaintiff's Exhibits Number 61 and 62.

24  A.  Yes.

25  Q.  What is Plaintiff's Exhibit Number 61?

1   A.   61 is my expert report for this case.

2   Q.   And what is Exhibit number 62?

3   A.   Fifty -- 62 is a rebuttal report that I wrote after

4   Dr. Uhlenberg also made an expert report.

5   Q.   And do these documents accurately reflect the opinions you

6   formed in this case?

7   A.   Yes, they do.

8        MR. BECK:   Your Honor, plaintiffs move to admit

9   Plaintiff's Exhibits Number 61 and 62 into evidence.

10        THE COURT:   Admitted.

11  Q.   Dr. Henshaw, turning to your opinions in this case, did you

12  make any assumptions about which clinics in Alabama would stay

13  open and which would close if the law were to go into effect?

14  A.   Yes.   In thinking about this case, I assumed that the

15  clinics in Birmingham, Montgomery, and Mobile would be closed,

16  leaving two cities with clinics.   And that would be Tuscaloosa

17  and Huntsville.

18  Q.   Do you have an opinion regarding the effect that

19  discontinuation of abortion services in those three clinics

20  would have on abortion access in Alabama?

21  A.   Yes.   It would reduce access for women who live in the areas

22  of the clinics that closed, meaning that fewer of them would

23  actually be able to obtain abortion services that they would

24  otherwise want.   And it would act to delay some of the women who

25  would be able to obtain services because of the additional

1    distance they would have to travel.

2    Q.  So let's discuss the first of the opinions you just offered.

3    What's the basis for your opinion on the effect that

4    discontinuation of abortion services at those clinics would have

5    on Alabama women seeking abortions?

6    A.  Well, I have reviewed the literature.  And most of the

7    study -- almost all the studies find an association between

8    accessibility of abortion services and the number of women able

9    to make use of those services.  I have identified four studies

10   that I thought were particularly strong on -- on that topic.

11   And my -- my opinion is based primarily on those four studies.

12   Q.  And can you give the Court an example of one of the studies

13   you're referring to?

14   A.  The most clear-cut example is a study that was done of data

15   from Texas.  As background, in 2004, a law went into effect in

16   Texas that prohibited nonhospital facilities from doing

17   abortions past 15 weeks unless they were certified as ambulatory

18   surgical centers.  In 2003, there were nine counties in Texas

19   that had nonhospital facilities doing abortions past six -- past

20   15 weeks.  None of them were ambulatory surgical centers.  So in

21   2004, as of January 1st, there were no nonhospital facilities in

22   Texas that were able to provide those services.  So women in

23   Texas had to travel to neighboring states if they wanted -- if

24   they needed an abortion past 15 weeks.

25   Q.  And what did that change in distance that you just described

1   amount to in terms of numbers?

2   A.   Well, these two researchers, one from the National Bureau of

3   Economic Research, which is actually a conservative research

4   unit, looked -- studied the statistics on what happened in Texas

5   at that time.   They calculated the distance of the women living

6   in Texas from the nearest out-of-state facility that could

7   provide abortions past 15 weeks.   They found the distance was

8   252 miles on -- this is average for the whole state -- compared

9   with 2003, when clinics were available in the state, at which

10  time, the distance was I believe 33 miles.

11       These researchers obtained the individual-level abortion

12  data from Texas for all women having abortions in Texas for over

13  six years, from 2001 to 2006, and then did an analysis comparing

14  what happened before 2004 to what happened after 2004.   They

15  found that in 2004 -- well, they also collected data from the

16  neighboring states, where women could go out of state to get

17  later abortions.   Their -- what they found was that the number

18  of abortions for Texas residents past 15 weeks dropped from

19  about 3,800 abortions in 2003 to 1,300 abortions in 2004.   And

20  that's including the women who went out of state and also a

21  small number of women who obtained abortions in hospitals.

22       Both before and after the law went into effect, some

23  hospitals did abortions, evidently only in special cases,

24  especially in cases of fetal anomalies.   There were about 200

25  abortions a year -- or a little fewer than 200 in hospitals,

1  both before this law went into effect and afterwards, which

2  indicates that the hospitals did not make any move to fill the

3  gap that was left by the clinics that could no longer provide

4  the service.

5  Q.  And what was the exact magnitude of the decline in

6  percentage between 2003 and 2004 of women obtaining abortions

7  after 15 weeks?

8  A.  It was a decline of 69 percent.

9  Q.  And did the authors also look at the rates or numbers of

10 abortions before 15 weeks in Texas during this time?

11 A.  The authors were interested in ruling out any alternative

12 explanations of this fairly dramatic change.  So they made

13 several different analyses to try to eliminate any other

14 possible explanation.  One was to compare the rate of abortions

15 after 15 weeks to the trend in the rate before 15 weeks.  They

16 found that between 2001 and 2006, the abortion rate for women

17 below 16 weeks remained fairly constant -- it was a smooth

18 pattern, as would be expected -- in contrast to the rate of

19 women after 15 weeks, which was a sharp drop starting in 2004.

20 Then they -- that was within Texas.

21     To be doubly sure, then they compared the trends in

22 abortions past 15 weeks to the trends in three other neighboring

23 states:  Oklahoma, Arkansas, and Kansas.  And similarly, they

24 found no such change in the neighboring states anything like

25 what happened in Texas.

1    Then to be doubly sure, they made another comparison.   They

2  compared the trend in Texas to the trend in all of the states

3  for which they could get data, which was 32 states based on data

4  published by the Centers for Disease Control.   They eliminated

5  the states bordering Texas so that the Texas law wouldn't be

6  influencing the results.   And they found, again, that the

7  pattern was fairly smooth in the rest of the country, and Texas

8  was an outlier in the very sharp drop in 2004 in the number of

9  abortions that women were able to obtain past 15 -- 15 weeks.

10 Q.   Dr. Henshaw, if you could turn to tab D in your binder.   Is

11 Plaintiff's Exhibit Number 63 the study that you've been

12 discussing?

13 A.   I'm on tab D.   Yes.

14 Q.   Could you please turn to page 782 of that study and walk us

15 through what's depicted in the figures on pages 782 and 783?

16 A.   Figure 2A on page 782 shows the trends in abortions before

17 and after 15 weeks for women -- for minors, women age -- under

18 17.   The dark line that drops sharply is the number of later

19 abortions, and the gray line above that that does not show any

20 sharp change is the number of abortions at 15 weeks or below

21 obtained by minors in -- over this time period from 2001 to

22 2006.

23    As you can see, in the first quarter of 2004, there's a very

24 sharp drop in the number of abortions past 15 weeks.

25 Q.   And what about Figures 2B and 2C on the next page?

1  A.   Those figures show exactly the same pattern for different

2  age groups.   Figure 2B is for women 18 to 19, and Figure 2C is

3  for women 20 and over.

4  Q.   And could you please turn to page 785 of the study and

5  explain what is depicted in Figure 3B.

6  A.   Figure 3B?   Seven --

7  Q.   Correct.   Figure 3B.

8  A.   Yes.   This compares the abortion rate for women in Texas

9  compared with these other comparisons that the authors made.

10 The dark line shows what happened in Texas, which is a very

11 sharp drop in 2004.   The -- the gray line at the top is the

12 trend in the other 32 states for which data were available.   And

13 the gray line down below is the trend in the neighboring three

14 states.   So you can see that the pattern in Texas is quite

15 different from what you would expect based on the experience in

16 the rest of the country.

17 Q.   Dr. Henshaw, are you aware that the state's witness,

18 Dr. Uhlenberg, criticizes this study because he thinks the

19 authors failed to rule out the possibility that women seeking

20 later abortions after the law went into effect simply got them

21 before 16 weeks?

22 A.   Yes.   Actually, the authors looked into that, and they

23 tallied the number of abortions by single week of gestation.

24 And they did find that in 2004, the number of abortions at 15

25 weeks increased, but the increase was only a tiny percentage of

1  the decrease of the total number of later abortions.  They found

2  no such increase at earlier gestations, 14 and 13 weeks.

3       Now, the Uhlenberg thesis is that the number of abortions --

4  or one of his theses is that the number of abortions at 13 to 15

5  weeks and 16 and over would have dropped sharply.  And he bases

6  this on the fact that the number of abortions at 11 to 12 weeks

7  also -- I mean did drop between the earlier period and the later

8  period.  That -- unfortunately, that assumption has no basis.

9  There's no support for that kind of an assumption.

10      I actually looked at national data from that same time

11 period, comparing the three years before and the three period --

12 years after, and looked at the trend in those gestational ages.

13 I found that the number of abortions at 11 to 12 weeks

14 nationally fell by 3 percent and the number at 13 to 15 weeks

15 increased by 3 percent during that period.  I think that

16 demonstrates that knowing the number -- the trends in abortions

17 at 11 to 12 weeks does not provide a basis for assuming a

18 similar trend at later points in gestation.

19 Q.  And are there any characteristics of women seeking abortions

20 at 15 weeks or after as compared to women seeking earlier

21 abortions that also relates to the opinion you've just

22 expressed?

23 A.  Yes.  Let me add something to my previous answer.  The --

24 Joyce and Colman estimated for the number of years that -- the

25 three years after the law went into effect that -- they

 1   estimated that over 6,000 women who would have gotten abortions

 2   didn't do so.  And the -- this took into account the increase in

 3   the number of abortions at 15 weeks.

 4      Okay.  In answer to your new question, yes.  Joyce and

 5   Colman also noted that most women who have later abortions do so

 6   because they don't recognize their pregnancy earlier on, and

 7   that's why they're delayed.  And a lot of women also are delayed

 8   by the need to get together the money to pay for the abortion,

 9   arrange transportation, and find the clinic and make the

10   arrangements.

11      The knowledge -- if they did know that abortions were not

12   available past 15 weeks, there's no way that, for most women,

13   they could have sped up their access to abortion services and

14   succeeded in obtaining earlier abortions.  It doesn't seem

15   plausible that very many of the later abortions would have been

16   replaced by early abortions.

17   Q.  And do women have incentives to obtain earlier abortions?

18   A.  Well, that's another point.  Yes.  As it is now, women do

19   not like to delay getting an abortion.  They don't like to have

20   a more developed embryo or fetus.  If they delay, the cost of

21   abortion can go up.  If they delay past 12 weeks, each week of

22   delay increases the possibility of complications and, at certain

23   points, increases the cost.  So yes, as it is now, even without

24   this limitation in abortion accessibility, women are motivated

25   to try to obtain early abortions.

1  Q.  Dr. Henshaw, could you turn to page 788 of this study and

2  look at Figure 4B and explain what's depicted in that figure.

3  A.  Figure 4B shows the trend in Texas compared with other

4  states in the number of abortions before 16 weeks.  As you can

5  see, the top trend is Texas.  There's no big -- it's a very

6  steady line, as is the line for the three neighboring states and

7  the 32 states nationally.  If -- if all of the sudden in 2004,

8  many of the women who would have had later abortions instead had

9  earlier abortions, you would see an increase in 2004.  And in

10  fact, in Texas, you see really no change in 2004 compared with

11  the other states.

12  Q.  Now, does this study discuss whether any abortion providers

13  were ultimately able to comply with the Texas law and open up

14  ambulatory surgical centers to comply with it?

15  A.  Yes.  After three years -- two to three years, there were

16  four counties that were -- that had ambulatory surgical centers

17  that were able to provide later abortions.  And as a result of

18  that, the number of later abortions did increase by almost 50

19  percent.

20  Q.  And what is the relationship between that increase in the

21  number of later abortions and travel distance?

22  A.  Well, when the new clinics were created, the average travel

23  distance needed by Texas women declined again to I think 53

24  miles or 52 miles from 252 miles.  So there was a decline in the

25  need -- the travel distance along with the increase in the

1  number of women obtaining later abortions.

2  Q.  Now, Dr. Henshaw, how do you respond to the suggestion that

3  this study's findings on the effect of travel distance are

4  limited to restrictions on abortions at or after 15 or 16 weeks?

5  A.  The -- the findings have to do with the elimination of

6  abortion clinics.  And it really doesn't matter why that

7  happened.  It's the fact if you have fewer places where a woman

8  can go for the service, then you'll have greater distances they

9  have to travel, and some of the women will be unable to make

10  that -- that trip.

11  Q.  And is the Colman and Joyce study consistent with other

12  studies addressing the impact of travel distance even for women

13  at earlier stages of gestation?

14  A.  Yes.  Other studies I'm citing and other studies I'm not

15  citing all find a similar result for all gestations, not limited

16  to -- to later abortions.

17  Q.  What is your assessment of the quality of the Colman and

18  Joyce study?

19  A.  I would judge it an excellent study.  They did everything

20  possible that they could with these comparisons to show the

21  impact of the law and the -- to rule out any alternative

22  explanations of the drop.  And in fact, the study was awarded an

23  award as the best study in that journal in that year.  So others

24  obviously agreed that this is a high-quality study.

25  Q.  Now, are there other studies that show the relationship

1  between travel distance and abortion?

2  A.  Yes.

3  Q.  And can you describe one of those studies?

4  A.  One that I think is particularly useful took place in

5  Georgia in 1974 and 1975.  There were three scientists at the

6  Centers for Disease Control in Atlanta who were interested in

7  whether the distance from an abortion provider had an impact on

8  whether women were able to obtain abortions.  So they obtained

9  data on both births and abortions in Georgia for those years,

10  the individual-level data from the Georgia Health Department;

11  and then they calculated the ratio of abortions to births for

12  every county in the state.  Then they related that -- the

13  distance of that county -- of each county from Atlanta.

14      Now, Atlanta was the only place where there were abortion

15  clinics that could serve large numbers of women.  There were

16  some small providers scattered throughout the state, but they

17  were apparently a minor factor.

18      The result was they found a strong relationship between the

19  abortion ratio -- and by that, I mean the ratio of abortions to

20  births -- in each county with the distance of the county from

21  Atlanta.  The number, in fact, was for each ten miles of

22  additional distance, the abortion ratio declined by 6.7

23  abortions per thousand live births.

24      Then in -- they were interested in whether, well, maybe a

25  lot of these counties are rural and maybe rural women are

1  different from urban women and don't require abortion services

2  to the same extent.  So they repeated the analysis for

3  nonmetropolitan counties only.  And in this case, they found a

4  decline of five abortions per thousand live births for each ten

5  miles of additional distance from Atlanta.  So they concluded

6  that the rural women were influenced as well as urban women by

7  the distance from an abortion provider.

8  Q.  And were there any other parts of this study?

9  A.  Yes.  That was the first part.  Actually, probably the most

10 revealing analysis came in a comparison of 1974 to 1975.  In

11 1975, clinic -- early in 1975, clinics opened in two other

12 cities in Georgia:  Columbus, Georgia, in Muscogee County, and

13 Augusta, Georgia, in Richmond County.  And those counties are

14 about a hundred miles and 140 miles from Atlanta.

15      So the researchers looked at what happened to the abortion

16 ratios in those places after these clinics were established in

17 1975.  And they found, again, a very large, substantial increase

18 in the abortion ratio in those counties and also in the

19 surrounding counties.

20 Q.  And -- and what's the name of the study and the name of the

21 authors that you've just been describing?

22 A.  The authors were -- the name of the study is "Abortion

23 Utilization:  Does Travel Distance Matter?"  And the authors

24 were James Shelton, Edward Brann, and Kenneth Schulz.

25 Q.  And what takeaways or conclusions can you draw from the

1    Shelton study that you've been discussing?

2    A.  Well, the -- let me continue on the findings.  The -- you

3    can see from Table 3 of this study that the abortion ratios

4    increased 35 percent in Muscogee County, which is Columbus, and

5    40 percent in Richmond -- excuse me -- 47 percent in Richmond

6    County, which is Augusta.  And in the counties surrounding those

7    cities -- they tallied the change for the -- all the counties

8    within 50 miles.  And again they found similar increases, of 43

9    percent and 40 percent.

10        Now, they also found that even in -- in the rest of the

11   state, there was also an increase in the abortion ratio.  So one

12   can assume that even in the absence of these new clinics, the

13   abortion ratios might have increased in those counties.  That

14   increase was about 18 percent.  So if you take that into

15   account, it appears that these additional clinics succeeded in

16   increasing the abortion ratios by about 24 percent.

17        I'm sorry.  What was your question?

18   Q.  And so my question is what conclusion can you draw from the

19   Shelton study that you've just discussed?

20   A.  Well, the first conclusion is that distance from an abortion

21   provider makes a substantial difference in utilization of

22   abortion services and whether women are able to access services.

23   Another point is if you look at Figure 2 in the study, you can

24   see that the effect of being -- shorter distances is also

25   substantial.  For example, the difference between Fulton and

1    DeKalb counties, which are Atlanta, and counties that are only

2    like 50 miles away are substantially -- abortion rates for

3    nearby counties are substantially lower than the abortion rates

4    for Atlanta itself.

5        So it's really a curved -- they fit a straight line, but it

6    really should have been a curved line to reflect the effect of

7    distance to abortion utilization.  So my conclusion there is

8    that shorter distances and distances closer to abortion services

9    also make -- make a substantial difference.

10   Q.  And what is your assessment of the quality of the study

11   you've just discussed?

12   A.  I couldn't find any fault with it.  I think it was an

13   excellent study.

14   Q.  Does the fact that this study was conducted in 1976 impact

15   its usefulness, in your opinion?

16   A.  Not really.  I think distance is distance.  And distance

17   still makes a difference to people, just as it did then.  I'm

18   not saying the exact numbers are applicable now.  The number --

19   the situation now is somewhat different.  There may be a

20   stronger effect or a weaker effect.

21       One difference is that, overall, abortion patients now are

22   more impoverished than they were in the 1970s.  Then it was more

23   of a middle-class phenomenon.  Since then, middle-class women or

24   higher-class women have improved their contraceptive use.

25   Abortions now are primarily obtained by low income women.  And

1  so the distance might actually have more impact now.

2      On the other hand, cars go faster.  I don't know if more

3  people have cars or not.  I would assume that since people are

4  poor, there probably would not be a great change in the number

5  of women needing abortions who would have automobiles.

6  Q.  And you mentioned that there are a couple other studies that

7  you relied upon in forming your opinions in this case.  What is

8  one such study?

9  A.  Yes.  There was a study in Texas by Brown and others that

10  looked at data from 1993.  And again, they collected the

11  individual-level data on births and abortions on all births in

12  Texas and all abortions in Texas in that year.  And they related

13  this -- these -- they calculated a ratio for each county and

14  related that ratio to the distance from an abortion provider.

15  They obtained the information about where abortion providers

16  were located from the Guttmacher Institute.  And they found a

17  strong relationship.

18      Now, they were aware that there's a possibility that

19  abortion providers are located in places where there's more of a

20  demand for abortion.  And so one could think that possibly the

21  relationship was due to that factor, that abortion providers

22  were located where they were most needed.  So in order to

23  control for that, they used a statistical technique that

24  calculated the expected distance from -- of each county from an

25  abortion provider based on the data they had.  Then in the

1  regression, they included that calculation, that expected

2  distance.

3      So in effect, they were looking at the difference between

4  the expected difference and the actual difference from an

5  abortion provider.  In that way, they -- I think they eliminated

6  the possibly distorting effect of providers being in places

7  where they were most needed.

8      Now, what they found was a fairly significant effect that

9  for white women, the abortion ratio decreased by I believe 2.3

10  percent for each 10 percent increase -- no -- 2.3 abortions per

11  thousand births -- I would have to look that up -- for each

12  additional 10 percent increase in the distance from a provider.

13  Q.  Would it help to look at your expert report to remind

14  yourself of those figures?

15  A.  Well, if those figures are in it, yes.

16      I'm afraid those -- I didn't go into that detail with this

17  study in the expert report.  But anyway, yes.  And for Hispanic

18  women, there was a change of 5.0 for each 10 percent increase in

19  the distance.  And for black women, it was 2.7 percent.

20  Q.  And what conclusions do you draw from the Brown study?

21  A.  I should point out that those changes are changes in fairly

22  small distances since the average distance to provider for white

23  women was -- for women was between 19 and 29 miles.  So these

24  distance -- these changes were reflecting a difference of

25  maybe -- 10 percent of that is three miles.  So these -- these

 1  changes were reflecting a fairly small change in the distance

 2  from a provider.

 3      And to answer your question, yes, again, there's a strong

 4  influence of the distance of abortion -- of women from an

 5  abortion provider on whether they're able to access and utilize

 6  services.

 7  Q.  And you said that there was a fourth study that you thought

 8  was useful in your analysis here?

 9  A.  Yes.  There was a study of data from the state of

10  Washington.  And a person there observed that in the 1980s and

11  nineties, the number of rural providers was declining sharply.

12  So the researcher wanted to know whether that was having an

13  effect on whether rural women in the state were able to reach

14  abortion services.  So she combined data from 1983 and '84 and

15  then from ten years later, 1993 and '94.

16      Now, over that time period -- and she compared experience in

17  rural areas with urban areas.  Over that time period, the number

18  of rural providers declined from 19 to four.  And in the earlier

19  period, 25 percent of the rural women having abortions went to

20  rural providers; and in the later period, it fell to I think 3

21  percent.

22      So she then related that to changes in the abortion rate of

23  rural and urban women.  She found in both cases, abortion rates

24  were falling; but in urban areas, the abortion rate fell by 17

25  percent; but in rural areas, the abortion rate fell by 27

1   percent.  So an additional 10 percent decline in the rural

2   abortion rate appears to be related to the additional distance

3   women had to travel in order to -- to get to services.  And it's

4   an especially strong effect, considering that only 25 percent of

5   the rural women were using rural services to begin with, so --

6   and they're the ones who would be affected by the elimination of

7   the rural clinics.

8   Q.  And what conclusion can you draw from the Dobie study -- I'm

9   sorry -- from the study you just described?

10  A.  Well, I wanted to draw -- report another finding from that

11  study, which had to do with the gestational age.  There are a

12  number of studies that show that if women have to go a long

13  distance, they tend to be delayed and are more likely to have

14  later abortions.  And in this particular case, the authors found

15  that the rural women -- in the earlier period, 8 percent of

16  women both in urban and rural areas were having second-trimester

17  abortions.  And in the later period, it increased to 11 percent

18  among urban women, but it increased to 15 percent among rural

19  women.  And then to further check that, she looked for rural

20  women alone and found that in the later period, of women --

21  rural women who traveled less than 75 miles to a facility, there

22  were 10 percent who had second-trimester abortions; but for

23  those who traveled more than 75 miles, the figure was 21

24  percent.  The conclusion being that the greater distance has

25  actually delayed women from obtaining abortions when they wanted

1    to.

2    Q.   Now, are the four studies you've just discussed the extent

3    of the universe of the literature on these issues?  Are there

4    any studies -- other studies out there that address the impact

5    of travel distance on abortion utilization?

6    A.   Yes.  There are quite a few other studies that address

7    distance, and almost all of them find a correlation between

8    abortion accessibility and abortion utilization.  I just picked

9    out the ones I thought were the best.  I know of three studies

10   that, at least in part, found no association.  And in all cases,

11   I think there's an easy explanation for that.

12   Q.   And what is that explanation?

13   A.   In most cases, it's that the measure of abortion

14   availability was not appropriate.  There was a study by Rebecca

15   Blank, who -- who looked at changes over time in abortion rates

16   related to changes over time in other variables.  And one of

17   those other variables was what she considered abortion

18   availability.  But her measure of abortion availability was

19   simply the number of abortion providers in a state.  This

20   analysis, like many others, used the states as the unit of

21   analysis, collected data from all 50 states for each year over a

22   period of time.  And this particular analysis, it was from 1978

23   to 1988.

24        And she found no relationship between provider availability

25   and abortion rates, but her measure of provider availability

1  was -- was faulty in this case.  In that period, the large

2  majority of abortion providers only provided a very small number

3  of abortions.  Hospitals were counted if they did one abortion

4  for a genetic anomaly.  Some doctors were doing small numbers of

5  abortions in their offices.

6      Now, over that time period, the number of abortion providers

7  declined.  I looked up the numbers.  The number of abortion

8  providers declined by 6 percent, which makes it look like

9  abortion became less available.  But in fact, a better measure

10  of availability is the number of women who live in counties that

11  have a larger abortion provider, usually a clinic, a place that

12  advertises and accepts walk-in patients.  And over that same

13  period, the number of such clinics increased nationally.  And in

14  fact, the number of women who lived in a county that had a

15  larger clinic increased by 6 percent.  So what she was counting

16  as a decrease wasn't in fact a real decrease from the point of

17  view of the average involvement in the country.

18  Q.  And do the other studies that did not find a relationship

19  between travel distance and abortion access suffer from the same

20  methodological flaw?

21  A.  Yes.  One of them -- the study by Gohmann actually found a

22  relationship in his first model, but then he did a model over

23  time.  And he used a very peculiar measure of accessibility

24  which had to do with the ratio of metropolitan abortion

25  providers to nonmetropolitan providers.  And in effect, in

1    his -- by that measure, if you increase the number of

2    metropolitan providers, you would actually be decreasing

3    accessibility.  And not surprisingly, they found no

4    relationship.  And the authors themselves concluded that, well,

5    maybe they didn't have a good measure of accessibility.

6        Now, there's a third study, a study by Currie that also

7    found no relationship.  This was quite a different study.  It

8    utilized a large-scale survey, and it was a survey that asked

9    women, young women, several different times over a period of

10   time about their reproductive history and many, many other

11   questions, one of the questions being have you had an abortion.

12   And in this survey, something like two-thirds of the abortions

13   were not reported.  We know this by comparing the abortion rate

14   reported by the women who were surveyed with what we know

15   nationally was the abortion rate.  And this was a national

16   sample.  So in this study, there were not too many women who

17   reported abortions, and there was no relationship found between

18   being in a state that had more abortion providers, more counties

19   with providers, and having had an abortion.  But again, I don't

20   think you can put much -- much credibility in a study that's

21   based on a survey where most of the abortions are not reported.

22   Q.  So you've discussed a lot of data this morning.  Let's

23   actually apply this data to the circumstances at issue in this

24   case.  If the clinics in Montgomery, Birmingham, and Mobile were

25   to cease offering abortion services, what distance would women

1  in those cities need to travel to access an abortion in Alabama?

2  A.  Well, the Birmingham women are I think 60 miles from

3  Tuscaloosa, so they would have to travel an additional 60 miles.

4  The Montgomery women are, what, a hundred miles from Tuscaloosa.

5  To obtain an abortion in the state, they would have to travel a

6  hundred miles.  Women who live in Mobile are more like 200 miles

7  from Tuscaloosa, where the nearest in-state abortion provider is

8  located.

9  Q.  And given the research that you've just discussed, what

10  effects do you think that the increased travel distance would

11  have on women in and around these areas?

12  A.  Well, in all cases, there would be an impact of the

13  distance.  If the women would have to travel longer distances,

14  some of them would be delayed and some of them would not be able

15  to make the trip.

16  Q.  And how do you evaluate how many of them or what percentage

17  of them would be unable to make the trip, looking to these

18  studies?

19  A.  Well, for a hundred miles, I think a conservative estimate

20  would be what was found in the Georgia study, which is on the

21  order of 20 percent would not be able to make the trip.  And for

22  a shorter distance, for 60 miles, it would be something less

23  than that; but it would still be a substantial proportion of the

24  women who would otherwise want to get abortions.

25  Q.  And just to be clear, the Georgia study that you reference

 1  is the Shelton study that you were describing earlier concerning

 2  travel distance to Atlanta?

 3  A.   That's correct.

 4  Q.   Dr. Henshaw, did you consider the possibility of

 5  out-of-state travel in forming your opinion?

 6  A.   Yes.  I did look into that.

 7  Q.   And does the possibility of traveling out of state affect

 8  your opinion in this case as to the impact, the likely impact,

 9  of enforcement of the law?

10  A.   Well, women in Birmingham would be able to travel to

11  Columbus, Georgia.  Women in -- well, no.  Montgomery would be

12  able to travel to Columbus, and it would be closer than

13  Tuscaloosa.  And women in Mobile would be able to travel to --

14  it's 60 miles, about, to Pensacola, Florida, where there is a

15  clinic.  So it's likely that the women would go to those

16  directions, to those clinics.  Those are still a substantial

17  number of additional miles to where they have to go now to find

18  facilities in their home communities.

19  Q.   And according to the research you've discussed, would the

20  distances, say, from Montgomery to Columbus or from Mobile to

21  Pensacola, affect abortion access?

22  A.   Yes.  Those distances would definitely affect access.  And

23  also, I mean, in the long run, it's not clear that you can count

24  on those clinics to remain in -- remain open.  I know there was

25  a period in the past when Columbus had no abortion clinic.  And

1    I know that it was -- it's difficult in these areas, actually,

2    to provide services.  As you can see in Alabama, it's difficult

3    to do it.  And that's also true in Georgia and Florida.  The

4    Pensacola clinic has had a bombing and a murder, and it's not

5    clear that that clinic will always be available.

6    Q.  Now, Dr. Henshaw, what impact does increased travel distance

7    have on low income women in particular?

8    A.  The --

9            THE COURT:  Can I just interject a question here?

10           THE WITNESS:  Sure.

11           THE COURT:  Do you know what percentage, actual

12   percentage -- well, let me ask this.  Do we know what the

13   demographics are of women who get abortions today?  What are the

14   demographics, income, racially, whatever?

15           THE WITNESS:  Yes.  Forty-two percent of women

16   nationally having abortions have incomes below the poverty

17   level, which is about $11,800 for a single person.  So -- and

18   then another 27 percent have incomes up to twice that amount,

19   which would be, what, $23,000.  So that's a large majority of

20   women having abortions have low income.  Racially, something

21   like 35 percent are African-American, and something like

22   twenty-some percent are Hispanic.  Some 35 percent are

23   nonHispanic white.  So actually, at this point, minorities

24   constitute a majority of women having abortions.

25           Abortion is more common among younger women.  Teenagers

```
 1   account for, what, 15 or 18 percent, something like that.  Women

 2   20 to 24 account for a big chunk.  And as you get older, there

 3   are -- the abortion rate gets -- goes down, partly because women

 4   don't get pregnant as easily when they're older, partly because

 5   they use contraception better, and partly because they want

 6   children.  They're more likely to be married.  And married women

 7   are -- are better at using contraception and are more able to

 8   continue an unintended pregnancy if they do get pregnant.  So

 9   the abortion rate declines.

10            THE COURT:  You said teenagers.  You're talking about,

11   what, under --

12            THE WITNESS:  Under age 20.

13            THE COURT:  Pardon me?

14            THE WITNESS:  Under age 20.

15            THE COURT:  And you say it's 15 percent?

16            THE WITNESS:  I should know this, but I -- I don't have

17   the figures exactly.  It's probably -- it's between 15 and 20

18   percent.

19            THE COURT:  Is this written anywhere?

20            THE WITNESS:  Yes.

21            THE COURT:  Where?

22            THE WITNESS:  We --

23            THE COURT:  I mean these figures that you're giving me,

24   are they written anywhere?

25            THE WITNESS:  There's a couple of sources.  One is a
```

```
1   source published by the Centers for Disease Control every year
2   called the Abortion Surveillance in the United States.  The
3   latest one would be for 2010.  And they would have a pretty good
4   figure on the percentage of abortions for women of each age
5   group.
6             MR. BECK:  And Your Honor --
7             THE COURT:  Does Exhibit 68 show this?  I think there's
8   an objection to it, isn't there?
9             MR. BECK:  Yes, Your Honor.  That is Exhibit 68.
10            THE COURT:  And there's an objection to that exhibit,
11  is there not, Mr. Davis?
12            Does that exhibit show the demographics that I was
13  asking about?
14            MR. BECK:  I believe, Your Honor, it includes age but
15  not other demographic variables.
16            THE COURT:  It includes what?
17            MR. BECK:  I believe that it includes age but not other
18  demographic variables.
19            THE COURT:  Okay.  So there's nothing -- there is no
20  exhibit that reflects all demographics, statistical
21  demographics -- age, race, income, whatever else -- that both
22  sides can agree to?
23            MR. DAVIS:  Your Honor -- Your Honor, our records show
24  that Plaintiff's Exhibit 68 has been admitted.
25            THE COURT:  Oh, it does?  Okay.  Very good.  I just --
```

1  it just showed on your joint exhibit list that it had a hearsay

2  exception, but it may have been admitted.  That's true.  But is

3  there any document that shows these demographics that I could

4  look at?

5          MR. BECK:  I am not --

6          THE COURT:  All the demographics.

7          MR. BECK:  I'm not aware of a single document that

8  consolidates all the --

9          THE COURT:  Well, any combination.  Is there a group of

10 documents that show the demographics?

11         MR. BECK:  Dr. Henshaw may have the answer to that.

12         THE WITNESS:  I'm sure that the Alabama Department of

13 Health publishes the demographics for women having abortions in

14 Alabama.

15         THE COURT:  Well, that would be helpful in itself.

16         THE WITNESS:  Almost all states publish that.  Almost

17 all states collect the information, and they publish the basics.

18 But we know that maybe 80 percent are unmarried.  Between 18 and

19 20 or so percent are married.

20         THE COURT:  I don't need -- I don't want

21 approximations.  Do you know if --

22         MR. BECK:  Your Honor, many -- sorry.  I didn't mean to

23 interrupt.

24         THE COURT:  -- Ms. Ivie has this information or not?

25         MR. BECK:  Many of these exhibits are contained in

1    Plaintiff's Exhibit 20, which is an affidavit from Catherine

2    Donald that includes many of the figures you've been asking for.

3            THE COURT:  Catherine Donald is --

4            MR. BECK:  Catherine Donald is an employee of the

5    Alabama Department of Public Health.  And that's Plaintiff's

6    Exhibit Number 20.

7            THE COURT:  Do you have that exhibit?  Could I see it?

8            MS. FLEMING:  There is a hearsay objection to that.

9            THE COURT:  Oh, there is?

10           MS. FLEMING:  Yes, Your Honor.

11           THE COURT:  Thank you.

12           MS. FLEMING:  I thought we withdrew that.

13           MR. BECK:  I believe you withdrew that hearsay

14   objection.

15           THE COURT:  I've been told that the hearsay objection

16   may have been withdrawn.

17           MS. FLEMING:  I apologize, Your Honor.  That objection

18   was withdrawn.

19           THE COURT:  Yes.  Does someone have that document?

20           MS. GRIFFITH:  Yes, Your Honor.  I believe it's also in

21   one of the binders.

22           THE COURT:  If I could just see it a second.

23           MR. BECK:  May I approach, Your Honor?

24           THE COURT:  Yes.  What document are you handing to me?

25           MR. BECK:  This is Exhibit 20.

1          THE COURT:  Exhibit 20.  Great.  Thank you.

2          Go ahead while I look at this.

3          MR. BECK:  Yes, Your Honor.

4    Q.  (Mr. Beck, continuing:)  Dr. Henshaw, you were discussing

5    the impact or the likely impact of enforcement of this law on

6    low income women.  Why is it the case that low income women

7    would be affected by this law in a particular way?

8    A.  Well, low income women are especially affected by any

9    increase in cost or the cost of abortions.  We have several

10   studies that show that when low income women have their

11   abortions covered under a state fund or Medicaid, that they're

12   more likely to have an abortion than when that coverage is

13   eliminated.

14   Q.  And can you say more about those studies?

15   A.  The best study was conducted in North Carolina.  In North

16   Carolina, over a period of ten or 15 years, the state

17   appropriated an abortion fund especially devoted to paying for

18   abortions for poor women.  And there was a study --

19   unfortunately, for I think five of those years, the fund ran out

20   of money before the end of the year; and that meant that women

21   who needed abortions in November and December, whenever the

22   fiscal year ended, were unable to get support from the state.

23        So researchers put together the individual-level data on

24   abortions and births and determined that for women who needed

25   abortions during the period when the funds were exhausted were

1   more -- those women were more likely to continue their

2   pregnancies.  And in fact, 37 percent of the women who would

3   have terminated their pregnancies given if state funds were

4   available instead were forced to have -- give birth.

5   Q.  And could you state the amount in dollars that made the

6   difference between whether or not a woman -- these 37 percent of

7   women continued their pregnancies or were able to have

8   abortions?

9   A.  At that time, an abortion I think cost 200 to $250.  It's in

10  the article.  And I am not sure I remember that correctly, but

11  that's approximately the number that the authors mention.  They

12  in fact were surprised that such a small amount of money made

13  such a big impact on the women.

14  Q.  And were there any other studies that found -- or that

15  addressed a similar topic?

16  A.  There was a detailed study in 1980-81 looking at the impact

17  of the Medicaid cutoff in Georgia and Ohio.  And they found that

18  in Georgia -- they concluded in Georgia, 18 percent of the women

19  continued their pregnancies; and in Ohio, 23 percent.  And there

20  was also a study in Texas that found that 35 percent of women

21  who would have had Medicaid abortions instead continued their

22  pregnancies.

23  Q.  And can you just say what you mean by the Medicaid cutoff?

24  A.  That would -- when -- when -- after *Roe versus Wade* was --

25  came down, abortion was covered by state Medicaid programs

1    nationally.  And starting in around 1978, except for a period in
2    1980, in most states, Medicaid stopped covering abortion
3    services.  Some states did continue with state funds to cover
4    abortions under Medicaid.
5    Q.  And are there any other studies on the impact of costs on
6    abortion access outside of the public funding context?
7    A.  Well, there have been studies of why women are delayed in
8    getting abortions, and those studies all ask, what is the reason
9    for your delay.  And they have found that a substantial portion
10   of women say they're delayed by either the cost of arranging --
11   arranging for the abortion and the cost or the transportation
12   problem of getting to a clinic.  There were two studies we cited
13   that had figures on that.
14   Q.  And could you just summarize those figures?
15   A.  Yes.  I would like to look at my expert report for that.
16       Okay.  The one study that took place in 11 clinics found
17   that 26 percent of the women who wanted to have earlier
18   abortions said they were delayed by the time needed to acquire
19   the money to pay for the abortion.  And 17 percent were delayed
20   because there was no nearby clinic, and they had to arrange --
21           THE COURT:  May I interrupt you just a moment?  I'm
22   sorry.
23       (Off-the-record discussion)
24           THE COURT:  I hate to interrupt, but I think I need to
25   get the court reporter to fix what's gone wrong.

1              MR. BECK:  Yes, Your Honor.

2              THE COURT:  We're going to take our morning recess now.

3              MR. BECK:  Yes, Your Honor.

4              THE COURT:  Court is in recess for 15 minutes.

5         (Recess at 10:16 a.m. until 10:35 a.m.)

6              THE CLERK:  Please remain seated.  Court is in session.

7              THE COURT:  Proceed.

8              MR. BECK:  Your Honor, just a few points of

9    clarification on what you asked about before the break.

10             THE COURT:  Yes.

11             MR. BECK:  Exhibit Number 68, which is the CDC data,

12   contains information on race, ethnicity, age, and marital status

13   of abortion patients.

14             THE COURT:  Right.

15             MR. BECK:  Exhibit Number 20 --

16             THE COURT:  Right.  I've already looked at 20, and it

17   has it there as well.

18             MR. BECK:  Okay.  And then both the expert reports of

19   Dr. Henshaw and Dr. Katz cite -- page -- paragraph 13 of

20   Dr. Henshaw's expert report discusses rates of poverty among

21   abortion patients.  And that's reflected in both the testimony

22   of these two witnesses.

23             THE COURT:  Thank you very much.  Thank you.

24   Q.  (Mr. Beck, continuing:)  Dr. Henshaw, just a couple more

25   questions.  Before the break, you were discussing studies

1 showing the impact of cost on low income women's access to

2 abortion.

3 A.   Yes.

4 Q.   Given that research that you were discussing before the

5 break, what do you -- how do you apply that research to what

6 would take place in Alabama if the law were to go into effect?

7 A.   Well, the need for additional travel is an additional

8 expense for low income women, and any additional expense is

9 going to be a burden to some women.   It wouldn't have to be the

10 entire cost of abortion.   If the entire cost of abortion is a

11 fairly large impact, any additional expense is going to have an

12 impact on low income women.

13 Q.   And when you talk about an impact, can you just clarify what

14 kind of impact you're speaking about?

15 A.   That fewer would be able to access abortion services.

16 Q.   And is there any other impact that you predict would take

17 place in Alabama?

18 A.   Well, I also predicted the distance would cause delay,

19 probably more delay for low income women because it's more

20 difficult for them to arrange the transportation.

21 Q.   Thank you, Dr. Henshaw.

22        THE COURT:   Is there any way to measure the impact on

23 women without singling out low income women or women by race or

24 anything else?   Just is there a way to say what is this impact

25 on women in general?

1          THE WITNESS:  Well, the studies I quoted were not

2    limited to low income women.  They were all women.  And we --

3    they all identified an impact for women in general who were

4    seeking abortions without -- some of them did look separately at

5    race and other groups, but the figures I quoted applied to

6    everyone.

7          THE COURT:  But you seemed to have focused mainly on

8    low income women just a moment ago.  So what would any of these

9    factors -- how would they burden, if they would burden at all,

10   women in general rather than just focusing on low income women?

11         THE WITNESS:  Yes.  Well --

12         THE COURT:  Can you give me any assessment of that?

13         THE WITNESS:  Well, the studies would refer to all

14   women in general.  I quoted the low income issue in relation to

15   the study in Georgia because women now having abortions have

16   less income than they did in 1974 and '75.

17         THE COURT:  I remember your testimony to that effect.

18         THE WITNESS:  Yeah.

19         THE COURT:  But my question is if one were to assess

20   just the impact on women in general, what conclusions could you

21   reach without singling out low income women?

22         THE WITNESS:  My overall estimate was that the distance

23   would prevent some 20 percent -- a hundred-mile additional

24   distance would prevent some 20 percent of the women who would

25   have had abortions from getting services, and that -- that's not

1   limited to low income.  That's just of the whole group of women

2   in Alabama who need abortion services.

3            THE COURT:  What if you looked at non low-income women?

4   What would be the impact of women who did not fall -- what would

5   be the impact on women who do not fall into the low income

6   group?

7            THE WITNESS:  I think the impact would be less for

8   nonlow-income women.  It would be probably less than that

9   percentage I gave.  That's an average of all women together.  I

10  think if --

11           THE COURT:  Is there any way to measure the impact on

12  nonlow-income women?

13           THE WITNESS:  I don't have data specific to

14  nonlow-income women, so I would not be able to -- to measure

15  that.  Obviously, if you have enough income, you're going to get

16  services.  Before *Roe versus Wade*, women traveled to Puerto Rico

17  or England.  So if you have enough resources -- so if you have a

18  high enough income, these barriers are pretty easy to overcome.

19           THE COURT:  Anything else?

20           MR. BECK:  No, Your Honor.

21           THE COURT:  Ms. Fleming?

22                         CROSS-EXAMINATION

23  BY MS. FLEMING:

24  Q.  Good morning, Dr. Henshaw.  My name is Margaret Fleming.

25  I'm an Assistant Attorney General for the State of Alabama, and

1    I'm here representing the defendants.  And I have a few

2    questions for you.

3       Are you aware that the Planned Parenthood of the Southeast

4    voluntarily closed its Birmingham clinic in January of this

5    year?

6    A.   Did you say in Montgomery?  No.

7    Q.   Birmingham.

8    A.   Birmingham.  Oh.  Yes, I was aware of that.

9    Q.   And did that decision have an adverse impact on women in

10   Alabama seeking abortion?

11   A.   Yes, I'm sure it did.  There are many women in Alabama, even

12   with these clinics, who are not able to get abortion services

13   they would want.  And if you eliminate a clinic, more of them

14   will be disadvantaged.

15   Q.   To your knowledge, has the abortion rate in Alabama declined

16   since January of 2014?

17   A.   Could -- my hearing isn't good.  Could you repeat the

18   question?

19   Q.   Certainly, Doctor.  To your knowledge, has the abortion rate

20   in Alabama declined in the first five months of 2014?

21   A.   No.  I haven't looked at any data for Alabama.

22   Q.   Now, yesterday, Doctor, Dr. Roe, the medical director of

23   Planned Parenthood of the Southeast, testified that she has

24   allowed the Mobile and Birmingham clinics to operate in

25   violation of Department of Public Health rules.  In your

1  opinion, does that have a negative impact on women seeking

2  abortion in Alabama?

3  A.  If I understood your question, the clinics remain open.  And

4  that does not have an impact as long as the clinics are open.

5  Q.  Do you know if Alabama Department of Public Health is the

6  regulatory agency responsible for licensing of abortion clinics

7  in Alabama?

8  A.  No.  I know nothing about that.

9  Q.  Do you know the -- how large the land area of Alabama is

10  compared to the land area of Texas?

11  A.  The land area of Alabama compared to Texas?  It's smaller.

12  I couldn't say the amount.

13  Q.  Is it half the size?  A tenth the size?  Do you have an

14  idea?

15  A.  I wouldn't be able to say.

16  Q.  Do you know how large the metropolitan area of Birmingham

17  is?

18  A.  No.

19  Q.  Do you know whether it extends all the way to Tuscaloosa?

20  A.  I don't know.

21  Q.  Where is Tuscaloosa located in reference to Birmingham,

22  Doctor?

23  A.  It's to the northwest, I believe.  I'm not an expert on the

24  map of Alabama.

25  Q.  And do you know what the most affluent area of Birmingham

1  is --

2  A.  No.

3  Q.  -- geographically?

4  A.  Excuse me?

5  Q.  Geographically, do you --

6  A.  Geographically, no.

7  Q.  Do you know what the most impoverished area of Birmingham

8  is --

9  A.  No, I don't.

10  Q.  -- metropolitan Birmingham?

11  A.  No, I don't.

12  Q.  Might that not be relevant in determining whether there is a

13  burden placed on women and what that burden might be in

14  requiring impoverished woman to drive to Tuscaloosa?

15  A.  My testimony had to do with the effect of distance for women

16  in general.  I did not look into particular areas or where women

17  live.

18  Q.  But it might be relevant to know the size of the

19  metropolitan area of Birmingham relative to Tuscaloosa, might it

20  not, Doctor?

21  A.  I don't think so.

22  Q.  Are you saying, Doctor, that if the metropolitan area of

23  Birmingham extends to within ten miles of Tuscaloosa, that would

24  not be relevant in your analysis?

25  A.  I don't think so.  What's relevant is how far women have to

1    travel.

2    Q.   Correct.  And have you done any studies that would help us

3    to understand how far a woman in Alabama seeking an abortion

4    would have to travel if the clinic in Birmingham closed -- or

5    now that the clinic in Birmingham has closed?

6    A.   I think if you look at a map, you can see how far women have

7    to travel from any particular county.

8    Q.   Do you have any idea, Doctor, in the last year how many

9    women who had abortions in Alabama resided in the metropolitan

10   Birmingham area?

11   A.   No, I don't know.

12   Q.   Do you have any idea how many of those women, if any,

13   resided in the metropolitan area of Mobile?

14   A.   No, I don't.

15   Q.   Or the metropolitan area of Montgomery?

16   A.   No.  I haven't looked at that.

17   Q.   Did you do any studies, Doctor, that would tell us how many

18   of the women who obtained abortion in Alabama were actually

19   Alabama residents?

20   A.   No.  I haven't looked at that.

21   Q.   During any year?

22   A.   No.

23   Q.   Now, I'll represent to you, Doctor, that Dr. Mary Roe, the

24   medical director of the Planned Parenthood of the Southeast

25   affiliates, has testified that women who obtain abortions in

 1    Planned Parenthood clinics in Mobile and Birmingham usually

 2    travel from out of state or from two to three hours away.  Do

 3    you have any evidence, Doctor, that would dispute that

 4    testimony?

 5            MR. BECK:  Objection, Your Honor.  That

 6    mischaracterizes the testimony.

 7            THE COURT:  How does it mischaracterize?

 8            MS. SANDMAN:  If I may, Your Honor?

 9            THE COURT:  Yes.

10            MS. SANDMAN:  Your Honor, there was a back and forth

11    about her testimony.  The precise words that she used during her

12    deposition did include what the state has just indicated;

13    however, on redirect, she indicated that in that testimony, she

14    was not being precise about her word choice and was not

15    intending to characterize it as more than half.

16            THE COURT:  Right.  I think the questions turned on the

17    word "usually," if I remember correctly.

18            MS. FLEMING:  Yes.  Yes, Your Honor.

19            THE COURT:  Why don't you just ask him whether that is

20    true or not rather than asking him to comment about how she used

21    it.  In other words, I'll resolve what she meant ultimately, but

22    you can pose the question to him, is it -- pose the question to

23    him, is it true that women usually.  Then I'll decide later

24    whether I -- how I want to characterize it.

25            MS. FLEMING:  I'll be happy to do that, Your Honor.

1    Q.  Dr. Henshaw, is it true that women in Alabama who obtain

2    abortions usually travel out of state or two to three hours away

3    from a clinic to obtain an abortion?

4    A.  That question I didn't understand.  You said women who

5    obtain abortions in Alabama usually travel out of state.  You

6    mean most women having abortions in Alabama come from other

7    states?

8    Q.  Let me rephrase, Doctor.

9          THE COURT:  Right.  It was confusing.

10   Q.  Let me rephrase, Doctor.  Is it true that women obtaining

11   abortions in Alabama usually travel to the clinics in Birmingham

12   and Mobile -- I'm speaking of these two clinics -- usually

13   travel to clinics in Birmingham and Mobile from out of state or

14   from two to three hours away?

15   A.  I think that would be unusual.  I have no data on that

16   particular topic.  From my experience, I think it would be

17   unusual if a majority of women having abortions in those places

18   traveled from out of state or two to three hours away, but I --

19   as I say, I can't testify specifically because I don't have data

20   on that topic.

21   Q.  So, Doctor, if that is in fact the case, if the reality in

22   Alabama is that women who obtain abortions in Birmingham and

23   Mobile usually travel from out of state or from two to three

24   hours away, would that change your opinion to the Court?

25   A.  No.  My opinion applies to those who do at present or would

1   have to travel an additional hundred miles.  So it would -- my

2   testimony would apply to women who live in the parts of

3   Birmingham and Montgomery that are 60 or a hundred miles away

4   from the clinic in Tuscaloosa.  Those are the women I'm

5   referring to.  Those who have to travel an additional 60 miles

6   would also be affected or 50 miles or 30 miles, even.

7   Q.   Yes, Doctor.  But you recall you actually gave a percentage

8   to the Court, a percentage of women that would be affected if

9   they had to drive additional distances, did you not?

10  A.   That's correct.

11  Q.   Would that percentage not be altered if more than half of

12  the women obtaining abortions in the state were already

13  traveling from either out of state or from two to three hours

14  away?

15  A.   No.  My percentage applies to those who have to travel an

16  additional hundred miles.

17  Q.   And what percentage of women obtaining abortions is that,

18  Doctor?

19  A.   I have no -- I don't know, for Alabama, how many -- what

20  percentage of Alabama women live in places that are more than a

21  hundred miles from Tuscaloosa or Huntsville.

22  Q.   So the answer is you really don't know?

23  A.   That's correct.

24  Q.   Are you aware, Doctor, that Dr. A is currently being sued

25  for malpractice arising from a failure to diagnose an ectopic

1  pregnancy of a patient in Birmingham -- a patient at a

2  Birmingham abortion clinic?

3  A.  Could you repeat the question?  I'm sorry.  I'm having

4  trouble hearing you.

5  Q.  Yes, sir.  Are you aware that Dr. A is currently being sued

6  for malpractice arising from his failure to diagnose an ectopic

7  pregnancy in a patient at a Birmingham abortion clinic?

8  A.  No, I am not aware of that.

9  Q.  Have you done any study or research that takes into account

10  the professional reputation of a physician performing an

11  abortion as it relates to a woman's decision to travel instead

12  of obtaining an abortion locally?

13  A.  No, I haven't.

14  Q.  In your professional opinion, might the professional

15  reputation of a physician performing abortions at a Birmingham

16  clinic influence a woman's decision to travel to a different

17  clinic?

18  A.  Well, if I can give a professional opinion, I would say a

19  small -- very small proportion of women might be influenced by

20  that.  In my experience, they're more influenced by the

21  convenience, the -- of the clinic and the other economic factors

22  rather than any concern about quality.

23  Q.  Are you aware that Dr. P2 was recently indicted by the

24  federal government for Medicaid fraud and for introducing

25  misbranded drugs into interstate commerce?

1    A.   No, I'm not aware of that.

2    Q.   Assume an article was published in the newspaper in the city

3    where Dr. P2 has an OB-GYN practice.  Do you think a woman

4    residing in the same metropolitan area as Dr. P2 would be more

5    likely than another woman to know the reputation of Dr. P2?

6    A.   If this information is published locally, then I think it's

7    more likely the local women would have the information.

8    Q.   Do you think that Dr. P2's indictment and publicity

9    surrounding it might influence a woman's decision to travel a

10   greater distance to obtain an abortion?

11   A.   As I say, I don't have specific information or data.  In my

12   judgment and experience, I think relatively few -- a very small

13   proportion of women seeking abortion services know about the

14   quality of the service they're looking for or take that really

15   into account.

16   Q.   And on what data do you base your opinion, Doctor?

17   A.   As I say, this is my professional opinion based on knowing

18   abortion providers and talking to people and knowing that women

19   tend to go to a nearby clinic in general.

20   Q.   How many patients or how many people in Alabama did you talk

21   to, Doctor?

22   A.   I haven't spoken to people in Alabama about this topic.

23   Q.   Are you aware that the Planned Parenthood in Birmingham

24   clinic was recently shut down because the clinic sold

25   abortion-inducing drugs to persons without prescription in the

1  parking lot?

2  A.  Yes, I am aware of that.

3  Q.  Are you aware that such activity in against the law in

4  Alabama?

5  A.  Yes.  I would assume that.

6  Q.  Do you believe that a woman residing in the Birmingham

7  metropolitan area is more likely to know the reputation of the

8  Birmingham clinic doctors and staff than a woman residing out of

9  state or 200 or 300 miles away?

10  A.  I would assume that's true.  It's not something I have

11  expert knowledge about, but I would assume it was true.

12  Q.  Might the reputation of the Birmingham clinic influence a

13  woman's decision to travel to another clinic, say one in

14  Tuscaloosa, rather than seek an abortion in the Birmingham

15  clinic?

16  A.  I think a very small minority of women would be influenced

17  by the reputation of the local clinic.  I think a majority of

18  women, first, wouldn't know and, second, if they did know, would

19  know that abortion is a very safe procedure and the risk is low

20  in any case.  I think very few would want to travel a long

21  distance for a clinic that they thought might have a better

22  reputation.

23  Q.  Doctor, my question to you was might that influence a

24  woman's decision.

25  A.  Almost anything can happen.  Sometimes it might, under rare

1  circumstances.

2  Q.  So your answer is yes, Doctor?

3  A.  Excuse me?

4  Q.  Your answer is yes?

5  A.  I -- I think my answer was clear.  It might influence, on

6  rare occasions, some women.

7  Q.  Are you aware that the plaintiff's three clinics are located

8  in the three largest cities in Alabama?

9  A.  Yes.

10  Q.  And how do you explain the fact that more than half of the

11  abortions in Alabama are performed at the other two clinics, in

12  Tuscaloosa and Huntsville?

13  A.  You would have to look at the populations of the areas

14  they're serving and whether they are serving people from out of

15  state.

16  Q.  Are you aware that the Tuscaloosa and Huntsville clinics

17  employ physicians who reside in the same community as the

18  clinic?

19  A.  I think I knew that.

20  Q.  And are you aware that the Birmingham, Mobile, and

21  Montgomery clinics employ physicians who are itinerant

22  physicians who do not reside in those communities?

23  A.  No, I wasn't really aware of that.

24  Q.  Are you aware that the Huntsville clinic advertises on its

25  Web site that it employs a physician with hospital admitting

1  privileges?

2  A.   No.   I haven't looked at their Web site.

3  Q.   Might that influence a woman's decision to trans- -- to

4  travel to Huntsville or to Tuscaloosa rather than obtain an

5  abortion in a more convenient location?

6  A.   I think on rare occasions, it might influence some women.

7  Obviously, the clinic thought it would -- would influence women

8  or they wouldn't have put it on their Web site.

9  Q.   Are you aware, Doctor, that the statistics that are

10  generated in the reports that you referred to earlier -- those

11  statistics are for all women who obtained an abortion in Alabama

12  regardless of their state of residency?

13  A.   Yes.   I'm sure Alabama collects statistics on all women.

14  Not necessarily all are reported, but probably the very large

15  majority.

16  Q.   And do you have any data about the percentage of the women

17  obtaining abortions in Alabama that are Alabama residents?

18  A.   I have that information, but I don't have it in my memory.

19  I think it's -- I think it's over -- I think it's like 91 or two

20  percent, but I don't have the data at hand.

21  Q.   Where did you obtain that data, Doctor?

22  A.   That would be from the Centers for Disease Control

23  publication called Abortion Surveillance United States.   They do

24  it for each year.   The latest one would be 2010.

25  Q.   What percentage of women obtaining abortion in Alabama are

1  married?

2  A.  I haven't looked up that statistic.

3  Q.  The report that was submitted, Plaintiff's Exhibit 20,

4  suggests that in 2011, that number was 1,000 married women

5  obtaining abortion as opposed to 9500 total abortions in the

6  state.  Do you know if that statistic is correct?

7  A.  It sounds reasonable compared to national figures in

8  other -- other states.

9  Q.  Would you agree, Doctor, that the National Abortion

10 Federation is a trade association of abortion clinics that is

11 concerned about making abortion services available as much as

12 possible?

13 A.  That's one of its concerns.  I think its major concern is

14 the quality of care and giving providers an opportunity to share

15 experiences with each other.

16       MS. FLEMING:  Could I have Dr. Henshaw's deposition at

17 page 26?

18 Q.  Doctor, let me refer you to line 15 on the deposition

19 transcript in front of you.  You were asked what is the National

20 Abortion Federation.  Would you give us -- read us your answer,

21 please.

22 A.  I said, It's fundamentally a trade association of abortion

23 clinics, but it's a little broader than that in that it's also

24 concerned about making abortion services available as much as

25 possible.

1  Q.  What statistical research have you done, Doctor, to

2  determine the actual distance traveled by any woman in Alabama

3  seeking -- who has obtained an abortion in the last three years?

4  A.  I have not looked at the distance women travel in Alabama

5  for abortion services.

6  Q.  Did you review any patient records of any of the patients --

7  A.  No.

8  Q.  -- in plaintiffs' clinics?

9  A.  No, I didn't.

10  Q.  Are your expert opinions in this case based upon a premise

11  that women in Alabama seeking an abortion will always travel to

12  the closest clinic?

13  A.  It assumes they usually travel to the closest clinic.

14  Q.  But you have not collected any research in this case to

15  support that premise?

16  A.  No, I haven't.

17  Q.  Are your expert opinions in this case based upon a premise

18  that the abortion rate among Alabama women is evenly dispersed

19  based upon population?

20  A.  I'm sorry.  Could you repeat it?

21  Q.  Are your expert opinions in this case based upon a premise

22  that the abortion rate among Alabama women is evenly dispersed

23  based upon population?

24  A.  Is evenly dispersed based on population?

25  Q.  Correct.

1    A.   I don't think my testimony relies on an assumption like

2    that.

3    Q.   Now, Doctor, if there is a woman who is traveling to Alabama

4    from Georgia to obtain an abortion, would it be a violation of

5    the Georgia woman's constitutional rights to require her to

6    obtain an abortion in Georgia rather than traveling the extra

7    two to three hours to come to Alabama?

8    A.   That's a legal question.  I don't think I'm qualified to

9    answer that.

10   Q.   Are there any sociological reasons why a woman might prefer

11   to travel out of town to obtain an abortion?

12   A.   It has been said that some women want to go to a place

13   farther from where they live in order to assure anonymity.  What

14   little actual information I've seen on that topic does not

15   support it.  I'm sure it's true sometimes, but I think it's a

16   rare phenomenon.

17   Q.   Doctor, would you agree with me that -- agree with me that

18   the stigma attached to abortion is different in different areas

19   of the country?

20   A.   Yes, I would.

21   Q.   Do you have an opinion as to the degree of stigma associated

22   with abortion in the state of Alabama?

23   A.   It's probably above average for the country.  I don't have

24   specific data on that, though.

25   Q.   And do you think that the stigma attached to abortion might

1    cause a woman to travel away from home seeking an abortion?

2    A.   I think that happens in a situation where the woman thinks

3    she might run across people she knows at the abortion facility.

4    It's more characteristic of a small town than it is a large

5    metropolitan area.   I -- I would think that women in a large

6    metropolitan area would generally not choose to leave that area

7    for abortion services because, in general, the chances of them

8    running into somebody they know would be small.

9    Q.   Do you know how large the metropolitan area of Montgomery is

10   by population, Doctor?

11   A.   No, I don't.

12   Q.   Do you know what the chances of a woman running into a

13   neighbor at any location in Montgomery might be?

14   A.   No, I don't.

15   Q.   Might a woman be afraid of losing her job if her employer

16   learned that she had obtained an abortion?

17   A.   I've never heard of that happening.   I've never -- and I

18   don't know any data on that.

19   Q.   You don't know whether that has ever happened in Alabama?

20   A.   I don't know if that's happened in Alabama.

21   Q.   Might a woman be afraid she might be subjected to violence

22   if a pro-life relative discovered that she had had an abortion?

23   A.   I haven't heard of that.   The only exception would be a

24   teenager not wanting their pro-life parents to know.   I've heard

25   of violence happening in that situation.   Other relatives, no, I

1  haven't heard of.

2  Q.  But you have heard of violence happening in that situation?

3  A.  Yes, between parents and teenagers.

4  Q.  For that reason, might a woman choose to go to have an

5  abortion out of town a further distance away from her home?

6  A.  That would be true only, as I said, if she felt there was a

7  significant danger that someone would know that she was having

8  an abortion.  Many -- many facilities have various services --

9  for example, many Planned Parenthoods have mainly family

10  planning patients.  So a woman going there would not necessarily

11  be identifying herself as an abortion patient.

12  Q.  That would certainly be true in the Tuscaloosa or Huntsville

13  clinics that offer a broad array of services.  Isn't that true?

14  A.  I don't know what services they offer, so I can't testify

15  about that.

16  Q.  Have you reviewed any of the transcripts of testimony in

17  this case?

18  A.  Not of testimony in the trial, no.

19  Q.  But deposition testimony, you have?

20  A.  No, I didn't.  I didn't read the deposition testimony.

21  Q.  So you have not read descriptions of abortion protests and

22  heard stories of violence directed at abortion providers?

23  A.  That's correct.  I haven't read that.

24  Q.  Do you have any idea how long it takes to drive from

25  Birmingham -- the center of Birmingham to the center of

1  Tuscaloosa?

2  A.  I don't recall exactly.

3  Q.  Do you know how long it takes to drive from the Atlanta

4  airport to Marietta, Georgia?

5  A.  No, I don't.

6  Q.  Do you know the circumference in miles of the metropolitan

7  area of Birmingham?

8  A.  No, I don't.

9  Q.  Or Montgomery?

10  A.  No.

11  Q.  Or Atlanta?

12  A.  Atlanta?  No.

13  Q.  If the clinic in Mobile were to close, would it be

14  reasonable to assume that a Mobile woman seeking an abortion

15  would travel to Pensacola to obtain an abortion?

16  A.  I think that would be reasonable, that many of the women

17  would travel to Pensacola, assuming Pensacola can expand its

18  services to accommodate those women.

19  Q.  And in general, do you think a woman seeking an abortion

20  would probably go to the city nearest with an abortion facility?

21  A.  Could you repeat that?

22  Q.  In general, do you think that a woman seeking an abortion

23  would probably go to the nearest city with an abortion facility?

24  A.  In general, yes.

25  Q.  You are not expressing an opinion in this case, Doctor, as

1  to the medical necessity of requiring abortion providers to have

2  hospital admitting privileges, are you?

3  A.  I have an opinion, but I don't have expertise, so I would

4  not want to offer an opinion.

5  Q.  And your testimony in this case hinges on your assumption

6  that abortion clinics in Birmingham, Mobile, and Montgomery,

7  will be forced to close?

8  A.  Yes.  That's correct.

9        MS. FLEMING:  May I have a brief moment to confer, Your

10  Honor?

11        THE COURT:  Yes.

12    (Brief pause)

13        MS. FLEMING:  Just -- just a couple more things, Your

14  Honor.

15        THE COURT:  While you're doing that, I have a couple of

16  questions.

17        MS. FLEMING:  Would you like to -- I'm sorry.  Would

18  you like to go, Your Honor?

19        THE COURT:  No.  Were you just about to ask another

20  question?

21        MS. FLEMING:  Yes, Your Honor.

22        THE COURT:  Go ahead.

23  Q.  Is it true, Doctor, that you have assumed that abortion

24  clinics would not be able to hire other doctors in order to come

25  in and meet the -- meet the admissions requirement?

1    A.  Well, I'm not an expert on what would happen in Alabama.  I

2    do know that many clinics have had difficulty hiring physicians

3    and that it is difficult to hire a physician in Alabama who

4    would do abortions.

5    Q.  How did you get that knowledge?

6    A.  From the fact that the clinics have not been able to hire

7    local people and the fact that there are so few providers in

8    Alabama.  If there were doctors who wanted to do abortions,

9    there would be -- it's a big state, and there used to be more

10   providers.  There would be more doctors offering the service.

11   Q.  Have you done any research to support that theory?

12   A.  We know that there used to be more providers in the state.

13   And we know that in states where doctors are more willing to do

14   abortions, there are more abortion facilities.  Yes, I've done

15   that research.

16   Q.  How many days a week does the abortion clinic in Birmingham

17   offer abortions, Doctor?

18   A.  I don't know.

19   Q.  How many days a week does the abortion clinic in Mobile

20   offer abortions, Doctor?

21   A.  I don't know.

22   Q.  Do you know whether those clinics are operating five days a

23   week, providing abortions five days a week?

24   A.  No, I don't know.

25   Q.  Do you know whether they're providing abortions one day a

1  week?

2  A.   I don't know.

3  Q.   So you really have no knowledge about whether the number of

4  facilities in Alabama is sufficient to provide the number of

5  abortions that women desire in the state?  Is there a scarcity

6  of abortion clinics in Alabama based on demand, Doctor?

7  A.   It's my understanding that the clinics that exist now are

8  able to serve the patients who come to them for services.

9  Q.   I'll represent to you, Doctor, that the abortion clinic in

10 Birmingham was providing abortion services one day per week.

11 A.   I'm sorry.  What's the question?

12 Q.   I will represent to you, Doctor, that the testimony has been

13 that the abortion clinic in Birmingham was supplying abortion

14 services to women on one day per week.  Do you have an opinion

15 as to whether that clinic could handle more volume?

16 A.   I think you'd have to ask the clinic whether they could

17 handle more volume.  There's a good chance they could; but

18 certainly, I can't testify to that.

19 Q.   And you're not testifying that any clinic in Alabama could

20 not handle more volume of abortions?

21 A.   No.  That's correct.

22 Q.   Now, the Texas study was done, Doctor -- do I understand

23 correctly it was done to determine what the impact on the

24 Women's Right to Know Act had on abortions in that state?

25 A.   I believe that's the act that required abortions after 15

1   weeks to be performed in an ambulatory surgical center.   If

2   that's correct, then yes.

3   Q.   Do you understand what the Women's Right to Know Act did in

4   Texas?

5   A.   It had a couple of provisions, one of which had to do with

6   counseling requirements and at least one of which had to do with

7   the ambulatory surgical center requirement.

8   Q.   Now, the counseling requirement, Doctor, was that enacted

9   because the legislature in Texas felt that women receiving

10  abortions did not receive adequate information about abortions

11  prior to their procedures?

12  A.   I can't testify about the motivations of the Texas

13  Legislature.   If I were to speculate, I would say it's mainly

14  their interest in making abortion more difficult for women to

15  obtain, but they could have had any motivation.

16  Q.   Did the act itself require abortion providers to provide

17  additional counseling and information to women in advance of

18  performing abortion procedures?

19  A.   I believe so.

20  Q.   And what interviews have you conducted to determine how many

21  of those women decided not to have an abortion because they had

22  changed their minds?

23  A.   I have not conducted such interviews, but you can see that

24  there was no change in the number of earlier abortions in Texas,

25  so that the authors of the Texas study concluded that that

1  aspect of the regulation had little impact.

2          MS. FLEMING:  Nothing further, Your Honor.

3          THE COURT:  I just have a few -- two quick questions.

4  The first one is you talked about a lack of a statistically

5  significant relationship between two variables.

6          THE WITNESS:  That's correct.

7          THE COURT:  Is that proof or evidence that there is no

8  actual relationship whatsoever between the variables or what?

9          THE WITNESS:  It means there wasn't a large enough

10  correlation to be detected by the study design and the sample

11  size.  There could have been a relationship or correlation that

12  was not identified.

13          THE COURT:  So you don't know whether it means there's

14  no actual relationship or there just could have been a

15  relationship?

16          THE WITNESS:  That's correct.

17          THE COURT:  Now, you mentioned that the relationship

18  between distance and abortion rate would fit a curved line

19  better than a straight line.

20          THE WITNESS:  That's correct.

21          THE COURT:  I have no idea what you're talking about.

22          THE WITNESS:  Oh.  If you look at the --

23          THE COURT:  You have to tell me what a curved line

24  is --

25          THE WITNESS:  A curved line would look --

1          THE COURT:  -- as opposed to a straight line.

2          THE WITNESS:  The straight line is --

3          THE COURT:  I know that.  But I mean what's the

4    meaning?  What's the significance of it?

5          THE WITNESS:  Oh.  The meaning is that the additional

6    ten miles for a county that's close to the provider has a

7    greater impact than an additional ten miles at a 200 to 210.  In

8    other words, 200 to 210 miles makes less difference than 50 to

9    60 miles.

10         THE COURT:  Well, what's the significance of a curved

11   line as opposed to a straight line?  Is there something

12   statistically meaningful in that, that you said it was a curved

13   line rather than a straight line?

14         THE WITNESS:  Well, it's meaningful only in that point,

15   that it's steeper closer to the abortion facility so that the

16   ten miles makes more difference at that point than it does later

17   on to a county that's a hundred or 200 miles away.

18         THE COURT:  If it had been a straight line, what would

19   have been the significance?

20         THE WITNESS:  It means ten miles from 20 to 30 has the

21   same impact as ten miles from 200 to 210.

22         THE COURT:  Right.  So a curved line means you have a

23   greater drop or whatever it is.

24         THE WITNESS:  That's correct.

25         THE COURT:  Okay.  I understand now.

1        Anything else?

2            MR. BECK:  Yes, Your Honor.  Just a few questions.

3            THE COURT:  Okay.

4                    REDIRECT EXAMINATION

5    BY MR. BECK:

6    Q.  Dr. Henshaw, you were asked about whether the abortion rate

7    declined in Alabama for the first five months of 2014.  Do you

8    remember that question?

9    A.  Yes, I do.

10   Q.  Are you aware of whether any data exists on that issue?

11   A.  It's possible that the Alabama health department has such

12   data.  It's rare for a health department to publish it or even

13   make it available, and often it takes several months or even a

14   year before their data are complete.  So I would wonder whether

15   such data, reliably, could exist at this point.

16   Q.  You were asked about the number of women who resided in

17   particular Alabama cities.  Is your opinion here based on the

18   number of women or the percentage or proportion of women who

19   would be affected?

20   A.  My testimony only concerns the proportion of women, not the

21   number of women who -- who are a certain distance from the

22   facility.

23   Q.  Even if you were to look only at the women who live in and

24   around Mobile, Montgomery, and Birmingham, would you predict or

25   conclude that the travel that we're talking about in this case

1  would impact a substantial percentage or proportion of the

2  affected women?

3  A.   Yes.   The women who live near the center of those districts

4  would have to travel the distance we specified, which is the

5  hundred miles or the 60 miles.   The ones who live near it might

6  have to travel a little bit less to the additional facility, to

7  the new facility; but they would also be affected.

8  Q.   You were asked questions about news stories impacting

9  women's ability or decisions to travel to distant clinics.   Do

10  you remember that line of questioning?

11  A.   Yes.

12  Q.   Based on the literature about the relationship between the

13  cost and low income women's access to abortion, do you think

14  that it's realistic or likely that those news stories would

15  prompt low income women to travel?

16  A.   No, I don't really.   There's one situation which I've seen

17  news stories impacting the business of an abortion facility.

18  This was a long time ago.   When a facility in Missouri was

19  target -- targeted by antiabortion people and there was

20  picketing and a lot of publicity, and the number of women who

21  came to that clinic actually increased because more people heard

22  about the existence of the clinic.   So it's possible that even

23  negative publicity could make more people aware of a facility.

24  Q.   You were asked a question or two about the Huntsville clinic

25  and how many women that particular clinic serves.   If the

1   Huntsville clinic is located close to the border of Tennessee,

2   does that affect the likely makeup of its patients in terms of

3   whether they're drawn from Alabama and/or Tennessee?

4   A.   Yes.   The closer you are to a state border, the more likely

5   you are to draw patients from the other state.

6   Q.   Do you think it was necessary to review patient records to

7   reach the opinions that you've reached in this case?

8   A.   No, I do not.

9   Q.   You were asked some questions about teens who fear violence

10  from pro-life parents and their inclination to travel.   Are

11  teens likely to have resources to undertake long-distance

12  travel?

13  A.   Well, teens are less likely to have resources than older

14  women.

15  Q.   And are there circumstances where a woman's risk of someone

16  she does not want to know she -- someone she does not want to

17  know finding out about her abortion -- are those risks increased

18  if she has to travel further to access an abortion?

19  A.   I'm sorry.   Could you repeat the question?

20  Q.   I read it badly.   Are there circumstances where a woman's

21  risk that someone she does not want to know about her

22  abortion finding out about her abortion -- are those risks

23  increased at times if she has to travel longer to access an

24  abortion?

25  A.   There can be an increase because she has to be away from

 1   her -- her normal routine for a longer period of time.  She may

 2   have to take more time off from school or -- and also borrow a

 3   car for a longer period of time.  So a greater distance can

 4   actually increase the risk of her family finding out.

 5         MR. BECK:  Thank you.  No further questions.

 6         MS. FLEMING:  No follow-up, Your Honor.

 7         THE COURT:  Thank you.  You may step down.

 8         Next witness.

 9         MS. KOLBI-MOLINAS:  Your Honor, our next witness is not

10   until the afternoon.  This is the physician who's --

11         THE COURT:  Very good.  What's our schedule for the

12   rest of the day, then?

13         MS. KOLBI-MOLINAS:  Just that physician, Your Honor,

14   and then plaintiffs have no more witnesses.

15         THE COURT:  Okay.  Now, how long do you expect this

16   witness to take?

17         MS. KOLBI-MOLINAS:  I would imagine our direct would be

18   no more than an hour.

19         THE COURT:  Is this an anonymous witness?

20         MS. KOLBI-MOLINAS:  Yes, Your Honor.

21         THE COURT:  And -- very good.  That gives me a good

22   idea.  We'll start back at 1:15.

23         MS. KOLBI-MOLINAS:  Thank you, Your Honor.

24      (Recess at 11:25 a.m. until 1:20 p.m.)

25         THE CLERK:  Please remain seated.  Court is in session.

1          THE COURT:  Counsel, proceed.

2          MS. KOLBI-MOLINAS:  Your Honor, before we call the next

3   witness, it's been raised to me that we may not have formally

4   moved for Exhibit 20 to be entered into evidence at the end of

5   the last witness, so plaintiffs move --

6          THE COURT:  It's admitted.

7          MS. KOLBI-MOLINAS:  Thank you.  Plaintiffs now call

8   their next fact witness, who is Dr. A.

9          THE COURT:  Dr. A.

10         MS. KOLBI-MOLINAS:  May we approach to stand over?

11         THE COURT:  Yes.

12     (The witness is sworn)

13         MS. CAMP:  Sorry, Your Honor.  It's taking me a minute

14   to get set up.

15         THE COURT:  That's okay.

16         MS. CAMP:  Your Honor, I'm sorry.  Would it be possible

17   for the curtains to be just a little bit more open?

18         THE COURT:  Yes.

19         MS. CAMP:  Thank you.  On this side.  Thank you.

20         THE COURT:  Can you see now?

21         MS. CAMP:  Just a --

22         THE COURT:  Just a little bit more.  No, no.  The other

23   way.

24         MS. CAMP:  Other way.  Thank you so much.

25         THE COURT:  She wants more, to be able to see more.

1          MS. CAMP:  Thank you kindly.

2          THE COURT:  Is that better?

3          MS. CAMP:  Yes, sir.

4          THE COURT:  Okay.  Can you see, Mr. Davis?

5          MR. DAVIS:  Yes.  Thank you, Your Honor.

6          **DR. A**, the witness, having been duly sworn to speak

7   the truth, the whole truth, and nothing but the truth, testified

8   as follows:

9                         DIRECT EXAMINATION

10  BY MS. CAMP:

11  Q.  Good afternoon, Dr. A.

12  A.  Good afternoon.

13  Q.  Please introduce yourself to the Court with the

14  nonidentifying name you're using in this case.

15  A.  I am Dr. A.

16  Q.  Thank you.  And what is your profession?

17  A.  Gynecology.

18  Q.  Are you a physician?

19  A.  Yes, I am.

20     (Brief interruption)

21  Q.  And are you an obstetrician-gynecologist?

22  A.  I was an obstetrician and gynecologist until I stopped

23  practicing obstetrics.

24  Q.  And how many years have you been practicing medicine?

25  A.  As an obstetrician and gynecologist, about 31 years.

1  Q.  Okay.  And do you currently provide care anywhere in

2  Alabama?

3  A.  Yes, I do.

4  Q.  And where is that?

5  A.  In Montgomery, Alabama, and Huntsville, Alabama.

6  Q.  Can you tell us at which facilities you provide care in

7  Montgomery and Huntsville?

8  A.  Reproductive Health in Montgomery and Alabama Women's Health

9  and Reproductive Services in Huntsville.

10 Q.  And are you an employee of those clinics or an independent

11 contractor?

12 A.  I'm independent contractor.

13 Q.  Are you a plaintiff in this lawsuit?

14 A.  No.

15 Q.  Are you familiar with HB 57, the Alabama law that plaintiffs

16 have challenged in this lawsuit?

17 A.  Yes.

18 Q.  What do you understand the law to do?

19 A.  The law asks that those doing outpatient procedures need to

20 have privileges in the hospitals for them to continue -- for

21 continued care.

22 Q.  And do you understand that admitting privileges requirement

23 to cover any specific surgeries?

24 A.  Say that again?

25 Q.  Do you understand the admitting privileges requirement in

1    this Alabama law to include any specific surgeries?

2    A.   I know some of it.

3    Q.   Do you understand it to require admitting privileges that

4    allow the physician to provide hysterectomy, laparotomy, and D&C

5    in the hospital?

6    A.   Yes.

7    Q.   Do you currently have staff privileges at a local hospital?

8    A.   No.

9    Q.   Do you believe you would be able to get staff privileges at

10   a local hospital?

11   A.   No.

12   Q.   Do you currently live in Alabama?

13   A.   No.

14   Q.   Where do you live?

15   A.   I temporarily live in Atlanta, but I live primarily in

16   Lagos, Nigeria.

17   Q.   How often do you travel to the United States?

18   A.   About four times a year.

19   Q.   And about how long do you stay each time you come?

20   A.   Four to six weeks.

21   Q.   And what do you do when you're in Nigeria?

22   A.   Well, I'm semiretired, and I do charity work as well I'm

23   trying some farming.  I also do -- trying to introduce solar

24   energy to the system in Nigeria.

25   Q.   You mentioned a charity.  Which charity is that?

1    A.   My wife's charity.

2    Q.   And you mentioned something about solar energy.  Can you

3    explain that a little more?

4    A.   Well, Nigeria has a very electrical -- electrical --

5    electricity and -- well, we have so much sun.  And I'm trying to

6    mainly convince the people that solar energy is the way to go

7    because it's clean and it's not -- in the long run, it's not as

8    expensive as people make it out to be.

9    Q.   You mentioned some charity work with your wife's charity.

10   Has that included medical work?

11   A.   Yes, it does.

12   Q.   Do you have any other family in Nigeria?

13   A.   Yeah.  My older brother, my younger sister, and lots of

14   cousins and aunts and -- you name it -- all in Nigeria.

15   Q.   Okay.  And do you do any paid work in Nigeria?

16   A.   Do I do any what?

17   Q.   Do you do any paid work in Nigeria?

18   A.   No.

19   Q.   Okay.  Is that because you are essentially retired?

20   A.   Yes.

21   Q.   Or semiretired?

22   A.   Yes.

23   Q.   Okay.  How much does it cost for you to fly from Nigeria to

24   the United States, approximately?

25   A.   $3,500.

1  Q.   Sorry?

2  A.   $3,500 per trip.

3  Q.   Okay.  And who pays for you to fly from Nigeria to Alabama

4  to work at the clinics?

5  A.   Now I do.

6  Q.   Doctor, why do you come all the way from Nigeria to do this

7  work?

8  A.   Well, because I've been doing this work for the last ten

9  years.  And since I retired, I continued because it's my

10  calling.  I feel like I -- I need to continue to do this work

11  because there are very few of us trained in these -- in these

12  procedures.

13  Q.   Let's take a step back and discuss your educational

14  background.  Where did you grow up?

15  A.   Well, I grew up in Lagos, Nigeria, until 17 years of age,

16  when I came to Chicago to go to college.

17  Q.   And where did you go to college?

18  A.   Chicago, Illinois.

19  Q.   Can you tell us which college?

20  A.   Loyola University of Chicago.

21  Q.   And where did you get your medical degree?

22  A.   University of Illinois in Chicago.

23  Q.   And where did you do your residency?

24  A.   Through Martin Luther King Hospital in Los Angeles.

25  Q.   What did you do after you completed your residency?

1    A.   I practiced for six months and then decided to go back to

2    Lagos, Nigeria.

3    Q.   And what did you do when you went back to Nigeria?

4    A.   I worked with the hospital for -- or, rather, with a

5    clinic -- well, clinic/hospital for a year and a half and then

6    opened up a hospital that I ran for women.

7    Q.   And about what year was that?

8    A.   Beg your pardon?

9    Q.   About what year was that that you opened the women's center

10   in Nigeria?

11   A.   1985.

12   Q.   And what kind of procedures did you perform at the women's

13   medical center in Nigeria?

14   A.   All -- mostly all obstetrics and gynecologic procedures.

15   Q.   Did you do deliveries?

16   A.   Deliveries, vaginal, C-section, vacuum.

17   Q.   Did you perform hysterectomies?

18   A.   Yes.

19   Q.   And laparotomies?

20   A.   Yes.

21   Q.   How long did you have that practice in Nigeria?

22   A.   From 1985 to 1995.

23   Q.   Uh-huh.  And when did you return to the United States?

24   A.   1994.

25   Q.   Okay.  So that practice in Nigeria was still open for some

 1   small -- short period of time after you moved back to the United

 2   States?

 3   A.   Yeah.   It was open for one year.

 4   Q.   Okay.   And where did you live starting in 1994?

 5   A.   In Tuscaloosa, Alabama.

 6   Q.   And what brought you there?

 7   A.   Again, places that were underserved.   I felt I could give

 8   back by coming to areas most people did not want to come to.

 9   Q.   Why did you leave Nigeria at that point?

10   A.   The political situation was too hot under the military

11   government, and those of us who were shouting for democracy were

12   being hounded, so it was best for me to get out at that time.

13   Q.   Okay.   And how did you happen to come to Tuscaloosa?

14   A.   Well, I was told by a colleague who was leaving Tuscaloosa

15   after doing a couple of years there that they needed help.   West

16   Alabama needed help.   And there are too -- very few doctors who

17   want to come there.   And I went there, and I found that there

18   was a place for me to do -- to help the -- the underprivileged.

19   Q.   Were you working in a federal clinic at that time?

20   A.   Yes, I was.

21   Q.   And was that in a rural area?

22   A.   Yes.   In Eutaw, Alabama.

23   Q.   Okay.   And for how long did you do that?

24   A.   That went on for about four years, until the -- until the

25   federal -- until the federal money ran out, got finished.

1  Q.   Okay.  So if that was for about four years, did that last

2  until about 1998?

3  A.   Yes.

4  Q.   But you -- did you still live in Tuscaloosa after 1998?

5  A.   Yes.

6  Q.   And what did you do in Tuscaloosa after the federal clinic

7  closed?

8  A.   I continued with a private practice, not to abandon those

9  patients that were not being seen anymore.

10 Q.   Okay.  And was that a full-time practice?

11 A.   Yes, it was.

12 Q.   Did you have staff privileges at a local hospital at that

13 time?

14 A.   Yes, I did.

15 Q.   How many hospitals?

16 A.   Well, two hospitals.  DCH Regional Center -- Regional

17 Medical Center, and a small hospital in Eutaw, Alabama.

18 Q.   And how did you apply for those privileges?

19 A.   Well, the Eutaw privileges -- Eutaw hospital privileges were

20 applied for by the -- the government-sponsored health facility,

21 as well as the DCH.  So I just continued with it when I went

22 into private practice.

23 Q.   Okay.  So, in other words, is it fair to say that the

24 federal health facility made the initial application for you?

25 Is that right?

1  A.  Yes.

2  Q.  And that you then renewed your admitting privileges each

3  year or so thereafter?

4  A.  Yes.

5  Q.  Okay.  So from 1994 to 2002, when you lived in Tuscaloosa,

6  is it accurate to say that your main occupation was a federal

7  clinic for four years and then your own private practice for

8  another four years?

9  A.  Yes.

10  Q.  During the time you lived in Tuscaloosa, did you also ever

11  work at Reproductive Health Services here in Montgomery?

12  A.  I think I worked one time or so when help was needed when a

13  doctor was not able to cover.

14  Q.  And what -- what care did you provide when you covered at

15  Reproductive Health services?

16  A.  I helped with voluntary termination of pregnancies.

17  Q.  Did you provide any other gynecological procedures?

18  A.  I did Pap smears and breast exams.

19  Q.  Did you perform abortions anywhere else in Alabama while you

20  were living in Tuscaloosa?

21  A.  Occasionally, I was called by Planned Parenthood to assist

22  them in the same way when they were short of doctors.

23  Q.  When did you close down your private practice in Tuscaloosa?

24  A.  2002.

25  Q.  And why did you close it?

1   A.   I wanted to get back to Nigeria.

2   Q.   And did you?

3   A.   I went back, but I only stayed there for six months.

4   Q.   Why was that?

5   A.   Again, at this time the political situation, which we

6   thought was democratic, was a sham; and I had to come back to

7   the U.S.

8   Q.   Was there an election in Nigeria?

9   A.   Yes.   I -- after I went back, I actually witnessed an

10   election in 2003; and it was rigged.   It was -- it wasn't an

11   election; it was a selection.

12   Q.   And was the outcome of that process part of why you left

13   Nigeria to come back to the United States?

14   A.   Yes.

15   Q.   And what did you do next?

16   A.   I worked in California in a group practice.

17   Q.   For how long did you live in California?

18   A.   From 2003 to 2008.   That's five years.

19   Q.   And what -- what was your work while you were in California?

20   A.   In full OB-GYN practice.

21   Q.   Were you part of a group practice?

22   A.   Yes.

23   Q.   Okay.   Were you an employee or independent contractor?

24   A.   Independent contractor.

25   Q.   Okay.   Was that a full-time job?

1    A.   Yes.

2    Q.   And that was a private practice?

3    A.   Yes.

4    Q.   What kinds of procedures did you perform as part of that

5    group?

6    A.   C-sections, vaginal deliveries, hysterectomies, tubal

7    ligations, myomectomies, vaginal repairs.   The works.

8    Q.   Did you have staff privileges at any hospitals in California

9    during that time?

10   A.   Yes, I did.

11   Q.   At how many?

12   A.   How many hospitals?

13   Q.   Yes, sir.

14   A.   Two.

15   Q.   Okay.   Which hospitals were those?

16   A.   Rancho Springs Medical Center and Inland Valley Medical

17   Center.

18   Q.   And are those both in Murrieta?

19   A.   Yes.

20   Q.   How did you go about applying for privileges at those two

21   hospitals in California?

22   A.   Again, the group that I was working with, Crown Medical

23   Center, helped -- helped with the -- with application.

24   Q.   Okay.   And did they make the initial communication with the

25   hospital?

1  A.   Yes.

2  Q.   And as -- again, as part of your practice, you were

3  delivering babies, right?

4  A.   Yes.

5  Q.   Do you have to be in a hospital when you do that?

6  A.   Yes.

7  Q.   Okay.  And were your privileges there temporary at first?

8  A.   Not temporary.  I think they were provisional, I think.

9  Q.   Provisional.  And then did you eventually get full-time,

10  permanent privileges?

11  A.   Yes.  After you meet certain requirements.

12  Q.   During those years from 2003 to 2008, is it fair to say that

13  your main occupation was the private practice in California?

14  A.   Yes.

15  Q.   During those years when you lived in California from 2003 to

16  2008, did you work anywhere else in addition to that private

17  practice in California?

18  A.   Yes.

19  Q.   Where were you working as well?

20  A.   I used to come out to Huntsville, Alabama, to help with the

21  clinic there because the owner of the clinic died and it was

22  struggling to keep the clinic open.

23  Q.   And so you were living in California, but you were coming to

24  provide abortion care in Huntsville, Alabama.  How did those

25  logistics work?

1  A.  Well, the clinic paid for my fare to come in and my hotel

2  for one or two days, and I saw patients for the clinic so that

3  it could be -- so that the clinic could stay open.

4  Q.  And why did you agree to fly all the way from California to

5  work at the Huntsville clinic?

6  A.  Because the clinic needed help, and I knew the -- the owner

7  of the clinic that died, and I thought it was the right thing to

8  do.  I -- I did it from 2004 till now.

9  Q.  And -- I'm sorry.  Was it Dalton Johnson who asked you to

10  come work at the Huntsville clinic?

11  A.  Yes.

12  Q.  Did you work anywhere else in Alabama besides the Huntsville

13  clinic between 2006 and 2008?

14  A.  I --

15  Q.  I'll --

16  A.  I -- if I am correct, I worked sometimes, occasionally, with

17  Planned Parenthood when I was in Huntsville.

18  Q.  And about how often did you do that?

19  A.  Very sporadic.

20  Q.  When did you leave California?

21  A.  When did I?

22  Q.  When -- I'm sorry.  When did you leave California?

23  A.  2008.

24  Q.  And where did you go?

25  A.  I moved back -- I moved to Nigeria.

1  Q.  And has Nigeria been your primary residence ever since?

2  A.  Yes.

3  Q.  Is that now your permanent residence?

4  A.  Yes.

5  Q.  Why did you move back to Nigeria in 2008?

6  A.  I got married in 2006, and my wife works there and lives

7  there, so I had to go to stay with her.  And I've been -- I was

8  now semiretired.  That's why -- that's why I stayed in Nigeria.

9  Q.  Did you continue to travel to Alabama to provide abortion

10 care after 2008?

11 A.  Yes.

12 Q.  Was there any period of time since 2004 in which you were

13 not working at the Huntsville clinic?

14 A.  No.  There was no time.  I worked from 2004 till the present

15 time.

16 Q.  Continuously.  Yes?

17 A.  Yes.

18 Q.  Did you also start working regularly with RHS here in

19 Montgomery?

20 A.  That got started in 2011.  No, no, no.  2012.

21 Q.  Okay.  And have you been working there continuously since

22 that time?

23 A.  Yes.

24 Q.  Okay.  And who pay -- who pays your airfare between Nigeria

25 and the United States?

```
 1  A.  Huntsville was paying it initially; but after a while, I
 2  started paying for it myself.
 3  Q.  And can you tell us why?
 4  A.  Because things were getting difficult in Huntsville with all
 5  the rules and regulations that were being brought in, and I just
 6  felt that -- I didn't want that clinic to close.  So if I could
 7  afford to do it, I would continue.  And that's what I've done.
 8  Q.  So did you start paying the airfare yourself in order to
 9  help the clinic stay open?
10  A.  Yes.
11  Q.  Why is that so important to you?
12  A.  Why is that important to me?
13  Q.  Yes, sir.
14  A.  Well, I'm doing work that I am called upon to do.  That's
15  my -- that's my calling.
16  Q.  Okay.  I want to talk to you for a bit about continuity of
17  care.  Do you believe that your patients in Alabama would be
18  adequately cared for in the event of a rare emergency once you
19  are no longer in the country?
20  A.  Yes.
21  Q.  And why is that?
22  A.  Because we always have a designated physician specialist
23  who -- who covers for our patients if they have to go to a
24  hospital for any reason.  Remember, we're doing outpatient work.
25  So we don't expect patients to go to a hospital; but in the few
```

1    instances that they may go, we make sure that they see a

2    physician competent to see our patients.

3            MS. CAMP:  I'm sorry.  Could you read back the last

4    answer?

5        (The court reporter read the answer)

6    Q.  Doctor, do some of your patients come to Montgomery or

7    Huntsville from out of town?

8    A.  Yes.

9    Q.  And if one of those patients had a rare complication that

10   required hospitalization a day or two after surgery, would you

11   know who the physician is who provides their care?

12   A.  If they go to the hospital that -- when they inform us that

13   they have to go to the hospital and we direct them to the

14   hospital that they have our doctors, yes, I can -- I can be told

15   that.  I can find out.  But if they go to some other hospital

16   without telling us, I have no way of knowing.

17   Q.  Okay.  If they live two or three hours from the clinic and

18   have a rare complication that requires them to go to the

19   hospital, would you know who the physician is who would treat

20   them at that hospital far away from Montgomery or Huntsville?

21   A.  No.

22   Q.  Okay.  Are you confident that they would nonetheless get

23   good care?

24   A.  Yes.

25   Q.  Okay.  Why is that?

1  A.  Because hospitals are supposed to have competent physicians

2  in all -- in all the specialities who can take care of the

3  patient once the patient tells them what the problem is.

4  Q.  So in the event that a woman has a rare complication that

5  requires her to visit the hospital, are ER doctors and hospital

6  OB-GYNs fully competent to treat her?

7  A.  Yes.

8  Q.  Is there any clinical benefit to the backup doctor being the

9  doctor who treats one of those rare complications?

10  A.  Not really.

11  Q.  Okay.  Doctor, if a patients of yours has a rare

12  complication that requires her to go to the hospital and she

13  lives two or three hours away from the clinic where you provided

14  the care and the 24-hour triage nurse advises her to go to the

15  ER, do you have any way of calling the ER before she gets there?

16  A.  No.

17  Q.  Why is that?

18  A.  Because you don't know where -- where she -- where she will

19  end up at.  She may say she wants to go to hospital A and then

20  go to hospital B.

21  Q.  Could you guess at what the nearest hospital might be and

22  simply call them and give her name?

23  A.  No.

24  Q.  Why not?

25  A.  Because that would be -- be getting into patient

1  confidentiality.

2  Q.  Okay.  Doctor, we're going to look at some hospital bylaws

3  now.

4  A.  Yes.

5  Q.  You have in front of you -- I'm sorry.  Yeah.  You have in

6  front of you Plaintiff's Exhibits 3 and 5, which have been

7  previously admitted into evidence.

8  A.  Yes.

9  Q.  So we're going to be looking at requirements that hospitals

10  have specifically for granting admitting privileges to perform

11  hysterectomy, laparotomy, and D&C in the hospital.

12  A.  Okay.

13  Q.  Doctor, can you travel from the home where you stay in

14  Alabama to Montgomery in 30 minutes?

15  A.  Can you ask that again?

16  Q.  Sure.  Are you able to travel from the home where you stay

17  in Atlanta -- can you travel from there to Montgomery in 30

18  minutes?

19  A.  For the what?

20  Q.  Are you able to travel from Atlanta to Montgomery in half an

21  hour?

22  A.  No.

23  Q.  Can you do it in 45 minutes?

24  A.  No.

25  Q.  In 60 minutes?

1  A.   No.

2  Q.   Could you provide ER coverage as an on-call OB-GYN for a

3  Montgomery hospital a set number of times each month?

4  A.   No.

5  Q.   Why not?

6  A.   Because I don't live close to the area.

7  Q.   Have you performed 25 gynecological procedures outside of an

8  abortion clinic in the last 12 months?

9  A.   No.

10  Q.   Have you performed any gynecological procedures outside of

11  an abortion clinic in the last 12 months?

12  A.   No.

13  Q.   When was the last time you performed a hysterectomy?

14  A.   Two years ago.

15  Q.   When was the last time you performed a laparotomy?

16  A.   Two years ago.

17  Q.   When was the last time you performed GYN surgery in any

18  hospital?

19  A.   Two years ago.

20  Q.   Do you currently treat any patients in any hospital?

21  A.   No.

22  Q.   If Montgomery hospitals had minimum admissions requirements

23  for granting privileges, could you meet such requirements?

24  A.   No.

25  Q.   Why?

1    A.   Because I don't do inpatient work anymore.

2    Q.   But you provide abortion care, don't you?

3    A.   But that's outpatient work.

4    Q.   Sorry?

5    A.   But that's outpatient work.  That's not inpatient.

6    Q.   Okay.  But does the nature of the care you provide allow you

7    to admit some minimum number of patients?

8    A.   Does the what?

9    Q.   Might you not be admitting your abortion patients to a

10   hospital in Montgomery?

11   A.   I don't expect to admit abortion patients to the hospital,

12   because abortion is a very safe procedure and is an outpatient

13   procedure.

14   Q.   Okay.  So is it fair to say that abortion is very safe and

15   rarely results in complications?

16   A.   Yes.

17   Q.   Okay.  So does that mean you would rarely, if ever, be

18   admitting patients to the hospital?

19   A.   Yes.

20   Q.   So would you be able to meet a requirement that you admit at

21   least ten patients a year?

22   A.   No.

23   Q.   In your over 30 years of experience as an OB-GYN, have you

24   ever gotten privileges at a hospital where you could not meet

25   the minimum threshold criteria?

1    A.   No.

2    Q.   Okay.

3              MS. CAMP:   Your Honor, Dr. A will be referring to

4    Plaintiff's Exhibits 3 and 5 already admitted.

5    Q.   Doctor, if you could please look at Plaintiff's Exhibit

6    Number 3.

7    A.   Yes.

8    Q.   Okay.   These are bylaws for Jackson Hospital in Montgomery.

9    The page numbers are in the lower right corner.   Please turn to

10   page JH-00025.

11   A.   Yes.

12   Q.   About halfway through this exhibit.

13   A.   Yes.   Yeah, I'm there.

14   Q.   Thank you.   Just wanted to give other folks time to find it.

15        Doctor, what is Section 3 called?

16   A.   Courtesy staff.

17   Q.   Can you read Section 3.A and tell the Court if you can

18   satisfy those requirements.

19   A.   Give me a second.

20        (Brief pause)

21   Q.   Could you -- I'm sorry.   Could you read it out loud, Doctor?

22   A.   Okay.   The courtesy staff shall consist of practitioners who

23   have met the basic qualifications for medical staff membership

24   set forth in Article IV and are located closely enough to the

25   hospital to provide continuous care to their patients but do not

1    regularly admit, consult, or perform outpatient procedures.

2        I cannot meet that.

3    Q.   And why is that?

4    A.   Because I don't live close enough.

5    Q.   Okay.  Can you now please read out loud Section 3.C?

6    A.   Courtesy staff members shall discharge the recognized

7    functions of courtesy staff membership by providing emergency

8    department coverage as required by the rules and regulations of

9    each department of the medical staff.

10       Again, I can't meet that because I don't live close enough.

11   Q.   Finally, please turn to page JH-00041.  What does that

12   appear to be?

13   A.   Request for documentation of clinical activity.

14   Q.   Yeah.  What does that appear to be?  It's part of an

15   application.  What does it appear to you to request?

16   A.   What does it -- would you repeat your question, please?

17   Q.   Sure.  This is what -- this is part of an application for

18   privileges, and it's a request for documentation of clinical

19   activity.

20   A.   Yes.

21   Q.   What clinical activity is it asking applicants to document?

22   A.   Well, you want me to read it out?

23   Q.   If you could just look at it and tell us what it seems to

24   request.

25   A.   Well, I can't -- I can't give you any number of procedures

 1  that it wants documented, because I don't admit in any facility.

 2  I don't practice inpatient medicine.

 3  Q.  Is this document asking for you to provide documentation of

 4  inpatient procedures you've performed in the last two years?

 5  A.  Yes.

 6  Q.  Does any such inpatient facility exist?

 7  A.  Does what?

 8  Q.  Does any such inpatient facility exist where you have

 9  practiced for the last two years?

10  A.  No.

11  Q.  Okay.  Let's put away Exhibit 3 and turn to Exhibit 5.

12  A.  Okay.

13  Q.  These are bylaws for Baptist Hospital here in Montgomery.

14  A.  Okay.

15  Q.  We're going to look at Section 3.3, about a third of the way

16  through the exhibit.

17       MS. CAMP:  And I'm sorry, Your Honor.  These aren't

18  consecutively paginated, but we'll only have to flip through

19  once.

20  Q.  It's about a third of the way through.  And at the bottom,

21  it just says six, not six of seven, just six.  And at the top,

22  it says 3.2, Nondiscrimination.

23     Okay.  Doctor, are you there?

24  A.  Yes.

25  Q.  Okay.  What is Section 3.3 called?

 1  A.  Qualifications for Membership.

 2  Q.  Can you please read out loud the first sentence of Section

 3  3.3.1.

 4  A.  A candidate shall be eligible for membership on the medical

 5  staff only if he or she satisfies all the following

 6  qualifications.

 7  Q.  On that same page, please read out loud Section 3.3.1g

 8  A.  Maintain a practice and residence within a reasonable

 9  distance to the Baptist Health hospital at which he or she

10  practices in order to maintain admitting privileges and provide

11  timely continuous care of his/her patients; each clinical

12  department is responsible for defining time and/or distance per

13  speciality in the campus rules and regulations.

14  Q.  Can you meet that requirement?

15  A.  I can't meet that requirement.

16  Q.  Okay.  This provision also refers to the geographic location

17  of your practice.  Do you consider the RHS clinic here in

18  Montgomery to be your practice?

19  A.  No.

20  Q.  Well, you do provide care there, don't you?

21  A.  Yes.  As an independent contractor.

22  Q.  Okay.  Do you own that practice?

23  A.  No, I don't.

24  Q.  Is that different from the practice you had in Tuscaloosa?

25  A.  Yes.

1  Q.  Did you consider that to be your practice?

2  A.  Yes.

3  Q.  So, Doctor, you're saying that neither your residence nor

4  your provision of medical services in Montgomery allows you to

5  provide what Baptist Hospital calls continuous care.  Does that

6  mean that your patients don't get continuity of care?

7  A.  If they go to the hospital, they would get continue --

8  continuity of care, but I don't expect them to go to the

9  hospital.

10  Q.  A representative of Baptist Hospital testified yesterday

11  that Baptist requires physicians to complete a one-year

12  provisional period before they are advanced to active or

13  courtesy level staff membership.  To fulfill this provisional

14  requirement, the physician must admit at least one patient.

15  Does the care you provide at RHS in Montgomery allow you to

16  fulfill that provisional requirement by admitting at least one

17  patient?

18  A.  No.

19  Q.  Why not?

20  A.  Because patients -- my patients don't go to the -- don't get

21  admitted.

22  Q.  Is that because abortion is very safe?

23  A.  Very safe.

24  Q.  Do you have any patient contacts at Baptist Hospital?

25  A.  No.

1    Q.   Okay.  Now please turn to the next page and read the opening

2    sentence under Section 3.4.

3    A.   The next page after --

4    Q.   Where you were just looking.  The very next page.

5    A.   Okay.

6    Q.   Do you see Section 3.4?

7    A.   Yes.

8    Q.   Could you tell us -- just read the first two lines there.

9    A.   Each -- basic responsibilities of membership.  Each member

10   of the medical staff shall.

11   Q.   Okay.  Now please read subsection K on that same page.

12   A.   Participate in emergency department coverage pursuant to

13   EMTALA regulations.

14   Q.   Would you be able to satisfy the emergency department

15   coverage requirement?

16   A.   No.

17   Q.   So, Doctor, you said that given your current practice, you

18   do not fulfill the hospital's requirements for granting

19   admitting privileges.

20   A.   Yes.

21   Q.   Would you -- would you be willing to move to Alabama to try

22   to satisfy the hospital's residency requirements?

23   A.   No, I wouldn't.

24   Q.   Why not?

25   A.   Because my wife would not want to come to Alabama, number

1  one.  Number two, I'm semiretired, and I prefer to do what I'm

2  doing right now.

3  Q.  Okay.  I want to ask you if admitting privileges would have

4  had any relevance to the following events.  Doctor, you're

5  currently being sued by a former patient who alleges you

6  committed malpractice in failing to diagnose an ectopic

7  pregnancy; is that right?

8  A.  Yes.

9  Q.  For what service did this patient come to you?

10  A.  For what?

11  Q.  For what service did she come to you?  What treatment was

12  she seeking when she came?

13  A.  For termination of her pregnancy.

14  Q.  Did she have an intrauterine pregnancy?

15  A.  Yes, she did.

16  Q.  Did you diagnose that intrauterine pregnancy?

17  A.  Yes, I did.

18  Q.  Did you end that intrauterine pregnancy?

19  A.  Yes, I did.

20  Q.  Did you check if she also had an ectopic pregnancy?

21  A.  No.  I don't check -- usually don't check for an ectopic

22  pregnancy once you diagnose an intrauterine pregnancy, because

23  it's so, so, so very rare.

24  Q.  Just to be clear, it's rare to have both an intrauterine and

25  an ectopic pregnancy; is that right?

1  A.  Yes.

2  Q.  Okay.  Did this patient have any symptoms of ectopic

3  pregnancy?

4  A.  No.

5  Q.  Is it standard of care not to check for an ectopic pregnancy

6  once you have diagnosed an asymptomatic woman with an

7  intrauterine pregnancy?

8  A.  Yes.

9  Q.  And that's true even though you know it is a rare

10  possibility --

11  A.  Yes.

12  Q.  -- for a woman to have both an ectopic and an intrauterine

13  pregnancy at the same time?

14  A.  Yes.

15  Q.  Can that same scenario also happen when a woman miscarries?

16  A.  Yes.

17  Q.  Okay.  So if a woman miscarries and presents for treatment

18  and the physician treats her and makes sure her uterus is empty,

19  would the physician necessarily check to see if she also had an

20  ectopic pregnancy?

21  A.  No.

22  Q.  If a physician did check to see if there were an ectopic

23  pregnancy for a woman who presented for an induced abortion or

24  with a spontaneous miscarriage, would the physician even

25  necessarily see the ectopic pregnancy?

1  A.  Most of the time, no.

2  Q.  When you had admitting privileges, did you check for ectopic

3  pregnancies after diagnosing an intrauterine pregnancy?

4  A.  No.

5  Q.  If you had had admitting privileges at the time you treated

6  this patient, would you have checked for an ectopic pregnancy?

7  A.  No.

8  Q.  Do you understand the admitting privileges law at issue in

9  this litigation to require doctors to check for an ectopic

10  pregnancy once they have diagnosed an intrauterine pregnancy?

11  A.  Do I -- what's the question?

12  Q.  The law at issue here today, Doctor, do you understand it to

13  require that physicians check for an ectopic pregnancy under any

14  circumstances?

15  A.  No.

16  Q.  Doctor, do you take security precautions when you go to the

17  clinics?

18  A.  No.

19  Q.  Are you scared?

20  A.  No.

21  Q.  Do you think that makes you unusual among physicians in

22  Alabama?

23  A.  I don't know, but I'm not scared.  I am doing God's work,

24  and God is protecting me, so I'm not scared.

25  Q.  So tell us again, why are you not scared?

1  A.  I said, I'm doing God's work, and I don't need any

2  protection except from Him.

3  Q.  Why do you continue to do the work you do for the clinics in

4  Montgomery and Huntsville?

5  A.  Well, it goes back to when I was in medical school when --

6  even before abortion became legal in the United States.  The

7  type of complications we saw from women who went down to Mexico

8  or somewhere else to have -- to procure an abortion and were

9  messed up for life just still rings clear in my head.  So where

10 there's a chance to help a patient terminate a pregnancy for

11 whatever reason, lawfully, I do that.  And I think I'm helping

12 the patient.

13 Q.  So, in other words, you saw women who suffered when they

14 were not able to access safe, legal abortion in this country; is

15 that correct?

16 A.  Yes, I did.

17 Q.  Has that also been true in Nigeria?

18 A.  Oh, yes.  Even more so there, because there abortion is

19 still illegal.

20 Q.  Doctor, in your experience, do women die when they cannot

21 access abortion care?

22 A.  Yes.

23 Q.  Is that why you continue to provide this care so far from

24 home, Dr. A?

25 A.  Yes.

```
 1              MS. CAMP:  May I have a moment, Your Honor?

 2              THE COURT:  Yes.

 3         (Brief pause)

 4              MS. CAMP:  Thank you.  No further questions.

 5              THE COURT:  Cross?

 6                         CROSS-EXAMINATION

 7  BY MR. DAVIS:

 8  Q.  Good afternoon, Dr. A.

 9  A.  Good afternoon.

10  Q.  My name is Jim Davis.  I'm an Assistant Attorney General,

11  and I have a few more questions, please.

12  A.  Okay.

13  Q.  If a woman comes to the clinic in Montgomery or Huntsville

14  and you give her an abortion, is that woman your patient?

15  A.  A patient of the clinic.

16  Q.  There can be complications after an abortion, can there not,

17  Dr. A?

18  A.  Yes.

19  Q.  What are those complications?

20  A.  When they happen, it could be bleeding.  And it could be,

21  later on, infection.  Those are the common ones.

22  Q.  Any others?

23  A.  There could be perforation.  And there could be death.

24  Q.  If a woman has a complication after an abortion that you

25  provided, Dr. A, do you care for those complications?
```

1  A.  Do I do what?

2  Q.  Do you provide medical care to a woman who has complications

3  after an abortion that you provided?

4  A.  If it's -- if the complication is -- is diagnosed while I'm

5  with the patient, yes.  If the complication comes on later after

6  the patient goes home and the complication comes on, the

7  designated doctor to cover the clinic gets to see the patient

8  and treats the patient.

9  Q.  If the abortion complication arises after she goes home, do

10  you have any further involvement with that patient?

11  A.  No.

12  Q.  Do you talk to the emergency room doctor who is treating

13  her?

14  A.  If the emergency doctor treating her call -- calls me, yes.

15  Q.  Do you ever go to the emergency room or the hospital to

16  visit that patient?

17  A.  No.  Because it has been very rare that I've had

18  complications that a patient had to go to the hospital.

19  Q.  Do you ever talk to the clinic's covering physician about

20  the patient?

21  A.  Yes.

22  Q.  When?

23  A.  As the patient is going to the hospital, we're telling the

24  doctor designated to cover for the clinic that so-and-so patient

25  is on the way to the emergency room for so-and-so problems.

1           MR. DAVIS:  Can you repeat that, please.

2       (The court reporter read the question and answer)

3   Q.  At that point in time, Dr. A, do you know what emergency

4   room the patient is being transferred to?

5   A.  Yeah.  We normally tell them where -- which hospital to go

6   to, usually located close -- to the closest hospital.  And

7   that's where the designated physician usually gets -- or usually

8   has privileges.

9   Q.  Dr. A, if a doctor needed to speak to you after you were --

10  had left the United States and gone back to Nigeria, would they

11  be able to do so?

12  A.  No.  And there's no need to speak to me.

13  Q.  How many months out of the year do you spend in the United

14  States, Doctor?

15  A.  Four months, four to -- four to five months.

16  Q.  And when you're here, you reside in Georgia, correct?

17  A.  Yes.

18  Q.  Why Georgia and not Alabama?

19  A.  You really want to know that reason?  I stay in a relation's

20  house in Georgia.

21  Q.  You stay with family?

22  A.  Yes.  Well -- yes.

23  Q.  Is it -- is it true, then, Dr. A, that it is simply your

24  personal choice to live in Georgia and not Alabama when you're

25  in the United States?

1  A.  Yes.  Because if it's Alabama, I would have to pay for a

2  hotel.

3  Q.  At the time, Dr. A, that you had an OB-GYN practice in

4  Tuscaloosa, you had admitting privileges, correct?

5  A.  Yes.

6  Q.  And you also did abortions during that time period, correct?

7  A.  Yes.

8  Q.  At the time you had an OB-GYN practice in California, you

9  had admitting privileges, correct?

10  A.  Yes.

11  Q.  And you also did abortions during that time period.

12  A.  Yes.

13  Q.  Do you have the skills and experience, Dr. A, to have an

14  OB-GYN practice today?

15  A.  Yes, I do, but I have to -- I have to get back to actual

16  full-time inpatient practice.

17  Q.  You would have to get back to full-time, but you have the

18  training that you need to do that, correct?

19  A.  Yes.

20  Q.  Has anyone asked you to apply for privileges, anyone from

21  the Huntsville clinic or the Montgomery clinic?

22  A.  No.

23  Q.  Has anyone offered you any incentives to do so?

24  A.  No.

25  Q.  Is there anything that would prevent you from living in

1  Huntsville or Montgomery?

2  A.  Well, I -- like I said, I am semiretired.  I don't practice

3  obstetrics anymore.  And that's part of full-time -- full-time

4  practice.

5  Q.  Is there anything other than your personal choice that would

6  prevent you from living in Huntsville or Montgomery?

7  A.  Personal choice.  Well, the fact that my -- my -- my wife is

8  in Nigeria, so I can't live here.

9  Q.  So it's her personal choice as well, then.

10  A.  Huh?

11  Q.  I'll withdraw the question, Dr. A.

12  A.  Okay.

13  Q.  Do you know what a D&C is, Dr. A?

14  A.  Dilation and curettage.

15  Q.  When you were in private practice, is that one of the

16  procedures that you would perform on occasion?

17  A.  Yes.

18  Q.  Do you know how much money you were paid as a doctor to

19  perform a D&C when you were in private practice?

20  A.  Well, because it was covered by insurance, very little.

21        MR. DAVIS:  Can you repeat that?

22        COURT REPORTER:  I think he --

23  A.  I cannot remember.

24  Q.  Do you have a general estimate, Dr. A?

25  A.  I do not remember.

1   Q.  You said it was rare, did you not, for a woman to have an

2   intrauterine pregnancy and also have an ectopic pregnancy.

3   A.  Yes.

4   Q.  But it does happen, doesn't it?

5   A.  Yes.

6   Q.  And it did happen, didn't it?

7   A.  Yes.

8   Q.  And abortion complications may be rare, but they do happen,

9   do they not?

10  A.  Yes.

11  Q.  What is continuity of care, Dr. A, in your understanding?

12  A.  It's a patient being followed by qualified personnel,

13  qualified physicians, if there are complications, until the

14  problem is resolved.

15          MR. DAVIS:  May I confer, Your Honor?

16      (Brief pause)

17  Q.  (Mr. Davis, continuing:)  What is an ectopic pregnancy,

18  Dr. A?

19  A.  A pregnancy outside the womb.

20          MR. DAVIS:  Thank you, Dr. A.  That's all the questions

21  I have, Your Honor.

22          THE COURT:  Any further direct?

23          MS. CAMP:  May we have a moment?

24      (Brief pause)

25          MS. CAMP:  No further questions.

1          THE COURT:  Thank you.  The witness is excused.

2          I thought that plaintiffs had another witness today; is

3     that correct?

4          MS. KOLBI-MOLINAS:  No, Your Honor.  This is it.

5          THE COURT:  Okay.  I don't know why I thought you said

6     three rather than two.

7          MS. KOLBI-MOLINAS:  No, Your Honor.  Just one this

8     morning and then this afternoon.

9          THE COURT:  Where do we stand for next Tuesday?

10         MR. DAVIS:  Next Tuesday, Your Honor --

11         THE COURT:  Are you still calling -- what is it,

12    Brooks?

13         MS. KOLBI-MOLINAS:  No, Your Honor.

14         THE COURT:  Okay.

15         MR. DAVIS:  Next Tuesday, Your Honor, we're calling an

16    expert in the morning at nine, and we have another one scheduled

17    in the afternoon at one.  These are both experts who will be

18    testifying from Virginia by video link.

19         THE COURT:  And they're both for the defendants?

20         MR. DAVIS:  That is correct.  They're both defendants'

21    experts.  And those links, Mr. White has already tested at the

22    courthouse.

23         THE COURT:  Very good.  The problem was that they

24    testify from places that have adequate equipment as well as some

25    IT persons.

 1            MR. DAVIS:  But this time, Your Honor, we've made

 2   arrangements, after the lessons we've learned, they will be

 3   testifying from federal courthouses.

 4            THE COURT:  Good.  That doesn't mean it will be

 5   correct, though, does it?

 6            MR. DAVIS:  There --

 7            THE COURT:  You don't have to answer that.

 8            MR. DAVIS:  We're hoping for the best.

 9            Your Honor, with respect to Ms. Brooks --

10            THE COURT:  Yes.

11            MR. DAVIS:  -- there is -- because she will not be

12   testifying -- we had expected her to testify.  If plaintiffs

13   have chosen not to call her, we will be offering her deposition

14   into the record.

15            THE COURT:  Any problems with that?

16            MS. KOLBI-MOLINAS:  No.  She's a party, so no.

17            THE COURT:  The deposition is admitted.  What exhibit

18   number is it?

19            MR. DAVIS:  I think we're up to 79.  The deposition

20   will be Exhibit 79, Your Honor.

21            THE COURT:  It's admitted, then.  Are those the only

22   two witnesses for Tuesday, or do you have other witnesses as

23   well?

24            MR. DAVIS:  We -- Your Honor, we have fact witnesses

25   for Wednesday in addition to an expert that plaintiffs will

 1   call.  At least one of those fact witnesses we will be able to

 2   call on Tuesday instead if there is a gap in the proceedings.

 3            THE COURT:  Very good.  So we could -- we're having at

 4   least two witnesses and maybe three, depending upon if we have

 5   the time.

 6            MR. DAVIS:  Yes.  That's correct.

 7            THE COURT:  Okay.  And then Wednesday, what are we

 8   looking at?

 9            MS. KOLBI-MOLINAS:  Plaintiffs have one witness at

10   nine a.m. in the morning.

11            THE COURT:  Okay.  And is that witness going to take

12   all day or just part of the day?

13            MS. KOLBI-MOLINAS:  No, no, no.  Just part of the

14   morning.

15            THE COURT:  Part of the morning?

16            Do the defendants have any witnesses for Wednesday?

17            MR. DAVIS:  We do.  Dr. Williamson will testify on

18   Wednesday and Carter Sims.  He's the one that, if there's time,

19   we'll move him to Tuesday to make the best use of the Court's

20   time.

21            THE COURT:  Now, is Williamson -- is that right?

22            MR. DAVIS:  Dr. Williamson, yes.

23            THE COURT:  Will that witness take all day?

24            MR. DAVIS:  No.

25            THE COURT:  Okay.  So we're looking at probably a

 1  partial day on Wednesday and maybe even a partial day on

 2  Tuesday.

 3          MR. DAVIS:  Correct.

 4          THE COURT:  Now, we won't be holding court on Thursday

 5  and Friday.  We won't resume until the following Thursday --

 6  I mean -- yes.  Thursday and Friday.

 7          MR. DAVIS:  Correct.  On June 5th, that Thursday, Your

 8  Honor, there's some guidance you might be able to provide to

 9  facilitate scheduling.  The witness who will be testifying in

10  the morning will be testifying from a federal courthouse in Los

11  Angeles.

12          THE COURT:  Oh.

13          MR. DAVIS:  In deference to the staff there, we -- it

14  might be prudent to start a little later.

15          THE COURT:  Yes.  There -- is it two or three -- two

16  hours.

17          MR. DAVIS:  There's a two-hour time difference, Your

18  Honor.

19          THE COURT:  Right.  What time is that witness scheduled

20  to test on Thursday?

21          MR. DAVIS:  We haven't set that definite time.  Only in

22  the morning.  We were waiting.  We wanted to speak to Your Honor

23  to see what your preference is.

24          THE COURT:  Is this the only witness that will testify

25  that day?

1              MR. DAVIS:  No, Your Honor.  Dr. Thorp will testify in

2    the afternoon from a courthouse.

3              THE COURT:  Is there no way we can take that witness in

4    the morning?

5              MR. DAVIS:  I've tried to switch those, Your Honor, and

6    the experts' schedules did not permit it.

7              THE COURT:  How long will the morning witness take?

8              MR. DAVIS:  Dr. Keyes will not be as long as Dr. Thorp.

9    We may be adjusting our plan somewhat because of this to try to

10   streamline that testimony.  We're confident that those two

11   witnesses can be put on during the day.  I certainly can't speak

12   for what plaintiffs have in cross; but based on the way things

13   are going, we are very confident that we can arrange things so

14   that those witnesses can be done during the day even if we were,

15   for example, to start at ten in the morning as opposed to nine.

16             THE COURT:  Okay.  Does starting at ten pose a problem

17   in California?  That's eight.

18             MR. DAVIS:  I will need to address -- it wouldn't with

19   our witness.  I would need to speak with Mr. White.

20             THE COURT:  That's what I mean.  I assume we're talking

21   about the personnel in California.

22             MR. DAVIS:  Correct.  I would assume that Mr. White

23   would need to speak with -- or someone from the courthouse would

24   need to speak with LA courthouse staff.

25             THE COURT:  Right.  Right.  Well, let's try to resolve

1   that as soon as we can and by no later than Tuesday.

2          MR. DAVIS:  We will do so.

3          MS. KOLBI-MOLINAS:  Your Honor.

4          THE COURT:  Yes.

5          MS. KOLBI-MOLINAS:  We anticipate, then, that we would

6   call our rebuttal witness on the 6th in the morning; is that

7   correct?

8          THE COURT:  Very good.  How long will your rebuttal

9   witness take?

10          MS. SANDMAN:  It's difficult to say, Your Honor, since

11   we don't know what we're rebutting yet.

12          THE COURT:  I know, but is it going to be like a full

13   morning?

14          MS. SANDMAN:  I would anticipate it would be a full

15   morning.

16          THE COURT:  Very good.  Okay.  We'll start Tuesday at

17   nine.

18          Then, Anthony, do we have anything else?

19          Oh, can we take this down?  Do we need the draperies

20   anymore?

21          MS. KOLBI-MOLINAS:  No.  We don't have any more.

22          THE COURT:  No more anonymous witnesses; is that right?

23          MS. KOLBI-MOLINAS:  No.

24          THE COURT:  Very good.  Thank you very much.

25      (Evening recess at 2:20 p.m.)

1                    COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4            This 3rd day of June, 2014.

5

6                                    /s/ Risa L. Entrekin
                                     Registered Diplomate Reporter
7                                    Certified Realtime Reporter
                                     Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25