1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE MIDDLE DISTRICT OF ALABAMA

3                              NORTHERN DIVISION

4

5   PLANNED PARENTHOOD
    SOUTHEAST, INC., et al.,

6
            Plaintiffs,

7
        vs.                      CASE NO.:  2:13cv405-MHT

8
    LUTHER STRANGE, et al.,

9
            Defendants.

10

11

12

                                 VOLUME VI

13
                       * * * * * * * * * *

14
                       NONJURY TRIAL PROCEEDINGS

15
                       * * * * * * * * * *

16

17          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

    DISTRICT JUDGE, at Montgomery, Alabama, on Tuesday, May 27,

18
    2014, commencing at 9:06 a.m.

19
    APPEARANCES:

20
    FOR THE PLAINTIFFS:      Ms. Alexa Kolbi-Molinas

21                           Mr. Andrew David Beck
                             Ms. Susan Talcott Camp

22                           Ms. Julia Heather Kaye
                             Attorneys at Law

23                           AMERICAN CIVIL LIBERTIES UNION
                             125 Broad Street, 18th Floor

24                           New York, New York  10004-2400

25

```
 1   APPEARANCES, Continued:

 2   FOR THE PLAINTIFFS:        Ms. Jennifer R. Sandman
                                Ms. Maithreyi Ratakonda
 3                              Attorneys at Law
                                PLANNED PARENTHOOD FEDERATION
 4                              OF AMERICA
                                434 West 33rd Street
 5                              New York, New York  10001

 6                              Ms. Dyanne Griffith
                                Attorney at Law
 7                              WILMER CUTLER PICKERING
                                HALE & DOOR, LLP
 8                              1875 Pennsylvania Avenue NW
                                Washington, D.C.  20006
 9
                                Mr. Randall C. Marshall
10                              Attorney at Law
                                ACLU of ALABAMA FOUNDATION, INC.
11                              P.O. Box 6179
                                Montgomery, Alabama  36106-0179
12
                                Mr. M. Wayne Sabel, Sr.
13                              Attorney at Law
                                SABEL & SABEL, P.C.
14                              2800 Zelda Road, Suite 100-5
                                Montgomery, Alabama  36106
15

16   FOR THE DEFENDANTS:        Mr. Andrew L. Brasher
                                Solicitor General
17                              STATE OF ALABAMA
                                OFFICE OF THE ATTORNEY GENERAL
18                              501 Washington Avenue
                                Montgomery, Alabama  36103
19
                                Mr. James William Davis
20                              Ms. Margaret Lindsey Fleming
                                Mr. Kyle A. Beckman
21                              Ms. Laura Elizabeth Howell
                                Assistant Attorneys General
22                              STATE OF ALABAMA
                                OFFICE OF THE ATTORNEY GENERAL
23                              501 Washington Avenue
                                Montgomery, Alabama  36130
24

25
```

1    APPEARANCES, Continued:

2    FOR THE DEFENDANTS:      Ms. Patricia Elaine Ivie
                              Mr. Phillip Brian Hale
3                             Assistant Attorneys General
                              Office of General Counsel
4                             STATE OF ALABAMA
                              DEPARTMENT OF PUBLIC HEALTH
5                             RSA Tower
                              201 Monroe Street
6                             Montgomery, Alabama  36104

7              Proceedings reported stenographically;
                 transcript produced by computer.
8
                       * * * * * * * * * *
9
                          VOLUME INDEX
10
     JAMES CORR ANDERSON, M.D.
11        DIRECT BY MR. DAVIS                      4
          CROSS BY MS. GRIFFITH                   40
12        REDIRECT BY MR. DAVIS                   61
          RECROSS BY MS. GRIFFITH                 70
13        REDIRECT BY MR. DAVIS                   71

14   WILLIAM CARTER SIMS
          DIRECT BY MR. DAVIS                     72
15
     PETER UHLENBERG, Ph.D.
16        DIRECT BY MS. HOWELL                    92
          CROSS BY MR. BECK                      123
17        REDIRECT BY MS. HOWELL                 140

18   WILLIAM CARTER SIMS
          FURTHER DIRECT BY MR. DAVIS           143
19        CROSS BY MS. SANDMAN                   146
          REDIRECT BY MR. DAVIS                  166
20
                       * * * * * * * * * *
21

22

23

24

25

```
 1        (The following proceedings were heard before the Honorable
 2         Myron H. Thompson, United States District Judge, at
 3         Montgomery, Alabama, on Tuesday, May 27, 2014, commencing
 4         at 9:06 a.m.:)
 5        (The witness is sworn)
 6        (Call to Order of the Court)
 7             THE COURT:  What's the agenda for today?
 8             MR. DAVIS:  Your Honor, the defendants are ready to
 9   call Dr. James Anderson, one of our experts, who is on screen
10   and ready to go.
11             THE COURT:  Okay.  Very good.  And I have your summary
12   here?
13             MR. DAVIS:  Yes.
14             THE COURT:  Very good.  Just let me take a moment and
15   read it.
16        (Brief pause)
17             THE COURT:  Thank you.  Go ahead.
18             JAMES CORR ANDERSON, M.D., the witness, having been
19   duly sworn to speak the truth, the whole truth, and nothing but
20   the truth, testified by videoconference as follows:
21                            DIRECT EXAMINATION
22   BY MR. DAVIS:
23   Q.  Good morning, Dr. Anderson.
24   A.  Good morning there, Mr. Davis.
25   Q.  Would you state your name for the record, please.
```

1  A.   James Corr, C-O-R-R, Anderson, A-N-D-E-R-S-O-N.

2  Q.   And what do you do for a living, Dr. Anderson?

3  A.   I've been a physician since 1978, when I finished medical

4  school.

5  Q.   Are you board --

6  A.   In practice full-time.

7  Q.   Are you board certified?

8  A.   Yes.

9  Q.   In what areas?

10  A.   Boarded in family practice and emergency medicine.

11  Q.   Have you been retained as an expert witness by the

12  defendants in this case, the State of Alabama, state officials,

13  to express opinions concerning HB57?

14  A.   Yes, I have.

15  Q.   And are the expert reports you've submitted an accurate

16  reflection of your expert opinions?

17  A.   Yes, they are.

18  Q.   And your first report contained a copy of your resume.  Does

19  that contain an accurate reflection of your career achievements

20  and education background?

21  A.   Yes, they are accurate.

22       MR. DAVIS:  Your Honor, we move to admit Exhibit 3,

23  Defendant's Exhibit 3, Dr. Anderson's first report and CV,

24  Exhibit 4, which is his supplemental report.  And we tender him

25  as an expert.

1        MS. GRIFFITH:  Plaintiffs object.  Dr. Anderson has not

2   been qualified as an expert to offer the opinions stated in

3   those expert reports.  They lack foundation.

4        THE COURT:  What do you mean not offered?  You mean

5   defendants have not met the procedural requirements of stating

6   that he is -- he's to be an expert?

7        MS. GRIFFITH:  Correct.

8        THE COURT:  Okay.  Mr. Davis?

9        MR. DAVIS:  I don't understand how.  We disclosed him

10  as an expert.  They have deposed him.  He has been a practicing

11  physician for 30 years.  He's offering opinions based on the

12  reasonableness and medical necessity of a privilege requirement,

13  which we contend affects the standard of care for women who seek

14  abortions.

15       THE COURT:  You're saying you didn't receive notice

16  that he would be an expert?

17       MS. GRIFFITH.  No.  We -- we received notice, Your

18  Honor.  We just don't know in what particular areas of medicine

19  Dr. Anderson is being offered as an expert.

20       THE COURT:  Okay.  You're saying that he just doesn't

21  meet the qualifications to testify about what he's testifying.

22       MS. GRIFFITH:  Correct.  Based on what defendants have

23  put forth thus far.

24       THE COURT:  Okay, then.  I'll consider his testimony

25  under the same circumstances as I'm considering, I believe, an

 1   expert from the plaintiffs; that is, I'll determine whether the

 2   *Daubert* requirements have been met and, if they have, whether

 3   I find the witness credible.

 4          MS. GRIFFITH:  Thank you, Your Honor.

 5          THE COURT:  Very good.  And I believe there was one

 6   witness for the plaintiff that I applied that criteria to.  Who

 7   was that?

 8          MS. KOLBI-MOLINAS:  Dr. Freedman, Your Honor.

 9          THE COURT:  Dr. Freedman.  Okay.  The same rule applies

10   here.  So I'll conditionally allow him to testify; that is,

11   Dr. Anderson.

12          MR. DAVIS:  Thank you, Your Honor.

13   Q.  (Mr. Davis, continuing:)  Dr. Anderson, would you tell His

14   Honor about your experiences working as an emergency room

15   physician.  How many years did you engage in an emergency room

16   practice?

17   A.  I was in emergency medicine full-time from 1984 through

18   1986 -- to 1996.  Excuse me.  Twelve years full-time.  And then

19   13 more years part-time, from 1996 to 2005.  But I had to resign

20   from the emergency room because I joined the U.S. Army Reserves

21   and did their deployments to Texas, Germany, Iraq, and

22   Afghanistan.  And I worked in the combat support hospitals in

23   emergency medicine there, as well as the step-down units

24   overseas.  So I still did emergency critical care overseas; but

25   I resigned from the hospital here, emergency room, in 2005.

1       And so the emergency medicine really spans until 2012, but

2   part of that time was with the Army.  But I joined a private

3   practice training program in family medicine in 1996 and have

4   been employed there full-time since 1996.  And we're with the

5   Medical College of Virginia here in Richmond.  And we train

6   family practice doctors in family medicine.  That's why I carry

7   a dual board certification.

8   Q.  Where did you receive your medical degree, Dr. Anderson?

9   A.  University of Virginia.

10  Q.  And you practice in the state of Virginia now?

11  A.  Yes.  My whole career.

12  Q.  Dr. Anderson, in your experience as an emergency room

13  physician, have you had occasion to treat patients who were

14  coming because of complications due to outpatient procedures?

15  A.  Yes.

16  Q.  Have some of those patients been people who have had

17  abortions?

18  A.  Yes.

19  Q.  So these were patients who came to the emergency room

20  because they had a complication due to an abortion that they had

21  previously, correct?

22  A.  Correct.

23  Q.  How frequent was that, that you saw such a patient?

24  A.  Well, I don't keep any database.  I don't have to have -- or

25  I don't have any accurate way to give you the exact number; but

1    I would say it was somewhat frequently, either monthly or every

2    other month, on some of the short-term complications, but if you

3    look at the bigger picture, the psychological impact and the

4    impact on them the long-term.

5       See, one thing about our hospital at Richmond is we're an

6    intake for the psychiatric institute there, called the Tucker

7    Psychiatric Institute.  So we saw a lot of people with

8    depression.  Now, that's been noted to be a complication of

9    abortion.  So, you know, abortion complications is a big area.

10   But I saw both short-term, acute complications as well as

11   long-term.

12   Q.  What are some of the complications a patient might have

13   because of an abortion, some of the physical complications that

14   she might have?

15   A.  Well, the -- the biggest would be persistent bleeding and

16   infection.  And you could have -- and this is more rare --

17   uterine perforation, but the bleeding and infection are your two

18   biggest.

19   Q.  Can a complication due to an abortion be a serious health

20   matter?

21   A.  It can be life-threatening, cause death.

22   Q.  Is it important that such a patient receive treatment as

23   quickly as possible?

24   A.  In the area of infection and hemorrhage, sometimes a

25   little -- a delay of an hour can mean the difference between

1    life and death with infection or bleeding, because they can both

2    be massive in this setting.

3    Q.  When that patient -- someone with a complication due to an

4    abortion, when she presents to the emergency room, is continuity

5    of care important for good treatment of that patient?

6    A.  Continuity of care is one of the foundational principles of

7    a good health care system because the treating physician knows

8    the patient.  They have an idea of the past medical history.

9    They have an idea of medications.  They know what past

10   procedures have been done, whether it's, you know, cardiac

11   intervention or surgical intervention for intraabdominal issues.

12   So the continuity of care brings a knowledge base and a

13   familiarity with the patient that is very important in the

14   present treatment of that patient.  It makes it much better for

15   the patient.

16   Q.  How would you define continuity of care?

17   A.  Well, it involves communication, accessibility, and

18   availability.  If a physician is -- probably the number one

19   request we hear from patients is accessibility.  When they need

20   us, they need someone to talk to or to see.  So continuity of

21   care involves being available, being accessible, and

22   communicating.  And sometimes it's just by phone.  Sometimes

23   it's face to face.  Sometimes it's being able to set up an

24   appointment if your back's not against the wall.  But it's

25   really those three things:  availability, accessibility, and

 1   communication.

 2   Q.   If a patient presented to you as an ER physician with a

 3   complication from an abortion, would it be helpful to you as the

 4   emergency room doctor to communicate with the abortion clinic

 5   about the patient?

 6   A.   It would always be helpful.   There's -- whenever you're

 7   starting off brand new with a patient, you've kind of got to be

 8   like a detective.   You get the history, what's going on, what

 9   are the symptoms, and do the physical exam and put that

10   information together.   And if I've had a call from an abortion

11   provider giving me that information, I'm not at all starting in

12   the dark.

13       And another thing that people don't factor into the

14   situation is if a young lady comes to the emergency room and

15   she's sick and she just gets put in line with the other

16   patients, you -- I don't know she's at the area in the waiting

17   room.   I don't know what's going on until she gets back.   And if

18   the abortion provider has given me a call and says, I'm sending

19   a patient, then I can tell the triage nurse, bring them straight

20   back because I have an idea.

21       And so the time delay of just getting into the medical ER is

22   significant.   But when you get history and you get patient

23   information in the present, it just gives you a reference point

24   that you can build on when you see that patient.   So it's more

25   than just a detective, you know, getting information.   You've

1   got two points of reference that is very helpful in determining

2   where she's going in her care or in her medical situation.

3   Q.  The plaintiffs in this case retained Dr. Paul Fine to

4   express expert opinions, Dr. Anderson.  And Dr. Fine testified

5   that in his opinion, there's no real benefit to a phone call

6   between the emergency doctor and the abortion doctor or even the

7   abortion clinic.  Do you agree with Dr. Fine?

8   A.  I completely disagree with that.  I -- I've been training

9   young doctors for almost 20 years.  And there are five

10  attributes the young physician has to have.  And one of them is

11  compassion, that every patient is valuable by virtue of their

12  title.  They're all mothers, fathers, brothers, sisters, sons,

13  daughters, husbands, wives.  People are valuable.  And the

14  second quality is communication.  If you don't communicate by

15  being accessible, available by phone call, basically, confusion

16  stays on the -- (audio skip) -- longer than nonconfusion.

17  Communication clears up the uncertainty of the situation.

18      So I just don't see any detrimental value of a two-minute

19  phone call versus -- I mean the information I get from that

20  phone call.  But communication is critical.  There's not one

21  person in the health care system that doesn't want communication

22  among other physicians or not one patient that doesn't want

23  their physicians talking.

24  Q.  Now, sometimes -- or if the doctor who performs the abortion

25  can follow the patient to the hospital and treat his or her

1    patient's complications directly, that is continuity of care,

2    one form of it.  Correct?

3    A.  Yes.  Absolutely.

4    Q.  If, for one reason or another, it's not possible for the

5    abortion doctor to go to the emergency room, would communication

6    between the emergency room doctor and the clinic be another form

7    of continuity of care?

8    A.  Absolutely.

9    Q.  What can -- what dangers might you see or face as an

10   emergency room provider -- or as an emergency room patient if

11   there's not communication between the ER doctor and the abortion

12   provider?

13   A.  I would continue to say that communication is critical in

14   three different arenas in the care of a patient.  The first is

15   like what you're referring to in continuity of care.  The

16   communication allows me to have an idea of what's been going on,

17   how long.

18       I mean if the abortion was done the day before and the young

19   lady's called the doctor and says, I've got fever, that helps

20   me.  So that anything historical about the procedure, her past

21   medical history, her medications, what she's gotten, help me

22   understand -- if she's gotten things that can lower blood

23   pressure or raise blood pressure.  So all of that, the history,

24   the time, the medication, is very important.  And it's been

25   shown to -- I mean that continuity of care there is definitely

1  tied to better clinical outcomes.

2     Another area where the communication is critical is between

3  other physicians on staff, your subspecialists.  Because if a

4  subspecialist is needed in a situation and they're brought into

5  it, they come in with a focus instead of me having to track down

6  a subspecialist.  So the phone call to either me or to the staff

7  physician helps them prepare their schedule to arrive earlier,

8  to be available, and to have focus.  So the communication is

9  between doctor to doctor, and that's been shown to be of very

10  much concern in a situation in today's primary medical world at

11  times.

12     And thirdly, the time delays.  Like I said, the phone call

13  puts everybody on alert that we're looking for a young lady that

14  has a potential of being much sicker than what she would sound

15  like if she had gone home and it was the day after abortion and

16  she's just talking about pain or bleeding.  But it gets it so

17  she doesn't wait in the waiting room.  She doesn't have to go

18  through a -- (audio skip) -- process to figure out what's going

19  on.  So communication helps with the patient care, continuity.

20  And every patient wants the physician-to-physician transfer

21  consultation process.  And it helps in time delays, whether it's

22  just waiting to get back or people being prepared to move

23  quickly.

24  Q.  You mentioned bringing in specialists on occasion,

25  Dr. Anderson.  Isn't it necessary sometimes for a doctor to

1  refer a patient to another physician?

2  A.  Well, it's probably a daily occurrence for me.  It is.

3  Because medicine is so technical and so comprehensive and

4  extensive that part of everybody's care is connecting a patient

5  with someone who's an expert in that arena, if that patient is

6  outside of my medical knowledge base or my technical skill.  So

7  that transfer of care or consultation process is something we do

8  daily.

9  Q.  When you refer a patient to a specialist, do you communicate

10  with the specialist about the patient?

11  A.  I tell the young doctors, as well as my own practice, you

12  will do a much better job if you treat the subspecialist with

13  respect and dignity and give him a heads up or her a heads up

14  and say, this is what I need.  I'm worried about this.  And I've

15  done this test and I've done this.  Can you help me in this

16  arena?

17     And they always are appreciative of that because they know

18  where to drill down and they don't feel like I'm just kind of

19  sloughing off on them.  I'm making an appeal that I need their

20  help, and you treat them with dignity and respect.  It turns out

21  to better patient care.  They go in there and their patients get

22  better care and I get a better consult.  So it's a win-win for

23  all of us.

24  Q.  So you share information and records with specialists when

25  you refer patients, correct?

1  A.  Absolutely.  I copy their record, I fax it to their chart --

2  I mean to their office.  I copy that record and give it to the

3  patient with a letter from me.  And many times if my back is

4  against the wall timewise, I'll also do the phone call.  Now, if

5  I send them to the emergency room, I always do two or three

6  phone calls.  I'll call the ER doctor, I call the -- our doctor

7  who's in the hospital, and then I'll call the subspecialist

8  about them.

9  Q.  So do you remain involved in your patient's care after he or

10  she has been referred to a specialist?

11  A.  Yes, we do.  They'll either give a courtesy consult or if

12  they want us to manage something -- like if I send someone to a

13  surgeon, they want us to still manage their hypertension and

14  diabetes and ongoing medical problems.  So many times you're

15  there just to say hi.  The patients use you as a reference

16  point.  So courtesy privileges, you know, courtesy visit, we

17  don't charge for; but a lot of times they want us to handle the

18  medical situation.  And in the case of a subspecialist, like a

19  gastroenterologist or endocrinologist, they're kind of narrow in

20  their area of expertise so they want us to take care of other

21  situations as well.  So we're very much involved in the

22  patient's care.

23  Q.  Are you familiar, Dr. Anderson, with the admitting

24  privileges requirements of HB57 as applied to doctors who

25  perform abortions?

1  A.   Yes, I am.

2  Q.   Do you have an opinion, based on your education and

3  experience, of whether this provision is reasonable and

4  medically necessary?

5  A.   Yes, I do.   I believe it is reasonable and medically

6  necessary.

7  Q.   You believe it will improve the quality of care for abortion

8  patients?

9  A.   I believe it will improve the quality of care for women who

10  experience postabortion complications.

11  Q.   Speaking of complications, Dr. Anderson, Dr. Fine, one of

12  the plaintiff's experts that I mentioned before, has testified

13  that the rate of complications for abortion patients is very

14  low.   Do you agree?

15  A.   Well, it -- I don't have a database of my patients that I've

16  seen with complications.   But in 2002, I was in a court case in

17  Alaska, and they asked me for numbers, and I had to kind of

18  guess.   I didn't have a database.   But basically, I would say I

19  would see one or two a month or every other month.   But that's

20  just -- I don't -- that's my best guess estimate.   And I don't

21  know if -- how accurate that is.   I have no way of determining

22  it.   But I have seen many complications, and never have I

23  reported one because there's no vehicle in which to report it.

24  There's no database that you can input that information to.

25  There's nobody -- I mean the health department doesn't collect

1    that information.

2        So when I'm looking at reporting institutes, knowing that,

3    really, between two-thirds and one-half of women do not follow

4    up with the abortion provider and many of them come to the ER,

5    they don't have any idea of the women that have come to the ER

6    for minor complications, per se.  They can be severe; but for

7    the most part, it's early and it's minor and we can treat it

8    without them needing admission or anything.  So I would say,

9    from my perspective, the data collection is very poor, very

10   inconsistent, and there's no vehicle to make that so that it is

11   good data, that I know of.

12   Q.  Have you had patients who are reluctant to share that

13   they've had an abortion?

14   A.  Very often.  I mean I wouldn't say it's the majority of

15   patients, but it's a significant minority that are really

16   fighting the guilt or sense of shame or being labeled.  It's

17   something that they're not proud of.  And it's private

18   information.  And I've had them tell me they haven't had an

19   abortion when actually they have.  And I've had them tell me,

20   please don't disclose on my medical record that I've had an

21   abortion, because it's hidden from family and friends, and they

22   don't want any way that it can come back.

23   Q.  Let's go -- let's go back to your emergency room experience,

24   Dr. Anderson.  When you have treated patients who have had

25   complications resulting from abortions, have you had the benefit

1  of communication with abortion providers?

2  A.  Well, in my -- at Chippenham Hospital and Johnston Willis

3  Hospital in Richmond, Virginia -- I've been in those hospitals,

4  like I said, 24 years -- 23 years.  And I never have received

5  once a call from an abortion provider about a young lady that he

6  was worried about and he would like me to see.  I've never

7  received an initiatory phone call.  Now, I've called them to let

8  them know and to give them information, but I've never had a

9  phone call initiated by the abortion provider.

10  Q.  When there has been no communication between you and the

11  abortion clinic, you've still been able to treat the patient,

12  correct?

13  A.  Yes.  I mean it takes longer to figure out what's going on

14  and the degree of her illness, the -- how far the problem has

15  gone, the bleeding or the infection.  But yes, absolutely, we

16  treat as soon as we can.

17  Q.  But would the treatment be better and quicker if you had

18  good communication between you, the ER doctor, and the abortion

19  provider?

20  A.  There is no question about that.  Continuity of care has

21  been shown over and over to improve clinical outcomes.  In a

22  good health care system, Jim, the -- the patient's safety and

23  the patient outcome is our top priority.  If you have a

24  patient-centered health care system, that's your priority.  Now,

25  if you have a doctor-centered health care system, it can get

1  entered as a convenience or things like that.  But all of us

2  want a patient-centered health care system where clinical

3  outcomes, patient safety are our top priority.  And continuity

4  of care has been shown over and over again to impact clinical

5  outcome and patient safety.

6  Q.  Dr. Anderson, I want you to assume that some of the clinics

7  in Alabama do not retain doctors who have local admitting

8  privileges.  I want you to assume that they retain doctors who

9  come from other cities for a day, perform abortions, and then go

10  back to their home cities.  What dangers does that model present

11  to patient care?

12  A.  Well, let me see.  Let's go to the credentialing process

13  that this law is making mandatory.  The credentialing process,

14  looking at a physician's comprehensive knowledge base and

15  technical skills proficiency has been -- really been shown to be

16  a very important thing for patient safety and clinical outcomes.

17  So if you have physicians that fly in and fly out or come in and

18  come out and they're not scrutinized by this very rigorous,

19  protective process, that can really leave women wide open if

20  they place their trust in a physician that could be unqualified,

21  both from a technical standpoint or from a knowledge-base

22  standpoint, to do this procedure.

23      And really, the key that you and I are driving at here is

24  physician and qualifications that are scrutinized and,

25  therefore, protective for the patient as well as the

1  vulnerability of the patient.  The patient trusts the physician,

2  that they've gone through some qualification process.  And

3  there's not been the process if they're coming in and going out

4  and don't have hospital privileges scrutiny.  So I think it

5  really leaves a major crack in the system that a vulnerable

6  young lady can fall into when she places her trust into that

7  physician.

8  Q.  Okay.  Let's pause there for just a second.  If -- do I

9  understand you to say that if a doctor has no privileges

10  anywhere, that they're missing an important check on their

11  qualifications?

12  A.  Yes.  I mean local or if they don't have privileges in other

13  hospitals.  It could be out of state.  That is beneficial for

14  sure.  But the local privileging brings them into the continuity

15  of care, the staff relationships, the communication, and the

16  time delays we talked about earlier.  But most hospitals are

17  governed by the Joint Commission and have a very rigorous

18  qualification scrutiny of physicians.  So out-of-state

19  hospitals' scrutiny should be somewhat equivalent from one

20  hospital to another, but I don't have experience in that realm

21  to give you an expert opinion on that.

22  Q.  Okay.  You mentioned continuity of care again, which can be

23  an advantage of having local privileges.  So are there problems

24  with continuity of care if a doctor lives in one city and treats

25  patients far away and then goes back home?

1   A.  Well, what I said, continuity of care involves

2   accessibility, availability, and communication.  So that doctor

3   who travels can communicate by phone if they take the initiative

4   to do that; but they're really not accessible and available if

5   they're out of touch, if they're on a plane, if they're out of

6   the city.  And it is very different than having your own

7   partner, who has access to your medical information, taking call

8   for you.

9       So I would say the continuity of care in that arena is zero

10  for the most part, except maybe a phone call.  But it's --

11  it's -- if it's -- if there's any, it's minuscule if the doctor

12  doesn't have relationships and a practicing physician partner

13  with him or her that has access to the information.

14  Q.  Okay.  Let's say a woman gets an abortion in her home city.

15  The doctor who performs the abortion has admitting privileges in

16  that same city.  If she has a complication, can, in many

17  situations, the doctor -- if the doctor is going to send her to

18  the emergency room, ask her to come to a particularly --

19  particular emergency room where -- where the doctor practices?

20  A.  I'm not sure I heard you right.  If the doctor lives in a

21  city that's different than her, he would ask her to come back to

22  her -- his city?

23  Q.  No.  I asked that poorly.  I asked that poorly,

24  Dr. Anderson.  Let's say everything is in the same city.  The

25  doctor practices in Birmingham, has privileges in Birmingham,

1   the woman lives in Birmingham.  Doctor has privileges at UAB

2   Hospital.  The doctor can say, you need to go to the emergency

3   room; I want you to come to the UAB emergency room so I can

4   treat you there.  Is that correct?

5   A.  Yes.  I mean -- yes.  That is correct.

6   Q.  And that would help continuity of care.

7   A.  Yes.  That -- that same physician who initiated treatment

8   and knows the patient is involved.  That's really what

9   continuity of care is.

10  Q.  But let's say the woman lives in Atlanta and she's chosen to

11  drive to Birmingham for an abortion for personal reasons and

12  then she goes back home to Atlanta.  Well, her doctor has

13  privileges in Birmingham.  So if she goes to the ER, she's most

14  likely to go to the ER in Atlanta, correct?

15  A.  Yes.

16  Q.  Is there any benefit to that patient to her doctor having

17  privileges in a Birmingham hospital?

18  A.  Outside of, you know, what we said about qualifications.  If

19  you get privileges anywhere, that's a good scrutiny.  But she

20  needs to go to the ER closest to her if at all, you know,

21  worried about hemorrhaging or infection.  You know, a phone call

22  at that time is the best they can do.  I mean in certain

23  situations, all you and I have is the best we can do.  And so

24  you've kind of got to opt for what's best for the patient.

25      In this case, I would say it's best for the patient to go to

1  the ER, notify the abortion provider in Birmingham, and have him

2  or her call the physician -- ER in Atlanta.  I mean it's easy to

3  call long distance.  You know that, I know that, and I do that

4  when I get a patient come in.

5  Q.  So the doctor can communicate with the emergency room in

6  Atlanta, but consider this, Dr. Anderson.  If the doctor in

7  Birmingham has local admitting privileges and is more accustomed

8  to following his patients through the emergency room and observe

9  continuity of care, is that doctor more likely to observe

10 continuity of care than a doctor who routinely flies in and out

11 and just refers patients to emergency rooms?

12 A.  Well, you're talking about habits.  That's what you're

13 talking about.  And with the young physicians, I tell them all

14 day long, you develop habits now that will last for 30 years.

15 If you're not going to be sloppy now, it will carry you through

16 30 years.  And the continuity of care habits, once they're

17 ingrained in you, you try to operate by those habits.

18     So if you're used to not communicating, if you're used to

19 not calling the ER physician, then you won't do it at any time,

20 because that's your norm.  That's your day to day.

21 Q.  So in that circumstance, it's still a benefit to the patient

22 if the doctor has admitting privileges and is accustomed to

23 observing continuity of care.  Would you agree with that?

24 A.  Yes.  Absolutely.

25 Q.  If an abortion clinic routinely depends on emergency rooms

1  to take care of their patients, is this likely to result in

2  delays and affect the speed of treatment?

3  A.   And affect what?

4  Q.   Affect the speed of treatment.

5  A.   Yes.   Because it -- the emergency room doctor has to start

6  over:  And how long was the gestation?  What procedure was done?

7  And like I said, I've had patients that denied the abortion.  So

8  you have to start off as a detective right from the beginning.

9  You might not even mention abortion.  If they come in and they

10  have a fever and you're thinking, well, they could just have a

11  pneumonia, they could have a gastroenteritis.  So in that

12  situation, time delays are very much a part, potentially.  And

13  then again, like I said, if you don't get a phone call, the

14  patient might sit out in the waiting room and be in extreme

15  distress, but nobody knows because that young lady is sitting

16  there quietly and just waiting her turn, and her blood pressure

17  and her sickness might be getting worse.

18      So if the physician doesn't communicate normally with the ER

19  doctor, there's -- just would be fraught with problems.

20  Q.   And if an abortion clinic routinely relies on emergency

21  rooms to treat their patients' complications, does that make

22  miscommunications more likely?

23  A.   It almost guarantees it.  Because when you get a 14- or a

24  15-year-old young lady who's had an abortion and she's scared to

25  death and you start asking her medical questions, you can't get

1  information from her, for the most part.  I mean sometimes you

2  can, but young people who are real scared -- and it doesn't have

3  to be young.  If people are sick, their communication skills get

4  inaccurate.  They feel lethargic, they feel poorly, and they

5  just want to get better.  So I would say it is fraught with

6  complications if the ER doctor is just considered normal

7  postabortion care.

8  Q.  Let's go back to admitting privileges, Dr. Anderson.  Do you

9  have admitting privileges at a hospital in Virginia?

10  A.  I do.

11  Q.  How many hospitals?

12  A.  Over my medical career, when I worked in different emergency

13  rooms, I would say six or eight hospitals in Virginia and

14  emergency room privileges.  And only two have I admitted

15  patients to, Chippenham Hospital and Johnston Willis Hospital,

16  as far as my family practice, general medical care.  I have

17  admitting privileges there.  And the Army gave me admitting

18  privileges when I was deployed by them in Landstuhl and

19  Beaumont, Texas, and in Afghanistan; Landstuhl, Germany, and

20  Iraq and Afghanistan.  I had to go through the credentialing

21  process with them every other year, that whole process.

22  Q.  As part of that credentialing process, do you have to

23  satisfy the hospitals of your qualifications as a doctor?

24  A.  It's very extensive.  You've got to get letters of

25  recommendation.  They go to your continuing education.  They go

1   to your technical skills as far as what I would do in emergency,

2   intubate and subclavian lines, proving that I was technically

3   proficient.  They look at my board status and my

4   recertification.  So -- and then they pass it through a board of

5   their own to check.  Then they call physicians that I work with.

6   Q.  Are you aware, Dr. Anderson, of any other states that, like

7   Alabama, has passed a statute requiring abortion doctors to have

8   local admitting privileges?

9   A.  I have.  Five different states, Mississippi, North Dakota,

10  Wisconsin, Alabama, and Texas have passed similar legislation.

11  Q.  Do you know if the law has gone into effect in any of those

12  states?

13  A.  Only in Texas that I know of.  I'm not sure if -- if -- I

14  don't think it's gone in effect in any other states; but in

15  Texas, it has.

16  Q.  Do you know if people can still get abortions in Texas?

17  A.  Yes.  I mean I -- in the deposition that we did for -- for

18  this case here in November, I received information from the

19  Attorney General's Office in Texas that an abortion provider had

20  applied for admitting privileges, received those admitting

21  privileges, and was continuing in providing abortions for the

22  women in his area.

23  Q.  There's been testimony in this case, Dr. Anderson, that a

24  doctor might be reluctant to apply for privileges because she's

25  fearful that the application will be denied and that will be a

1   stain on her record going forward.  Are there reporting

2   requirements if an application for privileges is denied?

3   A.  Yes, there are.

4   Q.  Do all denials get reported?

5   A.  No, they don't.

6   Q.  Are you familiar with the National Practitioner Data Bank

7   Guidebook, Dr. Anderson?

8   A.  I am.  I am.

9   Q.  And what's your understanding of what types of denials must

10  be reported?

11  A.  The ones that are based on physician competency and patient

12  care.  If a physician's privileges are denied for maybe

13  advertising or something like that, that's really not patient

14  care and physician competency.  That does not need to be

15  reported.  But if it has to do with patient safety and patient

16  care, the denial, then that has to be reported to the national

17  data bank.

18         MR. DAVIS:  Your Honor, I'm going to ask the witness

19  some questions about a document.  I have provided a copy to the

20  plaintiffs, and I have a copy for Your Honor as well, if I may

21  approach.

22         THE COURT:  Okay.  Go ahead.

23         MS. GRIFFITH:  Your Honor, I'd just like to reaffirm

24  our earlier objection in that Dr. Anderson has not established

25  experience with granting admitting privileges or being charged

1  with admitting privileges or making determinations about whether

2  or not denials need to be reported under the guidebook that he's

3  about to talk about.

4        THE COURT:  I know that defense counsel filed a brief

5  challenging the *Daubert* qualifications of two of the plaintiffs'

6  expert witnesses; is that correct?

7        MS. GRIFFITH:  Correct, Your Honor.

8        THE COURT:  And you filed a response?

9        MS. GRIFFITH:  Yes, Your Honor.

10        THE COURT:  Have you actually filed a brief challenging

11  the *Daubert* qualifications of this witness as well as any others

12  whom you contend do not meet the qualifications as an expert?

13        MS. GRIFFITH:  We have not, Your Honor.  Our intention

14  was to develop that during his testimony.

15        THE COURT:  Well, then, I have to wait --

16        MS. GRIFFITH:  And we did not know --

17        THE COURT:  I'll -- rather than interrupting

18  constantly, why don't you just reserve your challenge and either

19  let me know in writing exactly why I should not credit his

20  testimony and then I'll hear from plaintiffs in response.  Why

21  don't we put a tickler on this and any other experts whom you

22  contend I should discredit.  And then let me know why I should

23  not believe them, either because as a gatekeeper or whether I

24  should not believe them -- even if they are experts, I just

25  shouldn't find them qualified.  I need to know that in writing,

1  and I think I need to give the plaintiffs an opportunity to

2  respond.

3          MS. GRIFFITH:  Thank you, Your Honor.

4          THE COURT:  Okay?  With that understanding, as I said

5  before, I'll allow the testimony conditionally.

6          Go ahead.

7  Q.  (Mr. Davis, continuing:)  Dr. Anderson, is the reporting

8  requirement that hospitals face for denial of privileges, is

9  that something that's common knowledge among doctors?

10 A.  I would say no.  It's not common knowledge.  Because not

11 many doctors are covering that extensively.  Now, there is more

12 shift now than there's ever been; but in my range of physicians,

13 I've worked with groups that have been present for 30 years and

14 we've been operating -- I mean practicing medicine in the same

15 community.  So applying for privileges at a lot of different

16 hospitals is really unknown -- or not common practice for us.

17 That's my guess, that it's not that well-known.

18 Q.  Now, you are aware personally, though, that there are

19 reporting requirements, correct?

20 A.  Yes.

21 Q.  And you're aware that there are limitations on those

22 reporting requirements.

23 A.  Yes.

24 Q.  Is that something you've come to learn over your experience

25 as a doctor practicing in a hospital, over the course of your

1  career?

2  A.  You know, the database came in during my career.  And where

3  I'm kind of familiar with it is the malpractice situation.  So

4  it's just recently on this type of exposure that I'm familiar

5  with it in other cases.  I mean I didn't know that the database

6  was used in any way beyond the malpractice.  I've never been to

7  it until now in these cases.

8  Q.  Would you -- do you have a copy of the guidebook with you,

9  Section E, specifically?

10  A.  Yes, I do.

11  Q.  Would you look at page E-17, Dr. Anderson.

12  A.  All right.  I have it.

13  Q.  And do you see in the left column, the second paragraph that

14  begins, Reportable adverse clinical privileges?

15  A.  Yes.

16  Q.  Would you read that paragraph for the record, please.

17  A.  Reportable adverse clinical privileges actions are based on

18  a physician's or dentist's professional competence or

19  professional conduct that adversely affects or could adversely

20  affect the health or welfare of a patient.

21  Q.  Thank you.  That's --

22  A.  Hospital and other -- okay.

23  Q.  You can stop there, Dr. Anderson.  And let's --

24  A.  It's easy reading.

25  Q.  And look at the next page, please, page E-18.

1   A.   All right.

2   Q.   Do you see in the right-hand column the heading, Denial of

3   Applications?

4   A.   I don't think I have that.

5   Q.   Page E-18.

6   A.   Yeah.  I think I have E-17 and E-19.  I don't think I

7   printed out E-18.  I'm sorry.

8   Q.   Okay.  Well, let me ask -- let me read this and ask if this

9   is your understanding of what the guidebook requires; that,

10  quote, A restriction or denial of clinical privileges that

11  occurs solely because a practitioner does not meet a health care

12  institution's established threshold eligibility criteria for

13  that particular privilege is not reportable to the NPDB, which,

14  of course, stands for National Practitioners Data Bank.  And

15  then quoting again, Such restrictions or denials are not deemed

16  the result of a professional review action relating to the

17  practitioner's professional competence or professional conduct

18  but are considered decisions based upon eligibility.

19      Is that consistent with your understanding of what the

20  guidebook requires?

21  A.   Yes.  Yes.

22  Q.   So Dr. Anderson, if a doctor applies for privileges and the

23  hospital says, we're not going to grant you privileges because

24  of where you live, is that based on physician competence, and

25  would that be reportable?

1   A.   No.   It doesn't have anything to do with that.

2   Q.   What if a hospital denies privileges because a doctor --

3   because they don't believe the doctor will meet some minimum

4   admissions requirement?   Is that based on qualifications, and

5   would that be reportable?

6   A.   No, it would not.

7   Q.   And then page E-19, Dr. Anderson.   You do have that page?

8   A.   I have some of it.

9   Q.   Do you have the left-hand column that begins, Withdrawal of

10  applications?

11  A.   No, I don't.   I have adverse actions, but -- yeah, I don't

12  have that.   I remember reading that, but I don't have that.   I'm

13  sorry.

14  Q.   Thank you.   Well, if you read that, then does it sound

15  correct to you, Dr. Anderson, that, quote, Voluntary withdrawal

16  of an initial application for medical staff appointment or

17  clinical privileges prior to a final professional review action

18  generally is not reportable to the NPDB?   Is that consistent

19  with your understanding of the requirements?

20  A.   Yes.

21  Q.   So if a doctor voluntarily withdraws an application for some

22  reason other than physician competency, is that reportable under

23  your understanding?

24  A.   It is not reportable.   They're looking for qualification,

25  competency, conduct and -- that are relevant to patient care,

1    patient outcome, patient safety.

2          MR. DAVIS:  Your Honor, in light of questions that

3    plaintiffs may raise about Dr. Anderson and with the reading

4    that we've done, I would move that the copy of the National

5    Practitioners Data Bank Guidebook be admitted as an exhibit.  It

6    would be in the nature of a rebuttal exhibit because of

7    testimony that has arisen earlier in the trial and so that Your

8    Honor would have a record of what the National Practitioner Data

9    Bank requires for reporting.

10          THE COURT:  Have you highlighted the parts you want me

11    to look at so I don't have to read this document, which is --

12          MR. DAVIS:  I have not --

13          THE COURT:  -- pretty lengthy?

14          MR. DAVIS:  I have not physically highlighted a copy

15    yet, Your Honor.  Everything that we would refer Your Honor to

16    would be on pages E-17 through E-23.  Those six or seven pages.

17          THE COURT:  It's admitted subject to, as I said, my

18    ultimate decision as to whether I should consider this

19    testimony.

20          Anything else?

21          MR. DAVIS:  Yes, Your Honor.

22          THE COURT:  Go ahead.

23    Q.  (By Mr. Davis, continuing:)  Dr. Anderson, are you aware of

24    a regulation that's presently in effect in Alabama that permits

25    abortion clinics to operate even if the doctors don't have

1  admitting privileges but if they, instead, have a written

2  contract with an outside covering physician?

3  A.   Yes.

4  Q.   Is that arrangement sufficient, in your opinion, to ensure

5  continuity of care?

6  A.   It -- it's helpful.  It's not the best.  But if -- if that

7  physician has access to the medical records, if that physician

8  will communicate and be accessible to the ER physician so that

9  if a patient calls a clinic, that physician will handle that

10  transfer.  And so it really depends if it's in name only or if

11  it's somebody that's sharing call or a partner who has access to

12  the information.  But just to have a name only doesn't do

13  anything for the continuity of care.

14  Q.   Okay.

15  A.   So I'm not sure on the degree of involvement this individual

16  is.

17  Q.   If the clinic's practice is not to involve the outside

18  contracting physician as a matter of course but, instead, to

19  simply send patients to the emergency room, does that affect

20  your opinion on how effective that would be?

21  A.   Well, it's just a hollow shell.  I mean it might look like

22  it could help continuity of care; but if that physician doesn't

23  communicate and doesn't have access to information and doesn't

24  know the patient, then the accessibility, the availability, and

25  the communication that continuity of care implies, there's no

1   benefit.  So I would say it doesn't satisfy any of the

2   continuity of care desires that the law would have.

3   Q.  In your experience, do patients like going to a crowded

4   emergency room and waiting to see a doctor they've never met?

5   A.  Well, they put it off as long as they can.  They will wait

6   to make sure they're super sick before they do that.  And that's

7   what happens in our overcrowded emergency rooms is that patients

8   who haven't been there before or who don't want to go there and

9   meet a new physician or the expense -- I mean all of those

10  things -- say I don't want to go there, until they really

11  realize that they have to.

12      I had a call from a young lady that was super sick, and she

13  had waited three days.  Now, she wasn't an abortion

14  complication.  But as soon as she talked to me on the phone, I

15  said -- this is just two weeks ago -- you've got to go to the

16  ER.  And then she went to immediate surgery.  But she put it off

17  for three days because of expense.  She didn't have insurance

18  and didn't want to go and do that.  So when you talk about

19  crowding, new doctor, and expense, it's a big hurdle.

20  Q.  If a woman has a complication resulting from an abortion,

21  can that delay be detrimental to her health?

22  A.  Absolutely.

23  Q.  Do you know, Dr. Anderson, if physicians who practice in

24  ambulatory surgery centers typically have privileges?

25  A.  Well, the ambulatory surgical center that I use here, that

1   I -- the ear, nose, throat physicians and other -- the

2   urologists that I use in my practice, when I talk to them, it's

3   mandatory by -- to be on the group, you have to have admitting

4   privileges.  It's just a group requirement that they have

5   admitting privileges because they want them to be able to follow

6   up their patients in the hospital.

7   Q.  In your experience, do doctors who practice in ambulatory

8   surgery centers, are they typically local or do they fly in and

9   out?

10  A.  Well, the American Academy of Surgeons really condemns the

11  fly-in and fly-out because of a sense of abandonment to patient

12  care.  So they forbid their doctors fly in and fly out.  They're

13  all local physicians.

14  Q.  Dr. Anderson, based on your experience and education, is it

15  your opinion to a reasonable degree of medical certainty that if

16  doctors in Alabama who perform abortions were required to obtain

17  admitting privileges at a local hospital, that abortion would be

18  safer in our state?

19  A.  The complications of abortion as well as probably the

20  procedures would be safer.  I would agree.  Because on a number

21  of issues -- we've already said the scrutiny of hospital

22  privileging helps identify the comprehensive backgrounds of the

23  physician and the technical proficiency or the proficiency of

24  their technical skills.  So that's related to patient safety and

25  patient care.  And then being on staff, it improves the

1   continuity of care with the patient and improves communication

2   with the physician staff and reduces time delays if a patient

3   does come to the emergency room.  So in those areas, I would say

4   it would improve both abortion care as well as the care of women

5   experiencing complications of abortion.

6   Q.  And is it your opinion to a reasonable degree of medical

7   certainty that such a privileges requirement would reduce the

8   likelihood of communication errors in patient care?

9   A.  Yes.  Yes.  Just -- once you have a hospital's governing

10  board and their standard of care for consultation and transfer

11  of patient care, then both the admitting physician and the

12  subspecialist are operating on the same playing field or

13  expectations.  And it -- it holds you accountable.  If you don't

14  do it and things fall through the cracks, you have to answer for

15  it.  Now, if that physician does not have admitting privileges,

16  there's no standard of care that he or she is held accountable

17  to, so they can walk away from the situation, and then the

18  medical staff is just charged with picking it up and doing the

19  best they can.  So I would say yes.

20  Q.  And would the privileges requirement reduce the -- reduce

21  the likelihood of delays in treatment?

22  A.  It sure would.  It would cut down -- I mean care would get

23  instituted quicker.  You would start off with a knowledge base

24  of that patient sooner.  The patient would really come to the ER

25  sooner if they talked to their abortion provider and he or she

1  said go to the ER sooner than if that abortion provider wasn't

2  available and they just wait till the last minute before they

3  were sick enough that they knew they had to go.

4         MR. DAVIS:  Thank you, Dr. Anderson.

5         That concludes the direct examination, Your Honor.

6         THE COURT:  Very good.

7         MS. GRIFFITH:  Your Honor, may I have a brief moment

8  before we proceed?

9         THE COURT:  Yes.  Do you want like five minutes?

10        MS. GRIFFITH:  That would be great, Your Honor.  Thank

11 you.

12        THE COURT:  Pardon me?

13        MS. GRIFFITH:  That would be wonderful, Your Honor.

14 Thank you.

15        THE COURT:  We'll take a five-minute recess.

16        MR. DAVIS:  Your Honor, I'm not sure the witness

17 understands what's going on.  May I just tell him we're on a

18 recess?

19        THE COURT:  Yes, you may.

20        MR. DAVIS:  Dr. Anderson, the Court is in recess for

21 five minutes.

22        THE WITNESS:  You don't want me to drive away?

23        MR. DAVIS:  Please, no.

24        THE WITNESS:  Okay.

25     (Recess at 10:06 a.m. until 10:22 a.m.)

1           THE CLERK:  Please remain seated.  Court is in session.

2           THE COURT:  Proceed.

3                              CROSS-EXAMINATION

4  BY MS. GRIFFITH:

5  Q.  Good morning, Dr. Anderson.  My name is Dyanne Griffith.

6  I'm one of the attorneys here with the plaintiffs, and I believe

7  we've met before there in Richmond.  So I just wanted to follow

8  up on your qualifications you were discussing with counsel

9  before the break.  You've not published any report in a

10 peer-reviewed journal, correct?

11 A.  No.  You're correct.

12 Q.  And the last time that you worked in an emergency room

13 outside of the military hospitals was in 2005.  That's right?

14 A.  That's correct.

15 Q.  And you --

16 A.  I'm still board certified.  I mean I still maintain my ER

17 certification, so I'm still actively board certified and could

18 work in the ER.

19 Q.  But you have -- but you have not, outside of the military

20 hospitals, since 2005, correct?

21 A.  That's correct.

22 Q.  And you are only board certified in family and emergency

23 medicine, correct?

24 A.  That's correct.

25 Q.  And you've not completed a residency outside of those two

1  areas, correct?

2  A.   That's correct.

3  Q.   You've been provided or been retained to provide expert

4  testimony in support of similar admitting privileges

5  requirements, correct?

6  A.   Correct.

7  Q.   And that's in Wisconsin?

8  A.   Yes.

9  Q.   And in Texas?

10  A.   Yes.

11  Q.   And in Mississippi?

12  A.   Yes.

13  Q.   And in North Dakota.

14  A.   Yes.

15  Q.   And you have also provided expert testimony or expert

16  reports in other cases in support of laws that would restrict

17  access to abortion, correct?

18  A.   Parental notification in Alabama -- I mean -- excuse me --

19  in Alaska and Florida.   The parental notification laws in those

20  two states.

21  Q.   And it's also true that you belong to a number of

22  organizations that advocate for abortion restriction, correct?

23  A.   They advocate something better than abortion.   I wouldn't

24  say abortion restriction, but we do have what I believe are

25  better alternatives.

1  Q.  Those organizations advocate for abortion regulation; is

2  that right?

3  A.  I guess.  I mean the physician -- Physicians for Unborn

4  Children -- Unborn Child we dissolved in 1988.  And we worked on

5  a viability bill that said once a child had a 20 percent chance

6  of survival, then abortion wouldn't be an option.  And that's

7  about 21 weeks' gestation.  So that is an abortion limitation

8  based on time and age.

9  Q.  Thank you, Dr. Anderson.  Do you have your expert report

10 with you today?

11 A.  I do.

12       MS. GRIFFITH:  Is that Exhibit 3, Jim?

13       MR. DAVIS:  Three.

14 Q.  I believe that should be marked as Defendant's Exhibit 3,

15 Dr. Anderson.

16 A.  Okay.

17 Q.  Now, if you could turn --

18       THE COURT:  Could I just interrupt you for just a

19 minute?  I did not understand your response to the last

20 question.  You said, I guess I mean the physicians -- physicians

21 from unborn children -- unborn child we dissolved in 1988.  Did

22 you mean dissolved?  What were -- what were you saying?  I just

23 didn't understand your answer.

24       THE WITNESS:  Are you asking me?

25       THE COURT:  Yes.

1          THE WITNESS:  Oh.  We no long -- we disbanded that

2    organization in 1988.

3          THE COURT:  Oh, okay.  It's the organization that you

4    disbanded.

5          THE WITNESS:  Yes.

6          THE COURT:  Okay.  Go ahead.

7    Q.  (By Ms. Griffith, continuing:)  Dr. Anderson, you have

8    Defendant's Exhibit 3, your expert report, there?

9    A.  Yes.

10   Q.  And if you could turn to paragraph three, I'm going to read

11   the second sentence of that -- of that paragraph:  CMS

12   guidelines state that the ambulatory surgical center, ASC, must

13   ensure that all physicians performing surgery in the ASC have

14   admitting privileges at a hospital that meets the requirements

15   of paragraph B2 of that section.

16      Did I read that correctly?

17   A.  Yes.

18   Q.  Now, during your deposition, which I -- do you have a copy

19   of your deposition there, Dr. Anderson?

20   A.  I do.  Mr. Davis told me to print it out.

21   Q.  Well, I'm hoping that you have page 120.

22   A.  Is this where you corrected me?

23   Q.  It may be, yes.

24   A.  Okay.  I thought this was familiar.  All right.  120.

25   Q.  Okay.  Now, Dr. Anderson, if you'll recall, during your

1  deposition, we were looking at the CMS guidelines that you had

2  quoted from in paragraph three of your expert report.  That's

3  the paragraph that you -- the sentence that you just read for

4  us.  Does that sound familiar?

5  A.  Yes.

6  Q.  Okay.  And then in your deposition, you read that section of

7  the CMS guidelines.  And I'm going to read that for you now.

8  It's on page 120, starting at line 17:  The ASC --

9  A.  I'm there.

10  Q.  The ASC must have a written transfer agreement with a

11  hospital that meets the requirements of paragraph B2 of this

12  section or ensure that all physicians performing surgery in the

13  ASC have admitting privileges at a hospital that meets the

14  requirements of paragraph B2 of this section.

15      Did I read this correctly?

16  A.  You did.

17  Q.  And based on your recollection from the deposition, that was

18  an accurate representation of what was in the CMS guidelines,

19  correct?

20  A.  Correct.

21  Q.  Did you write that second sentence in paragraph three of

22  Exhibit 3 knowing that you were leaving out the first half of

23  the sentence?

24  A.  No, I did not.  You corrected me on the deposition.

25  Q.  Okay.  So now it's clear that HB57 does in fact have an

 1   alternative -- or HB57 is not similar in that it has an

 2   alternative to a physician maintaining privileges, correct?

 3   A.  Correct.

 4   Q.  Do you also have a copy of your supplemental report with

 5   you, Dr. Anderson?  I believe that is Exhibit 4, Defendant's

 6   Exhibit 4.

 7   A.  I do.

 8      (Brief pause)

 9   A.  All right.

10   Q.  Now, in this report, you purport to rely on a NAF

11   publication.  Does that sound correct?

12   A.  We quoted that, yes, on page 2.

13   Q.  When you submitted your supplemental report, you had not in

14   fact reviewed that NAF publication, correct?

15   A.  Correct.

16   Q.  In fact, you had only read the one sentence that was

17   included in your report, correct?

18   A.  Now, on this, I didn't refer to that in this expert report.

19   I don't remember.  I -- I don't remember so far as -- what are

20   you referring to?

21   Q.  Do you have -- you have your supplemental report that's

22   Exhibit 4?  I'm referring to --

23   A.  I --

24   Q.  -- paragraph seven.

25   A.  Yes.  Now, what's your question about that?

1  Q.  My question was at the time that you signed this report, you

2  had only --

3  A.  This report?

4  Q.  Yes.  This supplemental report, Dr. Anderson.

5  A.  Okay.

6  Q.  -- you had only read the portion of the NAF publication that

7  is included in this report.  Those are the sentences in

8  paragraph seven.

9  A.  Yes.

10 Q.  And it's accurate to say that you did not attempt to access

11 that Web site at the Internet address that you provided in the

12 text of that report; is that correct?

13 A.  At that time or now?

14 Q.  At that time.

15 A.  Yes, that's correct.  I had not accessed the Web site.

16 Q.  Did you -- did you have any idea when you signed your report

17 that neither the quote nor the publication you reference appears

18 on the Web site that you quoted in the text, that you cited to

19 in the text of your report?

20 A.  Well, I went to that Web site.  I mean the other day, I

21 looked at this.

22 Q.  You went to the Web site that is in the text of your report?

23 A.  Well, I went to a link.  It was archived.  I went to an

24 archive link that showed this.

25 Q.  And when did you do this, Dr. Anderson?

1  A.  Well, I did this afterwards, and then I did this the other

2  day.

3  Q.  Okay.  So when you signed --

4  A.  But not before.

5  Q.  When you signed your supplemental report, you had not

6  actually accessed that Web site?

7  A.  I think -- I would say yes.

8  Q.  And you were not aware that it was on an archived Web site;

9  is that correct?

10  A.  That is correct.

11  Q.  So you were not familiar with the Way Back When machine when

12  you signed your supplemental report.

13  A.  I'm not familiar with what?

14  Q.  The Way Back When machine.

15  A.  Oh, is that the archive machine?

16  Q.  When you signed this report, you were not familiar with it.

17  No?

18  A.  Well, it was different -- the archive machine I used was

19  different than what you're talking about, Way Back When.  But

20  anyway, no.

21  Q.  And so the way that you accessed this Web site just the

22  other day was through an archive?  Is that accurate?

23  A.  Yes.  But I don't know the name of it.

24  Q.  Isn't it true that you did not write your report on your

25  own?

1   A.  Well, I do have help with it, but I did write it, because it

2   takes a lot of time and I'm not a fast typer.  So you -- I mean

3   I spent a lot of time typing this report.  I did have help with

4   it, but this is my report.

5   Q.  Isn't it true that --

6   A.  And -- now, are you talking about the expert report or the

7   supplemental report?

8   Q.  I'm talking about both or either.

9   A.  All right.  The expert report, I wrote.  Initially -- this

10  was initiated from an e-mail and then sent to me.  So the

11  supplemental report, I was given that with the fellow I worked

12  with on this, but I wrote this expert report.  And this

13  supplemental report, I had read before I signed that; but I

14  didn't write this.

15  Q.  And who was it that sent you the supplemental report?

16  A.  The fellow that I work with, Vince Rue.

17  Q.  And you've worked with Mr. Rue on other cases regarding

18  restrictions on abortion; is that correct?

19  A.  I started doing that just because of time issues.  The

20  typing is very laborious.  And looking for documentation and

21  looking up things, it's time.  So I needed help.  So that's

22  basically -- I don't have a secretary helping me, so Vince is

23  kind of, you know, just that logistics help.

24  Q.  And he helps you -- he helps on this end on other cases; is

25  that right?

1  A.  Yes.  Yes.

2  Q.  When did you meet Vincent Rue?

3  A.  Two -- by 2011.  He called me when I was in Afghanistan in

4  2011 to see if I would help with that Alaska case on parental

5  notification.  Now, I'm pretty sure he was involved in the

6  Alaska case back in 2002 on parental note -- consent, but I

7  worked straight with the Attorney General's Office.  I didn't

8  work with Vince Rue on that case in 2002.  But he's the one who

9  contacted me, that said that they asked him to get hold of me,

10  or maybe it's just a copy of an e-mail.  I forget.  But the

11  Attorney General's Office and him and me were all on the same

12  e-mail, seeing if I would submit an expert report in 2011 for

13  parental notification.  So that's really when I had these

14  reports working together.

15  Q.  And Vincent Rue is not a medical doctor, correct?

16  A.  Not that I know of.  I'm sure -- I mean, I'd say I'm sure

17  he's not.  I've never asked him that.

18  Q.  You have never been trained to perform an abortion, correct?

19  A.  Correct.

20  Q.  You have never performed an abortion, correct?

21  A.  Correct.

22  Q.  You have never supervised others performing an abortion,

23  correct?

24  A.  Correct.

25  Q.  You have never taught the procedures for performing an

1    abortion, correct?

2    A.   Correct.

3    Q.   So you are not testifying as an expert in abortion

4    procedures, correct?

5    A.   Correct.

6    Q.   And the last time that you claim to have treated a

7    complication from an abortion procedure was in or before 2005,

8    correct?

9    A.   Correct.  But they -- basically, my clinical expertise in

10   hemorrhage and infection is why they asked me to submit a

11   report, because that -- in relation to emergency care.

12   Q.   At your deposition, you testified under oath that you could

13   only recall one specific instance of treating an abortion

14   complication, correct?

15   A.   An abortion-related death, not complication.

16   Abortion-related death.  I've treated many complications, but

17   there -- I know the name of the young lady on that one you're

18   referring to.  I'm pretty sure there's two young ladies that

19   I've had die, but that particular was one patient that died from

20   an abortion complication.

21   Q.   Dr. Anderson, do you still have your deposition there with

22   you?

23   A.   Yes.

24   Q.   Can you turn to page 183.

25        (Brief pause)

1  A.   I'm there.

2  Q.   Okay.  So starting on page 183 through 184, I'm asking you

3  about the specific instance of abortion complications that you

4  can recall.  Is that accurate?

5  A.   Oh.  Well, the question begins on line 25, the day -- page

6  before.  Okay.  That's correct.

7  Q.   Okay.  So then starting on page 184, on line 3, Question:

8  You don't have an estimate of how many women you treated?

9  Answer:  Witness shakes head.

10     Question:  What about women with bleeding or blood loss?

11  Answer:  Common.

12     Question:  When is the last one that you recall?  Answer:

13  Those final years of the ER.

14     Question:  Sometime between 2000 and 2005, you saw at least

15  one woman with bleeding?  Answer:  I'd say that's good.  I mean

16  I'm part-time.  I'm not full-time there.

17     Question:  And you don't remember any specific incidence?

18     I don't.

19     Question:  What about infection?

20     The same.  One thing, infection and bleeding can both look

21  the same, causing pain.  And early infection or early bleeding

22  are very similar looking.

23     Question:  But you don't recall any specific incidence of

24  treating a woman with infection following an abortion?  Answer:

25  I'm trying to update my memory.

1    Question:  I understand.  It's a bit late in the day.

2    And then I recall that we discussed one woman after that.

3  A.   Yeah.  So what -- what are you saying from that?

4  Q.   I say from that that you could only recall one or two

5  specific instances of treating a woman in the emergency room.

6  A.   What I'm basically saying was as far as memory, to give you

7  the exact circumstances, the patient's name and the details of

8  her situation, it really turns into a fog when you see 20 and 30

9  patients a day.  I had treated women with complications from

10 abortions; but to give you the exact incidents, I just got --

11 kind of got to pull pieces from different patients to give you

12 an accurate picture.  But it is not, at all, saying just one

13 patient between 2000 and 2005.  But if -- if I start trying to

14 give you exact details, I can't.

15    I don't think -- I mean I don't see me saying I just had one

16 patient there.  Now, I did have -- well, you and I talked about

17 one patient.  I did have one lady who died on me, a young lady,

18 but -- and I remember the details with her.

19 Q.   And in that instance, having admitting privileges would have

20 made no difference.  Isn't that right?

21 A.   Well, if she had come earlier, it could have made a

22 difference.  I mean she came septic and came late, and that's

23 why she died.  And if the doctor had been involved and had her

24 there earlier, it might have been different.

25 Q.   Dr. Anderson, when you were testifying earlier, you

1   discussed women that have psychological impact from abortion; is

2   that correct?

3   A.   Yes.

4   Q.   And this was some of the complications that you stated that

5   you treated in the emergency room; is that correct?

6   A.   Yes.

7   Q.   And it is not --

8   A.   The depression.

9   Q.   Excuse me?

10   A.   When -- when you see patients who are depressed.

11   Q.   And it is not your view that admitting privileges in

12   obstetrics and gynecology would change the treatment of

13   psychological complications, correct?

14   A.   Let me think about that.  It -- I -- I guess so.  I'm not

15   sure on that.  I don't know.  I mean if someone's severely

16   depressed and the physician knows about it and is seeing them in

17   follow-up care and they're suicidal, maybe they can get them in

18   sooner if they're accessible and available.  It could make a

19   difference if they're seeing them and they're still depressed.

20   There are some patients you see, you've kind of got to push them

21   toward intervention.

22   Q.   Dr. Anderson, you've been named as a defendant in at least

23   three malpractice suits, correct?

24   A.   Correct.

25   Q.   And your hospital privileges were not suspended while these

1    suits were pending, correct?

2    A.   No, not at all.

3    Q.   In paragraph five of your expert report -- that's

4    Defendant's Exhibit 3 -- you discuss complications from

5    abortion, correct?

6    A.   Paragraph five of page 3 of my expert report?

7    Q.   Yes.   You discuss complications --

8    A.   Yes.

9    Q.   -- from abortion, correct?   But as you already testified,

10   you do not have experience with abortion procedures; isn't that

11   right?

12   A.   That's true.   That doesn't mean you don't have experience

13   with complications.

14   Q.   In your report, you state that there is underreporting of

15   abortion complications, correct?

16   A.   Yes.

17   Q.   And one reason you cite for that is because many states do

18   not have mandatory reporting of data about abortion

19   complications, correct?

20   A.   Yes.   I'm not aware of a good national reporting source or a

21   state -- good sources.

22   Q.   Which states do not mandate reporting of abortion

23   complications?

24   A.   All I really know is Virginia for sure because it -- that's

25   where I practice medicine, but I've never seen good numbers from

1    other states.  I'm just assuming that many of them are like

2    Virginia.  And people's care is similar.  I mean other ERs are

3    similar to us if the patients don't follow up with abortion

4    providers or they don't want it known that they've had an

5    abortion.  People aren't real different from state to state.

6    Q.   Thank you.  I believe you testified earlier that if a woman

7    has persistent bleeding and infection, she should be treated as

8    soon as possible, correct?

9    A.   Correct.

10   Q.   So in that case, the woman should go to the emergency room

11   closest to her, correct?

12   A.   Correct.

13   Q.   And that --

14   A.   If she's unstable for sure.

15   Q.   Excuse me?

16   A.   Immediate -- if she's unstable or she's scared to death, she

17   should go to the closest emergency room.

18   Q.   That's --

19   A.   She can call her abortion provider process as an

20   intermediary step, which is a good step if she's starting to get

21   sick.

22   Q.   So she should go to the closest hospital even if that's not

23   the one where her physician has privileges, correct?

24   A.   If she's unstable, she should.  If -- if she's stable and

25   she can go see the physician that she knows -- I mean when we're

1  talking about closest hospitals, I'm talking about four or five

2  miles apart like we have in Richmond between a number of

3  hospitals; but if you're talking about 50 miles apart, then

4  that's a different -- comparing apples with oranges.

5  Q.  Dr. Anderson, I'd now like to talk a little bit about your

6  experience with the hospital privileging process.

7  A.  Uh-huh.

8  Q.  The extent of your experience with hospital credentialing

9  has been as the recipient of hospital privileges, correct?

10 A.  Correct.

11 Q.  You have never served on a committee charged with approving

12 physicians for privileges, correct?

13 A.  Correct.

14 Q.  You have never --

15 A.  I just know it's very rigorous.

16 Q.  You have never been responsible for determining what action

17 should be reported to the national practitioner database,

18 correct?

19 A.  Correct.

20 Q.  When did you find Defendant's Exhibit 80?  That's the

21 national practitioner database guide that you testified about

22 earlier.

23 A.  The last three or four days.  On this comment.

24 Q.  You just testified that until this case, you had no idea

25 that the database had anything to do with reporting malpractice;

1    is that right?

2    A.   Except malpractice.

3    Q.   So you don't have any --

4    A.   Until this --

5    Q.   Please continue.

6    A.   I mean that's the only experience I've had with the national

7    data reporting is malpractice.  I've never been to the Web site,

8    just because why?

9    Q.   So you don't have any personal knowledge or experience with

10   the national practitioner database beyond reading the document

11   that was provided to you about three days ago, correct?

12   A.   Outside of just knowing that it reports malpractices and a

13   lot of the young doctors are scared to death of it, yes.

14   Q.   Since you are not involved with reporting to the national

15   practitioner database, Exhibit 80 is not something that you

16   would typically rely on in your own practice, correct?

17   A.   What's Exhibit 80?  The national --

18   Q.   The national --

19   A.   Is that what you're referring to?

20   Q.   Yes.  The guidebook.

21   A.   That's right.  That's right.

22   Q.   Now, there are over 2,000 physicians on staff at the

23   hospital where you hold privileges, correct?

24   A.   Correct.

25   Q.   And you don't know all those physicians, do you?

1  A.   Correct.

2  Q.   In your report, you cite to certain studies that discuss the

3  miscommunication in medicine.   None of those studies you cite

4  identify lack of privileges as a contributing factor to errors

5  or miscommunication in medicine; isn't that right?

6  A.   I would say that's just related to my personal experience

7  for sure.   Because if they don't have privileges, they don't

8  feel at all -- I mean a doctor feels like he -- he's not in the

9  process.   And you don't know him relationally, so there's just

10  not the familiarity or the standard expectation of the hospital.

11  Q.   Now, I believe you also testified about a doctor in Texas

12  that received admitting privileges; is that correct?

13  A.   It is correct.

14  Q.   And the source of that information was an e-mail that you

15  received; is that right?

16  A.   Yes.   Under that supplemental support.

17  Q.   And is such an e-mail the type of material that you would

18  typically rely on in your practice?

19  A.   If I trust people, if I have a relationship with them.   I

20  mean it depends on the level of trust I have with the individual

21  who sends me the e-mail.   And that -- that looked pretty

22  reliable.   It was coming from Vince.

23  Q.   Do you have a relationship with the Texas Attorney General?

24  A.   Just that phone call that asked me to be involved.

25  Q.   Thank you.

1          MS. GRIFFITH:  May I have one moment --

2  A.  And submit a report.

3          THE COURT:  Yes.

4          MS. GRIFFITH:  -- to confer, Your Honor?

5     (Brief pause)

6  Q.  (By Ms. Griffith, continuing:)  Dr. Anderson, at the

7  beginning of our discussion, we were talking about Vincent Rue.

8  Do you recall that?

9  A.  Yes.

10 Q.  And are you aware that Vincent Rue has been discredited as

11 an expert in abortion cases by a number of courts?

12 A.  No.

13 Q.  In preparing your opinions in this case, you have not spoken

14 to any physician associated with an abortion or reproductive

15 health center in Alabama; is that right?

16 A.  That's correct.

17 Q.  You did not talk to any emergency room physician in Alabama,

18 correct?

19 A.  Correct.

20 Q.  It's also --

21 A.  Yes.

22 Q.  -- true that you did not do any research or review any data

23 specific to abortion care in Alabama?

24 A.  Yes.  Correct.

25 Q.  And you --

1   A.   I just know that admitting privileges are very protective in

2   a number of arenas with what I said earlier, with the standard

3   of care of medicine in the health care system.

4   Q.   Thank you.  You do not know if any patients from plaintiff's

5   clinics ever received hospital-based care, do you?

6   A.   I don't.

7   Q.   You do not know if any patients from plaintiff's clinics

8   have ever experienced a medication error, do you?

9   A.   You mean know those patients?  I don't know them.

10  Q.   So you have no way of knowing whether any abortion patient

11  in Alabama experienced a negative outcome because her provider

12  did not have admitting privileges; isn't that right?

13  A.   Yes, this is true.  I don't have any personal --

14          MS. GRIFFITH:  I have no further questions at this

15  time.

16          THE COURT:  Redirect?

17          MR. DAVIS:  Yes, Your Honor.  Your Honor, before

18  redirect, it is seven till eleven.

19          THE COURT:  Yes.

20          MR. DAVIS:  I would expect I have ten minutes or so.

21  There may be redirect.  By your leave, we will call Mr. Sims --

22  do you wish us to call Mr. Sims and have him begin at, say,

23  11:15 or --

24          THE COURT:  Whatever you want as long -- as efficiently

25  as we can proceed.

1           MR. DAVIS:  Then let's do.

2                    REDIRECT EXAMINATION

3     BY MR. DAVIS:

4     Q.  Dr. Anderson, however frequent it is for a woman to have

5     complications for an abortion -- or however infrequent it is,

6     would you agree that a woman who has a complication due to an

7     abortion deserves the best of care?

8     A.  I would agree.  Yes.

9     Q.  The opinions that you've expressed today and in your expert

10    report, are those opinions based on your personal views of

11    abortion or your personal views of what is good medical care?

12    A.  Well, since I teach physicians that are from many different

13    backgrounds and beliefs, I teach about health care itself and a

14    patient-centered health care system and building trust with the

15    patient.  So really, all of this is part of good clinical care,

16    patient safety.  Nothing -- it has nothing to do with my belief

17    about abortion itself.  This is just good clinical care and

18    patient safety issues.

19    Q.  In your discussion of the CMS guidelines a moment ago,

20    Dr. Anderson, is it your experience generally that doctors at

21    ambulatory surgical centers have admitting privileges, whether

22    it's required or not?

23    A.  Well, as I said, Jim, the -- the physicians in the

24    ambulatory care centers that I work with all have admitting

25    privileges.  The gastroenterologists who do colonoscopies are

1    required to have admitting privileges by their -- by the, you

2    know, office itself, as are the surgeons in the ambulatory care

3    centers, because they want to take care of the complications

4    themselves or be involved in the complications.  They want

5    continuity of care.

6    Q.  Are -- is it common for doctors in ambulatory surgical

7    centers to fly in and out of state to treat patients?

8    A.  It's not common at all.  It doesn't exist in Richmond.

9    Q.  Is it common for doctors at ambulatory surgical centers to

10   depend on emergency rooms to take care of their patients if

11   there's a -- a complication?

12   A.  Only to stabilize them until they can get there.  They use

13   it as an intervention.

14   Q.  But they don't abandon their patients to emergency rooms as

15   a matter of course, do they?

16   A.  They -- they would probably lose their privileges if they

17   did.  Abandonment is really very detrimental.

18   Q.  The reports that you have submitted in this case,

19   Dr. Anderson, do they accurately reflect your own personal

20   opinions?

21   A.  Yes.  Absolutely.

22   Q.  You got information from a variety of sources, correct?

23   A.  Correct.

24   Q.  Well, and that's true when you're treating a patient.  You

25   get information from the patient, you may have information based

1    on your experience and background, and you might sometimes refer

2    to a medical journal, correct?

3    A.   In all years of life, you're not an island.  You -- you

4    relate with people.  You build teams in whatever you do.

5    Q.   And then wherever the information comes from, you apply your

6    30 years plus of experience, your medical education, your years

7    of treating patients in the emergency room, and use that to form

8    your opinions.  Would you agree?

9    A.   I would agree.  That's really what you call -- talking about

10   is competence.  You take your education and training, your

11   ongoing review of the literature, 30 years of clinical

12   experience, combined with the patient's individual uniqueness;

13   and that makes your judgment competent.  It makes your judgment

14   good and individualized.  It's -- it really -- being isolated is

15   arrogance.  And that just opens up for all kinds of things.  But

16   over the years, you build a team concept in just about

17   everything you do.  And right now, it's a huge push in the

18   medical arena to build health care teams, that you're part of a

19   team and communicate with a team.  That's one of the

20   proficiencies that we have to measure residents by is how they

21   relate within a health care team.

22   Q.   Now, you testified that you've never performed an abortion,

23   correct?

24   A.   Correct.

25   Q.   You've never been trained in how to perform an abortion.

1    A.   Correct.

2    Q.   But you have treated women who had complications after an

3    abortion, haven't you?

4    A.   I have.   Many times.

5    Q.   How many patients would you typically see in a day if you're

6    a doctor working in an emergency room?

7    A.   Between 30 and 40.

8    Q.   And how many years, again, did you serve as an emergency

9    room doctor?

10   A.   Twenty-five.   Twenty-four total.

11   Q.   So that's a lot of patients.   Wouldn't you agree?

12   A.   I think I've seen, between all clinical practice, 150,000

13   patients.

14   Q.   So when you --

15   A.   Live patients.

16   Q.   When you say that you know you've treated many women who had

17   complications after an abortion, that doesn't mean you can

18   necessarily right now remember their name and the date and what

19   they were wearing and those other details, though, correct?

20   A.   It -- it turns into a fog real quickly when you're seeing 20

21   or 30 or 40 patients a day.

22   Q.   But are you certain that you have treated many patients who

23   had complications after an abortion and that you're familiar

24   with the dangers of those complications?

25   A.   I am certain.

1  Q.  You have known over the course of your career, have you not,

2  that the -- the data bank collects data concerning malpractice

3  suits.

4  A.  Yes.

5  Q.  So you knew that it was involved with recordkeeping

6  concerning physician competency, correct?

7  A.  Correct.

8  Q.  So you already knew, did you not, that they weren't involved

9  with keeping track of things unrelated to competency?

10  A.  I would say yes.

11  Q.  Yes.

12  A.  It was strictly related to malpractice.

13  Q.  And you reviewed that guidebook, correct?

14  A.  I did.

15  Q.  And what we read today accurately reflects what is in the

16  guidebook.

17  A.  Absolutely.

18  Q.  So are you, therefore, certain today that if a doctor has

19  said, I fear being reported because a hospital might not like

20  where I live or they might not think I make medical -- I might

21  not have sufficient admissions over the course of a year, that

22  that, according to the guidebook, is not the type of item that

23  would be reported?

24  A.  I would say their fear was unfounded, that that would not at

25  all be reportable.

```
1    Q.  Have you ever, over the course of your career, heard of

2    someone being reported to the data bank for something unrelated

3    to physician competency?

4    A.  Never.

5    Q.  Now, you said, Dr. Anderson, that you haven't spoken

6    directly to a patient in Alabama who's had an abortion; is that

7    correct?

8    A.  Yes.  I have not.

9    Q.  But do you know what good medical care is?

10   A.  I do.  I do know what good medical care is.

11   Q.  Whether you've spoken to an Alabama patient or not, do you

12   know that if their physician flies in and out of state and

13   doesn't observe continuity of care, that that's going to make it

14   harder for an ER doctor to treat those complications?

15   A.  With a hundred percent certainty, yes.

16            MR. DAVIS:  Thank you, Dr. Anderson.

17            Well, first, Your Honor, may I have a moment to confer?

18            THE COURT:  Yes.

19        (Brief pause)

20   Q.  (Mr. Davis, continuing:)  Dr. Anderson, you've mentioned a

21   couple of times a patient of yours that passed away that had

22   abortion complications.  Could you tell us about that situation,

23   what you recall of it, being careful, of course, not to use any

24   names?

25   A.  Well, it was a young lady that had an abortion probably 48
```

1    hours and was at home with a fever and pain, and then she came

2    to the emergency room.  And her -- she was hypotensive, and she

3    died about 12 hours later.  And she -- I can't remember the

4    details in her follow-up with the abortion clinic or anything;

5    but when she came to the emergency room, it was too far in to --

6    to intervene.  And there had been a ruptured uterus that had

7    happened during the abortion procedure.  And -- but anyway,

8    we -- we recognized what was going on, but it was just too late

9    to turn her around.  I don't -- I've admitted a number of ladies

10   in extreme infection, but antibiotics and fluid were able to

11   turn it around so that -- I mean, there are some ladies that

12   have had to have hysterectomies to deal with the site of

13   infection and the infected uterus, but they didn't die.

14   Q.  Is that an example of a situation where quick care is

15   critical for the patient?

16   A.  Yes.

17   Q.  Is it an example of a situation where good communication

18   between the ER doctor and the clinic is critical?

19   A.  Yes.

20          MR. DAVIS:  Thank you, Dr. Anderson.

21          MS. GRIFFITH:  We have nothing further, Your Honor.

22          THE COURT:  Okay.  Thank you.  Thank you.  Oh, I may

23   have some questions.  I would like to take just a recess to

24   gather my thoughts.

25          Doctor, I'm not through with you yet.

1        THE WITNESS:  Okay.

2        THE COURT:  Just give me about two or three minutes.

3     (Recess at 11:05 a.m. until 11:17 a.m.)

4        THE CLERK:  Please remain seated.  Court is in session.

5        THE COURT:  Dr. Anderson, can you hear me?

6        THE WITNESS:  Yes.

7        THE COURT:  Okay.  I believe one of the counsel

8    mentioned a Kevin Rue, R-O-O.

9        THE WITNESS:  A Vince Rue.

10        THE COURT:  Pardon me?

11        THE WITNESS:  R-U-E.

12        THE COURT:  Oh, it's R-U-E.  Great.  Thank you.

13        THE WITNESS:  That's right.

14        THE COURT:  Okay.  Does this person have any

15    institutional affiliations that you're aware of?

16        THE WITNESS:  Not that I'm aware of.

17        THE COURT:  Okay.  Are you aware of his employment

18    other than assisting you with writing I believe it was certain

19    expert reports?  I -- correct me if I'm wrong.

20        THE WITNESS:  No, I'm not.

21        THE COURT:  So you don't know his employment?

22        THE WITNESS:  I think that he's a consultant in this

23    arena, but that's all I know.

24        THE COURT:  Consultant.  What do you mean?

25        THE WITNESS:  Well, he's been a help in doing the

1  logistical typing and researching information.  So I know that

2  he's been involved in these cases and works with other states.

3          THE COURT:  Do you know exactly who he is?

4          THE WITNESS:  No, not beyond just talking to him.

5          THE COURT:  Okay.  Did he assist you in writing your

6  report?

7          THE WITNESS:  He helps me.  I write the report; and

8  then he helps me find materials, do searches for, you know,

9  backup articles and that type of thing.  But I write the reports

10 except for that supplemental report.

11         THE COURT:  Okay.  How long --

12         THE WITNESS:  He sent me that information, and we just

13 submitted that.

14         THE COURT:  Right.  How long have you known him?

15         THE WITNESS:  I -- I worked close with him -- with him

16 starting in 2011, but he was involved in the case in 2002 in

17 Alaska, but I was working straight for the Attorney General's

18 Office in 2002 in Alaska.

19         THE COURT:  You say you don't know his employment or

20 any organizations that he belongs to --

21         THE WITNESS:  No, I do not.

22         THE COURT:  -- or is affiliated with?

23         THE WITNESS:  I don't.

24         THE COURT:  Why do you trust him?

25         THE WITNESS:  Well, we go back to 2002, and I've found

1   him to be reliable, I mean.  So -- I mean talking to him on the

2   phone, I've just gotten to know him.  And when I write these

3   reports, the things that he gives me as far as typing assistance

4   and research has been good.

5           THE COURT:  Okay.  And you don't know anything about

6   what he does?

7           THE WITNESS:  No, I don't, outside this.

8           THE COURT:  Okay.  Anything else?

9           MS. GRIFFITH:  I just have two questions.

10          THE COURT:  Okay.  Go ahead.

11                      RECROSS-EXAMINATION

12  BY MS. GRIFFITH:

13  Q.  First I wanted to clarify, Dr. Anderson, it's Vincent Rue;

14  is that correct?

15  A.  Yeah.  Vincent.  Vince.

16  Q.  And are you aware of where Vincent Rue got his degree?

17  A.  No.

18  Q.  So you are not aware of whether he in fact has a degree from

19  a school of home economics?

20  A.  No.  I've been work -- I've been working with Vince and his

21  wordsmithing the document and finding articles.  And he's been

22  good in that arena.

23  Q.  But -- so just to clarify --

24  A.  And I write the --

25  Q.  You're not aware that he has a degree from the School of

```
1   Home Economics from UNC; is that correct?

2   A.  That's correct.

3           MS. GRIFFITH:  Thank you.  Nothing further.

4           THE COURT:  Okay.  Go ahead.

5                    REDIRECT EXAMINATION

6   BY MR. DAVIS:

7   Q.  Dr. Anderson, your opinions, again, are based on your views,

8   correct?

9   A.  Correct.

10  Q.  They're based on --

11  A.  A hundred percent.

12  Q.  They're based on your medical education, correct?

13  A.  Correct.

14  Q.  Has anybody told you what you should think as a doctor in

15  this case, what your medical opinions have to be?

16  A.  I started in this arena back in the 1981-82 time period.  I

17  didn't meet Vince until 2002.  I had been in this arena 20 years

18  before I met Vince.

19  Q.  So the -- the conclusions that you've reached in this case

20  and that you've expressed are based on your knowledge, your

21  experience, your education, correct?

22  A.  Absolutely.

23          MR. DAVIS:  Thank you.

24  A.  Absolutely.

25          THE COURT:  Anything else?
```

```
 1            MS. GRIFFITH:  No.  Nothing further, Your Honor.

 2            THE COURT:  Thank you.

 3            Thank you, Doctor, very much.

 4            THE WITNESS:  Thank you.

 5            THE COURT:  You're excused.

 6            Next witness.  Do we need to take a recess for the next

 7  witness?

 8            MR. DAVIS:  We're ready to go, Your Honor.

 9            THE COURT:  Okay.  Let's go, then.

10            MR. DAVIS:  The defendants call Carter Sims.

11            THE COURT:  Okay.

12       (Brief pause)

13            THE CLERK:  Raise your right hand.

14            WILLIAM CARTER SIMS, the witness, having been duly

15  sworn to speak the truth, the whole truth, and nothing but the

16  truth, testified as follows:

17                          DIRECT EXAMINATION

18  BY MR. DAVIS:

19  Q.  Would you state your name, please.

20  A.  William Carter Sims.

21  Q.  Where do you work, Mr. Sims?

22  A.  The Alabama Department of Public Health.

23  Q.  What is your title?  What is your job title, Mr. Sims?

24  A.  My current job title is supervisor for the Medicare Other

25  Unit.
```

1    Q.   And what do you do in that capacity?

2    A.   I supervise the field staff that go out and make on-site

3    visits to determine whether or not if facilities are in

4    compliance with rules.

5    Q.   What is your educational background?

6    A.   I'm a registered nurse.

7    Q.   When did you receive your certificate as a registered nurse?

8    A.   In 2001.

9    Q.   What roles do you have with respect to abortion clinics,

10   Mr. Sims?

11   A.   I would go out and do inspections sometimes myself, and then

12   at other times schedule survey staff to go out and make

13   inspections.

14   Q.   And the Department of Public Health regulates those clinics,

15   does it not?

16   A.   Yes, sir.

17   Q.   Were you involved, Mr. Sims, in an investigation of a

18   Planned Parenthood clinic in Birmingham in January of 2014?

19   A.   Yes, sir.

20          MR. DAVIS:  Your Honor, may I approach the witness to

21   provide him a copy of Defendant's Exhibit 25, which we'll be

22   discussing?

23          THE COURT:  Yes.

24          MR. DAVIS:  Also with Plaintiff's Exhibit 1.

25          THE COURT:  Very good.

1  Q.   Mr. Sims, first I want to direct you to Plaintiff's Exhibit

2  1, a list of names.  In this case, we are not discussing, under

3  order of the Court, the names of certain health care

4  professionals and others involved, and so that's a list of

5  pseudonyms that have been used in this litigation.  And I would

6  caution you in the testimony, before you use a name, to please

7  review and make sure that the name is not on the list and so

8  that we'll use the pseudonyms instead.

9      Second, could you identify Defendant's Exhibit 25 for me,

10  please.  Do you recognize that document?

11  A.   Yes.  This is a list of physician identifiers and employee

12  identifiers and a list of medical records.

13  Q.   And what about the rest of the document, Mr. Sims?

14  A.   This would be the statement of deficiencies or survey report

15  for the visit to Planned Parenthood.

16  Q.   The one in January of 2014?

17  A.   Yes, sir.

18  Q.   What is your procedure for conducting such an investigation,

19  Mr. Sims?

20  A.   For conducting investigations --

21  Q.   An inspection of an abortion clinic.  In general, how do you

22  do that?

23  A.   We would make an on-site, unannounced visit to the facility

24  preferably on days when they were scheduled to perform

25  procedures so that we could observe procedures being performed.

1    We would do tours, conduct interviews, and review documentation

2    while we were on-site.

3    Q.  And do you have certain things that you check for when

4    you're conducting such an inspection?

5    A.  Yes.

6    Q.  Generally, are those to see if the clinic is complying with

7    the Department of Public Health's regulations?

8    A.  Yes.

9    Q.  Okay.  Why did you go to the clinic in Birmingham in January

10   of 2014?

11   A.  We had received information that the facility had been

12   closed.  And we also had a separate complaint that came in from

13   a patient that we were going to go and investigate anyway.  So

14   we went on-site to see whether or not the facility was actually

15   opened or if they were closed.

16   Q.  And when did you go?  And feel free to refer to the report.

17   A.  The first surveyors attempted to make an unannounced visit

18   on a Friday, January 17th, and the facility had a note posted on

19   the door that they were closed.  So we weren't able to complete

20   the investigation at that time -- or start the investigation --

21   so we had to go back later, the following week, on January the

22   21st, 2014.

23   Q.  And when you went back the second time, were you able to see

24   anyone at the clinic?

25   A.  Yes, sir.

1    Q.  Who did you see?  Again, looking at the pseudonyms.  Or it

2    would be sufficient, Mr. Sims, just to give the job title of the

3    person with whom you spoke.

4    A.  We met with the interim administrator for the Planned

5    Parenthood Birmingham clinic, we met with the director of

6    quality management, and we met with the vice president of

7    external affairs.

8    Q.  And what did you learn during that visit?

9    A.  That the facility had stopped providing services.  They had

10   temporarily closed their operation.  We were told -- the

11   surveyors that were on-site were told that was because they had

12   a turnover in nonphysician staff and they were cleaning the

13   facility.

14   Q.  Did they ever tell you that one of the reasons for the

15   closures was because of illegal activity -- an illegal sale of

16   drugs?

17   A.  Not during our on-site visit.  No, sir.

18   Q.  When did they tell you that?

19   A.  We met with the CEO of Planned Parenthood Southeast and one

20   of their lawyers and an HR representative in February.

21   Q.  Were you ever told, Mr. Sims, that in the medical director's

22   view, there were systemic problems with patient care?

23   A.  We asked the medical director if the reason why the facility

24   closed was because of patient care issues, and the medical

25   director said that there were some problems with patient care

1    issues.

2    Q.   Did -- as a result of this inspection, did you make any

3    findings of deficiencies with regard to the Birmingham clinic?

4    A.   Yes.

5    Q.   Was the fact that there was an illegal sale of drugs in the

6    parking lot -- was that one of the deficiencies?

7    A.   No.

8    Q.   Okay.  So your citation deals with other things, not

9    something that the criminal laws would take care of, correct?

10   A.   Correct.

11   Q.   Okay.  What findings did you make of deficiencies with the

12   Birmingham clinic?

13   A.   Are you asking what we cited them for?

14   Q.   Yes.

15   A.   For failure to maintain an active license, to notify the

16   department that they were going to be temporarily closing, some

17   medical record documentation issues, some concerns with the

18   credentialing file for one of the physicians, and some concerns

19   we had related to dates that were on ultrasound images.

20   Q.   Did you review records and conduct interviews to see if the

21   clinic had made adequate plans for patients who had recently

22   received abortions?

23   A.   Yes, we did.

24   Q.   And what did you find?

25   A.   In those records for the patients that had had a procedure

1    on the 9th and 10th of January, they received the same discharge

2    instructions, according to the interviews, that all other

3    patients would have received.  During the interview with the

4    medical director, she stated that they tried to contact these

5    patients by telephone, but that information wasn't documented

6    anywhere for the surveyors to see.

7    Q.  Did they tell you that they had -- that the clinic in fact

8    contacted all recent patients, or did they tell you they had

9    attempted to do so?

10   A.  I'd have to look at the report to --

11   Q.  Please do.

12      (Brief pause)

13   Q.  Mr. Sims, I thought I had that provision marked where I

14   could direct you to it immediately.  Unfortunately, I do not.

15   If they told you one way or the other -- or, rather, would this

16   report accurately reflect the information that you received from

17   the clinic during the course of your investigation?

18   A.  Yes.

19   Q.  Okay.  Would you look -- and we'll see if I can't find that

20   and direct you more specifically to exactly what they told you.

21   Would you look at page 4 of 20 of the finding of deficiencies,

22   please.

23      Do you see that?

24   A.  (Nods head)

25   Q.  And in the top of the left-hand column, is that a record of

1   what you were told by the medical director in terms of the

2   reasons for the closure?

3   A.   Yes.

4   Q.   And what did they tell you?   What did she tell you, the

5   medical director?

6   A.   The reason for the closure had to do with -- it related to

7   patient care issues.   She stated multiple small things had added

8   up to their feeling that the clinic was not providing the best

9   care to patients.   She stated -- the medical director stated she

10  spoke with the senior-level administration at Planned Parenthood

11  Southeast, and they felt it was a systemic issue with the staff

12  and better to start over with new staff.

13  Q.   When you went to the clinic on the 17th and their doors were

14  closed, that was not because of some order from the Department

15  of Public Health, correct?

16  A.   Correct.

17  Q.   You didn't tell them to close.

18  A.   Correct.

19  Q.   Is it possible for the Birmingham clinic to reopen,

20  Mr. Sims?

21  A.   Yes.

22  Q.   What must happen before they can reopen?

23  A.   The department would need an acceptable plan of correction

24  for the deficiencies that were cited.   And then we've told the

25  facility that we would want to come back on-site and review the

1    personnel files and look at documentation they had related to

2    the new staff that they hired to make sure that they were

3    properly trained and qualified before they started providing

4    patient care.

5    Q.   So first the clinic has to submit a plan of correction that

6    is acceptable to the Department of Public Health, correct?

7    A.   Correct.

8    Q.   Has that occurred yet?

9    A.   It's my understanding not yet.

10   Q.   Once that does happen, then you will conduct an inspection

11   of new staff, correct?

12   A.   Yes, sir.

13   Q.   Do you have a judgment as to how long such an inspection

14   takes to schedule and conduct?

15   A.   They would notify us about when their plan was to want to

16   resume their services, and then we would have to work that out

17   with the survey schedule.  We have other facilities that we

18   survey besides abortion reproductive health centers.

19   Q.   The report that we've looked at, Mr. Sims, is Exhibit 25.

20   Is this a record that's common to investigations conducted of

21   any abortion clinic?

22   A.   I'm not sure I understand.

23   Q.   Is this the same format you always use?

24   A.   Yes, sir.

25   Q.   And is this record kept in the ordinary course of the

1   department's business?

2   A.  Yes, sir.

3   Q.  Now, you also investigate clinics other than abortion

4   clinics, do you not?

5   A.  Yes, sir.

6   Q.  What other type of health care facilities do you inspect and

7   regulate?

8   A.  We inspect and regulate home health agencies, hospice

9   agencies, hospitals, dialysis facilities, ambulatory surgery

10  centers, rural health clinics, rehab centers.

11  Q.  In your role as an investigator for the Department of Public

12  Health, are you familiar with the department's regulations as

13  applied to abortion clinics?

14  A.  Yes, I am.  There's 17 different sets of rules, so we have

15  to refer to them, but yes.

16  Q.  Let's look on screen, please, at the Alabama Regulatory

17  Code, Chapter 420-5-1.  And let's look at page 6 of that PDF.

18  Do you see it on your screen, Mr. Sims?

19  A.  Yes, I do.

20  Q.  Now, in the middle of that page, subsection (4) -- so this

21  is regulation number 420-5-1-.02, section (4), clinic schedule.

22  Mr. Sims, must clinics report to the department when they're

23  going to change their schedule or change the days on which they

24  are providing abortions?

25  A.  Yes.  They -- they have to notify us if they're going to

1    change their procedure day.

2    Q.   And was that one of the issues that the Birmingham clinic

3    was cited for?

4    A.   No, sir.

5    Q.   No, it was not?  Okay.  They were closed without notice to

6    the department, correct?

7    A.   Correct.

8    Q.   And what provision were they cited for?  Not -- you don't

9    have to give me a statute number, but what provision were they

10   violating by not being open without giving notice to the

11   department?

12   A.   It's my understanding -- I'm not a lawyer, but it's my

13   understanding that when the Department of Public Health issues a

14   license to a health care facility, they're supposed to be

15   primarily engaged in providing those services to the public.

16   When they stop being primarily engaged to providing those

17   services, then they would need to notify the licensing entity.

18   Q.   And in addition, they're also supposed to let you know, are

19   they not, if they're going to change their schedule or cancel

20   procedure days?

21   A.   Correct.  If they change the schedule or cancel procedure

22   days, they're supposed to tell us.

23   Q.   Let's look at the full page again, please.  And on page 7,

24   are you familiar with subsection (c) that you see on page 7

25   there, Mr. Sims, which defines the role of medical director?

1  A.  Yes.

2  Q.  And what are the duties of a medical director for an

3  abortion clinic?

4  A.  Well, the medical director is responsible for supervising

5  all the clinical functions, making sure the facility meets the

6  requirements of the Department of Public Health rules and

7  professional standards of care.  They have the ultimate

8  responsibility for developing and implementing policies and

9  protocols that the facility is going to use, and they make sure

10  that the medical staff and clinical staff are competent as the

11  rules require.

12  Q.  Does that include the other doctors who perform abortions in

13  the clinic?

14  A.  Correct.

15  Q.  Must the medical director also ensure the qualifications of

16  the outside contracting physician with whom a clinic may have

17  contracted?

18  A.  They're responsible for making sure that they're competent

19  to provide the needs of the patients.

20  Q.  And let's look on down at subdivision (d), please.  Is it

21  correct, Mr. Sims, according to Section 420-5-1.02(5)(d)2 --

22  does this again say that the medical director shall credential

23  each physician on the basis of qualifications and keep a record

24  of that?

25  A.  Correct.

1   Q.   Why do they need to keep a record of that?

2   A.   As evidence and proof that they have verified that the

3   physician was qualified to perform the procedures.

4   Q.   And let's look at page 9, please.  This is, again, 420-5-1,

5   and this is section .02(8), subsection (a).  What are the

6   requirements that an abortion clinic has to keep records of --

7   to keep medical records of its patients?

8   A.   The rule requires that they keep adequate records, including

9   procedure schedules, histories, results of examinations, nurses

10  notes, records of tests performed, and all forms required by

11  law.

12  Q.   Now, was this one of the things that you checked when you

13  inspected the Birmingham clinic in January of 2014?

14  A.   Yes.

15  Q.   Were there issues with keeping records in that case?

16  A.   Yes.

17  Q.   And what were some of those issues again?

18  A.   Related to signatures and dates on forms.  Related to

19  records being sent to other health care facilities where

20  patients were referred out for care from another provider.

21  Q.   And in fact, did you learn in the course of your inspection

22  whether they had made arrangements with any other clinic to care

23  for patients who may have had complications?

24  A.   Yes, sir.

25  Q.   Was there a written record of that arrangement?

1    A.   We asked for a written record, and one was given to us.

2    Q.   When was it given to you?

3    A.   After we asked for it.  I don't remember the specific date.

4    Q.   Okay.  Do you recall which clinic it was that they said they

5    had made arrangements with to take care of patients with

6    complications?

7    A.   Yes.

8    Q.   Which clinic was it?

9    A.   Do they have a pseudonym or can I say their name?

10   Q.   You can give a city of where the clinic is located.

11   A.   Tuscaloosa.

12   Q.   They had made arrangements with the Tuscaloosa clinic?

13   A.   Correct.

14   Q.   Okay.  Did the Tuscaloosa clinic ever contact the Department

15   of Public Health because it needed to be in touch with the

16   Birmingham clinic for records?

17   A.   Yes, sir.

18   Q.   What do you recall about that situation?

19   A.   I recall receiving a phone call from the administrator of

20   the Tuscaloosa clinic saying that she was trying to reach

21   someone at the Planned Parenthood Birmingham location to get a

22   copy of a medical record for a patient that they were seeing,

23   and she had difficulty getting someone to answer the telephone.

24   Q.   This was someone who had had an abortion at the Birmingham

25   clinic?

1   A.   It was my understanding, yes.

2   Q.   Is it your understanding that this patient was having a

3   complication and was then presenting to the Tuscaloosa clinic

4   for care?

5   A.   My understanding is the Tuscaloosa clinic was just doing a

6   follow-up.  I don't know if the patient had a complication or

7   not.

8   Q.   But they -- they needed records from the Birmingham clinic

9   and so contacted public health when they were unable to reach

10  anyone at the Birmingham clinic, correct?

11  A.   Correct.

12  Q.   Staying with the rules, let's look at page 10, please.  This

13  is Section 420-5-1-.03(1) titled Patient Care.  Do you see that

14  section, Mr. Sims?

15  A.   Yes.

16  Q.   And read the sentence, please, that begins "in order to

17  facilitate continuity of care" in the middle of that paragraph.

18  A.   In order to facilitate continuity of patient care, the

19  facility physician shall contact and communicate with any

20  physician rendering care for complications arising from the

21  abortion as soon as he or she is informed of the existence of

22  such complications.

23  Q.   And for the record, also read the sentence that comes before

24  that one, please, that begins "as with."

25  A.   As with any surgical procedure, the physician performing the

1  procedure is responsible for the procedure and for ensuring that

2  adequate follow-up care is provided.

3  Q.  Now, I understand you're not an attorney.  But in your role

4  as an investigator who assists with the regulation of clinics,

5  is it your understanding that these rules would require

6  communication between a clinic and an emergency room if the

7  clinic has a patient that presents to the emergency room with

8  complications?

9       MS. SANDMAN:  Your Honor, I'm going to object, if I

10  may.  To the degree that Mr. Sims is being asked to apply these

11  rules to a hypothetical situation or to something that may have

12  come out in testimony during these proceedings, this is a matter

13  that could potentially be an investigation before the department

14  of health in the future.  We don't know what position he's

15  proposing to take; but to the degree that he's going to be

16  testifying that this could be considered a violation of the

17  regulations, this is not something that's contained in the

18  statement of deficiencies.  This is not something that we have

19  been deemed by ADPH to be in violation for.

20       So I think it would be improper for him to be offering

21  that testimony at this juncture and quite prejudicial to our

22  client for an official from the ADPH to be asked to speak on

23  that situation in a way that's not part of their normal

24  licensing regulatory function but, rather, is in the context of

25  a constitutional proceeding with all of the heightened concerns

1   and attention that that involves.

2          MR. DAVIS:  And I'm asking, Your Honor, what Mr. Sims,

3   who is on the front line in enforcing the procedures -- what, as

4   a factual matter, is his understanding of this requirement.

5          THE COURT:  I'll allow it.  Overruled.  Now, if it ends

6   up violating a right of the clinic, the clinic can raise that

7   right later.  But that will be up to whoever hears it.

8          So you can ask the question, but you have to bear in

9   mind that it may prejudice someone in the future.  So I'm not

10  saying that it doesn't prejudice.  I'm just allowing the

11  question.

12         MR. DAVIS:  I understand Your Honor's ruling.  And to

13  proceed efficiently, I'm going to move on and then speak with

14  counsel for public health, who is present -- actually, may I

15  confer for just a moment --

16         THE COURT:  Sure.

17         MR. DAVIS:  -- since public health and Dr. Williamson's

18  attorneys are here?

19         THE COURT:  Very good.

20     (Brief pause)

21         MR. DAVIS:  We do wish to proceed, Your Honor.  And

22  I'll restate the question.

23  Q.  Mr. Sims, looking at this provision, is it your

24  understanding -- in your role with the Department of Public

25  Health, is it your understanding that if a patient goes to the

1    ER because of complications with an abortion, that there needs

2    to be direct communication between the abortion clinic and the

3    emergency room provider?

4    A.   The facility is responsible for having protocols for

5    communicating with outside covering physicians.  And so they

6    would need to follow their protocol for in fact communicating.

7    Q.   If their protocol is inconsistent with the department's

8    regulations, they need to follow the regulations, though,

9    correct?

10   A.   The rule would take precedence over a protocol.

11   Q.   Let's look now, please, at page 15.  And looking at -- in

12   section (6), subsection (a), near the bottom, Mr. Sims, what do

13   the rules require in terms of discharge instructions that a

14   patient must be given?

15   A.   The rule requires that the patient be given discharge

16   instructions and that they know who they're supposed to contact

17   in the event that they have a complication and they need to

18   contact a physician or someone else for care.

19   Q.   And let's look at section (b).  And who, according to the

20   rules, is responsible for the continuing care of a patient who

21   has had a procedure at an abortion clinic?

22   A.   The physician who performs an abortion procedure is

23   responsible for ensuring that all patients receive adequate

24   follow-up care.

25   Q.   Now let's skip down to section (c), please.  Is it your

1  understanding, Mr. Sims, that under current department

2  regulations, that a clinic must have either doctors with

3  admitting privileges or a contract with an outside physician who

4  has admitting privileges?

5  A.   Correct.

6  Q.   Now, if the outside physician is going to be unavailable --

7  on vacation for two weeks -- does that affect the clinic's

8  schedule in any way?

9  A.   The outside covering physician contract requires that that

10  physician notify the clinic of their unavailability or that

11  there's not a substitute physician available to cover in their

12  place.   So they wouldn't be allowed to perform procedures if

13  that physician or a substitute physician wasn't going to be

14  available.

15  Q.   If there is no outside covering physician, then the abortion

16  procedures have to stop, correct?

17  A.   That's what the rules require.   Correct.

18           THE COURT:   How much longer are you going to be?

19           MR. DAVIS:   I wish to move for admission of Exhibit 25

20  and then release the witness for cross-examination.

21           THE COURT:   Okay.   Why don't you do that.

22           MR. DAVIS:   I move for admission of Exhibit 25.

23           THE COURT:   Admitted.

24           And how long will the cross take?

25           MS. SANDMAN:   I'm thinking maybe 20 minutes to half an

 1    hour, Your Honor.

 2         THE COURT:  Twenty minutes, half an hour?  Good.  I

 3    have a judges meeting in less than five minutes which I have to

 4    go to.  So we'll start back let's say at 1:05, just to give me

 5    time to get back to court.  So we'll recess now.

 6         MR. DAVIS:  Thank you, Your Honor.

 7         THE COURT:  What about the videoconference witness this

 8    afternoon?

 9         MR. DAVIS:  It's presently scheduled for one, but we

10    understand -- we will call Dr. Uhlenberg and explain that we

11    have other proceedings.  And they'll be there.

12         THE COURT:  I have no problem, if this witness doesn't

13    have a problem, with delaying his cross until after the

14    videoconference, but I'll leave that up to you-all in

15    conjunction with my IT people.

16         MR. DAVIS:  I will confer with plaintiff's counsel and

17    with the staff.

18         THE COURT:  Okay.  Very good.  Either way is fine with

19    me.  We'll start back at 1:05.

20         MR. DAVIS:  Thank you.

21      (Recess at 11:53 a.m. until 1:05 p.m.)

22         THE CLERK:  Dr. Uhlenberg.

23         THE WITNESS:  Yes.

24         THE CLERK:  I'm going to swear you in.  Would you raise

25    your right hand, please.

1    (Dr. Uhlenberg is sworn)

2        THE CLERK:  Please remain seated.  Court is in session.

3        THE COURT:  Counsel, where are we in light of the lunch

4 break?

5        MR. DAVIS:  Your Honor, in light of both the courthouse

6 staffs being involved -- and Your Honor was generous enough to

7 allow this -- we decided to go ahead and call Mr. Uhlenberg --

8 Dr. Uhlenberg.  Pardon me.  And then we'll resume with Mr. Sims

9 as soon as that's complete.

10        THE COURT:  Very good.  Go ahead, then.

11        **PETER UHLENBERG, Ph.D.**, the witness, having been duly

12 sworn to speak the truth, the whole truth, and nothing but the

13 truth, testified as follows:

14                      DIRECT EXAMINATION

15 BY MS. HOWELL:

16 Q.  Good afternoon, Dr. Uhlenberg.  Would you please introduce

17 yourself to the Court.

18 A.  Yes.  I'm Peter Uhlenberg.  That's U-H-L-E-N-B-E-R-G.

19 Q.  Thank you.  Would you please tell us your educational

20 background beginning after high school.

21 A.  Yes.  I attended San Jose State College for one year and

22 then transferred to Wheaton College where I completed by

23 undergraduate work.  In 1964, I entered a graduate program at

24 the University of California at Berkeley and received my

25 master's degree and my Ph.D. in demography from there.

1   Q.   And what do you do now?

2   A.   I'm a professor of sociology at the University of North

3   Carolina at Chapel Hill.

4   Q.   And how long have you been in that position?

5   A.   Forty-five years.

6   Q.   What are your duties as a professor of sociology?

7   A.   The expectation is that we would -- the expectation is that

8   we would teach classes, both undergraduate and graduate-level

9   classes, that we would conduct research and publish findings

10  from that research, that we would be involved in professional

11  organizations and tasks in terms of administrative

12  responsibilities in the department.

13  Q.   And what -- what subjects -- excuse me -- do you

14  specifically teach?

15  A.   Most of my teaching is in the area of sociology of the

16  family, of population, demographic methods, and aging and life

17  course.

18  Q.   And do you conduct research on the same subjects?

19  A.   Yes.

20  Q.   Is that the focus of your research?

21  A.   Excuse me?

22  Q.   Sorry.  Is -- is your focus the same -- sorry -- as the

23  things that you teach?

24  A.   Yes.  The research -- the research is in the areas of

25  family, life course and aging and demography.

1    Q.   Have you been published in any of those areas?

2    A.   Yes.  I've published in all those areas.

3    Q.   Specifically, have you studied the areas of fertility and

4    fertility control as part of your research?

5    A.   Yes.  Quite a lot of attention to fertility change over

6    time.  And part of that would be reasons for changing fertility

7    or differences in fertility between minority groups and a

8    dominant group in a population.

9    Q.   Have you published anything specifically related to

10   fertility and fertility control?

11   A.   Yes.  Several.  Fertility control is marginally what the

12   studies would be with interest in why fertility changes over

13   time forces you to look at why -- what the factors are in

14   controlling fertility.

15   Q.   Dr. Uhlenberg, have you previously testified as an expert

16   witness?

17   A.   Yes.

18   Q.   When?

19   A.   The first case was in Wisconsin maybe 20 years ago.  And

20   since then, I have been an expert witness in probably seven or

21   eight other cases in different states.

22   Q.   Have those all been on similar subject matter?

23   A.   They've all been related to abortion policy.  And I've been

24   called as an expert to defend the state's policy.

25   Q.   Has your expertise ever been denied by any court?

1    A.   No.

2    Q.   If you have it with you, I'd like you to take a look at

3    Defendant's Exhibit 6, which I believe is your expert report.

4    And specifically, I want to focus on Attachment A, which begins

5    at page 19.

6    A.   Yes.  I have that.

7    Q.   Okay.  What is that?

8    A.   This is a recent copy of my curriculum vita, which goes

9    through my academic career of education, employment,

10   publications, and such things.

11   Q.   Okay.  And is it a true representation of your professional

12   accomplishments?

13   A.   Yes.

14        MS. HOWELL:  Your Honor, the State would tender

15   Dr. Uhlenberg as an expert in the field of demography and trends

16   in fertility and fertility control.

17        THE COURT:  Proceed.

18   Q.   Dr. Uhlenberg, I want to look back at Defendant's Exhibit 6

19   again but look at the report this time.  And you have that with

20   you, correct?

21   A.   Yes.

22   Q.   Does this document accurately represent the opinions you've

23   formed with regard to this case?

24   A.   Yes.

25        MS. HOWELL:  Your Honor, I'd move to admit Defendant's

1   Exhibit 6 into evidence.

2           THE COURT:  Admitted.

3   Q.  Dr. Uhlenberg, do you have an opinion as to the effects of

4   HB 57's admitting privileges requirement?

5   A.  Yes.  It's my opinion that there is not scientific evidence

6   to suggest that the effect of this act would be to prevent women

7   from obtaining abortions if they want.

8   Q.  And what is the basis for your opinion?

9   A.  There are two parts, I think, to the argument I would make.

10  The first is questioning the accuracy of the assertion that the

11  effect of the law would be to force the closing of abortion

12  clinics in Alabama.  I think that may or may not happen, but I

13  think the evidence is not clear that that would be a necessary

14  outcome.  If it did close one or more abortion clinics, then the

15  distance that women would have to travel for an abortion

16  provider would increase.  And Dr. Henshaw in particular makes

17  the argument based upon several studies that this would prevent

18  a significant number of women from obtaining abortions they

19  want.  I think the evidence that he has does not merit that kind

20  of strong conclusion.

21  Q.  And you've mentioned one of the plaintiff's experts in this

22  case, Dr. Henshaw.  And I take it that you have had time to

23  review his report; is that correct?

24  A.  That's right.

25  Q.  And what is your opinion with respect to his conclusions?

1  You've said a little bit about it, but if you could elaborate

2  more.

3  A.   Yes.  He is drawing conclusions from studies in several

4  different states at different time periods that show a

5  correlation between abortion rates per county and the distance

6  from that county to the nearest abortion provider.  The

7  difficulties I have with those studies are that in no case does

8  he have any evidence from women that they are unable to obtain

9  an abortion that they want.  The data simply do not say that and

10 are not relevant to that.

11     Beyond that, to suggest that this correlation means that

12 distance is the cause of a lower abortion rate is not justified.

13 As most all of us know at this point, causation requires much

14 stronger evidence than correlation.

15 Q.   Now, in his expert report, Dr. Henshaw cited a lot of

16 different data and specifically a lot of different studies that

17 pertain to different states that have faced similar trends in

18 abortion rates and distance from providers.  I want to look

19 closely at one of those studies, and that is the Colman and

20 Joyce study.  And I believe that is Plaintiff's Exhibit 63.

21 And do you have that?

22 A.   Yes, I have that.

23 Q.   Wonderful.  So we have already heard Dr. Henshaw's testimony

24 as to this study.  But if you could, just give us a brief recap

25 of what exactly the study set out to do and what it found, just

1   to refresh our memories.

2   A.   The motivation of the study was that in Texas in 2004 an act

3   was passed called the Women's Right to Know.  And one of the

4   aspects of that law was to say that abortion clinics could not

5   perform abortions on women past 15 weeks' gestational age unless

6   they were certified as ambulatory surgical centers.  None of the

7   abortion clinics in Texas at that time qualified, so that after

8   2004, women could not obtain abortions after 16 weeks' gestation

9   in Texas.  The Colman and Joyce study, then, is trying to

10  discover what the effect of that was on the number of abortions

11  to women -- late-term abortions for women in Texas.

12      They concluded that because women would have to travel out

13  of state to an abortion clinic to obtain the abortion, the

14  distance increased significantly from about 33 miles on average

15  to 250 miles on average.  And they found that the number of

16  abortions reported in Texas at gestational age past 15 declined

17  precipitously.  There were only a limited number occurring in

18  hospitals.  And the number increased in out-of-state abortions

19  for women at that gestational age, but not enough to counter the

20  decline so that the total was a much lower number of women past

21  gestational age 15 obtaining abortions in Texas after the act

22  was in effect.

23  Q.   But after a while, didn't some clinics reopen as ambulatory

24  surgical centers?

25  A.   Yes.  Within three years, clinics qualified for that in the

1    four largest metropolitan areas of Texas, which was -- about

2    two-thirds of the population live in these areas so that most

3    women in Texas, within two or three years, had access to

4    late-term abortions in Texas.  Despite that access, the number

5    of late-term abortions reported for residents of Texas increased

6    only a relatively small amount compared to the drop between 2004

7    and 2005.  It did not rebound nearly to what it was in the 2004

8    period.

9    Q.  In Dr. Henshaw's testimony, he told us that it rebounded by

10   50 percent, which sounds like a large number.  Why do you

11   disagree with that?

12   A.  No.  He's saying what the increase was from 2005 until 2006,

13   I believe.  But that is -- I've got the numbers in my expert

14   report if you want the actual numbers.  But as a proportion of

15   what they were prior to 2004, the increase was relatively

16   modest.

17   Q.  So Dr. Uhlenberg, if distance were a significant driver of

18   abortion rates, why wouldn't the rate increase all the way back

19   to the pre-2004 level once those clinics began offering those

20   services again?

21   A.  Yes.  The -- the average distance was still 20 miles greater

22   than it was in 2004, so one argument could be that that

23   increased travel distance would reduce the number of abortions.

24   But it's implausible that it could have had such a significant

25   effect, a 20-mile difference should have such a significant

 1  effect.   The other argument used by the Colman and Joyce -- in

 2  the Colman and Joyce article was that the cost of late-term

 3  abortions had increased and perhaps this increased cost of

 4  abortions had discouraged a very large proportion of women from

 5  obtaining these later term abortions.

 6  Q.   Now, what do the study's findings indicate to you in terms

 7  of a clinic's ability to comply with a newly imposed

 8  requirement?

 9  A.   Well, we know that in the case of Texas, that a significant

10  number of the abortion clinics performing late-term abortions

11  were able to comply with the new requirement within a few years.

12  And I think additional clinics have done that or evidence is

13  that new clinics are in -- expected to be available later this

14  year performing late-term -- meeting the ambulatory surgical

15  requirement.   So in general, I think that the immediate effect

16  of an abortion clinic not being able to comply with the law

17  doesn't mean that, over time, it is not able to.

18  Q.   Are there other possibilities for what might happen to the

19  availability of abortions in Alabama if the plaintiff clinics

20  here were to shut down, either permanently or temporarily?

21  A.   Yes.   I think the immediate consequence would be that women

22  would travel further to obtain abortions that they want.   And

23  we've looked at what those increased distances might be, and

24  they tend to be under a hundred miles.   But in addition, an

25  abortion clinic might be able to find a doctor who would be able

1  to perform abortions and meet the state requirement.  Or if an

2  existing clinic couldn't do that in a city like Birmingham,

3  which has over a million population, it's not unlikely that

4  another abortion clinic would be established that could comply

5  with the law.

6  Q.  And why do you say that it's not unlikely that another

7  clinic would open?

8  A.  We know that new abortion clinics are being established over

9  time in different places.  And in the case of Texas in

10  particular, we have evidence that Planned Parenthood is

11  preparing a new abortion clinic to comply with the law

12  requiring -- meeting the standard of ambulatory surgical

13  centers.

14  Q.  I believe in your report you also mentioned something about

15  the inelasticity about the demand for abortions.  Might that not

16  also be another reason?

17  A.  Well, a number of studies by economists suggest that there

18  is price inelasticity, which means that the demand for abortion

19  is not particularly sensitive to the cost.  If the cost goes up

20  and abortions are strongly enough wanted, they will pay the

21  additional cost.  And so if it is a market situation and the new

22  center could open and charge more for abortions, again, there

23  would be an incentive, then, to establish a new clinic.  If we

24  think of this as a supply and demand and the demand is high, the

25  market is there, there's no reason to expect that someone

1  wouldn't step forward to provide that service.

2  Q.  Thank you.  Looking back at the text of the Colman and Joyce

3  study, you had also suggested in your report that there were

4  several limitations to the study.  What were those limitations?

5  A.  Well, I think there are two issues here.  One is the

6  relevance of the Colman and Joyce study for the situation in

7  Alabama, which I think both the authors and myself would agree

8  the situation is not generalizable from Texas with a different

9  law applying to women in late gestational age.  Given all those

10  conditions, it simply is not applicable to the situation in

11  Alabama of some clinics closing, potentially closing, and women

12  having to travel distances of less than a hundred miles to

13  obtain abortions.

14     The other issue in the Colman and Joyce study that I call

15  attention to is probably a fairly significant exaggeration in

16  terms of the effect of the law in Texas in terms of deterring

17  women from obtaining late-term abortions.

18  Q.  How would it have been exaggerated?

19  A.  One of the obvious responses to making -- of a clinic not

20  being able to perform abortions after 15 weeks when it

21  previously had been performing late-term abortions would be for

22  that clinic to schedule abortion patients to come in before 16

23  weeks.  And Colman and Joyce say that they have taken that into

24  consideration and added a few hundred abortions occurring at 15

25  weeks that they think might have been transferred from 16-plus

1   weeks if the law had not gone into effect.  But their assumption

2   here is that there would have been no change in the number of

3   abortions after 16 weeks -- after 15 weeks if the law had not

4   gone into effect, and their assumption is that the number of

5   abortions at 13 through 15 weeks' gestation would have not

6   changed in absence of the law.

7       So the only possible transfer of abortions from later to

8   earlier period is the small increase in number of abortions at

9   15 weeks.  But that assumption that abortions at 13, 14, or 15

10  weeks would not increase, would not decrease, or that abortions

11  after 16 weeks would not decrease in the year following is only

12  an assumption.  And alternative assumptions could be made that

13  would suggest that probably the number of abortions that were

14  advanced by clinics was very significant.

15  Q.  So you mentioned that assumption.  And so I wanted to pose a

16  hypothetical to you, because Dr. Henshaw's testimony last week

17  said that the authors had essentially done as much as they

18  possibly could to make their study error-proof.  If Dr. Henshaw

19  is correct and the possibility of any kind of error, even based

20  on that assumption, is minimal, would that change your opinion

21  at all about the study's applicability to Alabama?

22  A.  That's a strong assumption.  But if I make that assumption,

23  I still would say that the application of the Texas study to

24  Alabama is not very helpful.

25  Q.  And why is that?

1  A.  The reason would be that -- and I'm sharing this exactly

2  with what Dr. Joyce has commented about trying to extrapolate

3  from the Texas study to other situations which involve abortions

4  for women of all gestational ages.  And he says that there's no

5  clear reason why it would be applicable.  The difficulty is that

6  abortions at 16-plus weeks' gestation account for only about

7  five percent of all abortions, and these women have limited time

8  to make other arrangements.  And the distances we're talking

9  about in Texas are much greater than anything in Alabama.  So to

10  try to transfer this to a whole population of women interested

11  in obtaining abortions simply is very, very limited.

12  Q.  Dr. Uhlenberg, just so that the record is perfectly clear,

13  what was the Colman and Joyce study's main goal?

14  A.  Well, I -- I'm not sure I have it right, but I think it had

15  to do with what the effect of this law would be on the number of

16  women obtaining late-term abortions in Texas and what impact it

17  would have on the clinics.

18  Q.  So did it deal directly with the relationship between

19  distance and abortion rates?

20  A.  No.  That's something that would have been very helpful if

21  they had actually calculated changes in abortion rates for

22  counties based upon the change in distance to an abortion

23  provider.  The data were available to do that; but for some

24  reason, they didn't.  So all they do is say that there was this

25  average change in distance of 200 miles or something and then

1    suggest that that was perhaps the deterrent to women traveling

2    out of state to obtain abortions.

3    Q.   Now, I think I heard you right to say that they said perhaps

4    that was a deterrent.  Was that correct?

5    A.   I wouldn't -- I would not suggest that they said perhaps.  I

6    think they said it may have been a deterrent, was their

7    language.

8    Q.   All right.  But in Dr. Henshaw's expert report, which is

9    Plaintiff's Exhibit 61, he concluded that the Joyce study showed

10   that the travel burden imposed by the ASC law, which was the

11   2004 Texas law, prevented thousands of women from obtaining

12   abortions.  So are you saying that Colman and Joyce did not make

13   that assertion in their article?

14   A.   No.  They never say that it prevented any particular number

15   of women from obtaining abortions that they wanted.

16   Q.   What did they say?

17   A.   They said that they found a significant decline in the

18   number of Texas women obtaining late-term abortions after the

19   law was in effect compared to the preceding time period.

20   Q.   So I've just mentioned Dr. Henshaw's expert report wherein,

21   as you note in your expert report, he argues repeatedly that the

22   implementation of HB 57, which is the Alabama act, would prevent

23   a substantial number of women from obtaining abortions in

24   Alabama.  In your expert opinion, did Dr. Henshaw make any

25   assumptions that would have affected his conclusions about the

1  law's effects on accessibility to abortion services?

2  A.  Well, he bases that opinion on probably four different

3  studies that show a correlation between distance from provider

4  and abortion rates at a county level.  In none of those studies

5  do the authors suggest that the distance is preventing women

6  from obtaining abortions.  So I think that Dr. Henshaw is making

7  a very large jump here from finding studies that correlate

8  distance to a provider with abortion rates at the county level

9  with the conclusion that women are being prevented from

10 obtaining abortions because of distance.

11 Q.  Now, in your report, you cited some events from other

12 states.  I remember specifically an example from Tennessee where

13 abortion clinics were responding to laws similar to HB 57, laws

14 that required admitting privileges.  I wonder if you could tell

15 us what happened in those states.

16 A.  Yes.  I have a few states where this would be relevant.  In

17 Tennessee, a very similar law was enacted.  It was not

18 challenged in the courts, and so the abortion clinics had to

19 comply with the law or close.  And eight of the nine abortion

20 clinics in Tennessee were able to comply with the law; that is,

21 they continued operation after the law was in effect.

22     In Utah, a somewhat similar law, not identical, did not have

23 the effect of closing any of the four abortion clinics in Utah.

24     In North Dakota, where the law was going to a court trial,

25 the one abortion clinic that had brought the case the last week

1   or so was able to obtain hospital admitting privileges for their

2   doctors.   And so the -- the case was withdrawn.

3       And in Wisconsin, where a very similar case is being heard,

4   the abortion provider in Appleton claimed that they would be

5   forced to close if the law was enacted; but now they -- their

6   doctors have been able to obtain admitting privileges, and so

7   the clinic does not have to close.

8       Also, we have the situation in Texas, which was recently

9   decided.   And in that case, we had plaintiffs saying that

10  abortion clinics in several cities would be forced to close if

11  the act was enforced.   And in some of those cases, those clinics

12  were able to obtain admitting privileges for their doctors, and

13  so they're still open.

14      So because this law is relatively recent in terms of being

15  enforced, we don't have a whole range of states to look at.   But

16  as far as I know, in every state where this has been suggested,

17  that it would force abortion clinics to close, at least some of

18  the clinics have not been forced to close.

19  Q.  So Doctor, just to make the record perfectly clear, are you

20  saying -- are you opining that these situations are more

21  applicable to the situation in Alabama than the studies cited by

22  Dr. Henshaw?

23  A.  I -- I don't know the situation in Alabama at all well in

24  terms of hospitals granting admitting privileges.   But, of

25  course, we do have the abortion clinics in Huntsville and

 1   Tuscaloosa where doctors have been able to obtain admitting

 2   privileges.  And so that's the only basis I have for suggesting

 3   that a huge metropolitan area like Birmingham -- it really seems

 4   plausible that an abortion doctor could obtain admitting

 5   privileges.

 6   Q.  And Doctor, that was a bad choice of words on my part.

 7   Would you say that the evidence that we've seen in those other

 8   situations is more predictive of what might happen in Alabama

 9   should the law go into effect?

10   A.  I'm sorry.  Are we talking about Henshaw's generalization

11   from other states?

12   Q.  No, sir.  Talking about the -- the different states that you

13   have just spoken about, Utah, South -- North Dakota -- excuse

14   me -- Wisconsin; that what we have seen with those laws and

15   their admitting privileges might be more indicative of what we

16   might hope to see in Alabama.

17   A.  Yeah.  I would have difficulty knowing whether the same

18   situation would apply in Alabama, but at least we have evidence

19   that abortion clinics that have claimed they would have to close

20   in these other states did not in fact have to close because they

21   were able to obtain admitting privileges.  I think admitting

22   privileges differ from state to state, and so it is only

23   suggestive of cases where this has really been tested and found

24   that abortion clinics often can comply with that requirement.

25   Q.  And Dr. Uhlenberg, let's assume for the moment that some of

1  the plaintiff clinics here did have to close because of the law,

2  if HB 57's admitting privileges requirement went into effect.

3  Are there other ways that access to abortion could be

4  maintained?

5  A.  Well, I think we've already mentioned that a new clinic

6  could open, which would increase access.  I think we've already

7  mentioned that women could travel to clinics in another area,

8  which presumably many women from Birmingham already are doing

9  that.  And so it's not clear that the burden would be very great

10 on them traveling to other abortion clinics to obtain abortions.

11 In the long-term, another possibility is that the provision of

12 abortions could shift from abortion clinics to OB-GYN doctors

13 incorporating abortion within their more general practices.  And

14 this has been suggested as a trend that might emerge as support

15 for that kind of plan, though that would presumably be a

16 long-term shift, not an immediate solution to the problem.

17 Q.  I'd like to turn now to the Shelton study that's discussed

18 in Dr. Henshaw's expert report.  Are you familiar with this

19 study?

20 A.  Yes.  I've reviewed that study.

21 Q.  During his trial testimony, Dr. Henshaw stated that the age

22 of this study did not in any way diminish its value for

23 predicting outcomes today.  Do you agree with his opinion on

24 that?

25 A.  No.  I think that a study that is -- I'm trying to think how

1  many years old it is now -- I think 50 years ago or so,

2  conditions have changed remarkably so that you would need to be

3  hesitant in terms of trying to say what happened in Georgia in

4  the 1970s, early 1970s, is applicable to Alabama in 2014.

5  Q.  What would be different now than it was in the mid 1970s if

6  I represent to you that that study was conducted in 1976?

7  A.  Yes.  The information available has changed remarkably now

8  with Internet so that it is very easy for people to gather

9  information about abortion providers, about transportation,

10  Google maps.  And we have increased use of Facebook and other

11  social media arrangements so that people can communicate

12  generally, get information, ask for support, ask for advice.

13  This -- these are just some of the way -- things that have

14  changed remarkably since the mid 1970s.

15  Q.  Now, your report also stated that there were problems in

16  using this particular study, regardless of its age, to predict

17  what could happen in Alabama.  One of the problems I believe

18  that you mentioned was the specific timing of that study, not

19  its age but when it was conducted.  What would that problem have

20  been?

21  A.  Well, this was probably a couple of years after *Roe v. Wade*

22  had been decided.  And up until that time, abortion had been

23  illegal in Georgia.  And one might assume that in rural areas

24  especially, there was not widespread acceptance of abortion as a

25  solution to unwanted pregnancy.  In a major metropolitan area

1  like Atlanta, it might be much more accepted.  And so the

2  information, attitudes toward abortion at that time period were

3  very different than they are today.

4  Q.  Why would we make the assumption that the attitudes in

5  Atlanta, which is also in Georgia, would be different from the

6  attitudes of the women living in rural Georgia?

7  A.  Yes.  All studies of urban/rural differences find that the

8  composition of the population differs, the -- things like church

9  attendance differ by rural/urban residents, access to medical

10  care, just a whole range of variables.  And so in large

11  metropolitan areas, I think we tend to find people with more

12  liberal attitudes, less -- greater anonymity, less constrained

13  by the community feelings.  And I haven't formulated a good

14  answer to your question, but all the evidence is that urban

15  areas differ substantially from rural areas on a lot of

16  dimensions.

17  Q.  Thank you, Doctor.  I want to ask you a couple of quick

18  questions about there are, I believe, three other studies that

19  Dr. Henshaw cites in his report to support his conclusions

20  regarding the correlation of distance to an abortion provider

21  and abortion rates.  And those are, I believe, a Dobie study,

22  Brown, and Matthews.  Are you familiar with those studies?

23  A.  Yes.  I've looked at all those.

24  Q.  And what is your expert opinion of those studies?

25  A.  In none of those studies do the authors report that any

1   women were denied access to an abortion that they wanted.  None

2   of those studies, in fact, look at characteristics of individual

3   women to determine whether they obtain an abortion or not that

4   they want.  And so they are based on aggregate data, usually at

5   the county level, and are for primarily reporting that counties

6   that are further from places where abortions are provided have

7   lower abortion rates than counties that are close to abortion

8   providers.  That is not very compelling evidence that distance

9   is the cause of lower abortion rates in these more distant

10  counties or that women in those counties have been prevented

11  from obtaining abortions that they want.

12  Q.  You also made the point in your expert report that

13  Dr. Henshaw didn't cite any literature that might contradict his

14  opinions.  Are there studies that contradict his conclusions?

15  A.  There are two or three studies that have concluded that

16  distance is not a significant predictor of abortion rates.  One

17  of these studies is probably valuable because this is looking at

18  individual women over time and comparing those who obtained

19  abortions to those who did not obtain abortions.  And that study

20  found that women's proximity -- or the availability of abortion

21  providers was not a predictor of whether these women obtained

22  abortions or not.  This is, I think, the Currie study.  I could

23  look up the whole title if you want.  Do you need the title for

24  that study?

25  Q.  Is it written in your expert report?

1    A.   Yes, it is.

2    Q.   Then we'll rely on that.  And just to confirm, you said it

3    was three different studies that contradicted his conclusions?

4    A.   Well, I referred to two studies.  The other was by Gohmann,

5    G-O-H-M-A-N-N, which is relatively similar to the Matthews study

6    in terms of looking at differences across states.  One of them

7    finds that access to abortions in the state is a predictor of

8    higher abortion rates.  The Gohmann study finds that it is not a

9    predictor.

10       I'm not -- what I'm not suggesting is that these are the

11   only two studies which don't support the conclusion of

12   Dr. Henshaw.  It was more to draw attention to the fact that he

13   has selected only studies that would reinforce his perspective.

14   Q.   Doctor, in your report, you also look specifically at some

15   data for the state of Alabama; specifically, I believe, from the

16   years 2005 to 2008.  Do you recall --

17   A.   Yes.

18   Q.   -- looking at that data?

19   A.   Yes.

20   Q.   What did it show?

21   A.   I think that the reference I was making there was to the

22   fact that the number of abortion providers in Alabama actually

23   declined from 2005 to 2008, but the abortion rate increased

24   somewhat.  I would also say that the same situation applied to

25   other states.  It wasn't unique to Alabama.  That a declining

1    number of abortion providers does not necessarily imply that

2    abortion rates will decrease.

3    Q.   What other states are you referring to?

4    A.   I don't have a whole list of states in front of me, but I

5    remember a significant decline in either number of abortion

6    providers or an increase in number of women living in counties

7    without an abortion provider occurred in Illinois and

8    Pennsylvania, but both of those states experienced increasing

9    abortion rates between 2005 and 2008.  There were other states

10   as well.  I haven't gone through and written down what those

11   states -- or I don't have that with me.

12   Q.   Dr. Uhlenberg, if you would, please look at your expert

13   report, which is, again, Defendant's Exhibit 6, on page 10, at

14   paragraph 16.  And just let me know when you get there.

15   A.   Yes.

16   Q.   And will you summarize the contents of this paragraph for

17   me.

18   A.   The first part of the paragraph is what we just discussed,

19   is that you cannot conclude that a decrease in number of

20   abortion providers in the state will lead to decreasing abortion

21   rates, because that did not happen in Alabama between 2005 and

22   2008.  The second part turns that around and says that, also,

23   increasing access to abortion does not necessarily mean that

24   abortion rates go up.  And we have the evidence there from Iowa

25   where telemedicine was used to increase access to abortion for

1   women in rural parts of the state, but the abortion rate in Iowa

2   did not increase after those were in place, after women had much

3   greater access to abortion.

4   Q.   And I wonder, Doctor, could you give me the specific data,

5   the numbers, for what the rate changes were in both of those

6   states.

7   A.   In Iowa?

8   Q.   In Iowa and then in Alabama.

9   A.   Okay.  Well, the videoconferencing made dispensing abortion

10  pills to women in clinics throughout the states allowed.  So

11  I don't have a number of new abortion clinics that were --

12  clinics providing abortions were, but it was substantial.  And

13  despite that increase, the number of abortions declined by 30

14  percent between 2007 and 2012 in Iowa.  So it was a very

15  significant drop in number of abortions despite greater access.

16      In the case of Alabama, the number of abortion providers

17  declined from 13 in 2005 to eight in 2008.  And the abortion

18  rate remained essentially stable at 11.9.  It increased to 12.0.

19  Q.   So it's actually a small increase, correct?

20  A.   A small increase, but I wouldn't make much of that.

21  Q.   Would you consider a drop from 13 abortion providers down to

22  eight within a span of three years a loss of a large number of

23  abortion clinics in Alabama, proportionally speaking?

24  A.   Yeah.  To answer that question, I would have to have

25  information about the number of abortions provided at each of

1  the different clinics; but certainly, it looks like a trend

2  going on here of a declining number of abortion providers.

3  Q.  And that doesn't appear to affect the abortion rate,

4  correct?

5  A.  Could you repeat that?

6  Q.  I'm sorry.  That doesn't appear to affect the abortion rate,

7  correct?

8  A.  It did not.  It -- again, one cannot say whether it affected

9  the abortion rate, but the abortion rate did not go down as a

10 consequence of that.  So there might have been other factors

11 involved that would have maintained the higher abortion rate.

12 I'm just trying to be cautious here in again saying that

13 correlation is not an indicator of causation.

14 Q.  Now, Doctor, we've talked some about what's been happening

15 in other states with similar legislation.  I want to ask you a

16 different question about out-of-state possibilities for women

17 seeking abortions.  If the three plaintiff clinics in this suit

18 were to all close down, what are the options for out-of-state

19 abortions?  Are they viable for the women of Alabama?

20 A.  Yes.  I think that clearly, for Montgomery, the distance to

21 Columbus, Georgia, is less than 80 miles.  And we already have

22 evidence that -- I don't know -- 900 or more women from Alabama

23 go to Georgia to obtain abortions, and so that kind of travel is

24 not exceptional.

25     For the clinic in Mobile, there's an abortion clinic

1  available in Pensacola, Florida.  I don't have the exact

2  distance, but 60 miles or something like that.  Unfortunately,

3  Florida does not report number of abortions to women from

4  other -- occurring in Florida to women from other states, so we

5  don't know the volume of that, but I have seen that that

6  Pensacola abortion clinic advertises in the Mobile context.

7  That is, if you do a Google search, abortion clinic Mobile, you

8  will get -- one of the sites that comes up near the top is the

9  Pensacola abortion center.  So it would appear that they are a

10 provider of abortions for women from Alabama.

11 Q.  Doctor, if I could get you to turn to page 11 of your expert

12 report.  And I'm specifically looking at paragraph 17.

13 A.  Yes.

14 Q.  If you would -- my apologies.  If you would, please read

15 aloud the last sentence of that paragraph.

16 A.  If abortion clinics in Montgomery, Birmingham, and Mobile

17 were to close, women in any of these cities would need to travel

18 less than 90 miles to the nearest abortion provider.

19 Q.  Thank you, Dr. Uhlenberg.  I want to ask you a couple more

20 quick questions about the other expert reports that you

21 addressed in your expert report.  One of the things that we have

22 heard about in the last couple of weeks is that poverty is

23 something that can stand in the way of accessibility for women

24 seeking abortions.  And we have heard testimony from the

25 plaintiff's expert, Dr. Katz, about poverty's effect on access.

1  Your report addresses her expert opinions and disagreed with her

2  conclusions saying that experts in the field probably wouldn't

3  agree with her.  Is that right?

4  A.  Yes.  That's my view.

5  Q.  Doctor, before I ask a couple more questions, just to

6  confirm, you wouldn't call yourself an expert in poverty

7  studies; is that correct?

8  A.  That is not a major area of my research, although I do

9  include poverty information in much of my research.  And I

10  certainly read the poverty literature and use that in my

11  classes.  So I know a great deal about poverty research in this

12  country.

13  Q.  So would it be fair to say that you're familiar enough with

14  the literature in the area to be able to summarize accurately

15  the findings of experts in the field?

16  A.  I'm confident in doing that, yes.

17  Q.  So why would you say that leading experts in the field of

18  poverty would disagree with Dr. Katz's conclusions?

19  A.  Well, the conclusion that she states in her report suggests

20  that women who are poor are incapable of planning and carrying

21  out a trip of a hundred miles or something like that to achieve

22  something that is very important to them.  And this fits more

23  into the old idea of a culture of poverty, that people who are

24  in poverty are there because they are incapable of making wise

25  choices and they're stuck in that situation.

1    That perspective on poor people or poor women, in

2  particular, has been challenged by a number of poverty experts

3  who find that people in poverty in fact do make rational

4  decisions, that they have significant social networks of support

5  and are able to make do.  No one is making light of the hardship

6  of people living in poverty, but to think that they are

7  incapable of accomplishing something like a trip of a hundred

8  miles is, I think, something that most poverty researchers would

9  not want to endorse.

10 Q.  And which poverty researchers are you thinking of

11 specifically right here?

12 A.  The first one that comes to mind is Carol Stack, who has

13 done qualitative research in the community of poor women, and

14 especially finding that from the inside, it looks very different

15 than it does for an outsider looking, who might think this is a

16 disorganized community and so on.  She finds strong levels of

17 support within the community and people able to help each other

18 out when crises emerge, a car breaks down or a child gets sick.

19 They have ways of meeting those unexpected challenges.

20    Other important research is done by someone like Kathy Edin,

21 a study called Fragile Families in Urban Areas, looking at --

22 this is mostly adolescent women who are having children.  And

23 she finds that, again, these women are not simply having

24 children because they aren't able to obtain abortions.  I mean

25 she -- I don't know how much attention she focuses on abortion,

1   but she is saying that these are the choices that these women

2   have made.  Often the pregnancy is -- sometimes the pregnancy is

3   unintended, sometimes it is intended, even though these are

4   poor, unmarried women; but the women are finding advantages to

5   having children and want to have these children.  And again, it

6   presents a picture of these women as making choices within a

7   context where those choices make sense to them.

8   Q.   Now, Dr. Uhlenberg, you also state in paragraph 18C of your

9   report, which is on page 12, that -- and I'm quoting here -- If

10  some women should decide not to obtain an abortion when the cost

11  increases, one cannot conclude that the increased cost prevented

12  the abortion.

13      Could you elaborate on that point for the Court?

14  A.   What I have in mind here is that people make choices under

15  certain constraints.  And if the cost of something goes up, they

16  may choose not to purchase that product.  It doesn't mean that

17  they're prevented from purchasing that product; but they have

18  decided that under new conditions, that they don't want to or

19  will make another choice.

20      In this situation of thinking of women who may be confronted

21  with traveling a greater distance to obtain an abortion, the

22  decision might be that this is not something that they want at

23  this point.  And even if that is their choice, I don't think the

24  way we generally use the word "prevent" would allow us to say

25  that they are prevented from traveling to obtain an abortion.

1    It is still a choice.

2    Q.   Thank you.  All right.  Dr. Uhlenberg, at the very end of

3    your report, you addressed a couple of other assertions made by

4    some of plaintiff's experts and then other declarations that

5    they had submitted at the beginning of the case.  And these

6    mainly dealt with the problems of threats of violence or fear of

7    physical harm that might be experienced by the employees of the

8    clinics.  This problem was raised by several clinic

9    administrators, and that would tend to make recruiting new

10   doctors or staying -- or finding new personnel more difficult,

11   wouldn't it?

12   A.   I'm sure there are several factors that make it challenging

13   to find doctors who want to provide abortions at these clinics.

14   If the doctors are indeed fearful of their safety, that would be

15   a consideration; but that is, of course, an empirical question

16   of whether that is a significant factor in terms of their

17   preference not to be abortion providers.

18   Q.   Well, several of them spoke about specific incidents of

19   violence, murder, that had occurred in the past.  And I believe

20   that you had a thought on that as being nonspecific.  And I

21   wondered if you could tell us what you meant by that.

22   A.   Well, one can talk about the number of abortion providers

23   who have been killed or injured in the last 50 years, but that

24   doesn't tell us what the current situation is, what the current

25   environment is.  And as I recall, looking at information on

1  abortion clinic violence in Alabama, there are no reported cases

2  in the past 15 years.  So I would think that this is probably

3  not a salient consideration for people preferring not to provide

4  abortions.

5      I also remember a study of 30 or so physicians who were

6  trained in providing abortions, and only three of them are

7  actual abortion providers, and asking why the others were not.

8  Fear of violence was expressed as the primary concern by only

9  three out of 30.  So, you know, I don't know if we have very

10  solid empirical evidence.  That's what you would really need to

11  answer that question.

12  Q.  Even if these instances of violence were more than 15 years

13  or more ago, wouldn't it be fair to say that the memory of some

14  of those instances and the extent to which people still think

15  about them have some effect on the current personnel in the

16  clinic?  I believe at your deposition, you were asked a question

17  about whether 9/11 might still have an effect on the citizens of

18  New York.

19  A.  Yes.  Of course, that is such a dramatic effect and still

20  discussed in the news and so on, that the relevance of that to

21  most people's thinking would be much greater than an abortion

22  doctor who was killed many years in the past, a single abortion

23  doctor who was assassinated.  But even in the case of New York

24  and the 9/11 tragedy, I think the evidence is that the impact

25  this has on people's daily lives falls off fairly quickly.  And

 1   in research -- of course, research asking about the impact of

 2   past events on current behavior, the consistent finding is that

 3   those proximate events have much greater significance than those

 4   events in the distant past.

 5           MS. HOWELL:  Thank you very much, Dr. Uhlenberg.

 6   That's all I have.

 7           THE WITNESS:  Thank you.

 8                            CROSS-EXAMINATION

 9   BY MR. BECK:

10   Q.  Good afternoon, Dr. Uhlenberg.  My name is Andrew Beck.  We

11   met several months ago in North Carolina, as you may remember,

12   and I represent the plaintiffs in this matter.

13       Can you just, before we -- before I ask some of the

14   substantive questions, do you have before you some of the

15   documents that were printed out there?  And in particular, do

16   you have the deposition from this case, the transcript, the

17   deposition from the recent Wisconsin case, and a transcript from

18   *Karlin versus Foust*?  I just want to make sure that you have

19   those materials in front of you.

20   A.  I do have three documents that were handed to me when I

21   arrived at court, yes.

22   Q.  Wonderful.  Now, if I understand your opinions correctly,

23   it's your opinion that plaintiffs have not met our burden of

24   proving that the statute will have negative consequences; is

25   that correct?

1    A.   That's correct.

2    Q.   And you have opinions about what might happen if the statute

3    is enforced, but you are not opining on what will happen; is

4    that correct?

5    A.   I do have the opinion that the effect would not be as

6    significant as Dr. Henshaw has suggested, although he's not

7    specific about the numbers.   He says a significant number of

8    women would be affected, and I think that that is unlikely.

9    Q.   But as to the remaining opinions in your report -- we can

10   return to that subject in a second.   You are saying the clinics

11   might stay open; they might not.   Women might be able to travel;

12   they might not.   Violence might not be so bad.   You're not --

13   you're not opining firmly that, for example, the clinics will

14   stay open, are you?   You're just saying we don't know?

15   A.   I'm saying we don't know.

16   Q.   Okay.   So let's talk for a moment about your hypothesis that

17   the clinics would not close.   It's your opinion that plaintiffs

18   have not met our burden of proving that three out of the five

19   abortion clinics in Alabama would close, but you're not opining,

20   again, that those clinics will stay open; is that correct?

21   A.   Correct.

22   Q.   And you don't have evidence of any physician with privileges

23   who would be willing to perform abortions at plaintiff's

24   clinics, do you?

25   A.   No, I don't.

1   Q.  And you don't know of a single abortion provider -- I'm

2   sorry -- a single physician in Alabama who is not currently

3   providing abortions but who wants to; is that correct?

4   A.  Correct.

5   Q.  And it's also correct, isn't it, that you similarly lack any

6   evidence of a single physician in Alabama who would provide

7   abortions and who could satisfy the requirements of the act if

8   the pay for doing so were higher; is that correct?

9   A.  Correct.

10  Q.  Now, you also don't have any specific information on what

11  kinds of efforts plaintiffs could make in order to persuade

12  local doctors with privileges to work at our clinics; is that

13  correct?

14  A.  Could you repeat the question?

15  Q.  Sure.  You don't have any specific information or theories

16  about what kind of steps plaintiff's clinics could take in order

17  to ensure that physicians would work at their clinics, correct?

18  A.  I think there are rather obvious steps that could be taken,

19  so I suppose I do have a theory of what would constitute a

20  genuine effort to find an abortion provider.

21  Q.  Okay.  Let's actually -- if you could look at your

22  deposition transcript from this case, at page 46.  And let me

23  know when you're there.  I'm going to read from line 2.

24      (Brief pause)

25  A.  I think this is it.  The cover page doesn't indicate what

1   the transcript is, but it has 11/18/13.  I guess that was the

2   date of the deposition?

3   Q.  That's correct.

4   A.  Okay.

5   Q.  Tell me if I read these questions and answers correctly.

6      Question:  And do you think that they just haven't made a

7   strong enough effort yet but that with the right incentive, they

8   would make a greater effort to find providers who comply with

9   the law?  Answer:  I don't know about that.

10     Question:  And you don't know what kind of efforts they'd

11  make, for example?  Answer:  I don't know.

12     Did I read that series of questions and answers correctly

13  word for word?

14  A.  Correct.

15  Q.  And in fact, the only support for your hypothesis that

16  plaintiff's clinics would stay open is what happened in some of

17  the other states you've mentioned with admitting privileges

18  laws; is that correct?

19  A.  The evidence from other states suggests that abortion

20  clinics have been able to comply with the law of having doctors

21  with admitting privileges.

22  Q.  But you wouldn't claim that the same thing that happened in

23  those other states with admitting privileges laws would

24  necessarily happen in Alabama, would you?

25  A.  No.

1  Q.  And in fact, you, I think, testified earlier you don't know

2  whether or not hospitals in Alabama use criteria similar to

3  hospitals in other states when deciding whether or not to grant

4  privileges; is that correct?

5  A.  Yes.  Except that we do know in Alabama, some abortion

6  providers are able to obtain hospital admitting privileges.

7  Q.  But once again, you don't know -- I'm sorry.  I didn't mean

8  to cut you off, but you don't know whether or not hospitals in

9  Alabama use the same criteria as hospitals in the other states

10 you've listed in determining whether or not to grant physicians

11 privileges; is that correct?

12 A.  I don't have that information.

13 Q.  And so you don't actually know whether or not plaintiff's

14 clinics would close; is that correct?

15 A.  I don't know.

16 Q.  You testified earlier that you submitted a declaration -- or

17 you're referring, actually, to the Texas lawsuit concerning an

18 admitting privileges law in that case; is that correct?

19 A.  Yes.

20 Q.  And you submitted a declaration in that case?

21 A.  I -- I believe it was a declaration, yes.

22 Q.  And in that declaration, just like in this case, you

23 questioned the assumption that abortion clinics would cease to

24 operate if the law went into effect; is that correct?

25 A.  Correct.

1   Q.  And you are aware that the admitting privileges law in Texas

2   has gone into effect; is that correct?

3   A.  Yes.

4   Q.  And you believe that six clinics have closed in Texas since

5   that law became effective; is that correct?

6   A.  I don't have information on all the abortion clinics in

7   Texas, but I have seen evidence that six have closed.

8   Q.  You've also hypothesized that if plaintiff's clinics are

9   forced to stop providing abortions, new abortion clinics might

10  open to take their place; is that correct?

11  A.  Yes.

12  Q.  You have no information, though, about anyone who intends to

13  open an abortion clinic if plaintiff's clinics close; is that

14  correct?

15  A.  Are you referring to Alabama?

16  Q.  That's correct.  Yes, I'm referring to Alabama.

17  A.  I don't -- okay.  No, I don't know about the situation in

18  Alabama.

19  Q.  And so you are just speculating that new clinics might open;

20  is that correct?

21  A.  I'm suggesting that as a possibility, as it happened in --

22  is happening in Texas, yes.

23  Q.  But at this point, it's speculation, correct?

24  A.  Yes, it's speculation about what could happen.

25  Q.  And even if a new abortion clinic were to open, you have no

1  information about when that would happen; is that correct?

2  A.  That's correct.

3  Q.  And it could be years before such a hypothetical clinic

4  would open?

5  A.  That's possible.

6  Q.  And there's no guarantee that such a hypothetical clinic

7  would ever open; is that correct?

8  A.  Correct.  It's possible that one could open next year or

9  it's possible that one would never open.

10  Q.  You also made reference to what you described as an emerging

11  trend in the provision of abortion care concerning provision of

12  abortion at OB-GYNs' offices; is that correct?

13  A.  I reported on an article that suggested that was an emerging

14  trend, yes.

15  Q.  And that article is a *New York Times Magazine* article by

16  Emily Bazelon called The New Abortion Providers; is that

17  correct?

18  A.  Correct.

19  Q.  Do you have your expert report in front of you?

20     (Brief pause)

21  Q.  And I'm specifically asking about paragraph 24 of your

22  expert report.  Tell me when you're there.

23     (Brief pause)

24  A.  Yes.

25  Q.  In paragraph 24, you quote this magazine article as saying

1  that, If the young doctors succeed at making abortion mainstream

2  and respected within medicine, abortion could move from clinics

3  to doctors' offices and hospitals.  Did I read your quotation of

4  that article correctly?

5  A.  Yes.

6  Q.  You have no information as to whether or not young doctors

7  are succeeding at making abortion mainstream and respected

8  within medicine in Alabama; is that correct?

9  A.  Correct.

10 Q.  And you also have no evidence that the provision of abortion

11 in Alabama would move to hospitals if plaintiff's clinics should

12 close; is that correct?

13 A.  Correct.

14 Q.  And the same question as to physicians' offices or OB-GYNs'

15 offices.  You have no information as to whether or not the

16 provision of abortion would shift to those offices if

17 plaintiff's clinics should cease providing abortions?

18 A.  Correct.

19 Q.  Now, Dr. Uhlenberg, you would agree that if plaintiff's

20 clinics close and if no new clinics open, that would increase

21 the distance that some women in Alabama would have to travel in

22 order to obtain an abortion; is that correct?

23 A.  Yes.

24 Q.  But you believe that plaintiffs have not met our burden of

25 proving that increased travel distance to obtain an abortion

1  would restrict abortion access; is that correct?

2  A.  Yes.

3  Q.  You would agree that an increase in travel distance would

4  increase the cost of obtaining an abortion for some women in

5  Alabama; is that correct?

6  A.  Yes.

7  Q.  And you have no opinion about the amount by which this

8  increased travel would increase the cost of obtaining an

9  abortion?

10  A.  I don't have those estimates, no.

11  Q.  You would also agree with me that proximity to an abortion

12  provider is one of the predictors of abortion rates in a given

13  area, correct?

14  A.  In the case of Alabama, I don't have that information.

15  Q.  How about in general?  Would you agree with me that in

16  general, proximity to an abortion provider is one of the

17  predictors of abortion rates in a given area?

18  A.  I know that several studies have reported that.

19  Q.  And you would agree that the majority of studies relating

20  abortion rates to distance find that there is a relationship

21  between travel distance and abortion rates; is that correct?

22  A.  Yes.  I would agree with that.

23  Q.  You would also agree that the number of abortion providers

24  in the state could have an effect on the abortion rate; is that

25  correct?

1   A.   I suppose anything could, yes.

2   Q.   And you've previously testified under oath that it is

3   reasonable to conclude that if one is geographically close to an

4   abortion provider, it would be easier to get an abortion; is

5   that correct?

6   A.   Well, that's a reasonable statement.   There might be

7   qualifications to that; but in general, that seems like a

8   reasonable conclusion.

9   Q.   And you still stand by that testimony today, don't you?

10  A.   Yes.

11  Q.   You have also previously testified, again under oath, that

12  access to abortion providers has an effect on abortion rates,

13  correct?

14  A.   I believe this is what you called to my attention from

15  testimony of some 20 years ago.   And as I recall in the

16  deposition, I said I would qualify that at this point.

17  Q.   But at that time, you did testify under oath that -- that

18  access to abortion providers has an effect on abortion rate; is

19  that correct?

20  A.   If that's what I said, yes.

21           THE COURT:   How much longer are you going to be?

22           MR. BECK:   I probably have about 15 or 20 minutes more.

23           THE COURT:   Okay.   And recross?

24           MS. HOWELL:   Should be very brief, Your Honor.   Just

25  about ten minutes.

1          THE COURT:  We're having some technical problems.

2    We'll take just a brief recess.

3        (Recess at 2:29 p.m. until 2:50 p.m.)

4          THE CLERK:  Please remain seated.  Court is in session.

5          THE COURT:  Proceed.

6          MR. BECK:  Thank you, Your Honor.

7    Q.  Dr. Uhlenberg, you have also, continuing the previous line

8    of questioning, previously testified under oath that the

9    evidence showing that travel distance has an impact on women's

10   access to abortions is quite solid, correct?

11   A.  I think that was the statement I made, yes.

12   Q.  You would agree with me that at some critical point, an

13   increase in travel distance would have an effect on abortion

14   rates, correct?

15   A.  Right.

16   Q.  Now, you testified earlier about events in Iowa related to

17   telemedicine.  Do you recall that testimony?

18   A.  Yes.

19   Q.  And the source of the -- or the source of your opinions on

20   that point, or the basis, was a *USA Today* news article on Iowa;

21   is that correct?

22   A.  Yes.  That's not the only source, but that's one I cite.

23   Q.  The only source you cited in your report is a *USA Today* news

24   article; is that correct?

25   A.  Correct.

1    Q.   The *USA Today* news article is not a peer-reviewed scholarly

2    study, is it?   It's just journalism?

3    A.   Journalism.

4    Q.   And the story doesn't conduct any statistical analysis, does

5    it?

6    A.   No.

7    Q.   Nor does it attempt to account for the influence of any

8    potentially confounding factors; is that correct?

9    A.   Correct.

10   Q.   And you would agree with me that a confounding factor is an

11   unaccounted-for variable; is that correct?

12   A.   Yes.

13   Q.   The news story mentions that at the time period in question,

14   there was a multimillion-dollar free contraceptive demonstration

15   project going on in Iowa; is that correct?

16   A.   I think that's correct.

17   Q.   And I think you'd agree with me that increased contraceptive

18   use could be a confounding factor in terms of the number of

19   abortions; is that correct?

20   A.   It could be.

21   Q.   And the news story doesn't rule out the potential influence

22   of increased contraceptive use at the time as a confounding

23   factor for the data it reports; is that correct?

24   A.   Correct.

25   Q.   And you also can't rule out increased contraceptive use as a

1   potentially confounding factor?

2   A.  Correct.

3   Q.  The news story also mentions increased antiabortion protest

4   activity in Iowa at that time; is that correct?

5   A.  Yes.

6   Q.  And like increased contraceptive use, that increased protest

7   activity could be a potentially confounding factor for the

8   abortion statistics at that time; is that correct?

9   A.  It could influence the abortion rate, yes.

10  Q.  And the article does not rule that out as a potentially

11  confounding factor?

12      I'm sorry.  I didn't hear your answer.

13  A.  No.

14  Q.  No.  And you can't rule that out as a potentially

15  confounding factor either; is that correct?

16  A.  Correct.

17  Q.  And would you agree with me that it would be unwise to go

18  very far in drawing a conclusion based on this *USA Today* news

19  article about the relationship between abortion rates and

20  distance to an abortion provider?

21  A.  I wouldn't go beyond the conclusion that increasing --

22  decreasing distance means that the abortion rate would increase.

23  Q.  But you would agree with me that this article is of lesser

24  quality compared to, for example, scholarly studies, as far as

25  evidence goes?

1  A.  Yes.  It's not scholarly.

2  Q.  And it's of lesser quality as evidence goes, correct?

3  A.  Yes.

4  Q.  Dr. Uhlenberg, you also testified using Alabama statistics

5  that a decline in the total number of abortion providers in

6  Alabama didn't necessarily change the abortion rate; is that

7  correct?

8  A.  Correct.

9  Q.  If all of those clinics closed in cities where one clinic

10  remained open, that wouldn't affect the travel distance for any

11  woman seeking an abortion in Alabama in any meaningful way,

12  would it?

13  A.  Correct.

14  Q.  You also testified about a study by Janet Currie that did

15  not find a relationship between travel distance and abortion

16  rates; is that correct?

17  A.  Yes.  For individual women.

18  Q.  And that study used, as its measure of abortion incidence, a

19  self-reported survey called the National Longitudinal Survey of

20  Youth; is that right?

21  A.  I'm not sure what you mean by self-reported.  Individuals

22  gave answers to questions.  Is that what you mean?

23  Q.  Yes, that is what I mean.  I believe it's described in the

24  article itself as a self-reported survey, but I guess I'm more

25  interested in just the name, the National Longitudinal Survey of

1  Youth.  Is that correct?

2  A.  That's correct.

3  Q.  And you don't think, I believe -- you don't think that that

4  survey is a reliable measure of abortion incidence, do you?

5  A.  No.  That's not the purpose.

6  Q.  But it -- okay.  And so you would agree with me that it's

7  not a reliable measure of abortion incidence?

8  A.  It should not be used in that way, yes.

9  Q.  And would you agree with me that the unreliability of that

10  data could affect the results of this study?

11  A.  It -- it could or it may not.  Yes.

12  Q.  And would you also agree with me that this study's measure

13  of the availability of abortion providers is not the best

14  measure of provider availability?

15  A.  Probably.  I would have to review that question.

16  Q.  Do you recall testifying at your deposition that you agreed

17  that the measure of abortion -- of abortion provider

18  availability was not the best measure?

19  A.  I don't recall saying that, but I -- I'm not saying I didn't

20  say that.

21  Q.  Okay.  You testified also about a study by Steven Gohmann

22  which did not find a relationship between abortion rates and

23  travel distance; is that correct?

24  A.  Correct.

25  Q.  And you would agree with me that that study has significant

1  weaknesses; is that correct?

2  A.  Weaknesses like all the other studies that were reviewed,

3  yes.

4  Q.  Switching gears to a different topic, Dr. Uhlenberg, you

5  don't consider yourself an expert on the extent to which

6  abortion providers experience violence and harassment, do you?

7  A.  No.  My expertise is in the area of evaluating statistics

8  and reports on that.

9  Q.  And so you don't consider yourself an expert on that

10  particular subject.

11  A.  That's a very narrow topic that I wouldn't list as an area

12  that I'm an expert in.

13  Q.  And you are not offering any opinion in this case about

14  whether or not abortion providers in Alabama experience

15  harassment and intimidation, are you?

16  A.  No.

17  Q.  And you have no idea whether abortion providers in Alabama

18  operate under a threat of violence; is that correct?

19  A.  That's right.

20  Q.  Is it correct that you've served as an expert witness in

21  eight to ten cases dealing with abortion?

22  A.  That sounds right.  I wouldn't -- if it's 11, I -- it's

23  possible, but eight or ten sounds about right.

24  Q.  Okay.  And in all of those cases, you've testified as a

25  witness for the state in defense of laws restricting abortion;

1  is that correct?

2  A.  Yes.

3  Q.  And the vast majority of your academic work has not

4  addressed abortion or reproductive health; is that correct?

5  A.  Yes.

6  Q.  And apart from the instances in which you've served as an

7  expert witness in litigation, you've done no original research

8  on abortion; is that correct?

9  A.  Limited research related to teaching.

10  Q.  But you've done -- you've conducted -- oh, excuse me,

11  Dr. Uhlenberg.  You've conducted no original research on

12  abortion outside of your work in litigation; is that correct?

13  A.  I have not published any research on that topic.  I expect

14  that I have done original research related to questions that

15  have come up with regard to teaching or other interests --

16  Q.  But none of that research has been --

17  A.  -- outside of litigation.

18  Q.  I apologize.  Could you repeat the end of your last answer?

19  I cut you off.

20  A.  I said I think the research was outside -- some of the

21  original research would have been outside of litigation research

22  but was not published, if that's the key element here.

23  Q.  And you've written no publication, whether peer-reviewed or

24  otherwise, on the topic of abortion; is that correct?

25  A.  Correct.

1      MR. BECK:  Your Honor, may I have one moment to confer

2   with counsel?

3      THE COURT:  Yes.

4    (Brief pause)

5      MR. BECK:  Thank you, Dr. Uhlenberg.  We have no

6   further questions.

7                    REDIRECT EXAMINATION

8   BY MS. HOWELL:

9   Q.  Dr. Uhlenberg, I just have a couple of follow-up questions

10  for you.  Mr. Beck just asked you some questions about whether

11  the plaintiff clinics in this case would definitely close, did

12  he not?

13  A.  I think so.

14  Q.  And at that point, you replied that you didn't know; is that

15  correct?

16  A.  That's right.

17  Q.  And you said that that was speculation; is that right?

18  A.  Yes.  Speculation as to whether it would or would not close.

19  Q.  Wasn't your point that no one could know whether the clinics

20  would close at this point?

21  A.  I think based on the experience of other states, that would

22  be a correct assertion.

23  Q.  So any speculation -- well, any answers about the ultimate

24  fate of the clinics would be speculation at this point; is that

25  correct?

1    A.   That would be my position.

2    Q.   Now, would it also be speculation to assume that abortion

3    clinics will close, as Dr. Henshaw did in his expert report?

4    A.   Yes.  I think he provides no evidence to support that

5    position except that's what he was told.

6    Q.   Okay.  And it would also be speculation to assume that no

7    other doctors in Alabama would perform abortions or would be

8    willing to perform abortions in the future; is that correct?

9    A.   Yes.  I'm quite sure that no research has been done of all

10   doctors in Alabama to answer that question.

11   Q.   So ultimately, a conclusion that the law would definitely be

12   a burden on women requires a lot of speculation, does it not?

13   A.   That would be my position.

14   Q.   Now, Mr. Beck also asked you about a *USA Today* article that

15   had contained certain facts about telemedicine and the

16   availability of abortions in Iowa; is that right?

17   A.   Yes.  Yes.

18   Q.   And to your knowledge, journalism is a method of reporting

19   or cataloging, for history, facts; is that correct?

20   A.   Well, that may be one function.

21   Q.   Now, the article presented the fact that access to abortion

22   increased, right?

23   A.   Yes.

24   Q.   And the article also presented the fact that at the same

25   time that access increased, the abortion rates decreased; is

1  that right?

2  A.  Yes.

3  Q.  Have you seen anything, whether scholarly or purely

4  journalistic, that contradicts those two facts?

5  A.  Well, I saw Rachel Jones from the Guttmacher Institute in

6  her most recent report on abortion incidence and clinic

7  availability -- I think that's the title of it -- which comes

8  out every few years -- made that same point in her article.

9  That's the other place I have seen that reported.

10 Q.  But you have seen nothing else that contradicts the facts.

11 A.  No.

12         MS. HOWELL:  Thank you very much, Dr. Uhlenberg.

13         MR. BECK:  We have no further questions, Judge.

14         THE COURT:  Thank you.

15         Thank you very much, Doctor.  Thank you.

16         THE WITNESS:  Thank you.

17         THE COURT:  Anything else, counsel?

18         MR. DAVIS:  We are ready when Your Honor is ready to

19 resume the examination of Carter Sims, Your Honor.

20         THE COURT:  I'm ready now.

21         MR. DAVIS:  Okay.

22         THE COURT:  You are excused.  Thank you.

23         MR. DAVIS:  While the witness is approaching, Your

24 Honor, I said before lunch that I was complete.  I had -- I said

25 that before I consulted with my counsel.  And plaintiffs have

1  graciously agreed that I can continue my direct for a few

2  moments.

3          THE COURT:  Very good.  I knew there was a risk.  I

4  knew there was a risk.

5          **WILLIAM CARTER SIMS**, the witness, having been

6  previously sworn, resumed the stand and testified further as

7  follows:

8                    FURTHER DIRECT EXAMINATION

9  BY MR. DAVIS:

10  Q.  Hello, Mr. Sims.  Thank you for returning.   Does the

11  Alabama Department of Public Health regulate kidney dialysis

12  centers, Mr. Sims?

13  A.  Yes.

14  Q.  Is that an elective procedure, is it your understanding?

15  A.  Kidney dialysis patients have an illness that requires them

16  to have dialysis treatments.

17  Q.  This is different from abortion in the sense that abortion

18  is elective and dialysis is not.  Would you -- is that your

19  understanding?

20  A.  Yes.

21  Q.  What is the health situation of people who generally go to

22  kidney dialysis centers?

23  A.  They're generally very ill people that have some sort of

24  underlying illness that's caused their kidneys to no longer

25  function.

1   Q.   Are they under the care of a physician?

2   A.   Yes.

3   Q.   In fact, if -- if you go to a dialysis center, is that not

4   generally -- is that not because a doctor has told you that

5   that's where you need to go?

6   A.   Yes.

7   Q.   They're there because a doctor has ordered them, correct?

8   A.   Correct.

9   Q.   Do you know -- do you have Exhibit 1 still there, the list

10  of pseudonyms, Mr. Sims?

11  A.   No, I don't.

12          MR. DAVIS:  May I approach the witness, Your Honor?

13          THE COURT:  Yes.

14  Q.   Mr. Sims, do you see the doctor who is referred to by the

15  pseudonym Dr. B on that list?

16  A.   Yes.

17  Q.   Without saying Dr. B's name, do you know who Dr. B is?

18  A.   He's a physician that has performed procedures in the state.

19  Q.   Have you had any occasion to speak with Dr. B in the recent

20  past?

21  A.   Yes.

22  Q.   How long ago, approximately?

23  A.   Maybe within the last two to three weeks.

24  Q.   During the course of that conversation, did Dr. B say

25  anything about his intention at that time about possibly moving

1  to Alabama?

2          MS. SANDMAN:  Objection, Your Honor.  Hearsay.

3          MR. DAVIS:  It is a statement of the declarant's

4  present intention, Your Honor, and an exception to the hearsay

5  rule under 803(3).

6          THE COURT:  I have no idea what he's going to say.  Go

7  ahead and ask the question.

8          MR. DAVIS:  Sure.

9  Q.  Did Dr. B say anything about his intentions concerning

10  moving to Alabama?

11          THE COURT:  Go ahead.  You can answer the question.

12  A.  Yes.

13  Q.  And what did he say?

14  A.  He said that he had a brother that lived in the Birmingham,

15  Alabama, area who was not healthy, and he was thinking about

16  moving back to be close to his brother.

17          MR. DAVIS:  And our position, Your Honor, under 803(3)

18  that that's a statement of the declarant's intention and an

19  exception to the hearsay rule.

20          THE COURT:  I'll allow it.  Go ahead.

21          MR. DAVIS:  If I may consult.

22          THE COURT:  Yes.

23      (Brief pause)

24          MR. DAVIS:  Thank you, Your Honor.

25

```
 1                      CROSS-EXAMINATION
 2  BY MS. SANDMAN:
 3  Q.  Good afternoon, Mr. Sims.  I'm Jennifer Sandman.  I
 4  represent Planned Parenthood in this case.  We met briefly by
 5  video during your deposition a couple of weeks ago.
 6      Now, Mr. Sims, you testified here today about the procedures
 7  that the Alabama Department of Public Health uses to survey,
 8  inspect, and license abortion clinics; and I'd just like to
 9  review a few things about that general process.  Am I correct
10  that any facility that performs ten or more abortions in a month
11  or 100 or more abortions in a year or that holds itself out to
12  the public as an abortion provider must be licensed by ADPH?
13  A.  Yes, ma'am.  That's my understanding.
14  Q.  And ADPH attempts to inspect licensed abortion clinics
15  approximately once a year?
16  A.  Yes, ma'am.
17  Q.  And as part of that inspection, the department comes to the
18  health center typically for two to three days?
19  A.  Typically two to three days.  Sometimes it can be more,
20  sometimes less, depending on what the visit is for.
21  Q.  And during the course of that inspection, officials from the
22  ADPH would speak with staff?
23  A.  Yes, ma'am.
24  Q.  Look at records and documentation?
25  A.  Yes, ma'am.
```

1   Q.   Observe procedures being performed?

2   A.   Yes, ma'am.

3   Q.   And if an abortion facility fails to comply with the

4   department's rules, the department can take licensure action

5   against it, correct?

6   A.   Yes, ma'am.

7   Q.   And in particular, if the department thinks that a

8   facility's practices are in any way a threat to women's health,

9   it has the authority to suspend or revoke the facility's

10  license; is that right?

11  A.   Yes, ma'am.  Yes, ma'am.

12  Q.   Or to place it on probationary status.

13  A.   Yes, ma'am.

14  Q.   Now, Mr. Sims, many of the department's current rules for

15  abortion clinics are directed at patient health and safety,

16  correct?

17  A.   Yes, ma'am.

18  Q.   For example, the regulations require that someone who knows

19  CPR must be in the facility while abortion patients are there;

20  is that right?

21  A.   Yes, ma'am.

22  Q.   And the regulations also require that certain tests be

23  performed before a woman has an abortion, such as a hematocrit

24  or STI testing or pregnancy test; is that right?

25  A.   Yes, ma'am, that's correct.

1  Q.  And they also require after an abortion procedure that

2  patients be observed until the determination can be made of

3  whether any immediate postoperative complications are present?

4  A.  Yes, ma'am, that's correct.

5  Q.  And they require that each woman is given written

6  instructions at discharge that includes a list of possible

7  complications and the signs and symptoms of each complication?

8  A.  Yes, ma'am, that's correct.

9  Q.  And a telephone number to call with questions or concerns?

10  A.  Yes, ma'am.

11  Q.  And in fact, the rules require that the facility have a

12  24-hour answering service that immediately refers all calls

13  related to postabortion problems to a qualified registered

14  nurse, nurse practitioner, physician's assistant, or physician?

15  A.  Yes, ma'am, that's correct.

16  Q.  And prior to the admitting privileges requirement that's

17  being challenged here, the ADPH rules required that a physician

18  with admitting privileges at a hospital within the same standard

19  metropolitan statistical area as the clinic must be available to

20  provide care for complications arising from an abortion 24 hours

21  a day, seven days a week; is that correct?

22  A.  Yes, ma'am.

23  Q.  But they allowed this to be done through a written contract

24  with an outside covering physician; is that right?

25  A.  Yes, ma'am.

1  Q.  I'd like to switch gears a bit now and ask you a few

2  questions specifically about Planned Parenthood's health center

3  in Birmingham.  First, you testified at your deposition about

4  two weeks ago that to the best of your knowledge, you would not

5  be testifying in court today about that closure; is that right?

6  A.  Yes, ma'am, that's correct.

7  Q.  And I assume that you were telling the truth at that time.

8  So when did that change?

9  A.  That changed on May the 20th -- I believe it was a

10  Tuesday -- when I had a meeting with the state health officer

11  and counsel.

12  Q.  So in other words, you weren't told this until after your

13  deposition was over?

14  A.  Yes, ma'am.  That's correct.

15  Q.  Now, you testified on direct examination about some of the

16  deficiencies that ADPH found during its January inspection of

17  the Birmingham facility.  There's nothing about that January

18  ADPH review that would have been any different if all of Planned

19  Parenthood's physicians had local admitting privileges; is that

20  right?

21  A.  Yes, ma'am, that's correct.

22  Q.  In fact, the statement of deficiencies would have been

23  exactly the same if each of the physicians had local admitting

24  privileges?

25  A.  Yes, ma'am, that's correct.

1  Q.  And none of the deficiencies that were found at Planned

2  Parenthood involved a patient not getting adequate care at a

3  hospital; is that right?

4  A.  Not from what we could tell based on the information that we

5  reviewed at that time.  That's correct.

6  Q.  And would you agree that ADPH's current rules without the

7  admitting privileges requirement provide protection for women

8  having health care services at an abortion facility?

9  A.  I think that the rules that we have in place protect and

10 promote the protection for patients who are receiving abortion

11 clinic services.

12 Q.  And the current scheme was certainly adequate to allow you

13 to make the determinations of deficiencies that you found in

14 Birmingham in January; is that right?

15        MR. DAVIS:  Your Honor, I object.  I think we're

16 exceeding the scope of this witness's expertise.  We have not

17 disclosed him as an expert witness.  We've asked him about facts

18 and what the rules require.  In terms of what's the foundation

19 of the rules or the adequacy of rules, there's no evidence that

20 Mr. Sims, competent as he is in his position, is a decision

21 maker or policy maker for the department or for the State.

22        THE COURT:  Response?

23        MS. SANDMAN:  Your Honor, I believe that given that he

24 has been called to testify here, all I'm asking him about is his

25 view from his capacity at the ADPH of the -- the protections

1    offered by their current regulations.  And the Court can take

2    that testimony in this bench trial for what weight it sees fit.

3            THE COURT:  Does that fall within your purview?

4            THE WITNESS:  I'm sorry, sir?

5            THE COURT:  Is that the type of thing you work with?

6            THE WITNESS:  The rules to determine whether or not

7    facilities are in compliance --

8            THE COURT:  Right.

9            THE WITNESS:  -- and if they protect patients?

10           THE COURT:  Yes.

11           THE WITNESS:  My role is to use the rules that the

12   board has already put into place to determine whether or not

13   they are in compliance.  I don't establish a rule.

14           THE COURT:  Right.  But you could determine their

15   effectiveness, can't you, or do you?

16           THE WITNESS:  If the facility was complying with the

17   rule.  Yes, sir.

18           THE COURT:  I'll allow it.  Overruled.

19           MS. SANDMAN:  Thank you, Your Honor.

20   Q.  (Ms. Sandman, continuing:)  Now, Mr. Sims, is it correct

21   that ADPH decided that no licensure action should be taken

22   against Planned Parenthood based on its review this past

23   January?

24   A.  Yes, ma'am, that's correct.

25   Q.  And you agreed with that decision, correct?

1  A.   Yes, ma'am.

2  Q.   And just to be clear, nothing in the statement of

3  deficiencies faults Planned Parenthood for what the nurse did in

4  selling drugs in the parking lot, correct?

5  A.   That's correct.

6  Q.   And also just to be clear, nothing about that incident would

7  have been any different if Planned Parenthood's physicians had

8  admitting privileges, correct?

9  A.   Correct.

10  Q.   And the department is currently working with Planned

11  Parenthood to finalize the plan of corrections in response to

12  the statement of deficiencies that was issued; is that right?

13  A.   Yes, ma'am.

14  Q.   In fact, there has been considerable back-and-forth with

15  Planned Parenthood about finalizing language for the plan of

16  corrections; is that right?

17  A.   I'm sorry.  Could you ask me that one more time?

18  Q.   I beg your pardon.  There has been considerable

19  back-and-forth between the ADPH and Planned Parenthood in an

20  attempt to get final language for that plan of corrections; is

21  that correct?

22  A.   Yes.  The department and Planned Parenthood have been

23  communicating with each other to get that language finalized.

24  Yes, ma'am.

25  Q.   And is it correct that Planned Parenthood submitted what

1  will hopefully be the final plan of corrections last week?

2  A.  Late last week, they did submit some additional information.

3  Yes, ma'am.

4  Q.  Now, typically the department does not talk about its cases

5  outside of the department until they are finalized; is that

6  right?

7  A.  Yes, ma'am.  That's my understanding.

8  Q.  But you did something different here because the Attorney

9  General's Office asked you to; is that right?

10          MR. DAVIS:  Object to the form, Your Honor.  We are

11  representing state officials.  I'm not sure where this is going.

12  If this is asking for information from attorneys in the Attorney

13  General's Office, I would object on grounds of privilege with

14  someone who's in the department --

15          THE COURT:  Let me see what the question is.

16          I think the question is rather broad.  You need to be

17  more specific if you're asking about what he did or what advice

18  he may have gotten from the Attorney General's Office and so

19  forth.

20          MS. SANDMAN:  It was not my intention to ask for that,

21  Your Honor.

22          THE COURT:  Well, you need to be more specific so that

23  you don't tread on any legal advice.

24  Q.  (Ms. Sandman, continuing:)  So the reason that you're

25  testifying here today is at the request of the Attorney

1  General's Office; is that correct?

2  A.  It's my understanding the Department of Public Health was

3  included in this case along with the Attorney General's Office.

4  So I was to give testimony related to what I understood to be

5  what surveyors do and survey activities.

6  Q.  Thank you.  I'd like to talk to you now about some of the

7  individual deficiencies that you testified about earlier.  Now,

8  you testified that you felt that Planned Parenthood was not

9  forthcoming with the department during the January survey.  And

10  I'd just like to walk you through the timeline.  From the time

11  that you first tried to contact Planned Parenthood about the

12  Birmingham closure until the time that someone at Planned

13  Parenthood returned your call was about three hours; is that

14  right?

15  A.  As I remember, yes, ma'am.

16  Q.  And Planned Parenthood then opened the facility and made it

17  available for inspection by you the next business day after that

18  phone call; is that right?

19  A.  Yes, ma'am.

20  Q.  And in fact, Planned Parenthood then allowed the surveyors

21  access to inspect the facility on that following business day

22  and the day after that; is that right?

23  A.  Yes, ma'am.

24  Q.  And they gave you access to all of the paper documents that

25  you requested, including patient records?

1  A.  Yes, ma'am.

2  Q.  And you were able to interview their director of quality

3  management while on-site?

4  A.  Yes, ma'am.

5  Q.  And their interim administrator?

6  A.  Yes, ma'am.

7  Q.  And to speak with the medical director, Dr. Roe, by

8  telephone?

9  A.  Yes, ma'am.

10 Q.  And the only question about which you felt that they were

11 not forthcoming was why the closure had occurred and, in

12 particular, whether the closure related to patient care; is that

13 correct?

14 A.  Our concern was if -- if the closure related to a patient

15 incident or patient care issue.  Yes, ma'am.

16 Q.  So that was the only question to which you felt that the

17 responses were not as forthcoming as you would have liked them

18 to be; is that correct?

19 A.  Correct.

20 Q.  So except for that one question, they were cooperative; is

21 that right?

22 A.  They cooperated with answering the questions except for if

23 it related to a patient care incident, which they -- they didn't

24 respond to that while we were on-site.

25 Q.  And you can't -- you can't actually cite to any rule of the

1  department that requires that abortion facility staff answer

2  every question that the department asks during an internal

3  investigation; is that right?

4  A.  That's right.  Most health care facilities understand that

5  they need to cooperate and work with survey staff so that we can

6  make a determination whether or not -- if the rules have been

7  complied with or the rules have been met.

8  Q.  But just to be clear, there's no specific rule or regulation

9  that you feel that they were violating there.  It's just a

10 question that you believe that they should have been more

11 forthcoming in response to that question.

12 A.  I don't know of a specific state rule or law that I could

13 cite you.  I know that it's the policy that people cooperate

14 with the Department of Public Health so that they provide

15 information to us to help us make a determination whether or

16 not -- if compliance has been achieved or not.

17 Q.  And on February 5th, you were able to meet with Planned

18 Parenthood's CEO, a human resources representative, and one of

19 the Planned Parenthood attorneys; is that right?

20 A.  I'm not sure of the specific date; but yes, ma'am, that

21 sounds right.

22 Q.  And at that meeting, the department had its questions about

23 why the facility was closed answered; is that right?

24 A.  Yes, ma'am.  Information was given to us about the reason

25 for the closure.

 1   Q.  And when you asked for additional documents, Planned

 2   Parenthood provided them?

 3   A.  Yes, ma'am.

 4   Q.  Just one more question on this topic.  What you perceived as

 5   a failure to be as forthcoming as you would have liked at that

 6   initial visit, that would not have been any different if all of

 7   Planned Parenthood's doctors had local admitting privileges,

 8   correct?

 9   A.  Correct.

10   Q.  Now, you testified that you were concerned that patients

11   seen in January in Birmingham could not get adequate follow-up

12   care, and you also testified that the department requires that

13   all abortion patients get postabortion instructions that give

14   them a way to reach the provider 24 hours a day; is that right?

15   A.  Yes, ma'am.

16   Q.  And Planned Parenthood in fact provided those instructions

17   to all of their patients, including those on January 9th and

18   10th, the two final clinic days prior to suspending services in

19   Birmingham; is that right?

20   A.  We were informed that they had given the same discharge

21   instructions to the patients on the 9th and 10th of January that

22   they give to all their patients.  And on that form, it has a

23   telephone number for the patients to call if they have a problem

24   or a concern.

25        What -- our concern with that was Planned Parenthood knew

1    that they weren't going to be open after that last procedure

2    day.  So our concern is what additional information was given to

3    those patients that came on the 9th and 10th that may have

4    needed follow-up care, to them, that would have differed from

5    the regular information they would have given to the patient.

6    Q.  But you have no reason to believe that those patients on

7    January 9th and 10th were not told that in fact, if they

8    required in-person follow-up care, it would have to be at a

9    different facility and not at Birmingham; is that right?

10   A.  There was nothing documented in the medical record to say

11   that they received different instructions from just the standard

12   instructions that Planned Parenthood had given out.

13   Q.  Though you have no reason to think they weren't given that

14   information, your complaint is that it wasn't documented in the

15   patient record; is that right?

16   A.  In health care facilities, if information isn't documented,

17   then we consider that not being done.

18   Q.  So just to be clear, your complaint really is that it wasn't

19   documented; is that right?

20   A.  Our concern is that there wasn't documentation that patients

21   had received different information for their follow-up care

22   needs that was different from what was on the standard form.

23   Q.  And as far as you know, that telephone number that was on

24   the discharge paper, that phone was still being answered

25   throughout this period; is that right?

1  A.  To my knowledge, yes, ma'am.

2  Q.  And were you also given information that Planned Parenthood

3  staff attempted to call the patients from the clinic days prior

4  to January 9th and 10th in order to let them know about the

5  closure?

6  A.  I'm sorry.  Could you ask me that one more time?

7  Q.  I apologize.  That was a long question.  Were you also given

8  information that the clinic staff attempted to call patients

9  from the clinic days prior to January 9th and 10th, the days

10  prior to that last clinic day before the closure, in order to

11  make sure they knew about the closure?

12  A.  We were told in an interview with the medical director that

13  they attempted to contact the patients or they tried to contact

14  the patients to let them know.

15  Q.  And there was also a sign posted on the facility's door that

16  gave a telephone number for anyone to call if they needed

17  assistance; is that right?

18  A.  There was a phone number posted on the sign.  I'm not sure

19  if it had those specific words; but yes, ma'am, there was a

20  phone number for people to call.

21  Q.  And just one more question on this topic.  If all of the

22  doctors who provided abortions in Birmingham had local admitting

23  privileges, would that have changed your concerns about the way

24  that the closure was handled in terms of follow-up care?

25  A.  No, ma'am.

1  Q.  Now, one of the deficiencies that ADPH found was that by

2  failing to maintain active operations, Planned Parenthood

3  violated two definitions in the licensing rules; is that right?

4  A.  Yes, ma'am.

5  Q.  And the concern was that by not notifying the department

6  that they were closing, they violated those same definitions; is

7  that right?

8  A.  Yes, ma'am.

9  Q.  But neither of those definitions actually require that a

10  licensed facility maintain active operations; is that right?

11  A.  The language in those definitions do not.  That's correct.

12  Q.  And neither one states that a facility has to notify the

13  department if there's a temporary closure; is that right?

14  A.  That's correct.

15  Q.  Now, you testified earlier that the department's regulations

16  do require that an abortion facility tell the department which

17  days it is going to perform abortion procedures; is that right?

18  A.  Yes, ma'am, that's correct.

19  Q.  And in fact, that is the only regulation that relates to

20  providing the department with an abortion clinic's hours or

21  schedule; is that right?

22  A.  To my knowledge, yes, ma'am.

23  Q.  And Planned Parenthood complied with that requirement for

24  Birmingham; is that correct?

25  A.  They sent us a schedule of the days they would be performing

1  procedures in January of 2014.  Yes, ma'am.

2  Q.  And that schedule showed that they would be doing abortions

3  only on January 9th and 10th, which were the days that they

4  actually remained open for abortion procedures; is that right?

5  A.  Yes, ma'am.

6  Q.  And no one at Planned Parenthood ever represented to the

7  department that they would be doing abortions at any date past

8  that; is that correct?

9  A.  That's correct.

10  Q.  Now, one last question on this topic.  These deficiencies

11  about a failure to open or to notify the department of the

12  closure, again, those have nothing to do with admitting

13  privileges, correct?

14  A.  Correct.

15  Q.  And to be clear, the deficiency would have been no different

16  if all of the physicians at Planned Parenthood had local

17  admitting privileges?

18  A.  Correct.

19  Q.  Now, you also testified that the department was concerned

20  about whether Dr. Roe documented her annual review of one

21  physician.  So to be clear, that was a concern about

22  documentation; is that right?

23  A.  The information in the credentialing file was incomplete.

24  There was not complete documentation in it.  That's correct.

25  Q.  But the documentation did reflect that Dr. Roe had conducted

1  a review of the physician's clinical skills in providing

2  surgical and medication abortion; is that right?

3  A.  From what I remember in the report, yes, ma'am.  There was a

4  year that that was documented.  I don't remember which specific

5  year, but yes.

6  Q.  And in fact, the deficiencies that you cited in your report,

7  none of that related to a claim that there was a failure to

8  document the abortion procedure.  They were -- the concern was

9  with failure to document other clinical review; is that correct?

10  A.  From what I remember from the report, that's correct.

11  Q.  And again, one more question on this topic.  If a physician

12  had local admitting privileges, would that change whether her

13  review of another physician would be adequately documented in

14  any way?

15  A.  Not that I'm aware of.  No, ma'am.

16  Q.  Now, in your review of the medical records at Birmingham,

17  you also testified that you found several documentation errors;

18  is that correct?

19  A.  Yes, ma'am.

20  Q.  And would you agree that health care providers in Alabama,

21  including abortion providers, have to fill out a lot of forms?

22  A.  Yes, ma'am.  All health care providers have to fill out lots

23  of papers.

24  Q.  And would you agree that there are documentation errors

25  across the board for all health care providers?

1   A.   Documentation errors are found in all different types of

2   health care facilities.  Yes, ma'am.

3   Q.   And would the physician having local admitting privileges

4   have prevented these documentation errors?

5   A.   No, ma'am.

6   Q.   Finally, you were asked to give some testimony about the

7   requirements around communication in the event of a

8   complication.  Now, Mr. Sims, ADPH has inspected Planned

9   Parenthood's health care centers every year; is that right?

10  A.   Well, I'm not sure they've inspected them every year, but

11  they've inspected them regularly.  Yes, ma'am.

12  Q.   And most recently, inspected the Birmingham health center in

13  January of this year, about five months ago?

14  A.   Correct.

15  Q.   And in those inspections, part of ADPH's rule is to review

16  the policies and procedures in place to comply with the

17  regulations?

18  A.   Part of what we look at when we do a comprehensive or what

19  we call a full survey would include that, yes, ma'am.

20  Q.   And ADPH inspectors are also authorized to ask any

21  additional questions that they think appropriate?

22  A.   Yes, ma'am.

23  Q.   Now, ADPH has never indicated to Planned Parenthood that its

24  policies and procedures on this topic are in any way inadequate;

25  is that right?

1    A.   Which topic are we referring to?

2    Q.   The requirements around communication in the event of a

3    complication.

4    A.   Not that I recall.   No, ma'am.

5    Q.   And Mr. Sims, you've actually been the inspector for at

6    least some of those reviews.   You've never included anything on

7    this in a statement of deficiencies, correct?

8    A.   Correct.

9    Q.   And you're not aware that anyone else from ADPH has done

10   this?

11   A.   Not to my knowledge.   That's not to say that someone that

12   did a survey that I wasn't on didn't, but not to my knowledge.

13   Q.   Now, ADPH has also reviewed patient files as part of the

14   inspections, correct?

15   A.   Correct.

16   Q.   And that includes patient files reflecting complications as

17   ADPH deems appropriate?

18   A.   Correct.

19   Q.   And again, the surveyor has the authority to ask any

20   questions that he or she thinks appropriate in order to have

21   full information about how complications are handled?

22   A.   Correct.

23   Q.   And again, ADPH has never notified Planned Parenthood that

24   its practices around the handling of complications are

25   inadequate; is that correct?

1  A.  Not that I can remember off the top of my head today.  There

2  might be something prior to me being involved, maybe.  I don't

3  know.

4  Q.  But nothing that you're aware of.

5  A.  Not that I can think of right now.  No, ma'am.

6        MS. SANDMAN:  One moment to confer, if I may, Your

7  Honor.

8        THE COURT:  Okay.

9    (Brief pause)

10  Q.  One further topic.  You testified that individuals on

11  dialysis are typically very sick; is that right?

12  A.  Yes, ma'am.

13  Q.  And physicians with admitting privileges are not required to

14  be on-site at a renal dialysis facility when dialysis is

15  performed; is that correct?

16  A.  I'm sorry.  Could you ask me that one more time?

17  Q.  I beg your pardon.  Physicians with admitting privileges are

18  not required to be on-site at a renal dialysis facility when

19  dialysis is being performed; is that right?

20  A.  To my knowledge, no, ma'am.  They have to -- there is a

21  medical director that's over the facility, and they have to have

22  physicians that are involved with the patients' care.  But I

23  don't know of a requirement in the dialysis licensure rules for

24  them to have local hospital admitting privileges.

25        MS. SANDMAN:  One more moment to confer, Your Honor.

1       (Brief pause)

2            MS. SANDMAN:  Nothing further.

3            THE COURT:  Okay.

4                        REDIRECT EXAMINATION

5   BY MR. DAVIS:

6   Q.  Mr. Sims, you were asked a lot of questions about whether

7   things would have been the same if the doctors at the Birmingham

8   clinic had had privileges.  Do you recall those?

9   A.  Yes, sir.

10  Q.  Let's see what that means.  Let's break it down.  If --

11  let's take a situation where a clinic had failed to document

12  inspections or monitoring of physician qualifications.  If the

13  medical director has privileges and fails to do that monitoring

14  or fails to document it or if the medical director does not have

15  privileges, it's still the same deficiency, right?  If you fail

16  to meet the rule, it's a deficiency whether or not you have

17  privileges.

18  A.  Correct.

19  Q.  Is that what you meant when you were answering those

20  questions?

21  A.  Correct.  That --

22  Q.  Do you know -- can you possibly know if things would have

23  been any different if there had been physicians present in the

24  clinic with local privileges?

25  A.  I can't answer that.  I don't know if it would have been

1    different or not.

2         MR. DAVIS:  Let's pull up a document, please, the sign.

3    Q.  And Mr. Sims, on your screen, can you identify whether or

4    not this is the sign that you saw on the door of the clinic?

5    A.  This appears to be the sign.  Yes, sir.

6    Q.  And for the record, see if I'm reading this correctly,

7    Mr. Sims.  It says:  We apologize for the inconvenience, but

8    this health center is temporarily closed.  Please call

9    205-322-2121 for more information about our other health centers

10   or to seek a referral.

11       And then it lists centers in Marietta, Georgia; Atlanta,

12   Georgia; and Mobile, correct?

13   A.  That's correct.

14   Q.  Now, you were asked, Mr. Sims, about your opinions

15   concerning the effectiveness of the department's regulation

16   requiring an outside covering physician.  Do you recall that?

17   A.  Yes.

18   Q.  Do you set the policy for the Department of Public Health,

19   Mr. Sims?

20   A.  No, I do not.

21   Q.  If you have an opinion about the effectiveness of the rule,

22   are you assuming that clinics are at least following the rules

23   concerning outside covering physicians?

24   A.  Yes.  The rules would have to be followed as written.

25   Q.  Let's look back at the department's regulation.  This is

1    page 8 of the exhibit.  And section 4, outside covering

2    physician.  Do you see that provision, Mr. Sims?

3    A.   Yes.

4    Q.   And it says, does it not, that outside covering physicians

5    must have privileges at a hospital within the same metropolitan

6    area that permit him or her to perform certain procedures and

7    any other procedures reasonably necessary to treat

8    abortion-related complications.

9        Did I read that correctly?

10   A.   Yes.

11   Q.   So if you think the rule is working, are you assuming that

12   outside physicians are actually involved in patient care, as

13   this rule implies?

14   A.   Yes.

15   Q.   Is it possible for the Department of Public Health to

16   regulate health clinics if health clinics take the position that

17   they don't have to answer inspectors' questions?

18   A.   I'm sorry.  Could you ask me that again?

19   Q.   Is it possible for you -- for the Department of Public

20   Health to effectively regulate medical clinics if the medical

21   clinic takes the position that they don't have to answer the

22   inspectors' questions?

23   A.   Well, the department wouldn't be able to determine

24   compliance if they weren't forthcoming with information when

25   asked.

1   Q.   Is it true, Mr. Sims, that a lot of the reason for the

2   inspection in the regulation is to ensure patient safety?

3   A.   Correct.   That's part of it.

4   Q.   So if the question is whether or not a situation involved

5   patient care, that's -- that's one of the more important

6   questions that you might raise in your inspection.   Would you

7   agree with that?

8   A.   Yes.   Patient care is -- is very important to the

9   department.

10          MR. DAVIS:   Thank you, Mr. Sims.

11          MS. SANDMAN:   Nothing further, Your Honor.

12          THE COURT:   Okay.   Thank you.   You may step down.

13          THE WITNESS:   Thank you.

14          THE COURT:   Where does that leave us, counsel?

15          MS. KOLBI-MOLINAS:   Your Honor, I think there's nothing

16   else on the schedule until plaintiffs are calling their final

17   witness for their case in chief, Margie Moore, tomorrow morning

18   at nine a.m.

19          THE COURT:   It's at nine?

20          MS. KOLBI-MOLINAS:   Yes, Your Honor.

21          THE COURT:   Okay.   And then what happens after that?

22          MR. DAVIS:   After that, Your Honor, the defendants will

23   call Dr. Williamson from the Alabama Department of Public

24   Health.   And that will be all of our witnesses until June the

25   5th.

1        THE COURT:  Okay.  And how long will your witness take?

2        MS. KOLBI-MOLINAS:  On direct, I can't imagine more

3   than 45 minutes to an hour.

4        THE COURT:  And yours?

5        MR. DAVIS:  Also be very short, Your Honor, because

6   we're admitting his deposition for other issues.  I would expect

7   we will be finished before lunch for the day.

8        THE COURT:  And neither of these witnesses is a video

9   witness, right?

10       MS. KOLBI-MOLINAS:  No, Your Honor, the witness at

11  nine a.m. is a video witness.

12       THE COURT:  Oh, at nine a.m. is a video witness.  Okay,

13  then.  Very good.

14       How do you suggest we proceed on the witnesses for whom

15  there have been *Daubert* objections?  Would you like to take that

16  up in the morning after you've both had a chance to talk about

17  it?

18       MR. DAVIS:  I think that would be appropriate, Your

19  Honor.  We'll confer and discuss and possibly make a suggestion

20  for Your Honor to consider.

21       THE COURT:  Does anyone in this case see any need for

22  posttrial briefs other than the *Daubert* issues?  Has anything

23  come up that -- and the issue that I think you're already

24  briefing?

25       MR. DAVIS:  Your Honor, from our issue (sic), it's

1   possible an issue could arise where we think it would be

2   helpful.

3          THE COURT:  I mean in light of what's happened today.

4   In light of what's happened so far, I should say.

5          MR. DAVIS:  If we're going to have closing arguments,

6   that would be sufficient from what we've seen so far.  I don't

7   see a need for both.

8          THE COURT:  Okay.

9          MS. KOLBI-MOLINAS:  Your Honor, unless the Court wants

10  it, we don't see a need for posttrial briefing.

11         THE COURT:  Okay.  Very good, then.  Other than

12  handling the *Daubert* issues.

13         MS. KOLBI-MOLINAS:  Yes, Your Honor.

14         THE COURT:  Very good.  Thank you.  If you-all will let

15  me know something by nine in the morning on the *Daubert* matters.

16         MR. DAVIS:  We will have a suggestion for Your Honor.

17         THE COURT:  Very good.  Thank you.  Court is in recess.

18      (Evening recess at 3:42 p.m.)

19                  *  *  *  *  *  *  *  *  *  *

20

21

22

23

24

25

1                  COURT REPORTER'S CERTIFICATE

2            I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4            This 3rd day of June, 2014.

5

6                                  /s/ Risa L. Entrekin
                                   Registered Diplomate Reporter
7                                  Certified Realtime Reporter
                                   Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25