1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                     NORTHERN DIVISION

4

5   PLANNED PARENTHOOD
    SOUTHEAST, INC., et al.,

6
            Plaintiffs,

7
        vs.                    CASE NO.:  2:13cv405-MHT

8   LUTHER STRANGE, et al.,

9           Defendants.

10

11

12                       VOLUME VII

13               * * * * * * * * * *

14            NONJURY TRIAL PROCEEDINGS

15               * * * * * * * * * *

16          BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

17   DISTRICT JUDGE, at Montgomery, Alabama, on Wednesday, May 28,

18   2014, commencing at 9:13 a.m.

19   APPEARANCES:

20   FOR THE PLAINTIFFS:      Ms. Alexa Kolbi-Molinas
                              Mr. Andrew David Beck
21                            Ms. Susan Talcott Camp
                              Ms. Julia Heather Kaye
22                            Attorneys at Law
                              AMERICAN CIVIL LIBERTIES UNION
23                            125 Broad Street, 18th Floor
                              New York, New York  10004-2400

24

25

```
 1   APPEARANCES, Continued:

 2   FOR THE PLAINTIFFS:      Ms. Jennifer R. Sandman
                             Ms. Maithreyi Ratakonda
 3                           Attorneys at Law
                             PLANNED PARENTHOOD FEDERATION
 4                           OF AMERICA
                             434 West 33rd Street
 5                           New York, New York  10001

 6                           Ms. Dyanne Griffith
                             Attorney at Law
 7                           WILMER CUTLER PICKERING
                             HALE & DOOR, LLP
 8                           1875 Pennsylvania Avenue NW
                             Washington, D.C.  20006
 9
                             Mr. Randall C. Marshall
10                           Attorney at Law
                             ACLU of ALABAMA FOUNDATION, INC.
11                           P.O. Box 6179
                             Montgomery, Alabama  36106-0179
12
                             Mr. M. Wayne Sabel, Sr.
13                           Attorney at Law
                             SABEL & SABEL, P.C.
14                           2800 Zelda Road, Suite 100-5
                             Montgomery, Alabama  36106
15

16   FOR THE DEFENDANTS:     Mr. Andrew L. Brasher
                             Solicitor General
17                           STATE OF ALABAMA
                             OFFICE OF THE ATTORNEY GENERAL
18                           501 Washington Avenue
                             Montgomery, Alabama  36103
19
                             Mr. James William Davis
20                           Ms. Margaret Lindsey Fleming
                             Mr. Kyle A. Beckman
21                           Ms. Laura Elizabeth Howell
                             Assistant Attorneys General
22                           STATE OF ALABAMA
                             OFFICE OF THE ATTORNEY GENERAL
23                           501 Washington Avenue
                             Montgomery, Alabama  36130
24

25
```

```
 1
     APPEARANCES, Continued:
 2
     FOR THE DEFENDANTS:     Ms. Patricia Elaine Ivie
 3                           Mr. Phillip Brian Hale
                             Assistant Attorneys General
 4                           Office of General Counsel
                             STATE OF ALABAMA
 5                           DEPARTMENT OF PUBLIC HEALTH
                             RSA Tower
 6                           201 Monroe Street
                             Montgomery, Alabama  36104
 7
                  Proceedings reported stenographically;
 8                  transcript produced by computer.

 9                     * * * * * * * * * *

10                         VOLUME INDEX

11   MARGARET MOORE
          DIRECT BY MS. KAYE                           7
12        CROSS BY MS. HOWELL                          57

13   DONALD WILLIAMSON, M.D.
          DIRECT BY MR. DAVIS                         71
14        CROSS BY MR. MARSHALL                       84

15                     * * * * * * * * * *

16      (The following proceedings were heard before the Honorable

17       Myron H. Thompson, United States District Judge, at

18       Montgomery, Alabama, on Wednesday, May 28, 2014, commencing

19       at 9:13 a.m.:)

20          THE CLERK:  Ms. Moore.

21          THE WITNESS:  Yes.

22          THE CLERK:  I need to swear you in.  Can you raise your

23   right hand, please.

24      (The witness is sworn)

25      (Call to Order of the Court)
```

```
 1          THE COURT:  Where are we today, counsel?

 2          MS. KOLBI-MOLINAS:  Your Honor, plaintiffs are going to

 3   call witness Margaret Moore, who is testifying by video.  But

 4   before then, I don't know if you wanted us to take up the issues

 5   of the various Dauberts and remaining exhibits.

 6          THE COURT:  Very good.  Why don't we do that first.

 7          MS. KOLBI-MOLINAS:  So the Daubert that has been fully

 8   briefed is defendant's Daubert against Dr. Freedman and

 9   Ms. Moore.  So it would probably make sense to argue that

10   sometime this afternoon after she has testified.

11          THE COURT:  You said to argue that?

12          MS. KOLBI-MOLINAS:  If you want to.

13          THE COURT:  Okay.  And what about the others?

14          MS. KOLBI-MOLINAS:  The other one, if it would be okay

15   with the Court, we would suggest that we submit posttrial

16   briefing on the Anderson Daubert.

17          THE COURT:  Okay.  Is Anderson the only one who's

18   subject to a Daubert challenge?

19          MS. KOLBI-MOLINAS:  From plaintiffs, yes.

20          THE COURT:  From the plaintiffs.  And how many do we

21   have from the defendants?

22          MR. DAVIS:  The posttrial briefing, if that's what they

23   would prefer, that will be fine with us, Your Honor.

24          THE COURT:  Okay.  But do we have any other Daubert

25   challenges other than Moore --
```

```
1              MS. KOLBI-MOLINAS:  And Freedman.
2              THE COURT:  -- Freedman, and Anderson?  Is that right?
3    Three?
4              MS. KOLBI-MOLINAS:  That is right.
5              MR. DAVIS:  That's correct.
6              THE COURT:  Okay.  So we only have Moore -- is it
7    Freedman?  Is that right?
8              MS. KOLBI-MOLINAS:  Freedman.  Yes.
9              THE COURT:  Moore, Freedman, and Anderson are the only
10   ones for which I have *Daubert* challenges.  And Anderson is the
11   only one that hasn't been briefed.
12             MS. KOLBI-MOLINAS:  Exactly.
13             THE COURT:  Okay.
14             MS. KOLBI-MOLINAS:  I would also mention there were two
15   deposition -- objections to deposition designations that the
16   Court took, said it would reserve judgment on.  One of those did
17   include a 702 challenge, but I don't know if you want to treat
18   that differently or not.
19             THE COURT:  Okay.  Now, what deposition was that?
20             MS. KOLBI-MOLINAS:  That was Hayes.
21             THE COURT:  Hayes?
22             MS. KOLBI-MOLINAS:  Yes.  Jeffrey Hayes.
23             THE COURT:  Okay.  Has that been briefed?
24             MS. KOLBI-MOLINAS:  No, Your Honor.
25             THE COURT:  And that's a 702.  That's a *Daubert*
```

1   challenge as well.  Okay.  So we only have Anderson and Hayes,

2   then, we have *Daubert* challenges to.

3            MS. KOLBI-MOLINAS:  (Nods head)

4            MR. DAVIS:  (Nods head)

5            THE COURT:  When would you like to get something to me

6   on the person who's filing the *Daubert* challenge?  In other

7   words, the objector?

8            MS. KOLBI-MOLINAS:  We could file something the 9th,

9   Your Honor, Monday, the 9th.

10           THE COURT:  The 9th of --

11           MS. KOLBI-MOLINAS:  June.

12           THE COURT:  -- June?  And I'm trying to remember who's

13  the objector and who is the respondent.

14           MS. KOLBI-MOLINAS:  So we are the objector with respect

15  to Anderson and Hayes.

16           THE COURT:  Both as to Anderson and Hayes?

17           MS. KOLBI-MOLINAS:  Yes, Your Honor.

18           THE COURT:  Okay.  And then when would the defendants

19  like to respond?

20           MR. DAVIS:  A week later, Your Honor.

21           THE COURT:  A week later is fine.  Okay.  Thank you.

22  And maybe two or three days later, if you want to file a reply.

23           MS. KOLBI-MOLINAS:  Thank you, Your Honor.

24           THE COURT:  Very good.  So we only have Hayes and

25  Anderson that haven't been briefed.

1          MS. KOLBI-MOLINAS:  Yes, Your Honor.

2          THE COURT:  Very good.  Thank you.

3          Let's proceed with this witness.  This is Ms. Moore.  I

4     believe the clerk needs to swear in the witness.

5          THE CLERK:  She's been sworn.

6          THE COURT:  She's been sworn?  Very good, then.

7          MS. KAYE:  May I proceed, Your Honor?

8          THE COURT:  Yes.  You may proceed.

9          MS. KAYE:  Thank you.

10          **MARGARET MOORE**, the witness, having been duly sworn to

11     speak the truth, the whole truth, and nothing but the truth,

12     testified by videoconference as follows:

13                          DIRECT EXAMINATION

14     BY MS. KAYE:

15     Q.  Could you please introduce yourself to the Court, Ms. Moore.

16     A.  My name is Margaret Moore.

17     Q.  What is your current profession?

18     A.  I'm retired.

19     Q.  When did you retire?

20     A.  December 31st of 2012.

21     Q.  What did you do before retiring?

22     A.  Before I retired, I worked at the Feminist Majority

23     Foundation.

24     Q.  Let's start with your educational background and then work

25     our way back up to the Feminist Majority Foundation.  Where did

1  you go to college?

2  A.  John Jay College in New York City.

3  Q.  Is that the full name of the college?

4  A.  John Jay College of Criminal Justice.

5  Q.  In what year did you graduate?

6  A.  1982.

7  Q.  What was your first job in law enforcement?

8  A.  I was a New York City police officer, undercover narcotics.

9  Q.  When did you start that job?

10  A.  1973.

11  Q.  What did you do after working as an undercover narcotics

12  officer in New York?

13  A.  After spending two and a half years with NYPD, I joined ATF

14  in 1976, in June of 1976.

15  Q.  What is ATF?

16  A.  The Bureau of Alcohol, Tobacco and Firearms, who at the time

17  was under the Treasury Department.  They're now under Justice

18  Department.

19  Q.  What is the Bureau of Alcohol, Tobacco and Firearms

20  responsible for?

21  A.  ATF is responsible for the investigations of the federal

22  firearms laws, federal arson laws, federal explosives laws, and

23  the federal tobacco laws.

24  Q.  What positions did you hold at ATF?

25  A.  I held positions as special agent, supervisory special

1    agent, project manager in headquarters, assistant special agent

2    in charge, special agent in charge, and deputy assistant

3    director.

4    Q.   It's my understanding that you were the first woman promoted

5    to the position of special agent in charge at ATF; is that

6    correct?

7    A.   Yes.

8    Q.   For how many years were you at ATF in total?

9    A.   Twenty-three years with ATF.

10   Q.   What kind of work did you do at ATF in your first few years

11   there?

12   A.   As a special agent, I investigated federal firearms laws,

13   and I also investigated arson-for-profit rings and also

14   investigated some bombings.  Primarily, I did a lot of

15   undercover work for ATF, as I did with the NYPD, played many

16   different roles to include posing as a woman from the IRA;

17   buying silencers, semiautomatic weapons, handguns, machine guns;

18   investigating firearms trafficking; investigating RICO

19   violations as it pertained to arson-for-profit rings in

20   Brooklyn, New York; and did some investigations into explosives

21   bombing incidents.

22   Q.   And in your later years at ATF, what was your focus?

23   A.   Well, as a supervisor and a manager and then at the

24   executive level, I oversaw a number of investigations into all

25   types of federal violations under ATF's jurisdiction.  I either

1   supervised, directly oversaw at least 500 investigations in

2   probably any one year.  And as a deputy assistant director, I

3   was responsible for the oversight of the ATF forensic labs and

4   all the support personnel that supported the investigations

5   nationwide.

6   Q.  Did you ever do any work at ATF relating to abortion

7   clinics?

8   A.  Yes.

9   Q.  Can you tell the Court what kind of work you did in that

10  capacity.

11  A.  Yes.  I investigated abortion clinic bombings in the 1980s.

12  I also supervised agents that were conducting investigations

13  into abortion clinic bombings in New York, Washington State,

14  Idaho, Oregon, and several other states.

15  Q.  Approximately how many investigations into bombings or

16  arsons at abortion clinics did you either participate in as an

17  investigator or supervise?

18  A.  About a dozen.

19  Q.  What kind of tasks were you responsible for as part of those

20  investigations?

21  A.  The normal investigative task of, you know, going through

22  the evidence, collecting evidence, storing the evidence,

23  interviewing witnesses, interviewing victims at the crime scene,

24  supervising agents who were conducting these investigations,

25  working in conjunction with the FBI and local police on certain

1    investigations, and also supporting and being briefed every day

2    when I was at the level of deputy assistant director on certain

3    bombings that were taking place during my tenure as the deputy

4    assistant director over the forensic labs.

5    Q.  How are antiabortion bombings and arsons generally

6    classified by law enforcement?

7    A.  They are acts of domestic terrorism.

8    Q.  We'll return to that a bit later.  Did your work at ATF

9    include investigating acts of domestic terrorism outside of the

10   abortion context?

11   A.  No.

12   Q.  Did you receive any awards for your work at ATF?

13   A.  Yes, I did.  I was awarded the Treasury Department's award

14   for two task forces that I supervised and directed in 1989 and

15   1991.

16       I also forgot to mention that I was the national response

17   team supervisor for the northeast team that investigated

18   bombings and arsons in the Northeast.  And that team was

19   responsible for the investigation of the first bombing of the

20   World Trade Center in 1993.  That was the team that I

21   supervised; however, I was not on that scene.  But that team did

22   investigate the World Trade Center bombing in 1973 (sic).  But I

23   was the supervisor there for two years.

24   Q.  When did you retire from ATF?

25   A.  In June of 1999.

1    Q.  And in what position -- from what position did you retire?

2    A.  I was the deputy assistant director of science and

3    technology.

4    Q.  It's my understanding that you retired as the

5    highest-ranking woman agent at ATF; is that correct?

6    A.  Yes.  I was the highest-ranking woman agent at the time.

7    Q.  What did you do after leaving ATF?

8    A.  After leaving ATF, I worked -- I left in June, took the

9    summer off, and started working at the Feminist Majority

10   Foundation in September of 1999.  And there, I was the director

11   for the law enforcement operations, which was under the National

12   Clinic Access Project, and I was also the director for the

13   National Center For Women and Policing.

14   Q.  Did you lose some lighting over there or was that just the

15   video?

16   A.  (Audio skip)  I believe there's a problem with the switch.

17   Q.  Okay.  Well, we can see you again.

18   A.  Okay.

19   Q.  So I'm sorry.  Can you please tell the Court what the

20   Feminist Majority Foundation is.

21   A.  The Feminist Majority Foundation is a nonprofit organization

22   which advocates the economic, political, and social equality of

23   women.  It is an organization that's been in existence I believe

24   since 1986, 1987, and it's primarily a nonprofit that practices

25   advocation for women's rights.

```
 1  Q.   May I refer to the Feminist Majority Foundation as FMF?
 2  A.   Yes.
 3  Q.   What were your responsibilities as director of law
 4  enforcement operations at FMF?
 5  A.   As director of law enforcement operations working under the
 6  National Clinic Access Project, my responsibilities included
 7  maintaining liaison with federal, state, and local police as it
 8  pertained to abortion clinic violence that occurred at clinics.
 9       I also acted as the chief point of contact for clinics when
10  they were reporting any types of violence that occurred at their
11  clinics.  I would do security assessments at some of these
12  clinics.  I would talk to security -- rather clinic directors
13  about security procedures at their clinics.  I would conduct
14  briefings for law enforcement and for clinics in conjunction
15  with the Department of Justice about the history of extremist
16  antiabortion clinic violence in this country.
17       I would monitor extremist Web sites, stay up on periodicals
18  that were written about antiabortion violence.  I would also
19  maintain open-source newspaper clippings in files to refer to
20  and just stay up on the issue daily as -- as to what was going
21  on nationwide with abortion clinic violence.
22  Q.   Were you responsible for disseminating any types of
23  information to clinics relating to security concerns?
24  A.   Yes.  We maintained a security alert system whereby if a
25  severe act of violence, such as an abortion -- an arson, the
```

1    murder of a doctor, or anything of great significance -- anthrax

2    hoax letters -- we would send out a fax security alert to all of

3    the clinics to let them know what was going on.

4        So in the case of the anthrax hoax letters in 2001, there

5    were over 500 of these letters mailed to clinics all over the

6    country.  Clinics were put on alert not to open these letters

7    once they received them because they had a certain return

8    address on the envelope.  And that also helped clinics to keep

9    that evidence at their desk and to call police right away --

10   dial 911 and call the FBI.  So those were the type of alerts

11   that we put out.

12   Q.  During your time at FMF, did you consult with any abortion

13   clinics in Alabama?

14   A.  Yes.

15   Q.  Which ones?

16   A.  I particularly had a number of conversations with Diane

17   Derzis in Birmingham.  She had a lot of security concerns about

18   her clinic and the protests that were occurring outside of her

19   clinic, because there were people there from out of state and

20   also people there that were quite disruptive to patients coming

21   into her clinic.

22   Q.  Do you recall the name of the clinic that Diane Derzis ran?

23   A.  I think it was --

24   Q.  Was it the New Woman All Women's clinic?

25   A.  All Women, yes.

1    Q.  And did you have any other interactions with clinic

2    administrators or providers in Alabama?

3    A.  Yes.  Several, several years ago, I did a briefing in

4    Birmingham, Alabama, for federal, state, and local police.  And

5    attending that briefing were also clinic providers that were

6    part of the meeting.  That is typically what takes place when we

7    do these briefings all over the country.

8    Q.  Did that briefing focus on the state of antiabortion

9    violence and intimidation nationally or in Alabama specifically

10   or both?

11   A.  It focused on both.

12   Q.  What outside organizations did you work most closely with

13   during your time at FMF?

14   A.  I worked with security directors from the National Abortion

15   Federation and the security director from Planned Parenthood.

16   Q.  For how many years did you serve as the director of law

17   enforcement operations at FMF?

18   A.  For 13 years.

19   Q.  In addition to consulting with law enforcement about

20   specific threats, did you work with government in any other way

21   during that time period?

22   A.  Yes.  I worked with the Department of Justice national

23   abortion providers task force.  It was a task force that was set

24   up in the mid 1990s after doctors were starting to be murdered.

25   And I would attend quarterly meetings with the Department of

1   Justice on clinic violence, and we would bring concerns of --

2   areas of concern about the violence that was existing around the

3   country targeting abortion clinics and abortion providers.

4       I also worked with state and local police on the -- in a

5   very -- how could I say? -- coordinated effort anytime there was

6   a violent act that took place within that area of jurisdiction.

7   Q.  The task force that you mentioned, was that the National

8   Task Force on Violence Against Health Care Providers?

9   A.  Yes.

10  Q.  Did you consult at all with the civil rights division in the

11  Department of Justice?

12  A.  Yes.  They were the attorneys that we met with quarterly,

13  but we also had interactions with civil -- the civil rights

14  division because of the number of FACE violations.  So we had

15  almost regular contact with -- and we had a point of contact at

16  the time with the civil rights division at DOJ.

17  Q.  What is FACE?

18  A.  FACE is Freedom of Access to Clinic Entrances.  It's a

19  federal statute that was enacted by Congress in 1993-94.  And it

20  allows for the free access of patients into clinics, but it also

21  allows access of worshippers into houses of worship also.

22  Q.  Let's return briefly to your time at ATF.  Did your

23  responsibilities there include both investigating past incidents

24  of crime and engaging in crime prevention work?

25  A.  Yes.

1  Q.  Did you consult with individuals about measures that they

2  could take to minimize their risk of becoming victims of crime?

3  A.  Yes, I did.

4  Q.  Did you ever help individuals enter into the witness

5  protection program?

6  A.  Yes, I did.

7  Q.  Let's move now to your work at FMF.  As director of law

8  enforcement operations, did you consult with physicians, clinic

9  administrators, and other clinic staff who had been victims of

10  antiabortion violence?

11  A.  Yes.

12  Q.  What about physicians, clinic administrators, and clinic

13  staff who had not been subject to violence?  Did you also

14  consult with them about safety concerns?

15  A.  Yes, I did.

16  Q.  Did you ever have occasion to interact with the family of an

17  abortion provider in the context of security concerns?

18  A.  I -- I interacted with a doctor whose wife was very

19  concerned about her husband's picture being posted on a piece of

20  paper and handed out through the neighborhood.  We did speak to

21  a number of clinic providers and their staff and some doctors

22  about security issues.

23  Q.  Is observing how people respond to the threat of violence a

24  standard part of a law enforcement officer's job?

25  A.  Yes.

1  Q.  In your almost 40 years of experience, have you had the

2  opportunity to observe patterns and how people respond to the

3  threat of violence?

4  A.  Yes.

5  Q.  What about how people respond to antiabortion violence,

6  specifically?

7  A.  Well, the targeted violence that takes place at abortion

8  clinics is either targeting the facility, the provider, the

9  doctors; and it puts people in fear.  They are in fear because

10  of the long campaign that has taken place in this country, the

11  domestic terrorism that has taken place for over decades,

12  bombings, arsons.  There's probably over 50 to 60 bombings and

13  arsons that have taken place in this country according to ATF's

14  statistics directed at abortion clinic facilities in addition to

15  the murders and maimings of individuals, doctors who have been

16  murdered, and people that have been wounded and killed as a

17  result of the campaign of violence against abortion clinics.

18  Q.  And have you had the opportunity to observe how people

19  respond to those incidents and that history?

20  A.  Yeah.  People are fearful and people are concerned for their

21  safety.

22  Q.  On what subjects do you intend to offer opinions in this

23  case?

24  A.  I intend to offer my opinion on the history of the

25  antiabortion extremist movement and how that campaign of

1  violence through decades has created a climate of fear and

2  intimidation directed at clinics and abortion providers and also

3  to say that because of this fear and intimidation, that it would

4  be difficult for many doctors, local doctors, to want to perform

5  abortions because of the fear that they would face in doing this

6  type of work in their communities.

7  Q.  Ms. Moore, please turn now to what I think is the first

8  document in front of you.  It should be marked as Plaintiff's

9  Exhibit Number 82.

10 A.  Yes.

11      MS. KAYE:  This document was not objected to, Your

12 Honor, and has been admitted.  May I proceed?  Your Honor?

13      THE COURT:  Yes.  Go ahead.

14      MS. KAYE:  Thank you.

15 Q.  Ms. Moore, do you recognize this document?

16 A.  Yes.

17 Q.  What is it?

18 A.  It's my biography.

19 Q.  Does this document accurately summarize your education and

20 experience?

21 A.  Yes.

22 Q.  Does it contain a truthful and complete summary of your

23 professional activities?

24 A.  Yes.

25      MS. KAYE:  Your Honor, plaintiffs tender Ms. Moore as

1   an expert in violence and intimidation targeting abortion

2   clinics and providers pursuant to Federal Rule of Evidence 702.

3           THE COURT:  Proceed.

4   Q.  Ms. Moore, please turn now to the document marked as

5   Plaintiff's Exhibit Number 81.  Do you have that in front of

6   you?

7   A.  Yes.

8   Q.  Could you please tell the Court what that document is.

9   A.  It is my expert report.

10  Q.  Is this document a complete and accurate summary of the

11  opinions you plan to testify to this morning?

12  A.  Yes.

13  Q.  Is that your signature on page 11?

14  A.  Yes, it is.

15          MS. KAYE:  Your Honor, plaintiffs move to admit

16  Plaintiff's Exhibit Number 81 into evidence.

17          MS. HOWELL:  Your Honor, we would maintain our

18  objection that we asserted in our earlier filings that Ms. Moore

19  is not an expert and, as such, her expert report is

20  inappropriate here.

21          THE COURT:  That objection is preserved.  Indeed,

22  you're going to brief it for me.

23          MS. HOWELL:  Correct.

24          THE COURT:  Very good.  Thank you.  Let's proceed.

25  Q.  (Ms. Kaye, continuing:)  Ms. Moore, let's --

1          THE COURT:  I'm sorry.  Ms. Moore you've already

2     briefed.

3          MS. HOWELL:  Yes.

4     Q.  Ms. Moore, let's start with some definitions.  What do you

5     contend to be an act of violence or intimidation?

6     A.  Murder, bombings, arsons, threats of murder, bomb threats,

7     e-mail threats, stalking, severe harassment, written threats,

8     and threats communicated verbally to an individual.

9     Q.  Ms. Moore, could you please turn now to the document that

10    reads at the top Definitions of Terrorism in the U.S. Code?

11    A.  Yes.

12         MS. KAYE:  Your Honor, this is not an exhibit, but it

13    just quotes from a federal statute.

14         THE COURT:  Proceed.

15    Q.  Ms. Moore, could you please read the first two lines

16    beginning "18 U.S.C." and ending "entitled terrorism," and then

17    the "definition of domestic terrorism" in the middle of the

18    page.

19    A.  Yeah.  18 U.S.C., Section 2331, defines "international

20    terrorism" and "domestic terrorism" for purposes of Chapter 113B

21    of the code, entitled Terrorism.  Then it goes on to say, in

22    quotes, "Domestic terrorism" means activities with the following

23    three characteristics:

24         involve acts dangerous to human life that violate

25    federal or state law;

1    appear intended to intimidate or coerce a civilian

2  population; to influence the policy of a government by

3  intimidation or coercion; or to affect the conduct of a

4  government by mass destruction, assassination, or kidnapping;

5    and occur primarily within the territorial jurisdiction

6  of the U.S.

7  Q.  Thank you.

8    MS. KAYE:  Your Honor, plaintiffs would ask the Court

9  to take judicial notice of 18 U.S.C., Section 2331.

10    THE COURT:  Proceed.

11    MS. KAYE:  Thank you.

12  Q.  Ms. Moore, what, in your understanding, is the meaning of

13  the phrase "coerce a civilian population" as used in this

14  statute?

15  A.  It's extreme intimidation or by force.  To force someone to

16  change to the ideas/beliefs of the terrorist.

17  Q.  Thank you.  Now, broadly speaking, how have violence and

18  intimidation historically been utilized against abortion

19  providers and clinics?

20  A.  Historically, the violence and intimidation have been

21  targeted at clinics and clinic providers.  The goal of this

22  intimidation and the severe acts of violence is to stop abortion

23  in this country.  That is the goal of the terrorists when it

24  comes to abortion clinic violence.

25  Q.  Approximately when did the campaign of violence and

1    intimidation begin?

2    A.   Well, the first act of arson was in 1976.  And that was

3    several years after the passage of *Roe v. Wade*, which was in

4    1972.

5    Q.   What form did the violence take in the 1970s and 1980s?

6    A.   There were bombings and arsons of clinics.  And in one year,

7    I believe there was about 25 incidents of bombings and arsons of

8    clinics in this country.

9    Q.   Were there any other patterns of violence or intimidation

10   during that time period?

11   A.   Oh, there were death threats, bomb threats.  During the

12   1990s, we started seeing the murder of doctors.  So there were a

13   number of stalking, intimidation, harassment, phone calls,

14   stalking that have taken place, you know, continuously over the

15   years, for decades.

16   Q.   Sticking with the 1980s for now, were there any types of

17   mass protests or blockades during that time period?

18   A.   Oh, yeah.  There -- yes.  During that time period, a number

19   of clinics across the country sustained massive protests and

20   blockades at their clinics and so much so that in 1988, there

21   was mass arrests of individuals, maybe 200 at a time,

22   particularly like in Atlanta, Georgia, of people who were

23   protesting and trespassing illegally by these clinics.  This

24   caused -- would cause an escalation in the violence because two

25   groups would be seen harassing patients going in for abortion

services or just going in to see a doctor. So it caused a lot of concerns. But with the passage of the FACE in about 1993-94, that type of violence, blockades, dropped dramatically.

Q. Were you involved personally in investigating any of the bombings or arsons occurring in the 1980s?

A. Yes.

Q. Which ones?

A. It was -- while I was in Long Island, there was an abortion clinic bombing at a facility. I cannot remember the name. There was also a person by the name of John Malvasi who bombed a Planned Parenthood clinic in New York City and also attempted to bomb another clinic. So I was on the periphery of that investigation; but as a supervisor in the New York office, I was fully briefed and was on one of the scenes of that -- the Planned Parenthood bombing.

I was also aware of the -- Michael Bray and the bombings that were taking place in Washington, D.C., and in Maryland. And a number of us agents were briefed up on those bombing incidents that were taking place during that time in the 1980s.

Q. Did you supervise any other investigations into bombings during that time period?

A. Up until -- yes, I did. And while in the Seattle division, there were a number of bombings that took place in Washington State, Spokane, Idaho, Oregon. And I was responsible for the oversight of those investigations into those -- those incidents,

1  those bombing incidents.  And I was on the site of a couple of

2  those incidents as a supervisor visiting the scene to see what

3  was going on and consulting with my supervisors and the

4  assistant special agent in charge at the time, who worked under

5  me.

6  Q.  You mentioned that after the passage of the FACE Act, there

7  were fewer incidents of mass clinic blockades.  Were there any

8  other ways in which the nature of this antiabortion violence

9  changed in the 1990s?

10  A.  Yes.  During that time, we witnessed the first murder of an

11  abortion provider in Pensacola, Florida, who traveled from

12  Alabama to Pensacola to provide abortions.  And that was

13  Dr. Gunn, and he was the first doctor that was murdered, I

14  believe about 1993.

15  Q.  Was he the only doctor who provided abortions who was

16  murdered in the 1990s?

17  A.  No.  After he was murdered, the -- Paul Hill, who was a

18  clinic protestor outside that same abortion clinic in

19  Pensacola -- the replacement for Dr. Gunn was Dr. Britton.  And

20  when he was entering the clinic with an escort, a retired Air

21  Force colonel, James Barrett, who was driving him to the clinic

22  as an escort, Paul Hill shot and killed Dr. Britton and

23  Dr. (sic) Barrett, and wounded Mr. Barrett's wife, who was also

24  in the car.  So that was the second abortion clinic doctor that

25  was murdered.

1   Q.  Were there any other murders during that time period?

2   A.  During the time period in the nineties there was

3   Dr. Slepian, who was murdered in 1998.  And that was in Upstate

4   New York right outside of Buffalo.  And as with Paul Hill, who

5   claimed that the murder of doctors was justifiable homicide --

6   and he actually stated that on national TV, that the murders of

7   doctors was justified to stop abortion.

8       And Dr. Slepian, then, was the next doctor, who was killed

9   by Charles Kopp.  And he shot Dr. Slepian when Dr. Slepian came

10  home from temple one night with his four sons and his wife.  And

11  it was a memorial service that was held at the temple for his

12  father, who had passed away.  And he was heating soup in the

13  microwave, and one shot came through the window of the kitchen

14  from the woods in the back of his home by Charles Kopp using a

15  .308 semiautomatic weapon and shot and killed Dr. Slepian.  So I

16  was involved in that investigation.

17  Q.  Were there any other murders during that time period?

18          THE COURT:  Just let me interrupt you here.

19      (Off-the-record discussion)

20          MS. KAYE:  I believe we're having a technological

21  problem.  Hold on just one moment, please.

22      (Off-the-record discussion)

23      (Recess at 9:49 a.m. until 10:07 a.m.)

24          THE CLERK:  Please remain seated.  Court is in session.

25          THE COURT:  Proceed.

1    Q.  Ms. Moore, before the break, you were discussing the murders

2    of abortion providers and other clinic staff that began to occur

3    in the 1990s.  And you described incidents -- two incidents in

4    Pensacola, Florida, and one murder in Upstate New York.  Were

5    there any others during this time period?

6    A.  Yes.  There was a bombing in Birmingham, Alabama, of a

7    clinic where the security guard, who was a police officer, and a

8    nurse who was outside -- the police officer was killed as a

9    result of the detonation from the device and Emily Lyons, the

10   nurse who stepped outside with the security officer, was maimed

11   and almost lost an eye and she received some severe wounds.  And

12   Eric Robert Rudolph was the individual responsible for that

13   bombing, and he used at that time a remote control device, which

14   indicated that he was watching the victims and, at the certain

15   moment, he decided to detonate the bomb.

16       He also was responsible for, within that immediate preceding

17   year, the bombing in Olympic Park during the 1996 Olympics.  And

18   he also was responsible for an abortion clinic bombing --

19   bombing, rather, in Sandy Springs about six months after the

20   Olympic Park bombing.  And about a month later, he also bombed a

21   nightclub in Atlanta, Georgia.

22       And both of those bombings, both at the nightclub, which was

23   a gay nightclub, and the abortion clinic, there were secondary

24   devices.  And that was the first time in the history of

25   investigating antiabortion clinic violence that law enforcement

1  was now facing the threat of -- you know, as a first responder,

2  people -- you know, emergency personnel and police that were

3  rushing in after getting a call of a detonation at an abortion

4  clinic, they now faced the fact that they themselves were the

5  target of this antiabortion, violent extremist.  And it was the

6  first time in history that we saw that type of phenomenon taking

7  place in this country.

8  Q.  Was the fact that he used the remote control device also

9  something that law enforcement found to be significant or

10 jarring?

11 A.  Yes.  It was significant and it was jarring, because clearly

12 he was intending to wait for certain targets.  And it could have

13 been the doctor going into the abortion clinic, but it was the

14 security officer, who was a Birmingham police officer, and the

15 clinic nurse on the staff of the clinic, who was -- who was

16 gravely wounded.

17 Q.  Were you involved in investigating that bombing in

18 Birmingham?

19 A.  Yes.  At the time, I was the deputy assistant director over

20 the forensic labs for ATF, so the evidence had gone to our labs.

21 And we were working in conjunction with the FBI on all of those

22 bombings because we determined that they were connected:  the

23 Olympic Park bombing; the Sandy Springs bombing in Atlanta, that

24 abortion clinic; the Other Side Lounge in Atlanta; and the

25 Birmingham bombing of the New Woman All Women's Clinic.

1    Q.  So now you've mentioned the Florida murders, New York, and

2    Alabama.  Were there any others in the 1990s?

3    A.  There were others.  I don't have the specifics that I can

4    recall.  Yes.  There was -- also, at the same time there were

5    murders taking place across the border in Canada.  And there was

6    a strong suspicion that Charles Kopp, who murdered Dr. Slepian

7    in Buffalo, was -- could have been responsible for a couple of

8    murders in Canada that took place.

9    Q.  Is it fair to say that during this time period in the 1990s

10   there was an increased focus in violence directed specifically

11   at providers?

12   A.  Yes.  It was in the 1990s when we witnessed more doctors

13   being killed.

14       Most recently, the 2009 murder of Dr. Tiller took place; in

15   fact, it was in May of 2009, so it was just about, you know,

16   five years ago that Dr. Tiller was murdered in his church on a

17   Sunday morning.  And he had been the target of violence before,

18   because Shelley Shannon, who, in the mid 1990s, about '93 or

19   '94, shot Dr. Tiller but wounded him in the arms.  And he

20   survived, obviously, those wounds and was able to go back to

21   work; and she was sentenced to a pretty long prison term because

22   she was also responsible for some arsons.  She is also

23   considered a domestic terrorist.  She was associated with the

24   Army of God, which is identified as a terrorist group in this

25   country by the FBI.

1      So Dr. Tiller was a target in 1993 and then in -- obviously,

2   in 2009, when he was murdered by Scott Roeder, who also is an

3   adherent to the Army of God and their philosophy.

4   Q.  Did the federal government take any actions in response to

5   this rash of murders that you described in the 1990s?

6   A.  Yes.  When doctors were being killed, the United States

7   Marshal Service did provide protection to some of the abortion

8   providers.

9   Q.  Were there any other initiatives started during that time

10  period to try to prevent future incidents of violence against

11  abortion providers?

12  A.  Yes.  It was in the mid 1990s when the task force was

13  initiated by the Department of Justice, the violence against

14  reproductive health care providers task force.  That was

15  initiated during that time period.

16  Q.  You started at the Feminist Majority Foundation in 1999; is

17  that correct?

18  A.  Yes.

19  Q.  In your role as director of law enforcement operations, I

20  believe you said that clinics across the country reported to you

21  with security concerns; is that right?

22  A.  Yes.

23  Q.  Approximately how many abortion clinics reported to you

24  during those 13 years?

25  A.  Well, there were just hundreds of abortion clinics.  So I'd

1  say there were about 700 clinics, not that I heard from every

2  single one of them, but I heard from a good many of the clinics.

3  And I also met a number of abortion clinic directors during my

4  law enforcement briefings and during my travels with the

5  Feminist Majority when I would go to different clinics and do a

6  security assessment, a physical security assessment of their

7  clinic.

8  Q.  Where were these 700 or so abortion clinics located?

9  A.  They're located all over the U.S.

10 Q.  What kind of reports of violence did you receive from

11 clinics during that time period?

12 A.  During the --

13 Q.  During your 13 years at FMF.  Yes.

14 A.  Oh.  From bombings, arsons, murder.  Death threats,

15 stalking, vandalism, invasions, anthrax threat hoax letters.

16 Butyric acid at clinics, burglary -- and I mentioned

17 vandalism -- stalking, harassment, e-mail threats.

18 Q.  Were you working at the Feminist Majority Foundation when

19 Dr. Tiller was killed in 2009?

20 A.  Yes.

21 Q.  Can you describe for the Court what your experience was like

22 on that day.

23 A.  That day was a Sunday.  And when I was notified by a

24 colleague that Dr. Tiller had been murdered, I drove to the

25 Feminist office -- Feminist Majority office in Arlington.  And

1  we began to contact clinics and send out security alerts about

2  what had happened, but it had received a lot of publicity on the

3  news.  We began making phone calls to clinics to let them know

4  what was happening.  But I was in immediate contact with the

5  Department of Justice and with the two other providers who were

6  flying in that same day, that Sunday, because they were going to

7  work with Dr. Tiller that Monday morning.

8      So I spoke with Paige Fitzgerald.  She was in the civil

9  rights division.  And I said, Paige, we really need to have some

10  type of protection for these doctors.  Can -- you know, are you

11  in a position to have U.S. Marshals provide protection to the

12  doctors flying in.  And she was in agreement that we did not

13  know how big this was, if it was a conspiracy, and the other two

14  doctors that were with Dr. Tiller in this particular practice

15  for that day, on Monday, would they also be targeted.  Because

16  clearly, during the investigation of Roeder, it was determined

17  that he was actually stalking Dr. Tiller a week before at the

18  church to see if he was at the church, but Dr. Tiller was not.

19  He was in Orlando with his family.  So one week before he went

20  to the church, he wasn't there.  And then he came back the

21  Sunday that he was there.

22      So we knew that, you know, there was a little bit more

23  planning going on here because of this target.  Because the

24  clinic itself where Dr. Tiller worked had a lot of security.

25  And because he was the victim of a shooting before and because

1   his clinic had been vandalized before and there had been death

2   threats before to him -- and he was actually targeted by

3   Operation Rescue who operated in Wichita, Kansas -- he was at

4   the -- you know, the center of the controversy.  I think if the

5   antiabortion extremist movement could remove him, they would

6   consider that a clear victory and also send a chilling effect to

7   other abortion providers across the country.

8        So that day the U.S. Marshals did pick up the other two

9   doctors and did safely bring them to the hotel, where they

10  stayed with them that night until law enforcement could have

11  further investigation to determine whether or not this was just

12  Roeder acting alone or whether there were other people involved.

13  Q.  What do you mean when you say there was a chilling effect

14  across the country?

15  A.  Well, clearly, when Dr. Tiller was murdered, other doctors

16  were concerned and were fearful.  There was -- that Sunday I

17  spoke to a doc who had a -- he was at his home.  And this was

18  Sunday evening.  And here was this truck that had on the side of

19  the truck, a panel truck, a picture of Dr. Tiller with a big

20  round red circle and an X going through it clearly sending a

21  message that Dr. Tiller had been eliminated and putting this

22  doctor in fear for his own safety since this truck was at his

23  home, which was, in and of itself, of grave concern.  It wasn't

24  at the clinic.  It was actually at the home where the doctor

25  lived.  So that was reported immediately to law enforcement, and

1   there was follow-up investigation by Department of Justice on

2   that particular case.

3   Q.  Were there any --

4   A.  We received a number of phone calls -- we received a number

5   of phone calls that day.  And the concerns that day were passed

6   on to the Department of Justice because a number of clinics were

7   actually receiving other threats, death threats along the lines

8   of, you know, you may be next.  And we gave all of that

9   information over to Department of Justice civil rights division.

10  And that went on for about a week.

11  Q.  Ms. Moore, in your experience, do individuals who commit

12  extreme acts of violence against an abortion clinic or provider

13  typically act independently?

14  A.  Well, no.  I don't believe they act independently.  Roeder

15  acted alone when he conducted the shooting.  He purchased a

16  firearm.  He went to a firearms range.  He practiced with the

17  firearm.  Prior to that, he was up in Topeka, Kansas.  He glued

18  locks to another abortion clinic.  And these are all escalating

19  tactics.  But his -- in his car, the police recovered the name

20  of Cheryl Sullenger, who is the -- also a convicted felon in the

21  antiabortion movement.  And she is part of Operation Rescue, who

22  works out of Wichita, Kansas, and her phone number and name were

23  in his car.  So clearly, he had associated with another

24  antiabortion group.

25      So I believe that these individuals, though they may act

1   alone, they are getting support emotionally, maybe financially;

2   but they have someone who's basically not stopping them but may

3   not be -- certainly is providing them with the emotional support

4   they need to go out and commit their act.

5   Q.   Just to clarify, is Scott Roeder Dr. Tiller's murderer?

6   A.   Yes.  Scott Roeder murdered Dr. Tiller.  And he was also an

7   Army of God adherent.

8   Q.   Are individuals who commit acts of violence against abortion

9   providers typically involved in the antiabortion movement in any

10   way before becoming violent?

11   A.   Yes.  I like to say, you know, you just don't wake up one

12   morning and decide to kill a doctor.  There is a path to

13   violence.  And what we have seen is that these murderers, such

14   as the case with Roeder and with Charles Kopp, is that they'll

15   start out protesting at a clinic.  And they may protest for a

16   number of years or become more involved by associating with

17   certain extremist groups, and then they escalate.  They just

18   have the ideation, their grievance, and then they escalate their

19   tactics.

20       As in the case with Roeder, he started out as a protestor.

21   But then we observed him; he was on film gluing a lock to a

22   clinic.  And that is significant because the Army of God has a

23   manual that tells people how to commit these acts of violence.

24   And that's one of the directives in the Army of God manual,

25   which would tell you, you know, use butyric acid; put glue in

1  the locks to stop people from opening up the clinic.  So clearly

2  he was one who adhered to these tactics and who committed the

3  act.  And I don't believe that a lot of them act alone, as I

4  said before.  They are seeking other support from people who are

5  like-minded but who may not pull the trigger.

6  Q.  I believe you said earlier that one of your responsibilities

7  while you were at FMF was to monitor protestors.  Did I get that

8  right?

9  A.  Yes.

10  Q.  How did you go about doing that?

11  A.  Well, the clinics would -- I mean there were the local

12  church groups that were out there and they were peaceably

13  demonstrating, and certainly there was not a concern.  But

14  when -- you had people who were coming in from out of state or

15  people who were showing up that may show up in camos and have a

16  beret or acted differently than the peace groups that were

17  sitting there praying the rosary or something.  So you had to be

18  on the lookout for changes and patterns of behavior changes.

19      If a person was approaching your car and coming up next to

20  your car and trying to block the car of the doctor trying to go

21  into the clinic, that is worrisome because that tactic was used

22  in Pensacola where, you know, the doctors were trying to drive

23  into the driveway and there was Paul Hill, who just shot the

24  doctor and the clinic escort.

25      There was another doctor in Charlotte, North Carolina, who

1    was fearful.  And I spoke to him because he said, I have to pull

2    off the highway and drive into the clinic and, you know, he has

3    folks coming up and approaching and stopping his entry into the

4    clinic's driveway.  And they're fearful that perhaps this is a

5    tactic that's being used to slow them down so somebody may come

6    after them.

7    Q.  Do any other nongovernmental organizations in addition to

8    the Feminist Majority Foundation monitor antiabortion domestic

9    terrorism groups?

10   A.  Southern Poverty Law Center.  NAF.  Planned Parenthood.

11   Q.  Would you say that most protestors outside abortion clinics

12   are violent or nonviolent?

13   A.  Nonviolent.

14   Q.  Can you give some additional examples of the types of

15   antiabortion protesting that you would consider to be

16   nonviolent?  You said peaceably praying with rosaries.  Other

17   things that you would consider to be nonviolent and peaceful.

18   A.  Sometimes groups have to obtain permits from the city, so

19   they lawfully obtain a permit and they hold a big demonstration

20   and maybe a prayer vigil.  They'll walk on the streets carrying

21   signs.  I mean they -- you have to watch them; but for the most

22   part, a lot of the demonstrations are people that are local.

23   But nonetheless, we do have to monitor and make sure that -- if

24   there are any changes in behavior that would seem more

25   aggressive.  And by that would be taking down the license plate

1  of the doctor coming into the clinic, taking a photograph of the

2  doctor and putting it up on a Web site.

3      And some clinics have been specifically targeted by groups

4  that are in certain states.  Like, you know, Operation Rescue is

5  in Wichita, and they targeted Dr. Tiller.  But they do travel to

6  other states, and they'll specifically and strategically target

7  their clinic and concentrate on a particular clinic in hopes of

8  getting that clinic to either shut down or have the doctor leave

9  and not provide abortions.

10 Q.  Were there any high profile protestors located in Alabama

11 while you were at FMF?

12 A.  Yeah.  You had David Lackey, who was one of the protestors.

13 He is now deceased.  He died a few years ago.  But he was very

14 active in the antiabortion movement.

15     In fact, it was in 2001 when I was with Feminist Majority,

16 and we got a call from a clinic in Pensacola, the same clinic

17 where the two doctors were murdered, that there was this van

18 outside encircling the clinic.  And it was driven by an

19 individual by the name of Paul Rudnick, who was an antiabortion

20 extremist.  And police at that time stopped the individual

21 because of a traffic violation and determined that there were a

22 number of semiautomatic weapons that were in that van.  But

23 because they were all legally obtained, there was nothing the

24 police could do; and they had to pack up the weapons into the

25 van, and the van continued.

1    That van eventually wound up in Birmingham, Alabama, and was

2  circling a clinic.  And because of the security alert that we

3  put out, clinics knew that there was a van that had weapons in

4  it that was circling clinics.  When the -- when the van showed

5  up in Birmingham, the police knew, because they were informed by

6  the clinic, that this van had been in other locations across the

7  country.  Besides Pensacola, they went to Louisiana; they wound

8  up in Birmingham.  And the police were able to question the

9  individuals and recovered the weapons from the van.  One of the

10  individuals who was driving the van had an outstanding warrant

11  for a failure to appear.  So those weapons were confiscated.

12    But by working together with other clinics and with our

13  security alert system, we're constantly working to minimize the

14  threat and to try and prevent another crime from happening.  And

15  that takes a lot of work with other federal, state, and local

16  and with the clinics to work together to make this happen.

17  Q.  How do individuals who seek either to harass or attack a

18  provider typically find their personal information?

19  A.  They will stand outside a clinic, get -- get the license

20  plate, take a picture of the individual.  And I'm sure they

21  probably have privy to different, you know, search engines that

22  may assist them.  But I do know that people have taken pictures

23  such as doctors who were put up on the Nuremberg Web site where

24  they have the names of the doctors who provided abortions and

25  their locations and some physical descriptions.  In fact, that's

1  where Dr. Gunn first appeared was on the Nuremberg Web site.

2  And then he subsequently was murdered, and then his name was

3  crossed off.  A line was, you know, drawn through his name on

4  that Web site.

5      There's also another Web site called abortion doctors dot

6  org, and there is always a call for abortion -- antiabortion

7  protestors to send them names of doctors and clinic staff so

8  they can put it up on the Web site and identify these people.

9  Q.  Does law enforcement intervene anytime an individual

10 escalates from peaceful protesting to more intimidating or

11 harassing actions?

12 A.  Sometimes it's difficult for law enforcement because it is

13 clearly sometimes not a clear violation of law.  It may be an

14 inappropriate communication, and these inappropriate

15 communications are considered free speech.  If somebody comes up

16 to a doctor or clinic worker and says, you're going to die,

17 well, we're all going to die; and people look at it as a

18 free-speech thing.  So sometimes it is very difficult to

19 prosecute this.

20     And the other frustration for police, it comes as he-said,

21 she-said.  Well, you know, he said this to me, and there's no

22 way to prove it.  So it's very difficult sometimes for police to

23 intervene in all of the incidents.

24 Q.  So is it fair to say that there's a limit to law

25 enforcement's ability to shield abortion providers from this

1    type of intimidation?

2    A.   Yes.   There is -- there is a limit.   Yes.

3    Q.   Just to clarify a small point from earlier, you mentioned a

4    Web site.   I think you said it was the Nuremberg Web site.   Is

5    that formally called the Nuremberg files?   Is that what you're

6    referring to?

7    A.   Yes.   That's what I'm referring to.

8    Q.   So you've mentioned a few times an organization called the

9    Army of God, and you've referred to it as a domestic terrorism

10   group.   What makes an antiabortion group a domestic terrorism

11   group?

12   A.   Under the definition that I previously read in court, that

13   group is involved in acts dangerous to human life that violate

14   federal or state law.   And they are -- their main goal is to

15   intimidate or coerce a civilian population or the government.

16   Their goal is to stop abortion.   So they want to coerce the

17   civilian population to do that.

18   Q.   Is all antiabortion violence considered domestic terrorism?

19   A.   No.

20   Q.   Can you explain?

21   A.   Yes.   You may have an individual who I know in one case

22   threw a Molotov cocktail at the door of an abortion clinic, but

23   he was upset because his partner had an abortion at that clinic.

24   Q.   So how does that contrast with the other types of

25   antiabortion violence that you've described that have the intent

1  to instill fear or coerce?

2  A.  Well, from what we've determined --

3     THE COURT:  Counsel, I need to interrupt you again.

4     MS. KAYE:  I'm sorry, Ms. Moore.  Just one moment,

5  please.

6     THE COURT:  Just a minute.  I have another matter I

7  have to take up at this time.  How much longer are you going to

8  be?

9     MS. KAYE:  Probably another half an hour.

10     THE COURT:  Okay.  We're going to take a ten-minute

11  recess right now.

12     MS. KAYE:  Thank you, Your Honor.

13     Did you hear that, Ms. Moore?

14     THE WITNESS:  I heard recess.

15     MS. KAYE:  Yes.  Ten minutes.  Thank You.

16    (Recess at 10:36 a.m. until 10:51 a.m.)

17     THE CLERK:  Please remain seated.  Court is in session.

18     THE COURT:  Proceed.

19  Q.  (Ms. Kaye, continuing:)  Ms. Moore, before the break, I

20  asked you whether all antiabortion violence was considered

21  domestic terrorism.  I think you may have been interrupted

22  during your answer to that question, so I'll ask it again.

23  A.  No.  I said not all violence directed at abortion clinics is

24  domestic terrorism.  And I gave an example of an individual who

25  was mad at his girlfriend because she had an abortion and threw

1  a Molotov cocktail at the door of the clinic.

2  Q.  Is that circumstance with the Molotov cocktail -- is that

3  exceptional, or would you say that's a common phenomenon here?

4  A.  I would say most of the violence directed at abortion

5  clinics is directed at them because of the desire of the

6  individual to stop abortions, whether it is a domestic terrorist

7  or other individuals.  But the desire is to stop abortions, not

8  to seek revenge or let out some frustrations, as this individual

9  did who threw the Molotov cocktail against the door.

10  Q.  Do you think it's a bit hyperbolic to compare an act of

11  antiabortion violence to domestic terrorism, which calls up

12  images of, say, the Oklahoma City bombing?

13  A.  No.  Terrorism is terrorism.  And domestic terrorism,

14  including the Oklahoma City bombing, which, you know, was a

15  domestic terrorist act in this country killing about 168 people

16  in -- in that building -- and it's also compared to -- I mean

17  when you look at it, I mean I -- there was an FBI agent that I

18  worked with who wrote a paper, the comparison of Al Qaeda and

19  Army of God, and how both organizations have manuals telling

20  individuals that adhere to their beliefs how to go about and

21  conduct terrorist events.

22      So here is an FBI agent who believed that -- you know,

23  comparing Al Qaeda with Army of God.  So the event that took

24  place on 9/11 -- I mean, let's face it.  All of us were affected

25  by that event, and it was a major event in our country.  And

 1   it's why we take off our shoes at the airports now and why a

 2   whole new agency, a department, a cabinet-level department was

 3   created, Homeland Security, to protect everyone, because of this

 4   one event that took place on 9/11.  I know there were three

 5   planes.

 6       But we're talking about -- it has the same effect when an

 7   abortion provider is killed and people know that this abortion

 8   provider had been targeted by Army of God.  It has the same

 9   effect.  It makes people fearful, and there's just no way of

10   getting around it.  I mean as with -- anybody who is thinking

11   about providing abortions would have to think about, I could be

12   killed.  It has happened.  Or I could be hurt.  Or my family

13   could be hurt.  Or they could come to my neighborhood and hand

14   out these flyers and, you know, try and isolate me from the

15   neighborhood that I live in because I provide abortions.

16       So there's clearly intimidation and fear that exists within

17   the abortion industry because of these terrorist acts.  They're

18   no different.

19   Q.  Has the Department of Justice's task force on violence

20   against health care providers identified any other area of

21   health care that's subject to domestic terrorism?

22   A.  No.

23   Q.  Ms. Moore, could you please turn to the document that's been

24   marked as Plaintiff's Exhibit Number 83.

25   A.  Yes.

1  Q.  Can you tell us what this document is.

2  A.  It's the National Abortion Federation Violence and

3  Disruption Statistics.

4  Q.  Do you know where the National Abortion Federation gets

5  these reports of clinic violence and disruption?

6  A.  From their clinics, their member clinics.

7  Q.  Are all abortion clinics in the country NAF members?

8  A.  No.

9  Q.  Do you know if these statistics reflect reports from clinics

10  that are not NAF members?

11  A.  No.  These statistics represent NAF-member clinics.

12  Q.  This has been admitted into evidence, but I just want to go

13  through a small sample of the numbers.  Ms. Moore, can you turn

14  to the section entitled Violence and tell the Court whether

15  there were any death threats of abortion providers or clinic

16  staff reported in 2013.

17  A.  Yes.  There were two.

18  Q.  What about the year before, 2012?

19  A.  In 2012, there were six.

20  Q.  Now, how many incidents of stalking were reported to NAF in

21  2013?

22  A.  In 2013, there were 20 incidents of stalking.

23  Q.  How many in 2012?

24  A.  Six.

25  Q.  Please look now at the section entitled Disruption.  How

1  many incidents of disruption were reported in 2013 in total?

2  A.   396.

3  Q.   Ms. Moore, I believe what you're reading there is the number

4  of incidents of obstruction.   It looks like the total is just

5  below that.

6  A.   Oh, yes.   6,484.

7  Q.   Ms. Moore, are the 2013 NAF statistics consistent with your

8  opinion that violence and intimidation targeting abortion

9  clinics and providers is an ongoing problem?

10  A.   Yes.   And I would even point out further, counsel, that with

11  the death threat statistic in 2009, the year that Dr. Tiller was

12  murdered, it was 16, which to me would be significant.

13  Q.   Thank you.   Does it affect your opinion that some forms of

14  violence were less common in 2013 than in 2012?

15  A.   No.

16  Q.   Does it affect your opinion that some forms of violence were

17  more common in 2013 than in 2012?

18  A.   No.   It doesn't affect my opinion.   It supports my opinion,

19  whether it's two or four.   This is an ongoing campaign that has

20  been going on for decades.   And it may vary by two percent up or

21  down in any one given year, but the fact is that this has been

22  going on for decades.   And no other industry in this country

23  experiences this type of violence.

24  Q.   Do you understand these statistics to be a complete record

25  of every incident of violence or disruption targeted at abortion

1    clinics or staff in a given year?

2    A.  It's not a complete record.  It's probably underreported.

3    Q.  Why do you say that?

4    A.  Because not all the clinics are included in this NAF

5    statistical report, because not all clinics belong to NAF.

6    Q.  Please turn now to the document marked as Plaintiff's

7    Exhibit Number 84.

8    A.  Okay.

9    Q.  Can you tell the Court what that document is.

10   A.  It is the 2010 National Clinic Violence Survey conducted by

11   the Feminist Majority Foundation.

12   Q.  Are you personally familiar with this report?

13   A.  Yes.

14   Q.  Were you working at FMF when this report was released?

15   A.  Yes.

16   Q.  Could you please turn to page 2, the executive summary, and

17   read aloud the second paragraph beginning with "overall."

18   A.  Overall, the percentage of clinics experiencing severe

19   violence has increased to 23.5 percent of all abortion providers

20   participating in the survey in 2010 compared to 20 percent in

21   2008 and 18.5 percent in 2005.  Moreover, this marked the

22   highest level of violence recorded since 1997 when 25 percent of

23   all clinics experienced one or more incidents of severe

24   violence.

25   Q.  Thank you.  So according to the FMF survey, what percentage

1   of participating abortion providers experienced severe violence

2   in 2010?

3   A.   23.5 percent.

4   Q.   Please turn now to the chart at the bottom of page 7 of the

5   report.   Referring to that chart, can you tell me and the Court

6   if the Feminist Majority survey found that any clinic staff have

7   resigned as a result of antiabortion violence and harassment?

8   A.   The percentage of staff resignations as a result of

9   antiabortion violence, harassment, or intimidation decreased

10  from four percent in 2008 to 2.2 percent in 2010.

11  Q.   Please continue reading.

12  A.   Okay.   However, of clinics with high violence, ten percent

13  experienced staff resignation, nearly five times the overall

14  percentage.

15  Q.   Thank you.

16  A.   This different --

17  Q.   Oh, I'm sorry.   Please continue.

18  A.   Okay.   Well, the last sentence says, This difference

19  indicates a strong correlation between the incidence of violence

20  and harassment and staff resignation.

21  Q.   Still looking at the chart at the bottom of page 7,

22  Ms. Moore, how many times between 1993 and 2010 has FMF released

23  its national clinic violence survey?

24  A.   A dozen times.

25  Q.   Have any of those surveys found that there were no incidents

1  of staff resignations due to violence, harassment, or

2  intimidation during the surveyed years?

3  A.   No.

4  Q.   Ms. Moore, are you familiar with HB 57, the abortion-related

5  legislation enacted in Alabama in 2013?

6  A.   Yes.

7  Q.   What do you understand that law to require?

8  A.   It requires that abortion providers have local privileges at

9  the hospital where they're -- the nearest facility to where they

10  are providing abortions.

11  Q.   Do you believe that the violence and intimidation tactics

12  that you've described this morning would influence an abortion

13  clinic's ability to find local physicians willing to provide

14  abortions?

15  A.   Yes.

16  Q.   Why?

17  A.   Because of the fear and intimidation that exists.  I mean

18  locally, when a doctor is found out -- and we saw this

19  experience happen in North Carolina.  The extremist movement is

20  targeting doctors and where they live, particularly in the

21  communities to where they're practicing close by.  That's why

22  you have a number of doctors fly into a community and fly out.

23  Because they want to remain anonymous and get in and get out

24  because they know the risk that they face.  And as what happened

25  in Charlotte, North Carolina, this one doctor was identified and

1    found out.  They put a picture of him on a "wanted" poster

2    giving his identifying information, went to his home in the same

3    county where he worked and was handing out these flyers to

4    neighbors, but banged on his own home and handed this to his

5    wife, who was just absolutely frightened because he was not home

6    and there are these people banging on her door and handing her

7    flyers that your husband is a murderer.

8        So I think locally it presents a much more difficult case

9    when you have people that live in the area unless they're able

10   to put up with this and want to engage in this.  Or they have to

11   harden themselves, as far as targets, with additional security.

12   It becomes very difficult for the local people -- the local

13   providers in the area to practice in the area because of the

14   fear.

15   Q.  What is your basis for that conclusion?  What experiences

16   are you taking into account in reaching that conclusion?

17   A.  It's my law enforcement experience when people are afraid,

18   when they want to go into situations, they want to avoid

19   situations -- you don't want to -- you know, my mother used to

20   tell me don't walk across Central Park at midnight because --

21   you know, back when it was a very violent time in New York City

22   when there were like 2,000 murders.  So you want to avoid

23   putting yourself in a situation where you could become a victim.

24   So most people, because of that, would not want to put

25   themselves in that position.

1    Q.  Are you --

2    A.  My conversation with clinic -- you know, my conversations

3    also with clinic directors over the years about their fear about

4    their doctors coming into the clinic, they would tell me how

5    there's concern.  They would always look to put themselves in a

6    facility that had cameras and that maybe didn't have too many

7    windows, that had an entryway, that had a bullet-proof at the --

8    a bullet-proof window where you sign in.  And once you

9    identified yourself, you let the person in.  But there are so

10   many security measures that abortion clinics have taken to

11   harden themselves as targets so they're not victims.

12       Dr. Tiller's clinic was one of those clinics that was well

13   fortified; but that's why Roeder went to his church, because,

14   you know, there was a breach there that he knew he could break,

15   and enter a church and murder him.  So I think it's very

16   difficult for people in the industry not to have fear.  You have

17   to be -- certainly a reasonable person would definitely consider

18   that fear and intimidation if he or she decided to become an

19   abortion provider.

20   Q.  Can you share some additional examples of steps that

21   providers in your experience have taken to try to harden

22   themselves as targets?

23   A.  Well, there are security assessments that an abortion clinic

24   would mandate themselves to have before setting up an operation

25   where you would come out and consult with them and improve their

1    security steps.  One of the things that we promoted and

2    certainly I promote was making sure that the abortion clinic had

3    really good relations with the police.  Because in areas where

4    there was a great relationship with the police department, the

5    police understood the violence and the intimidation that went

6    on, and they were able to respond more effectively to calls of

7    complaints from these clinics.

8        Like I said, there were security cameras.  We went from, you

9    know, black and white cameras to recommending, you know, color

10   cameras that you could view on line if something were to take

11   place; to make sure that shrubs are cut outside very low; making

12   sure that there were maybe some concrete barriers outside the

13   clinic by way of, you know, plantings so a truck couldn't be

14   pulled up -- could not pull up onto the clinic and have a car

15   bomb or something like that.

16       So there were different security measures that were

17   suggested that clinics could take to try and harden themselves

18   as targets including clinic workers coming to and from work and

19   driving a different way each time.  And then if somebody were to

20   follow them, to go directly to the police station and pull up to

21   the police station and not go home.  So there -- they -- clinic

22   workers and providers know that they could be under

23   surveillance, and they are taught to be always cognizant of

24   their surroundings and what's going on.

25   Q.  Are your opinions this morning based only on a national

 1   perspective, or are they drawn from your Alabama-specific

 2   experience as well?

 3   A.   They're drawn from all my experiences.  Violence is part of

 4   the national -- how do I say it?  It's a national concern for

 5   abortion providers and clinics.

 6       So I also did a briefing in Birmingham, Alabama, where I met

 7   a number of the clinic providers and clinics.  There were about,

 8   you know, 80, 90 federal, state, and local law enforcement.  And

 9   typically we invite the clinic folks to come so they can

10   interact with federal, state, and local.  And during these

11   briefings, I give them a history of the antiabortion extremist

12   movement.

13       A police officer will talk about what locally is going on in

14   their jurisdiction, and Birmingham would be no different.  They

15   would talk about David Lackey or Jeff White, who would be more

16   active in the Birmingham area.  The U.S. attorney -- or rather,

17   the AUSA would give a briefing on FACE and what it is and how to

18   investigate.  There would be local ordinances that would be

19   discussed.  Clinic providers would get up and talk about the

20   trespassing that was going on, the invasions, how they, you

21   know, were able to stop the invasions, how could they curb the

22   trespassing.

23       So there would be a number of discussions that would take

24   place not just in Alabama, but all across the country about how

25   to manage this threat.  It's really about managing this threat,

1    because it is a threat.  It's a constant threat.  It hasn't

2    stopped.  I don't see it stopping in the foreseeable future.

3    It's been going on for over three decades.

4        So my experience is based on my law enforcement background;

5    my 13 years with Feminist Majority Foundation, which I've had

6    numerous conversations with police, abortion providers, federal,

7    state, and local law enforcement; and from my interactions with

8    FBI agents who deal with domestic terrorism.

9    Q.  Are your conclusions about the law's impact based on

10   specific conversations with specific physicians who have told

11   you that they refuse to perform abortions because they're

12   afraid?

13   A.  There was one physician that I spoke to that was concerned.

14   And I could see the fear, because there always is that fear.  I

15   had conversations with Dr. Tiller and with Dr. Carhart in

16   Maryland.  And there is concern.  I mean Dr. Carhart has

17   experienced two arsons, one at his home and one at his clinic.

18   And there have been death threats against Dr. Carhart.

19   Dr. Tiller, obviously, was murdered.

20       I also spoke with Diane Derzis down in Birmingham, Alabama,

21   and she was terribly concerned about the activity and protests

22   going on outside her clinic and how that she was fearful because

23   that clinic was the subject of severe violence in the past.

24   Q.  Now, are abortion providers in a given state generally aware

25   of what their colleagues in other states are experiencing in

1  terms of violence and intimidation, or would they only be aware

2  of what's happening in their immediate community?

3  A.   I think both.   I think generally speaking, most clinics,

4  because of our security alerts, are aware of what's going on in

5  other communities.   And then locally, other abortion providers

6  talk to each other and there are news reports and local TV that

7  would cover probably some incidents that take place in local

8  communities that don't reach the national level, perhaps.

9      (Brief interruption)

10         THE COURT:  Just a minute.

11     (Off-the-record discussion)

12         THE COURT:  Go ahead.

13         MS. KAYE:   Thank you.

14  Q.   What about physicians who don't currently work at an

15  abortion clinic?  How might they be aware of the violence and

16  intimidation that has occurred over the past few decades

17  directed at abortion providers and clinics?

18  A.   Just from the national coverage that has been focused on

19  abortion clinic violence, I think generally speaking doctors are

20  aware that the targeted violence has been directed at abortion

21  providers.   And this is a known fact.

22  Q.   Ms. Moore, I just have a handful of questions left for you.

23  How has Alabama historically compared with other states in terms

24  of the level of antiabortion violence and harassment?

25  A.   Well, surely when you have an individual such as Eric Robert

1  Rudolph who is Army of God, that is significant, because it is a
2  domestic terrorist group.  Also, Eric Robert Rudolph used a
3  remote control device and killed a police officer and gravely
4  wounded a clinic staff person.  So he had to see exactly what he
5  was doing when he remotely controlled that device.

6      You also have other antiabortion extremists that do live in
7  Birmingham.  So -- and you just can't -- you know, terrorism
8  just doesn't stop at the boundary.  I mean clearly Alabama has
9  had its share of antiabortion extremist violence.  But in the
10  area and in the region, having Eric Robert Rudolph, who was --
11  who detonated this device in 1998, remember, and then was a
12  fugitive for five years -- so certainly that had to play a role
13  for five years looking for this individual.  And it appeared on
14  TV that this individual was still a fugitive.  He was arrested
15  in 2004, and then he was finally sentenced and pled guilty in
16  2005 and went to jail for life.

17      So this is a continuing, you know, picture of what was going
18  on at the time.  It was in the minds and on the TV and covered
19  by the press as to this very -- one incident that happened in
20  Birmingham, the Olympic Park bombing, and the Atlanta nightclub
21  and clinic there attributed to this one guy who was part of this
22  domestic terrorism organization.

23  Q.  The Feminist Majority Foundation survey that you read from
24  earlier, I believe it said that the percentage of clinics
25  experiencing severe violence increased between 2008 and 2010; is

1  that correct?

2  A.   Yes.  Did I say that?  Did I read that?

3  Q.   Yes.

4  A.   Yes.

5  Q.   If the survey --

6  A.   Yes.

7  Q.   -- had found the opposite, that in fact the percentage of

8  clinics experiencing severe violence had decreased, would that

9  change your opinions in this case?

10  A.   No.

11  Q.   Why not?

12  A.   Because like I said, after a campaign of violence that has

13  been going on for 30 years -- and it's severe violence and it's

14  escalated over the years -- I don't see this stopping.  I -- I

15  think that when you have this type of violence directed at the

16  particular industry, that it is severe and it is intimidating

17  and it does make people fearful.  So if it drops two percent one

18  year, it goes up two percent, it's still significant because

19  there shouldn't be any violence.

20          MS. KAYE:  Thank you, Ms. Moore.

21          THE COURT:  Cross?

22          MS. HOWELL:  Yes, Your Honor.

23                       CROSS-EXAMINATION

24  BY MS. HOWELL:

25  Q.   Hi, Ms. Moore.  Can you hear me okay?

1  A.  Yes, I can.

2  Q.  Well, I'm Laura Howell.  I'm with the Alabama Attorney

3  General's Office, and I'm representing the defendants in this

4  matter and just wanted to ask you a few follow-up questions

5  about what your counsel has already asked.

6      So starting at the very beginning, you say that your

7  expertise is in violence and harassment that targets abortion

8  providers and clinics; is that right?

9  A.  My expertise is in dealing with abortion providers for 13

10 years, from all forms of severe violence to include murder,

11 attempted murder, death threats, bombings, arson, anthrax

12 threats, vandalism, stalking, e-mail threats, butyric acid

13 attacks, and harassment.

14 Q.  And your expertise in all of those areas is based entirely

15 on your experience in law enforcement and then with the Feminist

16 Majority Foundation; is that right?

17 A.  Yes.

18 Q.  And a quick question.  At points in your deposition you had

19 referred to the Feminist Majority instead of the Feminist

20 Majority Foundation.  Are those two separate groups or are they

21 the same thing?

22 A.  When I was referring to, in my deposition, the Feminist

23 Majority Foundation or Feminist Majority, all of my references

24 were for the -- to the Feminist Majority Foundation.  And I may

25 have shortened the name.  But they're all 501(c)(3).  The

1  Feminist Majority has a separate PAC.  But all my work was under

2  the 501(c)(3) Feminist Majority Foundation.

3  Q.  Thank you for that clarification.  And the Feminist --

4  A.  You're welcome.

5  Q.  Sorry.  The Feminist Majority Foundation is a politically

6  active group, isn't it?

7  A.  The Feminist Majority Foundation is an advocacy group that

8  advocates for social, economic, and political equity for women

9  in this country.

10  Q.  And is one of the policies that it advocates for pro-choice?

11  A.  The Feminist Majority Foundation is a pro-choice

12  organization.  Correct.

13  Q.  So Ms. Moore, we talked about your experience.  But just to

14  confirm, you're not formally trained or have experience in

15  sociology, do you?

16  A.  I have no experience in sociology, but I did take sociology

17  courses when I was in college.

18  Q.  What about statistics?  Any formal training?

19  A.  We all had to take -- you know, we had some statistics, as

20  you-all know, in college.  So -- but I'm not formally trained as

21  a statistician.  No.

22  Q.  What about psychology?

23  A.  I took psychology in college and I've dealt with a lot of

24  victims of crime and people who perpetrate crime.  So had a lot

25  of very interesting conversations in understanding the criminal

1  mind and what goes on.

2  Q.  But you're not formally trained as a psychologist; is that

3  correct?

4  A.  No.  No.  No.  I'm a law enforcement officer for 25 years.

5  Q.  And it is -- is it your expert opinion that the measures

6  required by HB 57, which is the Alabama legislation at issue

7  here, are too restrictive for the abortion providers in the

8  state to comply with?

9  A.  I think that the provisions will have an effect on getting

10 local providers to provide abortions in the community because of

11 the restriction that you have to have admitting privileges at

12 the local hospital.  So it will decrease the pool of potential

13 abortion providers for a clinic.

14 Q.  Now, you stated in your report that -- exactly what you've

15 just said.  And this is at paragraph 35, I believe, which is on

16 page 10, if you'd care to look at it.  That in your opinion, the

17 fear and intimidation abortion providers face decreases the

18 number of providers, particularly local providers, willing to

19 provide abortions.

20     Did I read that correctly?

21 A.  Yes, you did.

22 Q.  Has any doctor told you that he or she will not perform

23 abortions locally because they're afraid of harassment?

24 A.  I have had conversations with doctors who were fearful and

25 who had concerns about their work providing abortions because of

1  the fear and intimidation that exists in this country directed

2  at abortion providers by the murders and by the over 55 bombings

3  and arsons directed at abortion clinics in this country.

4  Q.  But -- excuse me.  Sorry.  But none of them told you that

5  they would not provide abortions, is that correct, only that --

6  A.  No one told me that.  They were fearful.  Yes.

7  Q.  Now, to your knowledge, Ms. Moore, has past violence stopped

8  doctors at other Alabama clinics from providing abortions?

9  A.  I haven't had conversations to that effect.

10  Q.  So you don't know.

11  A.  But I do know -- I do know that the past violence has had an

12  effect on clinic staff resignations, and that's documented in

13  the surveys.  And that's the only means that we can document

14  this, by doing these surveys.  That's our only tool to measure

15  that.

16  Q.  But you would agree with me that the five abortion clinics

17  currently open in Alabama all have physicians there willing to

18  perform abortions.

19  A.  You're telling me that or asking me that?

20  Q.  Would you agree with me?  That is the question.  Would you

21  agree with that statement?

22  A.  Well, I haven't had conversations with abortion clinics in

23  Alabama since I left in 2012, but I have had conversations prior

24  with Diane Derzis at New Women All Women about her concerns with

25  the activities going on outside her clinic and her fear for the

1   doctors --

2   Q.   And --

3   A.   -- and the staff and herself.

4   Q.   And Diane Derzis is not a physician; is that correct?

5   A.   That's correct.  She's a clinic owner.

6   Q.   So just to confirm -- sorry -- going back, that you have no

7   personal knowledge about whether the doctors at other clinics in

8   Alabama have ever felt compelled to stop providing abortions

9   because of fear of violence or harassment.

10   A.   I have had no conversation with any of those doctors.

11   Q.   Have you spoken with any staff members at any Alabama

12   clinics about whether they felt compelled to resign out of fear?

13   A.   I never had a discussion with a staff member about them

14   feeling compelled to resign.  I've had conversations when we did

15   the law enforcement briefing in Birmingham, Alabama, with

16   clinics that centered on how they can better protect themselves

17   from the violence and the intimidation and the harassment that

18   was going on at their clinics.

19   Q.   In your opinion, would they be -- would they want

20   information about how better to protect themselves if they

21   intended it leave their work at the abortion clinics?

22   A.   The abortion clinics as well as the police wanted

23   information on how better to protect the clinics, whether it be

24   harden themselves as targets or how the police can better

25   respond.  So those conversations were very important between the

1  police and the abortion clinics on how to best protect those

2  clinics that were in Alabama.  And that was during that law

3  enforcement briefing.

4  Q.  Absolutely.  Because you would want to protect yourself if

5  you intended to continue doing the work that you were doing,

6  correct?

7  A.  Well, only they can answer that.  You know, they wanted the

8  information on the security, and I gave it to them.  So you'd

9  have to ask them.

10 Q.  So you don't have any personal knowledge of that.

11 A.  I have information on them wanting to know about how they

12 can best secure themselves and their facilities.

13 Q.  And have you ever had a conversation with any member of

14 clinic staff that actually had resigned out of fear?

15 A.  No.  That would not be something that I would be privy to

16 when -- these are individual clinics that -- they don't report

17 to me when somebody leaves.

18 Q.  And what about with physicians, say up-and-coming physicians

19 newly out of their residencies that might be interested in

20 providing work at abortion clinics.  Have you spoken with any of

21 them to find out whether they are being prevented from applying

22 for such positions by fear?

23 A.  No.  That would not come under my area working at the

24 Feminist Majority.  I don't deal with people that graduated and

25 their residency and have conversations like that.

1    Q.   So do you have any involvement at all in the process of

2    recruiting doctors to come and work at abortion clinics?

3    A.   No.   No.   That's not my area.   I focus on the violence with

4    abortion clinics and helping them secure themselves and their

5    staff.

6    Q.   Now, Ms. Moore, I know that you've said that you've had

7    conversations with Diane Derzis who did own a clinic in Alabama

8    or -- yes, she did own it and was the clinic administrator.   Did

9    she ever tell you that she had attempted to recruit local

10   doctors with admitting privileges but had been unable to do so

11   because of the atmosphere in Alabama?

12   A.   No, not specifically.   No.

13   Q.   Do you know whether any of the clinics in Alabama have tried

14   to hire local doctors with local admitting privileges?

15   A.   I'm not involved with that part of the business.   My

16   expertise deals with the violence.

17   Q.   To your knowledge, Ms. Moore, isn't it true that doctors

18   could choose to live anywhere for any one of a number of

19   reasons?

20   A.   What kind of doctors?   Doctors live all over.

21   Q.   Exactly.   But any kind of doctor.

22   A.   No.   My experience has been in the abortion industry, such

23   as Dr. Gunn who lived in Alabama and flew to Pensacola --

24   doctors wanted to remain anonymous because of the fear and

25   intimidation, and they would fly in and fly out.   There are

1  doctors who did -- who do perform abortions who do live locally;

2  but now the tactic of the antiabortion extremist groups has been

3  to target these doctors, such as in Charlotte, North Carolina.

4  That doctor was targeted because they had identified who the

5  doctor was and said, okay, he lives right here in this

6  neighborhood; we can target him and get him -- and try and drive

7  him out of the business of performing abortions through fear and

8  intimidation and presenting his wife with this "wanted" poster.

9  So there's a campaign specifically targeting these doctors.

10  And it's also on abortion doctors dot org.  It's a Web site

11  that looks to put up abortion doctors on the Web site with their

12  face and identifying information in hopes of driving them out of

13  the business.

14  Q.  I understand.  Are you -- are you aware of whether that

15  doctor that you had mentioned in Charlotte is still providing

16  abortions at the clinic there?

17  A.  Like I said, I left in December of 2012, so I don't know.

18  Q.  At the time that you left, did you have any knowledge of

19  whether he was still performing abortions?

20  A.  I know he went to trial, and I don't know what the -- the

21  individual was convicted of the threatening poster, but it was

22  on appeal.  So I don't know what he eventually did.

23  Q.  And you had mentioned the clinic in Pensacola saying that it

24  has been a target several times of violence of different

25  assortments, of arson, of a doctor being murdered down there; is

1  that right?

2  A.   Yes.

3  Q.   And to your knowledge, is that clinic still operating?

4  A.   I don't know.

5  Q.   If I were to represent to you that it were still operating,

6  would that surprise you at all?

7  A.   No, because a lot of -- I mean Dr. Tiller's clinic was just

8  reopened by one of his directors.  I mean people realize that

9  they want to be able to carry on this -- providing abortions,

10 but they've become very concerned and they harden themselves as

11 targets as much as they can.

12 Q.   When you say --

13 A.   So --

14 Q.   Oh, I'm sorry.  I cut you off.

15 A.   No.  Harden themselves as targets.  I mean they try and put

16 in place security precautions that will protect them from

17 violence.

18 Q.   And when you say hardening, I'm sorry; I'm a little confused

19 by what you mean.  Do you mean themselves personally, as in a

20 mental hardening against that, or just plain old security

21 measures for the clinic?

22 A.   Security measures that would harden it.  You know, when you

23 go into a federal building, they have some big potted plants

24 outside made of concrete.  I mean federal buildings are targets

25 that -- for domestic terrorism, as we saw with Oklahoma City.

1    So what I'm saying is you have the utmost security in place that

2    would prevent a car bomb from pulling up.  You have

3    surveillance.  You have security guards.  I have to take my bag

4    and put it through the security equipment in every federal

5    courthouse.  So that's what I mean by hardening targets.

6         (Brief pause)

7    Q.  Now, Ms. Moore, we had talked some or your counsel had

8    talked with you a bit about these statistics provided by NAF for

9    violence in abortion clinics.  And I believe that's Plaintiff's

10   Exhibit 83.  And you have that there with you, don't you?

11   A.  Yes.  Yes, I do.

12   Q.  And I know that she had talked with you some about these

13   zero rates in certain of these categories.  For example, in the

14   murder category, zero of those occurred in 2013; is that

15   correct?

16   A.  Yes.

17   Q.  And the same for attempted murder, correct?

18   A.  Yes.

19   Q.  And the same for bombing?

20   A.  For 2013?  Yes.

21   Q.  And the same for arson in 2013.

22   A.  Yes.  2012 had five arsons, though.

23   Q.  Correct.  And your expert report was based on the data from

24   2012, was it not?

25   A.  No.  It was based on data that I reviewed over all of these

1  reports over the years and over my experience over the years.

2  Q.  Right.  All I meant to say was --

3  A.  Including these reports.  Yeah.  Including these reports.

4  Q.  Right.  All I meant to say was that the data for 2013 was

5  not yet available, is that right, at the time that you composed

6  your report?

7  A.  Yeah.  Exactly.

8  Q.  Now, I believe you said earlier that a climate of fear can

9  still exist even if the rates of violence are decreasing; is

10 that right?

11 A.  Yes.

12 Q.  And you said that an increase or a decrease in the rate of

13 violence wouldn't alter your opinions as expressed in your

14 expert report.  Is that also correct?

15 A.  Yes.

16 Q.  So in your opinion, would it be fair to say that the only

17 way to get rid of that environment of fear is to get to a zero

18 rate of violence across the board?

19 A.  We haven't had any terrorist attacks by Al Qaeda in this

20 country since 9/11, but I don't think it eliminates the fear

21 that people still face when you go onto an airplane and go

22 through security.  So if this was completely eradicated and

23 there was absolutely no violence at any abortion clinics

24 anywhere nationwide, that would be quite an accomplishment.  And

25 then I would have to look at it and maybe form another opinion.

1    But it would clearly have to be zero violence for me to change

2    my opinion because of the ongoing campaign of over three

3    decades.

4    Q.  And I think you've -- you've indicated this somewhat, but

5    just to confirm, you don't believe that getting down to a zero

6    rate of violence is likely to happen anytime in the near future;

7    is that correct?

8    A.  Not from the reports that I have seen.  No.  And not -- and

9    not from any of the conversations I've had in the past with

10   police and federal agents.

11           MS. HOWELL:  Your Honor, if I might have a moment to

12   confer.

13           THE COURT:  Okay.

14      (Brief pause)

15           MS. HOWELL:  Thank you very much, Ms. Moore.  That's

16   all I need.  No further questions.

17           THE WITNESS:  Okay.

18           MS. KAYE:  We have nothing further, Your Honor.  Thank

19   you.

20           THE COURT:  Thank you.

21           Thank you very much.  Is that it for the morning?

22           MS. KOLBI-MOLINAS:  Your Honor, that's it for

23   plaintiffs.  And I know Dr. Williamson has been waiting.  I just

24   wanted to mention to the Court that there are still 17 of

25   plaintiff's exhibits that have objections that are still

1   pending.  So I don't know when the Court wants to take that up.

2           THE COURT:  Have you-all had a chance to go over those

3   17 exhibits to see whether any of them are still serious?

4           MS. KOLBI-MOLINAS:  Not -- not since before the trial,

5   Your Honor.

6           THE COURT:  Why don't you go over them.  I noticed that

7   when I went over them with you, quite often once the grounds for

8   their admissibility were stated, quite often the objection went

9   away or they were admitted for limited purposes and so forth.

10          What time is the witness this afternoon?

11          MR. DAVIS:  Your Honor, Dr. Williamson is here.  He's

12  been here.  We're ready to go.  He's a live witness and --

13          THE COURT:  Okay.  And this is the only other witness

14  we have today?

15          MR. DAVIS:  Yes.

16          THE COURT:  Okay.  Is there any reason why we shouldn't

17  start with him?  We should accommodate him.

18          MR. DAVIS:  We're ready to go.

19          THE COURT:  Well, let's go right now.

20          MR. DAVIS:  I expect a 20-minute direct.

21          THE COURT:  Okay, then.  Let's go right now.  And we'll

22  take up the exhibits later.  How long will he take, Mr. Davis?

23          MR. DAVIS:  I expect a 20- to 30-minute direct, Your

24  Honor.

25          THE CLERK:  Sir, I need to swear you in.

1    **DONALD WILLIAMSON, M.D.**, the witness, having been duly

2  sworn to speak the truth, the whole truth, and nothing but the

3  truth, testified as follows:

4                        DIRECT EXAMINATION

5  BY MR. DAVIS:

6  Q.   Would you state your name, please.

7  A.   Donald Williamson.

8  Q.   What do you do for a living, Dr. Williamson?

9  A.   I am the state health officer and director of the Department

10  of Public Health and also the chair of the governor's transition

11  team on Medicaid.

12  Q.   What is your educational background?

13  A.   I spent one year at East Mississippi Junior College, two

14  years at Mississippi State University, four years at the

15  University of Mississippi School of Medicine, got an M.D. there,

16  and then went to the University of Virginia and did internal

17  medicine and did board certification there.

18  Q.   What does the state health officer do?  What's your mission?

19  A.   Well, the mission of the department is simply to assure

20  conditions in which the citizens of Alabama can be healthy.  The

21  state health officer is the executive director of that

22  department.

23  Q.   Are you familiar with House Bill 57 that's the subject of

24  this lawsuit, Dr. Williamson?

25  A.   Yes, sir.

1  Q.  Are you familiar with the requirement in that bill that

2  doctors who perform abortions have admitting privileges in a

3  local hospital?

4  A.  Yes.

5  Q.  What is the department's current regulation as it affects

6  admitting privileges, Dr. Williamson?

7  A.  Our current requirement is that a physician at an abortion

8  clinic have admitting privileges.  However, if that is not

9  possible, then the abortion clinic must have a contract with an

10 outside physician in the same MSA as the abortion clinic.  And

11 that outside covering physician has to have -- has to be on

12 staff with the ability to do things such as hysterectomies,

13 D&Cs, laparotomies, those sorts of things that might arise as a

14 result of complications from an abortion.

15 Q.  In the course of this litigation, have you expressed any

16 opinions on the adequacy of the department's current regulation?

17 A.  When you mean -- in my deposition?

18 Q.  Yes.

19 A.  Okay.  In my deposition and certainly as we formulated

20 rules, the department believed that our current regulations

21 adequately protected the women of Alabama who were receiving

22 abortions.

23 Q.  Okay.  Let's look at some of those regulations, please.

24 Let's look -- go to page 12 of the PDF.  And we're going to look

25 at regulation -- we're going to look at Section 420-5-1-.03.

1  A.   Okay, sir.

2  Q.   The first section -- the first section titled Patient Care.

3  Do you see the second sentence or so where this regulation says,

4  As with any surgical procedure, the physician performing the

5  procedure is responsible for the procedure and for ensuring that

6  adequate follow-up care is provided?

7  A.   Yes.

8  Q.   Do the rules assume that a provider is not going to simply

9  abandon patients, Dr. Williamson?

10  A.   That was the -- the construct we used in -- in developing

11  these rules.   The assumption was that a physician, either

12  themselves through an outside contract physician or through the

13  transfer of information, would assure that the patient had the

14  best available care.

15  Q.   And that next sentence addresses some of that, I believe.

16  The next sentence says, In order to facilitate continuity of

17  patient care, the facility physician shall contact and

18  communicate with any physician rendering care for complications

19  arising from the abortion as soon as he or she is informed of

20  the existence of such complications.

21  A.   Yes, sir.

22  Q.   What -- you're assuming -- or rather, these rules

23  contemplate that such communication would be good for patient

24  care, correct?

25  A.   Yes, sir.   Our assumption is that in some circumstances --

1   not in all, but in some circumstances -- time makes a

2   difference.  And our hope with these rules was that if a patient

3   presented to an emergency room, that the emergency room

4   physician would be able to get additional information about what

5   had been performed on the patient from either the physician or

6   from the abortion provider.  So it -- it contemplates the effort

7   to provide continuity of care even if the -- the provider

8   himself or herself does not have admitting privileges.

9   Q.  On that outside covering physician, let's look at page 19 of

10  the PDF, please, at another provision that addresses the

11  contract with the outside covering physician and what the

12  requirements are.  In the top of the page, the first

13  paragraph -- the first partial paragraph that says "the contract

14  with the outside covering physician shall include these

15  items" -- and let's look at section one first.  What does this

16  provision require, Dr. Williamson, in the contract between an

17  abortion clinic and the outside covering physician?

18  A.  It requires -- well, it requires I think two things.  It

19  requires, number one, the presence of the outside covering

20  physician.  And second -- well, as evidenced by "shall be

21  available to treat and manage."  And then the second thing that

22  it requires is the skill set to respond to complications that

23  arise.

24  Q.  Okay.  And then let's go to paragraph two.  And what does

25  this require in that relationship between the clinic and the

1  outside covering physician under the current regulation?

2  A.  That -- that there be an established protocol for the

3  transfer of information between the facility, the facility

4  physician, and the outside covering physician so that at least

5  one of the physicians shall be available to communicate and

6  consult with the outside covering physician at all times.

7  Q.  Now, paragraph four, please.  This addresses, does it not,

8  the skills that are required of the outside covering physician?

9  A.  Yes, sir.  These were the ability to perform a dilation and

10  curettage, a laparotomy, a hysterectomy, and other procedures

11  necessary to treat abortion-related complications.  This is not

12  intended to be an inclusive list of complications, but it was

13  representative of what we would expect to be potential

14  complications that might arise.

15  Q.  This is -- the rules contemplate that these are the skills

16  that a doctor would need to treat expected complications

17  resulting from abortion.

18  A.  Yes, sir.

19  Q.  Did you have an opportunity, Dr. Williamson, to hear

20  Dr. Roe's testimony at trial?

21  A.  I heard a portion of Dr. Roe's testimony and reviewed her

22  testimony, her written -- the written portion of her testimony.

23  Q.  Did her testimony raise any concerns?

24        MR. MARSHALL:  Your Honor, plaintiffs object to this

25  line of questioning on the following grounds.  Dr. Williamson is

1   the director of the department.  The department is charged with

2   investigating, gathering factual information, and determining

3   whether or not the regulations are in -- that a provider is in

4   compliance with the regulations or not.  There is an

5   administrative process that must take place that affords a due

6   process mechanism so that Dr. Roe and Planned Parenthood could

7   have the opportunity to have a full opportunity to -- to present

8   a side of the story.

9          Using this federal court trial to circumvent that

10  process by asking the very individual for -- whom is ultimately

11  responsible for determinations made by the department to opine

12  on whether or not testimony raises concerns or violates the

13  regulations we think is -- is a terrible due process problem and

14  ask that it not be allowed.

15         MR. DAVIS:  We're not seeking to circumvent anything,

16  Your Honor.  They have sued Dr. Williamson challenging this law.

17  They have made a lot of Dr. Williamson's statements that in his

18  opinion, the current regulations are effective.  Those -- that

19  opinion was based at least in part on views of how those

20  regulations were being enforced and how they were being

21  followed.

22         The testimony at trial shows that they're not being

23  followed.  And our argument will be that they're not working and

24  not effective, and that's one reason why we need the statute

25  that the Legislature passed.  So his views and impressions from

1  Dr. Roe's testimony I think has direct bearing on the

2  effectiveness of the current regulation and why we need a new

3  statute.

4        MR. MARSHALL:  We think also, Your Honor, that this

5  approach circumvents the very regulations of the department

6  itself.  And that is that while a statement of deficiencies and

7  a corrective action ultimately are public record, information

8  leading up to the determination of a statement of deficiencies

9  and a corrective action is confidential and is not discussed by

10  the department.  And the matter of which counsel is inquiring

11  has not run through that process.

12        And so to the extent that there is anything going on

13  within the Department of Public Health regarding this line of

14  questioning, it is a matter under investigation.  And to talk

15  about it here without having that process run its course is,

16  again, we believe, highly improper.

17        THE COURT:  Anything else, counsel?

18        MR. DAVIS:  I don't see how we can call a time-out in

19  this trial and let the process run its course.  We've got to

20  deal with this issue.

21        THE COURT:  Well, he's testifying to matters that have

22  been presented in open court by plaintiffs, correct?  There's

23  nothing confidential about what Dr. Roe said here in open court.

24        MR. MARSHALL:  These -- these were matters that -- at

25  least this one matter -- that was brought out I believe in

1  cross-examination of Dr. Roe.

2          THE COURT:  Well, but I mean it's -- but it's things

3  that have been brought out without objection about Dr. Roe's

4  testimony.  I mean there's nothing confidential here.

5          MR. MARSHALL:  I --

6          THE COURT:  I assume his testimony is going to be based

7  on what was said here in open court and nothing else.

8          MR. MARSHALL:  Although I agree that that was brought

9  out in open court, now, the application of asking

10  Dr. Williamson, as the head of the Department of Public Health,

11  to make a determination, if you will, that that set of

12  circumstances are in violation of a state regulation, that's the

13  circumvention of the due process that we're concerned with.

14          THE COURT:  I'm not sure the question is whether what

15  she said was in violation.  I think the question is does it

16  raise some concerns that the regulation may not cover, is my

17  understanding.  Is that right?

18          MR. DAVIS:  The question is whether that testimony

19  raises concerns.  Correct, your Honor.

20          THE COURT:  Right.  I'll allow it.  Overruled.

21  Q.  (Mr. Davis, continuing:)  Let me start over just briefly,

22  Dr. Williamson.  You've heard Dr. Roe's testimony, read other

23  portions of it, the testimony that was provided here in open

24  court.  Did that testimony raise any concerns for you?

25  A.  The statements suggest that the way that the rules were

1  intended to be implemented were perhaps not being implemented in

2  that way in the Planned Parenthood clinic in Birmingham.

3  Q.  How so?

4  A.  The concern really was around two components.  One was the

5  lack of communication with a patient who showed up in the

6  emergency department between the clinic, whether it was the

7  doctor specifically or the nurse, and the ER physician.  The

8  other -- and let me be clear.  I'm not suggesting that every

9  complication, even in the same MSA, should go to the outside --

10  to an outside covering physician.  Patient severity of illness,

11  need for emergency care, takes priority.  However, it was

12  unclear to me that the outside covering physician was used when

13  that would have been a reasonable approach to take from a

14  patient care perspective.  But again, that's only impressions

15  formed from the testimony.

16  Q.  Was there anything else about the testimony that concerned

17  you, or had you completed your response?

18  A.  I had completed my response.

19  Q.  The levels of communication between the clinic and the

20  emergency room?  Was that -- any other --

21  A.  That was my first point, was the fact that patients were

22  simply referred to the emergency room without some information

23  going to the emergency room to say -- or even -- and this was

24  less clear, but it wasn't clear to me that there were responses

25  back from a call from the emergency room saying patient X has

1  appeared and she has a problem and she says she was in your

2  clinic yesterday, what did you do, so as to help inform her

3  treatment in the hospital.

4  Q.  Now, not dealing with any particular clinic or any

5  particular circumstance, Dr. Williamson, but just in general, if

6  an abortion clinic is not following a regulation, what options

7  are available to the department to enforce the regulations?

8  A.  Well, first, I think there is a -- a decision that the

9  department must make about whether or not the care that is

10  provided is so egregious as to put a patient's life and health

11  at risk and that it's unlikely that any remediation they might

12  do would remove that concern.  If that's the case, then the most

13  potent action that the department has is to seek a revocation of

14  a license either through a standard administrative process or

15  occasionally through an emergency revocation.  But that's pretty

16  uncommon.

17      The other two tools that the department has in its

18  armamentaria and far and away the most common with any sort of

19  health care facility, whether it's an abortion provider or

20  whether it's a nursing home, is we offer facilities the

21  opportunity to submit a plan of correction to respond to those

22  findings from the survey.  If they successfully submit a plan of

23  correction, then we will accept that plan of correction and the

24  department will, at some point, make an unannounced visit to

25  determine the facility is in compliance.

1        An intermediate sanction that the department has is to

2   downgrade a license to a probationary certification or to --

3   excuse me -- to a probationary license.  That's more likely to

4   happen if a facility has had repeated problems that are -- that

5   are severe, that each individually may not rise to the level of

6   licensure revocation, but we need to impress upon the facility

7   the importance of following the rules.  A license --

8   probationary license or licensure downgrade is good for only one

9   year, and we do not renew licensure revocations.  So

10  licensure -- excuse me.  Licensure downgrade.  A probationary

11  license is a trip wire, if you will.  Once you've got it, you've

12  got it. It's your opportunity to correct and improve.  But if

13  you fail to correct and improve, the only action the department

14  will have thereafter is licensure revocation.

15  Q.  Licensure revocation is the most extreme penalty --

16  A.  Yes, sir.

17  Q.  -- available.  Before that, sometimes the department gives

18  clinics an opportunity to present a plan of corrections.

19  A.  Yes, sir.

20  Q.  And there can be probationary licenses.

21  A.  Yes, sir.

22  Q.  Are you aware of what penalties are provided by HB 57?

23  A.  There are a number.  There are both Class C felony

24  penalties, I think there's a Class A misdemeanor penalty, and

25  then there are penalties against provider licenses up to and

1  including revocation of provider licenses.

2  Q.  Specifically for the admitting privileges requirement, are

3  you aware that there are criminal penalties associated with that

4  provision?

5  A.  There are.

6  Q.  Would you agree, Dr. Williamson, that the penalties provided

7  by HB 57 are a more severe punishment and possibly a more

8  effective punishment for noncompliance than what is currently

9  available to the department?

10  A.  They're certainly a more severe penalty than that which is

11  available to the department.  And to the extent that facing a

12  felony charge causes a provider to pay more attention to the

13  rules, they could possibly be a more effective penalty.

14  Q.  You believe in the importance of continuity of care.

15  A.  I do.

16  Q.  And you've made clear that you believe that some form of

17  privileges requirement is appropriate for abortion clinics.

18  A.  Yes, sir.

19  Q.  If this is governed by a regulation or if it remains

20  governed by a regulation and if you were to retire and if your

21  successor didn't place the same value on continuity of care,

22  that regulation can be changed, can it not?

23  A.  Anything that the department does by regulation can be

24  undone by regulation.

25  Q.  Now, the Legislature -- if the law goes into effect, the

1  Legislature has elevated the role from a regulation to a

2  statute.  Do you agree that would make it harder to change the

3  rule?

4  A.  It certainly has been my experience that getting legislation

5  passed is more difficult.

6  Q.  You said in your deposition, Dr. Williamson, that the

7  privilege requirement was, quote, a policy decision that the

8  Legislature was best suited to make.  Do you still agree with

9  that?

10 A.  Yes, sir.

11 Q.  No question in your mind the Legislature is the one that

12 sets the law of the state?

13 A.  Yes, sir.  No question.

14      MR. DAVIS:  Thank you.

15      THE COURT:  How long will you take?

16      MR. MARSHALL:  At least an hour, Your Honor.

17      THE COURT:  Okay.  Then we'll recess for lunch until

18 1:15.  Is this the last witness for today?

19      MR. MARSHALL:  Yes, it is.

20      MR. DAVIS:  It is.

21      THE COURT:  Okay, then.  We'll discuss after this

22 witness how to deal with the exhibits.  But why don't you-all

23 start looking at the list now individually and see if you can

24 come up with a way of resolving the objections to the exhibits.

25      MR. DAVIS:  Thank you, Judge.

 1       (Recess at 12:03 p.m. until 1:17 p.m.)

 2           THE CLERK:  Please remain seated.  Court is in session.

 3           THE COURT:  Proceed.

 4           MR. MARSHALL:  Thank you, Your Honor.  I greatly

 5   overestimated the amount of time that I'm going to need.

 6           THE COURT:  Oh.  I think that's the first time I've

 7   ever heard that from a lawyer.

 8                           CROSS-EXAMINATION

 9   BY MR. MARSHALL:

10   Q.  Good afternoon, Dr. Williamson.

11   A.  Good afternoon, sir.

12   Q.  My name is Randall Marshall.  I am with the ACLU of Alabama.

13   And we represent the Montgomery-based plaintiffs in this

14   litigation.  I believe we had the opportunity to meet at your

15   deposition.

16       Dr. Williamson, one of the ways that the department protects

17   the public health is by inspecting health care facilities under

18   its jurisdiction, correct?

19   A.  Yes, sir.

20   Q.  And the department regularly inspects abortion clinics and

21   documents any deficiencies identified in the course of the

22   inspection, doesn't it?

23   A.  Yes, sir.

24   Q.  And earlier today you testified that absent I believe you

25   said egregious health circumstances, the department would give a

1    clinic the opportunity to take corrective action, correct?

2    A.  Yes, sir.

3    Q.  And that's the hope of the department, is that the

4    regulations will be followed, correct?

5    A.  It is.

6    Q.  Now, most recently, the department inspected the Birmingham

7    health center Planned Parenthood Southeast, correct?

8    A.  Yes, sir.

9    Q.  And that was about five months ago?

10   A.  I'd defer to you, sir.  I'll accept that, but I don't --

11   Q.  Okay.  That's fine.  At that inspection, part of the

12   department's role was to review the policies in place to -- to

13   comply with the department's regulations, correct?

14   A.  The department, when it conducts a survey, will look at some

15   components of the policies.  They will -- they will look at

16   complaints.  They will select a sample of patients.

17   Q.  And they're not limited in their ability to do that,

18   correct?

19   A.  No, sir.

20   Q.  And the department inspectors are also authorized to ask any

21   questions that they deem relevant, correct?

22   A.  They are authorized -- yes, sir.

23   Q.  And to your knowledge, the department has never told Planned

24   Parenthood Southeast that its policies on handling complications

25   from an abortion are inadequate; isn't that correct?

1  A.  I am -- I am unaware that we have ever cited them for -- for

2  failing to follow the policies on -- on use of outside contract

3  physicians or referral of information to ER physicians.

4  Q.  And -- and more broadly, anything regarding handling

5  complications, correct?

6  A.  I'm hesitating only because I remember previous problems

7  related to follow-up of complications, and I just don't -- in

8  the Birmingham area, and I don't remember which center it was.

9  Q.  Could have been a center other than Planned Parenthood,

10  correct?

11  A.  It could have been.  Yes, sir.

12  Q.  And as part of the survey or inspection process, I believe

13  you said that the -- that the department reviews patient files,

14  correct?

15  A.  We -- they select a sample of patients.

16  Q.  And that sample would likely include any patient for whom

17  there had been a complication?

18  A.  That, I can't -- I don't select the sample methodology.

19  Q.  Okay.  But there's no limitation on the departmental

20  inspectors on which files they're asking to see, correct?

21  A.  No.  They -- they make the determination of which files to

22  look at.

23  Q.  And they have full rein in seeking information about how

24  complications are handled; is that correct?

25  A.  If they felt the need to follow up on that issue, they have

1  the ability to do that.

2  Q.  And again, as far as you know, the department has never

3  notified Planned Parenthood Southeast that its practices around

4  the handling of complications are inadequate, correct?

5  A.  I am unaware that we have.

6  Q.  And Doctor, you testified that the department has a broad

7  array of powers to deal with problems.  In other words, it can

8  suspend a license, can revoke a license, or reduce a license

9  from regular to probationary, correct?

10 A.  Yes, sir.

11 Q.  And Doctor, there has never been an instance in which the

12 department believed that an abortion clinic should be closed but

13 the department lacked the regulatory basis to close the clinic,

14 right?

15 A.  There's never been -- there has never been a situation where

16 we lacked the authority to take action against one of our

17 licensed facilities, including closing it, if that were deemed

18 necessary.

19 Q.  And the department has the current ability to enforce the

20 current regulations, correct?

21 A.  Yes, sir.

22 Q.  And Dr. Williamson, you would need more information other

23 than what you've heard so far before you could determine whether

24 the current regulations are not sufficient; isn't that correct?

25 A.  I -- can you expand on your question specifically about

1  which regulations?

2  Q.  Well, let's -- let's take the -- the one concern you

3  mentioned was follow-up with emergency rooms and the flow of

4  information between a clinic and the emergency rooms, correct?

5  A.  Yes, sir.  All that I -- all that -- all that that rises to

6  is information that I acquired in this proceeding.  I have no --

7  no factual basis at all at this point on which to -- to make a

8  judgment beyond I've just heard the information.

9  Q.  In other words, you would need much more information than

10 you currently have before you could come to a conclusion that

11 the current regulations are not sufficient; isn't that correct?

12 A.  Yes, sir.

13 Q.  Okay.  And that certainly is true with regard to admitting

14 privileges, right?

15 A.  The department -- the department has maintained that we

16 believe someone in the abortion reproductive health center

17 should have admitting privileges or that the facility should

18 have a contract with an outside covering physician who has

19 admitting privileges.  That's -- and we felt that that is

20 sufficient based on everything that I know at this point.

21 I'm -- I don't know -- in what context are you asking I need

22 additional information on admitting privileges?

23 Q.  Well, I believe you just said what the current policy is,

24 correct?

25 A.  Yes.

1  Q.  And -- and that it meets the department's belief in terms of

2  safe medical practices for there to be a contract with a backup

3  physician who has admitting privileges; is that right?

4  A.  Yes, sir.

5  Q.  Okay.  And you're not saying that that current policy is

6  inadequate in any respect, are you?

7  A.  No, sir.  I'm not saying the policy is inadequate, assuming

8  that the policies are being followed.

9  Q.  And again, the department has the authority under its

10  existing regulations to deal with any issue that comes up

11  regarding the following of policies, correct?

12  A.  Yes, sir.

13       MR. MARSHALL:  May I have a moment, Your Honor?

14       THE COURT:  Yes.

15  (Brief pause)

16       MR. MARSHALL:  That's all I have, Your Honor.

17       THE COURT:  Thank you.  Any further direct?

18       MR. DAVIS:  No further direct, Your Honor.

19       THE COURT:  Okay, then.  You may step down.

20       THE WITNESS:  Thank you, sir.

21       THE COURT:  Any more witnesses today?

22       MR. DAVIS:  Not from the defendants, Your Honor.

23       MS. KOLBI-MOLINAS:  Or from the plaintiffs.

24       THE COURT:  Okay.  So where are we when I come back on

25  next Thursday?

```
 1              MR. DAVIS:  Next Thursday, Your Honor, we're calling

 2    Dr. Keyes, who will be testifying by video.  I've spoken with

 3    courthouse staff here who has spoken with courthouse staff in

 4    Los Angeles.  They'll be ready to go at ten a.m. our time on the

 5    5th.

 6              THE COURT:  Okay.  Very good.  And how many witnesses

 7    do we have for Thursday?

 8              MR. DAVIS:  We have two for that day, one at ten a.m.

 9    and one at one p.m. or as we get to him.

10              THE COURT:  Okay.  How long will the ten o'clock

11    witness take?

12              MR. DAVIS:  We think there's an excellent chance that

13    that witness could be finished probably before the lunch break.

14              Would you agree?

15              MS. KOLBI-MOLINAS:  (Nods head)

16              THE COURT:  Very good, then.

17              MR. DAVIS:  If it were to go over, we think it would be

18    very unlikely it would be for long.

19              THE COURT:  What about the exhibits, now?

20              MR. DAVIS:  May I?

21              MS. KOLBI-MOLINAS:  Yes.

22              MR. DAVIS:  Your Honor, we spoke briefly, and there

23    was -- there was more to do over the lunch break than I

24    expected.  We haven't had the chance as we had hoped to discuss

25    it in earnest.  We were wondering if we might have the next few
```

1  days during this break to talk more intensively among ourselves

2  and try to narrow down the issues for Your Honor.

3         THE COURT:  Very good.  And perhaps even agree to which

4  exhibits can come in under limited circumstances.

5         MR. DAVIS:  To agree to as many of the exhibits as

6  possible.  And then hopefully when we come back, we'll have

7  few --

8         THE COURT:  Well, since we're going to start at ten

9  o'clock on Thursday, why don't we meet at nine o'clock to go

10  over the exhibits.

11         MR. DAVIS:  By that time, we can narrow it down.

12         THE COURT:  Very good.  Is there anything else we need

13  to take up in the interim?

14         Yes, Mr. Brasher.

15         MR. BRASHER:  Your Honor, this is Andrew Brasher.  We

16  had talked earlier about having argument on the expert issues.

17  I don't know whether you want to have argument on those.

18         THE COURT:  When are the briefs due?  Remind me now.

19         MS. KOLBI-MOLINAS:  Oh, I think Mr. Brasher is

20  referring to the ones that have already been briefed.

21         MR. BRASHER:  Right.  So the defendants have filed

22  their briefs with respect to the experts we object to --

23         THE COURT:  Right.

24         MR. BRASHER:  -- and plaintiffs had an opportunity to

25  respond to those.  And both of those witnesses have already

1   testified.

2           THE COURT:  Right.

3           MR. BRASHER:  Now, plaintiffs haven't filed a brief

4   with respect to --

5           THE COURT:  Why don't we -- is there any objection to

6   taking those up during closing arguments?

7           MS. KOLBI-MOLINAS:  No, sir, Your Honor.

8           THE COURT:  In fact, we can take up all of the expert

9   witnesses during closing arguments.

10          MS. KOLBI-MOLINAS:  Except our *Daubert* is being filed

11  after.

12          THE COURT:  Oh, it is?

13          MS. KOLBI-MOLINAS:  We can file it earlier if you want.

14          THE COURT:  When is your brief being filed?

15          MS. KOLBI-MOLINAS:  It was going to be filed the Monday

16  after --

17          THE COURT:  Oh, the Monday after the closing arguments.

18  And the defendant's brief is due the week after that, if I

19  remember correctly.  Right.

20          I don't want to do it separately because, you know,

21  *Daubert* itself is a long case.  I'll have to look at it again

22  and learn the law on it, so I don't want to do that twice.  I

23  think it might be efficient to go ahead and have the closing

24  arguments on all the *Daubert* issues on that Friday.  So when can

25  you have your brief in on *Daubert*?

1          MS. KOLBI-MOLINAS:  We can have it in by Monday.

2          THE COURT:  Monday?  And why don't you-all have

3    something to me by no later than eight o'clock on Thursday.

4    Eight o'clock in the morning on Thursday.

5          MR. DAVIS:  That works, Your Honor.

6          THE COURT:  Okay.  Thank you.

7          Court is in recess, then, until nine o'clock on

8    Thursday.  And we'll take up the objections to exhibits, the

9    witness at ten.

10      (Evening recess at 1:30 p.m.)

11                      * * * * * * * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3 from the record of proceedings in the above-entitled matter.

4          This 4th day of June, 2014.

5

6                              /s/ Risa L. Entrekin
                               Registered Diplomate Reporter
7                              Certified Realtime Reporter
                               Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25