No. 13-51008

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

PLANNED PARENTHOOD OF GREATER TEXAS SURGICAL HEALTH
SERVICES; PLANNED PARENTHOOD CENTER FOR CHOICE; PLANNED
PARENTHOOD SEXUAL HEALTHCARE SERVICES; WHOLE WOMAN'S
HEALTH; AUSTIN WOMEN'S HEALTH CENTER; KILLEEN WOMEN'S
HEALTH CENTER; SOUTHWESTERN WOMEN'S SURGERY CENTER;
WEST SIDE CLINIC, INCORPORATED; ROUTH STREET WOMEN'S
CLINIC; HOUSTON WOMEN'S CLINIC, each on behalf of itself, its patients
and physicians; ALAN BRAID, M.D.; LAMAR ROBINSON, M.D.; PAMELA
J. RICHTER, D.o., each on behalf of themselves and their patients; PLANNED
PARENTHOOD WOMEN'S HEALTH CENTER,

Plaintiffs-Appellees,

v.

ATTORNEY GENERAL GREGORY ABBOTT; DAVID LAKEY, M.D.;
MARI ROBINSON, Executive Director of the Texas Medical Board,

Defendants-Appellants.

On Appeal from the United States District Court for the
Western District of Texas, Austin Division
Case No. 1:13-cv-00862-LY

**BRIEF OF PLAINTIFFS-APPELLEES**

R. Jim George
Elizabeth von Kreisler
George Brothers Kincaid & Horton
LLP
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701

December 13, 2013

Janet Crepps
Esha Bhandari
Jennifer Sokoler
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005

*Attorneys for Plaintiffs-Appellees*
*(complete list of counsel follows)*

R. James George, Jr.
Elizabeth von Kreisler
George Brothers Kincaid & Horton LLP
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701
(512) 495-1400
(512) 499-0094
jgeorge@gbkh.com
evonkreisler@gbkh.com

*Attorneys for all Plaintiffs-Appellees*

Brigitte Amiri
Renée Paradis
American Civil Liberties Union Foundation
Reproductive Freedom Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7897
bamiri@aclu.org
rparadis@aclu.org

Rebecca L. Robertson
American Civil Liberties Union of Texas
1500 McGowen Street, Suite 250
Houston, TX 77004
(713) 942-8146
rrobertson@aclutx.org

*Attorneys for Plaintiffs-Appellees Routh Street Women's Clinic, Houston Women's Clinic, and Southwestern Women's Surgery Center*

Janet Crepps
Esha Bhandari
Jennifer Sokoler
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(864) 962-8519 (Crepps)
(917) 637-3600 (Bhandari & Sokoler)
jcrepps@reprorights.org
ebhandari@reprorights.org
jsokoler@reprorights.org

*Attorneys for Plaintiffs-Appellees Whole Woman's Health, Austin Women's Health Center, Killeen Women's Health Center, Southwestern Women's Surgery Center, West Side Clinic, Inc., Alan Braid, M.D., Lamar Robinson, M.D., and Pamela J. Richter, D.O.*

Helene T. Krasnoff
Alice Clapman
Planned Parenthood Federation of America
1110 Vermont Ave., N.W., Suite 300
Washington, D.C. 20005
(202) 973-4800
helene.krasnoff@ppfa.org
alice.clapman@ppfa.org

*Attorneys for Planned Parenthood Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

*Planned Parenthood, et al. v. Abbott, et al.*, No. 13-51008

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs-Appellees | Plaintiffs-Appellees' Counsel |
| --- | --- |
| • Planned Parenthood of Greater Texas Surgical Health Services<br>• Planned Parenthood Center for Choice<br>• Planned Parenthood Sexual Healthcare Services<br>• Planned Parenthood Women's Health Center | Helene T. Krasnoff<br>Alice Clapman<br>Planned Parenthood Federation of America |
| • Whole Woman's Health<br>• Austin Women's Health Center<br>• Killeen Women's Health Center<br>• Southwestern Women's Surgery Center<br>• West Side Clinic, Inc.<br>• Alan Braid, M.D.<br>• Lamar Robinson, M.D.<br>• Pamela J. Richter, D.O. | Janet Crepps<br>Esha Bhandari<br>Jennifer Sokoler<br>Center for Reproductive Rights |

| | |
|---|---|
| • Routh Street Women's Clinic<br>• Houston Women's Clinic<br>• Southwestern Women's Surgery Center | Brigitte Amiri<br>Renée Paradis<br>American Civil Liberties Union Foundation, Reproductive Freedom Project<br><br>Rebecca L. Robertson<br>American Civil Liberties Union of Texas |
| • All Plaintiffs | R. James George, Jr.<br>Elizabeth von Kreisler<br>Rico Reyes<br>George Brothers Kincaid & Horton, LLP |

| Defendants-Appellants | Defendants-Appellants' Counsel |
|---|---|
| • Greg Abbott<br>• David Lakey, M.D.<br>• Mari Robinson | Jonathan F. Mitchell<br>John B. Scott<br>Adam W. Aston<br>Andrew S. Oldham<br>Arthur C. D'Andrea<br>Beth Klusmann<br>Philip A. Lionberger<br>Michael P. Murphy<br>Gunnar P. Seaquist<br>Office of the Attorney General |

| Defendants in the District Court dismissed from this action upon the stipulation of the parties | Dismissed Defendants' Counsel |
|---|---|
| • David Escamilla | Elaine A. Casas |
| • Craig Watkins<br>• Devon Anderson<br>• Matthew Powell<br>• James E. Nichols<br>• Joe Shannon, Jr.<br>• Rene Guerra | Dismissed prior to appearance of counsel |

| | |
|---|---|
| • Susan D. Reed<br>• Abelino Reyna<br>• Jaime Esparza | |

| Amici Curiae | Amici Curiae's Counsel |
|---|---|
| • American Association of Pro-Life Obstetricians & Gynecologists<br>• Christian Medical Association<br>• Catholic Medical Association<br>• Physicians for Life<br>• National Association of Pro-Life Nurses<br>• National Catholic Bioethics Center<br>• National Association of Catholic Nurses | Mailee Rebecca Smith<br>Americans United for Life |
| • Texas Alliance for Life Trust Fund<br>• Texas Center for Defense of Life | Stephen Daniel Casey<br>Casey Law Office, P.C. |
| • David Dewhurst<br>• Association of American Physicians & Surgeons<br>• Texas Eagle Forum<br>• Texas Right to Life<br>• Eagle Forum Education & Legal Defense Fund<br>• Texas State Representatives:<br>   o Charles Anderson<br>   o Cecil Bell, Jr.<br>   o Dwayne Bohac<br>   o Dennis Bonnen<br>   o Greg Bonnen, M.D.<br>   o Cindy Burkett<br>   o Bill Callegari<br>   o Giovanni Capriglione<br>   o Tony Dale<br>   o John E. Davis<br>   o Gary Elkins<br>   o Pat Fallon<br>   o Allen Fletcher | Lawrence John Joseph |

- o Dan Flynn
- o James Frank
- o Craig Goldman
- o Linda Harper-Brown
- o Bryan Hughes
- o Jason Isaac
- o Philip King
- o Stephanie Klick
- o Matt Krause
- o Jodie Laubenberg
- o George Lavender
- o Jeff Leach
- o Rick Miller
- o Jim Murphy
- o John Otto
- o Chris Paddie
- o Tan Parker
- o Charles Perry
- o Larry Philips
- o Jim Pitts
- o Scott Sanford
- o Matt Schaefer
- o Ron Simmons
- o David Simpson
- o John T. Smithee
- o Drew Springer
- o Jonathan Stickland
- o Van Taylor
- o Ed Thompson
- o Steve Toth
- o Scott Turner
- o James White
- o Paul Workman
- o Bill Zedler
- Texas State Senators
  - o Brian Birdwell
  - o Donna Campbell
  - o John Carona
  - o Bob Deuell
  - o Craig Estes

iv

| | |
|---|---|
|     o  Tony Fraser<br>    o  Kelly Hancock<br>    o  Glenn Hegar, Jr.<br>    o  Eddie Lucio<br>    o  Jane Nelson<br>    o  Robert Nichols<br>    o  Dan Patrick<br>    o  Ken Paxton<br>    o  Larry Taylor | |
| • Texas State Representative Daniel Hugh Branch | Daniel Hugh Branch<br>Winstead, P.C. |
| • Alliance Defending Freedom<br>• Bioethics Defense Fund<br>• Family Research Council | Catherine Glenn Foster<br>Alliance Defending Freedom |

*/s/ Janet Crepps*
Janet Crepps
Attorney for Plaintiffs-Appellees

## STATEMENT REGARDING ORAL ARGUMENT

The Court has set this case for oral argument on January 6, 2014. Plaintiffs-Appellees agree that this case raises important constitutional issues that merit oral argument so that the parties may address any questions the Court may have.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ..................................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................vi

TABLE OF CONTENTS.............................................................. vii

TABLE OF AUTHORITIES ....................................................ix

COUNTER-STATEMENT OF THE ISSUES ........................................1

COUNTER-STATEMENT OF THE CASE ........................................2

      A.    The Admitting Privileges Requirement ................................3

           1.    Local Admitting Privileges Do Not Advance
                 Women's Health ........................................................3

           2.    The Effect of the Admitting Privileges Requirement ................4

      B.    The Medication Abortion Restrictions................................7

      C.    Post-Judgment Proceedings................................10

SUMMARY OF THE ARGUMENT .......................................11

ARGUMENT ........................................................................13

I.      STANDARD OF REVIEW.......................................13

II.     THE DISTRICT COURT PROPERLY HELD THE ADMITTING
        PRIVILEGES REQUIREMENT UNCONSTITUTIONAL .........................14

      A.    The District Court Properly Held the Admitting Privileges
           Requirement Unconstitutional Because It Is Not Reasonably
           Directed to Improving Women's Health.............................14

      B.    The District Court Properly Found That the Admitting Privileges
           Requirement Imposes a Substantial Obstacle on Texas Women
           Seeking Abortion................................22

      C.    Appellants' Objections to Dr. Potter's Testimony Should Be
           Rejected ................................26

D.    The District Court Properly Facially Invalidated the Admitting
      Privileges Requirement .......................................................................29

III.   THIS COURT SHOULD NOT REACH THE ADMITTING
       PRIVILEGES CLAIMS NOT ADJUDICATED BY THE DISTRICT
       COURT, BUT IF IT DOES, IT SHOULD RULE IN APPELLEES'
       FAVOR ................................................................................................34

       A.    Appellees' Procedural Due Process Claim is Live and Meritorious...35

       B.    The Admitting Privileges Requirement Is an Unconstitutional
             Delegation of Authority to Hospitals ..................................................37

IV.    THE DISTRICT COURT PROPERLY HELD THE MEDICATION
       ABORTION RESTRICTIONS UNCONSTITUTIONAL AS APPLIED
       TO WOMEN FOR WHOM THEY POSE SIGNIFICANT HEALTH
       RISKS ................................................................................................40

V.     THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS
       HAVE STANDING TO BRING ALL OF THEIR CONSTITUTIONAL
       CLAIMS, WHICH MAY BE ADJUDICATED PURSUANT TO 42
       U.S.C. § 1983................................................................................47

       A.    Appellees Have Third-Party Standing to Assert Claims on Behalf
             of Their Patients ..................................................................................47

       B.    Appellees Have Third-Party Standing to Assert Claims on Behalf
             of Their Physicians..............................................................................51

       C.    Appellees May Assert Their Patients' Claims Under 42 U.S.C.
             § 1983................................................................................................53

CONCLUSION ........................................................................................56

CERTIFICATE OF SERVICE ................................................................57

CERTIFICATE OF COMPLIANCE.......................................................58

# TABLE OF AUTHORITIES

## Cases

*Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793
  (8th Cir. 2006)........................................................................................55

*Anderson v. Bessemer*, 470 U.S. 564 (1985) ..........................................13

*Andrews v. Neer*, 253 F.3d 1052 (8th Cir. 2001)....................................55

*Arbor Foods, Inc. v. United States*, 9 CIT 119 (Ct. Int'l Trade 1985) ...................35

*Archuleta v. McShan*, 897 F.2d 495 (10th Cir. 1990)..............................55

*Atkins v. Parker*, 472 U.S. 115 (1985).....................................................36

*Ayotte v. Planned Parenthood of Northern New England*,
  546 U.S. 320 (2006) ....................................................................... *passim*

*Barnes v. Mississippi*, 992 F.2d 1335 (5th Cir. 1993) ...................... 17, 22

*Barnes v. Moore*, 970 F.2d 12 (5th Cir. 1992)........................................30

*Bates v. Sponberg*, 547 F.2d 325 (6th Cir. 1976) ...................................55

*Bellotti v. Baird*, 443 U.S 622 (1979) .............................................. 48, 49

*Birth Control Centers, Inc. v. Reizen*, 508 F. Supp. 1366 (E.D. Mich. 1981),
  *affirmed on other grounds*, 743 F.2d 352 (6th Cir. 1984)....................38

*Carey v. Population Services International*, 431 U.S. 678 (1977)....... 47, 50, 53, 54

*Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848 (3d Cir. 1994) ...................31

*Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096 (5th Cir.), *cert. denied*,
  118 S. Ct. 357 (1997), *overruled on other grounds by*
  *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) .................................30

*Charles v. Carey*, 627 F.2d 772 (7th Cir. 1980) .....................................49

*City of Akron v. Akron Center for Reproductive Health*, 462 U.S. 416 (1983),
  *overruled on other grounds*, *Planned Parenthood of Southeastern
  Pennsylvania v. Casey*, 505 U.S. 833 (1992) ................................... 11, 16, 22, 48

ix

*Claybrook v. Birchwell*, 199 F.3d 350 (6th Cir. 2000) ............................................55

*Colonial Penn Insurance v. Market Planners Insurance Agency Inc.*,
    157 F.3d 1032 (5th Cir. 1998) ...............................................29

*Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646 (5th Cir. 1978)................26

*Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1976)...................................................55

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................... 50, 54

*Currin v. Wallace*, 306 U.S. 1 (1939) ....................................................................40

*Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328
    (5th Cir. Unit B 1981).........................................................51

*Doe v. Bolton*, 410 U.S. 179 (1973)................................................... 51, 53

*Duke Power Co. v. Carolina Environmental Study Group, Inc.*,
    438 U.S. 59 (1978)............................................................50

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ......................................... 47, 49

*Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004) ........................50

*Estate of Gilliam v. City of Prattville*, 639 F.3d 1041 (11th Cir. 2011) ................55

*Foradori v. Harris*, 523 F.3d 477 (5th Cir. 2008) ...................................................27

*Garrett v. Clarke*, 147 F.3d 745 (8th Cir. 1998).....................................................55

*Gonzales v. Carhart*, 550 U.S. 124 (2007) ........................................ 14, 43

*Greco v. Orange Memorial Hospital Corp.*, 513 F.2d 873 (5th Cir. 1975) ............51

*Greenwood Utilities Commission v. Mississippi Power Co.*,
    751 F.2d 1484 (5th Cir. 1985) ..............................................29

*Griswold v. Connecticut*, 381 U.S. 479 (1965)................................. 47, 51

*Hallmark Clinic v. North Carolina Department of Human Resources*,
    380 F. Supp. 1153 (E.D.N.C. 1974) .......................................... 38, 39

*Hang On, Inc. v. City of Arlington*, 65 F.3d 1248 (5th Cir. 1995) .........................52

x

*Hunt v. City of Los Angeles*, 638 F.3d 703 (9th Cir. 2011) .....................................55

*Jackson Women's Health Organization v. Currier*, 940 F. Supp. 2d 416
    (S.D. Miss. 2013) ...............................................................................25

*Jane L. v. Bangerter*, 102 F.3d 1112 (10th Cir. 1996), *cert. denied*,
    117 S. Ct. 2453 (1997) ................................................................... 30-31

*Karlin v. Foust*, 975 F. Supp. 1177 (W.D. Wis. 1997),
    *affirmed on this holding*, 188 F.3d 446 (7th Cir. 1999).........................49

*Kendall v. Block*, 821 F.2d 1142 (5th Cir. 1987)....................................20

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) .............................................51

*Kratzer v. Capital Marine Supply, Inc.*, 645 F.2d 477 (5th Cir. 1981) ..................29

*Landgraf v. USI Film Products*, 511 U.S. 244 (1994).............................36

*Lawrence v. Texas*, 539 U.S. 558 (2003)................................................15

*Lewis v. BT Investment Managers Inc.*, 447 U.S. 27 (1980) ...................35

*Mazurek v. Amstrong*, 520 U.S. 968 (1997) ..........................................23

*N.A.A.C.P. v. Fordice*, 252 F.3d 361 (5th Cir. 2001) .............................13

*Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), *superseded on rehearing
    en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001)............................. 25, 50

*Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502 (6th Cir. 2006) ......44

*Planned Parenthood of Central Missouri v. Danforth*,
    428 U.S. 52 (1976)...................................................................... 16, 17, 25

*Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*,
    134 S. Ct. 506 (2013)............................................................................11

*Planned Parenthood of Greater Texas Surgical Health Services v. Abbott*,
    734 F.3d 406 (5th Cir. 2013) ...............................................................10

*Planned Parenthood of Houston and Southeastern Texas v. Sanchez*,
    403 F.3d 324 (5th Cir. 2005) ...............................................................54

xi

*Planned Parenthood of Southeastern Pennsylvania v. Casey*,
  505 U.S. 833 (1992)............................................................ *passim*

*Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-cv-465,
  2013 WL 3989238 (W.D. Wis. Aug. 2, 2013), *appeal docketed*,
  No. 13-2726 (7th Cir. Aug. 6, 2013) ..................................... 21-22, 26

*Planned Parenthood Southeast, Inc. v. Bentley*, No. 2:13cv405,
  2013 WL 3287109 (M.D. Ala. June 28, 2013)....................................25

*Planned Parenthood Southwest Ohio Region v. DeWine*,
  696 F.3d 490 (6th Cir. 2012) ...............................................44

*Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452
  (8th Cir. 1995), *cert. denied*, 517 U.S. 1174 (1996)............................31

*Richmond Medical Center for Women v. Herring*, 570 F.3d 165
  (4th Cir. 2009)............................................................31

*Rizzo v. Goode*, 423 U.S. 362 (1976)........................................54

*Roe v. Wade*, 410 U.S. 113 (1973)..........................................41

*Shaw v. Garrison*, 545 F.2d 980 (5th Cir. 1977) ...........................54

*Singleton v. Wulff*, 428 U.S. 106 (1976) .................................. 48, 49, 51

*Sojourner T. v. Edwards*, 974 F.2d 27 (5th Cir.1992) .......................30

*State of Washington ex. rel. Seattle Title Trust Co. v. Roberge*,
  278 U.S. 116 (1928)..................................................... 38, 40

*Stenberg v. Carhart*, 530 U.S. 914 (2000)..................................48

*Texaco, Inc. v. Short*, 454 U.S. 516 (1982)..................................36

*Thornburgh v. American College of Obstetricians and Gynecologists*,
  476 U.S. 747 (1986), *overruled on other grounds by Casey*, 505 U.S. 833 ........54

*Tucson Women's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004)...............39

*United States SEC v. Snyder*, 292 Fed. App'x 391 (5th Cir. 2008) .......................27

*United States v. American Telephone & Telegraph Co.*,
   551 F.2d 384 (D.C. Cir. 1976).................................................................35

*United States v. Cluck,* 143 F.3d 174 (5th Cir. 1998)................................13

*United States v. Locke*, 471 U.S. 84 (1985)..............................................36

*United States v. Rock Royal Cooperative*, 307 U.S. 533 (1939) ...........................40

*United States v. Southland Management Corp.*, 288 F.3d 665
   (5th Cir. 2002).......................................................................34

*United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971)........................................29

*Walker v. City of Mesquite,* 402 F.3d 532 (5th Cir. 2005) ................................13

*Williams v. Illinois*, 132 S. Ct. 2221 (2012) ..........................................28

*Women's Health  of West County, Inc. v. Webster*,
   871 F.2d 1377 (8th Cir. 1989) ...............................................26

*Women's Medical Professional Corp. v. Baird*, 438 F.3d 595
   (6th Cir. 2006)......................................................................40

*Women's Medical Professional Corp. v. Voinovich*, 130 F.3d 187
   (6th Cir. 1997), *cert. denied*, 118 S. Ct. 1347 (1998)...........................30

## Statutes

42 U.S.C. § 1983 ....................................................................53

Acts 2013, 83rd Leg., ch. 1 (H.B.2) § 1(a)(4)(B) ....................................45

Texas Health & Safety Code § 171.046 ................................................45

Texas Health & Safety Code § 171.061 ..............................................9, 45

Texas Health & Safety Code § 171.062 ..............................................9, 45

Texas Health & Safety Code § 171.063 ..............................................9, 45

Texas Health & Safety Code § 171.064 ..............................................9, 45

Texas Health & Safety Code § 171.0031(a)(2) .......................................................21

**Regulations**

25 Texas Administrative Code § 135.4(c)(11) .................................................. 19, 21

25 Texas Administrative Code § 139.32(b)(7) ......................................................52

25 Texas Administrative Code § 139.4(c)(5) .........................................................4

25 Texas Administrative Code § 139.5(3).............................................................4

25 Texas Administrative Code § 139.56(a) ...................................................... 19, 21

**Other Authorities**

National Abortion Federation *Clinical Policy Guidelines 2013* ...................... 20, 21

## COUNTER-STATEMENT OF THE ISSUES

1.  Was the district court correct to hold HB2's admitting privileges requirement unconstitutional when it found, based on the evidence, that it has "no rational relationship to improved patient care"?

2.  Was the district court correct to hold that the admitting privileges requirement imposes an undue burden on Texas women seeking abortions when it would prevent approximately one in three of those women from accessing abortion?

3.  Given these holdings, was the district court correct to facially invalidate the admitting privileges requirement?

4.  Was the district court correct in holding HB2's medication abortion restrictions unconstitutional as applied to women for whom they would impose a significant health risk based on "uncontroverted evidence that some women have medical conditions" that can make any alternative procedure "extremely difficult or impossible"?

5.  Was the district court correct in concluding that Plaintiffs-Appellees have third-party standing to bring constitutional claims on behalf of their patients?

## COUNTER-STATEMENT OF THE CASE

This appeal involves two provisions of 2013 Texas House Bill No. 2 ("the Act" or "HB2") that the district court properly ruled would unconstitutionally burden women's access to abortion. The first requires that physicians who perform abortions have admitting privileges at a hospital that provides obstetrical or gynecological services within 30 miles of the location of the abortion (the "admitting privileges requirement"). The second limits the provision of medication abortion, a safe and effective way to end an early pregnancy (the "medication abortion restrictions").

HB2 was enacted during a July 2013 special legislative session, and took effect on October 29, 2013. On September 27, Plaintiffs-Appellees ("Appellees"), a group of licensed abortion providers and physicians, filed suit on behalf of themselves and their patients on the grounds that the provisions violate their Fourteenth Amendment rights by, *inter alia*, imposing medically unwarranted regulations and undue burdens on access to abortion. ROA.28-59. On October 1, Appellees moved for a preliminary injunction.

The district court consolidated the preliminary injunction motion and trial on the merits, holding a bench trial on October 21-23 at which it heard live testimony from Appellees' witnesses and considered written declarations submitted by both Appellees and Defendants-Appellants ("Appellants"). On October 28, 2013, the court issued an opinion (the "Order"), ROA.1532-57, and Final Judgment, ROA.1558-60,

permanently enjoining the admitting privileges requirement and enjoining the medication abortion restrictions only as applied to those procedures necessary to protect women's lives or health.

## A.    The Admitting Privileges Requirement

The district court found the admitting privileges requirement unconstitutional because it does not advance the state's interest in women's health and it imposes an undue burden on women's access to abortion.[1]

### 1.    Local Admitting Privileges Do Not Advance Women's Health

The district court, after reviewing the evidence, correctly found that "whether an abortion provider has admitting privileges does nothing to further the interest of patient care" with respect to communication, timeliness or quality of emergency room and hospital care, patient abandonment, or provider accountability. ROA.1541-42. Indeed, it held that "admitting privileges have no rational relationship to improved patient care," and that a "lack of admitting privileges on the part of an abortion provider is of no consequence when a patient presents at a hospital emergency room." *Id*.

Legal abortion is one of the safest procedures in contemporary medicine. Major complications are extremely rare; nationwide, less than 0.3% of abortion patients experience a complication that requires hospitalization. ROA.238-39,

---

[1] The court rejected Appellees' vagueness claim, ROA.1540, and did not rule on Appellees' procedural due process or nondelegation claims. ROA.1545.

1098-102.[2] And in those rare cases, the district court concluded that: "emergency-room physicians treat patients of physicians with admitting privileges no differently than patients of physicians without admitting privileges"; there is "no evidence of correlation between admitting privileges and improved communication with patient handoff or that a communication problem actually exists between abortion providers and emergency-room physicians"; "[a]dmitting privileges make no difference in the quality of care received by an abortion patient in an emergency room"; and admitting privileges do not "impact the timeliness of care in the emergency room, where the nature of the practice is to treat patients with all possible haste." ROA.1541.

Emergency room physicians are trained to handle complications from a variety of outpatient procedures, including abortion and miscarriage which is much more frequent and can involve similar symptoms and treatment to abortion complications. ROA.1195-96. Existing Texas regulations and standards of emergency medicine are more than sufficient to ensure high quality care for abortion patients who seek hospital care. ROA.1194-99.

2.     The Effect of the Admitting Privileges Requirement

The district court properly concluded that Appellees "met [their] burden of demonstrating that the hospital-admitting-privileges-provision of the act places an

---

[2] Texas law requires all licensed abortion facilities to report complications. 25 Tex. Admin. Code §§ 139.4(c)(5), 139.5(3).

'undue burden' on a woman seeking abortions services in Texas because it necessarily has the effect of presenting a 'substantial obstacle' to access to abortion services." ROA.1542 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1992)). Specifically, the court found that, as a result of the requirement, "there will be abortion clinics that will close" and in particular noted that "the Rio Grande Valley would be left with no abortion provider because those providers do not have admitting privileges and are unlikely to get them." ROA.1542.

The evidence established that at least one-third of the state's licensed providers would stop providing abortions once the privileges requirement took effect. ROA.363-64, 1905-06. The only two providers in the Rio Grande Valley – in Harlingen and McAllen – could not continue to provide abortion services, leaving no services south of Corpus Christi. ROA.341-41, 2043-45. Services would likewise no longer be available in Fort Worth, Waco, Killeen, or Lubbock. App. A (Plaintiffs' Trial Exhibit 46); ROA.351, 353, 2043-45, 1428-35.[3] The evidence further showed that several other health centers would be forced to stop providing abortions, and others would have significantly reduced capacity because some, but not all, of the physicians have privileges. ROA.341-42, 351, 355, App. A.

---

[3] Since the district court's ruling, some abortion services have resumed in Fort Worth and the only provider in Lubbock – Planned Parenthood Women's Health Center (PPWHC) – has ceased operations.

The evidence also demonstrated that the privileges requirement would significantly reduce access to services after 15 weeks' gestation, as Texas law requires that those procedures be performed in an ambulatory surgery center ("ASC"). Two of the six ASCs providing abortions (in Austin and Fort Worth) would no longer be able to provide abortions. ROA.355-56, 1730-31. The ASC in San Antonio could provide only extremely limited services, forcing women who need abortions after 15 weeks to travel to either Dallas or Houston. ROA.340-42, *see also* ROA.364, 373.[4]

The record shows that as a result of the admitting privileges requirement, more than 20,000 women annually would no longer be able to access abortion due to the shortfall in capacity among remaining providers. ROA.364-65, 367-70, 385-86, 1138, 1906. Given that over 60,000 women will seek abortion each year in Texas, this amounts to approximately one in three women unable to effectuate their constitutionally protected choice to terminate a pregnancy. This number is solely related to capacity; it does *not* include those women who cannot overcome other obstacles created by the requirement, such as women forced to travel significant distances to access services because a closer provider lacks privileges. ROA.370.

---

[4] Since the district court's ruling, a physician at the Austin ASC has obtained privileges. Although services have resumed at the Fort Worth ASC, the physician who obtained local privileges does not perform abortions after 17 weeks, leaving later abortions still unavailable there.

### B.    The Medication Abortion Restrictions

For approximately 13 years prior to HB2, women in Texas with gestational ages through 63 days from the first day of their last menstrual period ("LMP") had two options: a surgical abortion in the health center or a procedure using medications alone, completed in a location of their choosing. Women who elect medication abortion take two medications: mifepristone, also known by its trade name "Mifeprex," and a prostaglandin, most commonly misoprostol. Mifepristone blocks a hormone needed to maintain a pregnancy. Approximately 24 to 48 hours after the patient takes mifepristone, she takes misoprostol, which causes the uterus to contract and expel its contents to complete the abortion. ROA.1546.

The U.S. Food and Drug Administration ("FDA") approved mifepristone for use in the United States in 2000 based on earlier clinical trials in which women took 600 mg mifepristone orally and returned to the health center two days later to take 400 µg misoprostol orally. Those trials proved that regimen safe and effective through 49 days LMP, and therefore, the final printed label ("FPL") for Mifeprex reflects that regimen and gestational age limit. However, the FDA has never required that mifepristone be used in a specific dosage, within any gestational age range, or following any particular regimen. *See* ROA.1546-47, 248-49.

By the time of mifepristone's approval, newer research showed that a lower mifepristone dose (200 mg instead of 600 mg), combined with a different dose and

route of self-administered misoprostol, is an equally safe regimen, costs less, has fewer side effects, eliminates an unnecessary trip to the health center, and is effective longer in pregnancy (through at least 63 days LMP). Based on this research, the overwhelming majority of U.S. abortion providers have always used a regimen different from the one on the FPL through at least 63 days LMP. ROA.1547-48, 249, 251-52.[5] Today, the most common regimen, which the district court found was "the *de facto* standard of care in Texas," ROA.1547, is 200 mg mifepristone taken orally, followed 24 to 48 hours later by 800 µg misoprostol, which the woman self-administers at home buccally (between her cheek and gum). ROA.249-50. More than 1.75 million women in the United States have now chosen medication abortion, and the vast majority has not followed the FPL regimen. ROA.1548. The American Congress of Obstetricians and Gynecologists ("ACOG"), the leading professional association of physicians who specialize in women's health care, has endorsed use of an alternative regimen through 63 days. ROA.1547-48. As the district court found, "when performed in accordance with the off-label protocol, medication abortion is a safe and effective procedure." ROA.1552.[6]

---

[5] As the district court found, "[t]he practice of developing new protocols using different dosages . . . is common in medicine." ROA.1547 n.12.

[6] Appellants and *Amici* draw this Court's attention to the fact that eight women who had medication abortions using an alternative regimen died from a serious infection and insinuate that those deaths are related to the regimen. Appellants' Br.

The Act restricts how Texas physicians provide "abortion-inducing drugs." Tex. Health & Safety Code §§ 171.061-064. It requires that women follow the FPL regimen and therefore bans medication abortion entirely after 49 days LMP, leaving women with greater gestational ages with only the option of a surgical abortion.[7] This is significant because, as the district court found, Appellees

> provide[d] uncontroverted evidence that some women have medical conditions that can make first-trimester surgical abortion extremely difficult or impossible. Such cases may include women who are extremely obese, have uterine fibroids distorting normal anatomy, have a uterus that is very flexed, or have certain uterine anomalies. For these women, surgical abortion poses much higher risks of failed abortion, as well as complications such as perforation of the uterus. Another circumstance where surgical abortion may be higher risk is when a woman has a condition known as stenotic cervix – a cervix with an abnormally small opening, often caused by scarring from prior surgeries. It may also happen when a woman has undergone female genital mutilation. Requiring a woman with these conditions to have surgical rather than medication abortion may put them at

---

(hereinafter "Br.") at 7; Br. of Am. Ass'n of Pro-Life Obstetricians and Gynecologists et al. at 22-23. But, as the district court found, "[t]he FDA studied the deaths and concluded that it 'do[es] not know whether using mifepristone and misoprostol caused these deaths' and has not suggested that an alternative regimen was to blame." ROA.1548 n.15. Appellants and *Amici* also ignore that over 1.75 million women have chosen that procedure, yielding an extremely low fatality rate of 0.0005 percent. ROA.1114-15, 1721. Moreover, Appellees provided evidence showing that in a sample size of nearly one million women who used an alternative regimen substantially identical to the one most often used prior to HB2, there were *no* deaths. ROA.1158-59, 1719.

[7] For women with gestational ages through 49 days, the Act does not ban medication abortion; it requires a protocol that is "clearly more burdensome," ROA.1553, and "assuredly more imposing and unpleasant for the woman." ROA.1552.

significantly higher risk for damage to the cervix or other complications, including uterine perforation.

ROA.1551 n.18.

Based on the foregoing, the district court concluded that the medication abortion restrictions are "an undue burden on those women for whom surgical abortion is, in the sound medical opinion of their treating physician, a significant health risk during the period of pregnancy falling 50 to 63 days LMP." ROA.1556. It therefore enjoined Appellants from enforcing the medication abortion restrictions "to the extent those provisions prohibit a medication abortion where a physician determines in appropriate medical judgment, such procedure is necessary for the preservation of the life or health of the mother." ROA.1559.

## C.     Post-Judgment Proceedings

Within twenty-four hours of the district court's order, Appellants filed their notice of appeal, ROA.1561-64, and moved this Court for an emergency stay of the district court's injunction. On October 31, a three-judge panel of this Court, in an opinion that "do[es] not bind the merits panel," granted Appellants' motion in large part, staying the district court's injunction against the admitting privileges requirement and narrowing its injunction against the medication abortion restrictions. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). Appellees filed an application with Justice Scalia asking the U.S. Supreme Court to vacate this Court's stay, and on

November 19, 2013, in a 5-4 decision, the Supreme Court denied that application. *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 134 S. Ct. 506 (2013).

## SUMMARY OF THE ARGUMENT

The district court properly held the admitting privileges requirement unconstitutional because it does not improve patient outcomes and imposes a substantial obstacle in the path of women seeking abortion. That ruling is supported both by the evidence and the law. Indeed, the district court made detailed factual findings that demonstrate that the admitting privileges requirement is not reasonably directed to improving women's health, which is the threshold question when examining the constitutionality of an abortion restriction. *See, e.g.*, *City of Akron v. Akron Ctr. for Reprod. Health*, 462 U.S. 416, 431 (1983) ("If a State . . . undertakes to regulate the performance of abortions . . . the health standards adopted must be legitimately related to the objective the State seeks to accomplish." (citation and quotation omitted)), *overruled on other grounds*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). Moreover, the district court held that even if the law is reasonably directed to women's health, it nevertheless is unconstitutional because it imposes a substantial obstacle on women seeking abortion. In reaching this conclusion, it considered evidence showing that the admitting privileges requirement would have an unprecedented

11

and devastating effect on access to abortion. Large parts of the state would no longer have an abortion provider. Those health centers that could continue to provide abortions would be forced to serve more women with fewer physicians. It would simply leave too few abortion providers in the state to meet the needs of all women who seek abortion, thereby denying more than 20,000 women each year access to safe and legal abortion. There can be no question that such a law is in direct conflict with Supreme Court precedent. *See Casey*, 505 U.S. at 877 (a statute that "has the effect of placing a substantial obstacle" in the path of women seeking abortion is unconstitutional).

As to the medication abortion restrictions, the district court properly held, based on detailed factual findings, that they are unconstitutional as applied to certain situations where medication abortion is the safest and most medically sound option for women with particular physical abnormalities or preexisting conditions. It is axiomatic that a law that does not adequately protect women's health is unconstitutional. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 327-28 (2006).

Lastly, as the district court properly held, Appellants' justiciability arguments are meritless. Decades of precedent from this Court and the Supreme Court have held that health centers and physicians can raise the rights of their

patients to challenge restrictions on reproductive health care. Accordingly, the district court's decision should be affirmed.

## ARGUMENT

## I.    STANDARD OF REVIEW

Following a final judgment after a trial on the merits, this Court reviews district court conclusions of law *de novo*, but reviews factual findings only for clear error. *Walker v. City of Mesquite,* 402 F.3d 532, 535 (5th Cir. 2005). This is true regardless of the constitutional claims at issue in the case. *Id.* (refusing to apply a less deferential standard of review for factual findings because of the constitutional nature of the case). "A factual finding is not clearly erroneous as long as it is plausible in the light of the record read as a whole." *United States v. Cluck,* 143 F.3d 174, 180 (5th Cir. 1998). A reviewing court may not "reverse a district court's findings when they are based on a plausible account of the evidence considered against the entirety of the record," even if the reviewing court "would have weighed the evidence differently had it been sitting as the trier of fact." *N.A.A.C.P. v. Fordice*, 252 F.3d 361, 365 (5th Cir. 2001); *see also Anderson v. Bessemer, N.C.*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

## II.    THE DISTRICT COURT PROPERLY HELD THE ADMITTING PRIVILEGES REQUIREMENT UNCONSTITUTIONAL

The district court correctly concluded that the admitting privileges requirement is unconstitutional both because it does not further the state's interest in women's health and because it "places a substantial obstacle in the path of a woman seeking an abortion." ROA.1535. This Court should affirm these conclusions, which are based on findings of fact that are well-supported by the record, and either of which is sufficient to support the permanent injunction.

### A.    The District Court Properly Held the Admitting Privileges Requirement Unconstitutional Because It Is Not Reasonably Directed to Improving Women's Health

The only plausible state interest advanced by the admitting privileges requirement is promoting women's health.[8] Appellants, seizing on the district

---

[8] Appellants make passing reference to their belief that the requirement promotes fetal life, but as the district court found, "[a]dmitting privileges do not rationally relate to the State's legitimate interest in protecting the unborn." ROA.1542. The only way that this requirement will result in fewer abortions is if women's access is foreclosed, which would be an admission that the law is unconstitutional. *See Casey*, 505 U.S. at 877 ("The means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not to hinder it."). The stay panel and several *Amici*, relying on *Gonzales v. Carhart*, 550 U.S. 124 (2007), claim the privileges requirement advances the State's interests in regulating the medical profession and protecting the integrity and ethics of the medical profession. The *Gonzales* Court, however, did not recognize regulation of the medical profession alone as an interest sufficient to justify restricting women's access to abortion. *See* 550 U.S. at 158 (state may "bar certain procedures . . . in furtherance of its legitimate interests in regulating the medical profession *in order to promote respect for life*" (emphasis added)). If that were the case, *any* regulation would be permissible because abortion is a medical procedure and all such

14

court's use of the phrase "rational basis," maintain that the court should not have considered any evidence about whether the law actually advances that interest, but instead must limit the inquiry to "whether it is *possible to imagine* that hospital admitting privileges could improve patient care." Br. at 12.

The Supreme Court has never applied such a low standard to an abortion regulation that purports to promote women's health. Indeed, accepting Appellants' claim that the state bears no burden beyond providing a "conceivable state of facts that could provide a rational basis" for an abortion regulation, Br. at 12, would be wholly inconsistent with the fundamental nature of a woman's right to decide whether to continue a pregnancy. *See Casey*, 505 U.S. at 834, 851 (the "decision whether to bear or beget a child" is one of those "fundamental[]" choices that is "central to the liberty protected by the Fourteenth Amendment"); *see also Lawrence v. Texas*, 539 U.S. 558, 565 (2003) (the right to abortion has "real and substantial protection as an exercise of [a woman's] liberty under the Due Process Clause").[9]

Therefore, when confronted with a regulation purporting to advance women's health, the Supreme Court has done what the district court did here: it

---

regulations, by definition, regulate the medical profession. As for the "integrity and ethics of the medical profession," neither the stay panel nor *Amici* explain how the privileges requirement protects any such interest.

[9] For these reasons, Appellants' similar claim that they bear *no burden at all* to demonstrate that the law advances women's health, Br. at 29-30, is also incorrect.

carefully examines the extent to which the restriction is actually (as opposed to hypothetically) tailored to advance the purported state interest and whether it is consistent with accepted medical practice. *See, e.g.*, *Akron*, 462 U.S. at 431 ("If a State . . . undertakes to regulate the performance of abortions . . . the health standards adopted must be legitimately related to the objective the State seeks to accomplish.") (citation and quotation omitted)); *Akron*, 462 U.S. at 430 ("the decisive factor" in upholding recordkeeping regulations in *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976), was that "the State met its burden of demonstrating that these regulations furthered important health-related State concerns").

Appellants are incorrect in claiming that these cases were "squelched" by *Casey*. Br. at 31. The portion of *Casey* to which Appellants cite relates to Pennsylvania's informed consent requirements, which were designed to promote the state's interest in fetal life by persuading women not to choose abortion. The *Casey* Court was clear that it overruled *Akron* and *Danforth* only "to the extent that we permit a State to further its legitimate goal of protecting the life of the unborn by enacting legislation aimed at ensuring a decision that is mature and informed." 505 U.S. at 883.

*Casey* did not overrule *Akron* and *Danforth* as they relate to regulations designed to promote women's health. To the contrary, the *Casey* Court considered

only one regulation designed to advance maternal health – the recordkeeping and reporting requirements – and it conducted the same analysis. It upheld those requirements because it recognized them as "a vital element of medical research" that were "reasonably directed to the preservation of maternal health." 505 U.S. at 900-01 (citing and quoting *Danforth*, 428 U.S. at 80). This Court too has recognized that there is to be "an examination of the importance of the state's interest in the regulation." *Barnes v. Mississippi*, 992 F.2d 1335, 1339 (5th Cir. 1993).

Under this precedent, the district court properly considered the evidence presented by the parties and concluded that Appellants failed to establish that the admitting privileges requirement is reasonably directed to an asserted interest in women's health. ROA.1541 ("whether an abortion provider has admitting privileges does nothing to further the interest of patient care"). In particular, it found no evidence to support Appellants' assertions that the requirement would lead to more effective management of complications, a reduction in medical errors, or improved continuity of care. ROA.1540-41. It found that "[a] lack of admitting privileges on the part of an abortion provider is of no consequence when a patient presents at a hospital emergency room" and that "[a]dmitting privileges make no difference in the quality of care received by an abortion patient in an emergency room." ROA.1541. As to Appellants' asserted interest in ensuring improved

17

communication between health care providers, the district court found that Appellants "provide[d] no evidence of correlation between admitting privileges and improved communication with patient handoff or that a communication problem actually exists between abortion providers and emergency-room physicians." *Id.* It therefore concluded that "whether an abortion provider has privileges does nothing to further the interest of patient care by improving communication. Nor does it impact the timeliness of care in the emergency room, where the nature of the practice is to treat all patients with all possible haste." *Id*. Nor, the district court found, would privileges improve patient care if a patient is admitted to the hospital, or assuage concerns about patient abandonment, hospital costs, or accountability. ROA.1541-42.

The district court also recognized that the admitting privileges requirement does not serve the "credentialing" purpose asserted by Appellants because physicians' inability to obtain privileges has nothing to do with the quality of care they provide. ROA.1543 ("[e]ach hospital's bylaws are unique" and can include variable requirements such as local residency, board certification, and a minimum number of admissions per year). Indeed, the district court specifically found that a requirement that physicians seeking admitting privileges admit a minimum number of patients per year often disqualified physicians performing abortions "because the nature of the physicians' low-risk abortion practice does not generally yield

any hospital admissions." *Id*. Moreover, if a third-party check on provider quality were necessary (and Appellants presented no credible evidence that it is), the Act's thirty-mile limit bears no relationship to that asserted goal. Some Texas providers have privileges, but not within thirty miles of all sites where they perform abortions. *See* ROA.347, 353, 1543.[10]

The district court's conclusion that admitting privileges are not reasonably directed to patient safety, and in fact depart from accepted medical practice, is bolstered by the fact that Texas does not require physicians performing surgeries far riskier than abortion at ASCs, ROA.1199, 1730-31, to have such privileges. *See* 25 Tex. Admin. Code § 135.4(c)(11). Moreover, Texas law already requires Appellees' physicians to "have admitting privileges or have a working arrangement with a physician(s) who has admitting privileges at a local hospital in order to ensure the necessary backup for medical complications," as well as a written protocol for emergency management and the transfer of patients to a hospital. 25 Tex. Admin. Code § 139.56(a).[11] While this may not be necessary, it is

---

[10] Furthermore, if a patient travels a significant distance to obtain an abortion, as many of Appellees' patients do, and needs emergency care after leaving the health center, she should go to the closest emergency room, making it irrelevant whether her physician has admitting privileges near where the abortion was performed. ROA.241-42.

[11] This conclusion is also supported by the only evidence submitted by Appellants from a physician who practices in Texas. Dr. Mikeal Love stated that: "A responsible surgeon who abides by the standard of care will have admitting

certainly sufficient to protect patients in the rare circumstance that they need hospital treatment.[12]

Appellants attempt to undermine the district court's well-supported findings by citing to a 2000 publication of the National Abortion Federation ("NAF"). That document does not, however, suggest that every physician have local privileges; rather, it suggests that a physician have a mechanism by which he or she can admit patients locally, Br. App. B. at 2-3, similar to what is already required under Texas law. Moreover, the current NAF Clinical Policy Guidelines require only that "[p]rotocols for the management of medical emergencies must be in place" that "include indications for emergency transport and written, readily available directions for contacting external emergency assistance (i.e., an ambulance)." NAF, *Clinical Policy Guidelines 2013* at 55, *available at* www.prochoice.org/ pubs_research/publications/documents/2013NAFCPGSforweb.pdf.      Texas      law

privileges *or a relationship with a surgeon who does*." ROA.622 (emphasis added). This is exactly what Texas law already requires of Appellees.

[12] Appellants rely heavily on the declaration of Dr. John Thorp to support the necessity of admitting privileges. Br. at 3-4. Appellees, however, directly rebutted Dr. Thorp's claims. ROA.1106-08. Having considered all of the evidence, including Dr. Thorp's declaration, which relies on general studies that do not relate to abortion care, the district court made explicit findings of fact that reject each of Dr. Thorp's assertions. ROA.1541-42. In making its findings, it noted that it "carefully weighed" the "witnesses' credibility." ROA.1536 n.4. "The assessment of the credibility of a witness is peculiarly within the province of the district court." *Kendall v. Block*, 821 F.2d 1142, 1146 (5th Cir. 1987). Moreover, the study and documents Appellants cite, Br. at 4-5, do not suggest that admitting privileges would cure communication or medication errors.

requires the same. *See* Tex. Health & Safety Code. § 171.0031(a)(2); 25 Tex. Admin. Code § 139.56(a).[13] Similarly, while ACOG recognizes that facilities where abortions are performed should have arrangements in place for transferring patients who require emergency treatment, it does not support requiring physicians performing abortions to have admitting privileges at a hospital. ROA.243.

Based on all of this evidence, the district court found the admitting privileges requirement so unnecessary and out of step with accepted medical practice that it fails even rational basis review. ROA.1541 (finding "no rational relationship between improved patient outcomes and hospital admitting privileges within 30 miles of [the abortion provider]").[14] Given the district court's rational basis conclusion, there can be no doubt that the admitting privileges requirement is not reasonably directed to improving women's health. *See Planned Parenthood of Wis., Inc. v. Van Hollen*, No. 13-cv-465, 2013 WL 3989238, at *15 (W.D. Wis. Aug. 2, 2013) ("[T]he court concludes that the State is not likely to succeed in

---

[13] NAF also recommends (but does not require) that providers "should consider developing a transfer agreement with a hospital outlining the means of communication and transport and the protocol for emergent transfer of care." NAF *2013 Guidelines* at 55. Indeed, a transfer agreement is all Texas law requires for ASCs. *See* 25 Tex. Admin. Code § 135.4(c)(11).

[14] Although Appellees are not pursuing a claim that the Act was passed for the "purpose" of placing a substantial obstacle in the path of women seeking abortions, the district court's finding that "[t]he State fails to show a valid purpose," for the requirement, ROA.1544, further supports its conclusion that the law is not reasonably directed to women's health.

21

demonstrating that the admitting privileges requirement is reasonably related to maternal health."), *appeal docketed*, No. 13-2726 (7th Cir. Aug. 6, 2013). For this reason, the district court's ruling should be affirmed.

**B. The District Court Properly Found That the Admitting Privileges Requirement Imposes a Substantial Obstacle on Texas Women Seeking Abortion**

A law with the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" is not "a permissible means of serving [a] legitimate end[]." *Casey*, 505 U.S. at 877; *see also Akron,* 462 U.S. at 438 (even if acting in the interest of women's health the state may not impose "a heavy, and unnecessary, burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure"); *Barnes*, 992 F.2d at 1339 ("As long as *Casey* remains authoritative, the constitutionality of an abortion regulation thus turns on an examination of the importance of the state's interest in the regulation *and* the severity of the burden that regulation imposes on the woman's right to seek an abortion." (emphasis added)).[15]

The question of whether a law imposes an undue burden is one of fact that

---

[15] *Amici* suggest, based on one sentence in *Casey*, that if a regulation is claimed to advance women's health, this Court should not consider its effect. *See* Amicus Brief of Lt. Gov. David Dewhurst, *et al*., at 17-18. But *Casey* was clear that this Court is also to look at a law's effect: "[r]egulations designed to foster the health of a woman seeking an abortion are valid *if they do not constitute an undue burden*." 505 U.S. at 878 (emphasis added); *see also id.* at 901 (recordkeeping and reporting requirements upheld not only because they reasonably relate to women's health but also because they do not "impose a substantial obstacle to a woman's choice").

will turn on the record in a particular case. *Mazurek v. Amstrong*, 520 U.S. 968, 974 (1997) (explaining that the physician-only law was not an undue burden because "no woman seeking an abortion would be required by the new law to travel to a different facility than was previously available"); *Casey*, 505 U.S. at 884-85 ("*Since there is no evidence on this record* that requiring a doctor to give the information . . . would amount . . . to a substantial obstacle . . . , we conclude that it is not an undue burden." (emphasis added)).

Based on its review of all of the evidence, the district court concluded that "Planned Parenthood has met its burden of demonstrating that the hospital-admitting privileges provision of the act places an 'undue burden' on a woman seeking abortion services in Texas because it necessarily has the effect of presenting a 'substantial obstacle' to access to abortion services." ROA.1542 (citations omitted). This conclusion should be affirmed.

As explained, *supra*, the evidence established that as a result of the admitting privileges requirement, approximately one-third of the licensed abortion providers in Texas would stop providing abortions, eliminating the availability of abortion in large parts of the state and reducing capacity in other places. As a result, one in three women in Texas would be unable to access desired abortion services. This evidence confirms what common sense suggests: the immediate, wide-spread reduction of services caused by the admitting privileges requirement

would produce a shortfall in the capacity of providers to serve all of the women seeking abortions.

Appellants argue that the district court's finding as to the Rio Grande Valley cannot sustain its conclusion that the admitting privileges requirement imposes an undue burden. Br. at 16-19.[16] While the district court used the Rio Grande Valley as an example of the effect of the law, its ultimate conclusion of undue burden is based on "the record as a whole." ROA.1536 n.4. Appellants similarly focus their argument on travel distances. In doing so, they ignore evidence before the court showing not just that the additional travel would be "particularly burdensome," Br. at 17, but that the additional travel would be an absolute obstacle for many women. ROA.1934. More importantly, Appellants ignore that the travel burdens are *in addition to* the shortfall in capacity, which will prevent women throughout Texas from obtaining an abortion.

The inability of one-third of women to exercise their constitutional right to effectuate their choice is the epitome of a "state regulation impos[ing] an undue burden on a woman's ability to make this decision" that "reach[es] into the heart of the liberty protected by the Due Process Clause." *Casey*, 505 U.S at 874; *see also*

---

[16] Appellants also argue that the court's finding as to the Rio Grande Valley is clearly erroneous because the court referred to 24, rather than 4, counties in the Rio Grande Valley. Br. at 18-19. This argument overlooks the obvious explanation that this was likely a typographical error, but more importantly, it overlooks the fact that the evidence established that as a result of the privileges requirement, there are no abortion services available in the Rio Grande Valley. ROA.1542.

*Okpalobi v. Foster*, 190 F.3d 337, 357 (5th Cir. 1999) (law that forces "all or a substantial portion of a state's abortion providers to stop offering such procedures creates a substantial obstacle to a woman's right to have a pre-viability abortion, thus constituting an undue burden under *Casey*"), *superseded on reh'g en banc on other grounds*, 244 F.3d 405 (5th Cir. 2001). If *Casey*'s undue burden standard means anything, it must mean that a law that forces a third of the providers in the state to cease providing abortions and prevents over 20,000 women a year from accessing safe abortion services is unconstitutional. *See Casey*, 505 U.S. at 893 (invalidating spousal notice requirement because it would "prevent a significant number of women from obtaining an abortion"); *see also Danforth*, 428 U.S. at 69, 74 (holding spousal and parental consent requirements unconstitutional because both would prevent women from obtaining an abortion).

As the district court noted, it was not the first to look at similar facts and conclude that a local admitting privileges requirement is likely unconstitutional. In the past two years alone, several other courts evaluating similar laws "have reached similar conclusions." ROA.1544 n.9 (citing *Planned Parenthood Se., Inc. v. Bentley*, No. 2:13cv405, 2013 WL 3287109, at *7 (M.D. Ala. June 28, 2013) (granting temporary restraining order where admitting privileges requirement would close three of five clinics in Alabama); *Jackson Women's Health Org. v. Currier*, 940 F. Supp. 2d 416, 422 (S.D. Miss. 2013) (granting preliminary

injunction where admitting privileges requirement would close only known abortion provider in Mississippi); *Planned Parenthood of Wis., Inc.*, 2013 WL 3989238, at *16).[17] Here, the district court's conclusion that the admitting privileges requirement imposes an undue burden is well-supported by the record and should be affirmed.[18]

### C.    Appellants' Objections to Dr. Potter's Testimony Should Be Rejected

Appellants seek to undermine the district court's undue burden conclusion by belatedly attacking the testimony of Dr. Joseph Potter, and seeking to disqualify him as an expert under Federal Rule of Evidence 702. Br. at 20-23. At the outset, Dr. Potter, who is a professor at the University of Texas, is a highly qualified and experienced demographer, with extensive experience analyzing the impact of laws on access to reproductive health services in Texas, who used well-accepted methodology to assess the impact of the admitting privileges requirement.

---

[17] *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377 (8th Cir. 1989), is inapposite because the law at issue merely required admitting privileges anywhere in the United States, not at a local hospital, and the evidence showed that only one physician in the entire state could not comply.

[18] As noted in the Counter-Statement of the Case, *supra*, some facts regarding the availability of abortion services have changed since the district court's judgment. Appellees maintain that these changes do not alter the district court's proper conclusion that the admitting privileges requirement poses an undue burden. However, if this Court believes consideration of these new facts is warranted, the proper course is not for this Court to decide this issue, but to remand to the district court to hear further evidence. *See Concerned Citizens of Vicksburg v. Sills*, 567 F.2d 646, 649-50 (5th Cir. 1978) (citations omitted).

ROA.362, 364-74, 1130, 1148-51, 1849, 1852-54, 1856-57. But this Court should not consider Appellants' *Daubert* argument because it was not properly raised before the district court. In fact, Appellants did not object to the admission of Dr. Potter's expert testimony. *See* ROA.1844.[19] Where a party does not "object to the admissibility" of expert testimony "that issue [is] . . . forfeited." *U.S. SEC v. Snyder*, 292 Fed. App'x 391, 400 n.1 (5th Cir. 2008); *see also Foradori v. Harris*, 523 F.3d 477, 508 (5th Cir. 2008) (the court will only review for "plain error" an expert's testimony to which the defendant failed to "timely object").

Appellants' untimely *Daubert* objection also lacks merit. Appellants claim that Dr. Potter's opinions should be disregarded because they are based solely on factual evidence provided to him by Appellees that did not require the application of "any methodology." *See* Br. at 21-23. This both misconstrues the substance of Dr. Potter's testimony and misunderstands what Rule 702 permits an expert to use as the basis of his opinion.

The record demonstrates that Dr. Potter's opinions are *not* based exclusively on evidence provided by Appellees. Dr. Potter oversaw a comprehensive survey of abortion providers throughout the state, which necessarily included Appellees, but

---

[19] Appellants originally suggested that they would have objections to Dr. Potter's declaration, ROA.600, and stated at trial that they would "probably have some *Daubert* challenges" to Dr. Potter's testimony and that they would raise these "as objections to the declaration." ROA.1844. They did not, however, pursue such objections, to either of Dr. Potter's declarations or testimony, ROA.1507-11, and therefore waived them.

which also included information from other health centers and additional sources. ROA.1849, 1853, 1856-57. The chart accompanying Dr. Potter's rebuttal declaration, ROA.1130, 1148-1151, to which Appellants did not object, specifies the various sources supporting his assumptions regarding the number of clinics that could not comply with the admitting privilege requirement and their capacity to perform abortions. ROA.1853-54.[20] Additionally, Dr. Potter's testimony as to clinics' ability to recruit new providers or reopen if they are compelled to close is rooted not only in Appellees' representations, but also his prior research on family planning clinic closures in Texas and the impact of "supply-side" restrictions on access to abortion. *See, e.g.,* ROA.1860-67.

There is also no merit to Appellants' effort to discredit Dr. Potter's testimony on the grounds that it is based on hearsay. Rule 703 expressly permits an expert to base his opinion on facts or data of which he has "been made aware."[21] The proper inquiry is whether the expert based his opinion on data of the type

---

[20] Appellants' argument also disregards Plaintiffs' Exhibit 46, a list of anticipated clinic closures among Plaintiffs (attached as Appendix A), which was admitted into evidence without objection. ROA.2026.

[21] The decision in *Williams v. Illinois*, 132 S. Ct. 2221 (2012), actually supports Appellees' position. In *Williams*, the defendant challenged the admissibility of testimony on the grounds that the state's expert read into the record the results of a third-party's forensic analysis of the defendant's DNA. The Court rejected the defendant's argument that the expert had merely regurgitated the absent analyst's statements because the out-of-court statements had not been introduced for the truth of the matter asserted but only as the basis for the testifying expert's conclusions.

reasonably relied upon by other experts in the field, even if those facts are "based in part or solely upon hearsay sources." *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971); *see also Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1495 (5th Cir. 1985).

Here, Dr. Potter testified that a clinic's representation as to whether it can comply with a new requirement is the "best way" to determine whether it will cease operating. ROA.1904. Indeed, there was no other way to obtain this evidence in advance of trial. Based on this data, using methodologies traditionally employed by demographers, Dr. Potter reached a series of conclusions, discussed above, which support the district court's holding that the admitting privileges requirement imposes an undue burden. *See Colonial Penn Ins. v. Mkt. Planners Ins. Agency Inc.*, 157 F.3d 1032, 1037 (5th Cir. 1998) ("[W]hen considering whether facts support the district court's judgment, we construe the court's findings liberally and find them to be in consonance with the judgment, so long as that judgment is supported by evidence in the record." (quotation omitted)); *see also Kratzer v. Capital Marine Supply, Inc.*, 645 F.2d 477, 483 (5th Cir. 1981).

### D.   The District Court Properly Facially Invalidated the Admitting Privileges Requirement

The district court correctly held the admitting privileges requirement facially unconstitutional. Under any test, the law must be entirely struck because, as the district court found, the admitting privileges requirement is not reasonably directed

to women's health. ROA.1542. In other words, it fails even under *Salerno,* as there is no application of the admitting privileges requirement that is constitutional.

Appellees are also entitled to facial invalidation because the admitting privileges requirement operates as a substantial obstacle for a "large fraction" of women. *Casey*, 505 U.S. at 895. Contrary to the State's claim that this Court has settled the matter of whether the "large fraction" test applies in abortion cases, this Court has taken contradictory positions. *See, e.g., Sojourner T. v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) (applying *Casey* standard to facial challenge to abortion statute); *Barnes v. Moore*, 970 F.2d 12, 14 n.2 (5th Cir. 1992) ("[W]e do not interpret *Casey* as having overruled, *sub silentio*, longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes."); *see also Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1102-04 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 357 (1997) (declining the parties' request to "confront head-on the question of the standard of proof that should govern facial challenges in abortion cases"), *overruled on other grounds by Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001).

This Court should hold that the *Casey* standard governs, as every other circuit court to consider the question has concluded. *See Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 195-96 (6th Cir. 1997), *cert. denied*, 118 S. Ct. 1347 (1998); *Jane L. v. Bangerter*, 102 F.3d 1112, 1116 (10th Cir. 1996), *cert.*

*denied*, 117 S. Ct. 2453 (1997); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456-58 (8th Cir. 1995), *cert. denied*, 517 U.S. 1174 (1996); *Casey v. Planned Parenthood of Se. Pa.*, 14 F.3d 848, 863 n.21 (3d Cir. 1994)). *But see Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 173-74 (4th Cir. 2009) (declining to address the question).

Under the "large fraction" test, facial invalidation was appropriate. Indeed, approximately one-third of women who seek abortion each year will be prevented entirely from obtaining an abortion. Appellants take the extreme position that a law that prevents that many women from accessing abortion is not a "large fraction." In their view, even a law that barred 49 percent of women from obtaining an abortion should not be facially invalidated. Br. at 28. No court has ever adopted such an extreme position.[22]

Appellants also argue that the Act's severability clause blindly dictates the remedy in this case. But as the Supreme Court has held, when a challenged law has

---

[22] Appellants claim that *all* women who seek abortion are the denominator for the "large faction test." That is incorrect under *Casey*, which instructs that the "proper focus" requires looking at "the group for whom the law is a restriction, not the group for whom the law is irrelevant." 505 U.S. at 894. Indeed, the *Casey* Court rejected the state's argument that the spousal notice law should not be invalidated because it "imposed almost no burden at all for the vast majority of women seeking abortions." *Id.* For the spousal notice law in *Casey*, that group "for whom the law is a restriction" was women who would not voluntarily tell their husbands of their abortion plans, which was approximately one percent of women seeking abortion. The Court nevertheless held that facial invalidation was appropriate. *Id.* at 894. Regardless, here, Appellees proved that one-third of *all* women seeking abortions would be prevented entirely from accessing abortion.

a severability clause, it is not conclusive; courts must still conduct an independent analysis of whether any part of the law can stand after a constitutional violation has been found. *Ayotte*, 546 U.S. 320. In *Ayotte*, for example, "writing in" a medical emergency exception to the challenged parental notice law would have been feasible because the Court has "long upheld state parental involvement statutes like the Act," and "only a few applications . . . would present a constitutional problem." *Id*. at 327, 331.[23] At the same time, the *Ayotte* Court counseled against rewriting statutes "where line-drawing is inherently complex." *Id.* at 330.

Applying these principles to the admitting privileges requirement, it is clear that facial invalidation was the correct remedy. First, unlike the parental involvement law at issue in *Ayotte*, there is no well-established federal law upholding a local admitting privileges requirement – to the contrary, most of the challenges to these provisions have resulted in preliminary injunctions. *See* Section II.B., *supra*. Second, the privileges requirement's unconstitutional applications are many: it is unconstitutional across the board because it is medically unnecessary, *see* Counter-Statement of the Case Section A.1. and Section II.A., *supra*, and it prevents over 20,000 women each year from obtaining abortion care, *see* Counter-Statement of the Case Section A.2. and Section II.C., *supra*. Third, line-drawing here is "inherently complex." Exempting the McAllen health center from the law,

---

[23] Indeed, that is what the district court did here with respect to the medication abortion restrictions. *See* Section IV, *infra*.

as Appellants suggest, Br. at 24-25, may alleviate the burdens for some women, but it would do nothing to solve the problem of too few providers being able to meet the needs of all women seeking abortion statewide. Appellants also argue that the remedy could be extended only to those facilities which experience a backlog of patients. But to cure the constitutional violation, the remedy would need to be extended to health centers that were forced to cease providing abortions – it is this loss of service that has created the backlog in *other* facilities.

Finally, Appellants' severability arguments are in direct tension with their claim that Appellees are not entitled to any relief unless they show that the law is unconstitutional in all of its applications. Br. at 27. As discussed above, *Ayotte* counsels that if a plaintiff shows some constitutional defect, she is entitled to some relief.[24] Therefore, under *Ayotte*, *Casey*, and even *Salerno* if it were to apply, facial invalidation was the appropriate remedy.[25]

---

[24] Appellees are unclear as to how partial relief could be granted in practice, but if such an avenue is a possibility, the proper course is for this Court to remand to the district court to make that determination. *See Ayotte*, 546 U.S. at 331.

[25] Appellants take the district court to task for not explicitly limiting the injunctive relief to the plaintiffs, Br. at 52-54, but regardless of the scope of the injunction, the district court also properly issued declaratory relief, which provides guidance to those who will enforce the statute.

### III. THIS COURT SHOULD NOT REACH THE ADMITTING PRIVILEGES CLAIMS NOT ADJUDICATED BY THE DISTRICT COURT, BUT IF IT DOES, IT SHOULD RULE IN APPELLEES' FAVOR

Appellants ask this Court to grant judgment in their favor on Appellants' procedural due process and nondelegation claims, which were not reached by the district court. Br. at 32-33; *see* ROA.1545 ("The court need not and does not address these claims."). This Court also need not reach these claims because it should affirm the district court's judgment.

However, should this Court reverse, it should remand these claims for consideration by the district court in the first instance. That is because, as is explained herein, both claims turn on factual issues. Appellees put forth evidence of these facts, but because it declined to reach these claims, the district court did not make any factual findings about them. *See United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 688 (5th Cir. 2002) ("the normal procedure where the lower court has not considered a pertinent issue is to remand the case"). But if this Court does reach the merits, it should hold the admitting privileges requirement unconstitutional for these two reasons as well.

### A. Appellees' Procedural Due Process Claim is Live and Meritorious

Appellants assert without any citation to authority that Appellees' procedural due process claim fails on two grounds: it will become moot 170 days after the Act's passage, and "the Due Process Clause affords no grace period for complying

with state law." Br. at 33. These statements reflect a misunderstanding of both the facts and the law governing Appellees' procedural due process claim.

The admitting privileges law was signed into law on July 18, 2013, and was to become effective October 29, 2013, leaving Appellees barely 100 days to comply. As the facts in the record demonstrate, securing privileges requires identifying hospitals at which to apply; seeking and receiving applications; completing those applications; and then waiting for the hospitals to respond. *See* ROA.342-45 (describing lengthy process of obtaining and preparing applications), 354-55 (same), 1922-26, 1963-68 (same). It is only this last step – the time that the hospital has to respond to an application for privileges – that is limited to 170 days. Therefore, while there may come a point when enough time has elapsed to allow physicians to obtain admitting privileges, it is much further in the future than 170 days after the Act's passage.

That this time may some day come does not mean that Appellants' claim is moot now. Indeed, courts routinely decide cases that may or will shortly become moot. *See, e.g.*, *Lewis v. BT Inv. Managers Inc.*, 447 U.S. 27, 53 n.15 (1980) (twenty-one days between decision and mooting event); *United States v. Am. Tel. & Tel. Co.*, 551 F.2d 384, 390 (D.C. Cir. 1976) (four days between decision and possible mootness); *Arbor Foods, Inc. v. United States*, 9 CIT 119, 124 (Ct. Int'l Trade 1985) (two days between decision and mooting event).

Appellants are also wrong to suggest that there is no "grace period" required by the Due Process Clause. To the contrary, the Supreme Court has repeatedly recognized that where a "statute regulates private conduct," due process requires "affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements." *United States v. Locke*, 471 U.S. 84, 108 (1985); *see also Atkins v. Parker*, 472 U.S. 115, 130 (1985) (sufficient "grace period" required); *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982) (legislature must "afford the citizenry a reasonable opportunity to familiarize itself with [the law's] terms and to comply"); *see also Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994) ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly.").

The Act's grace period – giving only until October 29, 2013, to apply for and obtain privileges – was manifestly insufficient, as demonstrated by the evidence of the cumbersome and lengthy application process and the law that allows hospitals 170 days to decide applications. ROA.342-45, 1922-26. Although the district court did not reach this claim or make any factual findings about it, it did "conclude[]" that the legislature never intended for a physician to be allowed a reasonable time to obtain admitting privileges." ROA.1545. As a result, should this

Court reach this claim, and decline to remand it, it should hold that the Act violates Appellees' due process rights.

## B.   The Admitting Privileges Requirement Is an Unconstitutional Delegation of Authority to Hospitals

The admitting privileges requirement grants hospitals unconstitutionally broad discretion to determine whether a physician is permitted to provide abortions for reasons that may be wholly unrelated to the safety of that care – reasons that the state could not itself impose as a condition of providing abortions. For example, the evidence shows that hospitals have varying requirements for privileges, including, among others, physician residency, board certification, threshold number of surgical procedures, and threshold number of annual hospital admissions. *See* ROA.1543. While the district court made no factual findings on this claim, it did note that the latter two requirements alone will prevent many of Appellees' physicians from obtaining privileges. *See id.* ("[T]here is evidence that if required by the hospital, the vast majority of abortion providers are unable to ever meet the threshold annual hospital admissions, because the nature of the physicians' low-risk abortion practice does not generally yield any hospital admissions. Clinic physicians are similarly unable or unlikely to meet the threshold surgery numbers because they simply do not perform the qualifying surgeries.").

The evidence also showed that hospitals make decisions about privileges not based on qualifications, but on the hospitals' own business needs, and that hospital

committees may act against any particular doctor for arbitrary reasons, which may be unknowable, as much of the process is secret. ROA.1104-05, 1743. Indeed, while the district court did not reach Appellees' nondelegation claim, it noted that it had "grave reservations about allowing a hodge podge of diverse medical committees and boards to determine, based solely on admitting privileges, which physicians may perform abortions." ROA.1545.

Longstanding principles of due process hold that: (1) states may not authorize private parties to act against third-party liberty or property interests in ways that the state itself could not act; and (2) in order for a delegation of governmental authority to be constitutional, states must retain the ability to review private parties' exercise of governmental discretion. *See, e.g.*, *State of Wash. ex. rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116 (1928) (striking down law preventing certain uses of land unless consented to in writing by two-thirds of the property owners in the immediate vicinity); *Birth Control Ctrs., Inc. v. Reizen*, 508 F. Supp. 1366, 1374 (E.D. Mich. 1981), *aff'd on other grounds*, 743 F.2d 352 (6th Cir. 1984) (law requiring abortion clinics to have a backup agreement with a physician who had staff privileges at a local hospital "violate[d] due process concepts because [it] delegate[d] a licensing function to private entitles without standards to guide their discretion"); *Hallmark Clinic v. N.C. Dep't of Human Res.*, 380 F. Supp. 1153, 1158 (E.D.N.C. 1974) (striking down written transfer

agreement or admitting privileges requirement for abortion providers because "the state . . . placed no limits on the hospital's decision to grant or withhold a transfer agreement").

The Act violates both requirements. As to the first, although Texas law requires hospitals to consistently apply whatever criteria they have for assessing privilege applications, it leaves hospitals with broad discretion to set those criteria in the first instance. This is precisely the sort of arbitrary result that the nondelegation doctrine guards against: As it would be unconstitutional for Texas to bar physicians from providing abortions solely because they do not send a minimum number of patients to the hospital each year, it is equally impermissible for the state to delegate such an irrational power to a private entity. *See Tucson Women's Clinic v. Eden*, 379 F.3d 531, 556 (9th Cir. 2004) (nondelegation doctrine prohibits the state from delegating to a third party the power to prohibit physicians from providing abortions based on criteria that would be illegitimate for the state to impose); *Hallmark Clinic*, 380 F. Supp. 2d at 1158-59 ("The state cannot grant hospitals power it does not have itself."). Appellants' citation to a Texas regulation prohibiting discrimination against physicians who provide abortions, *see* Br. at 32-33, is therefore irrelevant because hospitals remain free to deny privileges based on criteria having nothing to do with a physician's provision of abortion care or qualifications.

The Act violates the second requirement because there is no oversight or review of hospitals' criteria for or decisions granting or denying physicians' applications.[26] This sort of unreviewable power over a liberty or property interest is the *sine qua non* of unconstitutional delegation and it renders the admitting privileges requirement unconstitutional. *See, e.g.*, *Roberge*, 278 U.S. at 122 (finding due process violation where "[t]here is no provision for review under the ordinance; [the private property owners'] failure to give consent is final"); *cf. Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 610 (6th Cir. 2006) (holding nondelegation doctrine inapplicable where state could waive hospital transfer agreement requirement).

## IV.  THE DISTRICT COURT PROPERLY HELD THE MEDICATION ABORTION RESTRICTIONS UNCONSTITUTIONAL AS APPLIED TO WOMEN FOR WHOM THEY POSE SIGNIFICANT HEALTH RISKS

For more than 40 years, the Supreme Court has never wavered from holding that a state may not restrict access to abortions that are "necessary, in appropriate

---

[26] Appellants misconstrue Appellees' claim. Appellees do not claim that the admitting privileges requirement is an unlawful delegation solely because it transfers authority to private actors. *See* Br. at 32. The requirement is unconstitutional because it delegates authority to private actors without ensuring that the private actors' discretion is properly constrained and subject to adequate review. Accordingly, several of the cases on which Appellants rely – *Currin v. Wallace*, 306 U.S. 1 (1939) and *United States v. Rock Royal Coop.*, 307 U.S. 533, 577 (1939) – are inapposite as they support only the undisputed proposition that, in some instances, delegation of government authority to private actors is constitutional.

medical judgment, for the preservation of the life or health of the mother." *Roe v. Wade*, 410 U.S. 113, 165 (1973); *see also Ayotte*, 546 U.S. at 327-28; *Casey*, 505 U.S. at 879. The district court made well-supported factual findings, based on "uncontroverted evidence," ROA.1551, that "there are certain situations where medication abortion is the only safe and medically sound option for women with particular physical abnormalities or preexisting conditions." ROA.1554-55; *see also* Counter-Statement of the Case Section B, *supra*.

Applying that precedent to these facts, the district court properly concluded that "the medication-abortion provision of House Bill 2 is an undue burden on those women for whom surgical abortion is, in the sound medical opinion of their treating physician, a significant health risk during the period of pregnancy falling 50 to 63 days LMP." ROA.1556. Following the Court's instructions in *Ayotte* and *Gonzales*, it enjoined the medication abortion restrictions only as applied to women with gestational ages 50 through 63 days LMP when "a physician determines in appropriate medical judgment, such a procedure is necessary for the preservation of the life or health of the mother." ROA.1559.

Appellants' appeal of the district court's well-supported, limited injunction is both surprising and cruel. It is surprising because Appellants gave repeated assurances that they would not enforce the Act in such circumstances. ROA.1555 ("At trial, the State represented that it would not prosecute a physician who

41

violates the provisions of House Bill 2, if that physician provides a medication abortion to a woman whose life or health is endangered by the pregnancy or possibility of a surgical abortion.").[27] It is cruel because the "uncontroverted evidence" showed that the result Appellants seek would put women "at significantly higher risk for damage to the cervix or other complications, including uterine perforation." ROA.1551 n.18.

Notably, Appellants do not dispute that medication abortion is significantly safer for women with these conditions. Instead, they claim "ample justification" for denying them that option because medication abortion is "so risky that between 1-6% will require surgical completion." Br. at 35.[28] The district court considered this claim and found "the State's evidence on this matter unconvincing." ROA.1551 n.18. More importantly, Appellants' argument makes no sense. Even accepting their numbers, they are claiming that it is better for women with these conditions to be denied a 94 to 99 percent chance of avoiding a procedure that is significantly riskier for them, in favor of having the riskier procedure from the start.

Unable to dispute the safety advantages of medication abortion for these

---

[27] *See also* ROA.610 (State's Trial Br.) ("If a situation were ever to arise in which a woman's life or health is endangered by a pregnancy, and a surgical abortion is impossible because of a medical condition, then State officials assuredly will not punish or discipline a physician who prescribes mifepristone beyond the 49-day gestational age limit prescribed in HB 2.").

[28] The actual failure rate is between 0.5 and 2 percent. ROA.1116.

women, Appellants claim it "does not matter," Br. at 36, because the FDA did not approve mifepristone until 2000. *Id.* at 34-35. There is no law to support Appellants' position that they can take away improvements in care that prevent significant health risks to women simply because they did not exist 20 years ago.[29] To the contrary, the district court properly recognized that an abortion regulation may *not* subject women to significant health risks. *See, e.g.*, *Casey*, 505 U.S. at 880 (upholding law only because it had been interpreted to "not *in any way* pose a significant threat to the life or health of a woman" (emphasis added) (citation and internal quotation marks omitted)).

*Gonzales*, upon which Appellants rely, supports the district court's ruling. There, the Court recognized the same long-standing precedent. *Gonzales*, 550 U.S. at 161 ("The prohibition in the Act would be unconstitutional, under precedents we here assume to be controlling, if it subject[ed] [women] to significant health risks." (quoting *Ayotte*, 546 U.S. at 327-28 (citing *Casey*, 505 U.S. at 879))). Although the Court ruled that the plaintiffs had not demonstrated that the law violated that precedent on the face of the statute, the Court left the door open to a subsequent

---

[29] Appellants are wrong that the FDA "limits" mifepristone use to 49 days. Br. at 6-7. The FDA does not ban its use after 49 days. ROA.249. The Mifeprex label reflects this limit because that is what the manufacturer requested based on the fact that the regimen used in the clinical trials was less *effective* after 49 days – not because it had "increased complications." Br. at 6. Appellants similarly misrepresent the FDA's role in a drug's approval. The FDA cannot "update a protocol," *id*. at 35, without a request from the manufacturer. ROA.250-51, 1723.

challenge if it can be shown that in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used. *Id.* at 164, 167.

This is precisely what the district court did here. It found, based on "uncontroverted evidence," ROA.1551 n.18, that there are discrete and well-defined circumstances where women have a condition that has or is likely to occur where a banned medication abortion would be significantly safer. It enjoined the Act only in those applications. *Ayotte*, 546 U.S. at 967 ("[w]hen a statute restricting access to abortion may be applied in a manner that harms women's health," the question is not whether a remedy is available, but the scope of that remedy).

That is also what the Sixth Circuit did in *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490 (6th Cir. 2012), upon which Appellants rely. Br. at 36. That court rejected a facial challenge to virtually identical medication abortion restrictions, but affirmed in part a preliminary injunction precisely because medication abortion is significantly safer for women with these conditions. *DeWine*, 696 F.3d at 494 (noting that "a preliminary injunction is in place to cover the Act's failure to make an exception for circumstances involving the health and life of the mother"); *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 511-12, 514 (6th Cir. 2006) (affirming in part preliminary injunction because "the

abortion regulation at issue could pose a significant health risk to women with particular medical conditions" including "a bicornuate (i.e. divided) uterus, extreme flexion of the uterus, large uterine fibroids, cervical stenosis, female genital mutilation, and other abnormalities of the female genital tract").

The remainder of Appellants' arguments relate not to whether the Act's failure to protect women's health is a constitutional violation, but to the scope of the district court's injunction. First, Appellants claim that no injunction is needed at all because "[t]he statute provides an exception." Br. at 33. This is false. Appellants cite a legislative finding – Section 1(a)(4)(B) – which relates specifically and only to HB2's ban on abortions at 20 weeks:

> (4) *restricting elective abortion at or later than 20 weeks post-fertilization*, as provided by this Act, does not impose an undue burden or a substantial obstacle on a woman's ability to have an abortion because: … (B) this Act does not apply to abortions that are necessary to avert the death or substantial and irreversible impairment of major bodily function of the pregnant woman …

Acts 2013, 83rd Leg., ch. 1 (H.B.2) § 1(a)(4)(B) (emphasis added). Indeed, the law provides such an exception for the 20-week ban. Tex. Health & Safety Code § 171.046. But the medication abortion restrictions do not have any exception at all. *See id.* §§ 171.061-64.[30]

The remainder — Appellants also argue that the district court's injunction improperly reaches

---

[30] The legislative finding upon which the State relies is also too narrow. As is explained herein, the Supreme Court has consistently held that an abortion restriction cannot be applied if it would impose significant health risks.

women with gestational ages through 49 days LMP (for whom medication abortion using the FPL regimen remains legal). Br. at 39. Similarly, they complain that the district court improperly enjoined restrictions unrelated to allowing an alternative regimen for women with gestational ages 50 through 63 days LMP. *Id*. at 38. But the district court was quite clear that it only found a constitutional violation as applied to women with gestational ages 50 through 63 days LMP. ROA.1556. And the injunction applies only "to the extent those provisions prohibit a medication abortion" necessary to protect a woman's health. ROA.1559. Thus, the scope of the injunction *is* limited as Appellants desire: Plaintiffs' physicians may perform a mifepristone medication abortion using an alternative, evidence-based regimen for women with gestational ages 50 through 63 days LMP only if they "determine[] in appropriate medical judgment" that "such a procedure is necessary for the preservation of the life or health of the mother." *Id*.[31] The district court's injunction does not reach the other provisions of HB2's medication abortion restrictions.

This limited injunction is supported not only by the district court's factual findings, ROA.1551, but also by 40 years of precedent holding that abortion restrictions cannot be enforced when they pose a "significant health risk" to women. ROA.1555-56 (citations omitted). It should be affirmed.

---

[31] Appellants cite no evidence for their fears that the district court's limited injunction provides a "vague" exception that allows physicians "to disregard state abortion law at will." Br. at 39.

## V.  THE DISTRICT COURT PROPERLY FOUND THAT PLAINTIFFS HAVE STANDING TO BRING ALL OF THEIR CONSTITUTIONAL CLAIMS, WHICH MAY BE ADJUDICATED PURSUANT TO 42 U.S.C. § 1983

### A.  Appellees Have Third-Party Standing to Assert Claims on Behalf of Their Patients

As the district court held, "[t]hat abortion providers may raise constitutional challenges to state statutes that seek to regulate abortions is now so well established in our jurisprudence it is axiomatic." ROA.1537. Indeed, Appellants' contrary argument flies in the face of four decades of precedent. The Supreme Court's recognition that medical providers can raise the rights of their patients seeking reproductive health services dates back to 1965 in *Griswold v. Connecticut*, 381 U.S. 479, 481 (1965), where the Court held that the executive director and medical director of a reproductive health care clinic could raise the rights of married people with whom they had a confidential relationship. *See also Carey v. Population Servs. Int'l*, 431 U.S. 678, 683-84 (1977) (vendor of contraceptive devices had standing to assert rights of potential customers); *Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972) (distributor of contraceptives had third-party standing to raise the rights of nonmarried individuals who sought contraceptives).

In the context of abortion, the Court has *explicitly* recognized that abortion providers have standing to challenge abortion restrictions, and to raise the rights of

their patients. *Akron*, 462 U.S at 440 n.30 ("the physician plaintiff, who is subject to potential criminal liability for failure to comply with the [challenged] requirements . . . has standing to raise the claims of his minor patients); *Bellotti v. Baird*, 443 U.S 622, 627 & n.5 (1979) (accepting district court's decision to allow physician plaintiff to raise the rights of his minor patients); *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (allowing physicians to raise the rights of their patients to challenge restrictions on Medicaid reimbursement for abortion). The Supreme Court has also implicitly recognized the ability of physicians and health care centers to raise the rights of their patients in numerous cases. *See, e.g., Stenberg v. Carhart*, 530 U.S. 914 (2000); *Casey*, 505 U.S. 833.

The reasons for allowing third-party standing in this context are articulated in depth in *Singleton*, where the Court concluded, under the flexible prudential prong of standing, that physicians who provide abortion should be able to raise the rights of their patients because: (1) they have a sufficiently close relationship with their patients and are thus "uniquely qualified to litigate the constitutionality of the State's interference with" the abortion decision; and (2) there are several obstacles preventing women from bringing their own claims, including concerns about anonymity and potential mootness. 428 U.S. at 117-18.

Appellants' argument against third-party standing here boils down to whether Appellees have a sufficiently close relationship with their patients. But

this question is settled by *Singleton*, which held that "[a] woman cannot safely secure an abortion without the aid of a physician . . . the constitutionally protected abortion decision is one in which the physician is intimately involved." 428 U.S. at 117. Appellants further claim that there is a conflict between Appellees and their patients because they argue that the Act is designed to further women's health. But this same claim could be made with respect to any abortion regulation that purports to advance a valid state interest. For example, parental consent and mandatory counseling laws are defended as measures to inform women's decisions, but courts have repeatedly allowed abortion providers to challenge them, finding, implicitly or explicitly, that the providers' and women's interests are aligned and not adverse. *See, e.g., Bellotti*, 443 U.S at 627 & n.5, 635 (holding that physician plaintiff has standing to raise his minor patients' claims, and considering whether parental consent law should be upheld to protect the vulnerability of minors); *Charles v. Carey*, 627 F.2d 772, 779-80 n.10 (7th Cir. 1980) (rejecting state's claim of conflict of interest in challenge to counseling law designed to "protect women from abusive medical practices"); *Karlin v. Foust*, 975 F. Supp. 1177, 1202 (W.D. Wis. 1997) (same), *aff'd on this holding*, 188 F.3d 446, 457 n.5 (7th Cir. 1999). The same is true in similar contexts, such as access to contraception. *Eisenstadt*, 405 U.S. at 445-46, 450 (allowing plaintiff to raise the rights of others seeking contraception where government defended restriction as "regulating the

49

distribution of potentially harmful articles"); *Carey*, 431 U.S. at 683-84, 690 (granting third-party standing where government defended contraception restriction based on its interest in protecting health); *cf. Craig v. Boren*, 429 U.S. 190, 196, 200-01 (1976) (allowing vendor to raise rights of male customers to challenge restrictions on young men's beer purchases where law was defended as, *inter alia*, necessary to protect the safety of those young men).[32]

Rather than having interests at odds, Appellees and their patients share common interests. The challenged provisions of HB2 unconstitutionally impede access to abortion. Appellees' patients who will be improperly burdened when seeking abortion have the same interest as Appellees.[33]

Appellants also go to great lengths to relitigate the issues in *Okpalobi v. Foster*, 190 F.3d 337 (5th Cir. 1999), but this Court need not rely on that decision

---

[32] Appellants reliance on *Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004), is misplaced. In *Newdow*, the Court considered the complicated question of whether the plaintiff could raise the rights of his young child against the wishes of her mother, who had legal custody. The *Newdow* Court held that the father could not raise his daughter's rights because "the interests of *this* parent and *this* child are not parallel, and, indeed, are potentially in conflict." *Id.* at 15 (emphasis added). The Court *explicitly* distinguished the facts in *Newdow* from third-party standing in *Singleton*. *Id*. The Court in *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 80 (1978), upon which Appellants additionally rely, also explicitly refers to *Singleton* as an example of permissible third-party standing, namely because abortion providers have a close relationship with their patients.

[33] If there are women in Texas who, as Appellants claim, would prefer to obtain an abortion from a physician with admitting privileges, the district court's judgment does not prevent them from doing so because some Texas abortion providers do have admitting privileges.

50

to find Appellees have third-party standing. First, as discussed above, numerous Supreme Court cases make clear that Appellees have standing to raise the rights of their patients. Second, this Court has explicitly held in other cases that physicians and health care centers can raise the rights of their patients. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 333-34 (5th Cir. Unit B 1981) (holding that an abortion clinic that was denied a license could challenge the city commission's decision on its own behalf and on behalf of its potential patients); *Greco v. Orange Mem'l Hosp. Corp.*, 513 F.2d 873, 875 (5th Cir. 1975) (allowing physician to raise the rights of his patients in a challenge to a hospital policy restricting abortion). Accordingly, under Supreme Court and this Court's precedent, Appellees' ability to raise the rights of their patients is well settled.[34]

## B.  Appellees Have Third-Party Standing to Assert Claims on Behalf of Their Physicians

Appellee health centers have Article III injury. The challenged provisions will be codified in Chapter 171 of the Texas Health and Safety Code and if any of the health center's employees violate any provision of that chapter, the center faces

---

[34] *Amici* Lieutenant Governor argues against third-party standing relying on *Kowalski v. Tesmer*, 543 U.S. 125 (2004), but the Court in that case explicitly noted that the line of reproductive health cases is one of the few examples where it allows third-party standing. *Id.* at 130 (citing *Doe v. Bolton*, 410 U.S. 179 (1973) and *Griswold*). *Amici* also falsely claim that the "fifth *Singleton* vote rejected third-party standing." ROA.549. Justice Stevens provided that fifth vote, and only wrote separately to make clear that physicians only have standing to assert the rights of their patients if, as here, they are also seeking to assert their own rights and have at least an economic interest at issue. 428 U.S. at 121-22 (Stevens, J., concurring).

loss of licensure. *See* 25 Tex. Admin. Code § 139.32(b)(7). Contrary to Appellants' claims, Br. at 47-48, the health centers also have third-party standing to raise the Fourteenth Amendment rights of their physicians because there is a close relationship between them, and the physicians will face obstacles to bringing their own suit. Indeed, this Court has held that employers may properly assert the rights of their employees where, as here, there is a congruence of interests. *See, e.g., Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1252 (5th Cir. 1995).

Moreover, individual physicians are hindered from bringing suit in their individual capacity for all of the reasons that Appellees are unable to find doctors to provide abortion: many fear harassment, stigma, or violence. *See* ROA.347-48, ROA.354-55, ROA.1432-34. Although three physicians are named in this suit, it does not mean that all physicians would be willing to do the same. Indeed, this Court only needs to look at the docket in this case to see that doctors who provide abortion are the targets of harassment and intimidation. *See* ROA.477-86 (Motion for Intervention of Mitchell Williams); Motion for Reconsideration of Mitchell Williams (Docket #102).

The three individual physicians named in the complaint clearly have standing. While this Court is certainly not prohibited from reaching the question of whether the health centers can raise the rights of their employees, many courts have held that when one (or more) party has standing, there is no need to address

the question of other parties' standing. *See, e.g., Carey*, 431 U.S. at 682 (holding that one plaintiff had standing to challenge contraception restriction, and finding "no occasion to decide the standing of the other appellees"); *Doe*, 410 U.S. at 189 (refusing to determine standing of additional parties after finding that a woman seeking an abortion and a physician had standing).

### C.     Appellees May Assert Their Patients' Claims Under 42 U.S.C. § 1983

Appellants' argument that Appellees cannot bring third-party claims under Section 1983 appears to be an attempt to avoid paying attorneys' fees under 42 U.S.C. § 1988 if their appeal is unsuccessful. Br. at 48. Regardless of Appellants' motivation, their claim is plainly contradicted by the language of those statutes and numerous cases. Section 1983 states in relevant part: "Every person who . . . subjects . . . any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983. The statute does not limit who may bring suit, but only describes to whom Appellants may be liable. Here, Appellees may bring a claim under Section 1983 on behalf of their patients, who are the "injured" parties to whom Appellants "shall be liable." Indeed, as discussed above, Appellees – both health centers and physicians – will suffer injury as a result of Appellants' enforcement of the Act, and Appellees have third-party standing to raise the rights of their patients.

Appellants' argument is belied by numerous cases that have allowed health care centers to pursue actions under Section 1983 and have allowed third-party standing. *See, e.g., Ayotte*, 546 U.S. 320; *Thornburgh v. Am. Coll. of Obstetricians and Gynecologists*, 476 U.S. 747, 752 (1986), *overruled on other grounds by Casey*, 505 U.S. 833; *Carey*, 431 U.S. 678; *Craig*, 429 U.S. 190.[35]

None of the cases Appellants rely upon stands for the proposition that a plaintiff with third-party standing may not seek prospective relief under Section 1983 on behalf of the third party. Instead, most of the cases focus on whether there was sufficient allegation of direct injury to the plaintiff. For example, in *Rizzo v. Goode*, 423 U.S. 362 (1976), the Court was concerned that the plaintiffs were seeking a remedy based on a limited number of alleged improper police incidents, including by officers not named in the lawsuit. In *Coon v. Ledbetter*, 780 F.2d 1158 (5th Cir. 1976), this Court held that a man's wife could not show a deprivation of her own constitutional rights by the sheriffs who shot her husband. And *Shaw v. Garrison*, 545 F.2d 980 (5th Cir. 1977), stands for the unremarkable proposition that suits to enforce another's rights are generally impermissible. The cases from the other Courts of Appeals relied upon by Appellants are also

---

[35] In an especially puzzling argument, Appellants claim, relying on *Planned Parenthood of Houston and Se. Tex. v. Sanchez*, 403 F.3d 324 (5th Cir. 2005), that third-party claims can only proceed under the implied right of action established by the Supremacy Clause. Br. at 48. But the *Sanchez* plaintiffs were asserting their own rights under the Supremacy Clause. Indeed, *Sanchez* does not discuss third-party standing at all.

inapposite, given that they address the question of whether a Section 1983 claim for damages survives the complainant's death;[36] whether a bystander who witnesses another's constitutional rights being violated can bring a Section 1983 case;[37] whether damages are available under Section 1983 in First Amendment overbreadth challenges;[38] or whether a constitutional or federal right – rather than some other right – was invoked.[39] None of those cases are relevant to the proposition here, which has long been settled: a claim for injunctive and declaratory relief raising third-party rights can be brought under Section 1983 for constitutional violations.

---

[36] *Estate of Gilliam v. City of Prattville*, 639 F.3d 1041, 1044 (11th Cir. 2011); *Andrews v. Neer*, 253 F.3d 1052, 1056 (8th Cir. 2001).

[37] *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000); *Garrett v. Clarke*, 147 F.3d 745, 746-47 (8th Cir. 1998); *Archuleta v. McShan*, 897 F.2d 495, 497 (10th Cir. 1990).

[38] *Hunt v. City of Los Angeles*, 638 F.3d 703, 710 (9th Cir. 2011); *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006).

[39] *Bates v. Sponberg*, 547 F.2d 325, 331 (6th Cir. 1976).

## CONCLUSION

For all of the foregoing reasons, Appellees urge this Court to affirm the district court's judgment.

Dated: December 13, 2013                     Respectfully submitted,

                                             */s/ Janet Crepps*
                                             Janet Crepps
                                             Center for Reproductive Rights
                                             120 Wall Street, 14th Floor
                                             New York, NY 10005
                                             (864) 962-8519
                                             jcrepps@reprorights.org

                                             */s/ Helene T. Krasnoff*
                                             Helene T. Krasnoff
                                             Planned Parenthood Federation of America
                                             1110 Vermont Ave., N.W., Suite 300
                                             Washington, D.C. 20005
                                             (202) 973-4800
                                             helene.krasnoff@ppfa.org

                                             */s/ Rebecca L. Robertson*
                                             Rebecca L. Robertson
                                             American Civil Liberties Union of Texas
                                             1500 McGowen Street, Suite 250
                                             Houston, TX 77004
                                             (713) 942-8146
                                             rrobertson@aclutx.org

                                             */s/ Brigitte Amiri*
                                             Brigitte Amiri
                                             American Civil Liberties Union Foundation
                                             Reproductive Freedom Project
                                             125 Broad Street, 18th Floor
                                             New York, NY 10004
                                             (212) 519-7897
                                             bamiri@aclu.org

_/s/ R. James George, Jr._

R. James George, Jr.
George Brothers Kincaid & Horton LLP
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701
(512) 495-1400
jgeorge@gbkh.com


Attorneys for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of December, 2013, I electronically filed the foregoing **Brief of Plaintiffs-Appellees** with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for Defendants-Appellants and Amici Curiae.

*/s/ Janet Crepps*
Janet Crepps

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that:

1. The Brief of Plaintiffs-Appellees complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,937 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in Microsoft Office Word 2007 with 14 point Times New Roman font, a proportionally spaced typeface.

Dated: December 13, 2013

/s/ Janet Crepps
Janet Crepps
Attorney for Plaintiffs-Appellees

Janet Crepps
Senior Counsel
U.S. Legal Program
Direct Line: (864) 962-8519
Email: jcrepps@reprorights.org

January 3, 2014

Lyle W. Cayce
Clerk of Court
U.S. Court of Appeals for the Fifth Circuit
600 S. Maestri Place
New Orleans, LA 70130-3408

**Re:** ***Planned Parenthood of Greater Texas Surgical Health Services v. Abbott***,
   **No. 13-51008**

Dear Mr. Cayce,

Plaintiffs-Appellees submit this letter pursuant to Federal Rule of Appellate Procedure 28(j) and 5th Cir. R. 28.4 to inform this Court that, since the time Plaintiffs-Appellees filed their brief with this Court, physicians providing abortions at Plaintiff Whole Woman's Health in San Antonio have acquired admitting privileges in San Antonio and Plaintiff Dr. Lamar Robinson has acquired admitting privileges in Dallas.

Respectfully submitted,

*/s/ Janet Crepps*
Janet Crepps
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(864) 962-8519
jcrepps@reprorights.org

*/s/ Helene T. Krasnoff*
Helene T. Krasnoff
Planned Parenthood Federation of America

1110 Vermont Ave., N.W., Suite 300
Washington, D.C. 20005
(202) 973-4800
helene.krasnoff@ppfa.org

/s/ Rebecca L. Robertson
Rebecca L. Robertson
American Civil Liberties Union of Texas
1500 McGowen Street, Suite 250
Houston, TX 77004
(713) 942-8146
rrobertson@aclutx.org

/s/ Brigitte Amiri
Brigitte Amiri
American Civil Liberties Union Foundation
Reproductive Freedom Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7897
bamiri@aclu.org

/s/ R. James George, Jr.
R. James George, Jr.
George Brothers Kincaid & Horton LLP
1100 Norwood Tower
114 West 7th Street
Austin, TX 78701
(512) 495-1400
jgeorge@gbkh.com

Attorneys for Plaintiffs-Appellees

cc: All Counsel of Record



# ATTORNEY GENERAL OF TEXAS
## GREG ABBOTT

JONATHAN F. MITCHELL
SOLICITOR GENERAL

(512) 936-1695
JONATHAN.MITCHELL@TEXASATTORNEYGENERAL.GOV

March 17, 2014

Mr. Lyle W. Cayce, Clerk
U.S. Court of Appeals for the Fifth Circuit
600 South Maestri Place
New Orleans, LA 70130-3408

Re:    *Planned Parenthood of Greater Tex. Surgical Health Servs., et al. v. Abbott, et al.,* Case No. 13-51008

Dear Mr. Cayce:

The El Paso Times reports that Dr. Pamela Richter has "secured temporary privileges at an El Paso hospital." *See* Attach. Dr. Richter is a named plaintiff in this litigation, and the complaint alleges that Dr. Richter "will be forced to stop providing abortion[s]" if HB2 takes effect. ROA.35–36. At trial, Joseph Potter opined that Dr. Richter's El Paso clinic would close permanently if HB2 takes effect, forever reducing the "capacity" of Texas abortion providers by 1,430 abortions. *See* ROA.1155 (predicting that capacity in El Paso will drop from 2,230 to 800).

It now appears, based on newspaper reports, that Dr. Richter has obtained privileges and that her clinic has been performing abortions since last year. *See* Attach. These reports, if true, further discredit Potter's testimony, which rests on the unwarranted assumption that every abortion practitioner who lacked admitting privileges at the time HB2 took effect is incapable of obtaining them.

Respectfully submitted.

/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
Solicitor General

cc:    Janet Crepps, counsel for Plaintiffs-Appellees

## 1 El Paso abortion clinic to close in August, other may stay open

*By Marty Schladen \ Austin Bureau El Paso Times*
*Posted:*

ElpasoTimes.com

**AUSTIN >>** One El Paso abortion clinic will be forced to close in August if it has to upgrade to standards required by a Texas law passed last year.

The other might be able to afford to make the required changes.

Closing both clinics likely would make El Paso the largest U.S. city not to have an abortion provider. The anti-abortion American Family Association wrote last year that Chattanooga, Tenn., with a population of 171,000, was the largest U.S. city without an abortion clinic.

With 673,000 people, El Paso easily would be the largest city without a clinic.

Dr. Franz Theard, the doctor who owns El Paso's Hilltop Women's Reproductive Clinic, said there is no way his business can afford to make the upgrades required by House Bill 2, a controversial law passed in a special legislative session last summer that places harsh new regulations on abortion. Among them, the new law requires that clinics retrofit to qualify as "ambulatory surgical centers" — which would require Hilltop to widen hallways, enlarge surgical suites, add locker rooms, install backup generators and make other changes.

"We're not going to retrofit and spend $2 million to become a surgical center," Theard said.

Only five of Texas' 36 licensed abortion clinics complied with the regulation at the time House Bill 2 was passed. It goes into effect Sept. 1.

Another requirement of the law — that doctors at abortion clinics have admitting privileges at local hospitals — is already in effect. That requirement has forced some Texas clinics to stop performing abortions, including clinics in McAllen and Beaumont that announced earlier this month that they would close.

El Paso's other clinic, Reproductive Services, was forced to stop offering abortions for several months last year.

Gerri Laster, the clinic's executive administrator, last week said that the clinic's doctor, Pamela Richter, had secured temporary privileges at an El Paso hospital.

Asked if her clinic could afford to make the changes required by Sept. 1, Laster said she is uncertain that the requirement will take effect then.

"We don't know what the Fifth Court of Appeals is going to do," she said.

She was referring to a legal challenge to House Bill 2.

A federal judge in San Antonio ruled last year that the law amounted to an unconstitutional burden on women's abortion rights as spelled out in the U.S. Supreme Court ruling Roe v. Wade. An appeal of the

ruling is now before the 5th U.S. Circuit Court of Appeals in New Orleans.

A panel of the court ruled that House Bill 2's regulations will stay in force until the full court makes a ruling. Whatever it decides, the case is expected to be appealed to the Supreme Court.

Proponents of House Bill 2 say its requirements are meant to protect women.

But critics say they're superfluous to the vast majority of abortions — those that end early-term pregnancies. Those procedures involve women taking pills to terminate their pregnancies.

Laster said that if her clinic has to upgrade to qualify as an ambulatory surgical center, it seems well positioned to do so.

"Our building is really large," she said.

Laster said an architect has inspected the building and determined that its hallways don't have to be widened, saving that expense.

Marty Schladen may be reached at 512-479-6606.