1                  IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE MIDDLE DISTRICT OF ALABAMA

 3                          NORTHERN DIVISION

 4

 5   PLANNED PARENTHOOD
     SOUTHEAST, INC., et al.,
 6
            Plaintiffs,
 7
         vs.                        CASE NO.:  2:13cv405-MHT
 8
     LUTHER STRANGE, et al.,
 9
            Defendants.
10

11                            ROUGH DRAFT

12                   *  *  *  *  *  *  *  *  *  *

13             EXCERPT OF NONJURY TRIAL PROCEEDINGS

14                 TESTIMONY OF MARY ROE, M.D.

15                   *  *  *  *  *  *  *  *  *  *

16             BEFORE THE HONORABLE MYRON H. THOMPSON, UNITED STATES

17   DISTRICT JUDGE, at Montgomery, Alabama, on Thursday, May 22,

18   2014, commencing at 9:17 a.m.

19   APPEARANCES:

20
     FOR THE PLAINTIFFS:       Ms. Alexa Kolbi-Molinas
21                             Mr. Andrew David Beck
                               Ms. Susan Talcott Camp
22                             Ms. Julia Heather Kaye
                               Attorneys at Law
23                             AMERICAN CIVIL LIBERTIES UNION
                               125 Broad Street, 18th Floor
24                             New York, New York  10004-2400

25

1  A.   I moved in 2006.

2  Q.   And just to be clear, do you provide any medical services in

3  Birmingham now other than the abortion and family planning

4  services that you provide once a week for PPSE?

5  A.   No, I do not.

6  Q.   Do you think that you can get admitting privileges now at

7  any hospital in Birmingham that would meet the act's

8  requirements?

9  A.   No, I cannot.

10  Q.   Why not?

11  A.   Because I -- after reviewing the applications for those

12  hospitals, I can't meet either one or several of their

13  requirements in order to be granted privileges.

14  Q.   And can you just -- we'll get to the more specific

15  requirements a little bit later in your testimony.  But can you

16  just give an overview of the types of requirements that you

17  don't meet?

18  A.   There are generally admitting requirements, number of

19  patients that need to be admitted, location of either residence

20  and/or office.  There are support documents that are required

21  that generally I cannot meet.

22  Q.   We'll come back -- excuse me.  And just to be clear, do you

23  have an understanding of whether you can obtain admitting

24  privileges now at any hospital in Mobile that would meet the

25  act's requirements?

1    A.   No, I cannot.

2    Q.   And why is that?

3    A.   Because, again, I do not live in Mobile.  And I do not have

4    the -- I don't admit enough patients to meet their requirement,

5    nor would I be able to.  And there are also location requirement

6    for both office and/or residence.

7    Q.   Dr. Roe, have you taken any steps to try to obtain admitting

8    privileges in Alabama?

9    A.   Yes, I have.  Prior to the act becoming law, we -- I started

10   looking for the possibility of obtaining privileges.

11   Q.   And why did you try to obtain admitting privileges at that

12   stage?

13   A.   Because at that stage, there was no doubt that that

14   particular act would come to pass.  And I felt that it would be

15   smarter to try to obtain privileges before it became an issue of

16   contention.

17   Q.   And what steps did you take at that stage?

18   A.   I approached both the house staff office at Cooper Green,

19   and I approached the UAB department of OB -- obstetrics and

20   gynecology because I had previous relationships with them and

21   they had files on me.  And so I felt that those would be the

22   least complicated places to start because of previous

23   relationships.

24   Q.   And focusing first on Cooper Green, what steps did you take

25   there and what was the result?

1  A.  I called the house staff office and spoke to the lady who

2  was in charge of the house staff office.  She recognized me.

3  She sent me an application.  And at the time, Cooper Green was

4  going through its own changes.  And before I could even start

5  with the process, it stopped providing inpatient services.  Then

6  it stopped providing outpatient services, and then it just shut

7  down.

8  Q.  So just to be clear, was getting admitting privileges an

9  option at Cooper Green at that point?

10  A.  I'm sorry.  I don't understand the question.

11  Q.  Just to be clear, at that point, did you still have the

12  option of getting admitting privileges at Cooper Green?

13  A.  No, I did not.

14  Q.  And then turning to the steps that you took in connection

15  with UAB, can you explain to the Court what you did.

16  A.  Well, at teaching hospitals, in order to have admitting

17  privileges, you have to be a faculty on staff at that -- at that

18  medical school.  And so I approached it by trying to get a

19  volunteer appointment in the department of obstetrics and

20  gynecology.  Spoke to several faculty and explained to them what

21  I could bring to their educational program, including a long

22  conversation with the chairman.  They all were very

23  understanding, but they all -- they all felt that this was not a

24  relationship that they wanted to pursue.

25  Q.  And just to be clear, when you say this would have been a

1  volunteer position, that would have been an unpaid position that

2  you were seeking?

3  A.   Yes.

4  Q.   And when you say that this was not -- they indicated this

5  was not a relationship that they were -- would be comfortable

6  with, did you understand that they were referring to a

7  relationship with you or with Planned Parenthood?  Or what were

8  they referring to?

9  A.   They did not want a relationship with Planned Parenthood.

10  Q.   And did you have an understanding of their reasons for that

11  decision?

12  A.   They did not want the -- the -- they did not want the

13  political contention that comes with having a relationship with

14  Planned Parenthood.  They are a state-funded institution, and

15  they have mission and bylaws that they have to abide by.

16  Q.   And have you do you know that that was their reasons?

17  A.   Again, I had a long conversation with the chairman, who was

18  very respectful but very steadfast in his decision that he did

19  not want to have -- he did not want to have a relationship with

20  Planned Parenthood.

21  Q.   Dr. Roe, were you surprised that you were not able to get a

22  faculty appointment at UAB?

23  A.   No, I was not surprised.  Unfortunately, abortion is taken

24  out of context of the care that we provide to women.  Can and is

25  a very contentious topic, and I understood their position.

1  Q.  Now, Dr. Roe, you testified earlier that you used to have a

2  relationship with UAB.  You were on faculty there and were able

3  to obtain admitting privileges in that way.  What has changed

4  since that time?

5  A.  When I was on faculty at UAB, we had a different chair.  And

6  the political climate was different, both in Alabama and across

7  the United States.  And women's reproductive health and

8  reproductive rights were not such a hot topic of political

9  contention.

10  Q.  Do the meetings that you had with UAB affect your assessment

11  of your chances of being able to get privileges at other

12  hospitals?

13  A.  Yes.  I felt that if an institution where I was known and I

14  had a previous relationship -- if they were not willing to allow

15  me to have a voluntary appointment and work with them, the

16  likelihood of being able to obtain privileges at a hospital

17  where I had no previous or established relationship would be

18  that much harder.

19  Q.  Focusing now on the stage after the act passed, did you take

20  any steps -- any other steps to try to get admitting privileges

21  in Birmingham?

22  A.  Yes.  I worked with our health center managers, regional

23  director, and we also received some health from Planned

24  Parenthood national office to obtain application and information

25  about privileging application at hospitals in Birmingham and in

1    Mobile.

2    Q.  And just to be clear, did you initially look at all of the

3    hospitals?

4    A.  No.  When I knew that this act was going to pass, I looked

5    at it as a physician taking care of patients.  And so I

6    approached it by looking at hospitals that were closest to the

7    health center, because that's what made clinical sense in terms

8    of the patients' safety.

9    Q.  And at some stage, did you evaluate your eligibility for all

10   of the hospitals in Birmingham and Mobile?

11   A.  Yes, I did.

12   Q.  And what did you conclude?

13   A.  That I was unable it meet the requirement for staff

14   privileges at all those hospitals.

15   Q.  Now, I just want to go back to one thing you said a moment

16   ago, Dr. Roe.  You were saying that you thought about this --

17   when you were deciding which hospitals to look at initially, you

18   thought about it from a clinical perspective and looked at the

19   closest hospitals because that's what would make clinical sense

20   to you.  But just to be clear, did anything about this

21   requirement make clinical sense to you?

22           MS. FLEMING:  Objection, Your Honor.  Leading.

23           THE COURT:  I'll allow that.

24   A.  I'm sorry.  Could you repeat the question?

25   Q.  You testified a moment ago that when you were initially

1    deciding which applications to look at to in order to see

2    whether you could get privileges that meet the act's

3    requirement, you focused on the hospitals that were closest to

4    you because that's what made clinical sense to you.  But just to

5    be clear, does anything about the act's requirement make

6    clinical sense to you?

7            MS. FLEMING:  Objection.

8            THE COURT:  Overruled.

9    A.  No.

10           MS. SANDMAN:  Did you get her answer?

11           COURT REPORTER:  Yes.

12           MS. SANDMAN:  Thank you.

13           Your Honor, I would beg the Court's indulgence for a

14   moment.  When I was shifting locations, I left my binder behind.

15   Can I get it?

16           THE COURT:  All right.

17           MS. SANDMAN:  Thank you.

18       (Brief pause)

19           MS. SANDMAN:  Thank you, Your Honor.  I apologize.

20   Q.  Dr. Roe, I'm going to ask you questions about the specific

21   bylaws for each hospital now.  I'd like to direct your attention

22   to what's been marked for identification as Plaintiff's

23   Exhibit 2, which is a summary of the hospital bylaws for

24   Birmingham and Mobile.  This is a summary that contains

25   quotations from the relevant sections of the bylaws from each

1    hospital.

2         MS. SANDMAN:  I know there was an objection to this

3    exhibit.

4         MS. FLEMING:  Yes.

5         THE COURT:  What -- just a minute.

6         MS. SANDMAN:  This is Plaintiff's Exhibit 2.  And it's

7    also in the witness binder, Your Honor, for your convenience.

8         THE COURT:  This is Plaintiff's Exhibit what?

9         MS. SANDMAN:  Two.

10        THE COURT:  Just a minute.

11        MS. SANDMAN:  And it's marked in your witness binder as

12   hospital chart or perhaps bylaws chart.

13        THE COURT:  Is this 42 or 2?

14        MS. SANDMAN:  Two.

15        THE COURT:  Is this Dr. Roe?

16        MS. SANDMAN:  Dr. Roe.  I'm not sure that there's an

17   exhibit number on the label on your chart, but it says bylaws

18   chart.

19        THE COURT:  Okay.  I'm not sure -- it's not Exhibit 2;

20   but anyway, it does say hospital chart.

21        Okay.  Now, what's the objection?

22        MS. FLEMING:  Yes, Your Honor.  This exhibit is

23   actually a document I understand prepared by counsel; is that

24   right?

25        MS. SANDMAN:  That is correct.

1          MS. FLEMING:  That purports to be a summary of

2    different documents that have been introduced into evidence,

3    Your Honor.  I'm --

4          THE COURT:  I will consider it as secondary evidence,

5    which means that I will ignore it to the extent that there's not

6    primary evidence that supports it.  In other words, it amounts

7    to argument, is really what it comes down to.

8          MS. FLEMING:  A demonstrative aid, Your Honor.

9          THE COURT:  It's just demonstrative, yes.

10         MS. FLEMING:  Certainly.

11         MS. SANDMAN:  Your Honor --

12         THE COURT:  With that understanding, I'll admit it.

13         MS. SANDMAN:  Your Honor, just one further thought on

14   that, if I may.  We would also offer that as pursuant to Rule

15   1006 as a summary of voluminous records just to aid in the

16   Court's assistance.

17         THE COURT:  I think that it all amounts to the same

18   thing.

19         MS. SANDMAN:  Very good, Judge.

20   Q.  Directing your --

21         THE COURT:  I assume these records are in evidence; is

22   that right?

23         MS. SANDMAN:  They are, Your Honor.

24         THE COURT:  Right.

25         MS. SANDMAN:  My only concern is just to expedite the

1  testimony.  I would prefer not to have to bore the Court by

2  giving the full bylaws citation for each section I'm asking her

3  to rely on.  So that's why I wanted to make sure that the chart

4  would also be in evidence so that it would be clear what section

5  she was referring to if a question ever came up.

6          THE COURT:  Right.  And I'm assuming the footnotes down

7  here are the actual citations to the bylaws.

8          MS. SANDMAN:  Correct.

9          THE COURT:  So you don't have to go through that.

10          MS. SANDMAN:  Very good, Judge.  Thank you.

11          THE COURT:  Go ahead.

12  Q.  (Ms. Sandman, continuing:)  Dr. Roe, looking at the first

13  column, the minimum patient contacts requirement for active

14  staff, and this is for Brookwood Medical Center, can you meet

15  that requirement?

16  A.  No, I cannot meet that requirement.

17  Q.  And why is that?

18  A.  Because having hospital privileges is a professional

19  relationship that a physician establish with a hospital to

20  provide inpatient care.  And we provide -- at Planned

21  Parenthood, we provide outpatient care.  And so there's no way

22  that I could meet admitting an average of five patients a month.

23  Q.  And looking at the geographic requirements, the location

24  requirement in the next column, can you meet these for either

25  active or courtesy staff?

1    A.   No, I cannot.

2    Q.   And why is that?

3    A.   Because I do not live in Birmingham.

4    Q.   And Dr. Roe, just to be clear, do you have an office

5    location in Birmingham?

6    A.   Yes, I do.  But I am at that office one day a week.  And in

7    the sense that when you admit a patient to do hysterectomy or

8    myomectomy, in that context, you would be required to see your

9    patient before, during, and after the care that you provided in

10   the hospital.  And since I'm in the office one day a week, I

11   would not be able to meet that requirement.

12   Q.   Moving on to the coverage requirements, can you meet those

13   requirements for active and courtesy staff?

14   A.   No.  I would not be able to meet those requirements.  It

15   would be impossible to finds a physician willing to provide

16   coverage for me, which then would mean that they would have a

17   relationship with Planned Parenthood.

18   Q.   And when you say that it would be impossible, what's your

19   basis for saying that?

20   A.   Physicians in the community are not interested in having a

21   relationship with Planned Parenthood because of the impact it

22   can have on their standing in their community, the impact it can

23   have on their business, their ability to take care of their

24   patients.  And so they're not willing to have a relationship

25   with us.

1   Q.   And do you know any physicians at Brookwood who could

2   conceivably be willing?

3   A.   No, I do not.

4   Q.   In the next column, can you meet the assignment and

5   emergency department requirements for active or courtesy staff?

6   A.   No.  I would not be able to meet those requirements because

7   I don't live in Birmingham.

8   Q.   Now, as you can see in that last column, as a courtesy staff

9   member at Brookwood, you would also be required to be an active

10  member of at least one other hospital in the greater Birmingham

11  area.  Can you meet this requirement?

12  A.   No, I cannot.

13  Q.   Moving onto the next page, you will see requirements for

14  medical west.  Can you meet the minimum patient contact

15  requirements for active staff?

16  A.   No, I cannot.

17  Q.   And is that for the same reasons that you stated before?

18  A.   Yes.

19  Q.   What about the requirement on geographic location?

20  A.   I would not be able to meet those requirements either, for

21  the same reason.

22  Q.   Turning to the next page for Princeton Baptist, can you meet

23  the minimum patient contact requirements for active staff?

24  A.   No.  I would not be able to.

25  Q.   How about the localities requirements for active staff?

1  A.  Again, because I do not live in Birmingham, I would not be

2  able to meet those requirements.  And because I'm not in our

3  office on a frequent enough basis, I would not be able to meet

4  those requirements.

5  Q.  Dr. Roe, I do have one further question there.  Looking at

6  the language, it speaks specifically to being located closely

7  enough to the hospital to provide appropriate continuity of

8  quality of care.  Do you believe that you in fact do provide

9  such care?

10  A.  Absolutely.

11  Q.  Does that change your mind as to whether you would be able

12  to meet this location requirement?

13  A.  No, it does not.  Again, the hospital admitting privilege

14  bylaw are in the context of providing inpatient hospital care.

15  And in that context, because I am not in my office more than one

16  day a week, I would not be able to meet those bylaws.

17  Q.  What about the evaluation requirements for active and

18  courtesy staff?

19  A.  I would not be able to meet that requirement, because I

20  would not be able to admit enough patients to do enough surgery

21  to be able to be Proctored.

22  Q.  In the last Princeton Baptist column, there is one

23  additional requirement for courtesy staff related to

24  participation in a patient carry view program and other quality

25  maintenance activities at the hospital where you will currently

1  hold privileges.  Can you meet this requirement?

2  A.  No, I cannot.

3  Q.  And why is that?

4  A.  I currently do not participate in a quality maintenance

5  activities.

6  Q.  And just to be clear, when you say you don't part Pate,

7  could you explain to the Court what you mean by that?

8  A.  I personally am not on the QR or quality -- quality and risk

9  assessment management in any -- at any of the hospitals where I

10 currently hold privileges.  My records are reviewed by the

11 committee as any other physician in that hospital's, but I am

12 not on that committee myself.

13 Q.  Dr. Roe, in addition to the bylaws requirements, is there

14 any other reason you would not be able to get privileges at

15 Princeton Baptist?

16 A.  Princeton Baptist is a religious institution.  And religious

17 institutions, they stand by and hold fast by their mission and

18 values.  I trained at a religious institution as a residence --

19 OB-GYN resident, and I know that their mission and values are

20 very important to the way they conduct business and provide

21 care.  I remember as a third-year resident we had an obstetrical

22 patient who presented with severe preeclampsia and was only 18

23 weeks' gestation, so the fee us was not viable yet.  And

24 unfortunately for that woman, she was getting sicker very

25 quickly and potentially was -- her life was -- was threatened.

1   And the only way to take care of her and to save her life was to

2   terminate the pregnancy.  And so once that assessment was made,

3   our director of obstetrics approached the sisters of charity and

4   explained to them what was going on with the patient.  The

5   director of obstetrics was there with our perinatology, who was

6   the chairman.  And the sisters of charity understood the

7   situation and held fast that we could not terminate the

8   pregnancy.  We could transfer the patient to another hospital,

9   but we could not terminate the pregnancy in their hospital.  So

10  what we ended up doing was calling the city hospital, and the

11  patient was transported.  And our director of obstetrics

12  transported the patient with EMS just in case that patient

13  started seizing in EMS.  And once -- as soon as she got to the

14  city hospital, she was taken to the operating room, where the

15  pregnancy was terminated.

16  Q.  And is this experience a factor in your willingness to apply

17  for privileges at a religious hospital?

18  A.  Yes, it is.  They have their missions and values, and I

19  respect that.  And I know that they hold fast to it.  And I

20  respect that as well.

21  Q.  The next page contains requirements for privileges at Shelby

22  Baptist.  Can you meet the minimum patient requirements for

23  active staff?

24  A.  No, I cannot.

25  Q.  Can you meet the location requirements for active and

1   courtesy staff?

2   A.   No, I cannot.   I do not plan on moving within 45 minutes of

3   Shelby Baptist.

4   Q.   What about the evaluation requirements for active and

5   courtesy staff?

6   A.   No.   I would not be able to meet those requirements either.

7   Q.   And why is that?

8   A.   Because, again, I would not do enough inpatient GYN surgery

9   to be able to be Proctored.

10  Q.   Can you provide the emergency service coverage that is

11  required for active and courtesy staff in the last column?

12  A.   No.   I would not be able to, because I do not live in the --

13  within 45 minutes of Shelby Baptist.

14  Q.   And finally, are you a member of the active staff at another

15  Alabama hospital, as is required for courtesy staff?

16  A.   No, I am not.

17  Q.   Dr. Roe, we've been talking about some of the bylaws

18  requirements for Shelby Baptist.   Aside from these bylaws, is

19  there any other reason you do not believe you could get

20  privileges there?

21  A.   Again, Shelby Baptist is a religious mission based hospital.

22  And so that also -- that also makes me believe that I would not

23  be able to obtain privileges there.

24  Q.   Let's turn to the next page, St. Vincent's Birmingham.   Can

25  you meet the minimum patient contact requirement for active

1  staff?

2  A.  No.  I would not be able to.

3  Q.  What about the requirement regarding office or residence

4  location for active staff?

5  A.  I would not be able to meet those requirements.  Albeit that

6  our office is close to St. Vincent's, I am not in my office on a

7  regular enough basis.  I am only there once a week.  Therefore,

8  I would not be able to meet that requirement.

9  Q.  And what about the requirements for courtesy staff?

10  A.  No.  I would not be able to meet that.

11  Q.  What about the coverage requirements for active and courtesy

12  staff?

13  A.  I would not be able to meet that requirement either.

14  Q.  Can you meet the evaluation requirements for active and

15  courtesy staff?

16  A.  No.  I would not be able to.

17  Q.  And what about the last column for this hospital for active

18  staff?

19  A.  No.  I would not be able to.

20  Q.  Finally, looking at the religious-based language column,

21  I'll give you a moment to review that.

22      (Brief pause)

23  Q.  Does that give you any additional reason to believe that you

24  could not get privileges at this moment?

25  A.  Yes.

1  Q.  And actually, Dr. Roe, I'll ask you to go ahead and read the

2  items after the first and second bullet points into the record.

3  A.  On a personal basis, we feel that an individual's personal

4  conduct is, in general, his own private matter.  But we are a

5  church-related institution, and we expect that your actions will

6  not be in conflict with the mission, vision, and values of

7  St. Vincent's hospital.  If you were unable to function under

8  those circumstances, it is better that you withdraw.

9  Q.  Does that give you any additional reason to believe you

10 could not get privileges at this hospital?

11 A.  Yes.  It reinforced my belief that he would not be able to

12 give me admitting privileges.

13 Q.  Let's move on to St. Vincent's blunt.  Can you meet the

14 location requirements for active staff?

15 A.  No.  I would not be able to.

16 Q.  What about for courtesy staff?

17 A.  No.  I would not be able to.

18 Q.  Can you meet the evaluation requirements -- excuse me -- the

19 evaluation requirements for active and courtesy staff?

20 A.  No.  I would not be able to.

21 Q.  Can you meet the requirements for active and courtesy staff

22 in the last column?

23 A.  No.  I would not be able to.

24 Q.  Turning to St. Vincent's east on the next page, can you meet

25 the minimum patient contacts requirements for active staff?

1  A.   No.   I would not be able to.

2  Q.   What about the location requirements?

3  A.   No.   I would not be able to.

4  Q.   And what about the evaluation requirements for active and

5  courtesy staff?

6  A.   No.   I would not be able to.

7  Q.   And finally, what about the requirement in the last column

8  for active staff?

9  A.   No.   I would not be able to, because I do not live close

10  enough.   I do not live in Birmingham.   I live in Atlanta.

11  Q.   Let's turn now to Trinity medical center's requirements on

12  the next page.   Can you meet the patient contacts requirements

13  for active staff?

14  A.   No.   I would not be able to.

15  Q.   And what about the location requirements for active and

16  courtesy staff?

17  A.   No.   I would not be able to.

18  Q.   Please look at the next column, the religion-based language

19  for active and courtesy staff.   And I would like, again, to ask

20  you to read that language into the record.

21  A.   In accordance with the values that have always been the

22  foundation of Trinity Medical Center, we aver in the sanctity of

23  human life and believe that unborn children should be protected.

24  Medical and surgical abortions shall not be performed except in

25  the following situations, in the course of pregnancy,

1   occasionally situations arise in which the death of the mother

2   is likely and the fetus is deemed by the physician to be too

3   premature for extra uterine survival.

4   Q.  Does that language affect your willingness to apply for

5   privileges at Trinity Medical Center?

6   A.  Yes.  I do not meet their requirement.

7   Q.  Now, just to be clear, that requirement is directed at care

8   provided within the hospital, correct?

9   A.  Yes, it is.

10  Q.  But in your -- does this affect -- do you have a view as to

11  whether this would also affect the hospital's willingness to

12  grant you provider (sic) as an abortion provider who provides

13  abortions at a health center outside of the hospital?

14  A.  Yes.  Because I believe that this reflects the direct

15  mission and values of Trinity Medical Center.

16  Q.  And finally, Dr. Roe, can you meet the requirements for

17  courtesy staff in the final column?

18  A.  No.  I would not be able to.

19  Q.  Turning to the next page for UAB health system, can you meet

20  the requirements for active and courtesy staff at UAB?

21  A.  No, I cannot.

22  Q.  And why is that?

23  A.  Because I am not an appointed member of the faculty.

24  Q.  Dr. Roe, let's move on now to the Mobile hospitals.  Can you

25  meet the minimum patient contact requirements for active and

```
 1   courtesy staff at Mobile Infirmary?

 2   A.  No.  I would not be able to.

 3   Q.  What about the location requirements for active and courtesy

 4   staff?

 5   A.  No.  I would not be able to, because I do not live in

 6   Mobile.

 7   Q.  And can you meet the coverage requirements for active and

 8   courtesy staff?

 9   A.  No.  I would not be able to.

10   Q.  On the next page are the requirements for providence

11   hospital.  Can you meet the patient contact requirements for

12   active staff?

13   A.  No.  I would not be able to.

14   Q.  What about the location requirements for active staff?

15   A.  No.  I would not be able to.

16   Q.  And what about the location requirements for courtesy staff?

17   A.  No.  I would not be able to.

18   Q.  What about the coverage requirements for active and courtesy

19   staff?

20   A.  I would not be able to meet that either.

21   Q.  Do you know any physicians who have privileges at this

22   hospital?

23   A.  No, I do not.

24   Q.  Please look at the next column, the religion based language

25   for active and courtesy staff.  And again, I would ask you to
```

1   read that language into the record.

2   A.   Only physicians who meet the following criteria may be

3   considered for membership.   Are determined to, one, adhere to

4   the ethics of their respective professionals as well as the

5   ethical and religious directors for Catholic health care

6   services.

7   Q.   Does this language affect your willingness to apply for

8   privileges at Trinity Medical Center?

9   A.   Yes, it does.

10   Q.   And why is that?

11   A.   Because they're a religious hospital, and they adhere to

12   their mission and values.   And I would not be able to meet their

13   criteria based on their missions and values.

14   Q.   Moving on to Springhill on the next page, can you meet the

15   patient contacts requirement for active staff?

16   A.   No.   I would not be able to.

17   Q.   Can you meet the location requirements for active staff or

18   courtesy staff?

19   A.   No.   I would not be able to.

20   Q.   Can you meet the coverage requirements for active and

21   courtesy staff?

22   A.   No.   I would not be able to.

23   Q.   Can you read the evaluation requirements for active and

24   courtesy staff?

25   A.   No.   I would not be able to.

```
1   Q.  And finally, looking at the references requirement for
2   active and courtesy staff in the last column, can you meet
3   those?
4   A.  No.  I would not be able to.
5   Q.  Do you know any active staff members at Springhill?
6   A.  No, I do not.
7   Q.  Finally, the last hospital in Mobile is USA.  Can you meet
8   the minimum patient contacts requirements for courtesy and
9   active staff?
10  A.  No.  I would not be able to.
11  Q.  And I should be clear that for the record I'm referring to
12  the University of South Alabama, children's and women's hospital
13  when I say USA.  Can you meet the coverage requirements for
14  active and courtesy staff?
15  A.  No.  I would not be able to.
16  Q.  Dr. Roe, to be clear, we have just discussed the bylaws
17  requirements for 13 hospitals.  Have you applied for privileges
18  at any of these hospitals?
19  A.  No, I have in the applied for privileges at these hospitals.
20  Q.  Why not?
21  A.  Because applying for privileges is part of your professional
22  requirement.  It's not a membership.  It's something that you do
23  in the process of providing inpatient, GYN care to your
24  patients.  And to apply for these hospitals and not knowing --
25  knowingly not meeting their requirement could possibly have
```

1    negative effect on any professional career.

2    Q.  Can you explain what you mean by a negative effect on your

3    professional career?  What is the risk that you would be taking?

4    A.  When you apply for privileges, because it's a professional

5    relationship that you establish, if you are denied or if you

6    have to withdraw, there is the potential that this may be

7    reported to the national practitioner database.  And once it's

8    reported to the national practitioner database, every time you

9    have to reapply for your license, every time you have to apply

10   for a DEA number, every time you have to apply for privileges or

11   reapply for privileges, that information will come up.  And you

12   will have to explain to the respective committees or respective

13   institution why it happened.

14   Q.  And what do you believe would happen if it was reported to

15   another hospital that you applied for hospital privileges in

16   Birmingham or Mobile and were denied?

17   A.  They would question my professionalism knowing that I

18   applied for privileges at a hospital institution where I knew I

19   did not meet the requirement and yet pursued it anyway.

20   Q.  And does this concern also apply for your medical license?

21   A.  Yes.  Yes, it does.

22   Q.  But for either the hospitals or your license, wouldn't you

23   have the opportunity to explain why you were denied?

24   A.  The privilege and processes is something that happens behind

25   closed doors.  So as physician, you fill out your application.

1   You get all your support documentation, and you send in -- you

2   send it in to the committee that evaluates your sending and

3   whether you meet their requirements to receive staff privileges.

4   When you do have the opportunity to explain yourself, it's

5   usually in written.  Either way, they will look at you

6   unfavorably knowing that professionally you did not take into

7   account to respect the bylaws of the hospitals, and you casually

8   applied for privileges at all hospitals even when you knew you

9   could not meet the bylaws.

10  Q.  And what if you explained to them that you only did that

11  because you wanted to be able to continue providing abortion

12  services?  Would that help?

13  A.  No.  Because again, unfortunately, abortion services, taken

14  out of the context of providing women's health and providing

15  women access to their reproductive health is a politically

16  contentious topic.  And the hospitals do not want the type of --

17  do not to be engaged in that type of political contentiousness.

18  Q.  What if you were told that you did not meet some of the

19  requirements for admitting privileges, told by a hospital, and

20  you then withdrew your application for privileges?  Would this

21  protect you from having to report that you tried unsuccessful to

22  get privileges?

23          MS. FLEMING:  I'm going to object, Your Honor.  That

24  calls for speculation on the part of the witness.

25          THE COURT:  Repeat the question again.

1          MS. SANDMAN:  Suppose that you were told by one of the

2    hospitals that you did not meet some requirement for admitting

3    privileges and you then withdrew your application.  Would this

4    protect you from having to report that you tried unsuccessfully

5    to get privileges.

6          THE COURT:  I'll allow that.  Overruled.

7    A.   No.  It would not protect me.  Again, it's a -- it's a

8    matter of establishing your professionalism.  It is a

9    professional relationship.  And in some situation, for some

10   hospitals, they require that you disclose any application that

11   was made, whether it was denied or withdrawn.

12   Q.   Dr. Roe, please turn to the tab in your binder mark the

13   Princeton Baptist application.

14         MS. SANDMAN:  And Your Honor, this is just an excerpt

15   from the larger exhibit that has been admitted into evidence.

16   Q.   Do you recognize this document?

17   A.   Yes, I do.

18   Q.   And what is it?

19   A.   It is the -- the staff privilege application for Princeton

20   Baptist.

21   Q.   Directing your attention to the page with the flag, can you

22   read the highlighted section.

23   A.   Have you ever withdrawn an application for appointment,

24   reappointment, clinical privileges, or MCO panel, contracting

25   provider status or resigned before a decision was made by a

```
 1  governing board, whether voluntarily or involuntarily.
 2  Q.   So Dr. Roe, to your understanding, if you withdrew your
 3  application to another hospital and then applied for Princeton
 4  Baptist, would you, in fact, have to answer yes to this
 5  question?
 6  A.   Yes, I would.
 7  Q.   Please turn to the tab in your binder marked St. Vincent's
 8  east application.  Do you recognize this document?
 9  A.   Yes.
10  Q.   Please turn to the page with the flag and read the
11  highlighted section on page 6.
12  A.   Have you ever voluntarily or involuntarily withdrawn an
13  application for privileges at any hospital.
14  Q.   And again, if you were to apply in the future to a hospital
15  that had language on its application similar to this, would you
16  have to answer yes to that question if you applied for
17  privileges in Birmingham or Mobile and then withdrew that
18  application?
19  A.   Yes, I would.
20  Q.   Dr. Roe, one more question on voluntary withdrawals.
21  Suppose you voluntarily withdrew an application for privileges.
22  Would you trust the hospital not to report it to the national
23  practitioner database anyway?
24  A.   Again, the process is a closed-door process.  And once your
25  application and supporting documentation is turned, in you have
```

1   no control over what happens behind closed doors.  I have no --

2   no way of knowing how the hospital would report or choose to

3   report whether they denied my application.  And if there is one

4   member on that committee who feels strongly about abortion

5   services, that member may be the deciding factor in how the

6   hospital chooses to report that they denied my application.

7   Q.  And would you have the same concern if you applied for

8   waivers from some of the hospital requirements in the bylaws and

9   were denied?

10  A.  Yes.

11  Q.  Dr. Roe, is the fact that you would be applying for

12  admitting privileges in connection with the abortion services

13  that you provide a factor in your decision about whether you're

14  willing to apply?

15  A.  Yes.  Because again, it's -- unfortunately, a point of

16  contention.  And hospitals do not want to be associated with

17  that.

18  Q.  Are you aware that there is a law that prohibits hospitals

19  from discriminated against abortion providers when they apply

20  for admitting privileges?

21  A.  Yes, I am.

22  Q.  Do you think that protects you from such discrimination?

23  A.  Unfortunately, no, it doesn't.

24  Q.  Why not?

25  A.  Because, again, the process is a closed-door process.  What

1   happens behind closed door is -- I am not privy to it.  And

2   that's for any situation when you apply for staff privileges.

3   If there is one member on that committee who, again, feels very

4   strongly about abortion care, abortion services, that person may

5   be the deciding factor or the deciding voice on how and what

6   happens to my application.  And that's not a professional risk

7   that I'm willing to take.

8   Q.  Dr. Roe, you testified earlier that part of your inability

9   to get admitting privileges in Birmingham stems from the fact

10  that you live in Atlanta.  Are you willing to move back to

11  Birmingham?

12  A.  No, I'm not willing to move back to Birmingham.

13  Q.  And just so the record is clear, are you willing to move to

14  Mobile?

15  A.  No, I'm not willing to move to Mobile.

16  Q.  Turning to a different topic, as medical director, are you

17  familiar with the other physician who provides abortion services

18  for PPSE in Alabama?

19  A.  Yes, I am.

20  Q.  And who is that?  And if you need to reference your

21  pseudonym list, please do.

22  A.  Dr. P1.

23  Q.  Is Dr. P1 an OB-GYN?

24  A.  No.  Dr. P1 is a family medicine physician.

25  Q.  And can family medicine physicians perform hysterectomy or