IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, et al., | ) ) ) ) ) | |
| | ) | CIVIL ACTION NO. |
| Plaintiffs, | ) | 2:13cv405-MHT |
| | ) | (WO) |
| v. | ) | |
| | ) | |
| LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

OPINION

In <u>Planned Parenthood of Se. Pa. v. Casey</u>, 505 U.S. 833 (1992), the Supreme Court of the United States announced two principles that must govern this court's analysis of the right to choose to have an abortion. First, the Court reaffirmed "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." <u>Id</u>. at 846 (1992) (majority opinion). Second, the Court

endorsed "the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child." Id. However, in the controlling opinion, a plurality of the court announced that a State regulation goes too far in pursuing those legitimate interests when it imposes an "undue burden" on the woman's ability to choose an abortion. Id. at 874 (joint opinion of O'Connor, Kennedy, and Souter, JJ.).

As a trial court in the trenches, this court must remain faithful to the rule of law and not to its own doubts--or convictions--about the correctness of established law. Thus, this court must now apply the principles announced in Casey to determine the constitutionality of the State of Alabama's recently enacted requirement that all doctors who provide abortions must have staff privileges to perform designated procedures at a local hospital, codified at 1975 Ala. Code § 26-23E-4(c).

2

In order to give "real substance to the woman's liberty," id. at 869, while at the same time fully honoring the State's ability to pursue, in good faith, its own acknowledged legitimate interests, this court concludes that it must hold that this requirement is unconstitutional.  The evidence compellingly demonstrates that the requirement would have the striking result of closing three of Alabama's five abortion clinics, clinics which perform only early abortions, long before viability.  Indeed, the court is convinced that, if this requirement would not, in the face of all the evidence in the record, constitute an impermissible undue burden, then almost no regulation, short of those imposing an outright prohibition on abortion, would.


## I. PROCEDURAL HISTORY

The plaintiffs in this case, Reproductive Health Services, Planned Parenthood Southeast, and their administrators, operate abortion clinics in Montgomery,

Birmingham, and Mobile, Alabama.  They sued the Attorney General of Alabama, the District Attorneys for Montgomery, Jefferson, and Mobile Counties, and the State's Chief Medical Officer, challenging the constitutionality of Alabama's staff-privileges requirement, codified at 1975 Ala. Code § 26-23E-4(c). Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343(a)(3)-(4) (civil rights).  This court held a ten-day bench trial, and this matter is now before the court for resolution of the constitutionality of the staff-privileges provision.

## II. FACTUAL BACKGROUND

### A. The Climate in Alabama

### 1. A History of Violence

Although the vast majority of those who oppose abortion do so in nonviolent ways, this court cannot overlook the backdrop to this case: a history of severe

4

violence against abortion providers in Alabama and the surrounding region.

In 1993, a gunman shot and killed Dr. David Gunn, an Alabama resident who provided abortions throughout the State and in northern Florida.  Dr. Gunn was the first doctor in the nation to be murdered for performing abortions.  He became identifiable after his name, photo, and contact information were displayed on an anti-abortion poster at a rally in Montgomery.  The same gunman later killed Dr. Gunn's replacement in northern Florida, along with his guard, and also wounded that doctor's wife.

A few years later, in 1997, a person opposed to abortion climbed onto the roof of the West Alabama Women's Center in Tuscaloosa and dropped a lit flare into the air-conditioning unit.  The flare lit the entire inside of the clinic on fire, causing over $ 400,000 of damage.  The perpetrator of the arson was never identified.

The next year, a remote-control bomb was detonated outside New Woman All Women abortion clinic in Birmingham.  The bomb killed a police officer standing outside the clinic and wounded a nurse who had just walked out the clinic entrance.  After a detailed investigation, the federal Bureau of Alcohol, Tobacco, and Firearms determined that the same individual responsible for the New Woman All Women bombing, Eric Robert Rudolph, also bombed another abortion clinic in the Atlanta area, a gay bar in Georgia, and, most notoriously, the 1996 Olympics.

In 2001, staff at the Pensacola clinic where Dr. Gunn had worked noticed a van circling the clinic.  During a traffic stop, police noticed that there were a large number of semiautomatic weapons in the van but did not confiscate the weapons.  Soon afterward, the van drove to Birmingham, where it began to circle the New Woman All Women clinic.  The driver was identified as an abortion opponent.

Five or six years ago, a man intentionally drove through the front of the Tuscaloosa clinics, eventually fleeing and engaging police in a chase. Most recently, in 2012, a Pensacola clinic was firebombed.

Nationally, during the same period of time, other abortion doctors have been murdered, other clinics have been bombed and burned, and abortion providers have endured other, less dangerous forms of extreme harassment that exceed the boundaries of peaceful protest.

## 2. Current Climate

Against the backdrop of this history of violence, abortion providers and women seeking abortions in Alabama today live and work in a climate of extreme hostility to the practice of abortion. On a day-to-day basis, a provider or a patient sees this hostility when she opens the newspaper, drives by a group of protesters at a clinic, or learns that another piece of legislation concerning abortion has been enacted. Of course, the

7

court does not imply that such activities are illegal, improper, or morally wrong; indeed, the right to express deeply held beliefs is of the utmost importance.  But it is nonetheless necessary to recognize that such actions contribute to the climate surrounding the disputes in this case.

An Alabama resident reading the newspaper last year would have read that her elected officials were described as celebrating that they had "boldly defended the rights of the unborn," AL.com Article, PX 30, as being "pleased with" the idea that a piece of legislation would "truly limit abortion in Alabama," Decatur Daily Article, PX 31, and as believing that abortion regulations were "what God expects us to do," Associated Press Article, PX 32. Similarly, the governing political party's platform recently stated: "WE DARE DEFEND OUR RIGHT TO LIFE: Questionable Supreme Court rulings have eliminated the State 's ability to prohibit abortions altogether.

However, states may enact meaningful abortion-related reforms[.]" Alabama GOP 2013 Legislative Agenda, PX 29.

In fact, the State has enacted separate "abortion-related" legislation, id., in each of the last four years. See 2014 Ala. Acts 441 (extending informed-consent waiting period to 48 hours); 2013 Ala. Acts 79 (Women's Health and Safety Act); 2012 Ala. Acts 405 (Federal Abortion Mandate Opt Out Act); 2011 Ala. Acts 672 (Alabama Pain-Capable Unborn Child Protection Act).

### 3. Fear at the Trial

The effect that this climate of violence, harassment, and hostility has on abortion providers in Alabama was palpable at the trial in this case. In their testimony, discussed at length below, the doctors described their daily fears for their professional livelihoods as well as their personal safety. One of the physicians described being followed and threatened by abortion opponents, and

fearing for herself, her spouse, and her children every day that she goes to work in Alabama. Indeed, that fear was driven home to this court even in the conduct of the trial itself: in order to protect their identities, the doctors were referred to by pseudonyms throughout the case and would testify in open court only from behind a black curtain.[1]

## B. Abortion Clinics in Alabama

In the context of this climate of hostility, the number of abortion clinics in the State has steadily declined. As of 2001, there were 12 clinics providing abortions in the State. Today, that number has dwindled to five.[2]

_____

1. The list of pseudonyms and real names of most of the current and former abortion doctors has been filed under seal as PX 1.

Further, to protect the doctors' anonymity, the court generally refers to them by feminine pronouns, regardless of their actual gender.

2. In practice, there may actually be as few as three
(continued...)

Nonetheless, it is significant that five clinics continue to provide legal abortions in the State of Alabama.   The vast majority of abortions performed in Alabama occur in these five clinics.   None occurs in private doctors' offices, but state records reveal a small number of abortions have been performed at hospitals.

The plaintiffs in this case operate three of the State's clinics.   Reproductive Health Services operates a clinic in Montgomery, and Planned Parenthood operates one clinic in Birmingham and another in Mobile.   Together these three clinics provided approximately 40 % of legal

---

2. (...continued)
clinics in operation right now.   At the time of trial, the Birmingham clinic was closed, pending approval by the Alabama Department of Public Health of a plan of correction, discussed further below.   The Huntsville clinic had been planning to move into a new building in order to comply with recently enacted architectural requirements for abortion clinics.   At the time of trial, the administrator of that clinic testified that he had not yet secured approval of the new building and could operate continuously only if he secured such approval before July 1.   The parties have not notified the court as to whether the Huntsville clinic secured the approval.

11

abortions in the State in 2012.  The other two clinics in the State are Alabama Women's Center for Reproductive Alternatives in Huntsville and West Alabama Women's Center in Tuscaloosa.  Among these five clinics, there are seven doctors who perform abortions in Alabama.

There are two forms of abortion, described in detail below: surgical and medication abortion.  Montgomery's Reproductive Health Services clinic provides only surgical abortions, not medication abortions.  Two doctors perform those abortions, but because they reside outside Alabama, the clinic can offer abortions only one day a week.

A woman seeking an abortion at Planned Parenthood's Mobile or Birmingham clinics may obtain a medication abortion or a surgical abortion.  As a small part of their services, both clinics also provide access to birth control, sexually-transmitted-disease testing, and cancer screenings.  One doctor serves as the medical director for all the Planned Parenthood clinics in Alabama, Georgia, and Mississippi.  She also performs abortions at

the Birmingham clinic one day a week.  Another doctor is the primary abortion provider at the Mobile clinic, where she performs abortions about once a week.  Neither of these doctors resides in Alabama.

A woman visiting the Alabama Women's Center for Reproductive Alternatives in Huntsville may obtain a medication or surgical abortion.  The clinic also provides family planning services, such as pap smears or access to birth control.  There are currently three physicians performing abortions at the Huntsville clinic. Two of these doctors reside in the Huntsville area.  The third is one of the doctors who perform abortions at the Montgomery clinic.

West Alabama Women's Center in Tuscaloosa provides medication and surgical abortions.  One physician, a resident of the State, performs all of the abortions at the Tuscaloosa clinic.

13

## C. Abortion Procedures

The State contends that the staff-privileges requirement was enacted to further its interest in women's health, rather than to affect women's decision-making about whether to have an abortion.  See 1975 Ala. Code § 26-23E-2 (legislative findings).  The court, of course, recognizes that many individuals attach great moral significance to the decision to have an abortion, but the State's health rationale makes it necessary to understand the mechanics and risks of abortion as a medical procedure.

There are two types of abortion: medication and surgical abortion.  A medication abortion involves the oral administration of two sets of pills.  At Planned Parenthood clinics, the patient first takes a mifepristone pill at the clinic.  This first pill detaches the embryo from the walls of the uterus.  One to two days later, the patient takes four misoprostol pills at home, as well as prophylactic antibiotics. Approximately two to four hours after she takes the

misoprostol, these pills cause her uterus to contract and expel its contents, including the detached embryo.

A surgical abortion closely resembles the general gynecological procedure of dilation and curettage. First, the cervix is stretched open using a series of progressively larger metal rods, until it is open to approximately the diameter of a pencil. Misoprostol may also be used to loosen the cervical muscles. Once the cervix has been dilated, a tube is inserted into the uterus to suction out its contents. Sometimes, instead of, or in addition to, suction, a curette, which is a tool with a dull blade, is used to scrape the lining of the uterus. The procedure itself takes less than ten minutes, often significantly less.

The plaintiffs' clinics provide only early abortions. Medication abortions are provided only until nine weeks gestational age. Furthermore, the majority of the surgical abortions at the plaintiffs' clinics take place before 12 weeks gestational age. Early surgical abortions are significantly less invasive than late-term

15

abortions.    This  is  because,  at  later  stages,  it  is
necessary  to  dilate  the  cervix  to  a  wider  diameter  in
order  to  remove  the  fetus.


### D. Women's Health and Safety Act of 2013

On April 9, 2013, the Governor of Alabama signed the
Women's Health and Safety Act of 2013 into effect.   2013
Ala. Acts 79, codified at 1975 Ala. Code § 26-23E-1, et
seq.    The  statute  imposes  several  new  architectural,
personnel,  and  procedural  requirements  on  abortion
clinics.  The specific provision challenged in this case,
§ 4(c),  requires  every  doctor  performing  abortions  in
Alabama  to  "have  staff  privileges  at  an  acute  care
hospital  within  the  same  standard  metropolitan
statistical area as the facility is located that permit
him or her to perform dilation and curettage, laparotomy
procedures,  hysterectomy,  and  any  other  procedures
reasonably   necessary   to   treat   abortion-related

16

complications." § 26-23E-4(c).[3]  A clinic administrator who knowingly and wilfully operates an abortion clinic with doctors who do not have such privileges faces felony criminal liability, § 26-23E-12(c), and the State may revoke the clinic's license for violations of the Act. § 26-23E-14(b).


### III. LEGAL STANDARD

The question in this case is whether Alabama's staff-privileges requirement "violates the substantive due process rights of the women who seek abortions from the plaintiff clinics." <u>Planned Parenthood Se., Inc. v. Strange</u>, --- F. Supp. 2d ----, at ----, 2014 WL 1320158 at *5 (M.D. Ala. 2014) (Thompson, J.) (opinion on summary judgment).  The governing standard for the evaluation of such claims is the undue-burden standard articulated by

---

3. These are common gynecological procedures which doctors in other specialties may not be qualified to perform.  In addition to dilation and curettage, which is described above, hysterectomy is the surgical removal of the uterus, and a laparotomy is a surgery involving incision into the abdominal cavity.

17

the Supreme Court in <u>Planned Parenthood of Se. Pa. v.</u>
<u>Casey</u>.   <u>See</u> <u>Casey</u>, 505 U.S. 833, 877 (1992) (plurality
opinion) ("In our considered judgment, an undue burden is
an unconstitutional burden."). "A finding of an undue
burden is a shorthand for the conclusion that a state
regulation has the purpose or effect of placing a
substantial obstacle in the path of a woman seeking an
abortion of a nonviable fetus." <u>Id</u>.

This court discussed the undue-burden standard in
great detail in its opinion at summary judgment, and the
court anticipates that the summary-judgment opinion will
be read in conjunction with this one.  <u>See</u> <u>Strange</u>, ---
F. Supp. 2d at ----, 2014 WL 1320158 at *5-19.  For
present purposes, however, the court will again set forth
the test it will apply in this case and review its
principal reasons for adopting that test.

In its prior opinion, this court articulated "the
following test to determine whether an actual or intended
obstacle is substantial: the court must determine
whether, examining the regulation in its real-world

18

context, the obstacle is more significant than is warranted by the State's justifications for the regulation." <u>Strange</u>, --- F. Supp. 2d at ----, 2014 WL 1320158 at *13. This court explained that "the heart of this test is the relationship between the severity of the obstacle and the weight of justification the State must offer to warrant that obstacle" and that "the more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit." <u>Id</u>. This court then offered a non-exhaustive list of the factors it anticipated might be relevant in assessing the severity of the burdens imposed by a given regulation and in assessing the weight of the justification offered for the regulation. <u>See</u> <u>id</u>. at ----, 2014 WL 1320158 at *13-16. Finally, the court clarified that all of these considerations "apply to the interpretation of the term 'substantial obstacle'" and that, under <u>Casey</u>, "either

19

the 'purpose or effect of placing [such an] obstacle in the path of a woman seeking an abortion of a nonviable fetus' imposes an undue, and thus unconstitutional, burden." Id. at ----, 2014 WL 1320158 at *16 (quoting Casey, 505 U.S. at 877).

This court's conclusions were based on the reasoning of Casey and the application of the undue-burden standard in Casey itself as well as the subsequent case of Gonzales v. Carhart, 550 U.S. 124 (2007). This court first reviewed the history of the Supreme Court's abortion jurisprudence, beginning with the recognition in Roe v. Wade, 410 U.S. 113 (1973), that "women have a constitutionally protected right to decide whether to have an abortion." Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *6. "From the beginning," the Supreme Court took a balanced approach, taking account of both the protected liberty of the woman and the important interests of the State. Id. (internal quotation marks omitted). However, some subsequent Supreme Court cases departed from this balanced approach, requiring instead

20

"'that any regulation touching upon the abortion decision must survive strict scrutiny, to be sustained only if drawn in narrow terms to further a compelling state interest.'"  Id. (quoting Casey, 505 U.S. at 871).  At the same time, some Supreme Court Justices "were urging a complete reversal of Roe" and, in its place, the application of rational-basis review to abortion regulations.  Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *7.

The Supreme Court, in Casey, resolved this dispute by rejecting both approaches, returning to the first principles of Roe and following a "middle way" forward. Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *7. The Casey majority "upheld the central holding in Roe," which the Court articulated in part as a recognition of both "'the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State,'" and the State's "'legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the

21

fetus that may become a child.'" Id. (quoting Casey, 505 U.S. at 846).  In order to give effect to both important interests, the Casey plurality "adopted a new 'undue burden standard,' which found a middle ground" between those who would impose strict-scrutiny review of such regulations and those who would require only a rational basis.  Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *7; see also id. at ----, 2014 WL 1320158 at *7-8 (comparing the non-controlling opinions in Casey of Justice Blackmun and Chief Justice Rehnquist).  "The Casey Court's 'undue-burden' standard does not subject state regulation of abortions to strict scrutiny, which would 'undervalue[]' the State's interests, invalidating nearly all abortion regulations.  Nor does the undue-burden standard provide complete deference to the State by adopting a rational-basis standard of review, which would fail to give 'real substance to the woman's liberty to determine whether to carry her pregnancy to full term,' upholding nearly all abortion regulations."

<u>Strange</u>, --- F. Supp. 2d at ----, 2014 WL 1320158 at *8 (quoting <u>Casey</u>, 505 U.S. at 869, 873).

Thus, this court concluded, <u>Casey</u> forged a middle way forward.  However, it was "clear that the middle path <u>Casey</u> chose was not, as one might have expected, intermediate scrutiny."  <u>Strange</u>, --- F. Supp. 2d at ----, 2014 WL 1320158 at *9; <u>see also id</u>. (intermediate scrutiny requires "that a challenged regulation be 'substantially related' to 'important governmental objectives.'" (quoting <u>Wengler v. Druggists Mut. Ins. Co.</u>, 446 U.S. 142, 150 (1980)).  Instead, in discussing how to strike the proper balance among the relevant interests, "<u>Casey</u> pointed to the example of ballot-access jurisprudence," specifically the Supreme Court's decisions in <u>Anderson v. Celebrezze</u>, 460 U.S. 780 (1983), and <u>Norman v. Reed</u>, 502 U.S. 279 (1992).  <u>Strange</u>, --- F. Supp. 2d at ----, 2014 WL 1320158 at *9.  This court concluded that <u>Casey</u>'s reliance on <u>Anderson</u> and <u>Norman</u> indicates that, "in applying the undue-burden standard, the 'character and magnitude of the asserted injury'

23

affects whether the 'corresponding interest [is] sufficiently weighty to justify the limitation.'"  Id. (citations omitted) (quoting Anderson, 460 U.S. at 789 and Norman, 502 U.S. at 288–89, respectively).

Next, this court reviewed the actual application of the undue-burden standard in the only two Supreme Court cases to shed light on its proper interpretation: Casey itself and Gonzales.  See Strange, --- F. Supp. 2d at ---- & ---- n.10, 2014 WL 1320158 at *11 & *11 n.10. From the Supreme Court's analysis in those cases, this court discerned two general principles.  The first principle was that "[c]ontext matters" in the sense that "[c]ourts must perform a careful, fact-specific analysis of how the restrictions would impede women's ability to have an abortion, in light of the circumstances of their lives."  The second principle was that "[c]ourts must examine the strength of the State's justifications for regulations, not just the effects of the regulation." Id. at ----, 2014 WL 1320158 at *11.

24

Finally, this court acknowledged that some lower courts have employed analyses that are inconsistent with the test this court articulated at summary judgment; this court concluded that those other approaches were flawed and inconsistent with the Supreme Court's teachings.  See id. at ----, 2014 WL 1320158 at *17-19 (citing Parenthood of Greater Tex. Surg. Health Serv. v. Abbott, 748 F.3d 583 (5th Cir. 2014) (Abbott II); Planned Parenthood of Greater Tex. Surg. Health Serv. v. Abbott, 734 F.3d 406, 415 (5th Cir. 2013) (Abbott I); Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 601-2 (6th Cir. 2006); Greenville Women's Clinic v. Bryant, 222 F.3d 157, 171 (4th Cir. 2000)).[4]  This court noted that at least one Court of

---

4. This court believes these opinions took the wrong approach to Casey's undue-burden standard.  However, even apart from that difference of analysis, the cases are distinguishable.  First, many of the appellate cases were decided at the preliminary-injunction stage.  As a result, the courts did not have the benefit of trial to fully air the evidence.  Second, as discussed in further detail below,Alabama's particularly strong history of anti-abortion violence and professional stigma for abortion doctors makes clear that many abortion doctors in the State are likely to be categorically ineligible
(continued...)

Appeals had taken an approach similar to this court's. See Planned Parenthood of Wisconsin, Inc. v. Van Hollen, 738 F.3d 786, 798 (7th Cir. 2013) ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous.").

Since summary judgment in this case, another Court of Appeals has followed suit. See Planned Parenthood Arizona, Inc. v. Humble, 753 F.3d 905, 914 (9th Cir. 2014) (concluding that Abbott II "fails to recognize that the undue burden test is context-specific, and that both the severity of a burden and the strength of the state's justification can vary depending on the circumstances"). Also, the Fifth Circuit, in a recent opinion largely upholding the preliminary injunction barring Mississippi's staff-privileges law, distinguished its

---

4. (...continued)
for staff privileges.  In other cases, it has not been so clear, at the preliminary-injunction stage that clinics would actually be forced to close by similar requirements.

26

prior decision in <u>Abbott II</u> and stated that the undue-burden analysis must consider "the entire record and factual context in which the law operates." <u>Jackson Women's Health Organization v. Currier</u>, --- F.3d ----, ----, 2014 WL 3730467 at *9, *15 (5th Cir. July 29, 2014).[5]

In applying the test it has articulated to the circumstances of this case and in rejecting the approach taken by some other courts, this court finds the Supreme

---

5. In his dissenting opinion in <u>Jackson Women's Health</u>, Judge Garza suggests that the majority's focus on the factual specifics renders the majority's opinion "<u>ad hoc</u>" and "unworkable." <u>Jackson Women's Health</u>, --- F.3d at ----, 2014 WL 3730467 at *15 (Garza, J., dissenting). This appears to be a reference to the argument Mississippi made that the majority's approach would "preclude the State from closing the Clinic for sanitation violations." <u>Id.</u> at ----, 2014 WL 3730467 at *9 (majority opinion). The arguments made by Judge Garza and Mississippi point to a problem this court identified in its prior opinion: "If the severity of the burdens imposed has nothing to do with the strength of the reasons for those burdens, then courts are left to articulate a one-size-fits-all definition of 'substantial obstacle' applicable regardless of the weight of the governmental interests at stake." <u>Strange</u>, --- F. Supp. 2d at ----, 2014 WL 1320158 at *18. It is such an approach, taken by the Fifth Circuit in <u>Abbott I</u> and <u>Abbott II</u>, that is "unworkable." <u>Id</u>.

Court's decision in Doe v. Bolton, 410 U.S. 179 (1973), particularly instructive.   As discussed above, Casey returned to the essential first principles of Roe v. Wade, reinstituting the balance struck in Roe between the woman's right and the State's interest.   Doe was decided the same day as Roe, and the cases must, "of course, ... be read together."   Roe, 410 U.S. at 165.   Thus, Casey's reaffirmation of the balance of interests struck by Roe suggests that Doe, likewise, took the correct general approach.   Indeed, in discussing the undue-burden standard, Casey noted that "the Court's early abortion cases adhered to [the proper] view," and approvingly cited Doe.   Casey, 505 U.S. at 874-5.

In Doe, the Supreme Court invalidated a number of Georgia's statutory provisions that imposed procedural requirements on doctors who performed abortions.   Of those requirements, one stands out as particularly helpful to guide the court's approach in this case.   One provision of the Georgia law essentially made it illegal for a doctor to provide an abortion in a stand-alone

28

clinic rather than in a hospital setting. See Doe, 410 U.S. at 192. It is clear to this court that the constitutional problem with such a requirement was that it would significantly reduce access to abortion services. See id. at 199 (noting the plaintiffs' arguments based on "delay and the lack of facilities").[6]

In light of the burdens that such a clinic ban would impose on women seeking abortions, the Court demanded from the State an honest accounting of the health benefits of the hospital-only requirement. The Court ultimately struck down the requirement, finding that the persuasive "mass of data" offered by the plaintiffs and amici, tended to show that clinics with appropriate staff and facilities were "entirely adequate to perform abortions," while Georgia failed to offer "persuasive

---

6. Cf. Mazurek v. Armstrong, 520 U.S. 968, 974 (1997) (per curiam) (regulation did not have the effect of imposing a substantial obstacle because, in part, it did not reduce access to abortion services in that "no woman seeking an abortion would be required by the new law to travel to a different facility than was previously available").

data to show that only hospitals meet its acknowledged interest in insuring the quality of the operation and the full protection of the patient." Id. at 195. Thus, despite acknowledging the State's legitimate interest in protecting women's health, the Court carefully considered the evidence on the degree to which the hospital regulation would actually advance that interest. See id. ("[T]he State must show more than it has in order to prove that only the full resources of a licensed hospital, rather than those of some other appropriately licensed institution, satisfy these health interests.").

Doe does not, of course, directly control this case. The provisions at issue there imposed different requirements on abortion providers. Furthermore, as Doe itself emphasizes, the question of how well a woman's health regulation serves its stated purpose (and implicitly, the extent of the effect on women's access to abortion) is a necessarily fact-bound one, dependent on the evidence presented. Finally, although Casey reaffirmed Roe's "essential holding," Casey, 505 U.S. at

846, it rejected some aspects of <u>Roe</u>'s particular analysis. <u>Id</u>. at 873 (rejecting trimester framework). This court is cognizant that <u>Casey</u>, likewise, should not be read to necessarily endorse <u>Doe</u>'s analysis in all of its particulars.

Nonetheless, <u>Doe</u> is extremely important in setting the proper framework for this case. For in <u>Doe</u>, as in this case, the plaintiffs challenged as unconstitutional a regulation of the manner in which abortions were performed which threatened to reduce access and which the State justified by reference to protecting the health of the woman. And in <u>Doe</u>, as in this case, the Court did not doubt that the State had a legitimate interest in ensuring that abortions are performed safely. But the Court in <u>Doe</u> required more than general statements of concern and claims that the regulations conceivably might, in some cases, lead to better health outcomes; rather, the Court required the State to establish, through evidence, that the regulation really was strongly justified. This approach, namely one that examines the

31

strength of the justifications based on the evidence presented in a real-world context, laid a foundation for the analysis mandated by Casey and articulated by this court.

The court will now turn to application of the undue-burden test to the facts of this case; that is, it will "determine whether, examining the regulation in its real-world context, the obstacle is more significant than is warranted by the State's justifications for the regulation." Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *13.

## IV. DISCUSSION

The parties presented competing evidence on both sides of the court's substantial-obstacle test. On the obstacle side, the parties disagree as to what effect the staff-privileges requirement would have on current and potential abortion providers and what effect the elimination of abortion services in Montgomery, Birmingham, and Mobile would have on women seeking

abortion.   On the justification side, the parties disagree about the strength of the State's justifications for the staff-privileges requirement.[7]

The plaintiffs argue that the staff-privileges requirement would pose a substantial obstacle because none of the doctors who provide abortions at their clinics will be able to secure the privileges required by the law and no other doctors who could secure the privileges will begin performing abortions, either at the plaintiffs' clinics or in other settings in these cities. As a result, the only abortion clinics in the Montgomery, Birmingham, and Mobile metropolitan areas would close, leaving only two abortion providers in the State, in Tuscaloosa and Huntsville.   The plaintiffs further argue that the clinic closures would impose significant harms

---

7. The parties also put forward evidence concerning the purpose of the statute.   Since the court finds that the statute would have the effect of imposing a substantial obstacle, it is unnecessary to reach the purpose claim or discuss the parties' arguments concerning that claim.

on women seeking abortions and that the justifications
are weak.

The State counters that the obstacles for women would
be minor and the justifications for the requirement are
strong.  It asserts that the plaintiffs' doctors may be
able to secure privileges that satisfy the law and that,
if they are unable to, other doctors would take their
place.  Furthermore, the State contends that, even if the
staff-privileges requirement renders abortion unavailable
in these three cities, women seeking abortion would
experience only minimal obstacles.  Finally, according to
the State, the staff-privileges requirement has two
strong justifications, both grounded in the State's
legitimate interest in protecting women's health.
Primarily, it argues that the requirement ensures proper
care for complications.  Furthermore, the requirement has
a secondary benefit of 'credentialing' high-quality
doctors.

As discussed at length below, the court finds, by a
preponderance of the evidence, that none of the doctors

34

who provide abortions in Montgomery, Birmingham, and Mobile would be able to obtain staff privileges that satisfy the requirements of the Women's Health and Safety Act and that no doctors who currently hold or could obtain such privileges would begin performing abortions in those cities. The resulting unavailability of abortion in these three cities would impose significant obstacles, burdens, and costs for women across Alabama and particularly for women who live in the three cities. Finally, the court finds that the justifications that the State offers for the law are weak, at best.

Because the significant obstacles imposed by the staff-privileges requirement are not warranted by the justifications for the requirement, the court finds that the staff-privileges requirement would have the effect of imposing a substantial obstacle for women who would seek abortions in Alabama. The law would therefore impose an undue burden on their constitutional right to an abortion. The court will issue a declaratory judgment

that 1975 Ala. Code § 26-23E-4(c) is unconstitutional as applied to the plaintiffs.


### A. Obstacles

In order to determine the severity of an obstacle that a regulation places on women seeking abortion, the court must examine carefully the effect of the regulation on them, "considering the real world circumstances." Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at * 13. Several aspects of those real-world circumstances are helpful in determining the severity of the obstacle, including "the means by which the regulation operates on the right to obtain an abortion," "the nature and circumstances of the women affected by the regulation," "the availability of abortion services, both prior to and under the challenged regulation," "the kinds of harms created by the regulation," and "[t]he social, cultural, and political context." Id. at ----, 2014 WL 1320158 at *14-15.

In this case, the plaintiffs argue that the staff-privileges requirement interferes with women's abortion rights by closing their clinics and making it unlikely that other providers will emerge.  As a result, they claim that many women would be prevented from obtaining abortions and others would experience significant difficulty in obtaining an abortion.  Cf. Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *18 n.13 ("evidence that an obstacle actually prevents women from obtaining abortions would be extremely compelling evidence of a substantial obstacle").  Therefore, the court must undertake a two-step inquiry: first, determining the effect of the requirement on current and potential abortion providers; and, second, if clinics close and no one takes their place, determining the effects on women who seek abortions in the State.

37

## 1. Effect on Providers

### (a) Nature of Staff Privileges

The phrase "staff privileges," also referred to as 'admitting privileges,' describes a relationship between an individual doctor and a hospital or its medical staff that allows the doctor to admit patients to a hospital and to perform procedures at the hospital. Doctors may become a member of a hospital staff, and therefore entitled to certain privileges, at different levels, such as 'active staff,' 'consulting staff,' and 'courtesy staff.' Each membership level denotes the extent to which a doctor may use hospital facilities, and the exact definition of each level differs from hospital to hospital. Once a doctor has some form of affiliation with the hospital staff, privileges are granted for a particular specialty, such as family practice, obstetrics and gynecology ("OB/GYN"), or orthopedics. In order to comply with the new staff-privileges requirement, abortion doctors would need to obtain active or courtesy privileges with an OB/GYN specialty.

Each of the hospitals in the Montgomery, Birmingham, and Mobile areas has a different process and set of prerequisites for doctors who seek staff privileges in some form.  However, across many of the hospitals there are some common aspects of the staff-privileges credentialing process that are useful to introduce before discussing the specific circumstances in each metropolitan area.

First, many hospitals incorporate a proximity requirement for a doctor seeking privileges.  For some hospitals, this takes the form of an explicit radius within which a doctor must live or practice.  See, e.g., Mobile Infirmary Credential Policy, PX 15 at 4, § 2.A.1(c) (physician must "be located (office and residence) within 60 minutes of the Medical Center").  For other hospitals, the requirement is described more generally: the doctor must be "sufficiently close" to the

hospital.   <u>See, e.g.</u>, Jackson Hospital (Montgomery)
Bylaws, PX 3 at 16, Art. V, § 3(A).[8]

Second, many hospitals require that a doctor with
active-staff or courtesy-staff privileges admit a certain
number of patients or perform a certain number of
procedures on a regular basis.  <u>See, e.g.</u>, St. Vincent's
Hospital (Birmingham) Bylaws PX 10 at 9-10, § 3.7(b)
(requiring doctors seeking privileges in the OB/GYN
service to perform five procedures within the first six
months of receiving privileges).   These requirements
serve two main purposes.   Primarily, they offer an
opportunity for an existing member of the hospital's
medical staff to evaluate a doctor's clinical skills.   At
some hospitals, these requirements also serve an economic

_____

8. In many cases, the general proximity requirements
are designed to provide 'continuous care' to hospitalized
patients.   On the surface, this closely resembles the
State's 'continuity of care' justification for the
staff-privileges requirement.   However, as discussed
below, <u>infra.</u> at § IV.B.1.d, the appropriate model of
continuity of care for low-risk outpatient surgeries such
as early-term abortion, let alone medication
administrations, differs from the appropriate model for
hospitalized patients.

purpose, ensuring that a doctor with privileges uses that hospital, rather than others, to perform procedures.

Finally, it is important to remember that, at all hospitals, the granting of staff privileges is a discretionary process. Doctors who meet the prerequisites for privileges are not automatically entitled to privileges.


### (b) Current Doctors

None of the four doctors currently providing abortions at the plaintiffs' clinics has staff privileges at a hospital in the same metropolitan statistical area as the clinics. Based on trial testimony from the current abortion doctors and from abortion-clinic administrators and representatives of local hospitals, as well as the language in the bylaws of local hospitals, the court finds that none of the current abortion doctors at the plaintiffs' clinics would be able to obtain the necessary staff privileges, even if they applied.

### i. Montgomery

The two doctors performing abortions at the Montgomery clinic, Drs. A and B, will be unable to obtain staff privileges at any local hospital.[9]  Neither doctor resides in the Montgomery area.  Dr. A periodically flies from her permanent home in Nigeria to Alabama to perform abortions, and stays in Atlanta, Georgia during her trips.  For family reasons, she will not relocate to Alabama.  Dr. B lives, and has her primary practice, in Chicago, Illinois, and has privileges at a hospital there.  There was insufficient evidence at trial to conclude that she will move to Alabama in the foreseeable future.[10]

-----------------

9.  See supra note 1.

10. Carter Sims, an Alabama Department of Public Health investigator, testified at one point that Dr. B said that she "was thinking about moving [to Birmingham] to be close to" her brother.  Tr. at VI-145:15-16.  This statement was admissible hearsay, admitted over the plaintiffs' objection as a statement of present mental state. Fed. R. Evid. 803(3).  Nonetheless, this casual statement is too indefinite and noncommittal for the court to conclude that it is anything but a passing whim.

There are only two local hospital networks in the Montgomery area that offer privileges that could satisfy the staff-privileges requirement: Jackson Hospital and Baptist Health.   Representatives of the two networks confirmed that neither Dr. A nor Dr. B will be able to obtain staff privileges at a hospital in either network.

The Jackson Hospital representative testified that, while the residency requirement is not precisely specified, it is "just understood" that a doctor should not live farther than "about 30 minutes" away from the hospital.   Tr.  at  IV-156:22-23.   No doctor with privileges at Jackson Hospital lives farther than an hour's drive away.   In addition, the hospital requires doctors who apply for staff privileges to have documentation of at least 25 OB/GYN procedures from the past year.  No doctor has ever satisfied this requirement by performing only abortions.

Drs. A and B do not live within an hour's drive of Jackson Hospital.  Dr. A, who provides abortions only and does not have a separate OB/GYN practice, would also be

43

unable to provide documentation of 25 non-abortion-related procedures.[11]  There is no credible evidence that Jackson Hospital would make an exception to these requirements for the doctors.

Baptist Health, which runs three local hospitals in the Montgomery area, also requires a physician to have her practice within the community and to live in the area to be eligible for privileges.  According to the Baptist Health representative, the maximum time that it should take a physician with such privileges to drive to the hospital from her home is approximately 30 minutes. There are no OB/GYN doctors who currently hold staff privileges at any Baptist Health hospital and who live more than an hour from the hospital.  For the same reasons stated above, Drs. A and B cannot meet this

---

11. Dr. A is an OB/GYN and formerly had a private practice in Alabama.  However, when she moved to Nigeria, she went into semi-retirement.  She no longer provides medical care in the United States outside of her abortion practice.

residency requirement and therefore will be denied privileges at any Baptist Health hospital.

Furthermore, even if Drs. A and B were able to initially secure privileges at a Baptist Health hospital, a doctor with provisional privileges who does not treat enough patients in the hospital during her first year moves into consulting-privileges or referral-privileges status. Neither status would satisfy the terms of the staff-privileges requirement. Drs. A and B are unlikely to have a reason to use the hospital on a regular basis, due to the safety of the early-term abortion procedures that they perform and due to Dr. A's semi-retirement and Dr. B's primary practice in Chicago.

After hearing the testimony of the hospital representatives, the court is firmly convinced that neither Dr. A nor Dr. B could obtain privileges at a Montgomery-area hospital.[12]

_____

12. Although the Alabama Women's Center for Reproductive Alternatives in Huntsville is not a plaintiff in this case, it became clear that the clinic (continued...)

### ii. Birmingham

Dr. Mary Roe is the abortion doctor at the Birmingham clinic.  She resides in Atlanta, Georgia, travels to Birmingham to provide abortions once a week, and, for personal reasons, will not move to Birmingham.  She has staff privileges at two teaching hospitals and one private hospital in Atlanta, but she does not have such privileges at a hospital in Alabama.

---

12. (...continued)
and its patients would be affected by the staff-privileges requirement as well.  While the Huntsville clinic uses two doctors who live in the metropolitan area and have privileges at a local hospital, the clinic also contracts with Dr. A to provide abortion services.  The court credits the testimony of Dalton Johnson, the administrator of the Huntsville clinic, that Dr. A would be unable to secure privileges at a Huntsville-area hospital.  Given the similarities in staff-privileges prerequisites at hospitals across Montgomery, Birmingham, and Mobile, it is reasonable to believe that Huntsville hospitals have similar requirements.  Therefore, Dr. A's semi-retirement and residences in Georgia and Nigeria would likely prevent her from obtaining privileges at a Huntsville hospital.  Therefore, the Huntsville clinic would lose an abortion doctor, and its capacity for providing abortions would decrease.

46

There are nine hospitals in Birmingham that offer privileges that could satisfy the staff-privileges requirement. Dr. Roe meticulously and credibly reviewed at trial the prerequisites that she does not and could not satisfy for each of the nine hospitals.

Five of these hospitals impose explicit geographic residency and practice requirements, which Dr. Roe could not meet.[13] Three of the remaining hospitals, the St. Vincent's Hospitals, are affiliated with the Catholic Church and explicitly oppose abortion. See Tr. at II-159:21-22 (Freedman: "if you have Catholic hospitals in Alabama, there are explicit restrictions on abortion"). Furthermore, those hospitals require minimum

---

13. The court notes that some of the hospitals' bylaws require that a doctors 'office or residence' be within a certain geographic area, rather than her 'office and residence.' This raises the question of whether a doctor who works in a Birmingham clinic for a day or two at a time qualifies as maintaining an 'office' there. The credible evidence that was introduced indicates that the answer is no and that the abortion clinics' doctors would not satisfy 'office or residence' geographic requirements. See Tr. at II-41:1-10; II-131:4-9. The court so finds.

47

admissions in order to evaluate competence. Dr. Roe could not meet these minimums in Birmingham because her primary non-abortion practice is located in Atlanta. Finally, the three hospitals require a doctor with privileges to maintain a 'covering-physician' relationship with another doctor on the medical staff of the particular hospital. Dr. Roe testified that she did not know of a doctor at any of those hospitals who would agree to affiliate with her for the purpose of keeping the Planned Parenthood clinic open.

Finally, the University of Alabama-Birmingham hospital requires that a doctor be appointed to the medical school faculty to obtain privileges at the hospital. Dr. Roe previously was on the faculty and reached out to the university to investigate the possibility of a volunteer, unpaid faculty appointment which would allow her to obtain privileges at the hospital. However, the current chair of the OB/GYN department, who had not been there when she was on faculty, explained to her that he would not hire her

48

because of her work providing abortions and serving as medical director for Planned Parenthood. Because the university hospital is a state-funded institution, the chair did not want to involve his department with what he considered to be a politically contentious organization and procedure, that is, abortions.

Testimony from two Birmingham hospitals buttresses the conclusion that Dr. Roe will not gain privileges at a Birmingham hospital. A representative of Princeton Baptist Hospital testified that to secure staff privileges that would satisfy the statutory requirement, a doctor must live within a "reasonable distance" of the hospital. Tr. at II-112:7-10. No doctor with such privileges has ever lived more than 26 miles away. The committee considering applications for such privileges has never made an exception to this rule. The representative for Medical West Hospital in Bessemer, Alabama, about 20 miles from downtown Birmingham, testified that the hospital similarly imposes a geographical constraint. In the past five years, the

hospital has granted staff privileges to six obstetricians and gynecologists and all have resided within the Birmingham suburbs.

The court is therefore firmly convinced that Dr. Roe could not obtain privileges at a hospital in the Birmingham metropolitan area that would be sufficient to satisfy the staff-privileges requirement.[14]

### iii. Mobile

Dr. P1 is the current abortion doctor at the Mobile clinic. She flies into Mobile to provide abortions, but otherwise resides in Georgia. She is not willing to move to Mobile from her current residence in Georgia because she would have to sacrifice access to the variety of medical opportunities that are available in the Atlanta area. Currently, Dr. P1 has staff privileges at a teaching hospital in Atlanta, but she does not have any such privileges at any hospital in Alabama.

---

14. Dr. P1 occasionally performs abortions in Birmingham as well, but is similarly situated to Dr. Roe.

There are four hospitals in Mobile that offer staff privileges that could satisfy the statutory requirement. Dr. P1, like Dr. Roe, reviewed the prerequisites at each hospital and credibly concluded that they would bar her from obtaining the required privileges.  Mobile Infirmary and Springhill Memorial Hospital both maintain geographic requirements which Dr. P1 cannot satisfy, and representatives from those two hospitals confirmed that no doctor has been exempted from the requirements.

Three of the hospitals, Springhill, Mobile Infirmary, and University of South Alabama, also require a doctor to see a minimum number of patients at the hospital, a requirement which Dr. P1 could not meet because her non-abortion practice is located in Georgia.  Each of the four hospitals also requires references and coverage agreements with other doctors who have staff-privileges at the hospital.  Dr. P1 has one professional contact who could potentially satisfy this requirement, Dr. P10, the 'covering physician' for the Mobile clinic.   (The covering-physician requirement, established by state

51

regulation, is described in more detail below.  See infra at § IV.B.1.d.)  However, she is separately ineligible for privileges at the hospital where Dr. P10 practices. Furthermore, because Dr. P1's practice is in Georgia, she testified that she does not have those contacts at the other hospitals.  Finally, Providence Hospital, requires that all members of its medical staff "adhere to ... the Ethical and Religious Directives for Catholic Healthcare Services."  Providence Hospital Bylaws, PX 18, at 9, § 2.2-1(b).  That hospital "ha[s] publicly spoken out against abortion," Tr. at IV-188:12-13, making it unlikely that Dr. P1 could secure privileges there.

Dr. P1 faces an additional barrier. She was trained as a family-medicine physician, with a fellowship in family planning.  With this specialty, she is qualified to provide abortions, but she is not qualified to perform hysterectomies or laparotomies since those are only part of an OB/GYN residency.

From this evidence, the court is firmly convinced that Dr. P1 could not obtain privileges that would satisfy the staff-privileges requirement.[15]

### iv. Waivers & Making Doctors Try

The State argues that, despite the evidence that the current doctors are ineligible for privileges at local hospitals, the court should nonetheless refuse to find that the doctors would not receive privileges until the doctors actually apply.  It argues that, for example, the hospitals may choose to make exceptions or grant waivers to their prerequisites.  The parties disputed at summary judgment whether such exceptions would or might be granted.  Thereafter, the court gave the parties the opportunity to present evidence at trial on the issue. Despite this invitation, no credible evidence was presented to show that any one hospital would grant an

---

15. Dr. Roe occasionally performs abortions at the Mobile clinic, but would similarly be unable to meet the geographic and minimum-patient criteria for the Mobile hospitals.

exception to its prerequisites for staff privileges to accommodate the abortion doctors.[16]   Evidence of mere possibility and speculation is insufficient to rebut the consistent evidence that the abortion clinics' doctors are ineligible for privileges that could satisfy the statute's requirement.[17]

The plaintiffs' clinics' doctors did not apply because it would damage their professional reputations to file such futile applications.   Significant evidence to this effect was presented at trial.   As the Baptist Health representative testified credibly, "it is in the

_____

16. The Medical West representative testified that her hospital maintains relationships with tele-radiologists, who analyze X-rays and other imaging results from afar, and shift-based hospitalists, who are employees of the hospital.  A doctor in either category would not be able to admit and perform procedures on a patient whom the doctor had been treating outside the hospital.  Therefore, these categories of privileges for which exceptions are made to the residency requirement would not satisfy the staff-privileges requirement.

17. In fact, in the Mississippi case, the court noted that discretion on the part of hospital credentialing committees was used, not to make exceptions for abortion doctors, but to deny their applications for privileges. Jackson Women's Health, --- F.3d at ---, 2014 WL 3730467 at *2, *2 n.3.

physician's best interest to go through everything and make sure that they meet all the criteria because, again, it's not--it's not beneficial to them to--to submit something that's going to be rejected." Tr. at IV-168:16-20. The State argues that there would be no such consequence because rejections of futile applications are not reportable to the National Provider Data Bank, a database of doctors' credentials and reputations. However, many hospitals in their privileges applications require doctors to disclose all previous applications that they have withdrawn or that were denied for any reason. Therefore, even an application that never gets reported to the Data Bank could adversely affect a future, non-futile, privileges application. Dr. Roe testified credibly that, if a doctor presented an application that revealed large numbers of futile privileges applications, the hospital committee "will look at you unfavorably, knowing that, professionally, you did not take into account to respect the bylaws of the hospitals and you casually applied for privileges at

all hospitals even when you knew you could not meet the
bylaws." Id. at IV-54:3-7.

Finally, the court does not accept the State's
characterization that the plaintiffs and their doctors
have not tried to secure privileges. The Montgomery
clinic administrator made sincere efforts to determine
the application process for staff privileges, so that her
doctors could apply, if they were eligible. She
determined that they were not. Dr. Roe reached out to
the University of Alabama-Birmingham hospital, as
described above, and also attempted to secure privileges
at another Birmingham hospital which has now closed.


(c) New Abortion Doctors

The State argues that, even if the four current
abortion doctors at the plaintiffs' clinics cannot gain
staff privileges at local hospitals, the requirement may
not actually affect women who seek abortions. Perhaps
the current clinics would recruit and hire new doctors
who already have or can obtain local staff privileges?

56

Or perhaps other doctors, who either currently reside locally or who may move from out of state, would begin performing abortions to satisfy the apparent demand?  As the discussion above shows, any new doctor would have to reside and maintain an active gynecological practice in the area in which she provides abortions.

The State points to a handful of instances when local clinics were able to recruit a local doctor to serve as a covering physician, and to the fact that, as recently as 2012, the Birmingham clinic employed abortion doctors who lived in the area and therefore met residency requirements for staff privileges at local hospitals. However, as discussed more fully below, the court finds that the number of abortion doctors nationally and throughout the South is declining; the decision to perform abortions carries detrimental professional consequences in Alabama; violence against and harassment of abortion providers, beyond run-of-the-mill political protest, persist in the State; prior attempts to recruit local doctors have failed dramatically; and there are

significant regulatory barriers to entry for a new doctor
to begin providing abortions at any scale.

For these reasons, the court finds that it is most
unlikely that the plaintiffs' three clinics would find
new doctors who hold or could obtain staff privileges to
satisfy the requirement, nor will any new clinics open in
the foreseeable future.  Thus, if the staff-privileges
requirement were to go into effect, it would eliminate
abortion availability in Montgomery, Birmingham, and
Mobile.

### i. The Raw Numbers

A severe scarcity of abortion doctors exists
nationwide and particularly in the South.  Sixty-nine
percent of all counties nationwide have no abortion
doctors at all.  Between the years of 1982 and 2005, the
number of abortion providers in the country decreased by
38 %.  Only 14 % of OB/GYNs in the United States provide
any abortion services, including abortions for fetal
anomalies or to save the life of a mother, and only 8 %

percent of OB/GYNs in the South perform any abortions at all, compared to 26 % in the Northeast.  In Louisiana, Alabama, and Mississippi, no residency program offers abortion training to OB/GYN medical residents.  Based on these numbers, it is perhaps unsurprising that no doctor in the entire State of Alabama performed an abortion in her private office from 2007 through 2012.  When the Huntsville clinic, the last abortion clinic to open in the State, opened in 2001, there were 12 clinics providing abortion.  Today, that number has declined to five.

There are many causes of the scarcity.  First, it goes without saying that some, and perhaps many, doctors in Montgomery, Birmingham, and Mobile would never perform elective abortions out of deeply held religious and ethical convictions.  Even among those doctors who support abortion rights, some do not have training on how to perform an abortion.  Finally, even those doctors who are supportive of abortion rights and trained to perform an abortion are extremely unlikely to begin performing

abortions in these three cities, due to the severe professional consequences of doing so and the lingering threat of violence against abortion doctors, particularly in Alabama.

## ii. Professional Consequences

Dr. Lori Freedman, an expert for the plaintiffs, persuasively described the professional consequences for doctors who provide abortions. Even among doctors who do not view abortion doctors negatively, a phenomenon that Dr. Freedman names the 'cautionary tale' is a barrier to recruiting new abortion providers: Doctors who may consider performing abortions are warned, explicitly or by example, of the negative consequences past abortion doctors have faced for providing abortions in a particular community. For example, a doctor considering becoming an abortion provider may hear stories of past abortion doctors who were ostracized from their communities for being "abortionists," or of others whose private practices were destroyed by protests due to their

60

affiliations with abortion clinics. A doctor who is considering performing abortions therefore learns that any degree of abortion practice comes at a cost of losing her standing within the local medical community, and possibly also risking her ability to maintain an independent practice seeing other patients.

According to Dr. Freedman, the stigma of abortion and the 'cautionary tale' are particularly strong in small and mid-sized cities. An abortion doctor in a larger urban area can maintain anonymity and more easily find a medical professional community supportive of abortion rights, thereby mitigating the stigma the doctor faces for her work. In small towns and mid-sized cities, an abortion doctor is more recognizable and easily singled out. For example, in the course of Dr. Freedman's research, she spoke to one abortion doctor who moved from a large urban area to a small city and considered providing abortions there. However, he feared for his reputation and the detrimental consequences to his private practice in the new city, despite having provided

abortion services for many years.  The court therefore finds that it is highly likely that this effect would be particularly strong in Mobile and Montgomery, while still affecting doctors' decision-making in Birmingham.

Doctors affiliated with Alabama abortion clinics have experienced anti-abortion stigma consistent with the 'cautionary-tale' dynamic.  In Huntsville, Dr. Carl Palmer and clinic administrator Dalton Johnson opened the Alabama Women's Center for Reproductive Alternatives in 2001.  Because of difficulty finding a location that would agree to host an abortion clinic, the clinic originally operated in the same building as Dr. Palmer's own private OB/GYN practice.  However, when anti-abortion protestors discovered the abortion clinic, they started to protest outside Dr. Palmer's private practice.  They would confront non-abortion OB/GYN patients, particularly pregnant women.  Even on days when Dr. Palmer provided no abortion services, protesters would wave images of late-term abortions at the women.  Eventually, Dr. Palmer decided to discontinue his obstetric practice, that is,

delivering babies, because he did not want to subject his patients to the harassment.

In 2004, Dr. Palmer passed away suddenly, and clinic administrator Johnson found Dr. A to continue performing abortions at the clinic. However, at that time, Dr. A lived in California and was therefore unable to secure staff privileges at a local hospital. In order to stay open, the clinic needed to hire a local covering physician. Johnson approached Dr. H1, a friend of the late Dr. Palmer's, to serve in that role, but Dr. H1 was hesitant. She had seen the 'cautionary tale' of Dr. Palmer's practice, and she feared that if she became affiliated with an abortion clinic, she would also be forced to discontinue her obstetric practice and would not be able to support her family. Johnson was able to get Dr. H1 to agree to serve as covering physician, not performing any abortions, only after he promised that the relationship would remain confidential.

Despite Johnson's best efforts, Dr. H1's role as covering physician was revealed. Although she was not

63

performing abortions herself, protestors came to her private practice and began to confront her pregnant patients, just as they had Dr. Palmer's. Again, they held signs depicting third-trimester abortions. The local leader of the pro-life movement told Johnson that he would protest Dr. H1's practice for as long as Dr. H1 continued to serve as covering physician for the clinic. Dr. H1 removed her children from their Catholic school due to the publicity surrounding her affiliation with the abortion clinic. She "had a mass exodus of patients from his practice." Johnson Test., Tr. at II-65:24-25. Finally, she was forced to close the obstetric portion of his practice. Although she had initially refused to perform abortions herself, the loss of her private obstetric practice pushed her into becoming a full-time abortion provider so that she could continue to support her family as a gynecologist in Huntsville.

Recently, Dr. H2 has moved to Huntsville and opened a practice there, in addition to her practice in Opelika, Alabama. At Dr. H2's new practice in Huntsville,

64

anti-abortion protesters have again begun to confront pregnant women who go to her to have their babies delivered. At trial, clinic administrator Johnson movingly expressed his fear that Dr. H2 would be unable to start and maintain an obstetric practice, just as Dr. Payne's and Dr. H1's practices were shuttered.

The court finds that the protests at the Huntsville private practices go beyond the run-of-the-mill political protests prompted by an issue as morally and politically charged as abortion. The protesters in Huntsville were not targeting abortion patients and trying to dissuade them from going through with the procedure. Cf. McCullen v. Coakley, 134 S.Ct. 2518, 2527 (2014) (describing "sidewalk counseling" protests and engagement at abortion clinics). Instead, they were approaching women who sought to carry their pregnancies to term. Rather than attempting to change general public perceptions on the issue of abortions or dissuade women from obtaining abortions, the court must infer that these protesters sought to threaten economic destruction for any doctor

65

who enabled the provision of abortion within the city. They succeeded twice in ending a doctor's obstetric practice.

Doctors in Birmingham were also forced to choose between providing abortion and maintaining their private practice. Dr. P7 and Dr. Roe had both worked at a private practice in Birmingham, while also providing abortions at independent clinics, including Planned Parenthood. However, when the director of their practice learned of Dr. P7's work providing abortions, he initiated an investigation against the doctor. Ultimately, Dr. P7 was forced to choose between providing abortions or keeping her job. She stopped performing abortions. Soon, Dr. Roe was faced with the same hard choice and ultimately decided to leave the practice, rather than stop providing abortions.

In 2009, Planned Parenthood tried to recruit a Birmingham-area OB/GYN, who was a large financial contributor to the organization, to provide abortions at the clinic. However, despite her strong support for

66

abortion rights, the doctor refused to provide abortions. "[S]he and her family did not want to be associated with the stigma associated with providing abortions for family planning." Buchanan Dep. at 107:13-16.

The Montgomery clinic also experienced the power of anti-abortion stigma to keep doctors from affiliating. Wary and fearful of other medical professionals learning of his affiliation with abortion clinics, the original doctor whom the administrator secured as a covering physician refused to sign a written contract to that effect. As soon as state investigators contacted him, he terminated the affiliation because such a call put his anonymity and therefore professional reputation at great risk in the Montgomery medical community.

Any doctor who would consider starting to perform abortions in the three cities would likely hear the 'cautionary tales' about the experiences of Dr. Palmer, Dr. H1, Dr. H2, Dr. P7, and Dr. Roe.  She would realize that there was a good chance that an affiliation with abortion would lead to harassment of her non-abortion

patients, potentially preventing her from continuing to deliver babies. Given the intensive training for obstetrics, the loss of that part of a doctor's practice would be significant. This dynamic creates strong pressure, even for abortion-rights supporters, not to perform abortions.

### iii. Fear of Violence

Beyond the professional consequences of providing abortion, potential abortion doctors must also consider the physical threats to them and their families. As described above, Alabama has a particularly disturbing history of violence towards abortion providers.

To review, the first abortion doctor in the nation to be murdered, Dr. David Gunn, provided abortions at the Montgomery clinic, among other clinics. He was murdered in 1993. A now-closed clinic in Birmingham was bombed, killing an off-duty police officer serving as a security guard and wounding a nurse. Not long after, the Tuscaloosa clinic was essentially destroyed by an arson.

That clinic was later attacked by a driver who ran his car into the front of the building.  There were other incidents of violence as well.

These prior acts of violence provide a more than reasonable basis for abortion providers in Alabama to be afraid.  Dr. Roe testified that: "Every time I go to work, whether it's in Birmingham or Mobile, I'm always afraid that there will be somebody who is in the crowd who is passionate enough about the topic that they're willing to shoot.  I worry about my children.  I worry about my husband, my extended family." Tr. at IV-60:1-5. As she delivered this testimony, there was a hush over the courtroom, as the court and all others in attendance heard the palpable fear in her voice.

Dr. Roe's fears have been strengthened by several incidents of extreme harassment.  In one instance, a protestor tailgated and followed her car on the highway as she left the Birmingham clinic en route to her home in Atlanta.  She testified that: "I realized that every time [I] switched lane[s], whatever I did, the car was

matching my moves." Id. at IV-64:19-20. She feared that

the driver would run her car down or run her off the road

into a ditch. She was able to escape safely only after

a colleague gave her instructions on evasion techniques

over her cell phone. In another incident, a protestor

called Dr. Roe by name as she entered the clinic,

threatening that "they were coming for [her]" in Atlanta.

Id. at IV-65:15. Based on these incidents and others

like them, her home is under FBI surveillance and has a

security system. She also takes additional precautionary

measures in order to maintain anonymity, including

disguising her clothes, covering her face, and renting a

different car every time she drives from her Atlanta

residence to an Alabama clinic.

Like Dr. Roe, Dr. P1 experiences threats and

hostility beyond run-of-the-mill protesting at the Mobile

clinic where she performs abortions. Mobile protestors

placed the doctor's picture on an anti-abortion poster

and regularly call her by her first name as she enters

her clinic. Dr. P1 has worked at two clinics that were

targeted for violence, including the Birmingham clinic that was bombed by Eric Rudolph, killing a police officer and wounding a nurse. As a result, she takes all threats from anti-abortion protesters seriously. She does not use the same car twice when traveling to her clinic, only accepts personal mail through a Post Office Box, and prefers not to receive packages at her home.

Huntsville clinic administrator Johnson takes similar safety measures. He uses an alarm system at home, carries a personal firearm for protection, changes his everyday routine frequently, and visits a grocery store in a different area of town because protestors would confront him and harass him at his local grocery store.

Drs. Roe and P1 continue to provide abortion services in Alabama despite the State's history of violence and threats against abortion doctors, but other doctors have responded to the hostile environment differently. When anti-abortion activists in the State leaked Dr. P3's personal and professional information, including her Social Security number, onto the internet, she gave up

her abortion practice and moved to another State. Dr. D, an abortion provider at the Montgomery clinic for ten years, ceased providing abortions in 2012 when information she provided to the Board of Medical Examiners for licensure was similarly leaked to an anti-abortion website. In addition to professional information, her home address, personal cell phone number, names of family members, and photograph were posted to the website. This incident, along with repeated attempts by protestors to take photos as she entered the clinic, ultimately caused her to quit her job at the Montgomery clinic.

Clinic administrators for the Montgomery, Birmingham, and Huntsville clinics each offered examples of doctors declining requests to affiliate with a clinic or expressing great apprehension out of fear for the physical safety of themselves and their families.

Therefore, the court finds that even those doctors who support abortion, who have training in abortion, and who would be willing to withstand the professional

consequences of performing abortion would not agree to perform abortions because the threat of physical violence and harassment is so overwhelming.

### iv. Previous Recruitment Efforts

Prior failed attempts by clinic administrators to secure local doctors to affiliate with Alabama abortion clinics reinforce the conclusion that it would be difficult to find local OB/GYNs willing to provide abortions in Montgomery, Birmingham, and Mobile.

In 1999 and again in 2003, the Montgomery administrator, to comply with state regulations, sent a letter to every OB/GYN in the Montgomery area, seeking a local covering physician to treat any post-abortion complications (described in further detail below). In both years, she received only negative responses. One OB/GYN explained that he did not "wish to be involved in any way with any facility that provides such services." PX 37 at RHS-64. Another rejection from 2003 reads, "I speak for my entire practice when I say we must refuse

any involvement with your endeavors. ... [W]e have committed our practice to the preservation of human life, not to the destruction of it." Id. at RHS-82. In an attempt to recruit a local covering physician for his Huntsville clinic, administrator Johnson also sent letters to every OB/GYN in a 30-mile radius of his clinic. Johnson's letters reached roughly 40 to 50 physicians, but he received no positive responses.

Between 2006 and 2013, the former administrator of the Birmingham clinic attempted to recruit about eleven local physicians to work there, but received negative responses from all. For example, as described above, she made several attempts to recruit a local OB/GYN who donated significant funds to Planned Parenthood and was a strong supporter of abortion rights. Despite the doctor's support for abortion rights, she refused to perform abortions at the clinic, out of fear for her family's safety and the effects of anti-abortion stigma on her private practice.

## v. Barriers to Entry

To the extent that the State suggests that a local doctor may be willing to perform abortions outside the auspices of the plaintiffs' clinics, it is important to understand the regulatory landscape that would apply to her. Alabama law classifies as an "Abortion or Reproductive Health Center" any health care facility or doctor's office that advertises itself as performing abortion or any such facility or office where ten or more abortions are performed during a month or 100 or more abortions are performed during a calendar year. Ala. Admin. Code § 420-5-1-.01(2)(d). Any doctor who replaced even a fraction of the capacity of the plaintiffs' clinics would therefore be regulated as an abortion clinics.

Alabama law imposes several architectural and safety regulations on Abortion or Reproductive Health Centers. The building must meet several designated safety codes, including the standards for an Ambulatory Surgical Center. 1975 Ala. Code § 26-23E-9. The facility must

abide by the state standards for office-based surgeries that involve moderate sedation/analgesia, regardless of whether any anaesthesia is ever used.  § 26-23E-8.  The facility would have to abide by specific regulations on personnel, record-keeping, medical supplies, and administration which are different from and more extensive than the regulations for a doctor providing office-based surgery.  <u>Compare</u> Ala Admin. Code §§ 420-5-1-.01 through -.04 (regulations for Abortion or Reproductive Health Centers) <u>with</u> Ala. Admin. Code §§ 540-X-10-.01 through -.13 (regulations for office-based surgery).  These requirements would apply even to a doctor who provided only medication abortions, which consist of the oral administration of two sets of pills.

In other words, a doctor could not casually begin offering abortions in an office setting.  She would need a facility that met the architectural requirements of an ambulatory surgical center.  She may also need a

significantly larger staff in order to meet the personnel requirements.

These regulatory requirements alone would likely discourage many doctors from opening a new clinic, but the general hostility to abortion among many in Alabama makes the logistics of opening a clinic even more difficult. As noted above, the last abortion clinic to open in the State was the Huntsville one in 2001. Administrator Johnson testified to the day-to-day difficulty of operating a clinic. He stated that even locating space can be a challenge: "[A]s soon as we would sit down with the realtor or the owner of the property and we would tell them that an abortion clinic was going in there, they--they wouldn't lease to us." Tr. at II-59:4-7. The company that had serviced Dr. Palmer's medical equipment for 20 years refused to provide services to the clinic, forcing Johnson to hire a servicer from more than 100 miles away, adding $ 500 to the cost of every repair. Even the simple act of calling a plumber becomes complex:

> "People don't realize--hiring a plumber.
> In your mind, you have to strategically
> think, okay, what day are the protestors
> not going to be out there so they won't
> harass this man.   And you know, I'm
> always straight up and honest and tell
> people, hey, you know, you're coming to
> the local abortion clinic.   You know,
> and you try to, you know, tell them
> straight up so they won't be surprised.
> But, you know, even--I had my water
> heater replaced at my house.   And thank
> God I can just look in the phone book
> and call Mr. Rooter and don't have to go
> through this whole story and go through
> this whole thing of planning out how to
> get the plumber in so he won't get
> harassed.   And it's to the point that
> you don't even worry about how much it
> costs.   You're just glad that they're
> there to--they're there to cover and
> supply services."

Id. at II-55:6-19.

In reviewing these difficulties, the court does not

intend to chastise or criticize those individuals who,

because of deeply held beliefs or for any other reason,

choose not to do business with abortion providers.

Within the boundaries of the law, individuals are free to

conduct their affairs as they see fit.   Nor does the

court intend to make any claims or insinuations about the

78

legitimacy or propriety of abortion regulations in the State apart from the staff-privileges requirement.  These facts are presented instead to illustrate why facile assertions that new abortion providers would emerge to replace the plaintiffs' clinics are unconvincing.

### vi. The Economic Arguments

The State argues that the regulation would not diminish the provision of abortion services either because clinic administrators could overcome difficulties finding local abortion doctors if they were simply to pay doctors more or because new doctors would start clinics to satisfy the demand for abortion services.

The first argument relies in part on the discrepancy between the amount that the plaintiffs pay their doctors per procedure and the insurance reimbursement rates that doctors in private practice apparently charge for similar procedures.  From this discrepancy, the State argues that doctors choose not to provide abortions because it is not lucrative enough, relative to other options.  However,

the plaintiffs' expert Dr. Paul Fine explained that this is an inapt comparison.  Insurers do not always reimburse for the full listed rate.  Furthermore, the insurance rate covers various overhead, equipment, and staffing costs that are not included in the rate the plaintiffs pay their doctors, as those costs are paid by the clinics themselves.  Therefore, the court cannot find on this record that the plaintiffs pay below-market rates for their doctors.

Nonetheless, the State's argument holds a certain simplistic appeal.  In the words of the State's expert Dr. Peter Uhlenberg, describing the potential for new clinics opening, "If we think of this as a supply and demand and the demand is high, the market is there, there's no reason to expect that someone wouldn't step forward to provide that service."  Tr. at VI-101:23-102:1.

As the discussion above makes clear, there are in fact several very good reasons to expect that no one would step in to provide abortion services.  Many OB/GYNs

in Alabama do not know how to perform an abortion because many residency programs in the region do not offer the training; many OB/GYNs have strong anti-abortion convictions; and others fear, reasonably, that they could not provide abortions without sacrificing another part of their practice or that providing abortions would expose them and their families to violence. The court finds, therefore, that the inability to obtain local abortion doctors is not a matter of money, but rather a reflection of the difficulty of pursuing that occupation in the State.

Indeed, the court finds that doctors who continue to provide abortions in Alabama, despite the overwhelming pressures not to, do so because of a deep personal commitment to ensuring that safe and legal abortions are available to women in Alabama. Administrator Johnson continues to operate the Huntsville clinic because he doesn't see "the point of it being legal if there's nobody here to perform it." Tr. at II-87:10-11. Dr. Roe questions her decision to continue providing abortions

every time she goes to a clinic because of the risks involved, but continues her work because she does not know anyone else who would be willing to provide care to Alabama women in "very difficult situations, having to make very difficult decisions," and she could not "turn [her] back on them." Id. at IV-68:13-15. Dr. A flies from Nigeria to Atlanta at her own expense to provide abortions at the Montgomery and Huntsville clinics because of the experiences she had treating women who received illegal abortions prior to the legalization of abortion. Having seen women "messed up for life" due to unsafe and illegal abortions, she believes that, "where there's a chance to help a patient terminate a pregnancy for whatever reason, lawfully," she has a moral responsibility to do so. Id. at V-106:9-11.

For all of these reasons, the court finds that the four doctors who currently work at the Montgomery, Birmingham, and Mobile clinics will not be able to obtain staff privileges and that new doctors who are eligible for staff privileges would not emerge to take their

places.   Therefore, the court is firmly convinced that, if the staff-privileges requirement were to go into effect, it would wipe out the availability of abortion services in Montgomery, Birmingham, and Mobile.

### 2. Effect on Women

Determining how the staff-privileges requirement affects abortion providers is only the beginning of the court's inquiry.   The rights of the doctors and the clinics to provide abortion are "derivative" of women's rights to make family decisions and to physical autonomy. Casey, 505 U.S. at 884.   Abortion doctors themselves do not receive special protection, relative to the general constitutional rights of physicians and medical providers, absent an effect on the women who seek abortions.   Id.

By wiping out abortion availability in three of Alabama's five largest cities, the staff-privileges requirement would affect women who seek abortions in the State in several ways.   First, the patients who live in

83

Montgomery, Birmingham, and Mobile would need to travel outside of their respective cities to procure an abortion, which would cause three kinds of harms.  A significant number of the women would be prevented from obtaining an abortion; others would be delayed in obtaining abortions, exposing them to greater risks of complications; and even the women who are able to obtain abortions would suffer significant harms in terms of time, financial cost, and invasion of privacy.  Second, for all Alabama women, the number of abortions that can be performed in the State would be radically diminished, with every indication that the statewide capacity of abortion services would further diminish, rather than increase, in the future.  Finally, and particularly with the advent of illegal sales over the internet, there is significant risk that women who are unable to procure abortions would turn to unsupervised and unsafe use of abortion-inducing medications.

### (a) Distance

### i. Statistical Evidence

First, the plaintiffs introduced substantial statistical evidence, through their expert Dr. Stanley Henshaw (whose testimony the court credits), that women forgo abortions at higher rates when they must travel farther to reach an abortion provider.

A major example of this effect was documented by economics researchers Silvie Colman and Ted Joyce. They reviewed the effects of a Texas law that effectively eliminated, for a two-year period, availability of abortions after 16-weeks gestational age within the State. In the face of this restriction, some women were able to schedule abortions before the 16-week cutoff. Other women obtained the abortions out of state. Nonetheless, after reviewing health records in Texas and the surrounding States, Colman and Joyce found that a significant number of women--likely more than half of women considering late-term abortions--when faced with an average travel distance of 200 miles to the nearest

late-term abortion clinic, simply did not obtain an abortion at all.

Furthermore, other studies reviewing changes in distance that women must travel to obtain an abortion have consistently found that a woman who lives farther from abortion facilities will be less likely to obtain an abortion. One study found that the percentage of women who obtain an abortion dropped with each additional ten miles of distance. Another found that an increase of 100 miles in travel distance reduces the abortion rate by almost 22 %. A third found that, conversely, opening new clinics substantially increased the abortion rate in the surrounding areas, further confirming the relationship between distance from a clinic and the likelihood that a woman will obtain an abortion.

Furthermore, increased travel distance causes delays for women who do secure abortions. In two surveys of women who obtained abortions later than they had wanted, 7 % and 12 %, respectively, attributed the delay to difficulties arranging transportation that arose from not

having an abortion provider nearby.  Furthermore, 26 %
and 28 %, respectively, reported that they had to delay
their abortions in order to save money to pay for the
procedure; as described below, increased distance makes
it more costly for a woman to obtain an abortion.

While early-term abortions are quite safe, as
discussed below, the procedure carries greater risks if
delayed past the 14th week of the pregnancy.  Later term
abortions are also more expensive.  Finally, delay past
a certain point would make it illegal for a woman to
obtain an abortion.  In Alabama, abortion is illegal once
the pregnancy reaches 20 weeks, with certain exceptions
for the life and health of the mother.


ii. Qualitative Effects

The testimony of plaintiffs' expert Dr. Sheila Katz
is useful in explaining why additional distance has the
effect of decreasing abortion rates.  While much of her
testimony reflected general facts about women and
abortion patients nationally, she interpreted those

87

general statistics as they relate to the nature of
Alabama women in general and to abortion patients in
particular.  As a preliminary matter, it is essential to
understand that the large majority of abortion patients,
particularly in Alabama, survive on very low incomes.
More than 70 % of the patients at Planned Parenthood's
clinics in Mobile and Birmingham live at or below 150 %
of the poverty line.  In particular, the administrator of
the Mobile clinic testified that 90 % of that clinic's
patients live in poverty.  The demographics of the
Montgomery clinic's patients are similar; 60 % of the
patients qualify for financial assistance.  Cf. Strange,
--- F. Supp. 2d at ----, 2014 WL 1320158 at *14 (the
court should consider "the nature and circumstances of
the women affected by the regulation").

For these women, going to another city to procure an
abortion is particularly expensive and difficult.  Poor
women are less likely to own their own cars and are
instead dependent on public transportation, asking
friends and relatives for rides, or borrowing cars; they

are less likely to have internet access; many already have children, but are unlikely to have regular sources of child care; and they are more likely to work on an hourly basis with an inflexible schedule and without any paid time off or to receive public benefits which require regular attendance at meetings or classes. A woman who does not own her own car may need to buy two inter-city bus tickets (one for the woman procuring the abortion, and one for a companion) in order to travel to another city. Without regular internet access, it is more difficult to locate an abortion clinic in another city or find an affordable hotel room. The additional time to travel for the city requires her to find and pay for child care or to miss one or several days of work. Furthermore, at each juncture, a woman may have to tell relatives, romantic partners, or work supervisors why she is leaving town: to procure an abortion. And, in light of the pervasive anti-abortion sentiment among many in Alabama, such disclosures may present risks to women's employment and safety. Finally, as Dr. Katz testified,

many low-income women have never left the cities in which they live.  The idea of going to a city where they know no one and have never visited, in order to undergo a procedure that can be frightening in itself, can present a significant psychological hurdle.  "[T]his psychological hurdle is as serious a burden as the additional costs represented by travel."  Katz Rep., PX 56 at ¶ 24.

Here, the court must note an error that some courts have made in their undue-burden analyses.  These courts have treated obstacles that arise from the interactions of regulation with women's financial constraints, as well as other aspects of women's circumstances, as ineligible to be "substantial obstacles" under Casey.  See Planned Parenthood of Greater Texas v. Abbott (Abbott I), 734 F.3d 406, 415 (5th Cir. 2013) (describing some women's inability to travel to a remaining clinic, due to limited immigration authorization, as "unrelated to the hospital-admitting-privileges requirement").  In so holding, the Abbott I court relied on Supreme Court and

Fifth Circuit cases which refused to find unconstitutional governments' decisions not to subsidize abortion in a way that they subsidized other medical procedures, including childbirth. Id. at 415 nn. 45 & 49 (citing K.P. v. LeBlanc, 729 F.3d 427, 442 (5th Cir. 2013) (refusing to find that exclusion of abortion providers from a state malpractice-insurance subsidy constituted an undue burden), and Harris v. McRae, 448 U.S. 297, 316 (1980) (holding, under the pre-Casey strict-scrutiny framework, that denial of federal Medicaid funding for abortions does not infringe on the constitutional right to abortion)).

The public-funding cases do not show that obstacles that are aggravated by poverty are irrelevant to the constitutional analysis. The Supreme Court in the public-funding cases distinguished between "plac[ing] obstacles in the path of a woman's exercise of her freedom of choice" and "remov[ing] those not of its own creation." Harris, 448 U.S. at 316. In cases like this one, while poverty may be relevant, the plaintiffs seek

91

only for government not to regulate in a way that makes
it more difficult for those poor women, that is, not to
place an obstacle in the path.  In the public-funding
cases, plaintiffs sought to force affirmative government
action to facilitate women's  abortions, removing the
difficulties that poverty creates generally.  There is a
difference between declining to interfere with a person
and refusing to assist her.  The plaintiffs in this case
ask only that Alabama not interfere with their patients'
ability to obtain abortions.

Nor would a court that sought to ignore obstacles
aggravated by the realities of poverty be wise to rely on
Casey's observation that, "Whether a burden falls on a
particular group is a distinct inquiry from whether it is
a substantial obstacle even as to the women in that
group."  Casey, 505 U.S. at 887.  In that case, the
district    court    had    invalidated    Pennsylvania's
waiting-period requirement because it would "ha[ve] the
effect of 'increasing the cost and risk of delay of
abortions'"  and  those  harms  would  be  "'particularly

burdensome'" for poorer women, among other groups.  Id. at 886-87.  On this issue, the Supreme Court held that it is not enough to say that a regulation is unconstitutional because it makes it more difficult 'for me to obtain an abortion than it is for you.'  Rather, a woman must show that the regulation makes it sufficiently difficult for her to obtain an abortion in and of itself.

In Casey itself, the Supreme Court found that a spousal-notification requirement was an undue burden because of its effect on women who were in abusive relationships.  505 U.S. at 887-98.  The circumstances of those women and their relationships were at the core of the Casey analysis.  Casey's treatment of the spousal-notification requirement shows that the interaction of the state regulation and existing social conditions can create an obstacle for women.  And, if that obstacle is substantial, it can render the regulation unconstitutional.  Cf. Vosburg v. Putney, 50 N.W. 403 (Wisc. 1891) (exemplifying the eggshell-skull rule in tort law).

### iii. The First 50 Miles

The testimony of the plaintiffs' experts, Drs. Henshaw and Katz, also revealed an important aspect of the relationship between travel distance and women's ability to obtain an abortion: when a clinic closes, the largest effects are actually felt by women who, prior to the closure, needed to travel only short distances, less than 50 miles.

This can be a somewhat elusive concept, so the court will illustrate it with two hypothetical women. The first woman lives in the same urban area as abortion clinic X, which is just five miles away from her home. The second woman lives in a rural area 60 miles away from clinic X, which is the closest abortion provider to her home as well. Now imagine that clinic X closes, and the abortion provider closest to both the urban woman and the rural woman is now clinic Y. This change adds 30 miles to the distance each must now travel: the urban woman must travel 35 miles total, and the rural woman must now travel 90 miles.

94

The statistical and sociological evidence presented in this case demonstrates that the closure of clinic X will impose a much larger _additional_ burden on the urban woman than it will impose on the rural woman. Before the closure, the urban woman could obtain an abortion without any substantial departure from the logistics of her every-day life. For example, to get to the in-town clinic X, she could ask for a short ride from a friend or relative, take a taxi, or use public transportation. If necessary, she might be able to arrange a short period of time off work and childcare, as she would for any doctor's appointment, without the need to disclose that she was seeking an abortion. But once the in-town clinic X closes, she will need to arrange for travel outside her city, which Dr. Katz's testimony indicates may be highly unfamiliar and difficult. The greater time involved in traveling outside her city may also mean that she needs to arrange lodging, additional child care, and time off work. In the process, she may need to disclose the purpose of her trip. All this means that obtaining an

abortion will now be much more difficult and burdensome for the urban woman than it was when the in-town clinic X was still open.

In contrast, even before the closure of clinic X, the rural woman already needed to travel 60 miles to obtain an abortion.  She already needed to arrange for long-distance travel to a city that might be unfamiliar and, if applicable to her, already needed to arrange for child care or time off work.  This is not to say that the extra 30 miles she must now travel would impose no additional burden, for it would likely increase the time and money she will need to obtain an abortion.  But the critical point is this: even though, following the closure of clinic X, the rural woman must travel a longer total distance, 90 miles compared to the urban woman's 35, the evidence in this case demonstrates that the clinic closure actually imposes a much more significant additional burden on the urban woman.

Applied to the circumstances of this litigation, this insight means that the most severe burdens created by

96

this law are likely to fall on the women who live in Montgomery, Birmingham, and Mobile and who therefore currently have to travel only limited distances to obtain an abortion.  That category of women, like the urban woman described above, accounts for over half of the patients at the three clinics that would close as a result of the staff-privileges provision.

And, as discussed above, the impact on those women is likely to be quite substantial, and a significant number would be prevented from obtaining a desired abortion at all.  Indeed, if the staff-privileges requirement were to go into effect, the shortest trip between either Montgomery, Birmingham, or Mobile and the nearest in-state abortion provider would be the distance between Birmingham and the Tuscaloosa clinic: a distance of 59 miles.  In other words, all the women who live in those cities would now need to travel at least 59 miles to obtain an abortion in Alabama.

The court's factual conclusion, that clinic closures impose the greatest additional burdens on women who

previously lived close to an abortion clinic, directly
refutes one of the State's arguments in this case.  The
State strongly urged this court to apply the Fifth
Circuit's conclusion in <u>Abbott I</u> and <u>Abbott II</u> that "an
increase of travel of less than 150 miles for some women
is not an undue burden under <u>Casey</u>." <u>Abbott II</u>, 748 F.3d
at 598.  The State's argument seems to be this: if the
fact that women needed to travel 150 miles in the <u>Abbott</u>
cases did not constitute an undue burden, how could the
<u>shorter</u> travel distances in this case constitute one?
<u>See</u> State Pre-Trial Br. (Doc. No. 183) at 13.

What this court has already said should make the
answer obvious: shorter total distances can sometimes
impose greater additional burdens than longer ones.  For,
if the women who needed to travel 150 miles in the <u>Abbott</u>
cases were like the rural woman described above, the
additional burden may have been comparatively minor.  By
contrast, the additional burden on a woman in Birmingham,
who previously could obtain an abortion within the city
and now would need to travel at least 59 miles to

98

Tuscaloosa, is quite severe.   The State's view of the undue-burden analysis is simply wrong.   The State's absolute comparison (150 miles versus 90 miles) fails to take into consideration the many factors which bear on the burden imposed by this regulation, particularly the circumstances of the women of Alabama who would be affected by it.

Furthermore, the insight regarding the 'first 50 miles' also undermines the reasoning of the Abbott cases themselves.   Those cases looked to Casey's opinion upholding a 24-hour waiting period, concluding that "Casey counsels against striking down a statute solely because women may have to travel long distances to obtain abortions."   Abbott II, 748 F.3d at 598.   Casey did, indeed, find that the additional travel time and costs associated with Pennsylvania's 24-hour waiting period did not constitute a substantial obstacle.   505 U.S. at 887. But, again, the factual context matters.   The women at issue in that portion of Casey were like the rural woman described above: before the waiting-period provision,

they already had to, and were able to, make a two-to-three-hour trip to a clinic.  The new provision simply required them to make that trip twice or to stay overnight.  By contrast, as discussed above, the clinic closures in this case would impose severe new burdens on the urban woman.  Thus, the evidence introduced in this case shows that, perhaps counter to some courts' intuition, the burdens imposed by the additional travel noted in Casey are significantly less severe than the burdens imposed on the urban woman by clinic closures in this case.

Indeed contrary to the Fifth Circuit's interpretation, Casey's approach was consistent with this court's conclusion.  Casey did not set out to establish any bright-line legal rule about travel distances, but merely reached a conclusion, "on the record before [it]," about the additional distances in that case.  Casey, 505 U.S. at 887.  Courts, like the Abbott courts, err when they seek to transform that factual conclusion into a simplistic legal rule.  As this case demonstrates, in

assessing the burdens imposed by a regulation, the factual details are critical.

### iv. Out-of-State Clinics

There has been significant discussion over the course of this litigation about whether the court should consider women's ability to secure abortions outside the State of Alabama. This presents a difficult legal question. On the one hand, the effects prong of the undue-burden standard requires a real-world analysis. See Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at * 13 (court should consider obstacles "considering the real-world circumstances"). The court must acknowledge that state boundaries are not always significant in women's real-world decision-making. On the other hand, the State could identify no precedent for a court to consider conduct outside the political boundaries of a jurisdiction in order to justify the constitutionality of actions by that jurisdiction. On the contrary, in areas ranging from First Amendment free speech to Fourteenth

Amendment equal protection to Second Amendment firearm rights, courts have refused to allow out-of-jurisdiction access to cure within-jurisdiction restrictions.  See, e.g., Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981) (free speech); Missouri ex rel. Gaines v. Canada, 305 U.S. 337 (1938) (equal protection); Ezell v. City of Chicago, 651 F.3d 684, 689-90, 697 (7th Cir. 2011) (firearm rights); Islamic Ctr. of Miss., Inc. v. City of Starkville, 840 F.2d 293, 298-99 (5th Cir. 1988) (free exercise).  In fact, the Court of Appeals for the Fifth Circuit recently struck down Mississippi's staff-privileges requirement because it refused to look outside the borders of that State when conducting the undue-burden analysis.  Jackson Women's Health, --- F.3d at ----, 2014 WL 3730467 at *8-9.

This court does not need to resolve the legal issue of whether to consider out-of state clinics because, even if this court were to consider those clinics, it would reach the same conclusion.  The out-of-state clinic nearest to any of the three cities at issue in this case

is in Pensacola, Florida, approximately 50 miles away from Mobile.  The Columbus, Georgia clinic is approximately 80 miles away from Montgomery.  A woman in Mobile traveling to Pensacola or in Montgomery traveling to Columbus would still face the same threshold difficulties related to losing an abortion clinic in her home city; she would still have to overcome the challenges of the first 50 miles.  Furthermore, the record does not support the conclusion that the Pensacola and Columbus clinics could actually accommodate an influx of patients from Alabama, and, in fact, the evidence from the Huntsville and Tuscaloosa clinics, discussed below, shows that it is not always easy for a clinic to increase capacity and suggests that the out-of-state clinics may not be able to treat large numbers of new women from Alabama

Finally, in pointing to the Pensacola and Columbus clinics to support its case, the State is inviting this court to look only east and south.  But if the court were to look outside Alabama's borders, it would have to look

west as well.  Looking west, it is clear that similar laws to the one at issue here threaten to close clinics throughout the region.  See, eg. Jackson Women's Health Organization v. Currier, 940 F. Supp. 2d 416, 418 (S.D. Miss. 2013), aff'd, --- F.3d ----, 2014 WL 3730467 (5th Cir. 2014).  Again, the court reaches no conclusions on these matters, but hastens to point out that an out-of-state analysis is both much more complicated than the State suggests and potentially harmful, on balance, to the State's case.

For all of these reasons, it would be unwise to jump to conclusions about the curative effect of Pensacola's and Columbus's clinics on this thin record.

### v. Women Who Already Travel

Even those women who already travel from other cities in order to procure an abortion would face some of the challenges of additional distance, whether those challenges would manifest in additional time away from home, additional cost to reach another city, or

additional distance to drive.  However, in light of the burdens that would be imposed on women who live in cities that would be left without an abortion provider as a result of the staff-privileges requirement and the challenges, discussed below, that would be imposed by reduced capacity to perform abortions in the State, the travel-related burdens that would be faced by these women do not affect the court's calculus.


### (b) Capacity

Apart from the difficulties faced by an individual woman who must travel to Huntsville or Tuscaloosa, rather than obtaining an abortion in Montgomery, Birmingham, or Mobile, the staff-privileges requirement would also dramatically reduce the total capacity of providers to offer abortions in the State.  See Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *14 (court should consider "the availability of abortion services, both prior to and under the challenged regulation").

The Tuscaloosa and Huntsville clinics provided 4,954 of the 9,009 abortions performed in the State in 2012. Donald Aff., PX 20 ¶¶ 4-5.  If the three other clinics in the State were to close, as a result of the staff-privileges requirement, a large proportion of the women who would have gone to those clinics would instead have to seek abortion appointments at the Tuscaloosa and Huntsville clinics.  Huntsville administrator Johnson testified credibly that his clinic would not be able to accommodate additional patients.  In part, the capacity constraint arises because Dr. A would no longer be able to work at the Huntsville clinic if the staff-privileges requirement were to go into effect.  Because of this supply-side constraint, there would simply be fewer abortions performed in the State than there would be women who would otherwise seek to obtain them.  When a woman would call the Huntsville or Tuscaloosa clinic, whether from those cities or anywhere else in the State, it would be less likely that she could obtain a prompt appointment.  It is likely that she would have to make an

appointment further into the future, if the clinic even had capacity to treat her before her pregnancy reached 20 weeks, the statutory maximum gestational age. Therefore, there are significant risks that this capacity constraint would prevent some women and harmfully delay other women from obtaining abortions.

Nor can the court take the continued operation of the Huntsville and Tuscaloosa clinics for granted. As of the time of the trial, Huntsville administrator Johnson was still awaiting approval of architectural plans that would bring his clinic into compliance with unchallenged portions of the Women's Health and Safety Act. If the Department of Public Health does not approve the plans, his clinic will shut down. The doctor at the Tuscaloosa clinic has been practicing medicine since at least 1969, and is unlikely to continue practicing for very much longer. After he stops providing abortions, there are no current plans for keeping that clinic open. Therefore, if the staff-privileges requirement were to go into effect, there is a substantial likelihood that Alabama

would be left in the foreseeable future without a single abortion clinic due, in large part, to the staff-privileges requirement.  Cf. Jackson Women's Health, --- F.3d at ---, 2014 WL 3730467 at *10 (holding that Mississippi's staff-privileges law could not constitutionally be applied to close the only abortion clinic in the State).


### (c) Unsupervised Abortions

As already shown, by imposing travel-related obstacles and a statewide capacity constraint, the staff-privileges requirement would make it significantly more difficult to obtain an abortion in Alabama.  This difficulty also creates a greater risk that women would attempt to obtain an abortion illegally, without medical supervision.  See Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *14 ("Given proper proof, a court might also consider the likelihood that women will seek illegal abortions because of the regulation, and the corresponding dangers to life and health.").  Dr. P1

testified that she has already begun to see a few patients a month who had attempted to self-abort using illegally obtained medications, because the medications were less expensive than a supervised abortion.

This risk is particularly grave because, as plaintiffs' expert Dr. Fine testified, there are websites that illegally sell misoprostol and other abortion-inducing drugs. Of course, there are serious dangers for women who take unknown drugs which advertise themselves to be abortion-inducing, but which may not actually contain what is listed on the label. Even for those women who actually receive misoprostol, a woman who takes it without consultation with a medical professional and without the prior mifepristone pill faces increased risks of hemorrhaging and infection.

At the worst, there is a danger that women would attempt surgical abortions on themselves. Dr. Fine described how patients he saw when he was in his residency in the early 1970's "either got a botched back-alley abortion by some untrained person or they

actually put a coat hanger up inside of themselves." Tr. at III-85:9-11.  He further described the dangers posed by these illegal abortions: patients suffered "severe infections," including "gangrene of the uterus," and some even died.   Id. at III-85:11-12.   Recalling his experiences treating those women, he testified: "I will never forget the look in the eye of these women who are scared and frightened and desperate to end their pregnancy."  Id. at III-85:14-16.

### 3. Summary of Effects

In summary, for all of the above reasons, the court finds that the staff-privileges requirement would have the effect of eliminating abortion services in Montgomery, Birmingham, and Mobile.  The loss of abortion services in those cities would prevent some women who live there from obtaining abortions and delay others' abortions.   The increased distances would present financial difficulties and psychological obstacles for women who could previously obtain an abortion in their

110

own cities, as well as costing unnecessary additional time and causing women to forgo their medical confidentiality. For all Alabama women who might seek an abortion, the closures would present obstacles related to reduced capacity, namely delay and outright inability to secure abortion services. Each of these obstacles would be compounded by the threat that women who desperately seek to exercise their ability to decide whether to have a child would take unsafe measures to end their pregnancies.

Therefore, the court is firmly convinced that the staff-privileges requirement would impose severe and even, for some women, insurmountable obstacles on women seeking abortions in the State of Alabama.


## B. Justifications

The court will now analyze the strength of the State's justifications for the staff-privileges requirement. "[I]n order to evaluate the weight of the state interest involved in a particular case, it is not

enough simply to note that the State has invoked one of these legitimate interests. Rather, the court must look to case-specific factors." Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *15. These factors include "the extent of the anticipated benefit," "the likelihood of the anticipated benefit," "the means a regulation employs," and "the political history and context of the regulation." Id. at *15-*16.

The State puts forward two categories of justifications for the staff-privileges requirement. The primary justification is that the requirement furthers 'continuity of care' by improving care for women who experience complications and fostering improved follow-up care in general. Secondarily, the State argues that staff privileges serve a credentialing function, both as an initial screening mechanism and by providing ongoing review of physician quality. The court will now examine these justifications.

## 1. Continuity of Care

Continuity of care is the goal of ensuring that a patient receives high-quality care not only during a certain procedure but also after it, including treatment of complications and any necessary follow-up care.  While the parties and witnesses offered a number of formulations for what exactly the term 'continuity of care' means, it was clear from the trial that this is a somewhat elusive concept.

However, there emerged three models for ensuring continuity of care in the abortion context.  In order to evaluate these three models, the court will review the general nature, frequency, and treatment of complications from early-term abortion.  The court will also examine the current regulatory framework as it relates to continuity of care, as well as the Montgomery, Birmingham, and Mobile clinics' actual treatment of complications.

For the reasons described below, the court finds that there is a range of disagreement within the medical

113

community regarding the appropriate model of complication care for minor surgeries and medication-based procedures like early-term abortion.  However, the model that the State puts forward, which is the one reflected in the staff-privileges requirement, falls outside that range of disagreement.  Cf. Gonzales, 550 U.S. at 163-67 (upholding an abortion regulation where it fell within the range of opinion in the medical community).  Finally, the staff-privileges requirement would have the practical effect of undermining the patient-care goals put forward by the State.

(a) "Safer than Getting a Shot of Penicillin"

In order to understand proper care for abortion complications, it is first necessary to recognize how vanishingly rare it is for women to have serious complications from early-term abortions, like the ones performed at the three clinics.  Complications that require hospitalization occur in only 0.05 to 0.3 % of such abortions.  Furthermore, rates of death from

114

abortion are incredibly low.  According to the Centers
for Disease Control and Prevention, between 2004 and
2008, the mortality rate from abortions at all
gestational ages was 6.4 deaths per million abortion
performed; in light of the more dangerous nature of
later-term abortions, it appears that the mortality rate
for early-term abortions is even lower.  According to Dr.
Fine, the procedure is therefore "[s]afer than getting a
shot of penicillin."    Tr. at III-20:21.  While the
court need not adopt this characterization, the point is
well-taken that the penicillin is more than two to three
times more likely to kill a patient than an early-term
abortion.   In short, the evidence in this case
demonstrates that early-term abortions are
extraordinarily safe.


        (b) Three Models of Continuity of Care

    As with any medical procedure, though, there is some
possibility of complications, even serious complications.
No one disputes that, in those rare circumstances, the

patient deserves high-quality care.  The court heard three approaches to providing such high-quality care for complications from early-term abortions and similar procedures.

The first model was presented by Dr. Fine, who stated that the Montgomery, Birmingham, and Mobile clinics actually go beyond what is necessary to provide continuity of care.  According to him, the key to continuity of care in this context is 24-hour telephone access.  A woman can call a clinic's telephone number and be assessed by a doctor or nurse at any time.  That doctor or nurse may give instructions for in-home treatment, such as to take extra-strength Tylenol, or may schedule the woman for a follow-up visit at the clinic. If the medical professional determines that it would be appropriate for the woman to be immediately assessed or treated, she will be directed to the nearest emergency room.  Doctors at such facilities are trained to provide care for all abortion complications.  Dr. Fine also acknowledged that, in rare circumstances, a patient may

116

need to be transferred directly to a hospital from the clinic during the course of an abortion. In that situation, the abortion doctor should communicate with the emergency-room doctor. According to Dr. Fine, a clinic that takes these steps has provided continuity of care.

The second model, the covering-physician model, essentially reflects the current regulations governing abortion clinics in Alabama. The model was largely presented by the State's expert, Dr. Geoffrey Keyes, and has been adopted by his organization, the American Association for the Accreditation of Ambulatory Surgical Facilities ("the Surgical Association"). The Surgical Association certifies centers that perform various outpatient surgeries, including many that are significantly more dangerous than early-term abortions. In order for a facility to receive certification, the Association requires either that all doctors at the facility have staff privileges at a local hospital or that the facility maintain "a signed and dated document

117

from a person in the same specialty who has admitting privileges in a [local] hospital ... that indicates their willingness to admit the patient to the hospital." Surgical Association Standards, PX 70 at 73 (§ 800.010.025).[18]

As an example, Dr. Keyes maintains practices in Los Angeles and Bakersfield, California, which are approximately 120 miles apart. When he performs procedures in Bakersfield, he stays overnight, but arranges with a local doctor to provide follow-up care for any complications which may arise after he has returned to Los Angeles. Dr. Keyes stated, however, that in an urgent situation, it is more important for a patient to go to the nearest emergency room than that she be treated by the initial doctor or a covering physician.

---

18. The federal government imposes a similar requirement for ambulatory surgical centers that seek reimbursement from programs such as Medicare and Medicaid. If not all of the doctors at a center have staff privileges, the center must have a written transfer agreement with a local hospital. 42 C.F.R. § 416.41(b)(3).

Finally, the State presented a third approach to complication care.  Under this approach, which the court will call the 'country-doctor' model, the physician who performs the initial procedure would consistently provide most care for complications that may arise, rather than relying on a covering physician, a transfer agreement, or the emergency room.  While a specialist may need to become involved for certain treatments, the original doctor would handle nearly all of his patient's complications.  The State emphasized a sense that quality care depends on a traditional, personal, and ongoing relationship between doctor and patient.  Staff privileges at a local hospital, and implicitly local residence, would be necessary for such care.  Dr. Thorp, the State's expert, was the strongest voice for this country-doctor approach at trial.

The provision at issue in this case, requiring all abortion providers to have local staff privileges, goes beyond either of the other two models and instead reflects the country-doctor approach.

119

### (c) Nature and Treatment of Abortion Complications

To assess these three models, the court will first explain the nature of complications from the early-term abortions performed at the Montgomery, Birmingham, and Mobile clinics.  Most complications from such abortions closely resemble the complications from early-term miscarriages.  The common complications from miscarriages, as well as medication and early-term surgical abortions, are bleeding, infection, and cramps.  These complications sometimes arise because fetal tissue remains in the uterus or because the cervix fails to close fully after the fetal tissue is expelled.  The treatment for these complications is the same, regardless of how the pregnancy ended.

In extremely rare instances, other complications may arise which could not occur from a miscarriage.  In the case of a medication abortion, an allergic reaction to the abortion drugs was the only possibility suggested by the evidence in this case.  For a surgical abortion, it

120

is possible that an instrument may perforate or lacerate the uterus.

Most complications from early-term abortions do not require hospital treatment.  Most minor complications which arise during the course of an early-term surgical abortion are treated at the abortion clinic before the patient is discharged.  Moreover, as discussed above, most complications that arise after a patient has been discharged are best treated with over-the-phone instructions, prescription medication from a pharmacy, or a follow-up visit to the abortion clinic.  However, even when hospital care is unnecessary, patients will sometimes seek emergency-room treatment without first contacting the provider.  Indeed, in some such cases, the woman may not be suffering from any complication at all, but may simply need reassurance.

For the majority of complications which do require hospitalization, the appropriate treatment may include intravenous antibiotics or a further dilation and curettage to empty the uterus completely.  The

121

staff-privileges provision requires all abortion doctors to have local-hospital privileges that allow them to perform two specific, additional gynecological procedures: hysterectomy and laparotomy. Rare circumstances, such as a suspected uterine perforation, may require a laparotomy or the similar but less invasive laparoscopy, each of which involves examining the uterus or cervix and repairing any damage. In certain other extreme situations, a hysterectomy, or removal of the uterus, may be necessary. It is extremely rare that either hysterectomy or laparotomy would be necessary following an abortion, even a later-term abortion. Indeed, with approximately 9,000 abortions performed in Alabama each year, in most years not a single early-term abortion in the State would require either procedure.

### (d) Current Continuity-of-Care Regulations

As noted above, the current Alabama regulations governing abortion clinics resemble the Surgical Association approach. Each clinic is required under

current law to ensure, before a woman obtains an abortion, that a doctor who can admit her to a local hospital will be available if necessary. This requirement can be satisfied by a written contract with a "covering physician." Ala. Admin. Code § 420-5-1-.03(6)(b). The covering physician is required to have staff privileges that permit her to perform "dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures necessary to treat abortion-related complications" at a hospital within the same metropolitan statistical area as the clinic.[19] § 420-5-1-.03(6)(b)(4). A clinic may not provide abortions unless an affiliated doctor with staff privileges will be available for 72 hours after the procedure to treat any complications that may arise. § 420-5-1-.03(6)(b)(5); (6)(c). Furthermore, the

---

19. These are the same procedures which the staff-privileges requirement at issue in this case would require every doctor providing an abortion to have staff privileges to perform, not just the covering physician.

regulations require certain communications to facilitate continuity of care.  § 420-5-1-.03(1).

The State's Chief Medical Officer, defendant Dr. Donald E. Williamson, testified that the Department of Public Health believed, prior to the enactment of the Women's Health and Safety Act, that the preexisting regulations "did an adequate and effective job of protecting the public health." Williamson Dep. at 40:4-6.  The Department of Public Health had authority, prior to the enactment of the staff-privileges requirement, to impose the requirement on doctors, but decided such a requirement was unnecessary.  See id. at 40:6-8 ("If we had felt that something else was essential, we would have undertaken to do something else.").

In fact, the Department was consulted by a drafter of another bill, a predecessor to the Women's Health and Safety Act.  That bill was less demanding than the statute that was eventually enacted.  The prior bill would have required only that at least one doctor with local staff privileges be present at the clinic until the

124

last patient leaves, compared to the enacted requirement that _every_ doctor performing abortions have staff privileges.  The Department of Public Health requested that even this staff-privileges requirement be removed from the prior bill, and suggested that a codification of the existing covering-physician regulation would be more appropriate.

### (e) Complications and Continuity of Care in Practice

The court now turns to a description of the Birmingham, Mobile, and Montgomery clinics' actual protocols for treatment of complications.  As shown below, the protocols are consistent with the covering-physician model advocated by Dr. Keyes and exceed the model put forward by Dr. Fine.  However, because none of the doctors who perform abortions at these clinics has local staff privileges, they do not satisfy the State's country-doctor model of continuity of care.

125

In Birmingham and Mobile, most complication care is provided at the clinic itself by the doctor who provided the abortion, either before a patient is discharged or at a follow up visit.  Although Dr. Roe has never, in ten years of providing abortions, needed to transfer a patient directly to the hospital during a procedure, she described the protocols she would use in such a situation.  She would assess and stabilize the patient, while clinic staff secure an ambulance.  Then, she would ensure that the medical records were complete and send a copy of the patient's medical records with the ambulance staff.  Finally, she would call the emergency room to ensure that the doctors there were prepared for the patient and "could pick up the care where we ha[d] left off."  Tr. at IV-25:21-22.

As for complications that arise after the patient has left the clinic, a patient can call the 24-hour telephone line to reach a nurse.  If the complication is minor, such as pain from cramping, the nurse will offer home-care instructions after consulting with the doctor

126

who provided the abortion.  For a more serious, but non-urgent, complication, the clinic will schedule a follow-up appointment, so the physician who performed the abortion can provide complication care. Medication-abortion patients are automatically scheduled for a follow-up appointment, and surgical-abortion patients have the option of such an appointment. However, if a patient is experiencing complications that may require urgent care, the doctor will instruct her to go to the nearest emergency room.

To put the State's staff-privileges requirement in context, it is helpful to consider these clinics' actual history with complications and how the staff-privileges requirement might alter the provision of follow-up care. From 2010 through September 2013, to the Birmingham clinic's knowledge, only 13 of its abortion patients, of an estimated 5,000, obtained care related to their abortions at a hospital.[20]  Of those patients, none was a

_____

20.  The court bases these analyses of clinic
(continued...)

direct transfer from the clinic to the hospital.  Only five of the 13 contacted the Birmingham clinic before seeking hospital treatment.[21]  One of those five was not treated by an emergency room, but rather was a woman whose medication abortion had not terminated her pregnancy.  She decided to carry the pregnancy to term, and the clinic referred her to an OB/GYN at the hospital.

Only in the four remaining cases does the State's continuity-of-care justification for the staff-privileges

───────────────

20.(...continued)
complications on reports which were admitted into evidence.  See DX 14, 19, and 20.  The date ranges reflect the complication reports that were produced in evidence, and the total patient numbers per clinic reflect the court's own estimations.

One of the reported Birmingham-clinic complications came to the clinic's attention via a news article, but was unverified.  It is possible that this complication actually arose from an abortion performed at another Birmingham clinic, which has since closed.

21. During closing arguments, the State argued for the first time that the staff-privileges requirement may lead women to seek treatment at the abortion clinic, where they would otherwise have gone to an emergency room and hidden the cause of the complications.  However, there was no credible evidence in the record to support this inference.

requirement even potentially come into play.   In one case, the clinic's covering physician met the patient at the emergency room and successfully treated her for retained tissue from a medication abortion.   That leaves three instances, over three years and nine months, in which the Birmingham clinic directed a patient to seek emergency-room treatment without involving the covering physician.   One patient had a 99-degree fever; another had cramps; and the third said that she was in pain despite pain medication.   All three were treated and discharged from the emergency room.

During the same time period, to the Mobile clinic's knowledge, ten of its abortion patients, out of an estimated 3,500, sought care related to their abortions at a hospital.   Eight of those patients did not notify the clinic of their complications before seeking hospital treatment.   Of the two remaining patients, one was a direct transfer from the clinic, but that patient was not actually experiencing a complication.   Rather, she found the procedure to be too uncomfortable without sedation

and was transferred to the hospital for monitoring because she had already been administered misoprostol to widen her cervix.  Only one patient was directed to the emergency room for a complication during this three-year-and-nine-month period.  In only this one case would the State's continuity-of-care justification be relevant.  She had received a medication abortion but had missed her scheduled follow-up appointment.  When she called and reported clots and heavy bleeding, the clinic referred her to the emergency room, where she was treated and discharged.

From 2010 through 2013, to the Montgomery clinic's knowledge, three of its abortion patients, out of an estimated 2,900, received hospital care for issues arising from an abortion.  Of these three patients, one presented at the emergency room without first calling the clinic, leading the attending physician to call the clinic for more information about the abortion procedure. In response, the clinic sent its covering physician to treat the patient.  Indeed, all three patients were

treated by the clinic's covering physician, pursuant to its current policies.

The court notes that the Montgomery clinic's procedures were not always this robust, and in fact the clinic's current policies were put into place after the clinic had its license suspended arising out of a 2006 incident concerning complication care.  A patient presented at the hospital with complications from an abortion obtained at the Montgomery clinic.  When the gynecologist at the hospital attempted to speak with the doctor who had performed the abortion, he was apparently unable to, and he later filed a complaint with the Department of Public Health.[22]

The investigation of that incident revealed a somewhat different problem: the clinic did not have an

_____

22. The reporting doctor testified in this litigation that the clinic staff displayed a troubling lack of concern for the patient's care.  However, his version of events is disputed, with the clinic offering conflicting evidence.  The record is insufficient to support a conclusion one way or the other as to what actually happened during the 2006 incident, and the resolution of that issue is not material to the outcome of this case.

operational covering-physician agreement in place, as
required by state regulations.  The Department of Public
Health therefore suspended the clinic's license.  Before
its license could be reinstated, the clinic had to secure
a written agreement with a new covering physician and
revise its complication-care policies.  The clinic also
sent a letter to all area emergency rooms, so that the
emergency-room doctors easily could reach out to the
clinic if a patient presented at the hospital without
first contacting the clinic.  With the curative measures
taken after the 2006 incident, it is clear that the
Montgomery clinic actively has, since then, involved its
covering physician in the rare occasions that
complications occur.

In light of the safety of abortions, the rarity of
serious complications, and the robust regulation and
oversight of clinics in Alabama, the court is firmly
convinced that the Birmingham, Mobile, and Montgomery
clinics currently have strong complication-care policies

in place and, when complications have arisen, they
provided quality care to their patients.

### (f) Dr. Roe's 'Admission'

At trial, the State repeatedly emphasized an
admission elicited from Dr. Roe, the medical director of
the Birmingham and Mobile clinics and the primary
abortion provider at the Birmingham clinic.  The State
relied on her eventual agreement with the following
statement: "So your own protocol is inconsistent with the
rules of the Alabama Department of Public Health in this
instance."  Tr. at IV-122:8-9.  Indeed, again and again
the State returned to her concession, asking other
witnesses about it and arguing the point at closing.
See, e.g., id. at V-48:22-25 (State representing during
cross-examination of plaintiffs' statistics expert that
Roe "testified that she has allowed the Mobile and
Birmingham clinics to operate in violation of Department
of Public Health rules").  Clearly, in the State's view,
this concession is an important indication that the

existing policies and regulations do not provide for
continuity of care, and that, therefore, the
staff-privileges requirement is needed.   However, a
careful review of Dr. Roe's actual testimony and the
regulation at issue reveals that the clinics do, in fact,
provide high-quality complication care and comply with
state regulations.   Her concession to the contrary was
the result of confusion, in large part attributable to
the misleading questions posed by the State's attorney.

The court finds that there is no violation of the
applicable regulation.   That regulation provides that,
"In order to facilitate continuity of patient care, the
[abortion] physician shall contact and communicate with
any physician rendering care for complications arising
from the abortion as soon as he [or she] is informed of
the existence of such complications."   Ala. Admin. Code
§ 420-5-1-.03(1) (emphasis added, second alteration in
original).   As the State insists, the regulation does
require communication.   However, that communication is
required only once the abortion doctor "is informed of

134

the existence of ... complications."  Id.; see also Tr. at IV-121:23-24 (State asking, without qualifications, ""Q. Does it not say that the facility physician shall contact and communicate with any physician rendering care?"); id. at IV-121:12-15 (same, without reference to the abortion doctor being informed of the existence of complications).

But Dr. Roe's testimony made clear that, as to "[m]ost of the patients" who call the after-hours line, there is no known complication.  Id. at IV-120:16-17.  As a precaution, the clinic will sometimes instruct those women to go to the emergency room "so that the emergency room physician can evaluate the patient physically and in person."  Id. at IV-120:13-15.  This is done precisely so that an emergency-room doctor, who is available at all times, day or night, "can assess whether there is such a complication."  Id. at IV-120:15-16 (emphasis added); see also id. at IV-120:19-20 ("And so the assessment as to whether there is a complication is done by the emergency room physician."); id. at IV-120:24-121:1 ("the emergency

room physician will be able to evaluate the patient and
assess exactly what is going on with the patient").

At that point, the clinic doctor does <u>not</u> know that
the patient is actually experiencing a complication.
Indeed, often patients simply "need reassurance" or
additional "pain management," <u>id</u>. at IV-120:16-19,
neither of which constitutes a complication.  In
contrast, if a direct patient transfer from the clinic to
the emergency room is required, the doctor <u>knows</u> there is
a complication, and the clinic protocols accordingly
mandate that the doctor call the emergency room, as the
regulation requires.

Furthermore, clinic protocols are reviewed annually
by the Department of Public Health, and these clinics'
protocols have been approved by the Department.  The
Department's failure to raise the supposed 'flaw' in
those protocols, as identified by the State, further
reflects that, in fact, no such flaw exists.  Thus, the
court concludes that the approach to complication care at

136

the Birmingham and Mobile clinics is consistent with state regulations.

The State's attorney did, indeed, elicit a concession from Dr. Roe to the contrary. After watching that testimony, the court finds, as a matter of fact, that she was confused by the questions, which left the distinct, but incorrect, impression that the regulation always requires a call to the emergency room, including not only when there is a known complication but also when the woman is sent for assessment for possible complications. See Tr. at IV-120 to IV-122. The court further finds that Dr. Roe was, in the end, 'worn down.' Perhaps this was because she deferred to counsel's representations about the legal meaning of the State regulation. See, e.g., id. at IV-121:5-6 (Counsel representing that "these rules require such a contact" between the abortion doctor and emergency room, without specifying any 'known complication' qualification). Needless to say, while she is a medical expert, Dr. Roe is not an expert on

regulatory interpretation.   The court thus finds the State's reliance on her 'admission' unpersuasive.[23]

### (g) What is 'Continuity of Care'?

The court finds, again, that the complication-care practices of the Birmingham, Mobile, and Montgomery clinics are consistent with existing state regulations. They are also consistent with the covering-physician model for continuity of care and exceed Dr. Fine's model. However, the State is correct in suggesting that the clinics' practices would not satisfy its country-doctor model.   The court will therefore return to the core question: Is that model within the range of reasonable medical opinion?

---

23.   The State also relied on Dr. Roe's testimony to suggest that the Birmingham and Mobile clinics do not use their covering physicians often enough to satisfy the intent of the regulations.   However, the actual records of complications reveal that the clinics do not make frequent use of their covering physicians because the procedures they perform are extremely safe and because, where possible, the clinics themselves provide complication care.

From Dr. Fine's perspective, access to medical advice from the original provider, with the availability of trained emergency doctors, is sufficient continuity of care for a low-risk surgery such as early-term surgical abortion and the administration of pills involved in medication abortion.  According to Dr. Keyes and the Surgical Association, telephone access is insufficient, and it is important to have at least a preexisting relationship with a covering physician to provide for complication care.  Finally, under the State's 'country-doctor' approach, the physician who performed the original procedure treats nearly all complications. While the covering-physician approach is required by pre-existing Alabama law, the staff-privileges requirement reflects the third approach.

The key to all three of these models is ensuring that a doctor who treats a complication has enough information about the initial procedure to make wise choices about the patient's care.  As discussed above, abortion complications are extremely rare, and, for the majority

139

of complications from early-term abortions, there is no information about the abortion procedure that would change the appropriate course of treatment.  Instead, the treatment is the same as the treatment for the common emergency-room presentation of an early-term miscarriage.  However, there are rare circumstances in which information would be beneficial, for example in the case of a uterine perforation or an allergic reaction to medication.[24]

The court therefore finds that the country-doctor approach, while carrying an intuitive appeal, does not reflect the practice of 21st century medicine, as it relates to simple, low-risk surgeries and medication administrations.  A large number of complications and

_____

24. Drs. Thorp and Anderson each opined that proper care for even the simplest complication would require detailed knowledge about the patient's history, reproductive goals, and other information.  However, the court discredits Dr. Anderson's testimony on this point due to concerns about his judgment or honesty as described in the forthcoming supplemental opinion.  The court discredits Dr. Thorp's opinion on this point because it is inconsistent with his own practice, as described below.

patient concerns arising from abortion do not require in-person medical treatment. Sometimes the patient requires only reassurance, and many other times a medical professional can provide home-care instructions, for example, that the patient should take extra-strength Tylenol. Where there is a possibility of a more serious complication, it is more important that the patient be assessed quickly than that she be seen by her original doctor. As even the State's own expert, Dr. Anderson, admitted: "[I]f she's unstable or she's scared to death, she should go to the closest emergency room. ... She can call her abortion provider ... as an intermediary step." Tr. at VI-55:19-20.[25]

In fact, the behavior of the strongest proponent at trial of the country-doctor approach illustrates why that

---

25. Although the court discredits nearly all of Dr. Anderson's testimony, the court credits this statement for two reasons: first, the fact that it undermines the case for the Alabama legislation negates the court's concern that bias colored his conclusions and second, the statement is entirely consistent with all the other credible evidence presented on this issue.

approach is out of touch with contemporary medical practice. Dr. Thorp testified that, at his own office, he removes tissue that remains after early-term miscarriages, presumably using the dilation and curettage method, which is identical to early-term surgical abortion. He also puts patients under conscious sedation, exposing them to significant risk from anesthesia, and performs other procedures which carry risks of serious complications. But Dr. Thorp <u>does not maintain staff privileges</u> at any hospitals. It is not clear whether Dr. Thorp, in practice, ascribes to Dr. Fine's approach or to the Surgical Association's covering-physician approach. But it is clear that Dr. Thorp has refused to adopt the State's country-doctor approach in his own practice.

Therefore, while there does seem to be some medical disagreement about whether Dr. Fine's model is sufficient or, rather, whether a covering physician is necessary to provide high-quality continuity of care, the 'country-doctor' model does not fall within this range of

142

reasonable medical disagreement.  No credible evidence supports the State's contention that continuity of care requires adopting that model.

As a final note on the continuity-of-care justification, the court observes that the staff-privileges requirement would, in reality, do more to inhibit continuity of care than to promote it.  Women in Montgomery, Birmingham, and Mobile who currently go to their local clinic to obtain an abortion are able to return to that clinic for a scheduled or spontaneous follow-up, and a covering physician is available, if needed.  However, if this law were to go into effect, a woman in one of those three cities would have to travel to Tuscaloosa, Huntsville, or out of state to obtain an abortion.  If she experienced a complication, which would be most likely to occur only after she returned home, she would have to seek treatment close to her home.  Neither the doctor who performed the abortion nor the clinic's covering physician would be likely to have staff privileges at any hospital near her home.  Furthermore,

in light of the challenges that many women face in traveling outside their home cities to secure an abortion, she would almost certainly be more likely to miss a scheduled follow-up visit.

In summary, with regard to the continuity-of-care justification, the court makes several findings. First, complications from early-term abortion that require hospital treatment are extremely rare and doctors associated with emergency rooms are well-equipped to treat all such complications. Second, the staff-privileges requirement falls outside the range of standard medical practice for complication care for this kind of simple and extremely safe procedure, as reflected by standards and behavior of the State's own experts. Third, the plaintiffs' clinics have a good recent track record in providing patient care for complications. Finally, the staff-privileges requirement of the Women's Health and Safety Act would, in reality, undermine the State's goal of continuity of care, since women in

144

Montgomery, Mobile, and Birmingham would no longer have local access to the clinic or a covering physician.

## 2. Credentialing

The State's secondary justification for the staff-privileges requirement is that privileges serve a credentialing function. This function would operate in two ways: first, the initial credentialing process by hospitals would screen out incompetent or unethical doctors, preventing them from ever performing abortions within the State; and, second, the hospital's oversight and ability to terminate or non-renew a doctor's privileges would be an effective deterrent and corrective measure against poor-quality care.

## (a) Initial Screening

The initial-screening aspect of the credentialing function provides negligible benefit, as compared to preexisting law. Furthermore, it is clear that the four out-of-state doctors who perform abortions at the

145

Birmingham, Mobile, and Montgomery clinics are capable of performing abortions safely.

The current regulations for abortion clinics require that the doctors be credentialed in one of three ways:

> "(i) Certification from an accredited residency or fellowship program in the United States that the physician has been trained to perform abortions and manage and recognize complications;
>
> "(ii) Certification from an accredited hospital in the United States that the physician's staff privileges include performing abortions; [or]
>
> "(iii) Verification from a properly trained disinterested physician that the disinterested physician has had direct observation of the physician's clinical skill in performing both medical and surgical abortions at a range of gestational ages and finds them to be satisfactory and within the standard of care."

Ala. Admin. Code § 420-5-1-.02(d)(3). Furthermore, the doctor's ability to perform abortions safely is certified on an annual basis, through direct observation of the physician's clinical skills by the medical director. § 420-5-1.02(d)(2). These observations must be

146

documented, and the records are reviewed by the Department of Public Health.

Second, hospitals throughout the country impose a similar degree of scrutiny on doctors applying for privileges. Indeed, although he described the matter as outside his expertise, even the State's expert Dr. Anderson agreed: "most hospitals are governed by the Joint Commission [the main hospital-accreditation organization] and have a very rigorous qualification scrutiny of physicians. So out-of-state hospitals' scrutiny should be somewhat equivalent from one hospital to another." Tr. at VI-21:16-20.[26]

Three of the four current doctors hold privileges at acute-care hospitals, although not in Alabama. The fourth, Dr. A, held privileges for many years at hospitals in Alabama and elsewhere, before going into

_____

26. There were some suggestions at trial that requiring specifically <u>local</u> staff privileges added some initial screening benefit. The court finds that no credible evidence supports this view and that the initial-screening function is served equally well by local and non-local staff privileges.

147

semi-retirement.  Therefore, the court finds that, to the extent that the staff-privileges requirement would provide "rigorous qualification scrutiny," all four doctors have already withstood such scrutiny.[27]

_____

27. Some courts have drawn an analogy between the credentialing function of staff privileges and laws mandating that only doctors be permitted to provide abortions.  See Abbott I, 734 F.3d at 412.  This court is well aware of the string of cases stretching back to Roe itself that have specifically approved such 'doctors only' regulations.  See Mazurek v. Armstrong, 520 U.S. 968, 974 (1997); Casey, 505 U.S. at 885; City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 447 (1983), overruled in part on other grounds by Casey, 505 U.S. at 882; Connecticut v. Menillo, 423 U.S. 9, 11 (1975); Roe, 410 U.S. at 165.  However, courts should be wary of drawing too strong an inference from the 'doctors only' cases.  The Supreme Court has offered little elaboration of its 'doctors only' holdings, perhaps viewing it as self-evident that such restrictions ensure safety with little harm to access to abortion.  See Mazurek, 520 U.S. at 974 ("no woman seeking an abortion would be required by the [doctors only] law to travel to a different facility than was previously available").  Yet the Court has struck down other abortion regulations offered in the name of women's health, again without explaining how those regulations differed from 'doctors only' provisions.  See Doe 410 U.S. 179.  In this court's view, the best reading of the 'doctors only' cases is as a unique category: relying first and foremost on the recognition that "'the Constitution gives the States broad latitude to decide that particular functions may be performed only by licensed professionals.'"  Mazurek, 520 (continued...)

### (b) Ongoing Peer Review

The second aspect of the credentialing justification is more nuanced.  The State argues that the threat of losing staff privileges would be an effective incentive for doctors to provide high-quality abortion care. Relatedly, the State argues that recent adverse licensure actions against abortion clinics reveal both that clinics are rife with underlying quality-of-care problems beyond complication treatment and also that the Department of Public Health is unable to uncover such problems before they affect patient care.  In the State's view, hospitals and the doctors on credentialing committees would provide an effective supplement to Department of Public Health oversight.

---

27. (...continued)
U.S. at 973 (quoting <u>Casey</u>, 505 U.S. at 885).  The staff-privileges requirement goes beyond the specific role of defining the scopes of practice of the medical professions.  Therefore, the court rejects the analogy between the doctors-only cases and Alabama's staff-privileges requirement.

In evaluating this aspect of the credentialing argument, the court first rejects certain opinions of the plaintiffs' expert Dr. Fine.  He testified that credentialing committees sometimes have little concern for patient safety and instead make staff-privileges decisions primarily on economic grounds: which doctor will perform more procedures at the hospital, reaping profits for the institution.  On the contrary, the court heard from representatives of six Alabama hospitals over the course of the trial, and, based on their testimony, the court finds that the hospitals make credentialing decisions primarily to ensure that they and their doctors provide high-quality care to their patients.

However, even accepting that hospital credentialing committees seek to ensure high quality of care from doctors who have staff privileges, the court finds that the evidence does not actually support the State's contentions that the Department of Public Health's enforcement efforts were ineffective; that problems in care at abortion clinics stemmed from lack of oversight

150

over doctors; or that the threat of losing staff privileges would be particularly effective in preventing quality-of-care issues.

The Department of Public Health undertakes two-day scheduled inspections of all Abortion or Reproductive Health Centers on an annual basis. On the first day, inspectors review clinic policies and records to ensure compliance with state laws and regulations. On the second day, they inspect the physical premises, talk to staff, and observe procedures. Inspectors also make unannounced visits to ensure that clinics are actually following appropriate protocols on a day-to-day basis. Finally, inspectors respond to complaints from patients and other citizens; in fact, the trial evidence shows that anti-abortion activists often notify the Department of clinic activities that they believe violate state law.

The evidence shows a history of extensive and aggressive Department of Public Health enforcement of the State's abortion regulations. The parties stipulated that the Department revoked the licenses of three

151

now-defunct clinics.  Two of these clinics had failed to respond to patient calls, and the third clinic's nurse had administered a medication abortion to a woman whose pregnancy was too far advanced for such an abortion to be safe.

Similarly, there was significant discussion of recent problems at the Birmingham clinic.  A nurse there stole abortion-inducing medication from the clinic and was caught selling it in the clinic's parking lot.  The clinic responded by terminating all of its on-site clinic staff and closing the clinic until new staff could be hired.  When Department of Public Health investigators went to the clinic for a surprise inspection, they found the clinic closed.  During the course of the resulting investigation, the clinic was not initially forthcoming about the reason for its closure, but eventually disclosed the incident with the nurse.  The Department will not allow the Birmingham clinic to reopen until the Department approves its plan of corrections.

A Department official who investigated this incident testified that nothing would have been different with regard to the closure if the doctors had had privileges at a local hospital.  Nor did the State offer any explanation of how the Birmingham clinic should or could have handled the incident differently.  Perhaps most importantly, the Department of Public Health, with its surprise inspection, was able to learn of the closure more quickly than a hospital credentialing committee could have been expected to.

The State nonetheless argues that the problem links back to bad doctors.  However, after reviewing the Department of Public Health incident reports and information about the stipulated cases, the court finds that the patient-care flaws arose more from management problems than from problems with quality of the care that doctors themselves provided.[28]  The problems often dealt

---

28. The same is true of the problems the State cites at the now-closed New Women All Women clinic.  Dr. Anderson, one of the State's experts, pointed to the
(continued...)

with the ability of the clinic to ensure that nurses are providing effective telephone care and not overstepping their professional boundaries.   According to state regulations, the responsibility for these issues lies jointly with the clinic administrator and the medical director.   See Ala. Admin. Code §§ 420-5-1-.02(1)(a) (Administrator);   (5)(c)   (Medical   Director). Responsibility does not fall on the individual doctors who provide the abortions.[29]

------

28. (...continued)
Alabama Department of Public Health's numerous citations of that clinic and the clinic's subsequent closure, as evidence of substandard care and the need for heightened regulation of abortion clinics generally.   See Anderson Report, DX 3 Ex. A, at 21.  Obviously, the Department's findings are troubling.   But, from Dr. Anderson's description, it appears that the citations largely related to recordkeeping and the conduct of non-physician staff.   There is no indication in his report that the doctors themselves were inadequate, only that their qualifications were not documented.   Furthermore, the court notes that the clinic was shut down for these violations,   which   hardly   establishes   that   the Department's regulatory oversight was ineffective.

29. At trial, the State argued that, because Dr. Roe is the medical director of the Birmingham and Mobile clinics, she does bear responsibility for the management problems at those facilities.  But this misses the point.
(continued...)

Finally, the State introduced a malpractice complaint against Dr. A and an indictment of Dr. H2.  Dr. A acknowledged the factual substance of the malpractice complaint, but argues that his actions did not constitute malpractice, but rather that he provided high-quality care to the patient in that case, who suffered from an exceptionally rare condition.  No court or state agency has refuted his characterization that the actions did not constitute malpractice.  Furthermore, doctors with staff privileges, including the State's own experts, also have malpractice suits filed against them.  The indictment,

---

29. (...continued)

The staff-privileges requirement would regulate Dr. Roe not in her capacity as medical director, but rather in her capacity as abortion provider.  It is only by happenstance that the individual who provides abortions in Birmingham is also the medical director there and in Mobile.  Indeed, that is not the case at all at the Montgomery clinic, and it would be senseless to require additional credentialing of Dr. A, the abortion provider there, because of management problems that may be attributable to the medical director, an entirely different person.  It makes no more sense to require additional credentialing of all abortion providers simply because one such provider happens also to serve as a medical director.

like the complaint, is nothing more than an allegation.
More importantly, however, Dr. H2 has staff privileges at
local hospitals in Auburn and in Huntsville.  Therefore,
the indictment, even if it is ever substantiated, would,
if anything, constitute evidence against the State's
theory of staff privileges as providing ongoing
oversight.

Therefore, the court is left with the speculative
assertion that hospital oversight, through staff
privileges, would actually ensure that the physicians and
clinics are providing high-quality care and would be an
effective supplement to Department of Public Health
oversight.  Of course, outside the context of an
undue-burden challenge, a regulatory decision grounded
only in such speculation would be an acceptable exercise
of the State's police powers.  See Strange, --- F. Supp.
2d at ----, 2014 WL 1320158 at *3-*4 (rejecting
plaintiffs' rational-basis claim).  However, whether,
under Casey, the justification is strong enough to
warrant the burdens and obstacles that the

156

staff-privileges requirement would create for Alabama women seeking abortions is another question entirely.

### 3. Legislative Findings

The Alabama legislature made several legislative findings which, although expressed in general and vague terms, could be interpreted to conflict with the court's findings.  <u>See</u> 1975 Ala. Code § 26-23E-2 (legislative findings).[30]   The court has given the legislature's

---

30. The legislative findings are:
"(1) That the percentage of abortion or reproductive health centers that have been subject to adverse licensure action vastly exceeds the percentage of facilities in any other category that have similarly been subject to adverse licensure actions. This alarming level of regulatory non-compliance among abortion and reproductive health centers in Alabama puts abortion patients at unreasonable risk.

"(2) At abortion or reproductive health centers, patients are often treated in a manner inconsistent with a traditional physician/patient relationship.

"(3) Abortion or reproductive health centers are not operated in the same manner as ambulatory surgical treatment centers or physician offices.

"(4) Abortion involves not only a surgical procedure with
(continued...)

findings careful consideration.  However, while such findings are reviewed under a "deferential standard," they are not entitled to "dispositive weight."  Gonzales, 550 U.S. at 165.  On the contrary, this court "retains an

_____

30. (...continued)
the usual risks attending surgery, but also involves the taking of human life.

"(5) Abortion is a highly personal and very sensitive procedure which results in stress and concern for the patient that is unique to the decision to have an abortion.

"(6) Abortion is a very profitable procedure most often engaged in by stand-alone clinics without many of the safeguards found in a traditional physician/patient relationship or other medical care setting.

"(7) Because abortion and reproductive health centers do not currently provide the level of personal contact found in many physician/patient relationships and in other medical care settings, it is necessary for the Legislature to mandate the personal presence and participation of the physician in the process.

"(8) Moreover, because abortion or reproductive health centers have often failed to meet acceptable standards of medical care, it is necessary for Legislature to enact reasonable and medically appropriate health and safety standards for all abortion and reproductive health centers, and to provide effective enforcement mechanisms and disincentives for centers that are unable or unwilling to meet these requirements."  1975 Ala. Code § 26-23E-2.

independent constitutional duty to review factual findings where constitutional rights are at stake." Id. (citing Crowell v. Benson, 285 U.S. 22, 60 (1932)).

Based on the evidence presented, this court finds that, to the extent that the legislature made factual findings that early-term abortions are unsafe, that these clinics' continuity-of-care practices are out of compliance with current regulations, those findings were simply "incorrect," Gonzales, 550 U.S. at 165. The evidence in this case is clear that the procedures are remarkably safe and that the plaintiffs' clinics provide complication care in compliance with current regulations. On these matters, "deference to [the State's] factual findings ... is inappropriate." Id.

With regard to the state's other findings, the court defers to the legislature's conclusions, but finds that they do not conflict with the analysis presented above. The legislature identified a set of perceived problems. For example, that abortion doctors do not have a "traditional physician/patient relationship." 1975 Ala.

159

Code § 26-23E-2(6).  As described above, the court agrees with the State; the clinics' model of continuity of care does not comport with the traditional country-doctor approach.  However, while the legislature identified perceived problems with the nature of abortion care in the State, it did not make findings that the staff-privileges requirement would do much to solve those problems.  Since most of the court's findings concern this relationship between the staff-privileges requirement and the stated goals of the legislature, its findings on the State's justifications do not otherwise conflict with the legislative findings at § 26-23E-2.


## C. Substantial Obstacle

Now, the court must apply "the heart" of the substantial-obstacle test.  Planned Parenthood Southeast v. Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *13.  Are the obstacles imposed by the staff-privileges requirement more severe than warranted by the State's justifications for the regulation?  The answer is, Yes.

160

The court finds that the obstacles imposed by the staff-privileges requirement are large.  The requirement would have the effect of closing the only abortion clinics in three of Alabama's five largest cities, Montgomery, Mobile, and Birmingham.  <u>See</u> <u>supra</u> at § IV.A.1.  For a number of reasons, including pressure from the local medical community and the threat of violence, no new clinics would emerge to replace the plaintiffs' clinics in the foreseeable future.  <u>See</u> <u>supra</u> at § IV.A.1.c.

By eliminating abortion services in the three cities, the requirement would impose three main sets of difficulties.  First, the need to travel farther to obtain an abortion would cause some women to forgo abortion and others to delay their abortions, while imposing significant financial and other costs on remaining women.  <u>See</u> <u>supra</u> at § IV.A.2.a.  These effects would be particularly strong for women who live closer to the current abortion clinics.  <u>See</u> <u>supra</u> at § IV.A.2.a.iii.  For all women who seek abortions in the

State, the requirement would dramatically reduce the capacity of abortion clinics within the State, delaying and probably even preventing women's abortions.  <u>See</u> <u>supra</u> at § IV.A.2.b.  Finally, these obstacles create a significant risk that some women would pursue dangerous, illegal abortions.  <u>See</u> <u>supra</u> at § IV.A.2.c.

These harms are more than an "incidental effect of making it more difficult or more expensive to procure an abortion."  <u>Casey</u>, 505 U.S. at 874; <u>cf.</u> <u>Mazurek v.</u> <u>Armstrong</u>, 520 U.S. 968, 974 (1997) (regulation did not have the effect of imposing a substantial obstacle, in part because "no woman seeking an abortion would be required by the new law to travel to a different facility than was previously available.").  Indeed, as this court has noted, "evidence that an obstacle actually prevents women from obtaining abortions," which is "by no means necessary," is nonetheless "extremely compelling evidence of a substantial obstacle."  <u>Strange</u>, --- F. Supp. 2d at ----, 2014 WL 1320158 at *18 n.13.

The court further finds the State's justifications are exceedingly weak.  The State argues that the law would serve two purposes: improving continuity of care for clinic patients and imposing a credentialing scheme that would provide screening and oversight to ensure quality care.  With regard to the continuity-of-care justification, the court finds that the country-doctor approach to continuity of care which is reflected in the staff-privileges requirement falls outside the range of reasonable medical dispute in contemporary practice.  See supra at § IV.B.1.  Furthermore, as a matter of initial screening, the staff-privileges requirement would add nothing to the current credentialing requirements for abortion doctors.  See supra at § IV.B.2.a.  The one somewhat viable justification was the argument that hospital credentialing committees may helpfully supplement Department of Public Health oversight of abortion doctors.  However, with any degree of scrutiny, this justification proves to be weak and speculative.  See supra at § IV.B.2.b.

In light of the severity of the obstacles presented
by the requirement and the weakness of the State's
justifications, the court is firmly convinced that the
obstacles imposed by Alabama's staff-privileges
requirement are "more significant than is warranted by
the State's justifications for the regulation." <u>Strange</u>,
--- F. Supp. 2d at ----, 2014 WL 1320158 at *13; <u>see also</u>
<u>Van Hollen</u>, 738 F.3d at 798 (substantial obstacle where
"the medical grounds ... are feeble, yet the burden
great"); <u>Humble</u>, 753 F.3d at 917 (substantial obstacle
where burdens outweighed "non-existent" medical grounds).
Thus, the staff-privileges requirement has the effect of
imposing a substantial obstacle for the women who seek
abortions from the plaintiffs' clinics, and therefore
unduly burdens their constitutionally protected right to
an abortion.

While the court finds that the State's justifications
for the law are weak, it must emphasize that its
conclusion that the staff-privileges requirement is
unconstitutional does not turn solely on that finding.

In the alternative, the court further finds that the justifications are by no means sufficiently robust to justify the obstacles that the requirement would impose on women seeking abortion. Because "the heart of this test is the relationship between the severity of the obstacle and the weight of justification the State must offer to warrant that obstacle," "the more severe an obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the justification will actually achieve that benefit." Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *13. Here, because the obstacles to women that would result if the staff-privileges requirement were to go into effect are so severe, the State must come forward with justifications that are sufficiently "robust" to justify such obstacles. The court finds that the State's justifications are far, far from robust, especially in

light of the extensive and aggressive Department of Public Health oversight which is already in place.

## V.  CONCLUSION

The constitutional rights recognized by the Supreme Court are often viewed as more, or less, important in our minds based on our subjective beliefs, which may be the result of religion, personal philosophy, traditions, or experiences.  This is simply an aspect of human nature, but it is an aspect this court must resist.

In deciding this case, the court was struck by a parallel in some respects between the right of women to decide to terminate a pregnancy and the right of the individual to keep and bear firearms, including handguns, in her home for the purposes of self-defense.  <u>See</u> <u>McDonald v. City of Chicago</u>, 561 U.S. 742 (2010) (incorporating this right in the liberty interest protected by the Fourteenth Amendment due-process clause); <u>District of Columbia v. Heller</u>, 554 U.S. 570 (2008) (first recognizing this right as protected by the

Second Amendment).  At its core, each protected right is held by the individual: the right to decide to have an abortion and the right to have and use firearms for self-defense.  However, neither right can be fully exercised without the assistance of someone else.  The right to abortion cannot be exercised without a medical professional, and the right to keep and bear arms means little if there is no one from whom to acquire the handgun or ammunition.  In the context of both rights, the Supreme Court recognizes that some regulation of the protected activity is appropriate, but that other regulation may tread too heavily on the right.  Compare Heller, 554 U.S. at 626 ("Like most rights, the right secured by the Second Amendment is not unlimited.") with Casey, 505 U.S. at 876 ("Not all burdens on the right to decide whether to terminate a pregnancy will be undue."). Finally, as to each right, there are many who believe, as a matter of law, that the Supreme Court's reasoning in articulating the right was incorrect and who also believe, as a matter of strong moral or ethical

167

convictions, that the activity deserves no constitutional protection.

With this parallelism in mind, the court poses the hypothetical that suppose, for the public weal, the federal or state government were to implement a new restriction on who may sell firearms and ammunition and on the procedure they must employ in selling such goods and that, further, only two vendors in the State of Alabama were capable of complying with the restriction: one in Huntsville and one in Tuscaloosa. The defenders of this law would be called upon to do a heck of a lot of explaining--and rightly so in the face of an effect so severe. Similarly, in this case, so long as the Supreme Court continues to recognize a constitutional right to choose to terminate a pregnancy, any regulation that would, in effect, restrict the exercise of that right to only Huntsville and Tuscaloosa should be subject to the same skepticism. See Strange, --- F. Supp. 2d at ----, 2014 WL 1320158 at *13 ("the more severe an obstacle a

regulation creates, the more robust the government's justification must be").

This court, as a trial court, should not be in the business of picking and choosing which Supreme Court-recognized right to enforce or in deciding whether to enforce a right strongly or only somewhat, based on this court's independent assessment of the legal or moral wisdom behind the acknowledgment of that right.   While this trial court may have the license, if not the obligation, to contribute its proverbial "two cents" to the discussion of whether the law ought to be different, that voicing should in no way detract from this court's obligation to assure 100 % enforcement of that law as it is.   See Nelson v. Campbell, 286 F. Supp. 2d 1321 (M.D. Ala. 2003) (Thompson, J.) (after discussing why it believed Eleventh Circuit law was incorrect, trial court still followed and applied that law), aff'd, Nelson v. Campbell, 347 F.3d 910 (11th Cir. 2003), rev'd, Nelson v. Campbell, 541 U.S. 637 (2004).

Rather, like all trial courts, this court must be guided by one overarching principle: the rule of law. Just as the Supreme Court gave to the courts in the trenches their marching orders in <u>Heller</u> and <u>McDonald</u>, it gave us our marching orders in <u>Casey</u> as well  As the one Justice who signed onto both sets of marching orders has stated: "The power of a court, the prestige of a court, the primacy of a court stand or fall by one measure and one measure alone: the respect accorded its judgments." Anthony M. Kennedy, <u>Judicial Ethics and the Rule of Law</u>, 40 St. Louis U. L.J. 1067 (1996).  With this opinion today, this court, as it forges along as a soldier in the trenches carrying out orders from on high, puts its faith in this statement and hopes that, in resolving the constitutional question before it, it has been faithful to the lofty command of the rule of law.


***

For all the reasons stated above, the court believes that it should enter an immediate and initial judgment

170

declaring that the staff-privileges requirement of Alabama's Women's Health and Safety Act of 2013, 1975 Ala. Code § 26-23E-4(c), is unconstitutional as applied to the plaintiffs in this case.

However, the court further believes that, aside from the entry of this initial declaratory judgment, it should solicit more input from the parties before fashioning and tailoring final relief. See Powell v. McCormack, 395 U.S. 486, 499 (1969) (citations omitted) ("A court may grant declaratory relief even though it chooses not to issue an injunction or mandamus. A declaratory judgment can then be used as a predicate to further relief, including an injunction."). In particular, the court would like input as to whether 'facial' relief is warranted or necessary in light of the findings of this court and the discussion of such relief in the recent decision of the Fifth Circuit in Jackson Women's Health Organization; whether any part of the statute at issue may constitutionally be severed and take effect; and whether an injunction is necessary and, if so, what the scope and nature of that

171

injunction should be.   In addition, the court will shortly issue a supplemental opinion on the pending Fed. R. Evid. 702 and 801 issues.   Since some substantive issues have yet to be resolved, the temporary restraining order will remain in effect until the resolution of these issues.

An appropriate judgment will be entered.

DONE, this the 4th day of August, 2014.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE