IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, et al., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:13cv405-MHT (WO) |
| LUTHER STRANGE, in his Official capacity as Attorney General of the State of Alabama, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

OPINION

On August 4, 2014, the court issued an opinion on the merits of the plaintiffs' constitutional claim against the staff-privileges requirement of Alabama's Women's Health and Safety Act, 1975 Ala. Code § 26-23E-4(c).  See Planned Parenthood SE., Inc. v. Strange, --- F.Supp.2d ---, 2014 WL 3809403 (M.D. Ala. 2014).  Today, the court issues a supplemental opinion explaining how it had resolved certain evidentiary matters related to the August 4th opinion,

namely the admissibility of certain exhibits, the
admissibility of certain expert opinions, and the
credibility of the parties' witnesses.

## I. Newspaper-Article Exhibits

Both parties had introduced as exhibits several
newspaper articles that purport to represent statements
made by Alabama legislators and the Governor regarding the
Women's Health and Safety Act, among other issues.[1]  The
State objected to the admission of all of the exhibits on
hearsay grounds.

In Brooks v. Miller, 158 F.3d 1230 (11th Cir. 1998),
the Court of Appeals held that hearsay rules apply to the
use of newspaper evidence in a bench trial for the purpose
of proving legislative intent: "News articles often contain
multiple layers of hearsay and do not trump the sworn
testimony of eyewitnesses. In ascertaining legislative
purpose, a trial court operates under the same rules of

---

1. The exhibits are: PX 30, 31, 32, 72, and 80 and DX
44-48.

2

evidence that control in any case." <u>Id</u>. at 1242.  Applying those rules of evidence, the court sustained the State's objections in part: insofar as they were introduced to prove that certain statements were or were not made by elected officials, the articles are hearsay and were not admitted for that purpose.

A newspaper report that an event occurred, if used to prove that the event actually occurred, is classic hearsay. It is an out-of-court statement used for the truth of the matter asserted. <u>See</u> Fed. R. Evid. 801(c); <u>Southern Wine and Spirits of America, Inc. v. Div. of Alcohol and Tobacco Control</u>, 731 F.3d 799, 808 (8th Cir. 2013) ("Newspaper articles are 'rank hearsay'"). There is no general hearsay exception for newspaper articles.  <u>Hope for Families & Comm. Service, Inc. v. Warren</u>, 721 F. Supp. 2d 1079, 1178 n.114 (M.D. Ala. 2010) (Watkins, J.)(and cases cited).

Furthermore, newspaper articles rarely satisfy the requirements of the residual-hearsay exception.  Federal Rule of Evidence 807 allows for the admissibility of hearsay

not specifically covered by an enumerated hearsay exception

if:

> "(1) the statement has equivalent circumstantial guarantees of trustworthiness;

> "(2) it is offered as evidence of a material fact;

> "(3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and

> "(4) admitting it will best serve the purposes of these rules and the interests of justice."

Fed. R. Evid. 807(a).

In this case, the plaintiffs argued that the court should admit the newspaper articles under Rule 807 in light of the absence of official legislative history. However, even if the articles in question satisfy the requirement of trustworthiness and even if admitting them would serve the interests of justice, the articles would not be admissible because the plaintiffs could have introduced other, equally probative evidence of the reported statements: They could have called the legislators

4

themselves and examined them as to their statements; and, alternatively, they could have elicited testimony from the reporters or other witnesses who observed the statements reflected in the newspaper articles.  See Larez v. City of Los Angeles, 946 F.2d 630, 641-44 (9th Cir. 1991).  By attempting to introduce the articles instead, the plaintiffs denied the State the opportunity to cross-examine the observers as to the accuracy of the alleged statements.  The plaintiffs did not show that they made reasonable efforts to obtain such testimony or that it would have been futile to do so.

Therefore, the court did not admit the articles under the residual-hearsay exception.  However, an out-of-court statement is not hearsay if it is not offered to prove the truth of the matter asserted. Here, the articles were admitted for another purpose: for their effect on Alabama readers.  See U.S. v. Trujillo, 561 Fed. Appx. 840, 842 (11th Cir. 2014).  Regardless of whether the elected officials actually made the statements reported in these articles, the court found them to be relevant to the climate

5

in which abortion providers live.   Therefore, the articles were admitted for this limited purpose only.


## II. <u>Daubert</u> Challenges

There were five challenges to expert witnesses based on <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993). The plaintiffs challenged the admissibility of Dr. James C. Anderson's opinions on credentialing, as well as his supplemental expert report in its entirety.   They also challenged Dr. Jeffrey Hayes's deposition testimony in its entirety.   Finally, they challenged certain opinion statements made by Dr. Christopher Duggar.

The State of Alabama sought to exclude the testimony of Margaret Moore in its entirety or, at the least, her testimony about the supply of physicians who perform abortions.   It also challenged the testimony of Dr. Lori Freedman regarding the "stigma" that attaches to physicians who perform abortions and its impact.

## A. Daubert Standard

Federal Rule of Evidence 702 allows experts to offer opinion testimony if:

> "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> "(b) the testimony is based on sufficient facts or data;
>
> "(c) the testimony is the product of reliable principles and methods; and
>
> "(d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

Before an expert may testify, the court must play a gate-keeping role to ensure that the testimony is reliable. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 597. Even if part of an expert's testimony is based on unreliable methodology, the court should allow those parts that are reliable and admissible. United Fire and Cas. Co. v. Whirlpool Corp., 704 F.3d 1338, 1342 (11th Cir. 2013).

7

### B. Dr. James Anderson

The plaintiffs challenged the admissibility of two aspects of Dr. Anderson's opinion testimony. First, they challenged his opinions concerning the hospital-credentialing process, including the reporting requirements for the National Practitioner Data Bank. Second, they challenged the admissibility of his entire supplemental expert report, as well as particular matters it discusses: namely, a statement that allegedly appeared on a prior version of the National Abortion Federation website recommending that women seeking abortion find a doctor with admitting privileges at a local hospital; and an email from an attorney for Planned Parenthood of Greater Texas to the Texas Attorney General regarding certain physicians obtaining admitting privileges.

As to Anderson's opinions concerning hospital credentialing, the court rejected the plaintiffs' argument that Anderson is not qualified to discuss the nature and benefits of such credentialing. As a doctor who has applied for and received privileges at hospitals, Anderson

8

is qualified by virtue of his experience to discuss the nature of such privileges and his perception of their value.

However, Anderson's opinions about the reporting requirements for the National Practitioner Data Bank do not meet the Daubert standard.  At trial, Anderson admitted that his knowledge of the Data Bank's requirements came from reviewing the Data Bank's Guidebook a few days before he testified and, before then, his knowledge of the Data Bank was extremely limited.  Tr. VI 56:20-57:13.  The Guidebook to the Databank has been admitted as DX 80.  Therefore, Anderson's opinions regarding the circumstances in which a physician will be listed on the Data Bank provide no assistance to the court beyond what already is stated within the Guidebook itself, and were not admitted.

As to his supplemental report, Anderson testified that the report had been drafted, in its entirety, by Vincent Rue, a litigation consultant employed by the State.  Tr. VI-48:6-16.  Anderson said that he had read the report but had not independently verified its contents before submitting the opinions contained in it as his own.  See

9

Tr. at VI-46:25-47:4 (Anderson had not visited a website cited within the supplemental report until after submitting it to court); VI-58:11-25 (Anderson did not verify the information in an email forwarded to him by Rue that was included in supplemental report). Given that he neither wrote nor checked the report before submitting it to the court, the court found that his methodology is not reliable.

However, Anderson also testified at trial to the facts and opinions contained in the supplemental report, after having reviewed them. The report essentially presented two pieces of evidence: email from litigation about the Texas staff-privileges requirement; and a purported former version of the National Abortion Federation web page, as recovered from an internet archive. The Texas email was sent pursuant to litigation about that State's staff-privileges requirement. It states that some doctors who had initially been out of compliance with the staff-privileges requirement were able to secure privileges. The court has admitted other evidence to this effect. See Texas Litigation Documents, DX 82-84.

10

Similarly, the printout of the archived web page has been admitted.  NAF Webpage Information, DX 73.  Therefore, there was no harm in admitting Anderson's factual statements about these matters during live testimony.

Although these matters may be admissible, Anderson's court testimony about the supplemental report raised serious questions about his credibility.  It became apparent that Rue's involvement in drafting this supplemental report reached beyond the typical involvement of an attorney or litigation consultant in helping an expert put his opinions into words or providing background research.  Anderson presented the supplemental report as his own work by virtue of his signature at the bottom.  Furthermore, Anderson had shockingly little knowledge of Rue's background, credentials, or affiliations. Therefore, the court found that his reliance on Rue was unfounded.

The court was struck by the flimsiness of Anderson's basis for reliance on Rue and by his failure to obtain basic information about the affiliations, credentials, or employment of the consultant whose report he submitted as

11

his own. It can only describe how inexplicable it was by

reproducing the exchange at trial here:

> "THE COURT: Okay. Does this person have any institutional affiliations that you're aware of?
>
> "THE WITNESS: Not that I'm aware of.
>
> "THE COURT: Okay. Are you aware of his employment other than assisting you with writing I believe it was certain expert reports? I -- correct me if I'm wrong.
>
> "THE WITNESS: No, I'm not.
>
> "THE COURT: So you don't know his employment?
>
> "THE WITNESS: I think that he's a consultant in this arena, but that's all I know.
>
> "THE COURT: Consultant. What do you mean?
>
> "THE WITNESS: Well, he's been a help in doing the logistical typing and researching information. So I know that he's been involved in these cases and works with other states.
>
> "THE COURT: Do you know exactly who he is?
>
> "THE WITNESS: No, not beyond just talking to him.
>
> "THE COURT: Okay. Did he assist you in writing your report?

12

"THE WITNESS: He helps me. I write the report; and then he helps me find materials, do searches for, you know, backup articles and that type of thing. But I write the reports except for that supplemental report.

"THE COURT: Okay. How long --

"THE WITNESS: He sent me that information, and we just submitted that.

"THE COURT: Right. How long have you known him?

"THE WITNESS: I -- I worked close with him -- with him starting in 2011, but he was involved in the case in 2002 in Alaska, but I was working straight for the Attorney General's Office in 2002 in Alaska.

"THE COURT: You say you don't know his employment or any organizations that he belongs to --

"THE WITNESS: No, I do not.

"THE COURT: -- or is affiliated with?

"THE WITNESS: I don't.

"THE COURT: Why do you trust him?

"THE WITNESS: Well, we go back to 2002, and I've found him to be reliable, I mean. So -- I mean talking to him on the phone, I've just gotten to know him. And when I

13

write these reports, the things that he
gives me as far as typing assistance and
research has been good.

"THE COURT: Okay. And you don't know
anything about what he does?

"THE WITNESS: No, I don't, outside this."

Tr. at VI-68:14-VI-70:7.

The court believes that there are three explanations
for Anderson's willingness to sign his name to a report
written by a man about whom he knows so little, to do so
without even checking its contents, and then to represent
the opinions in it as his own: either he has extremely
impaired judgment; he lied to the court as to his
familiarity with Rue; or he is so biased against abortion
that he would endorse any opinion that supports increased
regulation on abortion providers.   Any of these
explanations severely undermines Anderson's credibility as
an expert witness.

Whether Anderson lacks judgment, is dishonest, or is
profoundly colored by his bias, his decision to adopt Rue's
supplemental report and submit it to the court without

14

verifying the validity of its contents deprives him of credibility.  Therefore, the court did not find his opinions credible, except where they were 'statements against interest,' that is, statements which would tend to support the plaintiffs' arguments.  To the extent that Anderson was dishonest or unduly biased, these statements would be least likely to be colored by that dishonesty or bias.  To the extent that his judgment is questionable, the court credited his opinions only where they confirmed the statements or practices of other witnesses.

## C. Dr. Jeffrey Hayes

Dr. Hayes is the president of the Alabama Association of Ambulatory Surgical Centers.  He testified in deposition but did not offer live testimony at trial.  The plaintiffs sought to exclude statements from Hayes about the extent to which doctors at ambulatory surgical centers in Alabama maintain staff privileges at local hospitals. He testified, "I felt like that, you know, just based on experience being in the business for a while that it seemed

15

like one of those pretty routine things that surgery centers require their medical staffs to have hospital privileges." Hayes Dep. at 11:20-12:3.  He also conducted an "informal poll" of a subset of the ambulatory surgical centers in Alabama.  Id. at 17:2; 21:5-7. Out of 18 centers that responded to his poll, 17 required that their doctors maintain staff privileges at a hospital (although his poll did not specifically inquire about local privileges, id. at 78:15-19).

The plaintiffs argued that the "informal poll" was not sufficiently scientific to meet Daubert standards and that Hayes did not adequately explain the ways that his experience leads him to his conclusions.  However, he made clear that his conclusions were based on "[g]eneral observation and practice of being in the ASC industry since 1991."  Id. at 74:21-22.  This explanation suffices to meet the requirements of admissibility, particularly in the context of a bench trial.  The plaintiffs' request to exclude Hayes's testimony was therefore denied.

16

The court credited Hayes's testimony, as far as it goes. However, for several reasons, the court did not give the testimony much weight.

First, Hayes's poll methodology is entirely unscientific and better understood as an extension of his general experience and interactions in the field. Fewer than half of the ambulatory surgical centers in the state (18 out of 42) responded to Hayes's poll. Furthermore, the question posed in the poll is only tenuously relevant to the dispute in this case. As noted above, he asked only whether the centers required privileges at any hospital, not necessarily a hospital nearby or even in Alabama. As discussed in the August 4th opinion, all of the doctors at the plaintiffs' clinics have (or, until recently, had) hospital privileges; the problem is in obtaining privileges at a local hospital.

Second, and more importantly, the fact that most ambulatory surgical centers require their doctors to maintain staff privileges at a local hospital has minimal relevance to whether abortion clinics should require the

17

same of their doctors.  In terms of the difficulty of the
procedure and probability of complications, the testimony
at trial revealed that early-term abortions are more
similar to several procedures that are commonly conducted
in doctors' offices, such as dilation and curettage
procedures.  In contrast, the procedures performed at
ambulatory surgical centers tend to be significantly more
complex and invasive than a surgical abortion, which
involves no cutting, or a medication abortion, which
amounts to administering pills.

Therefore, although Hayes's testimony was admissible
and credible, the court assigned it very little weight.


### D. Dr. Christopher Duggar

Dr. Duggar is a gynecologist in Montgomery.  The State
primarily introduced him as a fact witness regarding his
experience, as an on-call doctor in the Jackson Hospital
Emergency Room, treating a patient that had obtained an
abortion at plaintiff Reproductive Health Services in 2006.
However, he also made general statements about whether

18

physicians who performed abortions could secure admitting privileges at Montgomery hospitals and about the covering-physician approach taken by the plaintiffs' clinics.

The plaintiffs argued that Duggar's statement about whether physicians who perform abortions could get admitting privileges does not satisfy Daubert standards. They further objected to both of his general statements as opinion testimony from a witness who was not disclosed as an expert. The court overruled both objections.

First, as a doctor at Jackson Hospital, Duggar has experience with obtaining admitting privileges. Furthermore, as a gynecologist and obstetrician who serves on call in an emergency room, he has sufficient expertise to offer opinions about the covering-physician approach to continuity of care. The court therefore rejected the Daubert challenge.

While Duggar's opinions may be admissible as expert testimony, the court found them to be poorly founded. He opined that the clinics' doctors could easily obtain staff

19

privileges at Jackson Hospital.  However, the court heard testimony from a representative of Jackson Hospital that directly contradicted his opinion.  Robin Pate testified that a doctor seeking staff privileges sufficient to satisfy the statutory requirement would need to live nearby, have a sufficient caseload at the facility during the provisional period, and participate in the on-call schedule.  Tr. at IV-154:10-14, IV-155:13-15, IV-160:21-IV-161:1.  The abortion clinics' doctors can do none of these things, by virtue of their residence outside the State.

Duggar's other opinion regarded the propriety of the covering-physician model of continuity of care.  He stated, "It does seem somewhat negligent to abandon the patient off to another physician who is not currently involved in that patient's care."  Duggar Dep. at 41:2-5. However, Duggar admitted that he knew little about abortion care: "To be honest with you, I don't know how they do first-trimester abortions.  From what you hear, you know, there's a combination of both surgical and medical

management, but that's my limit of knowledge." Id. at
24:15-20. In addition, he revealed a lack of knowledge
about the type and timing of complications stemming from
abortion procedures. It became quite clear throughout the
trial that complications from abortion occur very rarely
during the procedure, and more commonly occur after a
patient has already gone home. Yet immediately after
opining that a covering-physician approach was
insufficient for treating complications, Duggar explained:
"They're having a complication during your procedure, and
now they're being shipped off to another facility, another
doctor who is not involved in the case." Id. at 41:7-12.
His concern about a handoff mid-procedure is misplaced; it
is much more likely (and in the case of a medication
abortion, a near certainty) that a covering physician would
become involved a day or more after the abortion. Given
Duggar's lack of knowledge of the procedures for performing
abortions and complications stemming from them, the court
gave little weight to his opinions. Because the court
discredited Duggar's opinion testimony, the State's

21

nondisclosure was harmless, and the opinions were not
excluded on that ground.  Fed. R. Civ. P. 37(c)(1).

Other than his opinion testimony, the State offered
Duggar's deposition testimony largely on the subject of his
complaint to the Alabama Department of Public Health about
Reproductive Health Services's lack of a covering physician
in 2006.  On this topic, Duggar's deposition largely
consists of his reading from the Department's statement of
deficiencies, which has been separately introduced as DX
54.

The statement of deficiencies contains several hearsay
(but admitted) accounts of the circumstances under which
Duggar treated a clinic patient at the emergency room.  In
his communications with the Department, Duggar portrayed
the abortion clinic staff as displaying apathy and scorn
toward his wish to communicate with the physician who
performed the abortion, and the staff's refusal to put him
in touch with her.  However, June Ayers, the clinic
administrator, testified to her own efforts during the
incident to put Duggar in communication with the initial

22

treating physician.  "[M]y response to the nurse that was relaying [Duggar's] message was to contact Dr. D and tell her that she needed to contact Duggar at the emergency room." Tr. at I-77:9-11.  The court credited Ayers's testimony about her own actions, which revealed some effort to establish communication between the doctors, but Ayers's testimony about her own actions did not resolve the questions about what happened between Duggar, the physician who performed the abortion, and the on-site clinic staff. The Department of Public Health report provides only muddled, contradictory evidence regarding these communications.  This evidence was sufficient to show that the clinic did not have a covering-physician relationship sufficient to comply with state regulations in 2006, but the court concluded that making any other findings from this evidence would have been unwise.  Thus, the court credited Duggar's testimony only to the extent that it supports the facts that Reproductive Health Services did not have a meaningful covering-physician arrangement in place at the time of the incident and that he therefore provided care

23

to one of the clinic's patients who was experiencing a complication.

### E. Margaret Moore

The State challenged Moore's testimony in its entirety on two grounds: first, the State argued that Moore is not an expert at all; and, second, it argued that her opinions as to the effect of anti-abortion violence on clinics' ability to recruit doctors are too speculative to constitute an admissible expert opinion.

Moore has an extensive background in law enforcement and substantial knowledge and experience in the area of violence against abortion providers.  She started her career as an undercover officer in the New York Police Department.  While serving in the police department, she earned a bachelor's degree in criminal justice.  She later moved to the federal Bureau of Alcohol, Tobacco, and Firearms, where she worked for 23 years.  During her time at the Bureau, she oversaw investigations into abortion-clinic bombings in several States, as well as the

24

first bombing of the World Trade Center.  After retiring from the Bureau in 1999, she worked for over a decade as director for law-enforcement operations at the Feminist Majority Foundation, where she advised law-enforcement agencies and abortion clinics on how best to prevent and respond to violence against abortion clinics.  In that role, she worked with the Department of Justice's National Abortion Providers Task Force, and briefed federal, state, and local law enforcement, including in Alabama, on violence against abortion providers, and consulted with law enforcement about specific acts of violence.

Moore's experience solidly qualifies her as an expert on law-enforcement matters and particularly on the nature of anti-abortion violence.  "Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from ... specialized experience.'" Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 148 (1999) (quoting Hand, Historical and Practical Considerations Regarding Expert Testimony, 15 Harv. L. Rev. 40, 54 (1901)); see also Fed.

R. Evid. 702 advisory committee note (2000 amends.)
("Nothing in this amendment is intended to suggest that
experience alone--or experience in conjunction with other
knowledge, skill, training or education--may not provide
a sufficient foundation for expert testimony. To the
contrary, the text of Rule 702 expressly contemplates that
an expert may be qualified on the basis of experience. In
certain fields, experience is the predominant, if not sole,
basis for a great deal of reliable expert testimony.").
Moore has an extensive background in tracking and analyzing
anti-abortion violence.   The fact that she has not produced
peer-reviewed research on the subject does not invalidate
her experiential expertise.

However, Moore's expertise does not include abortion
clinics' hiring processes or the decision-making process of
local doctors.   To the extent that her opinion testimony
included conclusions about how potential abortion
providers might react to the threat of violence in weighing
whether to perform abortions, those opinions are not
grounded in her expertise.   The court therefore excluded

paragraphs 34 and 35 of her expert report and all associated live testimony.

The court found Moore to be credible in her description of the many acts of violence that have been perpetrated against abortion providers, particularly in Alabama. The court did note one area in which Moore held a bias, and weighed her testimony appropriately. Moore testified that her perception of a "climate of fear" for abortion providers would be very hard to change and that she would consider changing that belief only if all violence against abortion providers were to cease. See Tr. at VII-68:8-VII-69:3. The court cannot endorse this view. Thus, the court was careful not to rely on Moore's generalized opinion for its finding of the existence of a significant risk of violence and fear of violence among abortion providers. However, the record contained ample evidence of such violence and fear, in the form of the specific facts to which Moore testified and the testimony of the abortion providers, such that it is clear that doctors who provide abortions are in fact plagued by the fear of violence on a regular basis and

27

that this fear plays a part in the difficulty in recruiting new doctors.

### F. Dr. Lori Freedman

Dr. Freedman testified for the plaintiffs about the stigma against abortion providers and how this stigma creates obstacles to finding doctors willing to perform abortions.  The State challenged Freedman's testimony in its entirety on two grounds: first, it argued that her qualitative--as opposed to quantitative--research methods are insufficiently rigorous to form the basis for admissible expert opinions; and, second, it argued that the history of abortion clinics in Alabama contradicts her findings.

Freedman earned a Ph.D. in sociology and currently serves on the research faculty of the University of California-San Francisco, one of the nation's premier medical schools.  Some of the qualitative research on which she based her expert testimony also formed the basis for her book, which was published by Vanderbilt University

28

Press, a peer-reviewed press.  In other words, other medical sociologists found her research to be sufficiently rigorous that her book should be published.  She has also published several peer-reviewed articles on her subsequent qualitative research.  <u>See</u> Freedman CV, PX 52.  "The fact of publication (or lack thereof) in a peer reviewed journal [] will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised."  <u>Daubert</u>, 509 U.S. at 594.  Freedman's success in publishing in peer-reviewed journals and at a peer-reviewed press strongly supports the validity of her qualitative method of research.

In addition, in her testimony, Freedman clearly articulated the way that qualitative methodologies such as hers are both legitimate and important parts of her field:

> "[B]oth [qualitative and quantitative research methods] are used in the medical and social scientific research world. And as I said, quantitative research is trying to understand sort of prevalence or associations of particular social factors. And they tend to test hypothesis

29

> or hypotheses using quantitative research, meaning you know what you're trying to prove or disprove. In qualitative research, we approach a research question with -- without a predetermined answer. And we're trying to understand why something is happening that we're seeing in -- often in quantitative research, why something is common, and trying to understand maybe the range of experience within that particular question."

Tr. II-137:9-20.

Freedman testified that quantitative research had shown that doctors who are trained in abortion often do not perform abortions and that her own qualitative research sought to explain why that was so. Her research was developed over the course of extended interviews, which she analyzed using text-analysis software in order to identify patterns and themes. Once she identified themes, she returned to the original source material in order to define them more precisely.

This methodology was sufficient, both in its data and its approach, to assist the court in its fact-finding. In particular, Freedman's testimony was useful to give the

court a framework, particularly the 'cautionary tale' frame, within which it could understand the experiences described by fact witnesses including June Ayers, Dalton Johnson, Dr. Roe, and Dr. P1, as they described their interactions with potential abortion providers and other healthcare providers.

The State's second argument, that Freedman's research conflicts with the actual experience of abortion providers in Alabama, went to credibility and weight, rather than admissibility.  See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (distinguishing between admissibility and persuasiveness of expert opinion). Furthermore, it misrepresented the experience of doctors in this State.

The State argued that the experience of doctors at the Tuscaloosa and Huntsville clinics, who overcame societal and professional challenges to continue performing abortions, refutes Freedman's research.  In Tuscaloosa, Dr. Payne's partners objected to his abortion practice, so he left the partnership and struck out on his own.  In

31

Huntsville, Dr. H1's mere association with an abortion clinic was sufficient to trigger anti-abortion harassment that wiped out her entire obstetric practice.   Both doctors' experiences reflect the very high level of commitment to providing abortion that a doctor must have in order to provide abortions in Alabama, and Dr. H1's experience illustrates the strong negative professional consequences from association with abortion that Freedman described.   The State's argument that the perseverance of these doctors illustrates a lack of stigma is facile and ignores the testimony about the difficulty the clinics have faced recruiting other doctors.   See, e.g., Tr. at II-62:21-II-65:13 (describing the difficulty in finding a covering-physician for the Huntsville clinic and Dr. H1's hesitation because of the effect protests targeted at abortion providers could have on her private practice); Buchanan Dep. at 131:7-13 (physicians with local-admitting privileges in Birmingham refused to perform abortions because "they could not risk their practices by providing abortion services for us.   They have practices, and their

32

family--they and their family rely on that livelihood, and they couldn't come work for [Planned Parenthood Birmingham].")

For these reasons, the court found Freedman's testimony to be admissible, credible, and helpful in explaining why doctors would be hesitant to begin performing abortions in Alabama.

### III. Additional Credibility Determinations

In order to further clarify the court's reasoning in its prior opinion, the court will briefly review the other witnesses who testified at trial or by deposition and explain the extent to which the court did or did not credit their testimony.

### A. Medical Expert Witnesses

In addition to the witnesses discussed above, the parties introduced three additional witnesses with expertise in the practice of medicine, including abortion procedures and treatment of complications.  The plaintiffs

33

presented Dr. Paul Fine, and the State presented Drs. Geoffrey Keyes and John Thorp, Jr.

Dr. Fine, the plaintiff's expert, is an obstetrician and gynecologist who serves as the medical director of Planned Parenthood Gulf Coast.[2]  He testified about early-term abortion procedures, hospital credentialing, and his view of proper care for complications from abortion.  Fine had a clear position on abortion rights and the necessity of laws such as Alabama's staff-privileges requirement. Nonetheless, having viewed and listened his testimony, the court was convinced that he testified honestly based on his beliefs about patient care, which he puts into practice at Planned Parenthood Gulf Coast.  As a result, the court credited his testimony, except where specifically noted in the main opinion.

Dr. Keyes, an expert for the State, is the president of the American Association for the Accreditation of

---

2.  Planned Parenthood Gulf Coast and Planned Parenthood Southeast, Inc., are separate organizations, although both are affiliated with the Planned Parenthood Federation of America.

Ambulatory Surgery Facilities, a credentialing organization for ambulatory surgical centers. He testified about standards for continuity of care that an ambulatory surgical center must meet in order to obtain credentialing from his organization. In large part, the court found Keyes's testimony to be credible and reliable, but at some points, cross-examination revealed that his initial testimony about the requirements of his organization was inaccurate. The court therefore credited Keyes, except where his testimony conflicted with the actual standards of his organization.

Dr. Thorp, the other medical expert for the State, is an obstetrician and gynecologist who practices in North Carolina. He testified about his research on complication rates from abortion and his opinions on the ideal form of continuity of care and on hospital credentialing.

In his testimony about complication rates, Thorp displayed a disturbing apathy toward the accuracy of his testimony. One example is particularly notable. In his expert report, he opined that the low-end estimate of the

35

complication rate was two percent, based on an article that he had written with the same claim.  Tr. VIII at 163:1-20. In fact, the range supported by his article is <u>0.2 %</u>.  <u>Id</u>. Although he was confronted with the error during his November 2013 deposition, he submitted a declaration to the court in April 2014 that again claimed the two percent figure.  <u>Id</u>.  In addition, other choices that he made in developing his estimates seemed to be driven more by a bias against abortion and a desire to inflate complication rates than by a true desire to reach an accurate estimate of the dangerousness of abortion procedures.  The court therefore discredited Thorp's testimony on complication rates from abortion.

With regard to Thorp's testimony about proper continuity of care, the court found that his testimony credibly reflected his own opinions about how doctors who perform abortions should provide continuity of care. However, even though the procedures he performs at his own office may, like abortion, in extremely rare cases cause complications that require post-procedure hysterectomy or

laparatomy, he himself does not maintain staff privileges at a local hospital that would allow him to perform gynecological surgery for his patients.   Tr. VIII 193:18-194:7.   This inconsistency between what he says and what he does led the court to give his opinions extremely limited weight.

### B. Social Science Expert Witnesses

The parties introduced three additional experts in social and statistical sciences, largely to address the effects that the staff-privileges requirement would have on women.   The plaintiffs presented Drs. Stanley Henshaw and Sheila Katz, and the State presented Dr. Peter R. Uhlenberg.

Dr. Henshaw is a sociologist and epidemiologist.   For the last 35 years, he has been affiliated in some manner with the Guttmacher Institute, an organization that advocates for abortion rights and access to contraception. At trial, he presented a number of studies of the effects of distance and cost on women's likelihood of obtaining an

37

abortion and on delays in obtaining abortion.  Henshaw has a bias against abortion restrictions and regulations. Nonetheless, having viewed the witness and listened to his testimony, the court found that he testified credibly and helpfully about the nature of the various studies and their strengths and limitations.  For these reasons, the court credited Henshaw's testimony and gave it considerable weight.

Dr. Katz is a sociologist who is currently an Assistant Professor at Sonoma State University.  She testified about certain demographic facts about poor women in general, the relationship between abortion and poverty, and the ways in which additional travel would hinder women who seek abortions.  The court found her testimony to be credible and helpful in understanding the effects of the law on women seeking abortions.

Dr. Uhlenberg is a demographer and Professor of Sociology at the University of North Carolina at Chapel Hill.  He testified about various flaws that he perceived in the studies on which Henshaw relied and the statistics

which Katz presented, arguing that additional travel
distance would not impede women who seek abortions.
However, Uhlenberg's opinion was based on news reports on
abortion rates, unsophisticated comparisons of abortion
rates with the number of abortion providers in Alabama, and
statistical analyses with serious methodological flaws.
For these reasons, the court did not credit Uhlenberg's
testimony.


## C. Fact Witnesses

The plaintiffs presented testimony from their own
staff and from some of the doctors who provide abortions
at their clinics, as well as from the administrators of the
other two abortion clinics in the State.  Each of these
witnesses has an economic and/or ideological interest in
the outcome of the litigation, and the court accounted for
such bias in considering each witness's testimony.  Having
viewed the witnesses and listened to their testimony, the
court credited the witnesses' testimony.  The court also
credited the expert testimony of Dr. Roe, who performs

abortions at plaintiff Planned Parenthood Southeast, Inc.'s Birmingham clinic, for reasons similar to those given above for Dr. Fine.

The plaintiffs further introduced testimony from staff at hospitals in Montgomery, Birmingham, and Mobile. Having viewed the witnesses and listened to their testimony, the court credited the testimony of those witnesses.

The State introduced testimony from the defendant State Health Officer, Dr. Donald Williamson, as well as other state officials. Having viewed the witnesses and listened to their testimony, the court credited the testimony of those witnesses.

DONE, this the 20th day of October, 2014.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE