IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD SOUTHEAST, INC., on behalf of its patients, physicians, and staff, et al., | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 2:13cv405-MHT |
| LUTHER STRANGE, in his official capacity as Attorney General of the State of Alabama, et al., | ) ) ) ) ) | (WO) |
| Defendants. | ) | |

ORDER

The court wishes to correct errata in regards to the initial opinion entered August 4, 2014 (doc. no. 238). Accordingly, it is ORDERED that the following changes are made:

(1) The sentence on page 5,

> The same gunman later killed Dr. Gunn's replacement in northern Florida, along with

>    his guard, and also wounded that doctor's wife.

>  is replaced by the following sentence:

>    A second gunman later killed Dr. Gunn's replacement in northern Florida, along with his guard, and also wounded that doctor's wife.


(2) The sentence on page 7,

>    Five or six years ago, a man intentionally drove through the front of the Tuscaloosa clinics, eventually fleeing and engaging police in a chase.

>  is replaced by the following sentence:

>    Five or six years ago, a man intentionally drove through the front of the Tuscaloosa clinic, eventually fleeing and engaging police in a chase.

(3) The sentence on page 58,

> Sixty-nine percent of all counties nationwide have no abortion doctors at all.

is replaced by the following sentence:

> As of 2005, 69 % of metropolitan counties nationwide and 97 % of non-metropolitan counties had no abortion doctors at all.

(4) The sentence on page 64,

> She "had a mass exodus of patients from his practice."

is replaced by the following sentence:

> She "had a mass exodus of patients from her practice."

(5) The sentence on page 65,

> At trial, clinic administrator Johnson movingly expressed his fear that Dr. H2 would be unable to start and maintain an

obstetric practice, just as Dr. Payne's and

Dr. H1's practices were shuttered.

is replaced by the following sentence:

At trial, clinic administrator Johnson movingly expressed his fear that Dr. H2 would be unable to start and maintain an obstetric practice, just as Dr. Palmer's and Dr. H1's practices were shuttered.

(6) The paragraph that begins on page 70 and continues on page 71,

Like Dr. Roe, Dr. P1 experiences threats and hostility beyond run-of-the-mill protesting at the Mobile clinic where she performs abortions. Mobile protestors placed the doctor's picture on an anti-abortion poster and regularly call her by her first name as she enters her clinic. Dr. P1 has worked at two clinics that were targeted for

violence, including the Birmingham clinic that was bombed by Eric Rudolph, killing a police officer and wounding a nurse. As a result, she takes all threats from anti-abortion protesters seriously. She does not use the same car twice when traveling to her clinic, only accepts personal mail through a Post Office Box, and prefers not to receive packages at her home.

is replaced by the following paragraph:

Like Dr. Roe, Dr. P1 experiences threats and hostility beyond run-of-the-mill protesting for her work at the Mobile clinic where she performs abortions. Dr. P1 has worked at two clinics that were targeted for violence, including the Birmingham clinic that was bombed by Eric Rudolph, killing a police officer and wounding a nurse. As a result, she takes all threats from

5

anti-abortion protesters seriously. She does not use the same car twice when traveling to her clinic, only accepts personal mail through a Post Office Box, and prefers not to receive packages at her home.

(7) The paragraph that begins on page 71 and continues on page 72,

> Drs. Roe and P1 continue to provide abortion services in Alabama despite the State's history of violence and threats against abortion doctors, but other doctors have responded to the hostile environment differently. When anti-abortion activists in the State leaked Dr. P3's personal and professional information, including her Social Security number, onto the internet, she gave up her abortion practice and moved to another State. Dr. D, an abortion

> provider at the Montgomery clinic for ten years, ceased providing abortions in 2012 when information she provided to the Board of Medical Examiners for licensure was similarly leaked to an anti-abortion website. In addition to professional information, her home address, personal cell phone number, names of family members, and photograph were posted to the website. This incident, along with repeated attempts by protestors to take photos as she entered the clinic, ultimately caused her to quit her job at the Montgomery clinic.

is replaced by the following paragraph:

> Drs. Roe and P1 continue to provide abortion services in Alabama despite the State's history of violence and threats against abortion doctors, but other doctors have responded to the hostile environment

>differently. Dr. P3, an abortion provider at the Montgomery clinic for ten years, ceased providing abortions in 2012 when information she provided to the Board of Medical Examiners for licensure was leaked to an anti-abortion website. In addition to professional information, her Social Security number, home address, personal cell phone number, names of family members, and photograph were posted to the website. This incident, along with repeated attempts by protestors to take photos as she entered the clinic, ultimately caused her to quit her job at the Montgomery clinic.

(8) The sentences on page 86,

>One study found that the percentage of women who obtain an abortion dropped with each additional ten miles of distance. Another

> found that an increase of 100 miles in travel distance reduces the abortion rate by almost 22 %. A third found that, conversely, opening new clinics substantially increased the abortion rate in the surrounding areas, further confirming the relationship between distance from a clinic and the likelihood that a woman will obtain an abortion.

are replaced by the following sentences:

> One study found that an increase of 100 miles in travel distance reduces the abortion rate by almost 22 %. Another study found that the percentage of women who obtain an abortion dropped with each additional ten miles of distance. A different component of that same study found that, conversely, opening new clinics substantially increased the abortion rate in the surrounding areas, further confirming

9

the relationship between distance from a clinic and the likelihood that a woman will obtain an abortion.

(9) The sentence that begins on page 108 and continues on page 109,

> Dr. P1 testified that she has already begun to see a few patients a month who had attempted to self-abort using illegally obtained medications, because the medications were less expensive than a supervised abortion.

is replaced by the following sentence:

> Dr. P1 testified that she has already begun to see a few patients a year who had attempted to self-abort using illegally obtained medications, because the medications were less expensive than a supervised abortion.

(10) The paragraph that begins on page 128 and continues on page 129,

> Only in the four remaining cases does the State's continuity-of-care justification for the staff-privileges requirement even potentially come into play. In one case, the clinic's covering physician met the patient at the emergency room and successfully treated her for retained tissue from a medication abortion. That leaves three instances, over three years and nine months, in which the Birmingham clinic directed a patient to seek emergency-room treatment without involving the covering physician. One patient had a 99-degree fever; another had cramps; and the third said that she was in pain despite pain medication. All three were treated and discharged from the emergency room.

is replaced by the following paragraph:

>Only in the four remaining cases does the State's continuity-of-care justification for the staff-privileges requirement even potentially come into play. In one case, the clinic's covering physician was notified when the patient experienced bleeding from retained tissue, but the patient elected to receive treatment from a different doctor. That leaves three instances, over three years and nine months, in which the Birmingham clinic directed a patient to seek emergency-room treatment without involving the covering physician. One patient had a 99-degree fever; another had cramps; and the third said that she was in pain despite pain medication. All three were treated and discharged from the emergency room.

(11) The text in footnote 24 on page 140,

> Drs. Thorp and Anderson each opined that proper care for even the simplest complication would require detailed knowledge about the patient's history, reproductive goals, and other information. However, the court discredits Dr. Anderson's testimony on this point due to concerns about his judgment or honesty as described in the forthcoming supplemental opinion. The court discredits Dr. Thorp's opinion on this point because it is inconsistent with his own practice, as described below.

is replaced by the following text:

> Drs. Thorp and Anderson each opined that proper care for even the simplest complication would require detailed knowledge about the patient's history, reproductive goals, and other information. However, the court discredits Dr. Anderson's testimony on this point due to concerns about his judgment or honesty as described in the forthcoming supplemental opinion. The court also discredits Dr. Thorp's opinion on this point.

(12) The paragraph that begins on page 141 and continues on page 142,

> In fact, the behavior of the strongest proponent at trial of the country-doctor

13

approach illustrates why that approach is out of touch with contemporary medical practice. Dr. Thorp testified that, at his own office, he removes tissue that remains after early-term miscarriages, presumably using the dilation and curettage method, which is identical to early-term surgical abortion. He also puts patients under conscious sedation, exposing them to significant risk from anesthesia, and performs other procedures which carry risks of serious complications. But Dr. Thorp <u>does not maintain staff privileges</u> at any hospitals. It is not clear whether Dr. Thorp, in practice, ascribes to Dr. Fine's approach or to the Surgical Association's covering-physician approach. But it is clear that Dr. Thorp has refused to adopt the

> State's country-doctor approach in his own practice.

is replaced by the following paragraph:

> In fact, the behavior of the strongest proponent at trial of the country-doctor approach illustrates why that approach is out of touch with contemporary medical practice. Dr. Thorp testified that, at his own office, he removes tissue that remains after early-term miscarriages, presumably using the dilation and curettage method, which is identical to early-term surgical abortion. He also performs other procedures which carry risks of serious complications. But Dr. Thorp <u>does not maintain staff privileges to perform gynecological surgery</u> at any hospitals. It is not clear whether Dr. Thorp, in practice, ascribes to Dr. Fine's approach or to the Surgical

15

Association's covering-physician approach. But it is clear that Dr. Thorp has refused to adopt the State's country-doctor approach in his own practice.

DONE, this the 24th day of October, 2014.

                                       /s/ Myron H. Thompson
                                    **UNITED STATES DISTRICT JUDGE**