IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

PLANNED PARENTHOOD          )
SOUTHEAST, INC., on behalf  )
of its patients,            )
physicians, and staff,      )
et al.,                     )
                            )
     Plaintiffs,            )
                            )          CIVIL ACTION NO.
     v.                     )           2:13cv405-MHT
                            )              (WO)
LUTHER STRANGE, in his      )
official capacity as        )
Attorney General of the     )
State of Alabama, et al.,   )
                            )
     Defendants.            )


OPINION

     Previously,  this  court  found  that  an  Alabama

statute  that  requires  abortion  providers  to  obtain

staff privileges at a local hospital unconstitutionally

restricts  the  rights  of  women  seeking  abortions  in

Alabama.   Planned  Parenthood  Se.,  Inc.  v.  Strange

(Strange III),   33   F.   Supp.   3d   1330,   1378

(M.D. Ala. 2014)  (Thompson, J.);  see  also  Planned

Parenthood  Se.,  Inc.  v.  Strange  (Strange II),  9  F.

Supp. 3d 1272 (M.D. Ala. 2014) (Thompson, J.) (summary judgment opinion laying the foundation for the application of the undue-burden test in this case); Planned Parenthood Se., Inc. v. Bentley (Strange I), 951 F. Supp. 2d 1280 (M.D. Ala. 2013) (Thompson, J.) (temporarily enjoining the State from enforcing the staff-privileges requirement). The court must now determine the appropriate legal remedy. First, it will examine whether, as the State argues, a phrase may be severed from within the provision, leaving a revised statute to take effect. The answer is no. Next, the court will determine whether facial or as-applied relief is appropriate. The answer is facial relief. Finally, the court will determine whether injunctive relief is necessary or declaratory relief will suffice. The answer is a declaration is adequate.

## I.   SEVERABILITY

The Women's Health and Safety Act contains a host of provisions regulating the administration of

2

abortions in Alabama.  Most of the law has already gone into effect.  The text of section 4 of the Act reads as follows:

> "(a) Only a physician may perform an abortion.
>
> "(b) During and after an abortion procedure performed at an abortion or reproductive health center, a physician must remain on the premises until all patients are discharged. The discharge order must be signed by the physician.  Prior to discharge from the facility, the patient shall be provided with the name and telephone number of the physician who will provide care in the event of complications.
>
> "(c) Every physician referenced in this section shall have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the facility is located that permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications."

2013 Ala. Acts 79 § 4, codified at 1975 Ala. Code § 26-23E-4.[1]   The Act imposes criminal liability on administrators of abortion clinics for violating the provision.   <u>See</u> 2013 Ala. Acts 79 § 12(c), codified at 1975 Ala. Code § 26-23E-12(c).

Subsection 4(c) of the Act, which imposes a staff-privileges requirement on physicians who perform abortions in the State, is the only part of the law at issue here, and it has been stayed pending the disposition of this litigation.   In a previous opinion, this court found that the subsection was unconstitutional as applied to the plaintiffs in this case.   <u>Strange III</u>, 33 F. Supp. 3d at 1380.   The court explained that the enforcement of the subsection would

---

1. "The phrase 'staff privileges,' also referred to as 'admitting privileges,' describes a relationship between an individual doctor and a hospital which allows that doctor to admit patients to a hospital and to perform procedures at the hospital. ... Doctors receive staff privileges after an application process. Hospitals generally delineate prerequisites and procedures for that application in their bylaws, but they retain discretion whether to grant privileges." <u>Strange II</u>, 9 F. Supp. 3d at 1276.

unduly burden women seeking abortions in Alabama by having the effect of closing the only abortion clinics in Alabama's three largest cities: Montgomery, Mobile, and Birmingham; these closures would impose significant "financial difficulties and psychological obstacles" on women forced to travel increased distances to obtain an abortion and impose "severe and even, for some ..., insurmountable obstacles" on women who would seek to obtain an abortion at those clinics.   <u>Id</u>. at 1363.

Prior to issuing an opinion outlining its final relief, the court solicited the views of the parties on whether subsection 4(c) may be severed to cure the constitutional infirmity.   The parties agree that the subsection is severable in its entirety from the remainder of the statute.   However, they dispute whether certain words can be struck from it, leaving a revised provision in effect.   The State argues that the subsection contains three parts, each of which is severable from the others.   Those are that a doctor

must hold staff privileges (1) at an acute-care hospital (2) within the same metropolitan statistical area (3) that enable him or her to perform certain procedures. The State contends that the court has found constitutional infirmity only as to the requirement that staff privileges be held locally. Therefore, the State asks the court to strike only the words requiring that the privileges be held within the same metropolitan statistical area as the abortion facility, leaving the remainder of the subsection to go into effect. The plaintiffs respond that no portion of the subsection is severable.

The State's request would require the court to excise the words "within the same standard metropolitan statistical area as the facility is located" from the midst of the single sentence that comprises subsection 4(c). After striking this language, the subsection would read as follows:

> "Every physician referenced in this section shall have staff privileges at an acute care hospital that permit him or her to perform dilation and

6

curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications."

The court rejects the State's argument that subsection 4(c)'s single sentence is divisible into three distinct fragments, each operating independently of the others. Rather, as explained below, the requirement that the physician have staff privileges at a <u>local</u> hospital is an essential element of the subsection. Without it, the revised subsection would take on a strikingly different meaning.

### A.   Guiding Principles of Severability

Severability is a matter of state law, <u>Leavitt v. Jane L.</u>, 518 U.S. 137, 139 (1996), and the Alabama Supreme Court has developed rules to guide courts in deciding whether to sever parts from a larger legislative act. Under Alabama law, "[t]he guiding star in severability cases is legislative intent." <u>Beck v. State</u>, 396 So. 2d 645, 658 (Ala. 1980).

The court must therefore determine whether the statute can be divided into parts that are "wholly

7

independent of each other," or whether "the legislature intended [the invalid and remaining parts] as a whole." <u>King v. Campbell</u>, 988 So. 2d 969, 982 (Ala. 2007). If the remaining portion of an act is "competent to stand without the invalid [portion]," <u>id</u>. at 983, the court may save the act by severing the offending portion. If, by contrast, the various parts of a statute are "so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently ... all the provisions which are thus dependent, conditional, or connected [to the invalid part] must fall with them." <u>Id</u>. at 982. Evaluating the importance of the invalid portion of the statute within the legislature's "general plan" for the law will assist in this determination. <u>Id</u>. (explaining that an invalid portion of a law should be severed to save the remaining provisions "unless the invalid

portion is so important to the general plan and operation of the law in its entirety as reasonably to lead to the conclusion that it would not have been adopted if the legislature had perceived the invalidity of the part so held to be unconstitutional"). The court will now apply these principles to determine whether the metropolitan-area requirement is severable.

## B. Evidence of Legislative Intent

This court has not previously decided what the Alabama Legislature intended in enacting subsection 4(c). As in its prior opinion, the court will assume for purposes of the current analysis that the purported legislative purposes argued by the State were the actual legislative intent behind the subsection.

Throughout the course of this litigation, the State has contended that the legislature had two purposes in enacting subsection 4(c). First, the State has asserted that the legislature's primary goal for the subsection was ensuring continuity of care, and that

**9**

"the requirement furthers 'continuity of care' by improving care for women who experience complications and fostering improved follow-up care in general." Strange III, 33 F. Supp. 3d at 1363. Second, the State has argued "that staff privileges serve a credentialing function, both as an initial screening mechanism and by providing ongoing review of physician quality." Id.

As explained above, the State proposes that subsection 4(c) be modified to read as follows:

> "Every physician referenced in this section shall have staff privileges at an acute care hospital that permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications."

The State thus asks this court to interpret the revised subsection as requiring that physicians who perform abortions in Alabama have staff privileges at an acute-care hospital "somewhere" that would allow them to handle the specified complications from abortions. Defs.' Br. Appropriate Final Relief (doc. no. 256) at 11 (emphasis in original).

10

The proposed modification, however, would do nothing to ensure continuity of care, as doctors governed by the revised law could have staff privileges at a hospital anywhere in the world. Under the State's proposed revision, a physician performing abortions in Alabama could comply with subsection 4(c) by maintaining staff privileges at a hospital in Alaska, with the ability to admit patients and perform complication-related procedures at an acute-care hospital over 3,000 miles away. As a practical matter, such a requirement would not advance continuity of care for women receiving abortions in Alabama. Therefore, absent the metropolitan-area requirement, the subsection could conceivably advance only the State's purported interest in 'credentialing.' As explained below, however, the proposed revision would be inconsistent with even this secondary justification.

The court previously found that credentialing by a local hospital would provide only "negligible" and "speculative" benefit, as compared to existing law and

current Department of Public Health oversight. Strange III, 33 F. Supp. 3d at 1373, 1378; see id. at 1366-67 (describing testimony by the State's Chief Medical Officer "that the preexisting regulations did an adequate and effective job of protecting the public health" and, therefore, that the Department, having considered imposing a staff-privileges requirement prior to the enactment of subsection 4(c), had decided the requirement "was unnecessary"). However, absent the metropolitan-area requirement, even that marginal benefit would be considerably weakened, if not eliminated. Under the metropolitan-area requirement, the credentialing function of the statute would at least be tied to local professional standards. All Alabama hospitals are regulated by the State's Department of Public Health, so the State would maintain--at least theoretically--some control over the scrutiny of physician qualifications. The proposed revision, in contrast, provides no limits on the location of the credentialing hospital. Without the

requirement that the hospital be local, the law would rely on regulatory processes of which the legislature neither knows nor approves. By severing the metropolitan-area requirement, the court would not merely void a modifier of the staff-privileges requirement. Instead, excising the requirement would tacitly insert a new modifier in its place: staff privileges may be obtained <u>anywhere in the world</u>. To make such a modification exceeds the institutional competence of the court, and would constitute a "far more serious invasion of the legislative domain" than the court is authorized to undertake. <u>Ayotte v. Planned Parenthood of N. New England</u>, 546 U.S. 320, 330 (2006); <u>see also id</u>. at 329.

Such a modification would also be contrary to the legislature's purported intent. The State itself admitted as much at trial, when it was asked by the court whether there was a benefit to local credentialing, as opposed to credentialing from a hospital located in a different city. In the words of

13

the State's counsel, "there are local community standards ... that physicians expect similar physicians within their community to follow. ... If you were to, for example, sever the provision of this requirement that requires the hospital privileges to be within 30 miles of a facility, then you would allow someone with hospital privileges at conceivably any hospital anywhere. <u>And we do not know what kinds of requirements that that unknown hospital in an unknown location might impose on a doctor to get privileges."</u> Tr. Vol. X at 103:19-104:8 (emphasis added). Indeed, under the State's proposal, even a hospital located outside of the United States, that might have a radically different conception of the standard of practice, could 'credential' an Alabama physician who performs abortions. If the metropolitan-area requirement were severed from it, subsection 4(c) would lose the substantive value the legislature purportedly sought in enacting it.

14

## C.   The Severability Clauses

The State nonetheless points to the existence of an applicable severability clause to argue that the metropolitan-area requirement is severable from the remainder of the subsection.  All Alabama statutes are subject to a general severability clause:

> "If any provision of this Code or any amendment hereto, or any other statute, or the application thereof to any person, thing or circumstances, is held invalid by a court of competent jurisdiction, such invalidity shall not affect the provisions or application of this Code or such amendment or statute that can be given effect without the invalid provisions or application, and to this end, the provisions of this Code and such amendments and statutes are declared to be severable."

1975 Ala. Code § 1-1-16.  As the Alabama Supreme Court has explained, "We regard § 1-1-16 as an expression of legislative intent regarding the general power and duty of the judiciary to sever and save statutory provisions not tainted by the unconstitutionality of other provisions in the same statute."  State ex rel. Pryor v. Martin, 735 So. 2d 1156, 1159 (Ala. 1999).

15

Additionally, the Women's Health and Safety Act, as it was passed, contained its own severability clause:

> "Any provision of this act held to be invalid or unenforceable by its terms, or as applied to any person or circumstance, shall be construed so as to give it the maximum effect permitted by law, unless such holding shall be one of utter invalidity or unenforceability, in which event such provision shall be deemed severable herefrom and shall not affect the remainder hereof or the application of such provision to other persons not similarly situated or to other, dissimilar circumstances."

2013 Ala. Acts 79 § 18.   While a severability clause provides "persuasive authority that the Legislature intended the valid portion [of a law] to survive," Beck, 396 So. 2d at 658, the existence of the clause does not end the court's inquiry. "[A] separability clause should be given effect, where possible, to save legislative enactment, ... that is, if the invalid portion is not so intertwined with the remaining portions that such remaining portions are rendered meaningless by the extirpation, in which event it must be assumed that the legislature would not have passed

the enactment thus rendered meaningless." <u>Allen v.</u>
<u>Walker County</u>, 199 So. 2d 854, 860 (Ala. 1967) 860
(emphasis added); <u>see also</u> <u>Ala. State Fed'n of Labor v.</u>
<u>McAdory</u>, 18 So. 2d 810, 830 (Ala. 1944) (recognizing
that such a clause "should be given effect, where
possible, to save the Act," but emphasizing that it is
"well understood that a clause of this character may
not be invoked to save the Act when in contravention of
the obvious legislative intent"). A severability
clause "does not authorize the court to give the
statute an effect altogether different from that sought
by the measure viewed as a whole." <u>Carter v. Carter</u>
<u>Coal Co.</u>, 298 U.S. 238, 313 (1936). Ultimately, a
severability clause acts as an "aid merely; not an
inexorable command." <u>Bell v. Maryland</u>, 378 U.S. 226,
240 (1964).

The court is especially wary of severability in a
situation, such as this one, in which it is asked to
sever particular words <u>from within a single sentence</u>.
This sort of alteration is particularly likely to

distort legislative intent, as it could dramatically alter a statute's meaning. As the United States Supreme Court has explained, "Along with punctuation, text consists of words living 'a communal existence,' in Judge Learned Hand's phrase, the meaning of each word informing the others and all in their aggregate taking their purport from the setting in which they are used." U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 454-55 (1993). Thus, for example, "the sentence 'there shall never be more than one hundred female students enrolled at the U.S. Naval Academy' is unconstitutional gender discrimination, but a court cannot remedy it by striking out only the word 'female.' That would leave us with a totally accidental meaning, limiting the size of the Academy to 100 students, which is absurd in light of the statute's purpose." Eric S. Fish, Severability as Conditionality, 64 Emory L.J. 1293, 1338 (2015). Courts may not save a statute or provision by excising a word or phrase from the statute if to do so would

leave a law that strays far from the legislature's intent. "[I]f a clause which violates the Constitution cannot be rejected without causing the act to enact what the legislature never intended the whole statute must fall." Ala. Pub. Serv. Comm'n v. AAA Motor Lines, Inc., 131 So. 2d 172, 180 (Ala. 1961).

Indeed, where Alabama courts have struck mere clauses or phrases from within a statute, they have first carefully considered whether the severance would disturb the law's intended effect. See, e.g., City of Birmingham v. Smith, 507 So. 2d 1312, 1316 (Ala. 1987) (severing an unconstitutional voting limitation which was "[b]uried in one section" and constituted a "textually minor provision"); Beck, 396 So. 2d at 657 (severing an unconstitutional 14-word preclusion clause from Alabama's death-penalty statute because the court found that "the only reason the legislature put the 'preclusion clause' in the statute was the erroneous belief that the Constitution of the United States ... required it"); Springer v. State ex rel. Williams, 157

19

So. 219, 221 (Ala. 1934) (severing a phrase that unconstitutionally fixed a county official's start date within the term of his predecessor, because the "dominant, major purpose of the act" was to change the mode of selecting the official, and not to set the start date for the term).  In these cases, the excision of words left an otherwise functional statute that was consistent with legislative intent; the meaning of the remaining statutory text was not changed by the modification.

The modification the State proposes is quite different from the modifications considered above.  The metropolitan-area requirement is neither "buried" in the subsection nor "textually minor" to the operation of the law.  <u>Birmingham</u>, 507 So. 2d at 1316.  Requiring a physician to obtain staff privileges at a <u>local</u> hospital is the <u>only</u> way the provision could be said to promote 'continuity of care,' which the State contends was the central justification for the subsection; the absence of the requirement would also undermine the

20

State's asserted interest in credentialing. When severance would cut the heart out of the legislature's intent for a provision, the presumption raised by the severability clause is swiftly rebutted.

The grammatical structure of subsection 4(c) provides further support for this conclusion. Had the legislature sought to enact a staff-privileges requirement comprised of several stand-alone elements, it could have easily made that clear: for example, it could have formally divided the subsection into numbered clauses, or even inserted a set of commas between the parts. See M. Douglass Bellis, Fed. Judicial Ctr., Statutory Structure and Legislative Drafting Conventions: A Primer for Judges 8-9 (Fed. Judicial Ctr. 2008) (explaining that sections or subsections may be further divided in order to describe distinct ideas or 'sub-ideas'); see also United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 241 (1989) (analyzing a statute's grammatical structure and finding that because a particular phrase was "set aside

21

by commas," it stood "independent of the language that
follow[ed]").   Instead, subsection 4(c) manifests a
single idea via one uninterrupted sentence.   This
structure, on its face, counsels against the intrusive
modification the State proposes.

Because eliminating the metropolitan-area
requirement would significantly change the meaning of
the provision, the court holds that subsection 4(c)
cannot be saved by severing the requirement and
allowing the remainder to stand alone.   Further, while
severability is ultimately a matter of state law, it is
worth noting that this conclusion finds support in
federal law, which makes clear that courts are not
authorized to rewrite a legislative directive so
dramatically.   See United States v. Stevens, 559 U.S.
460, 481 (2010) ("We will not rewrite a law to conform
it to constitutional requirements, for doing so would
constitute a serious invasion of the legislative
domain, and sharply diminish Congress's incentive to
draft a narrowly tailored law in the first place."

(internal citations and quotation marks omitted));
Ayotte, 546 U.S. at 329 ("[M]indful that [its]
constitutional mandate and institutional competence are
limited, [the Court] restrain[s] [itself] from
rewriting state law to conform it to constitutional
requirements." (internal quotation marks omitted)).
Therefore, the entire subsection must be invalidated.
Should the Alabama legislature seek to enact a statute
that promotes the health and safety of women without
unduly burdening their constitutionally protected
abortion rights, "the ball now lies in [its] court."
United States v. Booker, 543 U.S. 220, 265 (2005).


## II. RELIEF

### A.   Facial vs. As-Applied Relief

The court next turns to what relief should be
granted.  The plaintiffs have asked the court to
declare subsection 4(c) facially unconstitutional; that
is, to invalidate it throughout the State of Alabama.
The State argues that facial relief is inappropriate

and, therefore, that the court should invalidate the statute only as applied to the plaintiff clinics and administrators.

To be candid, the law on facial versus as-applied relief is a mess. First, the difference in the application of these two forms of relief is not always apparent, and this lack of clarity "begins with the terminology itself." Richard R. Fallon, Jr., <u>Fact and Fiction about Facial Challenges</u>, 99 Cal. L. Rev. 915, 922 (2011). Thus, in some cases, a court may strike down a blatantly unconstitutional statute--consider, for example, a law categorically prohibiting women from voting in all elections--on the basis of its text alone ('on its face'). But, in other cases, courts carefully consider the circumstances in which a statute will apply to determine whether it can withstand a facial challenge. <u>See</u>, <u>e.g.</u>, <u>Johnson v. United States</u>, 135 S. Ct 2551, 2556, 2560 (2015) (holding that the residual clause of the federal Armed Career Criminal Act was void for vagueness in part based on the Court's past

consideration of the provision in four factually distinct cases); Planned Parenthood Se. Pa. v. Casey, 505 U.S. 833, 891-92 (1992) (plurality opinion) (considering, in a facial challenge to an abortion law, the circumstances of the women for whom the law would be a restriction). Second, the Supreme Court has not clearly and consistently applied these two forms of relief, which exacerbates the confusion. See Fallon, 99 Cal. L. Rev. at 917 ("The Justices have lectured not only the lower courts, but also each other, about when facial challenges are and are not appropriate."); Gillian E. Metzger, Facial and As-Applied Challenges Under the Roberts Court, 36 Fordham Urb. L.J. 773, 774 (2009) (noting that the Court is divided as to the appropriate general test for facial challenges and arguing that the Court "has made little effort to describe the contours of as-applied litigation"); City of Los Angeles v. Patel, 135 S. Ct 2443, 2449 (2015) (citing Fallon, 99 Cal. L. Rev. at 918, for the proposition that, although the Court has described

facial challenges as being "the most difficult to mount successfully," it has, during several Terms, adjudicated more facial challenges on the merits than it has as-applied challenges).

Nevertheless, despite this confusion in terminology and application in general, application of the two forms of relief to the constitutional challenge here and to the compelling facts in support of that challenge solidly warrant the conclusion that subsection 4(c) is facially unconstitutional.[2]

_____

2.  At earlier stages of this litigation, the State appeared to argue that the plaintiffs had not properly requested both facial and as-applied relief. It appears that the State has abandoned this argument in its post-trial briefing. However, the court will address this threshold concern for clarification.

The court finds that the plaintiffs have pursued both facial and as-applied relief in this litigation. Compare Am. Compl. (doc. no. 85) at 13 ("Plaintiffs respectfully request that the Court: 1) declare Section 4(c) of HB 57, to be codified at Ala. Code § 26-23E-4(c), unconstitutional under the Fourteenth Amendment to the United States Constitution; ... 4) grant Plaintiffs such other, further, and different relief as the Court may deem just and proper."), with Ayotte, 546 U.S. at 331 (plaintiffs who initiated (continued...)

### 1.  Test for Facial Relief

In its earlier opinion granting a temporary restraining order, this court found that the test for facial relief in the abortion context presented here is whether, "in a <u>large fraction</u> of the cases in which the law is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." <u>Strange I</u>, 951 F. Supp. 2d at 1285 n.4 (emphasis in original) (citing <u>Casey</u>, 505 U.S. at 895 (plurality opinion)).

The large-fraction test was set forth in <u>Casey</u>'s plurality opinion.  In <u>Casey</u>, the Supreme Court confronted the same question presented here: whether a law restricting abortion that unduly burdened many, but not all, of the women it impacted warranted facial relief.  While the Court has addressed the facial-relief question in two other abortion cases

---

request for "any relief 'just and proper'" sought both facial and as-applied relief).

27

since _Casey_, in each the Court considered an abortion restriction where the undue burden imposed was speculative or present only in certain unusual cases; neither case is apposite here.   _Casey_ is the only Supreme Court precedent that clearly addresses the question presented in this case.

In _Casey_, the Court struck down as facially invalid a Pennsylvania law that required married women to notify their spouses prior to obtaining abortions. 505 U.S. at 898 (plurality opinion); _id_. at 922 (Stevens, J., concurring in part and dissenting in part); id. at 934 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part).   Pennsylvania objected that the vast majority of women seeking abortions would not be affected by this provision.   A plurality of the Court explained that the relevant group of women included only those directly impacted by the restriction; it noted that "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it

affects. ... The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." Id. at 894. Thus, the analysis was not based on the impact of the law on all women or even on all women seeking abortions--about 1 % of the women in the State. Rather, the plurality evaluated the impact on "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement." Id. at 895.

The Casey plurality relied on the district court's general findings regarding the specter of physical and emotional violence raised by a spousal-notification requirement. Id. at 888-92. "We must not blind ourselves to the fact that the significant number of women who fear for their safety and the safety of their children are likely to be deterred from procuring an abortion as surely as if the Commonwealth [of Pennsylvania] had outlawed abortion in all cases," the

opinion warned.  Id. at 894.  In light of the lower court's findings about the risk of abuse, the plurality wrote that, "in a large fraction of the cases in which [the notification requirement] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.  It is an undue burden, and therefore invalid." Id. at 895.

Since Casey, seven courts of appeals have found that, in a facial challenge to an abortion restriction, the appropriate test is whether the restriction acts as an undue burden on a woman's ability to obtain an abortion in a "large fraction of the cases in which [the act] is relevant"; if so, the restriction is facially invalid.  Id.; see Planned Parenthood Ariz., Inc. v. Humble, 753 F.3d 905, 914 (9th Cir. 2014); Planned Parenthood Sw. Ohio Region v. DeWine, 696 F.3d 490, 509-10 (6th Cir. 2012); Planned Parenthood Minn. v. Rounds, 653 F.3d 662, 669 (8th Cir. 2011), vacated in part on other grounds on reh'g en banc, 662 F.3d 1072 (8th Cir. 2011); Zbaraz v. Madigan, 572 F.3d 370,

381 (7th Cir. 2009); **Planned Parenthood of N. New England v. Heed**, 390 F.3d 53, 58 (1st Cir. 2004), vacated on other grounds sub nom. **Ayotte**, 546 U.S. 320; **Planned Parenthood v. Farmer**, 220 F.3d 127, 142-43 (3d Cir. 2000); **Jane L. v. Bangerter**, 102 F.3d 1112, 1116 (10th Cir. 1996).

However, the Fifth Circuit--standing alone--has required plaintiffs facially challenging an abortion restriction to prove that "no possible application of the challenged law would be constitutional." **Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott**, 748 F.3d 583, 588-89 (5th Cir. 2014) (citing **United States v. Salerno**, 481 U.S. 739, 745 (1987)); **see also Cincinnati Women's Servs., Inc. v. Taft**, 468 F.3d 361, 368 (6th Cir. 2006) ("The Fifth Circuit stands alone in its rejection of the large fraction test."). This outlier approach is also known as the

"no set of circumstances" test.  See United States v. Salerno, 481 U.S. 739, 745 (1987).[3]

Since Casey, the Supreme Court has not decided the facial validity of an abortion law that, like those at issue in Casey and in this case, imposes an undue

_____

3.  In Salerno, decided before Casey, plaintiffs brought a facial challenge to a provision of the Bail Reform Act of 1984 that "allow[ed] a federal court to detain an arrestee pending trial" based on a limited set of factors related to dangerousness.  481 U.S. at 741.  Noting that the Act "operates only on individuals who have been arrested for a specific category of extremely serious offenses," id. at 750, the Court refused to render the entire act invalid simply because it "might operate unconstitutionally under some conceivable set of circumstances," id. at 745.  Salerno also said, however, that in a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid."  Id.

As Justice Stevens later explained, the first of these statements appears to "correctly summarize[] a long established principle of our jurisprudence," while the latter--upon which the Fifth Circuit has relied--seems to be a "rhetorical flourish ... unsupported by citation or precedent [and] also unnecessary to the holding in the case, for the Court effectively held that the statute at issue would be constitutional as applied in a large fraction of cases."  Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175 (Stevens, J., mem. respecting denial of cert.).

burden on many, but not all, of the women affected by it. Its subsequent decisions therefore offer little, if any, direction regarding the application of the large-fraction test.

In Gonzales v. Carhart, the Supreme Court reversed a lower court decision facially invalidating a law that banned abortions using the intact dilation and extraction ("D & E") procedure. 550 U.S. 124 (2007). The plaintiffs argued, first, that intact D & E was at times medically necessary and, therefore, that the law was unconstitutional for lack of a health exception; and, second, that the ban would lead to doctors avoiding other, lawful forms of D & E procedures for fear of prosecution. Id. at 143. The Court acknowledged that facial relief had been "a subject of some question," [4] but assumed that the large-fraction

_____

4. See Janklow v. Planned Parenthood, Sioux Falls Clinic, 517 U.S. 1174, 1175 (Stevens, J., mem. respecting denial of cert.) (explaining that the "no set of circumstances" language in Salerno "does not accurately characterize the standard for deciding facial challenges"); id. at 1179-80 (Scalia, J., (continued...)

test adopted by the <u>Casey</u> plurality would apply.  <u>Id</u>. at 167.  Ultimately, the Court found the plaintiffs could not satisfy the large-fraction test because they had failed to prove that <u>any</u> woman would suffer an undue burden as a result of the law.  <u>See</u> <u>id</u>. at 163-64.  Citing disagreement in the medical community as to whether intact D & E was ever medically necessary, and finding the plaintiffs' argument that doctors would avoid other lawful procedures unconvincing, the Court observed that the burden the law imposed was merely speculative.  <u>See</u> <u>id</u>.  On those facts, the Court concluded that the law was only

---

dissenting from denial of cert.) (disagreeing with Justice Stevens's view of the proper standard for a facial challenge in abortion cases); <u>Fargo Women's Health Org. v. Schafer</u>, 507 U.S. 1013, 1013 (1993) (O'Connor, J., concurring in denial of application for stay) (opining that lower court's application of <u>Salerno</u> standard was incorrect because it was inconsistent with <u>Casey</u>); <u>Ada v. Guam Soc'y of Obstetricians & Gynecologists</u>, 506 U.S. 1011, 1011 (1992) (Scalia, J., dissenting from denial of cert.) (arguing that the existence of some legal applications saves statute).

susceptible to challenge on an as-applied basis.  See id. at 168.

In Ayotte v. Planned Parenthood of Northern New England, the Court likewise reversed a lower-court decision striking down as facially invalid a parental-notification law lacking a health exception for medical emergencies.  546 U.S. at 323-24.  The lower court had facially invalidated the law because "in some very small percentage of cases, pregnant minors, like adult women, need immediate abortions to avert serious and often irreversible damage to their health."  Id. at 328.  The Court explained that the question presented was "a question of remedy: If enforcing a statute that regulates access to abortion would be unconstitutional [only] in medical emergencies, what is the appropriate judicial response?"  Id. at 323.  In answering this question, the Court noted that it "tr[ies] to limit the solution to the problem," id. at 328, when determining relief and, that, in this case, where the lower court

invalidated a statute based on a "very small" set of cases, facial relief was too "blunt [a] remedy," <u>id</u>. at 330.

Facial relief was inappropriate in these cases because the plaintiffs had shown only that the laws at issue would create an undue burden in a "very small" number of cases (<u>Ayotte</u>), or indeed had failed to show that an undue burden would be imposed on any women at all (<u>Gonzales</u>). In neither case was a large fraction of the women affected by the law unduly burdened by it; thus, in both cases, facial relief was inappropriate.

Neither <u>Gonzales</u> nor <u>Ayotte</u> required the Court to decide the central question presented by this case: whether a facial challenge to an abortion restriction may prevail if the restriction would impose an undue burden on a significant number of women, but might operate in a constitutional manner in some instances. As to this question, only <u>Casey</u> is on point. Therefore, in keeping with all of the Supreme Court's abortion jurisprudence since <u>Casey</u>--and with the

overwhelming weight of appellate court authority--the court will adhere to Casey here.

## 2.   Definition of a Large Fraction

Casey teaches that the court need not find that a law imposes an undue burden on a precise percentage of impacted women in order find that facial relief is warranted facial invalidation.   The opinion cited studies indicating the general prevalence of domestic violence and describing how a woman who notifies her male partner of her decision to obtain an abortion may be at greater risk of such violence.   505 U.S. at 891-92 (plurality opinion).   These studies included statistics indicating that, in a 12-month period, "approximately two million women [in this country] are the victims of severe assaults by their male partners," that "nearly one of every eight husbands had assaulted their wives during the past year," and that "the primary reason women do not notify their husbands [of their decision to obtain an abortion] is that the

husband and wife are experiencing marital difficulties, often accompanied by incidents of violence." Id. From these studies, the plurality in Casey deduced that many women who did not want to inform their husbands of their decisions to obtain abortions faced the real threat of being abused if they notified their spouses. Id. at 893-95. Based on these findings, the Justices concluded that spousal notification would affect a significant number of women, without quantifying further. Id. at 888-94.

Therefore, this court adheres to the large-fraction test as Casey applied it: A law is facially invalid under the large-fraction test if its enforcement would unduly burden access to abortion for a significant number of the women for whom the law is relevant, id. at 894-95; plaintiffs must present enough evidence to support a logical deduction that a significant number of women would face an undue burden. Having adopted the large-fraction test and described its contours, this court now turns to its application in this case.

38

### 3.   Application of the Large-Fraction Test

As  discussed  above,  under  <u>Casey</u>,  the  court  must
define  the  group  of  women  for  whom  the  challenged  law
is  relevant  and  then  assess  whether  the  law  will  create
a  substantial  obstacle  to  obtaining  an  abortion  for  a
significant  number  of  the  women  in  that  group.   The
parties  have  offered  competing  arguments  for  how  the
court  should  define  the  denominator  and  the  numerator
for   calculating   whether   a   'large   fraction'   are
affected.    The  choice  of  a  denominator  makes  little
difference  in  this  case.   The  result  is  the  same  no
matter  whether,  as  the  State  argues,  the  denominator  is
defined  as  all  women  seeking  abortion  in  the  State  or
some  smaller  group.   Moreover,  determining  the  large
fraction  should  not  be  reduced  to  a  mere  arithmetical
calculation:   context   matters.    Cold   arithmetical
processes  should  not  be  used  to  obscure  the  true  nature
of  the  <u>Casey</u>'s  large-fraction  test--an  analysis  of  the
real-world  implications  of  the  challenged  law  on  the

39

lives of the women who will be impacted by the law, and an assessment of how seriously the law will impact these women and how broadly those impacts will be felt.

Under _Casey_'s approach, this court has no trouble concluding that a large fraction of women will be unduly burdened by subsection 4(c)'s implementation. Indeed, the impact of the law on the right of Alabama women to choose to have an abortion will simply be enormous.

Without repeating all of its findings in _Strange III_, which the court intends for the reader to consider in tandem with this opinion, the court here emphasizes the following particularly relevant findings. The subsection would force the three plaintiff clinics to close; these clinics perform approximately 40 % of abortions in Alabama, _Strange III_, 33 F. Supp. 3d at 1335, around 3,600 abortions per year, _see id_. at 1361.

The court further found that the law would impose severe burdens on many women who would otherwise seek abortions in Montgomery, Birmingham, or Mobile and who,

under the subsection, would have to travel outside of
these areas to obtain an abortion, in many cases a
considerable distance and in all cases more than 50
miles, id. at 1359; that the Huntsville clinic could
not meet the extra demand for abortions, that delays in
obtaining abortions would increase at both the
Huntsville and Tuscaloosa clinics, and that the future
ability of the Tuscaloosa clinic to provide abortions
was questionable due to the impending retirement of its
sole physician, id. at 1362; that "a significant number
of [the] women [who would otherwise seek an abortion in
Mobile, Montgomery, or Birmingham] would be prevented
from obtaining an abortion" entirely, and others would
be able to obtain abortions only after considerable
delay, increasing the risks associated with the
procedures, id. at 1359; that, given that clinics in
Alabama only provide abortions up to 20 weeks, with
certain exceptions for the life and health of the
mother, a delayed procedure would likely become a
denied procedure for many women, id. at 1356; and that

there is a significant risk that some women, faced with the inaccessibility or unavailability of an abortion provider, would pursue dangerous, unregulated abortions, id. at 1378.

Additionally, the court found that the hostile and pervasive anti-abortion sentiment in the State would prevent the doctors at the plaintiff clinics from obtaining staff privileges, id. at 1344, 1346-47, and would prevent the clinics themselves from recruiting new physicians who could comply with the requirement, id. at 1352. Because of the significant risk of violence and career-threatening stigma, no new clinics or providers would likely emerge to replace the "radically diminished" capacity for providing abortions in the State. Id. at 1355, 1377.

In short, the court finds that subsection 4(c) would result in the closure of abortion clinics in three of the State's five largest metropolitan areas, eliminate abortion services in approximately two-thirds of the State, and reduce the availability of abortions

in the State overall by approximately 40 percent.
Applying Casey's real-world analysis to the facts
before this court, it is beyond question that the
subsection would "prevent a significant number of women
from obtaining an abortion," Casey, 505 U.S. at 893
(plurality opinion), and this significant number would
constitute a large fraction of the women impacted by
the law.

The facts presented in this case are in stark
contrast to the facts in cases where the Supreme Court
has found facial relief inappropriate. Subsection 4(c)
would not impose a burden on only a "very small,"
narrow or exceptional group of women. See Ayotte, 546
U.S. at 328, 331 (holding that facial relief was not
warranted where "[o]nly a few applications of New
Hampshire's parental notification statute would present
a constitutional problem" such that the law imposed an
undue burden in only "a very small percentage of
cases"). Nor are the burdens it would impose a matter
of "speculation." See Gonzales, 550 U.S. at 162-63

(holding that facial invalidation of a prohibition on intact D & E was inappropriate due to disagreement among medical professionals as to whether intact D & E was ever medically necessary, in light of evidence that the health advantages of the procedure "were based on speculation without scientific studies to support them"). Nor would the right to obtain an abortion in Alabama unconstitutionally be burdened only in a "worst-case [scenario] that may never occur," Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 514 (1990) (rejecting as a "worst-case analysis" the plaintiffs' argument that a parental-notification statute that included a judicial-bypass provision was unduly burdensome because the bypass procedure could theoretically take up to 22 calendar days and thus delay a minor's abortion, increasing costs and risks). The staff-privileges requirement would make it impossible for a woman to obtain an abortion in much of the State. It is certain that thousands of women per

44

year--approximately 40 percent of those seeking abortions in the State--would be unduly burdened.

The court therefore holds that because the subsection will impose a substantial obstacle to a woman's choice to undergo an abortion in a large fraction of the cases in which it is relevant, it must be facially invalidated. This conclusion is in keeping with the plain language of the Casey plurality opinion and with decisions of two Courts of Appeals. Those courts, applying the large-fraction test, did not require plaintiffs to demonstrate that an abortion restriction would burden a majority of women for whom it is relevant; instead, they granted facial relief where the record contained sufficient evidence to show that a significant number of women would be unduly burdened. See Planned Parenthood of Wisconsin v. Schimel, 806 F.3d 908, 917-18 (7th Cir. 2015) (holding a similar staff-privileges requirement unconstitutional where it would have resulted in the closure of a clinic performing approximately 39 % of abortions in the

State); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1462-63 (8th Cir. 1995) (finding a parental-notice requirement for minors facially unconstitutional, relying on the fact that minors who feared abuse or neglect if they notified a particular parent would not necessarily qualify for the law's abuse exception and, as 18 % of minors lived in single-parent homes, many would not simply be able to notify their other parent); see also David S. Cogen & Jeffrey B. Bingenheimer, Abortion Rights and the Largeness of the Fraction 1/6, 164 U. Pa. L. Rev. Online 115, 121 (2016) (discussing the application of the large-fraction test by lower courts following Casey).[5]

---

5.   As Cogen and Bingenheimer note, whether one finds that a large fraction of people are impacted by a law depends to a large extent on the value one places on the right the law impacts. See id. at 133-34. Previously, the court drew a parallel between the right of a woman to obtain an abortion and her right to keep and bear a firearm in her home for purposes of self-defense. See Strange III, 33 F. Supp. 3d at 1379-80.   That parallel applies with equal force again.   Imagine that Alabama were to enact a statutory (continued...)

The court cannot close without further noting that the impact of the subsection on Alabama women will not be restricted to those burdened by the closures of the three plaintiff clinics.   In reality, it will also close a fourth abortion clinic--in Tuscaloosa [6] --and

---

restriction on the sale of firearms and ammunition. And imagine further that gun vendors that sell two-fifths of the guns purchased in the State (including the only vendors operating in approximately two-thirds of the State, and three of its five largest metropolitan areas) were to file suit along with their customers and further that the evidence at trial were to show the following: that the restriction would force all of these vendors to close, and that, even if a couple of vendors in the north and west of the State were to remain in business, they would be unable to sell any more guns than they currently do; that it would be a significant hardship for many residents to travel a long distance to obtain a gun (such that many would be unable to do so), and that some residents of the gun-vendor-free swath of the State would opt instead to obtain guns on the black market, despite the attendant risks to their safety; and that these burdens could not be justified by the State's interests in enacting the restriction.   If the question were then posed whether the rights of a "large fraction" of Alabamians were unduly burdened by this regulation, the answer would be, without question, yes.

6.   The Tuscaloosa clinic provides approximately 40 % of abortions in the State and is one of the only two clinics in the State that provides mid-second-trimester abortions.   West Ala. Women's Ctr. (continued...)

significantly   decrease   the   capacity   of   the   only

clinic--in Huntsville[7]--that would remain in the State.

_____

v. Williamson, 120 F. Supp. 3d 1296, 1302 (M.D. Ala.
2015) (Thompson, J.).   Its sole doctor does not have
staff privileges that would enable him to comply with
subsection 4(c)'s requirement.   Id. at 1301.   It is
unlikely that that doctor will be able to obtain the
staff privileges the subsection would require--and it
is unlikely that the clinic would be able to hire
another provider who could comply with the law.   Id. at
1308.   Thus, if subsection 4(c) goes into effect, the
three plaintiff clinics and the Tuscaloosa clinic will
likely close indefinitely, eliminating a full 80 % of
existing capacity to provide abortions in the State and
leaving only one clinic remaining in Alabama.   See id.
at 1309.

     The court gave the parties the opportunity to brief
the impact of subsection 4(c) on the Tuscaloosa clinic.
See Order (doc. no. 267).

     7.   It appears from the record that at least one
provider at the Huntsville clinic does not have staff
privileges that would enable her to comply with the
subsection; accordingly, under the law, the clinic
would likely lose one of its two or three existing
providers.   The clinic would not only "not be able to
accommodate additional patients," Strange III, 33 F.
Supp. 3d at 1362, and would be unable to meet its
existing demand due to the loss of a provider.

     Because the Huntsville clinic is located in the far
northern part of Alabama, and because the State lacks a
viable public transportation system between cities,
many women will be unable to travel there.   Those that
do may encounter a waiting list.   See West Ala. Women's
(continued...)

48

Although the court need not and does not rely on this additional evidence to conclude that subsection 4(c) is invalid, the effects of the subsection on Tuscaloosa and Huntsville provide further support--and context--for this court's conclusion.


### B.   Injunctive vs. Declaratory Relief

Having resolved the scope of relief required in this case, the court must now consider the appropriate type of relief, specifically, whether the court should

---

Ctr. v. Williamson, 120 F. Supp. 3d 1296, 1311 (M.D. Ala. 2015) (Thompson, J.).   Some women, unable to travel to Huntsville, may resort to dangerous, self-induced abortions.   See id. at 1311-12.   Finally, due to the particularly hostile anti-abortion climate in Huntsville, it is highly unlikely that the clinic would be able to recruit new providers who could comply with the staff-privileges requirement.   Strange III, 33 F. Supp. 3d at 1349-50 (describing Huntsville protest activity that threatened "economic destruction for any doctor who enabled the provision of abortion within the city"); Tr. Vol. II (doc. no. 216) at 62:21-63:20 (referencing unsuccessful efforts by the administrator of the Huntsville clinic to recruit physicians to provide abortions at that clinic); id. at 70:21-71:4 (referencing protests at a Huntsville hospital, in which State senators participated, for its having provided admitting privileges to doctors at the Huntsville clinic).

permanently enjoin enforcement of the provision at issue, or whether a declaration that subsection 4(c) is facially invalid will suffice.

The plaintiffs contend that injunctive relief is necessary to ensure that subsection 4(c) does not impose an undue burden on women seeking abortions in the State. They contend that the mere prospect of enforcement of the subsection, combined with the hostile political climate surrounding abortion in Alabama, risks imposing a "harmful chilling effect" on abortion providers and, by extension, on women's ability to exercise the right to an abortion. Plfs.' Supp. Br. Appropriate Final Relief (doc. no. 268) at 6. The State responds that, if this court determines that facial relief is warranted, its executive officials will comply with that determination in good faith and decline to enforce the subsection. Therefore, it argues, injunctive relief is unnecessary.

Generally, the effect of enjoining the enforcement of a statute and declaring it unconstitutional are

"virtually identical." <u>Wooley v. Maynard</u>, 430 U.S. 705, 711 (1977). "[A] district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary." <u>Id</u>. at 711. The Supreme Court has held that, particularly where a court is asked to enjoin the enforcement of a state criminal statute, such as the one at issue here, "[t]o justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights." <u>Id</u>. at 712.

Existing precedent provides little guidance on the meaning of 'exceptional circumstances.' In <u>Wooley</u>, the case most on point, the Supreme Court held that exceptional circumstances existed where the plaintiff had been subjected to three prosecutions for violation of the state statute in question, all within a five-week span. <u>Id</u>. at 712. In addition, the

51

plaintiff faced "the threat of repeated prosecutions in the future against both him and his wife." Id. at 712.

In the present case, however, no such prior record of prosecutions under subsection 4(c) exists. Additionally, because the court now declares the subsection facially invalid, there is no apparent threat of future prosecution. The State has represented as much to the court, stating unequivocally that it will not enforce the subsection should this court hold it to be unconstitutional. Because the court presumes that the State will adhere to this representation in good faith, it cannot hold that injunctive relief is "necessary in order to afford adequate protection of constitutional rights." Id. at 719. The plaintiffs' request for injunctive relief will therefore be denied. In so holding, the court notes that, should circumstances change, the plaintiffs may seek further relief in accordance with this opinion.

***

For the foregoing reasons, the court holds that the metropolitan-area requirement is not severable from subsection 4(c); that facial relief is appropriate; and that a declaration that the subsection is facially unconstitutional is adequate.

An appropriate judgment will be entered.

DONE, this the 25th day of March, 2016.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE